2025-1382

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP., SIDERCA S.A.I.C.,

Plaintiffs-Appellants,

v.

UNITED STATES, UNITED STATES STEEL CORPORATION, BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, WELDED TUBE,

Defendants-Appellees.

Appeal from the United States Court of International Trade
in Case No. 1:22-CV-00343-CRK
Judge Claire R. Kelly

## NON-CONFIDENTIAL VERSION

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS
## TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP., SIDERCA S.A.I.C.

Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs-Appellants
Tenaris Bay City, Inc., Maverick Tube
Corporation, IPSCO Tubulars Inc.,
Tenaris Global Services (U.S.A.) Corp.,
Siderca S.A.I.C.

March 24, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2025-1382 |
| **Short Case Caption** | Tenaris Bay City, Inc. v. US |
| **Filing Party/Entity** | Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corp., Siderca S.A.I.C. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/24/2025

Signature: /s/ Gregory J. Spak

Name: Gregory J. Spak

| **1. Represented Entities.**<br>Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.**<br>Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.**<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Tenaris Bay City, Inc. | | Tenaris S.A. |
| Maverick Tube Corporation | | Tenaris S.A. |
| IPSCO Tubulars Inc. | | Tenaris S.A. |
| Tenaris Global Services (U.S.A.) Corporation | | Tenaris S.A. |
| Siderca S.A.I.C. | | Tenaris S.A. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐　Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable      ☐     Additional pages attached

| | | |
|---|---|---|
| Ron Kendler,<br>White & Case LLP | Luca Bertazzo,<br>White & Case LLP | Jessica Lynd,<br>White & Case LLP |
| Jasper Martijn Wauters,<br>White & Case LLP | Colin Alejandro Dilley,<br>White & Case LLP | Cristina Maria Cornejo,<br>White & Case LLP |
| Danica Noble,<br>White & Case LLP | Neeraj Rajan Sabitha,<br>White & Case LLP | Earl Comstock,<br>White & Case LLP |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☑   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable      ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted on pages 34-37 describes the source and data relied upon by the U.S. Department of Commerce to estimate domestic production of oil country tubular goods for the purposes of its determination of whether the petition satisfies the statutory industry support thresholds and was filed by or on behalf of the industry. The Addendum to this brief contains the nonconfidential versions of the U.S. Court of International Trade opinions and the U.S. Department of Commerce's Initiation Determination (Initiation Checklist) and Final Remand Determination that are the subject of this appeal. The U.S. Court of International Trade and Department of Commerce redacted from their opinions/determinations certain material determined to be confidential, pursuant to the protective order of the Department of Commerce in the underlying investigation.

STATEMENT OF RELATED CASES ...................................................................1

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF THE ISSUES.............................................................................2

STATEMENT OF THE CASE.................................................................................4

SUMMARY OF THE ARGUMENT ....................................................................18

ARGUMENT .........................................................................................................20

    I.     STANDARD OF REVIEW.....................................................................20

    II.    COMMERCE'S DETERMINATION THAT THE PETITION SATISFIED THE STATUTORY INDUSTRY SUPPORT THRESHOLDS AND WAS FILED BY OR ON BEHALF OF THE INDUSTRY WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW............................................21

A.  Commerce's Determination That the Petition Satisfied the Statutory Industry Support Thresholds and Was Filed By or On Behalf of the Industry Was Contrary to Law ...........................21

  1.  Commerce failed to "examine" whether the information provided in the petition was "accurate" and "adequate" as required by 19 U.S.C. § 1673a(c)(1)(A) ...................................................................22

  2.  Commerce failed to give meaning to the statutory terms "industry" and "production" in making its determination that the petition satisfied the statutory industry support thresholds and was filed by or on behalf of the industry was contrary to 19 U.S.C. §§ 1673a(c)(1)(A) and 1673a(c)(4)(A), and 19 C.F.R. § 351.203(e)(1) ...................................................................28

B.  Commerce's Determination That the Denominator of the Industry Support Calculation Included Total U.S. Production of the Domestic Like Product Was Not Supported by Substantial Evidence ...................................................................32

  1.  Commerce's determination that intermingled OCTG mill and OCTG processor data, and the shipment data used as proxy information for the missing production data, was complete and adequate is not supported by substantial evidence ...........................................................32

  2.  Commerce used a flawed adjustment ratio that was based on incomplete industry data from 2018-2019 and that ratio further distorted the denominator ........................39

C.  Commerce's Determination That the Industry Support Calculation Does Not Include Any "Double-Counting" Distortions Was Not Supported By Substantial Evidence ............41

D.  Commerce's Determination That It Included Only Production of the Domestic Like Product in Its Industry Support Calculations (Such That Minor Processing Production, Such as Threading Operations Alone Were Not Included) Was Not Supported by Substantial Evidence................................................44

III. COMMERCE FAILED TO COMPLY WITH THE CIT'S
REMAND ORDER AND INSTRUCTIONS ..........................................46

    A. The Express Terms of the CIT's Remand Instructions
Required Commerce to Look Beyond Simply Double-
Counting Concerns..........................................................................46

    B. *Tenaris I* Left Unresolved Tenaris' Principal Claim of
Whether the Petition Satisfied the Statutory Industry Support
Requirements and Was Filed "By or on Behalf of the
Industry" and Resolution of this Claim Required Commerce
to Do More Than Just Reconsider or Explain Double-
Counting Concerns..........................................................................48

    C. Multiple Statements in Commerce's Remand Determination
Indicate That Commerce Understood That It Was Required to
Look Beyond Double-Counting to Determine Whether the
Data Relied upon Accurately Reflected Industry Support.............50

IV. TENARIS DID NOT FAIL TO EXHAUST ITS
ADMINISTRATIVE REMEDIES..........................................................52

    A. Exhaustion of Remedies Is Not a Jurisdictional Requirement ......52

    B. Commerce Was on Notice of Tenaris' Concerns and
Arguments Regarding the Lack of Industry Support for the
Petition Both Prior to Commerce's Initiation and as
Demonstrated on Appeal.................................................................54

    C. The CIT's Exhaustion Ruling in *Tenaris II* Is Inconsistent
with the CIT's Remand Order and Instructions in *Tenaris I* .........57

CONCLUSION AND RELIEF SOUGHT ...........................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Silicon Techs. v. United States*,
    334 F.3d 1033 (Fed Cir. 2003)........................................................20

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984)......................................................36

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)........................................................................21

*Chr. Bjelland Seafoods A/S v. United States*,
    19 C.I.T. 35 (1995) ........................................................................36

*Heinzelman v. Sec'y of HHS*,
    681 F.3d 1374 (Fed. Cir. 2012)......................................................29

*Huaiyin Foreign Trade Corp. v. United States*,
    322 F.3d 1369 (Fed. Cir. 2003)......................................................36

*Itochu Bldg. Prods. v. United States*,
    733 F.3d 1140 (Fed. Cir. 2013)......................................................56

*Itochu Bldg. Prods. v. United States*,
    865 F. Supp. 2d 1332 (Ct. Int'l Trade 2012) .................................57

*JTEKT Corp. v. United States*,
    642 F.3d 1378 (Fed. Cir. 2011)......................................................20

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)........................................................................21

*McCarthy v. Madigan*,
    503 U.S. 140 (1992)........................................................................53

*Montclair v. Ramsdell*,
    107 U.S. 147 (1883)........................................................................29

*Nexteel Co. Ltd. v. United States*,
    355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) .................................53

*NSK Ltd. v. United States*,
    481 F.3d 1355 (Fed. Cir. 2007)......................................33

*Qingdao Taifa Group Co. v. United States*,
    710 F. Supp. 2d 1352 (Ct. Int'l Trade 2010) .................27

*Taiwan Semiconductor Indus. Ass'n v. United States*,
    118 F. Supp. 2d 1250 (Ct. Int'l Trade 2000)....................52

*Tenaris Bay City, Inc. et al. v. United States*,
    693 F. Supp. 3d 1314 (Ct. Int'l Trade 2024) .........................passim

*Tenaris Bay City, Inc. et al. v. United States*,
    Slip Op. 24-133 (Dec. 2, 2024) ..............................4, 16, 20, 57, 59

*Travelers Indem. Co. v. United States*,
    580 F. Supp. 2d 1330 (Ct. Int'l Trade 2008) .................34

*Trust Chem Co. Ltd. v. United States*,
    791 F. Supp. 2d 1257 (Ct. Int'l Trade 2011)....................53, 54

*United States v. Nordic Vill., Inc.*,
    503 U.S. 30 (1992)......................................29

*United States v. Priority Products, Inc.*,
    793 F.2d 296 (Fed. Cir. 1986)....................52

*USX Corp. v. United States*,
    655 F. Supp. 487 (Ct. Int'l Trade 1987)....................36

*Viraj Group v. United States*,
    476 F.3d 1349 (Fed. Cir. 2007)....................21

*Weishan Hongda Aquatic Food Co. v. United States*,
    917 F.3d 1353 (Fed. Cir. 2019)....................52

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013)....................21

## STATUTES AND REGULATIONS

19 U.S.C. § 1673a(c)(1)(A) ..........................................2, 4, 22

19 U.S.C. § 1673a(c)(1)(B)..........................................6

19 U.S.C. § 1673a(c)(4)(A)(i) .................................................................4

19 U.S.C. § 1673a(c)(4)(A)(ii) ....................................................5, 22, 28

19 U.S.C. § 1673a(c)(4)(D) ......................................................................5

19 U.S.C. § 1673a(c)(4)(E) ....................................................................59

19 U.S.C. § 1677(4) ...............................................................................29

28 U.S.C. § 1295(a)(5) .............................................................................2

28 U.S.C. § 1581(c) .................................................................................2

28 U.S.C. § 2637(d) ...............................................................................52

19 C.F.R. § 351.203(e)(1) ............................................................2, 5, 28, 30

## ADMINISTRATIVE DETERMINATIONS

*Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final),
    USITC Pub. No. 4489 (Sept. 2014) ..............................................10

*Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review),
    USITC Pub. No. 5090 (July 2020) .................................................10

*Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*,
    87 Fed. Reg. 70,785 (Nov. 21, 2022) .............................................2

*Oil Country Tubular Goods From Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*,
    87 Fed. Reg. 59,054 (Sept. 29, 2022) .............................................1

## OTHER MATERIALS

OXFORD ENGLISH DICTIONARY (2024) ...............................................22, 23

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*,
     86 Fed. Reg. 52,300 (Sept. 20, 2021) ............................................................26

GORDON LOBERGER, PH.D. ET AL., WEBSTER'S NEW WORLD ENGLISH GRAMMAR
     HANDBOOK (2002) ............................................................................................47

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of this Court, counsel for Plaintiffs-Appellants, Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation (collectively "Tenaris USA"), and Siderca S.A.I.C. (collectively, "Plaintiffs-Appellants" or "Tenaris") make the following statement:

1.      No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate court.

2.      No other action pending before the Court of International Trade ("CIT") may be directly affected by the Court's disposition of this appeal.

## JURISDICTIONAL STATEMENT

The action filed by Plaintiff-Appellants, *Tenaris Bay City, Inc. et al. v. United States*, Court No. 22-00343, which resulted in this appeal, contested certain aspects of and the legal basis for the final determination by the U.S. Department of Commerce, International Trade Administration ("Commerce"), in its antidumping duty ("AD") investigation of oil country tubular goods ("OCTG") from Argentina, Inv. No. A-357-824. The final determination was published in the *Federal Register* as *Oil Country Tubular Goods From Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg. 59,054 (Sept. 29, 2022), Appx082-084. The

corresponding AD order was published in the *Federal Register* on November 21, 2022. *See Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*, 87 Fed. Reg. 70,785 (Nov. 21, 2022), Appx079-081. The CIT had exclusive jurisdiction over the Plaintiffs' complaint under 28 U.S.C. § 1581(c).

This Court has exclusive jurisdiction over appeals from final decisions of the CIT under 28 U.S.C. § 1295(a)(5).

On December 2, 2024, the CIT issued the final decision from which this appeal was taken. The Plaintiff-Appellants filed a notice of appeal on January 17, 2025. Appx2146-2147.

## STATEMENT OF THE ISSUES

**Issue 1:** Whether the initiation of the AD investigation on imports of OCTG from Argentina, based on Commerce's determination that the petition satisfied the statutory industry support thresholds and was filed by or on behalf of the industry, was supported by substantial evidence and otherwise in accordance with law? This issue includes the following:

- Whether Commerce acted contrary to 19 U.S.C. § 1673a(c)(1)(A) by failing to "examine" the information provided in the petition to confirm its "accuracy" and "adequacy"?

- Whether Commerce acted contrary to 19 U.S.C. §§ 1673a(c)(1)(A), 1673a(c)(4)(A), and 19 C.F.R. § 351.203(e)(1) by failing to give meaning

to the terms "industry" and "production" in determining that the petition satisfied the statutory industry support thresholds and was filed by or on behalf of the industry?

- Whether Commerce's determination that the denominator used for its industry support calculations was accurate and included total production of the domestic like product was supported by substantial evidence?

- Whether Commerce's determination that it did not "double count" certain production data in its industry support calculations was supported by substantial evidence?

- Whether Commerce's determination that it included only production of the domestic like product in its industry support calculations (such that minor processing like threading operations alone were not incorrectly included in the figures for production of the domestic like product) was supported by substantial evidence?

**Issue 2:** Whether the Redetermination on Remand complied with the CIT's remand order and instructions to Commerce to further explain or reconsider whether "the data relied upon accurately reflected industry support" such that the petition satisfied the statutory industry support thresholds and was filed by or on behalf of the industry?

**Issue 3:** Whether Tenaris failed to exhaust its administrative remedies regarding certain arguments demonstrating that the petition did not satisfy the statutory industry support thresholds and was not filed by or on behalf of the industry?

## STATEMENT OF THE CASE

Tenaris appeals from the final decision of the CIT in *Tenaris Bay City, Inc. et al. v. United States*, Slip Op. 24-133 (Dec. 2, 2024) ("*Tenaris II*"), Appx003-020, in which it sustained Commerce's initiation of the AD investigation on imports of OCTG from Argentina. The CIT issued *Tenaris II* after a remand proceeding by Commerce pursuant to the CIT's remand order and decision in *Tenaris Bay City, Inc. et al. v. United States*, 693 F. Supp. 3d 1314 (Ct. Int'l Trade 2024) ("*Tenaris I*"), Appx047-078, in which the CIT directed Commerce to further explain or reconsider whether "the data relied upon accurately reflected industry support, including whether finishing operations were counted twice."

### *Statutory Requirements for Initiation of an AD Investigation*

When a petition for an antidumping investigation is filed, the statute mandates that Commerce "examine" "the accuracy and adequacy of the evidence provided in the petition" and "determine if the petition has been filed by or on behalf of the industry." 19 U.S.C. § 1673a(c)(1)(A). Making that determination requires Commerce to assess the industry support for the petition. The statute requires that the petition satisfy two specific numerical thresholds. First, that "the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product." 19 U.S.C. § 1673a(c)(4)(A)(i). Second, that "the domestic producers or workers who support the petition account

- 4 -

for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition."  19 U.S.C. § 1673a(c)(4)(A)(ii).

If "the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product," which was the case with the petition here, the statute mandates that Commerce "shall … poll the industry or rely on other information in order to determine if there is support for the petition…."  19 U.S.C. § 1673a(c)(4)(D).  Commerce's regulations state that "{w}here a party to the proceeding establishes that production data for the relevant period, as specified by the Secretary, is unavailable, production levels may be established by reference to *alternative data* that the Secretary determines to be *indicative of production levels*."  19 C.F.R. § 351.203(e)(1) (emphasis added).  Commerce may depart from reliance on actual production data but can do so only when the information relied upon in its place serves as a reasonable proxy for, and is indicative of, actual production levels.

The time for Commerce to evaluate a petition and for interested parties to provide comments prior to the initiation of the investigation is 20 days.  The statute provides, however, that "{i}n any case in which the administering authority is required to poll or otherwise determine support for the petition" Commerce "may,

in exceptional circumstances" extend the 20-day deadline by an additional 20 days. 19 U.S.C. § 1673a(c)(1)(B).

***The U.S. OCTG Industry***

Oil country tubular goods are steel tubular products used by the oil and gas ("O&G") industry for the extraction of petroleum. OCTG, which is manufactured through either a seamless or welded process, consists primarily of casing and tubing of carbon and alloy steel used in the drilling of O&G wells and in the conveying of O&G from within the well to ground level. *See* Petition, Vol. I at 13-15 (Oct. 6, 2021), Appx247-249; Commerce's Initiation Checklist at Attachment I at 1 (Oct. 26, 2021), Appx128.

The OCTG industry includes integrated companies that produce the steel, form the pipe, and provide finishing operations. It also includes independent processors that purchase domestic and/or imported unfinished ("green") pipes and "finish" them. Finishing operations include heat-treatment, among other pipe processing, as needed for the final OCTG product. Petition, Appx249-252.

***The Petition and the Composition of Petitioners***

The Petitioners comprised both U.S. OCTG producers (the mills that form pipe) and U.S. OCTG processors (finishers of formed pipe). Appx1450-1451. Tenaris USA, the largest U.S. OCTG producer, was not a Petitioner and opposed the petition. Appx1451-1454. The composition of the Petitioners was critical for

Commerce's evaluation of the petition and whether it satisfied the statutory thresholds for industry support and was filed "by or on behalf of the industry." However, nether the Petitioners nor Commerce separated OCTG producers' data and OCTG processors' data. Tenaris alerted Commerce to the potential distortive effect of the comingling of production and processing data for the accuracy of the industry support calculations and the evidentiary basis for determining whether the petition satisfied the statutory industry support thresholds and was filed "by or on behalf of the industry." *See* Appx1712.

Petitioners submitted *four different industry support calculations* because of their successive failures to accurately establish that the petition was filed by or on behalf of the industry. *See* Appx292-293; Petitioners' General Issues Questionnaire Response at Exhibit 8 (Oct. 12, 2021), Appx1160; Petitioners' Response Comments on Standing at Attachment 6 (Oct. 18, 2021), Appx1699; Petitioners' Second General Issues Questionnaire Response at Exhibit 5 (Oct. 21, 2021), Appx1737. Tenaris USA submitted four sets of comments, and its counsel met separately with Commerce, to challenge the information in the petition that purported to demonstrate industry support because of factual errors, flawed assumptions, and deficient calculation methodologies. *See* Tenaris' October 8, 2021 Comments, Appx1054-1073; Tenaris' October 15, 2021 Comments, Appx1439-1631; Tenaris' October 20, 2021 Comments, Appx1705-1714; Commerce's Ex Parte Meeting Memorandum

(Oct. 21, 2021), Appx1742; Tenaris' October 22, 2021 Comments, Appx1743-1754. In short, as Tenaris demonstrated in the underlying investigation and on appeal, the proxy information for the missing production data in the petition was not "indicative of production levels" as required by Commerce's regulations to permit Commerce to determine whether the petition was filed by or on behalf of the industry. *See* Plaintiffs' Comments on Commerce's Final Remand Determination at 2 (July 26, 2024), Appx2060; Appx1058-1059; Appx1446-1450; Appx1710-1712; Appx1742; Appx1745-1747.

In this case, for the industry support calculation to be correct and reliable required that both the numerator and denominator accurately and properly reflect the production of the domestic like product, including that of processors. Tenaris cautioned that "Petitioners do not address how the issue of finishing pertains to Commerce's determination of industry support, and do not cite to any Commerce precedent to explain their unclear position." Appx1712. Given the composition of the Petitioners, and the implications of having data from both mills and processors for the accuracy of the industry support calculations, Tenaris requested that Commerce poll the industry and "require that the OCTG data be broken out by pipe production and finishing." Appx1713.

The record before Commerce demonstrated:

- Petitioners submitted *four different industry support calculations to resolve factual errors, flawed assumptions, and other calculation methodological issues*;

- *Petitioners' total production of the domestic like product was below the 50 percent statutory threshold level and therefore the use of alternative data was needed to satisfy the statutory support thresholds*;

- Petitioners comprised *U.S. OCTG producers* (the mills that form pipe) and *U.S. OCTG processors* (finishers of formed pipe);

- Nether the Petitioners nor Commerce separated OCTG producers' data and OCTG processors' data – *the data was intermingled*; and

- Tenaris USA, *the largest U.S. OCTG producer, repeatedly requested that Commerce poll the industry and request actual production information given the composition of the Petitioners, the use of proxy information for missing production data, and the uncertainty and questions regarding industry support*.

Tenaris' CIT Initial Brief at 41-45 (June 23, 2023), Appx1856-1860. Despite the risk of distortions to the industry support calculations presented by these circumstances, Commerce chose not to request the actual production data or to request that the data be separated between OCTG mill producer and OCTG processor data. Nor did Commerce avail itself of the additional 20 days afforded by the statute.

**Commerce Defined the Domestic Industry to Include U.S. OCTG Producers (the mills that form pipe) and U.S. OCTG processors (finishers of formed pipe)**

The parties – and Commerce – agreed that the domestic industry included both mill producers and processors, reflecting the consistent and accepted definition of

the domestic like product. Initiation Checklist, Appx130-131, Appx138, Appx142 (*citing Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. No. 4489 at 13 (Sept. 2014) ("ITC 2014 OCTG Investigation")); Final Remand Determination at 8-9 (June 26, 2024) (citing ITC 2014 OCTG Investigation), Appx028-029; Initiation Checklist, Appx130-133, Appx135, Appx138-139, Appx142-145 (citing *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. No. 5090 (July 2020) ("ITC 2020 OCTG Review")); Final Remand Determination, Appx028, Appx032, Appx034-037 (citing ITC 2020 OCTG Review).[1]

Therefore, the mathematical equation to determine industry support as required by the statute had to reflect the definition of the like product and the domestic industry established by Commerce: Both the numerator and denominator needed to include both OCTG mill production and imported green pipe that is, at a minimum, heat treated by U.S processors. In both its draft and final remand

---

[1] Commerce also relied on data from the 2020 OCTG sunset review to "approximate non-petitioning companies' production from the available shipment data." Appx133 ("To approximate non-petitioning companies' production from the available shipment data, the petitioners first calculated the historical ratio (2018-2019) of non-petitioning companies' production to shipments derived from data reported in the ITC's *India et al OCTG 2020 Review* and applied the resulting ratio to the estimated non-petitioning companies' shipments in 2020").

determinations, Commerce recognized for the industry support calculation to be accurate, ***the denominator must include U.S. mill operations producing OCTG and U.S. processor operations heat treating imported green pipe***:

> {T}he domestic like product is defined as co-extensive with the scope (*i.e.*, including unfinished green tube) and the domestic industry is defined as U.S. OCTG producers, including processors and finishers of green tube. Therefore, for determining industry support, it is appropriate to compare a numerator that includes the supporters' production of the domestic like product (including green tube finishing and processing operations as detailed above), to a denominator that likewise reflects production of the domestic like product, including green tube finishing and processing operations as detailed above.

Appx031; *see also* Commerce's Draft Remand Determination at 9-10 (May 28, 2024), Appx1971-1972; Tenaris' Resubmission of Comments on Commerce's Draft Remand Determination (June 10, 2024), Appx2019-2054.

On remand, Commerce continued to rely extensively on the ITC's past practice as support for its determinations regarding (1) the U.S. OCTG industry (the domestic industry) and (2) the domestic like product:

> Here, we reexamined the administrative record to determine whether companies engaged in OCTG green tube finishing operations (*i.e.*, heat treatment) should be part of the domestic industry. As this evidence shows, in the 2014 OCTG Final, the ITC applied its traditional six factor analysis regarding a firm's U.S. production-related activities and concluded that processors of green tube that provide heat treatment engage in sufficient production-related activities to be considered domestic producers of OCTG.

Final Remand Determination, Appx029-030 (citing ITC 2014 OCTG Investigation); *see also* Appx028 (citing ITC 2020 OCTG Review). Commerce also expressly

recognized the unique reporting and treatment of data for mills and processors of OCTG:

> With respect to Tenaris' argument that there are clear principles regarding the U.S. OCTG industry, the domestic like product, and the reporting, collecting, and presentation of production and shipment data, we agree. The existence of these clear principles in fact supports Commerce's conclusion that the industry support calculation accurately reflects U.S. OCTG production in calendar year 2020. As Tenaris explains, under these industry principles, processors that perform heat treatment on green tube are considered part of the domestic industry producing OCTG, but that threading alone is not considered domestic production.

Appx043.

### *Commerce Relied on Pipe Formation Production Data and Pipe Processing Production Data That Was Not Disaggregated*

Tenaris requested that Commerce "confirm whether the data submitted by Petitioners include only their own OCTG production, or include both OCTG production and finishing operations," and submitted evidence that two Petitioners – Borusan and PTC – have OCTG finishing operations in the United States. Appx1451. Tenaris USA also underscored the potential distortive effect of the comingling of mill production and processing data for Commerce's industry support calculation because "{t}he relationship of pipe formation and pipe finishing has implications for any assessment of a domestic OCTG industry given that the percentage of green pipe and plain end imports of OCTG into the United States will

vary year to year and may constitute the majority of imports in any given year."
Appx1712.

***Commerce Relied on Flawed Shipment Data as Proxy Data for Missing Production Data That Were Not Indicative of Production Levels***

Tenaris argued, *inter alia*, (1) against Commerce's use of shipment 2020 data rather than production data, and (2) that Commerce's use of 2018 and 2019 shipment and production data to adjust that 2020 shipment data further distorted the industry support calculation. *See, e.g.*, Appx1059-1060; Appx1446-1450; Appx1710-1712; Appx1746-1747. Central to Tenaris' arguments was the concern that Petitioners' estimated total U.S. production of the domestic like product was not a reasonable proxy for production and could not provide a basis for Commerce to determine whether the Petition satisfied the statutory thresholds and was filed "by or on behalf of the industry." *See generally* Appx2055-2085; *see also* Appx1058-1059; Appx1446-1450; Appx1710-1712; Appx1745-1747.

***The CIT Remand (Tenaris I) and Commerce's Failure to Comply with the Court's Remand Instructions.***

The CIT remanded for further explanation or reconsideration "***Commerce's determination that the data relied upon accurately reflected industry support, including whether finishing operations were counted twice***." Appx073 (emphasis added). Commerce failed to comply with the CIT's remand order.

*First*, the record does not support the conclusion that the data used by Commerce for the denominator were complete. The Petitioners claimed that they did not have the U.S. OCTG industry production data and instead offered OCTG "shipments" data as a proxy. *See* Initiation Checklist, Appx133. Commerce issued a supplemental questionnaire just one day after the petition was filed to ask about the "source" of the shipments data and the completeness of the shipments data. Commerce's First General Issues Questionnaire at Question 4 (Oct. 7, 2021), Appx1052. Commerce then relied on Petitioners' assertion that "*as far as Petitioner is aware*" the shipment data accounted for all U.S. shipments of the domestic like product. Appx1092 (emphasis added). Commerce did not seek, and Petitioners did not provide, corroborating evidence to substantiate the unsupported assertion that the shipment data was complete and accounted for all U.S. shipments of the domestic like product. The 2020 shipment data that USDOC relied on as the starting point for each of the industry support calculations did not appear to have included U.S. processing (heat treating) of imported green pipe in the denominator.

*Second*, Commerce's use of a ratio derived from 2018 and 2019 data to adjust the denominator further distorted the denominator. Commerce's adjustment of the 2020 domestic shipment data using a 2018/2019 production-to-shipments ratio suffered from the same flaw because *the data relied upon for the adjustment ratio do not represent production for the entire domestic industry. The data only*

*contained OCTG mill production and shipments data – and did not include OCTG processor production and shipments.* This is clear from the public versions of the Petitioners' first revised, second revised, and third revised industry support calculations and the methodology relied on by Commerce and the references to the 2020 Sunset Review data.[2]

*Third*, Commerce did not resolve the "double-counting" distortion identified by, and remanded by, the CIT. Nor does the record include the information necessary for Commerce to have considered the issues arising from a Petition supported by a combination of producers and processors.

*Fourth*, Commerce also failed to demonstrate that the industry support calculation includes only production of the domestic like product. In this regard, certain processing operations such as the threading of OCTG alone do not constitute production of the domestic like product and should not be included in the calculation of industry support. *See, e.g.*, Appx138-142 (citing USITC 2014 OCTG

---

[2] *See* Appx1159-1160; Appx1698-1699; Appx1736-1737 (in which Line "A" refers to: "Industry Production (USITC Pub. 5090, Table III-5)," Line "D" refers to: "Industry Shipments (USITC Pub. 5090, Table III-8)," and Line "G" refers to: the Ratio of Non-Petitioner Production to Shipments for 2018 and 2019)). *See also* Appx1109-1113 (containing USITC Pub. 5090, Table III-5, entitled "OCTG: U.S. mills' production and share of production by product type, 2014-19." Table III-8 from the same USITC publication is titled "OCTG: U.S. mills' U.S. shipments, exports shipments, and total shipments." Both tables contain the following note: "Source: Compiled from data submitted in response to Commission questionnaires").

Investigation and USITC 2020 OCTG Review); USITC 2014 OCTG Investigation at I-24 n.35 ("Discussion of independent threaders is limited in this report, as the Commission in recent OCTG investigations has not deemed independent threaders to be part of the domestic industry producing casing and tubing"). There is no evidence on the record that Commerce properly examined whether the reported U.S. production from the petition excluded minor processing (not including heat treatment) that is not OCTG production.

### The CIT Erred in its Second Decision (Tenaris II)

The CIT erroneously considered the double-counting issue to be limited to two petitioning companies, PTC and Borusan. Appx019-020. The CIT also erred in finding that the minor processing argument (*e.g.*, threading alone is not enough to constitute production of the domestic like product) and the "undercounting" of data in the denominator arguments were "new arguments" which Tenaris failed to raise during the pre-initiation period. Appx012-015. The CIT stated that Tenaris' comments referencing the potential "implications" of comingling production and processing data was insufficient notice, and that "Plaintiffs cannot now rely on the word 'implications' to fashion more specific arguments about potential undercounting or distinctions between processing that involves heat treatment as opposed to threading operations." Appx015. Therefore, the CIT found that Tenaris'

arguments regarding threading and undercounting in the denominator were not exhausted and therefore "not reviewable." Appx015.

Separately, the CIT's remand instructions required Commerce to consider whether "the data relied upon accurately reflected industry support." Appx073. This required Commerce to confirm that the calculation was accurate, separate from the issue of double-counting for two companies. The CIT, however, interpreted its remand instructions in exceedingly narrow terms, stating that it "did not order Commerce to confirm the completeness or the accuracy of the shipment data. Rather, it ordered Commerce to 'reconsider or further explain' its determination that the record accurately reflected industry support, including whether finishing operations were counted twice.'" Appx020.

The Court found that Commerce had sufficiently "reconsidered its determination … {and} examined the record evidence submitted by Plaintiffs" with respect to Borusan and PTC, two U.S. producers with processing capacity. Appx019. The Court does not specifically explain *how* Commerce's narrow discussion of the Borusan/PTC evidence reflected sufficient reconsideration or further explanation as to whether finishing operations were counted twice. The Court also cited to Commerce's cursory discussion of the industry source, and Commerce's blanket assertion that "the shipment data from this source account for all domestic shipments of the domestic like product." Appx019 (citing Final

Remand Determination at 12, Appx032). The Court ultimately found that, based on Commerce's explanation, its "industry support determination is reasonable, supported by substantial evidence, and therefore sustained." Appx020.

*Finally*, the CIT declined to consider arguments advanced by Tenaris showing that Commerce failed to comply with the CIT's remand order and instructions on the grounds that Tenaris had failed to exhaust its administrative remedies.

## SUMMARY OF THE ARGUMENT

**Issue 1:** The initiation of the AD investigation on imports of OCTG from Argentina, based on Commerce's determination that the petition satisfied the statutory industry support thresholds and was filed by or on behalf of the industry, is unsupported by substantial evidence and otherwise not in accordance with law.

Commerce violated its statutory obligations in two respects. First, Commerce failed to examine the intermingled OCTG mill and OCTG processor production data, and the proxy shipment information used in lieu of missing production data, provided in the petition to confirm its accuracy and adequacy contrary to its statutory obligations in 19 U.S.C. §§ 1673a(c)(1)(A). The information in the petition did not provide a reliable basis for Commerce to determine whether the petition satisfied the statutory industry support thresholds and was "filed by or on behalf of the industry." Second, and contrary to well settled principles of statutory interpretation, Commerce failed to give any meaning to the statutory terms "industry" and "production" in 19

U.S.C. §§ 1673a(c)(1)(A) and 1673a(c)(4)(A), given that the Petitioners and the domestic industry comprised both OCTG mills and OCTG processors, in making its determination that the petition satisfied the statutory industry support thresholds and was filed by or on behalf of the industry.

Separately, Commerce's determination that the petition satisfied the statutory industry support thresholds and was filed by or on behalf of the industry is not supported by substantial evidence. First, the denominator used for the industry support calculation, relying on shipment data as a proxy for missing production data, was neither accurate nor adequate, as the evidence on the record does not demonstrate that the denominator included total production of the domestic like product. Second, the record evidence was insufficient for Commerce to demonstrate that production data was not counted twice in its industry support calculations, which would distort the calculation. Third, there was no evidence to support Commerce's assertion that it included only production of the domestic like product in its industry support calculations, such that minor processing production, like threading operations alone, were not included and counted as domestic production.

**Issue 2:** Commerce's Redetermination on Remand failed to comply with the CIT's remand order and instructions to Commerce to further explain or reconsider whether "the data relied upon accurately reflected industry support" to ensure that the petition satisfied the statutory industry support thresholds and was filed by or on

behalf of the industry. The CIT's interpretation of the remand order was also inconsistent with the plain wording of the court's instructions and the underlying rationale of the CIT's decision.

**Issue 3:** Tenaris did not fail to exhaust its administrative remedies regarding certain arguments demonstrating that the petition did not satisfy the statutory industry support thresholds and was not filed by or on behalf of the industry. Commerce had sufficient notice of the arguments. Indeed, the recognition of the potential double-counting distortion remanded by the CIT in *Tenaris I* cannot be reconciled with the CIT's position in *Tenaris II* that Tenaris' arguments did not provide Commerce with notice of potential distortions to the numerator and denominator arising from the composition of the petitioners and the domestic industry, and the failure of the petition to provide data that was separated by OCTG mills and OCTG processors.

## ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews the CIT's rulings de novo, "stepping into its shoes and applying the same standard of review." *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011) (citation omitted). It does so "without affording any deference to the Court of International Trade." *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed Cir. 2003) (citation and internal quotation marks omitted).

This Court "must reverse a determination that is unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Viraj Group v. United States*, 476 F.3d 1349, 1354 (Fed. Cir. 2007) (citation and internal quotation marks omitted). The "substantial evidence" standard governing the courts' review does not ever allow Commerce to base its determinations on "mere conjecture or supposition." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013).

The U.S. Supreme Court recently overturned the longstanding administrative law doctrine, established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984), requiring a federal court reviewing an administrative agency decision to defer to agencies' interpretation of statutes. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). The Supreme Court emphasized that the "courts, not agencies" are the ones that "will decide '*all* relevant questions of law' arising on review of agency action . . . ." *Id.* at 392 (emphasis in original).

## II. COMMERCE'S DETERMINATION THAT THE PETITION SATISFIED THE STATUTORY INDUSTRY SUPPORT THRESHOLDS AND WAS FILED BY OR ON BEHALF OF THE INDUSTRY WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW

### A. Commerce's Determination That the Petition Satisfied the Statutory Industry Support Thresholds and Was Filed By or On Behalf of the Industry Was Contrary to Law

Upon the filing of a petition for the imposition of antidumping duties, the statute mandates that Commerce examine "the accuracy and adequacy of the evidence provided in the petition" and "determine if the petition has been filed by or on behalf of the industry." 19 U.S.C. § 1673a(c)(1)(A). Commerce did not do so here. Nor did Commerce comply with 19 U.S.C. § 1673a(c)(4)(A)(ii), which requires Commerce to ensure that the petition satisfies the industry support thresholds, including that "the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition."

**1. Commerce failed to "examine" whether the information provided in the petition was "accurate" and "adequate" as required by 19 U.S.C. § 1673a(c)(1)(A)**

The statute compels Commerce to "examine" the evidence in the petition to assess whether the information is "accurate," and "adequate." 19 U.S.C. § 1673a(c)(1)(A). The verb "*examine*" means: "To investigate the nature or condition of (a person or thing) by visual or physical inspection" and "to scrutinize." Oxford English Dictionary. The word "*accurate*," an adjective, means "precise; conforming exactly with the truth or with a given standard; free from error." Oxford English Dictionary. The word "*adequate*," also an adjective, is defined as "{f}ully satisfying what is required; quite sufficient, suitable, or acceptable in quality or quantity."

Oxford English Dictionary. The terms – "accurate" and "adequate" – inform the objective of Commerce's mandate to "examine" the information presented in the petition so that it can determine whether the petition satisfies the statutory industry support thresholds and was filed by or on behalf of the industry.

Commerce was required to "investigate the nature or condition of" the information in the petition and "to scrutinize" that information to ensure that such information was "precise" and "conforming exactly with the truth or with a given standard," and that it was "free from error" so that Commerce could "fully satisfy" itself that the information required to determine the industry support thresholds for the petition were "quite sufficient, suitable, or acceptable in quality or quantity." Commerce did not carry out its statutory mandate.

As an initial matter, Commerce failed to examine the shipment data provided by the Petitioners, that was offered as proxy information for missing production data. For the industry support calculation to be "accurate" and "adequate" the data used for the denominator must reflect production of both U.S. OCTG mill producers (*i.e.*, U.S. mills that form the OCTG) *and* U.S. OCTG processors (*i.e.*, companies that, at a minimum, heat treat imported green pipe). The record evidence on which Commerce relied does not establish that the industry source used to derive the denominator reflects all domestic shipments of OCTG from both U.S. mills *and* U.S. processors. Specifically, as detailed in Section II.B.1 below, Commerce failed to

confirm that the 2020 shipment data provided in Volume I, Exhibit I-2 of the petition was accurate, adequate, and complete, and that it could serve as reliable proxy data for missing production data. *See* Appx291.

Commerce issued a supplemental questionnaire one day after the petition was filed inquiring about the shipments data. Appx1049-1053. Commerce concluded that the industry source information in Volume I, Exhibit I-2 of the petition included all U.S. shipments of OCTG despite the lack of any evidence confirming the shipment data were in fact complete and included mill and processor shipments (including imported green pipe that is heat treated in the United States). *See, e.g.*, Initiation Checklist, Appx143-144. Rather, Commerce conceded in its Final Remand Determination that it relied solely on Petitioners' claim in its October 12, 2021 response to Commerce's October 7, 2021 supplemental questionnaire that, "to their knowledge" the industry source they provided in the petition that Commerce used as "the starting point" for the denominator "accounted for all U.S. shipments of the domestic like product." Appx031. Commerce also recognized in the Final Remand Determination that the denominator of the industry support calculation must "*reflect{} production of the domestic like product, including green tube finishing and processing operations*." Appx031 (emphasis added).

Commerce's reliance on Petitioners' assertion and belief ("to their knowledge") does not satisfy Commerce's statutory obligations to *examine*.

Commerce did not "investigate the nature or condition of" the information in the petition or "scrutinize" it to ensure it was *accurate* – that is, "precise" and "conforming exactly with the truth or with a given standard." Nor did Commerce ensure it was "free from error" to "fully satisfy" itself that the information required to determine the industry support thresholds for the petition were "quite sufficient, suitable, or acceptable in quality or quantity." Commerce did not confirm the information was *adequate*.

Separately, because the information presented in the petition did not disaggregate the OCTG mill producers' (pipe formation) production data and the OCTG processors' production data, *Commerce could not make the necessary assessment. Without disaggregated data, Commerce could not detect where the same pipe that was formed in the United States by one mill producer that was then subsequently heat-treated by another U.S. processor may have been counted twice. Nor could Commerce ensure that it only included only production of the domestic like product in its domestic industry support calculations, where certain processing of formed pipe in the United States (such as the threading only of formed pipe) does not qualify as production of the domestic like product.* Yet, Commerce did not request disaggregated data. *See* Appx1713 (Tenaris requested that Commerce should "require that the OCTG data be broken out by pipe production and finishing").

Commerce accepted a petition that contained flawed and incomplete information that was neither accurate nor adequate to demonstrate that the petition satisfied the statutory thresholds and was filed by or on behalf of the industry. In so doing, Commerce not only failed to carry out its own statutory obligation to "examine" the information, but it also relieved Petitioners of their burden to establish industry support for the petition. By failing to provide sufficient and accurate data that was indicative of production levels, ***Petitioners failed to meet their burden of establishing sufficient industry support for the petition that satisfies the statutory thresholds. The principle that Petitioners bear this burden is uncontested.*** Commerce confirmed this in the Final Rule implementing the "Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws":

> ***We have not adopted the proposed additions. The suggestion to impose new requirements on parties that object to a petition would establish a substantive change beyond the scope of the procedural rule Commerce has proposed… The petitioners are responsible for establishing industry support of the petition***.

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,305 (Sept. 20, 2021) (emphasis added) ("*Final Rule*"). Commerce expressly rejected the notion that a party challenging the existence of sufficient industry support be required to show that other data "is more accurate than the data in the petition" and confirmed that "{t}he

petitioners are responsible for establishing industry support of the petition." *Id*. Petitioners did *not* satisfy the statutory requirements despite multiple revisions to their industry support calculation to demonstrate that the petition was filed "by or on behalf of the industry."

Thus, Commerce's claim regarding the alleged failure of Tenaris USA, a non-petitioning domestic producer, to not place its own production data onto the record fails as an argument. Initiation Checklist, Appx149. Commerce did not request Tenaris USA's production data. Nor did Commerce cite to any authority to support the position that Tenaris USA should have placed its production data on the record. Rather it was the Petitioners, not Tenaris USA, who had the burden to establish industry support. *Final Rule*, 86 Fed. Reg. at 52,305.

Where a party bears the evidentiary burden (such as Petitioners in this case to establish that the petition satisfied the statutory thresholds for industry support), ***the burden will also extend to Commerce to request additional information if Commerce considers further examination is warranted or the matter at issue is not satisfactorily supported.*** *See, e.g.*, *Qingdao Taifa Group Co. v. United States*, 710 F. Supp. 2d 1352 (Ct. Int'l Trade 2010) ("{I}n some circumstances Commerce may have to perform an independent investigation of the facts…"). So too here.

Commerce could have obtained the actual production data of the other U.S. producers by polling the industry, or at a minimum, it could have requested that

Petitioners provide their production data on a disaggregated basis that separated mill (pipe formation) production from processors (processing of formed pipe) production, which is precisely what Tenaris USA requested and reasonably expected Commerce to do. Appx1450-1451; Appx1712-1713. It did not.

> **2. Commerce failed to give meaning to the statutory terms "industry" and "production" in making its determination that the petition satisfied the statutory industry support thresholds and was filed by or on behalf of the industry was contrary to 19 U.S.C. §§ 1673a(c)(1)(A) and 1673a(c)(4)(A), and 19 C.F.R. § 351.203(e)(1)**

For a petition to be filed "by or on behalf of the industry" that justifies initiation of an investigation, Commerce must determine that the petition satisfies bright-line industry support thresholds established by the statute. These include that "the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition." 19 U.S.C. § 1673a(c)(4)(A)(ii). Commerce failed to carry out its obligation consistently with the statute.

The petitioners and the domestic industry comprised both OCTG mills and OCTG processors. *The production data from OCTG mills and OCTG processors was intermingled and was not analyzed separately by Commerce for purposes of calculating industry support and determining whether the petition was filed by or on behalf of the industry.*

A fundamental rule of statutory construction is that all terms in a statute must be given meaning. Courts must therefore interpret statutes to give effect to every word within the legislation, assuming that each term was included intentionally and has a relevant purpose. "It is the duty of the court to give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed." *Montclair v. Ramsdell*, 107 U.S. 147 (1883); *Heinzelman v. Sec'y of HHS*, 681 F.3d 1374 (Fed. Cir. 2012) ("It is a well-settled principle of statutory interpretation that a 'statute is to be construed in a way which gives meaning and effect to all of its parts.'") (citation omitted); *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 36 (1992) (noting the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect").

The statute defines the term "***industry***" to mean "***the producers as a whole of a domestic like product***, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic ***production*** of the product." 19 U.S.C. § 1677(4) (emphasis added). That definition, in turn, includes the term "***production***." The ***domestic like product*** in this case is ***OCTG***. The domestic producers of OCTG comprise the U.S. mills that form pipe and the U.S. processors that heat-treat and provide other finishing operations on formed pipe. Thus, to assess whether the petition was filed "by or on behalf of the ***industry***,"

required Commerce to consider "*the producers as a whole*." In this case that meant that Commerce needed to analyze both the mill producers and the pipe processors when it was examining the accuracy and adequacy of the data to determine whether the petitioners satisfied the statutory support thresholds.

The statute at section 1673a(c)(4) also speaks in terms of the "*production* of the domestic like product" for purposes of Commerce's assessment of whether the petition satisfies the statutory industry support thresholds and was "filed by or on behalf of the *industry*." In its Final Remand Determination, Commerce confirmed that only certain types of processing of OCTG qualifies as U.S. OCTG production, that is production of the domestic like product:

> With respect to Tenaris' argument that there are clear principles regarding the U.S. OCTG industry, the domestic like product, and the reporting, collecting, and presentation of production and shipment data, we agree… As Tenaris explains, under these industry principles, processors that perform heat treatment on green tube are considered part of the domestic industry producing OCTG, but that threading alone is not considered domestic production.

Appx043.

Although the Petitioners accounted for less than 50 percent of the total *production* of the domestic like product, Commerce declined to poll the industry and seek actual production data despite the statutory authority to do so. Commerce may only rely on non-production data only when such data is a reasonable proxy for and is *indicative of actual production levels*. 19 C.F.R. § 351.203(e)(1).

Tenaris, the largest U.S. OCTG producer and opposing the petition, alerted Commerce to the potential distortive effect of the comingling of OCTG mill production and OCTG processing data for the accuracy of the industry support calculations. *See* Appx1450-1452; Appx1712-1713.

Tenaris explained the implications for the statutory industry support thresholds: "***The relationship of pipe formation and pipe finishing has implications for any assessment of a domestic OCTG industry given that the percentage of green pipe and plain end imports of OCTG into the United States will vary year to year and may constitute the majority of imports in any given year.***" Appx1712 (emphasis added). Having data from both mills ***and*** processors was critical for examining the accuracy and adequacy of the information that would be used to assess the "***production***" of the ***domestic producers*** for purposes of Commerce's determination regarding whether the "***industry***" support calculations satisfied the statutory industry support thresholds and was filed "by or on behalf of the ***industry***." Accordingly, Tenaris requested that Commerce "require that the OCTG data be broken out by pipe production and finishing." Appx1713. Although Commerce could not assess properly the statutory industry support thresholds and whether the petition was filed by or on behalf of the industry, Commerce declined Tenaris' request.

In this case, the ***Petitioners*** and the domestic ***industry*** comprised both OCTG mills and OCTG processors. The ***production data*** from OCTG mills and OCTG processors ***was intermingled and was not analyzed separately by Commerce for purposes of calculating industry support and determining whether the petition was filed by or on behalf of the industry.*** Based on the definition of the domestic industry, the composition of the Petitioners, and the record evidence, Commerce failed to give any meaning to the terms "***industry***" and "***production***" in the statute, and its determination that the petition satisfied the statutory industry support thresholds and was filed by or on behalf of the industry is contrary to law.

> **B.** **Commerce's Determination That the Denominator of the Industry Support Calculation Included Total U.S. Production of the Domestic Like Product Was Not Supported by Substantial Evidence**
>
> > **1.** **Commerce's determination that intermingled OCTG mill and OCTG processor data, and the shipment data used as proxy information for the missing production data, was complete and adequate is not supported by substantial evidence**

In the Final Remand Determination, Commerce describes the source from Volume I, Exhibit I-2 of the petition used for the denominator:

> The record indicates that ***the starting point for the denominator of the industry support calculation is based on the 2020 domestic shipment data from an industry source which the petitioners described as "the recognized authority on the U.S. pipe and tube market.***"

Appx031 (emphasis added) (citing Initiation Checklist at Attachment II at 4-5, Appx132-133, and Petition, Vol. I at 6, Appx240).  On remand, Commerce concluded that:

> the record supports Commerce's conclusion that the shipment data from this source account for all domestic shipments of the domestic like product (including the appropriate green tube finishing operations) and that … the resulting denominator used in the industry support calculation appropriately reflects the entire universe of production of the domestic like product in calendar year 2020.

Appx032.  This conclusion is not supported by substantial evidence.

As established in Section A above, the plain meaning of the statute requires Commerce to examine the information in the petition to confirm it is accurate and adequate.  Commerce did not do so.  Rather, Commerce merely accepted the claim of the Petitioners that the information was complete and did nothing further to establish that the assertion was supported by evidence.  Appx031.

The day after the petition was filed, Commerce asked Petitioners about the information provided as proxy data for the missing production data.  Appx1052.  Commerce concluded that the industry source information in Volume I, Exhibit I-2 of the petition included all U.S. shipments of OCTG based on a belief, rather than evidence confirming the shipment data were complete and included mill and processor shipments (including imported green pipe that is heat treated in the United States).  Initiation Checklist, Appx143.  An assertion based on belief is insufficient to serve as evidence, let alone substantial evidence.  *NSK Ltd. v. United States*, 481

F.3d 1355 (Fed. Cir. 2007) (court found that because a party "failed … to provide record evidence in support of {its} assertion," Commerce was justified in rejecting a submission as "insufficient" and applying adverse facts available); *Travelers Indem. Co. v. United States*, 580 F. Supp. 2d 1330, 1341 (Ct. Int'l Trade 2008) (court found that plaintiff's "assertions of fact, unreinforced by evidence, are only unfounded assertions"). Commerce did not request further information from Petitioners, nor did Commerce otherwise seek to develop any corroborating evidence on its own.

Commerce's conclusion "that the shipment data from {the industry source which served as the basis for its production estimates} account for all domestic shipments of the domestic like product" is [a conclusion]. Appx032. First, a review of the industry source information that Petitioners submitted in Volume I, Exhibit I-2 of the petition suggests that it [ Content of industry source

]. *See* Appx291. The industry source information is [ Description of industry source exhibit ] from the [ Industry source ]. It includes a [

Content of industry source

], the starting point for the denominator in Commerce's calculations. *See* Appx133 (describing the 2020 shipment data from the industry source that was used as the starting point for the first methodology and the second

"conservative, alternative methodology" and citing to Volume I at Exhibit I-2 of the petition, Appx291).

The industry source also states: [    Content of industry source

    ]  Appx291 (emphasis added).  The description of the [    Content of industry source

    ].    Therefore,  the  Petition information appears to be [  Content of industry source    ], and, therefore does not include [  Content of industry source ] as claimed by Commerce.  Appx031.

Second, Commerce relied upon the ITC's OCTG industry practice for purposes of its initiation determination and did so again in its Final Remand Determination.    *See*  Final  Remand  Determination,  Appx028-029;  Initiation Checklist, Appx130-133, Appx135, Appx138-139, Appx142-145.  The ITC collects shipment and production data (from mills) and from processors (tolling and non-tolling operations of domestically-produced and imported green pipe) and presents the data separately in OCTG cases.  Appx029-030 (discussing the ITC's OCTG practice from 2014 and 2020 in connection with its analysis of producers and processors).  This further calls into question [    Conclusion    ] relied on by Commerce.

The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly

detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (*quoting Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) ("taking into account the entire record") (emphasis added)). Separately, a determination based on inadequate analysis or conjecture cannot survive the "substantial evidence" standard of review. *See Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 37 (1995) (citing *USX Corp. v. United States*, 655 F. Supp. 487, 492 (Ct. Int'l Trade 1987)).

Commerce failed to point to any corroborating evidence that confirms the *denominator* of the industry support calculation includes complete shipments of U.S. mills and U.S. processors (including imported green pipe that is heat treated in the United States). In the Final Remand Determination, Commerce states that it "requested supplemental information regarding this source {...} in its October 7, 2021, supplemental questionnaire, in which Commerce sought clarification regarding whether all companies identified as U.S. producers in the Petition were accounted for in the domestic shipment data." Appx031. The specific question Commerce asked of Petitioners on October 7, 2021, only one day after the petition was filed, was:

> With regard to the source of data for shipments by the U.S. industry ([ Industry Source ]), do all of the producers listed on pages 3-5 of the Petitions [ Content of industry source ]? If not, please identify the producers [ Content of industry source ] and provide an estimate of the 2020 shipments of each producer. Provide supporting documentation for any estimates used.

Appx1052.

In response, Petitioners merely asserted that, "as far as Petitioner is aware," the "shipment data account for all U.S. shipments" and that Commerce [ Reference to Petitioners' questionnaire response ]. Appx1092-1093.

There was no follow up by Petitioners or Commerce. The record reflects that (1) Petitioners never responded to Commerce's specific question with actual evidence, but only offered their assertion, (2) Commerce failed to follow up with a request that Petitioners provide actual evidence instead of their best guess, and (3) Commerce did not [ Reference to Petitioners' questionnaire response ].

Commerce's sole defense of the absence of record evidence confirming the accuracy of the denominator was the assertion that "petitioners responded that, to their knowledge, this data source accounted for all U.S. shipments of the domestic like product and that these data are the best available information regarding the volume of domestic OCTG shipments in 2020." Appx031-032. This provides no defense. Thus, not only did Commerce violate its statutory obligation to "examine" the data to determine its "accuracy" and "adequacy," but its resulting determination that the petition was filed by or on behalf of the industry and satisfied the statutory industry support thresholds was not supported by substantial evidence.

Commerce claimed that "{n}o party submitted any evidence or argument to detract from this well-established industry source as the reasonable starting point for

the denominator of the industry support calculation," and "no interested party claimed that this source data did not reasonably reflect all U.S. producers' domestic shipments of the domestic like product (including green tube finishing operations) *in calendar year 2020*." Appx032 (emphasis original).

This assertion suggests Commerce never independently examined the source data in Volume I, Exhibit I-2 of the petition to examine whether it included complete mill and processors' data (including heat treatment of imported green pipe) to independently determine if the data were accurate and adequate. Equally important, however, Commerce is simply wrong that "no interested party" challenged its use of the 2020 shipment data.

First, Tenaris made four submissions in 14 days, and its counsel separately met with Commerce, to challenge the use of the combination of 2020 production and shipment data to estimate total U.S. production of the domestic like product, and Tenaris specifically requested that Commerce poll the industry to obtain actual production data. *See* Appx1742; *see also* Appx1446-1450; Appx1710-1712; Appx1745-1747. Another interested party, TMK, the foreign producer and exporter in the *OCTG from Russia* AD and CVD investigations, also submitted comments regarding the industry support calculation. *See* Appx136.

Second, Commerce noted in its Initiation Checklist that TMK also challenged the use of 2020 data, and stated that, "if Commerce determines that 2020 production

data are sufficiently representative of the U.S. OCTG industry, then Commerce should disregard the petitioners' industry support calculation and poll the industry for 'proper' 2020 production data." Appx140.

Third, both Tenaris and TMK objected to the use of the combination of the 2020 production and shipment data at all, as well as the use of shipment data instead of actual production data. Tenaris also raised arguments that the comingling of producer and processor data had implications for the accuracy of the domestic industry support calculations. *See* Appx1450-1451; Appx1712-1713; Appx1742; Appx1747; Appx136.

As further elaborated below in Section III, this falls far short of the Court's remand instructions to provide a further explanation or reconsider whether "the data relied upon accurately reflected industry support." Appx073.

### 2. Commerce used a flawed adjustment ratio that was based on incomplete industry data from 2018-2019 and that ratio further distorted the denominator

Wholly separate from the fact that the 2020 domestic shipment data was never determined to be complete and representative of the "domestic industry," Commerce further adjusted that data using a production-to-shipments ratio drawn from 2018 and 2019 data that suffered from the same flaw because the data relied upon *do not represent production for the entire domestic industry. The data used for the ratio*

*to adjust the 2020 domestic shipment data only contain OCTG mill production and shipments data; they do not include OCTG processor production and shipments.*

This is clear from the public versions of the Petitioners' first revised, second revised, and third revised industry support calculations, the methodology relied on by Commerce, and the references to the 2020 Sunset Review data. Appx1160; Appx1699; Appx1737. Each represent what purports to be "industry"-wide production and shipments data:

- Line "A" refers to: "***Industry <u>Production</u>*** (USITC Pub. 5090, Table III-5)" (emphasis added),

- Line "D" refers to: "***Industry <u>Shipments</u>*** (USITC Pub. 5090, Table III-8)" (emphasis added), and

- Line "G" refers to: the Ratio of Non-Petitioner ***Production to Shipments*** for 2018 and 2019 (emphasis added).

However, the data are not in fact industry-wide. They include only U.S. mills' OCTG production and shipment data and do not include OCTG processors' production and shipment data. This is evident from ***Petitioners' General Issues Questionnaire Response*** submitted to Commerce, which included:

- USITC Pub. 5090, Table III-5, entitled "***OCTG: <u>U.S. mills' production</u>*** and share of production by product type, 2014-19" (emphasis added).

- USITC Pub. 5090, Table III-8, entitled "***OCTG: <u>U.S. mills'</u> U.S. shipments***, exports shipments, and total shipments" (emphasis added).

- Both tables contain the following note: "Source: Compiled from data submitted in response to Commission questionnaires").

Appx1109-1113.

*The data used for the ratio to adjust the 2020 domestic shipment data only contain OCTG mill production and shipments data and do not include OCTG processor production and shipments.* This adjustment by Commerce created a further distortion to the 2020 domestic shipments data that was used as the starting point for the denominator that rendered the industry support calculation unsupported by substantial evidence.

### C. Commerce's Determination That the Industry Support Calculation Does Not Include Any "Double-Counting" Distortions Was Not Supported By Substantial Evidence

Commerce did not resolve the double-counting distortion risk that was remanded by the CIT. Commerce failed to demonstrate that it did not "double-count" certain production data in its industry support calculations, where OCTG production may have been counted twice. Commerce either misunderstood the double-counting issue or simply refused to address it.

Instead, Commerce focused on the relationship between the scope of the investigation and the domestic like product, and states that it "reexamined the administrative record to determine whether companies engaged in OCTG green tube finishing operations (*i.e.*, heat treatment) should be part of the domestic industry." Appx029. Commerce concluded that "OCTG, including unfinished green tube, as defined in the scope, constitutes a single domestic like product and that the domestic industry consists of all U.S. producers of OCTG, including finishers and processors

of green tube that provide heat treatment." Appx030. That discussion is superfluous because there is no disagreement about the scope of the investigation or the domestic like product, and the CIT did *not* remand on the issue of scope of the product under investigation or the definition of the domestic industry. Commerce explained its understanding of the "double-counting" issue as follows:

> Just because a company produces OCTG and has processing capabilities does not mean that it double counted its OCTG production for purposes of providing its own actual production for inclusion in the Petition, nor does it follow that the data from these companies must be inherently flawed. Likewise, just because a U.S. producer has processing capabilities does not mean that it reported the heat treatment processing it performed on another U.S. company's already reported, domestically-produced green tube, thereby duplicating the reported quantity of the green tube and the finished OCTG product. Nevertheless, there is no overstating of the numerator of the calculation, as the green tube processed by the supporters would already be reflected in the denominator that reflects total U.S. production (including green tube finishing operations) by all U.S. producers. In other words, the supporters' green tube finishing operations in the numerator would be effectively canceled out in the denominator.

Appx033.

The relationship *between* the numerator and denominator of the industry support ratio is not the issue on which the CIT remanded. As Plaintiff-Appellants explained:

> Rather, the distortion is *within* each of the numerator and denominator in circumstances where the production (formation of green pipe) and the processing (heat treatment) of that domestically-produced green pipe are each counted as U.S. production. Where one ton of domestically-produced green pipe produced by one U.S. company is processed (heat treated) by a different U.S. company and each are

separately counted as U.S. production, the result is "double-counting" of the same pipe. This is the simple reality that Commerce either does not understand or is avoided. Commerce's statement that the inclusion of the same pipe in the numerator and denominator would be "canceled out" would be correct *only if the ratio were 1:1*– that is, were the numerator and denominator the same, which they clearly are not. For example, removing one ton of OCTG from both the numerator and denominator of a "9/10" ratio transforms the ratio to "8/9," and a different percentage (*i.e.*, 90% to 88.8%). On the facts of this case, in debating whether the ratio reaches the statutory requirement of 50%, one ton in the numerator has much more significance than the same ton in the denominator. The ton in the numerator in no way "cancel{s} out" the same ton in the denominator.

Appx2068.

On remand, Commerce also incorrectly limited its analysis to two Petitioning companies. Commerce stated that "PTC Liberty is first and foremost a U.S. *producer* of OCTG that also has processing capabilities," and "Borusan U.S. is first and foremost a U.S. *producer* of OCTG casing that also *processes* green tube imported from its facility in Türkiye." Appx037 (emphasis in original). The issue remanded by the CIT was applicable to all U.S. producers/processors, however. In any event, it was impossible for Commerce to undertake the required analysis for PTC, Borusan, or any other processors based on the record in the underlying investigation. As Tenaris noted to Commerce, the record does not disaggregate the producers' (pipe formation) and processors' (heat treatment pipe finishing, and possibly only threading) data such that it is possible to determine the source of the green pipe – and whether processors are heat treating/finishing domestically-

produced green pipe or imported green pipe to ensure there is no double-counting. *See* Appx1713 (Tenaris requested that Commerce should "require that the OCTG data be broken out by pipe production and finishing").

## D. Commerce's Determination That It Included Only Production of the Domestic Like Product in Its Industry Support Calculations (Such That Minor Processing Production, Such as Threading Operations Alone Were Not Included) Was Not Supported by Substantial Evidence

Certain processing of formed pipe in the United States (such as the threading only of formed pipe) does not qualify as "production" of OCTG, the domestic like product. Appx043 (Commerce noted on Remand: "As Tenaris explains, under these industry principles, processors that perform heat treatment on green tube are considered part of the domestic industry producing OCTG, but that threading alone is not considered domestic production."). Commerce therefore needed to ensure that the industry support calculation reflected only processing that constitutes OCTG production (*i.e.*, at least heat treatment). Commerce failed to demonstrate that it included only production of the domestic like product in its domestic industry support calculations.

In both its original initiation determination and the Final Remand Determination, Commerce failed to confirm that the production by processors included its industry support calculation reflects only processing that constitutes OCTG production (*i.e.*, heat treatment) rather than minor processing that does not

result in OCTG production (*e.g.*, threading). Impermissible double-counting would also occur where one U.S. processor heat treats a quantity of pipe and a separate U.S. processor threads that same pipe.

Commerce's failure to do so is not surprising because the record in the investigation does not contain the information necessary to separate production resulting from processing that includes heat treatment versus processing that includes only threading. *See* Appx1713. By failing to ensure the processors' production in the industry support calculation only includes production of heat treated OCTG, Commerce has not demonstrated that the industry support calculation is accurate, as required by the Court.

The ITC has found: "processors that provide heat treatment engage in sufficient production-related activities in the United States to be treated as domestic producers." *See* ITC 2014 OCTG Investigation at 13. The ITC also has stated that the "Commission in recent OCTG investigations has not deemed independent threaders to be part of the domestic industry producing casing and tubing." ITC 2014 OCTG Investigation at I-24 n.35. Therefore, OCTG production for purposes of the industry calculation should include only imported OCTG that has been heat treated, and then it should not be counted again if it is threaded by a different company.

In the Final Remand Determination, Commerce points to evidence that PTC has "both API and Semi-Premium threading" and significant processing capacity. Appx035. To the extent PTC further processes imported pipe and only threads it, this should not be included in the industry support calculation. Commerce's discussion of PTC's threading capacity, which is not relevant for OCTG production, underscores that Commerce may not have properly distinguished between OCTG production and mere threading that does not qualify as production.

## III. COMMERCE FAILED TO COMPLY WITH THE CIT'S REMAND ORDER AND INSTRUCTIONS

### A. The Express Terms of the CIT's Remand Instructions Required Commerce to Look Beyond Simply Double-Counting Concerns

The Court's Remand Order stated: "Commerce's determination that the data relied upon accurately reflected industry support, including whether finishing operations were counted twice, is remanded for further explanation or reconsideration." Appx073. The language directed Commerce to further explain or reconsider whether "data relied upon accurately reflected industry support." Whether "finishing operations were counted twice" was offered as one of ("including") the problems that could affect the question of whether the data "accurately reflected industry support." Appx073.

The Court's conclusion comprises two sentences:

For the foregoing reasons, the Court sustains Commerce's determination to rely on other information rather than poll the industry to calculate industry

support for the AD investigation petition for OCTG from Argentina. ***Commerce's determination that the data relied upon accurately reflected industry support, including whether finishing operations were counted twice, is remanded for further explanation or reconsideration.***

Appx073 (emphasis added). The first sentence sustains Commerce's determination not to poll the industry and to rely on other information. The second sentence sets out the scope of the remand: "Commerce's determination that the data relied upon accurately reflected industry support, including whether finishing operations were counted twice, is remanded for further explanation or reconsideration." Appx073.

The second sentence contains two clauses. An independent clause and a dependent (or subordinate) clause. An independent clause, which has a subject and a predicate, expresses a complete thought and stands alone as a sentence. *See* Webster's New World English Grammar Handbook (2002) at 212-213. In terms of the remand instruction, the independent clause is: "***Commerce's determination that the data relied upon accurately reflected industry support is remanded for further explanation or reconsideration***."

This sentence stands on its own and constitutes an individual instruction. A dependent clause, however, does not express a complete thought and is not a sentence. In the remand instruction, the dependent clause is "including whether finishing operations were counted twice." The use of the word "***including***" in this clause is also a clear reference that this point is additional and supplements the main instruction. The remand instructions are clear that Commerce was required to look

beyond double-counting to determine whether the data relied upon accurately reflected industry support.

**B.**   ***Tenaris I* Left Unresolved Tenaris' Principal Claim of Whether the Petition Satisfied the Statutory Industry Support Requirements and Was Filed "By or on Behalf of the Industry" and Resolution of this Claim Required Commerce to Do More Than Just Reconsider or Explain Double-Counting Concerns**

Tenaris' concerns with the industry support calculation were much broader than the double-counting. The structure and content of the Court's opinion make that clear as well. The Court's opinion identifies Plaintiffs' two principal claims at the outset:

> Plaintiffs argue that: (1) Commerce's initiation of the antidumping duty ("AD") investigation and determination that the AD petition was filed "by or on behalf of the industry" is contrary to law and unsupported by substantial evidence; and (2) Commerce's decision not to poll the domestic industry and seek actual production data for the twelve months immediately preceding the filing of the petition to determine industry support is contrary to law, unsupported by substantial evidence, and an abuse of discretion.

Appx048.

The Court sustained Commerce's determination not to poll the industry and seek actual production information to calculate industry support. However, Plaintiffs' first claim remained: that Commerce's determination that the AD petition was filed "by or on behalf of the industry" is contrary to law and unsupported by substantial evidence. Whether the data relied upon accurately reflected industry support such that the petition was filed "by or on behalf of the industry" requires

Commerce to address more than double-counting, as the rationale in the opinion reflects generally. Tenaris supported this claim with two lines of arguments.

First, Tenaris argued that the estimated total U.S. production of the domestic like product was based on (1) anomalous 2020 production data, (2) the use of shipment data rather than production data, and (3) a further distorting adjustment by 2018 and 2019 shipment and production data, and this approach produced a result that was not a reasonable proxy for production as required by the statute. *See* Appx1058-1059; Appx1446-1450; Appx1710-1712; Appx1745-1747.

Second, Tenaris also argued that the fact that the U.S. domestic industry, and the Petitioners, are comprised of both producers (mills that form pipes) and processors (of formed pipe) has potential implications for the accuracy of industry support. Tenaris also requested that the data be separated by pipe formation and pipe processing. *See* Appx1450-1451; Appx1712-1713.

Other parts of *Tenaris I* show that the accuracy of the industry support calculation is central to the remand. For example, the Court's two separate remand instructions appear in the first paragraph leading off the Court's discussion:

> Commerce's decision to rely on other information rather than poll the domestic industry is supported by substantial evidence. *However, Commerce must either reconsider or further explain its use of data from the 2020 market period, and specifically to ensure that finishing operations data were not double counted.*

Appx056 (emphasis added).  The Court's conclusion is similar in structure to the Court's statement above where "*Commerce must either reconsider or further explain its use of data from the 2020 market period.*"  This sentence stands alone and is a separate remand instruction broader than double-counting.

Also important to the resolution of Plaintiffs' remaining claim is the fact that (1) Commerce relied in part on alternative data for the denominator and (2), relatedly, that the production supporting the petition was less than 50 percent of total production of the domestic like product.  This is reflected throughout *Tenaris I* in several places.  *See, e.g.*, Appx053, Appx060-062.

### C. Multiple Statements in Commerce's Remand Determination Indicate That Commerce Understood That It Was Required to Look Beyond Double-Counting to Determine Whether the Data Relied upon Accurately Reflected Industry Support

Commerce's remand determination itself repeats the two separate remand instructions at least six times throughout the remand determination, expressing an understanding of the scope of the remand determination as comprising broader instructions than simply the issue of "double-counting."  Appx021, Appx023, Appx031, Appx038-039, Appx043.  Commerce referenced the numerator and the denominator multiple times (19 times) throughout its determination.  Two passages are particularly notable.  First, the Final Remand Determination leaves no doubt that Commerce understood the broader scope of the remand instruction to confirm the accuracy of the industry support calculation:

As explained above, the domestic like product is defined as co-extensive with the scope (*i.e.*, including unfinished green tube) and the domestic industry is defined as U.S. OCTG producers, including processors and finishers of green tube. Therefore, for determining industry support, it is appropriate to compare a numerator that includes the supporters' production of the domestic like product (including green tube finishing and processing operations as detailed above), to a denominator that likewise reflects production of the domestic like product, including green tube finishing and processing operations as detailed above. Based on a reexamination of the record, Commerce continues to find it appropriate to include green tube heat-treatment processing performed on imported pipe as "U.S. production."

Appx030-031.

Second, the Final Remand Determination also confirms that Commerce fully understood and recognized Tenaris' arguments. This is critical and must be considered in the context of Tenaris' remaining claims regarding the scope of the Court's remand instructions, and the Court's questions posed to the parties.

> ***With respect to Tenaris' argument that there are clear principles regarding the U.S. OCTG industry, the domestic like product, and the reporting, collecting, and presentation of production and shipment data, we agree. The existence of these clear principles in fact supports Commerce's conclusion that the industry support calculation accurately reflects U.S. OCTG production in calendar year 2020. As Tenaris explains, under these industry principles, processors that perform heat treatment on green tube are considered part of the domestic industry producing OCTG, but that threading alone is not considered domestic production.***

Appx043 (emphasis added).

The CIT's remand order directed Commerce to further explain or reconsider whether "data relied upon accurately reflected industry support." Commerce failed to do so.

## IV. TENARIS DID NOT FAIL TO EXHAUST ITS ADMINISTRATIVE REMEDIES

### A. Exhaustion of Remedies Is Not a Jurisdictional Requirement

The statute, 28 U.S.C. § 2637(d), provides that: "In any civil action not specified in this section, the Court of International Trade shall, ***where appropriate***, require the exhaustion of administrative remedies." The Federal Circuit has interpreted the term "where appropriate" to mean that exhaustion of remedies is not a jurisdictional requirement. *See Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1363-64 (Fed. Cir. 2019) ("We clarify that the requirement to exhaust administrative remedies under § 2637(d) ***is not jurisdictional*** … Instead, § 2637(d) affords the CIT discretion through its inclusion of its 'where appropriate' clause … which is at odds with traditional notions of jurisdiction.") (emphasis added; citations omitted); *United States v. Priority Products, Inc.*, 793 F.2d 296, 300 (Fed. Cir. 1986) ("Exhaustion of administrative remedies is not strictly speaking a jurisdictional requirement and hence the court may waive that requirement and reach the merits of the complaint … In fact, Congress appears to have recognized this in cases such as the one at bar by granting the Court of International Trade some discretion to excuse the failure to exhaust administrative remedies.") (citations omitted); *Taiwan Semiconductor Indus. Ass'n v. United States*, 118 F. Supp. 2d 1250, 1263 n.18 (Ct. Int'l Trade 2000) (holding that "{t}he rule of exhaustion of administrative remedies is neither absolute nor inflexible" and agreeing to consider

a challenge to the ITC's threat analysis that was first raised in rebuttal comments "because the Commission clearly considered the issue").

Finally, "federal courts are vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992). To exhaust remedies, the agency must be on notice of the issue, but arguments can be further elaborated on appeal. *See Trust Chem Co. Ltd. v. United States*, 791 F. Supp. 2d 1257, 1268 n.27 (Ct. Int'l Trade 2011) (finding that an argument "is not barred by the doctrine of exhaustion of administrative remedies" because "*{t}he determinative question is whether Commerce was put on notice of the issue, not whether Plaintiff's exact wording below is used in the subsequent litigation*" (emphasis added)); *see also Nexteel Co. Ltd. v. United States*, 355 F. Supp. 3d 1336, 1360 n.5 (Ct. Int'l Trade 2019) (finding that respondent had exhausted its administrative remedies through its submission of a case brief in the administrative proceeding" even though respondent's "elaborate multi-page arguments presented to the Court" were allegedly "different from the scan one-paragraph argument in this issue it presented to the agency" according to the Government).

**B. Commerce Was on Notice of Tenaris' Concerns and Arguments Regarding the Lack of Industry Support for the Petition Both Prior to Commerce's Initiation and as Demonstrated on Appeal**

To exhaust remedies, the agency must be on notice of the issue and the arguments made before the agency relating to an issue can be further elaborated on appeal. *See Trust Chem Co.*, 791 F. Supp. 2d at 1268 n.27 (finding that an argument "is not barred by the doctrine of exhaustion of administrative remedies" because "*{t}he determinative question is whether Commerce was put on notice of the issue, not whether Plaintiff's exact wording below is used in the subsequent litigation*" (emphasis added)); *see also Nexteel*, 355 F. Supp. 3d at 1360 n.5 (finding that respondent had exhausted its administrative remedies through its submission of a case brief in the administrative proceeding" even though respondent's "elaborate multi-page arguments presented to the Court" were allegedly "different from the scan one-paragraph argument in this issue it presented to the agency" according to the Government).

Commerce was on notice of Tenaris' arguments during the pre-initiation phase regarding (1) the failure to use actual production data and the use of unreasonable proxy data for the industry support calculation, and (2) that the composition of the domestic industry and the Petitioners had implications for the accuracy of the industry support calculation and called for the pipe formation and pipe processing data to be broken out. *See* Appx1742 (confirming that "{d}uring

the meeting counsel to Tenaris USA Tenaris raised concerns noted in their submissions on the record of this proceeding regarding industry support"); Appx1058-1059 ("Petitioners also submit data on U.S. producers' shipments, explaining that 'domestic shipments are a good proxy for domestic production of steel tubular products.' However, the statutory threshold for determining industry support is 'more than 50 percent of the <u>production</u> of the domestic like product …'" (emphasis in original)); Appx1446-1452 (stating, for example, that "{t}he Petitioners' calculations of their own production and/or shipments might include data that pertain to mere finishing operations of Petitioners rather than the production of OCTG"); Appx1710-1713 (" Petitioners do not address how the issue of finishing pertains to Commerce's determination of industry support, and do not cite to any Commerce precedent to explain their unclear position. The relationship of pipe formation and pipe finishing has implications for any assessment of a domestic OCTG industry …"); Appx1745-1747 ("Petitioners' latest revised industry support calculation is still based on flawed data, and does not accurately represent the domestic industry as currently constituted"); *see also generally* Tenaris Remand Comments, Appx2055-2085.

There are three types of improper counting that implicates the industry support calculation:  (1) double-counting (the same pipe that is formed by one company and processed by a different company); (2) undercounting (in the case of the shipment

data that was used as a proxy for the missing production data and that served as the starting point for the denominator); and (3) overcounting (in the case of including production data that does not constitute production of the domestic like product). These are potential distortions to the numerator and denominator of the industry support calculation that stem from a petition that is supported by (1) proxy data that are not indicative of actual production data and (2) having both producers and processors as part of the domestic industry and petitioners, and the comingling of the producers' and processors' production data.

The record and the CIT's decision in *Tenaris I* demonstrate that Commerce was put on notice of this core issue. The CIT recognized the argument that "Petitioner's strategy to cobble together the requisite support based on data for a group that also included processors and finishers of OCTG had implications for the accuracy of the industry support calculations.'" Appx051 (citing Tenaris' Initial Brief at 8, Appx1823); *see also* Appx1712-1713.

In *Itochu Bldg. Prods.*, the CIT held that "Itochu waived its objection to Commerce's effective-date determination because it did not resubmit, after DOC's preliminary results rejected its position, the argument it had fully presented before that rejection." *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013). The CAFC disagreed that resubmission of Itochu's arguments was necessary:

> In the present case, no purpose was served by requiring Itochu to have resubmitted its effective-date argument after Commerce announced the

preliminary results. Itochu put its argument on the record before Commerce issued its preliminary results: it set forth its position in comments, met with eight department officials to discuss the issue, and submitted legal support for its position. Nothing in the record suggests that any additional material from Itochu would have been significant to Commerce's consideration of the issue or to later judicial review. Indeed, the trade court indicated that a simple resubmission would have sufficed for exhaustion.

*Itochu Bldg. Prods.*, 733 F.3d at 1146 (citing *Itochu Bldg. Prods. v. United States*, 865 F. Supp. 2d 1332, 1339 (Ct. Int'l Trade 2012)).

The CAFC further reasoned that there was apparently nothing "Itochu could have said but did not," and "that a resubmission by Itochu would have been futile." *Itochu Bldg. Prods.*, 733 F.3d at 1146. Similarly, here, Tenaris raised the concerns and requested that Commerce break out the OCTG mill producers and OCTG processors data, but Commerce declined to do so.

### C. The CIT's Exhaustion Ruling in *Tenaris II* Is Inconsistent with the CIT's Remand Order and Instructions in *Tenaris I*

The CIT's express recognition of the potential double-counting distortion, despite both Commerce and Petitioners arguing that the phrase was never mentioned on the agency record, is itself a strong indication that the argument was sufficient to put Commerce on notice. The CIT recognized the argument and ruled on the issue *in Tenaris I* and the CIT's remand order and instructions eliminated any doubt. The CIT's ruling on exhaustion in its second decision (*Tenaris II*) is thus inconsistent with the CIT's remand on double-counting in its first decision (*Tenaris I*).

Indeed, despite the absence of any reference by Tenaris to the specific distortion of "double-counting" on the record before Commerce, the CIT clearly recognized that Tenaris' arguments demonstrated that this was a potential distortion in the industry support calculations that was raised with sufficient clarity by the Plaintiff-Appellants during the pre-initiation phase and for which issue the CIT determined that remand was warranted. *Compare Tenaris I*, Appx073 (remanding for further explanation or reconsideration "Commerce's determination that the data relied upon accurately reflected industry support, including whether finishing operations were counted twice") *with* Defendant-Intervenors' Reply to Plaintiffs' Comments on Final Remand Determination at 25 n.4 (Aug. 26, 2024) ("Plaintiffs did not argue before Commerce in the remand proceeding that petition supporters accounted for more OCTG processing/finishing than other members of the domestic industry and identify no record evidence of any such disparity"), Appx2115, *and* Defendant's Comments on Final Remand Determination at 8-14 (Aug. 26, 2024) ("Tenaris's arguments with respect to 'undercounting,' heat treatment and threading operations, and the source underlying the industry support calculations were never raised before Commerce until the remand proceeding"), Appx2138-2144.

The ruling in *Tenaris I* recognizes that double-counting is one of many potential distortions to the industry support calculations that arises because of the composition of the Petitioners and the domestic industry as comprising both U.S.

OCTG producers (the mills that form pipe) and U.S. OCTG processors (finishers of formed pipe). This composition was critical for Commerce's evaluation of the petition and whether it satisfied the statutory thresholds for industry support and was filed "by or on behalf of the industry." Such recognition by the CIT in *Tenaris I* cannot be reconciled with the position in *Tenaris II* that Commerce was not on notice of distortions to the numerator and denominator arising from the composition of the Petitioners and the domestic industry, and the failure of the petition to provide data that was separated by OCTG mills and OCTG processors.

Finally, the CIT's finding of a failure to exhaust administrative remedies is particularly inequitable in this case given the context, which included: The unique governing statutory provision, Petitioners' successive filings that each purported to demonstrate industry support for the petition, and Commerce's refusal to avail itself of the additional 20 days permitted by the statute despite questions and uncertainty. The governing statutory provision, 19 U.S.C. § 1673a(c)(4)(E), unlike other parts of the AD law, provides that "the determination regarding industry support shall not be reconsidered." Thus, unless Commerce extended for an additional 20 days (which it refused to do), Tenaris' opportunity to comment on these issues was limited to the days immediately following the petition and each of the different industry support calculations submitted by Petitioners from October 6-21. Commerce cut off the discussion in 20 days and the statute barred Tenaris from raising industry support

for the petition again during the administrative proceedings. Tenaris filed four sets of comments in 14 days, identifying problems and asking Commerce to poll and request actual production data. Tenaris learned of Commerce's refusal to poll and to extend the initial review period *after* Commerce's initiation decision. There was no basis for finding that Tenaris had failed to exhaust its administrative remedies.

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, this Court should:

(1) Vacate the CIT's judgments in *Tenaris I* and *Tenaris II*;

(2) Find that Commerce's initiation of the antidumping investigation of OCTG from Argentina, which was based on Commerce's determination that the petition satisfied the statutory industry support thresholds and was filed by or on behalf of the industry, is unsupported by substantial evidence on the record and otherwise not in accordance with law;

(3) Find that Commerce's Final Remand Determination failed to comply with the CIT's remand order and instructions to Commerce to further explain or reconsider whether "the data relied upon accurately reflected industry support" such that the petition satisfied the statutory industry support thresholds and was filed by or on behalf of the industry;

(4) That Plaintiff-Appellants did not fail to exhaust their administrative remedies regarding certain arguments that demonstrated that the petition did not

satisfy the statutory industry support thresholds and was not filed by or on behalf of the industry; and

(5) Grant Plaintiff-Appellants such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Gregory J. Spak
Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs-Appellants Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corp., Siderca S.A.I.C.

March 24, 2025

# ADDENDUM

| Tab No. | Date | Description | Bates Range |
|---|---|---|---|
| 1 | 12/2/2024 | Judgment for Slip Op. 24-133 | Appx001-Appx002 |
| 2 | 12/2/2024 | CIT Slip Op. 24-133 | Appx003-Appx020 |
| 3 | 6/26/2024 | DOC Final Remand Results | Appx021-Appx046 |
| 4 | 3/14/2024 | CIT Slip Op. 24-31 | Appx047-Appx078 |
| 5 | 11/21/2022 | DOC Federal Register Notice of AD Order | Appx079-Appx081 |
| 6 | 9/29/2022 | DOC Federal Register Notice of Final Results | Appx082-Appx084 |
| 7 | 9/23/2022 | DOC Issues and Decision Memorandum for the Final Results | Appx085-Appx113 |
| 8 | 11/1/2021 | DOC Federal Register Initiation Notice | Appx114-Appx119 |
| 9 | 10/26/2021 | DOC Initiation Checklist | Appx120-Appx156 |

*Tenaris Bay City, Inc. et al., v. United States and*
*United States Steel Corporation, et al.* (Court No. 22-00343)

Judgment

December 2, 2024

Appx001 – Appx002

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TENARIS BAY CITY, INC. ET AL.,** | |
| **Plaintiffs,** | |
| v. | |
| **UNITED STATES,** | **Before: Claire R. Kelly, Judge** |
| **Defendant,** | **Court No. 22-00343** |
| and | |
| **UNITED STATES STEEL CORPORATION, ET AL.** | |
| **Defendant-Intervenors.** | |

## JUDGMENT

This case having been duly submitted for decision, and the Court, after due deliberation, having rendered its opinion, and now in conformity with that opinion, it is

**ORDERED** that the U.S. Department of Commerce's ("Commerce") final affirmative determination in the less than fair value ("LTFV") investigation of oil country tubular goods from Argentina and final negative determination of critical circumstances, See Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 87 Fed Reg. 59,054-01 (Dep't Commerce Sept. 29, 2022) (final determination of sales at less than fair value) and accompanying Issues and Decision Memo. for the Final Affirmative Determination in the LTFV Investigation

Court No. 22-00343                                                                                     Page 2

of Oil Country Tubular Goods from Argentina, and Final Negative Determination of

Critical Circumstances, PD 220, bar code 4287860-02 (Sept. 26, 2022), are sustained,

except for the matters remanded by the Court's Order, Mar. 14, 2024, ECF No. 61;

and it is further

      **ORDERED** that Commerce's remand redetermination, <u>see</u> Final Results of

Redetermination Pursuant to Court Remand, Jun. 26, 2024, ECF No. 74, is sustained;

and it is further

      **ORDERED** that the subject entries shall be liquidated in accordance with the

final court decision, including all appeals, as provided for in section 516A(e) of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1516a(e) (2012).

                            /s/ Claire R. Kelly
                            Claire R. Kelly, Judge

Dated:      December 2, 2024
          New York, New York

*Tenaris Bay City, Inc. et al., v. United States and
United States Steel Corporation, et al.* (Court No. 22-00343)

Slip Op. 24-133

December 2, 2024

(Nonconfidential Version)

Appx003 – Appx020

Slip Op. 24-133

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **TENARIS BAY CITY, INC. ET AL.,** | |
| **Plaintiffs,** | |
| **v.** | |
| **UNITED STATES,** | **Before: Claire R. Kelly, Judge** |
| **Defendant,** | **Court No. 22-00343** |
| **and** | **PUBLIC VERSION** |
| **UNITED STATES STEEL CORPORATION, ET AL.** | |
| **Defendant-Intervenors.** | |

## <u>OPINION</u>

[Sustaining the Department of Commerce's Remand Redetermination.]

Dated: December 2, 2024

<u>Gregory J. Spak</u>, <u>Frank J. Schweitzer</u>, <u>Kristina Zissis</u>, <u>Matthew W. Solomon</u>, and <u>Colin Alejandro Dilley</u>, White & Case LLP, of Washington D.C., argued for plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Inc., and Siderca S.A.I.C.

<u>Hardeep K. Josan</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, argued for defendant United States. Of counsel was Ian <u>Andrew McInerney</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce.

<u>Thomas M. Beline</u>, <u>Myles S. Getlan</u>, and <u>James E. Ransdell</u>, <u>Cassidy Levy Kent</u> (USA) LLP, of Washington D.C., argued for defendant-intervenor United States Steel Corporation.

Court No. 22-00343                                                                 Page 2
**PUBLIC VERSION**

Roger B. Schagrin, Alessandra A. Palazzolo, Christopher T. Cloutier, Elizabeth J. Drake, Jeffrey D. Gerrish, Justin M. Neuman, Luke A. Meisner, Michelle R. Avrutin, Nicholas J. Birch, Saad Y. Chalchal, and William A. Fennell, Schagrin Associates, of Washington D.C., argued for defendant-intervenors Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United States Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube.

Kelly, Judge:   Before the Court is the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), Jun. 26, 2024, ECF No. 74, in the antidumping ("AD") and countervailing duties ("CVD") investigation of Oil Country Tubular Goods ("OCTG") from Argentina (AD), Mexico (AD), Korea (CVD), and Russia (AD/CVD), made in accordance with the mandate of this Court in Tenaris Bay City, Inc. v. United States, 693 F.Supp.3d 1314 (Ct. Int'l Trade 2024) ("Tenaris I").   For the following reasons, Commerce's remand redetermination is sustained.

## BACKGROUND

The Court presumes familiarity with the facts as set forth in Tenaris I and will only recount those pertinent to the instant matter.   See generally Tenaris I, 693 F.Supp.3d 1314.   On October 6, 2021, Petitioners Borusan Mannesmann Pipe U.S. Inc, PTC Liberty Tubulars LLC, U.S. Steel Tubular Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"), and Welded Tube USA Inc. ("Petitioners") filed a petition for an imposition of antidumping and countervailing duties on OCTG from Argentina (AD), Mexico (AD), Korea (CVD), and Russia

(AD/CVD).    <u>See generally</u> Petitions for the Imposition of Antidumping and Countervailing Duties: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia ("Petitioner's Letter"), PDs 1–6, CDs 1–6 bar codes 4168004-01–06 (Oct. 6, 2021).[1]

On October 26, 2021, Commerce, after seeking and receiving additional information and comments from petitioners, initiated the antidumping investigation in accordance with the 20-day statutory deadline provided by 19 U.S.C. § 1673a(c)(1)(A).  <u>See generally</u> Letter from White & Case LLP to Sec. Commerce, re: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Factual Errors in Petitions ("Factual Error Cmts."), PD 15, CD 9, bar code 4169951–01 (Oct. 8, 2021); <u>see also</u> Letter Cassidy Levy Kent & Schagrin Assoc. to Sec. Commerce & Sec. Int'l Trade Comm. Pertaining Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to General Issues Questionnaire ("Resp. to General Questionnaire"), PD 19, CD 10 bar code 4170756–01 (Oct. 12, 2021); <u>see also</u> Letter from White & Case LLP to Sec. Commerce, re: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Comments on Petitioners' Standing ("Cmts. re Petitioners' Standing"), PDs 22–28, CDs 12–18, bar codes 4172063-01–05 (Oct. 15, 2021); <u>see also</u> Petitioners' Letter,

---

[1] Citations to administrative record documents in this opinion are to the numbers Commerce assigned to such documents in the indices, and all references to such documents are preceded by "PD" or "RPD" and "CD" or "RCD" to denote public or confidential documents.

**PUBLIC VERSION**

"Response to Tenaris Submission Concerning Petitioners' Standing" ("Rebuttal Cmts.

on Standing), PD 29, CD 19, bar code 4172946–01 (Oct. 18, 2021); <u>see also</u> Letter from

White & Case LLP to Sec. Commerce, re: Oil Country Tubular Goods from Mexico:

Reply Comments on Petitioners' Standing ("Reply Cmts. on Standing"), PD 31, CD

22, bar code 4173963–01 (Oct. 20, 2021); <u>see also</u> Letter from White & Case LLP to

Sec. Commerce, re: Oil Country Tubular Goods from Argentina, Mexico, the Republic

of Korea, and Russia: Comments on Petitioners' Second General Issues Questionnaire

Response ("Cmts. re Petitioners' Second GIQ Resp."), PD 35, CD 25, bar code

4174685–01 (Oct. 22, 2021); <u>see also</u> Commerce Initiation Checklist ("Initiation

Checklist"), PD 40, CD 26, bar code 4176347–01 (Oct. 26, 2021); <u>see also</u> <u>Oil Country</u>

<u>Tubular Goods from Argentina, Mexico, and the Russian Federation: Initiation of</u>

<u>Less-Than-Fair-Value Investigations</u> ("Initiation Notice"), 86 Fed. Reg. 60,205 (Dep't

Commerce Nov. 1, 2021).

　　　In its Initiation Checklist for the antidumping investigation, Commerce

identified reliance upon "industry support data contained in the [p]etitions" and

explained that the petitions satisfied statutory requirements.　<u>See</u> Initiation

Checklist at 4.　Commerce accepted Petitioners' October 21 revised calculations and

also conducted its own calculations with "a conservative, alternative methodology."

<u>Id.</u> at 5.　Under both methodologies, Commerce found that the petitions satisfied the

requirements of 19 U.S.C. § 1673a(c)(4)(A)(i) by exhibiting support from domestic

producers or workers accounting for "at least 25 percent of the total production of the

Court No. 22-00343                                                                    Page 5
**PUBLIC VERSION**

domestic like product." Id. at 6.  However, neither methodology demonstrated that

the domestic producers supporting the petition accounted for over 50 percent of the

production of the domestic like product, as required by 19 U.S.C.

§ 1673a(c)(4)(A)(ii).  Id. at 6–7.

Consequently, Commerce chose to "rely on other information," and determined

the petitions were adequately supported by declarations from domestic producers

contained on the agency record.[2]  Initiation Checklist, Attach II. at 6–7.  Additionally,

Commerce concluded that the October 1, 2020, through September 30, 2021, period

of investigation ("POI") was proper under 19 C.F.R. § 351.204, despite Plaintiffs'

characterization that it was anomalous, as it represented "the four most recently

completed fiscal quarters since the month preceding the filing date."  Initiation Notice

at 60,205.  Commerce also rejected Plaintiffs' concern that finishing operations were

_____

[2] Commerce used declarations of support from non-petitioning domestic producers
and [[                                                              ]].  Initiation Checklist,
Attach. II at 6; Def. Int. Resp. at 9.  Furthermore,

> Commerce noted that despite Plaintiffs' opposition to the petition,
> [Plaintiff] has not provided any production data for Commerce to include
> in the industry support calculation.  Accordingly, because [[
>
>                                                                        ]]
> Petitions, [Commerce] find[s] that the supporters of the Petitions
> account for [[        ]] percent of the total U.S. production of those parties
> expressing an opinion on the Petitions for which we have production
> data.

Initiation Checklist, Attach II. at 6–7 (footnotes omitted).

improperly included twice when Petitioners calculated industry support, stating that "[t]he scope and domestic like product of [AD] investigations includes OCTG 'whether finished . . . or unfinished.'"  Initiation Checklist, Attach. II at 14.

On May 11, 2022, Commerce issued its preliminary determination, finding that during the POI, OCTG from Argentina is being, or likely to be, sold in the United States at less than fair value ("LTFV").  See Oil Country Tubular Goods from Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures ("Prelim. Determination"), 87 Fed. Reg. 28,801 (Dep't Commerce May 11, 2022); see also Decision Memorandum for the Preliminary Affirmative Determinations of Sales at less Than Fair Value and Critical Circumstances in the Investigation of Oil Country Tubular Goods from Argentina ("Prelim. Issues and Decision Memo."), 87 ITADOC 28,801 (Dept. Commerce May 11, 2022).  On September 29, 2022, Commerce published its final results and, mirroring its previous conclusions, determined that OCTG from Argentina is being, or likely to be, sold in the United States for LTFV.  See Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances ("Final Determination"), 87 Fed Reg. 59,054–01 (Dep't Commerce Sept. 29, 2022); see also Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina, and Final Negative

**PUBLIC VERSION**

<u>Determination of Critical Circumstances</u> ("Final Issues and Decision Memo."), 87

ITADOC 59,054 (Dep't Commerce Sept. 29, 2022).

On January 13, 2023, Plaintiffs initiated this action.  <u>See generally</u> Compl.,

Jan. 13, 2023, ECF No. 16.  On June 26, 2023, Plaintiffs moved for judgment on the

agency record.  <u>See generally</u> Pls. Mot. Judgment Agency Record ("Pl. 56.2 Mot."),

Jun. 26, 2023, ECF No. 40.  Plaintiffs specifically challenged Commerce's

determination that the petitions were filed "by or on behalf of the industry," and its

decision not to poll the domestic industry and seek actual production data for the 12

months immediately preceding the filing of the petitions to determine industry

support.  <u>Id.</u> at 14–41.

On March 14, 2024, the Court sustained Commerce's determination to rely on

"other information" rather than poll the industry to calculate industry support for the

antidumping investigation petition for OCTG from Argentina and remanded the

Final Determination for Commerce to further explain or reconsider its determination

that the data relied upon accurately reflected industry support, including whether

finishing operations were counted twice.  <u>Tenaris I</u>, 693 F.Supp.3d at 1328.  On May

28, 2024, Commerce released its draft remand redetermination.  <u>See generally</u> Draft

Results of Redetermination Pursuant to Court Remand, <u>Tenaris Bay City, Inc. et al.</u>

<u>v. United States</u>, Court No. 22-00343, Slip Op. 24-31 (CIT March 14, 2024) ("Draft

Remand Results"), RPD 1, bar code 4565870–01 (May 28, 2024).  On June 4, 2024, in

response to the Draft Remand Results, both Plaintiffs and Defendant-Intervenors

Court No. 22-00343                                                    Page 8
**PUBLIC VERSION**

submitted comments.  <u>See</u> Tenaris Comments on Draft Remand Determination, RPD 3, RCD 1, bar code 4571563–01 (Jun 4, 2024); <u>see also</u> Defendant-Intervenors Comments on Draft Remand Redetermination, RPD 2, bar code 4570681–01 (Jun. 4, 2024).   On June 7, 2024, Commerce rejected Plaintiffs' submission because it contained untimely new factual information.   <u>See</u> Letter from Yang Jin Chun to White & Case LLP, re: Slip Op. 24-31, Oil Country Tubular Goods from Argentina: Rejection of Tenaris's Comments on Draft Results of Redetermination, RPDs 4-5, bar code 4573606–01 (Jun. 7, 2024).   On June 10, 2024, Plaintiffs resubmitted their comments, redacting references to the new factual information.   <u>See</u> Tenaris Resubmission of Comments on Draft Remand Determination, RPD 6, RCD 2, bar code 4575101–01 (Jun. 10, 2024).

On June 26, 2024, Commerce filed its Remand Results.  <u>See generally</u> Remand Results.  On July 26, 2024, Plaintiffs filed their comments on the Remand Results. <u>See generally</u> Comments of Plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, Ipsco Tubulars Inc., Tenaris Global Services (U.S.A.), Corporation, And Siderca S.A.I.C. on Commerce's Final Remand Determination ("Pl. Cmts."), Jul. 26, 2024, ECF No. 78.  On August 26, 2024, Defendant and Defendant-Intervenors filed their replies to Plaintiff's comments.  <u>See generally</u> Defendant's Reply to Comments on the Remand Redetermination ("Def. Reply Cmts."), Aug. 26, 2024, ECF No. 82; <u>see also</u> Defendant-Intervenors' Reply to Plaintiffs' Comments on the Remand Redetermination ("Def. Int. Reply Cmts."), Aug. 26, 2024, ECF No. 80.  On Sept. 16,

2024, the Court granted Plaintiffs' unopposed motion for oral argument.  <u>See</u> Order

Granting Unopposed Motion for Oral Argument, Sept. 16, 2024, ECF No. 87.  On

October 22, 2024, oral argument was held.  <u>See</u> Oral Argument, Oct. 22, 2024, ECF

No. 91.

## JURISDICTION AND STANDARD OF REVIEW

Pursuant to Section 516A of the Tariff Act of 1930,[3] as amended, 19 U.S.C.

§ 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2018),[4] this Court is granted the authority

to review actions contesting the final determination in an antidumping duty order.

The Court will uphold Commerce's determination unless it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  <u>Huaiyin Foreign</u>

<u>Trade Corp. (30) v. United States,</u> 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting

<u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  The Court determines

whether substantial evidence exists by considering the record as a whole, including

any evidence that supports or fairly detracts from the substantiality of the evidence.

<u>Huaiyin Foreign Trade Corp. (30)</u>, 322 F.3d at 1374 (quoting <u>Atl. Sugar, Ltd. v.</u>

<u>United States</u>, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  The possibility that two

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant
provisions of Title 19 of the U.S. Code, 2018 edition.
[4] Further citations to Title 28 of the U.S. Code and Code of Federal Regulations are
to the 2018 edition.

Court No. 22-00343                                                    Page 10
**PUBLIC VERSION**

inconsistent conclusions may be drawn from the evidence does not prevent an

agency's determination from being supported by substantial evidence.  Consolo v.

Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) (citing N.L.R.B. v. Nevada Consol.

Copper Corp., 316 U.S. 105, 106 (1942)).

## DISCUSSION

## I.     **Exhaustion of Administrative Remedies**

Defendant argues that Plaintiffs failed to raise arguments with respect to (1)

potential undercounting in Commerce's calculations, (2) whether Commerce's

calculations include only processing that involves heat treatment as opposed to

threading, and (3) the completeness of the industry source data ("Industry Source")[5]

used by Commerce.  Def. Reply Cmts. at 8–9, 13–14 (citing 19 U.S.C. § 1673a(c)(4)(E)).

Defendant-Intervenors echo Defendant's position.   Def. Int. Cmts. at 25, n.4.

Plaintiffs claim they have exhausted arguments that Commerce's determination (1)

allows for undercounting in its calculations, Pl. Cmts at 4, (2) fails to confirm that the

production by processors reflects only processing that involves heat treatment as

opposed to threading, id. at 10–11, and (3) fails to confirm that Industry Source data

is complete.  Id. at 18.  Specifically, they state they have "repeatedly argued that the

comingling of production and processing data had implications for the accuracy of the

industry support calculation and therefore requested that Commerce solicit

---

[5] The Industry Source that Commerce used in its determination is the [[
                    ]].

disaggregated data." Id. at 23.    Likewise, they point out that they argued to
Commerce that the relationship between formation and finishing "has implications
for any assessment" of support. Id. at 4 (quoting Reply Cmts. on Standing at 8).

Generally, parties must exhaust their administrative remedies to obtain
judicial review. McKart v. United States, 395 U.S. 185, 193 (1969) (internal
quotations omitted) (quoting Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41,
50–51 (1938)).  Requiring exhaustion acknowledges agency expertise, allows agencies
to correct mistakes, and promotes efficiency. Woodford v. Ngo, 548 U.S. 81, 89 (2006).
A plaintiff must show that it exhausted its administrative remedies, or that it
qualifies for an exception to the exhaustion doctrine. Consol. Bearings Co. v. United
States, 348 F.3d 997, 1003 (Fed. Cir. 2003) (citing 28 U.S.C. § 2637(d)).[6]

Plaintiffs are correct that they questioned the completeness of the Industry
Source data before Commerce; however, both Commerce and this Court addressed
that challenge.  Commerce acknowledged the imperfect nature of the Industry Source
data in its Initiation Checklist when it explained "neither the statute nor regulations
prevent the petitioners from estimating the production of the non-petitioning
companies." See Initiation Checklist at 16.  It also noted no party, including
Plaintiffs, had "offered any alternative sources for production estimates that would,

---

[6] The time in which a party must exhaust its arguments with respect to industry
support calculations, is the 20-day window which Congress has provided for
Commerce to make its industry support determination.  19 U.S.C. § 1673a(c)(4)(E).

in their view, be more reliable." Id.  Consequently, Commerce determined that the use of an estimate did not require it to poll the industry.  Id.  Commerce's explanation is reasonable on this the record, as it is the parties' burden to populate the record. See BMW of N. Am. LLC v. United States, 926 F.3d 1291, 1295 (Fed. Cir. 2019); Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386–87 (Fed. Cir. 2014); QVD Food Co., Ltd. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011). Commerce was not required to use perfect data so long as it explains why its choice was reasonable on the record, which it did.  See e.g. PT Pindo Deli Pulp and Paper Mills v. United States, 825 F.Supp.2d 1310, 1327–28 (Ct. Int'l Trade 2012) Finally, Tenaris I sustained Commerce's methodology and use of the Industry Source data as a reasonable estimate.  Tenaris I, 693 F.Supp.3d at 1324.

Although Commerce and this Court have already addressed Plaintiffs' challenge to the completeness of the Industry Source data, Plaintiffs now spin out two new arguments based upon their prior complaint.  Specifically, Plaintiffs theorize that the incompleteness of the Industry Source data led to undercounting and improper comingling of OCTG producers and processors, distorting Commerce's calculations.  Pl. Cmts at 4, 10.   Plaintiffs did not raise these arguments within the 20-day comment period provided by 19 U.S.C. § 1673a(c)(1)(A). See generally Factual Error Cmts.; Cmts. re Petitioners' Standing; Reply Cmts. on Standing; Cmts. re Petitioners' Second GIQ Resp.  Plaintiffs did, however, complain to Commerce of the "implications" of including both producers and processors in the industry support

calculation,[7] specifically arguing that Borusan U.S. ("Borusan") and PTC Liberty

("PTC") "appear to have potentially significant finishing relative to their actual

OCTG production."  Reply Cmts. on Standing at 8.  Plaintiffs ask too much of the

word "implications."  At best this argument would have raised to Commerce the

challenge that either (1) processors should not be included in the calculation, or (2)

the inclusion of processors might lead to double counting, both of which Commerce

addressed in its Remand Results.  Remand Results at 10–11.  Plaintiffs cannot now

rely on the word "implications" to fashion more specific arguments about potential

undercounting or distinctions between processing that involves heat treatment as

opposed to threading operations. Plaintiffs' specific arguments of undercounting, and

comingling of the producers and processors, are not exhausted, and therefore not

reviewable by this Court.

## II.    Industry Support Calculation

Plaintiffs argue that Commerce fails to comply with this Court's remand order

by failing to prove the accuracy of the industry support calculation and failing to

address whether domestically produced OCTG may have been double counted.  Pl.

Cmts. at 9, 13–23.   Plaintiffs contend, because the Industry Source did not

disaggregate its data, Commerce cannot confirm the accuracy of its industry support

---

[7] Reply Cmts. on Standing at 8 ("The relationship of pipe formation and pipe finishing
has implications for any assessment of a domestic OCTG industry given that the
percentage of green pipe and plain end imports of OCTG into the United States will
vary year to year and may constitute the majority of imports in any given year").

calculations.  Id. at 11–14.  Defendant asserts that Commerce complied with the Court's remand order and its determination is reasonable on this record.  Def. Reply Cmts. at 4–8.  Defendant-Intervenors concur with Defendant's assertions.  Def. Int. Reply Cmts. at 10–17.  For the reasons that follow, Commerce's industry support calculation is sustained.

An interested party[8] may petition Commerce to commence an antidumping investigation on behalf of the industry.  19 U.S.C. § 1673a(b)(1).  Commerce generally has 20 days to determine whether, inter alia, the petition was filed "by or on behalf of the industry."[9]  19 U.S.C. § 1673a(c)(1)(A).

> Commerce considers a petition to be filed "by or on behalf of the industry" if

---

[8] An "interested party," for the purposes of initiating an antidumping investigation by petition, includes:

> (C) a manufacturer, producer, or wholesaler in the United States of a domestic like product,
>
> (D) a certified union or recognized union or group of workers which is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a domestic like product,
>
> (E) a trade or business association a majority of whose members manufacture, produce, or wholesale a domestic like product in the United States,
>
> (F) an association, a majority of whose members is composed of interested parties described in subparagraph (C), (D), or (E) with respect to a domestic like product[.]

19 U.S.C. § 1677(9)(C)–(F).

[9] If warranted by "exceptional circumstances" at its discretion, Commerce can extend the 20-day initial determination timeline for a maximum of 40 days.  See 19 U.S.C. § 1673a(c)(1)(B); 19 U.S.C. § 1673a(c)(4)(D).  Here, Commerce did not extend the 20-day initial timeline, publishing its Initiation Checklist on October 26, 2021, 20 days after the Petitions were filed.  See Initiation Checklist.

Court No. 22-00343                                                                    Page 15
**PUBLIC VERSION**

     (i) the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product, and

     (ii) the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition.

19 U.S.C. § 1673a(c)(4)(A).[10]  Where the petition satisfies the 25 percent domestic industry support requirement, but does not establish the latter 50 percent requirement, Commerce "shall[] poll the industry or rely on other information in order to determine if there is support for the petition" before proceeding with formal initiation of the antidumping investigation.[11]  19 U.S.C. § 1673a(c)(4)(D)(i).

    A petition to initiate an antidumping proceeding must be accompanied by information "reasonably available" to the petitioner.  19 U.S.C. §1673a(b)(1).  When determining industry support for an antidumping petition, Commerce will "normally" measure production, based on either value or volume, "over a twelve-month period, as specified by the Secretary."  19 C.F.R. § 351.203(e)(1).  However, if an interested party demonstrates the unavailability of production data for the specified period,

---

[10] Commerce (1) "shall disregard the position of domestic producers who oppose the petition," if they are related to foreign producers, unless they can show their interests "would be adversely affected by the imposition of an antidumping duty order;" and (2) "may disregard the position of domestic producers of a domestic like product who are importers of the subject merchandise."  19 U.S.C. § 1673a(c)(4)(B).

[11] If Commerce decides to poll the industry it can "determine industry support for the petition by using any statistically valid sampling method[.]"  19 U.S.C. § 1673a(c)(4)(D)(ii).

then Commerce may establish production levels "by reference to alternative data that [Commerce] determines to be indicative of production levels." Id.

In Tenaris I, this Court sustained Commerce's decision to rely on other information to calculate industry support for the purposes of initiating the OCTG antidumping investigation at issue but ordered Commerce to "either reconsider or further explain its use of data from the 2020 market period, and specifically to ensure that finishing operations data were not double counted." Tenaris I, 693 F.Supp.3d at 1320. In particular, the Court took note of record evidence that might suggest finished pipe may have been counted twice in Commerce's calculations. Id. at 1326 (noting "certain domestic companies both produce and finish OCTG, leading to the inference that some domestic pipe may have been double counted in the industry support calculations"). Thus, the Court remanded for Commerce to reconsider or further explain its determination that the record "accurately reflected industry support, including whether finishing operations were counted twice." Id. at 1328.

On remand, Commerce considered the record evidence, including that which the Court noted might detract from Commerce's prior conclusion. Remand Results at 14–17. Commerce continues to use the Industry Source data to calculate industry support. Id. at 11. In reviewing the Industry Source data, Commerce continues to include both OCTG producers as well as processors who heat treat green tube as part

of the domestic industry.[12]  Id. at 12–13.  Commerce reconsidered its determination,

particularly in light of record evidence regarding Petitioners Borusan and PTC.  Id.

at 14.  It examined the record evidence submitted by Plaintiffs, showing screenshots

of both Borusan and PTC's websites, determining that PTC is "first and foremost" a

producer of OCTG with processing capabilities, and Borusan primarily manufactures

OCTG casing while processing imported tubing from its facility in Türkiye.  Id. at 15–

16.  Plaintiffs complain that Commerce, although addressing the record evidence

regarding these two companies, did not assess the accuracy and completeness of the

data more generally.  Pl. Cmts. at 13–19.  However, after finding that no evidence

undermined the Industry Source data, Commerce concluded:

> the record supports Commerce's conclusion that the shipment data from
> this source account for all domestic shipments of the domestic like
> product (including the appropriate green tube finishing operations) and
> that, after accounting for the domestic industry's export shipments
> derived from reasonably available information (including industry-wide
> data from the ITC's India et al. OCTG 2020 Review), the resulting
> denominator used in the industry support calculation appropriately
> reflects the entire universe of production of the domestic like product in
> calendar year 2020.

---

[12] Here, Commerce defines the domestic like product as OCTG, which includes green
tube.  Remand Results at 8–9.  Commerce defines the domestic industry as "producers
and workers who produce the domestic like product."  Remand Results at 7–8.  As
instructed, Commerce reexamined the record, determining that OCTG green tube
"finishing operations (i.e. heat treatment) should be a part of the domestic industry."
Remand Results at 9.  Commerce finds no evidence to suggest that OCTG processors
who provide heat treatment should not be included in the domestic industry
calculation.  Remand Results at 10.

Court No. 22-00343                                                                                    Page 18
**PUBLIC VERSION**

Remand Results at 12.

Plaintiffs further complain that because the data was not disaggregated it was

incomplete and therefore inaccurate.  Plaintiffs argue:

> Commerce did not demonstrate the data "accurately reflected industry
> support" because the record evidence does not support Commerce's
> conclusion that the denominator of the industry support calculation
> includes total U.S. production of the domestic like product, including
> imported green pipe that has been processed by a U.S. processor.
> Commerce failed to confirm the completeness of the shipment data from
> the industry source provided by Petitioners and relied upon by
> Commerce as the starting point of the industry support calculations.

Pl. Cmts. at 8.  However, in <u>Tenaris I</u> the Court did not order Commerce to confirm

the completeness or the accuracy of the shipment data.  Rather, it ordered Commerce

to "reconsider or further explain" its determination that the record accurately

reflected industry support, including whether finishing operations were counted

twice.  <u>See</u> <u>Tenaris I</u>, 693 F.Supp.3d at 1328.  Thus, Commerce's industry support

determination is reasonable, supported by substantial evidence, and therefore

sustained.

## CONCLUSION

For the reasons discussed above, Commerce's industry support determination

is sustained.  Judgment will enter accordingly.

                                               /s/ Claire R. Kelly
                                               Claire R. Kelly, Judge

Dated:        December 2, 2024
              New York, New York

*Tenaris Bay City, Inc. et al. v. United States,* Court No. 22-00343, Slip Op. 24-31
(CIT March 14, 2024)

*Oil Country Tubular Goods from Argentina: Final Results of Redetermination
Pursuant to Court Remand*

June 26, 2024

(Nonconfidential Version)

Appx021 – Appx046

A-357-824
Remand
Slip Op. 24-31
POI: 10/01/2020 – 09/30/2021
**Public Version**
E&C/TRCI: WS

*Tenaris Bay City, Inc. et al. v. United States*,
**Court No. 22-00343, Slip Op. 24-31 (CIT March 14, 2024)**
*Oil Country Tubular Goods from Argentina*

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.  SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the opinion and remand order of the U.S. Court of International

Trade (the Court) in *Tenaris Bay City, Inc. v. United States*, Court No. 22-000343, Slip Op. 24-

31 (CIT March 14, 2024) (*Remand Order*).  These final results of redetermination concern

Commerce's final affirmative determination in the investigation of sales of oil country tubular

goods (OCTG) from Argentina at less-than-fair value (LTFV).[1]  The Court remanded for

Commerce to reconsider or further explain its determination that the data relied upon accurately

reflected industry support, including whether finishing operations were counted twice.[2]

On remand, Commerce has reconsidered the facts on the record and further explained its

decision underlying industry support; specifically, whether the data relied upon accurately

reflected industry support and whether finishing operations were counted twice.  For the reasons

explained below, Commerce continues to find that initiating the underlying LTFV investigation

was lawful and supported by substantial evidence.

---

[1] *See Oil Country Tubular Goods from Argentina:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances*, 87 FR 59054 (September 29, 2022) (*Final Determination*), and accompanying Issues and Decision Memorandum.
[2] *See Remand Order* at 27.

## II.    BACKGROUND

On October 6, 2021, Commerce received an antidumping duty (AD) petition concerning imports of OCTG from Argentina, filed in proper form on behalf of the petitioners.[3]  On October 12 and 21, 2021, the petitioners provided supplemental information and clarifications, in response to Commerce's requests for additional information regarding the Petition.[4]  Also in October, Commerce received four submissions from Tenaris USA[5] commenting on industry support.[6]  On October 18, 2021, the petitioners responded to Tenaris USA's comments on industry support.[7]

On October 26, 2021, Commerce initiated the LTFV investigation on imports of OCTG from Argentina, finding that the Petition met the requirements of section 732 of the Tariff Act of 1930, as amended (the Act).[8]  On May 11, 2022, Commerce issued its preliminary determination that OCTG from Argentina is being, or is likely to be, sold in the United States at LTFV for the period of investigation (POI), October 1, 2020, through September 30, 2021.[9]  Commerce made

---

[3] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties," dated October 6, 2021 (the Petition).  The petitioners are Borusan Mannesmann Pipe U.S., Inc. (Borusan U.S.), PTC Liberty Tubulars LLC (PTC Liberty), United States Steel Corporation, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA, Inc. (collectively, the petitioners).

[4] *See* Petitioners' Letters, "Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement); and "Response to Second General Issues Questionnaire," dated October 21, 2021.

[5] Tenaris Bay City, Inc., IPSCO Tubulars Inc., Maverick Tube Corporation, Tenaris Global Services (U.S.A.) Corporation (collectively, Tenaris USA).

[6] *See* Tenaris USA's Letters, "Factual Errors in Petitions," dated October 8, 2021 (Tenaris USA Letter I); "Comments on Petitioners' Standing," dated October 15, 2021 (Tenaris USA Letter II); "Reply Comments on Petitioners' Standing," dated October 20, 2021 (Tenaris USA Letter III); and Comments on Petitioners' Second General Issues Questionnaire Response," dated October 22, 2021 (Tenaris USA Letter IV).

[7] *See* Petitioners' Letter, "Response to Tenaris Submission Concerning Petitioners' Standing," dated October 18, 2021 (Petitioners' Response).

[8] *See Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation:  Initiation of Less-Than-Fair-Value Investigations*, 86 FR 60205 (November 1, 2021).

[9] *See Oil Country Tubular Goods from Argentina:  Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 FR 28801 (May 11, 2022).

no change, in this regard, for purposes of its *Final Determination*.[10] Tenaris[11] subsequently

challenged the *Final Determination* at the Court, contesting Commerce's: (1) determination that

the Petition was filed "by or on behalf of the industry"; and (2) decision not to poll the domestic

industry and seek actual production data for the 12 months immediately preceding the filing of

the Petition to determine industry support.[12]

On March 14, 2024, the Court remanded the *Final Determination* for Commerce to

further explain or reconsider its determination that the data relied upon accurately reflected

industry support, including whether finishing operations were counted twice.[13] On May 28,

2024, Commerce released its draft results of redetermination[14] and provided interested parties the

opportunity to comment. On June 4, 2024, the petitioners and Tenaris each submitted comments

regarding the Draft Remand.[15] On June 7, 2024, however, Commerce rejected Tenaris'

comments after determining that the submission contained untimely new factual information not

previously contained on the record of the proceeding.[16] On June 10, 2024, Tenaris resubmitted

its comments redacting references containing new factual information in accordance with

Commerce's request.[17]

---

[10] *See Final Determination*, 87 FR at 59054.
[11] Tenaris USA and Siderca S.A.I.C. (collectively, Tenaris). Throughout this final remand, where appropriate, we refer to Tenaris USA and Tenaris separately, with Tenaris reflecting the collective entity that includes Tenaris USA and Siderca S.A.I.C.
[12] *See Remand Order* at 2.
[13] *Id.* at 3, 21, and 27.
[14] *See* Draft Results of Redetermination Pursuant to Court Remand, Tenaris Bay City, Inc. et al. v. United States, Court No. 22-00343, Slip Op. 24-31 (CIT March 14, 2024), dated May 28, 2024 (Draft Remand).
[15] *See* Petitioners' Letter, "Comments on Draft Remand Redetermination," dated June 4, 2024 (Petitioners' Comments); *see also* Tenaris' Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated June 4, 2024.
[16] *See* Commerce's Letter, "Rejection of Tenaris' Comments on Draft Results of Redetermination," dated June 7, 2024; *see also* Memorandum, "Rejection and Removal of Documents," dated June 7, 2024.
[17] *See* Tenaris' Letter, "Resubmission of Comments on Draft Results of Redetermination Pursuant to Court Remand," dated June 10, 2024 (Tenaris' Comments).

## III.   ANALYSIS

In its *Remand Order*, the Court held that "Commerce fail{ed} to address record evidence indicating that certain domestic companies both produce and finish OCTG, leading to the inference that some domestic pipe may have been double counted in the industry support calculations."[18]  The Court elaborated that "Commerce may have reasons to reject this inference; however, it must acknowledge consideration of such evidence and explain why it nonetheless rejects the reference."[19]  Additionally, the Court held that "Commerce fail{ed} to respond to record evidence suggesting the possibility of double counting within the industry support calculations, and therefore the Court cannot conclude that Commerce's determination is supported by substantial evidence."[20]  Consequently, the Court ordered that Commerce further explain or reconsider its determination on the double counting issue.[21]

As an initial matter, we note that during the initiation phase of the underlying investigation, Commerce addressed Tenaris USA's comments opposing the Petition on the merits, and, because the petition had the requisite support even when accounting for the opposition of Tenaris USA,[22] did not consider whether Tenaris USA's opposition should be disregarded by law, as argued by the petitioners.[23]  Indeed, even under the more conservative

---

[18] *Id.* at 24.

[19] *Id.* at 25.

[20] *Id.* at 27 (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

[21] *Id.*

[22] As Commerce previously noted, Tenaris USA did not provide its production data for Commerce to account for its opposition in the industry support calculation.  *See* Initiation Checklist at Attachment II (page 7 n.48).  Commerce further noted that, even assuming *arguendo* that all other U.S. producers of OCTG (including Tenaris USA) opposed the Petition, the supporters of the Petition would still have the requisite level of support pursuant to section 732(c)(4)(A)(ii) of the Act.  *Id.* at 7.

[23] *See* sections 732(c)(4)(B)(i) and (ii) of the Act ("In determining industry support under subparagraph (A), {Commerce} shall disregard the position of domestic producers who oppose the petition, if such producers are related to foreign producers, as defined in section 771(4)(B)(ii), unless such domestic producers demonstrate that their interests as domestic producers would be adversely affected by the imposition of an antidumping duty order. {Commerce} may disregard the position of domestic producers of a domestic like product who are importers of the

4

industry support calculations on the record, including the alternative methodology proposed by

Tenaris USA in its pre-initiation comments, initiation was, and continues to be, proper.[24]

We also note that, based on our analysis of the record, we find that the explicit issue of

"double counting" was never raised before Commerce in any of Tenaris USA's four submissions

on industry support prior to Commerce's initiation deadline.[25]  Specifically, the record before

Commerce prior to initiation contains no reference to "double counting," and Tenaris USA *never*

framed the issue as such in *any* of its four pre-initiation submissions.  Consequently, Tenaris

USA's claim failed to satisfy the requisite exhaustion of administrative remedies.[26]  Even so, to

address the Court's concerns, on remand, we have reexamined the four submissions from Tenaris

USA in the 20-calendar day pre-initiation phase and the arguments pertaining to the inclusion of

finishing operations in the industry support calculation and, pursuant to the *Remand Order*, have

addressed any concerns with respect to "double counting."

In its first submission, dated October 8, 2021, Tenaris USA failed to advance any

argument regarding finishing operations or green tube.[27]  In its second submission, dated October

---

subject merchandise."); 19 CFR 351.203(e)(4)(i) and (ii) ("{Commerce} will disregard the position of a domestic producer that opposes the petition if such producer is related to a foreign producer or to a foreign exporter under section 771(4)(B)(ii) of the Act, unless such domestic producer demonstrates to {Commerce's} satisfaction that its interests as a domestic producer would be adversely affected by the imposition of an antidumping order or a countervailing duty order, as the case may be; and {Commerce} may disregard the position of a domestic producer that is an importer of the subject merchandise, or that is related to such an importer, under section 771(4)(B)(ii) of the Act."); *see also* Checklist, "Oil Country Tubular Goods from Argentina," dated October 26, 2021 (Initiation Checklist), at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation (Attachment II), at 19-21.
[24] *See* Initiation Checklist at Attachment II (page 14).
[25] *See, e.g., U.S. Steel Corp. v. United States*, 348 F.Supp.3d 1248, 1259 (CIT 2018) ("Failure to raise and adequately develop a legal claim results in waiver.") (citing *Ad Hoc Shrimp Trade Action Comm. v. United States*, 616 F.Supp.2d 1354, 1367 (CIT 2009) (*Ad Hoc Shrimp*); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (*Rhone Poulenc*); and *JTEKT Corp. v. United States*, 768 F.Supp.2d 1333, 1354 (CIT 2011) (*JTEKT Corp.*)).
[26] *See U.S. Steel Corp. v. United States*, 348 F.Supp.3d 1248, 1259 (CIT 2018) ("Failure to raise and adequately develop a legal claim results in waiver.") (citing *Ad Hoc Shrimp*, 616 F.Supp.2d at 1367; *Rhone Poulenc*, 899 F.2d at 1191; and *JTEKT Corp.*, 768 F.Supp.2d at 1354).
[27] *See* Tenaris USA Letter I.

15, 2021, Tenaris USA argued that the petitioners' calculations "suffer from an additional *potential* flaw" as they *might* include data that pertain to "mere finishing operations" of the petitioners rather than the production of OCTG.[28]  Tenaris USA then argued that Commerce should exclude OCTG that is "merely finish{ed}" rather than produced.[29]  Tenaris USA also asserted that, based on publicly available information, two of the petitioning companies – Borusan U.S. and PTC Liberty – "appear to have potentially significant finishing operations relative to their actual OCTG production."[30]  Tenaris USA argued that this "deficiency" justifies a decision by Commerce to poll the industry.[31]  As support for its claim, Tenaris USA provided printouts of each company's website, containing basic "who we are" summary information.[32]  Tenaris USA asserted that, according to Borusan U.S.'s website, "it is unclear what portion of Borusan U.S.'s operations involve actual pipe production, as opposed to finishing operations for green tube."[33]  With respect to PTC Liberty, Tenaris USA asserted that the company's website provided "information that indicates its operations include finishing operations" and that PTC Liberty was not identified as a U.S. producer in the 2020 U.S. International Trade Commission (ITC) sunset review.[34]  Tenaris USA further claimed that Commerce should ensure that, to extent these two companies are processors, their further processed production is not included in the industry support calculation.[35]  In its third submission, dated October 20, 2021, Tenaris USA

---

[28] *See* Tenaris USA Letter II at 9 (emphasis added).
[29] *Id.* at 10.
[30] *Id.*
[31] *Id.*
[32] *Id.* at 10, Exhibit 5, and Exhibit 6.
[33] *See* Tenaris USA Letter I at 10 and Exhibit 5.  As support, Tenaris USA includes the following excerpt from Borusan U.S.'s website:  "Borusan's Baytown location manufactures OCTG casing…primarily with 'made and melted USA' steel.  Green tube from our world-class facility in Gemlik, Turkey…is also heat-treated, inspected, and threaded at our Baytown facility.…"  *see* Tenaris USA Letter I at 10 n.26).
[34] *Id.* at 10 and Exhibit 6.  As support, Tenaris USA includes the following excerpt from PTC Liberty's website:  "PTC Liberty Tubular produces highlight engineered {OCTG} for consumption in the US and Canadian natural gas and crude oil drilling markets.  We offer Electric Resistance Welded (ERW) and Seamless tube, full finishing capabilities, and both API and Semi-Premium threading."  *Id.* at 10 (n. 27).
[35] *Id.* at 10.

reiterated its claim that the petitioners' own production and/or shipment data *might* include data that pertain to "mere finishing operations" rather than the production of OCTG.[36]  In addition, Tenaris USA reiterated its claim that PTC Liberty was not recognized as a U.S. producer in the 2020 ITC sunset review.[37]  Tenaris USA further claimed that the petitioners did not address how the issue of finishing pertains to Commerce's determination of industry support and that the "relationship of pipe formation and pipe finishing has implications for any assessment of a domestic OCTG industry given that the percentage of green pipe and plain end imports of OCTG into the United States will vary year to year and may constitute the majority of imports in any given year," but failed to elucidate what such implications would be.[38]  Finally, in its fourth submission, dated October 22, 2021, Tenaris USA stated that it opposed the Petition and briefly referenced the page numbers of its prior submissions pertaining to its claims regarding processors/finishers of OCTG products.[39]  In three of these four pre-initiation submissions, Tenaris USA claimed to be the largest U.S. producer of OCTG, but failed to provide *any* information (*e.g.*, production data) to substantiate its assertion.[40]

In determining whether a petition was filed by or on behalf of the domestic industry under section 732(c)(4)(A) of the Act, Commerce must first define the domestic like product and the domestic industry producing the domestic like product.  Section 771(4)(A) of the Act defines the "industry" as producers, as a whole, of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the like product.  Thus, to determine whether a petition has the requisite industry

---

[36] *See* Tenaris USA Letter III at 8.
[37] *Id.*
[38] *Id.*
[39] *See* Tenaris USA Letter IV at 5.
[40] *See* Tenaris USA Letter II at 1 and 11; *see also* Tenaris USA Letter III at 2-3 and 10; and Tenaris USA Letter IV at 2.

support, the Act directs Commerce to look to producers and workers who produce the domestic

like product. While both Commerce and the ITC must apply the same statutory definition

regarding the domestic like product (*i.e.*, section 771(10) of the Act), they do so for different

purposes and pursuant to a separate and distinct authority. Although this may result in different

definitions of the like product, such differences do not render the decision of either agency

contrary to law.[41] Section 771(10) of the Act defines the domestic like product as "a product

which is like, or in the absence of like, most similar in characteristics and uses with, the article

subject to an investigation under this title." As such, the reference point from which the

domestic like product analysis begins is "the article subject to an investigation," which normally

will be the scope as defined in the Petition. While Commerce is not bound by the criteria used

by the ITC to determine the domestic like product in answering this question, we reviewed the

ITC's traditional six factors for the domestic like product presented by the petitioners in the

Petition.[42]

In the Petition, the petitioners did not offer a definition of the domestic like product

distinct from the scope of the investigation.[43] Based on our analysis of the information presented

by the petitioners, as well as past ITC determinations on OCTG, we concluded that the domestic

---

[41] *See USEC, Inc. v. United States*, 132 F.Supp.2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp., Ltd. v. United States*, 688 F.Supp. 639, 644 (CIT 1988), *aff'd Algoma Steel Corp., Ltd. v. United States*, 865 F.2d 240 (Fed. Cir. 1989)).
[42] *See* Petition at Volume I at 20 (citing *Cleo Inc. v. United States*, 501 F.3d 1291, 1295 (Fed. Cir. 2007) ("The Commission generally considers the following factors: (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions; (5) common manufacturing facilities, production processes, and production employees; and, where appropriate, (6) price.").
[43] *See* Initiation Checklist at Attachment II (pages 2-3); *see also* Petition at Volume I (pages 20-22 and Exhibits I-11 (containing *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. 5090 (July 2020) (*India et al. OCTG 2020 Review*), at 7), I-13 (containing *Oil Country Tubular Goods from China*, Inv. No. 701-TA-463 (Final), USITC Pub. 4124 (January 2010), at 6), I-14 (containing *Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. 4489 (September 2014) (*2014 OCTG Final*), at 12), and I-18 (containing *Oil Country Tubular Goods from China*, Inv. Nos. 701-TA-463 and 731-TA-1159 (Second Review), USITC Pub. 5136 (November 2020), at 6-7)).

8

like product consists of OCTG (including green tube), as defined in the scope of the Petition.[44]
This finding is consistent with Commerce's broad discretion to define and clarify the scope of an
LTFV investigation in a manner that reflects the intent of the Petition.[45] Consequently,
Commerce's discretion permits interpreting the Petition in such a way as to best effectuate not
only the intent of the Petition, but the overall purpose of the AD laws as well.[46]

In deciding whether a firm qualifies as a domestic producer of the domestic like product,
the ITC generally uses a six-factor framework to analyze the overall nature of a firm's U.S.
production-related activities.[47] Commerce also evaluates the sufficiency of companies'
production-related activities when identifying domestic producers for industry support purposes
and generally considers the same factors as the ITC.[48]

Here, we reexamined the administrative record to determine whether companies engaged
in OCTG green tube finishing operations (*i.e.*, heat treatment) should be part of the domestic
industry. As this evidence shows, in the *2014 OCTG Final*, the ITC applied its traditional six
factor analysis regarding a firm's U.S. production-related activities and concluded that
processors of green tube that provide heat treatment engage in sufficient production-related
activities to be considered domestic producers of OCTG.[49] The record also reflects that in

---

[44] *See* Initiation Checklist at Attachment II (page 3).
[45] *See, e.g.*, *Fujitsu Ltd. v. United States*, 36 F.Supp.2d 394 (CIT 1999) (citing *Kern-Liebers USA, Inc. v. United States*, 881 F.Supp. 618, 621 (CIT 1995)); and *Initiation of Antidumping Duty Investigations: Spring Table Grapes from Chile and Mexico*, 66 FR 26831 (May 15, 2001)).
[46] *See Notice of Final Determination of Sales at Less Than Fair Value: Freshwater Crawfish Tail Meat from the People's Republic of China*, 62 FR 41347, 42357 (August 1, 1997).
[47] The six factors for the ITC's "sufficient production-related activities" test are: (1) source and extent of the firm's capital investment; (2) technical expertise involved in U.S. production activities; (3) value added to the product in the United States; (4) employment levels; (5) quantity and type of parts sourced in the United States; and (6) any other costs and activities in the United States directly leading to production of the domestic like product. *See, e.g.*, *Diamond Sawblades and Parts Thereof from China and Korea*, Inv. Nos 731-TA-1092-93 (Final), USITC Pub. 3862 (July 2006), at 8-11.
[48] *See, e.g.*, *Pokarna Engineered Stone Limited. v. United States*, 56 F.4th 1345 (Fed. Cir. 2023).
[49] *See* Petitioners' Response at 7-8; *see also* Petition at Volume I (Exhibit I-14 (containing *2014 OCTG Final* at 8-14)).

subsequent proceedings on OCTG, the ITC consistently included processors of green tube that provide heat treatment as part of the domestic industry.[50]  Therefore, based on our analysis of the record evidence, including past ITC proceedings,[51] Commerce finds *no reason* to depart from the petitioners' domestic like product or domestic industry definitions as co-extensive with the scope of the proceedings and inclusive of green tube finishing operations.  Moreover, no interested party provided *any* evidence or argument in the pre-initiation period for Commerce to question these definitions.  The record is also devoid of evidence to suggest that processors providing heat treatment do *not* engage in sufficient production-related activities in the United States to be treated as domestic producers.  As such, the record supports Commerce's conclusion that OCTG, including unfinished green tube, as defined in the scope, constitutes a single domestic like product and that the domestic industry consists of all U.S. producers of OCTG, including finishers and processors of green tube that provide heat treatment.

Because processors and finishers of OCTG that provide heat treatment have consistently been found to engage in sufficient production-related activities under the ITC's traditional six factor analysis, such that these OCTG finishing operations constitute domestic production, since at least 2014, and absent any record information that calls into question the evidence in support, we find it is appropriate to include such production in the domestic industry and the industry support calculation.  This is consistent with Commerce's practice in prior proceedings, where finishers or processors engaged in sufficient production-related activities were found to constitute domestic production and included in the industry support calculation.[52]  As explained

---

[50] *See* Petitioners' Response at 8; *see also, e.g.*, Petition at Volume I (Exhibit I-18 (containing *2020 China Review* at 5-7)).

[51] *See* Initiation Checklist at Attachment II (page 14).

[52] *See, e.g., Frozen Warmwater Shrimp from Ecuador and Indonesia:  Initiation of Less-Than-Fair-Value Investigations*, 88 FR 81043, 81045 (November 21, 2023).

Filed By: Yang Chun, Filed Date: 6/26/24 3:23 PM, Submission Status: Approved

above, the domestic like product is defined as co-extensive with the scope (*i.e.*, including unfinished green tube) and the domestic industry is defined as U.S. OCTG producers, including processors and finishers of green tube. Therefore, for determining industry support, it is appropriate to compare a numerator that includes the supporters' production of the domestic like product (including green tube finishing and processing operations as detailed above), to a denominator that likewise reflects production of the domestic like product, including green tube finishing and processing operations as detailed above.[53] Based on a reexamination of the record, Commerce continues to find it appropriate to include green tube heat-treatment processing performed on imported pipe as "U.S. production."

The record indicates that the starting point for the denominator of the industry support calculation is based on the 2020 domestic shipment data from an industry source which the petitioners described as "the recognized authority on the U.S. pipe and tube market."[54] Commerce requested supplemental information regarding this source and the starting point for the denominator in its October 7, 2021, supplemental questionnaire, in which Commerce sought clarification regarding whether all companies identified as U.S. producers in the Petition were accounted for in the domestic shipment data.[55] The petitioners responded that, to their knowledge, this data source accounted for all U.S. shipments of the domestic like product and that these data are the best available information regarding the volume of domestic OCTG

---

[53] In accordance with section 732(c)(4)(A) of the Act, Commerce considers the following calculations for determining industry support: (1) whether the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product; and (2) whether the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition. Section 732(c)(4)(D) of the Act requires Commerce to poll the industry or rely on other information to determine industry support, if the petition does not establish the support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product.

[54] *See* Initiation Checklist at Attachment II (pages 4-5); *see also* Petition at Volume I (page 6).

[55] *See* Commerce's Letter, "Supplemental Questions," dated October 7, 2021.

shipments in 2020.[56] No party submitted any evidence or argument to detract from this well-established industry source as the reasonable starting point for the denominator of the industry support calculation. Further, no interested party claimed that this source data did not reasonably reflect all U.S. producers' domestic shipments of the domestic like product (including green tube finishing operations) *in calendar year 2020*. Tenaris USA argued that Commerce should consider a different time period other than calendar year 2020 and questioned certain of the petitioners' adjustments to approximate total U.S. production, but Tenaris USA failed to advance any argument that the industry source data for 2020 were inaccurate, or that there was a more appropriate, reasonably available source for industry-wide shipment or production data for calendar year 2020. Consequently, the record supports Commerce's conclusion that the shipment data from this source account for all domestic shipments of the domestic like product (including the appropriate green tube finishing operations) and that, after accounting for the domestic industry's export shipments derived from reasonably available information (including industry-wide data from the ITC's *India et al. OCTG 2020 Review*), the resulting denominator used in the industry support calculation appropriately reflects the entire universe of production of the domestic like product in calendar year 2020.

Tenaris USA's concerns about "double counting" are misplaced. The methodological approach taken here (*i.e.*, the inclusion of green tube finishing operations in the numerator and the denominator of the calculation) fairly accounts for total U.S. production by the supporters of the Petition and total U.S. production by the entire OCTG industry. Tenaris characterizes this approach as "double counting," but, as detailed below, it is unclear how this allegation impugns the industry support calculation or skews the calculation in such a way that would overstate the

---

[56] *See* First General Issues Supplement at 4-5.

Filed By: Yang Chun, Filed Date: 6/26/24 3:23 PM, Submission Status: Approved

supporters' share of total U.S. production, as the calculation is made on an apples-to-apples basis. As an initial matter, there is no evidence to suggest that, to the extent the companies also engage in processing, any of the U.S. producers who provided actual production data on the record literally counted each ton of pipe they produced twice – once upon the pipe formation and again upon heat treatment, threading, *etc.* Just because a company produces OCTG and has processing capabilities does not mean that it double counted its OCTG production for purposes of providing its own actual production for inclusion in the Petition, nor does it follow that the data from these companies must be inherently flawed. Likewise, just because a U.S. producer has processing capabilities does not mean that it reported the heat treatment processing it performed on another U.S. company's already reported, domestically-produced green tube, thereby duplicating the reported quantity of the green tube and the finished OCTG product. Nevertheless, there is no overstating of the numerator of the calculation, as the green tube processed by the supporters would already be reflected in the denominator that reflects total U.S. production (including green tube finishing operations) by all U.S. producers. In other words, the supporters' green tube finishing operations in the numerator would be effectively canceled out in the denominator. As detailed above, the record indicates that denominator includes the finishing or processing operations of *all* U.S. producers who processed green tube and/or produced OCTG. A denominator that includes green tube finishing or processing operations represents the most conservative basis for measuring industry support in this instance, as inclusion of green tube finishing or processing operations, in addition to OCTG production, results in a larger denominator, which yields a more conservative calculation of industry support (*i.e.*, the larger

Filed By: Yang Chun, Filed Date: 6/26/24 3:23 PM, Submission Status: Approved

the denominator, the smaller the share that supporters of a petition have).[57] The record indicates that the numerator reasonably reflects the supporters' production of the domestic like product (including green tube finishing operations, where applicable); there is no record evidence to the contrary. If the numerator does not include the supporters' green tube finishing operations, then the resulting calculations on the record would reflect an understated, albeit more conservative assessment of industry support. Comparing a numerator that reflects the supporters' production of OCTG (without accounting for any green tube processing operations) to a denominator that reflects the universe of U.S. production of the domestic like product (including green tube finishing operations) understates the supporters' share of both total U.S. production of the domestic like product and total U.S. production of the domestic like product produced by those producers and workers who have expressed support for, or opposition to, the Petition.

Finally, we address the record and various claims regarding petitioning companies Borusan U.S. and PTC Liberty. In its *Remand Order*, the Court explained that Tenaris USA points to record evidence that PTC Liberty was not identified as a producer in the ITC's sunset review that was relied upon by both the petitioners and Commerce to calculate industry support.[58] The Court then concluded that, "{b}ased upon the sunset review, it would appear that PTC Liberty finished, but did not produce pipe, in which case it is unclear whether the pipe PTC Liberty finished had already been counted in the industry support calculations."[59] Commerce has

---

[57] We provide the following mathematical examples of this approach, where A = supporters' OCTG production, B = supporters' green tube processing, C = all other U.S. producers' OCTG production, and D = all other U.S. producers' green tube processing: $(A + B) / (A + B + C + D)$. The supporters' green tube processing in the numerator and denominator effectively cancels each other out, resulting in the following equation: $(A) / (A + C + D)$. If green tube processing is not included in either the numerator or the denominator, the equation is as follows: $(A) / (A + C)$. As evident in a comparison of the mathematical equations, the inclusion of green tube processing yields a result where the supporters account for a *smaller* overall share of total U.S. production than they would if green tube processing were not included in the calculation. The calculation Commerce relied on for its initiation decision thus fairly accounts for the supporters' share of total U.S. production.

[58] *See Remand Order* at 24.

[59] *Id.*

reexamined the record evidence regarding PTC Liberty and finds, consistent with our finding in the Initiation Checklist, that this company (formerly Boomerang Tube) was identified as a U.S. producer of OCTG in the ITC's *India et al. OCTG 2020 Review*.[60]  Moreover, in the First General Issues Supplement, the petitioners clarified that PTC Liberty was identified in the ITC's list as Boomerang Tube, which is further supported by the fact that the two plants (*i.e.*, Liberty, TX and Houston, TX) listed in the ITC's *India et al. OCTG 2020 Review* for Boomerang represent the very same Liberty, TX and Houston, TX plants identified in Tenaris USA's website printout for PTC Liberty, as discussed below.[61]  Accordingly, the record supports Commerce's prior finding, that PTC Liberty was formerly Boomerang Tube, and was identified as a U.S. producer of OCTG in the ITC's *India et al. OCTG 2020 Review*.

We also reexamined record information submitted by Tenaris USA concerning PTC Liberty – specifically, the screenshot of the company's website.[62]  On the website's "Who We Are" page, PTC Liberty states that it "produces highly engineered {OCTG} … and offer{s} Electric Resistance Welded (ERW) and Seamless tube, full finishing capabilities, and both API and Semi-Premium threading."[63]  Under "Our Facilities," PTC Liberty describes its Liberty, TX plant as a 500,000 square foot facility that houses two ERW mills with 480,000 tons of annual capacity for ERW pipe as well as heat treatment capability of 300,000 tons per year.  PTC Liberty elaborates that its Houston, TX plant is a 350,000 square foot facility that "provide{s} seamless pipe and processing of green tube."[64]  The record demonstrates that PTC Liberty is first and foremost a *producer* of OCTG; a producer that also has capabilities to process (or finish)

---

[60] *See* Initiation Checklist at Attachment II (page 14); *see also* First General Issues Supplement at 1 and Exhibit 1 (containing *India et al. OCTG 2020 Review* at I-37).

[61] *See* First General Issues Supplement at 1 and Exhibit 1 (containing *India et al. OCTG 2020 Review* at I-37); *see also* Tenaris USA Letter II at Exhibit 6.

[62] *See* Tenaris USA Letter II at Exhibit 6.

[63] *Id.*

[64] *Id.*

OCTG.  The relevance of Tenaris USA's claim with respect to the significance of PTC Liberty's processing capabilities is unclear, as information on the record indicates that U.S. pipe mills are typically equipped with the facilities necessary to perform heat-treatment, end upsetting, threading, and coupling.[65]

Next we reexamined the information Tenaris USA submitted on the record for Borusan U.S. – specifically, a screenshot of Borusan U.S.'s website.[66]  On the webpage printout, Borusan U.S. states that its Baytown, TX facility has a 300,000 ton annual production capacity and produces OCTG casing.[67]  On the same webpage, Borusan U.S. elaborates that green tube from its Gemlik facility in the Republic of Türkiye (Türkiye) is heat-treated, inspected, and threaded at its Baytown facility.[68]  In addition, Borusan U.S. indicates that it contracts with the "leading tubing processors" in Houston, TX to ensure the highest quality final product for its tubing imported from its Gemlik, Türkiye facility.[69]  This information demonstrates that Borusan U.S.'s Baytown, Texas facility further processes *imported* green tube from its Gemlik, Türkiye facility, and not domestically produced green tube from another U.S. producer.[70]  Thus, the record evidence for Borusan U.S.'s Baytown, Texas facility suggests that this facility primarily *manufactures* OCTG casing and *also* engages in processing (*i.e.*, heat-treatment, inspection, and threading) of tubing from Borusan U.S.'s facility in Türkiye.  Borusan U.S.'s production appropriately reflects its U.S. mill operations as well as the heat treatment processing of its green tube imports from its Türkiye facility.

---

[65] *See* Petition at Volume I (Exhibit I-11 (citing *ITC et al. OCTG 2020 Review* at I-30)).
[66] *See* Tenaris USA Letter II at Exhibit 5.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*

Our reexamination of the record supports our conclusion that: (1) PTC Liberty (formerly Boomerang Tube) is a U.S. producer, and was previously recognized by the ITC in past proceedings as such; (2) PTC Liberty is first and foremost a U.S. *producer* of OCTG that also has processing capabilities;[71] and (3) Borusan U.S. is first and foremost a U.S. *producer* of OCTG casing that also *processes* green tube imported from its facility in Türkiye. Because Tenaris USA only provided information for PTC Liberty and Borusan U.S., the record is limited to information pertaining to those two companies, and as such, our analysis addresses only the information on the record. Consistent with the *Remand Order*, we have reconsidered the evidence on the record and further explained our analysis of the issue with respect to inclusion of green tube processing and finishing in the industry support calculation.

## IV. INTERESTED PARTIES' COMMENTS ON THE DRAFT REDETERMINATION

On May 28, 2024, Commerce released the Draft Remand and invited interested parties to comment on the Draft Remand. On June 4, 2024, the petitioners and Tenaris each submitted comments regarding the Draft Remand. On June 7, 2024, Commerce rejected Tenaris' June 4, 2024, comments after determining that the submission contained untimely new factual information not previously contained on the record of the proceeding. On June 10, 2024, Tenaris resubmitted its comments redacting references containing new factual information in accordance with Commerce's request. Our discussion of interested party comments is below.

---

[71] Based on record information, U.S. pipe mills are typically equipped with the facilities necessary to perform heat-treatment, end upsetting, threading, and coupling. *See* Petition at Volume I (Exhibit I-11 (citing *ITC et al. OCTG 2020 Review* at I-30)).

**Comment:   Inclusion of Green Tube Processing and "Double Counting"**

*Tenaris' Comments*:

*The following is a verbatim summary of arguments submitted by Tenaris.  For further details, see Tenaris' Comments at 2-27.*

> Commerce Fails to Demonstrate That Domestically-Produced Green Pipe That is Further Processed (Heat Treated) by a U.S. Processor is Not Double-Counted and, Therefore, Commerce's Draft Remand Determination Fails to Comply with the Court's Instructions to Demonstrate That "The Data Relied Upon Accurately Reflected Industry Support"
>
> Commerce Fails to Demonstrate That the Shipment Data That Serve as the Basis for the Denominator in the Industry Support Calculation Include Shipments of Both U.S. Mills and U.S. Processors of Imported Green Pipe, and Therefore, the Draft Remand Determination Fails to Comply with the Court's Instructions to Demonstrate that "the Data Relied Upon Accurately Reflected Industry Support"

*Petitioners' Comments*:

*The following is a verbatim summary of arguments submitted by the petitioners.  For further details, see Petitioners' Comments at 2-6.*

> The Draft Remand Redetermination is a thorough and well-supported response to the Court's order. Commerce should make no changes in the final remand redetermination. There has never been any factual basis underlying the claims of Tenaris Bay City, Inc. ("Tenaris") on appeal regarding purported double counting of green tube produced in the United States by one company and then processed into OCTG by another U.S. company.
>
> Commerce appropriately explains how its determination that the domestic like product consists of OCTG as defined by the scope – including both unfinished green tube and finished OCTG – is consistent with the determinations of the {ITC} in its separate analyses of the domestic like product in cases involving OCTG since at least 2014.
>
> Commerce further explains that its inclusion of finishing operations in the numerator and the denominator of the calculation does not constitute "double counting," as any OCTG processed by supporters of the petition would already be reflected in the denominator that reflects all U.S. production (including processing operations).
>
> Commerce also responds to Tenaris' claims that domestic producer PTC Liberty was not

listed as a domestic producer in a 2020 ITC publication by explaining that the company is an OCTG producer with capabilities to finish/process OCTG and operates the assets of the former Boomerang Tube, which the ITC did identify as a domestic producer of OCTG in its publication. Commerce also explains that, in addition to producing OCTG casing in the United States, U.S. producer Borusan Mannesmann also finishes green tube imported from an affiliate in Türkiye. Because the company's processing operations involve imported green tube, there is no double counting of domestically produced green tube subsequently finished by Borusan Mannesmann in the United States.

**Commerce's Position:**

We disagree with Tenaris' contention that our Draft Remand is not responsive to the Court's remand instruction, inconsistent with statutory requirements, and unsupported by substantial evidence on the record. The Court ordered Commerce to further explain or reconsider its determination that the data relied upon accurately reflected industry support, including whether finishing operations were counted twice.[72] In accordance with the Court's order, we reconsidered the information on the record and further explained the "double counting" issue as well as other arguments raised by Tenaris regarding the inclusion of processing/finishing operations.[73] We also presented mathematical examples to conceptualize the methodology and demonstrate that, even with the inclusion of green tube finishing operations, the industry support calculation was reasonable and appropriate. Contrary to Tenaris' claims that Commerce's discussion of the scope, the domestic like product, and the definition of the domestic industry are misplaced, these concepts are integral to Commerce's analysis of a petition and whether the petition meets the requirements set forth under the statute and regulations. As a result, Commerce continues to include a discussion of the relationship between these concepts in its analysis for the Court. In its remand comments, Tenaris argues that Commerce only addressed

---

[72] *See Remand Order* at 27.
[73] *See* Tenaris USA's Letter II at 9-10; *see also* Tenaris USA's Letter III at 8; and Tenaris USA's Letter IV at 5.

record information pertaining to Borusan U.S. and PTC Liberty in the Draft Remand.[74]

Commerce is limited to the record before it,[75] and because Tenaris USA only addressed

petitioning companies Borusan U.S. and PTC Liberty in its pre-initiation comments, our analysis

in the Draft Remand is likewise limited to the information on the record.

In its pre-initiation submissions, Tenaris USA argued that "mere finishing operations"

should not be included in the industry support calculation.[76] Commerce appropriately addressed

Tenaris USA's generalized "processing" arguments in its analysis of the record information at

the time of its initiation decision.[77] In its remand comments, Tenaris again attempts to move the

needle and fine tune its arguments with respect to processing. Specifically, in its remand

comments, Tenaris now concedes that processing *should* be included in the industry support

calculation, but argues that only heat treatment processing, not threading operations, should be

included.[78] For support, Tenaris points to information that was not on the record before

Commerce at the time of initiation or currently before Commerce.[79]

In its remand comments, Tenaris also contends that Commerce failed to corroborate

whether the shipment data are complete and include mill and processor shipments (including

imported green tube that is heat treated in the United States).[80] As support, Tenaris [

---

[74] *See* Tenaris' Comments at 3 and 9-10.
[75] *See Shandong Jinxiang Zhengyang Import & Export Co., Ltd. v. United States*, 429 F.Supp.3d 1373, fn. 14 ("Except in very limited circumstances, this court's review of Commerce's determination is limited to the record before it.").
[76] *See* Tenaris USA's Letter II at 9-10; *see also* Tenaris USA's Letter III at 8; and Tenaris USA's Letter IV at 5.
[77] *See* Initiation Checklist at Attachment II (pages 9-10 and 14).
[78] *See* Tenaris' Comments at 3.
[79] *Id.* at 24-25.
[80] *Id.* at 17.

Filed By: Yang Chun, Filed Date: 6/26/24 3:23 PM, Submission Status: Approved

].[81]  Tenaris states that the [

].[82]  We

reexamined the record with respect to this exhibit and found that [

].[83]  The petitioners [

].[84]  Tenaris attempts to muddy the water again and cast doubt on

data that up until this point had remained uncontested on the record.

As Commerce previously explained, no party – including Tenaris USA – contested the

validity of the industry data source in the pre-initiation period, despite having ample opportunity

to do so.  Nevertheless, Commerce has considered the merits of Tenaris' new claim and is

unpersuaded by the "facts" Tenaris points to as support.  A party's ability to point to an

alternative finding on the record – even a reasonable one – does not provide a basis for the Court

to set aside Commerce's determination.[85]  As the Court has held, "{t}he fact that industry data is

not perfect is not sufficient to suggest that Petitioners do not have industry standing" and, thus,

Tenaris "must do more than point out that industry data was not perfect in order to show that

---

[81] *Id.* at 18.
[82] *Id.*
[83] *See* Petition at Volume I (Exhibit I-2).
[84] *Id.* at Volume I (Exhibit I-2); *see also* Second General Issues Supplement at Exhibit 5.
[85] *See Pokarna Engineered Stone Ltd v. United States*, 56 F.4th 1345, 1351-52 (Fed. Cir. 2023).

Filed By: Yang Chun, Filed Date: 6/26/24 3:23 PM, Submission Status: Approved

{the petitioners} lack industry standing."[86]  Moreover, the Court has held that "the industry standing calculations are not meant to be exact and proxies are routinely used to estimate the amount of U.S. production of a particular product."[87]  Furthermore, merely disagreeing with the evidentiary weight Commerce assigns to pieces of evidence on the record is insufficient to overturn Commerce's determination.[88]  As such, Tenaris USA's unsubstantiated allegations of a *potential* flaw with inclusion of processing in its pre-initiation comments and Tenaris' allegations of "double counting" in its remand comments are insufficient to show that the petition was not filed by or on behalf of the domestic industry producing OCTG.  As in *QVD Food*, Tenaris "is in an awkward position to argue that Commerce abused its discretion by not relying on evidence that {Tenaris USA and Tenaris} failed to introduce into the {pre-initiation} record."[89]  Given the relatively low threshold for establishing industry support and the reliable record evidence showing that the petitioners accounted for at least 25 percent of total U.S. production of the domestic like product and more than 50 percent of total U.S. production of the domestic like product by those producers or workers expressing support for, or opposition to, the Petition, the burden was on Tenaris USA to submit adequate, rebuttal factual information in the pre-initiation period showing that the industry source used by the petitioners as the starting point for their estimate of 2020 industry-wide production data was incorrect.[90]

---

[86] *See PT Pindo Deli Pulp v. United States*, 825 F.Supp.2d 1310, 1327-28 (CIT 2012) (citing section 732(b)(1) of the Act, requiring the petition to contain information "reasonably available" to the petitioner to support its allegations).

[87] *Id.*

[88] *See Jacobi Carbons AB et.al. v. United States*, 422 F.Supp.3d 1318, 1325-26 (CIT 2019).

[89] *See QVD Foods Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (*QVD Foods*).

[90] Tenaris USA's burden to show lack of industry support was arguably higher in a case such as this one, where evidence in the Petition demonstrated that even if all other domestic producers (including Tenaris USA) were to oppose the Petition, the supporters still had the requisite level of industry support for Commerce to initiate the investigation.

As a point of clarification, Commerce did rely on data from the ITC's *India et al. OCTG 2020 Review* as industry-wide information available on the record to calculate the ratio of the U.S. industry's reported production to domestic shipments, for purposes of adjusting the domestic shipment data to approximate production for the U.S. OCTG industry.[91] We did *not* rely on this ITC data as "other information" pursuant to section 732(c)(4)(D)(i) of the Act,[92] as Tenaris incorrectly asserts.[93] Rather, as stated in the Initiation Checklist, we relied on [

] as other information, pursuant to section 732(c)(4)(D)(i) of the Act.[94]

With respect to Tenaris' argument that there are clear principles regarding the U.S. OCTG industry, the domestic like product, and the reporting, collecting, and presentation of production and shipment data, we agree. The existence of these clear principles in fact supports Commerce's conclusion that the industry support calculation accurately reflects U.S. OCTG production in calendar year 2020. As Tenaris explains, under these industry principles, processors that perform heat treatment on green tube are considered part of the domestic industry producing OCTG, but that threading alone is not considered domestic production.[95] U.S. companies, including the four petitioning companies, have participated in multiple investigations and reviews at the ITC, where they were required to report data according to these principles. There is no evidence on the record that indicates that the companies departed from these data reporting principles when providing data used in the Petition's industry support calculation.

---

[91] *See* Initiation Checklist at Attachment II (page 5).
[92] Section 732(c)(4)(D)(i) of the Act requires that Commerce poll the industry or rely on other information to determine industry support if the petition does not establish the support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product.
[93] *See* Tenaris' Comments at 23-24.
[94] *See* Initiation Checklist at Attachment II (page 6).
[95] *See* Tenaris' Comments at 24-25.

Filed By: Yang Chun, Filed Date: 6/26/24 3:23 PM, Submission Status: Approved

Thus, Tenaris' claims regarding potential flaws in the underlying data in the industry support calculation is unsubstantiated and without merit.

Finally, we note that as support for its arguments in its initial comments on the Draft Remand, which Commerce rejected from the record as they contained new factual information, Tenaris also provided information from the ITC's report published in *November 2022* – the year *after* Commerce evaluated the merits of the Petition and initiated the investigation.[96]  In reaching its initiation decision in October 2021, Commerce examined the information available on the record and concluded that the petitioners had provided information reasonably available to them to establish that the Petition was filed by or on behalf of the domestic industry producing OCTG. Data availability will always change as time goes by.  What constitutes "reasonably available information" on the pre-initiation record is not mercurial or fluid once a decision is made to initiate an investigation – otherwise, after every initiation there would be an endless loop of litigious claims that new data and information have become available, such that Commerce must reexamine its decision to initiate.  The statute and regulations support this determination – Commerce must evaluate the record before it within the short pre-initiation period to determine whether a petitioner has provided information reasonably available to it to support its allegations, including satisfying the requirement that the petition must contain, to the extent reasonably available to the petitioner, information relating to the degree of industry support for the petition. As detailed above, Commerce evaluated the record, including the merits of Tenaris USA's pre-initiation comments, and determined that the petition requirements were met.  Just because Commerce evaluated and weighed the evidence differently than Tenaris does not render

---

[96] *See* Commerce's Letter, "Rejection of Tenaris' Comments on Draft Results of Redetermination," dated June 7, 2024.

Commerce's initiation decision improper.[97]  As demonstrated above, throughout the course of this litigation and in its remand comments, Tenaris continues to refine its arguments, raising new concerns *post hoc* with a level of specificity that was not articulated in its pre-initiation comments.  Tenaris' assertions regarding green tube heat treatment processing, OCTG threading operations, concerns with the industry source used as the denominator, and other information from ITC reports were not on the record before Commerce in the pre-initiation period and are currently not on the record before Commerce.  Nevertheless, as outlined above, Commerce has considered the merits of Tenaris' newly articulated arguments and continues to find that the information on the record supports the conclusion that the petitioners provided information reasonably available to them and demonstrated that the Petition was filed by and has the support of the domestic industry.

Thus, Commerce's decision to initiate the LTFV investigation on OCTG from Argentina was reasonable considering the law and the facts on the record.

# V.    FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Order*, and based on the analysis above, Commerce has further explained and reconsidered the "double counting" question.  Accordingly, Commerce

---

[97] *See*, *e.g.*, *Mitsubishi Heavy Indus. Ltd. V. United States*, 275 F.3d 1056, 1062 (CIT 2001) ("{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence" and *Cleo*, 501 F.3d at 1296 (citing *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) ("Even if it is possible to draw two inconsistent conclusions from evidence on the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence."); *Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F.Supp.3d 1330, 1346 (CIT 2018) ("mere disagreement with Commerce's weighing of the evidence" insufficient basis for legal challenge)).

continues to find that initiating the investigation was in accordance with law and based on

substantial evidence.

6/26/2024

X  ～～～

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance

Filed By: Yang Chun, Filed Date: 6/26/24 3:23 PM, Submission Status: Approved

*Tenaris Bay City, Inc. et al., v. United States and*
*United States Steel Corporation, et al.* (Court No. 22-00343)

Slip Op. 24-31

March 14, 2024

(Nonconfidential Version)

Appx047 – Appx078

Slip Op. 24-31

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TENARIS BAY CITY, INC. ET AL.,** | |
| **Plaintiff,** | |
| v. | |
| **UNITED STATES,** | **Before: Claire R. Kelly, Judge** |
| **Defendant,** | **Court No. 22-00343** |
| and | **PUBLIC VERSION** |
| **UNITED STATES STEEL CORPORATION, ET AL.** | |
| **Defendant-Intervenors.** | |

## OPINION AND ORDER

[Granting in part and denying in part Plaintiffs' motion for judgment on the agency record.]

Dated: March 14, 2024

Gregory J. Spak, Frank J. Schweitzer, and Matthew W. Solomon, White & Case LLP, of Washington D.C., argued for plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Inc., and Siderca S.A.I.C.  On the brief were Kristina Zissis and Colin Alejandro Dilley.

Hardeep K. Josan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States.  On the brief were Patricia M. McCarthy, Director, Claudia Burke, Deputy Director, and Brian M. Boynton, Principal Deputy Assistant Attorney General.  Of counsel was Ian Andrew McInerney, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Court No. 22-00343                                                                    Page 2
**PUBLIC VERSION**

James E. Ransdell, Cassidy Levy Kent (USA) LLP, of Washington D.C., argued for
defendant-intervenor United States Steel Corporation.  On the brief were Thomas M.
Beline and Myles S. Getlan.

Christopher T. Cloutier and Saad Younus Chalchal, Schagrin Associates, of
Washington D.C., argued for defendant-intervenors Borusan Mannesmann Pipe U.S.
Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and Service Workers International Union,
AFL-CIO, CLC, and Welded Tube USA Inc.  On the brief were Roger B. Schagrin, and
Luke A. Meisner.

     Kelly, Judge:  Before the Court is Plaintiffs Tenaris Bay City, Inc., Maverick

Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.)

Corporation, and Siderca S.A.I.C.'s ("Plaintiffs") motion for judgment on the agency

record challenging the U.S. Department of Commerce's ("Commerce") final

determination in its 2020-2021 less-than-fair-value investigation of oil country

tubular goods ("OCTG") from Argentina.  Plaintiffs argue that: (1) Commerce's

initiation of the antidumping duty ("AD") investigation and determination that the

AD petition was filed "by or on behalf of the industry" is contrary to law and

unsupported by substantial evidence; and (2) Commerce's decision not to poll the

domestic industry and seek actual production data for the twelve months

immediately preceding the filing of the petition to determine industry support is

contrary to law, unsupported by substantial evidence, and an abuse of discretion.  For

the following reasons, the Court sustains Commerce's determination in part, and

remands in part for further explanation or reconsideration.

Court No. 22-00343                                                                    Page 3
**PUBLIC VERSION**

## BACKGROUND

Plaintiffs contest the initiation of the OCTG from Argentina AD investigation. [Pls.'] R. 56.2 Mot. J. Agency R. at 1, June 26, 2023, ECF No. 40 ("Pls. Mot."); Def.'s Resp. Opp'n [Pls. Mot.] at 1–2, Sept. 22, 2023, ECF No. 46 ("Def. Resp."). On October 6, 2021, Petitioners Borusan Mannesmann Pipe U.S. Inc, PTC Liberty Tubulars LLC, U.S. Steel Tubular Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"), and Welded Tube USA Inc. ("Petitioners") filed a petition for an imposition of AD and countervailing duties ("CVD") on OCTG from Argentina (AD), Mexico (AD), Korea (CVD), and Russia (AD/CVD). Pls. Mot. at 4; Def. Resp. at 2–3; see also Letters Schagrin Assoc. to Sec. Commerce Pertaining Borusan Mannesmann Pipe U.S., Inc. et al. Request for Admin Review, PDs 1–6, CDs 1–6, bar codes 4167998-01–06 (Oct. 5, 2021).[1] Pls. Mot. at 4;[2] Def. Resp. at 2–3. On October 7, 2021, Commerce issued its first questionnaire requesting additional information

---

[1] On February 22, 2023, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination. See ECF No. 35-4–5. Citations to administrative record documents in this opinion are to the numbers Commerce assigned to such documents in the indices, and all references to such documents are preceded by "PD" or "CD" to denote public or confidential documents.

[2] Plaintiffs note that "[s]everal U.S. OCTG producers did not join in the filing of the petition," including Plaintiffs and their production companies—comprising the "largest U.S. producer of OCTG"—and [[

]]. Pls. Mot. at 4–5.

and for Petitioners to address a "methodological error with respect to the calculation of total shipments for the U.S. industry."[3] Pls. Mot. at 5; Def. Resp. at 4.

On October 8, 2021, Plaintiffs submitted comments to Commerce alleging (1) Petitioners misrepresented which production plants were represented by USW, causing production figures to be improperly deducted from the industry support calculation; (2) the industry support calculation was unreliable because it was based on anomalous 2020 production data;[4] and (3) the Petitioner's reliance on shipment data, instead of production data, was not in accordance with 19 U.S.C. § 1673a(c)(4)(A)(ii). Pls. Mot. at 6. Plaintiffs asked Commerce to reject the petition or delay determination by twenty days to poll the industry and determine petition support per 19 U.S.C. § 1673a(c)(1)(B). Id.

On October 12, 2021, Petitioners submitted a modified calculation of industry support. Id. at 7; Def.-Ints.' Resp. Opp'n [Pls. Mot.] at 5, Sept. 22, 2023, ECF No. 44 ("Def.-Ints. Resp.").[5] On October 15, 2023, Plaintiffs submitted comments to

---

[3] Defendant asserts that Petitioners established the universe of domestic OCTG producers, consisting of 20 producers including the petitioning companies, based on the International Trade Commission's ("ITC") most recent full sunset review and knowledge of the OCTG industry. Commerce's Initiation Checklist: Attach. II at 4, PD 26, CD 40, bar code 4176344-01 (Oct. 26, 2021) ("Attach. II"); Def. Resp. at 3.

[4] Plaintiffs allege that the 2020 production data is anomalous because of the "oversupply of oil by [the Organization of the Petroleum Exporting Countries ('OPEC')], combined with the global COVID-19 pandemic." Pls. Mot. at 6.

[5] Petitioners' revised industry support calculations had multiple bases, including:

(footnote continued)

Petitioners' modified industry support calculations, again identifying flaws and requesting Commerce to poll the industry and extend its determination by 20 days. Pls. Mot. at 7; Def. Resp. at 5.  On October 18, 2021, Petitioners responded to Plaintiffs' comments with a second revised industry support calculation.  Pls. Mot. at 7–8; Def. Resp. at 6.

On October 19, Commerce issued its second questionnaire to Petitioners, requesting information concerning domestic OCTG production facilities represented by USW.  Pls. Mot. at 8; Def. Resp. at 3.  On October 20, 2021, Plaintiffs commented on Petitioners' October 18 submission, reasserting the alleged flaws in industry support calculations as identified in Plaintiffs' previous comments and that the domestic industry should be polled.  Pls. Mot. at 8; Def. Resp. at 6.  Plaintiffs also argued "Petitioners bear the burden of demonstrating industry support for the petition," and that "Petitioner's strategy to cobble together the requisite support based on data for a group that also included processors and finishers of OCTG had implications for the accuracy of the industry support calculations."  Pls. Mot. at 8.

On October 21, 2021, Petitioners responded to Commerce's second questionnaire, and provided "updated declarations and information on domestic mills

---

Petitioners' own 2020 production data and domestic shipment data for 2020 [[
                              ]];  data from the ITC's 2020 final sunset review; adjustments based on ratios of domestic and export shipments using 2020 data; and estimates of non-petitioning companies' production.  Pls. Resp. at 7; Def.-Ints. Resp. at 5.

Court No. 22-00343                                                                      Page 6
**PUBLIC VERSION**

represented by USW" and revised calculations.[6]  Def.-Ints. Resp. at 8; Pls. Mot. at 9;

Def. Resp. at 4–5.  That same day, counsel for Plaintiffs met with Commerce to

"reiterate [Plaintiffs'] concerns stated in its three sets of comments, including that

Commerce poll the domestic industry to determine whether the petition has the

statutorily-required level of domestic industry support."  Pls. Mot. at 9; Def.-Ints.

Resp. at 8.  On October 22, 2021, Plaintiffs submitted a fourth set of comments,

contesting Petitioners' October 21, 2021, response to Commerce's second

questionnaire on the same grounds as Plaintiffs' previous objections.[7]  Pls. Mot. at

10; Def. Resp. at 7.

On October 26, 2021, Commerce initiated the AD investigation in accordance

with the 20-day statutory deadline provided by 19 U.S.C. § 1673a(c)(1)(A).  See Oil

Country Tubular Goods from Argentina, Mexico, and the Russian Federation:

Initiation of Less-Than-Fair-Value Investigations, 86 Fed. Reg. 60,205 (Dep't

Commerce Nov. 1, 2021) (initiation notice).  In its initiation checklist for the AD

investigation ("Initiation Checklist"), Commerce identified reliance upon "industry

support data contained in the [p]etitions" and explained that the petition satisfied

statutory requirements.  See Attach. II at 4; Def. Resp. at 7; Def.-Ints. Resp. at 9; see

---

[6]  Petitioners also provided "a [[

                                        ]]" in the questionnaire response.  Def.-Ints.
Resp. at 8.
[7]  Defendant notes that Plaintiffs' fourth response was filed "16 days after the date of
the Petition and four days before Commerce's statutory deadline for determination
on initiation of the investigation."  Def. Resp. at 7.

Court No. 22-00343                                                                       Page 7
**PUBLIC VERSION**

<u>also</u> Pls. Mot. at 10.  Commerce accepted Petitioners' October 21 revised calculations

and also conducted its own calculations with "a conservative, alternative

methodology."[8]  Attach. II at 5; Def.-Ints. Resp. at 8.  Under both methodologies,

Commerce found that the petition satisfied 19 U.S.C.

§ 1673a(c)(4)(A)(i) by exhibiting support from domestic producers or workers

accounting for "at least 25 percent of the total production of the domestic like

product."[9]  Attach. II at 6; Pls. Mot. at 10; Def. Resp. at 7.  However, neither

methodology demonstrated that the domestic producers supporting the petition

accounted for over 50 percent of the production of the domestic like product, as

required by 19 U.S.C. § 1673a(c)(4)(A)(ii).  Attach II. at 6–7; Pls. Mot. at 10; Def.-Ints.

Resp. at 9.

 Consequently, Commerce chose to "rely on other information," and determined

the petition was adequately supported by declarations from domestic producers

---

[8]  In the alternative calculation, Commerce
  calculated 2020 production estimates using the information available on
  the record on domestic shipments of OCTG for the entire industry in
  2020, as reported in [[          ]], and the publicly
  available information on U.S. producers' production and domestic
  shipments reported in the ITC's India et al OCTG 2020 Review.
Attach. II at 5; <u>see also</u> Def.-Ints. Resp. at 8.
[9]  Specifically, Commerce found that domestic industry support accounted for
[[  ]] percent of total production of the domestic like product in 2020 under
Petitioners' calculations, and [[  ]] percent under the alternative methodology.
Attach. II at 6.

Court No. 22-00343                                                                Page 8
**PUBLIC VERSION**

contained in the agency record.[10]  Attach. II at 6–7; Def.-Ints. Resp. at 9; see Pls. Mot.

at 10–11.  Moreover, Commerce concluded that the October 1, 2020, through

September 30, 2021, period of investigation ("POI") was proper under 19 C.F.R.

§ 351.204, despite Plaintiffs' characterization that it was anomalous, as it

represented "the four most recently completed fiscal quarters since the month

preceding the filing date."  Def. Resp. at 8; Def.-Ints. Resp. at 10.  Commerce also

rejected Plaintiffs' concern that finishing operations were improperly included twice

when Petitioners calculated industry support, stating that "[t]he scope and domestic

like product of [AD] investigations includes OCTG 'whether finished . . . or

unfinished.'"  Attach. II at 14; Def.-Ints. Resp. at 9–10.

On May 11, 2022, Commerce published the preliminary results for the OCTG

AD investigation from Argentina, determining that OCTG is being, or likely to be,

sold in the United States at less than fair value.  See Oil Country Tubular Goods

---

[10]  Commerce used declarations of support from non-petitioning domestic producers
and [[                                                                        ]].  Attach. II at 6; Def.-
Ints. Resp. at 9.  Furthermore, Commerce noted that despite Plaintiffs' opposition to
the petition,
     [Plaintiff] has not provided any production data for Commerce to include
     in the industry support calculation.  Accordingly, because [[

                                         ]]
     Petitions, [Commerce] find[s] that the supporters of the Petitions
     account for [[     ]] percent of the total U.S. production of those parties
     expressing an opinion on the Petitions for which we have production
     data.
Attach II. at 6–7 (footnotes omitted).

<u>From Argentina</u>, 87 Fed. Reg. 28,801 (Dep't Commerce May 11, 2022) (preliminary determination of sales at less than fair value) and accompanying preliminary issues and decision memorandum.  On September 29, 2022, Commerce published the final results determining that OCTG from Argentina is being, or likely to be, sold in the United States at less than fair value.  <u>See</u> <u>Oil Country Tubular Goods From Argentina</u>, 87 Fed. Reg. 50,054 (Dep't Commerce Sept. 29, 2022) (final determination) and accompanying issues and decision memorandum.

On January 13, 2023, Plaintiffs filed the instant action.  <u>See generally</u> Compl., Jan. 13, 2023, ECF No. 16.  On June 26, 2023, Plaintiffs moved the Court for judgment on the agency record.  <u>See generally</u> Pls. Mot.  Defendant and Defendant-Intervenors filed response briefs on September 22, 2023.  <u>See generally</u> Def. Resp.; Def.-Ints. Resp.  Oral argument on the issues presented in Plaintiffs' motion was heard by the Court on January 10, 2024.  <u>See</u> Dig. Audio File Re. Oral Arg. Proc. [ECF No. 57] Held On Jan. 10, 2024, Jan. 11, 2023, ECF No. 58 ("Oral Arg.").

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to Section 516A of the Tariff Act of 1930,[11] as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2018),[12] which grants the Court authority to review actions contesting the final determination in an

---

[11]   Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.
[12]   Further citations to Title 28 of the U.S. Code and Code of Federal Regulations are to the 2018 edition.

**PUBLIC VERSION**

antidumping duty order.  The Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

Plaintiffs argue Commerce's decisions to (1) rely on "other information" including "anomalous" data from the 2020 OCTG market period, rather than poll the domestic industry, and (2) assume that OCTG counted for finishing operations were not counted twice in the industry support calculations, were unsupported by substantial evidence, an abuse of discretion, and otherwise contrary to law.  Pls. Mot. at 14–45.  Defendant and Defendant-Intervenors argue that Commerce was not required to poll the industry, and that its industry support determination is reasonable, supported by substantial evidence, and in accordance with law.  Def. Resp. at 9–21; Def.-Ints. Resp. at 13–32.  Commerce's decision to rely on other information rather than poll the domestic industry is supported by substantial evidence.  However, Commerce must either reconsider or further explain its use of data from the 2020 market period, and specifically to ensure that finishing operations data were not double counted.

## I.    Polling the Industry

Plaintiffs claim that Commerce's reliance on other information rather than polling the domestic industry to calculate industry support based on the most recent twelve-month period prior to filing the AD petition is contrary to law and unsupported

by substantial evidence.  Pls. Mot. at 35.  Specifically, Plaintiffs argue (1) 19 U.S.C.

§ 1673a(c)(4)(D) mandates that Commerce poll the domestic industry if the petition

does not establish the statutory 50 percent level of support; (2) Commerce's failure to

poll the industry and request data "indicative of production levels" was unreasonable;

and (3) Commerce abused its discretion by failing to poll the domestic producers to

establish industry support.  Id. at 35–41.  Defendant and Defendant-intervenors

counter that Commerce's reliance on other information is in accordance with law and

supported by substantial evidence.  Def. Resp. at 20–22; Def.-Ints. Resp. at 25–29.

Because Commerce has statutory discretion to poll the industry or "rely on other

information" under 19 U.S.C. § 1673a(c)(4)(D) when calculating industry support of

an AD petition, the Court sustains Commerce's determination on this issue.

Initiation of an AD investigation pursuant to 19 U.S.C. § 1673a(a)(1) requires

Commerce to determine, based upon available information, "that a formal

investigation is warranted into the question of whether the elements necessary for

the imposition of [AD] under [the statute] exist."  19 U.S.C. § 1673a(a)(1).  An

interested party[13] may initiate an AD investigation by filing a petition on behalf of

---

[13] An "interested party," for the purposes of initiating an AD investigation by petition,
includes:

    (C) a manufacturer, producer, or wholesaler in the United States of a
    domestic like product,

(footnote continued)

**PUBLIC VERSION**

the industry requesting Commerce investigate possible dumping. 19 U.S.C.

§ 1673a(b)(1). Before Commerce launches an investigation, it generally has 20 days

after the date a petition was filed to determine whether the petition: (1) alleges the

necessary elements for AD imposition and contains "information reasonably available

to the petitioner" after examining available sources and information to Commerce

and the strength of the evidence submitted by the petitioners; and (2) was filed "by

or on behalf of the industry." 19 U.S.C. § 1673a(c)(1)(A).

>   Commerce considers a petition to be filed "by or on behalf of the industry" if

>   (i) the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product, and

>   (ii) the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition.

---

>   (D) a certified union or recognized union or group of workers which is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a domestic like product,
>   (E) a trade or business association a majority of whose members manufacture, produce, or wholesale a domestic like product in the United States,
>   (F) an association, a majority of whose members is composed of interested parties described in subparagraph (C), (D), or (E) with respect to a domestic like product[.]

19 U.S.C. § 1677(9)(C)–(F).

19 U.S.C. § 1673a(c)(4)(A).[14]  Where the petition satisfies the 25 percent domestic

industry support requirement, but does not establish the latter 50 percent

requirement, the statute mandates that Commerce "shall[] poll the industry or rely

on other information in order to determine if there is support for the petition" before

proceeding with formal initiation of the AD investigation.[15]    19 U.S.C.

§ 1673a(c)(4)(D)(i).  In such a case, and if warranted by "exceptional circumstances"

at its discretion,[16] Commerce can extend the 20-day initial determination timeline for

a maximum of 40 days.  19 U.S.C. § 1673a(c)(4)(D).  When determining industry

support for an AD petition, Commerce is instructed to "normally" measure

---

[14] In Commerce's determination, it (1) "shall disregard the position of domestic producers who oppose the petition," if they are related to foreign producers, unless they can show their interests "would be adversely affected by the imposition of an antidumping duty order;" and (2) "may disregard the position of domestic producers of a domestic like product who are importers of the subject merchandise." 19 U.S.C. § 1673a(c)(4)(B).

[15] If Commerce decides to poll the industry, consisting of a large number of producers, Commerce can "determine industry support for the petition by using any statistically valid sampling method[.]"  19 U.S.C. § 1673a(c)(4)(D)(ii).

[16] The legislative history of the 19 U.S.C. § 1673a expounds upon Congress' grant of discretion to Commerce to extend the deadline under exceptional circumstances.  See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 835 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4193–94 ("SAA"). The SAA notes that "exceptional circumstances may arise where the petition provides insufficient information on support, the domestic industry is fragmented, or there is a large number of producers in the industry." Id. at 4193.  Congress drafted the exception despite its recognition that "in the vast majority of cases, the determination of industry support will be made within the initial [20]-day period." Id.  Nonetheless, Congress instructs that "Commerce will use this extension authority only in exceptional circumstances where the industry support issue cannot be decided in [20] days, and the initiation determination will be extended only for the additional time necessary to make a determination regarding industry support." Id.

**PUBLIC VERSION**

production, based on either value or volume, "over a twelve-month period, as specified

by the Secretary."  19 C.F.R. § 351.203(e)(1).  However, if an interested party

demonstrates the unavailability of production data for the specified period, then

Commerce may establish production levels "by reference to alternative data that

[Commerce] determines to be indicative of production levels."  <u>Id.</u>

     Here, Commerce's decision not to poll the industry and instead rely on other

information to determine industry support for the AD petition is in accordance with

law and within its discretion.  It is undisputed that both Petitioners' calculations and

Commerce's alternative methodology satisfied the 25 percent industry support

requirement of Section 1673a(c)(4)(A)(i) but failed to demonstrate over 50 percent

support for the petition required under Section 1673a(c)(4)(A)(ii). <u>See</u> Attach. II at 6;

Pls. Mot. at 10–11; Def. Resp. at 7–8; Def.-Ints. Resp. at 9.  Thus, Section

1673a(c)(4)(D) guides Commerce's course of action for how to proceed with the AD

investigation.

     As Commerce explains, it conformed with its statutory directive under 19

U.S.C. § 1673a(c)(4)(D) by choosing to "rely on other information" as specifically

provided by Section 1673a(c)(4)(D)(i).  <u>See</u> Attach. II at 6, 19; Def. Resp. at 21.

Congress gave Commerce the choice for how to proceed when faced with a petition

that does not meet the requirements of 19 U.S.C. § 1673a(c)(4)(A)(ii), in that it can

"poll the industry or rely on other information" to evaluate whether industry support

**PUBLIC VERSION**

for the petition exists.  19 U.S.C. § 1673a(c)(4)(D)(i).[17]  Commerce chose one of the

avenues expressly provided for by statute.

Tenaris avers Commerce was required to establish industry support by using

"actual production data for the most recent twelve months prior to the filing of the

petition" rather than shipment data provided by Petitioners.  See Pls. Mot. at 35.

Commerce evaluates industry support of a petition to satisfy 19 U.S.C.

§ 1673a(c)(4)(A) and (c)(4)(D), it "normally will measure production over a twelve-

month period," as specified by Commerce, based on value or volume.  19 C.F.R.

§ 351.203(e)(1).[18]  However, Commerce may establish production levels by reference

to an alternative data period that Commerce finds "indicative of production levels" if

a party to the proceeding establishes the unavailability of production data for the

relevant period.  Id.

---

[17]  The statute's use of the conjunction "or" indicates introduction of a choice or
alternative.  See Or, The Britannica Dictionary, https://www.britannica.com/diction
ary/or (last visited Feb. 27, 2024) ("1 – used to introduce another choice or
possibility"); Or, Oxford English Dictionary, https://www.oed.com/search/dictionary/
?scope=Entries&q=or (last visited Feb. 27, 2024) ("used to coordinate two (or more)
sentence elements between which there is an alternative).

[18]  Although the statute is silent as to the precise point in time Commerce must use
to calculate industry support, see 19 U.S.C. § 1673a(c)(4)(A)(ii); 19 C.F.R.
§ 351.203(e)(1), Commerce's past practice is to use the most recently completed
calendar year prior to filing of the petition. See Attach. II at 16; see also 19 C.F.R.
§ 351.204(b)(1) ("In an antidumping investigation, [Commerce] normally will examine
merchandise sold during the four most recently completed fiscal quarters . . . as of
the month preceding the month in which the petition was filed").

Court No. 22-00343                                                    Page 16
**PUBLIC VERSION**

     Here, Petitioners submitted their own production data, as well as declarations

of support from non-petitioning producers.  <u>See</u> Attach. II at 4, 15.  Commerce

recognized that such production data did not account for the entire domestic industry

and that a fully populated data set for 2020 was unavailable.  <u>See</u> <u>id.</u> at 10, 15; Def.-

Ints. Resp. at 29.  That Commerce did not use the most recent preceding twelve-

month period to the date the petition was filed does not render Commerce's decision

unreasonable.  Rather, consistent with 19 C.F.R. § 351.203(e)(1), Commerce resorted

to an alternative data which included 2018 and 2019 shipment data as well as

incomplete production data from 2020 to approximate production levels for the

purpose of industry support calculations for the petition.  <u>See</u> Attach. II at 14–15

(citing 19 C.F.R. § 351.203(e)(1)); Def. Resp. at 12–13.  Commerce considered

Petitioners' 2018 and 2019 shipment data[19] as well as its own estimates of the entire

---

[19]  Commerce explains Petitioners' estimated actual production calculation in the
Initiation Checklist:

     To estimate the total 2020 production of the domestic like product
for the entire domestic industry, the petitioners relied on shipment data
for [[                ]] domestic OCTG shipments in 2020 as
reported in [[

    ]], which the petitioners note is the recognized authority on the
U.S. pipe and tube market, [[

                          ]].  The
petitioners contend that the [[             ]] data are
the best available information regarding the volume of domestic OCTG
shipments in 2020.  The petitioners further contend that they do not

(footnote continued)

Court No. 22-00343                                                                Page 17
**PUBLIC VERSION**

industry's actual 2020 production data by relying on a similar, but more conservative

methodology."[20]  See Attach. II at 15; Def. Resp. at 12–13.  Moreover, Plaintiffs did

---

have access to 2020 industry production data and that industry shipment data are a reasonable proxy for production of OCTG, noting that the difference between their production levels and shipments [[

]].  The petitioners adjusted the domestic shipment data for 2020 reported in [[                                      ]] by the ratio of the petitioners' export shipments to total shipments in order to estimate total shipments (i.e., domestic and export shipments) in 2020.  The petitioners then deducted their own 2020 shipments from the estimated total shipments to derive non-petitioning companies' shipments in 2020.  To approximate non-petitioning companies' production from the available shipment data, the petitioners first calculated the historical ratio (2018-2019) of non-petitioning companies' production to shipments derived from data reported in the ITC's India et al OCTG 2020 Review and applied the resulting ratio to the estimated non-petitioning companies' shipments in 2020.  The petitioners then added this estimated production to their own 2020 production to estimate total production for the entire U.S. OCTG industry.  Using this methodology, the petitioners estimated total 2020 production of [[                    ]] short tons for the entire domestic industry.

Attach. II at 4–5 (internal citations omitted).

[20] Commerce explains its alternative, conservative methodology in the Initiation Checklist:

As a conservative, alternative methodology, we calculated 2020 production estimates using the information available on the record on domestic shipments of OCTG for the entire industry in 2020, as reported in [[                                      ]], and the publicly available information on U.S. producers' production and domestic shipments reported in the ITC's India et al OCTG 2020 Review.  Specifically, based on the available information on the record from the ITC publication and the [[                                      ]], we calculated the ratio of the U.S. industry's reported production to domestic shipments using data from

(footnote continued)

not offer their own production data to undermine Commerce's reliance on shipment

data, nor did they challenge the authoritative basis from which the selected shipment

data was derived.[21]  Attach. II at 15.  Thus, Commerce's decision to rely on other

information provided by Petitioners and its selection of an alternative time-period in

light of record evidence and reasonably available information in this case was in

accordance with law.

   Plaintiffs further allege Commerce was required to extend the initiation

deadline of the investigation pursuant to 19 U.S.C. § 1673a(c)(1)(B).  Pls. Mot. at 41–

42.  Plaintiffs assert that Commerce's past practice is to extend the investigation

initiation deadline by 20 days "where the petition did not clearly establish industry

support." Id. at 42.  As discussed, Commerce is required to poll the domestic industry

or rely on other information when a filed petition fails to establish the 50 percent

requirement of Section 1673a(c)(1)(A)(ii).  19 U.S.C. § 1673a(c)(1)(D)(i).  When

operating under Section 1673a(c)(1)(D), Commerce may extend by "a maximum of 20

days" the deadline to determine whether the elements for AD imposition are present

---

   the ITC publication and applied this ratio to the domestic shipment data
   from [[         ]] to approximate total 2020
   production for the U.S. OCTG industry.  Using this methodology, we
   estimated total 2020 production of [[   ]] short tons for the entire
   domestic industry.
Attach. II at 5 (internal citations omitted).
[21]  As noted, both Petitioners and Commerce used shipment data from [[
      ]] as a factor in estimating total domestic industry production for
2020.  Attach. II at 15; Def. Resp. at 12–13.

**PUBLIC VERSION**

and whether the petition has sufficient industry support.  19 U.S.C. § 1673a(c)(1)(B).

However, Commerce must first be presented with "exceptional circumstances" before

determining if an extension is warranted.  See id.  Moreover, a decision to extend the

deadline is within Commerce's discretion.  See Pokarna Engineered Stone Ltd. v.

United States, 547 F. Supp. 3d 1300, 1310 (Ct. Int'l Trade 2021), aff'd, 56 F.4th 1345

(Fed. Cir. 2023) (citing the Supreme Court in United States v. Rodgers, 461 U.S. 677,

706 (1983), for the proposition that the word "may" implies discretion in the context

of Section 1673a(c)(1)(B)).

Here, Commerce's decision to leave the deadline unaltered is supported by

substantial evidence.  First, Commerce's decision not to extend the deadline was

reasonable in light of what it thought was sufficient evidence of industry support

based upon Petitioner's and its own calculations.  The SAA explains that "Commerce

will use [Section 1673a(c)(1)(B)] only in exceptional circumstances where the industry

support issue cannot be decided in twenty days."  SAA at 4193.  Commerce's

findings—on which it based its decision not to extend the deadline—and

determination that the petition was adequately supported were made without polling

the industry, thus eliminating the need to consider extending the deadline in the first

place.[22]  See Attach. II at 17 (noting that polling was unnecessary because Commerce

---

[22] Plaintiffs claim that past agency practice supports their contention that Commerce

(footnote continued)

**PUBLIC VERSION**

relied on other information to determine industry support).  The legislative history of

the statute supports Commerce's decision.  <u>See</u> SAA at 4192–94.

Second, it is within Commerce's discretion to extend the initiation deadline.

<u>See</u> 19 U.S.C. § 1673a(c)(1)(B) ("the administering authority may, in exceptional

circumstances, apply subparagraph [Section 1673a(c)(1)(A)] by substituting 'a

maximum of 40 days' for '20 days'").  Plaintiffs' efforts to characterize the factual

circumstances here as "exceptional"—and thus requiring an extension—fails to

undermine the reasonableness of Commerce's decision to the contrary.  Although

---

was required to extend the initiation deadline and poll the industry.  Pls. Mot. at 42.
However, the determination extensions that Plaintiffs cite are inapposite because the
underlying petition in each of those cases were determined by Commerce to be
insufficient for industry support, unlike Commerce's calculations here.  <u>See, e.g.,</u>
<u>Utility Scale Wind Towers From India, Malaysia, and Spain</u>, 85 Fed. Reg. 65,028
(Dep't Commerce Oct. 14, 2020) (notice of extension of time) ("Petitions have not
established that the domestic producers or workers accounting for more than 50
percent of total production support the Petitions"); <u>Passenger Vehicle and Light</u>
<u>Truck Tires From Korea, Taiwan, Thailand, and Vietnam</u>, 85 Fed. Reg. 32,013 (Dep't
Commerce May 28, 2020 (notice of extension of time) ("Because it is not clear from
the Petitions whether the industry support criteria have been met, Commerce has
determined it should extend the time period for determining whether to initiate
investigations in order to further examine the issue of industry support"); 
<u>Polyethylene Terephthalate Sheet From the Republic of Korea, Mexico, and the</u>
<u>Sultanate of Oman</u>, 84 Fed. Reg. 39,801 (Dep't Commerce Aug. 12, 2019) (notice of
extension of time) ("Because it is not clear from the Petitions whether the industry
support criteria have been met, Commerce has determined it should extend the time
for initiating investigations in order to further examine the issue of industry
support").

Court No. 22-00343                                                      Page 21
**PUBLIC VERSION**

Plaintiffs invoke the phrase "exceptional circumstances,"[23] multiple times in a conclusory fashion, they fail to present persuasive evidence that any fact at issue actually fits into the purpose of the section.  Rather, Plaintiffs merely highlight Commerce's disagreement with their characterization that the circumstances here were exceptional, effectively requesting the Court to reweigh the evidence.  See, e.g. Pls. Mot. at 3 ("The record before Commerce demonstrated 'exceptional circumstances' warranting an extension . . ."); id. at 15 ("Given the 'exceptional circumstances' demonstrated by the record evidence . . ."); id. at 33 ("Commerce ignored the exceptional circumstances and [Plaintiffs'] repeated requests to extend the time for making a determination and poll the industry").  Plaintiffs' submissions that exceptional circumstances exist amount to factual disputes amongst the involved

---

[23] Plaintiffs also list a handful of bullet-pointed considerations in their motion that they believe constitutes "exceptional circumstances" warranting time extension under the statute, including:
- Petitioners' numerous revisions to the petition;
- Commerce's reliance on anomalous 2020 data from an unrepresentative OCTG market;
- Petitioners were below the 50 percent statutory level in the absence of using other information;
- Petitioners' treatment of OCTG processors/finishers in the calculation of domestic production and industry support;
- Repeated requests of Tenaris USA, the largest U.S. OCTG producer, to poll the industry; and
- Commerce's past practice to poll the domestic industry in similar situations in which industry support was unclear.

Pls. Mot. at 41.  Plaintiffs fail to offer more analysis of how these considerations warrant an extension of time as "exceptional circumstances" contemplated by 19 U.S.C. § 1673a(c)(1)B).

parties.  Without more, such allegations fail to demonstrate that Commerce's refusal

to extend the deadline was unreasonable requiring remand, as the Court will not re-

weigh the evidence in the record.[24]  See Downhole Pipe & Equipment, L.P. v. United

States, 776 F.3d 1369, 1376 (Fed. Cir. 2015).  Accordingly, Commerce's decision to

maintain its initial 20-day deadline for its initiation determination was reasonable.

Therefore, Commerce's decision to rely on other information to calculate industry

support for the purposes of initiating the OCTG AD investigation at issue is

supported by substantial evidence, in accordance with law, and thus sustained.

## II.    2020 OCTG Market Period Data

Plaintiffs challenge the sufficiency of the data Petitioners and Commerce relied

upon to calculate industry support for the initiation of the AD investigation.  Pls. Mot.

at 14; Reply In Supp'n [Pls. Mot.] at 3, Oct. 10, 2023, ECF No. 48 ("Pls. Reply").  In

addition to their previously discussed allegations that the data at issue presented

exceptional circumstances undermining its reliability, Plaintiffs also contend that

Commerce's and Petitioners' domestic production and industry support calculations

---

[24]  Plaintiffs argue that by rejecting their requests to poll the industry and consider
record evidence allegedly showing "exceptional circumstances," Commerce failed to
support its determination with substantial evidence because it did not address
Plaintiffs' submissions supporting an alternative conclusion.  Pls. Mot. at 33–34; id.at
34, 36 (citing Allegheny Ludlum Corp. v. United States, 112 F. Supp. 2d 1141, 1165
(Ct. Int'l Trade 2000)).  Plaintiffs' argument is unpersuasive.  As noted in the
Initiation Checklist, Commerce acknowledged and addressed Plaintiffs submissions
and ultimately found them unconvincing, see Attach. II at 9–21 (discussing and
rejecting Plaintiffs' submissions), thus underscoring the Court's conclusion that
Plaintiffs' claims of exceptional circumstances amount to factual disagreements.

failed to ensure that finishing operations were not counted twice and thus potentially distorting the data on which the initiation was based. Pls. Mot. at 27–28; Pls. Reply at 9–10. Defendant and Defendant-Intervenors counter that initiation of the investigation is supported by substantial evidence and that Plaintiffs' double counting concerns are meritless. Def. Resp. at 18, 23–24; Def.-Ints. Resp. at 14–15. Because Commerce did not adequately address Plaintiffs' concerns and record evidence that finishing operations were not counted twice, the Court remands this issue for further explanation or reconsideration.

Commerce must determine domestic industry support by evaluating the total "production of the domestic like product." 19 U.S.C. § 1673a(c)(4)(A)(ii). Although Commerce is afforded discretion in some respects to its choices in determining industry support, such as its choice to poll the industry or extend the initiation deadline as discussed above, its determination must nonetheless be supported by substantial evidence. See 19 U.S.C. § 1516a(b)(1)(B)(i). To meet this threshold, the Court must assess whether Commerce's action is reasonable in light of the entire record, see Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006), and whatever "fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). The reasonableness of Commerce's methodology must factor considerations that run counter to its decision. See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Substantial evidence has been described as "such relevant evidence as a reasonable mind might

**PUBLIC VERSION**

accept as adequate to support a conclusion." See DuPont Teijin Films USA v. United

States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB,

305 U.S. 197, 229 (1938)).

      Here, Commerce fails to address record evidence indicating that certain

domestic companies both produce and finish OCTG, leading to the inference that

some domestic pipe may have been double counted in the industry support

calculations. Plaintiffs point to record evidence, specifically Petitioners Borusan

Mannesmann and PTC Liberty Tubular's website, explaining that "it is unclear what

portion . . . of operations involves actual pipe production, as opposed to finishing

operations." See [Pls.'] Cmts. On Pets. Standing at 10, C.D. 12–18, P.D. 22–28 (Oct.

15, 2023) ("Pls. Oct. 15 Cmts.") (citing and explaining Borusan Mannesmann's and

PTC Liberty Tubular's OCTG production information on their websites).

Additionally, Plaintiffs point to record evidence that PTC Liberty Tubular was not

identified as a producer in ITC's sunset review that was relied upon by both

Petitioners and Commerce to calculate industry support. Id.; see Pls. Mot. at 27; Pls.

Reply at 9–10; see also Attach. II at 4–6; Def. Resp. at 12–13. Based upon the sunset

review, it would appear that PTC Liberty finished, but did not produce pipe, in which

case it is unclear whether the pipe PTC Liberty finished had already been counted in

the industry support calculations. Thus, the record evidence leads to the reasonable

inference, argued by Plaintiffs to Commerce, that there may be pipe that was counted

for the purposes of industry support when it was produced and again when it was

finished.  <u>See</u> Pls. Oct. 15 Cmts. at 10 (explaining that further processed production

may have been "included when calculating [P]etitioners' production in the [industry

support] calculation").[25]    Commerce may have reasons to reject this inference;

however, it must acknowledge consideration of such evidence and explain why it

nonetheless rejects the inference.

Commerce does not address this record evidence and the double counting

inference at all, other than to claim it is meritless.  Commerce and Defendant only

argue that finishing operations are included in the scope of the investigation.  <u>See</u>

Attach. II at 14 (explaining "the scope and domestic like product of OCTG AD

investigations includes OCTG whether finished or unfinished" gives Commerce "no

reason to believe that these finishing operations should not be included as production

of the domestic like product").[26]  Commerce's explanation suggests that it did not

understand Plaintiffs' argument and therefore the Court must remand to allow

Commerce opportunity to respond.    Defendant's post hoc rationalizations are

---

[25]    To illustrate their double counting concern, Plaintiffs offer the following
hypothetical: "[b]lindly accepting data that treats processed pipe as 'production' runs
the clear risk of double counting: one ton of green tube produced by an OCTG producer
could very well have been counted as two tons when the 'production' was reported by
a processor."  Pls. Mot. at 27; <u>see also</u> Pls. Reply at 10.  .

[26]  In its response brief, Defendant reiterates Commerce's conclusion, referencing a
2014 investigation to argue "the proposed scope definition covered both finished and
unfinished OCTG, and that the [International Trade Commission] has consistently
counted OCTG finishing operations as domestic production."  Def. Resp. at 18 (citing
<u>Certain [OCTG] From India, Korea, The Philippines, Taiwan, Thailand, Turkey,
Ukraine, and Vietnam</u>, USITC Pub. 4489, Invs. Nos. 701-TA-499-500, 731-TA-1215–
1217-1219–1223 (Sept. 14, 2014)).

irrelevant, as it concedes Commerce did not address the record evidence that suggest

double counting was possible.  Oral Arg. at 53:00.

Defendant-Intervenors contend that Plaintiffs' concern was a "transparent

delaying tactic" having "no factual basis."  Def.-Ints. Resp. at 23.  Defendant-

Intervenors also argue that Petitioners certified their production data, in accordance

with governing regulations, "as accurate by both company officials and their counsel,"

allowing Commerce to rely on them "as it always does with the volumes of information

submitted pursuant to such certifications." Id. at 23 (citing 19 C.F.R. §§ 351.303(g);[27]

207.3(a)).[28]  Defendant-Intervenors' assertion that Plaintiffs arguments were made

---

[27] The relevant portion of 19 C.F.R. § 351.303(g) reads as follows:
   (g) Certifications. Each submission containing factual information must
   include the following certification from the person identified in
   paragraph (g)(1) of this section and, in addition, if the person has legal
   counsel or another representative, the certification in paragraph (g)(2)
   of this section.  The certifying party must maintain the original signed
   certification for a period of five years from the date of filing the
   submission to which the certification pertains. The original signed
   certification must be available for inspection by U.S. Department of
   Commerce officials. Copies of the certifications must be included in the
   submission filed at the Department.
19 C.F.R. § 351.303(g).

[28] The relevant portion of 19 C.F.R. § 207.3(a) reads as follows:
   (a) Certification.  Any person submitting factual information on behalf
   of the petitioner or any other interested party for inclusion in the record,
   and any person submitting a response to a Commission questionnaire,
   must certify that such information is accurate and complete to the best
   of the submitter's knowledge.
19 C.F.R. § 207.3(a).

Court No. 22-00343                                                        Page 27
**PUBLIC VERSION**

only to delay is conclusory.  Further, mere reference to the Petitioners' certifications

fail to address the argument made by Plaintiff.

Commerce fails to respond to record evidence suggesting the possibility of

double counting within the industry support calculations, and therefore the Court

cannot conclude that Commerce's determination is supported by substantial

evidence.  See Universal Camera Corp., 340 U.S. at 488 ("The substantiality of

evidence must take into account whatever in the record fairly detracts from its

weight").  Accordingly, the Court remands determination on the double counting issue

to Commerce for further explanation or reconsideration.

**CONCLUSION**

For the foregoing reasons, the Court sustains Commerce's determination to

rely on other information rather than poll the industry to calculate industry support

for the AD investigation petition for OCTG from Argentina.  Commerce's

determination that the data relied upon accurately reflected industry support,

including whether finishing operations were counted twice, is remanded for further

explanation or reconsideration.  In accordance with the foregoing, it is

**ORDERED** that the final results, see ECF No. 35-2, are remanded for further

explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the

Court within 90 days of this date; and it is further

Court No. 22-00343                                                                                    Page 28
**PUBLIC VERSION**

     **ORDERED** that the parties shall have 30 days to file comments on the remand

redetermination; and it is further

     **ORDERED** that the parties shall have 30 days to file their replies to the

comments on the remand redetermination; and it is further

     **ORDERED** that the parties shall file the joint appendix within 14 days after

the filing of replies to the comments on the remand redetermination; and it is further

     **ORDERED** that commerce shall file the administrative record within 14 days

of the date of filing its remand redetermination.

                             /s/ Claire R. Kelly
                             Claire R. Kelly, Judge

Dated:      March 14, 2024
           New York, New York

# The Britannica Dictionary



**or**

**or** 

/ˈoɚ/ /ə/

*conjunction*

**1** — used to introduce another choice or possibility

> [+] Example sentences

**2** — used in negative statements to introduce something else that is also true

> [+] Example sentences

**3** — used to say what will happen if a specified thing is not done

> [+] Example sentences

**4** — used to introduce another number or amount that is possibly the correct one

> [+] Example sentences

**5** — used to introduce the reason why something said previously is true

> [+] Example sentences

**6 a** — used to introduce a word or phrase that defines or explains what another word or phrase means

> [+] Example sentences

**b** — used to introduce a word or phrase that corrects or states more precisely something you have just said

> [+] Example sentences

**or else**

— see ¹ELSE

**or so**

— see ²SO

22 results for "or"

Advanced search

| | |
|---|---|
| **c1175–** | **or, conj.¹**<br>Used to coordinate two (or more) sentence elements between which there is an alternative. In general use, coordinating noun phrases, adjectival… |
| **Old English–** | **or, adv.¹, prep., & conj.²**<br>Early, at an early hour; = ere, adv.¹ A.1(a). Obsolete. |
| **1968–** | **O.R., n.**<br>Operating room. |
| **1942–** | **O.R., n.**<br>Other ranks. |
| **1437–** | **or, n.¹**<br>Heraldry. Gold or yellow in armorial blazoning. |
| **1947–** | **OR, n.²**<br>A Boolean operator that has the value unity if at least one of the operands is unity, and is otherwise zero; more fully inclusive or (corresponding… |
| **c1429–** | **or, adv.²**<br>Misinterpretation of or, conj.¹ as an introductory particle meaning 'now': see quot. 1500 at or, conj.¹ 4a. |
| **1970–** | **OR, v.**<br>transitive. To combine using a Boolean or operator. |
| **1953–** | **OR, n.**<br>Operational research. |
| | **or-, prefix**<br>Forming nouns and adjectives with various senses; the latter esp. with the sense 'without (that which is designated by the second element)'. |
| | **-or, suffix** |

Appx076

(Not productive in English.) Forming nouns of condition, as error, n., horror, n., liquor, n., livor, n., mucor, n., pallor, n., squalor, n., tenor...

| 1785– | **or.,** in ors., pron. |
| | As a graphic abbreviation in the titles of legal cases, preceded by and: others. Also occasionally in singular: one other. |
| Old English– | **or,** variant of your, pron. & adj. |
| | Belonging or relating to the person or people being addressed; which you have, hold, or possess. With plural reference. Cf. you, pron. A.I |
| Old English– | **or,** variant of our, pron. & adj. |
| | Belonging to or associated with the speaker and one or more other people previously mentioned or easily identified; belonging to or associated with... |
| Old English– | **or,** variant of over, adv. & int. |
| | From one point to another across an intervening space. |
| Old English– | **or,** variant of ore, n.² |
| | A naturally occurring solid material containing a precious or useful metal in such quantity and in such chemical combination as to make its... |
| Old English– | **or,** variant of ere, adv.¹, prep., conj., adj. |
| | Before (in time). Also in compounds. ere-yesterday n. Obsolete the day before yesterday. |
| Old English– | **or,** variant of oar, n. |
| | A long pole, traditionally of wood, widened and flattened at one end into a blade, used to propel or (less commonly) steer a boat by pressure against... |
| Old English–1869 | **or,** variant of her, pron.¹ & adj.¹ |
| | The genitive case of the third person plural personal pronoun hi, pron.² (subsequently they, pron.): of them; of themselves. |
| Old English–1605 | **or,** variant of ore, n.¹ |
| | Respect, reverence; honour, glory. in ore: in an honourable manner; honourably. |
| Old English | **or,** variant of ore, n.³ |
| | A beginning. |

Appx077

**-or,** variant of -ory, suffix[2]

Forming adjectives, esp. adjectives designating someone or something that performs the action of the verb which constitutes the initial element.

## Results for "or" in:

- Quotation work title (3,454)
- Quotation text (316,908)
- Meanings (313)
- Definitions (342,553)
- Etymologies (41,590)
- Historical Thesaurus (9)

About OED

Historical Thesaurus

Editorial policy

Updates

Institutional Account management

Accessibility

Contact us

Upcoming events

Case studies

Media Enquiries

How to use the OED

Purchasing

Help with access

World Englishes

Contribute

Oxford University Press

Oxford Languages

Oxford Academic

Oxford Dictionary of National Biography

*Oxford University Press is a department of the University of Oxford. It furthers the University's objective of excellence in research, scholarship, and education by publishing worldwide*

Cookie policy     Privacy policy     Legal notice

Copyright © 2023 Oxford University Press

Appx078

*Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*

87 Fed. Reg. 70785

November 21, 2022

Appx079 – Appx081



## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–357–824, A–201–856, A–821–833]

### Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the U.S. Department of Commerce (Commerce) and the U.S. International Trade Commission (ITC), Commerce is issuing antidumping duty (AD) orders on oil country tubular goods (OCTG) from Argentina, Mexico, and the Russian Federation (Russia). In addition, Commerce is amending its final determination with respect to OCTG from Russia to correct a ministerial error.

**DATES:** Applicable November 21, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dmitry Vladimirov (Argentina), Yang Chun or Emily Bradshaw (Mexico), and George McMahon or Michael Heaney (Russia), AD/CVD Operations, Offices I and VI, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0665, (202) 482–5760, (202) 482–3986, (202) 482–1167, or (202) 482–4475, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

In accordance with sections 735(d) and 777(i) of the Tariff Act of 1930, as amended (the Act), on October 5, 2022, Commerce published its affirmative final determinations in the less-than-fair-value (LTFV) investigations of OCTG from Argentina, Mexico, and Russia.[1] In the investigation of OCTG from Russia, JSC Vyksa Steel Works (OMK/VSW) submitted a timely allegation that Commerce made a ministerial error in the final AD

determination.[2] We reviewed the allegation and determined that we made a ministerial error in the final AD determination on OCTG from Russia. *See* "Amendment to the Final Determination for Russia" section below for further discussion. On November 14, 2022, the ITC notified Commerce of its final determinations, pursuant to section 735(d) of the Act, that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act by reason of LTFV imports of OCTG from Argentina, Mexico, and Russia.[3]

### Scope of the Orders

The products covered by these orders are OCTG from Argentina, Mexico, and Russia. For a complete description of the scope of these orders, *see* the appendix to this notice.

### Amendment to the Final Determination for Russia

On September 30, 2022, OMK/VSW timely alleged that Commerce made a certain ministerial error in the *Russia Final Determination* with respect to the dumping margin assigned to OMK/VSW.[4] No other party made an allegation of ministerial errors or submitted a rebuttal to OMK/VSW's ministerial error allegation under 19 CFR 351.224(c)(3). Commerce reviewed the record and, on October 26, 2022, agreed that the error alleged by OMK/VSW constituted a ministerial error within the meaning of section 735(e) of the Act and 19 CFR 351.224(f).[5] Specifically, Commerce found that it made an inadvertent error in not converting into U.S. dollars a certification expense reported by OMK/VSW in Russian rubles.[6] Pursuant to 19 CFR 351.224(e), Commerce is amending the *Russia Final Determination* to reflect the correction of the ministerial error, as described in the Ministerial Error Memorandum.[7] Based on the correction, OMK/VSW's final dumping margin changed from 12.84 to 12.01 percent. As a result, we are also revising the all-others rate from 12.84 to 12.01 percent.

The amended estimated weighted-average dumping margins are listed in the "Estimated Weighted-Average Dumping Margins" section below.

### Antidumping Duty Orders

On November 14, 2022, in accordance with section 735(d) of the Act, the ITC notified Commerce of its final determinations in these investigations, in which it found that an industry in the United States is materially injured by reason of imports of OCTG from Argentina, Mexico, and Russia. Therefore, in accordance with section 735(c)(2) of the Act, Commerce is issuing these AD orders. Because the ITC determined that imports of OCTG from Argentina, Mexico, and Russia are materially injuring a U.S. industry, unliquidated entries of such merchandise from Argentina, Mexico, and Russia, entered or withdrawn from warehouse for consumption, are subject to the assessment of ADs.

Therefore, in accordance with section 736(a)(1) of the Act, Commerce will direct U.S. Customs and Border Protection (CBP) to assess, upon further instruction by Commerce, ADs equal to the amount by which the normal value of the merchandise exceeds the export price (or constructed export price) of the merchandise, for all relevant entries of OCTG from Argentina, Mexico, and Russia. With the exception of entries occurring after the expiration of the provisional measures period and before publication of the ITC's final affirmative injury determinations, as further described below, antidumping duties will be assessed on unliquidated entries of OCTG from Argentina, Mexico, and Russia, entered, or withdrawn from warehouse, for consumption, on or after May 11, 2022, the date of publication of the *Preliminary Determinations*.[8]

### Continuation of Suspension of Liquidation and Cash Deposits

Except as noted in the "Provisional Measures" section of this notice, in accordance with section 735(c)(1)(B) of

---

[1] *See Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,* 87 FR 59054 (September 29, 2022); *Oil Country Tubular Goods from Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances,* 87 FR 59041 (September 29, 2022); and *Oil Country Tubular Goods from the Russian Federation: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances Determination, in Part,* 87 FR 59045 (September 29, 2022) (*Russia Final Determination*).

[2] *See* OMK/VSW's Letter, "Oil Country Tubular Goods from the Russian Federation: OMK's Ministerial Error Comments," dated September 30, 2022 (Ministerial Error Allegation).

[3] *See* ITC's Letter, Investigation Nos. 701–TA–671–672 and 731–TA–1571–1573 (Final), dated November 14, 2022.

[4] *See* Ministerial Error Allegation.

[5] *See* Memorandum, "Antidumping Duty Investigation of Oil Country Tubular Goods from the Russian Federation: Allegation of Ministerial Error in the Final Determination," dated October 26, 2022 (Ministerial Error Memorandum).

[6] *See* Memorandum, "Amended Final Analysis Memorandum for JSC Vyksa Steel Works," dated October 26, 2022.

[7] *Id.*

[8] *See Oil Country Tubular Goods from Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,* 87 FR 28801 (May 11, 2022); *Oil Country Tubular Goods from Mexico: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,* 87 FR 28808 (May 11, 2022); and *Oil Country Tubular Goods from the Russian Federation: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Critical Circumstances Determination, Postponement of Final Determination, and Extension of Provisional Measures,* 87 FR 28804 (May 11, 2022) (collectively, *Preliminary Determinations*).

the Act, Commerce will instruct CBP to continue to suspend liquidation on all relevant entries of OCTG from Argentina, Mexico, and Russia. These instructions suspending liquidation will remain in effect until further notice.

Commerce will also instruct CBP to require cash deposits equal to the estimated weighted-average dumping margins indicated in the tables below. Accordingly, effective on the date of publication in the **Federal Register** of the notice of the ITC's final affirmative injury determinations, CBP will require, at the same time as importers would normally deposit estimated duties on subject merchandise, a cash deposit equal to the rates listed in the table below. The all-others rate applies to all producers or exporters not specifically listed, as appropriate.

**Estimated Weighted-Average Dumping Margins**

The estimated weighted-average dumping margins are as follows:

| Exporter or producer | Estimated weighted-average dumping margin (percent) |
| --- | --- |
| Argentina: | |
|   Siderca S.A.I.C ................................................................................................................................ | 78.30 |
|   All Others ......................................................................................................................................... | 78.30 |
| Mexico: | |
|   Tubos de Acero de Mexico, S.A ...................................................................................................... | 44.93 |
|   All Others ......................................................................................................................................... | 44.93 |

| Exporter or producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offset(s)) (percent) |
| --- | --- | --- |
| Russia: | | |
|   JSC Vyksa Steel Works ................................................................................................................... | 12.01 | 11.70 |
|   Volzhsky Pipe Plant, Joint Stock Company; Public Joint-Stock Company Trubnaya Metallurgicheskaya Kompaniya; Sinarsky Pipe Plant, Joint Stock Company; Seversky Pipe Plant, Joint Stock Company; Taganrog Metallurgical Plant, Joint Stock Company; Pervouralsk Pipe Plant, Joint Stock Company; Chelyabinsk Pipe Plant, Joint Stock Company; Orsky Machine Building Plant, Joint Stock Company \* ............................................................................... | 184.21 | 184.21 |
|   All Others ......................................................................................................................................... | 12.01 | 11.87 |

\* Rate based on adverse facts available.

**Provisional Measures**

Section 733(d) of the Act states that suspension of liquidation pursuant to an affirmative preliminary determination may not remain in effect for more than four months, except where exporters representing a significant proportion of exports of the subject merchandise request that Commerce extend the four-month period to no more than six months. At the request of exporters that account for a significant proportion of OCTG from Argentina, Mexico, and Russia, Commerce extended the four-month period to six months in each of these investigations. Commerce published the *Preliminary Determinations* on May 11, 2022.[9]

The extended provisional measures period, beginning on the date of publication of the *Preliminary Determinations,* ended on November 6, 2022. Therefore, in accordance with section 733(d) of the Act and our practice,[10] Commerce will instruct CBP to terminate the suspension of liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of OCTG from Argentina, Mexico, and Russia entered or withdrawn from warehouse, for consumption after November 6, 2022, the final day on which the provisional measures were in effect, until and through the day preceding the date of publication of the ITC's final affirmative injury determinations in the **Federal Register**. Suspension of liquidation and the collection of cash deposits will resume on the date of publication of the ITC's final determinations in the **Federal Register**.

**Establishment of the Annual Inquiry Service Lists**

On September 20, 2021, Commerce published the final rule titled "*Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*" in the **Federal Register**.[11] On September 27, 2021, Commerce also published the notice titled "*Scope Ruling Application; Annual Inquiry Service List; and Informational Sessions*" in the **Federal Register**.[12] The *Final Rule* and *Procedural Guidance* provide that Commerce will maintain an annual inquiry service list for each order or suspended investigation, and any interested party submitting a scope ruling application or request for circumvention inquiry shall serve a copy of the application or request on the persons on the annual inquiry service list for that order, as well as any companion order covering the same merchandise from the same country of origin.[13]

In accordance with the *Procedural Guidance,* for orders published in the **Federal Register** after November 4, 2021, Commerce will create an annual inquiry service list segment in Commerce's online e-filing and document management system, Antidumping and Countervailing Duty Electronic Service System (ACCESS), available *at https://access.trade.gov,* within five business days of publication of the notice of the order. Each annual inquiry service list will be saved in ACCESS, under each case number, and

---

[9] *Id.*

[10] *See, e.g., Certain Corrosion-Resistant Steel Products from India, India, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders,* 81 FR 48390, 48392 (July 25, 2016).

[11] *See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,* 86 FR 52300 (September 20, 2021) (*Final Rule*).

[12] *See Scope Ruling Application; Annual Inquiry Service List; and Informational Sessions,* 86 FR 53205 (September 27, 2021) (*Procedural Guidance*).

[13] *Id.*

under a specific segment type called "AISL-Annual Inquiry Service List." [14]

Interested parties who wish to be added to the annual inquiry service list for an order must submit an entry of appearance to the annual inquiry service list segment for the order in ACCESS within 30 days after the date of publication of the order. For ease of administration, Commerce requests that law firms with more than one attorney representing interested parties in an order designate a lead attorney to be included on the annual inquiry service list. Commerce will finalize the annual inquiry service list within five business days thereafter. As mentioned in the *Procedural Guidance,* the new annual inquiry service list will be in place until the following year, when the *Opportunity Notice* for the anniversary month of the order is published.

Commerce may update an annual inquiry service list at any time as needed based on interested parties' amendments to their entries of appearance to remove or otherwise modify their list of members and representatives, or to update contact information. Any changes or announcements pertaining to these procedures will be posted to the ACCESS website at *https://access.trade.gov.*

### Special Instructions for Petitioners and Foreign Governments

In the *Final Rule,* Commerce stated that, "after an initial request and placement on the annual inquiry service list, both petitioners and foreign governments will automatically be placed on the annual inquiry service list in the years that follow." [15] Accordingly, as stated above, the petitioners and foreign governments should submit their initial entry of appearance after publication of this notice in order to appear in the first annual inquiry service list. Pursuant to 19 CFR 351.225(n)(3), the petitioners and foreign governments will not need to resubmit their entries of appearance each year to continue to be included on the annual inquiry service list. However, the petitioners and foreign

governments are responsible for making amendments to their entries of appearance during the annual update to the annual inquiry service list in accordance with the procedures described above.

### Notification to Interested Parties

This notice constitutes the AD orders with respect to OCTG from Argentina, Mexico, and Russia pursuant to section 736(a) of the Act. Interested parties can find a list of AD orders currently in effect at *https://www.trade.gov/data-visualization/adcvd-proceedings.*

The amended Russia final determination and these AD orders are published in accordance with sections 735(e) and 736(a) of the Act and 19 CFR 351.224(e) and 19 CFR 351.211(b).

Dated: November 16, 2022

**Lisa W. Wang,**

*Assistant Secretary for Enforcement and Compliance.*

### Appendix—Scope of the Orders

The merchandise covered by these orders is certain OCTG, which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than case iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (*e.g.,* whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of these orders also covers OCTG coupling stock.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise processed in a third country, including by performing any heat treatment, cutting, upsetting, threading, coupling, or any other finishing, packaging, or processing that would not otherwise remove the merchandise from the scope of these orders if performed in the country of manufacture of the OCTG.

Excluded from the scope of these orders are: casing, tubing, or coupling stock containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

The merchandise subject to these orders is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7304.29.1010, 7304.29.1020, 7304.29.1030, 7304.29.1040, 7304.29.1050, 7304.29.1060, 7304.29.1080, 7304.29.2010, 7304.29.2020, 7304.29.2030, 7304.29.2040, 7304.29.2050, 7304.29.2060, 7304.29.2080, 7304.29.3110, 7304.29.3120, 7304.29.3130, 7304.29.3140, 7304.29.3150, 7304.29.3160, 7304.29.3180, 7304.29.4110, 7304.29.4120, 7304.29.4130, 7304.29.4140, 7304.29.4150, 7304.29.4160, 7304.29.4180, 7304.29.5015, 7304.29.5030, 7304.29.5045, 7304.29.5060, 7304.29.5075, 7304.29.6115, 7304.29.6130, 7304.29.6145, 7304.29.6160, 7304.29.6175,

7305.20.2000, 7305.20.4000, 7305.20.6000, 7305.20.8000, 7306.29.1030, 7306.29.1090, 7306.29.2000, 7306.29.3100, 7306.29.4100, 7306.29.6010, 7306.29.6050, 7306.29.8110, and 7306.29.8150.

The merchandise subject to these orders may also enter under the following HTSUS item numbers: 7304.39.0024, 7304.39.0028, 7304.39.0032, 7304.39.0036, 7304.39.0040, 7304.39.0044, 7304.39.0048, 7304.39.0052, 7304.39.0056, 7304.39.0062, 7304.39.0068, 7304.39.0072, 7304.39.0076, 7304.39.0080, 7304.59.6000, 7304.59.8015, 7304.59.8020, 7304.59.8025, 7304.59.8030, 7304.59.8035, 7304.59.8040, 7304.59.8045, 7304.59.8050, 7304.59.8055, 7304.59.8060, 7304.59.8065, 7304.59.8070, 7304.59.8080, 7305.31.4000, 7305.31.6090, 7306.30.5055, 7306.30.5090, 7306.50.5050, and 7306.50.5070.

The HTSUS subheadings and specifications above are provided for convenience and customs purposes only. The written description of the scope of these orders is dispositive.

[FR Doc. 2022–25401 Filed 11–18–22; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

### Notice of Scope Rulings

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable November 21, 2022.

**SUMMARY:** The U.S. Department of Commerce (Commerce) hereby publishes a list of scope rulings and circumvention determinations made during the period July 1, 2022, through September 30, 2022. We intend to publish future lists after the close of the next calendar quarter.

**FOR FURTHER INFORMATION CONTACT:** Marcia E. Short, AD/CVD Operations, Customs Liaison Unit, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: 202–482–1560.

**SUPPLEMENTARY INFORMATION:**

### Background

Commerce regulations provide that it will publish in the **Federal Register** a list of scope rulings on a quarterly basis.[1] Our most recent notification of scope rulings was published on August 25, 2022.[2] This current notice covers all scope rulings and scope ruling/circumvention determination combinations made by Enforcement and

---

[14] This segment will be combined with the ACCESS Segment Specific Information (SSI) field, which will display the month in which the notice of the order or suspended investigation was published in the **Federal Register,** also known as the anniversary month. For example, for an order under case number A–000–000 that published in the **Federal Register** in January, the relevant segment and SSI combination will appear in ACCESS as "AISL-January Anniversary." Note that there will be only one annual inquiry service list segment per case number, and the anniversary month will be pre-populated in ACCESS.

[15] *See Final Rule,* 86 FR at 52335.

[1] *See* 19 CFR 351.225(o).

[2] *See Notice of Scope Rulings,* 87 FR 52359 (August 25, 2022).

*Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Final Affirmative Determination of Sales at Less than Fair Value and Final Negative Determination of Critical Circumstances*

87 Fed. Reg. 59054

September 29, 2022

Apx082 – Appx084


Eastern Time on the due dates set forth in this notice. Note that Commerce has temporarily modified certain requirements for serving documents containing business proprietary information, until further notice.[11]

### Preliminary and Final Results of the CCRs

Commerce intends to publish in the **Federal Register** a notice of the preliminary results of these AD and CVD CCRs in accordance with 19 CFR 351.221(b)(4) and (c)(3)(i). Commerce will set forth its preliminary factual and legal conclusions in that notice. Unless extended, Commerce will issue the final results of these CCRs in accordance with the time limits set forth in 19 CFR 351.216(e).

### Notification to Interested Parties

This initiation notice is published in accordance with section 751(b)(1) of the Act and 19 CFR 351.221(b)(1).

Dated: September 22, 2022.

**Lisa W. Wang,**
*Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2022–21155 Filed 9–28–22; 8:45 am]

**BILLING CODE 3510–OS–P**

---

### DEPARTMENT OF COMMERCE

**International Trade Administration**

**[A–357–824]**

### Oil Country Tubular Goods From Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) determines that imports of oil country tubular goods (OCTG) from Argentina are being, or are likely to be, sold in the United States at less than fair value (LTFV) during the period of investigation, October 1, 2020, through September 30, 2021.

**DATES:** Applicable September 29, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dmitry Vladimirov, AD/CVD Operations, Office I, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0665.

---

[11] See *Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19; Extension of Effective Period,* 85 FR 41363 (July 10, 2020).

**SUPPLEMENTARY INFORMATION:**

### Background

On May 11, 2022, Commerce published in the **Federal Register** its preliminary affirmative determination in the LTFV investigation of OCTG from Argentina, in which it also postponed the final determination until September 23, 2022.[1] We invited interested parties to comment on the *Preliminary Determination.* A summary of the events that occurred since Commerce published the *Preliminary Determination* may be found in the Issues and Decision Memorandum.[2]

### Scope of the Investigation

The product covered by this investigation is OCTG from Argentina. For a complete description of the scope of this investigation, *see* appendix I.

### Analysis of Comments Received

All issues raised in the case and rebuttal briefs that were submitted by parties in this investigation are addressed in the Issues and Decision Memorandum. A list of the issues addressed in the Issues and Decision Memorandum is attached to this notice at appendix II. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *https://access.trade.gov/ public/FRNoticesListLayout.aspx.*

### Verification

Commerce was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation. However, in June 2022, we took additional steps in lieu of on-site verifications to verify the information relied upon in making this final determination, in accordance with section 782(i) of the Tariff Act of 1930, as amended (the Act). Specifically,

---

[1] See *Oil Country Tubular Goods from Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,* 87 FR 28801 (May 11, 2022) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum.

[2] See Memorandum, "Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina, and Final Negative Determination of Critical Circumstances," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

Commerce performed virtual verifications of the cost of production response, home market and U.S. sales responses, as well as a further-manufacturing cost response.[3]

### Changes Since the Preliminary Determination

Based on our analysis of the comments received, we made certain changes to the margin calculations for this final determination. For a discussion of these changes, *see* the "Changes from the Preliminary Determination" section of the Issues and Decision Memorandum.

### All-Others Rate

Section 735(c)(5)(A) of the Act provides that the estimated weighted-average dumping margin for all other producers and exporters not individually investigated shall be equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated excluding rates that are zero, *de minimis,* or determined entirely under section 776 of the Act (*i.e.,* facts otherwise available). Commerce calculated an individual estimated weighted-average dumping margin for Siderca S.A.I.C. (Siderca), the only individually examined producer or exporter in this investigation. Because the only individually calculated estimated weighted-average dumping margin is not zero, *de minimis,* or based entirely on facts otherwise available, the estimated weighted-average dumping margin calculated for all other producers and/or exporters is equal to the estimated weighted-average dumping margin calculated for the single examined respondent, Siderca, pursuant to section 735(c)(5)(A) of the Act.

### Final Negative Determination of Critical Circumstances

In accordance with section 735(a)(3) of the Act and 19 CFR 351.206(h), Commerce finds that critical

---

[3] See Memoranda, "Verification of the Sales Questionnaire Response of Siderca S.A.I.C. in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina," dated June 30 2022; "Verification of the Sales Questionnaire Response of Tenaris Global Services (U.S.A.) Corporation in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina," dated June 30, 2022; "Virtual Verification of the Further Manufacturing Cost Response of Siderca S.A.I.C. in the Antidumping Duty Investigation of Oil Country Tubular Goods from Argentina," dated July 28, 2022; and "Virtual Verification of the Cost of Manufacturing Response of Siderca S.A.I.C. in the Antidumping Duty Investigation of Oil Country Tubular Goods from Argentina," dated July 28, 2022.

circumstances do not exist for all companies in Argentina. For a full description of the methodology and results of Commerce's critical circumstances analysis, *see* the "Final Negative Determination of Critical Circumstances" section of the Issues and Decision Memorandum.

### Final Determination

The final estimated weighted-average dumping margins are as follows:

| Exporter or producer | Estimated weighted-average dumping margin (percent) |
|---|---|
| Siderca S.A.I.C ........................... | 78.30 |
| All Others ................................... | 78.30 |

### Disclosure

Commerce intends to disclose its calculations and analysis performed to interested parties in this final determination within five days of any public announcement or, if there is no public announcement, within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b).

### Continuation of Suspension of Liquidation

In accordance with section 735(c)(1)(B) of the Act, Commerce will instruct U.S. Customs and Border Protection (CBP) to continue the suspension of liquidation of all appropriate entries of subject merchandise, as described in appendix I of this notice, which were entered, or withdrawn from warehouse, for consumption on or after May 11, 2022, the date of publication of the *Preliminary Determination* in this investigation in the **Federal Register**. These suspension of liquidation instructions will remain in effect until further notice.

Pursuant to section 735(c)(1)(B)(ii) of the Act and 19 CFR 351.210(d), we will instruct CBP to require a cash deposit for estimated antidumping duties for such entries as follows: (1) the cash deposit rate for the companies listed above will be equal to the respondent-specific estimated weighted-average dumping margin determined in this final determination; (2) if the exporter is not a company identified above but the producer is identified above, then the cash deposit rate will be equal to the respondent-specific estimated weighted-average dumping margin established for that producer of the subject merchandise; and (3) the cash deposit rate for all other producers and exporters will be equal to the all-others

estimated weighted-average dumping margin.

As noted above, Commerce finds that critical circumstances do not exist for imports of OCTG from Argentina produced and exported by all companies. In accordance with section 735(c)(3) of the Act, Commerce will instruct CBP to terminate any retroactive suspension of liquidation required under section 733(e)(2) of the Act, and release any bond or other security, and refund any cash deposit required, under section 733(d)(1)(B) of the Act, with respect to entries of the merchandise the liquidation of which was suspended retroactively under section 733(e)(2) of the Act before May 11, 2022.

### U.S. International Trade Commission Notification

In accordance with section 735(d) of the Act, we will notify the International Trade Commission (ITC) of the final affirmative determination of sales at LTFV. Because Commerce's final determination is affirmative, in accordance with section 735(b)(2) of the Act, the ITC will make its final determination as to whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports or sales (or the likelihood of sales) for importation of OCTG no later than 45 days after this final determination. If the ITC determines that such injury does not exist, this proceeding will be terminated, and all cash deposits posted will be refunded and suspension of liquidation will be lifted. If the ITC determines that such injury does exist, Commerce will issue an antidumping order directing CBP to assess, upon further instruction by Commerce, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation, as discussed above in the "Suspension of Liquidation" section.

### Administrative Protective Order

This notice will serve as a final reminder to the parties subject to administrative protective order (APO) of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a sanctionable violation.

### Notification to Interested Parties

This determination and this notice are issued and published pursuant to sections 735(d) and 777(i)(1) of the Act, and 19 CFR 351.210(c).

Dated: September 23, 2022.

**Lisa W. Wang,**
*Assistant Secretary for Enforcement and Compliance.*

### Appendix I

### Scope of the Investigation

The merchandise covered by this investigation is certain OCTG, which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (*e.g.,* whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of this investigation also covers OCTG coupling stock.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise processed in a third country, including by performing any heat treatment, cutting, upsetting, threading, coupling, or any other finishing, packaging, or processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the OCTG.

Excluded from the scope of the investigation are: casing, tubing, or coupling stock containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

The merchandise subject to this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7304.29.1010, 7304.29.1020, 7304.29.1030, 7304.29.1040, 7304.29.1050, 7304.29.1060, 7304.29.1080, 7304.29.2010, 7304.29.2020, 7304.29.2030, 7304.29.2040, 7304.29.2050, 7304.29.2060, 7304.29.2080, 7304.29.3110, 7304.29.3120, 7304.29.3130, 7304.29.3140, 7304.29.3150, 7304.29.3160, 7304.29.3180, 7304.29.4110, 7304.29.4120, 7304.29.4130, 7304.29.4140, 7304.29.4150, 7304.29.4160, 7304.29.4180, 7304.29.5015, 7304.29.5030, 7304.29.5045, 7304.29.5060, 7304.29.5075, 7304.29.6115, 7304.29.6130, 7304.29.6145, 7304.29.6160, 7304.29.6175, 7305.20.2000, 7305.20.4000, 7305.20.6000, 7305.20.8000, 7306.29.1030, 7306.29.1090, 7306.29.2000, 7306.29.3100, 7306.29.4100, 7306.29.6010, 7306.29.6050, 7306.29.8110, and 7306.29.8150.

The merchandise subject to this investigation may also enter under the following HTSUS item numbers: 7304.39.0024, 7304.39.0028, 7304.39.0032, 7304.39.0036, 7304.39.0040, 7304.39.0044, 7304.39.0048, 7304.39.0052, 7304.39.0056, 7304.39.0062, 7304.39.0068, 7304.39.0072, 7304.39.0076, 7304.39.0080, 7304.59.6000,

7304.59.8015, 7304.59.8020, 7304.59.8025, 7304.59.8030, 7304.59.8035, 7304.59.8040, 7304.59.8045, 7304.59.8050, 7304.59.8055, 7304.59.8060, 7304.59.8065, 7304.59.8070, 7304.59.8080, 7305.31.4000, 7305.31.6090, 7306.30.5055, 7306.30.5090, 7306.50.5050, and 7306.50.5070.

The HTSUS subheadings and specifications above are provided for convenience and customs purposes only. The written description of the scope of this investigation is dispositive.

## Appendix II

### List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Changes from the *Preliminary Determination*
IV. Final Negative Determination of Critical Circumstances
V. Discussion of the Issues
 Comment 1: Constructed Export Price (CEP) Offset
 Comment 2: Third-Country Indirect Selling Expenses (ISE)
 Comment 3: Research and Development (R&D) Expenses for Further Manufacturing Costs
VI. Recommendation

[FR Doc. 2022–21184 Filed 9–28–22; 8:45 am]

BILLING CODE 3510-OS-P

## DEPARTMENT OF COMMERCE

### International Trade Administration

[C–580–913]

### Oil Country Tubular Goods From the Republic of Korea: Final Affirmative Countervailing Duty Determination

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and exporters of oil country tubular goods (OCTG) from the Republic of Korea (Korea). The period of investigation is January 1, 2020, through December 31, 2020.

**DATES:** Applicable September 29, 2022.

**FOR FURTHER INFORMATION CONTACT:** Jacob Garten or Melissa Porpotage, AD/CVD Operations, Office II, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–3342 or (202) 482–1413, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

On March 14, 2022, Commerce published the *Preliminary*

*Determination* in the **Federal Register**.[1] For a complete description of the events that followed the *Preliminary Determination, see* the Issues and Decision Memorandum.[2] The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov*. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *https://access.trade.gov/public/FRNoticesListLayout.aspx*.

## Scope of the Investigation

The products covered by this investigation are OCTG from Korea. For a complete description of the scope of this investigation, see appendix I.

## Scope Comments

On March 7, 2022, concurrent with the issuance of the *Preliminary Determination,* we issued a Preliminary Scope Memorandum.[3] In the Preliminary Scope Decision Memorandum, Commerce established the deadline for parties to submit scope case briefs.[4] Commerce did not receive any comments from interested parties regarding the scope by the deadline. Consequently, we made no changes to the scope from the Preliminary Scope Decision Memorandum.

## Analysis of Subsidy Programs and Comments Received

The subsidy programs under investigation, and the issues raised in the case and rebuttal briefs by parties in this investigation, are discussed in the Issues and Decision Memorandum. For a list of the issues raised by parties, and to which we responded in the Issues and Decision Memorandum, *see* appendix II of this notice.

---

[1] *See Oil Country Tubular Goods from the Republic of Korea: Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination,* 87 FR 14248 (March 14, 2022) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, "Decision Memorandum for the Final Determination of the Countervailing Duty Investigation of Oil Country Tubular Goods from the Republic of Korea," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[3] *See* Memorandum, "Antidumping Duty Investigations of Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation and Countervailing Duty Investigations of Oil Country Tubular Goods from the Republic of Korea, and the Russian Federation: Preliminary Scope Decision Memorandum," dated March 7, 2022 (Preliminary Scope Memorandum).

[4] *Id.* at 4.

## Methodology

Commerce conducted this investigation in accordance with section 701 of the Tariff Act of 1930, as amended (the Act). For each of the subsidy programs found to be countervailable, Commerce determines that there is a subsidy, *i.e.,* a financial contribution by an "authority" that gives rise to a benefit to the recipient and that the subsidy is specific.[5] For a full description of the methodology underlying our final determination, *see* the Issues and Decision Memorandum.

In making this final determination, Commerce relied, in part, on facts otherwise available, including adverse facts available (AFA), pursuant to sections 776(a) and (b) of the Act. For a full discussion of our application of AFA, *see* the section "Use of Facts Available and Adverse Inferences" in the accompanying Issues and Decision Memorandum.

## Verification

As provided in section 782(i) of the Act, in August 2022, Commerce verified the subsidy information reported by Hyundai Steel Company (Hyundai Steel),[6] SeAH Steel Corporation (SeAH Steel), and the Government of Korea. We used standard verification procedures, including an examination of relevant accounting records and original source documents provided by the respondents.

## Changes Since the Preliminary Determination

Based on our review and analysis of the information received at verification and comments received from parties, we made certain changes to the subsidy rate calculations for Hyundai Steel and SeAH Steel. As a result of these changes, Commerce also revised the all-others rate. For a discussion of these changes, *see* the Issues and Decision Memorandum.

## All-Others Rate

In accordance with section 705(c)(1)(B)(i)(I) of the Act, we calculated an individual estimated countervailing subsidy rate for the two mandatory respondents, Hyundai Steel and SeAH Steel. Section 705(c)(5)(A)(i) of the Act states that, for companies not individually investigated, Commerce will determine an all-others rate equal

---

[5] *See* sections 771(5)(B) and (D) of the Act regarding financial contribution; section 771(5)(E) of the Act regarding benefit; and section 771(5A) of the Act regarding specificity.

[6] Hyundai Steel Company is the same respondent from the *Preliminary Determination,* where we incorrectly stated the company's name as Hyundai Steel Corporation.



*Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina, and Final Negative Determination of Critical Circumstances*

September 23, 2022

Appx085 – Appx113

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

A-357-824
Investigation
**Public Document**
E&C/OI: DV

September 23, 2022

**MEMORANDUM TO:**     Lisa W. Wang
Assistant Secretary
 for Enforcement and Compliance

**FROM:**     James Maeder
Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations

**SUBJECT:**     Issues and Decision Memorandum for the Final Affirmative
Determination in the Less-Than-Fair-Value Investigation of Oil
Country Tubular Goods from Argentina, and Final Negative
Determination of Critical Circumstances

## I.     SUMMARY

The U.S. Department of Commerce (Commerce) finds that oil country tubular goods (OCTG) from Argentina are being, or are likely to be, sold in the United States at less than fair value (LTFV), as provided in section 735 of the Tariff Act of 1930, as amended (the Act). The period of investigation (POI) is October 1, 2020, through September 30, 2021.

After analyzing the comments submitted by interested parties, we have made certain changes to the *Preliminary Determination* with respect to the margin calculation for Siderca S.A.I.C. (Siderca), the sole mandatory respondent in this proceeding. We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.

Below is the complete list of the issues for which we received comments from interested parties:

    Comment 1:     Constructed Export Price (CEP) Offset
    Comment 2:     Third-Country Indirect Selling Expenses (ISE)
    Comment 3:     Research and Development (R&D) Expenses for Further Manufacturing Costs

## II.     BACKGROUND

On May 11, 2022, Commerce published in the *Federal Register* its *Preliminary Determination*.[1] Following the *Preliminary Determination*, Commerce issued a post-preliminary determination

---

[1] *See Oil Country Tubular Goods from Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional*



supplemental questionnaire to Siderca, regarding certain further manufacturing issues.[2]  We received a timely-filed response to this questionnaire from Siderca on May 24, 2022.[3]

Commerce was unable to conduct on-site verifications of the information relied upon in making the final determination in this investigation.  However, in June 2022, we took additional steps in lieu of on-site verifications to verify the information relied upon in making this final determination, in accordance with section 782(i) of the Act.  Specifically, Commerce performed virtual verifications of the cost of production response, home market and U.S. sales responses, as well as a further-manufacturing cost response.[4]

On August 1, 2022, we invited parties to comment on the *Preliminary Determination*.[5]  On August 8, 2022, Siderca and the petitioners[6] submitted respective case briefs for consideration in this final determination.[7]  On August 15, 2022, Siderca and the petitioners submitted respective rebuttal briefs.[8]  Although the petitioners filed a request for a hearing,[9] they later withdrew their request.[10]  As a result, we did not hold a hearing for this investigation.

---

*Measures*, 87 FR 28801 (May 11, 2022) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[2] *See* Commerce's Letter, "Antidumping Duty Investigation of Oil Country Tubular Goods from Argentina," dated May 17, 2022.

[3] *See* Siderca's Letter, "Oil Country Tubular Goods from Argentina:  Response to the Third Section E Supplemental Questionnaire," dated May 24, 2022.

[4] *See* Memoranda, "Verification of the Sales Questionnaire Response of Siderca S.A.I.C. in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina," dated June 30 2022; "Verification of the Sales Questionnaire Response of Tenaris Global Services (U.S.A.) Corporation in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina," dated June 30, 2022; "Virtual Verification of the Further Manufacturing Cost Response of Siderca S.A.I.C. in the Antidumping Duty Investigation of Oil Country Tubular Goods from Argentina," dated July 28, 2022; and "Virtual Verification of the Cost of Manufacturing Response of Siderca S.A.I.C. in the Antidumping Duty Investigation of Oil Country Tubular Goods from Argentina," dated July 28, 2022.

[5] *See* Memorandum, " Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina; Briefing Schedule," dated August 1, 2022.

[6] The petitioners in this investigation are Borusan Mannesmann Pipe U.S., Inc.; PTC Liberty Tubulars LLC; U.S. Steel Tubular Products, Inc.; the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC; and Welded Tube USA, Inc.

[7] *See* Siderca's Letter, "Oil Country Tubular Goods from Argentina:  Case Brief," dated August 8, 2022 (Siderca Case Brief); *see also* Petitioners' Letter, "Oil Country Tubular Goods from Argentina:  Case Brief of Petitioners," dated August 8, 2022 (Petitioners' Case Brief).

[8] *See* Siderca's Letter, "Oil Country Tubular Goods from Argentina:  Rebuttal Brief," dated August 15, 2022 (Siderca Rebuttal Brief); *see also* Petitioners' Letter, "Oil Country Tubular Goods from Argentina:  Petitioners' Rebuttal Brief," dated August 15, 2022, 2022 (Petitioners' Rebuttal Brief).

[9] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina:  U. S. Steel Tubular Products' Request for Public Hearing," dated June 10, 2022.

[10] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina:  U. S. Steel Tubular Products' Withdrawal of Request for Public Hearing," dated August 16, 2022.

## III.    CHANGES FROM THE *PRELIMINARY DETERMINATION*

For this final determination, we calculated CEP, normal value (NV), and cost of production (COP) for Siderca using the methodology stated in the *Preliminary Determination*,[11] except as follows:

- We implemented all minor pre-verification corrections identified by Siderca.
- We revised the calculation of general and administrative expenses (G&A) for further manufacturing costs.

## IV.    FINAL NEGATIVE DETERMINATION OF CRITICAL CIRCUMSTANCES

In the *Preliminary Determination*, we found imports of subject merchandise by Siderca, as well as by all other producers/exporters were massive, and thus, that critical circumstances existed with respect to imports of OCTG from Argentina shipped by all producers/exporters.[12]  Since the *Preliminary Determination*, we updated our critical circumstances analysis to incorporate Siderca's updated monthly shipment information and import data from Global Trade Atlas (GTA), which allow us to expand the base and comparison periods.

Specifically, because the petitions were filed on October 6, 2021, to determine whether there has been a massive surge in imports for Siderca, Commerce compared the total volume of shipments, reported by Siderca, during the period October 2021 through May 2022[13] with the volume of shipments during the preceding eight-month period of February 2021 through September 2021.[14] Based on this comparison, we determine that there were no massive imports of subject merchandise from Siderca[15] over a relatively short period pursuant to section 735(a)(3)(B) of the Act and 19 CFR 351.206.

For "all other producers and exporters," Commerce started with U.S. import data sourced from the U.S. Census Bureau and obtained via GTA, for the Harmonized Tariff Schedule of the United States (HTSUS) subheadings identified in the scope of the investigation for the periods February 2021 through September 2021, and October 2021 through May 2022.  We then subtracted shipments reported by Siderca for these same periods from U.S. import data. However, because the quantity of imports shown in the GTA data is smaller than that in Siderca's data,[16] we find the normal method of subtracting the mandatory respondent's data (*i.e.*, that of Siderca's) from the GTA data to be an unreliable indicator of the experience of the all-others companies for purposes of the "massive" determination.   Therefore, we are basing the "massive" finding for the non-individually investigated companies on the experience of

---

[11] *See Preliminary Determination* PDM.
[12] *Id*. at 21-25.
[13] Because the petition in this investigation was filed in the first half of a month, we treated that month as part of the comparison period.  *See, e.g.*, *Final Determination of Sales at Less Than Fair Value; Stainless Steel Sheet and Strip in Coils from Germany*, 64 FR 30710, 30729 (June 8, 1999); and *Notice of Final Determination of Sales at Less Than Fair Value:  Certain Steel Concrete Reinforcing Bars from Turkey*, 62 FR 9737, 9746 (March 4, 1997).
[14] *See* Memorandum, "Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina; Final Critical Circumstances Analysis," dated concurrently with this memorandum.
[15] *Id*.
[16] *Id*.

3

Siderca.[17]  Accordingly, we find that there were no massive imports of subject merchandise from all other producers and exporters in Argentina over a relatively short period pursuant to section 735(a)(3)(B) of the Act and 19 CFR 351.206.

Accordingly, for this final determination, we find that critical circumstances do not exist with respect to imports of OCTG from Argentina shipped by all producers/exporters within the meaning of section 735(a)(3) of the Act and 19 CFR 351.206(h).

## V.    DISCUSSION OF THE ISSUES

### Comment 1:  CEP Offset

In the *Preliminary Determination*, Commerce determined that the "qualitative analysis…which considers the documentation provided by Siderca…does not support an affirmative finding that the NV {level of trade} LOT was at a more advanced stage of distribution than the LOT of the CEP."[18]  This determination was based on the following synopsis of the outcome of our analysis:

> Siderca:  (1) did not provide sufficient and/or definitive source documentation, requested by Commerce in the initial and the supplemental questionnaires, that supports the performance of specific selling activities that Siderca claimed to have undertaken for reported home market channels of distribution; or (2) did not provide a sufficient/satisfactory explanation:  (a) establishing how the documentation provided supports Siderca's claim of having performed certain selling functions for home market channels of distributions; and (b) showing to what extent the claimed levels of intensity can be inferred from the documentation provided.[19]

In addition, in the *Preliminary Determination*, Commerce found the following:

> Siderca did not provide the quantitative analysis required by Commerce, as it requested in the initial and supplemental questionnaires, that shows how:  (1) the expenses for sales made at different claimed LOTs impact price comparability; or (2) the claimed levels of intensity for the selling activities reported in the selling functions chart are quantitatively supported.[20]

---

[17] *See Certain New Pneumatic Off-the-Road Tires from Sri Lanka:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Determination*, 81 FR 39900 (June 20, 2016), and accompanying PDM, at 6-8 (where we based our analysis for all other producers/exporters on the data of the sole mandatory respondent), unchanged in *Certain New Pneumatic Off-the-Road Tires from Sri Lanka:  Final Affirmative Countervailing Duty Determination, and Final Determination of Critical Circumstances*, 82 FR 2949 (January 10, 2017).
[18] *See Preliminary Determination* PDM at 16.
[19] *Id*. at 13.
[20] *Id*. at 16.

*Siderca's Case Brief*

Commerce should reconsider its decision in the final determination and grant Siderca a CEP offset.[21]

- The record demonstrates that Siderca's home-market sales are made at a more advanced LOT than the CEP LOT and that a CEP offset is warranted.[22]
  - The qualitative support Siderca provided, *i.e.*, narrative descriptions of its selling activities in the selling functions chart, sample documentation to support the activities and levels of intensity reported, including, *inter alia*, customer correspondence, training materials, and internal planning documents.[23] corroborates its reported selling functions.
    - A comparison of the selling functions undertaken by Siderca demonstrates that the LOT for Siderca's home market sales is more advanced than for Siderca's sales at the CEP LOT, and that a CEP offset is appropriate.[24]
    - Siderca summarizes the qualitative information provided in the record that supports each of the categories in the selling functions chart.[25]
    - Notably, Commerce described in the *Preliminary Determination* some of this information that Siderca provided, and it acknowledged that Siderca supported certain selling functions and concluded that support for the provision of certain activities was sufficient.[26]
  - Certain of the alleged deficiencies identified by Commerce in the *Preliminary Determination* can be answered through a closer review of the record.[27]
    - Commerce stated that Siderca did not explain: (1) whether the sample internal managerial forecast in Exhibit Supp. A3 is a product of Siderca's formal sales forecasting and planning processes; (2) how the drilling plans form the basis for Siderca's planning processes; or (3) whether similar documentation is prepared for Siderca's CEP sales.[28] Contrary to Commerce's statements, the forecast in Exhibit Supp. A3 describes Siderca's managerial plans/activities and the documentation in Exhibit Supp. A3 also demonstrates that the customers' drilling plans feed directly into Siderca's managerial forecast and planning process. Moreover, the record does not contain similar documentation prepared by Siderca for its CEP sales.[29]
    - Commerce also stated that, although Siderca provided excerpts of sample presentations, it did not explain, among other things, when they took place and "why … its level of intensity designations for the selling function category in question is appropriate."[30] Contrary to Commerce's claim, the presentation in Exhibit Supp. A3 is dated during the POI. Moreover, Siderca properly differentiated between the intensity of the provision of training services between home market channels based

---

[21] *See* Siderca's Case Brief at 1-2.
[22] *Id*. at 4.
[23] *Id*.
[24] *Id*. at 5.
[25] *Id*. at 6-9 (specific citations to record omitted).
[26] *Id*. at 9-10.
[27] *Id*. at 10.
[28] *Id*. at 11 (citing *Preliminary Determination* PDM at 13-14).
[29] *Id*.
[30] *Id*. (citing *Preliminary Determination* PDM at 14).

- on the extent of the support Siderca provides during string design and selection of OCTG and other material.[31]
  - Commerce also arbitrarily found as insignificant the number of instances Siderca's technical sales team worked with its home market customers that receive the full-service package to analyze OCTG performance, and questioned Siderca's reported high level of intensity designation for Home Market Channel 1 sales.[32]  However, the engineering services and technical support brochure provided in Exhibit A4 shows the range and complexity of technical services provided to these customers and, therefore, justifies Siderca's reported intensity level.[33]
  - Commerce incorrectly maintains that management of Home Market Channel 1 customers' withdrawals of OCTG from the well and related communications is the "sole activity" distinguishing Home Market Channel 1 and Channel 2 home market sales.[34]  Siderca explained that for Home Market Channel 1 sales, Siderca also manages the customer relationship daily as the point of contact for customers that receive the full-service package.  A review of the sample email correspondence in Exhibit Supp. A3 demonstrates the high level of coordination between Siderca and the customer required to execute the selling activities.[35]
- o Certain other alleged deficiencies identified by Commerce in the *Preliminary Determination* concern very specific information that Commerce did not request from Siderca and it should not be penalized for not providing it.[36]
  - In the *Preliminary Determination*, Commerce stated that Siderca failed to explain "which domestic customers were given the presentations … {provided by Siderca}, … or how frequently the presentations in question were prevalent during the POI."[37] Commerce also questioned "the prevalence of OCTG inspections in Siderca's warehouses during the POI for Channel 1 customers."[38]  Commerce also probed "how often {Siderca} manages{d} the withdrawal of OCTG from the well during the POI."[39]  All of these questions could have been answered in full by Siderca if Commerce had asked them in its supplemental questionnaires.[40]
  - In several recent cases, Commerce granted respondents a CEP offset where the respondent did not provide specific information that Commerce had not requested in supplemental questionnaires regarding support related to its LOT analysis.[41]
  - Similarly, here, Siderca could not provide information that Commerce did not request and consistent with its practice, Commerce should not penalize Siderca for not

---

[31] *Id*. at 12.
[32] *Id*. at 12 (citing *Preliminary Determination* PDM at 14).
[33] *Id*.
[34] *Id*. (citing *Preliminary Determination* PDM at 16).
[35] *Id*. at 13.
[36] *Id*. at 10, 13.
[37] *Id*. (citing *Preliminary Determination* PDM at 14).
[38] *Id*. (citing *Preliminary Determination* PDM at 15).
[39] *Id*.
[40] *Id*. at 13.
[41] *Id*. at 13 (citing *Granular Polytetrafluoroethylene Resin from India:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 FR 3772 (January 25, 2022) (*Polytetrafluoroethylene Resin from India*), and accompanying IDM, at 10; and *Welded Line Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 FR 38061 (June 27, 2022) (*Line Pipe from Korea*), and accompanying IDM, at 10).

6

providing information that Commerce did not specifically request, or that Siderca could have anticipated would be required for Commerce's analysis.[42]

- o Siderca's quantitative analysis supports the levels of intensity for its reported selling activities.
  - ▪ In its original questionnaire response, Siderca reported ISEs that reflect the different levels of selling expenses and related functions that Siderca performs for its home market versus its U.S. sales. In the first supplemental Section B response, Siderca also explained the approach followed in its quantitative analysis.[43]
  - ▪ Siderca's methodology for calculating these ISEs, and the resulting allocation of expenses to home market and U.S. sales results in the different level of expenses assigned to POI sales made at different levels of trade, which affects price comparability.[44]
  - ▪ As shown in Siderca's quantitative analysis, its ISEs incurred in Argentina for home market sales are multiples of that for U.S. sales. This difference reflects the additional expenses that correspond to the greater number of selling activities performed at a higher level of intensity for home market sales compared to sales at the CEP LOT.[45]
  - ▪ In the *Preliminary Determination*, Commerce stated that "Siderca's distribution of {ISEs} … relied on arbitrary numbers that formed an integral part of how the distribution concepts were calculated."[46] Contrary to Commerce's description, Siderca properly distributed the ISEs between the home market and the U.S. market based on the nature of the cost centers and general ledger accounts in its trial balance and a "distribution concept" that reflected (1) the "sales effort" required (*i.e.*, the degree of selling activities in each market), and (2) the total quantity of OCTG shipped to each market.[47]
  - ▪ Commerce did not ask Siderca to further substantiate the "distribution concepts" reported in its quantitative analysis. As discussed above, consistent with its past cases, Commerce should not penalize Siderca for not providing information that Commerce did not specifically request.[48]

*Petitioners' Rebuttal Brief*

- • Siderca has not established a qualitative difference between selling functions in the home market and those in the U.S. market.
  - o For each of the five sales activity categories included in Siderca's selling functions chart, Commerce reasonably found specific information lacking in detail necessary to be probative of the claimed differences in the selling functions performed in each market.[49]

---

[42] *Id*. at 14.
[43] *Id*.
[44] *Id*.
[45] *Id*. at 14-15.
[46] *Id*. at 15 (citing *Preliminary Determination* PDM at 17).
[47] *Id*.
[48] *Id*. (citing *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 26343 (May 4, 2022), and accompanying IDM at 13).
[49] *See* Petitioners' Rebuttal Brief at 3-4 (citing *Preliminary Determination* PDM at 14-16).

o Contrary to Siderca's claim that the record supports its reported selling functions, Siderca's brief merely repeats citations to the administrative record for the same factual information that Commerce's *Preliminary Determination* found lacking.[50]

o Siderca fails to address Commerce's findings squarely by either explaining why the type of activity the documentation purports to show demonstrates a meaningful difference in selling functions between the markets; or addressing Commerce's qualitative findings that the level of intensity for each selling function does not appear to be that different as between the home market and the U.S. CEP sales.[51]

o Siderca's limited engagement with Commerce's detailed rationale and factfinding in the *Preliminary Determination* does not actually address Commerce's concerns.

  ▪ First, Siderca claims that regarding Siderca's provision of sales support, Commerce should have inferred that the submitted drilling plans demonstrate that Siderca undertakes more planning processes in the home market.[52]

    (a) Commerce rejected this inference in the *Preliminary Determination*.[53]

    (b) Siderca merely claims that the absence of record information concerning drilling plans in the U.S. market demonstrates that there is a difference between the selling functions it performs in both markets. But the absence of information is not substantial evidence.[54]

    (c) Forecasts are not an indicium of intensity of planning/forecasting in the home market *vis-à-vis* the CEP market because drilling forecasts are always used by OCTG producers to determine overall demand for OCTG.[55]

  ▪ Second, Siderca claims that Commerce "arbitrarily found" the number of instances of training services provided in the home market to be insignificant.[56]

    (a) Commerce's finding was not arbitrary at all. Rather, Commerce noted the discrepancy between the use of technical support for the two home market channels and found lacking any information concerning the number of sales or transactions involved in receiving that technical support.[57]

    (b) Moreover, Commerce assessed the supporting documentation and found the technical support to be "limited in nature."[58]

  ▪ Third, Siderca claims that, regarding the "performance of sales related administrative activities" selling function, it provided evidence that it manages withdrawals of OCTG from the well "on a daily basis" in the home market and cites its response. Siderca fails to overcome Commerce's *Preliminary Determination* insofar as it cites to a questionnaire response that Commerce found deficient and Siderca points to no documentary support for its narrative response.[59]

---

[50] *Id*. at 5.

[51] *Id*.

[52] *Id*.

[53] *Id*. (citing *Preliminary Determination* PDM at 14).

[54] *Id*. at 5-6.

[55] *Id*. at 6 (citing *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Preliminary), USITC Pub. 5248 (November 2021), at 30).

[56] *Id*.

[57] *Id*. (citing *Preliminary Determination* PDM at 14).

[58] *Id*. (citing *Preliminary Determination* PDM at 14-15).

[59] *Id*. at 6-7 (citing *Preliminary Determination* PDM at 16).

- Siderca has not demonstrated a quantitative difference between selling functions in the home market and those in the U.S. market using documentary evidence under Commerce's practice.
  - o As an initial matter, Commerce's practice of not using ISE ratios as support for selling activities has been upheld by the U.S. Court of International Trade.[60]
  - o Siderca's reliance on its calculations of ISEs incurred in the home market for home market sales (INDIRSH) and ISEs incurred in the home market for U.S. sales (DINDIRS1U) is unresponsive to Commerce's question insofar as the INDIRSH and DINDIRS1U fields do not capture all the selling expenses reported in the selling functions chart and these fields do not distinguish between Siderca's two home market channels of distribution.[61]
  - o DINDIRS1U and INDIRSH will, by their nature, necessarily capture some selling expenses, but the additional quantitative analysis requested for Commerce's LOT analysis takes generalized cost differences as the starting point, instructing respondents to "show{} how the expenses assigned to POI/POR sales made at different claimed levels of trade impact price comparability."[62]
  - o Relying solely on comparing INDIRSH and DINDIRS1U when neither field accounts for costs associated with all the selling activities in the reported selling functions chart, highlights the inadequacy of Siderca's reporting.  Commerce, thus, "lacks any means of corroborating LOT claims."[63]  This gap in the record precludes Siderca from establishing its entitlement to a CEP offset.[64]
  - o Additional gaps in Siderca's reporting only reinforce this conclusion.
    - ▪ As Commerce has stated, "{s}ubstantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing."[65]  For example, Commerce must additionally examine "the level of selling expense for each type of sale."[66]
    - ▪ Whereas "the quantitative evidence is supposed to substantiate and explain the reported levels in the selling activities charts," Siderca's lump-them-together approach to providing quantitative support offers no indication as to why any selling activity in any channel was assigned a specific number.[67]
- Commerce should not accept Siderca's attempt to fault Commerce for its failure to establish entitlement to a favorable offset.

---

[60] *Id*. at 8 (citing *Andaman Seafood Co. v. United States*, 768 F. Supp. 2d 1315 (CIT 2011)).

[61] *Id*.

[62] *Id*. at 9 (citing Commerce's Letter, Initial AD Questionnaire, dated November 10, 2021, at A-7 to A-8 (Q.3.a)).

[63] *Id*. (citing *Certain Oil Country Tubular Goods from the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019-2020*, 86 FR 54928 (October 5, 2021) (*OCTG Korea AR6 Prelim*), and accompanying PDM, at 35).

[64] *Id*. (citing *Certain Oil Country Tubular Goods from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 20817 (April 8, 2022) (*OCTG Korea AR6 Final*), and accompanying IDM, at Comment 16).

[65] *Id*. at 10 (citing *Polyethylene Terephthalate Sheet from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value*, 85 FR 44276 (July 22, 2020) (*PET Sheet from Korea*), and accompanying IDM, at 17).

[66] *Id*.

[67] *Id*. (citing *OCTG Korea AR6 Final* IDM at Comment 16).

- o The respondent bears the burden of demonstrating its entitlement to a CEP offset permitted under section 773(a)(7)(B) of the Act.[68]
- o Commerce should continue to decline to apply a CEP offset to Siderca because Siderca "did not provide the quantitative evidence to demonstrate {its home market sales} were at a more advanced {LOT} than its CEP sales made to its U.S. affiliate." The determinative question is whether the record contains "necessary supporting source documentation." [69]
- o Here, despite Commerce generously providing Siderca an opportunity to supplement its woefully deficient initial questionnaire response, the record lacks the necessary supporting documentation.[70]
  - ▪ Commerce's initial questionnaire requested a quantitative analysis supporting the reported intensity levels, which Siderca failed to provide. Commerce notified Siderca of its deficient response and repeated its request that Siderca provide a quantitative analysis to support the intensity levels in the selling functions chart. Instead, Siderca resubmitted its calculation worksheets for fields INDIRSH and DINDIRS1U.[71]
- o Commerce's recent denials of CEP offsets under similar circumstances supports denying Siderca a CEP offset in this investigation.[72]
- o In *Rubber from Brazil* and *PET Sheet from Korea*, Commerce also explained the important policy reasons for requiring a quantitative analysis, namely, to avoid the potential for manipulation and to ground a CEP offset on objective data.[73]
- o In sum, Siderca's omission of quantitative evidence significantly impedes the analysis necessary before Commerce may grant a CEP offset.[74]

**Commerce's Position:** We continue to find that a CEP offset is not warranted for Siderca pursuant to section 773(a)(7)(B) of the Act.

Section 773(a)(1)(B)(i) of the Act states that, to the extent practicable, Commerce will calculate NV based on sales at the same LOT as the U.S. sales. Sales are made at different LOTs if they are made at different marketing stages (or their equivalent).[75] Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in

---

[68] *Id*. at 11 (citing *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 616 F. Supp. 2d 1354, 1374 (CIT 2009) (*Ad Hoc Shrimp*); *Corus Engineering Steels Ltd. v. United States*, 27 CIT 1286, 1290 (2003) (*Corus*); *Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327 (CIT 2010) (*Pakfood*); and 19 CFR 351.401(b)(1)).

[69] *Id*. at 11-12 (citing *OCTG Korea AR6 Prelim* PDM at 34-35, unchanged in *OCTG Korea AR6 Final* IDM at Comment 16).

[70] *Id*. at 12 (citing *PET Sheet from Korea* IDM at 20).

[71] *Id*. at 12-13 (citations to administrative record omitted).

[72] *Id*. at 13-15 (citing *OCTG Korea AR6 Final* IDM at Comment 16; *Emulsion Styrene-Butadiene Rubber from Brazil: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 38847 (June 29, 2020) (*Rubber from Brazil*), and accompanying IDM, at Comment 1; *PET Sheet from Korea* and accompanying IDM, at Comment 4; and *Utility Scale Wind Towers from Canada: Preliminary Affirmative Determination of Sales at Less-Than-Fair-Value, Preliminary Negative Determination of Critical Circumstances, and Postponement of Final Determination and Extension of Provisional Measures*, 85 FR 8562 (February 14, 2020), and accompanying PDM, at 15-16).

[73] *Id*. at 15 (citing *Rubber from Brazil* IDM at 10; and *PET Sheet from Korea* IDM at 20).

[74] *Id*. at 16.

[75] *See* 19 CFR 351.412(c)(2).

the stages of marketing.[76]  In order to determine whether the comparison market sales are at different stages in the marketing process than the U.S. sales, we examine the distribution system in each market, *i.e.*, the chain of distribution, including selling functions and class of customer (customer category), and the level of selling expenses for each type of sale.

Pursuant to section 773(a)(1)(B)(i) of the Act, in identifying LOTs for the EP and comparison market sales, *i.e.*, NV based on either home market or third-country prices,[77] we consider the starting prices before any adjustments.  For CEP sales, we consider only the selling activities reflected in the price after the deduction of expenses and profit under section 772(d) of the Act.[78] Where NV is based on CV, we determine the NV LOT based on the LOT of the sales from which we derive selling expenses, and profit for CV, where possible.[79]

When Commerce is unable to determine NV based on the sale prices of the foreign like product in the comparison market at the same LOT as the EP or CEP, Commerce may determine NV based on sale prices at a different LOT in the comparison market.  In comparing EP or CEP to NV based on sale prices at a different LOT in the comparison market, where available data make it possible, we make an LOT adjustment under section 773(a)(7)(A) of the Act.  Finally, for CEP sales only, if the NV LOT is at a more advanced stage of distribution than the LOT of the CEP and there are no available data for determining whether the difference in LOTs between NV and CEP affects price comparability, *i.e.*, no LOT adjustment is possible, Commerce will grant a CEP offset, as provided in section 773(a)(7)(B) of the Act.[80]

## A.  Qualitative LOT Analysis

In the *Preliminary Determination*, Commerce determined that the "qualitative analysis…which considers the documentation provided by Siderca … does not support an affirmative finding that the NV LOT was at a more advanced stage of distribution than the LOT of the CEP."[81] Specifically, Commerce determined the following:

> Siderca:  (1) did not provide sufficient and/or definitive source documentation, requested by Commerce in the initial and the supplemental questionnaires, that supports the performance of specific selling activities that Siderca claimed to have undertaken for reported home market channels of distribution; or (2) did not provide a sufficient/satisfactory explanation:  (a) establishing how the documentation provided supports Siderca's claim of having performed certain selling functions for home market channels of distributions; and (b) showing to

---

[76] *Id.*; *see also Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review and Notice of Intent Not to Revoke Antidumping Duty Order in Part*, 75 FR 50999 (August 18, 2010) (*OJ from Brazil*), and accompanying IDM, at Comment 7.
[77] Where NV is based on CV, we determine the NV LOT based on the LOT of the sales from which we derive selling, general and administrative expenses, and profit for CV, where possible.  *See* 19 CFR 351.412(c)(1).
[78] *See Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1314-16 (CAFC 2001).
[79] *See* 19 CFR 351.412(c)(1).
[80] *See, e.g.*, *OJ from Brazil* IDM at Comment 7.
[81] *See Preliminary Determination* PDM at 16.

what extent the claimed levels of intensity can be inferred from the documentation provided.[82]

Siderca claims that certain alleged deficiencies that Commerce identified in the *Preliminary Determination* with respect to certain selling function categories can be answered through a closer review of the record. Below, we discuss Siderca's specific claims for the affected selling function categories. Commerce hereby incorporates by reference its qualitative LOT analysis provided in the *Preliminary Determination* and affirms that analysis for areas that Siderca does not contest.

<u>Provision of Sales Support Selling Function Category</u>

In the *Preliminary Determination*, Commerce found the following:

> for the "provision of sales support" selling function category, Siderca reported that it provides, to a high degree for Channel 1, to a medium-high degree for Channel 2, and to a low degree for the CEP channel, sales forecasting and strategic/economic planning. Siderca explained that Channel 1 home market customers share biweekly their drilling plans with Siderca, allowing Siderca to forecast customers' OCTG consumption needs and adjust production schedules accordingly; for Channel 2 home market customers, an overall estimate and forecast of annual consumption is performed to allocate mill's resources. Siderca provided sample drilling plans for certain Channel 1 home market customers and a sample internal managerial forecast for the annual overall consumption for the home market, aggregated across main OCTG and non-OCTG business units. Siderca does not explain, however, whether the latter documentation is a product of Siderca's formal sales forecasting and strategic/economic planning processes; how the drilling plans routinely shared by Siderca's customers form the basis for said processes; and whether similar documentation is prepared with respect to sales to Siderca's U.S. affiliate or on behalf of Siderca's U.S. affiliate. Siderca also doesn't explain how and why the former and latter documentation infer its claim of the high selling intensity level associated with sales forecasting and strategic/economic planning with respect to home market Channel 1 and a medium-high selling intensity level associated with this activity with respect to home market Channel 2.[83]

Siderca first claims that the managerial forecast it provided in Exhibit Supp. A3 describes Siderca's managerial plans/activities and the documentation it provided in Exhibit Supp. A3 also demonstrates that the customers' drilling plans feed directly into Siderca's managerial forecast and planning process.

---

[82] *Id*. at 13.

[83] *Id*. at 13-14 (citing Siderca's Letters, "Oil Country Tubular Goods from Argentina:  Response to Section A of the Questionnaire," dated December 8, 2021 (AQR) at A-21 and A-24; and "Oil Country Tubular Goods from Argentina:  Response to Supplemental Sections A and B Questionnaire," dated February 18, 2022 (ABSQR) at 9-10 and Exhibits Supp. A2 and Supp. A3).

Due to a lack of explanation from Siderca, the record remains unclear, however, whether the three-page Excel spreadsheet that Siderca portrays as a sample internal managerial forecast captures, in its entirety, the essence of Siderca's formal sales forecasting and strategic/economic planning processes.[84]  Further, the record lacks a basic narrative from Siderca explaining the content/structure of the internal managerial forecast or showing how this report is demonstrative of the sample drilling plans for home market Channel 1 customers (provided by Siderca in the record) feeding directly into it and forming the basis for Siderca's formal managerial forecast and planning processes.[85]  Commerce's multiple requests for information required Siderca to provide documentation demonstrating the performance of a specific selling function during the POI, along with an explanation of how the provided documentation supports a claim of the performance of a given function.[86]  This exercise naturally necessitates an explanation of the documentation being provided, a detailed account of what information is contained therein and what it conveys, and how it is relevant to Commerce's LOT analysis.  In addition, and importantly, the record lacks an explanation from Siderca concerning how the claimed levels of intensity associated with sales forecasting and strategic/economic planning (*i.e.*, a high degree for home market Channel 1, a medium-high degree for home market Channel 2, and a low degree for the CEP channel) can be inferred or, at least, implied from the documentation provided in support of this selling function category.  For example, given Siderca's statement that home market Channel 1 customers share their drilling plans biweekly with Siderca for forecasting purposes, for home market Channel 2 customers, Siderca only performs an overall estimate and forecast of the annual consumption.[87]  In light of this information, Siderca does not explain why, for the "provision of sales support" selling function category it designated the level of intensity for Channel 1 with code "9" and for Channel 2 with code "6."[88]

Secondly, Siderca claims that the record does not contain similar documentation for the "provision of sales support" selling function category prepared by Siderca for its CEP sales.  However, notwithstanding Siderca's generalized statements that the U.S. affiliate performs the same selling functions in the United States as Siderca does in Argentina, Siderca stops short of explaining whether it prepares similar documentation on behalf of its U.S. affiliate, concerning the U.S. affiliate's sales in the United States.[89]  Accordingly, contrary to Siderca's claims, a closer review of the record does not remedy the deficiencies that Commerce identified in the *Preliminary Determination*, concerning this selling function category.

Provision of Training Services Selling Function Category

In the *Preliminary Determination*, Commerce found the following:

---

[84] *See* ABSQR at 9-10 and Exhibit Supp.A3.
[85] *Id*.
[86] *See* Commerce's Letters, Initial AD Questionnaire, dated November 10, 2021  (ADQ) at section A, subsection 3.a.ii., and first supplemental questionnaire, dated January 27, 2022 (SQ1) at 3.
[87] *See* ABSQR at 9-10.
[88] *Id*. at Exhibit Supp. A2.
[89] Notably, the record is void of any sample documentation pertaining to the "provision of sales support" selling function category with respect to the underlying selling functions undertaken by Siderca's U.S. affiliate in the United States.

For the "provision of training services" selling function category, Siderca reported that it provides, to a high degree for the home market Channel 1, to a medium degree for Channel 2, and to a low degree for the CEP channel, technical training for Siderca's customers, in order to improve the application and performance of Siderca's products. Siderca provided excerpts of sample presentations concerning certain performance-related pitfall issues for OCTG. Siderca does not explain which domestic customers were given the presentations in question, or when they took place, or how frequently the presentations in question were prevalent during the POI. Siderca does not explain why, given these facts, its level of intensity designations for the selling function category in question is appropriate.[90]

Regarding the timing of one presentation provided in the record, Siderca claims that the presentation in Exhibit Supp. A3 is dated during the POI. Moreover, Siderca claims that it properly differentiated between the intensity of the provision of training services between home market channels based on the extent of the support Siderca provides during string design and selection of OCTG and other material.

Commerce concedes that it overlooked the dates of the presentation materials for one presentation concerning certain performance-related pitfall issues for OCTG that Siderca provided in the record, dated during the POI, because the introductory page of the presentation in question wasn't translated.[91] Concerning the second presentation on certain performance-related pitfall issues for OCTG that Siderca provided in the record, because the presentation materials are not dated, Commerce cannot determine whether the presentation was provided during the POI.[92] Despite this, the presentation materials for both presentations do not appear to acknowledge, nor does Siderca specify, any specific party as the recipient of a given presentation, much less that it is, in fact, a home market customer and, particularly, a Channel 1 customer (given Siderca's higher level of intensity designation for home market Channel 1 than its designation for home market Channel 2).[93]

Equally important, Siderca does not explain how frequently the presentations in question were conducted during the POI for its home market customer in either Channel 1 or Channel 2. Given these facts, it is impossible to infer from the documentation that Siderca provided whether it claimed the appropriate levels of intensity designations for the selling function category in question. Commerce's multiple requests for information required Siderca to provide documentation demonstrating the performance of a specific selling function during the POI, along with an explanation of how the provided documentation supports a claim of the performance of a given function.[94] This exercise necessitates an explanation of the documentation being provided, and how it is relevant to Commerce's LOT analysis.

---

[90] *See Preliminary Determination* PDM at 14 (citing AQR at A-21 and A-24, ABSQR at 10 and Exhibits Supp. A2 and Supp. A3).
[91] *See* ABSQR at Exhibit Supp. A3.
[92] *Id.*
[93] *Id.*
[94] *See* ADQ at section A, subsection 3.a.ii., and SQ1 at 3.

14

Lastly, Siderca claims that it properly differentiated between the intensity of the provision of training services between home market channels based on the extent of the support Siderca provides during string design and selection of OCTG and other material. However, this alleged connection and correlation between the provision of OCTG string design and material selection and the provision of training services is first raised by Siderca in its case brief – the record is void of the discussion and the documentation on this point. Specifically, there is no explanation previously provided in the record by Siderca that the home market customers are given training presentations concerning certain performance-related pitfall issues for OCTG every time Siderca engages with them on OCTG string design and material selection. Accordingly, contrary to Siderca's claims, a closer review of the record does not remedy the deficiencies Commerce identified in the *Preliminary Determination*, concerning this selling function category.

<u>Provision of Technical Support Selling Function Category</u>

In the *Preliminary Determination*, Commerce found, in relevant part, the following:

> For the "provision of technical support" selling function category, Siderca reported that it provides, to a high degree for home market Channel 1, to a medium-high degree for home market Channel 2, and to a medium-low degree for the CEP channel, engineering services/advice and technical assistance regarding the technical specifications and the use of OCTG by its customers. Siderca provided sufficient documentation establishing the provision of engineering services and technical assistance for both home market channels. However, in relation to Siderca's significant number of sales reported for Channel 1, it reported an insignificant number of instances during the POI when Siderca's technical sales team worked with Channel 1 customers to analyze OCTG performance on different projects in Argentina. Siderca does not explain how the number of instances relates to the quantity of sales or the number of transactions with a nexus to the technical services received, that supports a high level of intensity designation for the "provision of technical support" selling function category with respect to Channel 1 … .[95]

Siderca claims that Commerce arbitrarily found as insignificant the number of instances Siderca's technical sales team worked with its home market customers that receive the full-service package to analyze OCTG performance, and questioned Siderca's reported high level of intensity designation for Home Market Channel 1 sales. Siderca claims that the engineering services and technical support brochure provided in Exhibit A4 shows the range and complexity of technical services provided to these customers and, therefore, justifies Siderca's reported intensity level.

There is nothing arbitrary in Commerce's finding that the provision of engineering services and technical assistance to home market Channel 1 customers amounted to an insignificant number

---

[95] *See Preliminary Determination* PDM at 14-15 (citing AQR at A-22 and A-24, and Exhibit 4; and ABSQR at 10-11 and Exhibits Supp. A1, Supp. A2, and Supp. A3).

of instances.[96]  As Commerce explained in the *Preliminary Determination*, we attributed the number of reported instances during the POI when Siderca's technical sales team worked with Channel 1 customers to analyze OCTG performance to the significant quantity of sales or the significant number of transactions reported for Channel 1 home market sales.  Commerce found that the number of claimed instances for the provision of engineering services and technical assistance to home market Channel 1 customers paled in comparison to the number of reported transactions.  Based on this comparison, and absent any clarification from Siderca, Commerce found Siderca's explanation in the record lacking as to why the number of transactions with a nexus to the number of instances where the technical services were provided supports a high level of intensity designation for the "provision of technical support" selling function category with respect to Channel 1.

We agree with Siderca that the engineering services and technical support brochure that Siderca provided in Exhibit A4 shows the breadth and complexity of technical services available to home market Channel 1 customers.[97]  However, the mere existence of the engineering services and technical support brochure is not indicative of whether and to what extent home market Channel 1 customers actually avail themselves of the myriad of engineering and technical support services that Siderca makes available to them.  Further, Siderca has not explained, and the record does not show, the degree to which certain major Channel 1 customers take advantage of these services; whether these customers always take full advantage of all available engineering and technical support services, whether they utilize these services on a limited basis, or whether they do not request services at all.  Commerce requested this information from Siderca multiple times; thus, it was incumbent upon Siderca to develop the record and then explain how the claimed level of intensity for a particular selling function can be inferred or implied from the information it provides.[98]  Contrary to Siderca's claims, a closer review of the record does not remedy the deficiencies that Commerce identified in the *Preliminary Determination*, concerning this selling function category.

Provision of Performance of Sales Related Administrative Activities Selling Function Category

In the *Preliminary Determination*, Commerce found, in relevant part, the following:

> {f}or the "performance of sales related administrative activities" selling function category, Siderca reported that it provides, to a high degree for home market Channel 1, to a medium degree for home market Channel 2, and to a medium-low degree for the CEP channel, the following administrative activities:  order input and processing; recordation of sales in the accounting system; issuance of sales-related documentation; and processing of payments.  For documentation related to the performance of the selling activities in this selling function category, Siderca relies on sales and expenses documentation provided for a sample home market sale.  For Channel 1, Siderca reported that it also manages customer's

---

[96] *See* AQR at A-22.  Commerce is withholding the reported number of instances concerning the provision of technical services because Siderca claimed business proprietary treatment of this information
[97] *See* ABSQR at Exhibit Supp. A1 (making public engineering and technical services brochure for the Tenaris "Southern Cone").
[98] *See* ADQ at section A, subsection 3.a.ii., and SQ1 at 3.

withdrawals of OCTG from the well and the communications related to this activity, *i.e.*, Siderca provided sample email correspondence showing Siderca's interaction with the customer regarding this activity. However, Siderca does not explain how often it manages the withdrawal of OCTG from the well during the POI and why this sole activity affords a higher level of intensity designation for Channel 1 in comparison to Channel 2. The record shows that sales to the United States, *i.e.*, the CEP channel, involve the very same set of selling activities described by Siderca in this selling function category undertaken by Siderca and Tenaris Global Services S.A., as those undertaken by Siderca for home market sales. Siderca does not explain why, given these facts, its levels of intensity designations vary between home market channels and, particularly, vary to a great degree between Channel 1 and the CEP channel.[99]

Siderca claims that Commerce incorrectly found that management of Home Market Channel 1 customers' withdrawals of OCTG from the well and related communications is the "sole activity" distinguishing Home Market Channel 1 and Channel 2 home market sales. Siderca claims it showed that for Home Market Channel 1 sales, Siderca also manages the customer relationship daily as the point of contact for customers that receive the full-service package. Siderca claims that a review of the sample email correspondence in Exhibit Supp. A3 demonstrates the high level of coordination between Siderca and the customer required to execute the selling activities.

Our review of the sample email correspondence to which Siderca refers, and which concerns the provision of the "performance of sales related administrative activities" selling function category, does not support Siderca's claim. The correspondence in question, showing Siderca's interaction with the customer regarding the management of the customer's withdrawals of OCTG from the well, consists of a single short email from Siderca's customer and Siderca's short reply.[100] The content of the emails in question does not provide any basis for inferring a high level of coordination for home market Channel 1 customers, and there is no other record evidence of claimed daily customer relationship management concerning Channel 1 customers. In the *Preliminary Determination*, Commerce found that Siderca does not explain how often it manages the withdrawal of OCTG from the well during the POI and why this sole activity affords a higher level of intensity designation for Channel 1 in comparison to Channel 2.[101] Given Commerce's multiple requests for information, it was incumbent upon Siderca to explain how the claimed level of intensity for a selling function can be inferred or implied from the information it provides and develop the record fully.[102] Accordingly, contrary to Siderca's claims, a closer review of the record does not remedy the deficiencies that Commerce identified in the *Preliminary Determination*, concerning this selling function category.

Next, Siderca raises certain other alleged deficiencies identified by Commerce in the *Preliminary Determination*, stating that they concern very specific information that Commerce did not

---

[99] *See* Preliminary Determination PDM at 15-16 (citing AQR at A-23 and A-24, and Exhibits A7 and A8; and ABSQR at 12 and Exhibits Supp. A2 and Supp. A3).
[100] *See* ABSQR at Exhibit A3.
[101] *See Preliminary Determination* PMD at 16.
[102] *See* ADQ at section A, subsection 3.a.ii.; *see also* SQ1 at 3.

request from Siderca and it should not be penalized for not providing it. Siderca claims that all of Commerce's concerns could have been addressed in full by Siderca if Commerce had asked them in its supplemental questionnaires. Commerce disagrees with Siderca on this point. The courts have confirmed that the mere existence of a CEP entity and CEP sales do not, alone, establish an entitlement to a CEP offset. For example, in *Corus*, the Court stated, "CEP offset analysis thus compares the indirect selling activities that are undertaken outside the United States in support of the U.S. and comparison market sales. It is not automatic each time {EP} is constructed … **{t}he burden of proof is upon the claimant to prove entitlement** … ('if a respondent claims an adjustment to decrease {NV}, as with **all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment**')."[103] A CEP offset to NV is a benefit to Siderca, and the burden of proof was upon Siderca to prove, to Commerce's satisfaction, Siderca's entitlement to it. In the original, as well as in a supplemental, questionnaire, Commerce requested that Siderca: (1) provide documentation demonstrating the performance of each of the claimed selling functions during the POI; (2) explain how the documentation provided supports the claims of performance of each reported activity; and (3) discuss how the reported activity is relevant to Commerce's LOT analysis.[104] As mentioned above, this exercise necessitates an explanation of the documentation being provided, a walk-through of what information is contained in the documentation and what it conveys, as well as an explanation of how it is relevant to Commerce's LOT analysis. Further, because this area of Commerce's LOT analysis focuses on qualitative factors, an explanation by a respondent to what extent the claimed levels of intensity can be inferred from, or supported by, the documentation provided, is necessary to Commerce's analysis. Accordingly, and given that what Commerce asked of Siderca is the same information Commerce routinely asks in the initial questionnaire, there is no basis to Siderca's claim that it could not have reasonably anticipated what would be required for Commerce's analysis, and that Commerce should not penalize Siderca for not providing information that Commerce did not specifically request. It was incumbent upon Siderca, a party with an exclusive and thorough knowledge/possession of its corporate information and business records, to develop the record fully in the first place, such that it satisfies its burden of proof for an entitlement to a favorable adjustment.

Further, the administrative precedent on which Siderca relies is inapposite to its claim.[105] In *Polytetrafluoroethylene Resin from India* and *Line Pipe from Korea*, Commerce accepted the respective respondent's deficient quantitative analysis, because Commerce found that it did not afford it with an opportunity to remedy certain deficiencies, as required under section 782(d) of the Act.[106] At issue here is the documentary support and Siderca's explanations/discussions that

---

[103] *See Corus Engineering Steels Ltd. v. United States*, 27 CIT 1286, 1290 (2003) (*Corus*) (citing *Micron Technology, Inc. v. United States*, 243 F.3d 1301, 1315-16 (Fed. Cir. 2001) and quoting Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) reprinted in 1994 U.S.C.C.A.N. 4040 at 829) (emphasis added)).
[104] *See* ADQ at section A, subsection 3.a.ii., and SQ1 at 3.
[105] *See* 19 CFR 351.401(b)(1) ("{t}he interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment.").
[106] *See Polytetrafluoroethylene Resin from India* IDM at 10 ("In its supplemental questionnaire, Commerce only requested generally that GFCL provide supporting documentation for its reported levels of intensity, which GFCL did for certain claimed selling activities. Accordingly, GFCL did not have an opportunity, pursuant to section 782(d) of the Act, to remedy any deficiency in its **quantitative analysis** by providing additional information in a supplemental questionnaire response…" (emphasis added)) and *Line Pipe from Korea* ("We note that Hyundai Steel

are relevant to Commerce's qualitative aspect of its LOT analysis and, as discussed above, the burden of proof was on Siderca, and it was given two separate opportunities to provide this information, in order to establish an entitlement to an adjustment for which Siderca is a direct beneficiary.

Based on this, for this final determination, we continue to find that Siderca did not provide adequate qualitative support concerning its claim for a CEP offset.

## B. Quantitative LOT Analysis

In the *Preliminary Determination*, Commerce found that "Siderca did not provide the quantitative analysis required by Commerce."[107]  Specifically, in the *Preliminary Determination*, Commerce found the following:

> Siderca did not provide the quantitative analysis required by Commerce, as it requested in the initial and supplemental questionnaires, that shows how:  (1) the expenses for sales made at different claimed LOTs impact price comparability; or (2) the claimed levels of intensity for the selling activities reported in the selling functions chart are quantitatively supported.[108]

In this investigation, Siderca reported ISEs that it alleges reflect the different levels of selling expenses and related functions that Siderca performs for its home market versus its U.S. sales; according to Siderca:  (1) its methodology for calculating ISEs, and the resulting allocation of expenses to home market and U.S. sales, is Siderca's quantitative analysis that results in the different level of expenses assigned to POI sales made at different levels of trade, thus impacting price comparability; and (2) its quantitative analysis supports the claimed levels of intensity for the selling activities reported.[109]

In the *Preliminary Determination*, Commerce disagreed with Siderca's assertions and provided the following explanation, concerning Siderca's purported quantitative analysis:

> {a}s a preliminary matter, Siderca's distribution of {ISEs} between home market and U.S. sales makes no distinction between two claimed home market channels of distribution, Channel 1 and Channel 2.  More importantly, Siderca's distribution of ISEs in the general ledger accounts for cost centers common to both home-market OCTG sales and U.S. market OCTG sales (accounting for a substantial portion of the total value of POI {ISEs}) relied on distribution concepts that were derived:  (1) for home market OCTG sales using either (a) a simple average of the designation codes for the selling intensities reported across

---

did not provide an analysis showing how expenses assigned to sales at the HM and CEP LOTs specifically impacted price comparability, as requested in the Initial Questionnaire.  However, we did not inform Hyundai Steel that we required more information with respect to this aspect of the **quantitative analysis**.  Thus, Hyundai Steel did not have an opportunity, pursuant to section 782(d) of the Act, to remedy this deficiency in its quantitative analysis" (citation omitted, emphasis added)).

[107] *See Preliminary Determination* PDM at 16.

[108] *Id*. at 16.

[109] *Id*. (citations to administrative record omitted).

all selling function categories for Channel 1 in the selling functions chart, or (b) the selling intensity designation (*i.e.*, code "9") with the most repetitions in the selling functions chart for Channel 1; (2) for U.S. market OCTG sales using the lowest reported designation code (*i.e.*, code "1") for the selling intensities reported across all selling function categories for the CEP channel in the selling functions chart; and (3) for both markets, the total quantity of OCTG shipped to the respective market.  However, as the record shows, Siderca did not provide any analysis that demonstrates how the claimed levels of intensity for the selling activities reported in the selling functions chart are quantitatively supported (and, as discussed above, a number of them appear to be qualitatively unsupported).  As a result, Siderca's distribution of {ISEs}, in a substantial part, relied on arbitrary numbers that formed an integral part of how the distribution concepts were calculated.  In essence, Siderca's quantitative analysis is an attempt to quantify the reported selling functions' intensities using their unquantified designated values as the cornerstone in the analysis.  Accordingly, we do not find that Siderca's quantitative analysis supports the claimed levels of intensity for the selling activities reported – Siderca merely calculates a higher ratio for {ISEs} attributable to home market sales versus the U.S. sales, a predicted and expected result, predicated on the unsubstantiated and arbitrary difference in the reported intensities of selling functions between two markets.  Because Siderca's reported selling functions and intensities thereof were unsubstantiated, we find that there is insufficient information on the record to determine, quantitatively, whether comparison market sales were made at a different LOTs than U.S. sales.[110]

Siderca argues that contrary to Commerce's description, Siderca properly distributed the ISEs between the home market and the U.S. market based on the nature of the cost centers and general ledger accounts in its trial balance and a "distribution concept" that reflected:  (1) the "sales effort" required (*i.e.*, the degree of selling activities in each market); and (2) the total quantity of OCTG shipped to each market.

Siderca misconstrues the record and misunderstands the core of Commerce's findings.  As Commerce explained in the *Preliminary Determination*, Commerce found that Siderca's distribution of ISEs in the general ledger accounts for cost centers *common* to both home-market OCTG sales and U.S. market OCTG sales accounted for a *substantial* portion of the total value of POI ISEs.  The total of such general ledger accounts *common* to both markets were allocated to each market using distribution concepts that relied on:  (1) the designation codes that Siderca reported for the levels of intensity of the selling function categories in Siderca's selling functions chart; and (2) the total quantity of OCTG shipped to the respective market.  But the numeric values associated with the designation codes that formed an integral part of the distribution concepts (*i.e.*, code "9" for home market Channel 1 sales and code "1" for U.S. CEP Channel sales) are not corroborated by any quantitative means.  In *OCTG Korea AR6 Final*, Commerce stated, "… the purpose of requiring quantitative analysis is to substantiate the respondent's reported selling activities levels…the quantitative evidence is supposed to substantiate and explain the reported levels in the selling activities charts"; "…without quantitative analysis and explanation, it is impossible to decipher from {the} source documents how {the respondent}

---

[110] *Id*. at 16-17 (citing ABSQR at Exhibit Supp. A2 and Supp. A4).

reported different levels of selling activities … ."[111]  Similarly, in *PET Sheet from Korea,*
Commerce found that, "{the respondent} does not provide the calculations it made to support its
assigned "1" to "10" level rankings, and as such, these assigned values, which supposedly reflect
the frequency and intensity of the selling activities performed, cannot be considered
'quantitative' analysis."[112]  Thus, the basis for the quantitative analysis is to show how the
claimed levels of intensity in the selling function chart are quantitatively derived and supported
using a respondent's normal business records.  Then, the quantitative analysis needs to show how
the expenses for sales made at different claimed LOTs affect price comparability.

Instead of the quantitative analysis that Commerce required from Siderca, it used, in substantial
part, arbitrary designation codes, unsupported by any quantitative means, and allocated ISEs
common to both markets using those codes to home market and U.S. sales; Siderca then claimed
that the results of this allocation manifest as the quantitative analysis that Commerce requires,
because the allocation arrives at different levels of expenses assigned to POI sales made at
different levels of trade and, allegedly, affect price comparability.  In other words, Siderca put
the cart before the horse.  For this reason, we found in the *Preliminary Results* that Siderca's
quantitative analysis is an attempt to quantify the intensities of the reported selling functions
using their unquantified designated values as the cornerstone in the analysis.  We reiterate in this
final determination our position stated in the *Preliminary Determination*:  merely calculating a
higher ratio for ISEs attributable to home market sales versus the U.S. sales is not a quantitative
analysis that supports the claimed differences in the levels of intensity for the selling activities
reported.  In *Rubber from Brazil*, Commerce stated that the record requires additional
quantitative evidence to rule out the possibility "that differences in prices between the {levels of
trade} is attributable to… other reasons, such as discretionary pricing decisions or differences in
sales volumes."[113]  In *OCTG Korea AR6 Final*, Commerce stated, "…a comparison of overall
{ISEs} reported in the U.S. sales database and third country sales database is not sufficient on its
own to establish that the sales occurred at different LOTs, because the difference in ISEs} could
be caused by other factors."[114]

Commerce explained the requirement for a quantitative analysis and its importance in
Commerce's LOT determinations, namely, to avoid the potential for manipulation and to ground
claimed differences in reported channels of distribution on objective data:

> reliance on qualitative evidence, such as narrative descriptions of differences in
> selling functions, customer correspondence, sample sales records, meeting
> presentations and the like, without supporting quantitative evidence frequently
> does not present a complete understanding of a respondent's selling activities.
> Additionally, reliance on purely qualitative information may create the potential
> for manipulation (or inaccurate reporting) by permitting respondents to create a
> narrative that is not linked in any way to its verifiable financial data.  Requiring
> quantitative evidence enhances our LOT analysis because such information
> allows us to determine whether differences in prices among various customer

---

[111] *See OCTG Korea AR6 Final* IDM at Comment 16.
[112] *See PET Sheet from Korea* IDM at 19.
[113] *See Rubber from Brazil* IDM at 9.
[114] *See OCTG Korea AR6 Final* IDM at Comment 16.

21

categories or differences in levels of expenses in different claimed LOTs are, in fact, attributable to differences in LOTs or to some other unrelated factor such as relative sales volumes. Quantitative information, such as the selling expense information requested by Commerce in this investigation, permits Commerce to examine whether a respondent's narrative explanations and qualitative evidence are supported by its books and records maintained in the ordinary course of business. Additionally, the requirement that respondents provide quantitative support for their claimed LOTs reduces subjectivity and the likelihood of inconsistency in the application of Commerce's analytical framework that results from the analysis of purely qualitative information, which can be, by its nature, subject to different interpretations.[115]

As explained above, the record lacks the quantitative analysis required under Commerce's practice.[116] Accordingly, we continue to find that Siderca did not provide the quantitative evidence demonstrating that its home market sales were at a more advanced LOT than its CEP sales made to its U.S. affiliate, because Siderca has not demonstrated a quantitative difference in the reported selling functions (and claimed intensities thereof) between the two markets.

Siderca argues that Commerce did not ask Siderca to further substantiate the methodology underlying its "quantitative analysis" and, therefore, Commerce should not penalize Siderca for not providing information that Commerce did not specifically request. We find no basis in Siderca's claim. In the original questionnaire, Commerce requested that Siderca: (1) provide a quantitative analysis showing how the expenses assigned to POI sales made at different claimed levels of trade impact price comparability; and (2) explain how the quantitative analysis provided in response to the requests for information above support the claimed levels of intensity for the selling activities reported in the selling functions chart.[117] In response, Siderca stated, "Siderca will provide indirect selling expense calculations in its Sections B and C responses. These expenses should capture any differences between levels of trade that are not based on direct selling expenses."[118] Having determined that what Siderca provided in response to sections B and C of the questionnaire is merely an attempt to demonstrate how ISEs vary by the different levels of trade claimed, Commerce again requested in a supplemental questionnaire that Siderca remedy its deficient response and provide the aforementioned information requested in the original questionnaire.[119] Rather than providing the quantitative analysis requested by Commerce, Siderca resubmitted its calculation worksheets for ISEs, purporting the underlying methodology and the outcome of such calculations as Siderca's quantitative analysis.[120] However, as we stated above, the circumstances present here are similar to those in *OCTG Korea AR6 Final*, where we did not find a mere difference in ISEs reported between a home and U.S. market to be dispositive of claimed differences in the LOTs.[121] In sum, Siderca was afforded two opportunities to report the quantitative information requested by Commerce, but it failed to do so.

---

[115] *See PET Sheet from Korea* IDM at 20 (internal citation omitted).
[116] *See, e.g.*, *OCTG Korea AR6 Final* IDM at Comment 16; and *PET Sheet from Korea* IDM at Comment 4.
[117] *See* ADQ at section A, subsection 3.a.ii.
[118] *See* AQR at A-26.
[119] *See* SQ1 at 3.
[120] *See* ABSQR at 13-16 and Exhibits Supp. A2 and Supp. A4.
[121] *See OCTG Korea AR6 Final* IDM at Comment 16.

As Commerce explained above, a CEP offset to NV is a benefit to Siderca and, thus, the burden of proof was Siderca's to demonstrate to Commerce that Siderca was entitled to it, by providing the requested quantitative analysis.[122]  It was incumbent upon Siderca, the party that has knowledge and possession of its corporate information and business records, to develop the record fully in the first place, such that it satisfies its burden of proof for an entitlement to a favorable adjustment.  Commerce agrees with the petitioners that Commerce should not countenance Siderca's attempt to fault Commerce for Siderca's own shortcomings in establishing an entitlement to a favorable adjustment.

As Siderca correctly points out, Commerce considers the submitted qualitative and quantitative information and makes a decision regarding whether the respondent has supported an LOT adjustment or CEP offset based on the "totality of the evidence."[123]  On the basis of this framework, for this final determination Commerce stands by its findings made in the *Preliminary Determination*:

> Due to the absence of sufficient/definitive source documentation and/or sufficient/satisfactory explanation accompanying the provided documentation and claimed differences in the LOTs, and the absence of the required quantitative analysis, the record lacks any means of corroborating LOT claims made by Siderca.  Further, given the importance of the quantitative analysis to Commerce's LOT analysis, we find that Siderca has not met its evidentiary burden.[124]

Accordingly, we find that the record does not support a finding that Siderca's home market and U.S. sales are at different LOTs and, thus, a CEP offset is not warranted under section 773(a)(7)(B) of the Act.  As Commerce indicated in the *Preliminary Determination*, this determination, under identical circumstances, is supported by recent administrative precedent.[125]

## Comment 2:  Third Country ISEs

*Petitioners' Case Brief*

In calculating CEP, Commerce should deduct selling expenses incurred in Uruguay by Tenaris Global Services S.A. (TGS Uruguay).

---

[122] *See, e.g.*, *Ad Hoc Shrimp*, 616 F. Supp. 2d at 1374; *Corus*, 27 CIT at 1290, *Pakfood*, 724 F. Supp. 2d at 1327; and 19 CFR 351.401(b)(1).

[123] *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Belgium:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 7116 (February 8, 2022), and accompanying IDM, at 31 and 33.

[124] *See Preliminary Determination* PDM at 17.

[125] *Id*. at 17-18 (citing *Rubber from Brazil* IDM at Comment 1 (where Commerce declined to find the existence of different LOTs or grant a CEP offset when the record lacked sufficient quantitative evidence corroborating a respondent's LOT claims); *Ripe Olives from Spain:  Final Results of Antidumping Duty Administrative Review; 2018–2019*, 86 FR 35068 (July 21, 2021), and accompanying IDM, at Comment 2 (denying a CEP offset due to a lack of a quantitative analysis); and *PET Sheet from Korea*, and accompanying IDM, at Comment 4); *see, also OCTG Korea AR6 Final* IDM at Comment 16.

- Consistent with statutory and regulatory requirements,[126] in the recent *Softwood Lumber from Canada Prelim*, Commerce deducted ISEs incurred in Canada from CEP.[127]
- In globally integrated companies, such as Tenaris Group, where selling activities are structured and centrally managed by a parent company or a designated subsidiary, support (and expenses) tied to U.S. selling activities can emanate from multiple entities in multiple countries. Therefore, Commerce needs to account for such selling expenses that are tied to sales of subject merchandise in the United States, "regardless of where they were incurred."[128]
- In the *Preliminary Results*, in declining to treat U.S. ISEs incurred in a third country as CEP expenses and, thus, deduct them from CEP, Commerce relied on *Mechanical Tubing from Italy.[129]*
  - In that case, Commerce declined to deduct the ISEs of third-country affiliates because "the petitioners cited no record information, nor provided any precedent, to support their claim."[130]
  - In the instant case, the record establishes that the ISEs incurred in Uruguay by TGS Uruguay are "for the account of" Siderca or affiliated seller in the United States, TGS USA, and are "associated with commercial activities in the Unites States that relate to the sales to an unaffiliated purchaser.[131]
    - TGS Uruguay's reported indirect U.S. selling expenses were calculated by dividing its indirect selling and administrative expenses by the total net value of foreign market sales.[132]
    - Such a calculation is consistent with Siderca's description of TGS Uruguay as overseeing a global commercial network of entities that provide marketing, logistics, distribution, and other commercial services for a various steel pipe products throughout the world. This network includes TGS USA, which imports, sells and distributes the OCTG produced by Siderca in the United States.[133]
    - According to Siderca, TGS Uruguay provides Siderca access to customers operating in key energy markets worldwide, allowing Siderca to focus solely on OCTG production.[134]

---

[126] *See* Petitioners' Case Brief at 3-4 (citing section 772(d)(1) of the Act and 19 CFR 351.402(b)).

[127] *Id.* at 4 (citing *Certain Softwood Lumber Products from Canada: Preliminary Results of Antidumping Duty Administrative Review*, 86 FR 28551 (May 27, 2021) (*Softwood Lumber from Canada*)).

[128] *Id.* at 4-5 (citing *Stainless Steel Sheet and Strip in Coils from Germany; Notice of Final Results of Antidumping Duty Administrative Review*, 67 FR 7668 (February 20, 2002) (*Sheet and Strip from Germany*), and accompanying IDM, at Comment 4).

[129] *Id.* at 5 (citing *Preliminary Determination* PDM at 10 (which references *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy: Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 FR 71 (January 3, 2022) (*Mechanical Tubing from Italy*)).

[130] *Id.* (citing *Mechanical Tubing from Italy* IDM at Comment 4).

[131] *Id.* at 6 (citing section 772(d)(1) of the Act and 19 CFR 351.402(b)).

[132] *Id.* at 6-7.

[133] *Id.* at 7.

[134] *Id*

24

*Siderca's Rebuttal Brief*

- Commerce should continue not to deduct ISEs incurred by TGS Uruguay in calculating CEP.
  - Section 772(d)(1) of the Act provides for Commerce to calculate CEP "by deducting credit expenses, selling expenses associated with economic activities occurring in the United States, which includes direct selling expenses and those {ISEs} associated with economic activities <u>occurring in the United States</u>."[135]
  - In the *Preliminary Determination*, Commerce already considered and rejected this argument and, consistent with the statute, "did not treat Siderca's U.S. {ISEs} incurred by TGS Uruguay in Uruguay as CEP expenses and, accordingly, did not deduct them from CEP."[136]
  - Commerce's approach in the *Preliminary Determination* of not deducting TGS Uruguay's selling expenses to calculate the CEP is in line with its normal practice.[137]
    - In *Dioctyl Terephthalate from Korea*, Commerce explained that it calculated "{ISEs} incurred in the country of manufacture for {respondent's} U.S. sales as the sum of the ISEs incurred by the {respondent} and its third-country affiliates."[138]
    - The petitioners' reliance on *Softwood Lumber from Canada* and *Sheet and Strip from Germany* is inapposite to the facts in this case. In this investigation, Siderca has demonstrated that TGS Uruguay's selling expenses for Siderca's U.S. sales are not related to sales to unaffiliated U.S. customers, but rather to limited logistical services and sales related administrative activities related to sales to TGS USA.[139]
  - Siderca followed Commerce's instructions in the initial Section C questionnaire that required the reporting of indirect selling and administrative expenses incurred in the United States separately from the ISEs incurred in the country of manufacture and third countries.[140]
  - In response to Commerce's request, Siderca provided a revised selling functions chart that shows, in one separate column, the selling functions (and intensities thereof) undertaken by TGS Uruguay with respect to sales of OCTG to TGS USA.[141]
  - In response to another request from Commerce, Siderca explained the role of TGS Uruguay with respect to Siderca's U.S. sales, which confirms that the U.S. ISEs incurred in Uruguay by TGS Uruguay are related solely to sales to TGS USA.[142]
    - Siderca explained that "for U.S. sales made at the constructed {LOT}, the main selling functions undertaken by TGS Uruguay with respect to sales of OCTG to TGS

---

[135] *See* Siderca Rebuttal Brief at 2-3 (citing *Certain Stilbenic Optical Brightening Agents from Taiwan: Preliminary Results of Antidumping Duty Administrative Review; 2015–2016*, 82 FR 26060 (June 6, 2017), accompanying PDM, at 6 (emphasis added)).

[136] *Id*. at 3 (citing *Preliminary Determination* PDM at 10).

[137] *Id*. at 3-4.

[138] *Id*. at 4 (citing *Dioctyl Terephthalate from the Republic of Korea: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 82 FR 28824 (June 26, 2017) (*Dioctyl Terephthalate from Korea*), and accompanying IDM, at 17).

[139] *Id*. (citing Siderca's Letter, "Oil Country Tubular Goods from Argentina: Response to the 4th Supplemental Questionnaire," dated April 15, 2022 (4th SQR), at 2-6).

[140] *Id*. at 4-5.

[141] *Id*. at 5.

[142] *Id*.

USA are the provision of logistical services, and performance of sales related administrative activities.[143]

- The sample sales documentation that Siderca submitted on the record confirms Siderca's explanation.[144]

**Commerce's Position:** In this final determination, consistent with our decision in the *Preliminary Determination*, we did not treat Siderca's U.S. ISEs incurred by TGS Uruguay in Uruguay as CEP expenses and, accordingly, did not deduct them from CEP.

Section 772(d)(1) of the Act states that the price used to establish CEP shall be reduced by "the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added): (A) commissions for selling the subject merchandise in the United States; (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties; (C) any selling expenses that the seller pays on behalf of the purchaser; and (D) any selling expenses not deducted under subparagraph (A), (B), or (C)." The regulations at 19 CFR 351.402(b) state, in relevant part, "{i}n establishing constructed export price under section 772(d) of the Act, the Secretary will make adjustments for expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, no matter where or when paid. The Secretary will not make an adjustment for any expense that is related solely to the sale to an affiliated importer in the United States… ."

In the *Preliminary Determination*, Commerce articulated the following:

> {i}t is not our practice to treat U.S. {ISEs} incurred in a third country as CEP expenses and deduct them from the gross unit price. Information on the record of this investigation demonstrates that Siderca's U.S. {ISEs} incurred in Uruguay by TGS Uruguay are related solely to sales to its U.S. sales affiliate, TGS USA, which invoiced the unaffiliated U.S. customers for Siderca's CEP sales. Therefore, we preliminarily did not treat Siderca's U.S. {ISEs} incurred by TGS Uruguay in Uruguay as CEP expenses and, accordingly, did not deduct them from CEP.[145]

In support of its decision in the *Preliminary Determination*, Commerce relied on the regulatory language in 19 CFR 351.402(b) which prohibits an adjustment to CEP for any expense that is related solely to the sale to an affiliated importer in the United States, and the precedent in *Mechanical Tubing from Italy*, which addressed the same issue and involved the same entities as those in this investigation, TGS Uruguay and TGS USA.[146]

Commerce's decision in the *Preliminary Determination* is consistent with its practice of treating U.S. ISEs incurred in a third country similar to how it treats U.S. ISEs incurred in a home

---

[143] *Id.* at 5-6.
[144] *Id.* at 6.
[145] *See Preliminary Determination* PDM at 10 (internal citations omitted).
[146] *Id.* (citing 19 CFR 351.402(b); and *Mechanical Tubing from Italy* IDM at Comment 4).

market.[147]  It is for this reason that Commerce requests, in the original Section C questionnaire, that a respondent report ISEs incurred in the United States separately from ISEs incurred outside the U.S. market.[148]

For this final determination, Commerce finds no compelling reasons to reverse its decision. Contrary to the petitioners' assertion, there is no record evidence that the ISEs incurred in Uruguay by TGS Uruguay were on behalf of Siderca or its affiliated seller in the United States, TGS USA, or that those expenses were associated with commercial activities in the Unites States.  On the contrary, the information on the record of this investigation demonstrates that Siderca's U.S. ISEs incurred in Uruguay by TGS Uruguay are related solely to sales to its U.S. sales affiliate, TGS USA, which invoiced the unaffiliated U.S. customers for Siderca's CEP sales.[149]  These facts stand in stark contrast with the factual scenarios underlying administrative precedent where Commerce made an adjustment, under section 772(d)(1) of the Act, for expenses incurred on behalf of a respondent or its U.S. affiliate that were found to have a nexus to a commercial activity in the United States.  For example, in *Ball Bearings et.al.*, Commerce deducted additional benefits expenses incurred by the respondent in Japan for certain Japanese employees because the expenses were in association with, and as compensation for, those employees having engaged in activity in the United States.[150]  Similarly, in *Sheet and Strip from Germany*, Commerce stated that it "…deducted {ISEs} incurred in the country of manufacture…from U.S. price to account for all U.S. selling expenses **that are associated with economic activities occurring in the United States**, regardless of where they were incurred."[151]  Likewise, in *Softwood Lumber from Canada*, Commerce stated, "We also deducted expenses **associated with economic activities occurring in the United States**… ."[152]

In this investigation, the only evidence on which the petitioners rely to allege that the ISEs incurred by TGS Uruguay are "for the account of" Siderca or TGS USA, and that such expenses are "associated with commercial activities in the Unites States," is Siderca's statements in the record, which the petitioners misconstrue.  In its questionnaire response, Siderca stated the following:

---

[147] *See, e.g.*, *Dioctyl Terephthalate from Korea* and accompanying IDM, at 17 ("… we have continued to calculate {ISEs} incurred in the country of manufacture for AKP's U.S. sales as the sum of the ISEs incurred in AKP and **its third-country affiliates** …" (emphasis added)).
[148] *See* ADQ at section C, C-26, and C-27.
[149] *See, e.g.*, AQR at A-10 and Exhibit A-8; ABSQR at 8, 13, and Exhibit Supp. A2 (showing the provision of logistics services and performance of sales related administrative activities as the only two selling functions undertaken by TGS Uruguay with respect to its sales of OCTG to TGS USA, information which is supported by the sales documentation); and 4th SQR at 2-6 (explaining the role of TGS Uruguay with respect to its sales of OCTG to TGS USA, *e.g.*, TGS Uruguay only "organizes freight and delivery of Siderca-manufactured OCTG to the United States and it processes and inputs the orders received from TGS USA and issues related sales documentation, such as sales invoices.").
[150] *See Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews*, 70 FR 54711 (September 16, 2005) (*Ball Bearings et.al.*), and accompanying IDM, at Comment 9A, affirmed in *Koyo Seiko Co., Ltd. v. United States*, 516 F. Supp.2d 1323 (CIT 2007).
[151] *See Sheet and Strip from Germany* IDM at Comment 4 (emphasis added).
[152] *See Softwood Lumber from Canada Prelim*, unchanged in *Certain Softwood Lumber Products from Canada: Final Results of Antidumping Duty Administrative Review*; 2019, 86 FR 68471 (December 2, 2021).

27

TGS Uruguay **and its affiliates, which include TGS USA**, have developed a global commercial network with subsidiaries, distribution facilities, representative offices, and agents providing marketing, logistics, distribution, finishing, and commercial services for a full range of steel pipe products throughout the world. This worldwide network supports Siderca and its sale of the OCTG products it produces. **TGS Uruguay and its affiliates** provide Siderca access to customers operating in key energy markets worldwide, allowing Siderca to focus on OCTG manufacturing excellence.[153]

Nothing in this language suggests that TGS Uruguay bypasses its affiliates, such as TGS USA, and provides the aforementioned services (and incurs expenses commensurate with the provision of such services) on behalf of Siderca or TGS USA that are associated with the commercial activities inside the U.S. market.

Next, the petitioners highlight the description of the main activity of TGS Uruguay, as reflected in Tenaris S.A.'s 2020 annual report, which states "marketing of steel products."[154] Nothing in this description suggests that TGS Uruguay completely bypasses its affiliates that are intentionally incorporated and domiciled in the markets they serve (*i.e.*, TGS USA in the U.S. market), and performs marketing activities for OCTG sales on behalf of Siderca or TGS USA in the United States.

Lastly, in response to the petitioners' pre-verification comments and suggested verification procedures,[155] Commerce explored the nature of certain general ledger accounts of TGS Uruguay. We found no evidence that TGS Uruguay collected commissions or earned service revenue in connection with sales of subject merchandise in the United States.[156] Further, Commerce explored, through an examination of documentation that Siderca provided at verification, how TGS Uruguay's compensation was determined, calculated, and represented in its invoice to TGS USA for the services it provided to Siderca and TGS USA. For TGS Uruguay's sales to TGS USA, we did not observe any charges incurred by TGS Uruguay for any services other than those claimed in the record.[157]

Based on the above, and consistent with our precedent and record evidence, Commerce continues to find that it is not appropriate to treat U.S. ISEs incurred by TGS Uruguay in Uruguay as CEP expenses and deduct them from CEP under section 772(d)(1) of the Act.

---

[153] *See* AQR at A-10 (emphasis added).
[154] *See* Petitioners' Case Brief (citing AQR at Exhibit A16, page 217).
[155] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina: U. S. Steel's Comments Regarding the Verification of Siderca," dated May 25, 2022, at 10-11.
[156] *See* Memorandum, "Verification of the Sales Questionnaire Response of Tenaris Global Services (U.S.A.) Corporation in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina," dated June 30, 2022, at 11-12 and Exhibit 11.
[157] *Id.*

## Comment 3: R&D Expenses for Further Manufacturing Costs

*Petitioners' Case Brief:*

- At verification, Commerce found that Siderca excluded certain R&D expenses incurred by its affiliated further manufacturer, Hydril Company (Hydril) from the reported G&A and, thus, further manufacturing costs.[158]
- For the final determination Commerce should include the R&D expenses in question in the further manufacturing G&A ratio.[159]

No other party commented on this issue.

**Commerce's Position:** We agree with the petitioners. Siderca's affiliated further manufacturer, Hydril, incurred R&D expenses during the POI related to project development. During verification, we determined that certain project development R&D expenses were excluded from Hydril's further manufacturing G&A expenses.[160] For the final determination, we revised the calculation of Hydril's G&A expense rate to include the R&D expenses at issue.[161]

## VI.    RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting the above positions. If this recommendation is accepted, we will publish the final determination of the investigation and the final estimated weighted-average dumping margins in the *Federal Register* and will notify the U.S. International Trade Commission of our determination.

☒                                          ☐

_____                      _____
Agree                                    Disagree


X  *Lisa W. Wang*
_____

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[158] *See* Petitioners' Case Brief at 8 and 9.

[159] *Id.*

[160] *See* Memorandum, "Virtual Verification of the Further Manufacturing Cost Response of Siderca S.A.I.C. in the Antidumping Duty Investigation of Oil Country Tubular Goods from Argentina," dated July 28, 2022

[161] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Siderca S.A.I.C.," dated September 23, 2022.

*Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*

86 Fed. Reg. 60205

November 1, 2021

Appx114 – Appx119


final and conclusive court decision, Commerce intends to instruct CBP to assess antidumping duties on unliquidated entries of subject merchandise exported by Carbon Activated, Datong Juqiang, Beijing Pacific, GHC, Ningxia Mineral, and Shanxi Sincere in accordance with 19 CFR 351.212(b). We will instruct CBP to assess antidumping duties on all appropriate entries covered by this review when the importer-specific assessment rate is not zero or *de minimis*. Where an import-specific assessment rate is zero or *de minimis*,[10] we will instruct CBP to liquidate the appropriate entries without regard to antidumping duties.

**Notification to Interested Parties**

This notice is issued and published in accordance with sections 516A(c) and (e) and 777(i)(1) of the Act.

Dated: October 26, 2021.

**Ryan Majerus,**
*Deputy Assistant Secretary for Policy and Negotiations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2021–23858 Filed 10–28–21; 4:15 pm]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A-357-824, A-201-856, A-821-833]**

**Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable October 26, 2021.

**FOR FURTHER INFORMATION CONTACT:**
Dmitry Vladimirov at (202) 482–0665 and Christopher Williams at (202) 482–5166 (Argentina); James Hepburn at (202) 482–1882 and Preston Cox at (202) 482–5041 (Mexico); George McMahon at (202) 482–1167 and Marc Castillo at (202) 482–0519 (the Russian Federation (Russia)); AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

**The Petitions**

On October 6, 2021, the Department of Commerce (Commerce) received

antidumping duty (AD) petitions concerning imports of oil country tubular goods (OCTG) from Argentina, Mexico, and Russia filed in proper form on behalf of Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, U.S. Steel Tubular Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC (the USW), and Welded Tube USA, Inc. (the petitioners), domestic producers of OCTG and a certified union that represents workers engaged in the production of OCTG.[1] The Petitions were accompanied by countervailing duty (CVD) petitions concerning imports of OCTG from the Republic of Korea and Russia.[2]

On October 7, 8, 14, and 19, 2021, Commerce requested supplemental information pertaining to certain aspects of the Petitions in separate supplemental questionnaires.[3] The petitioners filed responses to the supplemental questionnaires on October 12, 13, 18, and 21, 2021.[4]

In accordance with section 732(b) of the Tariff Act of 1930, as amended (the Act), the petitioners allege that imports of OCTG from Argentina, Mexico, and Russia are being, or are likely to be, sold in the United States at less than fair value (LTFV) within the meaning of section 731 of the Act, and that imports of such products are materially injuring, or threatening material injury, to the OCTG industry in the United States. Consistent with section 732(b)(1) of the

Act, the Petitions are accompanied by information reasonably available to the petitioners supporting their allegations.

Commerce finds that the petitioners filed the Petitions on behalf of the domestic industry, because the petitioners are interested parties, as defined in sections 771(9)(C) and 771(9)(D) of the Act. Commerce also finds that the petitioners demonstrated sufficient industry support for the initiation of the requested LTFV investigations.[5]

**Period of Investigation**

Because the Petitions were filed on October 6, 2021, the period of investigation (POI) for these LTFV investigations is October 1, 2020, through September 30, 2021, pursuant to 19 CFR 351.204(b)(1).[6]

**Scope of the Investigations**

The products covered by these investigations are OCTG from Argentina, Mexico, and Russia. For a full description of the scope of these investigations, *see* the appendix to this notice.

**Comments on the Scope of the Investigations**

On October 13, 2021, Commerce spoke with counsel to the petitioners regarding the proposed scope, to ensure that the scope language in the Petitions is an accurate reflection of the products for which the domestic industry is seeking relief.[7]

As discussed in the *Preamble* to Commerce's regulations, we are setting aside a period for interested parties to raise issues regarding product coverage (*i.e.*, scope).[8] Commerce will consider all comments received from interested parties and, if necessary, will consult with interested parties prior to the issuance of the preliminary determinations. If scope comments include factual information,[9] all such factual information should be limited to public information. To facilitate preparation of its questionnaires, Commerce requests that all interested parties submit such comments by 5:00 p.m. Eastern Time (ET) on November

---

[10] *See* 19 CFR 351.106(c)(2).

[1] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia," dated October 6, 2021 (Petitions).

[2] *Id.*

[3] *See* Commerce's Letters, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Supplemental Questions," dated October 7, 2021; and "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Supplemental Questions," dated October 19, 2021; and Country-Specific Supplemental Questionnaires: Argentina Supplemental, Mexico Supplemental, and Russia Supplemental, dated October 8, 2021, and Russia Second Supplemental, dated October 14, 2021.

[4] *See* Petitioners' Letters, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement) and "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to Second General Issues Questionnaire," dated October 21, 2021 (Second General Issues Supplement); *see also* Petitioners' Country-Specific Supplemental Responses, dated October 13, 2021; and Russia Second Supplemental Response, dated October 18, 2021.

[5] *See infra*, section titled "Determination of Industry Support for the Petitions."

[6] *See* 19 CFR 351.204(b)(1).

[7] *See* Memorandum, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Phone Call with Counsel to the Petitioners," dated October 13, 2021.

[8] *See Antidumping Duties; Countervailing Duties, Final Rule*, 62 FR 27296, 27323 (May 19, 1997) (*Preamble*).

[9] *See* 19 CFR 351.102(b)(21) (defining "factual information").

15, 2021, which is 20 calendar days from the signature date of this notice. Any rebuttal comments, which may include factual information, must be filed by 5:00 p.m. ET on November 26, 2021, which is the first business day after ten calendar days from the initial comment deadline.[10]

Commerce requests that any factual information that parties consider relevant to the scope of these investigations be submitted during this period. However, if a party subsequently finds that additional factual information pertaining to the scope of these investigations may be relevant, the party may contact Commerce and request permission to submit the additional information. All such submissions must be filed on the records of each of the concurrent AD and CVD investigations.

**Filing Requirements**

All submissions to Commerce must be filed electronically via Enforcement and Compliance's Antidumping Duty and Countervailing Duty Centralized Electronic Service System (ACCESS), unless an exception applies.[11] An electronically filed document must be received successfully in its entirety by the time and date on which it is due.

**Comments on Product Characteristics**

Commerce is providing interested parties an opportunity to comment on the appropriate physical characteristics of OCTG to be reported in response to Commerce's AD questionnaires. This information will be used to identify the key physical characteristics of the subject merchandise in order to report the relevant costs of production accurately, as well as to develop appropriate product-comparison criteria.

Interested parties may provide any information or comments that they feel are relevant to the development of an accurate list of physical characteristics.

Specifically, they may provide comments as to which characteristics are appropriate to use as: (1) General product characteristics; and (2) product comparison criteria. We note that it is not always appropriate to use all product characteristics as product comparison criteria. We base product comparison criteria on meaningful commercial differences among products. In other words, although there may be some physical product characteristics utilized by manufacturers to describe OCTG, it may be that only a select few product characteristics take into account commercially meaningful physical characteristics. In addition, interested parties may comment on the order in which the physical characteristics should be used in matching products. Generally, Commerce attempts to list the most important physical characteristics first and the least important characteristics last.

In order to consider the suggestions of interested parties in developing and issuing the AD questionnaires, all product characteristics comments must be filed by 5:00 p.m. ET on November 15, 2021, which is 20 calendar days from the signature date of this notice. Any rebuttal comments must be filed by 5:00 p.m. ET on November 26, 2021, which is the first business day after 10 calendar days from the initial comment deadline.[12] All comments and submissions to Commerce must be filed electronically using ACCESS, as explained above, on the record of each of the LTFV investigations.

**Determination of Industry Support for the Petitions**

Section 732(b)(1) of the Act requires that a petition be filed on behalf of the domestic industry. Section 732(c)(4)(A) of the Act provides that a petition meets this requirement if the domestic producers or workers who support the petition account for: (i) At least 25 percent of the total production of the domestic like product; and (ii) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. Moreover, section 732(c)(4)(D) of the Act provides that, if the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product,

Commerce shall: (i) Poll the industry or rely on other information in order to determine if there is support for the petition, as required by subparagraph (A); or (ii) determine industry support using a statistically valid sampling method to poll the "industry."

Section 771(4)(A) of the Act defines the "industry" as the producers as a whole of a domestic like product. Thus, to determine whether a petition has the requisite industry support, the statute directs Commerce to look to producers and workers who produce the domestic like product. The International Trade Commission (ITC), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both Commerce and the ITC must apply the same statutory definition regarding the domestic like product,[13] they do so for different purposes and pursuant to a separate and distinct authority. In addition, Commerce's determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[14]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation" (i.e., the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition).

With regard to the domestic like product, the petitioners do not offer a definition of the domestic like product distinct from the scope of the investigations.[15] Based on our analysis of the information submitted on the record, we have determined that OCTG, as defined in the scope, constitutes a single domestic like product, and we have analyzed industry support in terms of that domestic like product.[16]

---

[10] The deadline for rebuttal comments falls on November 25, 2021, which is a Federal holiday. Commerce's practice dictates that where a deadline falls on a weekend or Federal holiday, the appropriate deadline is the next business day (in this instance, November 26, 2021). *See Notice of Clarification: Application of "Next Business Day" Rule for Administrative Determination Deadlines Pursuant to the Tariff Act of 1930, As Amended*, 70 FR 24533 (May 10, 2005) (*Notice of Clarification*).

[11] *See Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures*, 76 FR 39263 (July 6, 2011); *see also Enforcement and Compliance; Change of Electronic Filing System Name*, 79 FR 69046 (November 20, 2014) for details of Commerce's electronic filing requirements, effective August 5, 2011. Information on help using ACCESS can be found at *https://access.trade.gov/help.aspx* and a handbook can be found at *https://access.trade.gov/help/Handbook_on_Electronic_Filing_Procedures.pdf*.

[12] The deadline for rebuttal comments falls on November 25, 2021, which is a Federal holiday. Commerce's practice dictates that where a deadline falls on a weekend or Federal holiday, the appropriate deadline is the next business day (in this instance, November 26, 2021). *See Notice of Clarification.*

[13] *See* section 771(10) of the Act.

[14] *See USEC, Inc.* v. *United States*, 132 F. Supp. 2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp., Ltd.* v. *United States*, 688 F. Supp. 639, 644 (CIT 1988), *aff'd* 865 F. 2d 240 (Fed. Cir. 1989)).

[15] *See* Petitions at Volume I at 20–22 and Exhibits I–11, I–13, I–14, and I–18.

[16] For a discussion of the domestic like product analysis as applied to these cases and information regarding industry support, *see* Country-Specific Checklists, "Antidumping Duty Investigation Initiation Checklists: Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation," dated concurrently with this **Federal Register** notice and on file electronically via

---

In determining whether the petitioners have standing under section 732(c)(4)(A) of the Act, we considered the industry support data contained in the Petitions with reference to the domestic like product as defined in the "Scope of the Investigations," in the appendix to this notice. To establish industry support, the petitioners provided the 2020 production of OCTG for the U.S. producers that support the Petitions.[17] The petitioners estimated the 2020 production by non-petitioning companies using shipment data available for the entire OCTG industry and publicly available information on production and domestic shipments from the ITC's 2020 report from the sunset review of OCTG from India, Korea, Turkey, Ukraine, and the Socialist Republic of Vietnam.[18] The petitioners estimated the total 2020 production of the domestic like product for the entire industry by adding their production to the estimated production of the non-petitioning producers.[19] We relied on data provided by the petitioners for purposes of measuring industry support.[20]

On October 8, 15, and 20, 2021, we received comments on industry support from Tenaris Bay City, Inc., IPSCO Tubulars Inc., Maverick Tube Corporation, and Tenaris Global Services (U.S.A.) Corporation (collectively, Tenaris USA), U.S. producers of OCTG.[21] On October 18,

2021, the petitioners responded to the comments from Tenaris USA.[22] On October 21, 2021, the Government of Russia (GOR) raised industry support comments during the consultations held regarding the Russia CVD Petition.[23] On October 21, 2021, we received comments from TMK Group (TMK), a Russian producer and exporter of OCTG.[24] On October 22, 2021, Tenaris USA filed its fourth submission with Commerce and formally indicated that it opposes the Petitions.[25] Also on October 22, 2021, the petitioners responded to TMK's comments.[26]

Based on the information provided in the Petitions, the First General Issues Supplement, Petitioners' Letter, the Second General Issues Supplement, Petitioners' Letter II, and other information readily available to Commerce, we determine that the domestic producers and workers have met the statutory criteria for industry support under section 732(c)(4)(A)(i) of the Act because the domestic producers (or workers) who support the Petitions account for at least 25 percent of the total production of the domestic like product.[27] Because the Petitions and supplemental submissions did not establish support from domestic producers (or workers) accounting for more than 50 percent of the total production of the domestic like product, Commerce was required to take further action in order to evaluate industry

support.[28] In this case, Commerce was able to rely on other information, in accordance with section 732(c)(4)(D)(i) of the Act, to determine industry support.[29] Based on information provided in the Petitions, the First General Issues Supplement, Petitioners' Letter, the Second General Issues Supplement, Petitioners' Letter II, and other information readily available to Commerce, the domestic producers and workers have met the statutory criteria for industry support under section 732(c)(4)(A)(ii) of the Act because the domestic producers (or workers) who support the Petitions account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions.[30] We note that, even if all other U.S. producers of OCTG oppose the Petitions (including Tenaris USA), the supporters of the Petitions would still have the requisite level of industry support pursuant to section 732(c)(4)(A)(ii) of the Act.[31] Accordingly, Commerce determines that the Petitions were filed on behalf of the domestic industry within the meaning of section 732(b)(1) of the Act.[32]

**Allegations and Evidence of Material Injury and Causation**

The petitioners allege that the U.S. industry producing the domestic like product is being materially injured, or is threatened with material injury, by reason of the imports of the subject merchandise sold at LTFV. In addition, the petitioners allege that subject imports exceed the negligibility threshold provided for under section 771(24)(A) of the Act.[33]

The petitioners contend that the industry's injured condition is illustrated by a significant and increasing volume of subject imports; reduced market share; underselling and price suppression; lost sales and revenues; declines in production, U.S. shipments, and capacity utilization; decline in employment; and adverse impact on the domestic industry's financial performance.[34] We assessed the allegations and supporting evidence regarding material injury, threat of material injury, causation, as well as

---

ACCESS (Country-Specific AD Initiation Checklists) at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation (Attachment II).

[17] See Petitions at Volume I at Exhibits I–1 and I–3; see also First General Issues Supplement at 4 and Exhibits 4 and 8; and Second General Issues Supplement at Exhibits 3–5.

[18] See Petitions at Volume I at Exhibits I–1 and I–2; see also First General Issues Supplement at 6–10 and Exhibit 1 (containing *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. No. 701–TA–499–500 and 731–TA–1215–1216, 1221–1223 (Review), USITC Pub. 5090 (July 2020) (*OCTG Review*) and Exhibit 8 (containing *OCTG Review* at Table III–5); and Second General Issues Supplement at Exhibit 5.

[19] See First General Issues Supplement at 7 and Exhibit 8; see also Second General Issues Supplement at Exhibit 5.

[20] See Petitions at Volume I at Exhibits I–1 and I–2; see also First General Issues Supplement at 3–10 and Exhibits 1, 4, 5, and 8; and Second General Issues Supplement at 1–2 and Exhibits 2–5.

[21] See Tenaris USA's Letters, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Factual Errors in Petitions," dated October 8, 2021; "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Comments on Petitioners' Standing," dated October 15, 2021; and "Oil Country Tubular Goods from Mexico: Reply Comments on Petitioners' Standing," dated October 20, 2021. In addition, on October 21, 2021, Commerce met via video conference with counsel

to Tenaris USA to discuss its industry support comments. See Memorandum, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation," dated October 21, 2021.

[22] See Petitioners' Letter, "Oil Country Tubular Goods from Argentina, Mexico, Russia, and the Republic of Korea: Response to Tenaris Submission Concerning Petitioners' Standing," dated October 18, 2021 (Petitioners' Letter).

[23] See Memorandum, "Countervailing Duty Petition on Oil Country Tubular Goods from the Russian Federation: Consultations with Officials from the Government of the Russian Federation," dated October 21, 2021; see also GOR Letter, "Re: Countervailing Duty Investigation of Certain Oil Country Tubular Goods from the Russian Federation: Consultations," dated October 25, 2021.

[24] See TMK's Letter, "Oil Country Tubular Goods from Russia: Comments on Petitioners' Standing," dated October 21, 2021.

[25] See Tenaris USA's Letter, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Comments on Petitioners' Second General Issues Questionnaire Response," dated October 22, 2021. We note that, though Tenaris USA opposes the Petitions, it has not provided any production data for Commerce to include in the industry support calculation. See Country-Specific AD Initiation Checklists at Attachment II at footnote 47.

[26] See Petitioners' Letter, "Oil Country Tubular Goods from Russia: Response to TMK's Comments on Petitioners' Standing," dated October 22, 2021 (Petitioners' Letter II).

[27] See Country-Specific AD Initiation Checklists at Attachment II.

[28] See section 732(c)(4)(D) of the Act.

[29] See Country-Specific AD Initiation Checklists at Attachment II.

[30] Id.

[31] Id.

[32] Id.

[33] See Petitions at Volume I at 28 and Exhibit I–22.

[34] Id. at 1–2, 28–48 and Exhibits I–1, I–5, I–6, I–8, I–9, I–11, I–13, I–14, I–20, I–22 through I–34; see also First General Issues Supplement at 10.

negligibility, and we have determined that these allegations are properly supported by adequate evidence and meet the statutory requirements for initiation.[35]

### Allegations of Sales at LTFV

The following is a description of the allegations of sales at LTFV upon which Commerce based its decision to initiate these LTFV investigations of imports of OCTG from Argentina, Mexico, and Russia. The sources of data for the deductions and adjustments relating to U.S. price and normal value (NV) are discussed in greater detail in the country-specific AD Initiation Checklists.

### U.S. Price

For Argentina, Mexico, and Russia, the petitioners established export prices (EPs) on the average unit value (AUVs) of publicly available import data. For Argentina and Mexico, the petitioners conservatively made no adjustments to the AUVs for foreign inland freight and foreign brokerage and handling expenses incurred in subject foreign countries for purposes of calculating net EPs. For Russia, the petitioners deducted expenses associated with inland freight and brokerage and handling costs incurred in Russia to calculate an ex-factory, or net, EP.[36]

### Normal Value Based on Constructed Value [37]

For Argentina, Mexico, and Russia, the petitioners stated they were unable to obtain home-market or third-country prices for OCTG to use as a basis for NV. Therefore, for Argentina, Mexico, and Russia, the petitioners calculated NV based on constructed value (CV).[38]

Pursuant to section 773(e) of the Act, the petitioners calculated CV as the sum of the cost of manufacturing, selling, general, and administrative expenses, financial expenses, and profit.[39] For Argentina, Mexico, and Russia, in calculating the cost of manufacturing, the petitioners relied on the production experience and input consumption rates

of a U.S. OCTG producer, valued using publicly available information applicable to each respective subject country.[40] For Argentina, Mexico, and Russia, in calculating selling, general, and administrative expenses, financial expenses, and profit ratios (where applicable), the petitioners relied on the 2020 financial statements of an OCTG producer(s) domiciled in each respective subject country.[41]

### Fair Value Comparisons

Based on the data provided by the petitioners, there is reason to believe that imports of OCTG from Argentina, Mexico, and Russia are being, or are likely to be, sold in the United States at LTFV. Based on comparisons of EP to CV in accordance with section 773 of the Act, the estimated dumping margins for OCTG concerning each of the countries covered by this initiation are as follows: (1) Argentina—168.49 percent; (2) Mexico—59.75 percent; and (3) Russia—136.96 percent.[42]

### Initiation of LTFV Investigations

Based upon the examination of the Petitions and supplemental responses, we find that they meet the requirements of section 732 of the Act. Therefore, we are initiating these LTFV investigations to determine whether imports of OCTG from Argentina, Mexico, and Russia are being, or are likely to be, sold in the United States at LTFV. In accordance with section 733(b)(1)(A) of the Act and 19 CFR 351.205(b)(1), unless postponed, we will make our preliminary determinations no later than 140 days after the date of this initiation.

### Respondent Selection

In the Petitions, the petitioners identified 18 companies in Argentina, 78 companies in Mexico, and 14 companies in Russia, as producers and/or exporters of OCTG.[43]

Following standard practice in LTFV investigations involving market economy countries, in the event that Commerce determines that the number of exporters or producers in any individual case is large such that Commerce cannot individually examine each company based upon its resources, where appropriate, Commerce intends to select mandatory respondents in that case based on U.S. Customs and Border Protection (CBP) data for U.S. imports under the appropriate Harmonized Tariff Schedule of the United States

subheadings listed in the "Scope of the Investigations," in the appendix.

On October 19, 2021, Commerce released CBP data on imports of OCTG from Argentina, Mexico, and Russia under administrative protective order (APO) to all parties with access to information protected by APO and indicated that interested parties wishing to comment on the CBP data must do so within three business days after the publication date of the notice of initiation of these investigations.[44] Commerce will not accept rebuttal comments regarding the CBP data or respondent selection.

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305(b). Instructions for filing such applications may be found on Commerce's website at *https://enforcement.trade.gov/apo*.

Comments on CBP data and respondent selection must be filed electronically using ACCESS. An electronically filed document must be received successfully in its entirety via ACCESS by 5:00 p.m. ET on the specified deadline.

### Distribution of Copies of the AD Petitions

In accordance with section 732(b)(3)(A) of the Act and 19 CFR 351.202(f), copies of the public version of the AD Petitions have been provided to the governments of Argentina, Mexico, and Russia via ACCESS. To the extent practicable, we will attempt to provide a copy of the public version of the AD Petitions to each exporter named in the AD Petitions, as provided under 19 CFR 351.203(c)(2).

### ITC Notification

We will notify the ITC of our initiation, as required by section 732(d) of the Act.

### Preliminary Determinations by the ITC

The ITC will preliminarily determine, within 45 days after the date on which the AD Petitions were filed, whether there is a reasonable indication that imports of OCTG from Argentina, Mexico, and/or Russia are materially injuring, or threatening material injury to, a U.S. industry.[45] A negative ITC determination for any country will

---

[35] *See* Country-Specific AD Initiation Checklists at Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation.

[36] *See* Country-Specific AD Initiation Checklists.

[37] In accordance with section 773(b)(2) of the Act, for these investigations, Commerce will request information necessary to calculate the CV and cost of production (COP) to determine whether there are reasonable grounds to believe or suspect that sales of the foreign like product have been made at prices that represent less than the COP of the product.

[38] *See* Country-Specific AD Initiation Checklists.

[39] *See* Country-Specific AD Initiation Checklists.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *See* Volume I of the Petitions at Exhibit I–19.

[44] *See* Memoranda, "Antidumping Duty Petition on Imports of Oil Country Tubular Goods from Argentina: Release of U.S. Customs and Border Protection Data,"; "Antidumping Duty Petition on Imports of Oil Country Tubular Goods from Mexico: Release of U.S. Customs and Border Protection Data,"; and "Antidumping Duty Petition on Imports of Oil Country Tubular Goods from Russia: Release of U.S. Customs and Border Protection Data," dated October 19, 2021.

[45] *See* section 733(a) of the Act.

result in the investigation being terminated with respect to that country.[46] Otherwise, these LTFV investigations will proceed according to statutory and regulatory time limits.

**Submission of Factual Information**

Factual information is defined in 19 CFR 351.102(b)(21) as: (i) Evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by Commerce; and (v) evidence other than factual information described in (i)–(iv). Section 351.301(b) of Commerce's regulations requires any party, when submitting factual information, to specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted[47] and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct.[48] Time limits for the submission of factual information are addressed in 19 CFR 351.301, which provides specific time limits based on the type of factual information being submitted. Interested parties should review the regulations prior to submitting factual information in these investigations.

**Particular Market Situation Allegation**

Section 773(e) of the Act addresses the concept of particular market situation (PMS) for purposes of CV, stating that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology." When an interested party submits a PMS allegation pursuant to section 773(e) of the Act, Commerce will respond to such a submission consistent with 19 CFR 351.301(c)(2)(v). If Commerce finds that a PMS exists under section 773(e) of the Act, then it will modify its dumping calculations appropriately.

Neither section 773(e) of the Act, nor 19 CFR 351.301(c)(2)(v), set a deadline for the submission of PMS allegations

and supporting factual information. However, in order to administer section 773(e) of the Act, Commerce must receive PMS allegations and supporting factual information with enough time to consider the submission. Thus, should an interested party wish to submit a PMS allegation and supporting new factual information pursuant to section 773(e) of the Act, it must do so no later than 20 days after submission of a respondent's initial section D questionnaire response.

**Extensions of Time Limits**

Parties may request an extension of time limits before the expiration of a time limit established under 19 CFR 351.301, or as otherwise specified by Commerce. In general, an extension request will be considered untimely if it is filed after the expiration of the time limit established under 19 CFR 351.301. For submissions that are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. ET on the due date. Under certain circumstances, we may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, we will inform parties in a letter or memorandum of the deadline (including a specified time) by which extension requests must be filed to be considered timely. An extension request must be made in a separate, stand-alone submission; under limited circumstances we will grant untimely-filed requests for the extension of time limits. Parties should review Commerce's regulations concerning factual information prior to submitting factual information in these investigations.[49]

**Certification Requirements**

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[50] Parties must use the certification formats provided in 19 CFR 351.303(g).[51] Commerce intends to reject factual submissions if the submitting party does not comply with

the applicable certification requirements.

**Notification to Interested Parties**

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305. Parties wishing to participate in these investigations should ensure that they meet the requirements of 19 CFR 351.103(d) (e.g., by the filing a letter of appearance as discussed). Note that Commerce has temporarily modified certain of its requirements for serving documents containing business proprietary information, until further notice.[52]

This notice is issued and published pursuant to sections 732(c)(2) and 777(i) of the Act, and 19 CFR 351.203(c).

Dated: October 26, 2021.

**Ryan Majerus,**
*Deputy Assistant Secretary for Policy and Negotiations, Performing the Non-Exclusive Functions and Duties of the Assistant Secretary for Enforcement and Compliance.*

**Appendix**

**Scope of the Investigations**

The merchandise covered by the investigations is certain oil country tubular goods (OCTG), which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than case iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (e.g., whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of the investigations also covers OCTG coupling stock.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise processed in a third country, including by performing any heat treatment, cutting, upsetting, threading, coupling, or any other finishing, packaging, or processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the country of manufacture of the OCTG.

Excluded from the scope of the investigations are: casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

The merchandise subject to these investigations is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7304.29.1010, 7304.29.1020, 7304.29.1030, 7304.29.1040, 7304.29.1050, 7304.29.1060, 7304.29.1080, 7304.29.2010, 7304.29.2020, 7304.29.2030, 7304.29.2040, 7304.29.2050,

---

[46] *Id.*

[47] *See* 19 CFR 351.301(b).

[48] *See* 19 CFR 351.301(b)(2).

[49] *See* 19 CFR 351.301; *see also Extension of Time Limits; Final Rule,* 78 FR 57790 (September 20, 2013), available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm.*

[50] *See* section 782(b) of the Act.

[51] *See Certification of Factual Information to Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) (*Final Rule*). Answers to frequently asked questions regarding the *Final Rule* are available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf.*

[52] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19; Extension of Effective Period,* 85 FR 41363 (July 10, 2020).

7304.29.2060, 7304.29.2080, 7304.29.3110, 7304.29.3120, 7304.29.3130, 7304.29.3140, 7304.29.3150, 7304.29.3160, 7304.29.3180, 7304.29.4110, 7304.29.4120, 7304.29.4130, 7304.29.4140, 7304.29.4150, 7304.29.4160, 7304.29.4180, 7304.29.5015, 7304.29.5030, 7304.29.5045, 7304.29.5060, 7304.29.5075, 7304.29.6115, 7304.29.6130, 7304.29.6145, 7304.29.6160, 7304.29.6175, 7305.20.2000, 7305.20.4000, 7305.20.6000, 7305.20.8000, 7306.29.1030, 7306.29.1090, 7306.29.2000, 7306.29.3100, 7306.29.4100, 7306.29.6010, 7306.29.6050, 7306.29.8110, and 7306.29.8150.

The merchandise subject to the investigations may also enter under the following HTSUS item numbers: 7304.39.0024, 7304.39.0028, 7304.39.0032, 7304.39.0036, 7304.39.0040, 7304.39.0044, 7304.39.0048, 7304.39.0052, 7304.39.0056, 7304.39.0062, 7304.39.0068, 7304.39.0072, 7304.39.0076, 7304.39.0080, 7304.59.6000, 7304.59.8015, 7304.59.8020, 7304.59.8025, 7304.59.8030, 7304.59.8035, 7304.59.8040, 7304.59.8045, 7304.59.8050, 7304.59.8055, 7304.59.8060, 7304.59.8065, 7304.59.8070, 7304.59.8080, 7305.31.4000, 7305.31.6090, 7306.30.5055, 7306.30.5090, 7306.50.5050, and 7306.50.5070.

The HTSUS subheadings and specifications above are provided for convenience and customs purposes only. The written description of the scope of the investigations is dispositive.

[FR Doc. 2021–23715 Filed 10–29–21; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

**International Trade Administration**

**[C–580–913, C–821–834]**

**Oil Country Tubular Goods From the Republic of Korea and the Russian Federation: Initiation of Countervailing Duty Investigations**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable October 26, 2021.

**FOR FURTHER INFORMATION CONTACT:** Paul Litwin (the Republic of Korea) or Allison Hollander (the Russian Federation), AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–6002 or (202) 482–2805, respectively.

**SUPPLEMENTARY INFORMATION:**

**The Petitions**

On October 6, 2021, the U.S. Department of Commerce (Commerce) received countervailing duty (CVD) petitions concerning imports of oil country tubular goods (OCTG) from the Republic of Korea (Korea) and the Russian Federation (Russia), filed in

proper form on behalf of Borusan Mannesmann Pipe U.S., Inc.; PTC Liberty Tubulars LLC; U.S. Steel Tubular Products, Inc.; the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC; and Welded Tube USA, Inc. (the petitioners), domestic producers of OCTG and a certified union that represents workers engaged in the production of OCTG.[1] The Petitions were accompanied by antidumping duty (AD) petitions concerning imports of OCTG from Argentina, Mexico, and Russia.[2]

On October 8, 12, and 19, 2021, Commerce requested supplemental information pertaining to certain aspects of the Petitions.[3] The petitioners filed responses to these requests on October 12, 13, 15, and 21, 2021.[4]

In accordance with section 702(b)(1) of the Tariff Act of 1930, as amended (the Act), the petitioners allege that the Government of Korea (GOK) and the Government of Russia (GOR) are providing countervailable subsidies, within the meaning of sections 701 and 771(5) of the Act, to producers of OCTG in Korea and Russia, and that such imports are materially injuring, or threatening material injury to, the

domestic industry producing OCTG in the United States. Consistent with section 702(b)(1) of the Act and 19 CFR 351.202(b), for those alleged programs on which we are initiating CVD investigations, the Petitions were accompanied by information reasonably available to the petitioners supporting their allegations.

Commerce finds that the petitioners filed the Petitions on behalf of the domestic industry because the petitioners are interested parties, as defined in sections 771(9)(C) and (D) of the Act. Commerce also finds that the petitioners demonstrated sufficient industry support with respect to the initiation of the requested CVD investigations.[5]

**Period of Investigation**

Because the Petitions were filed on October 6, 2021, the period of investigation (POI) for these CVD investigations is January 1, 2020, through December 31, 2020.[6]

**Scope of the Investigations**

The merchandise covered by these investigations are oil country tubular goods from Korea and Russia. For a full description of the scope of these investigations, *see* the appendix to this notice.

**Comments on Scope of the Investigations**

On October 13, 2021, Commerce spoke with counsel to the petitioners regarding the proposed scope to ensure that the scope language in the Petitions is an accurate reflection of the products for which the domestic industry is seeking relief.[7]

As discussed in the *Preamble* to Commerce's regulations, we are setting aside a period for interested parties to raise issues regarding product coverage (scope).[8] Commerce will consider all comments received from interested parties and, if necessary, will consult with interested parties prior to the issuance of the preliminary determination. If scope comments include factual information,[9] all such factual information should be limited to public information. To facilitate

---

[1] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia," dated October 6, 2021 (Petitions).

[2] *Id.*

[3] *See* Commerce's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Supplemental Questions," dated October 8, 2021 (General Issues Questionnaire); Commerce's Letter, "Petition for the Imposition of Countervailing Duties on Imports of Oil Country Tubular Goods from the Russian Federation: Supplemental Questions," dated October 8, 2021; Commerce's Letter, "Petition for the Imposition of Countervailing Duties on Imports of Oil Country Tubular Goods from the Republic of Korea: Supplemental Questions," dated October 12, 2021; and Commerce's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Supplemental Questions," dated October 19, 2021.

[4] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea and Russia: Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement); Petitioners' Letter, "Oil Country Tubular Goods from the Russian Federation: Responses to Supplemental Questions," dated October 13, 2021; Petitioners' Letter, "Oil Country Tubular Goods from the Republic of Korea: Responses to Supplemental Questions," dated October 15, 2021; and Petitioners' Letter, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to Second General Issues Questionnaire," dated October 21, 2021 (Second General Issues Supplement).

[5] *See* "Determination of Industry Support for the Petitions" section, *infra*.

[6] *See* 19 CFR 351.204(b)(2).

[7] *See* Memorandum, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation; Phone Call with Counsel to the Petitioners," dated October 13, 2021.

[8] *See Countervailing Duties*, 62 FR 27323 (May 19, 1997).

[9] *See* 19 CFR 351.102(b)(21) (defining "factual information").

---

*Oil Country Tubular Goods from Argentina: Antidumping Duty Investigation Initiation Checklist*

October 26, 2021

(Nonconfidential Version)

Appx120 – Appx156

A-357-824
Investigation
POI:  10/01/2020 – 9/30/2021
**Public Version**
E&C/Office I:  DV

October 26, 2021

---

## ENFORCEMENT AND COMPLIANCE
## OFFICE OF AD/CVD OPERATIONS
## ANTIDUMPING DUTY INVESTIGATION INITIATION CHECKLIST

---

**SUBJECT:**     Oil Country Tubular Goods from Argentina
**CASE NUMBER:**     A-357-824

---

**THE PETITIONERS:**

Borusan Mannesmann Pipe U.S., Inc.
4949 Borusan Road
Baytown, TX 77523
(832) 399-6042

PTC Liberty Tubulars LLC
1100 FM 3361 Road
Liberty, TX 77575
(713) 289-5555

U.S. Steel Tubular Products, Inc.
600 Grant Street
Pittsburgh, PA 15219
(412) 422-1121

United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial
and Service Workers International Union,
AFL-CIO, CLC
60 Boulevard of the Allies
Pittsburgh, PA 15222

Welded Tube USA, Inc.
2537 Hamburg Turnpike
Lackawanna, NY 14218
(906) 669-1111

**COUNSEL TO THE PETITIONERS:**

Thomas M. Beline
Myles S. Getlan
Mary Jane Alves
Jack A. Levy
Cassidy Levy Kent (USA) LLP
900 19th Street NW, Suite 400
Washington, DC 20006
(202) 567-2300

Roger B. Schagrin
Christopher T. Cloutier
Jeffrey D. Gerrish
Luke A. Meisner
William A. Fennell
Benjamin J. Bay
Michelle R. Avrutin
Schagrin Associates
900 Seventh Street NW, Suite 500
Washington, DC 2001
(202) 223-1700

**POTENTIAL RESPONDENTS:**

A list of the producers/exporters of oil country tubular goods (OCTG) in Argentina identified by Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, U.S. Steel Tubular Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA, Inc. (collectively, the petitioners) can be found in "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia:  Petition for the Imposition of Antidumping and Countervailing Duties," dated October 6, 2021 (the Petition).[1]

**SCOPE:**  *See* Attachment I – Scope of the Investigation, to this checklist.

**IMPORT STATISTICS:**

| Argentina | 2018 | 2019 | 2020 | Jan-June 2020 | Jan-June 2021 |
|---|---|---|---|---|---|
| **Quantity (metric tons)** | 146,829 | 147,757 | 15,182 | 9,539 | 73,495 |
| **Customs Value (USD)** | 188,881,672 | 208,315,839 | 19,210,840 | 12,825,972 | 75,119,553 |

Source:  U.S. Census Data.  The petitioners reported the volume (metric tons) and customs value for imports of OCTG using Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7304.29.10 10, 7304.29.1020, 7304.29.1030, 7304.29.1040, 7304.29.1050, 7304.29.1060, 7304.29.1080, 7304.29.2010, 7304.29.2020, 7304.29.2030, 7304.29.2040, 7304.29.2050, 7304.29.2060, 7304.29.2080, 7304.29.3110, 7304.29.3120, 7304.29.3130, 7304.29.3140, 7304.29.3150, 7304.29.3160, 7304.29.3180, 7304.29.4110, 7304.29.4120, 7304.29.4130, 7304.29.4140, 7304.29.4150, 7304.29.4160, 7304.29.4180, 7304.29.5015, 7304.29.5030, 7304.29.5045, 7304.29.5060, 7304.29.5075, 7304.29.6115, 7304.29.6130, 7304.29.6145, 7304.29.6160, 7304.29.6175, 7305.20.2000, 7305.20.4000, 7305.20.6000, 7305.20.8000, 7306.29.1030, 7306.29.1090, 7306.29.2000, 7306.29.3100, 7306.29.4100, 7306.29.6010, 7306.29.6050, 7306.29.8110, and 7306.29.8150.[2]

---

[1] *See* Petition at Volume I at 22 and Exhibit I-19.
[2] *Id.* at 23 and Exhibit I-20.

**APPROXIMATE CASE CALENDAR:**

| Event | No. of Days | Date of Action | Day of Week |
|---|---|---|---|
| | **Antidumping Duty Investigation** | | |
| Petition Filed | 0 | October 6, 2021 | Wednesday |
| Initiation Date | 20 | October 26, 2021 | Tuesday |
| ITC Preliminary Determination* | 45 | November 22, 2021 | Monday |
| ITA Preliminary Determination†** | 160 | March 15, 2022 | Tuesday |
| ITA Final Determination*† | 235 | May 31, 2022 | Tuesday |
| ITC Final Determination*** | 280 | July 15, 2022 | Friday |
| Publication of Order**** | 287 | July 22, 2022 | Friday |

*Where the deadline falls on a weekend/holiday, the appropriate date is the next business day.
† These deadlines may be extended under the governing statute.
** This will take place only in the event of a preliminary affirmative determination from the ITC.
*** This will take place only in the event of a final affirmative determination from the International Trade Administration (ITA).
**** This will take place only in the event of a final affirmative determination from the ITA and the ITC.
*Note*: The ITC final determination will take place no later than 45 days after a final affirmative ITA determination.
*Note*: Publication of order will take place approximately seven days after an affirmative ITC final determination.

**INDUSTRY SUPPORT:**

Does the Petition identify the <u>entire</u> domestic industry, including the names, addresses, and phone numbers of the petitioners and all domestic producers known to the petitioners?

| ☒ | Yes |
|---|---|
| ☐ | No |

Does the Petition contain information relating to the degree of industry support for the Petition, including:

The total volume or value of U.S. production of the domestic like product for the most recently completed calendar year?

| ☒ | Yes |
|---|---|
| ☐ | No |

The volume or value of the domestic like product produced by the petitioners and each domestic producer identified for the most recently completed calendar year?

3

| ☒ | Yes |
|---|-----|
| ☐ | No |

Do the petitioners and those expressing support for the Petition account for more than 50% of production of the domestic like product?

| ☐ | Yes |
|---|-----|
| ☒ | No |

If No, do those expressing support account for the majority of those expressing an opinion and at least 25% of domestic production?

| ☒ | Yes |
|---|-----|
| ☐ | No |
| ☐ | Not Applicable |

Was there opposition to the Petition from any producers or workers engaged in the production of the domestic like product?

| ☒ | Yes |
|---|-----|
| ☐ | No |

Are any of the parties who have expressed opposition to the Petition either importers or domestic producers affiliated with foreign producers?

| ☒ | Yes |
|---|-----|
| ☐ | No |
| ☐ | Not Applicable |

For a detailed analysis of industry support, s*ee* Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation, to this checklist.

**INJURY ALLEGATION:**

The ITC's notice of institution of antidumping and countervailing duty investigations was published in the *Federal Register* on October 13, 2021. The notice indicates that the ITC instituted investigations to determine whether there is a reasonable indication that the domestic

industry producing OCTG is materially injured, or threatened with material injury, by reason of imports of OCTG from Argentina.[3]

The information relevant to material injury, threat of material injury, or material retardation, and causation, including information on the volume of imports, the effect of these imports on prices in the U.S. market, and the consequent impact of imports on the domestic industry, can be found in the Petition at Volume I at 1-2, 25, 28-48 and Exhibits I-1, I-2, I-5, I-6, I-11, I-14, I-20, and I-22 through I-34, and the First General Issues Supplement[4] at 10.

For analysis of the injury allegation, *see* Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation, to this checklist.

---

**PETITION REQUIREMENTS:**

Does the Petition contain the following?

☒ a clear and detailed description of the merchandise to be investigated, including the appropriate Harmonized Tariff Schedule subheadings (*See* Petition at Volume I at 11-19 and Exhibits I-11, I-16, and I-17).

☒ the name of each country in which the merchandise originates or from which the merchandise is exported (*See* Petition at Volume I at 22).

☒ the identity of each known exporter, foreign producer, and importer of the merchandise (*See* Petition at Volume I at 22 and 24 and Exhibits I-19 and I-21).

☒ import volume and value information for the most recent two-year period (*See* Petition at Volume I at 23, 28, 34-36 and Exhibits I-20 and I-22).

☒ a statement indicating that the Petition was filed simultaneously with the Department of Commerce (Commerce) and the ITC (*See* cover letter to the Petition at 2).

---

[3] *See Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea; Institution of Anti-Dumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 86 FR 56983 (October 13, 2021).

[4] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement).

☒    an adequate summary of the proprietary data (*See* public versions of the Petition, the First General Issues Supplement, the Second General Issues Supplement,[5] and the Argentina AD Supplement).[6]

☒    a statement regarding release under administrative protective order (*See* the cover letters to the Petition at 1-4, cover letter to the First General Issues Supplement at 1-3, cover letter to the Second General Issues Supplement at 1-3, and cover letter to the Argentina AD Supplement at 1).

☒    a certification of the facts contained in the Petition by an official of the petitioning firm(s) and its legal representative (if applicable) (*See* attachments to the cover letters to the Petition, the First General Issues Supplement, the Second General Issues Supplement, and the Argentina AD Supplement).

---

## LESS THAN FAIR VALUE ALLEGATION:

The Petition was officially filed on October 6, 2021. On October 7, 8, and 19, 2021, Commerce issued supplemental questionnaires to the petitioners. On October 12, 13, and 21, 2021, the petitioners responded to Commerce's requests for information (General Issues Supplement, the Argentina AD Supplement, and Second General Issues Supplement, respectively). In accordance with 19 CFR 351.204(b)(1), because the Petition was filed on October 6, 2021, the appropriate period of investigation (POI) is October 1, 2020 through September 30, 2021.

### U.S. Price

Information relevant to the U.S. price calculations can be found on pages 1-2 and Exhibits II-1 and II-2 of the Petition at Volume II and pages 1-2 of the Argentina AD Supplement.

The petitioners established an export price (EP) using the average unit value (AUV) derived from official import data for imports of OCTG from Argentina into the United States during the POI under HTSUS subheading 7304.29.3110. The petitioners conservatively made no adjustments to the AUV for foreign inland freight and foreign brokerage and handling expenses for purposes of calculating net EP. We examined the information provided by the petitioners and made no additional adjustments. The final net U.S. price is $975.74/short ton.[7]

Did the Petition contain the following?

---

[5] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to Second General Issues Questionnaire," dated October 21, 2021 (Second General Issues Supplement).
[6] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina: Responses to Supplemental Questions," dated October 13, 2021 (Argentina AD Supplement).
[7] *See* page 2 and Exhibit II-2 of Volume II of the Petition.

Filed By: Dmitry Vladimirov, Filed Date: 10/27/21 3:43 PM, Submission Status: Approved

☒ supporting documentation for the alleged price(s) and any adjustments to the price(s) (*See* Petition at Volume II at 2 and Exhibits II-1 and II-2 and Argentina AD Supplement at 1-2)

☒ current price(s) (and adjustments to the price(s), if applicable) (*See* Petition at Volume II at Exhibits II-1 and II-2)

☒ conversion factors for comparisons of differing units of measure (*See* Petition at Volume II at Exhibits II-1 and II-2.)

## Normal Value (NV)

Information relevant to the normal value calculations can be found on pages 3-5 and Exhibits II-3, II-4, II-5, II-6, II-7, II-8, II-9, and II-10 of Volume II of the Petition and Argentina AD Supplement at 3-7 and Exhibits II-S1, II-S2, II-S3, and II-S4.

The petitioners were unable to obtain the selling price of OCTG in the home market or in third country markets. Consequently, the petitioners, pursuant to section 773(a)(4) of the Act, relied on constructed value (CV) as the basis for NV. We examined the information provided by the petitioners and made no additional adjustments. The petitioners provided data that are contemporaneous with the POI and, where appropriate, adjusted for inflation. The final CV is $2,619.80/short ton.[8]

| COP and CV | Source | Satisfactory |
|---|---|---|
| Raw Material: | U.S. Producer's Input and Usage Rates<br>Argentina Import Statistics from Global Trade Atlas | Yes |
| Labor: | U.S. Producer's Labor Usage<br>Labor Rates from *The Conference Board* – International Comparisons of Hourly Compensation Costs in Manufacturing and Sub-Manufacturing Industries (2016) | Yes |
| Energy: (electricity and natural gas) | U.S. Producer's Electricity and Natural Gas Usage<br>Electricity and Natural Gas rates from www.globalpetrolprices.com. | Yes |
| Variable Overhead: | U.S. Producer's Books and Records | Yes |
| Fixed Overhead: | Tenaris Argentina S.A. Financial Statements for FY 2020 | Yes |
| G&A Expenses: | Tenaris Argentina S.A. Financial Statements for FY 2020 | Yes |

---

[8] *See* Argentina AD Supplement at 7 and Exhibit II-S4.

| | | |
|---|---|---|
| Interest Expenses: | Tenaris Argentina S.A. Financial Statements for FY 2020 | Yes |
| Profit: | Tenaris Argentina S.A. Financial Statements for FY 2020 | Yes |

## ESTIMATED MARGIN:

The petitioners provided a dumping margin based on a price-to-CV comparison. The estimated dumping margin is 168.49.[9]

## RECOMMENDATION:

We examined the accuracy and adequacy of the evidence provided in the Petition as discussed in this checklist and the attachments and recommend determining that the evidence is sufficient to justify the initiation of an antidumping duty investigation with regard to Argentina. We also recommend determining that the Petition has been filed by, or on behalf of, the domestic industry.

## ATTACHMENTS:

I. Scope of the Investigation
II. Analysis of Industry Support
III. Analysis of Allegations and Evidence of Material Injury and Causation

---

[9] *See* Argentina AD Supplement at 7.

**Attachment I**
**Scope of the Investigation**

The merchandise covered by the investigation is certain oil country tubular goods (OCTG), which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than case iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (*e.g.*, whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached.  The scope of the investigation also covers OCTG coupling stock.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise processed in a third country, including by performing any heat treatment, cutting, upsetting, threading, coupling, or any other finishing, packaging, or processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the OCTG.

Excluded from the scope of the order are:  casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

The merchandise subject to this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers:  7304.29.1010, 7304.29.1020, 7304.29.1030, 7304.29.1040, 7304.29.1050, 7304.29.1060, 7304.29.1080, 7304.29.2010, 7304.29.2020, 7304.29.2030, 7304.29.2040, 7304.29.2050, 7304.29.2060, 7304.29.2080, 7304.29.3110, 7304.29.3120, 7304.29.3130, 7304.29.3140, 7304.29.3150, 7304.29.3160, 7304.29.3180, 7304.29.4110, 7304.29.4120, 7304.29.4130, 7304.29.4140, 7304.29.4150, 7304.29.4160, 7304.29.4180, 7304.29.5015, 7304.29.5030, 7304.29.5045, 7304.29.5060, 7304.29.5075, 7304.29.6115, 7304.29.6130, 7304.29.6145, 7304.29.6160, 7304.29.6175, 7305.20.2000, 7305.20.4000, 7305.20.6000, 7305.20.8000, 7306.29.1030, 7306.29.1090, 7306.29.2000, 7306.29.3100, 7306.29.4100, 7306.29.6010, 7306.29.6050, 7306.29.8110, and 7306.29.8150.

The merchandise subject to the investigation may also enter under the following HTSUS item numbers:  7304.39.0024, 7304.39.0028, 7304.39.0032, 7304.39.0036, 7304.39.0040, 7304.39.0044, 7304.39.0048, 7304.39.0052, 7304.39.0056, 7304.39.0062, 7304.39.0068, 7304.39.0072, 7304.39.0076, 7304.39.0080, 7304.59.6000, 7304.59.8015, 7304.59.8020, 7304.59.8025, 7304.59.8030, 7304.59.8035, 7304.59.8040, 7304.59.8045, 7304.59.8050, 7304.59.8055, 7304.59.8060, 7304.59.8065, 7304.59.8070, 7304.59.8080, 7305.31.4000, 7305.31.6090, 7306.30.5055, 7306.30.5090, 7306.50.5050, and 7306.50.5070.

The HTSUS subheadings above are provided for convenience and customs purposes only.  The written description of the scope of the investigation is dispositive.

## Attachment II

## Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation

**Background**

Sections 702(c)(4)(A) and 732(c)(4)(A) of the Tariff Act of 1930, as amended (the Act), state that the administering authority shall determine that a petition has been filed by or on behalf of the industry if the domestic producers or workers who support the petition account for: (1) at least 25 percent of the total production of the domestic like product; and (2) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition.

Section 771(4)(A) of the Act defines the "industry" as the producers, as a whole, of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product. Thus, to determine whether a petition has the requisite industry support, the Act directs the Department of Commerce (Commerce) to look to producers and workers who produce the domestic like product. The International Trade Commission (ITC), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both Commerce and the ITC must apply the same statutory definition regarding the domestic like product (section 771(10) of the Act), they do so for different purposes and pursuant to a separate and distinct authority. In addition, Commerce's determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[1]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation," *i.e.*, the class or kind of merchandise to be investigated, which normally will be the scope as defined in the Petitions.[2] While Commerce is not bound by the criteria used by the ITC to determine the domestic like product in answering

---

[1] *See USEC, Inc. v. United States*, 132 F. Supp. 2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp. Ltd. v. United States*, 688 F. Supp. 639, 644 (CIT 1988), *aff'd* 865 F.2d 240 (Fed. Cir. 1989)).

[2] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia," dated October 6, 2021 (the Petitions). The petitioners filed "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement) and "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to Second General Issues Questionnaire," dated October 21, 2021 (Second General Issues Supplement), in response to Commerce's requests for additional information regarding the Petitions.

this question, we have reviewed these factors as presented by the petitioners[3] in the Petitions.[4] With respect to the domestic like product, the petitioners do not offer a definition of domestic like product distinct from the scope of the investigations and contend that the domestic like product consists of all oil country tubular goods (OCTG) that are within the scope of the investigations.[5] For a detailed analysis and discussion, see the "Analysis of Domestic Like Product" section below.

**Analysis of Domestic Like Product**

For support of their like product analysis, the petitioners note that, in prior investigations on OCTG involving cases with an almost identical scope, the ITC determined that OCTG constitutes a single like product co-extensive with the scope.[6] The petitioners also note that, in the most recent sunset reviews on OCTG from the People's Republic of China (China), India, the Republic of Korea (Korea), the Republic of Turkey (Turkey), Ukraine, and the Socialist Republic of Vietnam (Vietnam) in 2020, the ITC continued to define a single like product co-extensive with the scope.[7] The petitioners contend that the facts that supported the ITC's prior findings remain the same today.[8] To further support their domestic like product definition, the petitioners note that all OCTG, regardless of manufacturing process, shares basic physical characteristics and is produced in accordance with specifications promulgated by the American Petroleum Institute.[9] According to the petitioners, all OCTG is used in drilling for oil or natural gas, though certain OCTG may be required or preferred in certain drilling conditions.[10] The petitioners note that the ITC previously found that welded OCTG and seamless OCTG are interchangeable and that the degree of overlap between seamless OCTG and welded OCTG has grown over the last decade.[11] According to the petitioners, OCTG is primarily sold through distributors, with some sold directly to end users.[12] Additionally, the petitioners note that customers and producers perceive OCTG as a product suited for one end use—drilling for oil and gas.[13] With respect to manufacturing facilities, production processes, and employees, the

---

[3] The petitioners are Borusan Mannesmann Pipe U.S., Inc. (Borusan); PTC Liberty Tubulars LLC (PTC Liberty); U.S. Steel Tubular Products, Inc. (U.S. Steel); the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (the USW); and Welded Tube USA, Inc. (Welded Tube) (collectively, the petitioners). *See* Petitions at Volume I at 2-3.

[4] *Id.* at 20-22.

[5] *See* Attachment I – Scope of the Investigation, to this Checklist; *see also* Petitions at Volume I at 20-22.

[6] *See* Petitions at Volume I at 20 and Exhibits I-13 (containing *Oil Country Tubular Goods from China*, Inv. No. 701-TA-463 (Final), USITC Pub. 4124 (January 2010) (*2010 China OCTG Final*) at 6) and I-14 (containing *Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. 4489 (September 2014) (*2014 OCTG Final*) at 12).

[7] *See* Petitions at Volume I at 20-21 and Exhibits I-11 (containing *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. 5090 (July 2020) (*India et al OCTG 2020 Review*) at 7) and I-18 (containing *Oil Country Tubular Goods from China*, Inv. Nos. 701-TA-463 and 731-TA-1159 (Second Review), USITC Pub. 5136 (November 2020) (*China OCTG Second Review*) at 6-7).

[8] *See* Petitions at Volume I at 21.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

petitioners note that U.S. mills produce welded and seamless OCTG on separate production lines and that some producers make both welded and seamless OCTG.[14]  The petitioners further note that, although the initial production processes are different for welded and seamless OCTG, the processes for heat treating and finishing are the same.[15]  Finally, with respect to price, the petitioners note that OCTG is sold in a large price range, depending on the size and grade of OCTG.[16]  As a result, the petitioners argue that, consistent with past cases involving OCTG, there is no clear dividing line between the range of OCTG products, and, as such, all OCTG constitutes a single domestic like product.[17]

**Commerce's Position:**

We analyzed the criteria presented by the petitioners with respect to the ITC's domestic like product factors.  We note that the petitioners' domestic like product definition is consistent with the domestic like product defined by the ITC in past investigations and reviews of OCTG.[18]  Based on our analysis of the information submitted in the Petitions, we have determined that the domestic like product consists of OCTG, as defined in the scope of the Petitions.[19]

Furthermore, unless Commerce finds the petitioners' definition of the domestic like product to be inaccurate, we will adopt the domestic like product definition set forth in the Petitions.[20]  While the statute defines the "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation," pursuant to section 771(10) of the Act, the petitioners have presented Commerce with information pertaining to the factors the ITC traditionally analyzes.  We analyzed the information presented by the petitioners, as well as the past ITC determinations on OCTG, and have found there is reason to conclude that OCTG constitutes a single domestic like product.  This finding is consistent with Commerce's broad discretion to define and clarify the scope of antidumping and countervailing duty investigations in a manner that reflects the intent of the Petitions.[21]  Consequently, Commerce's discretion permits interpreting the Petitions in such a way as to best effectuate not only the intent of the Petitions, but the overall purpose of the antidumping and countervailing duty laws as well.[22]

---

[14] *Id.*
[15] *Id.*
[16] *Id.* at 22.
[17] *Id.*
[18] *Id.* at 20-22 and Exhibits I-11 (containing *India et al OCTG 2020 Review* at 7), I-13 (containing *2010 China OCTG Final* at 6), I-14 (containing *2014 OCTG Final* at 12), and I-18 (containing *China OCTG Second Review* at 6-7).
[19] *See* Petitions at Volume I at 20-22 and Exhibits I-11 (containing *India et al OCTG 2020 Review* at 7), I-13 (containing *2010 China OCTG Final* at 6), I-14 (containing *2014 OCTG Final* at 12), and I-18 (containing *China OCTG Second Review* at 6-7).
[20] *See* Petitions at Volume I at 20-22.
[21] *See, e.g., Fujitsu Ltd. v. United States*, 36 F. Supp. 2d 394 (CIT 1999) (citing *Kern-Liebers USA, Inc. v. United States*, 881 F. Supp. 618, 621 (CIT 1995)) and *Initiation of Antidumping Duty Investigations: Spring Table Grapes from Chile and Mexico*, 66 FR 26831 (May 15, 2001).
[22] *See Notice of Final Determination of Sales at Less Than Fair Value:  Freshwater Crawfish Tail Meat from the People's Republic of China*, 62 FR 41347, 42357 (August 1, 1997).

3

**Industry Support Calculation**

In determining whether the petitioners have standing (*i.e.*, those domestic workers and producers supporting the Petitions account for:  (1) at least 25 percent of the total production of the domestic like product; and (2) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions), in accordance with sections 702(c)(4)(A) and 732(c)(4)(A) of the Act, we conducted the following analysis.

We considered the industry support data contained in the Petitions with reference to the domestic like product as defined in Attachment I, "Scope of the Investigation," to this Checklist and as discussed above.  The petitioners established the universe of producers based on the producers identified in the ITC's most recent full sunset review, *India et al OCTG 2020 Review*, and their knowledge of the industry.[23]  The petitioners identified 20 producers (including the petitioning companies Borusan, PTC Liberty, U.S. Steel, and Welded Tube) as the producers constituting the U.S. OCTG industry.[24]  In addition, the USW, the petitioning union, identified the U.S. OCTG production facilities with workers that are represented by the USW.[25]

To establish industry support, the petitioners provided their own production of the domestic like product in 2020.[26]  The petitioners provided letters of support from Kevin Kelly, President – Pipe Division at Wheatland Tube Company (Wheatland), stating the company's support for the Petitions and establishing its 2020 production of OCTG.[27]  In addition, the petitioners provided [

                                                                    ] 2020 production of
OCTG.[28]  The petitioners also provided [

            ].[29]  In the [

              ] Petitions.[30]  In the [

              ] Petitions.[31]

---

[23] *See* First General Issues Supplement at 1-2 and Exhibits 1 (containing *India et al OCTG 2020 Review* at I-37) and 2.

[24] *See* Petitions at Volume I at 2-5; *see also* First General Issues Supplement at 1-2.

[25] *See* Second General Issues Supplement at 1 and Exhibit 1.

[26] *See* Petitions at Volume I at 5 and Exhibit I-3; *see also* First General Issues Supplement at 3-4 and Exhibits 4 and 8; and Second General Issues Supplement at Exhibit 5.

[27] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina, Mexico, Russia, and the Republic of Korea: Response to Tenaris Submission Concerning Petitioners' Standing," dated October 18, 2021 (Petitioners' Letter) at 4 and Exhibit 6; *see also* Second General Issues Supplement at 1-2 and Exhibit 3.

[28] *See* Second General Issues Supplement at 1-2 and Exhibit 4.

[29] *See* First General Issues Supplement at 8 and Exhibit 5; *see also* Petitioners' Letter at 4 and Attachment 6; and Second General Issues Supplement at 1-2 and Exhibit 2.

[30] *See* First General Issues Supplement at 8 and Exhibit 5.

[31] *See* Petitioners' Letter at Attachment 6; and Second General Issues Supplement at Exhibit 2.

To estimate the total 2020 production of the domestic like product for the entire domestic industry, the petitioners relied on shipment data for [                                    ] domestic OCTG shipments in 2020 as reported in [                                                                    ], which the petitioners note is the recognized authority on the U.S. pipe and tube market, [

].[32]  The petitioners contend that the [                                    ] data are the best available information regarding the volume of domestic OCTG shipments in 2020.[33]  The petitioners further contend that they do not have access to 2020 industry production data and that industry shipment data are a reasonable proxy for production of OCTG, noting that the difference between their production levels and shipments [                ].[34]  The petitioners adjusted the domestic shipment data for 2020 reported in [                        ] by the ratio of the petitioners' export shipments to total shipments in order to estimate total shipments (i.e., domestic and export shipments) in 2020.[35]  The petitioners then deducted their own 2020 shipments from the estimated total shipments to derive non-petitioning companies' shipments in 2020.[36]  To approximate non-petitioning companies' production from the available shipment data, the petitioners first calculated the historical ratio (2018-2019) of non-petitioning companies' production to shipments derived from data reported in the ITC's *India et al OCTG 2020 Review* and applied the resulting ratio to the estimated non-petitioning companies' shipments in 2020.[37]  The petitioners then added this estimated production to their own 2020 production to estimate total production for the entire U.S. OCTG industry.[38]  Using this methodology, the petitioners estimated total 2020 production of [        ] short tons for the entire domestic industry.[39]

As a conservative, alternative methodology, we calculated 2020 production estimates using the information available on the record on domestic shipments of OCTG for the entire industry in 2020, as reported in [                                    ], and the publicly available information on U.S. producers' production and domestic shipments reported in the ITC's *India et al OCTG 2020 Review*.[40]  Specifically, based on the available information on the record from the ITC publication and the [                                    ], we calculated the ratio of the U.S. industry's reported production to domestic shipments using data from the ITC publication and applied this ratio to the domestic shipment data from [                            ] to approximate total 2020

[32] *See* Petitions at Volume I at 6 and Exhibit I-2; *see also* First General Issues Supplement at 4-6 and Exhibit 6.
[33] *See* First General Issues Supplement at 5.
[34] *Id*. at 3, 6 and Exhibits 4 and 5.
[35] *Id*. at 5-6 and Exhibits 7 and 8; *see also* Petitioners' Letter at Exhibit 6; and Second General Issues Supplement at Exhibit 5.
[36] *See* First General Issues Supplement at 6 and Exhibit 8; *see also* Petitioners' Letter at Exhibit 6; and Second General Issues Supplement at Exhibit 5.
[37] *See* First General Issues Supplement at 6-7 and Exhibits 1, 4, and 8; *see also* Petitioners' Letter at Exhibit 6; and Second General Issues Supplement at Exhibit 5.
[38] *See* First General Issues Supplement at 7 and Exhibit 8; *see also* Petitioners' Letter at Exhibit 6; and Second General Issues Supplement at Exhibit 5.
[39] *See* First General Issues Supplement at Exhibit 8; *see also* Petitioners' Letter at Exhibit 6; and Second General Issues Supplement at Exhibit 5.
[40] *See* Petitions at Volume I at Exhibit I-2; *see also* First General Issues Supplement at Exhibits 1 and 8.

Filed By: Dmitry Vladimirov, Filed Date: 10/27/21 3:43 PM, Submission Status: Approved

production for the U.S. OCTG industry.[41]  Using this methodology, we estimated total 2020 production of [          ] short tons for the entire domestic industry.[42]

Based on the information in the Petitions, the share of estimated U.S. production of the domestic like product in calendar year 2020 represented by the supporters of the Petitions was equal to or more than 25 percent of total U.S. production, but less than 50 percent of total production of the domestic like product.  Under the petitioners' methodology, the supporters of the Petitions account for [     ] percent of total production of the domestic like product in 2020, which is well above the 25 percent threshold established in sections 701(c)(4)(A)(i) and 732(c)(4)(A)(i) of the Act.[43]  Under the alternative methodology described above, the supporters of the Petitions account for [     ] percent of total production of the domestic like product in 2020, which is also well above the 25 percent threshold established in sections 701(c)(4)(A)(i) and 732(c)(4)(A)(i) of the Act.[44]

Sections 702(c)(4)(D) and 732(c)(4)(D) of the Act require Commerce to poll the industry or rely on other information to determine industry support if the petition does not establish the support of domestic producers accounting for more than 50 percent of the total production of the domestic like product.  The Petitions did not establish the support of domestic producers accounting for more than 50 percent of the total production of the domestic like product.[45]  Therefore, we have relied on other information to determine industry support for the Petitions, pursuant to sections 702(c)(4)(D)(i) and 732(c)(4)(D)(i) of the Act.  Specifically, we note that, in the Petitions and Petitioners' Letter, the petitioners provided [

                                                                    ] the Petitions.[46]  Accordingly, Commerce's reliance on [

                                ] as other information, pursuant to sections 702(c)(4)(D)(i) and 732(c)(4)(D)(i) of the Act, is a reasonable methodology to use in determining industry support under sections 702(c)(4)(A)(ii) and 732(c)(4)(A)(ii) of the Act.  On October 22, 2021, Tenaris USA indicated that it formally opposes the Petitions.[47]  However, it has not provided any

---

[41] *See* Table 1, Calculation of Industry Support, below.

[42] *Id.*  The production to shipments ratio for the reported 2018-2019 time period in the ITC report is 0.9935 (*i.e.*, 0.9935 = 6,060,077/6,099,888).  *See* First General Issues Supplement at Exhibit 1 and 8 (containing *India et al OCTG 2020 Review* at Tables III-5 and III-8).  Applying this ratio to the domestic shipment data from [          ] results in estimated production of [          ] short tons for the domestic industry (*i.e.*, [          ] = [          ] * 0.9935).

[43] *See* Table I, Calculation of Industry Support, below.  We note that the petitioners understated the supporters' share for the 25 percent test, as they did not include the support from Wheatland [               ] in the numerator of their calculation.  *See* Second General Issues Supplement at Exhibit 5.  We have corrected this calculation in Table I, Calculation of Industry Support, to properly account for all supporters of the Petitions in the numerator.

[44] *See* Table 1, Calculation of Industry Support, below.

[45] *See* Second General Issues Supplement at Exhibit 5; *See also* Table I, Calculation of Industry Support, below.

[46] *See* First General Issues Supplement at Exhibit 5; *see also* Petitioners' Letter at Attachment 6; and Second General Issues Supplement at Exhibit 2.

[47] In its October 22, 2021, comments on industry support, Tenaris Bay City, Inc.; IPSCO Tubulars Inc.; Maverick Tube Corporation; and Tenaris Global Services (U.S.A.) Corporation (collectively, Tenaris USA), U.S. producers of OCTG, formally indicates opposition to the Petitions.  *See* Tenaris USA's Letter, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia:  Comments on Petitioners' Second General Issues Questionnaire Response," dated October 22, 2021 (Tenaris USA Letter IV) at 2.

6

production data for Commerce to include in the industry support calculation. Accordingly, because [

] Petitions,[48] we find that the supporters of the Petitions account for [    ] percent of the total U.S. production of those parties expressing an opinion on the Petitions for which we have production data.[49]

In addition, we note that, even assuming that all other known U.S. producers of OCTG oppose the Petitions (including Tenaris USA), [

], under the petitioners' methodology, the supporters of the Petitions would account for [    ] percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions.[50] Under the alternative methodology, the supporters of the Petitions would account for [    ] percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions.[51] Thus, even assuming *arguendo* that all other U.S. producers of OCTG oppose the Petitions (including Tenaris USA), the supporters of the Petitions would still have the requisite level of support pursuant to sections 702(c)(4)(A)(ii) and 732(c)(4)(A)(ii) of the Act.

### Table 1
### Calculation of Industry Support

| U.S. Producers | 2020 Production of OCTG (short tons) | Position |
|---|---|---|
| Borusan (Petitioner) | [    ] | Support |
| PTC Liberty (Petitioner) | [    ] | Support |
| U.S. Steel (Petitioner) | [    ] | Support |
| Welded Tube (Petitioner) | [    ] | Support |
| Wheatland Tube | [    ] | Support |
| [          ] | [    ] | [          ] |
| [          ] | [    ] | [          ] |
| [          ] | [    ] | [          ] |
| **Total 2020 Production of the Supporters of the Petitions** | [    ] | |

---

[48] In its fourth submission, Tenaris USA formally states that it opposes the Petitions. We note that, though Tenaris USA opposes the Petitions, it has not provided any production data for Commerce to include in the industry support calculation. For further discussion, *see* "Challenges to Industry Support" section, *infra*.
[49] *See* sections 702(c)(4)(A)(ii) and 732(c)(4)(A)(ii) of the Act; *see also* Table 1, Calculation of Industry Support.
[50] *See* Table 1, Calculation of Industry Support.
[51] *Id.*

7

| Total 2020 U.S. Production of OCTG | 1st Methodology: [    ] | 2nd Methodology:[52] [    ] |
|---|---|---|
| Total Support | [       ] | [         ] |
| Total Opposition | [       ] | [         ] |
| Total Opinion | [       ] | [         ] |
| Total Neutral | [       ] | [         ] |
| Support/Total (25% test) | [    ]% | [    ]% |
| Support/Opinion (50% test) | [    ]% | [    ]% |
| Support/Opinion (50% test) (assuming all other U.S. OCTG producers oppose the Petitions)[53] | [    ]% | [    ]% |

**Challenges to Industry Support**

On October 8 and 15, 2021, we received comments on industry support from Tenaris USA, a U.S. producer of OCTG.[54]  The petitioners responded to the industry support comments from Tenaris USA on October 18, 2021.[55]  On October 20, 2021, Tenaris USA responded to the petitioners' rebuttal.[56]  On October 21, 2021, the Government of Russia (GOR) raised industry support comments during consultations held with respect to the Russia countervailing duty (CVD) Petition.[57]  Also, on October 21, 2021, we received comments on industry support from TMK Group (TMK), a Russian producer and exporter of OCTG.[58]  On October 22, 2021, we received additional comments on industry support from Tenaris USA.[59]  Also on October 22,

---

[52] Based on the available information on the record, Commerce calculated alternative 2020 production estimates using the ratio of production to domestic shipments derived from data in the ITC's *India et al OCTG 2020 Review* and applying this ratio to the 2020 domestic shipment data for the industry from [                    ].
[53] This is a conservative calculation because some of those producers have workers represented by the USW.  These calculations take into account the opposition of Tenaris USA, who formally opposes the Petitions but did not provide its production data to Commerce in any of its four submissions challenging industry support.  The calculations were derived as follows:  1st Methodology ([    ]/([    ]-[    ]) = [    ] percent; 2nd Methodology ([    ]/([    ]-[    ]) = [    ] percent).
[54] *See* Tenaris USA's Letters, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia:  Factual Errors in Petitions," dated October 8, 2021 (Tenaris USA Letter I); and "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia:  Comments on Petitioners' Standing," dated October 15, 2021 (Tenaris USA Letter II).
[55] *See* Petitioners' Letter.
[56] *See* Tenaris USA's Letter, "Oil Country Tubular Goods from Mexico:  Reply Comments on Petitioners' Standing," dated October 20, 2021 (Tenaris USA Letter III).
[57] *See* Memorandum, "Countervailing Duty Petition on Oil Country Tubular Goods from the Russian Federation: Consultations with Officials from the Government of the Russian Federation," dated October 21, 2021 (Russia CVD Consultations Memo); *see also* GOR Letter, "Re:  Countervailing Duty Investigation of Certain Oil Country Tubular Goods from the Russian Federation:  Consultations," dated October 25, 2021 (GOR Letter) at 2.
[58] *See* TMK's Letter, "Oil Country Tubular Goods from Russia:  Comments on Petitioners' Standing," dated October 21, 2021 (TMK Letter).
[59] *See* Tenaris USA Letter IV.

8

2021, the petitioners responded to TMK's comments.[60]  The parties make the following arguments:

1) *Whether the petitioners' industry support calculation is flawed and insufficient*

In its October 8, 2021, submission, Tenaris USA argues that there are several factual errors in the industry support calculation contained in the Petitions and that such flaws warrant that Commerce should dismiss the Petitions or, in the absence of rejecting the Petitions, extend the deadline and poll the industry.[61]  Specifically, Tenaris USA argues that the petitioners inappropriately deduct from the denominator of the industry support calculation production figures for certain mills that the petitioners claim are represented by the USW but, according to Tenaris USA, are non-unionized mills.[62]  In addition, Tenaris USA argues that, consistent with the wording of the statute, Commerce should rely only on production data offered by the petitioners, not on shipment data.[63]  Tenaris USA further contends that the petitioners' use of "anomalous" 2020 production data does not accurately reflect the domestic industry as currently constituted, noting that there were unique market factors that rendered the steel market in 2020 volatile and "highly" unusual.[64]  Furthermore, Tenaris USA argues that Commerce must consider how the changed market conditions affect whether a petition filed in October 2021 was filed on behalf of the industry, as provided in the statute, and whether data from a different, more representative period are appropriate.[65]

In its October 15, 2021, submission, Tenaris USA reiterates its arguments regarding the factual errors pertaining to non-unionized mills, the original industry support calculation in the Petitions, and the use of anomalous 2020 production data in the industry support calculation, given the fact that the market has changed dramatically, with OCTG demand recovering in 2021 and projected to continue increasing.[66]  Tenaris USA also contends that the petitioners' modified approach to the industry support calculation in the First General Issues Supplement relies on total industry production and domestic shipment volumes for 2018 and 2019—an even more distant period and an approach that also rests on flawed assumptions.[67]  According to Tenaris USA, these inadequacies and the failure to satisfy the 50 percent threshold warrant rejection of the Petitions.[68]  Tenaris USA further contends that, at the very least, Commerce should extend the deadline for initiation and poll the industry to obtain reliable data to ensure the petitions have been filed "by or on behalf of the industry."[69]

---

[60] *See* Petitioners' Letter, "Oil Country Tubular Goods from Russia:  Response to TMK's Comments on Petitioners' Standing," dated October 22, 2021 (Petitioners' Letter II).
[61] *See* Tenaris USA Letter I at 1-2.
[62] *Id.* at 3-5.
[63] *Id.* at 5-6.
[64] *Id.* at 6-7.
[65] *Id.* at 7.
[66] *See* Tenaris USA Letter II at 2-9.
[67] *Id.* at 3.
[68] *Id.* at 7.
[69] *Id.* at 3 and 7.

9

In its October 15, 2021, submission, Tenaris USA also contends that the industry support calculation suffers from another potential flaw with respect to OCTG finishing operations.[70] According to Tenaris USA, two of the petitioning companies (Borusan and PTC Liberty) appear to have potentially significant finishing operations relative to their actual OCTG production, and it is unclear what portion of Borusan's operations involves actual pipe production, as opposed to finishing operations for green tube.[71] Tenaris USA argues that this deficiency further justifies a decision by Commerce to poll the industry and require that any production data provided do not include OCTG that companies merely finish rather than produce.[72]

In their October 18, 2021, submission, the petitioners rebut the arguments from Tenaris USA and contend that Tenaris USA's suppositions with respect to flaws lack any evidentiary support.[73] The petitioners contend that they have revised their industry support calculation using the best available information regarding U.S. production and have established adequate industry support for Commerce to initiate the investigations.[74] The petitioners note that their revised industry support calculation does not rely upon any specific mill production where employees are represented by the USW.[75] In addition, the petitioners contend that the revised calculation is conservative because it does not rely on any production at non-petitioning companies' OCTG mills that are represented by the USW, including that of EVRAZ Pueblo.[76] The petitioners note that they used their own information "to the maximum extent possible" and limited the estimated figures to non-petitioning companies where no public available production information was available.[77] The petitioners further note that they relied on historical data reported to the ITC to estimate 2020 production and shipment data and contend that, if Tenaris USA possessed factual information to call the ITC's data into question, it could have and should have provided such data.[78] Moreover, the petitioners note that Tenaris USA [

].[79] Regarding Tenaris USA's assertion that Commerce should not rely on 2020 data for measuring industry support, the petitioners note that Tenaris provides no suggested alternate period nor any legal authority requiring Commerce to use another period.[80] The petitioners contend that, given that existing data (*i.e.*, ITC production and shipment data and [

]) are available on an annual basis, using calendar year 2020 "makes logical sense."[81]

In their October 18, 2021, submission, the petitioners further note that finishing processing operations for green tube have "long been recognized" by the ITC as domestic production by the U.S. OCTG industry.[82] For support, the petitioners note that, in the *2014 OCTG Final*

[70] *Id.* at 9.
[71] *Id.* at 10.
[72] *Id.* at 10.
[73] *See* Petitioners' Letter at 2-13.
[74] *Id.* at 3-4.
[75] *Id.* at 3 and 8.
[76] *Id.* at 4 and 8.
[77] *Id.* at 6.
[78] *Id.*.
[79] *Id.*
[80] *Id.* at 9.
[81] *Id.*
[82] *Id.* at 3 and 6.

investigations, the ITC applied its traditional six factor analysis regarding a firm's U.S. production-related activities and concluded that processors engage in sufficient production-related activities to be considered domestic producers of OCTG.[83]  The petitioners further note that in subsequent reviews, including the *India et al OCTG 2020 Review*, the ITC again included processors of green tube in the domestic industry.[84]

In its October 20, 2021, submission, Tenaris USA reiterates its arguments from its two previous submissions with respect to the industry support calculation.[85]  Tenaris USA states that it has raised a number of issues regarding industry support, which the petitioners have not resolved and which Commerce should investigate further.[86]  After reiterating its contention that 2020 data are anomalous, Tenaris USA argues that Commerce should poll the domestic industry and request actual production data, including for the most recent 12 months.[87]  Tenaris USA further reiterates its arguments that the petitioners' own production and/or shipment data might include data pertaining to finishing operations, rather than production of OCTG, and argues that the petitioners do not address how the issue of finishing pertains to industry support.[88]  In addition, Tenaris USA questions whether imported, subsidized OCTG from Turkey for finishing in the United States should be included in the industry support calculation, contending that such an issue warrants a pause in the industry support analysis to collect additional data.[89]  Tenaris USA further notes that the petitioners do not address the fact that PTC Tubulars was not identified as a U.S. producer in the ITC's *India et al OCTG 2020 Review*, yet the company is identified as part of the U.S. industry in the Petitions.[90]

In their October 21, 2021, Second General Issues Supplement, the petitioners clarify that the USW represents workers engaged in the production of OCTG at the following facilities: EVRAZ Pueblo in Pueblo, CO; Tenaris USA in Ambridge, PA, Koppel, PA, and Wilder, KY; U.S. Steel in Bellville, TX, Fairfield, AL, Lone Star, TX, and Lorain, OH; and Wheatland Tube in Warren, OH, and Wheatland, PA.[91]  The petitioners reiterate that its revised calculations do not rely on any production for non-petitioning OCTG mills represented by the USW.[92]  The petitioners further note that, even without accounting for union support at the mills referenced above, which they note would only increase the total level of industry support, the petitioners still account for more than 50 percent of that portion of the domestic industry that has expressed support for or opposition to the Petitions.[93]  Furthermore, the petitioners note that, while USW support establishes additional levels of industry support, USW support is not necessary to initiate the investigations.[94]

---

[83] *Id.* at 7-8; *see also* Petitions at Volume I at Exhibit I-14 (containing *2014 OCTG Final* at 13).
[84] *See* Petitioners' Letter at 8; *see also* Petitions at Volume I at Exhibit I-11 (containing *India et al OCTG 2020 Review* at 7-9).
[85] *See* Tenaris USA Letter III at 1-15.
[86] *Id.* at 9-10.
[87] *Id.* at 6-7.
[88] *Id.* at 8.
[89] *Id.* at 9.
[90] *Id.* at 8.
[91] *See* Second General Issues Supplement at 1 and Exhibit 1.
[92] *Id.* at 1.
[93] *Id.*
[94] *Id.* at 2.

Filed By: Dmitry Vladimirov, Filed Date: 10/27/21 3:43 PM, Submission Status: Approved

In its October 21, 2021, submission, TMK expresses its support for the arguments raised in Tenaris USA's submissions.[95]  Referencing a past case involving *Large Power Transformers*,[96] TMK notes that Commerce has previously acknowledged that it will depart from its standard practice of using production data from the previous calendar year where there is a "compelling argument that a different time period is more appropriate."[97]  TMK  argues that calendar year 2020 data are inappropriate for evaluating industry support and that there is a compelling reason to use a more recent period because of unique conditions in the OCTG market.[98]  In addition, TMK argues that there have been unique and significant changes in the OCTG market as to make calendar year 2020 data or proxy production data less appropriate than production data from a more recent 12-month period for evaluating industry support.[99]  TMK notes that, based on *Preston Pipe and Tube's* July 2021 report, changes have occurred in the U.S. OCTG market between 2020 and 2021, noting that domestic shipments of welded OCTG and seamless OCTG [    ] between the first half of 2020 and the first half of 2021.[100]  According to TMK, such data indicate that production figures that take into account the first half of 2021 should look different than production figures for calendar year 2020.[101]  TMK further contends that it is likely that the petitioners' production was far lower during a more recent 12- month period than calendar year 2020 and that the trends suggest that the petitioners would lack the requisite support over a more recent 12-month period.[102]  Moreover, TMK contends that the 2018-2019 ITC data, which the petitioners used to estimated 2020 production data, are not representative of the OCTG market in 2020.[103]  As a result, TMK argues that Commerce should reject the petitioners' industry support calculation and poll the industry to ensure the Petitions are adequately supported over a recent and representative 12-month period.[104]  TMK further argues that, if Commerce determines that 2020 production data are sufficiently representative of the U.S. OCTG industry, then Commerce should disregard the petitioners' industry support calculation and poll the industry for "proper" 2020 production data.[105]

In its October 22, 2021, submission, Tenaris USA reiterates its arguments regarding the factual errors pertaining to USW mills, use of 2020 production data, inclusion of processors/finishers, and use of unfairly traded OCTG imports for finishing in the industry support calculation.[106] Tenaris USA notes that the petitioners submitted a fourth revised industry support calculation in the Second General Issues Supplement and contends that the successive changes to the industry support go beyond what Commerce should countenance in the exercise of reasonable discretion in amending a petition.[107]  Tenaris USA further argues that the revised industry support

---

[95] *See* TMK Letter at 2.
[96] *See Large Power Transformers from the Republic of Korea:  Initiation of Antidumping Duty Investigation*, 76 FR 49439 (August 10, 2011) (*Large Power Transformers*), and the unpublished Initiation Checklist, at Attachment II at 19; *see also* TMK Letter at Exhibit 1.
[97] *Id.* at 3-4 and Exhibit 1.
[98] *Id.* at 3-4.
[99] *Id.* at 3-7.
[100] *Id.* at 5 and Exhibit 2.
[101] *Id.* at 5.
[102] *Id.* at 6-7.
[103] *Id.* at 7-8.
[104] *Id.* at 7.
[105] *Id.*
[106] *See* Tenaris USA Letter IV at 4-5.
[107] *Id.* at 2.

12

calculation in the Second General Issues Supplement is based on flawed data and assumptions and that the petitioners remain unable to satisfy their burden to demonstrate standing.[108]  Tenaris USA also notes that it opposes the Petitions and contends that the Petitions should be dismissed or withdrawn.[109]  In the alternative, Tenaris USA argues Commerce should extend the initiation deadline and poll the industry.[110]

In their October 22, 2021, submission, the petitioners note that TMK asserts arguments already presented by Tenaris that have been either disproven or shown to be irrelevant.[111]  The petitioners reiterate that their calculation is conservative, using the best information available to them, and does not factor the support of mills with USW representation into the calculation.[112]  The petitioners note that, like Tenaris, TMK fails to provide any suggested alternate period for calculating industry support and lacks any legal authority requiring Commerce to depart from its longstanding practice of measuring industry support over the most recently completed calendar year.[113]  The petitioners further note that, though TMK cites to *Large Power Transformers* for support of its arguments regarding the time period used for industry support, the case actually highlights that the use of estimates does not require Commerce to poll the industry.[114]  The petitioners contend that they have not only factored in actual production data from the petitioning companies [                                                    ], they have also provided a reasonable estimate of total production based on the best available information, including information from the ITC and [                              ].[115]  Furthermore, the petitioners note that Commerce has accepted similar estimates in past cases, particularly when those in opposition to a petition provide no alternative estimate of total U.S. production or any evidence that the petitioners' estimates are inaccurate, and as such, contend that Commerce should similarly accept the petitioners' estimates of U.S. production in this case.[116]  The petitioners also point out that Tenaris USA has failed to provide any production data that would prove that its production is sufficient to prevent the supporters of the Petitions from reaching the 50 percent threshold, nor has it provided any data on domestic production that should be used in a revised calculation of industry support.[117]  According to the petitioners, this is likely because providing such data would demonstrate that the petitioners have overwhelmingly met the requisite level of support.[118]

**Commerce's Position**

As an initial matter, we note that the petitioners clarified which mills are represented by the USW in the Second General Issues Supplement.[119]  Regarding Tenaris USA's contention that the

---

[108] *Id.* at 3.
[109] *Id.* at 2.
[110] *Id.* at 2-3.
[111] *See* Petitioners' Letter II at 2.
[112] *Id.* at 2.
[113] *Id.*
[114] *Id.* at 3.
[115] *Id.*
[116] *Id.* at 3-4.
[117] *Id.* at 4.
[118] *Id.*
[119] *See* Second General Issues Supplement at 1 and Exhibit 1.

petitioners' original standing calculation is flawed, we note that, as described above, starting with the First General Issues Supplement, which was filed on October 12, 2021, and in subsequent submissions, the petitioners relied on an updated industry support calculation that does not take into account the production of those mills at non-petitioning companies that are represented by the petitioning union, the USW, nor does it involve any adjustments for these non-petitioning USW-represented mills for purposes of calculating the 50 percent support/opinion test. Therefore, the comments from Tenaris USA regarding the factual errors and other flaws pertaining to the USW mills' production in the original standing calculation in the Petitions are moot. We further note that the petitioners' revised calculation is conservative, as it does not include the production of EVRAZ Pueblo's Pueblo, CO, mill, which the USW represents, in the numerator.[120]

With respect to the inclusion of OCTG finishing operations, including the finishing of green tube, our examination of the record gives us no reason to believe that these finishing operations should not be included as production of the domestic like product. The scope and domestic like product of these investigations includes OCTG "whether finished…or unfinished (including green tubes and limited service OCTG products)."[121] In past proceedings involving similar scopes, the ITC has found that OCTG, as defined in the scope, constitutes a single like product and that green tube processing constitutes domestic production.[122] Tenaris USA does not contest these arguments or the petitioners' definition of the domestic like product as co-extensive with the scope. In addition, the data from the ITC that the petitioners used in their industry support calculation clearly include finishing activities. Accordingly, the information on the record supports the conclusion that petitioners properly accounted for production of the domestic like product in their industry support calculation. Furthermore, we note that the petitioners previously indicated that Boomerang Tube, identified as a U.S. producer in *India et al OCTG 2020 Review*, is now PTC Liberty.[123] Tenaris USA also questions the reliability of petitioners' own data, particularly with respect to whether the industry support calculation includes imported, subsidized OCTG from Turkey that it asserts has been processed by Borusan.[124] However, in addition to being an unsubstantiated assertion, this is irrelevant to the question of industry support. The statute is clear that industry support is calculated based on "production of the domestic like product"[125] and does not envision adjustments to the industry support calculation to adjust for potentially subsidized inputs.

With respect to the sufficiency of the petitioners' industry support calculations, the petitioners have provided, with supporting documentation, reasonable estimates of total 2020 production of OCTG in the United States, which are ultimately derived from domestic shipment data for the industry. Sections 702(c)(4)(A) and 732(c)(4)(A) of the Act state that industry support is measured using *production* of the domestic like product. Further, Commerce's regulations state that

---

[120] We also note that the denominator of the petitioners' revised calculation for the 50 percent support/opinion test is overstated, because it counts Tenaris USA's full production as opposition, not just the production of those mills operated by Tenaris USA that are not represented by the USW.
[121] *See* Attachment I, Scope of the Investigation.
[122] *See, e.g.*, *2014 OCTG Final* at 13; *see also, e.g.*, *India et al OCTG 2020 Review* at 6-7.
[123] *See* First General Issues Supplement at 1 and Exhibit 1 (containing *India et al OCTG 2020 Review* at I-37).
[124] *See* Tenaris USA Letter III at 9; *see also* Tenaris USA Letter IV at 5.
[125] *See, e.g.*, section 702(c)(4)(A) and 732(c)(4)(A).

14

> "{t}he Secretary normally will measure production over a twelve-month period specified by the Secretary, and may measure production based on either value or volume. Where a party to the proceeding established that production data for the relevant period, as specified by the Secretary, is unavailable, production levels may be established by reference to alternative data that the Secretary determines to be indicative of production levels."[126]

While Commerce has relied on alternative data, such as shipment data, as a proxy for production in past cases, we do so when production data are not reasonably available to the petitioners. Because 2020 production data were not available for the entire domestic industry, the petitioners provided reasonably available domestic shipment data for the U.S. OCTG industry and used these data as the starting point, making adjustments and accompanied by supporting documentation, to ultimately approximate production. We note that the petitioners provide their own production data, as well as production data for Wheatland, [           ]. We further note that Tenaris USA has not provided any evidence or made any arguments to impugn the [                    ] shipment data, which form the basis of the denominator used in the petitioner's calculation of industry support. In addition, we note that Tenaris USA has not provided its own production data to include in the calculation, despite having ample opportunity to do so in any of its four submissions challenging industry support.

In its fourth submission, Tenaris USA complains that the petitioners' revised their industry support calculation in the Second General Issues Supplement, but fails to acknowledge that the calculation was updated to [                    ]. The petitioners' methodology for calculating total U.S. production of OCTG has remained the same since the First General Issues Supplement filed on October 12, 2021, where the petitioners revised the calculation in response to questions from Commerce and Tenaris USA's October 8, 2021, submission. The petitioners updated the calculation to account for Wheatland's support, [                                        ], but the underlying methodology remained unchanged. We note that amending a petition is permissible under Commerce's regulations,[127] and a petitioner may amend the petition at any time during the pre-initiation period. Commerce has the discretion to accept the petition amendment, ask for further clarification, or reject an amendment. Moreover, all amendments and supplements are considered part of the "Petitions" as a whole.[128] As such, it is not unreasonable, as Tenaris USA contends, for the petitioners to revise their industry support calculation to accurately reflect the support [                    ] for the Petitions. Moreover, we note that the clarifications and revised declarations contained in the Second General Issues Supplement were based on a request from Commerce.

Although Tenaris USA and TMK argue that the ITC historical ratios are insufficient, it is unclear on what basis they make such a claim. Tenaris USA and TMK object to the petitioners' use of the most recently available industry-wide production and shipment data from the *India et al OCTG 2020 Review* to derive a ratio to approximate production from the available domestic

---

[126] *See* 19 CFR 351.203(e)(1).
[127] *See* 19 CFR 351.202(e).
[128] *See*, *generally*, sections 702(b)(1) and 732(b)(1) of the Act, "{t}he petition may be amended at such time, and upon such conditions, as {Commerce}…may permit."

15

shipment data for the entire U.S. OCTG industry, as reported in [                                    ], but they do not offer any alternative sources or production estimates that would, in their view, be more reliable.  In many cases, Commerce has accepted industry support calculations that are based, in whole or in part, on production or shipment data obtained from an ITC report.[129]  Moreover, we note that Commerce has accepted similar estimates in past cases.[130]  As Commerce has noted in past cases, neither the statute nor regulations prevent the petitioners from estimating the production of the non-petitioning companies.[131]  Nor does the statute or regulations require Commerce to poll the industry if the petitioners provide reasonable estimates of non-petitioning company production.[132]  The use of estimates does not require Commerce to poll the industry.

With respect to Tenaris USA's and TMK's contention that the 2020 time period is anomalous and inappropriate, we see no reason to depart from our longstanding practice of measuring production over the most recently completed calendar year for purposes of determining industry support.  We note that Tenaris USA contends that another time period would be more appropriate, but it does not offer a specific time period that would be more appropriate, only broadly suggesting that Commerce should poll the industry and request production data, "including for the most recent 12 months."[133]  Moreover, despite its arguments regarding anomalous production data for 2020, Tenaris USA did not provide any production or shipment data or any other relevant data for comparison purposes to support its contention that an alternate time period is more appropriate than calendar year 2020 for purposes of determining industry support.  TMK also argues that another time period is appropriate and, like Tenaris USA, does not identify what period would be more appropriate, simply suggesting "a recent and representative 12-month period."[134]  TMK notes that industry shipments of OCTG reported by Preston Pipe and Tube [      ] from the first half of 2020 to the first half of 2021 and speculates that the petitioners likely produced far less in a more recent 12-month period than in calendar year 2020, but it is unclear how fluctuations in production and product mix from year-to-year are compelling arguments to support a departure from Commerce's longstanding practice of measuring industry support over the most recently completed calendar year.  In fact, Commerce has declined to adjust the time period for industry support in other cases where parties made similar arguments regarding changes in the state of the industry.[135]  In any antidumping or countervailing duty petition where a domestic industry is alleging material injury to the domestic industry by reason of dumped or subsidized imports, the industry may have produced far less in a more recent 12-month period than the most recently completed calendar year period used by Commerce to determine industry support.  However, given TMK's assertion that trends suggest the petitioners would lack the requisite support over a more recent 12-month period, it appears the ultimate basis of TMK's argument is for Commerce to adjust the time period analyzed for

---

[129] *See, e.g.*, *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam*, 85 FR 23002, 23004 (April 24, 2020).
[130] *See* Petitioners' Letter II at 3; *see also* TMK Letter at Exhibit 1.
[131] *See* Petitioners' Letter II at 3; *see also* TMK Letter at Exhibit 1.
[132] *See* Petitioners' Letter II at 3; *see also* TMK Letter at Exhibit 1.
[133] *See* Tenaris USA Letter III at 7.
[134] *See* TMK Letter at 7.
[135] *See, e.g.*, *Initiation of Antidumping Duty Investigation:  Circular Seamless Stainless Steel Hollow Products from Japan*, 64 FR 63285, 63287 (November 19, 1999).

Filed By: Dmitry Vladimirov, Filed Date: 10/27/21 3:43 PM, Submission Status: Approved

industry support to move the needle in such a way so that the Petitions no longer have the requisite level of support.

Finally, as noted above, as an alternative methodology, we used the publicly available record information on industry-wide production and shipments for 2018-2019 to derive the ratio of industry-wide shipments to production and directly applied this ratio to the 2020 domestic shipment data available for the entire U.S. OCTG industry to approximate total U.S. production of OCTG in 2020.[136]  This alternative calculation takes into account the industry-wide ratio of production to shipments, as reported in the ITC's *India et al OCTG 2020 Review* (and without an adjustment for export shipments), not the petitioners' own ratios or the ratios derived for the "non-petitioners," which Tenaris USA contends are skewed.  Tenaris USA proposes its own alternative calculation using [

          ] and contends that the calculation [

                                                             ].[137]  However, Tenaris USA's alternative calculation did not account for Wheatland's production [

          ].[138]  Commerce's alternative methodology of applying the industry-wide ratio using the data available on the record to the industry domestic shipment data to estimate the entire industry's production and Tenaris USA's proposed alternative methodology, once corrected to properly account for the production noted above, lead to the same end results as the petitioners' calculation—*i.e.*, the supporters of the Petitions account for more than 25 percent of total U.S. production, but less than 50 percent of total production of the domestic like product.[139]  TMK argues that the 2018-2019 ITC data used to estimate 2020 production data are not representative of the OCTG market in 2020, however, using the petitioners' 2020 ratio of production to domestic shipments to adjust the industry-wide domestic shipments yields the same results— *i.e.*, the supporters of the Petitions account for more than 25 percent of total U.S. production, but less than 50 percent of total production of the domestic like product.[140]  Moreover, Commerce's reliance on other information (*i.e.*, [

          ]) to determine industry support for the Petitions, pursuant to sections 702(c)(4)(D)(i) and 732(c)(4)(D)(i) of the Act, is unchanged under the alternative methodologies, and, as such, polling is not required.  Furthermore, because [

                              ] Petitions, under the alternative Commerce and Tenaris USA calculations, we also find that the supporters of the Petitions account for [    ] percent of the total U.S. production of those parties expressing an opinion on the Petitions for which we have production data.[141]  Even if we assume all other U.S. producers oppose the Petitions, in addition to the

---

[136] *See* Table I, Calculation of Industry Support, above.

[137] *See* Tenaris Letter II at 6-7 and Exhibit 1.

[138] *Id.* at Exhibit 1.

[139] As explained above, depending on the methodology applied, the supporters of the Petitions account for [    ] percent, [    ] percent, or [    ] percent of total U.S. production.  The calculation under Tenaris USA's alternative methodology, once corrected, is as follows:  [        ]/[          ] = [      ] percent.

[140] Applying the petitioners' 2020 ratio of production to domestic shipments to the industry-wide 2020 domestic shipment data from [                              ] results in estimated total U.S. production of [          ] short tons (*i.e.*, [        ] * ([        ]/[        ]) = [        ]).  Under this methodology, the supporters of the Petitions account for [      ] percent of total U.S. production (*i.e.*, [        ]/[          ] = [      ] percent).

[141] As noted above, Tenaris USA did not provide its production for Commerce to account for its opposition in the industry support calculation, despite having ample opportunity to do so.

Filed By: Dmitry Vladimirov, Filed Date: 10/27/21 3:43 PM, Submission Status: Approved

opposition expressed by Tenaris USA, under Commerce's and Tenaris USA's alternative methodologies, the supporters of the Petitions would account for [    ] percent, [    ] percent, or [    ] percent of the production of the parties expressing an opinion on the Petitions.[142] Accordingly, Commerce determines that the petitioners have provided reasonably available information to account for total production of the domestic like product in their industry support calculation and that the Petitions have met the requirements under sections 702(c)(4)(A) and 732(c)(4)(A) of the Act.

*2) Whether Commerce should poll the industry to determine industry support*

In each of its submissions, Tenaris USA argues that flawed assumptions, errors, and other inadequacies raise serious doubts about whether the Petitions satisfy the 50 percent test and, as such, Commerce must extend the deadline to poll the industry.[143]

In its October 18, 2021, submission, the petitioners argue that Tenaris USA has failed to demonstrate that the Petitions do not establish the requisite 50 percent support among total production of domestic producers expressing a position on the Petitions.[144] The petitioners further argue that only then would Commerce have an obligation under sections 702(c)(4)(D) and 732(c)(4)(D) of the Act to make further inquiry about industry support by either polling the industry or relying on other information.[145] The petitioners further note that Tenaris never proffers its total production of OCTG that should be used in a revised calculation of industry support and, without such production data, the record does not demonstrate enough opposition to trigger the requirement for Commerce to poll the industry or rely on other information to determine industry support.[146]

In the October 21, 2021, Russia CVD consultations, the GOR requested that Commerce extend the initiation deadline and poll the industry.[147]

In its October 21, 2021, submission, TMK argues that the petitioners have not established that domestic producers or workers who support the Petitions account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the Petitions over an appropriate 12-month period.[148] As a result, TMK contends that, if Commerce does not outright reject initiation, Commerce should extend the initiation deadline and poll the industry to collect the requisite information.[149]

---

[142] *See* Table I, Calculation of Industry Support; *see also* Tenaris Letter II at Exhibit 1 (once corrected to account for Wheatland's production [                                    ]). The calculation under Tenaris USA's alternative methodology, once corrected, is as follows:  [       ]/([                    ]) = [    ] percent.  Using the petitioners' 2020 ratio of production to shipments to adjust the industry shipment data to approximate production described above, even if we assume all other U.S. producers (including Tenaris USA) oppose the Petitions, the supporters of the Petitions would account for [    ] percent of the production of the parties expressing an opinion on the Petitions (*i.e.*, [      ]/([              ]) = [    ] percent).
[143] *See* Tenaris USA Letters I, II, III, and IV.
[144] *See* Petitioners' Letter at 10.
[145] *Id.* at 10.
[146] *Id.*
[147] *See* Russia CVD Consultations Memo; *see also* GOR Letter at 2.
[148] *See* TMK Letter at 3.
[149] *Id.*

In their October 22, 2021, submission, the petitioners note that the record, as it stands without Tenaris USA's production, does not demonstrate enough opposition to trigger the requirement for Commerce to poll the industry or rely on other information to determine industry support.[150] The petitioners contend that TMK and Tenaris want Commerce to ignore the petitioners' demonstration of industry support to go on a "fishing expedition" to find evidence that they, themselves are unwilling to provide, just to delay the inevitable initiation of these investigations.[151] The petitioners further note that sections 702(c)(4)(D) and 732(c)(4)(D) of the Act set out that only when the petitioners do not establish the requisite 50 percent support threshold will Commerce have an obligation to make further inquiry about industry support.[152]

**Commerce Position:**

Based on the information provided in the Petitions and supplements thereto, including the petitioners' response to the industry support comments from Tenaris USA, we find that the petitioners provided reasonably available information, in accordance with the requirements of the statute[153] and Commerce's regulations,[154] to account for all production of the domestic like product in their industry support calculation and have the industry support required by sections 702(c)(4)(A) and 732(c)(4)(A) of the Act. Sections 702(c)(4)(D)(i) and 732(c)(4)(D)(i) of the Act provide that, if the petition does not establish support of domestic producers of workers accounting for more than 50 percent of the total production of the domestic like product, Commerce shall poll the industry or rely on other information to determine if there is support for the petition. As described above, because the supporters of the Petitions accounted for at least 25 percent of total U.S. production, but less than 50 percent of total U.S. production,[155] Commerce relied on other information available (*i.e.*, [                                                  ]) and determined that domestic producers (or workers) who support the Petitions have the requisite level of industry support for Petitions, pursuant to sections 702(c)(4)(D)(i) and 732(c)(4)(D)(i) of the Act. When Commerce relies on other information (*i.e.*, [                                                                        ]) in accordance with sections 702(c)(4)(D)(i) and 732(c)(4)(D)(i) of the Act, under multiple calculation methodologies described above, including the alternative calculation provided by Tenaris, the Petitions have the required level of industry support for initiating these investigations. As a result, it is unnecessary for Commerce to poll the industry to determine industry support.

*3) Whether Commerce should disregard opposition to the Petitions*

In its October 15, 2021, submission, Tenaris USA contends that it is the largest U.S. producer of OCTG and has made major investments in its U.S. pipe manufacturing presence over the

---

[150] *See* Petitioners' Letter II at 4-5.
[151] *Id.* at 5.
[152] *Id.*
[153] *See* sections 702(c)(4) and 732(c)(4) of the Act.
[154] *See* 19 CFR. 351.203(e).
[155] As explained above, depending on the methodology applied, the supporters of the Petitions account for [     ] percent, [     ] percent, or [     ] percent of total U.S. production. *See* Table I, Calculation of Industry Support; *see also* Tenaris Letter II at Exhibit 1 (once corrected to account for Wheatland's production [          ]).

19

years.[156]  In addition, Tenaris USA notes that it complements its U.S. production with imports from foreign Tenaris mills, in order to maximize its domestic capabilities, reduce inefficiencies, and improve its offerings to U.S. customers.[157]  In reference to sections 702(c)(4)(B)(i) and 732(c)(4)(B)(i) of the Act, Tenaris USA further notes that the statute allows U.S. producers to demonstrate whether their interests as a domestic producer would be adversely affected by an order.[158]  Tenaris USA argues that Commerce should not disregard the position it has taken because the imposition of duties would adversely affect its investments in U.S. production and processing capabilities and negatively impact its relationships with U.S. customers that rely on the full range of Tenaris USA products.[159]

In the Petitions, the petitioners contend that Commerce should disregard the positions of Tenaris USA and SeAH Steel USA, U.S. producers of OCTG that are related to foreign producers or exporters in Argentina and Mexico (for Tenaris USA) and Korea (for SeAH Steel USA).[160]  In their October 18, 2021, submission, the petitioners contend that Tenaris USA favors foreign production over its domestic production and does not import to complement its domestically-produced OCTG.[161]  As such, the petitioners contend that the imposition of duties would not adversely affect Tenaris USA because Tenaris USA can produce domestically what it now imports.[162]  The petitioners further contend that Tenaris USA has provided no evidence that the imposition of duties would adversely affect its U.S. OCTG production activities and its workers and that its position should be disregarded.[163]

In its October 20, 2021, submission, Tenaris USA reiterates its arguments regarding the investments it has made in the U.S. market and rebuts the petitioners' assertions that it favors imports to domestic interests.[164]  Tenaris USA also reiterates its contention that it is the largest OCTG producer and its position must be considered and counted in determining industry support for the Petitions.[165]

In its October 21, 2021, submission, TMK contends that Commerce should not disregard Tenaris USA's position when determining industry support for the Russia Petitions because Tenaris USA is neither related to a Russian foreign producer nor an importer of record of OCTG from Russia.[166]

In its October 22, 2021, submission, its fourth submission, Tenaris USA formally states that it opposes the Petitions.[167]

---

[156] *See* Tenaris USA Letter II at 11-17.
[157] *Id.* at 17.
[158] *Id.* at 17-18.
[159] *Id.* at 18-22.
[160] *See* Petitions at Volume I at 8-9.
[161] *See* Petitioners' Letter at 11-13.
[162] *Id.* at 13.
[163] *Id.* at 11-12.
[164] *See* Tenaris USA Letter III at 10-14.
[165] *Id.*
[166] *Id.* at 8-10.
[167] *See* Tenaris USA Letter IV at 2.

20

In their October 22, 2021, submission, the petitioners acknowledge it is unnecessary to disregard Tenaris USA's opposition, because the industry support calculation demonstrates that the supporters of the Petitions account for at least [      ] percent of that portion of the domestic industry that has expressed an opinion with respect to the Petitions, even when factoring in Tenaris USA's total estimated production in opposition.[168]  The petitioners emphasize that their industry support calculation does not exclude any of Tenaris USA's production.[169]

**Commerce Position:**

We note that, despite providing four submissions on the topic of industry support and arguing that Commerce should not disregard its opposition, Tenaris USA did not provide any data on its production of the domestic like product for Commerce to account for Tenaris USA in the industry support calculations or to call into question the data provided by the petitioners.[170] While the petitioners are responsible for establishing industry support of the petition, parties that oppose the petition or seek to impugn the data provided by the petitioners are responsible for giving effect to their opposition and/or arguments by providing evidence that supports them.  As Tenaris USA points out, such information was readily available to Tenaris USA as it had recently been compiled and submitted to the ITC.[171]

We also note that, although the petitioners contend that Commerce should disregard SeAH Steel USA's position, SeAH Steel USA has not filed any submission stating its position with respect to the Petitions.  Commerce does not impute support for or opposition to a petition for any party, and, as such, we have not imputed any position (neither support nor opposition) for SeAH Steel USA.  Furthermore, we note that it is unnecessary to exclude any opposition to these Petitions.  Even assuming that all other U.S. producers of OCTG (including SeAH Steel USA) oppose the Petitions in addition to Tenaris USA, [

                                       ], the supporters of the Petitions would still have the requisite level of support pursuant to sections 702(c)(4)(A)(ii) and 732(c)(4)(A)(ii) of the Act under the petitioners' methodology and the alternative methodologies described above.  As a result, it is unnecessary for Commerce to consider whether to disregard opposition of certain producers because the supporters of the Petitions have demonstrated the industry support required by sections 702(c)(4)(A)(ii) and 732(c)(4)(A)(ii) of the Act.

**Findings**

Commerce relied on information provided by the petitioners, as described above, to establish total 2020 production of the domestic like product.  Using these data, as demonstrated above, we find that the domestic producers and workers who support the Petitions account for at least 25 percent of total production of the domestic like product.  Commerce further finds that domestic producers and workers who support the Petitions account for more than 50 percent of the total production of the domestic like product produced by that portion of the industry expressing

---

[168] *See* Petitioners' Letter II at 4.
[169] *Id.* at 4.
[170] *See* Tenaris USA Letters I, II, III, and IV.
[171] *See* Tenaris USA Letter III at 7.

support for, or opposition to, the Petitions.  Therefore, we find that there is adequate industry support within the meaning of sections 702(c)(4)(A) and 732(c)(4)(A) of the Act.

Commerce conducted a search of the internet and has been unable to locate information that contradicts the petitioners' assertions.  We find that the petitioners have provided data that are reasonably available.  For these reasons, we find that there is adequate industry support for initiating these investigations.  Accordingly, Commerce finds that the Petitions have met the requirements of sections 702(c)(4)(A) and 732(c)(4)(A) of the Act.

22

## Attachment III

### Analysis of Allegations and Evidence of Material Injury and Causation for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation

## I.      Introduction

When making a determination regarding the initiation of antidumping and countervailing duty investigations, the Department of Commerce (Commerce) examines, on the basis of sources readily available to Commerce, the accuracy and adequacy of the evidence contained in the petitions, and it determines whether the petitions allege the elements necessary for the imposition of antidumping and countervailing duties and contain information reasonably available to the petitioners that supports the allegations.[1]  This attachment analyzes the sufficiency of the allegations and supporting evidence regarding material injury and causation.

## II.      Definition of Domestic Industry

The domestic industry is described with reference to producers of the domestic like product, as provided for in section 771(4)(A) of the Act.  The Petitions[2] define the domestic industry as U.S. producers of oil country tubular goods (OCTG).[3]  The petitioners[4] identify themselves and fifteen other producers of the domestic like product as the companies constituting the domestic industry in the United States.[5]  For a discussion of the domestic like product, *see* Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation, to this Checklist.

## III.      Evidence of Injury and Threat of Injury

To determine injury, the statute requires an evaluation of the volume, price effects, and impact of imports on the domestic industry and permits consideration of other economic factors.[6]  Specifically, in examining the impact of imports, section 771(7)(C)(iii) of the Act states that:

---

[1] *See* sections 702(c)(1)(A)(i) and 732(c)(1)(A)(i) of the Tariff Act of 1930, as amended (the Act).

[2] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties:  Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia," dated October 6, 2021 (the Petitions). The petitioners filed "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement) and "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia:  Response to Second General Issues Questionnaire," dated October 21, 2021 (Second General Issues Supplement), in response to Commerce's requests for additional information regarding the Petitions.

[3] *See* Petitions at 26-28.

[4] The petitioners are Borusan Mannesmann Pipe U.S., Inc.; PTC Liberty Tubulars LLC; U.S. Steel Tubular Products, Inc.; the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC; and Welded Tube USA, Inc. (collectively, the petitioners).

[5] *See* Petitions at Volume I at 3-5; *see also* General Issues Supplement at 2.

1

In examining the impact {of imports on domestic producers} …, the {International Trade} Commission {ITC} shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to–

> (I) actual and potential decline in output, sales, market share, gross profits, operating profits, net profits, ability to service debt, productivity, return on investments, return on assets, and utilization of capacity,
> (II) factors affecting domestic prices,
> (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
> (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry..., and
> (V) in {an antidumping proceeding}…, the magnitude of the margin of dumping.

The Petitions allege that the domestic industry has experienced the following types of injury by reason of imports from Argentina, Mexico, the Republic of Korea (Korea), and the Russian Federation (Russia):

- Significant and increasing volume of subject imports (*See* Petitions at Volume I at 34-36 and Exhibit I-20);
- Declining market share (*See* Petitions at Volume I at 1, 34-36, 39, 40 and Exhibits I-2 and I-20);
- Underselling and price suppression (*See* Petitions at Volume I at 1, 36-37 and Exhibits I-1 and I-20);
- Lost sales and revenues (*See* Petitions at Volume I at 37-38);
- Declines in production, U.S. shipments, and capacity utilization rates (*See* Petitions at Volume I at 2, 39-40 and Exhibit I-1);
- Declining employment (*See* Petitions at Volume I at 47 and Exhibit I-34; *see also* General Issues Supplement at 10); and
- Adverse impact on the domestic industry's financial performance (*See* Petitions at Volume I at 40 and Exhibit I-1).

The Petitions also allege that the domestic industry could be threatened with further injury by reason of imports from Argentina, Mexico, Korea, and Russia due to the following:

- Vulnerability of the domestic industry to material injury by reason of subject imports (*See* Petitions at Volume I at 47-48 and Exhibit I-34);
- Countervailable subsidies which encourage production and export of OCTG from Korea and Russia (See Petitions at Volume I at 42-43);
- Rapid and continued increase in the volume and market penetration of subject imports (*See* Petitions at Volume I at 46);
- Potential for product shifting at foreign facilities (*See* Petitions at Volume I at 45-46 and Exhibits I-13 and I-33);

2

- Diversion of exports to the U.S. market due to the imposition of trade measures on OCTG in third countries (*See* Petitions at Volume I at 44-45 and Exhibits I-29 through I-32);
- Substantial existing capacity and planned capacity expansion to increase production of subject merchandise and ship increasing volumes of subject merchandise to the U.S. market (*See* Petitions at Volume I at 43-44 and Exhibits I-5 through I-6, I-8 through I-9, and Exhibits I-25 through I-28); and
- Likelihood of continued underselling and depression and/or suppression of U.S. prices (*See* Petitions at Volume I at 47 and Exhibits I-1 and I-20).

## IV.  Cumulation

Section 771(7)(G)(i) of the Act requires the ITC to cumulate imports from all countries for which petitions were filed on the same day if such imports compete with each other and with the domestic like product in the United States. On October 6, 2021, the petitioners filed the Petitions against Argentina, Mexico, Korea, and Russia. The petitioners argue that a reasonable overlap of competition exists with subject imports and with the domestic like product in the United States, and as such, the criteria for cumulation have been satisfied.[7]

In determining whether cumulation is appropriate, the ITC uses a framework of four factors.[8] Each factor, along with the sections of the Petitions in which it is addressed, is listed below.

- The degree of fungibility between imports from the subject countries and between the imports and the domestic like product.

    The petitioners submit that the domestic like product and OCTG from Argentina, Mexico, Korea, and Russia are fungible products that are produced to standard industry specifications and directly compete against one another.[9] The petitioners note that the ITC previously determined that there is "a sufficient degree of substitutability" between the different grades of OCTG and that the differences between seamless and welded OCTG do not significantly limit competition.[10]

- The presence of sales or offers for sale of the imports and the domestic like product in the same geographic markets.

---

[7] *See* Petitions at Volume I at 28-29.
[8] *See Certain Cast-Iron Pipe Fittings from Brazil, the Republic of Korea, and Taiwan*, Inv. Nos. 731-TA-278-280 (Final), USITC Pub. 1845 (May 1986); *see also Fundicao Tupy, S.A. v. United States*, 678 F. Supp. 898, 902 (CIT 1988), *aff'd*, 859 F.2d 915 (Fed. Cir. 1988).
[9] *See* Petitions at Volume I at 29-30 and Exhibit I-14.
[10] *Id.* at 29-30 and Exhibit I-14 (containing *Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final) USITC Pub. 4489 (September 2014) (*OCTG 2014 Final*) at 21-22).

3

The petitioners note that both domestically-produced OCTG and subject imports are sold on a nationwide basis and, thus, in the same geographic markets.[11]  For support, the petitioners provide import data demonstrating that imports of OCTG from each of the subject countries entered at ports in all regions of the United States.[12]

- Whether the imports and the domestic like product are handled in common or similar channels of distribution.

  The petitioners contend that subject imports and domestically-produced OCTG are sold through the same distribution channels, primarily through distributors to end users who consume the OCTG in oil and gas exploration activities.[13]

- Whether the imports are present in the U.S. market simultaneously.

  The petitioners contend that subject imports have been simultaneously present in the U.S. market in each of the past three years.[14]  For support, the petitioners provided annual import data for the time period of 2018-2020 and interim data up to June 2021 demonstrating that subject imports have been present in the U.S. market throughout the three-year period.[15]

## V.     Negligibility

Section 771(24)(A)(i) of the Act states that "imports from a country of merchandise corresponding to a domestic like product identified by the Commission are 'negligible' if such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which the data are available . . . ."

The petitioners contend that imports from Argentina, Mexico, Korea, and Russia are not negligible.[16]  For support, the petitioners provided import data for the most recent twelve-month period for which data are available (August 2020 through July 2021), which demonstrate that imports from Argentina, Mexico, Korea, and Russia account for 11.7 percent, 22.5 percent, 39.2 percent, and 8.3 percent, respectively, of the volume of total imports over this period.[17]  The data provided by the petitioners demonstrate that imports of OCTG from Argentina, Mexico, Korea, and Russia individually exceed the three percent negligibility threshold provided under section 771(24)(A)(i) of the Act.[18]

---

[11] *See* Petitions at 30 and Exhibit I-(containing *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216 and 1221-1223 (Review) USITC Pub. 5090 (July 2020) at II-4).
[12] *See* Petitions at Volume I at 30 and Exhibit I-20.
[13] *Id.* at 30 and Exhibit I-14 (containing *OCTG 2014 Final* at 23).
[14] *Id.* at 31.
[15] *Id.* at 31 and Exhibit I-20.
[16]  *See* Petitions at Volume I at 28.
[17] *Id.* at 28 and Exhibit I-22.
[18] *Id.*

4

## VI.     Causation of Material Injury and Threat of Material Injury

The petitioners contend that the material injury and the threat of material injury to the domestic industry discussed in Section III above were caused by the impact of the allegedly dumped and subsidized imports from Argentina, Mexico, Korea, and Russia.  In support of their argument, the petitioners provided information on the historical trend of the volume and value of the allegedly dumped and subsidized imports, beginning with January 2018 and ending with June 2021.[19]  In the Petitions, the petitioners demonstrate the effect of these imports on domestic prices and market share, and the consequent impact on the domestic industry, specifically on financial and operating performance, sales, and revenue.[20]  The petitioners argue that this evidence reflects the injurious effects on the U.S. industry's performance and domestic selling prices caused by imports of OCTG at prices substantially lower than prices offered from the petitioners, thereby resulting in lost sales and revenues and declining financial and operating performance.[21]

In making a determination regarding causation of material injury, the ITC is directed to evaluate the volume of subject imports (section 771(7)(B)(i)(I) of the Act), the effect of those imports on the prices of domestically produced products (section 771(7)(B)(i)(II) of the Act), and their impact on the domestic operations of U.S. producers (section 771(7)(B)(i)(III) of the Act).  The petitioners base their allegations of causation of current injury upon the significant and increasing volume of subject imports; declining market share; underselling and price suppression; lost sales and revenues; declines in production, U.S. shipments, and capacity utilization rates; declining employment; and adverse impact on the domestic industry's financial performance.[22]

With regard to the threat of material injury, the petitioners base their allegations upon vulnerability of the domestic industry to material injury by reason of subject imports; countervailable subsidies provided by the governments of Korea and Russia; substantial existing capacity and planned capacity expansion to increase production for shipment to the U.S. market; potential for product shifting; diversion of exports to the U.S. market due to the imposition of trade measures in third countries; and the likelihood of continued underselling, price depression, and/or suppression.[23]

The allegations of causation of material injury and the threat of material injury are based upon the factors indicating current injury, as well as the factors indicating threat of material injury as noted above.  The factors related to causation presented in the injury section of the Petitions are the types of factors that the ITC is directed to consider for the purpose of evaluating causation under sections 771(7)(C) and 771(7)(F) of the Act.

---

[19] *Id.* at 23, 28, 34-36 and Exhibits I-20 and I-22.
[20] *See* Petitions at 1-2, 34-40 and Exhibits I-1, I-2, and I-20; *see also* General Issues Supplement at 10.
[21] *See* Petitions at 1-2, 34-40 and Exhibits I-1, I-2, and I-20; *see also* General Issues Supplement at 10.
[22] *See* Section III, above.
[23] *Id.*

5

## VII.    Conclusion

In order to assess the accuracy and adequacy of the evidence relating to the allegations regarding material injury, threat of material injury, cumulation, negligibility, and causation, we examined the information presented in the Petitions and supplement to the Petitions and compared it with information that was reasonably available (*e.g.*, import data on the ITC website).  We did not locate any information that contradicts the petitioners' assertions.

We analyzed the petitioners' evidence regarding material injury, threat of material injury, cumulation, negligibility, and causation, and have found that the information in the Petitions and supplement to the Petitions demonstrates a sufficient showing of injury or threat of injury to the U.S. industry producing OCTG.  Therefore, we find the overall evidence of injury included in the Petitions to be adequate to initiate the investigations of OCTG from Argentina, Mexico, Korea, and Russia.  Ultimately, the ITC will make the final determination with respect to material injury, or threat thereof, cumulation, negligibility, and causation.

Filed By: Dmitry Vladimirov, Filed Date: 10/27/21 3:43 PM, Submission Status: Approved

(Form 19)

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS
## CAFC Court No. 2025-1382

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes <u>13,769</u> words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: March 24, 2025

Signature:   <u>/s/ Gregory J. Spak</u>

Name:       <u>Gregory J. Spak</u>