# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

———————————

TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP., SIDERCA S.A.I.C.,

Plaintiffs-Appellants,

v.

UNITED STATES,

and

UNITED STATES STEEL CORPORATION, BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, WELDED TUBE,DEPARTMENT OF VETERANS AFFAIRS,

Defendants-Appellees.

———————————

On Appeal from the Court of International Trade in case no. 1:22-cv-00343-CRK, Hon. Judge Claire R. Kelly

———————————
NONCONFIDENTIAL
**DEFENDANT-APPELLEE'S BRIEF**
———————————

BRETT A. SHUMATE
*Assistant Attorney General*

PATRICA M. McCARTHY
*Director*

CLAUDIA BURKE
MARGARET J. JANTZEN
*Attorneys, Commercial Litigation Branch*
*Civil Division, U.S. Department of Justice*
*P.O. Box 480, Ben Franklin Station*
*Washington, DC 20044*
*(202) 353-7994*

August 5, 2025

# TABLE OF CONTENTS

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been removed from single brackets on pages 6, 9, 18, 26, and 28. The name of the industry source for OCTG was omitted from pages 9, 18, 26 and 28. Information contained in this source was omitted from page 26. Characterization of industry support was omitted from pages 6 and 18.

**Page**

STATEMENT OF RELATED CASES…………………………………………..1

INTRODUCTION ....................................................................................................1

STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS...............2

I.     Nature of the Case....................................................................................2

II.    Relevant Legal Framework for Initiating Antidumping Duty Proceedings .........2

III.   Statement of Fact and Course of Proceedings Below ...........................................5

    A.     The Petition .....................................................................................5

    B.     Tenaris' Challenges to the Industry Support Calculation............................7

    C.     Initiation of the Investigation ......................................................8

    D.     Preliminary and Final Determinations......................................... 10

    E.     Proceedings at the Court of International Trade.................................... 11

    F.     The Trial Court Sustains Commerce's Final Redetermination............... 13

SUMMARY OF ARGUMENT................................................................. 15

ARGUMENT ........................................................................................ 16

I.     Standard of Review................................................................................. 16

II.    Commerce Complied with the Remand Order and its Industry Support
Calculation is Supported by Substantial Evidence ................................................. 17

    A.     Commerce's Industry Support Calculation is Supported by Substantial
Evidence........................................................................................... 17

i

B.      Commerce Complied with the Remand.................................................... 19

C.      Commerce Reasonably Relied on Shipment Data as a Proxy for Production................................................................................................ 25

III.    Tenaris Raises New Arguments for which it has Failed to Exhaust its Administrative Remedies and Should not be Considered by this Court ........... 28

CONCLUSION ............................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  802 F.3d 1339 (Fed. Cir. 2015) ..........................................................................16

*Agro Dutch Industries Ltd. v. U.S.*,
  508 F.3d 1024 (Fed. Cir. 2007) ..........................................................................28

*Amado v. Microsoft Corp.*,
  517 F.3d 1353 (Fed. Cir. 2008) ..........................................................................17

*Apex Frozen Foods Priv. Ltd. v. United States*,
  862 F.3d 1322 (Fed. Cir. 2017) ..............................................................17, 19, 20

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) ..........................................................................17

*Cleo Inc. v. United States*,
  501 F.3d 1291 (Fed. Cir. 2007) ..........................................................................17

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ..........................................................................................16

*Consolidated Bearings Co. v. U.S.*,
  348 F.3d 997 (Fed. Cir. 2003) ............................................................................28

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ..........................................................................................16

*Corus Staal BV v. United States*,
  502 F.3d 1370 (Fed. Cir. 2007) ..............................................................28, 29, 30

*Gerber Food (Yunnan) Co. v. United States*,
  601 F.Supp.2d 1370 (CIT 2009) .............................................................. 30, 32

*Itochu Bldg. Prods. v. United States*,
  733 F.3d 1140 (Fed. Cir. 2013) ..............................................................28, 29, 33

*Nippon Steel Corp. v. United States,*
458 F.3d 1345 (Fed. Cir. 2006) ..............................................................................17

*PT Pindo Deli Pulp v. United States,*
825 F.Supp.2d 1310 (CIT 2012) .............................................................................25

*Qingdao Sea-Line Trading Co., Ltd. v. United States,*
766 F.3d 1378 (Fed. Cir. 2014) ..............................................................................27

*Qingdao Taifa Grp. Co., v. United States,*
710 F.Supp.2d 1352 (Ct. of Int'l Trade 2010) ........................................................27

*Tenaris Bay City, Inc. v. United States,*
745 F.Supp.3d 1336 (Ct. Int'l Trade 2024) ..................................................2, 13, 14

*Trust Chem Co. Ltd.,*
791 F.Supp.2d 1257 (CIT 2011) .............................................................................30

*United States v. Eurodif,*
555 U.S. 305 (2009) ................................................................................................16

*Universal Camera Corp. v. N.L.R.B.,*
340 U.S. 474 (1951) ..........................................................................................22, 23

*Weishan Hongda Aquatic Food Col, Ltd. v. United States,*
917 F.3d 1353 (Fed. Cir 2019) ...............................................................................29

## Statutes

19 U.S.C. § 1516a ......................................................................................................4
19 U.S.C. § 1516a(b)(1)(B)(i) ..................................................................................16
19 U.S.C. § 1673a(a)(1) .............................................................................................2
19 U.S.C. § 1673a(b)(1) ................................................................................2, 25, 26
19 U.S.C. § 1673a(c)(1)(A) ..........................................................................3, 8, 12, 14
19 U.S.C. § 1673a(c)(1)(B) ........................................................................................4
19 U.S.C. § 1673a(c)(4)(A) .................................................................................3, 8, 9
19 U.S.C. § 1673a(c)(4)(A)(ii) ......................................................................11, 17, 18
19 U.S.C. § 1673a(c)(4)(D)(i) .................................................................................4, 9
19 U.S.C. § 1673a(c)(4)(E) .....................................................................4, 10, 26, 27
28 U.S.C. § 2637(d) .................................................................................................28

## Regulations

19 C.F.R. § 351.102(b)(21) ...............................................................................13

19 C.F.R. § 351.203 ..............................................................................................3

19 C.F.R. § 351.203(e)(1) .....................................................................................3

19 C.F.R. § 351.204(b)(1) ...................................................................................10

19 C.F.R. § 351.301(b) .......................................................................................13

## Other Authorities

*Oil Country Tubular Goods from Argentina: Final Affirmative determination of Sales at Less than Fair Value and Final Negative Determination of Critical Circumstances,*
  87 Fed. Reg. 59,054 (Dep't of Commerce Sept. 29, 2022) .............................................2

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,*
  86 Fed. Reg. 52,300, 52,303-05 (Dep't of Commerce Sep. 20, 2021) ............................3

*Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations,*
  86 Fed. Reg. 60,205 (Dep't of Commerce Nov. 1, 2021) ......................................... 8, 10

*Oil Country Tubular Goods From Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,*
  87 Fed. Reg. 28,801 (Dep't of Commerce May 11, 2022) ........................................... 10

*Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation,*
  87 Fed. Reg. 70,785 (Dep't of Commerce Nov. 21, 2022) .......................................... 10

H.R. Rep. No. 103-316, vol. 1, *reprinted in* 1994 U.S.C.C.A.N. 4040 (1994) ....................4

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, defendant-appellee's counsel states that she is unaware of any other appeal in or from this action that was previously before this Court, or any other appellate court, under this same or similar title. Counsel is also unaware of any case pending in this or any other court that may be directly affected by the Court's disposition of this appeal.

## INTRODUCTION

Plaintiffs-appellants are domestic producers of oil country tubular goods (OCTG). They oppose Commerce's determination to initiate an antidumping investigation into OCTG from Argentina and challenge Commerce's industry support calculation. But despite claiming to be the largest domestic producer of OCTG, plaintiffs failed to provide any of their own production data to be included in Commerce's calculation and declined to provide alternate evidence that would reflect more accurate production data than what Commerce used. Instead, plaintiffs raise mere *possibilities* of error with the data that Commerce relied upon. These hypothetical critiques do not defeat Commerce's reasonable and substantiated industry support determination.

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(5). On December 2, 2024 the Court of International Trade (CIT or trial court) issued an order sustaining

1

Commerce's final remand redetermination in the antidumping duty (AD) investigation of oil country tubular goods (OCTG) from Argentina. *Oil Country Tubular Goods from Argentina: Final Affirmative determination of Sales at Less than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg. 59,054 (Dep't of Commerce Sept. 29, 2022). *See* Appx085-Appx113. Plaintiffs-appellant companies Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, and Siderca S.A.I.C. (collectively Tenaris) appeal from that judgment.

## STATEMENT OF THE ISSUES

1. Commerce's industry support calculation is supported by substantial evidence.

2. Tenaris' evolving arguments challenging Commerce's industry support calculation have not been administratively exhausted and should not be reviewed by this Court.

## STATEMENT OF THE CASE

### I. Statutory Background

An AD investigation is initiated whenever Commerce determines that a formal investigation is warranted into the question of whether the elements necessary for the imposition of duties exist under the statute. 19 U.S.C. § 1673a(a)(1). An interested party may initiate an investigation by filing a petition on behalf of the domestic industry requesting that Commerce investigate possible dumping. *Id.* at § 1673a(b)(1).

Upon receiving such a petition, Commerce generally has 20 days to determine whether the petition: (1) alleges the necessary elements for the imposition of duties, based upon "information reasonably available to the petitioner" and after examining sources readily available to Commerce; and (2) was filed "by or on behalf of the industry." *Id.* at § 1673a(c)(1)(A). A petition is filed "by or on behalf of the industry" when:

> (i)    the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product, and

> (ii)    the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition.

*Id.* at § 1673a(c)(4)(A). Production is normally measured over a twelve-month period, as specified by Commerce, and is based on either value or volume. 19 C.F.R. § 351.203(e)(1).[1] But if an interested party demonstrates that production data is unavailable for the specific period, production levels may be established "by reference to alternative data that {Commerce} determines to be indicative of production levels." *Id.*

---

[1] After initiating this investigation, Commerce amended 19 C.F.R. § 351.203. This investigation was conducted pursuant to the prior version of the regulation. *See Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,303-05 (Dep't of Commerce Sep. 20, 2021).

If the petition satisfies the 25 percent domestic industry support requirement, but not the 50 percent requirement, Commerce "shall poll the industry *or* rely on other information in order to determine if there is support for the petition" before proceeding with a formal initiation. 19 U.S.C. § 1673a(c)(4)(D)(i) (emphasis supplied). Where Commerce must poll the industry or otherwise determine support for the petition, it may, in exceptional circumstances, extend the 20-day period to a maximum of 40 days. *Id.* at § 1673a(c)(1)(B).

Prior to initiation, interested parties "may submit comments or information on the issue of industry support. 19 U.S.C. § 1673a(c)(4)(E). But once Commerce "makes a determination with respect to initiating an investigation, the determination regarding industry support shall not be reconsidered." *Id.* The Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1, *reprinted in* 1994 U.S.C.C.A.N. 4040 (1994) (SAA) at 863, repeats this principle: "Arguments regarding industry support should not be made to either Commerce or the Commission following initiation. Interested parties will continue to be able to challenge the adequacy of Commerce's industry support determination under {19 U.S.C. § 1516a}. . . ."

## II.    Factual Background

### A.    The Petition

On October 6, 2021, Commerce received an AD petition concerning imports of OCTG from Argentina.  Appx218-Appx1025.  The petition was filed on behalf of domestic producers and a certified union that represents workers engaged in the production of OCTG.  Appx218-Appx219 (Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, U.S. Steel Tubular Products, Inc., Welded Tube USA, Inc.; and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC)(collectively, petitioners).

On October 7, 2021, Commerce issued its first questionnaire to petitioners, asking how the universe of domestic producers was established.  Appx1040-Appx1044; Appx1086-Appx1162.  Petitioners explained that the universe of domestic OCTG producers was based upon the producers that were identified by the International Trade Commission (ITC) in the most recent full sunset review on OCTG from any country (*India et al OCTG 2020 Review*), as well as petitioners' knowledge of the OCTG industry.  *See* Appx1089-Appx1090; Appx1109-Appx1113. Petitioners identified 20 producers, including themselves, as the domestic OCTG industry.  Appx1089-Appx1090.

Commerce followed up with a second questionnaire on October 19, 2021, asking about the labor union that represented workers in domestic OCTG production facilities.  Appx1738-Appx1741.  Petitioners provided the names and locations of 10 such production facilities, including three Tenaris facilities in Ambridge, PA; Koppel, PA; and Wilder, KY.  Appx1718-Appx1719.

In both responses, petitioners reported their own and non-petitioning producers' production data from 2020.  Appx1089-Appx1091; *see also* Appx1736-Appx1737.  Petitioners also provided letters from several non-petitioning producers that demonstrated support for the petition and reported their 2020 OCTG production data. Appx1718-Appx1719; Appx1732-Appx1735.  [Characterization of industry support


] Appx1096; Appx1146-Appx1147; Appx1730-Appx1731.

The petitioners also calculated the entire domestic industry's 2020 OCTG production data as derived from publicly available shipment data and the ITC's *India et al OCTG 2020 Review.*  Appx286-Appx291; Appx1094-Appx1098; Appx1109-Appx1113; Appx1159-Appx1162; Appx1736-Appx1737; Appx1159-Appx1162; *see also* Appx1736-Appx1737.

## B. Tenaris' Challenges to the Industry Support Calculation

On October 8 and 15, 2021, Tenaris filed comments challenging the petitioners' industry support calculations. *See* Appx1054-Appx1073; Appx1439-Appx1631. Tenaris alleged that workers in three of Tenaris' mills are not represented by the petitioning labor union, and thus, the industry support calculations must be readjusted. *See* Appx1056-Appx1058; Appx1066-Appx1069; Appx1449. Next, Tenaris challenged petitioners' use of shipment data as a proxy for domestic production of OCTG. Appx1058-Appx1059; Appx1450. Tenaris also argued that 2020 production data are unreliable for industry support calculations because, during the global COVID-19 pandemic, the OCTG market was volatile and highly unusual. Appx1059-Appx1060; *see also* Appx1450. Finally, Tenaris argued that Commerce should extend the deadline for initiation and poll the industry to obtain reliable data to ensure the petition was filed by or on behalf of the industry. Appx1444; Appx1448.

Petitioners responded to Tenaris' comments on October 18, 2021, Appx1632-Appx1701, explaining that the revised industry support calculations are based on their own production data, to the maximum extent possible, and an estimate of production data derived from published data in the ITC's *India et al OCTG 2020 Review*. Appx1634; 1636-37. Petitioners' revised methodology did not rely upon any production where employees are represented by the union and resulted in sufficient industry support. Appx1634; Appx1639. As to Tenaris' claim that 2020 data is

anomalous and should not be relied upon for measuring industry support, petitioners pointed out that Tenaris provides no suggested alternate period or any legal authority requiring Commerce to use another period.  Appx1640.

On October 20, 2021, Tenaris replied to petitioners' comments reiterating the arguments from its two previous submissions and again asking Commerce to poll the domestic industry and request production data for the most recent 12 months. Appx1705-Appx1714.  Tenaris never put any of its own production data on the record to be included in the industry support calculation.

### C.     Initiation of the Investigation

Commerce initiated the AD investigation on October 26, 2021, within the 20-day statutory deadline.  *See Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 60,205 (Dep't of Commerce Nov. 1, 2021) (Initiation Notice), Appx114-Appx119; *see also* 19 U.S.C. § 1673a(c)(1)(A).

Commerce calculated industry support for the petition using the information and data provided by petitioners.  *See generally* Appx120-Appx156; Appx132. Commerce determined that petitioners demonstrated the requisite level of industry support prescribed in 19 U.S.C. § 1637a(c)(4)(A).  In determining whether the 50 percent requirement had been met, Commerce did not poll the domestic industry but

instead relied on "other information" in the record submitted by petitioners. 19

U.S.C. §1673a(c)(4)(D)(i). *See* Appx134, Appx145-Appx147.

Specifically, Commerce calculated industry-wide 2020 production estimates

using information on the record of domestic shipments of OCTG as reported in the

[ industry source                              ,] a recognized authority on the

U.S. pipe and tube market and "the premier source for pipe and tube statistics," along

with publicly available information of domestic production and shipments reported in

the ITC's *India et al OCTG 2020 Review*. Appx133. Commerce determined that even if

all non-petitioning domestic OCTG producers oppose the petition, domestic

producers and workers who support the petition accounted for [ Characterization ] percent of the

entire industry. Appx134-Appx136. And supporters of the petition accounted for

[ Characterization ] percent of the production of the parties expressing an opinion on the petition.

*See id.* Thus, Commerce found that petitioners met the statutory requirement for

standing and the petition was filed by or on behalf of the domestic industry. *See* 19

U.S.C. § 1637a(c)(4)(A).

Because the petition was filed on October 6, 2021, Commerce identified the

period of investigation as October 1, 2020, through September 30, 2021, which are

the four most recently completed fiscal quarters since the month preceding the filing

date of the petition. *See* 19 C.F.R. § 351.204(b)(1); *see also* Initiation Notice, 86 Fed.

Reg. at 60,205, Appx114.

### D. Preliminary and Final Determinations

On May 11, 2022, Commerce published its preliminary determination that OCTG from Argentina is being, or likely to be, sold in the United States at less than fair value. *See Oil Country Tubular Goods From Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28,801 (Dep't of Commerce May 11, 2022). Commerce published the final determination on September 29, 2022, continuing to determine that OCTG from Argentina is being, or likely to be, sold in the United States at less than fair value. *See* Final Determination. On November 21, 2022, Commerce published the corresponding AD order. *See Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*, 87 Fed. Reg. 70,785 (Dep't of Commerce Nov. 21, 2022). Appx079-Appx081.[2]

### III. Prior Proceedings

On December 16, 2022, Tenaris initiated a challenge to Commerce's final determination by filing suit in the Court of International Trade (trial court or CIT).

---

[2] Once it has determined to initiate an investigation, Commerce may not reconsider issues regarding industry support. 19 U.S.C. § 1673a(c)(4)(E). Accordingly, neither the preliminary determination nor the final determination analyze any of the issues raised in Tenaris' briefs before the trial court or this Court. *See generally* Appx1804-Appx1863.

Appx1786. Tenaris challenged Commerce's decision to initiate the AD investigation on imports of OCTG from Argentina as "inconsistent with the statutory requirements for determining the requisite industry support to permit the initiation of the investigation." Appx1792-Appx1803. Specifically, Tenaris argued that Commerce's decision (1) to rely on "other information" including "anomalous" data from the 2020 OCTG market period, rather than poll the domestic industry; and (2) to assume that OCTG counted for finishing operations were not counted twice in the industry support calculations, was not supported by substantial evidence and contrary to law. *See* Appx1804-Appx1863.

On March 14, 2024, the trial court sustained Commerce's decision to rely upon "other information," but remanded the case for Commerce to further explain or reconsider its determination that the data relied upon accurately reflected industry support. The trial court first explained that Commerce retained discretion for how to proceed when faced with a petition, as here, that satisfies the 25 percent industry support requirement but not the 50 percent support requirement under 19 U.S.C. § 1673a(c)(4)(A)(ii). Appx060. Accordingly, "Commerce chose one of the avenues expressly provided for by statute." Appx061. And recognizing that production data supplied by petitioners did not account for the entire domestic industry and that a fully populated data set for 2020 was unavailable, Commerce reasonably resorted to alternative data that included 2018 and 2019 shipment data, as well as incomplete

11

production data from 2020, to approximate production levels for calculating industry support.  Appx062.  The trial court also pointed out that Tenaris did not offer its own production data to undermine Commerce's reliance on shipment data or challenge the authoritative basis from which the selected data was derived.  Appx064.  Thus, Commerce's decision to rely on other information and some information from an alternate time period, considering record evidence and reasonably available information, was in accordance with law.  *Id.*  By extension, Commerce's decision to leave the 20-day deadline unaltered was reasonable in light of the sufficient evidence of industry support.  Appx065.  Tenaris' attempts to characterize the facts as presenting "exceptional circumstances" justifying an extension were nothing more than factual disputes with Commerce's calculation.  Appx067.  The trial court declined to reweigh the evidence in the record and sustained Commerce's decision to rely on other information to calculate industry support.  Appx068.

Tenaris also challenged the sufficiency of the data that Commerce relied upon, arguing that its industry support calculations "failed to ensure that finishing operations were not counted twice."  Appx068-Appx069.  The trial court agreed that Commerce failed to address record evidence "indicating that certain domestic companies both produce and finish OCTG, leading to the inference that some domestic pipe may have been double counted in the industry support calculations."

Appx070.  Accordingly, the trial court remanded the determination "on the double counting issue to Commerce for further explanation or reconsideration."  Appx073.

On May 28, 2024, Commerce released draft results of its remand redetermination, on which interested parties could comment.  Appx1963-Appx1977. Tenaris submitted comments on Commerce's draft remand that included "untimely new factual information" not in the administrative record.  Appx1985-Appx2014. Commerce rejected these comments, explaining that the record was not reopened during the remand.  Appx2015.  Tenaris was permitted to refile its comments after removing references to the new information.  Appx2015-Appx2018.

Commerce filed its final remand redetermination on June 26, 2024.  Appx021-Appx046.  On July 26, 2024, Tenaris filed comments on the remand results and Commerce and petitioners filed replies.  *See* Appx2055-Appx2085; Appx2126-Appx2145.

On December 2, 2024, the trial court sustained Commerce's remand results, finding that Commerce's industry support calculation is supported by substantial evidence.  *See Tenaris Bay City, Inc. v. United States*, 745 F.Supp.3d 1336 (Ct. Int'l Trade 2024).  Appx015-Appx020.  In doing so, the trial court addressed, and dismissed, new arguments made by Tenaris for the first time during the remand proceedings. Following the remand, Tenaris made arguments concerning (1) "potential undercounting" in Commerce's calculations; (2) whether the calculations distinguished

13

between heat treatment and threading in processing; and (3) the completeness of the industry source data. Appx012. The trial court held that, although Tenaris had questioned the completeness of the industry source data before Commerce, the other two arguments were "spun out" from Tenaris' prior complaints and not exhausted. Appx014. Specifically, Tenaris "theorize[s] that the incompleteness of the Industry Source data led to undercounting and improper comingling of OCTG producers and processors." *Id.* But the trial court held that these were not raised with Commerce within the 20-day comment period provided by 19 U.S.C. § 1673a(c)(1)(A) or fairly encompassed by Tenaris' earlier complaint of the "implications" of including both producers and processors in the industry support calculation. *Id.*; *and see* Appx1712. The trial court explained that Tenaris' earlier argument, at best, raises a challenge that "either (1) processors should not be included in the calculation, or (2) the inclusion of processors might lead to double counting, both of which Commerce addressed in its remand results." Appx015. But Tenaris could not rely on the word "implications" to fashion more specific arguments about potential undercounting or finer distinctions between processing. *Id.* Accordingly, the trial court rejected Tenaris' specific arguments of undercounting and comingling of the producers and processors as not exhausted, and therefore not reviewable. *Id.*

The trial court sustained Commerce's industry support calculation, as reconsidered and explained by its remand results. Appx015-Appx020. Although

Tenaris argued that Commerce did not assess the accuracy and completeness of the industry source data, the trial court explained that it "did not order Commerce to confirm the completeness or the accuracy of the shipment data," but only to "reconsider or further explain" whether finishing operations were counted twice. Appx020. And on that issue, Commerce reexamined the record evidence and determined that the two petitioners who appeared to have potentially significant finishing operations relative to their actual OCTG production, are primarily producers of the product. Appx019. The trial court therefore sustained Commerce's industry support determination as reasonable and supported by substantial evidence. This appeal followed. Appx2146-Appx2147.

## SUMMARY OF THE ARGUMENT

Commerce complied with the remand order and correctly determined that processors and producers were not double-counted in its domestic production calculation. As a starting point, Commerce's industry support calculation reasonably relied on shipment data as a proxy for production, along with record evidence of domestic production from petitioners and industry sources. Tenaris fails to identify any alternate evidence that would reflect more reliable or accurate data and instead raises the mere *possibility* of errors in the data that Commerce relied upon. These arguments cannot defeat industry support.

At the trial court and before this Court, Tenaris continues to develop

challenges that it should have, but failed, to raise with Commer during the initiation

proceedings. The principles of exhaustion should apply here and this Court should

decline to consider these new arguments.

## ARGUMENT

### I.    Standard of Review

Commerce's determinations will be upheld by the reviewing Court unless

"unsupported by substantial evidence on the record, or otherwise not in accordance

with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also United States v. Eurodif*, 555 U.S. 305,

316 n.6 (2009) ("The specific factual findings on which {Commerce} relies . . . are

conclusive unless unsupported by substantial evidence."). This Court "will not ignore

the informed opinion of the {trial court}." *Ad Hoc Shrimp Trade Action Comm. v.*

*United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (citations and quotation marks

omitted).

Substantial evidence connotes "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the

evidence," and the possibility of drawing inconsistent conclusions from the record

does not render Commerce's findings unsupported by substantial evidence. *Consolo v.*

*Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Nor is it proper to overturn an agency

determination under the substantial evidence standard "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007). Hence, a party disputing Commerce's determination as unsupported by substantial evidence "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's determinations if they are reasonable and supported by the record as a whole, even if some evidence detracts from them. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

Finally, this Court has held that "{a} district court's interpretation of its order is entitled to deference unless the interpretation is unreasonable or is otherwise an abuse of discretion." *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1358 (Fed. Cir. 2008). This Court "review{s} the CIT's failure to exhaust determination for an abuse of discretion, . . . ." *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1322, 1332 (Fed. Cir. 2017).

## II. Commerce Complied with the Remand Order and its Industry Support Calculation is Supported by Substantial Evidence.

### A. Commerce's Industry Support Calculation is Supported by Substantial Evidence

Commerce determines domestic industry support by evaluating the total "production of the domestic like product." 19 U.S.C. § 1673a(c)(4)(A)(ii). Here, Commerce calculated 2020 production estimates using information provided in the

17

petition – specifically, 2020 domestic shipment data reported in [ industry source,]

and publicly reported domestic production and shipment data from the ITC's full

sunset review of OCTG in 2020 (*India et al OCTG 2020 Review*).  Appx133.  Using

domestic production and shipment data from the ITC's *India et al OCTG 2020 Review,*

Commerce calculated the ratio of the domestic industry's reported production to

domestic shipments.  Appx133.  Commerce then applied that ratio to the domestic

shipment data reported in [ industry source] to approximate total 2020 production

for the domestic OCTG industry.  Appx133-Appx134.  Based upon information in

the petition, the share of domestic production of OCTG in 2020 that was represented

by the supporters of the petition was at least 25 percent of total U.S. production, but

less than the 50 percent of total production as required by § 1673a(c)(4)(A)(ii).

Appx134.

Accordingly, Commerce turned to "other information" in the record to

determine industry support.  Appx134. Specifically, petitioners provided [ Characterization of industry support

.]  Appx134.

And although Tenaris formally opposed the petition, it never provided its production

data to Commerce to include in the industry support calculation, despite multiple

opportunities to do so.  As a result, supporters of the petition accounted for 100

percent of the total U.S. production of those parties expressing an opinion for which

Commerce has production data. Appx134-Appx135. But even assuming that all other known domestic producers of OCTG oppose the petition (including Tenaris), under Commerce's methodology, supporters of the petition would still account for over 50 percent of the production of the domestic product by that portion of the industry expressing an opinion (support or opposition to) the petition. Therefore, Commerce found the requisite level of industry support to initiate an AD investigation. Appx135.

### B. Commerce Complied with the Remand

The trial court sustained Commerce's decision to rely on "other information," rather than poll the industry, and to maintain the 20-day deadline, but found that Commerce failed "to address record evidence indicating that certain domestic companies both produce and finish OCTG, leading to the inference that some domestic pipe may have been double counted in the industry support calculations." Appx070.

On remand, Commerce reconsidered the record evidence of Borusan U.S. and PTC Liberty, two petitioning companies for whom it was "unclear what portion . . . of operations involve{} actual pipe production, as opposed to finishing operations." Appx070; Appx034. As to PTC Liberty, Commerce determined that in the ITC's *India et al. ICTG 2020 Review,* PTC Liberty was identified under its former name, Boomerang Tube, as a *producer* of OCTG. Appx034-Appx035 (emphasis supplied).

And excerpts from its website – which Tenaris put on the record – reflect a 500,000 square foot production facility that "houses two ERW mills with 480,000 tons of annual capacity for ERW pipe as well as heat treatment capability." Another "350,000 square foot facility . . . 'provide{s} seamless pipe and processing of green tube.'" Appx035. Furthermore, PRC Liberty describes itself as "produc{ing} highly engineered {OCTG}" but also "offering {ERW} and Seamless tube, full finishing capabilities, and both API and Smi-Premium threading." *Id.* From this record evidence, Commerce determined that PTC Liberty is "first and foremost a *producer* of OCTG" – which also has capabilities to finish OCTG. Appx035-Appx036. PTC Liberty's processing capabilities do not alter its significance as a producer because "information on the record indicates that U.S. pipe mills are typically equipped with the facilities necessary to perform heat-treatment, end upsetting, threading, and coupling." Appx036 (citing ITC's *India et al. ICTG 2020 Review*).

The record evidence, supplied by Tenaris, of Borusan U.S. reflects that its "Baytown, Texas facility has a 300,000 ton annual production capacity and produces OCTG casing." Appx036. Commerce also determined from the record evidence that Borusan "further processes *imported* green tube from its Gemlik, Türkiye facility, and not domestically produced green tube from another U.S. producer." Appx036 (emphasis in original). Thus, Commerce concluded that "Borusan U.S.'s production appropriately reflects its U.S. mill operations as well as the heat treatment processing

of its green tube imports from its Türkiye facility." *Id.* The trial court found

Commerce's reconsideration of the potential "double-counting issue" reasonable,

supported by substantial evidence, and sustained.

Tenaris challenges Commerce's compliance with the remand order, arguing

that Commerce was required to "look beyond double-counting to determine whether

the data relied upon accurately reflected industry support." *See* Applnt. Br. at 47-48.

Tenaris posits that the potential double-counting of finishing operations were but one

example of the problems that Commerce should reconsider when reconsidering

"whether the data 'accurately reflected industry support.'" *Id.* at 46. Tenaris goes on

to dissect the independent and dependent clauses of excerpted sentences from the

remand instructions. *See id.* at 46-47. Although this grammatical tutorial is

entertaining, it is ultimately belied by the language of the order itself as well as the trial

court's own clarification of the scope of its order. Tenaris relies on this argument to

disguise new issues that it failed to bring before Commerce during the initiation

proceedings.

The trial court's remand instructions were clearly limited to the double-

counting issue. In the first paragraph of the discussion on the sufficiency of the data

underlying industry support, the trial court states "{*b*}*ecause* Commerce did not

adequately address Plaintiffs' concerns and record evidence that finishing operations

were not counted twice, the Court remands this issue for further explanation or

reconsideration." Appx069 (emphasis supplied). This makes clear that double counting was the sole issue requiring remand. The trial court goes on to explain which record evidence is problematic: "Here, Commerce fails to address record evidence indicating that certain domestic companies both produce and finish OCTG, leading to the inference that some domestic pipe may have been double counted in the industry support calculations." No other record evidence is discussed in the remand order. And the final paragraph before the conclusion states:

> Commerce fails to respond to record evidence suggesting the possibility of double counting within the industry support calculations and therefore the Court cannot conclude that Commerce's determination is supported by substantial evidence. *See Universal Camera Corp.,* 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight"). Accordingly, the Court remands determination *on the double counting issue* to Commerce for further explanation or reconsideration

Appx073 (emphasis supplied). Remand was clearly limited to the double counting issue. When Tenaris argued that Commerce "did not assess the accuracy and completeness of the data more generally" on remand, the trial court explained that it "did not order Commerce to confirm the completeness or the accuracy of shipment data," but only to " 'reconsider or further explain' its determination that the record accurately reflected industry support, including whether finishing operations were counted twice." Appx020.

Finally, in its discussion of exhaustion, the trial court made clear that Tenaris' other complaints about the data more generally were not only not contemplated by

the remand, some were not even reviewable by the court because Tenaris had not first raised these challenges with Commerce during the initiation proceedings. Appx014. In short, the trial court's specific remand instructions were limited to whether some domestic pipe may have been double counted in the industry support calculations. They were not to be read more broadly as requiring Commerce to revisit the general basis for its industry support calculation.

Tenaris argues that Commerce did not "resolve the double-counting distortion risk that was remanded" by the trial court. Applnt. Br. at 41. The fault with this argument lies in how Tenaris characterizes the issue on remand. In mischaracterizing the issue, Tenaris attempts to spin out new arguments on the industry support calculation that were not raised with Commerce during initiation. To be clear, and as explained above, the double-counting issue for which the remand was required, was concerned with "record evidence indicating that certain domestic companies both produce and finish OCTG, leading to the inference that some domestic pipe may have been double counted." Appx070. Specifically, the "distortion risk" identified by Tenaris came from its pre-initiation comments to Commerce – that Borusan and PTC Liberty "appear to have potentially significant finishing operations relative to their actual OCTG production," (appx1451) and "to the extent Borusan U.S. and PTC are processors, their further processed production {should} not {be} included when

calculating petitioners' production in the standing calculation." *Id.;* Appx070

(attributing the double counting concern to Tenaris).

This issue was addressed by Commerce's reconsideration of the record

evidence on these two companies. In particular, Commerce reexamined record

evidence of the companies' websites – which Tenaris put on the record – and

determined that they were not processors, but primarily *producers* of OCTG with

capabilities to finish OCTG. Appx035-Appx036. Commerce's determination

therefore responded directly to Tenaris' concern that these companies may be

engaged in "mere finishing operations . . . rather than the production of OCTG."

Appx1450-Appx1451. In its comments on remand, however, Tenaris expands this

argument – claiming that the double-counting "distortion" occurs where the

production and processing of the same ton of domestically-produced pipe are each

counted as U.S. production. Applnt Br. at 42-43 (citing Appx2068). This is a

different, and more broadly conceived argument than what was presented to

Commerce in the pre-initiation period, and for which the trial court issued a remand.

As such, the argument has not been exhausted, as explained more fully below, and is

not reviewable by this Court.

Tenaris' argument that "Commerce incorrectly limited its analysis to {Borusan

and PTC Liberty}" when the double-counting issue is "applicable to all U.S.

producers/processors" suffers the same fate. Appellant Br. at 43-44. Tenaris

identified the two petitioning companies for which it was "unclear" what portion of

their operations involve actual pipe production.  Appx1451.  It did *not* identify this

issue as applying to *all* U.S. producers and processors.  Commerce is limited to the

record before it, and because Tenaris only addressed these two companies, Commerce

properly considered only the record evidence related to Borusan and PTC Liberty.

### C. Commerce Reasonably Relied on Shipment Data as a Proxy for Production Data

Tenaris challenges Commerce's use of shipment data to serve as a proxy for

actual production data.  *See, e.g.,* Applnt. Br. at 18, 23; Appx1058; Appx1450.

Commerce failed to "examine the shipment data provided by the Petitioners," and

does not establish that the [ industry source ] from which Commerce derived

shipment data reflects all domestic shipments of OCTG from both mills *and*

processors.  Applnt. Br. at 23; 33.  As an initial matter, Tenaris never challenged the

validity of the industry source itself in its pre-initiation proceedings – instead

maintaining that Commerce should only consider actual production data and poll the

industry as necessary to obtain that.  *See, e.g.,* Appx1058; Appx1450.

Commerce is entitled to rely on information that is "reasonably available" to

determine industry support.  19 U.S.C. § 1673a(b)(1).  Proxies – like shipment data –

"are routinely used to estimate the amount of U.S. production of a particular

product."  *PT Pindo Deli Pulp v. United States,* 825 F.Supp.2d 1310, 1327-28 (Ct. Int'l

Trade 2012)("industry standing calculations are not meant to be exact").  Plaintiff

must do more than point out that this industry data was not perfect to show that

petitioners lack industry standing. *Id.* (although Commerce may have partially relied

on industry data that was not a perfect proxy for the domestic industry, plaintiff did

not present evidence to suggest the error was so great as to defeat petitioners'

standing). Tenaris does not do so here. In fact, Tenaris only raises *the possibility* of a

flaw in the data. And despite having multiple opportunities – and a statutory right –

to do so, Tenaris presents no evidence of a more accurate and available source of

shipment data than the [ industry source .] *See* 19 U.S.C. § 1673a(c)(4)(E)

("any interested party . . . may submit comments or information on the issue of

industry support.")

    Instead, Tenaris points to a [information from industry source


] Applnt. Br. at 34-35. Tenaris deduces that this

description of [information from industry source

.] *Id.* Commerce reexamined this

portion of the report and found that the [information from industry source


.] Appx041. Petitioners [information from industry source

.] *Id.*

Commerce has no burden to "corroborate" this record evidence as Tenaris

suggests. *See* Applnt. Br. at 36 ("Commerce failed to . . . corroborat{e} evidence that

confirms the *denominator* of the industry support calculation includes complete

shipments of U.S. mills and U.S. processors.")  Indeed, the burden of creating an

adequate record lies with the interested parties, not with Commerce. *See, e.g., Qingdao*

*Sea-Line Trading Co., Ltd. v. United States,* 766 F.3d 1378, 1386 (Fed. Cir. 2014).  Tenaris

was obligated – and had the statutory *right* – to submit verifiable evidence showing

that other, more reliable shipment data existed and should be used as a proxy for

production. *Id;* 19 U.S.C. § 1673a(c)(4)(E) ("Before the administering authority makes

a determination with respect to initiating an investigation, any person who would

qualify as an interested party under section 1677(9) of this title if an investigation were

initiated, may submit comments or information on the issue of industry support.") It

failed to do so.

The holding in *Qingdao Taifa Grp. Co., v. United States,* 710 F.Supp.2d 1352 (Ct.

of Int'l Trade 2010) does not compel a different result, as Tenaris argues. *See* Apllnt.

Br. at 27.  When Commerce investigates potential dumping in a nonmarket economy,

there is a presumption of government control that a respondent must affirmatively

rebut to be assigned a company-specific rate, rather than the country-wide rate. *Id.* at

1355.  In *Qingdao,* the trial court explained that "in some circumstances Commerce

may have to perform an independent investigation of the facts related to the question

of government control if the parties' filings do not answer it to Commerce's satisfaction." *Id.* at 1357. None of these circumstances are present here. Commerce was satisfied with the [ **industry source** ] as providing reliable proxy information from which to estimate domestic production of OCTG, and Tenaris, as an interested party, offered nothing to demonstrate that this data was so erroneous as to defeat standing.

## III. Tenaris Raises New Arguments for which it has Failed to Exhaust its Administrative Remedies and Should not be Considered by this Court

Tenaris raises a number of arguments challenging Commerce's industry support calculation that it failed to administratively exhaust during the 20-day comment period of the initiation proceedings. The trial court dismissed two of these new arguments as not reviewable. Before this Court, Tenaris again raises these arguments and spins out even more challenges that were not before the trial court, let alone Commerce. The Court should not consider these arguments.

The CIT "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d); *Consolidated Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003) (*Consol. Bearings*). In trade cases, the application of this principle is subject to the discretion of the trial judge. *Agro Dutch Industries Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007) (internal quotations omitted) (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1381 (Fed. Cir. 2007)). This Court reviews for abuse of discretion the trade court's determination that dismissal for failure to exhaust

was appropriate. 28 U.S.C. § 2637(d); *Agro Dutch Industr.,* 508 F.3d at 1029; *Itochu Bldg. Prods. v. United States,* 733 F.3d 1140, 1145 (Fed. Cir. 2013).

Tenaris points out that exhaustion of remedies under § 2637(d) is not jurisdictional, and CIT may waive the requirement at the court's discretion. Applnt. Br. at 52; *Weishan Hongda Aquatic Food Col, Ltd. v. United States,* 917 F.3d 1353, 1363 (Fed. Cir 2019). True enough. But on more than one occasion this Court has explained that "section 2637(d) 'indicates a congressional intent that, absent a strong contrary reason, the {trade} court should insist that parties exhaust their remedies before the pertinent administrative agencies.'" *Itochu Bldg. Prods.,* 733 F.3d at 1145 (citing *Corus Staal BV v. United States,* 502 F.3d 1370, 1379 (Fed. Cir. 2007)).

This Court has identified circumstances in which interests are not served by applying the doctrine of exhaustion – for example, when pursuing an administrative challenge would be futile, or where the issue for the court is a pure question of law that can be addressed without further factual development or further agency exercise of discretion. *Id.* at 1146 (internal citations omitted). Tenaris identifies no such circumstances here, and there is no basis to disturb the trial court's determination on exhaustion.

Following the trial court's remand, Tenaris raised challenges to Commerce's industry support calculation that it had not raised with Commerce during the initiation proceedings. Specifically, Tenaris "spin{s} out two new arguments based upon their

prior {challenge to the completeness of the Industry Source data.}" Appx014. Following remand, Tenaris "theorize[s] that the incompleteness of the Industry Source data led to undercounting and improper comingling of OCTG producers and processors, distorting Commerce's calculations." *Id.* The trial court correctly held that these new arguments are not exhausted and therefore not reviewable by the court. Appx015.

Tenaris pointed to its earlier comments on standing where Tenaris stated that "{t}he relationship of pipe formation and pipe finishing has implications for any assessment of a domestic OCTG industry…." Appx015. But this general comment could not have put Commerce on notice of the more specific arguments Tenaris makes about potential undercounting, the comingling of producers and processors, or distinctions between processing that involve heat treatment as opposed to threading. *Id.* ("At best this argument would have raised to Commerce the challenge that either (1) processors should not be included in the calculation, or (2) the inclusion of processors might lead to double counting.")

The determinative question at the heart of exhaustion is whether Commerce was put on notice of the issue. Applnt. Br. at 54; *Trust Chem Co. Ltd.,* 791 F.Supp.2d 1257, 1268 at n27 (Ct. Int'l Trade 2011). But raising a general issue with Commerce's calculations or data does not provide sufficient notice to exhaust "all specific issues under that general umbrella." *Id.*; *Gerber Food (Yunnan) Co. v. United States,* 601

F.Supp.2d 1370, 1379 (Ct. Int'l Trade 2009). In *Trust Chem Co. Ltd.,* Commerce was aware that plaintiff was contesting the high surrogate value price of nitric acid and the specific information upon which plaintiff relied was submitted by petitioners and before Commerce. *Id.* at 1268. Tenaris did not provide this level of notice to Commerce on any of its new challenges raised during remand and before this Court.

Tenaris continues to make specific arguments about the commingling of production and processing data before this Court. *See, e.g.,* Applnt. Br. at 25 (arguing that because information in the petition did not disaggregate mill producers' data from processors' data, Commerce could not detect where the same pipe formed in the United States by one producer was then heat-treated by another and may have been counted twice); 30-31 (arguing that having data from both mills and processors was critical to inspect the accuracy and adequacy of the information that would be used to assess production of the domestic industry). These arguments were not exhausted by Tenaris' comments during initiation proceedings that "Petitioners had to cobble together production from smaller producers, and supplement this list with processors/finishers of OCTG products," or that "{t}he relationship of pipe formation and pipe finishing has implications for any assessment of a domestic OCTG industry." Appx1712.

Neither is Tenaris' argument that Commerce failed to ensure that minor processing production, like threading operations, was not included and counted as

domestic production. *See, e.g.,* Applnt. Br. at 19. Prior to initiation, Tenaris only ever raised the issue of "mere" finishing operations. *See* Appx1450 ("Petitioners' calculations of their own production and/or shipments might include data that pertain to mere finishing operations . . . rather than the production of OCTG"); Appx1451("two of the petitioner companies . . . appear to have potentially significant finishing operations relative to their actual OCTG production" . . . "Commerce [should] require that any production data they provide do{es} not include OCTG that they merely finish rather than produce."; Appx1712 (same). Raising general concerns about distortions, implications and finishing processes during initiation does not permit Tenaris to later fashion more specific arguments. *See Yunnan,* 601 F.Supp.2d at 1379 (raising general issue of Commerce's application of a 198% rate did not preserve plaintiff's later argument that the rate is factually unsupported or impermissible punitive).

Before this Court, Tenaris raises a brand-new argument relating to the data used to derive the ratio that Commerce applied in estimating production data. Applnt Br. at 39-40. Prior to initiation Tenaris challenged petitioner's ratio on the grounds that it "inappropriately works in Petitioners' favor when using shipment volume as the starting point." Appx1447. Before this Court, however, Tenaris argues that *Commerce's* ratio – not petitioner's – is flawed because the data used for the ratio only contain OCTG mill production and shipments data, but not OCTG processor

production and shipments.  Applnt. Br. at 39-40.  Commerce could not have been on notice from Tenaris' earlier comments that its own ratio – not petitioner's – would be challenged on the specific basis that Tenaris advances here.

The purposes of requiring exhaustion are fully served in this case.  As the initial decisionmaker, Commerce is charged with developing the factual record and implementing the initiation statute under which Congress has delegated authority.  *See Itochu Bldg. Prods.,* 733 F.3d at 1145.  But Tenaris' shifting challenges to initiation have prevented Commerce from effectively executing that role, addressing specific challenges to initiation before judicial review was sought, and developing the record in a way that allows adequate judicial review.  For example, Tenaris' general comments about the relationship between pipe formation and pipe finishing did not permit Commerce to address the specific distinctions between heat treatment and threading operations that Tenaris subsequently raised.  Yet these factual nuances, that are product and industry-specific, are exactly the type of record development and discretionary decision making that is squarely within the bounds of Commerce's expertise.

## CONCLUSION

For these reasons, this Court should affirm the trial court's judgment and sustain Commerce's Remand Results.

Respectfully submitted,

BRETT A. SHUMATE
   *Principal Deputy Assistant Attorney General*

PATRICIA M. McCARTHY
   *Director*

/s/ *Franklin White, Jr. for Claudia M. Burke*
CLAUDIA M. BURKE
   *Assistant Director*

/s/ *Margaret J. Jantzen*
MARGARET J. JANTZEN
   *Senior Trial Counsel*
   *Commercial Litigation Branch*
   *Civil Division*
   *U.S. Department of Justice*
   *P.O. Box 480, Ben Franklin Station*
   *Washington, DC 20044*
   *(202) 353-7994*
   *Margaret.j.jantzen@usdoj.gov*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  25-1382

**Short Case Caption:**  Tenaris Bay City, Inc. v. United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  7334  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date:  08/05/2025

Signature:  /s/ Margaret J. Jantzen

Name:  Margaret J. Jantzen

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 25-1382 ⊞

**Short Case Caption:** Tenaris Bay City, Inc. v. United States

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains ___50___ number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 08/05/2025

Signature: /s/ Margaret J. Jantzen

Name: Margaret J. Jantzen