VOLUME I – Appx001-Appx630

2025-1382

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORP., SIDERCA S.A.I.C.,

Plaintiffs-Appellants,

v.

UNITED STATES, UNITED STATES STEEL CORPORATION, BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, WELDED TUBE,

Defendants-Appellees.

---

Appeal from the United States Court of International Trade
in Case No. 1:22-CV-00343-CRK
Judge Claire R. Kelly

---

## NON-CONFIDENTIAL JOINT APPENDIX

Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiffs-Appellants Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corp., Siderca S.A.I.C.

September 15, 2025

**Tenaris Bay City, Inc. v. US**
**Court No. 2025-1382**
**CAFC Joint Appendix – Non-Confidential Version**

Pursuant to Federal Circuit Rule 25.1(3)(B), this Joint Appendix contains confidential material that has been omitted. The material omitted on pages Appx007, Appx012, Appx049, Appx051 – Appx054, and Appx062 – Appx064 contains the non-confidential version of the U.S. Court of International Trade Slip Opinions that are, in part, the subject of this appeal. The U.S. Court of International Trade deleted from its opinions certain material that it determined to be confidential, pursuant to its protective order in the underlying administrative review and remand proceeding.  The material omitted on pages Appx040 – Appx041, and Appx043 contains the non-confidential version of the U.S. Department of Commerce's remand redetermination that is, in part, the subject of this appeal. The U.S. Department of Commerce deleted from its remand redetermination certain material that it determined to be confidential, pursuant to its protective order in the underlying administrative review and remand proceeding.  The material omitted on pages Appx132 – Appx136, Appx138, Appx140 – Appx141, Appx143 – Appx147, Appx149, Appx235 – Appx236, Appx239 – Appx241, Appx267 – Appx269, Appx271 – Appx274, Appx280 – Appx282, Appx284, Appx287 – Appx288, Appx290 – Appx291, Appx293 contains the nonconfidential versions  of  the Department of Commerce's Initiation Checklist and the Petition.

| Tab No. | Description | Orig. Designation | Security | Bates Range |
|---------|-------------|-------------------|----------|-------------|
| A | A-357-824, *Oil Country Tubular Goods from Argentina*: Administrative Protective Order | P.R. 7 | Public Document | N/A |

| Tab No. | Description | Orig. Designation | Security | Bates Range |
|---|---|---|---|---|
| 1 | *Tenaris Bay City, Inc. et. al. v. United States,* Judgment for Slip Op. 24-133 (Dec. 2, 2024) | CMF-95 | Public Document | Appx001-Appx002 |
| 2 | *Tenaris Bay City, Inc. et. Al. v. United States,* CIT Slip Op. 24-133 (Dec. 2, 2024) | CMF-101 | Public Version | Appx003-Appx020 |
| 3 | *Tenaris Bay City, Inc. et al. v. United States,* Court No. 22-00343, Slip Op. 24-31 (CIT March 14, 2024), Oil Country Tubular Goods from Argentina: Final Results of Redetermination Pursuant to Court Remand (June 26, 2024) | R.P.R. 7 / CMF-75 | Public Version | Appx021-Appx046 |
| 4 | *Tenaris Bay City, Inc. et. Al. v. United States,* CIT Slip Op. 24-31 (Mar. 14, 2024) | CMF-68 | Public Version | Appx047-Appx078 |
| 5 | *Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*, 87 Fed. Reg. 70785 (Nov. 21, 2022) | P.R. 233 | Public Document | Appx079-Appx081 |
| 6 | *Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg. 59054 (Sep. 29, 2022) | P.R. 226 | Public Document | Appx082-Appx084 |

| Tab No. | Description | Orig. Designation | Security | Bates Range |
|---|---|---|---|---|
| 7 | *Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina, and Final Negative Determination of Critical Circumstances* (Sep. 23, 2022) | P.R. 220 | Public Document | Appx085-Appx113 |
| 8 | *Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 60205 (Nov. 1, 2021) | P.R. 44 | Public Document | Appx114-Appx119 |
| 9 | Enforcement And Compliance, Office of AD/CVD Operations, Antidumping Duty Investigation Initiation Checklist (Oct. 26, 2021) | P.R. 40 | Public Version | Appx120-Appx156 |
| 10 | Docket Sheet for CIT Ct. No. 22-343 | N/A | Public Document | Appx157-Appx174 |
| 11 | Certified Administrative Record – Public Index (Initial and Remand) | N/A | Public Document | Appx175-Appx190 |
| 12 | Certified Administrative Record – Confidential Index (Initial and Remand) | N/A | Public Document | Appx191-Appx217 |

| Tab No. | Description | Orig. Designation | Security | Bates Range |
|---|---|---|---|---|
| **13** | Letter from Cassidy Levy Kent (USA) LLP and Schagrin Associates: *Petitions for the Imposition of Antidumping and Countervailing Duties: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia* (Oct. 5, 2021) | P.R. 1 – P.R. 6 | Public Version | Appx218-Appx630 |

A-357-824, *Oil Country Tubular Goods from Argentina*:
Administrative Protective Order
P.R. 7
Public

Barcode:4168273-01 A-357-824 INV - Investigation -

A-357-824
Oil Country Tubular Goods From Argentina
INV - Investigation
INV

ADMINISTRATIVE PROTECTIVE ORDER

IT IS HEREBY ORDERED THAT:

All business proprietary information submitted in the above-referenced segment of the proceeding, including new information submitted in a remand during litigation on this segment of the proceeding, which the submitting party agrees to release or the Department of Commerce ("the Department") determines to release, will be released to the authorized applicants on the administrative protective order ("APO") service list for this segment of the proceeding, except the following:

- customer names in an investigation; and
- specific information of a type for which the Department determines there is a clear and compelling need to withhold from disclosure.

## **USE OF BUSINESS PROPRIETARY INFORMATION UNDER THIS APO**

An authorized applicant may use business proprietary information submitted in this segment of the proceeding in this segment.  If business proprietary information that is submitted in this segment of the proceeding is relevant to an issue in two consecutive subsequent administrative reviews, an authorized applicant may place such information on the record of those reviews.  If business proprietary information submitted in this segment of the proceeding is relevant to an issue in other segments of this proceeding (such as scope, anticircumvention, changed circumstances) that are initiated before publication of the final results in the second consecutive subsequent administrative review, an authorized applicant may place such information on the record of those segments.  At the conclusion of the second consecutive subsequent administrative review or at such earlier date as the Department may determine to be appropriate, the authorized applicant must certify to the destruction of business proprietary information within 30 days in accordance with item 6 of this APO.  The existence of a judicial protective order in a subsequent administrative review does not extend the deadline for destruction of business proprietary information subject to this APO.

In the event of a negative injury determination by the International Trade Commission (ITC) under sections 703(a)(1), 705(b)(1), 733(a)(1) and 735(b)(1) of the Tariff Act of 1930, as amended, authorized applicants may retain business proprietary information released under this APO until any litigation of the ITC determination is complete.

Filed By: Donna Watkins, Filed Date: 10/6/21 11:45 AM, Submission Status: Approved

A-1

Barcode:4168273-01 A-357-824 INV - Investigation  -

## REQUIREMENTS FOR AUTHORIZED APPLICANTS

All applicants authorized to have access to business proprietary information under this APO are subject to the following terms:

1. The authorized applicant must establish and follow procedures to ensure that no employee of the authorized applicant's firm releases business proprietary information to any person other than the submitting party, an authorized applicant, or the appropriate Department official identified in section 351.306(a) of the regulations.  No person in the authorized applicant's firm may release business proprietary information received under this APO to any person other than those described in this paragraph.

2. The authorized applicant may allow APO access to one or more paralegals, law clerks, secretaries, or other support staff employed by or on behalf of the applicant's firm and operating within the confines of the firm.  The authorized applicant also may use the services of subcontracted individuals to transport business proprietary information released by the Department and to deliver APO information to other parties.  All support staff must sign and date an acknowledgment that they will abide by the terms and conditions of the APO at the time they are first permitted access to any information subject to APO.

3. The authorized applicant must ensure that business proprietary information in an electronic format will not be accessible to parties not authorized to receive business proprietary information.

4. The authorized applicant must pay all reasonable costs incurred by the submitter of the electronic business proprietary information for the copying of its electronic information released to the authorized applicant, if payment is requested.  Reasonable costs include the cost of the electronic medium and the cost of copying the complete proprietary version of the electronic information/medium submitted to the Department in APO releasable form, but not costs borne by the submitter of the electronic data in the creation of the electronic data/medium submitted to the Department.

## NOTIFICATION REQUIREMENTS

5. If changed circumstances affect the authorized applicant's representation of an interested party at any time authorized under this APO (i.e., reassignment, departure from firm), the authorized applicant must notify the Department in accordance with section 351.305(a)(2) of the regulations.

6. At the expiration of the time specified in this APO, the authorized applicant must destroy all

business proprietary information and notify the Department of the destruction in accordance with section 351.305(a)(3) of the regulations, or provide to the Department official responsible for the administration of the APO in this segment of the proceeding a protective order issued by a court or in a binational panel proceeding.

## SANCTIONS FOR BREACH OF THIS APO

7.  The authorized applicant will be subject to any or all of the sanctions described in 19 C.F.R. Part 354 if there is a violation of this APO by the authorized applicant or any of the persons identified in item 8 of this APO.

8.  The authorized applicant will accept full responsibility, individually and on behalf of the authorized applicant's firm or corporate office, for violation of this APO by any employee of the firm or corporate office, support staff retained by the firm or corporate office, or any other consultant, expert, or other outside staff retained for the subject proceeding, who is permitted access to APO information.

9.  The authorized applicant will promptly report and confirm in writing any possible violation of this APO to the Department.

## DEFINITIONS

For purposes of this APO, the following definitions apply:

**"Representative"** is an individual, enterprise, or entity acting on behalf of an interested party.

**"Applicant"** is an individual representative of an interested party who has applied for access to business proprietary information under this APO.

**"Authorized Applicant"** is an applicant that the Secretary has authorized to receive business proprietary information under this APO.

**"Lead firm"** is the firm that will be the primary contact with the Department and that will accept service of all documents for the party it represents where two firms independently have access under APO.

**"Support staff"** includes paralegals, law clerks, secretaries and other support staff that are employed by or on behalf of the applicant's firm, are operating within the premises of the firm, and work under the supervision of an authorized applicant, as well as subcontractors of the firm providing similar support staff functions.

**"Electronic data"** includes (1) data submitted by a party, generated by the Department, or entered by the recipient on computer tape, disk, diskette, or any other electronic computer medium; and (2) all electronic work products resulting from manipulation of this data, as transferred in any form onto any other electronic computer medium, such as tape, disk, diskette, Bernoulli cartridge, removable disk pack, etc.

Generated By: Donna Watkins

_____

APO/Dockets Unit
Enforcement and Compliance

Generated Date: 10/06/2021 11:45:46 AM

_____

1

*Tenaris Bay City, Inc. et. al. v. United States,* Judgment for Slip Op. 24-133

(Dec. 2, 2024)

CMF-95

Public

Appx001-Appx002

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TENARIS BAY CITY, INC. ET AL.,**<br><br>    **Plaintiffs,**<br><br>v.<br><br>**UNITED STATES,**<br><br>    **Defendant,**<br><br>and<br><br>**UNITED STATES STEEL CORPORATION, ET AL.**<br><br>    **Defendant-Intervenors.** | **Before: Claire R. Kelly, Judge**<br><br>Court No. 22-00343 |

## <u>JUDGMENT</u>

This case having been duly submitted for decision, and the Court, after due deliberation, having rendered its opinion, and now in conformity with that opinion, it is

**ORDERED** that the U.S. Department of Commerce's ("Commerce") final affirmative determination in the less than fair value ("LTFV") investigation of oil country tubular goods from Argentina and final negative determination of critical circumstances, <u>See</u> <u>Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances</u>, 87 Fed Reg. 59,054-01 (Dep't Commerce Sept. 29, 2022) (final determination of sales at less than fair value) and accompanying Issues and Decision Memo. for the Final Affirmative Determination in the LTFV Investigation

Court No. 22-00343                                                                                          Page 2

of Oil Country Tubular Goods from Argentina, and Final Negative Determination of

Critical Circumstances, PD 220, bar code 4287860-02 (Sept. 26, 2022), are sustained,

except for the matters remanded by the Court's Order, Mar. 14, 2024, ECF No. 61;

and it is further

   **ORDERED** that Commerce's remand redetermination, <u>see</u> Final Results of

Redetermination Pursuant to Court Remand, Jun. 26, 2024, ECF No. 74, is sustained;

and it is further

   **ORDERED** that the subject entries shall be liquidated in accordance with the

final court decision, including all appeals, as provided for in section 516A(e) of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1516a(e) (2012).

<div align="right">
<u>/s/ Claire R. Kelly</u><br>
Claire R. Kelly, Judge
</div>

Dated:   December 2, 2024<br>
     New York, New York

2

*Tenaris Bay City, Inc. et. Al. v. United States,* CIT Slip Op. 24-133

(Dec. 2, 2024)

CMF-101

Public Version

Appx003-Appx020

Slip Op. 24-133

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TENARIS BAY CITY, INC. ET AL.,** | |
| **Plaintiffs,** | |
| **v.** | **Before: Claire R. Kelly, Judge** |
| **UNITED STATES,** | **Court No. 22-00343** |
| **Defendant,** | **PUBLIC VERSION** |
| **and** | |
| **UNITED STATES STEEL CORPORATION, ET AL.** | |
| **Defendant-Intervenors.** | |

## OPINION

[Sustaining the Department of Commerce's Remand Redetermination.]

Dated: December 2, 2024

Gregory J. Spak, Frank J. Schweitzer, Kristina Zissis, Matthew W. Solomon, and Colin Alejandro Dilley, White & Case LLP, of Washington D.C., argued for plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Inc., and Siderca S.A.I.C.

Hardeep K. Josan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, argued for defendant United States. Of counsel was Ian Andrew McInerney, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce.

Thomas M. Beline, Myles S. Getlan, and James E. Ransdell, Cassidy Levy Kent (USA) LLP, of Washington D.C., argued for defendant-intervenor United States Steel Corporation.

Court No. 22-00343                                                                    Page 2
**PUBLIC VERSION**

<u>Roger B. Schagrin</u>, <u>Alessandra A. Palazzolo</u>, <u>Christopher T. Cloutier</u>, <u>Elizabeth J. Drake</u>, <u>Jeffrey D. Gerrish</u>, <u>Justin M. Neuman</u>, <u>Luke A. Meisner</u>, <u>Michelle R. Avrutin</u>, <u>Nicholas B. Birch</u>, <u>Saad Y. Chalchal</u>, and <u>William A. Fennell</u>, Schagrin Associates, of Washington D.C., argued for defendant-intervenors Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United States Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube.

Kelly, Judge:    Before the Court is the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), Jun. 26, 2024, ECF No. 74, in the antidumping ("AD") and countervailing duties ("CVD") investigation of Oil Country Tubular Goods ("OCTG") from Argentina (AD), Mexico (AD), Korea (CVD), and Russia (AD/CVD), made in accordance with the mandate of this Court in <u>Tenaris Bay City, Inc. v. United States</u>, 693 F.Supp.3d 1314 (Ct. Int'l Trade 2024) ("<u>Tenaris I</u>").    For the following reasons, Commerce's remand redetermination is sustained.

## BACKGROUND

The Court presumes familiarity with the facts as set forth in <u>Tenaris I</u> and will only recount those pertinent to the instant matter.    <u>See generally</u> <u>Tenaris I</u>, 693 F.Supp.3d 1314.    On October 6, 2021, Petitioners Borusan Mannesmann Pipe U.S. Inc, PTC Liberty Tubulars LLC, U.S. Steel Tubular Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"), and Welded Tube USA Inc. ("Petitioners") filed a petition for an imposition of antidumping and countervailing duties on OCTG from Argentina (AD), Mexico (AD), Korea (CVD), and Russia

Court No. 22-00343                                                                 Page 3
**PUBLIC VERSION**

(AD/CVD).  <u>See generally</u> Petitions for the Imposition of Antidumping and
Countervailing Duties: Oil Country Tubular Goods from Argentina, Mexico, the
Republic of Korea, and Russia ("Petitioner's Letter"), PDs 1–6, CDs 1–6 bar codes
4168004-01–06 (Oct. 6, 2021).[1]

On October 26, 2021, Commerce, after seeking and receiving additional
information and comments from petitioners, initiated the antidumping investigation
in accordance with the 20-day statutory deadline provided by 19 U.S.C.
§ 1673a(c)(1)(A).  <u>See generally</u> Letter from White & Case LLP to Sec. Commerce, re:
Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and
Russia: Factual Errors in Petitions ("Factual Error Cmts."), PD 15, CD 9, bar code
4169951–01 (Oct. 8, 2021); <u>see also</u> Letter Cassidy Levy Kent & Schagrin Assoc. to
Sec. Commerce & Sec. Int'l Trade Comm. Pertaining Oil Country Tubular Goods from
Argentina, Mexico, the Republic of Korea, and Russia: Response to General Issues
Questionnaire ("Resp. to General Questionnaire"), PD 19, CD 10 bar code 4170756–
01 (Oct. 12, 2021); <u>see also</u> Letter from White & Case LLP to Sec. Commerce, re: Oil
Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia:
Comments on Petitioners' Standing ("Cmts. re Petitioners' Standing"), PDs 22–28,
CDs 12–18, bar codes 4172063-01–05 (Oct. 15, 2021); <u>see also</u> Petitioners' Letter,

---

[1] Citations to administrative record documents in this opinion are to the numbers
Commerce assigned to such documents in the indices, and all references to such
documents are preceded by "PD" or "RPD" and "CD" or "RCD" to denote public or
confidential documents.

Court No. 22-00343                                                    Page 4
**PUBLIC VERSION**

"Response to Tenaris Submission Concerning Petitioners' Standing" ("Rebuttal Cmts.

on Standing), PD 29, CD 19, bar code 4172946–01 (Oct. 18, 2021); see also Letter from

White & Case LLP to Sec. Commerce, re: Oil Country Tubular Goods from Mexico:

Reply Comments on Petitioners' Standing ("Reply Cmts. on Standing"), PD 31, CD

22, bar code 4173963–01 (Oct. 20, 2021); see also Letter from White & Case LLP to

Sec. Commerce, re: Oil Country Tubular Goods from Argentina, Mexico, the Republic

of Korea, and Russia: Comments on Petitioners' Second General Issues Questionnaire

Response ("Cmts. re Petitioners' Second GIQ Resp."), PD 35, CD 25, bar code

4174685–01 (Oct. 22, 2021); see also Commerce Initiation Checklist ("Initiation

Checklist"), PD 40, CD 26, bar code 4176347–01 (Oct. 26, 2021); see also Oil Country

Tubular Goods from Argentina, Mexico, and the Russian Federation: Initiation of

Less-Than-Fair-Value Investigations ("Initiation Notice"), 86 Fed. Reg. 60,205 (Dep't

Commerce Nov. 1, 2021).

        In its Initiation Checklist for the antidumping investigation, Commerce

identified reliance upon "industry support data contained in the [p]etitions" and

explained that the petitions satisfied statutory requirements.   See Initiation

Checklist at 4.  Commerce accepted Petitioners' October 21 revised calculations and

also conducted its own calculations with "a conservative, alternative methodology."

Id. at 5.  Under both methodologies, Commerce found that the petitions satisfied the

requirements of 19 U.S.C. § 1673a(c)(4)(A)(i) by exhibiting support from domestic

producers or workers accounting for "at least 25 percent of the total production of the

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Court No. 22-00343                                                                          Page 5
**PUBLIC VERSION**

domestic like product." Id. at 6.  However, neither methodology demonstrated that

the domestic producers supporting the petition accounted for over 50 percent of the

production of the domestic like product, as required by 19 U.S.C.

§ 1673a(c)(4)(A)(ii).  Id. at 6–7.

Consequently, Commerce chose to "rely on other information," and determined

the petitions were adequately supported by declarations from domestic producers

contained on the agency record.[2]  Initiation Checklist, Attach II. at 6–7.  Additionally,

Commerce concluded that the October 1, 2020, through September 30, 2021, period

of investigation ("POI") was proper under 19 C.F.R. § 351.204, despite Plaintiffs'

characterization that it was anomalous, as it represented "the four most recently

completed fiscal quarters since the month preceding the filing date." Initiation Notice

at 60,205.  Commerce also rejected Plaintiffs' concern that finishing operations were

---

[2] Commerce used declarations of support from non-petitioning domestic producers
and [[                                                                      ]].  Initiation Checklist,
Attach. II at 6; Def. Int. Resp. at 9.  Furthermore,

> Commerce noted that despite Plaintiffs' opposition to the petition,
> [Plaintiff] has not provided any production data for Commerce to include
> in the industry support calculation.  Accordingly, because [[
>
>                                                                      ]]
> Petitions, [Commerce] find[s] that the supporters of the Petitions
> account for [[      ]] percent of the total U.S. production of those parties
> expressing an opinion on the Petitions for which we have production
> data.

Initiation Checklist, Attach II. at 6–7 (footnotes omitted).

Court No. 22-00343                                                    Page 6
**PUBLIC VERSION**

improperly included twice when Petitioners calculated industry support, stating that "[t]he scope and domestic like product of [AD] investigations includes OCTG 'whether finished . . . or unfinished.'"  Initiation Checklist, Attach. II at 14.

      On May 11, 2022, Commerce issued its preliminary determination, finding that during the POI, OCTG from Argentina is being, or likely to be, sold in the United States at less than fair value ("LTFV").  See <u>Oil Country Tubular Goods from Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures</u> ("Prelim. Determination"), 87 Fed. Reg. 28,801 (Dep't Commerce May 11, 2022); <u>see also</u> <u>Decision Memorandum for the Preliminary Affirmative Determinations of Sales at less Than Fair Value and Critical Circumstances in the Investigation of Oil Country Tubular Goods from Argentina</u> ("Prelim. Issues and Decision Memo."), 87 ITADOC 28,801 (Dept. Commerce May 11, 2022).  On September 29, 2022, Commerce published its final results and, mirroring its previous conclusions, determined that OCTG from Argentina is being, or likely to be, sold in the United States for LTFV.  See <u>Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances</u> ("Final Determination"), 87 Fed Reg. 59,054–01 (Dep't Commerce Sept. 29, 2022); <u>see also</u> <u>Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina, and Final Negative</u>

Court No. 22-00343                                                    Page 7
**PUBLIC VERSION**

<u>Determination of Critical Circumstances</u> ("Final Issues and Decision Memo."), 87

ITADOC 59,054 (Dep't Commerce Sept. 29, 2022).

On January 13, 2023, Plaintiffs initiated this action. <u>See generally</u> Compl.,

Jan. 13, 2023, ECF No. 16. On June 26, 2023, Plaintiffs moved for judgment on the

agency record. <u>See generally</u> Pls. Mot. Judgment Agency Record ("Pl. 56.2 Mot."),

Jun. 26, 2023, ECF No. 40. Plaintiffs specifically challenged Commerce's

determination that the petitions were filed "by or on behalf of the industry," and its

decision not to poll the domestic industry and seek actual production data for the 12

months immediately preceding the filing of the petitions to determine industry

support. <u>Id.</u> at 14–41.

On March 14, 2024, the Court sustained Commerce's determination to rely on

"other information" rather than poll the industry to calculate industry support for the

antidumping investigation petition for OCTG from Argentina and remanded the

Final Determination for Commerce to further explain or reconsider its determination

that the data relied upon accurately reflected industry support, including whether

finishing operations were counted twice. <u>Tenaris I</u>, 693 F.Supp.3d at 1328. On May

28, 2024, Commerce released its draft remand redetermination. <u>See generally</u> Draft

Results of Redetermination Pursuant to Court Remand, <u>Tenaris Bay City, Inc. et al.</u>

<u>v. United States</u>, Court No. 22-00343, Slip Op. 24-31 (CIT March 14, 2024) ("Draft

Remand Results"), RPD 1, bar code 4565870–01 (May 28, 2024). On June 4, 2024, in

response to the Draft Remand Results, both Plaintiffs and Defendant-Intervenors

Court No. 22-00343                                                          Page 8
**PUBLIC VERSION**

submitted comments.  <u>See</u> Tenaris Comments on Draft Remand Determination, RPD
3, RCD 1, bar code 4571563–01 (Jun 4, 2024); <u>see also</u> Defendant-Intervenors
Comments on Draft Remand Redetermination, RPD 2, bar code 4570681–01 (Jun. 4,
2024).   On June 7, 2024, Commerce rejected Plaintiffs' submission because it
contained untimely new factual information.  <u>See</u> Letter from Yang Jin Chun to
White & Case LLP, re: Slip Op. 24-31, Oil Country Tubular Goods from Argentina:
Rejection of Tenaris's Comments on Draft Results of Redetermination, RPDs 4-5, bar
code 4573606–01 (Jun. 7, 2024).   On June 10, 2024, Plaintiffs resubmitted their
comments, redacting references to the new factual information.   <u>See</u> Tenaris
Resubmission of Comments on Draft Remand Determination, RPD 6, RCD 2, bar code
4575101–01 (Jun. 10, 2024).

On June 26, 2024, Commerce filed its Remand Results.  <u>See generally</u> Remand
Results.   On July 26, 2024, Plaintiffs filed their comments on the Remand Results.
<u>See generally</u> Comments of Plaintiffs Tenaris Bay City, Inc., Maverick Tube
Corporation, Ipsco Tubulars Inc., Tenaris Global Services (U.S.A.), Corporation, And
Siderca S.A.I.C. on Commerce's Final Remand Determination ("Pl. Cmts."), Jul. 26,
2024, ECF No. 78.  On August 26, 2024, Defendant and Defendant-Intervenors filed
their replies to Plaintiff's comments.  <u>See generally</u> Defendant's Reply to Comments
on the Remand Redetermination ("Def. Reply Cmts."), Aug. 26, 2024, ECF No. 82; <u>see
also</u> Defendant-Intervenors' Reply to Plaintiffs' Comments on the Remand
Redetermination ("Def. Int. Reply Cmts."), Aug. 26, 2024, ECF No. 80.  On Sept. 16,

Court No. 22-00343                                                          Page 9
**PUBLIC VERSION**

2024, the Court granted Plaintiffs' unopposed motion for oral argument. <u>See</u> Order

Granting Unopposed Motion for Oral Argument, Sept. 16, 2024, ECF No. 87. On

October 22, 2024, oral argument was held. <u>See</u> Oral Argument, Oct. 22, 2024, ECF

No. 91.

### JURISDICTION AND STANDARD OF REVIEW

Pursuant to Section 516A of the Tariff Act of 1930,[3] as amended, 19 U.S.C.

§ 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2018),[4] this Court is granted the authority

to review actions contesting the final determination in an antidumping duty order.

The Court will uphold Commerce's determination unless it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" <u>Huaiyin Foreign</u>

<u>Trade Corp. (30) v. United States,</u> 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting

<u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). The Court determines

whether substantial evidence exists by considering the record as a whole, including

any evidence that supports or fairly detracts from the substantiality of the evidence.

<u>Huaiyin Foreign Trade Corp. (30)</u>, 322 F.3d at 1374 (quoting <u>Atl. Sugar, Ltd. v.</u>

<u>United States</u>, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The possibility that two

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant
provisions of Title 19 of the U.S. Code, 2018 edition.
[4] Further citations to Title 28 of the U.S. Code and Code of Federal Regulations are
to the 2018 edition.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Court No. 22-00343                                                              Page 10

**PUBLIC VERSION**

inconsistent conclusions may be drawn from the evidence does not prevent an

agency's determination from being supported by substantial evidence.   Consolo v.

Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) (citing N.L.R.B. v. Nevada Consol.

Copper Corp., 316 U.S. 105, 106 (1942)).

## DISCUSSION

**I.      Exhaustion of Administrative Remedies**

Defendant argues that Plaintiffs failed to raise arguments with respect to (1)

potential undercounting in Commerce's calculations, (2) whether Commerce's

calculations include only processing that involves heat treatment as opposed to

threading, and (3) the completeness of the industry source data ("Industry Source")[5]

used by Commerce.  Def. Reply Cmts. at 8–9, 13–14 (citing 19 U.S.C. § 1673a(c)(4)(E)).

Defendant-Intervenors echo Defendant's position.   Def. Int. Cmts. at 25, n.4.

Plaintiffs claim they have exhausted arguments that Commerce's determination (1)

allows for undercounting in its calculations, Pl. Cmts at 4, (2) fails to confirm that the

production by processors reflects only processing that involves heat treatment as

opposed to threading, id. at 10–11, and (3) fails to confirm that Industry Source data

is complete.  Id. at 18.  Specifically, they state they have "repeatedly argued that the

comingling of production and processing data had implications for the accuracy of the

industry support calculation and therefore requested that Commerce solicit

---

[5] The Industry Source that Commerce used in its determination is the [[

]].

Court No. 22-00343                                                      Page 11
**PUBLIC VERSION**

disaggregated data." <u>Id.</u> at 23.   Likewise, they point out that they argued to
Commerce that the relationship between formation and finishing "has implications
for any assessment" of support. <u>Id.</u> at 4 (quoting Reply Cmts. on Standing at 8).

Generally, parties must exhaust their administrative remedies to obtain
judicial review. <u>McKart v. United States</u>, 395 U.S. 185, 193 (1969) (internal
quotations omitted) (quoting <u>Myers v. Bethlehem Shipbuilding Corp.</u>, 303 U.S. 41,
50–51 (1938)).  Requiring exhaustion acknowledges agency expertise, allows agencies
to correct mistakes, and promotes efficiency. <u>Woodford v. Ngo</u>, 548 U.S. 81, 89 (2006).
A plaintiff must show that it exhausted its administrative remedies, or that it
qualifies for an exception to the exhaustion doctrine. <u>Consol. Bearings Co. v. United
States</u>, 348 F.3d 997, 1003 (Fed. Cir. 2003) (citing 28 U.S.C. § 2637(d)).[6]

Plaintiffs are correct that they questioned the completeness of the Industry
Source data before Commerce; however, both Commerce and this Court addressed
that challenge.  Commerce acknowledged the imperfect nature of the Industry Source
data in its Initiation Checklist when it explained "neither the statute nor regulations
prevent the petitioners from estimating the production of the non-petitioning
companies." <u>See</u> Initiation Checklist at 16.  It also noted no party, including
Plaintiffs, had "offered any alternative sources for production estimates that would,

---

[6] The time in which a party must exhaust its arguments with respect to industry
support calculations, is the 20-day window which Congress has provided for
Commerce to make its industry support determination.  19 U.S.C. § 1673a(c)(4)(E).

Court No. 22-00343                                                        Page 12
**PUBLIC VERSION**

in their view, be more reliable." Id.  Consequently, Commerce determined that the use of an estimate did not require it to poll the industry.  Id.  Commerce's explanation is reasonable on this the record, as it is the parties' burden to populate the record. See BMW of N. Am. LLC v. United States, 926 F.3d 1291, 1295 (Fed. Cir. 2019); Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386–87 (Fed. Cir. 2014); QVD Food Co., Ltd. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011). Commerce was not required to use perfect data so long as it explains why its choice was reasonable on the record, which it did.  See e.g. PT Pindo Deli Pulp and Paper Mills v. United States, 825 F.Supp.2d 1310, 1327–28 (Ct. Int'l Trade 2012) Finally, Tenaris I sustained Commerce's methodology and use of the Industry Source data as a reasonable estimate.  Tenaris I, 693 F.Supp.3d at 1324.

Although Commerce and this Court have already addressed Plaintiffs' challenge to the completeness of the Industry Source data, Plaintiffs now spin out two new arguments based upon their prior complaint.  Specifically, Plaintiffs theorize that the incompleteness of the Industry Source data led to undercounting and improper comingling of OCTG producers and processors, distorting Commerce's calculations.  Pl. Cmts at 4, 10.  Plaintiffs did not raise these arguments within the 20-day comment period provided by 19 U.S.C. § 1673a(c)(1)(A).  See generally Factual Error Cmts.; Cmts. re Petitioners' Standing; Reply Cmts. on Standing; Cmts. re Petitioners' Second GIQ Resp.  Plaintiffs did, however, complain to Commerce of the "implications" of including both producers and processors in the industry support

Court No. 22-00343                                                      Page 13
**PUBLIC VERSION**

calculation,[7] specifically arguing that Borusan U.S. ("Borusan") and PTC Liberty

("PTC") "appear to have potentially significant finishing relative to their actual

OCTG production." Reply Cmts. on Standing at 8. Plaintiffs ask too much of the

word "implications." At best this argument would have raised to Commerce the

challenge that either (1) processors should not be included in the calculation, or (2)

the inclusion of processors might lead to double counting, both of which Commerce

addressed in its Remand Results. Remand Results at 10–11. Plaintiffs cannot now

rely on the word "implications" to fashion more specific arguments about potential

undercounting or distinctions between processing that involves heat treatment as

opposed to threading operations. Plaintiffs' specific arguments of undercounting, and

comingling of the producers and processors, are not exhausted, and therefore not

reviewable by this Court.

## II.    Industry Support Calculation

Plaintiffs argue that Commerce fails to comply with this Court's remand order

by failing to prove the accuracy of the industry support calculation and failing to

address whether domestically produced OCTG may have been double counted. Pl.

Cmts. at 9, 13–23. Plaintiffs contend, because the Industry Source did not

disaggregate its data, Commerce cannot confirm the accuracy of its industry support

---

[7] Reply Cmts. on Standing at 8 ("The relationship of pipe formation and pipe finishing
has implications for any assessment of a domestic OCTG industry given that the
percentage of green pipe and plain end imports of OCTG into the United States will
vary year to year and may constitute the majority of imports in any given year").

Court No. 22-00343                                                    Page 14
**PUBLIC VERSION**

calculations.  Id. at 11–14.  Defendant asserts that Commerce complied with the

Court's remand order and its determination is reasonable on this record.  Def. Reply

Cmts. at 4–8.  Defendant-Intervenors concur with Defendant's assertions.  Def. Int.

Reply Cmts. at 10–17.  For the reasons that follow, Commerce's industry support

calculation is sustained.

An interested party[8] may petition Commerce to commence an antidumping

investigation on behalf of the industry.  19 U.S.C. § 1673a(b)(1).  Commerce generally

has 20 days to determine whether, inter alia, the petition was filed "by or on behalf

of the industry."[9]  19 U.S.C. § 1673a(c)(1)(A).

Commerce considers a petition to be filed "by or on behalf of the
industry" if

---

[8] An "interested party," for the purposes of initiating an antidumping investigation
by petition, includes:
> (C) a manufacturer, producer, or wholesaler in the United States of a
> domestic like product,
> (D) a certified union or recognized union or group of workers which is
> representative of an industry engaged in the manufacture, production,
> or wholesale in the United States of a domestic like product,
> (E) a trade or business association a majority of whose members
> manufacture, produce, or wholesale a domestic like product in the
> United States,
> (F) an association, a majority of whose members is composed of
> interested parties described in subparagraph (C), (D), or (E) with respect
> to a domestic like product[.]

19 U.S.C. § 1677(9)(C)–(F).
[9] If warranted by "exceptional circumstances" at its discretion, Commerce can extend
the 20-day initial determination timeline for a maximum of 40 days.  See 19 U.S.C.
§ 1673a(c)(1)(B); 19 U.S.C. § 1673a(c)(4)(D).  Here, Commerce did not extend the 20-
day initial timeline, publishing its Initiation Checklist on October 26, 2021, 20 days
after the Petitions were filed.  See Initiation Checklist.

Court No. 22-00343                                                    Page 15
**PUBLIC VERSION**

> (i) the domestic producers or workers who support the petition account
> for at least 25 percent of the total production of the domestic like
> product, and

> (ii) the domestic producers or workers who support the petition account
> for more than 50 percent of the production of the domestic like product
> produced by that portion of the industry expressing support for or
> opposition to the petition.

19 U.S.C. § 1673a(c)(4)(A).[10] Where the petition satisfies the 25 percent domestic

industry support requirement, but does not establish the latter 50 percent

requirement, Commerce "shall[] poll the industry or rely on other information in

order to determine if there is support for the petition" before proceeding with formal

initiation of the antidumping investigation.[11] 19 U.S.C. § 1673a(c)(4)(D)(i).

A petition to initiate an antidumping proceeding must be accompanied by

information "reasonably available" to the petitioner. 19 U.S.C. §1673a(b)(1). When

determining industry support for an antidumping petition, Commerce will "normally"

measure production, based on either value or volume, "over a twelve-month period,

as specified by the Secretary." 19 C.F.R. § 351.203(e)(1). However, if an interested

party demonstrates the unavailability of production data for the specified period,

---

[10] Commerce (1) "shall disregard the position of domestic producers who oppose the petition," if they are related to foreign producers, unless they can show their interests "would be adversely affected by the imposition of an antidumping duty order;" and (2) "may disregard the position of domestic producers of a domestic like product who are importers of the subject merchandise." 19 U.S.C. § 1673a(c)(4)(B).
[11] If Commerce decides to poll the industry it can "determine industry support for the petition by using any statistically valid sampling method[.]" 19 U.S.C. § 1673a(c)(4)(D)(ii).

Court No. 22-00343                                                                 Page 16
**PUBLIC VERSION**

then Commerce may establish production levels "by reference to alternative data that
[Commerce] determines to be indicative of production levels." Id.

In Tenaris I, this Court sustained Commerce's decision to rely on other
information to calculate industry support for the purposes of initiating the OCTG
antidumping investigation at issue but ordered Commerce to "either reconsider or
further explain its use of data from the 2020 market period, and specifically to ensure
that finishing operations data were not double counted." Tenaris I, 693 F.Supp.3d at
1320. In particular, the Court took note of record evidence that might suggest
finished pipe may have been counted twice in Commerce's calculations. Id. at 1326
(noting "certain domestic companies both produce and finish OCTG, leading to the
inference that some domestic pipe may have been double counted in the industry
support calculations"). Thus, the Court remanded for Commerce to reconsider or
further explain its determination that the record "accurately reflected industry
support, including whether finishing operations were counted twice." Id. at 1328.

On remand, Commerce considered the record evidence, including that which
the Court noted might detract from Commerce's prior conclusion. Remand Results
at 14–17. Commerce continues to use the Industry Source data to calculate industry
support. Id. at 11. In reviewing the Industry Source data, Commerce continues to
include both OCTG producers as well as processors who heat treat green tube as part

Court No. 22-00343                                                                 Page 17
**PUBLIC VERSION**

of the domestic industry.[12]  Id. at 12–13.  Commerce reconsidered its determination,

particularly in light of record evidence regarding Petitioners Borusan and PTC.  Id.

at 14.  It examined the record evidence submitted by Plaintiffs, showing screenshots

of both Borusan and PTC's websites, determining that PTC is "first and foremost" a

producer of OCTG with processing capabilities, and Borusan primarily manufactures

OCTG casing while processing imported tubing from its facility in Türkiye.  Id. at 15–

16.  Plaintiffs complain that Commerce, although addressing the record evidence

regarding these two companies, did not assess the accuracy and completeness of the

data more generally.  Pl. Cmts. at 13–19.  However, after finding that no evidence

undermined the Industry Source data, Commerce concluded:

> the record supports Commerce's conclusion that the shipment data from
> this source account for all domestic shipments of the domestic like
> product (including the appropriate green tube finishing operations) and
> that, after accounting for the domestic industry's export shipments
> derived from reasonably available information (including industry-wide
> data from the ITC's India et al. OCTG 2020 Review), the resulting
> denominator used in the industry support calculation appropriately
> reflects the entire universe of production of the domestic like product in
> calendar year 2020.

---

[12] Here, Commerce defines the domestic like product as OCTG, which includes green
tube.  Remand Results at 8–9.  Commerce defines the domestic industry as "producers
and workers who produce the domestic like product."  Remand Results at 7–8.  As
instructed, Commerce reexamined the record, determining that OCTG green tube
"finishing operations (i.e. heat treatment) should be a part of the domestic industry."
Remand Results at 9.  Commerce finds no evidence to suggest that OCTG processors
who provide heat treatment should not be included in the domestic industry
calculation.  Remand Results at 10.

Court No. 22-00343                                                      Page 18
**PUBLIC VERSION**

Remand Results at 12.

Plaintiffs further complain that because the data was not disaggregated it was

incomplete and therefore inaccurate.  Plaintiffs argue:

> Commerce did not demonstrate the data "accurately reflected industry
> support" because the record evidence does not support Commerce's
> conclusion that the denominator of the industry support calculation
> includes total U.S. production of the domestic like product, including
> imported green pipe that has been processed by a U.S. processor.
> Commerce failed to confirm the completeness of the shipment data from
> the industry source provided by Petitioners and relied upon by
> Commerce as the starting point of the industry support calculations.

Pl. Cmts. at 8.  However, in Tenaris I the Court did not order Commerce to confirm

the completeness or the accuracy of the shipment data.  Rather, it ordered Commerce

to "reconsider or further explain" its determination that the record accurately

reflected industry support, including whether finishing operations were counted

twice.  See Tenaris I, 693 F.Supp.3d at 1328.  Thus, Commerce's industry support

determination is reasonable, supported by substantial evidence, and therefore

sustained.

## CONCLUSION

For the reasons discussed above, Commerce's industry support determination

is sustained.  Judgment will enter accordingly.

                                                     /s/ Claire R. Kelly
                                                     Claire R. Kelly, Judge

Dated:           December 2, 2024
                 New York, New York

3

*Tenaris Bay City, Inc. et al. v. United States,*
Court No. 22-00343, Slip Op. 24-31 (CIT March 14, 2024), Oil Country Tubular
Goods from Argentina: Final Results of Redetermination Pursuant to Court
Remand (June 26, 2024)
R.P.R. 7 / CMF-75
Public Version
Appx021-Appx046

Barcode:4585797-01 A-357-824 REM - Remand 10/1/20 - 9/30/21 Slip Op. 24-31

A-357-824
Remand
Slip Op. 24-31
POI: 10/01/2020 – 09/30/2021
**Public Version**
E&C/TRCI: WS

***Tenaris Bay City, Inc. et al. v. United States*,
Court No. 22-00343, Slip Op. 24-31 (CIT March 14, 2024)
*Oil Country Tubular Goods from Argentina***

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the opinion and remand order of the U.S. Court of International Trade (the Court) in *Tenaris Bay City, Inc. v. United States*, Court No. 22-000343, Slip Op. 24-31 (CIT March 14, 2024) (*Remand Order*). These final results of redetermination concern Commerce's final affirmative determination in the investigation of sales of oil country tubular goods (OCTG) from Argentina at less-than-fair value (LTFV).[1] The Court remanded for Commerce to reconsider or further explain its determination that the data relied upon accurately reflected industry support, including whether finishing operations were counted twice.[2]

On remand, Commerce has reconsidered the facts on the record and further explained its decision underlying industry support; specifically, whether the data relied upon accurately reflected industry support and whether finishing operations were counted twice. For the reasons explained below, Commerce continues to find that initiating the underlying LTFV investigation was lawful and supported by substantial evidence.

---

[1] *See Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances*, 87 FR 59054 (September 29, 2022) (*Final Determination*), and accompanying Issues and Decision Memorandum.
[2] *See Remand Order* at 27.

## II.    BACKGROUND

On October 6, 2021, Commerce received an antidumping duty (AD) petition concerning imports of OCTG from Argentina, filed in proper form on behalf of the petitioners.[3]  On October 12 and 21, 2021, the petitioners provided supplemental information and clarifications, in response to Commerce's requests for additional information regarding the Petition.[4]  Also in October, Commerce received four submissions from Tenaris USA[5] commenting on industry support.[6]  On October 18, 2021, the petitioners responded to Tenaris USA's comments on industry support.[7]

On October 26, 2021, Commerce initiated the LTFV investigation on imports of OCTG from Argentina, finding that the Petition met the requirements of section 732 of the Tariff Act of 1930, as amended (the Act).[8]  On May 11, 2022, Commerce issued its preliminary determination that OCTG from Argentina is being, or is likely to be, sold in the United States at LTFV for the period of investigation (POI), October 1, 2020, through September 30, 2021.[9]  Commerce made

---

[3] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties," dated October 6, 2021 (the Petition).  The petitioners are Borusan Mannesmann Pipe U.S., Inc. (Borusan U.S.), PTC Liberty Tubulars LLC (PTC Liberty), United States Steel Corporation, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA, Inc. (collectively, the petitioners).

[4] *See* Petitioners' Letters, "Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement); and "Response to Second General Issues Questionnaire," dated October 21, 2021.

[5] Tenaris Bay City, Inc., IPSCO Tubulars Inc., Maverick Tube Corporation, Tenaris Global Services (U.S.A.) Corporation (collectively, Tenaris USA).

[6] *See* Tenaris USA's Letters, "Factual Errors in Petitions," dated October 8, 2021 (Tenaris USA Letter I); "Comments on Petitioners' Standing," dated October 15, 2021 (Tenaris USA Letter II); "Reply Comments on Petitioners' Standing," dated October 20, 2021 (Tenaris USA Letter III); and Comments on Petitioners' Second General Issues Questionnaire Response," dated October 22, 2021 (Tenaris USA Letter IV).

[7] *See* Petitioners' Letter, "Response to Tenaris Submission Concerning Petitioners' Standing," dated October 18, 2021 (Petitioners' Response).

[8] *See Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation:  Initiation of Less-Than-Fair-Value Investigations*, 86 FR 60205 (November 1, 2021).

[9] *See Oil Country Tubular Goods from Argentina:  Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 FR 28801 (May 11, 2022).

no change, in this regard, for purposes of its *Final Determination*.[10]  Tenaris[11] subsequently

challenged the *Final Determination* at the Court, contesting Commerce's:  (1) determination that

the Petition was filed "by or on behalf of the industry"; and (2) decision not to poll the domestic

industry and seek actual production data for the 12 months immediately preceding the filing of

the Petition to determine industry support.[12]

On March 14, 2024, the Court remanded the *Final Determination* for Commerce to

further explain or reconsider its determination that the data relied upon accurately reflected

industry support, including whether finishing operations were counted twice.[13]  On May 28,

2024, Commerce released its draft results of redetermination[14] and provided interested parties the

opportunity to comment.  On June 4, 2024, the petitioners and Tenaris each submitted comments

regarding the Draft Remand.[15]  On June 7, 2024, however, Commerce rejected Tenaris'

comments after determining that the submission contained untimely new factual information not

previously contained on the record of the proceeding.[16]  On June 10, 2024, Tenaris resubmitted

its comments redacting references containing new factual information in accordance with

Commerce's request.[17]

---

[10] *See Final Determination*, 87 FR at 59054.
[11] Tenaris USA and Siderca S.A.I.C. (collectively, Tenaris).  Throughout this final remand, where appropriate, we refer to Tenaris USA and Tenaris separately, with Tenaris reflecting the collective entity that includes Tenaris USA and Siderca S.A.I.C.
[12] *See Remand Order* at 2.
[13] *Id.* at 3, 21, and 27.
[14] *See* Draft Results of Redetermination Pursuant to Court Remand, Tenaris Bay City, Inc. et al. v. United States, Court No. 22-00343, Slip Op. 24-31 (CIT March 14, 2024), dated May 28, 2024 (Draft Remand).
[15] *See* Petitioners' Letter, "Comments on Draft Remand Redetermination," dated June 4, 2024 (Petitioners' Comments); *see also* Tenaris' Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated June 4, 2024.
[16] *See* Commerce's Letter, "Rejection of Tenaris' Comments on Draft Results of Redetermination," dated June 7, 2024; *see also* Memorandum, "Rejection and Removal of Documents," dated June 7, 2024.
[17] *See* Tenaris' Letter, "Resubmission of Comments on Draft Results of Redetermination Pursuant to Court Remand," dated June 10, 2024 (Tenaris' Comments).

## III.    ANALYSIS

In its *Remand Order*, the Court held that "Commerce fail{ed} to address record evidence indicating that certain domestic companies both produce and finish OCTG, leading to the inference that some domestic pipe may have been double counted in the industry support calculations."[18]  The Court elaborated that "Commerce may have reasons to reject this inference; however, it must acknowledge consideration of such evidence and explain why it nonetheless rejects the reference."[19]  Additionally, the Court held that "Commerce fail{ed} to respond to record evidence suggesting the possibility of double counting within the industry support calculations, and therefore the Court cannot conclude that Commerce's determination is supported by substantial evidence."[20]  Consequently, the Court ordered that Commerce further explain or reconsider its determination on the double counting issue.[21]

As an initial matter, we note that during the initiation phase of the underlying investigation, Commerce addressed Tenaris USA's comments opposing the Petition on the merits, and, because the petition had the requisite support even when accounting for the opposition of Tenaris USA,[22] did not consider whether Tenaris USA's opposition should be disregarded by law, as argued by the petitioners.[23]  Indeed, even under the more conservative

---

[18] *Id.* at 24.

[19] *Id.* at 25.

[20] *Id.* at 27 (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

[21] *Id.*

[22] As Commerce previously noted, Tenaris USA did not provide its production data for Commerce to account for its opposition in the industry support calculation.  *See* Initiation Checklist at Attachment II (page 7 n.48).  Commerce further noted that, even assuming *arguendo* that all other U.S. producers of OCTG (including Tenaris USA) opposed the Petition, the supporters of the Petition would still have the requisite level of support pursuant to section 732(c)(4)(A)(ii) of the Act.  *Id.* at 7.

[23] *See* sections 732(c)(4)(B)(i) and (ii) of the Act ("In determining industry support under subparagraph (A), {Commerce} shall disregard the position of domestic producers who oppose the petition, if such producers are related to foreign producers, as defined in section 771(4)(B)(ii), unless such domestic producers demonstrate that their interests as domestic producers would be adversely affected by the imposition of an antidumping duty order. {Commerce} may disregard the position of domestic producers of a domestic like product who are importers of the

industry support calculations on the record, including the alternative methodology proposed by Tenaris USA in its pre-initiation comments, initiation was, and continues to be, proper.[24]

We also note that, based on our analysis of the record, we find that the explicit issue of "double counting" was never raised before Commerce in any of Tenaris USA's four submissions on industry support prior to Commerce's initiation deadline.[25]  Specifically, the record before Commerce prior to initiation contains no reference to "double counting," and Tenaris USA *never* framed the issue as such in *any* of its four pre-initiation submissions.  Consequently, Tenaris USA's claim failed to satisfy the requisite exhaustion of administrative remedies.[26]  Even so, to address the Court's concerns, on remand, we have reexamined the four submissions from Tenaris USA in the 20-calendar day pre-initiation phase and the arguments pertaining to the inclusion of finishing operations in the industry support calculation and, pursuant to the *Remand Order*, have addressed any concerns with respect to "double counting."

In its first submission, dated October 8, 2021, Tenaris USA failed to advance any argument regarding finishing operations or green tube.[27]  In its second submission, dated October

---

subject merchandise."); 19 CFR 351.203(e)(4)(i) and (ii) ("{Commerce} will disregard the position of a domestic producer that opposes the petition if such producer is related to a foreign producer or to a foreign exporter under section 771(4)(B)(ii) of the Act, unless such domestic producer demonstrates to {Commerce's} satisfaction that its interests as a domestic producer would be adversely affected by the imposition of an antidumping order or a countervailing duty order, as the case may be; and {Commerce} may disregard the position of a domestic producer that is an importer of the subject merchandise, or that is related to such an importer, under section 771(4)(B)(ii) of the Act."); *see also* Checklist, "Oil Country Tubular Goods from Argentina," dated October 26, 2021 (Initiation Checklist), at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation (Attachment II), at 19-21.

[24] *See* Initiation Checklist at Attachment II (page 14).

[25] *See, e.g., U.S. Steel Corp. v. United States*, 348 F.Supp.3d 1248, 1259 (CIT 2018) ("Failure to raise and adequately develop a legal claim results in waiver.") (citing *Ad Hoc Shrimp Trade Action Comm. v. United States*, 616 F.Supp.2d 1354, 1367 (CIT 2009) (*Ad Hoc Shrimp*); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (*Rhone Poulenc*); and *JTEKT Corp. v. United States*, 768 F.Supp.2d 1333, 1354 (CIT 2011) (*JTEKT Corp.*)).

[26] *See U.S. Steel Corp. v. United States*, 348 F.Supp.3d 1248, 1259 (CIT 2018) ("Failure to raise and adequately develop a legal claim results in waiver.") (citing *Ad Hoc Shrimp*, 616 F.Supp.2d at 1367; *Rhone Poulenc*, 899 F.2d at 1191; and *JTEKT Corp.*, 768 F.Supp.2d at 1354).

[27] *See* Tenaris USA Letter I.

15, 2021, Tenaris USA argued that the petitioners' calculations "suffer from an additional *potential* flaw" as they *might* include data that pertain to "mere finishing operations" of the petitioners rather than the production of OCTG.[28]  Tenaris USA then argued that Commerce should exclude OCTG that is "merely finish{ed}" rather than produced.[29]  Tenaris USA also asserted that, based on publicly available information, two of the petitioning companies – Borusan U.S. and PTC Liberty – "appear to have potentially significant finishing operations relative to their actual OCTG production."[30]  Tenaris USA argued that this "deficiency" justifies a decision by Commerce to poll the industry.[31]  As support for its claim, Tenaris USA provided printouts of each company's website, containing basic "who we are" summary information.[32]  Tenaris USA asserted that, according to Borusan U.S.'s website, "it is unclear what portion of Borusan U.S.'s operations involve actual pipe production, as opposed to finishing operations for green tube."[33]  With respect to PTC Liberty, Tenaris USA asserted that the company's website provided "information that indicates its operations include finishing operations" and that PTC Liberty was not identified as a U.S. producer in the 2020 U.S. International Trade Commission (ITC) sunset review.[34]  Tenaris USA further claimed that Commerce should ensure that, to extent these two companies are processors, their further processed production is not included in the industry support calculation.[35]  In its third submission, dated October 20, 2021, Tenaris USA

---

[28] *See* Tenaris USA Letter II at 9 (emphasis added).
[29] *Id.* at 10.
[30] *Id.*
[31] *Id.*
[32] *Id.* at 10, Exhibit 5, and Exhibit 6.
[33] *See* Tenaris USA Letter I at 10 and Exhibit 5.  As support, Tenaris USA includes the following excerpt from Borusan U.S.'s website:  "Borusan's Baytown location manufactures OCTG casing…primarily with 'made and melted USA' steel.  Green tube from our world-class facility in Gemlik, Turkey…is also heat-treated, inspected, and threaded at our Baytown facility.…"  *see* Tenaris USA Letter I at 10 n.26).
[34] *Id.* at 10 and Exhibit 6.  As support, Tenaris USA includes the following excerpt from PTC Liberty's website: "PTC Liberty Tubular produces highlight engineered {OCTG} for consumption in the US and Canadian natural gas and crude oil drilling markets.  We offer Electric Resistance Welded (ERW) and Seamless tube, full finishing capabilities, and both API and Semi-Premium threading."  *Id.* at 10 (n. 27).
[35] *Id.* at 10.

reiterated its claim that the petitioners' own production and/or shipment data *might* include data

that pertain to "mere finishing operations" rather than the production of OCTG.[36]  In addition,

Tenaris USA reiterated its claim that PTC Liberty was not recognized as a U.S. producer in the

2020 ITC sunset review.[37]  Tenaris USA further claimed that the petitioners did not address how

the issue of finishing pertains to Commerce's determination of industry support and that the

"relationship of pipe formation and pipe finishing has implications for any assessment of a

domestic OCTG industry given that the percentage of green pipe and plain end imports of OCTG

into the United States will vary year to year and may constitute the majority of imports in any

given year," but failed to elucidate what such implications would be.[38]  Finally, in its fourth

submission, dated October 22, 2021, Tenaris USA stated that it opposed the Petition and briefly

referenced the page numbers of its prior submissions pertaining to its claims regarding

processors/finishers of OCTG products.[39]  In three of these four pre-initiation submissions,

Tenaris USA claimed to be the largest U.S. producer of OCTG, but failed to provide *any*

information (*e.g.*, production data) to substantiate its assertion.[40]

     In determining whether a petition was filed by or on behalf of the domestic industry

under section 732(c)(4)(A) of the Act, Commerce must first define the domestic like product and

the domestic industry producing the domestic like product.  Section 771(4)(A) of the Act defines

the "industry" as producers, as a whole, of a domestic like product, or those producers whose

collective output of a domestic like product constitutes a major proportion of the total domestic

production of the like product.  Thus, to determine whether a petition has the requisite industry

---

[36] *See* Tenaris USA Letter III at 8.
[37] *Id.*
[38] *Id.*
[39] *See* Tenaris USA Letter IV at 5.
[40] *See* Tenaris USA Letter II at 1 and 11; *see also* Tenaris USA Letter III at 2-3 and 10; and Tenaris USA Letter IV at 2.

7

support, the Act directs Commerce to look to producers and workers who produce the domestic

like product.  While both Commerce and the ITC must apply the same statutory definition

regarding the domestic like product (*i.e.*, section 771(10) of the Act), they do so for different

purposes and pursuant to a separate and distinct authority.  Although this may result in different

definitions of the like product, such differences do not render the decision of either agency

contrary to law.[41]  Section 771(10) of the Act defines the domestic like product as "a product

which is like, or in the absence of like, most similar in characteristics and uses with, the article

subject to an investigation under this title."  As such, the reference point from which the

domestic like product analysis begins is "the article subject to an investigation," which normally

will be the scope as defined in the Petition.  While Commerce is not bound by the criteria used

by the ITC to determine the domestic like product in answering this question, we reviewed the

ITC's traditional six factors for the domestic like product presented by the petitioners in the

Petition.[42]

In the Petition, the petitioners did not offer a definition of the domestic like product

distinct from the scope of the investigation.[43]  Based on our analysis of the information presented

by the petitioners, as well as past ITC determinations on OCTG, we concluded that the domestic

---

[41] *See USEC, Inc. v. United States*, 132 F.Supp.2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp., Ltd. v. United States*, 688 F.Supp. 639, 644 (CIT 1988), *aff'd Algoma Steel Corp., Ltd. v. United States*, 865 F.2d 240 (Fed. Cir. 1989)).

[42] *See* Petition at Volume I at 20 (citing *Cleo Inc. v. United States*, 501 F.3d 1291, 1295 (Fed. Cir. 2007) ("The Commission generally considers the following factors:  (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions; (5) common manufacturing facilities, production processes, and production employees; and, where appropriate, (6) price.").

[43] *See* Initiation Checklist at Attachment II (pages 2-3); *see also* Petition at Volume I (pages 20-22 and Exhibits I-11 (containing *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. 5090 (July 2020) (*India et al. OCTG 2020 Review*), at 7), I-13 (containing *Oil Country Tubular Goods from China*, Inv. No. 701-TA-463 (Final), USITC Pub. 4124 (January 2010), at 6), I-14 (containing *Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. 4489 (September 2014) (*2014 OCTG Final*), at 12), and I-18 (containing *Oil Country Tubular Goods from China*, Inv. Nos. 701-TA-463 and 731-TA-1159 (Second Review), USITC Pub. 5136 (November 2020), at 6-7)).

like product consists of OCTG (including green tube), as defined in the scope of the Petition.[44]
This finding is consistent with Commerce's broad discretion to define and clarify the scope of an
LTFV investigation in a manner that reflects the intent of the Petition.[45]  Consequently,
Commerce's discretion permits interpreting the Petition in such a way as to best effectuate not
only the intent of the Petition, but the overall purpose of the AD laws as well.[46]

      In deciding whether a firm qualifies as a domestic producer of the domestic like product,
the ITC generally uses a six-factor framework to analyze the overall nature of a firm's U.S.
production-related activities.[47]  Commerce also evaluates the sufficiency of companies'
production-related activities when identifying domestic producers for industry support purposes
and generally considers the same factors as the ITC.[48]

      Here, we reexamined the administrative record to determine whether companies engaged
in OCTG green tube finishing operations (*i.e.*, heat treatment) should be part of the domestic
industry.  As this evidence shows, in the *2014 OCTG Final*, the ITC applied its traditional six
factor analysis regarding a firm's U.S. production-related activities and concluded that
processors of green tube that provide heat treatment engage in sufficient production-related
activities to be considered domestic producers of OCTG.[49]  The record also reflects that in

---

[44] *See* Initiation Checklist at Attachment II (page 3).
[45] *See, e.g., Fujitsu Ltd. v. United States*, 36 F.Supp.2d 394 (CIT 1999) (citing *Kern-Liebers USA, Inc. v. United States*, 881 F.Supp. 618, 621 (CIT 1995)); and *Initiation of Antidumping Duty Investigations:  Spring Table Grapes from Chile and Mexico*, 66 FR 26831 (May 15, 2001)).
[46] *See Notice of Final Determination of Sales at Less Than Fair Value:  Freshwater Crawfish Tail Meat from the People's Republic of China*, 62 FR 41347, 42357 (August 1, 1997).
[47] The six factors for the ITC's "sufficient production-related activities" test are:  (1) source and extent of the firm's capital investment; (2) technical expertise involved in U.S. production activities; (3) value added to the product in the United States; (4) employment levels; (5) quantity and type of parts sourced in the United States; and (6) any other costs and activities in the United States directly leading to production of the domestic like product.  *See, e.g., Diamond Sawblades and Parts Thereof from China and Korea*, Inv. Nos 731-TA-1092-93 (Final), USITC Pub. 3862 (July 2006), at 8-11.
[48] *See, e.g., Pokarna Engineered Stone Limited. v. United States*, 56 F.4th 1345 (Fed. Cir. 2023).
[49] *See* Petitioners' Response at 7-8; *see also* Petition at Volume I (Exhibit I-14 (containing *2014 OCTG Final* at 8-14)).

subsequent proceedings on OCTG, the ITC consistently included processors of green tube that provide heat treatment as part of the domestic industry.[50]  Therefore, based on our analysis of the record evidence, including past ITC proceedings,[51] Commerce finds *no reason* to depart from the petitioners' domestic like product or domestic industry definitions as co-extensive with the scope of the proceedings and inclusive of green tube finishing operations.  Moreover, no interested party provided *any* evidence or argument in the pre-initiation period for Commerce to question these definitions.  The record is also devoid of evidence to suggest that processors providing heat treatment do *not* engage in sufficient production-related activities in the United States to be treated as domestic producers.  As such, the record supports Commerce's conclusion that OCTG, including unfinished green tube, as defined in the scope, constitutes a single domestic like product and that the domestic industry consists of all U.S. producers of OCTG, including finishers and processors of green tube that provide heat treatment.

Because processors and finishers of OCTG that provide heat treatment have consistently been found to engage in sufficient production-related activities under the ITC's traditional six factor analysis, such that these OCTG finishing operations constitute domestic production, since at least 2014, and absent any record information that calls into question the evidence in support, we find it is appropriate to include such production in the domestic industry and the industry support calculation.  This is consistent with Commerce's practice in prior proceedings, where finishers or processors engaged in sufficient production-related activities were found to constitute domestic production and included in the industry support calculation.[52]  As explained

---

[50] *See* Petitioners' Response at 8; *see also, e.g.*, Petition at Volume I (Exhibit I-18 (containing *2020 China Review* at 5-7)).

[51] *See* Initiation Checklist at Attachment II (page 14).

[52] *See, e.g.*, *Frozen Warmwater Shrimp from Ecuador and Indonesia:  Initiation of Less-Than-Fair-Value Investigations*, 88 FR 81043, 81045 (November 21, 2023).

10

above, the domestic like product is defined as co-extensive with the scope (*i.e.*, including

unfinished green tube) and the domestic industry is defined as U.S. OCTG producers, including

processors and finishers of green tube.  Therefore, for determining industry support, it is

appropriate to compare a numerator that includes the supporters' production of the domestic like

product (including green tube finishing and processing operations as detailed above), to a

denominator that likewise reflects production of the domestic like product, including green tube

finishing and processing operations as detailed above.[53]  Based on a reexamination of the record,

Commerce continues to find it appropriate to include green tube heat-treatment processing

performed on imported pipe as "U.S. production."

     The record indicates that the starting point for the denominator of the industry support

calculation is based on the 2020 domestic shipment data from an industry source which the

petitioners described as "the recognized authority on the U.S. pipe and tube market."[54]

Commerce requested supplemental information regarding this source and the starting point for

the denominator in its October 7, 2021, supplemental questionnaire, in which Commerce sought

clarification regarding whether all companies identified as U.S. producers in the Petition were

accounted for in the domestic shipment data.[55]  The petitioners responded that, to their

knowledge, this data source accounted for all U.S. shipments of the domestic like product and

that these data are the best available information regarding the volume of domestic OCTG

---

[53] In accordance with section 732(c)(4)(A) of the Act, Commerce considers the following calculations for determining industry support:  (1) whether the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product; and (2) whether the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition.  Section 732(c)(4)(D) of the Act requires Commerce to poll the industry or rely on other information to determine industry support, if the petition does not establish the support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product.
[54] *See* Initiation Checklist at Attachment II (pages 4-5); *see also* Petition at Volume I (page 6).
[55] *See* Commerce's Letter, "Supplemental Questions," dated October 7, 2021.

Filed By: Yang Chun, Filed Date: 6/26/24 3:23 PM, Submission Status: Approved

shipments in 2020.[56]  No party submitted any evidence or argument to detract from this well-established industry source as the reasonable starting point for the denominator of the industry support calculation.  Further, no interested party claimed that this source data did not reasonably reflect all U.S. producers' domestic shipments of the domestic like product (including green tube finishing operations) *in calendar year 2020*.  Tenaris USA argued that Commerce should consider a different time period other than calendar year 2020 and questioned certain of the petitioners' adjustments to approximate total U.S. production, but Tenaris USA failed to advance any argument that the industry source data for 2020 were inaccurate, or that there was a more appropriate, reasonably available source for industry-wide shipment or production data for calendar year 2020.  Consequently, the record supports Commerce's conclusion that the shipment data from this source account for all domestic shipments of the domestic like product (including the appropriate green tube finishing operations) and that, after accounting for the domestic industry's export shipments derived from reasonably available information (including industry-wide data from the ITC's *India et al. OCTG 2020 Review*), the resulting denominator used in the industry support calculation appropriately reflects the entire universe of production of the domestic like product in calendar year 2020.

Tenaris USA's concerns about "double counting" are misplaced.  The methodological approach taken here (*i.e.*, the inclusion of green tube finishing operations in the numerator and the denominator of the calculation) fairly accounts for total U.S. production by the supporters of the Petition and total U.S. production by the entire OCTG industry.  Tenaris characterizes this approach as "double counting," but, as detailed below, it is unclear how this allegation impugns the industry support calculation or skews the calculation in such a way that would overstate the

---

[56] *See* First General Issues Supplement at 4-5.

supporters' share of total U.S. production, as the calculation is made on an apples-to-apples basis.   As an initial matter, there is no evidence to suggest that, to the extent the companies also engage in processing, any of the U.S. producers who provided actual production data on the record literally counted each ton of pipe they produced twice – once upon the pipe formation and again upon heat treatment, threading, *etc.*  Just because a company produces OCTG and has processing capabilities does not mean that it double counted its OCTG production for purposes of providing its own actual production for inclusion in the Petition, nor does it follow that the data from these companies must be inherently flawed.  Likewise, just because a U.S. producer has processing capabilities does not mean that it reported the heat treatment processing it performed on another U.S. company's already reported, domestically-produced green tube, thereby duplicating the reported quantity of the green tube and the finished OCTG product. Nevertheless, there is no overstating of the numerator of the calculation, as the green tube processed by the supporters would already be reflected in the denominator that reflects total U.S. production (including green tube finishing operations) by all U.S. producers.  In other words, the supporters' green tube finishing operations in the numerator would be effectively canceled out in the denominator.  As detailed above, the record indicates that denominator includes the finishing or processing operations of *all* U.S. producers who processed green tube and/or produced OCTG. A denominator that includes green tube finishing or processing operations represents the most conservative basis for measuring industry support in this instance, as inclusion of green tube finishing or processing operations, in addition to OCTG production, results in a larger denominator, which yields a more conservative calculation of industry support (*i.e.*, the larger

the denominator, the smaller the share that supporters of a petition have).[57]  The record indicates

that the numerator reasonably reflects the supporters' production of the domestic like product

(including green tube finishing operations, where applicable); there is no record evidence to the

contrary.  If the numerator does not include the supporters' green tube finishing operations, then

the resulting calculations on the record would reflect an understated, albeit more conservative

assessment of industry support.  Comparing a numerator that reflects the supporters' production

of OCTG (without accounting for any green tube processing operations) to a denominator that

reflects the universe of U.S. production of the domestic like product (including green tube

finishing operations) understates the supporters' share of both total U.S. production of the

domestic like product and total U.S. production of the domestic like product produced by those

producers and workers who have expressed support for, or opposition to, the Petition.

      Finally, we address the record and various claims regarding petitioning companies

Borusan U.S. and PTC Liberty.  In its *Remand Order*, the Court explained that Tenaris USA

points to record evidence that PTC Liberty was not identified as a producer in the ITC's sunset

review that was relied upon by both the petitioners and Commerce to calculate industry

support.[58]  The Court then concluded that, "{b}ased upon the sunset review, it would appear that

PTC Liberty finished, but did not produce pipe, in which case it is unclear whether the pipe PTC

Liberty finished had already been counted in the industry support calculations."[59]  Commerce has

---

[57] We provide the following mathematical examples of this approach, where A = supporters' OCTG production, B = supporters' green tube processing, C = all other U.S. producers' OCTG production, and D = all other U.S. producers' green tube processing:  $(A + B) / (A + B + C + D)$.  The supporters' green tube processing in the numerator and denominator effectively cancels each other out, resulting in the following equation:  $(A) / (A + C + D)$.  If green tube processing is not included in either the numerator or the denominator, the equation is as follows:  $(A) / (A + C)$.  As evident in a comparison of the mathematical equations, the inclusion of green tube processing yields a result where the supporters account for a *smaller* overall share of total U.S. production than they would if green tube processing were not included in the calculation.  The calculation Commerce relied on for its initiation decision thus fairly accounts for the supporters' share of total U.S. production.

[58] *See Remand Order* at 24.

[59] *Id.*

reexamined the record evidence regarding PTC Liberty and finds, consistent with our finding in the Initiation Checklist, that this company (formerly Boomerang Tube) was identified as a U.S. producer of OCTG in the ITC's *India et al. OCTG 2020 Review*.[60]  Moreover, in the First General Issues Supplement, the petitioners clarified that PTC Liberty was identified in the ITC's list as Boomerang Tube, which is further supported by the fact that the two plants (*i.e.*, Liberty, TX and Houston, TX) listed in the ITC's *India et al. OCTG 2020 Review* for Boomerang represent the very same Liberty, TX and Houston, TX plants identified in Tenaris USA's website printout for PTC Liberty, as discussed below.[61]  Accordingly, the record supports Commerce's prior finding, that PTC Liberty was formerly Boomerang Tube, and was identified as a U.S. producer of OCTG in the ITC's *India et al. OCTG 2020 Review*.

We also reexamined record information submitted by Tenaris USA concerning PTC Liberty – specifically, the screenshot of the company's website.[62]  On the website's "Who We Are" page, PTC Liberty states that it "produces highly engineered {OCTG} … and offer{s} Electric Resistance Welded (ERW) and Seamless tube, full finishing capabilities, and both API and Semi-Premium threading."[63]  Under "Our Facilities," PTC Liberty describes its Liberty, TX plant as a 500,000 square foot facility that houses two ERW mills with 480,000 tons of annual capacity for ERW pipe as well as heat treatment capability of 300,000 tons per year.  PTC Liberty elaborates that its Houston, TX plant is a 350,000 square foot facility that "provide{s} seamless pipe and processing of green tube."[64]  The record demonstrates that PTC Liberty is first and foremost a *producer* of OCTG; a producer that also has capabilities to process (or finish)

---

[60] *See* Initiation Checklist at Attachment II (page 14); *see also* First General Issues Supplement at 1 and Exhibit 1 (containing *India et al. OCTG 2020 Review* at I-37).
[61] *See* First General Issues Supplement at 1 and Exhibit 1 (containing *India et al. OCTG 2020 Review* at I-37); *see also* Tenaris USA Letter II at Exhibit 6.
[62] *See* Tenaris USA Letter II at Exhibit 6.
[63] *Id.*
[64] *Id.*

OCTG.  The relevance of Tenaris USA's claim with respect to the significance of PTC Liberty's processing capabilities is unclear, as information on the record indicates that U.S. pipe mills are typically equipped with the facilities necessary to perform heat-treatment, end upsetting, threading, and coupling.[65]

Next we reexamined the information Tenaris USA submitted on the record for Borusan U.S. – specifically, a screenshot of Borusan U.S.'s website.[66]  On the webpage printout, Borusan U.S. states that its Baytown, TX facility has a 300,000 ton annual production capacity and produces OCTG casing.[67]  On the same webpage, Borusan U.S. elaborates that green tube from its Gemlik facility in the Republic of Türkiye (Türkiye) is heat-treated, inspected, and threaded at its Baytown facility.[68]  In addition, Borusan U.S. indicates that it contracts with the "leading tubing processors" in Houston, TX to ensure the highest quality final product for its tubing imported from its Gemlik, Türkiye facility.[69]  This information demonstrates that Borusan U.S.'s Baytown, Texas facility further processes *imported* green tube from its Gemlik, Türkiye facility, and not domestically produced green tube from another U.S. producer.[70]  Thus, the record evidence for Borusan U.S.'s Baytown, Texas facility suggests that this facility primarily *manufactures* OCTG casing and *also* engages in processing (*i.e.*, heat-treatment, inspection, and threading) of tubing from Borusan U.S.'s facility in Türkiye.  Borusan U.S.'s production appropriately reflects its U.S. mill operations as well as the heat treatment processing of its green tube imports from its Türkiye facility.

---

[65] *See* Petition at Volume I (Exhibit I-11 (citing *ITC et al. OCTG 2020 Review* at I-30)).
[66] *See* Tenaris USA Letter II at Exhibit 5.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*

Barcode:4585797-01 A-357-824 REM - Remand 10/1/20 - 9/30/21 Slip Op. 24-31

Our reexamination of the record supports our conclusion that:  (1) PTC Liberty (formerly Boomerang Tube) is a U.S. producer, and was previously recognized by the ITC in past proceedings as such; (2) PTC Liberty is first and foremost a U.S. *producer* of OCTG that also has processing capabilities;[71] and (3) Borusan U.S. is first and foremost a U.S. *producer* of OCTG casing that also *processes* green tube imported from its facility in Türkiye.  Because Tenaris USA only provided information for PTC Liberty and Borusan U.S., the record is limited to information pertaining to those two companies, and as such, our analysis addresses only the information on the record.  Consistent with the *Remand Order*, we have reconsidered the evidence on the record and further explained our analysis of the issue with respect to inclusion of green tube processing and finishing in the industry support calculation.

## IV.    INTERESTED PARTIES' COMMENTS ON THE DRAFT REDETERMINATION

On May 28, 2024, Commerce released the Draft Remand and invited interested parties to comment on the Draft Remand.  On June 4, 2024, the petitioners and Tenaris each submitted comments regarding the Draft Remand.  On June 7, 2024, Commerce rejected Tenaris' June 4, 2024, comments after determining that the submission contained untimely new factual information not previously contained on the record of the proceeding.  On June 10, 2024, Tenaris resubmitted its comments redacting references containing new factual information in accordance with Commerce's request.  Our discussion of interested party comments is below.

---

[71] Based on record information, U.S. pipe mills are typically equipped with the facilities necessary to perform heat-treatment, end upsetting, threading, and coupling.  *See* Petition at Volume I (Exhibit I-11 (citing *ITC et al. OCTG 2020 Review* at I-30)).

**Comment:   Inclusion of Green Tube Processing and "Double Counting"**

*Tenaris' Comments*:

*The following is a verbatim summary of arguments submitted by Tenaris.  For further details, see Tenaris' Comments at 2-27.*

> Commerce Fails to Demonstrate That Domestically-Produced Green Pipe That is Further Processed (Heat Treated) by a U.S. Processor is Not Double-Counted and, Therefore, Commerce's Draft Remand Determination Fails to Comply with the Court's Instructions to Demonstrate That "The Data Relied Upon Accurately Reflected Industry Support"
>
> Commerce Fails to Demonstrate That the Shipment Data That Serve as the Basis for the Denominator in the Industry Support Calculation Include Shipments of Both U.S. Mills and U.S. Processors of Imported Green Pipe, and Therefore, the Draft Remand Determination Fails to Comply with the Court's Instructions to Demonstrate that "the Data Relied Upon Accurately Reflected Industry Support"

*Petitioners' Comments*:

*The following is a verbatim summary of arguments submitted by the petitioners.  For further details, see Petitioners' Comments at 2-6.*

> The Draft Remand Redetermination is a thorough and well-supported response to the Court's order. Commerce should make no changes in the final remand redetermination. There has never been any factual basis underlying the claims of Tenaris Bay City, Inc. ("Tenaris") on appeal regarding purported double counting of green tube produced in the United States by one company and then processed into OCTG by another U.S. company.
>
> Commerce appropriately explains how its determination that the domestic like product consists of OCTG as defined by the scope – including both unfinished green tube and finished OCTG – is consistent with the determinations of the {ITC} in its separate analyses of the domestic like product in cases involving OCTG since at least 2014.
>
> Commerce further explains that its inclusion of finishing operations in the numerator and the denominator of the calculation does not constitute "double counting," as any OCTG processed by supporters of the petition would already be reflected in the denominator that reflects all U.S. production (including processing operations).
>
> Commerce also responds to Tenaris' claims that domestic producer PTC Liberty was not

listed as a domestic producer in a 2020 ITC publication by explaining that the company is an OCTG producer with capabilities to finish/process OCTG and operates the assets of the former Boomerang Tube, which the ITC did identify as a domestic producer of OCTG in its publication.  Commerce also explains that, in addition to producing OCTG casing in the United States, U.S. producer Borusan Mannesmann also finishes green tube imported from an affiliate in Türkiye.  Because the company's processing operations involve imported green tube, there is no double counting of domestically produced green tube subsequently finished by Borusan Mannesmann in the United States.

**Commerce's Position:**

We disagree with Tenaris' contention that our Draft Remand is not responsive to the Court's remand instruction, inconsistent with statutory requirements, and unsupported by substantial evidence on the record.  The Court ordered Commerce to further explain or reconsider its determination that the data relied upon accurately reflected industry support, including whether finishing operations were counted twice.[72]  In accordance with the Court's order, we reconsidered the information on the record and further explained the "double counting" issue as well as other arguments raised by Tenaris regarding the inclusion of processing/finishing operations.[73]  We also presented mathematical examples to conceptualize the methodology and demonstrate that, even with the inclusion of green tube finishing operations, the industry support calculation was reasonable and appropriate.  Contrary to Tenaris' claims that Commerce's discussion of the scope, the domestic like product, and the definition of the domestic industry are misplaced, these concepts are integral to Commerce's analysis of a petition and whether the petition meets the requirements set forth under the statute and regulations.  As a result, Commerce continues to include a discussion of the relationship between these concepts in its analysis for the Court.  In its remand comments, Tenaris argues that Commerce only addressed

---

[72] *See Remand Order* at 27.
[73] *See* Tenaris USA's Letter II at 9-10; *see also* Tenaris USA's Letter III at 8; and Tenaris USA's Letter IV at 5.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED
Barcode:4585797-01 A-357-824 REM - Remand 10/1/20 - 9/30/21 Slip Op. 24-31

record information pertaining to Borusan U.S. and PTC Liberty in the Draft Remand.[74]

Commerce is limited to the record before it,[75] and because Tenaris USA only addressed

petitioning companies Borusan U.S. and PTC Liberty in its pre-initiation comments, our analysis

in the Draft Remand is likewise limited to the information on the record.

In its pre-initiation submissions, Tenaris USA argued that "mere finishing operations"

should not be included in the industry support calculation.[76]  Commerce appropriately addressed

Tenaris USA's generalized "processing" arguments in its analysis of the record information at

the time of its initiation decision.[77]  In its remand comments, Tenaris again attempts to move the

needle and fine tune its arguments with respect to processing.  Specifically, in its remand

comments, Tenaris now concedes that processing *should* be included in the industry support

calculation, but argues that only heat treatment processing, not threading operations, should be

included.[78]  For support, Tenaris points to information that was not on the record before

Commerce at the time of initiation or currently before Commerce.[79]

In its remand comments, Tenaris also contends that Commerce failed to corroborate

whether the shipment data are complete and include mill and processor shipments (including

imported green tube that is heat treated in the United States).[80]  As support, Tenaris [

---

[74] *See* Tenaris' Comments at 3 and 9-10.
[75] *See Shandong Jinxiang Zhengyang Import & Export Co., Ltd. v. United States*, 429 F.Supp.3d 1373, fn. 14 ("Except in very limited circumstances, this court's review of Commerce's determination is limited to the record before it.").
[76] *See* Tenaris USA's Letter II at 9-10; *see also* Tenaris USA's Letter III at 8; and Tenaris USA's Letter IV at 5.
[77] *See* Initiation Checklist at Attachment II (pages 9-10 and 14).
[78] *See* Tenaris' Comments at 3.
[79] *Id.* at 24-25.
[80] *Id.* at 17.

20

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED
Barcode:4585797-01 A-357-824 REM - Remand 10/1/20 - 9/30/21 Slip Op. 24-31

].[81]  Tenaris states that the [

].[82]  We

reexamined the record with respect to this exhibit and found that [

].[83]  The petitioners [

].[84]  Tenaris attempts to muddy the water again and cast doubt on

data that up until this point had remained uncontested on the record.

As Commerce previously explained, no party – including Tenaris USA – contested the

validity of the industry data source in the pre-initiation period, despite having ample opportunity

to do so.  Nevertheless, Commerce has considered the merits of Tenaris' new claim and is

unpersuaded by the "facts" Tenaris points to as support.  A party's ability to point to an

alternative finding on the record – even a reasonable one – does not provide a basis for the Court

to set aside Commerce's determination.[85]  As the Court has held, "{t}he fact that industry data is

not perfect is not sufficient to suggest that Petitioners do not have industry standing" and, thus,

Tenaris "must do more than point out that industry data was not perfect in order to show that

---

[81] *Id.* at 18.
[82] *Id.*
[83] *See* Petition at Volume I (Exhibit I-2).
[84] *Id.* at Volume I (Exhibit I-2); *see also* Second General Issues Supplement at Exhibit 5.
[85] *See Pokarna Engineered Stone Ltd v. United States*, 56 F.4th 1345, 1351-52 (Fed. Cir. 2023).

{the petitioners} lack industry standing."[86]  Moreover, the Court has held that "the industry standing calculations are not meant to be exact and proxies are routinely used to estimate the amount of U.S. production of a particular product."[87]  Furthermore, merely disagreeing with the evidentiary weight Commerce assigns to pieces of evidence on the record is insufficient to overturn Commerce's determination.[88]  As such, Tenaris USA's unsubstantiated allegations of a *potential* flaw with inclusion of processing in its pre-initiation comments and Tenaris' allegations of "double counting" in its remand comments are insufficient to show that the petition was not filed by or on behalf of the domestic industry producing OCTG.  As in *QVD Food*, Tenaris "is in an awkward position to argue that Commerce abused its discretion by not relying on evidence that {Tenaris USA and Tenaris} failed to introduce into the {pre-initiation} record."[89]  Given the relatively low threshold for establishing industry support and the reliable record evidence showing that the petitioners accounted for at least 25 percent of total U.S. production of the domestic like product and more than 50 percent of total U.S. production of the domestic like product by those producers or workers expressing support for, or opposition to, the Petition, the burden was on Tenaris USA to submit adequate, rebuttal factual information in the pre-initiation period showing that the industry source used by the petitioners as the starting point for their estimate of 2020 industry-wide production data was incorrect.[90]

---

[86] *See PT Pindo Deli Pulp v. United States*, 825 F.Supp.2d 1310, 1327-28 (CIT 2012) (citing section 732(b)(1) of the Act, requiring the petition to contain information "reasonably available" to the petitioner to support its allegations).
[87] *Id.*
[88] *See Jacobi Carbons AB et.al. v. United States*, 422 F.Supp.3d 1318, 1325-26 (CIT 2019).
[89] *See QVD Foods Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (*QVD Foods*).
[90] Tenaris USA's burden to show lack of industry support was arguably higher in a case such as this one, where evidence in the Petition demonstrated that even if all other domestic producers (including Tenaris USA) were to oppose the Petition, the supporters still had the requisite level of industry support for Commerce to initiate the investigation.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

As a point of clarification, Commerce did rely on data from the ITC's *India et al. OCTG 2020 Review* as industry-wide information available on the record to calculate the ratio of the U.S. industry's reported production to domestic shipments, for purposes of adjusting the domestic shipment data to approximate production for the U.S. OCTG industry.[91]  We did *not* rely on this ITC data as "other information" pursuant to section 732(c)(4)(D)(i) of the Act,[92] as Tenaris incorrectly asserts.[93]  Rather, as stated in the Initiation Checklist, we relied on [

] as other information, pursuant to section 732(c)(4)(D)(i) of the Act.[94]

With respect to Tenaris' argument that there are clear principles regarding the U.S. OCTG industry, the domestic like product, and the reporting, collecting, and presentation of production and shipment data, we agree.  The existence of these clear principles in fact supports Commerce's conclusion that the industry support calculation accurately reflects U.S. OCTG production in calendar year 2020.  As Tenaris explains, under these industry principles, processors that perform heat treatment on green tube are considered part of the domestic industry producing OCTG, but that threading alone is not considered domestic production.[95]  U.S. companies, including the four petitioning companies, have participated in multiple investigations and reviews at the ITC, where they were required to report data according to these principles. There is no evidence on the record that indicates that the companies departed from these data reporting principles when providing data used in the Petition's industry support calculation.

---

[91] *See* Initiation Checklist at Attachment II (page 5).
[92] Section 732(c)(4)(D)(i) of the Act requires that Commerce poll the industry or rely on other information to determine industry support if the petition does not establish the support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product.
[93] *See* Tenaris' Comments at 23-24.
[94] *See* Initiation Checklist at Attachment II (page 6).
[95] *See* Tenaris' Comments at 24-25.

23
Appx043

Barcode:4585797-01 A-357-824 REM - Remand 10/1/20 - 9/30/21 Slip Op. 24-31

Thus, Tenaris' claims regarding potential flaws in the underlying data in the industry support calculation is unsubstantiated and without merit.

Finally, we note that as support for its arguments in its initial comments on the Draft Remand, which Commerce rejected from the record as they contained new factual information, Tenaris also provided information from the ITC's report published in *November 2022* – the year *after* Commerce evaluated the merits of the Petition and initiated the investigation.[96]  In reaching its initiation decision in October 2021, Commerce examined the information available on the record and concluded that the petitioners had provided information reasonably available to them to establish that the Petition was filed by or on behalf of the domestic industry producing OCTG. Data availability will always change as time goes by.  What constitutes "reasonably available information" on the pre-initiation record is not mercurial or fluid once a decision is made to initiate an investigation – otherwise, after every initiation there would be an endless loop of litigious claims that new data and information have become available, such that Commerce must reexamine its decision to initiate.  The statute and regulations support this determination – Commerce must evaluate the record before it within the short pre-initiation period to determine whether a petitioner has provided information reasonably available to it to support its allegations, including satisfying the requirement that the petition must contain, to the extent reasonably available to the petitioner, information relating to the degree of industry support for the petition. As detailed above, Commerce evaluated the record, including the merits of Tenaris USA's pre-initiation comments, and determined that the petition requirements were met.  Just because Commerce evaluated and weighed the evidence differently than Tenaris does not render

---

[96] *See* Commerce's Letter, "Rejection of Tenaris' Comments on Draft Results of Redetermination," dated June 7, 2024.

Commerce's initiation decision improper.[97]  As demonstrated above, throughout the course of this litigation and in its remand comments, Tenaris continues to refine its arguments, raising new concerns *post hoc* with a level of specificity that was not articulated in its pre-initiation comments.  Tenaris' assertions regarding green tube heat treatment processing, OCTG threading operations, concerns with the industry source used as the denominator, and other information from ITC reports were not on the record before Commerce in the pre-initiation period and are currently not on the record before Commerce.  Nevertheless, as outlined above, Commerce has considered the merits of Tenaris' newly articulated arguments and continues to find that the information on the record supports the conclusion that the petitioners provided information reasonably available to them and demonstrated that the Petition was filed by and has the support of the domestic industry.

Thus, Commerce's decision to initiate the LTFV investigation on OCTG from Argentina was reasonable considering the law and the facts on the record.

## V.    FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Order*, and based on the analysis above, Commerce has further explained and reconsidered the "double counting" question.  Accordingly, Commerce

---

[97] *See*, *e.g.*, *Mitsubishi Heavy Indus. Ltd. V. United States*, 275 F.3d 1056, 1062 (CIT 2001) ("{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence" and *Cleo*, 501 F.3d at 1296 (citing *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) ("Even if it is possible to draw two inconsistent conclusions from evidence on the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence."); *Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F.Supp.3d 1330, 1346 (CIT 2018) ("mere disagreement with Commerce's weighing of the evidence" insufficient basis for legal challenge)).

Barcode:4585797-01 A-357-824 REM - Remand 10/1/20 - 9/30/21 Slip Op. 24-31

continues to find that initiating the investigation was in accordance with law and based on substantial evidence.

6/26/2024

X _____

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance

26

4

*Tenaris Bay City, Inc. et. Al. v. United States,* CIT Slip Op. 24-31
(Mar. 14, 2024)

CMF-68

PUBLIC VERSION

Appx047-Appx078

Slip Op. 24-31

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TENARIS BAY CITY, INC. ET AL.,** | |
| **Plaintiff,** | |
| v. | |
| **UNITED STATES,** | **Before: Claire R. Kelly, Judge** |
| **Defendant,** | **Court No. 22-00343** |
| and | **PUBLIC VERSION** |
| **UNITED STATES STEEL CORPORATION, ET AL.** | |
| **Defendant-Intervenors.** | |

## OPINION AND ORDER

[Granting in part and denying in part Plaintiffs' motion for judgment on the agency record.]

Dated: March 14, 2024

Gregory J. Spak, Frank J. Schweitzer, and Matthew W. Solomon, White & Case LLP, of Washington D.C., argued for plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Inc., and Siderca S.A.I.C. On the brief were Kristina Zissis and Colin Alejandro Dilley.

Hardeep K. Josan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States. On the brief were Patricia M. McCarthy, Director, Claudia Burke, Deputy Director, and Brian M. Boynton, Principal Deputy Assistant Attorney General. Of counsel was Ian Andrew McInerney, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Court No. 22-00343                                                      Page 2
**PUBLIC VERSION**

James E. Ransdell, Cassidy Levy Kent (USA) LLP, of Washington D.C., argued for defendant-intervenor United States Steel Corporation.  On the brief were Thomas M. Beline and Myles S. Getlan.

Christopher T. Cloutier and Saad Younus Chalchal, Schagrin Associates, of Washington D.C., argued for defendant-intervenors Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA Inc.  On the brief were Roger B. Schagrin, and Luke A. Meisner.

        Kelly, Judge:  Before the Court is Plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, and Siderca S.A.I.C.'s ("Plaintiffs") motion for judgment on the agency record challenging the U.S. Department of Commerce's ("Commerce") final determination in its 2020-2021 less-than-fair-value investigation of oil country tubular goods ("OCTG") from Argentina.  Plaintiffs argue that: (1) Commerce's initiation of the antidumping duty ("AD") investigation and determination that the AD petition was filed "by or on behalf of the industry" is contrary to law and unsupported by substantial evidence; and (2) Commerce's decision not to poll the domestic industry and seek actual production data for the twelve months immediately preceding the filing of the petition to determine industry support is contrary to law, unsupported by substantial evidence, and an abuse of discretion.  For the following reasons, the Court sustains Commerce's determination in part, and remands in part for further explanation or reconsideration.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Court No. 22-00343                                                                 Page 3
**PUBLIC VERSION**

## BACKGROUND

Plaintiffs contest the initiation of the OCTG from Argentina AD investigation. [Pls.'] R. 56.2 Mot. J. Agency R. at 1, June 26, 2023, ECF No. 40 ("Pls. Mot."); Def.'s Resp. Opp'n [Pls. Mot.] at 1–2, Sept. 22, 2023, ECF No. 46 ("Def. Resp.").  On October 6, 2021, Petitioners Borusan Mannesmann Pipe U.S. Inc, PTC Liberty Tubulars LLC, U.S. Steel Tubular Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"), and Welded Tube USA Inc. ("Petitioners") filed a petition for an imposition of AD and countervailing duties ("CVD") on OCTG from Argentina (AD), Mexico (AD), Korea (CVD), and Russia (AD/CVD).  Pls. Mot. at 4; Def. Resp. at 2–3; see also Letters Schagrin Assoc. to Sec. Commerce Pertaining Borusan Mannesmann Pipe U.S., Inc. et al. Request for Admin Review, PDs 1–6, CDs 1–6, bar codes 4167998-01–06 (Oct. 5, 2021).[1]  Pls. Mot. at 4;[2] Def. Resp. at 2–3.  On October 7, 2021, Commerce issued its first questionnaire requesting additional information

---

[1]  On February 22, 2023, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination. See ECF No. 35-4–5. Citations to administrative record documents in this opinion are to the numbers Commerce assigned to such documents in the indices, and all references to such documents are preceded by "PD" or "CD" to denote public or confidential documents.

[2]  Plaintiffs note that "[s]everal U.S. OCTG producers did not join in the filing of the petition," including Plaintiffs and their production companies—comprising the "largest U.S. producer of OCTG"—and [[

]].  Pls. Mot. at 4–5.

Court No. 22-00343                                                                      Page 4
**PUBLIC VERSION**

and for Petitioners to address a "methodological error with respect to the calculation of total shipments for the U.S. industry."[3] Pls. Mot. at 5; Def. Resp. at 4.

On October 8, 2021, Plaintiffs submitted comments to Commerce alleging (1) Petitioners misrepresented which production plants were represented by USW, causing production figures to be improperly deducted from the industry support calculation; (2) the industry support calculation was unreliable because it was based on anomalous 2020 production data;[4] and (3) the Petitioner's reliance on shipment data, instead of production data, was not in accordance with 19 U.S.C. § 1673a(c)(4)(A)(ii). Pls. Mot. at 6. Plaintiffs asked Commerce to reject the petition or delay determination by twenty days to poll the industry and determine petition support per 19 U.S.C. § 1673a(c)(1)(B). Id.

On October 12, 2021, Petitioners submitted a modified calculation of industry support. Id. at 7; Def.-Ints.' Resp. Opp'n [Pls. Mot.] at 5, Sept. 22, 2023, ECF No. 44 ("Def.-Ints. Resp.").[5] On October 15, 2023, Plaintiffs submitted comments to

---

[3] Defendant asserts that Petitioners established the universe of domestic OCTG producers, consisting of 20 producers including the petitioning companies, based on the International Trade Commission's ("ITC") most recent full sunset review and knowledge of the OCTG industry. Commerce's Initiation Checklist: Attach. II at 4, PD 26, CD 40, bar code 4176344-01 (Oct. 26, 2021) ("Attach. II"); Def. Resp. at 3.

[4] Plaintiffs allege that the 2020 production data is anomalous because of the "oversupply of oil by [the Organization of the Petroleum Exporting Countries ('OPEC')], combined with the global COVID-19 pandemic." Pls. Mot. at 6.

[5] Petitioners' revised industry support calculations had multiple bases, including:

(footnote continued)

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Court No. 22-00343                                                                 Page 5
**PUBLIC VERSION**

Petitioners' modified industry support calculations, again identifying flaws and requesting Commerce to poll the industry and extend its determination by 20 days. Pls. Mot. at 7; Def. Resp. at 5.  On October 18, 2021, Petitioners responded to Plaintiffs' comments with a second revised industry support calculation.  Pls. Mot. at 7–8; Def. Resp. at 6.

On October 19, Commerce issued its second questionnaire to Petitioners, requesting information concerning domestic OCTG production facilities represented by USW.  Pls. Mot. at 8; Def. Resp. at 3.  On October 20, 2021, Plaintiffs commented on Petitioners' October 18 submission, reasserting the alleged flaws in industry support calculations as identified in Plaintiffs' previous comments and that the domestic industry should be polled.  Pls. Mot. at 8; Def. Resp. at 6.  Plaintiffs also argued "Petitioners bear the burden of demonstrating industry support for the petition," and that "Petitioner's strategy to cobble together the requisite support based on data for a group that also included processors and finishers of OCTG had implications for the accuracy of the industry support calculations."  Pls. Mot. at 8.

On October 21, 2021, Petitioners responded to Commerce's second questionnaire, and provided "updated declarations and information on domestic mills

_____

Petitioners' own 2020 production data and domestic shipment data for 2020 [[
            ]]; data from the ITC's 2020 final sunset review; adjustments based on ratios of domestic and export shipments using 2020 data; and estimates of non-petitioning companies' production.  Pls. Resp. at 7; Def.-Ints. Resp. at 5.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Court No. 22-00343                                                                    Page 6
**PUBLIC VERSION**

represented by USW" and revised calculations.[6]  Def.-Ints. Resp. at 8; Pls. Mot. at 9;

Def. Resp. at 4–5.  That same day, counsel for Plaintiffs met with Commerce to

"reiterate [Plaintiffs'] concerns stated in its three sets of comments, including that

Commerce poll the domestic industry to determine whether the petition has the

statutorily-required level of domestic industry support."  Pls. Mot. at 9; Def.-Ints.

Resp. at 8.  On October 22, 2021, Plaintiffs submitted a fourth set of comments,

contesting Petitioners' October 21, 2021, response to Commerce's second

questionnaire on the same grounds as Plaintiffs' previous objections.[7]  Pls. Mot. at

10; Def. Resp. at 7.

On October 26, 2021, Commerce initiated the AD investigation in accordance

with the 20-day statutory deadline provided by 19 U.S.C. § 1673a(c)(1)(A).  See Oil

Country Tubular Goods from Argentina, Mexico, and the Russian Federation:

Initiation of Less-Than-Fair-Value Investigations, 86 Fed. Reg. 60,205 (Dep't

Commerce Nov. 1, 2021) (initiation notice).  In its initiation checklist for the AD

investigation ("Initiation Checklist"), Commerce identified reliance upon "industry

support data contained in the [p]etitions" and explained that the petition satisfied

statutory requirements.  See Attach. II at 4; Def. Resp. at 7; Def.-Ints. Resp. at 9; see

---

[6] Petitioners also provided "a [[

                                                        ]]"  in the questionnaire response.  Def.-Ints.
Resp. at 8.
[7] Defendant notes that Plaintiffs' fourth response was filed "16 days after the date of
the Petition and four days before Commerce's statutory deadline for determination
on initiation of the investigation."  Def. Resp. at 7.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Court No. 22-00343                                                                    Page 7
**PUBLIC VERSION**

<u>also</u> Pls. Mot. at 10.  Commerce accepted Petitioners' October 21 revised calculations and also conducted its own calculations with "a conservative, alternative methodology."[8]  Attach. II at 5; Def.-Ints. Resp. at 8.  Under both methodologies, Commerce found that the petition satisfied 19 U.S.C. § 1673a(c)(4)(A)(i) by exhibiting support from domestic producers or workers accounting for "at least 25 percent of the total production of the domestic like product."[9]  Attach. II at 6; Pls. Mot. at 10; Def. Resp. at 7.  However, neither methodology demonstrated that the domestic producers supporting the petition accounted for over 50 percent of the production of the domestic like product, as required by 19 U.S.C. § 1673a(c)(4)(A)(ii).  Attach II. at 6–7; Pls. Mot. at 10; Def.-Ints. Resp. at 9.

Consequently, Commerce chose to "rely on other information," and determined the petition was adequately supported by declarations from domestic producers

---

[8]  In the alternative calculation, Commerce
       calculated 2020 production estimates using the information available on
       the record on domestic shipments of OCTG for the entire industry in
       2020, as reported in [[                                    ]], and the publicly
       available information on U.S. producers' production and domestic
       shipments reported in the ITC's India et al OCTG 2020 Review.
Attach. II at 5; <u>see also</u> Def.-Ints. Resp. at 8.
[9]  Specifically, Commerce found that domestic industry support accounted for
[[        ]] percent of total production of the domestic like product in 2020 under
Petitioners' calculations, and [[       ]] percent under the alternative methodology.
Attach. II at 6.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Court No. 22-00343                                                        Page 8
**PUBLIC VERSION**

contained in the agency record.[10]  Attach. II at 6–7; Def.-Ints. Resp. at 9; see Pls. Mot.
at 10–11.  Moreover, Commerce concluded that the October 1, 2020, through
September 30, 2021, period of investigation ("POI") was proper under 19 C.F.R.
§ 351.204, despite Plaintiffs' characterization that it was anomalous, as it
represented "the four most recently completed fiscal quarters since the month
preceding the filing date."  Def. Resp. at 8; Def.-Ints. Resp. at 10.  Commerce also
rejected Plaintiffs' concern that finishing operations were improperly included twice
when Petitioners calculated industry support, stating that "[t]he scope and domestic
like product of [AD] investigations includes OCTG 'whether finished . . . or
unfinished.'"  Attach. II at 14; Def.-Ints. Resp. at 9–10.

On May 11, 2022, Commerce published the preliminary results for the OCTG
AD investigation from Argentina, determining that OCTG is being, or likely to be,
sold in the United States at less than fair value.  See Oil Country Tubular Goods

---

[10]  Commerce used declarations of support from non-petitioning domestic producers
and [[                                                    ]].  Attach. II at 6; Def.-
Ints. Resp. at 9.  Furthermore, Commerce noted that despite Plaintiffs' opposition to
the petition,

> [Plaintiff] has not provided any production data for Commerce to include
> in the industry support calculation.  Accordingly, because [[
>
>                                                                    ]]
> Petitions, [Commerce] find[s] that the supporters of the Petitions
> account for [[     ]] percent of the total U.S. production of those parties
> expressing an opinion on the Petitions for which we have production
> data.

Attach II. at 6–7 (footnotes omitted).

Court No. 22-00343                                                      Page 9
**PUBLIC VERSION**

<u>From Argentina</u>, 87 Fed. Reg. 28,801 (Dep't Commerce May 11, 2022) (preliminary determination of sales at less than fair value) and accompanying preliminary issues and decision memorandum.  On September 29, 2022, Commerce published the final results determining that OCTG from Argentina is being, or likely to be, sold in the United States at less than fair value.  <u>See</u> <u>Oil Country Tubular Goods From Argentina</u>, 87 Fed. Reg. 50,054 (Dep't Commerce Sept. 29, 2022) (final determination) and accompanying issues and decision memorandum.

On January 13, 2023, Plaintiffs filed the instant action.  <u>See generally</u> Compl., Jan. 13, 2023, ECF No. 16.  On June 26, 2023, Plaintiffs moved the Court for judgment on the agency record.  <u>See generally</u> Pls. Mot.  Defendant and Defendant-Intervenors filed response briefs on September 22, 2023.  <u>See generally</u> Def. Resp.; Def.-Ints. Resp.  Oral argument on the issues presented in Plaintiffs' motion was heard by the Court on January 10, 2024.  <u>See</u> Dig. Audio File Re. Oral Arg. Proc. [ECF No. 57] Held On Jan. 10, 2024, Jan. 11, 2023, ECF No. 58 ("Oral Arg.").

### JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to Section 516A of the Tariff Act of 1930,[11] as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2018),[12] which grants the Court authority to review actions contesting the final determination in an

---

[11]  Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.
[12]  Further citations to Title 28 of the U.S. Code and Code of Federal Regulations are to the 2018 edition.

Court No. 22-00343                                                    Page 10
**PUBLIC VERSION**

antidumping duty order.  The Court will uphold Commerce's determination unless it

is "unsupported by substantial evidence on the record, or otherwise not in accordance

with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

<div align="center">

**DISCUSSION**

</div>

Plaintiffs argue Commerce's decisions to (1) rely on "other information"

including "anomalous" data from the 2020 OCTG market period, rather than poll the

domestic industry, and (2) assume that OCTG counted for finishing operations were

not counted twice in the industry support calculations, were unsupported by

substantial evidence, an abuse of discretion, and otherwise contrary to law.  Pls. Mot.

at 14–45.  Defendant and Defendant-Intervenors argue that Commerce was not

required to poll the industry, and that its industry support determination is

reasonable, supported by substantial evidence, and in accordance with law.  Def.

Resp. at 9–21; Def.-Ints. Resp. at 13–32.  Commerce's decision to rely on other

information rather than poll the domestic industry is supported by substantial

evidence.  However, Commerce must either reconsider or further explain its use of

data from the 2020 market period, and specifically to ensure that finishing operations

data were not double counted.

**I.    Polling the Industry**

Plaintiffs claim that Commerce's reliance on other information rather than

polling the domestic industry to calculate industry support based on the most recent

twelve-month period prior to filing the AD petition is contrary to law and unsupported

<div align="center">

Appx056

</div>

Court No. 22-00343                                                    Page 11
**PUBLIC VERSION**

by substantial evidence. Pls. Mot. at 35. Specifically, Plaintiffs argue (1) 19 U.S.C.
§ 1673a(c)(4)(D) mandates that Commerce poll the domestic industry if the petition
does not establish the statutory 50 percent level of support; (2) Commerce's failure to
poll the industry and request data "indicative of production levels" was unreasonable;
and (3) Commerce abused its discretion by failing to poll the domestic producers to
establish industry support. Id. at 35–41. Defendant and Defendant-intervenors
counter that Commerce's reliance on other information is in accordance with law and
supported by substantial evidence. Def. Resp. at 20–22; Def.-Ints. Resp. at 25–29.
Because Commerce has statutory discretion to poll the industry or "rely on other
information" under 19 U.S.C. § 1673a(c)(4)(D) when calculating industry support of
an AD petition, the Court sustains Commerce's determination on this issue.

Initiation of an AD investigation pursuant to 19 U.S.C. § 1673a(a)(1) requires
Commerce to determine, based upon available information, "that a formal
investigation is warranted into the question of whether the elements necessary for
the imposition of [AD] under [the statute] exist." 19 U.S.C. § 1673a(a)(1). An
interested party[13] may initiate an AD investigation by filing a petition on behalf of

---

[13] An "interested party," for the purposes of initiating an AD investigation by petition,
includes:

    (C) a manufacturer, producer, or wholesaler in the United States of a
    domestic like product,

(footnote continued)

Court No. 22-00343                                                          Page 12
**PUBLIC VERSION**

the industry requesting Commerce investigate possible dumping. 19 U.S.C.

§ 1673a(b)(1). Before Commerce launches an investigation, it generally has 20 days

after the date a petition was filed to determine whether the petition: (1) alleges the

necessary elements for AD imposition and contains "information reasonably available

to the petitioner" after examining available sources and information to Commerce

and the strength of the evidence submitted by the petitioners; and (2) was filed "by

or on behalf of the industry." 19 U.S.C. § 1673a(c)(1)(A).

Commerce considers a petition to be filed "by or on behalf of the industry" if

(i) the domestic producers or workers who support the petition account
for at least 25 percent of the total production of the domestic like
product, and

(ii) the domestic producers or workers who support the petition account
for more than 50 percent of the production of the domestic like product
produced by that portion of the industry expressing support for or
opposition to the petition.

---

(D) a certified union or recognized union or group of workers which is
representative of an industry engaged in the manufacture, production,
or wholesale in the United States of a domestic like product,
(E) a trade or business association a majority of whose members
manufacture, produce, or wholesale a domestic like product in the
United States,
(F) an association, a majority of whose members is composed of
interested parties described in subparagraph (C), (D), or (E) with respect
to a domestic like product[.]
19 U.S.C. § 1677(9)(C)–(F).

Court No. 22-00343                                                        Page 13
**PUBLIC VERSION**

19 U.S.C. § 1673a(c)(4)(A).[14]  Where the petition satisfies the 25 percent domestic

industry support requirement, but does not establish the latter 50 percent

requirement, the statute mandates that Commerce "shall[] poll the industry or rely

on other information in order to determine if there is support for the petition" before

proceeding with formal initiation of the AD investigation.[15]    19 U.S.C.

§ 1673a(c)(4)(D)(i).  In such a case, and if warranted by "exceptional circumstances"

at its discretion,[16] Commerce can extend the 20-day initial determination timeline for

a maximum of 40 days.  19 U.S.C. § 1673a(c)(4)(D).  When determining industry

support for an AD petition, Commerce is instructed to "normally" measure

---

[14]  In Commerce's determination, it (1) "shall disregard the position of domestic producers who oppose the petition," if they are related to foreign producers, unless they can show their interests "would be adversely affected by the imposition of an antidumping duty order;" and (2) "may disregard the position of domestic producers of a domestic like product who are importers of the subject merchandise." 19 U.S.C. § 1673a(c)(4)(B).

[15]  If Commerce decides to poll the industry, consisting of a large number of producers, Commerce can "determine industry support for the petition by using any statistically valid sampling method[.]"  19 U.S.C. § 1673a(c)(4)(D)(ii).

[16]  The legislative history of the 19 U.S.C. § 1673a expounds upon Congress' grant of discretion to Commerce to extend the deadline under exceptional circumstances.  See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 835 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4193–94 ("SAA").  The SAA notes that "exceptional circumstances may arise where the petition provides insufficient information on support, the domestic industry is fragmented, or there is a large number of producers in the industry." Id. at 4193.  Congress drafted the exception despite its recognition that "in the vast majority of cases, the determination of industry support will be made within the initial [20]-day period." Id.  Nonetheless, Congress instructs that "Commerce will use this extension authority only in exceptional circumstances where the industry support issue cannot be decided in [20] days, and the initiation determination will be extended only for the additional time necessary to make a determination regarding industry support." Id.

Court No. 22-00343                                                      Page 14
**PUBLIC VERSION**

production, based on either value or volume, "over a twelve-month period, as specified by the Secretary." 19 C.F.R. § 351.203(e)(1). However, if an interested party demonstrates the unavailability of production data for the specified period, then Commerce may establish production levels "by reference to alternative data that [Commerce] determines to be indicative of production levels." Id.

Here, Commerce's decision not to poll the industry and instead rely on other information to determine industry support for the AD petition is in accordance with law and within its discretion. It is undisputed that both Petitioners' calculations and Commerce's alternative methodology satisfied the 25 percent industry support requirement of Section 1673a(c)(4)(A)(i) but failed to demonstrate over 50 percent support for the petition required under Section 1673a(c)(4)(A)(ii). See Attach. II at 6; Pls. Mot. at 10–11; Def. Resp. at 7–8; Def.-Ints. Resp. at 9. Thus, Section 1673a(c)(4)(D) guides Commerce's course of action for how to proceed with the AD investigation.

As Commerce explains, it conformed with its statutory directive under 19 U.S.C. § 1673a(c)(4)(D) by choosing to "rely on other information" as specifically provided by Section 1673a(c)(4)(D)(i). See Attach. II at 6, 19; Def. Resp. at 21. Congress gave Commerce the choice for how to proceed when faced with a petition that does not meet the requirements of 19 U.S.C. § 1673a(c)(4)(A)(ii), in that it can "poll the industry or rely on other information" to evaluate whether industry support

Court No. 22-00343                                                                                    Page 15
**PUBLIC VERSION**

for the petition exists.  19 U.S.C. § 1673a(c)(4)(D)(i).[17]  Commerce chose one of the

avenues expressly provided for by statute.

      Tenaris avers Commerce was required to establish industry support by using

"actual production data for the most recent twelve months prior to the filing of the

petition" rather than shipment data provided by Petitioners.  <u>See</u> Pls. Mot. at 35.

Commerce evaluates industry support of a petition to satisfy 19 U.S.C.

§ 1673a(c)(4)(A) and (c)(4)(D), it "normally will measure production over a twelve-

month period," as specified by Commerce, based on value or volume.  19 C.F.R.

§ 351.203(e)(1).[18]  However, Commerce may establish production levels by reference

to an alternative data period that Commerce finds "indicative of production levels" if

a party to the proceeding establishes the unavailability of production data for the

relevant period.  <u>Id.</u>

---

[17]  The statute's use of the conjunction "or" indicates introduction of a choice or
alternative.  <u>See Or</u>, The Britannica Dictionary, https://www.britannica.com/diction
ary/or (last visited Feb. 27, 2024) ("1 – used to introduce another choice or
possibility"); <u>Or</u>, Oxford English Dictionary, https://www.oed.com/search/dictionary/
?scope=Entries&q=or (last visited Feb. 27, 2024) ("used to coordinate two (or more)
sentence elements between which there is an alternative).

[18]  Although the statute is silent as to the precise point in time Commerce must use
to calculate industry support, <u>see</u> 19 U.S.C. § 1673a(c)(4)(A)(ii); 19 C.F.R.
§ 351.203(e)(1), Commerce's past practice is to use the most recently completed
calendar year prior to filing of the petition. <u>See</u> Attach. II at 16; <u>see also</u> 19 C.F.R.
§ 351.204(b)(1) ("In an antidumping investigation, [Commerce] normally will examine
merchandise sold during the four most recently completed fiscal quarters . . . as of
the month preceding the month in which the petition was filed").

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Court No. 22-00343                                                                    Page 16
**PUBLIC VERSION**

      Here, Petitioners submitted their own production data, as well as declarations

of support from non-petitioning producers.  <u>See</u> Attach. II at 4, 15.  Commerce

recognized that such production data did not account for the entire domestic industry

and that a fully populated data set for 2020 was unavailable.  <u>See</u> <u>id.</u> at 10, 15; Def.-

Ints. Resp. at 29.  That Commerce did not use the most recent preceding twelve-

month period to the date the petition was filed does not render Commerce's decision

unreasonable.  Rather, consistent with 19 C.F.R. § 351.203(e)(1), Commerce resorted

to an alternative data which included 2018 and 2019 shipment data as well as

incomplete production data from 2020 to approximate production levels for the

purpose of industry support calculations for the petition.  <u>See</u> Attach. II at 14–15

(citing 19 C.F.R. § 351.203(e)(1)); Def. Resp. at 12–13.  Commerce considered

Petitioners' 2018 and 2019 shipment data[19] as well as its own estimates of the entire

---

[19]  Commerce explains Petitioners' estimated actual production calculation in the
Initiation Checklist:

      To estimate the total 2020 production of the domestic like product
for the entire domestic industry, the petitioners relied on shipment data
for [[                                        ]] domestic OCTG shipments in 2020 as
reported in [[
      ]], which the petitioners note is the recognized authority on the
U.S. pipe and tube market, [[
                                           ]].  The
petitioners contend that the [[                                        ]] data are
the best available information regarding the volume of domestic OCTG
shipments in 2020.  The petitioners further contend that they do not

                                                    (footnote continued)

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Court No. 22-00343                                                                          Page 17
**PUBLIC VERSION**

industry's actual 2020 production data by relying on a similar, but more conservative

methodology."[20]  See Attach. II at 15; Def. Resp. at 12–13.  Moreover, Plaintiffs did

---

have access to 2020 industry production data and that industry shipment data are a reasonable proxy for production of OCTG, noting that the difference between their production levels and shipments [[

]].  The petitioners adjusted the domestic shipment data for 2020 reported in [[                                     ]] by the ratio of the petitioners' export shipments to total shipments in order to estimate total shipments (i.e., domestic and export shipments) in 2020.  The petitioners then deducted their own 2020 shipments from the estimated total shipments to derive non-petitioning companies' shipments in 2020. To approximate non-petitioning companies' production from the available shipment data, the petitioners first calculated the historical ratio (2018-2019) of non-petitioning companies' production to shipments derived from data reported in the ITC's India et al OCTG 2020 Review and applied the resulting ratio to the estimated non-petitioning companies' shipments in 2020.   The petitioners then added this estimated production to their own 2020 production to estimate total production for the entire U.S. OCTG industry.  Using this methodology, the petitioners estimated total 2020 production of [[                     ]] short tons for the entire domestic industry.

Attach. II at 4–5 (internal citations omitted).

[20] Commerce explains its alternative, conservative methodology in the Initiation Checklist:

As a conservative, alternative methodology, we calculated 2020 production estimates using the information available on the record on domestic shipments of OCTG for the entire industry in 2020, as reported in [[                                       ]], and the publicly available information on U.S. producers' production and domestic shipments reported in the ITC's India et al OCTG 2020 Review.  Specifically, based on the available information on the record from the ITC publication and the [[                                   ]], we calculated the ratio of the U.S. industry's reported production to domestic shipments using data from

(footnote continued)

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Court No. 22-00343                                                                    Page 18
**PUBLIC VERSION**

not offer their own production data to undermine Commerce's reliance on shipment

data, nor did they challenge the authoritative basis from which the selected shipment

data was derived.[21]  Attach. II at 15.  Thus, Commerce's decision to rely on other

information provided by Petitioners and its selection of an alternative time-period in

light of record evidence and reasonably available information in this case was in

accordance with law.

Plaintiffs further allege Commerce was required to extend the initiation

deadline of the investigation pursuant to 19 U.S.C. § 1673a(c)(1)(B).  Pls. Mot. at 41–

42.  Plaintiffs assert that Commerce's past practice is to extend the investigation

initiation deadline by 20 days "where the petition did not clearly establish industry

support." Id. at 42.  As discussed, Commerce is required to poll the domestic industry

or rely on other information when a filed petition fails to establish the 50 percent

requirement of Section 1673a(c)(1)(A)(ii).   19 U.S.C. § 1673a(c)(1)(D)(i).   When

operating under Section 1673a(c)(1)(D), Commerce may extend by "a maximum of 20

days" the deadline to determine whether the elements for AD imposition are present

---

the ITC publication and applied this ratio to the domestic shipment data
from [[                                                       ]] to approximate total 2020
production for the U.S. OCTG industry.  Using this methodology, we
estimated total 2020 production of [[                ]] short tons for the entire
domestic industry.

Attach. II at 5 (internal citations omitted).

[21]  As noted, both Petitioners and Commerce used shipment data from [[
                      ]] as a factor in estimating total domestic industry production for
2020.  Attach. II at 15; Def. Resp. at 12–13.

Court No. 22-00343                                                                                    Page 19
**PUBLIC VERSION**

and whether the petition has sufficient industry support.  19 U.S.C. § 1673a(c)(1)(B).

However, Commerce must first be presented with "exceptional circumstances" before

determining if an extension is warranted.  See id.  Moreover, a decision to extend the

deadline is within Commerce's discretion.  See Pokarna Engineered Stone Ltd. v.

United States, 547 F. Supp. 3d 1300, 1310 (Ct. Int'l Trade 2021), aff'd, 56 F.4th 1345

(Fed. Cir. 2023) (citing the Supreme Court in United States v. Rodgers, 461 U.S. 677,

706 (1983), for the proposition that the word "may" implies discretion in the context

of Section 1673a(c)(1)(B)).

   Here, Commerce's decision to leave the deadline unaltered is supported by

substantial evidence.  First, Commerce's decision not to extend the deadline was

reasonable in light of what it thought was sufficient evidence of industry support

based upon Petitioner's and its own calculations.  The SAA explains that "Commerce

will use [Section 1673a(c)(1)(B)] only in exceptional circumstances where the industry

support issue cannot be decided in twenty days."  SAA at 4193.  Commerce's

findings—on which it based its decision not to extend the deadline—and

determination that the petition was adequately supported were made without polling

the industry, thus eliminating the need to consider extending the deadline in the first

place.[22]  See Attach. II at 17 (noting that polling was unnecessary because Commerce

---

[22] Plaintiffs claim that past agency practice supports their contention that Commerce

(footnote continued)

Court No. 22-00343                                                    Page 20
**PUBLIC VERSION**

relied on other information to determine industry support).  The legislative history of

the statute supports Commerce's decision.  See SAA at 4192–94.

Second, it is within Commerce's discretion to extend the initiation deadline.

See 19 U.S.C. § 1673a(c)(1)(B) ("the administering authority may, in exceptional

circumstances, apply subparagraph [Section 1673a(c)(1)(A)] by substituting 'a

maximum of 40 days' for '20 days'").  Plaintiffs' efforts to characterize the factual

circumstances here as "exceptional"—and thus requiring an extension—fails to

undermine the reasonableness of Commerce's decision to the contrary.  Although

_____

was required to extend the initiation deadline and poll the industry.  Pls. Mot. at 42.
However, the determination extensions that Plaintiffs cite are inapposite because the
underlying petition in each of those cases were determined by Commerce to be
insufficient for industry support, unlike Commerce's calculations here.  See, e.g.,
Utility Scale Wind Towers From India, Malaysia, and Spain, 85 Fed. Reg. 65,028
(Dep't Commerce Oct. 14, 2020) (notice of extension of time) ("Petitions have not
established that the domestic producers or workers accounting for more than 50
percent of total production support the Petitions"); Passenger Vehicle and Light
Truck Tires From Korea, Taiwan, Thailand, and Vietnam, 85 Fed. Reg. 32,013 (Dep't
Commerce May 28, 2020 (notice of extension of time) ("Because it is not clear from
the Petitions whether the industry support criteria have been met, Commerce has
determined it should extend the time period for determining whether to initiate
investigations in order to further examine the issue of industry support");
Polyethylene Terephthalate Sheet From the Republic of Korea, Mexico, and the
Sultanate of Oman, 84 Fed. Reg. 39,801 (Dep't Commerce Aug. 12, 2019) (notice of
extension of time) ("Because it is not clear from the Petitions whether the industry
support criteria have been met, Commerce has determined it should extend the time
for initiating investigations in order to further examine the issue of industry
support").

Court No. 22-00343                                                          Page 21
**PUBLIC VERSION**

Plaintiffs invoke the phrase "exceptional circumstances,"[23] multiple times in a

conclusory fashion, they fail to present persuasive evidence that any fact at issue

actually fits into the purpose of the section.  Rather, Plaintiffs merely highlight

Commerce's disagreement with their characterization that the circumstances here

were exceptional, effectively requesting the Court to reweigh the evidence.  See, e.g.

Pls. Mot. at 3 ("The record before Commerce demonstrated 'exceptional

circumstances' warranting an extension . . ."); id. at 15 ("Given the 'exceptional

circumstances' demonstrated by the record evidence . . ."); id. at 33 ("Commerce

ignored the exceptional circumstances and [Plaintiffs'] repeated requests to extend

the time for making a determination and poll the industry").  Plaintiffs' submissions

that exceptional circumstances exist amount to factual disputes amongst the involved

---

[23]  Plaintiffs also list a handful of bullet-pointed considerations in their motion that
they believe constitutes "exceptional circumstances" warranting time extension
under the statute, including:
  • Petitioners' numerous revisions to the petition;
  • Commerce's reliance on anomalous 2020 data from an
    unrepresentative OCTG market;
  • Petitioners were below the 50 percent statutory level in the absence
    of using other information;
  • Petitioners' treatment of OCTG processors/finishers in the
    calculation of domestic production and industry support;
  • Repeated requests of Tenaris USA, the largest U.S. OCTG producer,
    to poll the industry; and
  • Commerce's past practice to poll the domestic industry in similar
    situations in which industry support was unclear.
Pls. Mot. at 41.  Plaintiffs fail to offer more analysis of how these considerations
warrant an extension of time as "exceptional circumstances" contemplated by 19
U.S.C. § 1673a(c)(1)B).

Court No. 22-00343                                                                    Page 22
**PUBLIC VERSION**

parties. Without more, such allegations fail to demonstrate that Commerce's refusal

to extend the deadline was unreasonable requiring remand, as the Court will not re-

weigh the evidence in the record.[24]  See Downhole Pipe & Equipment, L.P. v. United

States, 776 F.3d 1369, 1376 (Fed. Cir. 2015).  Accordingly, Commerce's decision to

maintain its initial 20-day deadline for its initiation determination was reasonable.

Therefore, Commerce's decision to rely on other information to calculate industry

support for the purposes of initiating the OCTG AD investigation at issue is

supported by substantial evidence, in accordance with law, and thus sustained.

## II.    2020 OCTG Market Period Data

Plaintiffs challenge the sufficiency of the data Petitioners and Commerce relied

upon to calculate industry support for the initiation of the AD investigation.  Pls. Mot.

at 14; Reply In Supp'n [Pls. Mot.] at 3, Oct. 10, 2023, ECF No. 48 ("Pls. Reply").  In

addition to their previously discussed allegations that the data at issue presented

exceptional circumstances undermining its reliability, Plaintiffs also contend that

Commerce's and Petitioners' domestic production and industry support calculations

---

[24]  Plaintiffs argue that by rejecting their requests to poll the industry and consider
record evidence allegedly showing "exceptional circumstances," Commerce failed to
support its determination with substantial evidence because it did not address
Plaintiffs' submissions supporting an alternative conclusion. Pls. Mot. at 33–34; id.at
34, 36 (citing Allegheny Ludlum Corp. v. United States, 112 F. Supp. 2d 1141, 1165
(Ct. Int'l Trade 2000)).  Plaintiffs' argument is unpersuasive.  As noted in the
Initiation Checklist, Commerce acknowledged and addressed Plaintiffs submissions
and ultimately found them unconvincing, see Attach. II at 9–21 (discussing and
rejecting Plaintiffs' submissions), thus underscoring the Court's conclusion that
Plaintiffs' claims of exceptional circumstances amount to factual disagreements.

Court No. 22-00343                                                                    Page 23

**PUBLIC VERSION**

failed to ensure that finishing operations were not counted twice and thus potentially

distorting the data on which the initiation was based.  Pls. Mot. at 27–28; Pls. Reply

at 9–10.    Defendant and Defendant-Intervenors counter that initiation of the

investigation is supported by substantial evidence and that Plaintiffs' double

counting concerns are meritless.  Def. Resp. at 18, 23–24; Def.-Ints. Resp. at 14–15.

Because Commerce did not adequately address Plaintiffs' concerns and record

evidence that finishing operations were not counted twice, the Court remands this

issue for further explanation or reconsideration.

　　　Commerce must determine domestic industry support by evaluating the total

"production of the domestic like product."  19 U.S.C. § 1673a(c)(4)(A)(ii).  Although

Commerce is afforded discretion in some respects to its choices in determining

industry support, such as its choice to poll the industry or extend the initiation

deadline as discussed above, its determination must nonetheless be supported by

substantial evidence.  See 19 U.S.C. § 1516a(b)(1)(B)(i).  To meet this threshold, the

Court must assess whether Commerce's action is reasonable in light of the entire

record, see Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir.

2006), and whatever "fairly detracts from its weight."  Universal Camera Corp. v.

NLRB, 340 U.S. 474, 488 (1951).  The reasonableness of Commerce's methodology

must factor considerations that run counter to its decision.  See Motor Vehicle Mfrs.

Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Substantial

evidence has been described as "such relevant evidence as a reasonable mind might

Court No. 22-00343                                                    Page 24
**PUBLIC VERSION**

accept as adequate to support a conclusion." See DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Here, Commerce fails to address record evidence indicating that certain domestic companies both produce and finish OCTG, leading to the inference that some domestic pipe may have been double counted in the industry support calculations.  Plaintiffs point to record evidence, specifically Petitioners Borusan Mannesmann and PTC Liberty Tubular's website, explaining that "it is unclear what portion . . . of operations involves actual pipe production, as opposed to finishing operations." See [Pls.'] Cmts. On Pets. Standing at 10, C.D. 12–18, P.D. 22–28 (Oct. 15, 2023) ("Pls. Oct. 15 Cmts.") (citing and explaining Borusan Mannesmann's and PTC Liberty Tubular's OCTG production information on their websites). Additionally, Plaintiffs point to record evidence that PTC Liberty Tubular was not identified as a producer in ITC's sunset review that was relied upon by both Petitioners and Commerce to calculate industry support. Id.; see Pls. Mot. at 27; Pls. Reply at 9–10; see also Attach. II at 4–6; Def. Resp. at 12–13. Based upon the sunset review, it would appear that PTC Liberty finished, but did not produce pipe, in which case it is unclear whether the pipe PTC Liberty finished had already been counted in the industry support calculations.  Thus, the record evidence leads to the reasonable inference, argued by Plaintiffs to Commerce, that there may be pipe that was counted for the purposes of industry support when it was produced and again when it was

Court No. 22-00343                                                        Page 25
**PUBLIC VERSION**

finished.  <u>See</u> Pls. Oct. 15 Cmts. at 10 (explaining that further processed production

may have been "included when calculating [P]etitioners' production in the [industry

support] calculation").[25]    Commerce may have reasons to reject this inference;

however, it must acknowledge consideration of such evidence and explain why it

nonetheless rejects the inference.

    Commerce does not address this record evidence and the double counting

inference at all, other than to claim it is meritless.  Commerce and Defendant only

argue that finishing operations are included in the scope of the investigation.  <u>See</u>

Attach. II at 14 (explaining "the scope and domestic like product of OCTG AD

investigations includes OCTG whether finished or unfinished" gives Commerce "no

reason to believe that these finishing operations should not be included as production

of the domestic like product").[26]    Commerce's explanation suggests that it did not

understand Plaintiffs' argument and therefore the Court must remand to allow

Commerce opportunity to respond.    Defendant's post hoc rationalizations are

---

[25]    To illustrate their double counting concern, Plaintiffs offer the following hypothetical: "[b]lindly accepting data that treats processed pipe as 'production' runs the clear risk of double counting: one ton of green tube produced by an OCTG producer could very well have been counted as two tons when the 'production' was reported by a processor."  Pls. Mot. at 27; <u>see also</u> Pls. Reply at 10.  .

[26]    In its response brief, Defendant reiterates Commerce's conclusion, referencing a 2014 investigation to argue "the proposed scope definition covered both finished and unfinished OCTG, and that the [International Trade Commission] has consistently counted OCTG finishing operations as domestic production."  Def. Resp. at 18 (citing <u>Certain [OCTG] From India, Korea, The Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam</u>, USITC Pub. 4489, Invs. Nos. 701-TA-499-500, 731-TA-1215–1217-1219–1223 (Sept. 14, 2014)).

Court No. 22-00343                                                         Page 26
**PUBLIC VERSION**

irrelevant, as it concedes Commerce did not address the record evidence that suggest

double counting was possible.  Oral Arg. at 53:00.

Defendant-Intervenors contend that Plaintiffs' concern was a "transparent

delaying tactic" having "no factual basis."  Def.-Ints. Resp. at 23.  Defendant-

Intervenors also argue that Petitioners certified their production data, in accordance

with governing regulations, "as accurate by both company officials and their counsel,"

allowing Commerce to rely on them "as it always does with the volumes of information

submitted pursuant to such certifications."  Id. at 23 (citing 19 C.F.R. §§ 351.303(g);[27]

207.3(a)).[28]  Defendant-Intervenors' assertion that Plaintiffs arguments were made

---

[27] The relevant portion of 19 C.F.R. § 351.303(g) reads as follows:
> (g) Certifications. Each submission containing factual information must include the following certification from the person identified in paragraph (g)(1) of this section and, in addition, if the person has legal counsel or another representative, the certification in paragraph (g)(2) of this section.  The certifying party must maintain the original signed certification for a period of five years from the date of filing the submission to which the certification pertains. The original signed certification must be available for inspection by U.S. Department of Commerce officials. Copies of the certifications must be included in the submission filed at the Department.

19 C.F.R. § 351.303(g).

[28] The relevant portion of 19 C.F.R. § 207.3(a) reads as follows:
> (a) Certification.  Any person submitting factual information on behalf of the petitioner or any other interested party for inclusion in the record, and any person submitting a response to a Commission questionnaire, must certify that such information is accurate and complete to the best of the submitter's knowledge.

19 C.F.R. § 207.3(a).

Court No. 22-00343                                                                                           Page 27
**PUBLIC VERSION**

only to delay is conclusory.  Further, mere reference to the Petitioners' certifications

fail to address the argument made by Plaintiff.

Commerce fails to respond to record evidence suggesting the possibility of

double counting within the industry support calculations, and therefore the Court

cannot conclude that Commerce's determination is supported by substantial

evidence.  See Universal Camera Corp., 340 U.S. at 488 ("The substantiality of

evidence must take into account whatever in the record fairly detracts from its

weight").  Accordingly, the Court remands determination on the double counting issue

to Commerce for further explanation or reconsideration.

<p align="center">**CONCLUSION**</p>

For the foregoing reasons, the Court sustains Commerce's determination to

rely on other information rather than poll the industry to calculate industry support

for the AD investigation petition for OCTG from Argentina.  Commerce's

determination that the data relied upon accurately reflected industry support,

including whether finishing operations were counted twice, is remanded for further

explanation or reconsideration.  In accordance with the foregoing, it is

**ORDERED** that the final results, see ECF No. 35-2, are remanded for further

explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the

Court within 90 days of this date; and it is further

Court No. 22-00343                                                                    Page 28
**PUBLIC VERSION**

    **ORDERED** that the parties shall have 30 days to file comments on the remand

redetermination; and it is further

    **ORDERED** that the parties shall have 30 days to file their replies to the

comments on the remand redetermination; and it is further

    **ORDERED** that the parties shall file the joint appendix within 14 days after

the filing of replies to the comments on the remand redetermination; and it is further

    **ORDERED** that commerce shall file the administrative record within 14 days

of the date of filing its remand redetermination.


                    /s/ Claire R. Kelly
                    Claire R. Kelly, Judge


Dated:      March 14, 2024
           New York, New York

3/4/24, 4:29 PM    Case 1:22-cv-00343-CRK    Document 61-1    SEALED    Britannica Dictionary    Filed 03/14/24    Page 1 of 1

# The Britannica Dictionary



---

**or** 🔊

/ˈoɚ/ /ə/

*conjunction*

**1** — used to introduce another choice or possibility

> [+] Example sentences

**2** — used in negative statements to introduce something else that is also true

> [+] Example sentences

**3** — used to say what will happen if a specified thing is not done

> [+] Example sentences

**4** — used to introduce another number or amount that is possibly the correct one

> [+] Example sentences

**5** — used to introduce the reason why something said previously is true

> [+] Example sentences

**6 a** — used to introduce a word or phrase that defines or explains what another word or phrase means

> [+] Example sentences

**b** — used to introduce a word or phrase that corrects or states more precisely something you have just said

> [+] Example sentences

**or else**

— see ¹ELSE

**or so**

— see ²SO

Appx075

22 results for "or"

Advanced search

| | |
|---|---|
| **c1175–** | **or, conj.¹** |
| | Used to coordinate two (or more) sentence elements between which there is an alternative. In general use, coordinating noun phrases, adjectival… |
| **Old English–** | **or, adv.¹, prep., & conj.²** |
| | Early, at an early hour; = ere, adv.¹ A.1(a). Obsolete. |
| **1968–** | **O.R., n.** |
| | Operating room. |
| **1942–** | **O.R., n.** |
| | Other ranks. |
| **1437–** | **or, n.¹** |
| | Heraldry. Gold or yellow in armorial blazoning. |
| **1947–** | **OR, n.²** |
| | A Boolean operator that has the value unity if at least one of the operands is unity, and is otherwise zero; more fully inclusive or (corresponding… |
| **c1429–** | **or, adv.²** |
| | Misinterpretation of or, conj.¹ as an introductory particle meaning 'now': see quot. 1500 at or, conj.¹ 4a. |
| **1970–** | **OR, v.** |
| | transitive. To combine using a Boolean or operator. |
| **1953–** | **OR, n.** |
| | Operational research. |
| | **or-, prefix** |
| | Forming nouns and adjectives with various senses; the latter esp. with the sense 'without (that which is designated by the second element)'. |
| | **-or, suffix** |

Appx076

| | |
|---|---|
| | (Not productive in English.) Forming nouns of condition, as error, n., horror, n., liquor, n., livor, n., mucor, n., pallor, n., squalor, n., tenor... |
| **1785–** | **or., in ors., pron.**<br>As a graphic abbreviation in the titles of legal cases, preceded by and: others. Also occasionally in singular: one other. |
| **Old English–** | **or, variant of your, pron. & adj.**<br>Belonging or relating to the person or people being addressed; which you have, hold, or possess. With plural reference. Cf. you, pron. A.I |
| **Old English–** | **or, variant of our, pron. & adj.**<br>Belonging to or associated with the speaker and one or more other people previously mentioned or easily identified; belonging to or associated with... |
| **Old English–** | **or, variant of over, adv. & int.**<br>From one point to another across an intervening space. |
| **Old English–** | **or, variant of ore, n.[2]**<br>A naturally occurring solid material containing a precious or useful metal in such quantity and in such chemical combination as to make its... |
| **Old English–** | **or, variant of ere, adv.[1], prep., conj., adj.**<br>Before (in time). Also in compounds. ere-yesterday n. Obsolete the day before yesterday. |
| **Old English–** | **or, variant of oar, n.**<br>A long pole, traditionally of wood, widened and flattened at one end into a blade, used to propel or (less commonly) steer a boat by pressure against... |
| **Old English–1869** | **or, variant of her, pron.[1] & adj.[1]**<br>The genitive case of the third person plural personal pronoun hi, pron.[2] (subsequently they, pron.): of them; of themselves. |
| **Old English–1605** | **or, variant of ore, n.[1]**<br>Respect, reverence; honour, glory. in ore: in an honourable manner; honourably. |
| **Old English** | **or, variant of ore, n.[3]**<br>A beginning. |

**-or,** variant of -ory, suffix²

Forming adjectives, esp. adjectives designating someone or something that performs the action of the verb which constitutes the initial element.

## Results for "or" in:

- Quotation work title (3,454)

- Quotation text (316,908)

- Meanings (313)

- Definitions (342,553)

- Etymologies (41,590)

- Historical Thesaurus (9)

About OED                                    How to use the OED

Historical Thesaurus                         Purchasing

Editorial policy                             Help with access

Updates                                      World Englishes

Institutional Account management             Contribute

Accessibility                                Oxford University Press

Contact us                                   Oxford Languages

Upcoming events                              Oxford Academic

Case studies                                 Oxford Dictionary of National Biography

Media Enquiries

*Oxford University Press is a department of the University of Oxford. It furthers the University's objective of excellence in research, scholarship, and education by publishing worldwide*

Cookie policy    Privacy policy    Legal notice

Copyright © 2023 Oxford University Press

5

*Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*, 87 Fed. Reg. 70785 (Nov. 21, 2022)

P.R. 233

Public

Appx079-Appx081

# DEPARTMENT OF COMMERCE

## International Trade Administration

[A–357–824, A–201–856, A–821–833]

## Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the U.S. Department of Commerce (Commerce) and the U.S. International Trade Commission (ITC), Commerce is issuing antidumping duty (AD) orders on oil country tubular goods (OCTG) from Argentina, Mexico, and the Russian Federation (Russia). In addition, Commerce is amending its final determination with respect to OCTG from Russia to correct a ministerial error.

**DATES:** Applicable November 21, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dmitry Vladimirov (Argentina), Yang Chun or Emily Bradshaw (Mexico), and George McMahon or Michael Heaney (Russia), AD/CVD Operations, Offices I and VI, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0665, (202) 482–5760, (202) 482–3986, (202) 482–1167, or (202) 482–4475, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

In accordance with sections 735(d) and 777(i) of the Tariff Act of 1930, as amended (the Act), on October 5, 2022, Commerce published its affirmative final determinations in the less-than-fair-value (LTFV) investigations of OCTG from Argentina, Mexico, and Russia.[1] In the investigation of OCTG from Russia, JSC Vyksa Steel Works (OMK/VSW) submitted a timely allegation that Commerce made a ministerial error in the final AD

determination.[2] We reviewed the allegation and determined that we made a ministerial error in the final AD determination on OCTG from Russia. *See* "Amendment to the Final Determination for Russia" section below for further discussion. On November 14, 2022, the ITC notified Commerce of its final determinations, pursuant to section 735(d) of the Act, that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act by reason of LTFV imports of OCTG from Argentina, Mexico, and Russia.[3]

### Scope of the Orders

The products covered by these orders are OCTG from Argentina, Mexico, and Russia. For a complete description of the scope of these orders, *see* the appendix to this notice.

### Amendment to the Final Determination for Russia

On September 30, 2022, OMK/VSW timely alleged that Commerce made a certain ministerial error in the *Russia Final Determination* with respect to the dumping margin assigned to OMK/VSW.[4] No other party made an allegation of ministerial errors or submitted a rebuttal to OMK/VSW's ministerial error allegation under 19 CFR 351.224(c)(3). Commerce reviewed the record and, on October 26, 2022, agreed that the error alleged by OMK/VSW constituted a ministerial error within the meaning of section 735(e) of the Act and 19 CFR 351.224(f).[5] Specifically, Commerce found that it made an inadvertent error in not converting into U.S. dollars a certification expense reported by OMK/VSW in Russian rubles.[6] Pursuant to 19 CFR 351.224(e), Commerce is amending the *Russia Final Determination* to reflect the correction of the ministerial error, as described in the Ministerial Error Memorandum.[7] Based on the correction, OMK/VSW's final dumping margin changed from 12.84 to 12.01 percent. As a result, we are also revising the all-others rate from 12.84 to 12.01 percent.

The amended estimated weighted-average dumping margins are listed in the "Estimated Weighted-Average Dumping Margins" section below.

### Antidumping Duty Orders

On November 14, 2022, in accordance with section 735(d) of the Act, the ITC notified Commerce of its final determinations in these investigations, in which it found that an industry in the United States is materially injured by reason of imports of OCTG from Argentina, Mexico, and Russia. Therefore, in accordance with section 735(c)(2) of the Act, Commerce is issuing these AD orders. Because the ITC determined that imports of OCTG from Argentina, Mexico, and Russia are materially injuring a U.S. industry, unliquidated entries of such merchandise from Argentina, Mexico, and Russia, entered or withdrawn from warehouse for consumption, are subject to the assessment of ADs.

Therefore, in accordance with section 736(a)(1) of the Act, Commerce will direct U.S. Customs and Border Protection (CBP) to assess, upon further instruction by Commerce, ADs equal to the amount by which the normal value of the merchandise exceeds the export price (or constructed export price) of the merchandise, for all relevant entries of OCTG from Argentina, Mexico, and Russia. With the exception of entries occurring after the expiration of the provisional measures period and before publication of the ITC's final affirmative injury determinations, as further described below, antidumping duties will be assessed on unliquidated entries of OCTG from Argentina, Mexico, and Russia, entered, or withdrawn from warehouse, for consumption, on or after May 11, 2022, the date of publication of the *Preliminary Determinations*.[8]

### Continuation of Suspension of Liquidation and Cash Deposits

Except as noted in the "Provisional Measures" section of this notice, in accordance with section 735(c)(1)(B) of

---

[1] *See Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,* 87 FR 59054 (September 29, 2022); *Oil Country Tubular Goods from Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances,* 87 FR 59041 (September 29, 2022); and *Oil Country Tubular Goods from the Russian Federation: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances Determination, in Part,* 87 FR 59045 (September 29, 2022) (*Russia Final Determination*).

[2] *See* OMK/VSW's Letter, "Oil Country Tubular Goods from the Russian Federation: OMK's Ministerial Error Comments," dated September 30, 2022 (Ministerial Error Allegation).

[3] *See* ITC's Letter, Investigation Nos. 701–TA–671–672 and 731–TA–1571–1573 (Final), dated November 14, 2022.

[4] *See* Ministerial Error Allegation.

[5] *See* Memorandum, "Antidumping Duty Investigation of Oil Country Tubular Goods from the Russian Federation: Allegation of Ministerial Error in the Final Determination," dated October 26, 2022 (Ministerial Error Memorandum).

[6] *See* Memorandum, "Amended Final Analysis Memorandum for JSC Vyksa Steel Works," dated October 26, 2022.

[7] *Id.*

[8] *See Oil Country Tubular Goods from Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,* 87 FR 28801 (May 11, 2022); *Oil Country Tubular Goods from Mexico: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,* 87 FR 28808 (May 11, 2022); and *Oil Country Tubular Goods from the Russian Federation: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Critical Circumstances Determination, Postponement of Final Determination, and Extension of Provisional Measures,* 87 FR 28804 (May 11, 2022) (collectively, *Preliminary Determinations*).

**70786**    **Federal Register** / Vol. 87, No. 223 / Monday, November 21, 2022 / Notices

the Act, Commerce will instruct CBP to continue to suspend liquidation on all relevant entries of OCTG from Argentina, Mexico, and Russia. These instructions suspending liquidation will remain in effect until further notice.

Commerce will also instruct CBP to require cash deposits equal to the estimated weighted-average dumping margins indicated in the tables below. Accordingly, effective on the date of publication in the **Federal Register** of the notice of the ITC's final affirmative injury determinations, CBP will require, at the same time as importers would normally deposit estimated duties on subject merchandise, a cash deposit equal to the rates listed in the table below. The all-others rate applies to all producers or exporters not specifically listed, as appropriate.

**Estimated Weighted-Average Dumping Margins**

The estimated weighted-average dumping margins are as follows:

| Exporter or producer | Estimated weighted-average dumping margin (percent) | |
|---|---|---|
| Argentina: | | |
| Siderca S.A.I.C ............... | 78.30 | |
| All Others ............... | 78.30 | |
| Mexico: | | |
| Tubos de Acero de Mexico, S.A ............... | 44.93 | |
| All Others ............... | 44.93 | |

| Exporter or producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offset(s)) (percent) |
|---|---|---|
| Russia: | | |
| JSC Vyksa Steel Works ............... | 12.01 | 11.70 |
| Volzhsky Pipe Plant, Joint Stock Company; Public Joint-Stock Company Trubnaya Metallurgicheskaya Kompaniya; Sinarsky Pipe Plant, Joint Stock Company; Seversky Pipe Plant, Joint Stock Company; Taganrog Metallurgical Plant, Joint Stock Company; Pervouralsk Pipe Plant, Joint Stock Company; Chelyabinsk Pipe Plant, Joint Stock Company; Orsky Machine Building Plant, Joint Stock Company * ............... | 184.21 | 184.21 |
| All Others ............... | 12.01 | 11.87 |

* Rate based on adverse facts available.

**Provisional Measures**

Section 733(d) of the Act states that suspension of liquidation pursuant to an affirmative preliminary determination may not remain in effect for more than four months, except where exporters representing a significant proportion of exports of the subject merchandise request that Commerce extend the four-month period to no more than six months. At the request of exporters that account for a significant proportion of OCTG from Argentina, Mexico, and Russia, Commerce extended the four-month period to six months in each of these investigations. Commerce published the *Preliminary Determinations* on May 11, 2022.[9]

The extended provisional measures period, beginning on the date of publication of the *Preliminary Determinations,* ended on November 6, 2022. Therefore, in accordance with section 733(d) of the Act and our practice,[10] Commerce will instruct CBP to terminate the suspension of

liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of OCTG from Argentina, Mexico, and Russia entered or withdrawn from warehouse, for consumption after November 6, 2022, the final day on which the provisional measures were in effect, until and through the day preceding the date of publication of the ITC's final affirmative injury determinations in the **Federal Register**. Suspension of liquidation and the collection of cash deposits will resume on the date of publication of the ITC's final determinations in the **Federal Register**.

**Establishment of the Annual Inquiry Service Lists**

On September 20, 2021, Commerce published the final rule titled ''*Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*'' in the **Federal Register**.[11] On September 27, 2021, Commerce also published the notice titled ''*Scope Ruling Application; Annual Inquiry Service List; and Informational Sessions*'' in the **Federal**

**Register**.[12] The *Final Rule* and *Procedural Guidance* provide that Commerce will maintain an annual inquiry service list for each order or suspended investigation, and any interested party submitting a scope ruling application or request for circumvention inquiry shall serve a copy of the application or request on the persons on the annual inquiry service list for that order, as well as any companion order covering the same merchandise from the same country of origin.[13]

In accordance with the *Procedural Guidance,* for orders published in the **Federal Register** after November 4, 2021, Commerce will create an annual inquiry service list segment in Commerce's online e-filing and document management system, Antidumping and Countervailing Duty Electronic Service System (ACCESS), available at *https://access.trade.gov,* within five business days of publication of the notice of the order. Each annual inquiry service list will be saved in ACCESS, under each case number, and

---

[9] *Id.*

[10] *See, e.g., Certain Corrosion-Resistant Steel Products from India, India, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders,* 81 FR 48390, 48392 (July 25, 2016).

[11] *See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,* 86 FR 52300 (September 20, 2021) (*Final Rule*).

[12] *See Scope Ruling Application; Annual Inquiry Service List; and Informational Sessions,* 86 FR 53205 (September 27, 2021) (*Procedural Guidance*).

[13] *Id.*

under a specific segment type called "AISL-Annual Inquiry Service List." [14]

Interested parties who wish to be added to the annual inquiry service list for an order must submit an entry of appearance to the annual inquiry service list segment for the order in ACCESS within 30 days after the date of publication of the order. For ease of administration, Commerce requests that law firms with more than one attorney representing interested parties in an order designate a lead attorney to be included on the annual inquiry service list. Commerce will finalize the annual inquiry service list within five business days thereafter. As mentioned in the *Procedural Guidance,* the new annual inquiry service list will be in place until the following year, when the *Opportunity Notice* for the anniversary month of the order is published.

Commerce may update an annual inquiry service list at any time as needed based on interested parties' amendments to their entries of appearance to remove or otherwise modify their list of members and representatives, or to update contact information. Any changes or announcements pertaining to these procedures will be posted to the ACCESS website at *https://access.trade.gov.*

## Special Instructions for Petitioners and Foreign Governments

In the *Final Rule,* Commerce stated that, "after an initial request and placement on the annual inquiry service list, both petitioners and foreign governments will automatically be placed on the annual inquiry service list in the years that follow." [15] Accordingly, as stated above, the petitioners and foreign governments should submit their initial entry of appearance after publication of this notice in order to appear in the first annual inquiry service list. Pursuant to 19 CFR 351.225(n)(3), the petitioners and foreign governments will not need to resubmit their entries of appearance each year to continue to be included on the annual inquiry service list. However, the petitioners and foreign

governments are responsible for making amendments to their entries of appearance during the annual update to the annual inquiry service list in accordance with the procedures described above.

## Notification to Interested Parties

This notice constitutes the AD orders with respect to OCTG from Argentina, Mexico, and Russia pursuant to section 736(a) of the Act. Interested parties can find a list of AD orders currently in effect at *https://www.trade.gov/data-visualization/adcvd-proceedings.*

The amended Russia final determination and these AD orders are published in accordance with sections 735(e) and 736(a) of the Act and 19 CFR 351.224(e) and 19 CFR 351.211(b).

Dated: November 16, 2022

**Lisa W. Wang,**

*Assistant Secretary for Enforcement and Compliance.*

## Appendix—Scope of the Orders

The merchandise covered by these orders is certain OCTG, which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than case iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (*e.g.,* whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of these orders also covers OCTG coupling stock.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise processed in a third country, including by performing any heat treatment, cutting, upsetting, threading, coupling, or any other finishing, packaging, or processing that would not otherwise remove the merchandise from the scope of these orders if performed in the country of manufacture of the OCTG.

Excluded from the scope of these orders are: casing, tubing, or coupling stock containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

The merchandise subject to these orders is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7304.29.1010, 7304.29.1020, 7304.29.1030, 7304.29.1040, 7304.29.1050, 7304.29.1060, 7304.29.1080, 7304.29.2010, 7304.29.2020, 7304.29.2030, 7304.29.2040, 7304.29.2050, 7304.29.2060, 7304.29.2080, 7304.29.3110, 7304.29.3120, 7304.29.3130, 7304.29.3140, 7304.29.3150, 7304.29.3160, 7304.29.3180, 7304.29.4110, 7304.29.4120, 7304.29.4130, 7304.29.4140, 7304.29.4150, 7304.29.4160, 7304.29.4180, 7304.29.5015, 7304.29.5030, 7304.29.5045, 7304.29.5060, 7304.29.5075, 7304.29.6115, 7304.29.6130, 7304.29.6145, 7304.29.6160, 7304.29.6175,

7305.20.2000, 7305.20.4000, 7305.20.6000, 7305.20.8000, 7306.29.1030, 7306.29.1090, 7306.29.2000, 7306.29.3100, 7306.29.4100, 7306.29.6010, 7306.29.6050, 7306.29.8110, and 7306.29.8150.

The merchandise subject to these orders may also enter under the following HTSUS item numbers: 7304.39.0024, 7304.39.0028, 7304.39.0032, 7304.39.0036, 7304.39.0040, 7304.39.0044, 7304.39.0048, 7304.39.0052, 7304.39.0056, 7304.39.0062, 7304.39.0068, 7304.39.0072, 7304.39.0076, 7304.39.0080, 7304.59.6000, 7304.59.8015, 7304.59.8020, 7304.59.8025, 7304.59.8030, 7304.59.8035, 7304.59.8040, 7304.59.8045, 7304.59.8050, 7304.59.8055, 7304.59.8060, 7304.59.8065, 7304.59.8070, 7304.59.8080, 7305.31.4000, 7305.31.6090, 7306.30.5055, 7306.30.5090, 7306.50.5050, and 7306.50.5070.

The HTSUS subheadings and specifications above are provided for convenience and customs purposes only. The written description of the scope of these orders is dispositive.

[FR Doc. 2022–25401 Filed 11–18–22; 8:45 am]

**BILLING CODE 3510–DS–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

## Notice of Scope Rulings

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable November 21, 2022.

**SUMMARY:** The U.S. Department of Commerce (Commerce) hereby publishes a list of scope rulings and circumvention determinations made during the period July 1, 2022, through September 30, 2022. We intend to publish future lists after the close of the next calendar quarter.

**FOR FURTHER INFORMATION CONTACT:** Marcia E. Short, AD/CVD Operations, Customs Liaison Unit, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Ave NW, Washington, DC 20230; telephone: 202–482–1560.

**SUPPLEMENTARY INFORMATION:**

## Background

Commerce regulations provide that it will publish in the **Federal Register** a list of scope rulings on a quarterly basis.[1] Our most recent notification of scope rulings was published on August 25, 2022.[2] This current notice covers all scope rulings and scope ruling/ circumvention determination combinations made by Enforcement and

---

[14] This segment will be combined with the ACCESS Segment Specific Information (SSI) field, which will display the month in which the notice of the order or suspended investigation was published in the **Federal Register**, also known as the anniversary month. For example, for an order under case number A–000–000 that published in the **Federal Register** in January, the relevant segment and SSI combination will appear in ACCESS as "AISL-January Anniversary." Note that there will be only one annual inquiry service list segment per case number, and the anniversary month will be pre-populated in ACCESS.

[15] *See Final Rule,* 86 FR at 52335.

[1] *See* 19 CFR 351.225(o).

[2] *See Notice of Scope Rulings,* 87 FR 52359 (August 25, 2022).

6

*Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg. 59054

(Sep. 29, 2022)

P.R. 226

Public

Appx082-Appx084

Eastern Time on the due dates set forth in this notice. Note that Commerce has temporarily modified certain requirements for serving documents containing business proprietary information, until further notice.[11]

## Preliminary and Final Results of the CCRs

Commerce intends to publish in the **Federal Register** a notice of the preliminary results of these AD and CVD CCRs in accordance with 19 CFR 351.221(b)(4) and (c)(3)(i). Commerce will set forth its preliminary factual and legal conclusions in that notice. Unless extended, Commerce will issue the final results of these CCRs in accordance with the time limits set forth in 19 CFR 351.216(e).

## Notification to Interested Parties

This initiation notice is published in accordance with section 751(b)(1) of the Act and 19 CFR 351.221(b)(1).

Dated: September 22, 2022.

**Lisa W. Wang,**
*Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2022–21155 Filed 9–28–22; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–357–824]

### Oil Country Tubular Goods From Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) determines that imports of oil country tubular goods (OCTG) from Argentina are being, or are likely to be, sold in the United States at less than fair value (LTFV) during the period of investigation, October 1, 2020, through September 30, 2021.

**DATES:** Applicable September 29, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dmitry Vladimirov, AD/CVD Operations, Office I, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0665.

## SUPPLEMENTARY INFORMATION:

### Background

On May 11, 2022, Commerce published in the **Federal Register** its preliminary affirmative determination in the LTFV investigation of OCTG from Argentina, in which it also postponed the final determination until September 23, 2022.[1] We invited interested parties to comment on the *Preliminary Determination.* A summary of the events that occurred since Commerce published the *Preliminary Determination* may be found in the Issues and Decision Memorandum.[2]

### Scope of the Investigation

The product covered by this investigation is OCTG from Argentina. For a complete description of the scope of this investigation, *see* appendix I.

### Analysis of Comments Received

All issues raised in the case and rebuttal briefs that were submitted by parties in this investigation are addressed in the Issues and Decision Memorandum. A list of the issues addressed in the Issues and Decision Memorandum is attached to this notice at appendix II. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *https://access.trade.gov/public/FRNoticesListLayout.aspx.*

### Verification

Commerce was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation. However, in June 2022, we took additional steps in lieu of on-site verifications to verify the information relied upon in making this final determination, in accordance with section 782(i) of the Tariff Act of 1930, as amended (the Act). Specifically,

Commerce performed virtual verifications of the cost of production response, home market and U.S. sales responses, as well as a further-manufacturing cost response.[3]

### Changes Since the Preliminary Determination

Based on our analysis of the comments received, we made certain changes to the margin calculations for this final determination. For a discussion of these changes, *see* the "Changes from the Preliminary Determination" section of the Issues and Decision Memorandum.

### All-Others Rate

Section 735(c)(5)(A) of the Act provides that the estimated weighted-average dumping margin for all other producers and exporters not individually investigated shall be equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated excluding rates that are zero, *de minimis,* or determined entirely under section 776 of the Act (*i.e.,* facts otherwise available). Commerce calculated an individual estimated weighted-average dumping margin for Siderca S.A.I.C. (Siderca), the only individually examined producer or exporter in this investigation. Because the only individually calculated estimated weighted-average dumping margin is not zero, *de minimis,* or based entirely on facts otherwise available, the estimated weighted-average dumping margin calculated for all other producers and/or exporters is equal to the estimated weighted-average dumping margin calculated for the single examined respondent, Siderca, pursuant to section 735(c)(5)(A) of the Act.

### Final Negative Determination of Critical Circumstances

In accordance with section 735(a)(3) of the Act and 19 CFR 351.206(h), Commerce finds that critical

---

[11] *See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19; Extension of Effective Period,* 85 FR 41363 (July 10, 2020).

[1] *See Oil Country Tubular Goods from Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,* 87 FR 28801 (May 11, 2022) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, "Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina, and Final Negative Determination of Critical Circumstances," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[3] *See* Memoranda, "Verification of the Sales Questionnaire Response of Siderca S.A.I.C. in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina," dated June 30 2022; "Verification of the Sales Questionnaire Response of Tenaris Global Services (U.S.A.) Corporation in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina," dated June 30, 2022; "Virtual Verification of the Further Manufacturing Cost Response of Siderca S.A.I.C. in the Antidumping Duty Investigation of Oil Country Tubular Goods from Argentina," dated July 28, 2022; and "Virtual Verification of the Cost of Manufacturing Response of Siderca S.A.I.C. in the Antidumping Duty Investigation of Oil Country Tubular Goods from Argentina," dated July 28, 2022.

Barcode:4287860-03 A-357-824 INV - Investigation -
**Federal Register**/Vol. 87, No. 188/Thursday, September 29, 2022/Notices    **59055**

circumstances do not exist for all companies in Argentina. For a full description of the methodology and results of Commerce's critical circumstances analysis, *see* the ''Final Negative Determination of Critical Circumstances'' section of the Issues and Decision Memorandum.

### Final Determination

The final estimated weighted-average dumping margins are as follows:

| Exporter or producer | Estimated weighted-average dumping margin (percent) |
|---|---|
| Siderca S.A.I.C ........................... | 78.30 |
| All Others ................................... | 78.30 |

### Disclosure

Commerce intends to disclose its calculations and analysis performed to interested parties in this final determination within five days of any public announcement or, if there is no public announcement, within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b).

### Continuation of Suspension of Liquidation

In accordance with section 735(c)(1)(B) of the Act, Commerce will instruct U.S. Customs and Border Protection (CBP) to continue the suspension of liquidation of all appropriate entries of subject merchandise, as described in appendix I of this notice, which were entered, or withdrawn from warehouse, for consumption on or after May 11, 2022, the date of publication of the *Preliminary Determination* in this investigation in the **Federal Register**. These suspension of liquidation instructions will remain in effect until further notice.

Pursuant to section 735(c)(1)(B)(ii) of the Act and 19 CFR 351.210(d), we will instruct CBP to require a cash deposit for estimated antidumping duties for such entries as follows: (1) the cash deposit rate for the companies listed above will be equal to the respondent-specific estimated weighted-average dumping margin determined in this final determination; (2) if the exporter is not a company identified above but the producer is identified above, then the cash deposit rate will be equal to the respondent-specific estimated weighted-average dumping margin established for that producer of the subject merchandise; and (3) the cash deposit rate for all other producers and exporters will be equal to the all-others

estimated weighted-average dumping margin.

As noted above, Commerce finds that critical circumstances do not exist for imports of OCTG from Argentina produced and exported by all companies. In accordance with section 735(c)(3) of the Act, Commerce will instruct CBP to terminate any retroactive suspension of liquidation required under section 733(e)(2) of the Act, and release any bond or other security, and refund any cash deposit required, under section 733(d)(1)(B) of the Act, with respect to entries of the merchandise the liquidation of which was suspended retroactively under section 733(e)(2) of the Act before May 11, 2022.

### U.S. International Trade Commission Notification

In accordance with section 735(d) of the Act, we will notify the International Trade Commission (ITC) of the final affirmative determination of sales at LTFV. Because Commerce's final determination is affirmative, in accordance with section 735(b)(2) of the Act, the ITC will make its final determination as to whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports or sales (or the likelihood of sales) for importation of OCTG no later than 45 days after this final determination. If the ITC determines that such injury does not exist, this proceeding will be terminated, and all cash deposits posted will be refunded and suspension of liquidation will be lifted. If the ITC determines that such injury does exist, Commerce will issue an antidumping order directing CBP to assess, upon further instruction by Commerce, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation, as discussed above in the ''Suspension of Liquidation'' section.

### Administrative Protective Order

This notice will serve as a final reminder to the parties subject to administrative protective order (APO) of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a sanctionable violation.

### Notification to Interested Parties

This determination and this notice are issued and published pursuant to sections 735(d) and 777(i)(1) of the Act, and 19 CFR 351.210(c).

Dated: September 23, 2022.

**Lisa W. Wang,**
*Assistant Secretary for Enforcement and Compliance.*

### Appendix I

**Scope of the Investigation**

The merchandise covered by this investigation is certain OCTG, which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (*e.g.,* whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of this investigation also covers OCTG coupling stock.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise processed in a third country, including by performing any heat treatment, cutting, upsetting, threading, coupling, or any other finishing, packaging, or processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the OCTG.

Excluded from the scope of the investigation are: casing, tubing, or coupling stock containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

The merchandise subject to this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7304.29.1010, 7304.29.1020, 7304.29.1030, 7304.29.1040, 7304.29.1050, 7304.29.1060, 7304.29.1080, 7304.29.2010, 7304.29.2020, 7304.29.2030, 7304.29.2040, 7304.29.2050, 7304.29.2060, 7304.29.2080, 7304.29.3110, 7304.29.3120, 7304.29.3130, 7304.29.3140, 7304.29.3150, 7304.29.3160, 7304.29.3180, 7304.29.4110, 7304.29.4120, 7304.29.4130, 7304.29.4140, 7304.29.4150, 7304.29.4160, 7304.29.4180, 7304.29.5015, 7304.29.5030, 7304.29.5045, 7304.29.5060, 7304.29.5075, 7304.29.6115, 7304.29.6130, 7304.29.6145, 7304.29.6160, 7304.29.6175, 7305.20.2000, 7305.20.4000, 7305.20.6000, 7305.20.8000, 7306.29.1030, 7306.29.1090, 7306.29.2000, 7306.29.3100, 7306.29.4100, 7306.29.6010, 7306.29.6050, 7306.29.8110, and 7306.29.8150.

The merchandise subject to this investigation may also enter under the following HTSUS item numbers: 7304.39.0024, 7304.39.0028, 7304.39.0032, 7304.39.0036, 7304.39.0040, 7304.39.0044, 7304.39.0048, 7304.39.0052, 7304.39.0056, 7304.39.0062, 7304.39.0068, 7304.39.0072, 7304.39.0076, 7304.39.0080, 7304.59.6000,

**59056**     **Federal Register** / Vol. 87, No. 188 / Thursday, September 29, 2022 / Notices

7304.59.8015, 7304.59.8020, 7304.59.8025, 7304.59.8030, 7304.59.8035, 7304.59.8040, 7304.59.8045, 7304.59.8050, 7304.59.8055, 7304.59.8060, 7304.59.8065, 7304.59.8070, 7304.59.8080, 7305.31.4000, 7305.31.6090, 7306.30.5055, 7306.30.5090, 7306.50.5050, and 7306.50.5070.

The HTSUS subheadings and specifications above are provided for convenience and customs purposes only. The written description of the scope of this investigation is dispositive.

## Appendix II

List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Changes from the *Preliminary Determination*
IV. Final Negative Determination of Critical Circumstances
V. Discussion of the Issues
  Comment 1: Constructed Export Price (CEP) Offset
  Comment 2: Third-Country Indirect Selling Expenses (ISE)
  Comment 3: Research and Development (R&D) Expenses for Further Manufacturing Costs
VI. Recommendation

[FR Doc. 2022–21184 Filed 9–28–22; 8:45 am]

BILLING CODE 3510-OS-P

## DEPARTMENT OF COMMERCE

### International Trade Administration

[C–580–913]

### Oil Country Tubular Goods From the Republic of Korea: Final Affirmative Countervailing Duty Determination

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and exporters of oil country tubular goods (OCTG) from the Republic of Korea (Korea). The period of investigation is January 1, 2020, through December 31, 2020.

**DATES:** Applicable September 29, 2022.

**FOR FURTHER INFORMATION CONTACT:** Jacob Garten or Melissa Porpotage, AD/CVD Operations, Office II, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–3342 or (202) 482–1413, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On March 14, 2022, Commerce published the *Preliminary*

*Determination* in the Federal Register.[1] For a complete description of the events that followed the *Preliminary Determination, see* the Issues and Decision Memorandum.[2] The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov*. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *https://access.trade.gov/public/FRNoticesListLayout.aspx*.

### Scope of the Investigation

The products covered by this investigation are OCTG from Korea. For a complete description of the scope of this investigation, see appendix I.

### Scope Comments

On March 7, 2022, concurrent with the issuance of the *Preliminary Determination,* we issued a Preliminary Scope Memorandum.[3] In the Preliminary Scope Decision Memorandum, Commerce established the deadline for parties to submit scope case briefs.[4] Commerce did not receive any comments from interested parties regarding the scope by the deadline. Consequently, we made no changes to the scope from the Preliminary Scope Decision Memorandum.

### Analysis of Subsidy Programs and Comments Received

The subsidy programs under investigation, and the issues raised in the case and rebuttal briefs by parties in this investigation, are discussed in the Issues and Decision Memorandum. For a list of the issues raised by parties, and to which we responded in the Issues and Decision Memorandum, *see* appendix II of this notice.

---

[1] *See Oil Country Tubular Goods from the Republic of Korea: Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination,* 87 FR 14248 (March 14, 2022) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, "Decision Memorandum for the Final Determination of the Countervailing Duty Investigation of Oil Country Tubular Goods from the Republic of Korea," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[3] *See* Memorandum, "Antidumping Duty Investigations of Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation and Countervailing Duty Investigations of Oil Country Tubular Goods from the Republic of Korea, and the Russian Federation: Preliminary Scope Decision Memorandum," dated March 7, 2022 (Preliminary Scope Memorandum).

[4] *Id.* at 4.

### Methodology

Commerce conducted this investigation in accordance with section 701 of the Tariff Act of 1930, as amended (the Act). For each of the subsidy programs found to be countervailable, Commerce determines that there is a subsidy, *i.e.,* a financial contribution by an "authority" that gives rise to a benefit to the recipient and that the subsidy is specific.[5] For a full description of the methodology underlying our final determination, *see* the Issues and Decision Memorandum.

In making this final determination, Commerce relied, in part, on facts otherwise available, including adverse facts available (AFA), pursuant to sections 776(a) and (b) of the Act. For a full discussion of our application of AFA, *see* the section "Use of Facts Available and Adverse Inferences" in the accompanying Issues and Decision Memorandum.

### Verification

As provided in section 782(i) of the Act, in August 2022, Commerce verified the subsidy information reported by Hyundai Steel Company (Hyundai Steel),[6] SeAH Steel Corporation (SeAH Steel), and the Government of Korea. We used standard verification procedures, including an examination of relevant accounting records and original source documents provided by the respondents.

### Changes Since the Preliminary Determination

Based on our review and analysis of the information received at verification and comments received from parties, we made certain changes to the subsidy rate calculations for Hyundai Steel and SeAH Steel. As a result of these changes, Commerce also revised the all-others rate. For a discussion of these changes, *see* the Issues and Decision Memorandum.

### All-Others Rate

In accordance with section 705(c)(1)(B)(i)(I) of the Act, we calculated an individual estimated countervailable subsidy rate for the two mandatory respondents, Hyundai Steel and SeAH Steel. Section 705(c)(5)(A)(i) of the Act states that, for companies not individually investigated, Commerce will determine an all-others rate equal

---

[5] *See* sections 771(5)(B) and (D) of the Act regarding financial contribution; section 771(5)(E) of the Act regarding benefit; and section 771(5A) of the Act regarding specificity.

[6] Hyundai Steel Company is the same respondent from the *Preliminary Determination,* where we incorrectly stated the company's name as Hyundai Steel Corporation.

7

*Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina, and Final Negative Determination of Critical Circumstances*

(Sep. 23, 2022)

P.R. 220

Public

Appx085-Appx113



Barcode:4287860-02 A-357-824 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-357-824
Investigation
**Public Document**
E&C/OI:  DV

September 23, 2022

**MEMORANDUM TO:**    Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

**FROM:**    James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

**SUBJECT:**    Issues and Decision Memorandum for the Final Affirmative
Determination in the Less-Than-Fair-Value Investigation of Oil
Country Tubular Goods from Argentina, and Final Negative
Determination of Critical Circumstances

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) finds that oil country tubular goods (OCTG)
from Argentina are being, or are likely to be, sold in the United States at less than fair value
(LTFV), as provided in section 735 of the Tariff Act of 1930, as amended (the Act).  The period
of investigation (POI) is October 1, 2020, through September 30, 2021.

After analyzing the comments submitted by interested parties, we have made certain changes to
the *Preliminary Determination* with respect to the margin calculation for Siderca S.A.I.C.
(Siderca), the sole mandatory respondent in this proceeding.  We recommend that you approve
the positions described in the "Discussion of the Issues" section of this memorandum.

Below is the complete list of the issues for which we received comments from interested parties:

Comment 1:    Constructed Export Price (CEP) Offset
Comment 2:    Third-Country Indirect Selling Expenses (ISE)
Comment 3:    Research and Development (R&D) Expenses for Further Manufacturing
Costs

## II.    BACKGROUND

On May 11, 2022, Commerce published in the *Federal Register* its *Preliminary Determination*.[1]
Following the *Preliminary Determination*, Commerce issued a post-preliminary determination

---

[1] *See Oil Country Tubular Goods from Argentina:  Preliminary Affirmative Determinations of Sales at Less Than
Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional*

supplemental questionnaire to Siderca, regarding certain further manufacturing issues.[2]  We received a timely-filed response to this questionnaire from Siderca on May 24, 2022.[3]

Commerce was unable to conduct on-site verifications of the information relied upon in making the final determination in this investigation.  However, in June 2022, we took additional steps in lieu of on-site verifications to verify the information relied upon in making this final determination, in accordance with section 782(i) of the Act.  Specifically, Commerce performed virtual verifications of the cost of production response, home market and U.S. sales responses, as well as a further-manufacturing cost response.[4]

On August 1, 2022, we invited parties to comment on the *Preliminary Determination*.[5]  On August 8, 2022, Siderca and the petitioners[6] submitted respective case briefs for consideration in this final determination.[7]  On August 15, 2022, Siderca and the petitioners submitted respective rebuttal briefs.[8]  Although the petitioners filed a request for a hearing,[9] they later withdrew their request.[10]  As a result, we did not hold a hearing for this investigation.

---

*Measures*, 87 FR 28801 (May 11, 2022) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[2] *See* Commerce's Letter, "Antidumping Duty Investigation of Oil Country Tubular Goods from Argentina," dated May 17, 2022.

[3] *See* Siderca's Letter, "Oil Country Tubular Goods from Argentina:  Response to the Third Section E Supplemental Questionnaire," dated May 24, 2022.

[4] *See* Memoranda, "Verification of the Sales Questionnaire Response of Siderca S.A.I.C. in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina," dated June 30 2022; "Verification of the Sales Questionnaire Response of Tenaris Global Services (U.S.A.) Corporation in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina," dated June 30, 2022; "Virtual Verification of the Further Manufacturing Cost Response of Siderca S.A.I.C. in the Antidumping Duty Investigation of Oil Country Tubular Goods from Argentina," dated July 28, 2022; and "Virtual Verification of the Cost of Manufacturing Response of Siderca S.A.I.C. in the Antidumping Duty Investigation of Oil Country Tubular Goods from Argentina," dated July 28, 2022.

[5] *See* Memorandum, " Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina; Briefing Schedule," dated August 1, 2022.

[6] The petitioners in this investigation are Borusan Mannesmann Pipe U.S., Inc.; PTC Liberty Tubulars LLC; U.S. Steel Tubular Products, Inc.; the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC; and Welded Tube USA, Inc.

[7] *See* Siderca's Letter, "Oil Country Tubular Goods from Argentina:  Case Brief," dated August 8, 2022 (Siderca Case Brief); *see also* Petitioners' Letter, "Oil Country Tubular Goods from Argentina:  Case Brief of Petitioners," dated August 8, 2022 (Petitioners' Case Brief).

[8] *See* Siderca's Letter, "Oil Country Tubular Goods from Argentina:  Rebuttal Brief," dated August 15, 2022 (Siderca Rebuttal Brief); *see also* Petitioners' Letter, "Oil Country Tubular Goods from Argentina:  Petitioners' Rebuttal Brief," dated August 15, 2022, 2022 (Petitioners' Rebuttal Brief).

[9] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina:  U. S. Steel Tubular Products' Request for Public Hearing," dated June 10, 2022.

[10] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina:  U. S. Steel Tubular Products' Withdrawal of Request for Public Hearing," dated August 16, 2022.

Barcode:4287860-02 A-357-824 INV - Investigation -

## III.    CHANGES FROM THE *PRELIMINARY DETERMINATION*

For this final determination, we calculated CEP, normal value (NV), and cost of production (COP) for Siderca using the methodology stated in the *Preliminary Determination*,[11] except as follows:

- We implemented all minor pre-verification corrections identified by Siderca.
- We revised the calculation of general and administrative expenses (G&A) for further manufacturing costs.

## IV.    FINAL NEGATIVE DETERMINATION OF CRITICAL CIRCUMSTANCES

In the *Preliminary Determination*, we found imports of subject merchandise by Siderca, as well as by all other producers/exporters were massive, and thus, that critical circumstances existed with respect to imports of OCTG from Argentina shipped by all producers/exporters.[12]  Since the *Preliminary Determination*, we updated our critical circumstances analysis to incorporate Siderca's updated monthly shipment information and import data from Global Trade Atlas (GTA), which allow us to expand the base and comparison periods.

Specifically, because the petitions were filed on October 6, 2021, to determine whether there has been a massive surge in imports for Siderca, Commerce compared the total volume of shipments, reported by Siderca, during the period October 2021 through May 2022[13] with the volume of shipments during the preceding eight-month period of February 2021 through September 2021.[14] Based on this comparison, we determine that there were no massive imports of subject merchandise from Siderca[15] over a relatively short period pursuant to section 735(a)(3)(B) of the Act and 19 CFR 351.206.

For "all other producers and exporters," Commerce started with U.S. import data sourced from the U.S. Census Bureau and obtained via GTA, for the Harmonized Tariff Schedule of the United States (HTSUS) subheadings identified in the scope of the investigation for the periods February 2021 through September 2021, and October 2021 through May 2022.  We then subtracted shipments reported by Siderca for these same periods from U.S. import data. However, because the quantity of imports shown in the GTA data is smaller than that in Siderca's data,[16] we find the normal method of subtracting the mandatory respondent's data (*i.e.*, that of Siderca's) from the GTA data to be an unreliable indicator of the experience of the all-others companies for purposes of the "massive" determination.   Therefore, we are basing the "massive" finding for the non-individually investigated companies on the experience of

---

[11] *See Preliminary Determination* PDM.
[12] *Id*. at 21-25.
[13] Because the petition in this investigation was filed in the first half of a month, we treated that month as part of the comparison period.  *See, e.g.*, *Final Determination of Sales at Less Than Fair Value; Stainless Steel Sheet and Strip in Coils from Germany*, 64 FR 30710, 30729 (June 8, 1999); and *Notice of Final Determination of Sales at Less Than Fair Value:  Certain Steel Concrete Reinforcing Bars from Turkey*, 62 FR 9737, 9746 (March 4, 1997).
[14] *See* Memorandum, "Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina; Final Critical Circumstances Analysis," dated concurrently with this memorandum.
[15] *Id*.
[16] *Id*.

Filed By: Dmitry Vladimirov, Filed Date: 9/26/22 12:31 PM, Submission Status: Approved

Barcode:4287860-02 A-357-824 INV - Investigation  -

Siderca.[17]  Accordingly, we find that there were no massive imports of subject merchandise from all other producers and exporters in Argentina over a relatively short period pursuant to section 735(a)(3)(B) of the Act and 19 CFR 351.206.

Accordingly, for this final determination, we find that critical circumstances do not exist with respect to imports of OCTG from Argentina shipped by all producers/exporters within the meaning of section 735(a)(3) of the Act and 19 CFR 351.206(h).

## V.     DISCUSSION OF THE ISSUES

### Comment 1:  CEP Offset

In the *Preliminary Determination*, Commerce determined that the "qualitative analysis…which considers the documentation provided by Siderca…does not support an affirmative finding that the NV {level of trade} LOT was at a more advanced stage of distribution than the LOT of the CEP."[18]  This determination was based on the following synopsis of the outcome of our analysis:

> Siderca:  (1) did not provide sufficient and/or definitive source documentation, requested by Commerce in the initial and the supplemental questionnaires, that supports the performance of specific selling activities that Siderca claimed to have undertaken for reported home market channels of distribution; or (2) did not provide a sufficient/satisfactory explanation:  (a) establishing how the documentation provided supports Siderca's claim of having performed certain selling functions for home market channels of distributions; and (b) showing to what extent the claimed levels of intensity can be inferred from the documentation provided.[19]

In addition, in the *Preliminary Determination*, Commerce found the following:

> Siderca did not provide the quantitative analysis required by Commerce, as it requested in the initial and supplemental questionnaires, that shows how:  (1) the expenses for sales made at different claimed LOTs impact price comparability; or (2) the claimed levels of intensity for the selling activities reported in the selling functions chart are quantitatively supported.[20]

---

[17] *See Certain New Pneumatic Off-the-Road Tires from Sri Lanka:  Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Determination*, 81 FR 39900 (June 20, 2016), and accompanying PDM, at 6-8 (where we based our analysis for all other producers/exporters on the data of the sole mandatory respondent), unchanged in *Certain New Pneumatic Off-the-Road Tires from Sri Lanka:  Final Affirmative Countervailing Duty Determination, and Final Determination of Critical Circumstances*, 82 FR 2949 (January 10, 2017).

[18] *See Preliminary Determination* PDM at 16.

[19] *Id*. at 13.

[20] *Id*. at 16.

*Siderca's Case Brief*

Commerce should reconsider its decision in the final determination and grant Siderca a CEP offset.[21]

- The record demonstrates that Siderca's home-market sales are made at a more advanced LOT than the CEP LOT and that a CEP offset is warranted.[22]
  - The qualitative support Siderca provided, *i.e.*, narrative descriptions of its selling activities in the selling functions chart, sample documentation to support the activities and levels of intensity reported, including, *inter alia*, customer correspondence, training materials, and internal planning documents.[23] corroborates its reported selling functions.
    - A comparison of the selling functions undertaken by Siderca demonstrates that the LOT for Siderca's home market sales is more advanced than for Siderca's sales at the CEP LOT, and that a CEP offset is appropriate.[24]
    - Siderca summarizes the qualitative information provided in the record that supports each of the categories in the selling functions chart.[25]
    - Notably, Commerce described in the *Preliminary Determination* some of this information that Siderca provided, and it acknowledged that Siderca supported certain selling functions and concluded that support for the provision of certain activities was sufficient.[26]
  - Certain of the alleged deficiencies identified by Commerce in the *Preliminary Determination* can be answered through a closer review of the record.[27]
    - Commerce stated that Siderca did not explain: (1) whether the sample internal managerial forecast in Exhibit Supp. A3 is a product of Siderca's formal sales forecasting and planning processes; (2) how the drilling plans form the basis for Siderca's planning processes; or (3) whether similar documentation is prepared for Siderca's CEP sales.[28]  Contrary to Commerce's statements, the forecast in Exhibit Supp. A3 describes Siderca's managerial plans/activities and the documentation in Exhibit Supp. A3 also demonstrates that the customers' drilling plans feed directly into Siderca's managerial forecast and planning process.  Moreover, the record does not contain similar documentation prepared by Siderca for its CEP sales.[29]
    - Commerce also stated that, although Siderca provided excerpts of sample presentations, it did not explain, among other things, when they took place and "why … its level of intensity designations for the selling function category in question is appropriate."[30]  Contrary to Commerce's claim, the presentation in Exhibit Supp. A3 is dated during the POI.  Moreover, Siderca properly differentiated between the intensity of the provision of training services between home market channels based

---

[21] *See* Siderca's Case Brief at 1-2.
[22] *Id*. at 4.
[23] *Id*.
[24] *Id*. at 5.
[25] *Id*. at 6-9 (specific citations to record omitted).
[26] *Id*. at 9-10.
[27] *Id*. at 10.
[28] *Id*. at 11 (citing *Preliminary Determination* PDM at 13-14).
[29] *Id*.
[30] *Id*. (citing *Preliminary Determination* PDM at 14).

on the extent of the support Siderca provides during string design and selection of OCTG and other material.[31]

- Commerce also arbitrarily found as insignificant the number of instances Siderca's technical sales team worked with its home market customers that receive the full-service package to analyze OCTG performance, and questioned Siderca's reported high level of intensity designation for Home Market Channel 1 sales.[32]  However, the engineering services and technical support brochure provided in Exhibit A4 shows the range and complexity of technical services provided to these customers and, therefore, justifies Siderca's reported intensity level.[33]

- Commerce incorrectly maintains that management of Home Market Channel 1 customers' withdrawals of OCTG from the well and related communications is the "sole activity" distinguishing Home Market Channel 1 and Channel 2 home market sales.[34]  Siderca explained that for Home Market Channel 1 sales, Siderca also manages the customer relationship daily as the point of contact for customers that receive the full-service package.  A review of the sample email correspondence in Exhibit Supp. A3 demonstrates the high level of coordination between Siderca and the customer required to execute the selling activities.[35]

o Certain other alleged deficiencies identified by Commerce in the *Preliminary Determination* concern very specific information that Commerce did not request from Siderca and it should not be penalized for not providing it.[36]

- In the *Preliminary Determination*, Commerce stated that Siderca failed to explain "which domestic customers were given the presentations … {provided by Siderca}, … or how frequently the presentations in question were prevalent during the POI."[37]  Commerce also questioned "the prevalence of OCTG inspections in Siderca's warehouses during the POI for Channel 1 customers."[38]  Commerce also probed "how often {Siderca} manages{d} the withdrawal of OCTG from the well during the POI."[39]  All of these questions could have been answered in full by Siderca if Commerce had asked them in its supplemental questionnaires.[40]

- In several recent cases, Commerce granted respondents a CEP offset where the respondent did not provide specific information that Commerce had not requested in supplemental questionnaires regarding support related to its LOT analysis.[41]

- Similarly, here, Siderca could not provide information that Commerce did not request and consistent with its practice, Commerce should not penalize Siderca for not

---

[31] *Id*. at 12.
[32] *Id*. at 12 (citing *Preliminary Determination* PDM at 14).
[33] *Id*.
[34] *Id*. (citing *Preliminary Determination* PDM at 16).
[35] *Id*. at 13.
[36] *Id*. at 10, 13.
[37] *Id*. (citing *Preliminary Determination* PDM at 14).
[38] *Id*. (citing *Preliminary Determination* PDM at 15).
[39] *Id*.
[40] *Id*. at 13.
[41] *Id*. at 13 (citing *Granular Polytetrafluoroethylene Resin from India:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 FR 3772 (January 25, 2022) (*Polytetrafluoroethylene Resin from India*), and accompanying IDM, at 10; and *Welded Line Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 FR 38061 (June 27, 2022) (*Line Pipe from Korea*), and accompanying IDM, at 10).

    providing information that Commerce did not specifically request, or that Siderca could have anticipated would be required for Commerce's analysis.[42]

o  Siderca's quantitative analysis supports the levels of intensity for its reported selling activities.

    ▪ In its original questionnaire response, Siderca reported ISEs that reflect the different levels of selling expenses and related functions that Siderca performs for its home market versus its U.S. sales.  In the first supplemental Section B response, Siderca also explained the approach followed in its quantitative analysis.[43]

    ▪ Siderca's methodology for calculating these ISEs, and the resulting allocation of expenses to home market and U.S. sales results in the different level of expenses assigned to POI sales made at different levels of trade, which affects price comparability.[44]

    ▪ As shown in Siderca's quantitative analysis, its ISEs incurred in Argentina for home market sales are multiples of that for U.S. sales.  This difference reflects the additional expenses that correspond to the greater number of selling activities performed at a higher level of intensity for home market sales compared to sales at the CEP LOT.[45]

    ▪ In the *Preliminary Determination*, Commerce stated that "Siderca's distribution of {ISEs} … relied on arbitrary numbers that formed an integral part of how the distribution concepts were calculated."[46]  Contrary to Commerce's description, Siderca properly distributed the ISEs between the home market and the U.S. market based on the nature of the cost centers and general ledger accounts in its trial balance and a "distribution concept" that reflected (1) the "sales effort" required (*i.e.*, the degree of selling activities in each market), and (2) the total quantity of OCTG shipped to each market.[47]

    ▪ Commerce did not ask Siderca to further substantiate the "distribution concepts" reported in its quantitative analysis.  As discussed above, consistent with its past cases, Commerce should not penalize Siderca for not providing information that Commerce did not specifically request.[48]

*Petitioners' Rebuttal Brief*

• Siderca has not established a qualitative difference between selling functions in the home market and those in the U.S. market.

o  For each of the five sales activity categories included in Siderca's selling functions chart, Commerce reasonably found specific information lacking in detail necessary to be probative of the claimed differences in the selling functions performed in each market.[49]

---

[42] *Id*. at 14.
[43] *Id*.
[44] *Id*.
[45] *Id*. at 14-15.
[46] *Id*. at 15 (citing *Preliminary Determination* PDM at 17).
[47] *Id*.
[48] *Id*. (citing *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 26343 (May 4, 2022), and accompanying IDM at 13).
[49] *See* Petitioners' Rebuttal Brief at 3-4 (citing *Preliminary Determination* PDM at 14-16).

o Contrary to Siderca's claim that the record supports its reported selling functions, Siderca's brief merely repeats citations to the administrative record for the same factual information that Commerce's *Preliminary Determination* found lacking.[50]

o Siderca fails to address Commerce's findings squarely by either explaining why the type of activity the documentation purports to show demonstrates a meaningful difference in selling functions between the markets; or addressing Commerce's qualitative findings that the level of intensity for each selling function does not appear to be that different as between the home market and the U.S. CEP sales.[51]

o Siderca's limited engagement with Commerce's detailed rationale and factfinding in the *Preliminary Determination* does not actually address Commerce's concerns.

  ▪ First, Siderca claims that regarding Siderca's provision of sales support, Commerce should have inferred that the submitted drilling plans demonstrate that Siderca undertakes more planning processes in the home market.[52]

    (a) Commerce rejected this inference in the *Preliminary Determination*.[53]

    (b) Siderca merely claims that the absence of record information concerning drilling plans in the U.S. market demonstrates that there is a difference between the selling functions it performs in both markets. But the absence of information is not substantial evidence.[54]

    (c) Forecasts are not an indicium of intensity of planning/forecasting in the home market *vis-à-vis* the CEP market because drilling forecasts are always used by OCTG producers to determine overall demand for OCTG.[55]

  ▪ Second, Siderca claims that Commerce "arbitrarily found" the number of instances of training services provided in the home market to be insignificant.[56]

    (a) Commerce's finding was not arbitrary at all. Rather, Commerce noted the discrepancy between the use of technical support for the two home market channels and found lacking any information concerning the number of sales or transactions involved in receiving that technical support.[57]

    (b) Moreover, Commerce assessed the supporting documentation and found the technical support to be "limited in nature."[58]

  ▪ Third, Siderca claims that, regarding the "performance of sales related administrative activities" selling function, it provided evidence that it manages withdrawals of OCTG from the well "on a daily basis" in the home market and cites its response. Siderca fails to overcome Commerce's *Preliminary Determination* insofar as it cites to a questionnaire response that Commerce found deficient and Siderca points to no documentary support for its narrative response.[59]

---

[50] *Id*. at 5.
[51] *Id*.
[52] *Id*.
[53] *Id*. (citing *Preliminary Determination* PDM at 14).
[54] *Id*. at 5-6.
[55] *Id*. at 6 (citing *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Preliminary), USITC Pub. 5248 (November 2021), at 30).
[56] *Id*.
[57] *Id*. (citing *Preliminary Determination* PDM at 14).
[58] *Id*. (citing *Preliminary Determination* PDM at 14-15).
[59] *Id*. at 6-7 (citing *Preliminary Determination* PDM at 16).

- Siderca has not demonstrated a quantitative difference between selling functions in the home market and those in the U.S. market using documentary evidence under Commerce's practice.
  - As an initial matter, Commerce's practice of not using ISE ratios as support for selling activities has been upheld by the U.S. Court of International Trade.[60]
  - Siderca's reliance on its calculations of ISEs incurred in the home market for home market sales (INDIRSH) and ISEs incurred in the home market for U.S. sales (DINDIRS1U) is unresponsive to Commerce's question insofar as the INDIRSH and DINDIRS1U fields do not capture all the selling expenses reported in the selling functions chart and these fields do not distinguish between Siderca's two home market channels of distribution.[61]
  - DINDIRS1U and INDIRSH will, by their nature, necessarily capture some selling expenses, but the additional quantitative analysis requested for Commerce's LOT analysis takes generalized cost differences as the starting point, instructing respondents to "show{} how the expenses assigned to POI/POR sales made at different claimed levels of trade impact price comparability."[62]
  - Relying solely on comparing INDIRSH and DINDIRS1U when neither field accounts for costs associated with all the selling activities in the reported selling functions chart, highlights the inadequacy of Siderca's reporting. Commerce, thus, "lacks any means of corroborating LOT claims."[63] This gap in the record precludes Siderca from establishing its entitlement to a CEP offset.[64]
  - Additional gaps in Siderca's reporting only reinforce this conclusion.
    - As Commerce has stated, "{s}ubstantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing."[65] For example, Commerce must additionally examine "the level of selling expense for each type of sale."[66]
    - Whereas "the quantitative evidence is supposed to substantiate and explain the reported levels in the selling activities charts," Siderca's lump-them-together approach to providing quantitative support offers no indication as to why any selling activity in any channel was assigned a specific number.[67]
- Commerce should not accept Siderca's attempt to fault Commerce for its failure to establish entitlement to a favorable offset.

---

[60] *Id.* at 8 (citing *Andaman Seafood Co. v. United States*, 768 F. Supp. 2d 1315 (CIT 2011)).

[61] *Id.*

[62] *Id.* at 9 (citing Commerce's Letter, Initial AD Questionnaire, dated November 10, 2021, at A-7 to A-8 (Q.3.a)).

[63] *Id.* (citing *Certain Oil Country Tubular Goods from the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019-2020*, 86 FR 54928 (October 5, 2021) (*OCTG Korea AR6 Prelim*), and accompanying PDM, at 35).

[64] *Id.* (citing *Certain Oil Country Tubular Goods from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 20817 (April 8, 2022) (*OCTG Korea AR6 Final*), and accompanying IDM, at Comment 16).

[65] *Id.* at 10 (citing *Polyethylene Terephthalate Sheet from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value*, 85 FR 44276 (July 22, 2020) (*PET Sheet from Korea*), and accompanying IDM, at 17).

[66] *Id.*

[67] *Id.* (citing *OCTG Korea AR6 Final* IDM at Comment 16).

- o The respondent bears the burden of demonstrating its entitlement to a CEP offset permitted under section 773(a)(7)(B) of the Act.[68]
- o Commerce should continue to decline to apply a CEP offset to Siderca because Siderca "did not provide the quantitative evidence to demonstrate {its home market sales} were at a more advanced {LOT} than its CEP sales made to its U.S. affiliate." The determinative question is whether the record contains "necessary supporting source documentation."[69]
- o Here, despite Commerce generously providing Siderca an opportunity to supplement its woefully deficient initial questionnaire response, the record lacks the necessary supporting documentation.[70]
  - ▪ Commerce's initial questionnaire requested a quantitative analysis supporting the reported intensity levels, which Siderca failed to provide. Commerce notified Siderca of its deficient response and repeated its request that Siderca provide a quantitative analysis to support the intensity levels in the selling functions chart. Instead, Siderca resubmitted its calculation worksheets for fields INDIRSH and DINDIRS1U.[71]
- o Commerce's recent denials of CEP offsets under similar circumstances supports denying Siderca a CEP offset in this investigation.[72]
- o In *Rubber from Brazil* and *PET Sheet from Korea*, Commerce also explained the important policy reasons for requiring a quantitative analysis, namely, to avoid the potential for manipulation and to ground a CEP offset on objective data.[73]
- o In sum, Siderca's omission of quantitative evidence significantly impedes the analysis necessary before Commerce may grant a CEP offset.[74]

**Commerce's Position:** We continue to find that a CEP offset is not warranted for Siderca pursuant to section 773(a)(7)(B) of the Act.

Section 773(a)(1)(B)(i) of the Act states that, to the extent practicable, Commerce will calculate NV based on sales at the same LOT as the U.S. sales. Sales are made at different LOTs if they are made at different marketing stages (or their equivalent).[75] Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in

---

[68] *Id*. at 11 (citing *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 616 F. Supp. 2d 1354, 1374 (CIT 2009) (*Ad Hoc Shrimp*); *Corus Engineering Steels Ltd. v. United States*, 27 CIT 1286, 1290 (2003) (*Corus*); *Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327 (CIT 2010) (*Pakfood*); and 19 CFR 351.401(b)(1)).

[69] *Id*. at 11-12 (citing *OCTG Korea AR6 Prelim* PDM at 34-35, unchanged in *OCTG Korea AR6 Final* IDM at Comment 16).

[70] *Id*. at 12 (citing *PET Sheet from Korea* IDM at 20).

[71] *Id*. at 12-13 (citations to administrative record omitted).

[72] *Id*. at 13-15 (citing *OCTG Korea AR6 Final* IDM at Comment 16; *Emulsion Styrene-Butadiene Rubber from Brazil: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 38847 (June 29, 2020) (*Rubber from Brazil*), and accompanying IDM, at Comment 1; *PET Sheet from Korea* and accompanying IDM, at Comment 4; and *Utility Scale Wind Towers from Canada: Preliminary Affirmative Determination of Sales at Less-Than-Fair-Value, Preliminary Negative Determination of Critical Circumstances, and Postponement of Final Determination and Extension of Provisional Measures*, 85 FR 8562 (February 14, 2020), and accompanying PDM, at 15-16).

[73] *Id*. at 15 (citing *Rubber from Brazil* IDM at 10; and *PET Sheet from Korea* IDM at 20).

[74] *Id*. at 16.

[75] *See* 19 CFR 351.412(c)(2).

the stages of marketing.[76]  In order to determine whether the comparison market sales are at different stages in the marketing process than the U.S. sales, we examine the distribution system in each market, *i.e.*, the chain of distribution, including selling functions and class of customer (customer category), and the level of selling expenses for each type of sale.

Pursuant to section 773(a)(1)(B)(i) of the Act, in identifying LOTs for the EP and comparison market sales, *i.e.*, NV based on either home market or third-country prices,[77] we consider the starting prices before any adjustments.  For CEP sales, we consider only the selling activities reflected in the price after the deduction of expenses and profit under section 772(d) of the Act.[78] Where NV is based on CV, we determine the NV LOT based on the LOT of the sales from which we derive selling expenses, and profit for CV, where possible.[79]

When Commerce is unable to determine NV based on the sale prices of the foreign like product in the comparison market at the same LOT as the EP or CEP, Commerce may determine NV based on sale prices at a different LOT in the comparison market.  In comparing EP or CEP to NV based on sale prices at a different LOT in the comparison market, where available data make it possible, we make an LOT adjustment under section 773(a)(7)(A) of the Act.  Finally, for CEP sales only, if the NV LOT is at a more advanced stage of distribution than the LOT of the CEP and there are no available data for determining whether the difference in LOTs between NV and CEP affects price comparability, *i.e.*, no LOT adjustment is possible, Commerce will grant a CEP offset, as provided in section 773(a)(7)(B) of the Act.[80]

## A.  Qualitative LOT Analysis

In the *Preliminary Determination*, Commerce determined that the "qualitative analysis…which considers the documentation provided by Siderca … does not support an affirmative finding that the NV LOT was at a more advanced stage of distribution than the LOT of the CEP."[81] Specifically, Commerce determined the following:

> Siderca:  (1) did not provide sufficient and/or definitive source documentation, requested by Commerce in the initial and the supplemental questionnaires, that supports the performance of specific selling activities that Siderca claimed to have undertaken for reported home market channels of distribution; or (2) did not provide a sufficient/satisfactory explanation:  (a) establishing how the documentation provided supports Siderca's claim of having performed certain selling functions for home market channels of distributions; and (b) showing to

---

[76] *Id.*; *see also Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review and Notice of Intent Not to Revoke Antidumping Duty Order in Part*, 75 FR 50999 (August 18, 2010) (*OJ from Brazil*), and accompanying IDM, at Comment 7.
[77] Where NV is based on CV, we determine the NV LOT based on the LOT of the sales from which we derive selling, general and administrative expenses, and profit for CV, where possible.  *See* 19 CFR 351.412(c)(1).
[78] *See Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1314-16 (CAFC 2001).
[79] *See* 19 CFR 351.412(c)(1).
[80] *See, e.g.*, *OJ from Brazil* IDM at Comment 7.
[81] *See Preliminary Determination* PDM at 16.

what extent the claimed levels of intensity can be inferred from the documentation provided.[82]

Siderca claims that certain alleged deficiencies that Commerce identified in the *Preliminary Determination* with respect to certain selling function categories can be answered through a closer review of the record. Below, we discuss Siderca's specific claims for the affected selling function categories. Commerce hereby incorporates by reference its qualitative LOT analysis provided in the *Preliminary Determination* and affirms that analysis for areas that Siderca does not contest.

<u>Provision of Sales Support Selling Function Category</u>

In the *Preliminary Determination*, Commerce found the following:

> for the "provision of sales support" selling function category, Siderca reported that it provides, to a high degree for Channel 1, to a medium-high degree for Channel 2, and to a low degree for the CEP channel, sales forecasting and strategic/economic planning. Siderca explained that Channel 1 home market customers share biweekly their drilling plans with Siderca, allowing Siderca to forecast customers' OCTG consumption needs and adjust production schedules accordingly; for Channel 2 home market customers, an overall estimate and forecast of annual consumption is performed to allocate mill's resources. Siderca provided sample drilling plans for certain Channel 1 home market customers and a sample internal managerial forecast for the annual overall consumption for the home market, aggregated across main OCTG and non-OCTG business units. Siderca does not explain, however, whether the latter documentation is a product of Siderca's formal sales forecasting and strategic/economic planning processes; how the drilling plans routinely shared by Siderca's customers form the basis for said processes; and whether similar documentation is prepared with respect to sales to Siderca's U.S. affiliate or on behalf of Siderca's U.S. affiliate. Siderca also doesn't explain how and why the former and latter documentation infer its claim of the high selling intensity level associated with sales forecasting and strategic/economic planning with respect to home market Channel 1 and a medium-high selling intensity level associated with this activity with respect to home market Channel 2.[83]

Siderca first claims that the managerial forecast it provided in Exhibit Supp. A3 describes Siderca's managerial plans/activities and the documentation it provided in Exhibit Supp. A3 also demonstrates that the customers' drilling plans feed directly into Siderca's managerial forecast and planning process.

---

[82] *Id*. at 13.
[83] *Id*. at 13-14 (citing Siderca's Letters, "Oil Country Tubular Goods from Argentina: Response to Section A of the Questionnaire," dated December 8, 2021 (AQR) at A-21 and A-24; and "Oil Country Tubular Goods from Argentina: Response to Supplemental Sections A and B Questionnaire," dated February 18, 2022 (ABSQR) at 9-10 and Exhibits Supp. A2 and Supp. A3).

Filed By: Dmitry Vladimirov, Filed Date: 9/26/22 12:31 PM, Submission Status: Approved

Due to a lack of explanation from Siderca, the record remains unclear, however, whether the three-page Excel spreadsheet that Siderca portrays as a sample internal managerial forecast captures, in its entirety, the essence of Siderca's formal sales forecasting and strategic/economic planning processes.[84]  Further, the record lacks a basic narrative from Siderca explaining the content/structure of the internal managerial forecast or showing how this report is demonstrative of the sample drilling plans for home market Channel 1 customers (provided by Siderca in the record) feeding directly into it and forming the basis for Siderca's formal managerial forecast and planning processes.[85]  Commerce's multiple requests for information required Siderca to provide documentation demonstrating the performance of a specific selling function during the POI, along with an explanation of how the provided documentation supports a claim of the performance of a given function.[86]  This exercise naturally necessitates an explanation of the documentation being provided, a detailed account of what information is contained therein and what it conveys, and how it is relevant to Commerce's LOT analysis.  In addition, and importantly, the record lacks an explanation from Siderca concerning how the claimed levels of intensity associated with sales forecasting and strategic/economic planning (*i.e.*, a high degree for home market Channel 1, a medium-high degree for home market Channel 2, and a low degree for the CEP channel) can be inferred or, at least, implied from the documentation provided in support of this selling function category.  For example, given Siderca's statement that home market Channel 1 customers share their drilling plans biweekly with Siderca for forecasting purposes, for home market Channel 2 customers, Siderca only performs an overall estimate and forecast of the annual consumption.[87]  In light of this information, Siderca does not explain why, for the "provision of sales support" selling function category it designated the level of intensity for Channel 1 with code "9" and for Channel 2 with code "6."[88]

Secondly, Siderca claims that the record does not contain similar documentation for the "provision of sales support" selling function category prepared by Siderca for its CEP sales.  However, notwithstanding Siderca's generalized statements that the U.S. affiliate performs the same selling functions in the United States as Siderca does in Argentina, Siderca stops short of explaining whether it prepares similar documentation on behalf of its U.S. affiliate, concerning the U.S. affiliate's sales in the United States.[89]  Accordingly, contrary to Siderca's claims, a closer review of the record does not remedy the deficiencies that Commerce identified in the *Preliminary Determination*, concerning this selling function category.

<u>Provision of Training Services Selling Function Category</u>

In the *Preliminary Determination*, Commerce found the following:

---

[84] *See* ABSQR at 9-10 and Exhibit Supp.A3.

[85] *Id*.

[86] *See* Commerce's Letters, Initial AD Questionnaire, dated November 10, 2021  (ADQ) at section A, subsection 3.a.ii., and first supplemental questionnaire, dated January 27, 2022 (SQ1) at 3.

[87] *See* ABSQR at 9-10.

[88] *Id*. at Exhibit Supp. A2.

[89] Notably, the record is void of any sample documentation pertaining to the "provision of sales support" selling function category with respect to the underlying selling functions undertaken by Siderca's U.S. affiliate in the United States.

13

For the "provision of training services" selling function category, Siderca reported that it provides, to a high degree for the home market Channel 1, to a medium degree for Channel 2, and to a low degree for the CEP channel, technical training for Siderca's customers, in order to improve the application and performance of Siderca's products. Siderca provided excerpts of sample presentations concerning certain performance-related pitfall issues for OCTG. Siderca does not explain which domestic customers were given the presentations in question, or when they took place, or how frequently the presentations in question were prevalent during the POI. Siderca does not explain why, given these facts, its level of intensity designations for the selling function category in question is appropriate.[90]

Regarding the timing of one presentation provided in the record, Siderca claims that the presentation in Exhibit Supp. A3 is dated during the POI. Moreover, Siderca claims that it properly differentiated between the intensity of the provision of training services between home market channels based on the extent of the support Siderca provides during string design and selection of OCTG and other material.

Commerce concedes that it overlooked the dates of the presentation materials for one presentation concerning certain performance-related pitfall issues for OCTG that Siderca provided in the record, dated during the POI, because the introductory page of the presentation in question wasn't translated.[91] Concerning the second presentation on certain performance-related pitfall issues for OCTG that Siderca provided in the record, because the presentation materials are not dated, Commerce cannot determine whether the presentation was provided during the POI.[92] Despite this, the presentation materials for both presentations do not appear to acknowledge, nor does Siderca specify, any specific party as the recipient of a given presentation, much less that it is, in fact, a home market customer and, particularly, a Channel 1 customer (given Siderca's higher level of intensity designation for home market Channel 1 than its designation for home market Channel 2).[93]

Equally important, Siderca does not explain how frequently the presentations in question were conducted during the POI for its home market customer in either Channel 1 or Channel 2. Given these facts, it is impossible to infer from the documentation that Siderca provided whether it claimed the appropriate levels of intensity designations for the selling function category in question. Commerce's multiple requests for information required Siderca to provide documentation demonstrating the performance of a specific selling function during the POI, along with an explanation of how the provided documentation supports a claim of the performance of a given function.[94] This exercise necessitates an explanation of the documentation being provided, and how it is relevant to Commerce's LOT analysis.

---

[90] *See Preliminary Determination* PDM at 14 (citing AQR at A-21 and A-24, ABSQR at 10 and Exhibits Supp. A2 and Supp. A3).
[91] *See* ABSQR at Exhibit Supp. A3.
[92] *Id.*
[93] *Id.*
[94] *See* ADQ at section A, subsection 3.a.ii., and SQ1 at 3.

Lastly, Siderca claims that it properly differentiated between the intensity of the provision of training services between home market channels based on the extent of the support Siderca provides during string design and selection of OCTG and other material. However, this alleged connection and correlation between the provision of OCTG string design and material selection and the provision of training services is first raised by Siderca in its case brief – the record is void of the discussion and the documentation on this point. Specifically, there is no explanation previously provided in the record by Siderca that the home market customers are given training presentations concerning certain performance-related pitfall issues for OCTG every time Siderca engages with them on OCTG string design and material selection. Accordingly, contrary to Siderca's claims, a closer review of the record does not remedy the deficiencies Commerce identified in the *Preliminary Determination*, concerning this selling function category.

<u>Provision of Technical Support Selling Function Category</u>

In the *Preliminary Determination*, Commerce found, in relevant part, the following:

> For the "provision of technical support" selling function category, Siderca reported that it provides, to a high degree for home market Channel 1, to a medium-high degree for home market Channel 2, and to a medium-low degree for the CEP channel, engineering services/advice and technical assistance regarding the technical specifications and the use of OCTG by its customers. Siderca provided sufficient documentation establishing the provision of engineering services and technical assistance for both home market channels. However, in relation to Siderca's significant number of sales reported for Channel 1, it reported an insignificant number of instances during the POI when Siderca's technical sales team worked with Channel 1 customers to analyze OCTG performance on different projects in Argentina. Siderca does not explain how the number of instances relates to the quantity of sales or the number of transactions with a nexus to the technical services received, that supports a high level of intensity designation for the "provision of technical support" selling function category with respect to Channel 1 … .[95]

Siderca claims that Commerce arbitrarily found as insignificant the number of instances Siderca's technical sales team worked with its home market customers that receive the full-service package to analyze OCTG performance, and questioned Siderca's reported high level of intensity designation for Home Market Channel 1 sales. Siderca claims that the engineering services and technical support brochure provided in Exhibit A4 shows the range and complexity of technical services provided to these customers and, therefore, justifies Siderca's reported intensity level.

There is nothing arbitrary in Commerce's finding that the provision of engineering services and technical assistance to home market Channel 1 customers amounted to an insignificant number

---

[95] *See Preliminary Determination* PDM at 14-15 (citing AQR at A-22 and A-24, and Exhibit 4; and ABSQR at 10-11 and Exhibits Supp. A1, Supp. A2, and Supp. A3).

Barcode:4287860-02 A-357-824 INV - Investigation  -

of instances.[96]  As Commerce explained in the *Preliminary Determination*, we attributed the number of reported instances during the POI when Siderca's technical sales team worked with Channel 1 customers to analyze OCTG performance to the significant quantity of sales or the significant number of transactions reported for Channel 1 home market sales.  Commerce found that the number of claimed instances for the provision of engineering services and technical assistance to home market Channel 1 customers paled in comparison to the number of reported transactions.  Based on this comparison, and absent any clarification from Siderca, Commerce found Siderca's explanation in the record lacking as to why the number of transactions with a nexus to the number of instances where the technical services were provided supports a high level of intensity designation for the "provision of technical support" selling function category with respect to Channel 1.

We agree with Siderca that the engineering services and technical support brochure that Siderca provided in Exhibit A4 shows the breadth and complexity of technical services available to home market Channel 1 customers.[97]  However, the mere existence of the engineering services and technical support brochure is not indicative of whether and to what extent home market Channel 1 customers actually avail themselves of the myriad of engineering and technical support services that Siderca makes available to them.  Further, Siderca has not explained, and the record does not show, the degree to which certain major Channel 1 customers take advantage of these services; whether these customers always take full advantage of all available engineering and technical support services, whether they utilize these services on a limited basis, or whether they do not request services at all.  Commerce requested this information from Siderca multiple times; thus, it was incumbent upon Siderca to develop the record and then explain how the claimed level of intensity for a particular selling function can be inferred or implied from the information it provides.[98]  Contrary to Siderca's claims, a closer review of the record does not remedy the deficiencies that Commerce identified in the *Preliminary Determination*, concerning this selling function category.

<u>Provision of Performance of Sales Related Administrative Activities Selling Function Category</u>

In the *Preliminary Determination*, Commerce found, in relevant part, the following:

> {f}or the "performance of sales related administrative activities" selling function category, Siderca reported that it provides, to a high degree for home market Channel 1, to a medium degree for home market Channel 2, and to a medium-low degree for the CEP channel, the following administrative activities:  order input and processing; recordation of sales in the accounting system; issuance of sales-related documentation; and processing of payments.  For documentation related to the performance of the selling activities in this selling function category, Siderca relies on sales and expenses documentation provided for a sample home market sale.  For Channel 1, Siderca reported that it also manages customer's

---

[96] *See* AQR at A-22.  Commerce is withholding the reported number of instances concerning the provision of technical services because Siderca claimed business proprietary treatment of this information

[97] *See* ABSQR at Exhibit Supp. A1 (making public engineering services and technical services brochure for the Tenaris "Southern Cone").

[98] *See* ADQ at section A, subsection 3.a.ii., and SQ1 at 3.

withdrawals of OCTG from the well and the communications related to this activity, *i.e.*, Siderca provided sample email correspondence showing Siderca's interaction with the customer regarding this activity. However, Siderca does not explain how often it manages the withdrawal of OCTG from the well during the POI and why this sole activity affords a higher level of intensity designation for Channel 1 in comparison to Channel 2. The record shows that sales to the United States, *i.e.*, the CEP channel, involve the very same set of selling activities described by Siderca in this selling function category undertaken by Siderca and Tenaris Global Services S.A., as those undertaken by Siderca for home market sales. Siderca does not explain why, given these facts, its levels of intensity designations vary between home market channels and, particularly, vary to a great degree between Channel 1 and the CEP channel.[99]

Siderca claims that Commerce incorrectly found that management of Home Market Channel 1 customers' withdrawals of OCTG from the well and related communications is the "sole activity" distinguishing Home Market Channel 1 and Channel 2 home market sales. Siderca claims it showed that for Home Market Channel 1 sales, Siderca also manages the customer relationship daily as the point of contact for customers that receive the full-service package. Siderca claims that a review of the sample email correspondence in Exhibit Supp. A3 demonstrates the high level of coordination between Siderca and the customer required to execute the selling activities.

Our review of the sample email correspondence to which Siderca refers, and which concerns the provision of the "performance of sales related administrative activities" selling function category, does not support Siderca's claim. The correspondence in question, showing Siderca's interaction with the customer regarding the management of the customer's withdrawals of OCTG from the well, consists of a single short email from Siderca's customer and Siderca's short reply.[100] The content of the emails in question does not provide any basis for inferring a high level of coordination for home market Channel 1 customers, and there is no other record evidence of claimed daily customer relationship management concerning Channel 1 customers. In the *Preliminary Determination*, Commerce found that Siderca does not explain how often it manages the withdrawal of OCTG from the well during the POI and why this sole activity affords a higher level of intensity designation for Channel 1 in comparison to Channel 2.[101] Given Commerce's multiple requests for information, it was incumbent upon Siderca to explain how the claimed level of intensity for a selling function can be inferred or implied from the information it provides and develop the record fully.[102] Accordingly, contrary to Siderca's claims, a closer review of the record does not remedy the deficiencies that Commerce identified in the *Preliminary Determination*, concerning this selling function category.

Next, Siderca raises certain other alleged deficiencies identified by Commerce in the *Preliminary Determination*, stating that they concern very specific information that Commerce did not

---

[99] *See* Preliminary Determination PDM at 15-16 (citing AQR at A-23 and A-24, and Exhibits A7 and A8; and ABSQR at 12 and Exhibits Supp. A2 and Supp. A3).
[100] *See* ABSQR at Exhibit A3.
[101] *See Preliminary Determination* PMD at 16.
[102] *See* ADQ at section A, subsection 3.a.ii.; *see also* SQ1 at 3.

request from Siderca and it should not be penalized for not providing it.  Siderca claims that all of Commerce's concerns could have been addressed in full by Siderca if Commerce had asked them in its supplemental questionnaires.  Commerce disagrees with Siderca on this point.  The courts have confirmed that the mere existence of a CEP entity and CEP sales do not, alone, establish an entitlement to a CEP offset.  For example, in *Corus*, the Court stated, "CEP offset analysis thus compares the indirect selling activities that are undertaken outside the United States in support of the U.S. and comparison market sales.  It is not automatic each time {EP} is constructed … **{t}he burden of proof is upon the claimant to prove entitlement** … ('if a respondent claims an adjustment to decrease {NV}, as with **all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment**')."[103]  A CEP offset to NV is a benefit to Siderca, and the burden of proof was upon Siderca to prove, to Commerce's satisfaction, Siderca's entitlement to it.  In the original, as well as in a supplemental, questionnaire, Commerce requested that Siderca:  (1) provide documentation demonstrating the performance of each of the claimed selling functions during the POI; (2) explain how the documentation provided supports the claims of performance of each reported activity; and (3) discuss how the reported activity is relevant to Commerce's LOT analysis.[104]  As mentioned above, this exercise necessitates an explanation of the documentation being provided, a walk-through of what information is contained in the documentation and what it conveys, as well as an explanation of how it is relevant to Commerce's LOT analysis.  Further, because this area of Commerce's LOT analysis focuses on qualitative factors, an explanation by a respondent to what extent the claimed levels of intensity can be inferred from, or supported by, the documentation provided, is necessary to Commerce's analysis.  Accordingly, and given that what Commerce asked of Siderca is the same information Commerce routinely asks in the initial questionnaire, there is no basis to Siderca's claim that it could not have reasonably anticipated what would be required for Commerce's analysis, and that Commerce should not penalize Siderca for not providing information that Commerce did not specifically request.  It was incumbent upon Siderca, a party with an exclusive and thorough knowledge/possession of its corporate information and business records, to develop the record fully in the first place, such that it satisfies its burden of proof for an entitlement to a favorable adjustment.

Further, the administrative precedent on which Siderca relies is inapposite to its claim.[105]  In *Polytetrafluoroethylene Resin from India* and *Line Pipe from Korea*, Commerce accepted the respective respondent's deficient quantitative analysis, because Commerce found that it did not afford it with an opportunity to remedy certain deficiencies, as required under section 782(d) of the Act.[106]  At issue here is the documentary support and Siderca's explanations/discussions that

[103] *See Corus Engineering Steels Ltd. v. United States*, 27 CIT 1286, 1290 (2003) (*Corus*) (citing *Micron Technology, Inc. v. United States*, 243 F.3d 1301, 1315-16 (Fed. Cir. 2001) and quoting Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) reprinted in 1994 U.S.C.C.A.N. 4040 at 829) (emphasis added)).
[104] *See* ADQ at section A, subsection 3.a.ii., and SQ1 at 3.
[105] *See* 19 CFR 351.401(b)(1) ("{t}he interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment.").
[106] *See Polytetrafluoroethylene Resin from India* IDM at 10 ("In its supplemental questionnaire, Commerce only requested generally that GFCL provide supporting documentation for its reported levels of intensity, which GFCL did for certain claimed selling activities.  Accordingly, GFCL did not have an opportunity, pursuant to section 782(d) of the Act, to remedy any deficiency in its **quantitative analysis** by providing additional information in a supplemental questionnaire response…" (emphasis added)) and *Line Pipe from Korea* ("We note that Hyundai Steel

Barcode:4287860-02 A-357-824 INV - Investigation  -

are relevant to Commerce's qualitative aspect of its LOT analysis and, as discussed above, the burden of proof was on Siderca, and it was given two separate opportunities to provide this information, in order to establish an entitlement to an adjustment for which Siderca is a direct beneficiary.

Based on this, for this final determination, we continue to find that Siderca did not provide adequate qualitative support concerning its claim for a CEP offset.

## B. Quantitative LOT Analysis

In the *Preliminary Determination*, Commerce found that "Siderca did not provide the quantitative analysis required by Commerce."[107]  Specifically, in the *Preliminary Determination*, Commerce found the following:

> Siderca did not provide the quantitative analysis required by Commerce, as it requested in the initial and supplemental questionnaires, that shows how:  (1) the expenses for sales made at different claimed LOTs impact price comparability; or (2) the claimed levels of intensity for the selling activities reported in the selling functions chart are quantitatively supported.[108]

In this investigation, Siderca reported ISEs that it alleges reflect the different levels of selling expenses and related functions that Siderca performs for its home market versus its U.S. sales; according to Siderca:  (1) its methodology for calculating ISEs, and the resulting allocation of expenses to home market and U.S. sales, is Siderca's quantitative analysis that results in the different level of expenses assigned to POI sales made at different levels of trade, thus impacting price comparability; and (2) its quantitative analysis supports the claimed levels of intensity for the selling activities reported.[109]

In the *Preliminary Determination*, Commerce disagreed with Siderca's assertions and provided the following explanation, concerning Siderca's purported quantitative analysis:

> {a}s a preliminary matter, Siderca's distribution of {ISEs} between home market and U.S. sales makes no distinction between two claimed home market channels of distribution, Channel 1 and Channel 2.  More importantly, Siderca's distribution of ISEs in the general ledger accounts for cost centers common to both home-market OCTG sales and U.S. market OCTG sales (accounting for a substantial portion of the total value of POI {ISEs}) relied on distribution concepts that were derived:  (1) for home market OCTG sales using either (a) a simple average of the designation codes for the selling intensities reported across

---

did not provide an analysis showing how expenses assigned to sales at the HM and CEP LOTs specifically impacted price comparability, as requested in the Initial Questionnaire.  However, we did not inform Hyundai Steel that we required more information with respect to this aspect of the **quantitative analysis**.  Thus, Hyundai Steel did not have an opportunity, pursuant to section 782(d) of the Act, to remedy this deficiency in its quantitative analysis" (citation omitted, emphasis added)).

[107] *See Preliminary Determination* PDM at 16.

[108] *Id*. at 16.

[109] *Id*. (citations to administrative record omitted).

Filed By: Dmitry Vladimirov, Filed Date: 9/26/22 12:31 PM, Submission Status: Approved

all selling function categories for Channel 1 in the selling functions chart, or (b) the selling intensity designation (*i.e.*, code "9") with the most repetitions in the selling functions chart for Channel 1; (2) for U.S. market OCTG sales using the lowest reported designation code (*i.e.*, code "1") for the selling intensities reported across all selling function categories for the CEP channel in the selling functions chart; and (3) for both markets, the total quantity of OCTG shipped to the respective market.  However, as the record shows, Siderca did not provide any analysis that demonstrates how the claimed levels of intensity for the selling activities reported in the selling functions chart are quantitatively supported (and, as discussed above, a number of them appear to be qualitatively unsupported).  As a result, Siderca's distribution of {ISEs}, in a substantial part, relied on arbitrary numbers that formed an integral part of how the distribution concepts were calculated.  In essence, Siderca's quantitative analysis is an attempt to quantify the reported selling functions' intensities using their unquantified designated values as the cornerstone in the analysis.  Accordingly, we do not find that Siderca's quantitative analysis supports the claimed levels of intensity for the selling activities reported – Siderca merely calculates a higher ratio for {ISEs} attributable to home market sales versus the U.S. sales, a predicted and expected result, predicated on the unsubstantiated and arbitrary difference in the reported intensities of selling functions between two markets.  Because Siderca's reported selling functions and intensities thereof were unsubstantiated, we find that there is insufficient information on the record to determine, quantitatively, whether comparison market sales were made at a different LOTs than U.S. sales.[110]

Siderca argues that contrary to Commerce's description, Siderca properly distributed the ISEs between the home market and the U.S. market based on the nature of the cost centers and general ledger accounts in its trial balance and a "distribution concept" that reflected:  (1) the "sales effort" required (*i.e.*, the degree of selling activities in each market); and (2) the total quantity of OCTG shipped to each market.

Siderca misconstrues the record and misunderstands the core of Commerce's findings.  As Commerce explained in the *Preliminary Determination*, Commerce found that Siderca's distribution of ISEs in the general ledger accounts for cost centers *common* to both home-market OCTG sales and U.S. market OCTG sales accounted for a *substantial* portion of the total value of POI ISEs.  The total of such general ledger accounts *common* to both markets were allocated to each market using distribution concepts that relied on:  (1) the designation codes that Siderca reported for the levels of intensity of the selling function categories in Siderca's selling functions chart; and (2) the total quantity of OCTG shipped to the respective market.  But the numeric values associated with the designation codes that formed an integral part of the distribution concepts (*i.e.*, code "9" for home market Channel 1 sales and code "1" for U.S. CEP Channel sales) are not corroborated by any quantitative means.  In *OCTG Korea AR6 Final*, Commerce stated, "… the purpose of requiring quantitative analysis is to substantiate the respondent's reported selling activities levels…the quantitative evidence is supposed to substantiate and explain the reported levels in the selling activities charts"; "…without quantitative analysis and explanation, it is impossible to decipher from {the} source documents how {the respondent}

---

[110] *Id*. at 16-17 (citing ABSQR at Exhibit Supp. A2 and Supp. A4).

reported different levels of selling activities … ."[111]   Similarly, in *PET Sheet from Korea,*
Commerce found that, "{the respondent} does not provide the calculations it made to support its
assigned "1" to "10" level rankings, and as such, these assigned values, which supposedly reflect
the frequency and intensity of the selling activities performed, cannot be considered
'quantitative' analysis."[112]   Thus, the basis for the quantitative analysis is to show how the
claimed levels of intensity in the selling function chart are quantitatively derived and supported
using a respondent's normal business records.  Then, the quantitative analysis needs to show how
the expenses for sales made at different claimed LOTs affect price comparability.

Instead of the quantitative analysis that Commerce required from Siderca, it used, in substantial
part, arbitrary designation codes, unsupported by any quantitative means, and allocated ISEs
common to both markets using those codes to home market and U.S. sales; Siderca then claimed
that the results of this allocation manifest as the quantitative analysis that Commerce requires,
because the allocation arrives at different levels of expenses assigned to POI sales made at
different levels of trade and, allegedly, affect price comparability.  In other words, Siderca put
the cart before the horse.  For this reason, we found in the *Preliminary Results* that Siderca's
quantitative analysis is an attempt to quantify the intensities of the reported selling functions
using their unquantified designated values as the cornerstone in the analysis.  We reiterate in this
final determination our position stated in the *Preliminary Determination*:  merely calculating a
higher ratio for ISEs attributable to home market sales versus the U.S. sales is not a quantitative
analysis that supports the claimed differences in the levels of intensity for the selling activities
reported.  In *Rubber from Brazil*, Commerce stated that the record requires additional
quantitative evidence to rule out the possibility "that differences in prices between the {levels of
trade} is attributable to… other reasons, such as discretionary pricing decisions or differences in
sales volumes."[113]   In *OCTG Korea AR6 Final*, Commerce stated, "…a comparison of overall
{ISEs} reported in the U.S. sales database and third country sales database is not sufficient on its
own to establish that the sales occurred at different LOTs, because the difference in ISEs} could
be caused by other factors."[114]

Commerce explained the requirement for a quantitative analysis and its importance in
Commerce's LOT determinations, namely, to avoid the potential for manipulation and to ground
claimed differences in reported channels of distribution on objective data:

> reliance on qualitative evidence, such as narrative descriptions of differences in
> selling functions, customer correspondence, sample sales records, meeting
> presentations and the like, without supporting quantitative evidence frequently
> does not present a complete understanding of a respondent's selling activities.
> Additionally, reliance on purely qualitative information may create the potential
> for manipulation (or inaccurate reporting) by permitting respondents to create a
> narrative that is not linked in any way to its verifiable financial data.  Requiring
> quantitative evidence enhances our LOT analysis because such information
> allows us to determine whether differences in prices among various customer

---

[111] *See OCTG Korea AR6 Final* IDM at Comment 16.
[112] *See PET Sheet from Korea* IDM at 19.
[113] *See Rubber from Brazil* IDM at 9.
[114] *See OCTG Korea AR6 Final* IDM at Comment 16.

categories or differences in levels of expenses in different claimed LOTs are, in fact, attributable to differences in LOTs or to some other unrelated factor such as relative sales volumes.  Quantitative information, such as the selling expense information requested by Commerce in this investigation, permits Commerce to examine whether a respondent's narrative explanations and qualitative evidence are supported by its books and records maintained in the ordinary course of business.  Additionally, the requirement that respondents provide quantitative support for their claimed LOTs reduces subjectivity and the likelihood of inconsistency in the application of Commerce's analytical framework that results from the analysis of purely qualitative information, which can be, by its nature, subject to different interpretations.[115]

As explained above, the record lacks the quantitative analysis required under Commerce's practice.[116]  Accordingly, we continue to find that Siderca did not provide the quantitative evidence demonstrating that its home market sales were at a more advanced LOT than its CEP sales made to its U.S. affiliate, because Siderca has not demonstrated a quantitative difference in the reported selling functions (and claimed intensities thereof) between the two markets.

Siderca argues that Commerce did not ask Siderca to further substantiate the methodology underlying its "quantitative analysis" and, therefore, Commerce should not penalize Siderca for not providing information that Commerce did not specifically request.  We find no basis in Siderca's claim.  In the original questionnaire, Commerce requested that Siderca:  (1) provide a quantitative analysis showing how the expenses assigned to POI sales made at different claimed levels of trade impact price comparability; and (2) explain how the quantitative analysis provided in response to the requests for information above support the claimed levels of intensity for the selling activities reported in the selling functions chart.[117]  In response, Siderca stated, "Siderca will provide indirect selling expense calculations in its Sections B and C responses.  These expenses should capture any differences between levels of trade that are not based on direct selling expenses."[118]  Having determined that what Siderca provided in response to sections B and C of the questionnaire is merely an attempt to demonstrate how ISEs vary by the different levels of trade claimed, Commerce again requested in a supplemental questionnaire that Siderca remedy its deficient response and provide the aforementioned information requested in the original questionnaire.[119]  Rather than providing the quantitative analysis requested by Commerce, Siderca resubmitted its calculation worksheets for ISEs, purporting the underlying methodology and the outcome of such calculations as Siderca's quantitative analysis.[120] However, as we stated above, the circumstances present here are similar to those in *OCTG Korea AR6 Final*, where we did not find a mere difference in ISEs reported between a home and U.S. market to be dispositive of claimed differences in the LOTs.[121]  In sum, Siderca was afforded two opportunities to report the quantitative information requested by Commerce, but it failed to do so.

---

[115] See *PET Sheet from Korea* IDM at 20 (internal citation omitted).
[116] See, e.g., *OCTG Korea AR6 Final* IDM at Comment 16; and *PET Sheet from Korea* IDM at Comment 4.
[117] See ADQ at section A, subsection 3.a.ii.
[118] See AQR at A-26.
[119] See SQ1 at 3.
[120] See ABSQR at 13-16 and Exhibits Supp. A2 and Supp. A4.
[121] See *OCTG Korea AR6 Final* IDM at Comment 16.

As Commerce explained above, a CEP offset to NV is a benefit to Siderca and, thus, the burden of proof was Siderca's to demonstrate to Commerce that Siderca was entitled to it, by providing the requested quantitative analysis.[122]  It was incumbent upon Siderca, the party that has knowledge and possession of its corporate information and business records, to develop the record fully in the first place, such that it satisfies its burden of proof for an entitlement to a favorable adjustment.  Commerce agrees with the petitioners that Commerce should not countenance Siderca's attempt to fault Commerce for Siderca's own shortcomings in establishing an entitlement to a favorable adjustment.

As Siderca correctly points out, Commerce considers the submitted qualitative and quantitative information and makes a decision regarding whether the respondent has supported an LOT adjustment or CEP offset based on the "totality of the evidence."[123]  On the basis of this framework, for this final determination Commerce stands by its findings made in the *Preliminary Determination*:

> Due to the absence of sufficient/definitive source documentation and/or sufficient/satisfactory explanation accompanying the provided documentation and claimed differences in the LOTs, and the absence of the required quantitative analysis, the record lacks any means of corroborating LOT claims made by Siderca.  Further, given the importance of the quantitative analysis to Commerce's LOT analysis, we find that Siderca has not met its evidentiary burden.[124]

Accordingly, we find that the record does not support a finding that Siderca's home market and U.S. sales are at different LOTs and, thus, a CEP offset is not warranted under section 773(a)(7)(B) of the Act.  As Commerce indicated in the *Preliminary Determination*, this determination, under identical circumstances, is supported by recent administrative precedent.[125]

## Comment 2:  Third Country ISEs

*Petitioners' Case Brief*

In calculating CEP, Commerce should deduct selling expenses incurred in Uruguay by Tenaris Global Services S.A. (TGS Uruguay).

---

[122] *See, e.g.*, *Ad Hoc Shrimp*, 616 F. Supp. 2d at 1374; *Corus*, 27 CIT at 1290, *Pakfood*, 724 F. Supp. 2d at 1327; and 19 CFR 351.401(b)(1).

[123] *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Belgium:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 FR 7116 (February 8, 2022), and accompanying IDM, at 31 and 33.

[124] *See Preliminary Determination* PDM at 17.

[125] *Id*. at 17-18 (citing *Rubber from Brazil* IDM at Comment 1 (where Commerce declined to find the existence of different LOTs or grant a CEP offset when the record lacked sufficient quantitative evidence corroborating a respondent's LOT claims); *Ripe Olives from Spain:  Final Results of Antidumping Duty Administrative Review; 2018–2019*, 86 FR 35068 (July 21, 2021), and accompanying IDM, at Comment 2 (denying a CEP offset due to a lack of a quantitative analysis); and *PET Sheet from Korea*, and accompanying IDM, at Comment 4); *see, also OCTG Korea AR6 Final* IDM at Comment 16.

Barcode:4287860-02 A-357-824 INV - Investigation  -

- Consistent with statutory and regulatory requirements,[126] in the recent *Softwood Lumber from Canada Prelim*, Commerce deducted ISEs incurred in Canada from CEP.[127]
- In globally integrated companies, such as Tenaris Group, where selling activities are structured and centrally managed by a parent company or a designated subsidiary, support (and expenses) tied to U.S. selling activities can emanate from multiple entities in multiple countries.  Therefore, Commerce needs to account for such selling expenses that are tied to sales of subject merchandise in the United States, "regardless of where they were incurred."[128]
- In the *Preliminary Results*, in declining to treat U.S. ISEs incurred in a third country as CEP expenses and, thus, deduct them from CEP, Commerce relied on *Mechanical Tubing from Italy*.[129]
  - In that case, Commerce declined to deduct the ISEs of third-country affiliates because "the petitioners cited no record information, nor provided any precedent, to support their claim."[130]
  - In the instant case, the record establishes that the ISEs incurred in Uruguay by TGS Uruguay are "for the account of" Siderca or affiliated seller in the United States, TGS USA, and are "associated with commercial activities in the Unites States that relate to the sales to an unaffiliated purchaser.[131]
    - TGS Uruguay's reported indirect U.S. selling expenses were calculated by dividing its indirect selling and administrative expenses by the total net value of foreign market sales.[132]
    - Such a calculation is consistent with Siderca's description of TGS Uruguay as overseeing a global commercial network of entities that provide marketing, logistics, distribution, and other commercial services for a various steel pipe products throughout the world.  This network includes TGS USA, which imports, sells and distributes the OCTG produced by Siderca in the United States.[133]
    - According to Siderca, TGS Uruguay provides Siderca access to customers operating in key energy markets worldwide, allowing Siderca to focus solely on OCTG production.[134]

---

[126] *See* Petitioners' Case Brief at 3-4 (citing section 772(d)(1) of the Act and 19 CFR 351.402(b)).

[127] *Id.* at 4 (citing *Certain Softwood Lumber Products from Canada:  Preliminary Results of Antidumping Duty Administrative Review*, 86 FR 28551 (May 27, 2021) (*Softwood Lumber from Canada*)).

[128] *Id*. at 4-5 (citing *Stainless Steel Sheet and Strip in Coils from Germany; Notice of Final Results of Antidumping Duty Administrative Review*, 67 FR 7668 (February 20, 2002) (*Sheet and Strip from Germany*), and accompanying IDM, at Comment 4).

[129] *Id*. at 5 (citing *Preliminary Determination* PDM at 10 (which references *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Italy:  Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 FR 71 (January 3, 2022) (*Mechanical Tubing from Italy*)).

[130] *Id*. (citing *Mechanical Tubing from Italy* IDM at Comment 4).

[131] *Id*. at 6 (citing section 772(d)(1) of the Act and 19 CFR 351.402(b)).

[132] *Id*. at 6-7.

[133] *Id*. at 7.

[134] *Id*

*Siderca's Rebuttal Brief*

- Commerce should continue not to deduct ISEs incurred by TGS Uruguay in calculating CEP.
  - Section 772(d)(1) of the Act provides for Commerce to calculate CEP "by deducting credit expenses, selling expenses associated with economic activities occurring in the United States, which includes direct selling expenses and those {ISEs} associated with economic activities <u>occurring in the United States</u>."[135]
  - In the *Preliminary Determination*, Commerce already considered and rejected this argument and, consistent with the statute, "did not treat Siderca's U.S. {ISEs} incurred by TGS Uruguay in Uruguay as CEP expenses and, accordingly, did not deduct them from CEP."[136]
  - Commerce's approach in the *Preliminary Determination* of not deducting TGS Uruguay's selling expenses to calculate the CEP is in line with its normal practice.[137]
    - In *Dioctyl Terephthalate from Korea*, Commerce explained that it calculated "{ISEs} incurred in the country of manufacture for {respondent's} U.S. sales as the sum of the ISEs incurred by the {respondent} and its third-country affiliates."[138]
    - The petitioners' reliance on *Softwood Lumber from Canada* and *Sheet and Strip from Germany* is inapposite to the facts in this case. In this investigation, Siderca has demonstrated that TGS Uruguay's selling expenses for Siderca's U.S. sales are not related to sales to unaffiliated U.S. customers, but rather to limited logistical services and sales related administrative activities related to sales to TGS USA.[139]
  - Siderca followed Commerce's instructions in the initial Section C questionnaire that required the reporting of indirect selling and administrative expenses incurred in the United States separately from the ISEs incurred in the country of manufacture and third countries.[140]
  - In response to Commerce's request, Siderca provided a revised selling functions chart that shows, in one separate column, the selling functions (and intensities thereof) undertaken by TGS Uruguay with respect to sales of OCTG to TGS USA.[141]
  - In response to another request from Commerce, Siderca explained the role of TGS Uruguay with respect to Siderca's U.S. sales, which confirms that the U.S. ISEs incurred in Uruguay by TGS Uruguay are related solely to sales to TGS USA.[142]
    - Siderca explained that "for U.S. sales made at the constructed {LOT}, the main selling functions undertaken by TGS Uruguay with respect to sales of OCTG to TGS

---

[135] *See* Siderca Rebuttal Brief at 2-3 (citing *Certain Stilbenic Optical Brightening Agents from Taiwan: Preliminary Results of Antidumping Duty Administrative Review; 2015–2016*, 82 FR 26060 (June 6, 2017), accompanying PDM, at 6 (emphasis added)).

[136] *Id.* at 3 (citing *Preliminary Determination* PDM at 10).

[137] *Id.* at 3-4.

[138] *Id.* at 4 (citing *Dioctyl Terephthalate from the Republic of Korea: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 82 FR 28824 (June 26, 2017) (*Dioctyl Terephthalate from Korea*), and accompanying IDM, at 17).

[139] *Id.* (citing Siderca's Letter, "Oil Country Tubular Goods from Argentina: Response to the 4th Supplemental Questionnaire," dated April 15, 2022 (4th SQR), at 2-6).

[140] *Id.* at 4-5.

[141] *Id.* at 5.

[142] *Id.*

USA are the provision of logistical services, and performance of sales related administrative activities.[143]

▪ The sample sales documentation that Siderca submitted on the record confirms Siderca's explanation.[144]

**Commerce's Position:**  In this final determination, consistent with our decision in the *Preliminary Determination*, we did not treat Siderca's U.S. ISEs incurred by TGS Uruguay in Uruguay as CEP expenses and, accordingly, did not deduct them from CEP.

Section 772(d)(1) of the Act states that the price used to establish CEP shall be reduced by "the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added):  (A) commissions for selling the subject merchandise in the United States; (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties; (C) any selling expenses that the seller pays on behalf of the purchaser; and (D) any selling expenses not deducted under subparagraph (A), (B), or (C)."  The regulations at 19 CFR 351.402(b) state, in relevant part, "{i}n establishing constructed export price under section 772(d) of the Act, the Secretary will make adjustments for expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, no matter where or when paid.  The Secretary will not make an adjustment for any expense that is related solely to the sale to an affiliated importer in the United States… ."

In the *Preliminary Determination*, Commerce articulated the following:

> {i}t is not our practice to treat U.S. {ISEs} incurred in a third country as CEP expenses and deduct them from the gross unit price.  Information on the record of this investigation demonstrates that Siderca's U.S. {ISEs} incurred in Uruguay by TGS Uruguay are related solely to sales to its U.S. sales affiliate, TGS USA, which invoiced the unaffiliated U.S. customers for Siderca's CEP sales.  Therefore, we preliminarily did not treat Siderca's U.S. {ISEs} incurred by TGS Uruguay in Uruguay as CEP expenses and, accordingly, did not deduct them from CEP.[145]

In support of its decision in the *Preliminary Determination*, Commerce relied on the regulatory language in 19 CFR 351.402(b) which prohibits an adjustment to CEP for any expense that is related solely to the sale to an affiliated importer in the United States, and the precedent in *Mechanical Tubing from Italy*, which addressed the same issue and involved the same entities as those in this investigation, TGS Uruguay and TGS USA.[146]

Commerce's decision in the *Preliminary Determination* is consistent with its practice of treating U.S. ISEs incurred in a third country similar to how it treats U.S. ISEs incurred in a home

---

[143] *Id*. at 5-6.
[144] *Id*. at 6.
[145] *See Preliminary Determination* PDM at 10 (internal citations omitted).
[146] *Id*. (citing 19 CFR 351.402(b); and *Mechanical Tubing from Italy* IDM at Comment 4).

26

market.[147]  It is for this reason that Commerce requests, in the original Section C questionnaire, that a respondent report ISEs incurred in the United States separately from ISEs incurred outside the U.S. market.[148]

For this final determination, Commerce finds no compelling reasons to reverse its decision. Contrary to the petitioners' assertion, there is no record evidence that the ISEs incurred in Uruguay by TGS Uruguay were on behalf of Siderca or its affiliated seller in the United States, TGS USA, or that those expenses were associated with commercial activities in the Unites States.  On the contrary, the information on the record of this investigation demonstrates that Siderca's U.S. ISEs incurred in Uruguay by TGS Uruguay are related solely to sales to its U.S. sales affiliate, TGS USA, which invoiced the unaffiliated U.S. customers for Siderca's CEP sales.[149]  These facts stand in stark contrast with the factual scenarios underlying administrative precedent where Commerce made an adjustment, under section 772(d)(1) of the Act, for expenses incurred on behalf of a respondent or its U.S. affiliate that were found to have a nexus to a commercial activity in the United States.  For example, in *Ball Bearings et.al.*, Commerce deducted additional benefits expenses incurred by the respondent in Japan for certain Japanese employees because the expenses were in association with, and as compensation for, those employees having engaged in activity in the United States.[150]  Similarly, in *Sheet and Strip from Germany*, Commerce stated that it "…deducted {ISEs} incurred in the country of manufacture…from U.S. price to account for all U.S. selling expenses **that are associated with economic activities occurring in the United States**, regardless of where they were incurred."[151]  Likewise, in *Softwood Lumber from Canada*, Commerce stated, "We also deducted expenses **associated with economic activities occurring in the United States**… ."[152]

In this investigation, the only evidence on which the petitioners rely to allege that the ISEs incurred by TGS Uruguay are "for the account of" Siderca or TGS USA, and that such expenses are "associated with commercial activities in the Unites States," is Siderca's statements in the record, which the petitioners misconstrue.  In its questionnaire response, Siderca stated the following:

---

[147] *See, e.g.*, *Dioctyl Terephthalate from Korea* and accompanying IDM, at 17 ("… we have continued to calculate {ISEs} incurred in the country of manufacture for AKP's U.S. sales as the sum of the ISEs incurred in AKP and **its third-country affiliates** …" (emphasis added)).

[148] *See* ADQ at section C, C-26, and C-27.

[149] *See, e.g.*, AQR at A-10 and Exhibit A-8; ABSQR at 8, 13, and Exhibit Supp. A2 (showing the provision of logistics services and performance of sales related administrative activities as the only two selling functions undertaken by TGS Uruguay with respect to its sales of OCTG to TGS USA, information which is supported by the sales documentation); and 4th SQR at 2-6 (explaining the role of TGS Uruguay with respect to its sales of OCTG to TGS USA, *e.g.*, TGS Uruguay only "organizes freight and delivery of Siderca-manufactured OCTG to the United States and it processes and inputs the orders received from TGS USA and issues related sales documentation, such as sales invoices.").

[150] *See Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews*, 70 FR 54711 (September 16, 2005) (*Ball Bearings et.al.*), and accompanying IDM, at Comment 9A, affirmed in *Koyo Seiko Co., Ltd. v. United States*, 516 F. Supp.2d 1323 (CIT 2007).

[151] *See Sheet and Strip from Germany* IDM at Comment 4 (emphasis added).

[152] *See Softwood Lumber from Canada Prelim*, unchanged in *Certain Softwood Lumber Products from Canada: Final Results of Antidumping Duty Administrative Review*; 2019, 86 FR 68471 (December 2, 2021).

> TGS Uruguay **and its affiliates, which include TGS USA,** have developed a global commercial network with subsidiaries, distribution facilities, representative offices, and agents providing marketing, logistics, distribution, finishing, and commercial services for a full range of steel pipe products throughout the world. This worldwide network supports Siderca and its sale of the OCTG products it produces. **TGS Uruguay and its affiliates** provide Siderca access to customers operating in key energy markets worldwide, allowing Siderca to focus on OCTG manufacturing excellence.[153]

Nothing in this language suggests that TGS Uruguay bypasses its affiliates, such as TGS USA, and provides the aforementioned services (and incurs expenses commensurate with the provision of such services) on behalf of Siderca or TGS USA that are associated with the commercial activities inside the U.S. market.

Next, the petitioners highlight the description of the main activity of TGS Uruguay, as reflected in Tenaris S.A.'s 2020 annual report, which states "marketing of steel products."[154]  Nothing in this description suggests that TGS Uruguay completely bypasses its affiliates that are intentionally incorporated and domiciled in the markets they serve (*i.e.*, TGS USA in the U.S. market), and performs marketing activities for OCTG sales on behalf of Siderca or TGS USA in the United States.

Lastly, in response to the petitioners' pre-verification comments and suggested verification procedures,[155] Commerce explored the nature of certain general ledger accounts of TGS Uruguay.  We found no evidence that TGS Uruguay collected commissions or earned service revenue in connection with sales of subject merchandise in the United States.[156]  Further, Commerce explored, through an examination of documentation that Siderca provided at verification, how TGS Uruguay's compensation was determined, calculated, and represented in its invoice to TGS USA for the services it provided to Siderca and TGS USA.  For TGS Uruguay's sales to TGS USA, we did not observe any charges incurred by TGS Uruguay for any services other than those claimed in the record.[157]

Based on the above, and consistent with our precedent and record evidence, Commerce continues to find that it is not appropriate to treat U.S. ISEs incurred by TGS Uruguay in Uruguay as CEP expenses and deduct them from CEP under section 772(d)(1) of the Act.

---

[153] *See* AQR at A-10 (emphasis added).
[154] *See* Petitioners' Case Brief (citing AQR at Exhibit A16, page 217).
[155] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina:  U. S. Steel's Comments Regarding the Verification of Siderca," dated May 25, 2022, at 10-11.
[156] *See* Memorandum, "Verification of the Sales Questionnaire Response of Tenaris Global Services (U.S.A.) Corporation in the Less-Than-Fair-Value Investigation of Oil Country Tubular Goods from Argentina," dated June 30, 2022, at 11-12 and Exhibit 11.
[157] *Id.*

28

Barcode:4287860-02 A-357-824 INV - Investigation -

**Comment 3:  R&D Expenses for Further Manufacturing Costs**

*Petitioners' Case Brief:*

- At verification, Commerce found that Siderca excluded certain R&D expenses incurred by its affiliated further manufacturer, Hydril Company (Hydril) from the reported G&A and, thus, further manufacturing costs.[158]
- For the final determination Commerce should include the R&D expenses in question in the further manufacturing G&A ratio.[159]

No other party commented on this issue.

**Commerce's Position:**  We agree with the petitioners.  Siderca's affiliated further manufacturer, Hydril, incurred R&D expenses during the POI related to project development.  During verification, we determined that certain project development R&D expenses were excluded from Hydril's further manufacturing G&A expenses.[160]  For the final determination, we revised the calculation of Hydril's G&A expense rate to include the R&D expenses at issue.[161]

## VI.    RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting the above positions. If this recommendation is accepted, we will publish the final determination of the investigation and the final estimated weighted-average dumping margins in the *Federal Register* and will notify the U.S. International Trade Commission of our determination.

☒                                   ☐
_____                          _____
Agree                              Disagree


X   *Lisa W. Wang*
_____

Signed by: LISA WANG
Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[158] *See* Petitioners' Case Brief at 8 and 9.
[159] *Id.*
[160] *See* Memorandum, "Virtual Verification of the Further Manufacturing Cost Response of Siderca S.A.I.C. in the Antidumping Duty Investigation of Oil Country Tubular Goods from Argentina," dated July 28, 2022
[161] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Siderca S.A.I.C.," dated September 23, 2022.

Filed By: Dmitry Vladimirov, Filed Date: 9/26/22 12:31 PM, Submission Status: Approved

8

*Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*,
86 Fed. Reg. 60205 (Nov. 1, 2021)

P.R. 44

Public

Appx114-Appx119

final and conclusive court decision, Commerce intends to instruct CBP to assess antidumping duties on unliquidated entries of subject merchandise exported by Carbon Activated, Datong Juqiang, Beijing Pacific, GHC, Ningxia Mineral, and Shanxi Sincere in accordance with 19 CFR 351.212(b). We will instruct CBP to assess antidumping duties on all appropriate entries covered by this review when the importer-specific assessment rate is not zero or *de minimis*. Where an import-specific assessment rate is zero or *de minimis*,[10] we will instruct CBP to liquidate the appropriate entries without regard to antidumping duties.

**Notification to Interested Parties**

This notice is issued and published in accordance with sections 516A(c) and (e) and 777(i)(1) of the Act.

Dated: October 26, 2021.

**Ryan Majerus,**
*Deputy Assistant Secretary for Policy and Negotiations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2021–23858 Filed 10–28–21; 4:15 pm]
**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–357–824, A–201–856, A–821–833]**

**Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable October 26, 2021.

**FOR FURTHER INFORMATION CONTACT:** Dmitry Vladimirov at (202) 482–0665 and Christopher Williams at (202) 482–5166 (Argentina); James Hepburn at (202) 482–1882 and Preston Cox at (202) 482–5041 (Mexico); George McMahon at (202) 482–1167 and Marc Castillo at (202) 482–0519 (the Russian Federation (Russia)); AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

**The Petitions**

On October 6, 2021, the Department of Commerce (Commerce) received

antidumping duty (AD) petitions concerning imports of oil country tubular goods (OCTG) from Argentina, Mexico, and Russia filed in proper form on behalf of Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, U.S. Steel Tubular Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC (the USW), and Welded Tube USA, Inc. (the petitioners), domestic producers of OCTG and a certified union that represents workers engaged in the production of OCTG.[1] The Petitions were accompanied by countervailing duty (CVD) petitions concerning imports of OCTG from the Republic of Korea and Russia.[2]

On October 7, 8, 14, and 19, 2021, Commerce requested supplemental information pertaining to certain aspects of the Petitions in separate supplemental questionnaires.[3] The petitioners filed responses to the supplemental questionnaires on October 12, 13, 18, and 21, 2021.[4]

In accordance with section 732(b) of the Tariff Act of 1930, as amended (the Act), the petitioners allege that imports of OCTG from Argentina, Mexico, and Russia are being, or are likely to be, sold in the United States at less than fair value (LTFV) within the meaning of section 731 of the Act, and that imports of such products are materially injuring, or threatening material injury, to the OCTG industry in the United States. Consistent with section 732(b)(1) of the

Act, the Petitions are accompanied by information reasonably available to the petitioners supporting their allegations.

Commerce finds that the petitioners filed the Petitions on behalf of the domestic industry, because the petitioners are interested parties, as defined in sections 771(9)(C) and 771(9)(D) of the Act. Commerce also finds that the petitioners demonstrated sufficient industry support for the initiation of the requested LTFV investigations.[5]

**Period of Investigation**

Because the Petitions were filed on October 6, 2021, the period of investigation (POI) for these LTFV investigations is October 1, 2020, through September 30, 2021, pursuant to 19 CFR 351.204(b)(1).[6]

**Scope of the Investigations**

The products covered by these investigations are OCTG from Argentina, Mexico, and Russia. For a full description of the scope of these investigations, *see* the appendix to this notice.

**Comments on the Scope of the Investigations**

On October 13, 2021, Commerce spoke with counsel to the petitioners regarding the proposed scope, to ensure that the scope language in the Petitions is an accurate reflection of the products for which the domestic industry is seeking relief.[7]

As discussed in the *Preamble* to Commerce's regulations, we are setting aside a period for interested parties to raise issues regarding product coverage (*i.e.*, scope).[8] Commerce will consider all comments received from interested parties and, if necessary, will consult with interested parties prior to the issuance of the preliminary determinations. If scope comments include factual information,[9] all such factual information should be limited to public information. To facilitate preparation of its questionnaires, Commerce requests that all interested parties submit such comments by 5:00 p.m. Eastern Time (ET) on November

---

[10] *See* 19 CFR 351.106(c)(2).

[1] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia," dated October 6, 2021 (Petitions).

[2] *Id.*

[3] *See* Commerce's Letters, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Supplemental Questions," dated October 7, 2021; and "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Supplemental Questions," dated October 19, 2021; and Country-Specific Supplemental Questionnaires: Argentina Supplemental, Mexico Supplemental, and Russia Supplemental, dated October 8, 2021, and Russia Second Supplemental, dated October 14, 2021.

[4] *See* Petitioners' Letters, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement) and "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to Second General Issues Questionnaire," dated October 21, 2021 (Second General Issues Supplement); *see also* Petitioners' Country-Specific Supplemental Responses, dated October 13, 2021; and Russia Second Supplemental Response, dated October 18, 2021.

[5] *See infra*, section titled "Determination of Industry Support for the Petitions."

[6] *See* 19 CFR 351.204(b)(1).

[7] *See* Memorandum, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Phone Call with Counsel to the Petitioners," dated October 13, 2021.

[8] *See Antidumping Duties; Countervailing Duties, Final Rule*, 62 FR 27296, 27323 (May 19, 1997) (*Preamble*).

[9] *See* 19 CFR 351.102(b)(21) (defining "factual information").

15, 2021, which is 20 calendar days from the signature date of this notice. Any rebuttal comments, which may include factual information, must be filed by 5:00 p.m. ET on November 26, 2021, which is the first business day after ten calendar days from the initial comment deadline.[10]

Commerce requests that any factual information that parties consider relevant to the scope of these investigations be submitted during this period. However, if a party subsequently finds that additional factual information pertaining to the scope of these investigations may be relevant, the party may contact Commerce and request permission to submit the additional information. All such submissions must be filed on the records of each of the concurrent AD and CVD investigations.

**Filing Requirements**

All submissions to Commerce must be filed electronically via Enforcement and Compliance's Antidumping Duty and Countervailing Duty Centralized Electronic Service System (ACCESS), unless an exception applies.[11] An electronically filed document must be received successfully in its entirety by the time and date on which it is due.

**Comments on Product Characteristics**

Commerce is providing interested parties an opportunity to comment on the appropriate physical characteristics of OCTG to be reported in response to Commerce's AD questionnaires. This information will be used to identify the key physical characteristics of the subject merchandise in order to report the relevant costs of production accurately, as well as to develop appropriate product-comparison criteria.

Interested parties may provide any information or comments that they feel are relevant to the development of an accurate list of physical characteristics.

Specifically, they may provide comments as to which characteristics are appropriate to use as: (1) General product characteristics; and (2) product comparison criteria. We note that it is not always appropriate to use all product characteristics as product comparison criteria. We base product comparison criteria on meaningful commercial differences among products. In other words, although there may be some physical product characteristics utilized by manufacturers to describe OCTG, it may be that only a select few product characteristics take into account commercially meaningful physical characteristics. In addition, interested parties may comment on the order in which the physical characteristics should be used in matching products. Generally, Commerce attempts to list the most important physical characteristics first and the least important characteristics last.

In order to consider the suggestions of interested parties in developing and issuing the AD questionnaires, all product characteristics comments must be filed by 5:00 p.m. ET on November 15, 2021, which is 20 calendar days from the signature date of this notice. Any rebuttal comments must be filed by 5:00 p.m. ET on November 26, 2021, which is the first business day after 10 calendar days from the initial comment deadline.[12] All comments and submissions to Commerce must be filed electronically using ACCESS, as explained above, on the record of each of the LTFV investigations.

**Determination of Industry Support for the Petitions**

Section 732(b)(1) of the Act requires that a petition be filed on behalf of the domestic industry. Section 732(c)(4)(A) of the Act provides that a petition meets this requirement if the domestic producers or workers who support the petition account for: (i) At least 25 percent of the total production of the domestic like product; and (ii) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. Moreover, section 732(c)(4)(D) of the Act provides that, if the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product,

Commerce shall: (i) Poll the industry or rely on other information in order to determine if there is support for the petition, as required by subparagraph (A); or (ii) determine industry support using a statistically valid sampling method to poll the "industry."

Section 771(4)(A) of the Act defines the "industry" as the producers as a whole of a domestic like product. Thus, to determine whether a petition has the requisite industry support, the statute directs Commerce to look to producers and workers who produce the domestic like product. The International Trade Commission (ITC), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both Commerce and the ITC must apply the same statutory definition regarding the domestic like product,[13] they do so for different purposes and pursuant to a separate and distinct authority. In addition, Commerce's determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[14]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation" (i.e., the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition).

With regard to the domestic like product, the petitioners do not offer a definition of the domestic like product distinct from the scope of the investigations.[15] Based on our analysis of the information submitted on the record, we have determined that OCTG, as defined in the scope, constitutes a single domestic like product, and we have analyzed industry support in terms of that domestic like product.[16]

---

[10] The deadline for rebuttal comments falls on November 25, 2021, which is a Federal holiday. Commerce's practice dictates that where a deadline falls on a weekend or Federal holiday, the appropriate deadline is the next business day (in this instance, November 26, 2021). *See Notice of Clarification: Application of "Next Business Day" Rule for Administrative Determination Deadlines Pursuant to the Tariff Act of 1930, As Amended,* 70 FR 24533 (May 10, 2005) (*Notice of Clarification*).

[11] *See Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures,* 76 FR 39263 (July 6, 2011); *see also Enforcement and Compliance; Change of Electronic Filing System Name,* 79 FR 69046 (November 20, 2014) for details of Commerce's electronic filing requirements, effective August 5, 2011. Information on help using ACCESS can be found at *https://access.trade.gov/help.aspx* and a handbook can be found at *https://access.trade.gov/help/Handbook_on_Electronic_Filing_Procedures.pdf.*

[12] The deadline for rebuttal comments falls on November 25, 2021, which is a Federal holiday. Commerce's practice dictates that where a deadline falls on a weekend or Federal holiday, the appropriate deadline is the next business day (in this instance, November 26, 2021). *See Notice of Clarification.*

[13] *See* section 771(10) of the Act.

[14] *See USEC, Inc.* v. *United States,* 132 F. Supp. 2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp., Ltd.* v. *United States,* 688 F. Supp. 639, 644 (CIT 1988), *aff'd* 865 F. 2d 240 (Fed. Cir. 1989)).

[15] *See* Petitions at Volume I at 20–22 and Exhibits I–11, I–13, I–14, and I–18.

[16] For a discussion of the domestic like product analysis as applied to these cases and information regarding industry support, *see* Country-Specific Checklists, "Antidumping Duty Investigation Initiation Checklists: Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation," dated concurrently with this **Federal Register** notice and on file electronically via

In determining whether the petitioners have standing under section 732(c)(4)(A) of the Act, we considered the industry support data contained in the Petitions with reference to the domestic like product as defined in the "Scope of the Investigations," in the appendix to this notice. To establish industry support, the petitioners provided the 2020 production of OCTG for the U.S. producers that support the Petitions.[17] The petitioners estimated the 2020 production by non-petitioning companies using shipment data available for the entire OCTG industry and publicly available information on production and domestic shipments from the ITC's 2020 report from the sunset review of OCTG from India, Korea, Turkey, Ukraine, and the Socialist Republic of Vietnam.[18] The petitioners estimated the total 2020 production of the domestic like product for the entire industry by adding their production to the estimated production of the non-petitioning producers.[19] We relied on data provided by the petitioners for purposes of measuring industry support.[20]

On October 8, 15, and 20, 2021, we received comments on industry support from Tenaris Bay City, Inc., IPSCO Tubulars Inc., Maverick Tube Corporation, and Tenaris Global Services (U.S.A.) Corporation (collectively, Tenaris USA), U.S. producers of OCTG.[21] On October 18,

2021, the petitioners responded to the comments from Tenaris USA.[22] On October 21, 2021, the Government of Russia (GOR) raised industry support comments during the consultations held regarding the Russia CVD Petition.[23] On October 21, 2021, we received comments from TMK Group (TMK), a Russian producer and exporter of OCTG.[24] On October 22, 2021, Tenaris USA filed its fourth submission with Commerce and formally indicated that it opposes the Petitions.[25] Also on October 22, 2021, the petitioners responded to TMK's comments.[26]

Based on the information provided in the Petitions, the First General Issues Supplement, Petitioners' Letter, the Second General Issues Supplement, Petitioners' Letter II, and other information readily available to Commerce, we determine that the domestic producers and workers have met the statutory criteria for industry support under section 732(c)(4)(A)(i) of the Act because the domestic producers (or workers) who support the Petitions account for at least 25 percent of the total production of the domestic like product.[27] Because the Petitions and supplemental submissions did not establish support from domestic producers (or workers) accounting for more than 50 percent of the total production of the domestic like product, Commerce was required to take further action in order to evaluate industry

support.[28] In this case, Commerce was able to rely on other information, in accordance with section 732(c)(4)(D)(i) of the Act, to determine industry support.[29] Based on information provided in the Petitions, the First General Issues Supplement, Petitioners' Letter, the Second General Issues Supplement, Petitioners' Letter II, and other information readily available to Commerce, the domestic producers and workers have met the statutory criteria for industry support under section 732(c)(4)(A)(ii) of the Act because the domestic producers (or workers) who support the Petitions account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions.[30] We note that, even if all other U.S. producers of OCTG oppose the Petitions (including Tenaris USA), the supporters of the Petitions would still have the requisite level of industry support pursuant to section 732(c)(4)(A)(ii) of the Act.[31] Accordingly, Commerce determines that the Petitions were filed on behalf of the domestic industry within the meaning of section 732(b)(1) of the Act.[32]

### Allegations and Evidence of Material Injury and Causation

The petitioners allege that the U.S. industry producing the domestic like product is being materially injured, or is threatened with material injury, by reason of the imports of the subject merchandise sold at LTFV. In addition, the petitioners allege that subject imports exceed the negligibility threshold provided for under section 771(24)(A) of the Act.[33]

The petitioners contend that the industry's injured condition is illustrated by a significant and increasing volume of subject imports; reduced market share; underselling and price suppression; lost sales and revenues; declines in production, U.S. shipments, and capacity utilization; decline in employment; and adverse impact on the domestic industry's financial performance.[34] We assessed the allegations and supporting evidence regarding material injury, threat of material injury, causation, as well as

---

ACCESS (Country-Specific AD Initiation Checklists) at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation (Attachment II).

[17] See Petitions at Volume I at Exhibits I–1 and I–3; see also First General Issues Supplement at 4 and Exhibits 4 and 8; and Second General Issues Supplement at Exhibits 3–5.

[18] See Petitions at Volume I at Exhibits I–1 and I–2; see also First General Issues Supplement at 6–10 and Exhibit 1 (containing Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam, Inv. No. 701–TA–499–500 and 731–TA–1215–1216, 1221–1223 (Review), USITC Pub. 5090 (July 2020) (OCTG Review)) and Exhibit 8 (containing OCTG Review at Table III–5); and Second General Issues Supplement at Exhibit 5.

[19] See First General Issues Supplement at 7 and Exhibit 8; see also Second General Issues Supplement at Exhibit 5.

[20] See Petitions at Volume I at Exhibits I–1 and I–2; see also First General Issues Supplement at 3–10 and Exhibits 1, 4, 5, and 8; and Second General Issues Supplement at 1–2 and Exhibits 2–5.

[21] See Tenaris USA's Letters, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Factual Errors in Petitions," dated October 8, 2021; "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Comments on Petitioners' Standing," dated October 15, 2021; and "Oil Country Tubular Goods from Mexico: Reply Comments on Petitioners' Standing," dated October 20, 2021. In addition, on October 21, 2021, Commerce met via video conference with counsel

to Tenaris USA to discuss its industry support comments. See Memorandum, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation," dated October 21, 2021.

[22] See Petitioners' Letter, "Oil Country Tubular Goods from Argentina, Mexico, Russia, and the Republic of Korea: Response to Tenaris Submission Concerning Petitioners' Standing," dated October 18, 2021 (Petitioners' Letter).

[23] See Memorandum, "Countervailing Duty Petition on Oil Country Tubular Goods from the Russian Federation: Consultations with Officials from the Government of the Russian Federation," dated October 21, 2021; see also GOR Letter, "Re: Countervailing Duty Investigation of Certain Oil Country Tubular Goods from the Russian Federation: Consultations," dated October 25, 2021.

[24] See TMK's Letter, "Oil Country Tubular Goods from Russia: Comments on Petitioners' Standing," dated October 21, 2021.

[25] See Tenaris USA's Letter, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Comments on Petitioners' Second General Issues Questionnaire Response," dated October 22, 2021. We note that, though Tenaris USA opposes the Petitions, it has not provided any production data for Commerce to include in the industry support calculation. See Country-Specific AD Initiation Checklists at Attachment II at footnote 47.

[26] See Petitioners' Letter, "Oil Country Tubular Goods from Russia: Response to TMK's Comments on Petitioners' Standing," dated October 22, 2021 (Petitioners' Letter II).

[27] See Country-Specific AD Initiation Checklists at Attachment II.

[28] See section 732(c)(4)(D) of the Act.

[29] See Country-Specific AD Initiation Checklists at Attachment II.

[30] Id.

[31] Id.

[32] Id.

[33] See Petitions at Volume I at 28 and Exhibit I–22.

[34] Id. at 1–2, 28–48 and Exhibits I–1, I–5, I–6, I–8, I–9, I–11, I–13, I–14, I–20, I–22 through I–34; see also First General Issues Supplement at 10.

**60208**     **Federal Register** / Vol. 86, No. 208 / Monday, November 1, 2021 / Notices

negligibility, and we have determined that these allegations are properly supported by adequate evidence and meet the statutory requirements for initiation.[35]

## Allegations of Sales at LTFV

The following is a description of the allegations of sales at LTFV upon which Commerce based its decision to initiate these LTFV investigations of imports of OCTG from Argentina, Mexico, and Russia. The sources of data for the deductions and adjustments relating to U.S. price and normal value (NV) are discussed in greater detail in the country-specific AD Initiation Checklists.

## U.S. Price

For Argentina, Mexico, and Russia, the petitioners established export prices (EPs) on the average unit value (AUVs) of publicly available import data. For Argentina and Mexico, the petitioners conservatively made no adjustments to the AUVs for foreign inland freight and foreign brokerage and handling expenses incurred in subject foreign countries for purposes of calculating net EPs. For Russia, the petitioners deducted expenses associated with inland freight and brokerage and handling costs incurred in Russia to calculate an ex-factory, or net, EP.[36]

## Normal Value Based on Constructed Value[37]

For Argentina, Mexico, and Russia, the petitioners stated they were unable to obtain home-market or third-country prices for OCTG to use as a basis for NV. Therefore, for Argentina, Mexico, and Russia, the petitioners calculated NV based on constructed value (CV).[38]

Pursuant to section 773(e) of the Act, the petitioners calculated CV as the sum of the cost of manufacturing, selling, general, and administrative expenses, financial expenses, and profit.[39] For Argentina, Mexico, and Russia, in calculating the cost of manufacturing, the petitioners relied on the production experience and input consumption rates

of a U.S. OCTG producer, valued using publicly available information applicable to each respective subject country.[40] For Argentina, Mexico, and Russia, in calculating selling, general, and administrative expenses, financial expenses, and profit ratios (where applicable), the petitioners relied on the 2020 financial statements of an OCTG producer(s) domiciled in each respective subject country.[41]

## Fair Value Comparisons

Based on the data provided by the petitioners, there is reason to believe that imports of OCTG from Argentina, Mexico, and Russia are being, or are likely to be, sold in the United States at LTFV. Based on comparisons of EP to CV in accordance with section 773 of the Act, the estimated dumping margins for OCTG concerning each of the countries covered by this initiation are as follows: (1) Argentina—168.49 percent; (2) Mexico—59.75 percent; and (3) Russia—136.96 percent.[42]

## Initiation of LTFV Investigations

Based upon the examination of the Petitions and supplemental responses, we find that they meet the requirements of section 732 of the Act. Therefore, we are initiating these LTFV investigations to determine whether imports of OCTG from Argentina, Mexico, and Russia are being, or are likely to be, sold in the United States at LTFV. In accordance with section 733(b)(1)(A) of the Act and 19 CFR 351.205(b)(1), unless postponed, we will make our preliminary determinations no later than 140 days after the date of this initiation.

## Respondent Selection

In the Petitions, the petitioners identified 18 companies in Argentina, 78 companies in Mexico, and 14 companies in Russia, as producers and/or exporters of OCTG.[43]

Following standard practice in LTFV investigations involving market economy countries, in the event that Commerce determines that the number of exporters or producers in any individual case is large such that Commerce cannot individually examine each company based upon its resources, where appropriate, Commerce intends to select mandatory respondents in that case based on U.S. Customs and Border Protection (CBP) data for U.S. imports under the appropriate Harmonized Tariff Schedule of the United States

subheadings listed in the ''Scope of the Investigations,'' in the appendix.

On October 19, 2021, Commerce released CBP data on imports of OCTG from Argentina, Mexico, and Russia under administrative protective order (APO) to all parties with access to information protected by APO and indicated that interested parties wishing to comment on the CBP data must do so within three business days after the publication date of the notice of initiation of these investigations.[44] Commerce will not accept rebuttal comments regarding the CBP data or respondent selection.

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305(b). Instructions for filing such applications may be found on Commerce's website at *https://enforcement.trade.gov/apo.*

Comments on CBP data and respondent selection must be filed electronically using ACCESS. An electronically filed document must be received successfully in its entirety via ACCESS by 5:00 p.m. ET on the specified deadline.

## Distribution of Copies of the AD Petitions

In accordance with section 732(b)(3)(A) of the Act and 19 CFR 351.202(f), copies of the public version of the AD Petitions have been provided to the governments of Argentina, Mexico, and Russia via ACCESS. To the extent practicable, we will attempt to provide a copy of the public version of the AD Petitions to each exporter named in the AD Petitions, as provided under 19 CFR 351.203(c)(2).

## ITC Notification

We will notify the ITC of our initiation, as required by section 732(d) of the Act.

## Preliminary Determinations by the ITC

The ITC will preliminarily determine, within 45 days after the date on which the AD Petitions were filed, whether there is a reasonable indication that imports of OCTG from Argentina, Mexico, and/or Russia are materially injuring, or threatening material injury to, a U.S. industry.[45] A negative ITC determination for any country will

---

[35] *See* Country-Specific AD Initiation Checklists at Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation.

[36] *See* Country-Specific AD Initiation Checklists.

[37] In accordance with section 773(b)(2) of the Act, for these investigations, Commerce will request information necessary to calculate the CV and cost of production (COP) to determine whether there are reasonable grounds to believe or suspect that sales of the foreign like product have been made at prices that represent less than the COP of the product.

[38] *See* Country-Specific AD Initiation Checklists.

[39] *See* Country-Specific AD Initiation Checklists.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *See* Volume I of the Petitions at Exhibit I–19.

[44] *See* Memoranda, ''Antidumping Duty Petition on Imports of Oil Country Tubular Goods from Argentina: Release of U.S. Customs and Border Protection Data,''; ''Antidumping Duty Petition on Imports of Oil Country Tubular Goods from Mexico: Release of U.S. Customs and Border Protection Data,''; and ''Antidumping Duty Petition on Imports of Oil Country Tubular Goods from Russia: Release of U.S. Customs and Border Protection Data,'' dated October 19, 2021.

[45] *See* section 733(a) of the Act.

result in the investigation being terminated with respect to that country.[46] Otherwise, these LTFV investigations will proceed according to statutory and regulatory time limits.

### Submission of Factual Information

Factual information is defined in 19 CFR 351.102(b)(21) as: (i) Evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by Commerce; and (v) evidence other than factual information described in (i)–(iv). Section 351.301(b) of Commerce's regulations requires any party, when submitting factual information, to specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted[47] and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct.[48] Time limits for the submission of factual information are addressed in 19 CFR 351.301, which provides specific time limits based on the type of factual information being submitted. Interested parties should review the regulations prior to submitting factual information in these investigations.

### Particular Market Situation Allegation

Section 773(e) of the Act addresses the concept of particular market situation (PMS) for purposes of CV, stating that ''if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology.'' When an interested party submits a PMS allegation pursuant to section 773(e) of the Act, Commerce will respond to such a submission consistent with 19 CFR 351.301(c)(2)(v). If Commerce finds that a PMS exists under section 773(e) of the Act, then it will modify its dumping calculations appropriately.

Neither section 773(e) of the Act, nor 19 CFR 351.301(c)(2)(v), set a deadline for the submission of PMS allegations

and supporting factual information. However, in order to administer section 773(e) of the Act, Commerce must receive PMS allegations and supporting factual information with enough time to consider the submission. Thus, should an interested party wish to submit a PMS allegation and supporting new factual information pursuant to section 773(e) of the Act, it must do so no later than 20 days after submission of a respondent's initial section D questionnaire response.

### Extensions of Time Limits

Parties may request an extension of time limits before the expiration of a time limit established under 19 CFR 351.301, or as otherwise specified by Commerce. In general, an extension request will be considered untimely if it is filed after the expiration of the time limit established under 19 CFR 351.301. For submissions that are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. ET on the due date. Under certain circumstances, we may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, we will inform parties in a letter or memorandum of the deadline (including a specified time) by which extension requests must be filed to be considered timely. An extension request must be made in a separate, stand-alone submission; under limited circumstances we will grant untimely-filed requests for the extension of time limits. Parties should review Commerce's regulations concerning factual information prior to submitting factual information in these investigations.[49]

### Certification Requirements

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[50] Parties must use the certification formats provided in 19 CFR 351.303(g).[51] Commerce intends to reject factual submissions if the submitting party does not comply with

the applicable certification requirements.

### Notification to Interested Parties

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305. Parties wishing to participate in these investigations should ensure that they meet the requirements of 19 CFR 351.103(d) (e.g., the filing a letter of appearance as discussed). Note that Commerce has temporarily modified certain of its requirements for serving documents containing business proprietary information, until further notice.[52]

This notice is issued and published pursuant to sections 732(c)(2) and 777(i) of the Act, and 19 CFR 351.203(c).

Dated: October 26, 2021.

**Ryan Majerus,**
*Deputy Assistant Secretary for Policy and Negotiations, Performing the Non-Exclusive Functions and Duties of the Assistant Secretary for Enforcement and Compliance.*

### Appendix

#### Scope of the Investigations

The merchandise covered by the investigations is certain oil country tubular goods (OCTG), which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than case iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (e.g., whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of the investigations also covers OCTG coupling stock.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise processed in a third country, including by performing any heat treatment, cutting, upsetting, threading, coupling, or any other finishing, packaging, or processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the country of manufacture of the OCTG.

Excluded from the scope of the investigations are: casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

The merchandise subject to these investigations is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7304.29.1010, 7304.29.1020, 7304.29.1030, 7304.29.1040, 7304.29.1050, 7304.29.1060, 7304.29.1080, 7304.29.2010, 7304.29.2020, 7304.29.2030, 7304.29.2040, 7304.29.2050,

---

[46] Id.

[47] See 19 CFR 351.301(b).

[48] See 19 CFR 351.301(b)(2).

[49] See 19 CFR 351.301; see also Extension of Time Limits; Final Rule, 78 FR 57790 (September 20, 2013), available at http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm.

[50] See section 782(b) of the Act.

[51] See Certification of Factual Information to Import Administration During Antidumping and Countervailing Duty Proceedings, 78 FR 42678 (July 17, 2013) (Final Rule). Answers to frequently asked questions regarding the Final Rule are available at http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf.

[52] See Temporary Rule Modifying AD/CVD Service Requirements Due to COVID–19; Extension of Effective Period, 85 FR 41363 (July 10, 2020).

Barcode:4176052-02 A-357-824 INV - Investigation -

7304.29.2060, 7304.29.2080, 7304.29.3110, 7304.29.3120, 7304.29.3130, 7304.29.3140, 7304.29.3150, 7304.29.3160, 7304.29.3180, 7304.29.4110, 7304.29.4120, 7304.29.4130, 7304.29.4140, 7304.29.4150, 7304.29.4160, 7304.29.4180, 7304.29.5015, 7304.29.5030, 7304.29.5045, 7304.29.5060, 7304.29.5075, 7304.29.6115, 7304.29.6130, 7304.29.6145, 7304.29.6160, 7304.29.6175, 7305.20.2000, 7305.20.4000, 7305.20.6000, 7305.20.8000, 7306.21.3030, 7306.29.1090, 7306.29.2000, 7306.29.3100, 7306.29.4100, 7306.29.6010, 7306.29.6050, 7306.29.8110, and 7306.29.8150.

The merchandise subject to the investigations may also enter under the following HTSUS item numbers: 7304.39.0024, 7304.39.0028, 7304.39.0032, 7304.39.0036, 7304.39.0040, 7304.39.0044, 7304.39.0048, 7304.39.0052, 7304.39.0056, 7304.39.0062, 7304.39.0068, 7304.39.0072, 7304.39.0076, 7304.39.0080, 7304.59.6000, 7304.59.8015, 7304.59.8020, 7304.59.8025, 7304.59.8030, 7304.59.8035, 7304.59.8040, 7304.59.8045, 7304.59.8050, 7304.59.8055, 7304.59.8060, 7304.59.8065, 7304.59.8070, 7304.59.8080, 7305.31.4000, 7305.31.6090, 7306.30.5055, 7306.30.5090, 7306.50.5050, and 7306.50.5070.

The HTSUS subheadings and specifications above are provided for convenience and customs purposes only. The written description of the scope of the investigations is dispositive.

[FR Doc. 2021–23715 Filed 10–29–21; 8:45 am]

**BILLING CODE 3510–OS–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

[C–580–913, C–821–834]

### Oil Country Tubular Goods From the Republic of Korea and the Russian Federation: Initiation of Countervailing Duty Investigations

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable October 26, 2021.

**FOR FURTHER INFORMATION CONTACT:** Paul Litwin (the Republic of Korea) or Allison Hollander (the Russian Federation), AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–6002 or (202) 482–2805, respectively.

**SUPPLEMENTARY INFORMATION:**

## The Petitions

On October 6, 2021, the U.S. Department of Commerce (Commerce) received countervailing duty (CVD) petitions concerning imports of oil country tubular goods (OCTG) from the Republic of Korea (Korea) and the Russian Federation (Russia), filed in proper form on behalf of Borusan Mannesmann Pipe U.S., Inc.; PTC Liberty Tubulars LLC; U.S. Steel Tubular Products, Inc.; the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC; and Welded Tube USA, Inc. (the petitioners), domestic producers of OCTG and a certified union that represents workers engaged in the production of OCTG.[1] The Petitions were accompanied by antidumping duty (AD) petitions concerning imports of OCTG from Argentina, Mexico, and Russia.[2]

On October 8, 12, and 19, 2021, Commerce requested supplemental information pertaining to certain aspects of the Petitions.[3] The petitioners filed responses to these requests on October 12, 13, 15, and 21, 2021.[4]

In accordance with section 702(b)(1) of the Tariff Act of 1930, as amended (the Act), the petitioners allege that the Government of Korea (GOK) and the Government of Russia (GOR) are providing countervailable subsidies, within the meaning of sections 701 and 771(5) of the Act, to producers of OCTG in Korea and Russia, and that such imports are materially injuring, or threatening material injury to, the domestic industry producing OCTG in the United States. Consistent with section 702(b)(1) of the Act and 19 CFR 351.202(b), for those alleged programs on which we are initiating CVD investigations, the Petitions were accompanied by information reasonably available to the petitioners supporting their allegations.

Commerce finds that the petitioners filed the Petitions on behalf of the domestic industry because the petitioners are interested parties, as defined in sections 771(9)(C) and (D) of the Act. Commerce also finds that the petitioners demonstrated sufficient industry support with respect to the initiation of the requested CVD investigations.[5]

## Period of Investigation

Because the Petitions were filed on October 6, 2021, the period of investigation (POI) for these CVD investigations is January 1, 2020, through December 31, 2020.[6]

## Scope of the Investigations

The merchandise covered by these investigations are oil country tubular goods from Korea and Russia. For a full description of the scope of these investigations, *see* the appendix to this notice.

## Comments on Scope of the Investigations

On October 13, 2021, Commerce spoke with counsel to the petitioners regarding the proposed scope in the Petitions to ensure that the scope language in the Petitions is an accurate reflection of the products for which the domestic industry is seeking relief.[7]

As discussed in the *Preamble* to Commerce's regulations, we are setting aside a period for interested parties to raise issues regarding product coverage (scope).[8] Commerce will consider all comments received from interested parties and, if necessary, will consult with interested parties prior to the issuance of the preliminary determination. If scope comments include factual information,[9] all such factual information should be limited to public information. To facilitate

---

[1] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia," dated October 6, 2021 (Petitions).

[2] *Id.*

[3] *See* Commerce's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Supplemental Questions," dated October 8, 2021 (General Issues Questionnaire); Commerce's Letter, "Petition for the Imposition of Countervailing Duties on Imports of Oil Country Tubular Goods from the Russian Federation: Supplemental Questions," dated October 8, 2021; Commerce's Letter, "Petition for the Imposition of Countervailing Duties on Imports of Oil Country Tubular Goods from the Republic of Korea: Supplemental Questions," dated October 12, 2021; and Commerce's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Supplemental Questions," dated October 19, 2021.

[4] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement); Petitioners' Letter, "Oil Country Tubular Goods from the Russian Federation: Responses to Supplemental Questions," dated October 13, 2021; Petitioners' Letter, "Oil Country Tubular Goods from the Republic of Korea: Responses to Supplemental Questions," dated October 15, 2021; and Petitioners' Letter, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to Second General Issues Questionnaire," dated October 21, 2021 (Second General Issues Supplement).

[5] *See* "Determination of Industry Support for the Petitions" section, *infra.*

[6] *See* 19 CFR 351.204(b)(2).

[7] *See* Memorandum, "Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation; Phone Call with Counsel to the Petitioners," dated October 13, 2021.

[8] *See Countervailing Duties,* 62 FR 27323 (May 19, 1997).

[9] *See* 19 CFR 351.102(b)(21) (defining "factual information").

Filed By: Dmitry Vladimirov, Filed Date: 11/1/21 9:27 AM, Submission Status: Approved

9

Enforcement And Compliance, Office of AD/CVD Operations, Antidumping Duty Investigation Initiation Checklist

(Oct. 26, 2021)

P.R. 40

PUBLIC VERSION

Appx120-Appx156

Barcode:4176347-01 A-357-824 INV - Investigation  -

A-357-824
Investigation
POI:  10/01/2020 – 9/30/2021
**Public Version**
E&C/Office I:  DV

October 26, 2021

---

## ENFORCEMENT AND COMPLIANCE
## OFFICE OF AD/CVD OPERATIONS
## ANTIDUMPING DUTY INVESTIGATION INITIATION CHECKLIST

---

**SUBJECT:**   Oil Country Tubular Goods from Argentina
**CASE NUMBER:**   A-357-824

---

**THE PETITIONERS:**

Borusan Mannesmann Pipe U.S., Inc.
4949 Borusan Road
Baytown, TX 77523
(832) 399-6042

PTC Liberty Tubulars LLC
1100 FM 3361 Road
Liberty, TX 77575
(713) 289-5555

U.S. Steel Tubular Products, Inc.
600 Grant Street
Pittsburgh, PA 15219
(412) 422-1121

United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial
and Service Workers International Union,
AFL-CIO, CLC
60 Boulevard of the Allies
Pittsburgh, PA 15222

Welded Tube USA, Inc.
2537 Hamburg Turnpike
Lackawanna, NY 14218
(906) 669-1111

**COUNSEL TO THE PETITIONERS:**

Thomas M. Beline
Myles S. Getlan
Mary Jane Alves
Jack A. Levy
Cassidy Levy Kent (USA) LLP
900 19th Street NW, Suite 400
Washington, DC 20006
(202) 567-2300

Roger B. Schagrin
Christopher T. Cloutier
Jeffrey D. Gerrish
Luke A. Meisner
William A. Fennell
Benjamin J. Bay
Michelle R. Avrutin
Schagrin Associates
900 Seventh Street NW, Suite 500
Washington, DC 2001
(202) 223-1700

Barcode:4176347-01 A-357-824 INV - Investigation -

## POTENTIAL RESPONDENTS:

A list of the producers/exporters of oil country tubular goods (OCTG) in Argentina identified by Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, U.S. Steel Tubular Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA, Inc. (collectively, the petitioners) can be found in "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Petition for the Imposition of Antidumping and Countervailing Duties," dated October 6, 2021 (the Petition).[1]

**SCOPE:** *See* Attachment I – Scope of the Investigation, to this checklist.

## IMPORT STATISTICS:

| Argentina | 2018 | 2019 | 2020 | Jan-June 2020 | Jan-June 2021 |
|---|---|---|---|---|---|
| **Quantity (metric tons)** | 146,829 | 147,757 | 15,182 | 9,539 | 73,495 |
| **Customs Value (USD)** | 188,881,672 | 208,315,839 | 19,210,840 | 12,825,972 | 75,119,553 |

Source: U.S. Census Data. The petitioners reported the volume (metric tons) and customs value for imports of OCTG using Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7304.29.10 10, 7304.29.1020, 7304.29.1030, 7304.29.1040, 7304.29.1050, 7304.29.1060, 7304.29.1080, 7304.29.2010, 7304.29.2020, 7304.29.2030, 7304.29.2040, 7304.29.2050, 7304.29.2060, 7304.29.2080, 7304.29.3110, 7304.29.3120, 7304.29.3130, 7304.29.3140, 7304.29.3150, 7304.29.3160, 7304.29.3180, 7304.29.4110, 7304.29.4120, 7304.29.4130, 7304.29.4140, 7304.29.4150, 7304.29.4160, 7304.29.4180, 7304.29.5015, 7304.29.5030, 7304.29.5045, 7304.29.5060, 7304.29.5075, 7304.29.6115, 7304.29.6130, 7304.29.6145, 7304.29.6160, 7304.29.6175, 7305.20.2000, 7305.20.4000, 7305.20.6000, 7305.20.8000, 7306.29.1030, 7306.29.1090, 7306.29.2000, 7306.29.3100, 7306.29.4100, 7306.29.6010, 7306.29.6050, 7306.29.8110, and 7306.29.8150.[2]

---

[1] *See* Petition at Volume I at 22 and Exhibit I-19.
[2] *Id.* at 23 and Exhibit I-20.

Barcode:4176347-01 A-357-824 INV - Investigation  -

## APPROXIMATE CASE CALENDAR:

| Event | No. of Days | Date of Action | Day of Week |
|---|---|---|---|
| | **Antidumping Duty Investigation** | | |
| Petition Filed | 0 | October 6, 2021 | Wednesday |
| Initiation Date | 20 | October 26, 2021 | Tuesday |
| ITC Preliminary Determination* | 45 | November 22, 2021 | Monday |
| ITA Preliminary Determination†** | 160 | March 15, 2022 | Tuesday |
| ITA Final Determination*† | 235 | May 31, 2022 | Tuesday |
| ITC Final Determination*** | 280 | July 15, 2022 | Friday |
| Publication of Order**** | 287 | July 22, 2022 | Friday |

*Where the deadline falls on a weekend/holiday, the appropriate date is the next business day.
† These deadlines may be extended under the governing statute.
** This will take place only in the event of a preliminary affirmative determination from the ITC.
*** This will take place only in the event of a final affirmative determination from the International Trade Administration (ITA).
**** This will take place only in the event of a final affirmative determination from the ITA and the ITC.
*Note*:  The ITC final determination will take place no later than 45 days after a final affirmative ITA determination.
*Note*:  Publication of order will take place approximately seven days after an affirmative ITC final determination.

## INDUSTRY SUPPORT:

Does the Petition identify the <u>entire</u> domestic industry, including the names, addresses, and phone numbers of the petitioners and all domestic producers known to the petitioners?

| ☒ | Yes |
|---|---|
| ☐ | No |

Does the Petition contain information relating to the degree of industry support for the Petition, including:

The total volume or value of U.S. production of the domestic like product for the most recently completed calendar year?

| ☒ | Yes |
|---|---|
| ☐ | No |

The volume or value of the domestic like product produced by the petitioners and each domestic producer identified for the most recently completed calendar year?

Barcode:4176347-01 A-357-824 INV - Investigation  -

| | |
|:---:|:---|
| ☒ | Yes |
| ☐ | No |

Do the petitioners and those expressing support for the Petition account for more than 50% of production of the domestic like product?

| | |
|:---:|:---|
| ☐ | Yes |
| ☒ | No |

If No, do those expressing support account for the majority of those expressing an opinion and at least 25% of domestic production?

| | |
|:---:|:---|
| ☒ | Yes |
| ☐ | No |
| ☐ | Not Applicable |

Was there opposition to the Petition from any producers or workers engaged in the production of the domestic like product?

| | |
|:---:|:---|
| ☒ | Yes |
| ☐ | No |

Are any of the parties who have expressed opposition to the Petition either importers or domestic producers affiliated with foreign producers?

| | |
|:---:|:---|
| ☒ | Yes |
| ☐ | No |
| ☐ | Not Applicable |

For a detailed analysis of industry support, *see* Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation, to this checklist.

---

**INJURY ALLEGATION:**

The ITC's notice of institution of antidumping and countervailing duty investigations was published in the *Federal Register* on October 13, 2021. The notice indicates that the ITC instituted investigations to determine whether there is a reasonable indication that the domestic

industry producing OCTG is materially injured, or threatened with material injury, by reason of imports of OCTG from Argentina.[3]

The information relevant to material injury, threat of material injury, or material retardation, and causation, including information on the volume of imports, the effect of these imports on prices in the U.S. market, and the consequent impact of imports on the domestic industry, can be found in the Petition at Volume I at 1-2, 25, 28-48 and Exhibits I-1, I-2, I-5, I-6, I-11, I-14, I-20, and I-22 through I-34, and the First General Issues Supplement[4] at 10.

For analysis of the injury allegation, *see* Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation, to this checklist.

---

## PETITION REQUIREMENTS:

Does the Petition contain the following?

☒   a clear and detailed description of the merchandise to be investigated, including the appropriate Harmonized Tariff Schedule subheadings (*See* Petition at Volume I at 11-19 and Exhibits I-11, I-16, and I-17).

☒   the name of each country in which the merchandise originates or from which the merchandise is exported (*See* Petition at Volume I at 22).

☒   the identity of each known exporter, foreign producer, and importer of the merchandise (*See* Petition at Volume I at 22 and 24 and Exhibits I-19 and I-21).

☒   import volume and value information for the most recent two-year period (*See* Petition at Volume I at 23, 28, 34-36 and Exhibits I-20 and I-22).

☒   a statement indicating that the Petition was filed simultaneously with the Department of Commerce (Commerce) and the ITC (*See* cover letter to the Petition at 2).

---

[3] *See* Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea; Institution of Anti-Dumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations, 86 FR 56983 (October 13, 2021).
[4] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement).

☒    an adequate summary of the proprietary data (*See* public versions of the Petition, the First General Issues Supplement, the Second General Issues Supplement,[5] and the Argentina AD Supplement).[6]

☒    a statement regarding release under administrative protective order (*See* the cover letters to the Petition at 1-4, cover letter to the First General Issues Supplement at 1-3, cover letter to the Second General Issues Supplement at 1-3, and cover letter to the Argentina AD Supplement at 1).

☒    a certification of the facts contained in the Petition by an official of the petitioning firm(s) and its legal representative (if applicable) (*See* attachments to the cover letters to the Petition, the First General Issues Supplement, the Second General Issues Supplement, and the Argentina AD Supplement).

---

**LESS THAN FAIR VALUE ALLEGATION:**

The Petition was officially filed on October 6, 2021.  On October 7, 8, and 19, 2021, Commerce issued supplemental questionnaires to the petitioners.  On October 12, 13, and 21, 2021, the petitioners responded to Commerce's requests for information (General Issues Supplement, the Argentina AD Supplement, and Second General Issues Supplement, respectively).  In accordance with 19 CFR 351.204(b)(1), because the Petition was filed on October 6, 2021, the appropriate period of investigation (POI) is October 1, 2020 through September 30, 2021.

**U.S. Price**

Information relevant to the U.S. price calculations can be found on pages 1-2 and Exhibits II-1 and II-2 of the Petition at Volume II and pages 1-2 of the Argentina AD Supplement.

The petitioners established an export price (EP) using the average unit value (AUV) derived from official import data for imports of OCTG from Argentina into the United States during the POI under HTSUS subheading 7304.29.3110.  The petitioners conservatively made no adjustments to the AUV for foreign inland freight and foreign brokerage and handling expenses for purposes of calculating net EP.   We examined the information provided by the petitioners and made no additional adjustments.  The final net U.S. price is $975.74/short ton.[7]

Did the Petition contain the following?

---

[5] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to Second General Issues Questionnaire," dated October 21, 2021 (Second General Issues Supplement).
[6] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina: Responses to Supplemental Questions," dated October 13, 2021 (Argentina AD Supplement).
[7] *See* page 2 and Exhibit II-2 of Volume II of the Petition.

☒ supporting documentation for the alleged price(s) and any adjustments to the price(s) (*See* Petition at Volume II at 2 and Exhibits II-1 and II-2 and Argentina AD Supplement at 1-2)

☒ current price(s) (and adjustments to the price(s), if applicable) (*See* Petition at Volume II at Exhibits II-1 and II-2)

☒ conversion factors for comparisons of differing units of measure (*See* Petition at Volume II at Exhibits II-1 and II-2.)

## **Normal Value (NV)**

Information relevant to the normal value calculations can be found on pages 3-5 and Exhibits II-3, II-4, II-5, II-6, II-7, II-8, II-9, and II-10 of Volume II of the Petition and Argentina AD Supplement at 3-7 and Exhibits II-S1, II-S2, II-S3, and II-S4.

The petitioners were unable to obtain the selling price of OCTG in the home market or in third country markets. Consequently, the petitioners, pursuant to section 773(a)(4) of the Act, relied on constructed value (CV) as the basis for NV. We examined the information provided by the petitioners and made no additional adjustments. The petitioners provided data that are contemporaneous with the POI and, where appropriate, adjusted for inflation. The final CV is $2,619.80/short ton.[8]

| COP and CV | Source | Satisfactory |
|---|---|---|
| Raw Material: | U.S. Producer's Input and Usage Rates Argentina Import Statistics from Global Trade Atlas | Yes |
| Labor: | U.S. Producer's Labor Usage Labor Rates from *The Conference Board* – International Comparisons of Hourly Compensation Costs in Manufacturing and Sub-Manufacturing Industries (2016) | Yes |
| Energy: (electricity and natural gas) | U.S. Producer's Electricity and Natural Gas Usage Electricity and Natural Gas rates from www.globalpetrolprices.com. | Yes |
| Variable Overhead: | U.S. Producer's Books and Records | Yes |
| Fixed Overhead: | Tenaris Argentina S.A. Financial Statements for FY 2020 | Yes |
| G&A Expenses: | Tenaris Argentina S.A. Financial Statements for FY 2020 | Yes |

[8] *See* Argentina AD Supplement at 7 and Exhibit II-S4.

Barcode:4176347-01 A-357-824 INV - Investigation -

| Interest Expenses: | Tenaris Argentina S.A. Financial Statements for FY 2020 | Yes |
| Profit: | Tenaris Argentina S.A. Financial Statements for FY 2020 | Yes |

**ESTIMATED MARGIN:**

The petitioners provided a dumping margin based on a price-to-CV comparison. The estimated dumping margin is 168.49.[9]

**RECOMMENDATION:**

We examined the accuracy and adequacy of the evidence provided in the Petition as discussed in this checklist and the attachments and recommend determining that the evidence is sufficient to justify the initiation of an antidumping duty investigation with regard to Argentina. We also recommend determining that the Petition has been filed by, or on behalf of, the domestic industry.

**ATTACHMENTS:**

- I.   Scope of the Investigation
- II.  Analysis of Industry Support
- III. Analysis of Allegations and Evidence of Material Injury and Causation

---

[9] *See* Argentina AD Supplement at 7.

Barcode:4176347-01 A-357-824 INV - Investigation  -

## Attachment I
## Scope of the Investigation

The merchandise covered by the investigation is certain oil country tubular goods (OCTG), which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (*e.g.*, whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached.  The scope of the investigation also covers OCTG coupling stock.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise processed in a third country, including by performing any heat treatment, cutting, upsetting, threading, coupling, or any other finishing, packaging, or processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the OCTG.

Excluded from the scope of the order are:  casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

The merchandise subject to this investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers:  7304.29.1010, 7304.29.1020, 7304.29.1030, 7304.29.1040, 7304.29.1050, 7304.29.1060, 7304.29.1080, 7304.29.2010, 7304.29.2020, 7304.29.2030, 7304.29.2040, 7304.29.2050, 7304.29.2060, 7304.29.2080, 7304.29.3110, 7304.29.3120, 7304.29.3130, 7304.29.3140, 7304.29.3150, 7304.29.3160, 7304.29.3180, 7304.29.4110, 7304.29.4120, 7304.29.4130, 7304.29.4140, 7304.29.4150, 7304.29.4160, 7304.29.4180, 7304.29.5015, 7304.29.5030, 7304.29.5045, 7304.29.5060, 7304.29.5075, 7304.29.6115, 7304.29.6130, 7304.29.6145, 7304.29.6160, 7304.29.6175, 7305.20.2000, 7305.20.4000, 7305.20.6000, 7305.20.8000, 7306.29.1030, 7306.29.1090, 7306.29.2000, 7306.29.3100, 7306.29.4100, 7306.29.6010, 7306.29.6050, 7306.29.8110, and 7306.29.8150.

The merchandise subject to the investigation may also enter under the following HTSUS item numbers:  7304.39.0024, 7304.39.0028, 7304.39.0032, 7304.39.0036, 7304.39.0040, 7304.39.0044, 7304.39.0048, 7304.39.0052, 7304.39.0056, 7304.39.0062, 7304.39.0068, 7304.39.0072, 7304.39.0076, 7304.39.0080, 7304.59.6000, 7304.59.8015, 7304.59.8020, 7304.59.8025, 7304.59.8030, 7304.59.8035, 7304.59.8040, 7304.59.8045, 7304.59.8050, 7304.59.8055, 7304.59.8060, 7304.59.8065, 7304.59.8070, 7304.59.8080, 7305.31.4000, 7305.31.6090, 7306.30.5055, 7306.30.5090, 7306.50.5050, and 7306.50.5070.

The HTSUS subheadings above are provided for convenience and customs purposes only.  The written description of the scope of the investigation is dispositive.

Barcode:4176347-01 A-357-824 INV - Investigation  -

**Attachment II**

**Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation**

**Background**

Sections 702(c)(4)(A) and 732(c)(4)(A) of the Tariff Act of 1930, as amended (the Act), state that the administering authority shall determine that a petition has been filed by or on behalf of the industry if the domestic producers or workers who support the petition account for: (1) at least 25 percent of the total production of the domestic like product; and (2) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition.

Section 771(4)(A) of the Act defines the "industry" as the producers, as a whole, of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product. Thus, to determine whether a petition has the requisite industry support, the Act directs the Department of Commerce (Commerce) to look to producers and workers who produce the domestic like product. The International Trade Commission (ITC), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both Commerce and the ITC must apply the same statutory definition regarding the domestic like product (section 771(10) of the Act), they do so for different purposes and pursuant to a separate and distinct authority. In addition, Commerce's determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[1]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation," *i.e.*, the class or kind of merchandise to be investigated, which normally will be the scope as defined in the Petitions.[2] While Commerce is not bound by the criteria used by the ITC to determine the domestic like product in answering

---

[1] *See USEC, Inc. v. United States*, 132 F. Supp. 2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp. Ltd. v. United States*, 688 F. Supp. 639, 644 (CIT 1988), *aff'd* 865 F.2d 240 (Fed. Cir. 1989)).

[2] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia," dated October 6, 2021 (the Petitions). The petitioners filed "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement) and "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to Second General Issues Questionnaire," dated October 21, 2021 (Second General Issues Supplement), in response to Commerce's requests for additional information regarding the Petitions.

Filed By: Dmitry Vladimirov, Filed Date: 10/27/21 3:43 PM, Submission Status: Approved

this question, we have reviewed these factors as presented by the petitioners[3] in the Petitions.[4] With respect to the domestic like product, the petitioners do not offer a definition of domestic like product distinct from the scope of the investigations and contend that the domestic like product consists of all oil country tubular goods (OCTG) that are within the scope of the investigations.[5]  For a detailed analysis and discussion, see the "Analysis of Domestic Like Product" section below.

**Analysis of Domestic Like Product**

For support of their like product analysis, the petitioners note that, in prior investigations on OCTG involving cases with an almost identical scope, the ITC determined that OCTG constitutes a single like product co-extensive with the scope.[6]  The petitioners also note that, in the most recent sunset reviews on OCTG from the People's Republic of China (China), India, the Republic of Korea (Korea), the Republic of Turkey (Turkey), Ukraine, and the Socialist Republic of Vietnam (Vietnam) in 2020, the ITC continued to define a single like product co-extensive with the scope.[7]  The petitioners contend that the facts that supported the ITC's prior findings remain the same today.[8]  To further support their domestic like product definition, the petitioners note that all OCTG, regardless of manufacturing process, shares basic physical characteristics and is produced in accordance with specifications promulgated by the American Petroleum Institute.[9]  According to the petitioners, all OCTG is used in drilling for oil or natural gas, though certain OCTG may be required or preferred in certain drilling conditions.[10]  The petitioners note that the ITC previously found that welded OCTG and seamless OCTG are interchangeable and that the degree of overlap between seamless OCTG and welded OCTG has grown over the last decade.[11]  According to the petitioners, OCTG is primarily sold through distributors, with some sold directly to end users.[12]  Additionally, the petitioners note that customers and producers perceive OCTG as a product suited for one end use—drilling for oil and gas.[13]  With respect to manufacturing facilities, production processes, and employees, the

---

[3] The petitioners are Borusan Mannesmann Pipe U.S., Inc. (Borusan); PTC Liberty Tubulars LLC (PTC Liberty); U.S. Steel Tubular Products, Inc. (U.S. Steel); the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (the USW); and Welded Tube USA, Inc. (Welded Tube) (collectively, the petitioners).  *See* Petitions at Volume I at 2-3.

[4] *Id.* at 20-22.

[5] *See* Attachment I – Scope of the Investigation, to this Checklist; *see also* Petitions at Volume I at 20-22.

[6] *See* Petitions at Volume I at 20 and Exhibits I-13 (containing *Oil Country Tubular Goods from China*, Inv. No. 701-TA-463 (Final), USITC Pub. 4124 (January 2010) (*2010 China OCTG Final*) at 6) and I-14 (containing *Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. 4489 (September 2014) (*2014 OCTG Final*) at 12).

[7] *See* Petitions at Volume I at 20-21 and Exhibits I-11 (containing *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. 5090 (July 2020) (*India et al OCTG 2020 Review*) at 7) and I-18 (containing *Oil Country Tubular Goods from China*, Inv. Nos. 701-TA-463 and 731-TA-1159 (Second Review), USITC Pub. 5136 (November 2020) (*China OCTG Second Review*) at 6-7).

[8] *See* Petitions at Volume I at 21.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

2

petitioners note that U.S. mills produce welded and seamless OCTG on separate production lines and that some producers make both welded and seamless OCTG.[14]  The petitioners further note that, although the initial production processes are different for welded and seamless OCTG, the processes for heat treating and finishing are the same.[15]  Finally, with respect to price, the petitioners note that OCTG is sold in a large price range, depending on the size and grade of OCTG.[16]  As a result, the petitioners argue that, consistent with past cases involving OCTG, there is no clear dividing line between the range of OCTG products, and, as such, all OCTG constitutes a single domestic like product.[17]

**Commerce's Position:**

We analyzed the criteria presented by the petitioners with respect to the ITC's domestic like product factors.  We note that the petitioners' domestic like product definition is consistent with the domestic like product defined by the ITC in past investigations and reviews of OCTG.[18]  Based on our analysis of the information submitted in the Petitions, we have determined that the domestic like product consists of OCTG, as defined in the scope of the Petitions.[19]

Furthermore, unless Commerce finds the petitioners' definition of the domestic like product to be inaccurate, we will adopt the domestic like product definition set forth in the Petitions.[20]  While the statute defines the "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation," pursuant to section 771(10) of the Act, the petitioners have presented Commerce with information pertaining to the factors the ITC traditionally analyzes.  We analyzed the information presented by the petitioners, as well as the past ITC determinations on OCTG, and have found there is reason to conclude that OCTG constitutes a single domestic like product.  This finding is consistent with Commerce's broad discretion to define and clarify the scope of antidumping and countervailing duty investigations in a manner that reflects the intent of the Petitions.[21]  Consequently, Commerce's discretion permits interpreting the Petitions in such a way as to best effectuate not only the intent of the Petitions, but the overall purpose of the antidumping and countervailing duty laws as well.[22]

---

[14] *Id.*

[15] *Id.*

[16] *Id.* at 22.

[17] *Id.*

[18] *Id.* at 20-22 and Exhibits I-11 (containing *India et al OCTG 2020 Review* at 7), I-13 (containing *2010 China OCTG Final* at 6), I-14 (containing *2014 OCTG Final* at 12), and I-18 (containing *China OCTG Second Review* at 6-7).

[19] *See* Petitions at Volume I at 20-22 and Exhibits I-11 (containing *India et al OCTG 2020 Review* at 7), I-13 (containing *2010 China OCTG Final* at 6), I-14 (containing *2014 OCTG Final* at 12), and I-18 (containing *China OCTG Second Review* at 6-7).

[20] *See* Petitions at Volume I at 20-22.

[21] *See, e.g., Fujitsu Ltd. v. United States*, 36 F. Supp. 2d 394 (CIT 1999) (citing *Kern-Liebers USA, Inc. v. United States*, 881 F. Supp. 618, 621 (CIT 1995)) and *Initiation of Antidumping Duty Investigations: Spring Table Grapes from Chile and Mexico*, 66 FR 26831 (May 15, 2001).

[22] *See Notice of Final Determination of Sales at Less Than Fair Value:  Freshwater Crawfish Tail Meat from the People's Republic of China*, 62 FR 41347, 42357 (August 1, 1997).

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Barcode:4176347-01 A-357-824 INV - Investigation  -

**Industry Support Calculation**

In determining whether the petitioners have standing (*i.e.*, those domestic workers and producers supporting the Petitions account for:  (1) at least 25 percent of the total production of the domestic like product; and (2) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions), in accordance with sections 702(c)(4)(A) and 732(c)(4)(A) of the Act, we conducted the following analysis.

We considered the industry support data contained in the Petitions with reference to the domestic like product as defined in Attachment I, "Scope of the Investigation," to this Checklist and as discussed above.  The petitioners established the universe of producers based on the producers identified in the ITC's most recent full sunset review, *India et al OCTG 2020 Review*, and their knowledge of the industry.[23]  The petitioners identified 20 producers (including the petitioning companies Borusan, PTC Liberty, U.S. Steel, and Welded Tube) as the producers constituting the U.S. OCTG industry.[24]  In addition, the USW, the petitioning union, identified the U.S. OCTG production facilities with workers that are represented by the USW.[25]

To establish industry support, the petitioners provided their own production of the domestic like product in 2020.[26]  The petitioners provided letters of support from Kevin Kelly, President – Pipe Division at Wheatland Tube Company (Wheatland), stating the company's support for the Petitions and establishing its 2020 production of OCTG.[27]  In addition, the petitioners provided
[
                                                                              ] 2020 production of
OCTG.[28]  The petitioners also provided [

].[29]  In the [

] Petitions.[30]  In the [

] Petitions.[31]

---

[23] *See* First General Issues Supplement at 1-2 and Exhibits 1 (containing *India et al OCTG 2020 Review* at I-37) and 2.
[24] *See* Petitions at Volume I at 2-5; *see also* First General Issues Supplement at 1-2.
[25] *See* Second General Issues Supplement at 1 and Exhibit 1.
[26] *See* Petitions at Volume I at 5 and Exhibit I-3; *see also* First General Issues Supplement at 3-4 and Exhibits 4 and 8; and Second General Issues Supplement at Exhibit 5.
[27] *See* Petitioners' Letter, "Oil Country Tubular Goods from Argentina, Mexico, Russia, and the Republic of Korea: Response to Tenaris Submission Concerning Petitioners' Standing," dated October 18, 2021 (Petitioners' Letter) at 4 and Exhibit 6; *see also* Second General Issues Supplement at 1-2 and Exhibit 3.
[28] *See* Second General Issues Supplement at 1-2 and Exhibit 4.
[29] *See* First General Issues Supplement at 8 and Exhibit 5; *see also* Petitioners' Letter at 4 and Attachment 6; and Second General Issues Supplement at 1-2 and Exhibit 2.
[30] *See* First General Issues Supplement at 8 and Exhibit 5.
[31] *See* Petitioners' Letter at Attachment 6; and Second General Issues Supplement at Exhibit 2.

4

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Barcode:4176347-01 A-357-824 INV - Investigation  -

To estimate the total 2020 production of the domestic like product for the entire domestic industry, the petitioners relied on shipment data for [                    ] domestic OCTG shipments in 2020 as reported in [                                                          ], which the petitioners note is the recognized authority on the U.S. pipe and tube market, [

          ].[32]  The petitioners contend that the [                              ] data are the best available information regarding the volume of domestic OCTG shipments in 2020.[33]  The petitioners further contend that they do not have access to 2020 industry production data and that industry shipment data are a reasonable proxy for production of OCTG, noting that the difference between their production levels and shipments [                    ].[34]  The petitioners adjusted the domestic shipment data for 2020 reported in [                    ] by the ratio of the petitioners' export shipments to total shipments in order to estimate total shipments (*i.e.*, domestic and export shipments) in 2020.[35]  The petitioners then deducted their own 2020 shipments from the estimated total shipments to derive non-petitioning companies' shipments in 2020.[36]  To approximate non-petitioning companies' production from the available shipment data, the petitioners first calculated the historical ratio (2018-2019) of non-petitioning companies' production to shipments derived from data reported in the ITC's *India et al OCTG 2020 Review* and applied the resulting ratio to the estimated non-petitioning companies' shipments in 2020.[37]  The petitioners then added this estimated production to their own 2020 production to estimate total production for the entire U.S. OCTG industry.[38]  Using this methodology, the petitioners estimated total 2020 production of [          ] short tons for the entire domestic industry.[39]

As a conservative, alternative methodology, we calculated 2020 production estimates using the information available on the record on domestic shipments of OCTG for the entire industry in 2020, as reported in [                              ], and the publicly available information on U.S. producers' production and domestic shipments reported in the ITC's *India et al OCTG 2020 Review*.[40]  Specifically, based on the available information on the record from the ITC publication and the [                              ], we calculated the ratio of the U.S. industry's reported production to domestic shipments using data from the ITC publication and applied this ratio to the domestic shipment data from [                    ] to approximate total 2020

---

[32] *See* Petitions at Volume I at 6 and Exhibit I-2; *see also* First General Issues Supplement at 4-6 and Exhibit 6.
[33] *See* First General Issues Supplement at 5.
[34] *Id.* at 3, 6 and Exhibits 4 and 5.
[35] *Id*. at 5-6 and Exhibits 7 and 8; *see also* Petitioners' Letter at Exhibit 6; and Second General Issues Supplement at Exhibit 5.
[36] *See* First General Issues Supplement at 6 and Exhibit 8; *see also* Petitioners' Letter at Exhibit 6; and Second General Issues Supplement at Exhibit 5.
[37] *See* First General Issues Supplement at 6-7 and Exhibits 1, 4, and 8; *see also* Petitioners' Letter at Exhibit 6; and Second General Issues Supplement at Exhibit 5.
[38] *See* First General Issues Supplement at 7 and Exhibit 8; *see also* Petitioners' Letter at Exhibit 6; and Second General Issues Supplement at Exhibit 5.
[39] *See* First General Issues Supplement at Exhibit 8; *see also* Petitioners' Letter at Exhibit 6; and Second General Issues Supplement at Exhibit 5.
[40] *See* Petitions at Volume I at Exhibit I-2; *see also* First General Issues Supplement at Exhibits 1 and 8.

Filed By: Dmitry Vladimirov, Filed Date: 10/27/21 3:43 PM, Submission Status: Approved

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

production for the U.S. OCTG industry.[41]  Using this methodology, we estimated total 2020 production of [      ] short tons for the entire domestic industry.[42]

Based on the information in the Petitions, the share of estimated U.S. production of the domestic like product in calendar year 2020 represented by the supporters of the Petitions was equal to or more than 25 percent of total U.S. production, but less than 50 percent of total production of the domestic like product.  Under the petitioners' methodology, the supporters of the Petitions account for [      ] percent of total production of the domestic like product in 2020, which is well above the 25 percent threshold established in sections 701(c)(4)(A)(i) and 732(c)(4)(A)(i) of the Act.[43]  Under the alternative methodology described above, the supporters of the Petitions account for [      ] percent of total production of the domestic like product in 2020, which is also well above the 25 percent threshold established in sections 701(c)(4)(A)(i) and 732(c)(4)(A)(i) of the Act.[44]

Sections 702(c)(4)(D) and 732(c)(4)(D) of the Act require Commerce to poll the industry or rely on other information to determine industry support if the petition does not establish the support of domestic producers accounting for more than 50 percent of the total production of the domestic like product.  The Petitions did not establish the support of domestic producers accounting for more than 50 percent of the total production of the domestic like product.[45]  Therefore, we have relied on other information to determine industry support for the Petitions, pursuant to sections 702(c)(4)(D)(i) and 732(c)(4)(D)(i) of the Act.  Specifically, we note that, in the Petitions and Petitioners' Letter, the petitioners provided [

                                                               ] the Petitions.[46]  Accordingly, Commerce's reliance on [

                        ] as other information, pursuant to sections 702(c)(4)(D)(i) and 732(c)(4)(D)(i) of the Act, is a reasonable methodology to use in determining industry support under sections 702(c)(4)(A)(ii) and 732(c)(4)(A)(ii) of the Act.  On October 22, 2021, Tenaris USA indicated that it formally opposes the Petitions.[47]  However, it has not provided any

---

[41] *See* Table 1, Calculation of Industry Support, below.

[42] *Id.*  The production to shipments ratio for the reported 2018-2019 time period in the ITC report is 0.9935 (*i.e.*, 0.9935 = 6,060,077/6,099,888).  *See* First General Issues Supplement at Exhibit 1 and 8 (containing *India et al OCTG 2020 Review* at Tables III-5 and III-8).  Applying this ratio to the domestic shipment data from [
                       ] results in estimated production of [          ] short tons for the domestic industry (*i.e.*, [          ] =
[          ] * 0.9935).

[43] *See* Table I, Calculation of Industry Support, below.  We note that the petitioners understated the supporters' share for the 25 percent test, as they did not include the support from Wheatland [                        ] in the numerator of their calculation.  *See* Second General Issues Supplement at Exhibit 5.  We have corrected this calculation in Table I, Calculation of Industry Support, to properly account for all supporters of the Petitions in the numerator.

[44] *See* Table 1, Calculation of Industry Support, below.

[45] *See* Second General Issues Supplement at Exhibit 5; *See also* Table I, Calculation of Industry Support, below.

[46] *See* First General Issues Supplement at Exhibit 5; *see also* Petitioners' Letter at Attachment 6; and Second General Issues Supplement at Exhibit 2.

[47] In its October 22, 2021, comments on industry support, Tenaris Bay City, Inc.; IPSCO Tubulars Inc.; Maverick Tube Corporation; and Tenaris Global Services (U.S.A.) Corporation (collectively, Tenaris USA), U.S. producers of OCTG, formally indicates opposition to the Petitions.  *See* Tenaris USA's Letter, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia:  Comments on Petitioners' Second General Issues Questionnaire Response," dated October 22, 2021 (Tenaris USA Letter IV) at 2.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Barcode:4176347-01 A-357-824 INV - Investigation  -

production data for Commerce to include in the industry support calculation.  Accordingly, because [                                                  ] Petitions,[48] we find that the supporters of the Petitions account for [    ] percent of the total U.S. production of those parties expressing an opinion on the Petitions for which we have production data.[49]

In addition, we note that, even assuming that all other known U.S. producers of OCTG oppose the Petitions (including Tenaris USA), [                                            ], under the petitioners' methodology, the supporters of the Petitions would account for [    ] percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions.[50]  Under the alternative methodology, the supporters of the Petitions would account for [    ] percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions.[51]  Thus, even assuming *arguendo* that all other U.S. producers of OCTG oppose the Petitions (including Tenaris USA), the supporters of the Petitions would still have the requisite level of support pursuant to sections 702(c)(4)(A)(ii) and 732(c)(4)(A)(ii) of the Act.

**Table 1**
**Calculation of Industry Support**

| U.S. Producers | 2020 Production of OCTG (short tons) | Position |
|---|---|---|
| Borusan (Petitioner) | [      ] | Support |
| PTC Liberty (Petitioner) | [      ] | Support |
| U.S. Steel (Petitioner) | [      ] | Support |
| Welded Tube (Petitioner) | [      ] | Support |
| Wheatland Tube | [      ] | Support |
| [                    ] | [      ] | [                    ] |
| [                    ] | [      ] | [         ] |
| [                    ] | [      ] | [         ] |
| **Total 2020 Production of the Supporters of the Petitions** | [      ] | |

---

[48] In its fourth submission, Tenaris USA formally states that it opposes the Petitions.  We note that, though Tenaris USA opposes the Petitions, it has not provided any production data for Commerce to include in the industry support calculation.  For further discussion, *see* "Challenges to Industry Support" section, *infra*.
[49] *See* sections 702(c)(4)(A)(ii) and 732(c)(4)(A)(ii) of the Act; *see also* Table 1, Calculation of Industry Support.
[50] *See* Table 1, Calculation of Industry Support.
[51] *Id.*

7

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Barcode:4176347-01 A-357-824 INV - Investigation -

| Total 2020 U.S. Production of OCTG | 1st Methodology: [     ] | 2nd Methodology:[52] [     ] |
|---|---|---|
| **Total Support** | [     ] | [     ] |
| **Total Opposition** | [     ] | [     ] |
| **Total Opinion** | [     ] | [     ] |
| **Total Neutral** | [     ] | [     ] |
| **Support/Total (25% test)** | [   ]% | [   ]% |
| **Support/Opinion (50% test)** | [   ]% | [   ]% |
| **Support/Opinion (50% test)** (assuming all other U.S. OCTG producers oppose the Petitions)[53] | [   ]% | [   ]% |

## Challenges to Industry Support

On October 8 and 15, 2021, we received comments on industry support from Tenaris USA, a U.S. producer of OCTG.[54]  The petitioners responded to the industry support comments from Tenaris USA on October 18, 2021.[55]  On October 20, 2021, Tenaris USA responded to the petitioners' rebuttal.[56]  On October 21, 2021, the Government of Russia (GOR) raised industry support comments during consultations held with respect to the Russia countervailing duty (CVD) Petition.[57]  Also, on October 21, 2021, we received comments on industry support from TMK Group (TMK), a Russian producer and exporter of OCTG.[58]  On October 22, 2021, we received additional comments on industry support from Tenaris USA.[59]  Also on October 22,

---

[52] Based on the available information on the record, Commerce calculated alternative 2020 production estimates using the ratio of production to domestic shipments derived from data in the ITC's *India et al OCTG 2020 Review* and applying this ratio to the 2020 domestic shipment data for the industry from [                    ].

[53] This is a conservative calculation because some of those producers have workers represented by the USW.  These calculations take into account the opposition of Tenaris USA, who formally opposes the Petitions but did not provide its production data to Commerce in any of its four submissions challenging industry support.  The calculations were derived as follows:  1st Methodology ([     ]/([     ]-[     ]) = [   ] percent; 2nd Methodology ([     ]/([     ]-[     ]) = [   ] percent).

[54] *See* Tenaris USA's Letters, "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia:  Factual Errors in Petitions," dated October 8, 2021 (Tenaris USA Letter I); and "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia:  Comments on Petitioners' Standing," dated October 15, 2021 (Tenaris USA Letter II).

[55] *See* Petitioners' Letter.

[56] *See* Tenaris USA's Letter, "Oil Country Tubular Goods from Mexico:  Reply Comments on Petitioners' Standing," dated October 20, 2021 (Tenaris USA Letter III).

[57] *See* Memorandum, "Countervailing Duty Petition on Oil Country Tubular Goods from the Russian Federation:  Consultations with Officials from the Government of the Russian Federation," dated October 21, 2021 (Russia CVD Consultations Memo); *see also* GOR Letter, "Re:  Countervailing Duty Investigation of Certain Oil Country Tubular Goods from the Russian Federation:  Consultations," dated October 25, 2021 (GOR Letter) at 2.

[58] *See* TMK's Letter, "Oil Country Tubular Goods from Russia:  Comments on Petitioners' Standing," dated October 21, 2021 (TMK Letter).

[59] *See* Tenaris USA Letter IV.

8

2021, the petitioners responded to TMK's comments.[60]  The parties make the following arguments:

### 1) Whether the petitioners' industry support calculation is flawed and insufficient

In its October 8, 2021, submission, Tenaris USA argues that there are several factual errors in the industry support calculation contained in the Petitions and that such flaws warrant that Commerce should dismiss the Petitions or, in the absence of rejecting the Petitions, extend the deadline and poll the industry.[61]  Specifically, Tenaris USA argues that the petitioners inappropriately deduct from the denominator of the industry support calculation production figures for certain mills that the petitioners claim are represented by the USW but, according to Tenaris USA, are non-unionized mills.[62]  In addition, Tenaris USA argues that, consistent with the wording of the statute, Commerce should rely only on production data offered by the petitioners, not on shipment data.[63]  Tenaris USA further contends that the petitioners' use of "anomalous" 2020 production data does not accurately reflect the domestic industry as currently constituted, noting that there were unique market factors that rendered the steel market in 2020 volatile and "highly" unusual.[64]  Furthermore, Tenaris USA argues that Commerce must consider how the changed market conditions affect whether a petition filed in October 2021 was filed on behalf of the industry, as provided in the statute, and whether data from a different, more representative period are appropriate.[65]

In its October 15, 2021, submission, Tenaris USA reiterates its arguments regarding the factual errors pertaining to non-unionized mills, the original industry support calculation in the Petitions, and the use of anomalous 2020 production data in the industry support calculation, given the fact that the market has changed dramatically, with OCTG demand recovering in 2021 and projected to continue increasing.[66]  Tenaris USA also contends that the petitioners' modified approach to the industry support calculation in the First General Issues Supplement relies on total industry production and domestic shipment volumes for 2018 and 2019—an even more distant period and an approach that also rests on flawed assumptions.[67]  According to Tenaris USA, these inadequacies and the failure to satisfy the 50 percent threshold warrant rejection of the Petitions.[68]  Tenaris USA further contends that, at the very least, Commerce should extend the deadline for initiation and poll the industry to obtain reliable data to ensure the petitions have been filed "by or on behalf of the industry."[69]

---

[60] *See* Petitioners' Letter, "Oil Country Tubular Goods from Russia:  Response to TMK's Comments on Petitioners' Standing," dated October 22, 2021 (Petitioners' Letter II).
[61] *See* Tenaris USA Letter I at 1-2.
[62] *Id.* at 3-5.
[63] *Id.* at 5-6.
[64] *Id.* at 6-7.
[65] *Id.* at 7.
[66] *See* Tenaris USA Letter II at 2-9.
[67] *Id.* at 3.
[68] *Id.* at 7.
[69] *Id.* at 3 and 7.

9

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

In its October 15, 2021, submission, Tenaris USA also contends that the industry support calculation suffers from another potential flaw with respect to OCTG finishing operations.[70] According to Tenaris USA, two of the petitioning companies (Borusan and PTC Liberty) appear to have potentially significant finishing operations relative to their actual OCTG production, and it is unclear what portion of Borusan's operations involves actual pipe production, as opposed to finishing operations for green tube.[71] Tenaris USA argues that this deficiency further justifies a decision by Commerce to poll the industry and require that any production data provided do not include OCTG that companies merely finish rather than produce.[72]

In their October 18, 2021, submission, the petitioners rebut the arguments from Tenaris USA and contend that Tenaris USA's suppositions with respect to flaws lack any evidentiary support.[73] The petitioners contend that they have revised their industry support calculation using the best available information regarding U.S. production and have established adequate industry support for Commerce to initiate the investigations.[74] The petitioners note that their revised industry support calculation does not rely upon any specific mill production where employees are represented by the USW.[75] In addition, the petitioners contend that the revised calculation is conservative because it does not rely on any production at non-petitioning companies' OCTG mills that are represented by the USW, including that of EVRAZ Pueblo.[76] The petitioners note that they used their own information "to the maximum extent possible" and limited the estimated figures to non-petitioning companies where no public available production information was available.[77] The petitioners further note that they relied on historical data reported to the ITC to estimate 2020 production and shipment data and contend that, if Tenaris USA possessed factual information to call the ITC's data into question, it could have and should have provided such data.[78] Moreover, the petitioners note that Tenaris USA [

].[79] Regarding Tenaris USA's assertion that Commerce should not rely on 2020 data for measuring industry support, the petitioners note that Tenaris provides no suggested alternate period nor any legal authority requiring Commerce to use another period.[80] The petitioners contend that, given that existing data (*i.e.*, ITC production and shipment data and [

]) are available on an annual basis, using calendar year 2020 "makes logical sense."[81]

In their October 18, 2021, submission, the petitioners further note that finishing processing operations for green tube have "long been recognized" by the ITC as domestic production by the U.S. OCTG industry.[82] For support, the petitioners note that, in the *2014 OCTG Final*

---

[70] *Id.* at 9.
[71] *Id.* at 10.
[72] *Id.* at 10.
[73] *See* Petitioners' Letter at 2-13.
[74] *Id.* at 3-4.
[75] *Id.* at 3 and 8.
[76] *Id.* at 4 and 8.
[77] *Id.* at 6.
[78] *Id.*.
[79] *Id.*
[80] *Id.* at 9.
[81] *Id.*
[82] *Id.* at 3 and 6.

10

investigations, the ITC applied its traditional six factor analysis regarding a firm's U.S. production-related activities and concluded that processors engage in sufficient production-related activities to be considered domestic producers of OCTG.[83]  The petitioners further note that in subsequent reviews, including the *India et al OCTG 2020 Review*, the ITC again included processors of green tube in the domestic industry.[84]

In its October 20, 2021, submission, Tenaris USA reiterates its arguments from its two previous submissions with respect to the industry support calculation.[85]  Tenaris USA states that it has raised a number of issues regarding industry support, which the petitioners have not resolved and which Commerce should investigate further.[86]  After reiterating its contention that 2020 data are anomalous, Tenaris USA argues that Commerce should poll the domestic industry and request actual production data, including for the most recent 12 months.[87]  Tenaris USA further reiterates its arguments that the petitioners' own production and/or shipment data might include data pertaining to finishing operations, rather than production of OCTG, and argues that the petitioners do not address how the issue of finishing pertains to industry support.[88]  In addition, Tenaris USA questions whether imported, subsidized OCTG from Turkey for finishing in the United States should be included in the industry support calculation, contending that such an issue warrants a pause in the industry support analysis to collect additional data.[89]  Tenaris USA further notes that the petitioners do not address the fact that PTC Tubulars was not identified as a U.S. producer in the ITC's *India et al OCTG 2020 Review*, yet the company is identified as part of the U.S. industry in the Petitions.[90]

In their October 21, 2021, Second General Issues Supplement, the petitioners clarify that the USW represents workers engaged in the production of OCTG at the following facilities: EVRAZ Pueblo in Pueblo, CO; Tenaris USA in Ambridge, PA, Koppel, PA, and Wilder, KY; U.S. Steel in Bellville, TX, Fairfield, AL, Lone Star, TX, and Lorain, OH; and Wheatland Tube in Warren, OH, and Wheatland, PA.[91]  The petitioners reiterate that its revised calculations do not rely on any production for non-petitioning OCTG mills represented by the USW.[92]  The petitioners further note that, even without accounting for union support at the mills referenced above, which they note would only increase the total level of industry support, the petitioners still account for more than 50 percent of that portion of the domestic industry that has expressed support for or opposition to the Petitions.[93]  Furthermore, the petitioners note that, while USW support establishes additional levels of industry support, USW support is not necessary to initiate the investigations.[94]

---

[83] *Id.* at 7-8; *see also* Petitions at Volume I at Exhibit I-14 (containing *2014 OCTG Final* at 13).
[84] *See* Petitioners' Letter at 8; *see also* Petitions at Volume I at Exhibit I-11 (containing *India et al OCTG 2020 Review* at 7-9).
[85] *See* Tenaris USA Letter III at 1-15.
[86] *Id.* at 9-10.
[87] *Id.* at 6-7.
[88] *Id.* at 8.
[89] *Id.* at 9.
[90] *Id.* at 8.
[91] *See* Second General Issues Supplement at 1 and Exhibit 1.
[92] *Id.* at 1.
[93] *Id.*
[94] *Id.* at 2.

11

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

In its October 21, 2021, submission, TMK expresses its support for the arguments raised in Tenaris USA's submissions.[95]  Referencing a past case involving *Large Power Transformers*,[96] TMK notes that Commerce has previously acknowledged that it will depart from its standard practice of using production data from the previous calendar year where there is a "compelling argument that a different time period is more appropriate."[97]  TMK  argues that calendar year 2020 data are inappropriate for evaluating industry support and that there is a compelling reason to use a more recent period because of unique conditions in the OCTG market.[98]  In addition, TMK argues that there have been unique and significant changes in the OCTG market as to make calendar year 2020 data or proxy production data less appropriate than production data from a more recent 12-month period for evaluating industry support.[99]  TMK notes that, based on *Preston Pipe and Tube's* July 2021 report, changes have occurred in the U.S. OCTG market between 2020 and 2021, noting that domestic shipments of welded OCTG and seamless OCTG [     ] between the first half of 2020 and the first half of 2021.[100]  According to TMK, such data indicate that production figures that take into account the first half of 2021 should look different than production figures for calendar year 2020.[101]  TMK further contends that it is likely that the petitioners' production was far lower during a more recent 12- month period than calendar year 2020 and that the trends suggest that the petitioners would lack the requisite support over a more recent 12-month period.[102]  Moreover, TMK contends that the 2018-2019 ITC data, which the petitioners used to estimated 2020 production data, are not representative of the OCTG market in 2020.[103]  As a result, TMK argues that Commerce should reject the petitioners' industry support calculation and poll the industry to ensure the Petitions are adequately supported over a recent and representative 12-month period.[104]  TMK further argues that, if Commerce determines that 2020 production data are sufficiently representative of the U.S. OCTG industry, then Commerce should disregard the petitioners' industry support calculation and poll the industry for "proper" 2020 production data.[105]

In its October 22, 2021, submission, Tenaris USA reiterates its arguments regarding the factual errors pertaining to USW mills, use of 2020 production data, inclusion of processors/finishers, and use of unfairly traded OCTG imports for finishing in the industry support calculation.[106] Tenaris USA notes that the petitioners submitted a fourth revised industry support calculation in the Second General Issues Supplement and contends that the successive changes to the industry support go beyond what Commerce should countenance in the exercise of reasonable discretion in amending a petition.[107]  Tenaris USA further argues that the revised industry support

---

[95] *See* TMK Letter at 2.
[96] *See Large Power Transformers from the Republic of Korea:  Initiation of Antidumping Duty Investigation*, 76 FR 49439 (August 10, 2011) (*Large Power Transformers*), and the unpublished Initiation Checklist, at Attachment II at 19; *see also* TMK Letter at Exhibit 1.
[97] *Id.* at 3-4 and Exhibit 1.
[98] *Id.* at 3-4.
[99] *Id.* at 3-7.
[100] *Id.* at 5 and Exhibit 2.
[101] *Id.* at 5.
[102] *Id.* at 6-7.
[103] *Id.* at 7-8.
[104] *Id.* at 7.
[105] *Id.*
[106] *See* Tenaris USA Letter IV at 4-5.
[107] *Id.* at 2.

12

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED
Barcode:4176347-01 A-357-824 INV - Investigation -

calculation in the Second General Issues Supplement is based on flawed data and assumptions and that the petitioners remain unable to satisfy their burden to demonstrate standing.[108]  Tenaris USA also notes that it opposes the Petitions and contends that the Petitions should be dismissed or withdrawn.[109]  In the alternative, Tenaris USA argues Commerce should extend the initiation deadline and poll the industry.[110]

In their October 22, 2021, submission, the petitioners note that TMK asserts arguments already presented by Tenaris that have been either disproven or shown to be irrelevant.[111]  The petitioners reiterate that their calculation is conservative, using the best information available to them, and does not factor the support of mills with USW representation into the calculation.[112]  The petitioners note that, like Tenaris, TMK fails to provide any suggested alternate period for calculating industry support and lacks any legal authority requiring Commerce to depart from its longstanding practice of measuring industry support over the most recently completed calendar year.[113]  The petitioners further note that, though TMK cites to *Large Power Transformers* for support of its arguments regarding the time period used for industry support, the case actually highlights that the use of estimates does not require Commerce to poll the industry.[114]  The petitioners contend that they have not only factored in actual production data from the petitioning companies [                                        ], they have also provided a reasonable estimate of total production based on the best available information, including information from the ITC and [                            ].[115]  Furthermore, the petitioners note that Commerce has accepted similar estimates in past cases, particularly when those in opposition to a petition provide no alternative estimate of total U.S. production or any evidence that the petitioners' estimates are inaccurate, and as such, contend that Commerce should similarly accept the petitioners' estimates of U.S. production in this case.[116]  The petitioners also point out that Tenaris USA has failed to provide any production data that would prove that its production is sufficient to prevent the supporters of the Petitions from reaching the 50 percent threshold, nor has it provided any data on domestic production that should be used in a revised calculation of industry support.[117]  According to the petitioners, this is likely because providing such data would demonstrate that the petitioners have overwhelmingly met the requisite level of support.[118]

**Commerce's Position**

As an initial matter, we note that the petitioners clarified which mills are represented by the USW in the Second General Issues Supplement.[119]  Regarding Tenaris USA's contention that the

---

[108] *Id.* at 3.
[109] *Id.* at 2.
[110] *Id.* at 2-3.
[111] *See* Petitioners' Letter II at 2.
[112] *Id.* at 2.
[113] *Id.*
[114] *Id.* at 3.
[115] *Id.*
[116] *Id.* at 3-4.
[117] *Id.* at 4.
[118] *Id.*
[119] *See* Second General Issues Supplement at 1 and Exhibit 1.

13

petitioners' original standing calculation is flawed, we note that, as described above, starting with the First General Issues Supplement, which was filed on October 12, 2021, and in subsequent submissions, the petitioners relied on an updated industry support calculation that does not take into account the production of those mills at non-petitioning companies that are represented by the petitioning union, the USW, nor does it involve any adjustments for these non-petitioning USW-represented mills for purposes of calculating the 50 percent support/opinion test. Therefore, the comments from Tenaris USA regarding the factual errors and other flaws pertaining to the USW mills' production in the original standing calculation in the Petitions are moot. We further note that the petitioners' revised calculation is conservative, as it does not include the production of EVRAZ Pueblo's Pueblo, CO, mill, which the USW represents, in the numerator.[120]

With respect to the inclusion of OCTG finishing operations, including the finishing of green tube, our examination of the record gives us no reason to believe that these finishing operations should not be included as production of the domestic like product. The scope and domestic like product of these investigations includes OCTG "whether finished…or unfinished (including green tubes and limited service OCTG products)."[121] In past proceedings involving similar scopes, the ITC has found that OCTG, as defined in the scope, constitutes a single like product and that green tube processing constitutes domestic production.[122] Tenaris USA does not contest these arguments or the petitioners' definition of the domestic like product as co-extensive with the scope. In addition, the data from the ITC that the petitioners used in their industry support calculation clearly include finishing activities. Accordingly, the information on the record supports the conclusion that petitioners properly accounted for production of the domestic like product in their industry support calculation. Furthermore, we note that the petitioners previously indicated that Boomerang Tube, identified as a U.S. producer in *India et al OCTG 2020 Review*, is now PTC Liberty.[123] Tenaris USA also questions the reliability of petitioners' own data, particularly with respect to whether the industry support calculation includes imported, subsidized OCTG from Turkey that it asserts has been processed by Borusan.[124] However, in addition to being an unsubstantiated assertion, this is irrelevant to the question of industry support. The statute is clear that industry support is calculated based on "production of the domestic like product"[125] and does not envision adjustments to the industry support calculation to adjust for potentially subsidized inputs.

With respect to the sufficiency of the petitioners' industry support calculations, the petitioners have provided, with supporting documentation, reasonable estimates of total 2020 production of OCTG in the United States, which are ultimately derived from domestic shipment data for the industry. Sections 702(c)(4)(A) and 732(c)(4)(A) of the Act state that industry support is measured using *production* of the domestic like product. Further, Commerce's regulations state that

---

[120] We also note that the denominator of the petitioners' revised calculation for the 50 percent support/opinion test is overstated, because it counts Tenaris USA's full production as opposition, not just the production of those mills operated by Tenaris USA that are not represented by the USW.

[121] *See* Attachment I, Scope of the Investigation.

[122] *See, e.g.*, *2014 OCTG Final* at 13; *see also, e.g.*, *India et al OCTG 2020 Review* at 6-7.

[123] *See* First General Issues Supplement at 1 and Exhibit 1 (containing *India et al OCTG 2020 Review* at I-37).

[124] *See* Tenaris USA Letter III at 9; *see also* Tenaris USA Letter IV at 5.

[125] *See, e.g.*, section 702(c)(4)(A) and 732(c)(4)(A).

14

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

"{t}he Secretary normally will measure production over a twelve-month period specified by the Secretary, and may measure production based on either value or volume. Where a party to the proceeding established that production data for the relevant period, as specified by the Secretary, is unavailable, production levels may be established by reference to alternative data that the Secretary determines to be indicative of production levels."[126]

While Commerce has relied on alternative data, such as shipment data, as a proxy for production in past cases, we do so when production data are not reasonably available to the petitioners. Because 2020 production data were not available for the entire domestic industry, the petitioners provided reasonably available domestic shipment data for the U.S. OCTG industry and used these data as the starting point, making adjustments and accompanied by supporting documentation, to ultimately approximate production. We note that the petitioners provide their own production data, as well as production data for Wheatland, [          ]. We further note that Tenaris USA has not provided any evidence or made any arguments to impugn the [                    ] shipment data, which form the basis of the denominator used in the petitioner's calculation of industry support. In addition, we note that Tenaris USA has not provided its own production data to include in the calculation, despite having ample opportunity to do so in any of its four submissions challenging industry support.

In its fourth submission, Tenaris USA complains that the petitioners' revised their industry support calculation in the Second General Issues Supplement, but fails to acknowledge that the calculation was updated to [          ]. The petitioners' methodology for calculating total U.S. production of OCTG has remained the same since the First General Issues Supplement filed on October 12, 2021, where the petitioners revised the calculation in response to questions from Commerce and Tenaris USA's October 8, 2021, submission. The petitioners updated the calculation to account for Wheatland's support, [                              ], but the underlying methodology remained unchanged. We note that amending a petition is permissible under Commerce's regulations,[127] and a petitioner may amend the petition at any time during the pre-initiation period. Commerce has the discretion to accept the petition amendment, ask for further clarification, or reject an amendment. Moreover, all amendments and supplements are considered part of the "Petitions" as a whole.[128] As such, it is not unreasonable, as Tenaris USA contends, for the petitioners to revise their industry support calculation to accurately reflect the support [                    ] for the Petitions. Moreover, we note that the clarifications and revised declarations contained in the Second General Issues Supplement were based on a request from Commerce.

Although Tenaris USA and TMK argue that the ITC historical ratios are insufficient, it is unclear on what basis they make such a claim. Tenaris USA and TMK object to the petitioners' use of the most recently available industry-wide production and shipment data from the *India et al OCTG 2020 Review* to derive a ratio to approximate production from the available domestic

---

[126] *See* 19 CFR 351.203(e)(1).
[127] *See* 19 CFR 351.202(e).
[128] *See*, *generally*, sections 702(b)(1) and 732(b)(1) of the Act, "{t}he petition may be amended at such time, and upon such conditions, as {Commerce}…may permit."

15

# CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

shipment data for the entire U.S. OCTG industry, as reported in [                    ], but they do not offer any alternative sources or production estimates that would, in their view, be more reliable.  In many cases, Commerce has accepted industry support calculations that are based, in whole or in part, on production or shipment data obtained from an ITC report.[129]  Moreover, we note that Commerce has accepted similar estimates in past cases.[130]  As Commerce has noted in past cases, neither the statute nor regulations prevent the petitioners from estimating the production of the non-petitioning companies.[131]  Nor does the statute or regulations require Commerce to poll the industry if the petitioners provide reasonable estimates of non-petitioning company production.[132]  The use of estimates does not require Commerce to poll the industry.

With respect to Tenaris USA's and TMK's contention that the 2020 time period is anomalous and inappropriate, we see no reason to depart from our longstanding practice of measuring production over the most recently completed calendar year for purposes of determining industry support.  We note that Tenaris USA contends that another time period would be more appropriate, but it does not offer a specific time period that would be more appropriate, only broadly suggesting that Commerce should poll the industry and request production data, "including for the most recent 12 months."[133]  Moreover, despite its arguments regarding anomalous production data for 2020, Tenaris USA did not provide any production or shipment data or any other relevant data for comparison purposes to support its contention that an alternate time period is more appropriate than calendar year 2020 for purposes of determining industry support.  TMK also argues that another time period is appropriate and, like Tenaris USA, does not identify what period would be more appropriate, simply suggesting "a recent and representative 12-month period."[134]  TMK notes that industry shipments of OCTG reported by Preston Pipe and Tube [     ] from the first half of 2020 to the first half of 2021 and speculates that the petitioners likely produced far less in a more recent 12-month period than in calendar year 2020, but it is unclear how fluctuations in production and product mix from year-to-year are compelling arguments to support a departure from Commerce's longstanding practice of measuring industry support over the most recently completed calendar year.  In fact, Commerce has declined to adjust the time period for industry support in other cases where parties made similar arguments regarding changes in the state of the industry.[135]  In any antidumping or countervailing duty petition where a domestic industry is alleging material injury to the domestic industry by reason of dumped or subsidized imports, the industry may have produced far less in a more recent 12-month period than the most recently completed calendar year period used by Commerce to determine industry support.  However, given TMK's assertion that trends suggest the petitioners would lack the requisite support over a more recent 12-month period, it appears the ultimate basis of TMK's argument is for Commerce to adjust the time period analyzed for

---

[129] *See, e.g.*, *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam*, 85 FR 23002, 23004 (April 24, 2020).
[130] *See* Petitioners' Letter II at 3; *see also* TMK Letter at Exhibit 1.
[131] *See* Petitioners' Letter II at 3; *see also* TMK Letter at Exhibit 1.
[132] *See* Petitioners' Letter II at 3; *see also* TMK Letter at Exhibit 1.
[133] *See* Tenaris USA Letter III at 7.
[134] *See* TMK Letter at 7.
[135] *See, e.g.*, *Initiation of Antidumping Duty Investigation:  Circular Seamless Stainless Steel Hollow Products from Japan*, 64 FR 63285, 63287 (November 19, 1999).

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

industry support to move the needle in such a way so that the Petitions no longer have the requisite level of support.

Finally, as noted above, as an alternative methodology, we used the publicly available record information on industry-wide production and shipments for 2018-2019 to derive the ratio of industry-wide shipments to production and directly applied this ratio to the 2020 domestic shipment data available for the entire U.S. OCTG industry to approximate total U.S. production of OCTG in 2020.[136]  This alternative calculation takes into account the industry-wide ratio of production to shipments, as reported in the ITC's *India et al OCTG 2020 Review* (and without an adjustment for export shipments), not the petitioners' own ratios or the ratios derived for the "non-petitioners," which Tenaris USA contends are skewed.  Tenaris USA proposes its own alternative calculation using [

            ] and contends that the calculation [

                            ].[137]  However, Tenaris USA's alternative calculation did not account for Wheatland's production [

        ].[138]  Commerce's alternative methodology of applying the industry-wide ratio using the data available on the record to the industry domestic shipment data to estimate the entire industry's production and Tenaris USA's proposed alternative methodology, once corrected to properly account for the production noted above, lead to the same end results as the petitioners' calculation—*i.e.*, the supporters of the Petitions account for more than 25 percent of total U.S. production, but less than 50 percent of total production of the domestic like product.[139]  TMK argues that the 2018-2019 ITC data used to estimate 2020 production data are not representative of the OCTG market in 2020, however, using the petitioners' 2020 ratio of production to domestic shipments to adjust the industry-wide domestic shipments yields the same results— *i.e.*, the supporters of the Petitions account for more than 25 percent of total U.S. production, but less than 50 percent of total production of the domestic like product.[140]  Moreover, Commerce's reliance on other information (*i.e.*, [

            ]) to determine industry support for the Petitions, pursuant to sections 702(c)(4)(D)(i) and 732(c)(4)(D)(i) of the Act, is unchanged under the alternative methodologies, and, as such, polling is not required.  Furthermore, because [

                            ] Petitions, under the alternative Commerce and Tenaris USA calculations, we also find that the supporters of the Petitions account for [    ] percent of the total U.S. production of those parties expressing an opinion on the Petitions for which we have production data.[141]  Even if we assume all other U.S. producers oppose the Petitions, in addition to the

---

[136] *See* Table I, Calculation of Industry Support, above.

[137] *See* Tenaris Letter II at 6-7 and Exhibit 1.

[138] *Id.* at Exhibit 1.

[139] As explained above, depending on the methodology applied, the supporters of the Petitions account for [    ] percent, [    ] percent, or [    ] percent of total U.S. production.  The calculation under Tenaris USA's alternative methodology, once corrected, is as follows:  [    ]/[    ] = [    ] percent.

[140] Applying the petitioners' 2020 ratio of production to domestic shipments to the industry-wide 2020 domestic shipment data from [                    ] results in estimated total U.S. production of [    ] short tons (*i.e.*, [    ] * ([    ]/[    ]) = [    ]).  Under this methodology, the supporters of the Petitions account for [    ] percent of total U.S. production (*i.e.*, [    ]/[    ] = [    ] percent).

[141] As noted above, Tenaris USA did not provide its production for Commerce to account for its opposition in the industry support calculation [    ], despite having ample opportunity to do so.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

opposition expressed by Tenaris USA, under Commerce's and Tenaris USA's alternative methodologies, the supporters of the Petitions would account for [    ] percent, [    ] percent, or [    ] percent of the production of the parties expressing an opinion on the Petitions.[142] Accordingly, Commerce determines that the petitioners have provided reasonably available information to account for total production of the domestic like product in their industry support calculation and that the Petitions have met the requirements under sections 702(c)(4)(A) and 732(c)(4)(A) of the Act.

   2)  *Whether Commerce should poll the industry to determine industry support*

In each of its submissions, Tenaris USA argues that flawed assumptions, errors, and other inadequacies raise serious doubts about whether the Petitions satisfy the 50 percent test and, as such, Commerce must extend the deadline to poll the industry.[143]

In its October 18, 2021, submission, the petitioners argue that Tenaris USA has failed to demonstrate that the Petitions do not establish the requisite 50 percent support among total production of domestic producers expressing a position on the Petitions.[144]  The petitioners further argue that only then would Commerce have an obligation under sections 702(c)(4)(D) and 732(c)(4)(D) of the Act to make further inquiry about industry support by either polling the industry or relying on other information.[145]  The petitioners further note that Tenaris never proffers its total production of OCTG that should be used in a revised calculation of industry support and, without such production data, the record does not demonstrate enough opposition to trigger the requirement for Commerce to poll the industry or rely on other information to determine industry support.[146]

In the October 21, 2021, Russia CVD consultations, the GOR requested that Commerce extend the initiation deadline and poll the industry.[147]

In its October 21, 2021, submission, TMK argues that the petitioners have not established that domestic producers or workers who support the Petitions account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the Petitions over an appropriate 12-month period.[148]  As a result, TMK contends that, if Commerce does not outright reject initiation, Commerce should extend the initiation deadline and poll the industry to collect the requisite information.[149]

---

[142] *See* Table I, Calculation of Industry Support; *see also* Tenaris Letter II at Exhibit 1 (once corrected to account for Wheatland's production [                                    ]).  The calculation under Tenaris USA's alternative methodology, once corrected, is as follows:  [      ]/([                ]) = [    ] percent.  Using the petitioners' 2020 ratio of production to shipments to adjust the industry shipment data to approximate production described above, even if we assume all other U.S. producers (including Tenaris USA) oppose the Petitions, the supporters of the Petitions would account for [      ] percent of the production of the parties expressing an opinion on the Petitions (*i.e.*, [      ]/([                ]) = [    ] percent).
[143] *See* Tenaris USA Letters I, II, III, and IV.
[144] *See* Petitioners' Letter at 10.
[145] *Id.* at 10.
[146] *Id.*
[147] *See* Russia CVD Consultations Memo; *see also* GOR Letter at 2.
[148] *See* TMK Letter at 3.
[149] *Id.*

# CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

In their October 22, 2021, submission, the petitioners note that the record, as it stands without Tenaris USA's production, does not demonstrate enough opposition to trigger the requirement for Commerce to poll the industry or rely on other information to determine industry support.[150] The petitioners contend that TMK and Tenaris want Commerce to ignore the petitioners' demonstration of industry support to go on a "fishing expedition" to find evidence that they, themselves are unwilling to provide, just to delay the inevitable initiation of these investigations.[151]  The petitioners further note that sections 702(c)(4)(D) and 732(c)(4)(D) of the Act set out that only when the petitioners do not establish the requisite 50 percent support threshold will Commerce have an obligation to make further inquiry about industry support.[152]

**Commerce Position:**

Based on the information provided in the Petitions and supplements thereto, including the petitioners' response to the industry support comments from Tenaris USA, we find that the petitioners provided reasonably available information, in accordance with the requirements of the statute[153] and Commerce's regulations,[154] to account for all production of the domestic like product in their industry support calculation and have the industry support required by sections 702(c)(4)(A) and 732(c)(4)(A) of the Act.  Sections 702(c)(4)(D)(i) and 732(c)(4)(D)(i) of the Act provide that, if the petition does not establish support of domestic producers of workers accounting for more than 50 percent of the total production of the domestic like product, Commerce shall poll the industry or rely on other information to determine if there is support for the petition.  As described above, because the supporters of the Petitions accounted for at least 25 percent of total U.S. production, but less than 50 percent of total U.S. production,[155] Commerce relied on other information available (*i.e.*, [                    
                            ]) and determined that domestic producers (or workers) who support the Petitions have the requisite level of industry support for Petitions, pursuant to sections 702(c)(4)(D)(i) and 732(c)(4)(D)(i) of the Act.  When Commerce relies on other information (*i.e.*, [                                                            ]) in accordance with sections 702(c)(4)(D)(i) and 732(c)(4)(D)(i) of the Act, under multiple calculation methodologies described above, including the alternative calculation provided by Tenaris, the Petitions have the required level of industry support for initiating these investigations.  As a result, it is unnecessary for Commerce to poll the industry to determine industry support.

    *3)  Whether Commerce should disregard opposition to the Petitions*

In its October 15, 2021, submission, Tenaris USA contends that it is the largest U.S. producer of OCTG and has made major investments in its U.S. pipe manufacturing presence over the

---

[150] *See* Petitioners' Letter II at 4-5.
[151] *Id.* at 5.
[152] *Id.*
[153] *See* sections 702(c)(4) and 732(c)(4) of the Act.
[154] *See* 19 CFR. 351.203(e).
[155] As explained above, depending on the methodology applied, the supporters of the Petitions account for [     ] percent, [     ] percent, or [     ] percent of total U.S. production.  *See* Table I, Calculation of Industry Support; *see also* Tenaris Letter II at Exhibit 1 (once corrected to account for Wheatland's production [     
    ]).

years.[156]  In addition, Tenaris USA notes that it complements its U.S. production with imports from foreign Tenaris mills, in order to maximize its domestic capabilities, reduce inefficiencies, and improve its offerings to U.S. customers.[157]  In reference to sections 702(c)(4)(B)(i) and 732(c)(4)(B)(i) of the Act, Tenaris USA further notes that the statute allows U.S. producers to demonstrate whether their interests as a domestic producer would be adversely affected by an order.[158]  Tenaris USA argues that Commerce should not disregard the position it has taken because the imposition of duties would adversely affect its investments in U.S. production and processing capabilities and negatively impact its relationships with U.S. customers that rely on the full range of Tenaris USA products.[159]

In the Petitions, the petitioners contend that Commerce should disregard the positions of Tenaris USA and SeAH Steel USA, U.S. producers of OCTG that are related to foreign producers or exporters in Argentina and Mexico (for Tenaris USA) and Korea (for SeAH Steel USA).[160]  In their October 18, 2021, submission, the petitioners contend that Tenaris USA favors foreign production over its domestic production and does not import to complement its domestically-produced OCTG.[161]  As such, the petitioners contend that the imposition of duties would not adversely affect Tenaris USA because Tenaris USA can produce domestically what it now imports.[162]  The petitioners further contend that Tenaris USA has provided no evidence that the imposition of duties would adversely affect its U.S. OCTG production activities and its workers and that its position should be disregarded.[163]

In its October 20, 2021, submission, Tenaris USA reiterates its arguments regarding the investments it has made in the U.S. market and rebuts the petitioners' assertions that it favors imports to domestic interests.[164]  Tenaris USA also reiterates its contention that it is the largest OCTG producer and its position must be considered and counted in determining industry support for the Petitions.[165]

In its October 21, 2021, submission, TMK contends that Commerce should not disregard Tenaris USA's position when determining industry support for the Russia Petitions because Tenaris USA is neither related to a Russian foreign producer nor an importer of record of OCTG from Russia.[166]

In its October 22, 2021, submission, its fourth submission, Tenaris USA formally states that it opposes the Petitions.[167]

---

[156] *See* Tenaris USA Letter II at 11-17.
[157] *Id.* at 17.
[158] *Id.* at 17-18.
[159] *Id.* at 18-22.
[160] *See* Petitions at Volume I at 8-9.
[161] *See* Petitioners' Letter at 11-13.
[162] *Id.* at 13.
[163] *Id.* at 11-12.
[164] *See* Tenaris USA Letter III at 10-14.
[165] *Id.*
[166] *Id.* at 8-10.
[167] *See* Tenaris USA Letter IV at 2.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

In their October 22, 2021, submission, the petitioners acknowledge it is unnecessary to disregard Tenaris USA's opposition, because the industry support calculation demonstrates that the supporters of the Petitions account for at least [    ] percent of that portion of the domestic industry that has expressed an opinion with respect to the Petitions, even when factoring in Tenaris USA's total estimated production in opposition.[168]  The petitioners emphasize that their industry support calculation does not exclude any of Tenaris USA's production.[169]

**Commerce Position:**

We note that, despite providing four submissions on the topic of industry support and arguing that Commerce should not disregard its opposition, Tenaris USA did not provide any data on its production of the domestic like product for Commerce to account for Tenaris USA in the industry support calculations or to call into question the data provided by the petitioners.[170] While the petitioners are responsible for establishing industry support of the petition, parties that oppose the petition or seek to impugn the data provided by the petitioners are responsible for giving effect to their opposition and/or arguments by providing evidence that supports them.  As Tenaris USA points out, such information was readily available to Tenaris USA as it had recently been compiled and submitted to the ITC.[171]

We also note that, although the petitioners contend that Commerce should disregard SeAH Steel USA's position, SeAH Steel USA has not filed any submission stating its position with respect to the Petitions.  Commerce does not impute support for or opposition to a petition for any party, and, as such, we have not imputed any position (neither support nor opposition) for SeAH Steel USA.  Furthermore, we note that it is unnecessary to exclude any opposition to these Petitions.  Even assuming that all other U.S. producers of OCTG (including SeAH Steel USA) oppose the Petitions in addition to Tenaris USA, [                                                                          ], the supporters of the Petitions would still have the requisite level of support pursuant to sections 702(c)(4)(A)(ii) and 732(c)(4)(A)(ii) of the Act under the petitioners' methodology and the alternative methodologies described above.  As a result, it is unnecessary for Commerce to consider whether to disregard opposition of certain producers because the supporters of the Petitions have demonstrated the industry support required by sections 702(c)(4)(A)(ii) and 732(c)(4)(A)(ii) of the Act.

**Findings**

Commerce relied on information provided by the petitioners, as described above, to establish total 2020 production of the domestic like product.  Using these data, as demonstrated above, we find that the domestic producers and workers who support the Petitions account for at least 25 percent of total production of the domestic like product.  Commerce further finds that domestic producers and workers who support the Petitions account for more than 50 percent of the total production of the domestic like product produced by that portion of the industry expressing

---

[168] *See* Petitioners' Letter II at 4.
[169] *Id.* at 4.
[170] *See* Tenaris USA Letters I, II, III, and IV.
[171] *See* Tenaris USA Letter III at 7.

Barcode:4176347-01 A-357-824 INV - Investigation -

support for, or opposition to, the Petitions.  Therefore, we find that there is adequate industry support within the meaning of sections 702(c)(4)(A) and 732(c)(4)(A) of the Act.

Commerce conducted a search of the internet and has been unable to locate information that contradicts the petitioners' assertions.  We find that the petitioners have provided data that are reasonably available.  For these reasons, we find that there is adequate industry support for initiating these investigations.  Accordingly, Commerce finds that the Petitions have met the requirements of sections 702(c)(4)(A) and 732(c)(4)(A) of the Act.

22

Barcode:4176347-01 A-357-824 INV - Investigation -

Attachment III

**Analysis of Allegations and Evidence of Material Injury and Causation for the
Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular
Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation**

## I. Introduction

When making a determination regarding the initiation of antidumping and countervailing duty investigations, the Department of Commerce (Commerce) examines, on the basis of sources readily available to Commerce, the accuracy and adequacy of the evidence contained in the petitions, and it determines whether the petitions allege the elements necessary for the imposition of antidumping and countervailing duties and contain information reasonably available to the petitioners that supports the allegations.[1]  This attachment analyzes the sufficiency of the allegations and supporting evidence regarding material injury and causation.

## II. Definition of Domestic Industry

The domestic industry is described with reference to producers of the domestic like product, as provided for in section 771(4)(A) of the Act.  The Petitions[2] define the domestic industry as U.S. producers of oil country tubular goods (OCTG).[3]  The petitioners[4] identify themselves and fifteen other producers of the domestic like product as the companies constituting the domestic industry in the United States.[5]  For a discussion of the domestic like product, *see* Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation, to this Checklist.

## III. Evidence of Injury and Threat of Injury

To determine injury, the statute requires an evaluation of the volume, price effects, and impact of imports on the domestic industry and permits consideration of other economic factors.[6] Specifically, in examining the impact of imports, section 771(7)(C)(iii) of the Act states that:

---

[1] *See* sections 702(c)(1)(A)(i) and 732(c)(1)(A)(i) of the Tariff Act of 1930, as amended (the Act).

[2] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties:  Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia," dated October 6, 2021 (the Petitions). The petitioners filed "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement) and "Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia:  Response to Second General Issues Questionnaire," dated October 21, 2021 (Second General Issues Supplement), in response to Commerce's requests for additional information regarding the Petitions.

[3] *See* Petitions at Volume I at 26-28.

[4] The petitioners are Borusan Mannesmann Pipe U.S., Inc.; PTC Liberty Tubulars LLC; U.S. Steel Tubular Products, Inc.; the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC; and Welded Tube USA, Inc. (collectively, the petitioners).

[5] *See* Petitions at Volume I at 3-5; *see also* General Issues Supplement at 2.

1

Barcode:4176347-01 A-357-824 INV - Investigation -

In examining the impact {of imports on domestic producers} …, the {International Trade} Commission {ITC} shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to–

> (I) actual and potential decline in output, sales, market share, gross profits, operating profits, net profits, ability to service debt, productivity, return on investments, return on assets, and utilization of capacity,
> (II) factors affecting domestic prices,
> (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
> (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry..., and
> (V) in {an antidumping proceeding}…, the magnitude of the margin of dumping.

The Petitions allege that the domestic industry has experienced the following types of injury by reason of imports from Argentina, Mexico, the Republic of Korea (Korea), and the Russian Federation (Russia):

- Significant and increasing volume of subject imports (*See* Petitions at Volume I at 34-36 and Exhibit I-20);
- Declining market share (*See* Petitions at Volume I at 1, 34-36, 39, 40 and Exhibits I-2 and I-20);
- Underselling and price suppression (*See* Petitions at Volume I at 1, 36-37 and Exhibits I-1 and I-20);
- Lost sales and revenues (*See* Petitions at Volume I at 37-38);
- Declines in production, U.S. shipments, and capacity utilization rates (*See* Petitions at Volume I at 2, 39-40 and Exhibit I-1);
- Declining employment (*See* Petitions at Volume I at 47 and Exhibit I-34; *see also* General Issues Supplement at 10); and
- Adverse impact on the domestic industry's financial performance (*See* Petitions at Volume I at 40 and Exhibit I-1).

The Petitions also allege that the domestic industry could be threatened with further injury by reason of imports from Argentina, Mexico, Korea, and Russia due to the following:

- Vulnerability of the domestic industry to material injury by reason of subject imports (*See* Petitions at Volume I at 47-48 and Exhibit I-34);
- Countervailable subsidies which encourage production and export of OCTG from Korea and Russia (See Petitions at Volume I at 42-43);
- Rapid and continued increase in the volume and market penetration of subject imports (*See* Petitions at Volume I at 46);
- Potential for product shifting at foreign facilities (*See* Petitions at Volume I at 45-46 and Exhibits I-13 and I-33);

2

Barcode:4176347-01 A-357-824 INV - Investigation -

- Diversion of exports to the U.S. market due to the imposition of trade measures on OCTG in third countries (*See* Petitions at Volume I at 44-45 and Exhibits I-29 through I-32);
- Substantial existing capacity and planned capacity expansion to increase production of subject merchandise and ship increasing volumes of subject merchandise to the U.S. market (*See* Petitions at Volume I at 43-44 and Exhibits I-5 through I-6, I-8 through I-9, and Exhibits I-25 through I-28); and
- Likelihood of continued underselling and depression and/or suppression of U.S. prices (*See* Petitions at Volume I at 47 and Exhibits I-1 and I-20).

## IV.  Cumulation

Section 771(7)(G)(i) of the Act requires the ITC to cumulate imports from all countries for which petitions were filed on the same day if such imports compete with each other and with the domestic like product in the U.S. market.  On October 6, 2021, the petitioners filed the Petitions against Argentina, Mexico, Korea, and Russia.  The petitioners argue that a reasonable overlap of competition exists with subject imports and with the domestic like product in the United States, and as such, the criteria for cumulation have been satisfied.[7]

In determining whether cumulation is appropriate, the ITC uses a framework of four factors.[8] Each factor, along with the sections of the Petitions in which it is addressed, is listed below.

- The degree of fungibility between imports from the subject countries and between the imports and the domestic like product.

    The petitioners submit that the domestic like product and OCTG from Argentina, Mexico, Korea, and Russia are fungible products that are produced to standard industry specifications and directly compete against one another.[9]  The petitioners note that the ITC previously determined that there is "a sufficient degree of substitutability" between the different grades of OCTG and that the differences between seamless and welded OCTG do not significantly limit competition.[10]

- The presence of sales or offers for sale of the imports and the domestic like product in the same geographic markets.

---

[7] *See* Petitions at Volume I at 28-29.
[8] *See Certain Cast-Iron Pipe Fittings from Brazil, the Republic of Korea, and Taiwan*, Inv. Nos. 731-TA-278-280 (Final), USITC Pub. 1845 (May 1986); *see also Fundicao Tupy, S.A. v. United States*, 678 F. Supp. 898, 902 (CIT 1988), *aff'd*, 859 F.2d 915 (Fed. Cir. 1988).
[9] *See* Petitions at Volume I at 29-30 and Exhibit I-14.
[10] *Id.* at 29-30 and Exhibit I-14 (containing *Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final) USITC Pub. 4489 (September 2014) (*OCTG 2014 Final*) at 21-22).

3

The petitioners note that both domestically-produced OCTG and subject imports are sold on a nationwide basis and, thus, in the same geographic markets.[11]  For support, the petitioners provide import data demonstrating that imports of OCTG from each of the subject countries entered at ports in all regions of the United States.[12]

- Whether the imports and the domestic like product are handled in common or similar channels of distribution.

  The petitioners contend that subject imports and domestically-produced OCTG are sold through the same distribution channels, primarily through distributors to end users who consume the OCTG in oil and gas exploration activities.[13]

- Whether the imports are present in the U.S. market simultaneously.

  The petitioners contend that subject imports have been simultaneously present in the U.S. market in each of the past three years.[14]  For support, the petitioners provided annual import data for the time period of 2018-2020 and interim data up to June 2021 demonstrating that subject imports have been present in the U.S. market throughout the three-year period.[15]

## V.    Negligibility

Section 771(24)(A)(i) of the Act states that "imports from a country of merchandise corresponding to a domestic like product identified by the Commission are 'negligible' if such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which the data are available . . . ."

The petitioners contend that imports from Argentina, Mexico, Korea, and Russia are not negligible.[16]  For support, the petitioners provided import data for the most recent twelve-month period for which data are available (August 2020 through July 2021), which demonstrate that imports from Argentina, Mexico, Korea, and Russia account for 11.7 percent, 22.5 percent, 39.2 percent, and 8.3 percent, respectively, of the volume of total imports over this period.[17]  The data provided by the petitioners demonstrate that imports of OCTG from Argentina, Mexico, Korea, and Russia individually exceed the three percent negligibility threshold provided under section 771(24)(A)(i) of the Act.[18]

---

[11] *See* Petitions at 30 and Exhibit I-(containing *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216 and 1221-1223 (Review) USITC Pub. 5090 (July 2020) at II-4).

[12] *See* Petitions at Volume I at 30 and Exhibit I-20.

[13] *Id.* at 30 and Exhibit I-14 (containing *OCTG 2014 Final* at 23).

[14] *Id.* at 31.

[15] *Id.* at 31 and Exhibit I-20.

[16] *See* Petitions at Volume I at 28.

[17] *Id.* at 28 and Exhibit I-22.

[18] *Id.*

4

## VI.     Causation of Material Injury and Threat of Material Injury

The petitioners contend that the material injury and the threat of material injury to the domestic industry discussed in Section III above were caused by the impact of the allegedly dumped and subsidized imports from Argentina, Mexico, Korea, and Russia.  In support of their argument, the petitioners provided information on the historical trend of the volume and value of the allegedly dumped and subsidized imports, beginning with January 2018 and ending with June 2021.[19]  In the Petitions, the petitioners demonstrate the effect of these imports on domestic prices and market share, and the consequent impact on the domestic industry, specifically on financial and operating performance, sales, and revenue.[20]  The petitioners argue that this evidence reflects the injurious effects on the U.S. industry's performance and domestic selling prices caused by imports of OCTG at prices substantially lower than prices offered from the petitioners, thereby resulting in lost sales and revenues and declining financial and operating performance.[21]

In making a determination regarding causation of material injury, the ITC is directed to evaluate the volume of subject imports (section 771(7)(B)(i)(I) of the Act), the effect of those imports on the prices of domestically produced products (section 771(7)(B)(i)(II) of the Act), and their impact on the domestic operations of U.S. producers (section 771(7)(B)(i)(III) of the Act).  The petitioners base their allegations of causation of current injury upon the significant and increasing volume of subject imports; declining market share; underselling and price suppression; lost sales and revenues; declines in production, U.S. shipments, and capacity utilization rates; declining employment; and adverse impact on the domestic industry's financial performance.[22]

With regard to the threat of material injury, the petitioners base their allegations upon vulnerability of the domestic industry to material injury by reason of subject imports; countervailable subsidies provided by the governments of Korea and Russia; substantial existing capacity and planned capacity expansion to increase production for shipment to the U.S. market; potential for product shifting; diversion of exports to the U.S. market due to the imposition of trade measures in third countries; and the likelihood of continued underselling, price depression, and/or suppression.[23]

The allegations of causation of material injury and the threat of material injury are based upon the factors indicating current injury, as well as the factors indicating threat of material injury as noted above.  The factors related to causation presented in the injury section of the Petitions are the types of factors that the ITC is directed to consider for the purpose of evaluating causation under sections 771(7)(C) and 771(7)(F) of the Act.

---

[19] *Id.* at 23, 28, 34-36 and Exhibits I-20 and I-22.
[20] *See* Petitions at 1-2, 34-40 and Exhibits I-1, I-2, and I-20; *see also* General Issues Supplement at 10.
[21] *See* Petitions at 1-2, 34-40 and Exhibits I-1, I-2, and I-20; *see also* General Issues Supplement at 10.
[22] *See* Section III, above.
[23] *Id.*

5

Barcode:4176347-01 A-357-824 INV - Investigation  -

## VII.    Conclusion

In order to assess the accuracy and adequacy of the evidence relating to the allegations regarding material injury, threat of material injury, cumulation, negligibility, and causation, we examined the information presented in the Petitions and supplement to the Petitions and compared it with information that was reasonably available (*e.g.*, import data on the ITC website).  We did not locate any information that contradicts the petitioners' assertions.

We analyzed the petitioners' evidence regarding material injury, threat of material injury, cumulation, negligibility, and causation, and have found that the information in the Petitions and supplement to the Petitions demonstrates a sufficient showing of injury or threat of injury to the U.S. industry producing OCTG.  Therefore, we find the overall evidence of injury included in the Petitions to be adequate to initiate the investigations of OCTG from Argentina, Mexico, Korea, and Russia.  Ultimately, the ITC will make the final determination with respect to material injury, or threat thereof, cumulation, negligibility, and causation.

6

10
Docket Sheet for CIT Ct. No. 22-343
N/A
Public
Appx157-Appx174

U.S. Court of International Trade (LIVE Database)

APPEAL,TERMINATED

# U.S. Court of International Trade
## LIVE Database (New York)
### CIT DOCKET FOR CASE #: 1:22-cv-00343-CRK

Tenaris Bay City, Inc. et al. v. United States
**Assigned to:** Claire R. Kelly
**Panelists:** US Court of International Trade

**Lead Docket:**

**Jurisdiction:**
28USC § 1581(c) Antidumping or Countervailing Duty Determination(s)

**Category:**
Final Affirmative Determinations: Investigations 19USC § 1516a(a)(2)(B)(i)

**Agency:**
U.S. Department of Commerce

**Product Description:**
Oil Country Tubular Goods

**Export Country:**
Argentina

**Plaintiff**

**Tenaris Bay City, Inc.**

**Date Filed:** 12/16/2022
**Jury Demand:** No

**Date Terminated:** 12/02/2024

**Date Reopened:**

**Does this action raise an issue of constitutionality?:** N

represented by **Gregory James Spak**
White & Case, LLP
701 Thirteenth Street, NW.
Suite 1100
Washington, DC 20005-3807
(202) 626-3641
Fax: (202) 639-9355
Email: gspak@whitecase.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Colin Alejandro Dilley**
White & Case, LLP
701 Thirteenth Street, NW.
#600
Washington, DC 20005
(202) 729-2387
Fax: (202) 639-9355
Email: alex.dilley@whitecase.com
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Cristina M. Cornejo**
White & Case, LLP
701 Thirteenth Street, NW.
Washington, DC 20005
(202) 729-2980
Fax: (202) 639-9355
Email: cristina.cornejo@whitecase.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Danica Noble**

Appx157

U.S. Court of International Trade (LIVE Database)

White & Case, LLP
701 Thirteenth Street, NW.
1100
Washington, DC 20005-3807
(202) 729-2970
Fax: (202) 639-9355
Email: danica.h.noble@gmail.com
*TERMINATED: 10/17/2024*
*Bar Status: ACTIVE*

**Frank John Schweitzer**
White & Case, LLP
701 Thirteenth Street, NW.
1100
Washington, DC 20005-3807
(202) 637-6166
Fax: (202) 639-9355
Email: frank.schweitzer@whitecase.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Kristina Zissis**
White & Case, LLP
701 Thirteenth Street, NW.
1100
Washington, DC 20005-3807
(202) 626-3636
Fax: (202) 639-9355
Email: kzissis@whitecase.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Luca Bertazzo**
White & Case, LLP
701 Thirteenth Street, NW.
1100
Washington, DC 20005-3807
(202) 626-6532
Fax: (202) 639-9355
Email: lbertazzo@whitecase.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Matthew Wolf Solomon**
White & Case, LLP
701 Thirteenth Street, NW.
1100
Washington, DC 20005-3807
(202) 626-3668
Fax: (202) 639-9355
Email: matt.solomon@whitecase.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Ron Kendler**
White & Case, LLP
701 Thirteenth Street, NW.
1100
Washington, DC 20005-3807
(202) 729-2312
Fax: (202) 639-9355
Email: ron.kendler@whitecase.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

U.S. Court of International Trade (LIVE Database)

**Plaintiff**

**Maverick Tube Corporation**                     represented by  **Gregory James Spak**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  ***ATTORNEY IN SEALED GROUP***
                                                                  ***Bar Status: ACTIVE***

                                                                  **Colin Alejandro Dilley**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  ***Bar Status: ACTIVE***

                                                                  **Cristina M. Cornejo**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  ***ATTORNEY IN SEALED GROUP***
                                                                  ***Bar Status: ACTIVE***

                                                                  **Danica Noble**
                                                                  (See above for address)
                                                                  ***TERMINATED: 10/17/2024***
                                                                  ***Bar Status: ACTIVE***

                                                                  **Frank John Schweitzer**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  ***ATTORNEY IN SEALED GROUP***
                                                                  ***Bar Status: ACTIVE***

                                                                  **Kristina Zissis**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  ***ATTORNEY IN SEALED GROUP***
                                                                  ***Bar Status: ACTIVE***

                                                                  **Luca Bertazzo**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  ***ATTORNEY IN SEALED GROUP***
                                                                  ***Bar Status: ACTIVE***

                                                                  **Matthew Wolf Solomon**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  ***ATTORNEY IN SEALED GROUP***
                                                                  ***Bar Status: ACTIVE***

                                                                  **Ron Kendler**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  ***ATTORNEY IN SEALED GROUP***
                                                                  ***Bar Status: ACTIVE***

**Plaintiff**

**IPSCO Tubulars Inc.**                           represented by  **Gregory James Spak**
                                                                  (See above for address)
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  ***ATTORNEY IN SEALED GROUP***
                                                                  ***Bar Status: ACTIVE***

                                                                  **Colin Alejandro Dilley**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*
                                                                  ***Bar Status: ACTIVE***

                                                                  **Cristina M. Cornejo**
                                                                  (See above for address)
                                                                  *ATTORNEY TO BE NOTICED*

*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Danica Noble**
(See above for address)
*TERMINATED: 10/17/2024*
*Bar Status: ACTIVE*

**Frank John Schweitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Kristina Zissis**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Luca Bertazzo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Matthew Wolf Solomon**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Ron Kendler**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Plaintiff**

**Tenaris Global Services (U.S.A.) Corporation**          represented by   **Gregory James Spak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Colin Alejandro Dilley**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Cristina M. Cornejo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Danica Noble**
(See above for address)
*TERMINATED: 10/17/2024*
*Bar Status: ACTIVE*

**Frank John Schweitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Kristina Zissis**
(See above for address)

U.S. Court of International Trade (LIVE Database)

*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Luca Bertazzo**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Matthew Wolf Solomon**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Ron Kendler**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Plaintiff**

**Siderca S.A.I.C.**                    represented by   **Gregory James Spak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Colin Alejandro Dilley**
(See above for address)
*ATTORNEY TO BE NOTICED*
***Bar Status: ACTIVE***

**Cristina M. Cornejo**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Danica Noble**
(See above for address)
***TERMINATED: 10/17/2024***
***Bar Status: ACTIVE***

**Frank John Schweitzer**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Kristina Zissis**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Luca Bertazzo**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Matthew Wolf Solomon**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Ron Kendler**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Defendant**

**United States**                                    represented by   **Kara Marie Westercamp**
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 305-7571
Fax: (202) 514-8624
Email: kara.m.westercamp@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Alexander Paul Fried**
Of Counsel
U.S. Department of Commerce
Office of the Chief Counsel for Trade Enforcement and
Compli
1401 Constitution Avenue, NW.
Washington, DC 20230
(202) 482-4184
Fax: (202) 482-4912
Email: alexander.fried@trade.gov
***TERMINATED: 03/07/2024***
***Bar Status: ACTIVE***

**Hardeep K. Josan**
U.S. Department of Justice
International Trade Field Office
26 Federal Plaza
New York, NY 10278
(212) 264-9245
Fax: (212) 264-1916
Email: hjosan@cov.com
***TERMINATED: 01/12/2025***
***Bar Status: ACTIVE***

**Ian Andrew McInerney**
Of Counsel
U.S. Department of Commerce
Office of Chief Counsel for Trade Enforcement and
Compliance
1401 Constitution Avenue, NW.
Washington, DC 20230-0001
(202) 482-2327
Email: Ian.McInerney@trade.gov
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Spencer C. Neff**
Of Counsel
U.S. Department of Commerce
Office of Chief Counsel for Trade Enforcement &
Compliance
1401 Constitution Avenue, NW.
Suite 3627
Washington, DC 20008
(202) 482-8184
Fax: (202) 482-8184
Email: spencer.neff@trade.gov

Appx162

*TERMINATED: 10/11/2024*
*Bar Status: ACTIVE*

**Defendant-Intervenor**

**United States Steel Corporation**    represented by   **Thomas Martin Beline**
Cassidy Levy Kent (USA) LLP
2112 Pennsylvania Avenue, NW.
Suite 300
Washington, DC 20037
(202) 567-2316
Fax: (202) 567-2301
Email: tbeline@cassidylevy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**James Edward Ransdell , IV**
Cassidy Levy Kent (USA) LLP
2112 Pennsylvania Avenue, NW.
Suite 300
Washington, DC 20037
(202) 567-2321
Fax: (202) 567-2301
Email: jransdell@cassidylevy.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Sarah E. Shulman**
Cassidy Levy Kent (USA) LLP
2112 Pennsylvania Avenue, NW.
Suite 300
Washington, DC 20037
(202) 567-2322
Fax: (202) 567-2301
Email: sshulman@cassidylevy.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Defendant-Intervenor**

**Borusan Mannesmann Pipe U.S. Inc.**    represented by   **Roger Brian Schagrin**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: rschagrin@schagrinassociates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Alessandra A. Palazzolo**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: apalazzolo@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Benjamin Jacob Bay**
Schagrin Associates
900 Seventh Street, NW.

Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: bbay@schagrinassociates.com
*TERMINATED: 06/28/2023*
*Bar Status: ACTIVE*

**Christopher Todd Cloutier**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: ccloutier@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Elizabeth Jackson Drake**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: edrake@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Jeffrey David Gerrish**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Email: jgerrish@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Joseph A. Laroski , Jr.**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 763-7769
Email: jlaroski@schagrinassociates.com
*TERMINATED: 02/22/2024*
*Bar Status: ACTIVE*

**Justin M. Neuman**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: jneuman@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Kelsey Marie Rule**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001

(202) 223-1700
Fax: (202) 429-2522
Email: krule@schagrinassociates.com
*TERMINATED: 05/08/2023*
***Bar Status: INACTIVE***

**Luke Anthony Meisner**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: lmeisner@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Michelle Rose Avrutin**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 516-5213
Fax: (202) 429-2522
Email: mavrutin@schagrinassociates.com
*TERMINATED: 01/16/2025*
***Bar Status: ACTIVE***

**Nicholas Joel Birch**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Email: nbirch@SchagrinAssociates.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Saad Younus Chalchal**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: schalchal@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**William A. Fennell**
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: wfennell@schagrinassociates.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Defendant-Intervenor**

**PTC Liberty Tubulars LLC**                        represented by **Roger Brian Schagrin**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*
                                                                    ***ATTORNEY IN SEALED GROUP***

U.S. Court of International Trade (LIVE Database)

*Bar Status: ACTIVE*

**Alessandra A. Palazzolo**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Benjamin Jacob Bay**
(See above for address)
***TERMINATED: 06/28/2023***
*Bar Status: ACTIVE*

**Christopher Todd Cloutier**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Elizabeth Jackson Drake**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Jeffrey David Gerrish**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Joseph A. Laroski , Jr.**
(See above for address)
***TERMINATED: 02/22/2024***
*Bar Status: ACTIVE*

**Justin M. Neuman**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Kelsey Marie Rule**
(See above for address)
***TERMINATED: 05/08/2023***
*Bar Status: INACTIVE*

**Luke Anthony Meisner**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Michelle Rose Avrutin**
(See above for address)
***TERMINATED: 01/16/2025***
*Bar Status: ACTIVE*

**Nicholas Joel Birch**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Saad Younus Chalchal**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

|                                                       |               | **William A. Fennell** |
|---|---|---|
|                                                       |               | (See above for address) |
|                                                       |               | *ATTORNEY TO BE NOTICED* |
|                                                       |               | ***ATTORNEY IN SEALED GROUP*** |
|                                                       |               | ***Bar Status: ACTIVE*** |

**Defendant-Intervenor**

| **United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC** | represented by | **Roger Brian Schagrin** |
|---|---|---|
|  |  | (See above for address) |
|  |  | *LEAD ATTORNEY* |
|  |  | *ATTORNEY TO BE NOTICED* |
|  |  | ***ATTORNEY IN SEALED GROUP*** |
|  |  | ***Bar Status: ACTIVE*** |
|  |  |  |
|  |  | **Alessandra A. Palazzolo** |
|  |  | (See above for address) |
|  |  | *ATTORNEY TO BE NOTICED* |
|  |  | ***ATTORNEY IN SEALED GROUP*** |
|  |  | ***Bar Status: ACTIVE*** |
|  |  |  |
|  |  | **Benjamin Jacob Bay** |
|  |  | (See above for address) |
|  |  | ***TERMINATED: 06/28/2023*** |
|  |  | ***Bar Status: ACTIVE*** |
|  |  |  |
|  |  | **Christopher Todd Cloutier** |
|  |  | (See above for address) |
|  |  | *ATTORNEY TO BE NOTICED* |
|  |  | ***ATTORNEY IN SEALED GROUP*** |
|  |  | ***Bar Status: ACTIVE*** |
|  |  |  |
|  |  | **Elizabeth Jackson Drake** |
|  |  | (See above for address) |
|  |  | *ATTORNEY TO BE NOTICED* |
|  |  | ***ATTORNEY IN SEALED GROUP*** |
|  |  | ***Bar Status: ACTIVE*** |
|  |  |  |
|  |  | **Jeffrey David Gerrish** |
|  |  | (See above for address) |
|  |  | *ATTORNEY TO BE NOTICED* |
|  |  | ***ATTORNEY IN SEALED GROUP*** |
|  |  | ***Bar Status: ACTIVE*** |
|  |  |  |
|  |  | **Joseph A. Laroski , Jr.** |
|  |  | (See above for address) |
|  |  | ***TERMINATED: 02/22/2024*** |
|  |  | ***Bar Status: ACTIVE*** |
|  |  |  |
|  |  | **Justin M. Neuman** |
|  |  | (See above for address) |
|  |  | *ATTORNEY TO BE NOTICED* |
|  |  | ***ATTORNEY IN SEALED GROUP*** |
|  |  | ***Bar Status: ACTIVE*** |
|  |  |  |
|  |  | **Kelsey Marie Rule** |
|  |  | (See above for address) |
|  |  | ***TERMINATED: 05/08/2023*** |
|  |  | ***Bar Status: INACTIVE*** |
|  |  |  |
|  |  | **Luke Anthony Meisner** |
|  |  | (See above for address) |
|  |  | *ATTORNEY TO BE NOTICED* |
|  |  | ***ATTORNEY IN SEALED GROUP*** |
|  |  | ***Bar Status: ACTIVE*** |
|  |  |  |
|  |  | **Michelle Rose Avrutin** |
|  |  | (See above for address) |
|  |  | ***TERMINATED: 01/16/2025*** |
|  |  | ***Bar Status: ACTIVE*** |

Appx167

U.S. Court of International Trade (LIVE Database)

**Nicholas Joel Birch**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Saad Younus Chalchal**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**William A. Fennell**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Defendant-Intervenor**

**Welded Tube**                    represented by    **Roger Brian Schagrin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Alessandra A. Palazzolo**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Benjamin Jacob Bay**
(See above for address)
***TERMINATED: 06/28/2023***
***Bar Status: ACTIVE***

**Christopher Todd Cloutier**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Elizabeth Jackson Drake**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Jeffrey David Gerrish**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Joseph A. Laroski , Jr.**
(See above for address)
***TERMINATED: 02/22/2024***
***Bar Status: ACTIVE***

**Justin M. Neuman**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Kelsey Marie Rule**
(See above for address)
***TERMINATED: 05/08/2023***
***Bar Status: INACTIVE***

Appx168

U.S. Court of International Trade (LIVE Database)

**Luke Anthony Meisner**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Michelle Rose Avrutin**
(See above for address)
***TERMINATED: 01/16/2025***
*Bar Status: ACTIVE*

**Nicholas Joel Birch**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Saad Younus Chalchal**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**William A. Fennell**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/16/2022 | 1 | Summons . Filed by Gregory James Spak of White & Case, LLP on behalf of All Plaintiffs. (Spak, Gregory) (Entered: 12/16/2022) |
| 12/16/2022 | 2 | Form 5 Information Statement . Filed by Gregory James Spak of White & Case, LLP on behalf of All Plaintiffs. (Spak, Gregory) (Entered: 12/16/2022) |
| 12/16/2022 | 3 | Form 13 Corporate Disclosure Statement . Filed by Gregory James Spak of White & Case, LLP on behalf of All Plaintiffs. (Spak, Gregory) (Entered: 12/16/2022) |
| 12/16/2022 | 4 | Form 17 Business Proprietary Information Certification filed on behalf of Gregory J. Spak as Attorney/Consultant(s) . Filed by Gregory James Spak of White & Case, LLP on behalf of All Plaintiffs. (Spak, Gregory) (Entered: 12/16/2022) |
| 12/16/2022 | 5 | Form 17 Business Proprietary Information Certification filed on behalf of Frank J. Schweitzer as Attorney/Consultant(s) . Filed by Frank John Schweitzer of White & Case, LLP on behalf of All Plaintiffs. (Schweitzer, Frank) (Entered: 12/16/2022) |
| 12/16/2022 | 6 | Form 17 Business Proprietary Information Certification filed on behalf of Kristina Zissis as Attorney/Consultant(s) . Filed by Kristina Zissis of White & Case, LLP on behalf of All Plaintiffs. (Zissis, Kristina) (Entered: 12/16/2022) |
| 12/16/2022 | 7 | Form 17 Business Proprietary Information Certification filed on behalf of Matthew W. Solomon as Attorney/Consultant(s) . Filed by Matthew Wolf Solomon of White & Case, LLP on behalf of All Plaintiffs. (Solomon, Matthew) (Entered: 12/16/2022) |
| 12/16/2022 | 8 | Form 17 Business Proprietary Information Certification filed on behalf of Danica Harvey as Attorney/Consultant(s) . Filed by Danica Harvey of White & Case, LLP on behalf of All Plaintiffs. (Harvey, Danica) (Entered: 12/16/2022) |
| 12/19/2022 | 9 | Summons served by Clerk's Office upon Plaintiff and appropriate Government Agency/Agencies . (Benbow, Troy) (Entered: 12/19/2022) |
| 12/22/2022 | 10 | Form 11 Notice of Appearance . Filed by Ron Kendler of White & Case, LLP on behalf of All Plaintiffs.(Kendler, Ron) (Entered: 12/22/2022) |
| 12/22/2022 | 11 | Form 17 Business Proprietary Information Certification filed on behalf of Ron Kendler as Attorney/Consultant(s) . Filed by Ron Kendler of White & Case, LLP on behalf of All Plaintiffs. (Kendler, Ron) (Entered: 12/22/2022) |
| 12/22/2022 | 12 | Form 11 Notice of Appearance . Filed by Luca Bertazzo of White & Case, LLP on behalf of All Plaintiffs.(Bertazzo, Luca) (Entered: 12/22/2022) |
| 12/22/2022 | 13 | Form 17 Business Proprietary Information Certification filed on behalf of Luca Bertazzo as Attorney/Consultant(s) . Filed by Luca Bertazzo of White & Case, LLP on behalf of All Plaintiffs. (Bertazzo, Luca) (Entered: 12/22/2022) |

U.S. Court of International Trade (LIVE Database)

| | | |
|---|---|---|
| 12/23/2022 | 14 | Form 11 Notice of Appearance *Hardeep K. Josan*. Filed by Hardeep K. Josan of U.S. Department of Justice on behalf of United States.(Josan, Hardeep) (Entered: 12/23/2022) |
| 12/27/2022 | 15 | Form 11 Notice of Appearance . Filed by Ian Andrew McInerney of U.S. Department of Commerce on behalf of United States.(McInerney, Ian) (Entered: 12/27/2022) |
| 01/13/2023 | 16 | Complaint against United States. Administrative Record due by 2/22/2023. Filed by Gregory James Spak of White & Case, LLP on behalf of All Plaintiffs.(Spak, Gregory) (Entered: 01/13/2023) |
| 01/25/2023 | 17 | Order entered on 1/25/2023, assigning action to Judge Claire R. Kelly. (Taronji, Steve) (Entered: 01/25/2023) |
| 02/08/2023 | 18 | [***NOTE: THIS DOCUMENT HAS BEEN ENTERED IN ERROR. SEE CORRECT DOC # 19***] Form 11 Notice of Appearance *for Thomas M. Beline, Sarah E. Shulman, and James E. Ransdell*. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of United States Steel Corporation.(Beline, Thomas) Modified on 2/8/2023 (Taronji, Steve). (Entered: 02/08/2023) |
| 02/08/2023 | 19 | Form 11 Notice of Appearance *for Thomas M. Beline, Sarah E. Shulman, and James E. Ransdell*. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of United States Steel Corporation.(Beline, Thomas) (Entered: 02/08/2023) |
| 02/08/2023 | 20 | Form 13 Corporate Disclosure Statement . Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of United States Steel Corporation. (Beline, Thomas) (Entered: 02/08/2023) |
| 02/08/2023 | 21 | Consent Motion to Intervene as Defendant-Intervenor . Responses due by 3/1/2023. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of United States Steel Corporation.(Beline, Thomas) (Entered: 02/08/2023) |
| 02/08/2023 | 22 | Form 17 Business Proprietary Information Certification filed on behalf of Thomas M. Beline, Sarah E. Shulman, and James E. Ransdell as Attorney/Consultant(s) . Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of United States Steel Corporation. (Attachments: # 1 Form 17, # 2 Form 17)(Beline, Thomas) (Entered: 02/08/2023) |
| 02/08/2023 | 23 | Order entered on 2/8/2023, granting consent Motion to intervene. ORDERED that United States Steel Corporation shall be designated as Defendant-Intervenor in this action. (Related Doc # 21 ). (Taronji, Steve) (Entered: 02/08/2023) |
| 02/10/2023 | 24 | Form 24 Proposed Order for Statutory Injunction Upon Consent . Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation. (Spak, Gregory) (Entered: 02/10/2023) |
| 02/10/2023 | 25 | Form 11 Notice of Appearance *for Roger B. Schagrin, Jeffrey D. Gerrish, Christopher T. Cloutier, Elizabeth J. Drake, Luke A. Meisner, William A. Fennell, Nicholas J. Birch, Benjamin J. Bay, Joseph J. Laroski, Saad Y. Chalchal, Justin Neuman, Kelsey M. Rule, and Michelle R. Avrutin*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Welded Tube.(Schagrin, Roger) (Entered: 02/10/2023) |
| 02/10/2023 | 26 | Form 17 Business Proprietary Information Certification filed on behalf of for Roger B. Schagrin, Jeffrey D. Gerrish, Christopher T. Cloutier, Elizabeth J. Drake, Luke A. Meisner, William A. Fennell, Nicholas J. Birch, Benjamin J. Bay, Joseph J. Laroski, Saad Y. Chalchal, Justin Neuman, Kelsey M. Rule, Michelle R. Avrutin, Michael Panfeld, Rui Fan, David De Prest, and David Albright as Attorney/Consultant(s) . Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Welded Tube. (Schagrin, Roger) (Entered: 02/10/2023) |
| 02/10/2023 | 27 | Form 13 Corporate Disclosure Statement *for Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA, Inc.*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Welded Tube. (Schagrin, Roger) (Entered: 02/10/2023) |
| 02/10/2023 | 28 | Consent Motion to Intervene as Defendant-Intervenor . Responses due by 3/3/2023. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Welded Tube.(Schagrin, Roger) (Entered: 02/10/2023) |
| 02/10/2023 | 29 | Order entered on 2/10/2023, Form 24 Order for Statutory Injunction Upon Consent Granted. (Taronji, Steve) (Entered: 02/10/2023) |
| 02/13/2023 | 30 | Order entered on 2/13/2023, granting consent Motion to intervene. ORDERED that Borusan Mannesmann Pipe U.S., Inc.; PTC Liberty Tubulars LLC; the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC; and Welded Tube USA, Inc. shall be designated as Defendant-Intervenors in this action. (Related Doc # 28 ). (Taronji, Steve) (Entered: 02/13/2023) |
| 02/16/2023 | 31 | Form 11 Notice of Appearance . Filed by Cristina M. Cornejo of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation. (Cornejo, Cristina) (Entered: 02/16/2023) |

| 02/16/2023 | 32 | Form 17 Business Proprietary Information Certification filed on behalf of Cristina M. Cornejo as Attorney/Consultant(s) . Filed by Cristina M. Cornejo of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation. (Cornejo, Cristina) (Entered: 02/16/2023) |
|---|---|---|
| 02/16/2023 | 33 | Form 11 Notice of Appearance . Filed by Colin Alejandro Dilley of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation.(Dilley, Colin) (Entered: 02/16/2023) |
| 02/16/2023 | 34 | Form 17 Business Proprietary Information Certification filed on behalf of Alex Dilley as Attorney/Consultant(s) . Filed by Colin Alejandro Dilley of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation. (Dilley, Colin) (Entered: 02/16/2023) |
| 02/22/2023 | 35 | Administrative Record Index for U.S. Department of Commerce filed . Filed by Ian Andrew McInerney of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Analyst Declaration, # 2 Final FR Notice, # 3 Final IDM, # 4 Public Record Index, # 5 BPI Record Index)(McInerney, Ian) (Entered: 02/22/2023) |
| 03/23/2023 | 36 | Joint status report and proposed briefing schedule. Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation. (Attachments: # 1 Proposed Order)(Spak, Gregory) (Entered: 03/23/2023) |
| 03/24/2023 | 37 | Order entered on 3/24/2023, Scheduling Order: ORDERED that: 1. Plaintiffs shall file their motion for judgment on the agency record and opening briefs on or before Friday, June 23, 2023; 2. Defendant and Defendant-Intervenors shall file their response briefs on or before Friday, September 22, 2023; 3. Plaintiffs shall file their reply briefs on or before Friday, October 20, 2023; 4. Plaintiffs shall file the Joint Appendix on or before Friday, November 3, 2023; and 5. Any motions for oral argument shall be filed on or before Monday, November 27, 2023. (related document(s) 36 ) (Taronji, Steve) (Entered: 03/24/2023) |
| 05/08/2023 | 38 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Kelsey M. Rule*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC and Welded Tube USA Inc. (Schagrin, Roger) Modified on 5/8/2023 (Taronji, Steve). (Entered: 05/08/2023) |
| 06/23/2023 | 39 | Confidential Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 9/22/2023. Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation.(Spak, Gregory) Modified on 6/23/2023 (Taronji, Steve). (Entered: 06/23/2023) |
| 06/26/2023 | 40 | Confidential Motion for judgment on agency record 56.2 *(Final Version)*. Response to 56.2 Motion due by 9/22/2023. Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation.(Spak, Gregory) Modified on 6/27/2023 (Taronji, Steve). (Entered: 06/26/2023) |
| 06/26/2023 | 41 | Public Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 9/22/2023. Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation.(Spak, Gregory) Modified on 6/27/2023 (Taronji, Steve). (Entered: 06/26/2023) |
| 06/28/2023 | 42 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Benjamin J. Bay*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA Inc. (Schagrin, Roger) Modified on 6/28/2023 (Taronji, Steve). (Entered: 06/28/2023) |
| 08/25/2023 | 43 | Form 11 Notice of Appearance . Filed by Alexander Paul Fried of U.S. Department of Commerce on behalf of United States.(Fried, Alexander) (Entered: 08/25/2023) |
| 09/22/2023 | 44 | Confidential Response *in Opposition to Rule 56.2* to Motion (related document(s) 40 , 39 ). Reply due by 10/20/2023. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United States Steel Corporation, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Welded Tube.(Schagrin, Roger) (Entered: 09/22/2023) |
| 09/22/2023 | 45 | Public Response *in Opposition to Rule 56.2* to Motion (related document(s) 41 ). Reply due by 10/20/2023. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United States Steel Corporation, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Welded Tube.(Schagrin, Roger) (Entered: 09/22/2023) |
| 09/22/2023 | 46 | Confidential Response *in Opposition* to Motion *by Plaintiffs* (related document(s) 41 , 40 , 39 ). Reply due by 10/20/2023. Filed by Hardeep K. Josan of U.S. Department of Justice on behalf of United States. (Attachments: # 1 Proposed Order) (Josan, Hardeep) (Entered: 09/22/2023) |
| 09/22/2023 | 47 | Public Response *in Opposition* to Motion *by Plaintiffs* (related document(s) 41 , 40 ). Reply due by 10/20/2023. Filed by Hardeep K. Josan of U.S. Department of Justice on behalf of United States. (Attachments: # 1 Proposed Order)(Josan, Hardeep) (Entered: 09/22/2023) |

| Date | No. | Description |
|---|---|---|
| 10/20/2023 | 48 | Confidential Reply *in Support of Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record* (related document(s) 46 , 44 ). Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation.(Spak, Gregory) (Entered: 10/20/2023) |
| 10/20/2023 | 49 | Public Reply *in Support of Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record* (related document(s) 48 , 47 , 45 ). Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation.(Spak, Gregory) (Entered: 10/20/2023) |
| 11/03/2023 | 50 | Confidential Joint Appendix . Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation. (Spak, Gregory) (Entered: 11/03/2023) |
| 11/03/2023 | 51 | Joint Appendix *(Public Version)* (related document(s) 50 ). Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation. (Spak, Gregory) (Entered: 11/03/2023) |
| 11/22/2023 | 52 | Unopposed Motion for oral argument on Antidumping Duty Investigation . Responses due by 12/13/2023. Filed by Gregory James Spak of White & Case, LLP on behalf of All Plaintiffs.(Spak, Gregory) (Entered: 11/22/2023) |
| 11/30/2023 | 53 | Order entered on 11/30/2023, granting unopposed Motion for oral argument. ORDERED that oral argument shall be held on Wednesday, January 10, 2024, at 11:00 a.m. in Courtroom 1 of the United States Court of International Trade, One Federal Plaza, New York, NY. (Related Doc # 52 ). (Taronji, Steve) (Entered: 11/30/2023) |
| 12/21/2023 | 54 | [***NOTE: THIS DOCUMENT HAS BEEN ENTERED IN ERROR AND SUPERSEDED BY DOC # 56 ***] Confidential Letter filed by the Honorable Claire R. Kelly concerning *Oral Argument Questions*. (Taronji, Steve) Modified on 12/21/2023 (Taronji, Steve). (Entered: 12/21/2023) |
| 12/21/2023 | 55 | [***NOTE: THIS DOCUMENT HAS BEEN ENTERED IN ERROR***] Letter filed by the Honorable Claire R. Kelly concerning *the public version of the oral argument questions*. Response to Court Request/Order due by 1/3/2024. (Taronji, Steve) Modified on 12/21/2023 (Taronji, Steve). (Entered: 12/21/2023) |
| 12/21/2023 | 56 | Letter filed by the Honorable Claire R. Kelly concerning *Oral Argument Questions*. (Taronji, Steve) (Entered: 12/21/2023) |
| 01/10/2024 | 57 | Oral Argument held on 1/10/2024 at 11:00 AM in Courtroom 1. *Appearance sheet attached*. (Taronji, Steve) (Entered: 01/10/2024) |
| 01/11/2024 | 58 | 🔊 Digital Audio File regarding Oral Argument Proceeding 57 held on January 10, 2024 before Judge Kelly. AUDIO FILE SIZE (60.1 MB) (Taronji, Steve) (Entered: 01/11/2024) |
| 02/22/2024 | 59 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Joseph A. Laroski, Jr.*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Welded Tube. (Schagrin, Roger) (Entered: 02/22/2024) |
| 03/07/2024 | 60 | Form 18A Notification of Termination of Government Attorney Access to Business Proprietary Information on behalf of . Filed by Alexander Paul Fried of U.S. Department of Commerce on behalf of All Defendants (Fried, Alexander) (Entered: 03/07/2024) |
| 03/14/2024 | 61 | Confidential Order entered on 3/14/2024, Slip Op. 24-31, ORDERED that the final results, see ECF No. 35-2, are remanded for further explanation or reconsideration consistent with this opinion; and it is further ORDERED that Commerce shall file its remand redetermination with the Court within 90 days (6/12/2024) of this date; and it is further ORDERED that the parties shall have 30 days (7/12/2024) to file comments on the remand redetermination; and it is further ORDERED that the parties shall have 30 days (8/12/2024) to file their replies to the comments on the remand redetermination; and it is further ORDERED that the parties shall file the joint appendix within 14 days (8/26/2024) after the filing of replies to the comments on the remand redetermination; and it is further ORDERED that commerce shall file the administrative record within 14 days (6/26/2024) of the date of filing its remand redetermination. (related document(s) 41 , 40 , 35 ) (Attachments: # 1 Web Pages Cited, # 2 Web Pages Cited). (Taronji, Steve) (Entered: 03/14/2024) |
| 03/14/2024 | 62 | Letter filed by the Honorable Claire R. Kelly concerning *the Public Version of Slip Op. 24-31*. Response to Court Request/Order due by 3/21/2024. (Taronji, Steve) (Entered: 03/14/2024) |
| 03/15/2024 | 63 | Response to Court's Request/Order . Filed by Christopher Todd Cloutier of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Welded Tube. (Cloutier, Christopher) (Entered: 03/15/2024) |
| 03/15/2024 | 64 | Response to Court's Request/Order *Concerning the Bracketing of Confidential Information in Slip Op. 24-31*. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of United States Steel Corporation. (Beline, Thomas) (Entered: 03/15/2024) |
| 03/20/2024 | 65 | Response to Court's Request/Order *(comments on confidential information in Slip Op. and Order 24-31)*. Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation. (Spak, Gregory) (Entered: 03/20/2024) |
| 03/21/2024 | 66 | Errata filed for slip opinion 24-31 (Confidential) (related document(s) 61 ). (Taronji, Steve) (Entered: 03/21/2024) |

| | | |
|---|---|---|
| 03/21/2024 | 67 | Response to Court's Request/Order . Filed by Hardeep K. Josan of U.S. Department of Justice on behalf of United States. (Josan, Hardeep) (Entered: 03/21/2024) |
| 03/21/2024 | 68 | Order entered on 3/21/2024, Public Slip Op. 24-31. (related document(s) 61 ). (Taronji, Steve) (Additional attachment(s) added on 3/21/2024: # 1 Web Pages Cited, # 2 Web Pages Cited) (Taronji, Steve). (Entered: 03/21/2024) |
| 03/28/2024 | 69 | Form 11 Notice of Appearance *Alessandra A. Palazzolo*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Welded Tube. (Schagrin, Roger) (Entered: 03/28/2024) |
| 03/28/2024 | 70 | Form 17 Business Proprietary Information Certification filed on behalf of Alessandra A. Palazzolo as Attorney/Consultant(s) . Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Welded Tube. (Schagrin, Roger) (Entered: 03/28/2024) |
| 06/10/2024 | 71 | Motion for extension of time until 6/26/2024 to *file remand redetermination*. Responses due by 7/1/2024. Filed by Hardeep K. Josan of U.S. Department of Justice on behalf of United States.(Josan, Hardeep) (Entered: 06/10/2024) |
| 06/10/2024 | 72 | Order entered on 6/10/2024, granting Motion for extension of time. ORDERED that: 1. Commerce shall file the remand redetermination on or before Wednesday, June 26, 2024; 2. Commerce shall file the administrative record on or before Wednesday, July 10, 2024; 3. The parties shall file comments on the remand redetermination on or before Friday, July 26, 2024; 4. The parties shall file their replies to the comments on the remand redetermination on or before Monday, August 26, 2024; and 5. The parties shall file the joint appendix on or before Monday, September 9, 2024. (Related Doc # 71 ). (Taronji, Steve) (Entered: 06/10/2024) |
| 06/13/2024 | 73 | Amended Form 11 Notice of Appearance *on behalf of Thomas M. Beline*. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of United States Steel Corporation.(Beline, Thomas) (Entered: 06/13/2024) |
| 06/26/2024 | 74 | Confidential Remand results filed by U.S. Department of Commerce . Filed by Ian Andrew McInerney of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 BPI Remand Results)(McInerney, Ian) (Entered: 06/26/2024) |
| 06/26/2024 | 75 | Remand results filed by U.S. Department of Commerce . Filed by Ian Andrew McInerney of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Public Remand Results)(McInerney, Ian) (Entered: 06/26/2024) |
| 07/10/2024 | 76 | Form 11 Notice of Appearance . Filed by Spencer C. Neff of U.S. Department of Commerce on behalf of United States. (Neff, Spencer) (Entered: 07/10/2024) |
| 07/10/2024 | 77 | Administrative Record Index for U.S. Department of Commerce filed . Filed by Spencer C. Neff of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Declaration, # 2 Public Remand Record, # 3 Confidential Remand Record)(Neff, Spencer) (Entered: 07/10/2024) |
| 07/26/2024 | 78 | Confidential Comments on remand results (related document(s) 74 ). Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation. (Spak, Gregory) (Entered: 07/26/2024) |
| 07/26/2024 | 79 | Public Comments on remand results (related document(s) 78 , 75 ). Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation. (Spak, Gregory) (Entered: 07/26/2024) |
| 08/26/2024 | 80 | Confidential Reply to comments on remand results (related document(s) 74 , 75 ). Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United States Steel Corporation, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Welded Tube. (Schagrin, Roger) (Entered: 08/26/2024) |
| 08/26/2024 | 81 | Public Reply to comments on remand results (related document(s) 79 , 78 ). Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United States Steel Corporation, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Welded Tube. (Schagrin, Roger) (Entered: 08/26/2024) |
| 08/26/2024 | 82 | Confidential Reply to comments on remand results (related document(s) 79 , 78 ). Filed by Hardeep K. Josan of U.S. Department of Justice on behalf of United States. (Josan, Hardeep) (Entered: 08/26/2024) |
| 08/26/2024 | 83 | Public Reply to comments on remand results (related document(s) 79 , 78 ). Filed by Hardeep K. Josan of U.S. Department of Justice on behalf of United States. (Josan, Hardeep) (Entered: 08/26/2024) |
| 09/09/2024 | 84 | Confidential Joint Appendix *(Remand)*. Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation. (Spak, Gregory) (Entered: 09/09/2024) |
| 09/09/2024 | 85 | Joint Appendix *(Public)* (related document(s) 84 ). Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation. (Spak, Gregory) (Entered: 09/09/2024) |
| 09/13/2024 | 86 | Unopposed Motion for oral argument on Remand *Redetermination*. Responses due by 10/4/2024. Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation.(Spak, Gregory) (Entered: 09/13/2024) |

| 09/16/2024 | 87 | Order entered on 9/16/2024, granting unopposed Motion for oral argument. ORDERED that oral argument shall be held on Tuesday, October 22, 2024, at 11:00 a.m. in Courtroom 1 of the United States Court of International Trade, One Federal Plaza, New York, NY.. (Related Doc # 86 ) (Taronji, Steve) (Entered: 09/16/2024) |
|---|---|---|
| 09/27/2024 | 88 | Letter filed by the Honorable Claire R. Kelly concerning *Oral Argument Questions*. (Taronji, Steve) (Entered: 09/27/2024) |
| 10/11/2024 | 89 | Form 18A Notification of Termination of Government Attorney Access to Business Proprietary Information on behalf of *Spencer C. Neff*. Filed by Spencer C. Neff of U.S. Department of Commerce on behalf of United States. (Neff, Spencer) (Entered: 10/11/2024) |
| 10/17/2024 | 90 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Danica Harvey*. Filed by Gregory James Spak of White & Case, LLP on behalf of IPSCO Tubulars Inc., Maverick Tube Corporation, Siderca S.A.I.C., Tenaris Bay City, Inc., Tenaris Global Services (U.S.A.) Corporation. (Spak, Gregory) (Entered: 10/17/2024) |
| 10/22/2024 | 91 | Oral Argument held on 10/22/2024 at 11:00 AM in Courtroom 1. *Appearance sheet attached*. (Taronji, Steve) (Entered: 10/22/2024) |
| 10/24/2024 | 92 | 🔊 Digital Audio File regarding Oral Argument Courtroom Proceeding 91 held on October 22, 2024 before Judge Claire R. Kelly. AUDIO FILE SIZE (65.4 MB) (Taronji, Steve) (Entered: 10/24/2024) |
| 10/24/2024 | 93 | 🔊 Digital Audio File regarding Digital Audio File 92 , Oral Argument Courtroom Proceeding 91 held on October 22, 2024 before Judge Claire R. Kelly. AUDIO FILE SIZE (26.0 MB) (Taronji, Steve) (Entered: 10/24/2024) |
| 12/02/2024 | 94 | Confidential Order entered on 12/2/2024, Slip Op. 24-133; Sustaining the Department of Commerce's Remand Redetermination. Judgment will enter accordingly. (related document(s) 74 , 75 ). (Taronji, Steve) (Entered: 12/02/2024) |
| 12/02/2024 | 95 | Order entered on 12/2/2024, Judgment for Slip Op. 24-133. (related document(s) 94 ). (Taronji, Steve) (Entered: 12/02/2024) |
| 12/02/2024 | 96 | Letter filed by the Honorable Claire R. Kelly concerning *the Public Version of Slip Op. 24-133*. Response to Court Request/Order due by 12/9/2024. (Taronji, Steve) (Entered: 12/02/2024) |
| 12/05/2024 | 97 | Response to Court's Request/Order *regarding Redactions of Business Proprietary Information*. Filed by Roger Brian Schagrin of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Welded Tube. (Schagrin, Roger) (Entered: 12/05/2024) |
| 12/09/2024 | 98 | Response to Court's Request/Order *Regarding Double-Bracketing Confidential Information*. Filed by Gregory James Spak of White & Case, LLP on behalf of Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, Siderca S.A.I.C.. (Spak, Gregory) (Entered: 12/09/2024) |
| 12/09/2024 | 99 | Response to Court's Request/Order *Regarding the Redaction of Confidential Information in Slip Op. 24-133*. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of United States Steel Corporation. (Beline, Thomas) (Entered: 12/09/2024) |
| 12/10/2024 | 100 | Response to Court's Request/Order . Filed by Hardeep K. Josan of U.S. Department of Justice on behalf of United States. (Josan, Hardeep) (Entered: 12/10/2024) |
| 12/10/2024 | 101 | Order entered on 12/10/2024, Public Slip Op. 24-133. (related document(s) 94 ). (Taronji, Steve) (Entered: 12/10/2024) |
| 01/12/2025 | 102 | Form 11 Notice of Appearance . Filed by Kara Marie Westercamp of U.S. Department of Justice on behalf of United States. (Westercamp, Kara) (Entered: 01/12/2025) |
| 01/16/2025 | 103 | Form 18 Notice of Termination of Access to Business Proprietary Information filed on behalf of *Michelle R. Avrutin*. Filed by Luke Anthony Meisner of Schagrin Associates on behalf of Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC and Welded Tube. (Meisner, Luke) Modified on 1/16/2025 (Taronji, Steve). (Entered: 01/16/2025) |
| 01/17/2025 | 104 | Notice of Appeal of Judgment of December 2, 2024 filed. (related document(s) 101 , 94 , 95 ). Filed by Gregory James Spak of White & Case, LLP on behalf of Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, Siderca S.A.I.C..(Spak, Gregory) (Entered: 01/17/2025) |
| 01/23/2025 | 105 | *Plaintiff's* Appeal of *Slip Op. 24-133 and Judgment* docketed on 1/23/2025 by the USCAFC as appeal no. 2025-1382 (related document(s) 104 ). (Taronji, Steve) (Entered: 01/23/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/14/2025 14:32:39 | | |
| **PACER Login:** | spakgreg | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00343-CRK |
| **Billable Pages:** | 24 | **Cost:** | 2.40 |

11

Certified Administrative Record – Public Index (Initial and Remand)

N/A

Public

Appx175-Appx190

Report generated on: 2/1/2023 1:01:45 PM

## UNITED STATES DEPARTMENT OF COMMERCE - INTERNATIONAL TRADE ADMINISTRATION - INDEX TO ADMINISTRATIVE RECORD

## CASE NUMBER A-357-824 - Oil Country Tubular Goods From Argentina

### INV

*Contains Data files*

**\* Public Document \* Public Document \* Public Document**

Print

| Item No. | Upload Date | Document Title | Segment | Bar Code |
|---|---|---|---|---|
| 1<br>Public Version | 10/5/2021 | PETITION FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>PETITION - COVER LTR | INV | 4168004-01 |
| 2<br>Public Version | 10/5/2021 | PETITION FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>PETITION - VOL I - PART 1 | INV | 4168004-02 |
| 3<br>Public Version | 10/5/2021 | PETITION FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>PETITION - VOL I - PART 2 | INV | 4168004-03 |
| 4<br>Public Version | 10/5/2021 | PETITION FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>PETITION - VOL I - PART 3 | INV | 4168004-04 |
| 5<br>Public Version | 10/5/2021 | PETITION FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>PETITION - VOL I - PART 4 | INV | 4168004-05 |
| 6<br>Public Version | 10/5/2021 | PETITION FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>PETITION - VOL II - NARRATIVE & EXHIBITS | INV | 4168004-06 |
| 7<br>Public Document | 10/6/2021 | APO FROM USDOC TO FILE PERTAINING TO ALL APO AUTHORIZED APPLICANTS<br>APO | INV | 4168273-01 |
| 8<br>Public Document | 10/6/2021 | ENTRY_OF_APPEARANCE FROM WHITE & CASE LLP TO SEC. OF COMMERCE PERTAINING TO MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., IPSCO TUBULARS INC.<br>ENTRY OF APPEARANCE | INV | 4168326-01 |
| 9<br>Public Document | 10/6/2021 | APO FROM WHITE & CASE LLP TO SEC. OF COMMERCE PERTAINING TO MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., AND IPSCO TUBULARS INC.<br>APO APPLICATION | INV | 4168339-01 |
| 10<br>Public Document | 10/6/2021 | APO FROM SCHAGRIN ASSOCIATES TO SEC. OF COMMERCE PERTAINING TO BORUSAN MANNESMANN PIPE U.S., INC., PTC LIBERTY TUBULARS LLC, AND WELDED TUBE USA, INC., USW<br>APO APPLICATION | INV | 4168531-01 |

| | | | | |
|---|---|---|---|---|
| 11<br>Public<br>Document | 10/7/2021 | APO FROM SCHAGRIN ASSOCIATES TO SEC. OF COMMERCE<br>PERTAINING TO BORUSAN MANNESMANN PIPE USA, INC., PTC LIBERTY<br>TUBULARS LLC, AND WELDED TUBE USA, INC, , THE UNITED STEEL, PAPER AND<br>FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND<br>SERVICE W ET AL.<br>AMENDED APO APPLICATION | INV | 4168590-<br>01 |
| 12<br>Public<br>Version | 10/8/2021 | LETTER FROM USDOC TO SCHAGRIN ASSOC. AND CASSIDY LEVY<br>PERTAINING TO PETITIONERS<br>PETITION SUPP QNAIRE | INV | 4169628-<br>01 |
| 13<br>Public<br>Document | 10/8/2021 | APO FROM CASSIDY LEVY KENT (USA) LLP TO SEC. OF COMMERCE<br>PERTAINING TO UNITED STATES STEEL TUBULAR PRODUCTS, INC.<br>APO APPLICATION | INV | 4169655-<br>01 |
| 14<br>Public<br>Version | 10/8/2021 | LETTER FROM USDOC TO SCHAGRIN ASSOC. AND CASSIDY LEVY<br>PERTAINING TO PETITIONERS<br>GENERAL ISSUES QUESTIONNAIRE | INV | 4169749-<br>01 |
| 15<br>Public<br>Version | 10/8/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS USA<br>FACTUAL ERROR CMTS | INV | 4169951-<br>01 |
| 16<br>Public<br>Document | 10/11/2021 | APO FROM WHITE & CASE LLP TO SEC. OF COMMERCE<br>PERTAINING TO MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., AND<br>IPSCO TUBULARS INC.<br>AMENDED APO APPLICATION | INV | 4170133-<br>01 |
| 17<br>Public<br>Document | 10/11/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS USA<br>SUBMISSION OF COMPANY CERTIFICATION | INV | 4170161-<br>01 |
| 18<br>Public<br>Document | 10/12/2021 | APO FROM WHITE & CASE LLP TO SEC. OF COMMERCE<br>PERTAINING TO MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., AND<br>IPSCO TUBULARS INC.<br>AMENDED APO APPLICATION | INV | 4170709-<br>01 |
| 19<br>Public<br>Version | 10/12/2021 | RESPONSE FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE<br>PERTAINING TO PETITIONERS<br>GENERAL ISSUES QR | INV | 4170756-<br>01 |
| 20<br>Public<br>Version | 10/13/2021 | RESPONSE FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO PETITIONERS<br>ARGENTINA AD SUPP QR | INV | 4171140-<br>01 |
| 21<br>Public<br>Document | 10/13/2021 | MEMO FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>SCOPE PHONE CALL W/PETITIONERS | INV | 4171461-<br>01 |
| 22<br>Public<br>Version | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS USA<br>CMTS RE PETITIONER'S STANDING | INV | 4172063-<br>01 |
| 23<br>Public<br>Version | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS USA<br>EXHIBITS - PART 1 | INV | 4172063-<br>02 |
| 24<br>Public<br>Version | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS USA<br>EXHIBITS - PART 2 | INV | 4172063-<br>03 |
| 25<br>Public<br>Version | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS USA<br>EXHIBITS - PART 3 | INV | 4172063-<br>04 |
| 26<br>Public<br>Version | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS USA<br>EXHIBITS - PART 4 | INV | 4172063-<br>05 |

| 27<br>Public<br>Version | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS USA<br>EXHIBITS - PART 5 | INV | 4172063-06 |
| 28<br>Public<br>Version | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS USA<br>EXHIBITS - PART 6 | INV | 4172063-07 |
| 29<br>Public<br>Version | 10/18/2021 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO PETITIONERS<br>REBUTTAL CMTS ON STANDING | INV | 4172946-01 |
| 30<br>Public<br>Version | 10/19/2021 | MEMO FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>CBP DATA RELEASE | INV | 4173052-01 |
| 31<br>Public<br>Version | 10/20/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS USA<br>SURREBUTTAL CMTS ON STANDING | INV | 4173963-01 |
| 32<br>Public<br>Version | 10/21/2021 | RESPONSE FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE<br>PERTAINING TO PETITIONERS<br>2ND GENERAL ISSUES QR | INV | 4174043-01 |
| 33<br>Public<br>Version | 10/21/2021 | LETTER FROM USDOC TO SCHAGRIN ASSOCIATES AND CASSIDY LEVY<br>PERTAINING TO PETITIONERS<br>SECOND GENERAL ISSUES QNAIRE | INV | 4174098-01 |
| 34<br>Public<br>Document | 10/22/2021 | MEMO FROM USDOC TO FILE<br>PERTAINING TO TENARIS<br>EX PARTE MEETING - PETITION | INV | 4174580-01 |
| 35<br>Public<br>Version | 10/22/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS USA<br>CMTS RE PETITIONERS' 2ND GENERAL ISSUES QR | INV | 4174685-01 |
| 36<br>Public<br>Document | 10/27/2021 | FR_NOTICE_UNPUBLISHED FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>INITIATION OF INVESTIGATIONS | INV | 4176052-01 |
| 37<br>Public<br>Document | 10/27/2021 | LETTER FROM USDOC TO ITC<br>PERTAINING TO INTERESTED PARTIES<br>ITC NOTIFICATION - INITIATION | INV | 4176056-01 |
| 38<br>Public<br>Document | 10/27/2021 | LETTER FROM USDOC TO EMBASSY OF ARGENTINA<br>PERTAINING TO GOV'T OF ARGENTINA<br>EMBASSY LETTER | INV | 4176065-01 |
| 39<br>Public<br>Document | 10/27/2021 | MEMO FROM USDOC TO INTERESTED PARTIES<br>PERTAINING TO INTERESTED PARTIES<br>PLACING PRODUCT CHARACTERISTICS INFO ON RECORD | INV | 4176221-01 |
| 40<br>Public<br>Version | 10/27/2021 | INITIATION_CHECKLIST FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>INITIATION CHECKLIST | INV | 4176347-01 |
| 41<br>Public<br>Document | 10/27/2021 | ENTRY_OF_APPEARANCE FROM WHITE & CASE LLP TO SEC. OF COMMERCE<br>PERTAINING TO SIDERCA S.A.I.C., TENARIS GLOBAL SERVICES (U.S.A.)<br>CORPORATION, MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., IPSCO<br>TUBULARS INC.<br>AMENDED ENTRY OF APPEARANCE | INV | 4176460-01 |
| 42<br>Public<br>Document | 10/27/2021 | APO FROM WHITE & CASE LLP TO SEC. OF COMMERCE<br>PERTAINING TO SIDERCA S.A.I.C., TENARIS GLOBAL SERVICES (U.S.A.)<br>CORPORATION, MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., AND<br>IPSCO TUBULARS INC.<br>AMENDED APO APPLICATION | INV | 4176461-01 |

| 43 Public Document | 10/29/2021 | ENTRY_OF_APPEARANCE FROM EMBASSY OF ARGENTINA TO SEC OF COMMERCE PERTAINING TO GOA ENTRY OF APPEARANCE | INV | [4176967-01](#) |
|---|---|---|---|---|
| 44 Public Document | 11/1/2021 | FR_NOTICE_PUBLISHED FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES INITIATION OF INVESTIGATIONS | INV | [4176052-02](#) |
| 45 Public Document | 11/2/2021 | PUBLIC_SERVICE_LIST FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES PUBLIC SERVICE LIST | INV | [4168448-01](#) |
| 46 Public Document | 11/2/2021 | CUSTOMS_INSTRUCTIONS FROM USDOC TO U.S. CBP PERTAINING TO INTERESTED PARTIES INITIATION INSTRUCTIONS | INV | [4178100-01](#) |
| 47 Public Document | 11/8/2021 | APO FROM CASSIDY LEVY KENT (USA) LLP TO SEC. OF COMMERCE PERTAINING TO UNITED STATES STEEL TUBULAR PRODUCTS, INC. AMENDED APO APPLICATION | INV | [4180114-01](#) |
| 48 Public Version | 11/10/2021 | MEMO FROM USDOC TO DAS FOR OPERATIONS PERTAINING TO INTERESTED PARTIES RESPONDENT SELECTION | INV | [4181218-01](#) |
| 49 Public Document | 11/10/2021 | LETTER FROM USDOC TO WHITE & CASE PERTAINING TO SIDERCA S.A.I.C. QUESTIONNAIRE | INV | [4181319-01](#) |
| 50 Public Document | 11/10/2021 | DATA FROM USDOC TO WHITE & CASE PERTAINING TO SIDERCA S.A.I.C. APPENDIX VII | INV | [4181319-02](#) |
| 51 Public Document | 11/15/2021 | LETTER FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS PRODUCT CHARACTERISTICS CMTS | INV | [4182184-01](#) |
| 52 Public Document | 11/15/2021 | LETTER FROM WINTON & CHAPMAN PLLC TO SEC OF COMMERCE PERTAINING TO TMK GROUP (REJECTED) SCOPE COMMENTS | INV | [4182342-01](#) |
| 53 Public Document | 11/15/2021 | LETTER FROM WINTON & CHAPMAN PLLC TO SEC OF COMMERCE PERTAINING TO TMK GROUP PRODUCT CHARACTERISTIC CMTS | INV | [4182409-01](#) |
| 54 Public Document | 11/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO TENARIS USA, TGS USA, SIDERCA AND TAMSA CMTS ON PRODUCT CHARACTERISTICS | INV | [4182432-01](#) |
| 55 Public Document | 11/15/2021 | LETTER FROM WINTON & CHAPMAN PLLC TO SEC OF COMMERCE PERTAINING TO TMK GROUP SCOPE CMTS | INV | [4182440-01](#) |
| 56 Public Document | 11/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO TENARIS USA, TGS USA, SIDERCA AND TAMSA SCOPE COMMENTS | INV | [4182560-01](#) |
| 57 Public Document | 11/15/2021 | LETTER FROM WINTON & CHAPMAN PLLC TO SEC OF COMMERCE PERTAINING TO TMK GROUP CORRECTED CERTIFICATE OF SERVICE | INV | [4182615-01](#) |
| 58 Public Document | 11/19/2021 | APO FROM WHITE & CASE LLP TO SEC. OF COMMERCE PERTAINING TO SIDERCA S.A.I.C., TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION, MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., AND IPSCO TUBULARS INC. AMENDED APO APPLICATION | INV | [4183763-01](#) |
| 59 Public | 11/24/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA | INV | [4185196-01](#) |

| Document | | NOTIFICATIONS REGARDING QR | | |
|---|---|---|---|---|
| 60<br>Public<br>Document | 11/26/2021 | APO FROM WHITE & CASE LLP TO SEC. OF COMMERCE<br>PERTAINING TO SIDERCA S.A.I.C., TENARIS GLOBAL SERVICES (U.S.A.)<br>CORPORATION, MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., AND<br>IPSCO TUBULARS INC.<br>AMENDED APO APPLICATION | INV | 4185450-01 |
| 61<br>Public<br>Document | 11/26/2021 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO PETITIONERS<br>REBUTTAL SCOPE CMTS | INV | 4185454-01 |
| 62<br>Public<br>Document | 11/26/2021 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO PETITIONERS<br>REBUTTAL CMTS ON PRODUCT CHARACTERISTICS | INV | 4185464-01 |
| 63<br>Public<br>Document | 11/29/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>REQ FOR EXT TO SUPP SEC A QR | INV | 4185611-01 |
| 64<br>Public<br>Document | 11/29/2021 | LETTER FROM USDOC TO WHITE CASE<br>PERTAINING TO SIDERCA<br>GRANTS PARTIAL EXT FOR SEC A QR | INV | 4185807-01 |
| 65<br>Public<br>Document | 11/30/2021 | LETTER FROM U.S. INTERNATIONAL TRADE COMMISSION TO SEC OF<br>COMMERCE<br>PERTAINING TO USITC<br>ITC DETERMINATION REPORT AND VIEWS | INV | 4186641-01 |
| 66<br>Public<br>Document | 12/1/2021 | LETTER FROM USDOC TO WHITE CASE<br>PERTAINING TO SIDERCA<br>REQUESTS INFO RE HIGH INFLATION | INV | 4186843-01 |
| 67<br>Public<br>Document | 12/3/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>REQ FOR EXT | INV | 4187780-01 |
| 68<br>Public<br>Document | 12/3/2021 | LETTER FROM USDOC TO WHITE & CASE LLP<br>PERTAINING TO SIDERCA<br>GRANTS EXT FOR INFO | INV | 4187897-01 |
| 69<br>Public<br>Document | 12/8/2021 | MEMO FROM USDOC TO INTERESTED PARTIES<br>PERTAINING TO INTERESTED PARTIES<br>PRODUCT CHARACTERISTICS HIERARCHY | INV | 4189197-01 |
| 70<br>Public<br>Version | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>RESPONSE TO REQ FOR INFORMATION | INV | 4189297-01 |
| 71<br>Public<br>Version | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SEC A QR | INV | 4189518-01 |
| 72<br>Public<br>Version | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBITS A1 - A32 | INV | 4189518-02 |
| 73<br>Public<br>Version | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBITS A33 - A-35 | INV | 4189518-03 |
| 74<br>Public<br>Document | 12/9/2021 | LETTER FROM USDOC TO WHITE & CASE LLP<br>PERTAINING TO SIDERCA<br>REQ FOR HIGH INFLATION REPORTING | INV | 4189581-01 |
| 75<br>Public<br>Document | 12/10/2021 | MEMO FROM USDOC TO FILE<br>PERTAINING TO SIDERCA<br>CLARIFY HIGH INFLATION REPORTING | INV | 4189705-01 |

| 76 Public Document | 12/13/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA REQ EXT FOR SEC B-E QR | INV | 4190931-01 |
|---|---|---|---|---|
| 77 Public Document | 12/14/2021 | LETTER FROM USDOC TO WHITE & CASE PERTAINING TO SIDERCA GRANTS EXTENSIONS FOR SEC C AND E AND SEC B AND D QNIARE | INV | 4191351-01 |
| 78 Public Version | 12/27/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COMMENTS ON COMPARISON MARKET | INV | 4194921-01 |
| 79 Public Document | 12/29/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TENARIS REQ 2ND EXT FOR QR - SECS C AND # | INV | 4195493-01 |
| 80 Public Document | 12/30/2021 | LETTER FROM USDOC TO WHITE CASE PERTAINING TO SIDERCA GRANTS EXT FOR SEC C, E QR | INV | 4196164-01 |
| 81 Public Document | 1/4/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA REQ FOR EXT TO SUPP SEC B-D QR | INV | 4196788-01 |
| 82 Public Document | 1/4/2022 | LETTER FROM USDOC TO WHITE CASE PERTAINING TO SIDERCA DENIES EXT FOR SEC B AND D QR | INV | 4196963-01 |
| 83 Public Document | 1/6/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA REQ EXT FOR SEC B & D QR | INV | 4197757-01 |
| 84 Public Document | 1/6/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA CLARIFICATION FOR 3RD EXT REQ | INV | 4197885-01 |
| 85 Public Document | 1/6/2022 | LETTER FROM USDOC TO WHITE & CASE PERTAINING TO SIDERCA GRANTS EXT. FOR SEC B AND D QNAIRE | INV | 4197912-01 |
| 86 Public Document | 1/10/2022 | APO FROM SCHAGRIN ASSOCIATES TO SEC. OF COMMERCE PERTAINING TO BORUSAN MANNESMANN PIPE USA, INC., PTC LIBERTY TUBULARS LLC, AND WELDED TUBE USA, INC, , THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE W ET AL. AMENDED APO APPLICATION | INV | 4198771-01 |
| 87 Public Version | 1/10/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SECTIONS C & E RESPONSE PUBLIC | INV | 4199144-01 |
| 88 Public Document | 1/12/2022 | LETTER FROM EMBASSY OF ARGENTINA TO SEC OF COMMERCE PERTAINING TO GOA CMTS RE NORMAL VALUE AND PRICE COMPARISON | INV | 4199925-01 |
| 89 Public Version | 1/12/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA (REJECTED) SEC B & D QR | INV | 4200214-01 |
| 90 Public Version | 1/18/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE PERTAINING TO PETITIONERS COMPARISON MARKET REBUTTAL CMTS | INV | 4202279-01 |
| 91 Public Version | 1/20/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA (REJECTED) THIRD COUNTRY SECTION B RESPONSE | INV | 4203565-01 |
| 92 Public | 1/20/2022 | MEMO FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES | INV | 4203679-01 |

| | | | | |
|---|---|---|---|---|
| | | EX-PARTE MEETING | | |
| 93 Public Document | 1/21/2022 | LETTER FROM USDOC TO WHITE & CASE PERTAINING TO SIDERCA REJECTING UNSOLICITED INFORMATION | INV | 4203772-01 |
| 94 Public Document | 1/21/2022 | REJECTION_MEMO FROM USDOC TO FILE PERTAINING TO SIDERCA REJECTION OF QR SUBMISSIONS | INV | 4203773-01 |
| 95 Public Document | 1/21/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE PERTAINING TO U. S. STEEL REQ TO REJECT QR - SEC B 3RD COUNTRY | INV | 4203906-01 |
| 96 Public Document | 1/24/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA RESPONSE TO DEPT'S AND PETITS LTRS OF 1/21/2022 | INV | 4204347-01 |
| 97 Public Version | 1/24/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA RESUBMISSION OF IQR - SECS B & D | INV | 4204427-01 |
| 98 Public Version | 1/26/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COMPARISON MARKET REBUTTAL CMTS - NARRATIVE | INV | 4205246-01 |
| 99 Public Version | 1/26/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COMPARISON MARKET REBUTTAL CMTS - EXHIBITS | INV | 4205246-02 |
| 100 Public Document | 1/27/2022 | APO FROM CASSIDY LEVY KENT (USA) LLP TO SEC. OF COMMERCE PERTAINING TO UNITED STATES STEEL TUBULAR PRODUCTS, INC. AMENDED APO APPLICATION | INV | 4205503-01 |
| 101 Public Version | 1/27/2022 | LETTER FROM USDOC TO WHITE CASE PERTAINING TO SIDERCA SEC A-C SUPP QNAIRE | INV | 4206203-01 |
| 102 Public Document | 2/2/2022 | APO FROM SCHAGRIN ASSOCIATES TO SEC. OF COMMERCE PERTAINING TO BORUSAN MANNESMANN PIPE USA, INC., PTC LIBERTY TUBULARS LLC, AND WELDED TUBE USA, INC, , THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE W ET AL. AMENDED APO APPLICATION | INV | 4208189-01 |
| 103 Public Document | 2/8/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA , U.S.A. & TGS USA REQ FOR EXT TO SUPP SEC A-C QR | INV | 4209652-01 |
| 104 Public Document | 2/8/2022 | LETTER FROM USDOC TO WHITE & CASE PERTAINING TO SIDERCA GRANTS PARTIAL EXT. FOR SUPPL QNAIRE | INV | 4209708-01 |
| 105 Public Document | 2/10/2022 | LETTER FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS (REJECTED) REQ POSTPONEMENT OF PRELIM DET | INV | 4210579-01 |
| 106 Public Document | 2/10/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE PERTAINING TO PETITIONERS REQ TO POSTPONE PRELIM DETERMINATION | INV | 4210732-01 |
| 107 Public Document | 2/11/2022 | REJECTION_MEMO FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES REJECTION OF REQ FOR POSTPONEMENT OF PRELIM DET | INV | 4211199-01 |
| 108 Public Document | 2/14/2022 | FR_NOTICE_UNPUBLISHED FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES POSTPONEMENT OF PRELIM | INV | 4211682-01 |

Appx181

| 109<br>Public<br>Document | 2/16/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>REQ EXT OF SEC A-C SUPP QR | INV | 4212940-<br>01 |
|---|---|---|---|---|
| 110<br>Public<br>Document | 2/16/2022 | LETTER FROM USDOC TO WHITE & CASE<br>PERTAINING TO SIDERCA<br>GRANTS EXT. SEC A,D SUPPL QNAIRE AND SEC C SUPP QNAIRE | INV | 4212988-<br>01 |
| 111<br>Public<br>Document | 2/17/2022 | FR_NOTICE_PUBLISHED FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>POSTPONEMENT OF PRELIM | INV | 4211682-<br>02 |
| 112<br>Public<br>Version | 2/22/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SUPPL QR - SECS A-B - CVR LTR AND NARRATIVE - PART 1 | INV | 4214696-<br>01 |
| 113<br>Public<br>Version | 2/22/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SUPPL QR - SECS A-B - CVR LTR AND NARRATIVE - PART 2 | INV | 4214696-<br>02 |
| 114<br>Public<br>Version | 2/22/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SEC A EXHIBITS | INV | 4214696-<br>03 |
| 115<br>Public<br>Version | 2/22/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SEC B EXHIBITS | INV | 4214696-<br>04 |
| 116<br>Public<br>Document | 2/23/2022 | APO FROM WHITE & CASE LLP TO SEC. OF COMMERCE<br>PERTAINING TO SIDERCA S.A.I.C., TENARIS GLOBAL SERVICES (U.S.A.)<br>CORPORATION, MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., AND<br>IPSCO TUBULARS INC.<br>AMENDED APO APPLICATION | INV | 4214920-<br>01 |
| 117<br>Public<br>Version | 2/25/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SUPP. SECTION C QNAIRE RESP PUBLIC COVER | INV | 4215953-<br>01 |
| 118<br>Public<br>Version | 2/25/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SUPP SEC C QNAIRE RESP PUBLIC EXH C1-C16 | INV | 4215953-<br>02 |
| 119<br>Public<br>Document | 3/4/2022 | APO FROM SCHAGRIN ASSOCIATES TO SEC. OF COMMERCE<br>PERTAINING TO BORUSAN MANNESMANN PIPE USA, INC., PTC LIBERTY<br>TUBULARS LLC, AND WELDED TUBE USA, INC, , THE UNITED STEEL, PAPER AND<br>FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND<br>SERVICE W ET AL.<br>AMENDED APO APPLICATION | INV | 4218488-<br>01 |
| 120<br>Public<br>Version | 3/7/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U.S. STEEL<br>CMTS ON SIDERCA SUPP QR | INV | 4219347-<br>01 |
| 121<br>Public<br>Version | 3/7/2022 | LETTER FROM USDOC TO WHITE & CASE<br>PERTAINING TO SIDERCA<br>SECOND SUPPLEMENTAL QNAIRE | INV | 4219482-<br>01 |
| 122<br>Public<br>Document | 3/9/2022 | MEMO FROM USDOC TO DAS FOR OPERATIONS<br>PERTAINING TO INTERESTED PARTIES<br>PRELIMINARY SCOPE DECISION | INV | 4220190-<br>01 |
| 123<br>Public<br>Document | 3/10/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>REQ FOR EXT TO SUPP QR | INV | 4220797-<br>01 |
| 124<br>Public<br>Document | 3/10/2022 | LETTER FROM USDOC TO WHITE CASE<br>PERTAINING TO SIDERCA<br>GRANTS EXR FOR SUPP QR | INV | 4220810-<br>01 |

| 125 Public Version | 3/11/2022 | LETTER FROM USDOC TO FILE PERTAINING TO SIDERCA SEC D-E SUPP QNAIRE | INV | 4221134-01 |
|---|---|---|---|---|
| 126 Public Version | 3/15/2022 | LETTER FROM USDOC TO WHITE & CASE LLP PERTAINING TO SIDERCA REQUEST FOR BPI RE-BRACKET | INV | 4221834-01 |
| 127 Public Document | 3/16/2022 | LETTER FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS ALLEGATION OF THE EXISTENCE OF CRITICAL CIRCUMSTANCES | INV | 4222397-01 |
| 128 Public Document | 3/16/2022 | LETTER FROM USDOC TO WHITE CASE PERTAINING TO SIDERCA NOTICE OF VIRTUAL VERIFICATION | INV | 4222408-01 |
| 129 Public Document | 3/17/2022 | LETTER FROM USDOC TO WHITE & CASE PERTAINING TO SIDERCA REQUEST FOR SHIPMENT DATA | INV | 4222729-01 |
| 130 Public Version | 3/21/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA 2ND SUPP SEC B-C QR | INV | 4223478-01 |
| 131 Public Document | 3/22/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA REQ FOR EXT TO SUPP SEC D-E QR | INV | 4224104-01 |
| 132 Public Version | 3/22/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA BRACKETING REVISIONS TO REBUTTAL CMTS ON CM | INV | 4224187-01 |
| 133 Public Document | 3/23/2022 | LETTER FROM USDOC TO WHITE & CASE PERTAINING TO SIDERCA EXT. REQUEST RESPONSE FOR SEC E AND SEC D SUPPL QNAIRE | INV | 4224346-01 |
| 134 Public Version | 3/25/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA MONTHLY SHIPMENT DATA | INV | 4225315-01 |
| 135 Public Version | 3/28/2022 | LETTER FROM USDOC TO WHITE CASE PERTAINING TO SIDERCA SEC B-C SUPP QNAIRE | INV | 4226309-01 |
| 136 Public Version | 3/29/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA REBUTTAL TO CRITICAL CIRCUMSTANCES ALLEGATION | INV | 4226569-01 |
| 137 Public Document | 3/29/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA REQ FOR EXT TO SUPP SEC D QR | INV | 4226728-01 |
| 138 Public Document | 3/30/2022 | LETTER FROM USDOC TO WHITE & CASE PERTAINING TO SIDERCA GRANTS EXT. | INV | 4226974-01 |
| 139 Public Version | 3/30/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SEC E SUPP QR | INV | 4227101-01 |
| 140 Public Document | 4/4/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE PERTAINING TO U. S. STEEL (REJECTED) NFI SUBMISSION | INV | 4228748-01 |
| 141 Public Document | 4/5/2022 | LETTER FROM USDOC TO CASSIDY LEVY PERTAINING TO US STEEL NEW FACTUAL INFORMATION (NFI) REJECTION | INV | 4229335-01 |

| 142<br>Public<br>Document | 4/5/2022 | REJECTION_MEMO FROM USDOC TO FILE<br>PERTAINING TO US STEEL<br>REJECTION OF NFI SUBMISSION | INV | 4229336-01 |
|---|---|---|---|---|
| 143<br>Public<br>Document | 4/7/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U.S. STEEL<br>RESUBMISSION OF NFI | INV | 4229849-01 |
| 144<br>Public<br>Document | 4/7/2022 | LETTER FROM USDOC TO INTERESTED PARTIES<br>PERTAINING TO INTERESTED PARTIES<br>OPPORTUNITY FOR REBUTTAL NFI | INV | 4230064-01 |
| 145<br>Public<br>Version | 4/7/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SUPP D AND 3RD SUPP QRS | INV | 4230120-01 |
| 146<br>Public<br>Version | 4/8/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>RESUBMISSION OF DATA FILES | INV | 4230317-01 |
| 147<br>Public<br>Version | 4/8/2022 | LETTER FROM USDOC TO WHITE CASE<br>PERTAINING TO SIDERCA<br>4TH A-C SUPPLEMENTAL | INV | 4230324-01 |
| 148<br>Public<br>Version | 4/8/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U.S. STEEL<br>DEFICIENCY CMTS ON SIDERCA QR | INV | 4230650-01 |
| 149<br>Public<br>Version | 4/13/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U.S. STEEL<br>PRE-PRELIM CMTS | INV | 4231733-01 |
| 150<br>Public<br>Version | 4/13/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U.S. STEEL<br>PRE-PRELIM CMTS ERRATUM | INV | 4231735-01 |
| 151<br>Public<br>Document | 4/13/2022 | LETTER FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE<br>PERTAINING TO PETITIONERS<br>REQ POSTPONEMENT OF FINAL DET | INV | 4231794-01 |
| 152<br>Public<br>Document | 4/14/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS<br>REQ FOR PUBLIC INTEREST TERMINATION | INV | 4231976-01 |
| 153<br>Public<br>Version | 4/15/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>CRITICAL CIRCUMSTANCES | INV | 4232349-01 |
| 154<br>Public<br>Version | 4/18/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>4TH SUPPL QR | INV | 4232978-01 |
| 155<br>Public<br>Document | 4/20/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U.S. STEEL<br>REBUTTAL FACTUAL INFORMATION RE SIDERCA SUPP QR | INV | 4233594-01 |
| 156<br>Public<br>Version | 4/21/2022 | LETTER FROM USDOC TO WHITE CASE<br>PERTAINING TO SIDERCA<br>SUPPLEMENTAL QNAIRE 2 | INV | 4233886-01 |
| 157<br>Public<br>Version | 4/26/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>2ND SUPPL QR - SEC E | INV | 4235335-01 |
| 158<br>Public<br>Document | 4/27/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>REQ POSTPONEMENT OF FINAL DET | INV | 4235628-01 |

| | | | | |
|---|---|---|---|---|
| 159<br>Public<br>Version | 5/2/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U. S. STEEL TUBULAR PRODUCTS, INC.<br>SUBMISSION OF REBUTTAL FACTUAL INFO | INV | 4237377-01 |
| 160<br>Public<br>Document | 5/4/2022 | LETTER FROM USDOC TO WHITE & CASE<br>PERTAINING TO TENARIS<br>PROPOSED TERMINATION | INV | 4238455-01 |
| 161<br>Public<br>Document | 5/5/2022 | FR_NOTICE_UNPUBLISHED FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>PRELIMINARY AFFIRMATIVE DETERMINATION | INV | 4238759-01 |
| 162<br>Public<br>Document | 5/5/2022 | MEMO FROM USDOC TO ASSISTANT SECRETARY FOR E&C<br>PERTAINING TO INTERESTED PARTIES<br>ISSUES & DECISION MEMO | INV | 4238759-02 |
| 163<br>Public<br>Version | 5/5/2022 | MEMO FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>PRELIM ANALYSIS MEMORANDUM | INV | 4238762-01 |
| 164<br>Public<br>Document | 5/5/2022 | LETTER FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>DISCLOSURE LETTER | INV | 4238763-01 |
| 165<br>Public<br>Version | 5/5/2022 | MEMO FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>CRITICAL CIRCUMSTANCES MEMO | INV | 4238767-01 |
| 166<br>Public<br>Document | 5/5/2022 | COMPUTER_PROGRAMS FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>COMMON MACROS | INV | 4238771-01 |
| 167<br>Public<br>Document | 5/5/2022 | COMPUTER_PROGRAMS FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>ME MACROS | INV | 4238771-02 |
| 168<br>Public<br>Document | 5/5/2022 | DATA FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>EXCHANGE RATES - ARS | INV | 4238773-01 |
| 169<br>Public<br>Document | 5/5/2022 | LETTER FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>ITC NOTIFICATION LETTER - PRELIMINARY DET | INV | 4238774-01 |
| 170<br>Public<br>Version | 5/5/2022 | MEMO FROM USDOC TO OFFICE DIR/OA<br>PERTAINING TO SIDERCA<br>PRELIMINARY COST MEMO | INV | 4238887-01 |
| 171<br>Public<br>Document | 5/10/2022 | REJECTION_MEMO FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>REJECTION OF W EXHIBIT | INV | 4240007-01 |
| 172<br>Public<br>Document | 5/11/2022 | FR_NOTICE_PUBLISHED FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>PRELIMINARY AFFIRMATIVE DETERMINATION | INV | 4238759-03 |
| 173<br>Public<br>Document | 5/12/2022 | CUSTOMS_INSTRUCTIONS FROM USDOC TO U.S. CBP<br>PERTAINING TO INTERESTED PARTIES<br>CASH DEPOSIT INSTRUCTIONS | INV | 4240723-01 |
| 174<br>Public<br>Version | 5/13/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>MONTHLY SHIPMENT DATA | INV | 4241114-01 |
| 175<br>Public<br>Version | 5/17/2022 | LETTER FROM USDOC TO WHITE CASE<br>PERTAINING TO SIDERCA<br>SUPPL QNAIRE - SEC E | INV | 4242595-01 |

| 176<br>Public<br>Document | 5/19/2022 | LETTER FROM EMBASSY OF ARGENTINA TO SEC OF COMMERCE<br>PERTAINING TO GOA<br>LTR OF SUPPORT | INV | 4243734-01 |
|---|---|---|---|---|
| 177<br>Public<br>Document | 5/19/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SUSPENSION AGREEMENT PROPOSAL | INV | 4243816-01 |
| 178<br>Public<br>Document | 5/20/2022 | MEMO FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>VIRTUAL VERIFICATION SCHEDULE | INV | 4244195-01 |
| 179<br>Public<br>Document | 5/20/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS<br>REQUEST FOR PUBLIC INTEREST TERMINATION | INV | 4244202-01 |
| 180<br>Public<br>Document | 5/24/2022 | MEMO FROM USDOC TO FILE<br>PERTAINING TO SIDERCA<br>EX PARTE MEETING WITH COUNSEL | INV | 4245015-01 |
| 181<br>Public<br>Version | 5/24/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>3RD SUPP SEC E QNAIRE RESP | INV | 4245091-01 |
| 182<br>Public<br>Version | 5/24/2022 | VERIFICATION FROM USDOC TO WHITE CASE<br>PERTAINING TO SIDERCA<br>SALES VERIFICATION AGENDA | INV | 4245110-01 |
| 183<br>Public<br>Version | 5/26/2022 | VERIFICATION FROM USDOC TO WHITE CASE<br>PERTAINING TO SIDERCA<br>CEP VERIFICATION AGENDA | INV | 4245756-01 |
| 184<br>Public<br>Version | 5/26/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U. S. STEEL<br>PRE-VERIFICATION CMTS | INV | 4245775-01 |
| 185<br>Public<br>Version | 5/27/2022 | LETTER FROM USDOC TO WHITE & CASE<br>PERTAINING TO SIDRECA<br>COST AGENDA | INV | 4246097-01 |
| 186<br>Public<br>Version | 6/7/2022 | VERIFICATION FROM USDOC TO WHITE & CASE<br>PERTAINING TO SIDERCA<br>VIRTUAL COST VERIFICATION AGENDA | INV | 4249495-01 |
| 187<br>Public<br>Document | 6/7/2022 | MEMO FROM USDOC TO FILE<br>PERTAINING TO PETITIONERS<br>EX PARTE MEETING | INV | 4249499-01 |
| 188<br>Public<br>Version | 6/8/2022 | MEMO FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>EX PARTE MEETING | INV | 4249553-01 |
| 189<br>Public<br>Version | 6/10/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>HM VIRTUAL VERIFICATION MINOR CORRECTIONS PUBLIC | INV | 4250306-01 |
| 190<br>Public<br>Document | 6/10/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U.S. STEEL<br>REQUEST FOR HEARING | INV | 4250385-01 |
| 191<br>Public<br>Document | 6/10/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>REQ FOR HEARING | INV | 4250549-01 |
| 192<br>Public<br>Version | 6/10/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>PROPOSED SECTION 734(A)(2) AGREEMENT-PV | INV | 4250584-01 |

| 193 Public Version | 6/15/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA RESP TO REQ FOR MONTHLY Q & V SHIPMENT DATA | INV | 4251604-01 |
|---|---|---|---|---|
| 194 Public Document | 6/15/2022 | MEMO FROM USDOC TO FILE PERTAINING TO SIDERCA EX PARTE MEETING | INV | 4251630-01 |
| 195 Public Version | 6/15/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA FURTHER MANUFACTURING MINOR CORRECTIONS | INV | 4251883-01 |
| 196 Public Version | 6/17/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VV MINOR CORRECTIONS PUBLIC | INV | 4252870-01 |
| 197 Public Version | 6/22/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA VERIFICATION EXHIBITS | INV | 4254105-01 |
| 198 Public Version | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COST VERIFICATION MINOR CORRECTIONS | INV | 4254567-01 |
| 199 Public Version | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA HOME MARKET SALES VERIFICATION EXHIBITS | INV | 4254661-01 |
| 200 Public Document | 6/24/2022 | MEMO FROM USDOC TO FILE PERTAINING TO PETITIONERS EX PARTE MEETING | INV | 4255141-01 |
| 201 Public Document | 6/24/2022 | MEMO FROM USDOC TO FILE PERTAINING TO SIDERCA EX PARTE CALL WITH COUNSEL | INV | 4255467-01 |
| 202 Public Version | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA VERIFICATION EXHIBITS | INV | 4256301-01 |
| 203 Public Document | 6/27/2022 | LETTER FROM USDOC TO WHITE & CASE LLP PERTAINING TO SIDERCA AND TENARIS USA PROPOSED SUSP AGR AND REQ FOR TERMINATION | INV | 4256530-01 |
| 204 Public Version | 7/1/2022 | VERIFICATION FROM USDOC TO FILE PERTAINING TO SIDERCA HM VERIFICATION REPORT | INV | 4259776-01 |
| 205 Public Version | 7/1/2022 | VERIFICATION FROM USDOC TO FILE PERTAINING TO TGS CEP VERIFICATION REPORT | INV | 4259778-01 |
| 206 Public Version | 7/5/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COST VERIFICATION EXHIBITS | INV | 4260014-01 |
| 207 Public Document | 7/15/2022 | APO FROM CASSIDY LEVY KENT (USA) LLP TO SEC. OF COMMERCE PERTAINING TO UNITED STATES STEEL TUBULAR PRODUCTS, INC. AMENDED APO APPLICATION | INV | 4264983-01 |
| 208 Public Document | 7/29/2022 | LETTER FROM USDOC TO WHITE CASE PERTAINING TO SIDERCA REQ FOR REVISED COST DATABASE | INV | 4269006-01 |
| 209 Public Version | 7/30/2022 | MEMO FROM USDOC TO FILE PERTAINING TO SIDERCA COST VERIFICATION REPORT | INV | 4269171-01 |

| | | | | |
|---|---|---|---|---|
| 210<br>Public<br>Version | 7/30/2022 | MEMO FROM USDOC TO FILE<br>PERTAINING TO SIDERCA<br>FURTHER MANUFACTURING COST VERIFICATION REPORT | INV | [4269173-01](#) |
| 211<br>Public<br>Document | 8/1/2022 | MEMO FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>BRIEFING SCHEDULE | INV | [4269531-01](#) |
| 212<br>Public<br>Version | 8/2/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA AND TGS USA<br>REVISED FURTHER MANUFACTURING DATABASE | INV | [4270349-01](#) |
| 213<br>Public<br>Version | 8/8/2022 | BRIEF FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO PETITIONERS<br>CASE BRIEF | INV | [4272277-01](#) |
| 214<br>Public<br>Version | 8/9/2022 | BRIEF FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA AND TGS USA<br>CASE BRIEF | INV | [4272903-01](#) |
| 215<br>Public<br>Version | 8/16/2022 | BRIEF FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA AND TGS USA<br>REBUTTAL BRIEF | INV | [4275030-01](#) |
| 216<br>Public<br>Version | 8/16/2022 | BRIEF FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO PETITIONERS<br>REBUTTAL BRIEF | INV | [4275055-01](#) |
| 217<br>Public<br>Document | 8/16/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U. S. STEEL<br>WITHDRAWAL OF REQ FOR HEARING | INV | [4275153-01](#) |
| 218<br>Public<br>Document | 9/1/2022 | APO FROM SCHAGRIN ASSOCIATES TO SEC. OF COMMERCE<br>PERTAINING TO BORUSAN MANNESMANN PIPE USA, INC., PTC LIBERTY<br>TUBULARS LLC, AND WELDED TUBE USA, INC, , THE UNITED STEEL, PAPER AND<br>FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND<br>SERVICE W ET AL.<br>AMENDED APO APPLICATION | INV | [4280601-01](#) |
| 219<br>Public<br>Document | 9/26/2022 | FR_NOTICE_UNPUBLISHED FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>FINAL AFFIRMATIVE DETERMINATION | INV | [4287860-01](#) |
| 220<br>Public<br>Document | 9/26/2022 | MEMO FROM USDOC TO ASSISTANT SECRETARY FOR E&C<br>PERTAINING TO INTERESTED PARTIES<br>ISSUES & DECISION MEMO | INV | [4287860-02](#) |
| 221<br>Public<br>Document | 9/26/2022 | MEMO FROM USDOC TO INTERESTED PARTIES<br>PERTAINING TO INTERESTED PARTIES<br>CALCULATIONS DISCLOSURE MEMO | INV | [4287864-01](#) |
| 222<br>Public<br>Version | 9/26/2022 | MEMO FROM USDOC TO FILE<br>PERTAINING TO SIDERCA<br>FINAL ANALYSIS MEMO | INV | [4287867-01](#) |
| 223<br>Public<br>Document | 9/26/2022 | LETTER FROM USDOC TO ITC<br>PERTAINING TO INTERESTED PARTIES<br>ITC NOTIFICATION - FINAL | INV | [4287871-01](#) |
| 224<br>Public<br>Version | 9/26/2022 | LETTER FROM USDOC TO DIRECTOR OF ACCOUNTING<br>PERTAINING TO SIDERCA S.A.I.C<br>FINAL COST CALCULATION MEMORANDUM | INV | [4287885-01](#) |
| 225<br>Public<br>Version | 9/27/2022 | MEMO FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>CRITICAL CIRCUMSTANCES MEMO | INV | [4288536-01](#) |
| 226<br>Public | 9/29/2022 | FR_NOTICE_PUBLISHED FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES | INV | [4287860-03](#) |

| Document | | FINAL AFFIRMATIVE DETERMINATION | | |
|---|---|---|---|---|
| 227 Public Document | 10/3/2022 | CUSTOMS_INSTRUCTIONS FROM USDOC TO U.S. CBP PERTAINING TO INTERESTED PARTIES CASH DEPOSIT INSTRUCTIONS | INV | 4291057-01 |
| 228 Public Document | 10/11/2022 | CUSTOMS_INSTRUCTIONS FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES LIQUIDATION INSTRUCTIONS | INV | 4297092-01 |
| 229 Public Document | 10/20/2022 | APO FROM CASSIDY LEVY KENT (USA) LLP TO SEC. OF COMMERCE PERTAINING TO UNITED STATES STEEL TUBULAR PRODUCTS, INC. AMENDED APO APPLICATION | INV | 4302265-01 |
| 230 Public Document | 11/14/2022 | LETTER FROM U.S. INTERNATIONAL TRADE COMMISSION TO AS/EC PERTAINING TO USITC ITC NOTIFICATION LETTER | INV | 4310053-01 |
| 231 Public Document | 11/17/2022 | FR_NOTICE_UNPUBLISHED FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES AMENDED FINAL AND ORDERS | INV | 4311771-01 |
| 232 Public Document | 11/21/2022 | APO FROM CASSIDY LEVY KENT (USA) LLP TO SEC. OF COMMERCE PERTAINING TO UNITED STATES STEEL TUBULAR PRODUCTS, INC. AMENDED APO APPLICATION | INV | 4312490-01 |
| 233 Public Document | 11/21/2022 | FR_NOTICE_PUBLISHED FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES AMENDED FINAL AND ORDER | INV | 4311771-02 |
| 234 Public Document | 11/23/2022 | CUSTOMS_INSTRUCTIONS FROM USDOC TO U.S. CBP PERTAINING TO INTERESTED PARTIES CASH DEPOSIT - ORDER | INV | 4313838-01 |
| 235 Public Document | 11/23/2022 | CUSTOMS_INSTRUCTIONS FROM USDOC TO U.S. CBP PERTAINING TO INTERESTED PARTIES LIQUIDATION INSTRUCTIONS - GAP PERIOD | INV | 4313839-01 |
| 236 Public Document | 11/29/2022 | APO_SERVICE_LIST FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES APO SERVICE LIST | INV | 4168447-01 |

Report generated on: 7/5/2024 9:08:19 AM

UNITED STATES DEPARTMENT OF COMMERCE - INTERNATIONAL TRADE ADMINISTRATION - INDEX TO ADMINISTRATIVE RECORD

CASE NUMBER A-357-824 - Oil Country Tubular Goods From Argentina

REM - SLIP OP. 24-31

*Contains Data files*

**\* Public Document \* Public Document \* Public Document**

Print

| Item No. | Upload Date | Document Title | Segment | Bar Code |
|---|---|---|---|---|
| 1<br>Public Document | 5/28/2024 | OTHER FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>DRAFT REMAND REDETERMINATION | REM - Slip Op. 24-31 | 4565870-01 |
| 2<br>Public Document | 6/4/2024 | LETTER FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE<br>PERTAINING TO PETITIONERS<br>CMTS ON DRAFT REDETERMINATION | REM - Slip Op. 24-31 | 4570681-01 |
| 3<br>Public Version | 6/5/2024 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>(REJECTED) CMTS ON DRAFT REMAND | REM - Slip Op. 24-31 | 4571563-01 |
| 4<br>Public Document | 6/7/2024 | LETTER FROM USDOC TO WHITE CASE<br>PERTAINING TO TENARIS<br>REJECTS DRAFT REMAND CMTS | REM - Slip Op. 24-31 | 4573606-01 |
| 5<br>Public Document | 6/7/2024 | REJECTION_MEMO FROM USDOC TO FILE<br>PERTAINING TO TENARIS<br>REJECTION OF DRAFT REMAND CMTS | REM - Slip Op. 24-31 | 4573607-01 |
| 6<br>Public Version | 6/10/2024 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO TENARIS<br>RESUBMISSION OF CMTS ON DRAFT REMAND | REM - Slip Op. 24-31 | 4575101-01 |
| 7<br>Public Version | 6/26/2024 | OTHER FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>FINAL RESULTS OF REDETERMINATION | REM - Slip Op. 24-31 | 4585797-01 |

12

Certified Administrative Record – Confidential Index (Initial and Remand)

N/A

Public

Appx191-Appx217

Report generated on: 2/1/2023 1:01:14 PM

## UNITED STATES DEPARTMENT OF COMMERCE - INTERNATIONAL TRADE ADMINISTRATION - INDEX TO ADMINISTRATIVE RECORD

CASE NUMBER A-357-824 - Oil Country Tubular Goods From Argentina

INV

*Contains Data files*

**\* BPI Documents - May Be Released Under APO \* BPI Documents - May Be Released Under APO**

Print

| Item No. | Upload Date | Document Title | Segment | Bar Code |
|---|---|---|---|---|
| 1<br>BPI Releasable | 10/5/2021 | PETITION FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>PETITION - COVER LTR | INV | 4167998-01 |
| 2<br>BPI Releasable | 10/5/2021 | PETITION FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>PETITION - VOL I - PART 1 | INV | 4167998-02 |
| 3<br>BPI Releasable | 10/5/2021 | PETITION FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>PETITION - VOL I - PART 2 | INV | 4167998-03 |
| 4<br>BPI Releasable | 10/5/2021 | PETITION FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>PETITION - VOL I - PART 3 | INV | 4167998-04 |
| 5<br>BPI Releasable | 10/5/2021 | PETITION FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>PETITION - VOL I - PART 4 | INV | 4167998-05 |
| 6<br>BPI Releasable | 10/5/2021 | PETITION FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>PETITION - VOL II - NARRATIVE & EXHIBITS | INV | 4167998-06 |
| 7<br>BPI Releasable | 10/8/2021 | LETTER FROM USDOC TO SCHAGRIN ASSOC. AND CASSIDY LEVY PERTAINING TO PETITIONERS<br>PETITION SUPP QNAIRE | INV | 4169626-01 |
| 8<br>BPI Releasable | 10/8/2021 | LETTER FROM USDOC TO SCHAGRIN ASSOC. AND CASSIDY LEVY PERTAINING TO PETITIONERS<br>GENERAL ISSUES QUESTIONNAIRE | INV | 4169748-01 |
| 9<br>BPI Releasable | 10/8/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO TENARIS USA<br>FACTUAL ERROR CMTS | INV | 4169949-01 |
| 10<br>BPI Releasable | 10/12/2021 | RESPONSE FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>GENERAL ISSUES QR | INV | 4170753-01 |
| 11<br>BPI Releasable | 10/13/2021 | RESPONSE FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE PERTAINING TO PETITIONERS<br>ARGENTINA AD SUPP QR | INV | 4171133-01 |

| 12 BPI Releasable | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO TENARIS USA CMTS RE PETITIONER'S STANDING | INV | 4172055-01 |
|---|---|---|---|---|
| 13 BPI Releasable | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO TENARIS USA EXHIBITS - PART 1 | INV | 4172055-02 |
| 14 BPI Releasable | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO TENARIS USA EXHIBITS - PART 2 | INV | 4172055-03 |
| 15 BPI Releasable | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO TENARIS USA EXHIBITS - PART 3 | INV | 4172055-04 |
| 16 BPI Releasable | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO TENARIS USA EXHIBITS - PART 4 | INV | 4172055-05 |
| 17 BPI Releasable | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO TENARIS USA EXHIBITS - PART 5 | INV | 4172055-06 |
| 18 BPI Releasable | 10/15/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO TENARIS USA EXHIBITS - PART 6 | INV | 4172055-07 |
| 19 BPI Releasable | 10/18/2021 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE PERTAINING TO PETITIONERS REBUTTAL CMTS ON STANDING | INV | 4172944-01 |
| 20 BPI Releasable | 10/19/2021 | MEMO FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES CBP DATA RELEASE | INV | 4173050-01 |
| 21 BPI Releasable | 10/19/2021 | DATA FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES CBP DATA | INV | 4173050-02 |
| 22 BPI Releasable | 10/20/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO TENARIS USA SURREBUTTAL CMTS ON STANDING | INV | 4173956-01 |
| 23 BPI Releasable | 10/21/2021 | RESPONSE FROM SCHAGRIN ASSOCIATES TO SEC OF COMMERCE PERTAINING TO PETITIONERS 2ND GENERAL ISSUES QR | INV | 4174042-01 |
| 24 BPI Releasable | 10/21/2021 | LETTER FROM USDOC TO SCHAGRIN ASSOCIATES AND CASSIDY LEVY PERTAINING TO PETITIONERS SECOND GENERAL ISSUES QNAIRE | INV | 4174097-01 |
| 25 BPI Releasable | 10/22/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO TENARIS USA CMTS RE PETITIONERS' 2ND GENERAL ISSUES QR | INV | 4174683-01 |
| 26 BPI Releasable | 10/27/2021 | INITIATION_CHECKLIST FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES INITIATION CHECKLIST | INV | 4176344-01 |
| 27 BPI Releasable | 11/10/2021 | MEMO FROM USDOC TO DAS FOR OPERATIONS PERTAINING TO INTERESTED PARTIES RESPONDENT SELECTION | INV | 4181217-01 |
| 28 BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA RESPONSE TO REQ FOR INFORMATION | INV | 4189295-01 |

| 29<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>SEC A QR | INV | [4189463-01](#) |
| 30<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBITS A1 - A5 | INV | [4189463-02](#) |
| 31<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT A6 - PART 1 | INV | [4189463-03](#) |
| 32<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT A6 - PART 2 | INV | [4189463-04](#) |
| 33<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT A6 - PART 3 | INV | [4189463-05](#) |
| 34<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT A6 - PART 4 | INV | [4189463-06](#) |
| 35<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT A7 | INV | [4189463-07](#) |
| 36<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBITS A8 - A16 | INV | [4189463-08](#) |
| 37<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT A17 | INV | [4189463-09](#) |
| 38<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT A18 - PART 1 | INV | [4189463-10](#) |
| 39<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT A18 - PART 2 | INV | [4189463-11](#) |
| 40<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBITS A19 - A26 | INV | [4189463-12](#) |
| 41<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT A27 | INV | [4189463-13](#) |
| 42<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT A28 - PART 1 | INV | [4189463-14](#) |
| 43<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT A28 - PART 2 | INV | [4189463-15](#) |
| 44<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT A28 - PART 3 | INV | [4189463-16](#) |
| 45<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBITS A29 - A31 | INV | [4189463-17](#) |

| 46<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT A32 - PART 1 | INV | 4189463-18 |
|---|---|---|---|---|
| 47<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT A32 - PART 2 | INV | 4189463-19 |
| 48<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT A32 - PART 3 | INV | 4189463-20 |
| 49<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT A32 - PART 4 | INV | 4189463-21 |
| 50<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT A32 - PART 5 | INV | 4189463-22 |
| 51<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT A32 - PART 6 | INV | 4189463-23 |
| 52<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT A32 - PART 7 | INV | 4189463-24 |
| 53<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT A32 - PART 8 | INV | 4189463-25 |
| 54<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT A32 - PART 9 | INV | 4189463-26 |
| 55<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT A32 - PART 10 | INV | 4189463-27 |
| 56<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT A32 - PART 11 | INV | 4189463-28 |
| 57<br>BPI Releasable | 12/9/2021 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBITS A33 - A-35 | INV | 4189463-29 |
| 58<br>BPI Releasable | 12/27/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COMMENTS ON COMPARISON MARKET - PART 1 | INV | 4194919-01 |
| 59<br>BPI Releasable | 12/27/2021 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COMMENTS ON COMPARISON MARKET - PART 2 | INV | 4194919-02 |
| 60<br>BPI Releasable | 1/10/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SECTIONS C & E RESPONSE FINAL | INV | 4199109-01 |
| 61<br>BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SIDERCAUS01 | INV | 4199109-02 |
| 62<br>BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SIDERCAFURMAN01 | INV | 4199109-03 |

| 63 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA DATABASE SUMMARIES 0107 US | INV | 4199109-04 |
|---|---|---|---|---|
| 64 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA DATABASE SUMMARIES 0107 FURMAN | INV | 4199109-05 |
| 65 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C02 (2) | INV | 4199109-06 |
| 66 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C04 | INV | 4199109-07 |
| 67 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C08 (2) | INV | 4199109-08 |
| 68 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C09 (2) | INV | 4199109-09 |
| 69 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C10 (2) | INV | 4199109-10 |
| 70 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C11 (2) | INV | 4199109-11 |
| 71 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C12 (2) | INV | 4199109-12 |
| 72 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C13 (2) | INV | 4199109-13 |
| 73 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C14 (2) | INV | 4199109-14 |
| 74 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C15 | INV | 4199109-15 |
| 75 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C16 (2) | INV | 4199109-16 |
| 76 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C17 (2) | INV | 4199109-17 |
| 77 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C18 (A) | INV | 4199109-18 |
| 78 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C18 (B) | INV | 4199109-19 |
| 79 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C18 (C) | INV | 4199109-20 |

| 80 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C19 (2) | INV | 4199109-21 |
|---|---|---|---|---|
| 81 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C20 (2) | INV | 4199109-22 |
| 82 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C21 (2) | INV | 4199109-23 |
| 83 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT C23 | INV | 4199109-24 |
| 84 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E2 | INV | 4199109-25 |
| 85 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E4 | INV | 4199109-26 |
| 86 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E5 | INV | 4199109-27 |
| 87 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E6 | INV | 4199109-28 |
| 88 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E7 | INV | 4199109-29 |
| 89 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E9 | INV | 4199109-30 |
| 90 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E10 | INV | 4199109-31 |
| 91 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E11 | INV | 4199109-32 |
| 92 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E12 | INV | 4199109-33 |
| 93 BPI Releasable | 1/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E13 | INV | 4199109-34 |
| 94 BPI Releasable | 1/12/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA (REJECTED) SEC B & D QR | INV | 4200164-01 |
| 95 BPI Releasable | 1/18/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE PERTAINING TO PETITIONERS COMPARISON MARKET REBUTTAL CMTS | INV | 4202277-01 |
| 96 BPI Releasable | 1/20/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA (REJECTED) THIRD COUNTRY SECTION B RESPONSE | INV | 4203533-01 |

Appx196

| 97<br>BPI Releasable | 1/24/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA RESUBMISSION OF IQR - SECS B & D | INV | 4204399-01 |
| 98<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SIDERCAHM01 | INV | 4204399-02 |
| 99<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SIDERCACOP01 | INV | 4204399-03 |
| 100<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA DATABASE SUMMARIES 0111 HM | INV | 4204399-04 |
| 101<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA DATABASE SUMMARIES 0111 COP | INV | 4204399-05 |
| 102<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT B03 | INV | 4204399-06 |
| 103<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT B08 | INV | 4204399-07 |
| 104<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT B09 | INV | 4204399-08 |
| 105<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT B10 | INV | 4204399-09 |
| 106<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT B11 (PART 1) | INV | 4204399-10 |
| 107<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT B11 (PART 2) | INV | 4204399-11 |
| 108<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT B11 (PART 3) | INV | 4204399-12 |
| 109<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT B12 | INV | 4204399-13 |
| 110<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT B14 | INV | 4204399-14 |
| 111<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT D03 | INV | 4204399-15 |
| 112<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT D05 | INV | 4204399-16 |
| 113<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT D06 | INV | 4204399-17 |

| | | | | |
|---|---|---|---|---|
| 114<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBIT D09 | INV | 4204399-18 |
| 115<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBIT D10 | INV | 4204399-19 |
| 116<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBIT D11 | INV | 4204399-20 |
| 117<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBIT D12 | INV | 4204399-21 |
| 118<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBIT D14 | INV | 4204399-22 |
| 119<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBIT D15 (A) | INV | 4204399-23 |
| 120<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBIT D16 | INV | 4204399-24 |
| 121<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBIT D17 | INV | 4204399-25 |
| 122<br>BPI Releasable | 1/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBIT D18 | INV | 4204399-26 |
| 123<br>BPI Releasable | 1/26/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>REBUTTAL TO RESP TO CMTS ON COMPARISON MARKET | INV | 4205240-01 |
| 124<br>BPI Releasable | 1/27/2022 | LETTER FROM USDOC TO WHITE CASE<br>PERTAINING TO SIDERCA<br>SEC A-C SUPP QNAIRE | INV | 4206202-01 |
| 125<br>BPI Releasable | 2/22/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SUPPL QR - SECS A-B - CVR LTR AND NARRATIVE | INV | 4214585-01 |
| 126<br>BPI Releasable | 2/22/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SIDERCA EXHIBITS SUPP A1 - SUPP A2 | INV | 4214585-02 |
| 127<br>BPI Releasable | 2/22/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SIDERCA EXHIBITS SUPP A3 - SUPP A5 | INV | 4214585-03 |
| 128<br>BPI Releasable | 2/22/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SIDERCA EXHIBITS SUPP A6 - SUPP A14 | INV | 4214585-04 |
| 129<br>BPI Releasable | 2/22/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SIDERCA EXHIBITS SUPP B1 - SUPP B8 | INV | 4214585-05 |
| 130<br>BPI Releasable | 2/22/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SIDERCA EXHIBITS SUPP B9 - SUPP B18 | INV | 4214585-06 |

| 131<br>BPI Releasable | 2/22/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>SIDERCA EXHIBITS SUPP B19 - SUPP B20 | INV | 4214585-07 |
|---|---|---|---|---|
| 132<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>SIDERCAHM02 | INV | 4214585-08 |
| 133<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>DATABASE SUMMARIES 0218 HM | INV | 4214585-09 |
| 134<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT A29 | INV | 4214585-10 |
| 135<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT B10 | INV | 4214585-11 |
| 136<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT SUPP. A04 (A) | INV | 4214585-12 |
| 137<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT SUPP. A04 (B) | INV | 4214585-13 |
| 138<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT SUPP. A04 (C) | INV | 4214585-14 |
| 139<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT SUPP. A15 | INV | 4214585-15 |
| 140<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT SUPP. B02 | INV | 4214585-16 |
| 141<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT SUPP. B07 | INV | 4214585-17 |
| 142<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT SUPP. B08 | INV | 4214585-18 |
| 143<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT SUPP. B09 | INV | 4214585-19 |
| 144<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT SUPP. B10 | INV | 4214585-20 |
| 145<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT SUPP. B11 | INV | 4214585-21 |
| 146<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT SUPP. B12 | INV | 4214585-22 |
| 147<br>BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>EXHIBIT SUPP. B13 | INV | 4214585-23 |

| 148 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. B14 | INV | 4214585-24 |
|---|---|---|---|---|
| 149 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. B15 | INV | 4214585-25 |
| 150 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. B16 | INV | 4214585-26 |
| 151 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. B18 | INV | 4214585-27 |
| 152 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. B19 | INV | 4214585-28 |
| 153 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. B20 | INV | 4214585-29 |
| 154 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA QUANTITY CONVERSION FOR EXHIBIT SUPP B8 | INV | 4214585-30 |
| 155 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA QUANTITY CONVERSION FOR EXHIBIT SUPP B9 | INV | 4214585-31 |
| 156 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA QUANTITY CONVERSION FOR EXHIBIT SUPP B10 | INV | 4214585-32 |
| 157 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA QUANTITY CONVERSION FOR EXHIBIT SUPP B11 | INV | 4214585-33 |
| 158 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA QUANTITY CONVERSION FOR EXHIBIT SUPP B12 | INV | 4214585-34 |
| 159 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA QUANTITY CONVERSION FOR EXHIBIT SUPP B15 | INV | 4214585-35 |
| 160 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA QUANTITY CONVERSION FOR EXHIBIT SUPP B16 | INV | 4214585-36 |
| 161 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA QUANTITY CONVERSION FOR EXHIBIT SUPP B18 | INV | 4214585-37 |
| 162 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA QUANTITY CONVERSION FOR EXHIBIT SUPP B19 | INV | 4214585-38 |
| 163 BPI Releasable | 2/22/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA QUANTITY CONVERSION FOR EXHIBIT SUPP B20 | INV | 4214585-39 |
| 164 BPI Releasable | 2/25/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SUPP SEC C QNAIRE RESP BPI | INV | 4215916-01 |

| 165 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SIDERCAUS02.SAS | INV | 4215916-02 |
|---|---|---|---|---|
| 166 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA DATABASE SUMMARIES | INV | 4215916-03 |
| 167 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. C02 | INV | 4215916-04 |
| 168 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. C03 | INV | 4215916-05 |
| 169 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. C04 | INV | 4215916-06 |
| 170 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. C05 | INV | 4215916-07 |
| 171 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. C06 | INV | 4215916-08 |
| 172 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. C07 | INV | 4215916-09 |
| 173 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. C08 | INV | 4215916-10 |
| 174 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. C09 | INV | 4215916-11 |
| 175 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. C10 | INV | 4215916-12 |
| 176 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. C11 | INV | 4215916-13 |
| 177 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. C12 | INV | 4215916-14 |
| 178 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. C14 | INV | 4215916-15 |
| 179 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP. C15 | INV | 4215916-16 |
| 180 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA QUANTITY CONVERSION FOR EXH SUPP C6 | INV | 4215916-17 |
| 181 BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA QUANTITY CONVERSION FOR EXH SUPP C08 | INV | 4215916-18 |

| 182<br>BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>QUANTITY CONVERSION FOR EXH SUPP C10 | INV | 4215916-19 |
|---|---|---|---|---|
| 183<br>BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>QUANTITY CONVERSION FOR EXH SUPP C12 | INV | 4215916-20 |
| 184<br>BPI Releasable | 2/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>QUANTITY CONVERSION FOR EXH SUPP C15 | INV | 4215916-21 |
| 185<br>BPI Releasable | 3/7/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U.S. STEEL<br>CMTS ON SIDERCA SUPP QR | INV | 4219341-01 |
| 186<br>BPI Releasable | 3/7/2022 | LETTER FROM USDOC TO WHITE & CASE<br>PERTAINING TO SIDERCA<br>SECOND SUPPLEMENTAL QNAIRE | INV | 4219481-01 |
| 187<br>BPI Releasable | 3/11/2022 | LETTER FROM USDOC TO WHITE CASE<br>PERTAINING TO SIDERCA<br>SEC D-E SUPP QNAIRE | INV | 4221133-01 |
| 188<br>BPI Releasable | 3/15/2022 | LETTER FROM USDOC TO WHITE & CASE LLP<br>PERTAINING TO SIDERCA<br>REQUEST FOR BPI RE-BRACKET | INV | 4221833-01 |
| 189<br>BPI Releasable | 3/21/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>2ND SUPP SEC B-C QR | INV | 4223466-01 |
| 190<br>BPI Releasable | 3/21/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SIDERCACOP02.SAS | INV | 4223466-02 |
| 191<br>BPI Releasable | 3/21/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SIDERCAHM03.SAS | INV | 4223466-03 |
| 192<br>BPI Releasable | 3/21/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SIDERCAUS03.SAS | INV | 4223466-04 |
| 193<br>BPI Releasable | 3/21/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>DATABASE SUMMARIES 0318 COP | INV | 4223466-05 |
| 194<br>BPI Releasable | 3/21/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>DATABASE SUMMARIES 0318 HM | INV | 4223466-06 |
| 195<br>BPI Releasable | 3/21/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>DATABASE SUMMARIES 0318 US | INV | 4223466-07 |
| 196<br>BPI Releasable | 3/22/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>BRACKETING REVISIONS TO REBUTTAL CMTS ON CM | INV | 4224178-01 |
| 197<br>BPI Releasable | 3/25/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>MONTHLY SHIPMENT DATA | INV | 4225313-01 |
| 198<br>BPI Releasable | 3/25/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>QV DATA - FEB 21 - FEB 22 | INV | 4225313-02 |

| 199 BPI Releasable | 3/28/2022 | LETTER FROM USDOC TO WHITE CASE PERTAINING TO SIDERCA SEC B-C SUPP QNAIRE | INV | 4226308-01 |
|---|---|---|---|---|
| 200 BPI Releasable | 3/29/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA REBUTTAL TO CRITICAL CIRCUMSTANCES ALLEGATION | INV | 4226562-01 |
| 201 BPI Releasable | 3/30/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SEC E SUPP QR | INV | 4227084-01 |
| 202 BPI Releasable | 3/30/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBITS E1 TO E7 | INV | 4227084-02 |
| 203 BPI Releasable | 3/30/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBITS E8 TO E10 | INV | 4227084-03 |
| 204 BPI Releasable | 3/30/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA FURTHER MANUFACTURED DATABASE | INV | 4227084-04 |
| 205 BPI Releasable | 3/30/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA DATABASE SUMMARIES | INV | 4227084-05 |
| 206 BPI Releasable | 3/30/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E2 | INV | 4227084-06 |
| 207 BPI Releasable | 3/30/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E3 | INV | 4227084-07 |
| 208 BPI Releasable | 3/30/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E4 | INV | 4227084-08 |
| 209 BPI Releasable | 3/30/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E5 | INV | 4227084-09 |
| 210 BPI Releasable | 3/30/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E6 | INV | 4227084-10 |
| 211 BPI Releasable | 3/30/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E7 | INV | 4227084-11 |
| 212 BPI Releasable | 3/30/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E8 | INV | 4227084-12 |
| 213 BPI Releasable | 3/30/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT E9 | INV | 4227084-13 |
| 214 BPI Releasable | 4/7/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SUPP D AND 3RD SUPP QRS | INV | 4230072-01 |
| 215 BPI Releasable | 4/7/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBITS SUPP2. D1 - SUPP2. D6 | INV | 4230072-02 |

Appx203

| | | | | |
|---|---|---|---|---|
| 216 BPI Releasable | 4/7/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBITS SUPP2. D7 - SUPP2. D11 | INV | 4230072-03 |
| 217 BPI Releasable | 4/7/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBITS SUPP2. D12 - SUPP2. D20 | INV | 4230072-04 |
| 218 BPI Releasable | 4/7/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA 3RD SUPP QR NARRATIVE AND EXHIBITS | INV | 4230072-05 |
| 219 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA HOME MARKET SALES | INV | 4230072-06 |
| 220 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA US SALES | INV | 4230072-07 |
| 221 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA FURTHER MANUFACTURED DATABASE | INV | 4230072-08 |
| 222 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COP DATA | INV | 4230072-09 |
| 223 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA HOME MARKET SUMMARIES | INV | 4230072-10 |
| 224 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA US SUMMARIES | INV | 4230072-11 |
| 225 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA FURMAN SUMMARIES | INV | 4230072-12 |
| 226 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COP SUMMARIES | INV | 4230072-13 |
| 227 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D04 | INV | 4230072-14 |
| 228 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D05 | INV | 4230072-15 |
| 229 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D07 | INV | 4230072-16 |
| 230 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D08 | INV | 4230072-17 |
| 231 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D09 | INV | 4230072-18 |
| 232 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D10 | INV | 4230072-19 |

| 233 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D11 (A) | INV | 4230072-20 |
|---|---|---|---|---|
| 234 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D11 (B) | INV | 4230072-21 |
| 235 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D12 | INV | 4230072-22 |
| 236 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D13 (A) | INV | 4230072-23 |
| 237 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D13 (B) | INV | 4230072-24 |
| 238 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D14 | INV | 4230072-25 |
| 239 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D15 | INV | 4230072-26 |
| 240 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D16 | INV | 4230072-27 |
| 241 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D17 | INV | 4230072-28 |
| 242 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D18 | INV | 4230072-29 |
| 243 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D19 | INV | 4230072-30 |
| 244 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D20 (B) | INV | 4230072-31 |
| 245 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP2. D20 | INV | 4230072-32 |
| 246 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP3. B02 | INV | 4230072-33 |
| 247 BPI Releasable | 4/7/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA EXHIBIT SUPP3. C02 | INV | 4230072-34 |
| 248 BPI Releasable | 4/8/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA RESUBMISSION OF DATA FILES | INV | 4230311-01 |
| 249 BPI Releasable | 4/8/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA DATABASE SUMMARIES 0406 HM | INV | 4230311-02 |

| 250<br>BPI Releasable | 4/8/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBIT SUPP3. B2 | INV | 4230311-03 |
|---|---|---|---|---|
| 251<br>BPI Releasable | 4/8/2022 | LETTER FROM USDOC TO WHITE CASE<br>PERTAINING TO SIDERCA<br>4TH A-C SUPPLEMENTAL | INV | 4230322-01 |
| 252<br>BPI Releasable | 4/8/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U.S. STEEL<br>DEFICIENCY CMTS ON SIDERCA QR | INV | 4230647-01 |
| 253<br>BPI Releasable | 4/13/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U.S. STEEL<br>PRE-PRELIM CMTS | INV | 4231729-01 |
| 254<br>BPI Releasable | 4/13/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U.S. STEEL<br>PRE-PRELIM CMTS ERRATUM | INV | 4231734-01 |
| 255<br>BPI Releasable | 4/15/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>CRITICAL CIRCUMSTANCES | INV | 4232345-01 |
| 256<br>BPI Releasable | 4/15/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>US EXPORTS FEB21-MAR22 | INV | 4232345-02 |
| 257<br>BPI Releasable | 4/18/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>4TH SUPPL QR | INV | 4232977-01 |
| 258<br>BPI Releasable | 4/21/2022 | LETTER FROM USDOC TO WHITE CASE<br>PERTAINING TO SIDERCA<br>SUPPLEMENTAL QNAIRE 2 | INV | 4233885-01 |
| 259<br>BPI Releasable | 4/26/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>2ND SUPPL QR - SEC E | INV | 4235322-01 |
| 260<br>BPI Releasable | 4/26/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>2ND SUPPL QR - SEC E - EXHS SUPP2. E1 | INV | 4235322-02 |
| 261<br>BPI Releasable | 4/26/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>2ND SUPPL QR - SEC E - EXHS SUPP2. E2 PART1 | INV | 4235322-03 |
| 262<br>BPI Releasable | 4/26/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>2ND SUPPL QR - SEC E - EXHS SUPP2. E2 PART2 | INV | 4235322-04 |
| 263<br>BPI Releasable | 4/26/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>2ND SUPPL QR - SEC E - EXHS SUPP2. E3 - E4 | INV | 4235322-05 |
| 264<br>BPI Releasable | 4/26/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SIDERCAFURMAN04.SAS | INV | 4235322-06 |
| 265<br>BPI Releasable | 4/26/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>SIDERCAUS05.SAS | INV | 4235322-07 |
| 266<br>BPI Releasable | 4/26/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>DATABASE SUMMARIES 0425 FURMAN | INV | 4235322-08 |

| 267<br>BPI Releasable | 4/26/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>DATABASE SUMMARIES 0425 US | INV | 4235322-09 |
|---|---|---|---|---|
| 268<br>BPI Releasable | 4/26/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBIT SUPP2. E02 | INV | 4235322-10 |
| 269<br>BPI Releasable | 4/26/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBIT SUPP2. E03 | INV | 4235322-11 |
| 270<br>BPI Releasable | 4/26/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>EXHIBIT SUPP2. E4 | INV | 4235322-12 |
| 271<br>BPI Releasable | 5/2/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE<br>PERTAINING TO U S STEEL<br>SUBMISSION OF REBUTTAL FACTUAL INFO | INV | 4237371-01 |
| 272<br>BPI Releasable | 5/5/2022 | MEMO FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>PRELIM ANALYSIS MEMORANDUM | INV | 4238761-01 |
| 273<br>BPI Releasable | 5/5/2022 | MEMO FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>CRITICAL CIRCUMSTANCES MEMO | INV | 4238765-01 |
| 274<br>BPI Releasable | 5/5/2022 | DATA FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>CRITICAL CIRCUMSTANCES ANALYSIS | INV | 4238765-02 |
| 275<br>BPI Releasable | 5/5/2022 | COMPUTER_PROGRAMS FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>SURROGATE COSTS PROGRAM | INV | 4238768-01 |
| 276<br>BPI Releasable | 5/5/2022 | COMPUTER_PROGRAMS FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>HM PROGRAM | INV | 4238768-02 |
| 277<br>BPI Releasable | 5/5/2022 | COMPUTER_PROGRAMS FROM USDOC TO FILE<br>PERTAINING TO INTERESTED PARTIES<br>MARGIN PROGRAM | INV | 4238768-03 |
| 278<br>BPI Releasable | 5/5/2022 | MEMO FROM USDOC TO OFFICE DIR/OA<br>PERTAINING TO SIDERCA<br>PRELIMINARY COST MEMO | INV | 4238884-01 |
| 279<br>BPI Releasable | 5/10/2022 | TEMPVIRTUALVERIFICATIONEXHIBIT FROM USDOC TO FILE<br>PERTAINING TO BLAH<br>(REJECTED) VV EXHIBIT | INV | 4239839-01 |
| 280<br>BPI Releasable | 5/13/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>MONTHLY QUANTITY AND VALUE SHIPMENT DATA BPI | INV | 4241109-01 |
| 281<br>BPI Releasable | 5/13/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>US EXPORTS FEB21-APR22 | INV | 4241109-02 |
| 282<br>BPI Releasable | 5/17/2022 | LETTER FROM USDOC TO WHITE CASE<br>PERTAINING TO SIDERCA<br>SUPPL QR - SEC E | INV | 4242594-01 |
| 283<br>BPI Releasable | 5/24/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE<br>PERTAINING TO SIDERCA<br>3RD SUPP SEC E QNAIRE RESP | INV | 4245088-01 |

| | | | | |
|---|---|---|---|---|
| 284 BPI Releasable | 5/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SIDERCAFURMAN05.SAS | INV | 4245088-02 |
| 285 BPI Releasable | 5/24/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA DATABASE SUMMARIES 0524 FURMAN | INV | 4245088-03 |
| 286 BPI Releasable | 5/24/2022 | VERIFICATION FROM USDOC TO WHITE CASE PERTAINING TO SIDERCA SALES VERIFICATION AGENDA | INV | 4245109-01 |
| 287 BPI Releasable | 5/26/2022 | VERIFICATION FROM USDOC TO WHITE CASE PERTAINING TO SIDERCA CEP VERIFICATION AGENDA | INV | 4245755-01 |
| 288 BPI Releasable | 5/26/2022 | LETTER FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE PERTAINING TO U. S. STEEL PRE-VERIFICATION CMTS | INV | 4245773-01 |
| 289 BPI Releasable | 5/27/2022 | LETTER FROM USDOC TO WHITE & CASE PERTAINING TO SIDRECA COST AGENDA | INV | 4246090-01 |
| 290 BPI Releasable | 6/7/2022 | VERIFICATION FROM USDOC TO WHITE & CASE PERTAINING TO SIDERCA VIRTUAL COST VERIFICATION AGENDA | INV | 4249494-01 |
| 291 BPI Releasable | 6/8/2022 | MEMO FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES EX PARTE MEETING | INV | 4249551-01 |
| 292 BPI Releasable | 6/10/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA HM VIRTUAL VERIFICATION MINOR CORRECTIONS BPI | INV | 4250299-01 |
| 293 BPI Releasable | 6/10/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA MINOR CORRECTIONS - EXPORT TAX AND INDIRECT TAX REFUND | INV | 4250299-02 |
| 294 BPI Releasable | 6/10/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA PROPOSED SECTION 734(A)(2) AGREEMENT - PROPRIETARY | INV | 4250579-01 |
| 295 BPI Releasable | 6/15/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA RESP TO REQ FOR MONTHLY Q & V SHIPMENT DATA | INV | 4251602-01 |
| 296 BPI Releasable | 6/15/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA US EXPORTS FEB21-MAY22. PO DATE | INV | 4251602-02 |
| 297 BPI Releasable | 6/15/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA FURTHER MANUFACTURING MINOR CORRECTIONS | INV | 4251880-01 |
| 298 BPI Releasable | 6/17/2022 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VV MINOR CORRECTIONS BPI | INV | 4252866-01 |
| 299 BPI Releasable | 6/17/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP - MC ATTACHMENT #1(A) | INV | 4252866-02 |
| 300 BPI Releasable | 6/17/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP - MC ATTACHMENT #2 | INV | 4252866-03 |

| 301 BPI Releasable | 6/22/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA VERIFICATION EXHIBITS COVER LTR | INV | 4254094-01 |
|---|---|---|---|---|
| 302 BPI Releasable | 6/22/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA VERIFICATION EXHIBIT 1 | INV | 4254094-02 |
| 303 BPI Releasable | 6/22/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA VERIFICATION EXHIBIT 2 | INV | 4254094-03 |
| 304 BPI Releasable | 6/22/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA VERIFICATION EXHIBIT 3 | INV | 4254094-04 |
| 305 BPI Releasable | 6/22/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA VERIFICATION EXHIBIT 4 PART 1 | INV | 4254094-05 |
| 306 BPI Releasable | 6/22/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA VERIFICATION EXHIBIT 4 PART 2 | INV | 4254094-06 |
| 307 BPI Releasable | 6/22/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA VERIFICATION EXHIBIT 5 | INV | 4254094-07 |
| 308 BPI Releasable | 6/22/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA VERIFICATION EXHIBIT 6 | INV | 4254094-08 |
| 309 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COST VERIFICATION MINOR CORRECTIONS | INV | 4254566-01 |
| 310 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA HOME MARKET SALES VERIFICATION EXHIBITS | INV | 4254629-01 |
| 311 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 1 | INV | 4254629-02 |
| 312 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 2 PART 1 | INV | 4254629-03 |
| 313 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 2 PART 2 | INV | 4254629-04 |
| 314 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 2 PART 3 | INV | 4254629-05 |
| 315 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 3 | INV | 4254629-06 |
| 316 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 4 PART 1 | INV | 4254629-07 |
| 317 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 4 PART 2 | INV | 4254629-08 |

| 318 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 5 PART 1 | INV | 4254629-09 |
|---|---|---|---|---|
| 319 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 5 PART 2 | INV | 4254629-10 |
| 320 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 5 PART 3 | INV | 4254629-11 |
| 321 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 6 | INV | 4254629-12 |
| 322 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 7 PART 1 | INV | 4254629-13 |
| 323 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 7 PART 2 | INV | 4254629-14 |
| 324 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 7 PART 3 | INV | 4254629-15 |
| 325 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 8 | INV | 4254629-16 |
| 326 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 9 | INV | 4254629-17 |
| 327 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 10 | INV | 4254629-18 |
| 328 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 11 | INV | 4254629-19 |
| 329 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 12 PART 1 | INV | 4254629-20 |
| 330 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 12 PART 2 | INV | 4254629-21 |
| 331 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 13 PART 1 | INV | 4254629-22 |
| 332 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 13 PART 2 | INV | 4254629-23 |
| 333 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 14 PART 1 | INV | 4254629-24 |
| 334 BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA SALES VERIFICATION EXHIBIT 14 PART 2 | INV | 4254629-25 |

| 335<br>BPI Releasable | 6/23/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>SALES VERIFICATION EXHIBIT 15 | INV | 4254629-26 |
|---|---|---|---|---|
| 336<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#1 | INV | 4254666-01 |
| 337<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#3 (PART C) | INV | 4254666-02 |
| 338<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#3 (PART D) | INV | 4254666-03 |
| 339<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#4 | INV | 4254666-04 |
| 340<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#5 | INV | 4254666-05 |
| 341<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#6 | INV | 4254666-06 |
| 342<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#7 | INV | 4254666-07 |
| 343<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#8 | INV | 4254666-08 |
| 344<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#10 | INV | 4254666-09 |
| 345<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#11 | INV | 4254666-10 |
| 346<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#12-A | INV | 4254666-11 |
| 347<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#12-B | INV | 4254666-12 |
| 348<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#12-C | INV | 4254666-13 |
| 349<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#13 | INV | 4254666-14 |
| 350<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#14 | INV | 4254666-15 |
| 351<br>BPI Releasable | 6/23/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA<br>HM SALES - VE#15 | INV | 4254666-16 |

| 352 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA VERIFICATION EXHIBITS | INV | 4256184-01 |
|---|---|---|---|---|
| 353 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #01 | INV | 4256184-02 |
| 354 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #02 | INV | 4256184-03 |
| 355 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #03 PART 1 | INV | 4256184-04 |
| 356 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #03 PART2 | INV | 4256184-05 |
| 357 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #03 PART 3 | INV | 4256184-06 |
| 358 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #03 PART 4 | INV | 4256184-07 |
| 359 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #03 PART 5 | INV | 4256184-08 |
| 360 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #03 PART 6 | INV | 4256184-09 |
| 361 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #03 PART 7 | INV | 4256184-10 |
| 362 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #03 PART 8 | INV | 4256184-11 |
| 363 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #03 PART 9 | INV | 4256184-12 |
| 364 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #04 PART 1 | INV | 4256184-13 |
| 365 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #04 PART 2 | INV | 4256184-14 |
| 366 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #04 PART 3 | INV | 4256184-15 |
| 367 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #04 PART 4 | INV | 4256184-16 |
| 368 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #05 PART 1 | INV | 4256184-17 |

| 369 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #05 PART 2 | INV | 4256184-18 |
|---|---|---|---|---|
| 370 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #05 PART 3 | INV | 4256184-19 |
| 371 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #05 PART 4 | INV | 4256184-20 |
| 372 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #06 PART 1 | INV | 4256184-21 |
| 373 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #06 PART 2 | INV | 4256184-22 |
| 374 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #06 PART 3 | INV | 4256184-23 |
| 375 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #07 | INV | 4256184-24 |
| 376 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #08 | INV | 4256184-25 |
| 377 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #09 | INV | 4256184-26 |
| 378 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #10 | INV | 4256184-27 |
| 379 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA SIDERCA CEP VE #11 | INV | 4256184-28 |
| 380 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #12 PART 1 | INV | 4256184-29 |
| 381 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #12 PART 2 | INV | 4256184-30 |
| 382 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #12 PART 3 | INV | 4256184-31 |
| 383 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #13 PART 1 | INV | 4256184-32 |
| 384 BPI Releasable | 6/27/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP VE #13 PART 2 | INV | 4256184-33 |
| 385 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE#1(A) | INV | 4256184-34 |

| 386 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE#1(B) | INV | 4256184-35 |
|---|---|---|---|---|
| 387 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE#2 - SEQU 33 | INV | 4256184-36 |
| 388 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE#2 - SEQU 528 | INV | 4256184-37 |
| 389 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE#2 - SEQU 566 | INV | 4256184-38 |
| 390 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE#2 - SEQU 670 | INV | 4256184-39 |
| 391 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE#2 - SEQU 862 | INV | 4256184-40 |
| 392 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE#2 - SEQU 1341 | INV | 4256184-41 |
| 393 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE#2 (A) | INV | 4256184-42 |
| 394 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #2 (B) | INV | 4256184-43 |
| 395 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #2 (C) | INV | 4256184-44 |
| 396 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #2 (D) | INV | 4256184-45 |
| 397 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #2 (E) | INV | 4256184-46 |
| 398 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #3 - SEQU 33 | INV | 4256184-47 |
| 399 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #4 - SEQU 528 | INV | 4256184-48 |
| 400 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #5 - SEQU 566 | INV | 4256184-49 |
| 401 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #6 - SEQU 862 | INV | 4256184-50 |
| 402 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #7 (A) | INV | 4256184-51 |

| 403 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #7 (B) | INV | 4256184-52 |
|---|---|---|---|---|
| 404 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #8 | INV | 4256184-53 |
| 405 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #2 (E) | INV | 4256184-54 |
| 406 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #9 (B) | INV | 4256184-55 |
| 407 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #10 | INV | 4256184-56 |
| 408 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE #11 | INV | 4256184-57 |
| 409 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE#12 - SEQU 670 | INV | 4256184-58 |
| 410 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VE#13 - SEQU 1341 | INV | 4256184-59 |
| 411 BPI Releasable | 6/27/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CEP SALES - VES ##3 -6 | INV | 4256184-60 |
| 412 BPI Releasable | 7/1/2022 | VERIFICATION FROM USDOC TO FILE PERTAINING TO SIDERCA HM VERIFICATION REPORT | INV | 4259775-01 |
| 413 BPI Releasable | 7/1/2022 | VERIFICATION FROM USDOC TO FILE PERTAINING TO TGS CEP VERIFICATION REPORT | INV | 4259777-01 |
| 414 BPI Releasable | 7/5/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COST VERIFICATION EXHIBITS | INV | 4260005-01 |
| 415 BPI Releasable | 7/5/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COST EXHIBIT 1 | INV | 4260005-02 |
| 416 BPI Releasable | 7/5/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COST EXHIBIT 2 | INV | 4260005-03 |
| 417 BPI Releasable | 7/5/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COST EXHIBIT 3 | INV | 4260005-04 |
| 418 BPI Releasable | 7/5/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COST EXHIBIT 4 | INV | 4260005-05 |
| 419 BPI Releasable | 7/5/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COST EXHIBIT 5 | INV | 4260005-06 |

| 420 BPI Releasable | 7/5/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COST EXHIBIT 6 | INV | 4260005-07 |
| 421 BPI Releasable | 7/5/2022 | VERIFICATION FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA COST EXHIBIT 7 | INV | 4260005-08 |
| 422 BPI Releasable | 7/30/2022 | MEMO FROM USDOC TO FILE PERTAINING TO SIDERCA COST VERIFICATION REPORT | INV | 4269170-01 |
| 423 BPI Releasable | 7/30/2022 | MEMO FROM USDOC TO FILE PERTAINING TO SIDERCA FURTHER MANUFACTURING COST VERIFICATION REPORT | INV | 4269172-01 |
| 424 BPI Releasable | 8/2/2022 | RESPONSE FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA REVISED FURTHER MANUFACTURING DATABASE | INV | 4270345-01 |
| 425 BPI Releasable | 8/2/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA DATABASE SUMMARIES | INV | 4270345-02 |
| 426 BPI Releasable | 8/2/2022 | DATA FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA SIDERCAFURMAN06 | INV | 4270345-03 |
| 427 BPI Releasable | 8/8/2022 | BRIEF FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE PERTAINING TO PETITIONERS CASE BRIEF | INV | 4272275-01 |
| 428 BPI Releasable | 8/9/2022 | BRIEF FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA CASE BRIEF | INV | 4272890-01 |
| 429 BPI Releasable | 8/16/2022 | BRIEF FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA AND TGS USA REBUTTAL BRIEF | INV | 4275028-01 |
| 430 BPI Releasable | 8/16/2022 | BRIEF FROM CASSIDY LEVY KENT (USA) LLP TO SEC OF COMMERCE PERTAINING TO PETITIONERS REBUTTAL BRIEF | INV | 4275050-01 |
| 431 BPI Releasable | 9/26/2022 | MEMO FROM USDOC TO FILE PERTAINING TO SIDERCA FINAL ANALYSIS MEMO | INV | 4287866-01 |
| 432 BPI Releasable | 9/26/2022 | COMPUTER_PROGRAMS FROM USDOC TO FILE PERTAINING TO SIDERCA CM PROGRAM | INV | 4287869-01 |
| 433 BPI Releasable | 9/26/2022 | COMPUTER_PROGRAMS FROM USDOC TO FILE PERTAINING TO SIDERCA MARGIN PROGRAM | INV | 4287869-02 |
| 434 BPI Releasable | 9/26/2022 | LETTER FROM USDOC TO DIRECTOR OF ACCOUNTING PERTAINING TO SIDERCA S.A.I.C FINAL COST CALCULATION MEMORANDUM | INV | 4287878-01 |
| 435 BPI Releasable | 9/27/2022 | MEMO FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES CRITICAL CIRCUMSTANCES MEMO | INV | 4288532-01 |
| 436 BPI Releasable | 9/27/2022 | DATA FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES CRITICAL CIRCUMSTANCES ANALYSIS | INV | 4288532-02 |

Report generated on: 7/5/2024 9:07:47 AM

UNITED STATES DEPARTMENT OF COMMERCE - INTERNATIONAL TRADE ADMINISTRATION - INDEX TO ADMINISTRATIVE RECORD

CASE NUMBER A-357-824 - Oil Country Tubular Goods From Argentina

REM - SLIP OP. 24-31

*Contains Data files*

**\* BPI Documents – May Be Released Under APO \* BPI Documents – May Be Released Under APO**

Print

| Item No. | Upload Date | Document Title | Segment | Bar Code |
|---|---|---|---|---|
| 1<br>BPI Releasable | 6/5/2024 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO SIDERCA (REJECTED) CMTS ON DRAFT REMAND | REM - Slip Op. 24-31 | 4571554-01 |
| 2<br>BPI Releasable | 6/10/2024 | LETTER FROM WHITE & CASE LLP TO SEC OF COMMERCE PERTAINING TO TENARIS RESUBMISSION OF CMTS ON DRAFT REMAND | REM - Slip Op. 24-31 | 4575073-01 |
| 3<br>BPI Releasable | 6/26/2024 | OTHER FROM USDOC TO FILE PERTAINING TO INTERESTED PARTIES FINAL RESULTS OF REDETERMINATION | REM - Slip Op. 24-31 | 4585791-01 |

Appx217

13

Letter from Cassidy Levy Kent (USA) LLP and Schagrin Associates: *Petitions for the Imposition of Antidumping and Countervailing Duties: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia*
(Oct. 5, 2021)

P.R. 1 – P.R. 6

Public Version

Appx218-Appx1025

Barcode:4168004-01 A-357-824 INV - Investigation -

October 6, 2021

USITC Inv. Nos. 701-TA-____ and
731-TA-____
DOC Inv. Nos. A-357-824, C-580-913, A-201-856,
A-821-833, and C-821-834
Total Pages: 10,479
Investigation

**PUBLIC VERSION**
Business Proprietary Treatment Requested for
Information Deleted from Brackets in Volume I on
Pages 1-2, 5-7, 33-35, 37-40 & 46-48, Table of
Exhibits, and Exhibits I-1 – I-3, I-19, & I-21; in
Volume II on Pages 3-4 & 6, Exhibit List, and
Exhibits II-3 & II-10; in Volume III on Pages 3-4 &
6, Exhibit List, and Exhibits III-3 & III-10; and in
Volume IV on Pages 6-7 and Exhibits IV-9a,
IV-9b, & IV-10.

BY ELECTRONIC FILING
The Honorable Gina M. Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

BY ELECTRONIC FILING
The Honorable Lisa R. Barton
Secretary
U.S. International Trade Commission
500 E Street, S.W., Room 112
Washington, D.C. 20436

Re:    **Petitions for the Imposition of Antidumping and Countervailing Duties:
Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea,
and Russia**

Dear Secretary Raimondo and Secretary Barton:

On behalf of Borusan Mannesmann Pipe U.S., Inc. ("Borusan U.S."), PTC Liberty

Tubulars LLC ("PTC"), U. S. Steel Tubular Products, Inc. ("U. S. Steel"), the United Steel,

Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers

International Union, AFL-CIO, CLC (the "USW"), and Welded Tube USA, Inc. ("Welded

Tube") (collectively, "Petitioners"), we hereby submit to the U.S. Department of Commerce

Barcode:4168004-01 A-357-824 INV - Investigation  -  PUBLIC VERSION

("Commerce") and the U.S. International Trade Commission (the "Commission") petitions for the imposition of antidumping and countervailing duties on Oil Country Tubular Goods ("OCTG") from Argentina, Mexico, and Russia pursuant to sections 701, 702(b), 731, and 732(b) of the Tariff Act of 1930, as amended (19 U.S.C. §§ 1671, 1671a(b), 1673, and 1673a(b)). Borusan U.S., PTC, U. S. Steel, and Welded Tube are domestic producers of OCTG, and are thus domestic interested parties within the meaning of 19 U.S.C. § 1677(9)(C) and 19 C.F.R. § 351.102(b)(17). The USW is a recognized union representing workers in OCTG production facilities in the United States, and is this a domestic interested party within the meaning of 19 U.S.C. § 1677(9)(D) and 19 C.F.R. § 351.102(b)(17).

Pursuant to Commerce's regulations codified at 19 C.F.R. § 351.202(c), we hereby certify that the petitions are being filed simultaneously today with the Commission.

At Commerce, we are filing Volume I (General Issues and Injury) matched with both the information on sales at less-than-fair value and, where applicable, the provision of countervailable subsidies for each respective country. At the Commission, pursuant to instructions from Secretary Barton and temporary measures taken by the Commission to accept electronic petition filings instead of filings by hand, we are filing all six volumes of the petition, including exhibits for each volume: Volume I (General Issues and Injury), Volume II (Antidumping for Argentina), Volume III (Antidumping for Mexico), Volume IV (Antidumping for Russia), Volume V (Countervailable Subsidies for Korea), and Volume VI (Countervailable Subsidies for Russia).

On behalf of the Petitioners, we request proprietary treatment for information designated as proprietary in these petitions pursuant to Commerce's regulations codified at 19 C.F.R.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

§§ 351.202(d) and 351.304 and the Commission's rules codified at 19 C.F.R. § 201.6(b).

Business proprietary information is enclosed in single brackets ("[ ]").

The information in these petitions for which the Petitioner requests proprietary treatment, and the location of same, is as follows:

Volume I (General Issues and Injury)

- Specific business information related to the operational and trade data of the petitioner, including production, shipments, revenue, costs, and financial performance, as well as confidential industry data obtained by the petitioner pursuant to a subscription service or other confidential agreement (19 C.F.R. §§ 201.6(a) and 351.105(c)(11)): Pages 1-2, 5-7, 33-35, 37-40 & 46-48, Table of Exhibits, and Exhibits I-1 – I-3, I-19, & I-21.

Volume II (Antidumping Argentina)

- Information obtained by submitter's personnel regarding the petitioner's production process, input usage rates, production costs and other specific business information (19 C.F.R. §§ 201.6(a) and 351.105(c)(1), (2) and (11)): Exhibits II-3 and II-10.

- The names of particular persons from whom business proprietary information was obtained, as well as other specific business information the release of which to the public would cause substantial harm to the competitive position of the submitter (19 C.F.R. §§ 201.6(a) and 351.105(c)(9) and (11)): Pages 3-4 & 6, Exhibit List, and Exhibit II-3.

Volume III (Antidumping Mexico)

- Information obtained by submitter's personnel regarding the petitioner's production process, input usage rates, production costs and other specific business information (19 C.F.R. §§ 201.6(a) and 351.105(c)(1), (2) and (11)): Exhibits III-3 and III-10.

- The names of particular persons from whom business proprietary information was obtained, as well as other specific business information the release of which to the public would cause substantial harm to the competitive position of the submitter (19 C.F.R. §§ 201.6(a) and 351.105(c)(9) and (11)): Pages 3-4 & 6, Exhibit List, and Exhibit III-3.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-01 A-357-824 INV - Investigation   -   PUBLIC VERSION

Volume IV (Antidumping Russia)

- Information obtained by submitter's personnel regarding the petitioner's production process, input usage rates, production costs and other specific business information (19 C.F.R. §§ 201.6(a) and 351.105(c)(1), (2) and (11)): Pages 6-7 and Exhibits IV-9a, IV-9b, and IV-10.

The bracketed information in these petitions for which business proprietary treatment is requested is entitled to proprietary treatment in accordance with Commerce's regulations codified at 19 C.F.R. § 351.304(a) and the Commission's regulations codified at 19 C.F.R. § 201.6(b). Information for which proprietary treatment is requested is not available to the public. Public disclosure of this information would cause substantial harm to the competitive position of the submitter. The disclosure of this information would also likely have the effect of impairing the ability of Commerce and the Commission to obtain such information as is necessary to perform their statutory functions. The requisite certification that substantially identical information is not available to the public is attached to this letter, in accordance with the Commission's rules codified at 19 C.F.R. § 201.6(b)(3)(iii).

Pursuant to Commerce's regulations codified at 19 C.F.R. § 351.304(b), Petitioner agrees in principle to permit disclosure of the bracketed business proprietary information contained in these petitions under an appropriately drawn administrative protective order ("APO"). Petitioner, however, reserves the right to comment on all APO applications prior to disclosure.

A public version of these petitions has been prepared and is being filed simultaneously with this submission pursuant to Commerce's regulations codified at 19 C.F.R. § 351.304(c)(1) and the Commission's rules codified at 19 C.F.R. § 201.8(d).

*     *     *

4

Please contact the undersigned with any questions regarding these petitions.

Respectfully submitted,

_____
Thomas M. Beline
Myles S. Getlan
Mary Jane Alves
Jack A. Levy
Cassidy Levy Kent (USA) LLP
900 19th Street NW
Suite 400
Washington, DC 20006
(202) 567-2300
*Counsel to U. S. Steel Tubular Products, Inc.*

_____
Roger B. Schagrin
Christopher T. Cloutier
Jeffrey D. Gerrish
Luke A. Meisner
William A. Fennell
Benjamin J. Bay
Michelle R. Avrutin
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700
*Counsel to Borusan Mannesmann Pipe USA, Inc., PTC Liberty Tubulars LLC, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA, Inc.*

5

Barcode:4168004-01 A-357-824 INV - Investigation -

# ATTORNEY CERTIFICATION

District of Columbia: SS

    I, Thomas M. Beline, counsel to United States Steel Corporation, certify that (1) I have read the enclosed submission dated October 6, 2021, and (2) based on the information made available to me, I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

    In accordance with section 201.6(b) of the Commission's rules, I also hereby certify that, to the best of my knowledge, information substantially identical to that for which business proprietary treatment has been requested is not available to the general public.

    I certify pursuant to 28 U.S.C. § 1746 that the foregoing statements are true and accurate. I am aware that the information contained above may be subject to verification or corroboration (as appropriate) by the U.S. International Trade Commission. I am also aware that U.S. Law (including, but not limited to 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.

Dated: October 6, 2021

_____
Thomas M. Beline

## CERTIFICATION OF COUNSEL

In accordance with section 201.6(b)(3)(iii) of the Commission's rules, I, Roger B. Schagrin, of Schagrin Associates, counsel to Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union,  AFL-CIO, CLC, and Welded Tube USA, Inc., certify that information substantially identical to the information for which we are requesting proprietary treatment in the attached submission is not available to the public.

In accordance with section 207.3(a) of the Commission's rules, I further certify that (1) I have read the attached submission, and (2) the information contained in this submission is accurate and complete to the best of my knowledge.

In accordance with section 207.11(b)(3) of the Commission's rules, I further certify that, to the extent any item of information specified in paragraph 207.11(b)(2) of the Commission's rules is not contained in these petitions, that item of information was not reasonably available to the petitioner.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 5, 2021


_____
Roger B. Schagrin

Barcode:4168004-01 A-357-824 INV - Investigation  -

## REPRESENTATIVE CERTIFICATION

I, Thomas M. Beline, with Cassidy Levy Kent (USA) LLP, counsel to United States Steel Corporation, certify that I prepared or otherwise supervised the preparation of the attached submission of *Petitions for the Imposition of Antidumping and Countervailing Duties on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia,* filed on October 6, 2021, pursuant to the antidumping and countervailing duty investigations on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia (Case Nos. A-357-824, A-201-856, A-821-833, C-580-913, and C-821-834).   In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge.   I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.   In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification.   I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____
Thomas M. Beline

Date: _____October 6, 2021_____

### Counsel Certification

I, Rober B. Schagrin, counsel to Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union,  AFL-CIO, CLC, and Welded Tube USA, Inc., certify that I have prepared or otherwise supervised the preparation of the attached *Petitions for the Imposition of Antidumping and Countervailing Duties on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia*, filed on October 6, 2021 pursuant to the antidumping and countervailing duty investigations on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia (Case Nos. A-357-824, A-201-856, A-821-833, C-580-913, and C-821-834).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: _____ October 5, 2021 _____

Barcode:4168004-01 A-357-824 INV - Investigation  -

**Company Certification**

I, Joel Johnson, currently employed by Borusan Mannesmann Pipe U.S., Inc., certify that I prepared or otherwise supervised the preparation of the attached *Petitions for the Imposition of Antidumping and Countervailing Duties on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia*, filed on October 6, 2021 pursuant to the antidumping and countervailing duty investigations on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia (Case Nos. A-357-824, A-201-856, A-821-833, C-580-913, and C-821-834).

I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: <u>4 October 2021</u>_____

Appx227

Barcode:4168004-01 A-357-824 INV - Investigation  -

## Company Certification

I, Cary Hart, currently in a managing and support role for PTC Liberty Tubulars LLC, certify that I prepared or otherwise supervised the preparation of the attached *Petitions for the Imposition of Antidumping and Countervailing Duties on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia*, filed on October 6, 2021 pursuant to the antidumping and countervailing duty investigations on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia (Case Nos. A-357-824, A-201-856, A-821-833, C-580-913, and C-821-834).

I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will  e filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: _____

Barcode:4168004-01 A-357-824 INV - Investigation  -

## COMPANY CERTIFICATION

I, Benjamin Blase Caryl, Associate General Counsel of International Trade and Public Policy, currently employed by United States Steel Corporation ("U. S. Steel"), certify that I prepared or otherwise supervised the preparation of the attached submission of *Petitions for the Imposition of Antidumping and Countervailing Duties on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia,* filed on October 6, 2021, pursuant to the antidumping and countervailing duty investigations on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia (Case Nos. A-357-824, A-201-856, A-821-833, C-580-913, and C-821-834). I certify that the public information and any business proprietary information of U. S. Steel contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____
                          Benjamin Blase Caryl

Date: _____ October 6, 2021 _____

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-01 A-357-824 INV - Investigation -

### Union Certification

I, Roy Houseman, Legislative Director for the United Steelworkers ("USW"), certify that I prepared or otherwise supervised the preparation of the attached *Petitions for the Imposition of Antidumping and Countervailing Duties on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia*, filed on October 6, 2021 pursuant to the antidumping and countervailing duty investigations on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia (Case Nos. A-357-824, A-201-856, A-821-833, C-580-913, and C-821-834).

I certify that the public information and any business proprietary information of the USW contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: _10-4-21_____

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-01 A-357-824 INV - Investigation  -

## Company Certification

I, Butch Mandel, currently employed by Welded Tube USA, Inc., certify that I prepared or otherwise supervised the preparation of the attached *Petitions for the Imposition of Antidumping and Countervailing Duties on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia*, filed on October 6, 2021 pursuant to the antidumping and countervailing duty investigations on Oil Country Tubular Goods from Argentina, Mexico, Korea, and Russia (Case Nos. A-357-824, A-201-856, A-821-833, C-580-913, and C-821-834).

I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: _____

Date: _____OcTOBeR 5, 2021_____

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-02 A-357-824 INV - Investigation  -

USITC Inv. Nos. 701-TA-___ and 731-TA-___
DOC Inv. Nos. A-357-824, C-580-913, A-201-856, A-821-833, and C-821-834
Total Pages: 385
Investigation

**PUBLIC VERSION**
Proprietary Treatment Requested for Information Deleted from Brackets on Pages 1-2, 5-7, 33-35, 37-40 & 46-48, Table of Exhibits, and Exhibits I-1 – I-3, I-19, & I-21.

BEFORE THE
**INTERNATIONAL TRADE ADMINISTRATION**
**UNITED STATES DEPARTMENT OF COMMERCE AND THE**
**UNITED STATES INTERNATIONAL TRADE COMMISSION**

| |
|---|
| **OIL COUNTRY TUBULAR GOODS FROM ARGENTINA, MEXICO, THE REPUBLIC OF KOREA, AND RUSSIA** |

**PETITION FOR THE IMPOSITION**
**OF ANTIDUMPING AND COUNTERVAILING DUTIES PURSUANT TO**
**SECTIONS 701 AND 731 OF THE TARIFF ACT OF 1930, AS AMENDED**

**VOLUME I – GENERAL ISSUES AND INJURY INFORMATION**

Thomas M. Beline
Myles S. Getlan
Mary Janes Alves
Jack A. Levy
CASSIDY LEVY KENT (USA) LLP
900 19th Street NW
Suite 400
Washington, DC 20006
(202) 567-2300
*Counsel to U. S. Steel Tubular Products, Inc.*

Roger B. Schagrin
Christopher T. Cloutier
Jeffrey D. Gerrish
Luke A. Meisner
William A. Fennell
Benjamin J. Bay
Michelle R. Avrutin
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700
*Counsel to Borusan Mannesmann Pipe USA, Inc., PTC Liberty Tubulars LLC, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA, Inc.*

October 6, 2021

Barcode:4168004-02 A-357-824 INV - Investigation  -  PUBLIC VERSION

# Table of Contents

I. Common Issues .................................................................................................... 2

   A. Contact information for the petitioner (19 C.F.R. § 207.11(a); 19 C.F.R. § 351.202(b)(I)) .......................................................................................................... 2

   B. Identity of the industry on whose behalf the petitions are filed (19 C.F.R. § 207.11(b)(2)(ii); 19 C.F.R. § 351.202(b)(2)) ........................................................... 3

   C. Information relating to the degree of industry support for the petitions (19 C.F.R. § 351.202(b)(3)) ......................................................................................... 5

   D. Previous requests for import relief for the merchandise (19 C.F.R. § 351.202(b)(4)).... 10

   E. Scope of the investigations and a detailed description of the subject merchandise (19 C.F.R. § 351.202(b)(5)) .............................................................. 11

      1. Scope of investigations ............................................................... 11

      2. Technical characteristics and uses .............................................. 13

      3. Production process....................................................................... 15

      4. Tariff classification ..................................................................... 19

   F. The domestic like product proposed by the petitioner (19 C.F.R. § 207.11(b)(2)(i)) ..... 20

   G. The names of the home market countries and the name of any intermediate country through which the merchandise is transshipped (19 C.F.R. § 351.202(b)(6)) ............... 22

   H. The names and addresses of each person believed to sell the merchandise at less than normal value and the proportion of total exports to the United States (19 C.F.R. § 351.202(b)(7)(i)(A)) ............................................................................................ 22

   I. All factual information related to the calculation of export price and the constructed export price of the subject merchandise and the normal value of the foreign like product (19 C.F.R. § 351.202(b)(7)(i)(B)) ............................................................... 22

   J. The names and addresses of each person believed to benefit from a countervailable subsidy who exports the subject merchandise to the United States and the proportion of total exports to the United States (19 C.F.R. § 351.202(b)(7)(ii)(A))........................... 23

   K. The alleged countervailable subsidies and related factual information (19 C.F.R. § 351.202(b)(7)(ii)(B)) ........................................................................................ 23

   L. The volume and value of the merchandise imported during the most recent two-year period (19 C.F.R. § 351.202(b)(8)) ..................................................................... 23

   M. Contact information for each entity the petitioners believe imports or is likely to import the subject merchandise (19 C.F.R. § 207.11(b)(2)(iii); 19 C.F.R. § 351.202(b)(9)) ..... 24

   N. Identification of pricing products (19 C.F.R. § 207.11(b)(2)(iv))................................. 24

   O. Lost sales and revenue (19 C.F.R. § 207.11(b)(2)(v)) ................................................ 24

II. Injury Information .............................................................................................. 25

i

Barcode:4168004-02 A-357-824 INV - Investigation  -  PUBLIC VERSION

A.  The Domestic like product consists of all OCTG covered by the scope ........................ 25

B.  The domestic industry consists of U.S. producers of the like product ........................... 26

C.  Subject imports are not negligible ................................................................ 28

D.  Subject imports should be cumulated ............................................................. 28

    1. Fungibility ........................................................................................... 29

    2. Channels of distribution ....................................................................... 30

    3. Geographic overlap ............................................................................. 30

    4. Simultaneous presence in the market .................................................... 31

    5. Conclusion .......................................................................................... 31

E.  Conditions of Competition .......................................................................... 31

F.  Subject imports are causing material injury to the domestic industry ......................... 34

    1. The volume of subject imports is significant .......................................... 34

    2. Subject imports have had significant adverse price effects ........................ 36

    3. Subject imports have had a significant adverse impact on the domestic industry ...... 38

G.  Subject imports threaten the domestic industry with additional material injury ............. 41

    1. Cumulative assessment of threat ........................................................... 41

    2. Countervailable subsidies encourage production and export of OCTG from Korea and Russia ............................................................ 42

    3. Subject producers have large and growing capacity and exports .............................. 43

    4. Other trade measures incentivize subject producers to export to the U.S. market ..... 44

    5. Facilities in the subject countries that are currently being used to make other products could be used to produce OCTG ...................... 45

    6. Subject producers have demonstrated their ability to rapidly penetrate the U.S. market 46

    7. Subject imports will likely enter at prices that will further undersell and suppress and/or depress U.S. prices ........................................ 47

    8. Rising volumes of low-priced imports will further injure the domestic industry ....... 47

    9. Conclusion .......................................................................................... 48

III.  CONCLUSION .................................................................................... 48

TABLE OF EXHIBITS

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Barcode:4168004-02 A-357-824 INV - Investigation  -    PUBLIC VERSION

These petitions are filed on behalf of Borusan Mannesmann Pipe U.S., Inc. ("Borusan

U.S."), PTC Liberty Tubulars LLC ("PTC"), U. S. Steel Tubular Products, Inc. ("U. S. Steel"),

the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and

Service Workers International Union, AFL-CIO, CLC (the "USW"), and Welded Tube USA,

Inc. ("Welded Tube") (collectively, "Petitioners"). Petitioners allege that oil country tubular

goods ("OCTG") from Argentina, Mexico, and Russia are being sold or are likely to be sold at

less than normal value in the United States within the meaning of Section 731 of the Tariff Act

of 1930, as amended, (the "Act") (19 U.S.C. § 1673). Petitioners also allege that OCTG from the

Republic of Korea ("Korea") and Russia benefit from countervailable subsidies within the

meaning of Section 701 of the Act (19 U.S.C. § 1671). Petitioners further allege that these

unfairly traded imports from Argentina, Mexico, Korea, and Russia have materially injured the

United States domestic industry producing OCTG and threaten to cause further material injury if

remedial action is not taken. The petitions contain information reasonably available to the

Petitioners in support of these allegations.

The domestic OCTG industry is experiencing a historically weak market, as demand

plummeted and prices crashed in 2020, and with conditions having barely improved in the first

half of 2021. At a time of extreme vulnerability for the domestic industry, subject imports rushed

into the market, increasing by 46 percent from the first half of 2020 to the first half of 2021 and

[                    ] their market share — from [      ] percent in the first half of 2020 to [       ]

percent in the first half of 2021. This surge in subject imports came at the expense of the

domestic OCTG industry, which lost [      ] percentage points of market share across these

periods. Subject imports claimed this [       ] increase in market share by underselling the

domestic industry and suppressing prices to such an extent that domestic producers were [

1

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

]. As a result of these unfairly priced imports, the domestic industry was forced to decrease its production levels, leaving its capacity utilization rate at a [                              ] percent, and the industry is incurring unsustainable operating losses. The domestic industry is vulnerable and the current situation is untenable. Without relief from dumped and subsidized subject imports, the viability of the domestic OCTG industry is in jeopardy.

Separate volumes regarding the allegations of dumping by subject producers in Argentina, Mexico, and Russia as well as the countervailable subsidies provided to producers and exporters in Korea and Russia are being filed simultaneously at both the U.S. Department of Commerce ("Commerce") and the U.S. International Trade Commission (the "Commission"). Petitioners request that antidumping ("AD") and countervailing duties ("CVD") be imposed to offset the dumping and subsidy programs detailed in the specific AD and CVD volumes.

## I.    COMMON ISSUES

This section contains certain information required in AD and CVD petitions by 19 C.F.R. §§ 207.1 and 351.202(b)(1) – (9).

### A.    Contact information for the petitioner (19 C.F.R. § 207.11(a); 19 C.F.R. § 351.202(b)(I))

Petitioners are domestic producers of OCTG and workers engaged in the manufacture of OCTG in the United States. Petitioners are domestic interested parties within the meaning of 19 U.S.C. § 1677(9)(C)-(D) and 19 C.F.R. § 351.102(b)(17).[1]

The Petitioners' contact information is:

---

[1]    Petitioners provide their confidential trade and financial data in **Exhibit I-1**.

2

Barcode:4168004-02 A-357-824 INV - Investigation  -  PUBLIC VERSION

**Borusan Mannesmann Pipe U.S., Inc.**
4949 Borusan Road
Baytown, TX 77523
Website:
borusanmannesmannpipe.com
Tel: (832) 399-6042
Fax: N/A
Contact: Josh Croix
Email: joshcroix@borusan.com

**PTC Liberty Tubulars LLC**
1100 FM 3361 Road
Liberty, TX 77575
Website: ptclibertytubulars.com
Tel: (713) 289-5555
Fax: N/A
Contact: Cary Hart
Email: cary.hart@ptcalliance.com

**U. S. Steel Tubular Products, Inc.**
600 Grant Street
Pittsburgh, PA 15219
Website: ussteel.com
Tel: (412) 433-1121
Fax: (412) 433-1167
Contact: Benjamin Caryl
Email: bbcaryl@uss.com

**United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC**
60 Boulevard of the Allies
Pittsburgh PA 15222
Website: usw.org
Tel: (412) 562-2400
Fax: (412) 562-3863
Contact: Roy Houseman
Email: rhouseman@usw.org

**Welded Tube USA, Inc.**
2537 Hamburg Turnpike
Lackawanna, NY 14218
Website: weldedtube.com
Tel: (906) 669-1111
Fax: (905) 738-4070
Contact: Robert Mandel
Email: bmandel@weldedtube.com

**B.**   **Identity of the industry on whose behalf the petitions are filed (19 C.F.R. § 207.11(b)(2)(ii); 19 C.F.R. § 351.202(b)(2))**

These petitions are filed on behalf of the United States industry that produces OCTG. In addition to the petitioning U.S. producers and workers identified above, and according to the best information available to Petitioners, the other U.S. producers of OCTG and their available contact information are as follows:

3

Barcode:4168004-02 A-357-824 INV - Investigation  -  PUBLIC VERSION

**ArcelorMittal Tubular**
1 South Dearborn Street, 13th floor
Chicago, IL 60603
Website:
tubularnorthamerica.arcelormittal.com
Tel: (713) 877-4407
Fax: (713) 961-9687
Contact: Dan Nichols

**Axis Pipe and Tube, LLC**
16420 Park Ten Place, Suite 412
Houston, TX 77084
Website: axispipeandtube.com
Tel: (979) 599-7602
Fax: N/A
Contact: Rusty Fischer
Email:
rusty.fisher@axispipeandtube.com

**BENTELER Steel/Tube Mfg. Corp.**
1 Benteler Drive
Shreveport, LA 71115
Website: benteler-steeltube.com
Tel: (318) 216-4200
Fax: (318) 216-4141
Contact: Corey Stringer
Email: corey.stringer@benteler.com

**Centric Pipe, LLC**
430 Hamilton Road
Bossier City, LA 71111
Website: centricpipe.com
Tel: (318) 741-2220
Fax: N/A
Contact: Kole Caston

**EVRAZ Pueblo**
2100 South Freeway
Pueblo, CO 81004
Website: EVRAZNA.com
Tel: (719) 561-6426
Fax: N/A
Contact: David Coffin
Email: dave.coffin@evrazna.com

**Paragon Industries, Inc.**
3378 West Highway 117
Sapulpa, OK 74066
Website: paragonindinc.com
Tel: (918) 291-4459
Fax: N/A
Contact: Dave Dufresne
Email: info@paragonindinc.com

**SeAH Steel USA**
16937 Leonard Road
Houston, TX 77049
Website: seahsteelusa.com
Tel: (832) 734-0080
Fax: N/A
Contact: David Duroy

**Tejas Tubular Products, Inc.**
8799 North Loop East, Suite 300
Houston, TX 77028
Website: tejastubular.com
Tel: (713) 631-0071
Fax: (281) 822-3401
Contact: Marina Morales

**Tex-Tube Company**
P.O. Box 55710
1503 North Post Oak Rd.
Houston, TX 77255
Website: tex-tube.com
Tel: (713) 686-4351
Fax: (713) 681-5256
Contact: Lindsey Neuwirth
Email: info@tex-tube.com

**Tenaris Global Services USA Corp**
2200 West Loop South, 8th Floor
Houston, TX 77027
Website: tenaris.com
Tel: (713) 767-4400
Fax: (713) 767-4444
Contact: Luis Rodriguez
Email: luisrodriguez@tenaris.com

4

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

**TimkenSteel Corporation**
1835 Dueber Ave. SW
Canton, OH 44706-2728
Tel: 330-471-7000
Fax: N/A
Website: timkensteel.com
Contact: Frank DiPiero
Email: frank.dipeiro@timkensteel.com

**Wheatland Tube**
1 Council Avenue
P.O. Box 608
Wheatland, PA 16161
Website: wheatland.com
Tel: (800) 257-8182
Fax: N/A
Contact: Randy Boswell

**Vallourec Star, LP**
2107 CityWest Boulevard, Suite 1300
Houston, TX 77042
Website: vallourec.com
Tel: (713) 479-3307
Fax: N/A
Contact: Jack Bowler
Email: jack.bowler@vallourec.com

C.      **Information relating to the degree of industry support for the petitions (19 C.F.R. § 351.202(b)(3))**

According to 19 U.S.C. §§ 1671a(c)(4)(A) and 1673a(c)(4)(A), a petition is filed by or on

behalf of the domestic industry if: (1) the domestic producers or workers who support the

petition account for at least 25 percent of the total production of the domestic like product; and

(2) the domestic producers or workers who support the petition account for more than 50 percent

of the production of the domestic like product produced by that portion of the industry

expressing support for or opposition to the petition. As shown in **Exhibit I-3**, which sets forth

the calculation of industry support for the petitions, Petitioners accounted for the majority of

domestic shipments and exports in 2020 after total domestic production is adjusted to account for

[

]. Thus, both of these statutory requirements are met.

There are no sources available for the total domestic production of the domestic industry

in the United States. However, there are data that are published regarding total domestic

5

Appx239

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

shipments of OCTG. As Commerce has recognized in numerous prior investigations, domestic shipments are a good proxy for domestic production of steel tubular products.[2] The recognized authority on the U.S. pipe and tube market, the [                    ], reports that the domestic industry shipped a total of [        ] ST of domestic OCTG shipments for the domestic market in 2020.[3] In addition, in order to estimate exports, Petitioners calculated the ratio of exports to total shipments for Borusan U.S., PTC, U. S. Steel, and Welded Tube.[4] The calculation shows that exports were [    ] percent of those companies' domestic shipments in 2020.[5] Thus, 2020 export shipments for the entire domestic industry can be estimated to be [      ] ST in 2020. Together, based on the sum of the domestic industry's domestic shipments and exports, Petitioners estimate that the domestic industry produced [        ] ST of OCTG in 2020.

The estimated total production of [        ] ST does not reflect the total shipments for all producers who express either support or opposition for the petitions. [

---

[2]   *See, e.g., Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe From the Republic of Korea and the Russian Federation: Initiation of Countervailing Duty Investigations*, 85 Fed. Reg. 47,170, 47,172 (Dep't Commerce Aug. 4, 2020) ("Because total industry production data for the domestic like product for 2019 are not reasonably available to the petitioner, and the petitioner has established that shipments are a reasonable proxy for production data, we have relied on the data provided by the petitioner for purposes of measuring industry support"); *Large Diameter Welded Pipe from Canada, Greece, India, the People's Republic of China, the Republic of Korea, and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations*, 83 Fed. Reg. 7,154, 7,157 (Dep't Commerce Feb. 20, 2018).

[3]   *See* [                              ], excerpts attached at **Exhibit I-2**.

[4]   Official export statistics for U.S. exports of OCTG are not reliable enough to use in these calculations, as U.S. Export Merchandise trade statistics from USA Trade Online reports [
                    ].

[5]   Petitioners [                                        ]. Petitioners' Confidential Data, attached at **Exhibit I-1**.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Barcode:4168004-02 A-357-824 INV - Investigation -

PUBLIC VERSION

].

[        ], the USW is a member of the petitioner group. As shown in the letter provided in

**Exhibit I-4**, the USW represent workers at multiple OCTG mills in the United States, including

the following mills not owned by a member of the petitioner group: EVRAZ in Pueblo, CO;

Tenaris in Ambridge PA, Camanche, IA, Hickman, AR, and Conroe, TX; and Wheatland Tube

in Warren, OH and Wheatland, PA. Commerce's regulations provide that if the management of a

firm expresses a position in direct opposition to the position of the workers in that firm,

Commerce will treat the production of that firm as representing neither support for, nor

opposition to, the petition.[6] Conservatively, assuming that the management for all of the USW

mills may oppose the petition, Petitioners do not include these mills' production in the

denominator for the standing calculation – *i.e.*, the total production of the domestic industry

expressing support for or opposition to the petition. Petitioners provide estimates of the USW

mills' production in 2020 based on Petitioners' knowledge of the U.S. OCTG market. As shown

in **Exhibit I-3**, this results in a total production of OCTG produced by that portion of the

industry expressing support for or opposition to the petition of [        ] ST.

    **Exhibit I-3** shows that regardless of whether Petitioners' 2020 production volumes

[        ] or shipment volumes [        ] are used, the Petitioners satisfy both

industry support thresholds. It is important to note that these calculations are conservative. First,

these calculations are based on the assumption that the management of all domestic OCTG

producers with workers represented by the USW, but who are not members of the Petitioners'

group, will oppose the petitions. However, Petitioners expect that some of these OCTG

producers would support the petitions, thus raising the level of industry support even higher.

---

[6]    19 C.F.R. § 351.203(e)(3).

7

Appx241

Furthermore, there may be related party issues that will lead to the position of at least two domestic producers to be disregarded in the calculation of industry support if those domestic producers oppose these petitions. The statute states that Commerce "*shall* disregard the position of domestic producers who oppose the petition, if such producers are related to foreign producers… unless such domestic producers demonstrate that their interests as domestic producers would be adversely affected by the imposition" of an order.[7] Moreover, Commerce "may disregard the position of domestic producers of a domestic like product who are importers of the subject merchandise."[8] The Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") also explains that Commerce excludes members of the domestic industry related to foreign producers from its industry support analysis in order "to eliminate any conflicts of interest that may distort its consideration of the level of industry support for an antidumping or countervailing duty petition."[9]

As set out in Section II.B of this Volume, Tenaris, while a domestic producer, is a related party as a producer of the subject merchandise in Argentina and Mexico. Tenaris' subsidiary in in Argentina, Siderca, has the capacity to produce 900,000 tons of seamless OCTG.[10] In Mexico, Tubos de Acero de México, S.A. ("TAMSA" or "TenarisTamsa") has the capacity to produce 1,230,000 tons of seamless OCTG per year, 70 percent of which is exported.[11] Tenaris not only exports the subject merchandise from those two countries to the United States but also distributes

---

[7]     19 U.S.C. §§ 1671a(c)(4)(B)(i) and 1673a(c)(4)(B)(i) (emphasis added).

[8]     19 U.S.C. §§ 1671a(c)(4)(B)(ii) and 1673a(c)(4)(B)(ii)

[9]     *Certain Uncoated Groundwood Paper From Canada: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 39,412 (Dep't Commerce Aug. 9, 2018) and accompanying Issues and Decision Memorandum at 9 (quoting SAA, H.R. Rep. 103-318, Vol. I at 858 (1994)).

[10]    Tenaris, Environmental Production Declaration: Oil Country Tubular Goods OCTG, Version 2.2 (Revised Oct. 19, 2018) at 4, attached as **Exhibit I-5**.

[11]    *Id*. and TenarisTamsa, Industrial Center at Slide 3, attached as **Exhibit I-6**.

8

subject merchandise within the United States from Russia as part of a distribution agreement with Russian producer TMK.[12] It is unclear whether Tenaris is also acting as the importer of record for the OCTG produced by TMK and sold in the United States.

Given Tenaris' position as an importer of the subject merchandise, the position of Tenaris' non-USW mills should be disregarded with respect to the petitions on Argentina and Mexico as a foreign producer.[13] Similarly, SeAH Steel USA is a subsidiary of Korean producer and exporter SeAH Steel, which has the capacity to produce over 2.2 million tons of steel pipes and plates each year.[14] The position of SeAH Steel USA should thus also be disregarded with respect to the industry support calculation for the countervailing duty petition against imports of OCTG from Korea.

For the foregoing reasons, Petitioners account for the majority of domestic production, and these petitions are therefore filed on behalf of the domestic industry within the meaning of 19 U.S.C. §§ 1671a(c)(4)(A) and 1673a(c)(4)(A).

---

[12]  Press Release, Tenaris completes acquisition of IPSCO Tubulars from TMK, attached as **Exhibit I-7**. Tenaris is also a future producer in Russia. In 2019, Tenaris and Severstal announced a joint venture to build a welded OCTG pipe mill in Russia that would have an annual production capacity of 300,000 tons. *Tenaris and Severstal to form joint venture to build a welded pipe plant in West Siberia*, Tenaris Website (Feb. 5, 2019), attached as **Exhibit I-8**. Tenaris and Severstal paused construction activities on this plant in March 2021 due to demand conditions. *Tenaris and Severstal provide update on the status of their welded pipe plant in West Siberia*, Tenaris Website (Mar. 15, 2021), attached as **Exhibit I-9**. Despite this pause, Tenaris' decision indicates that when demand returns, it will be invested not only in imported Russian OCTG produced by TMK, but also in producing Russian-made OCTG in its own joint venture facility with Severstal.

[13]  Furthermore, if Tenaris is the importer of record for the Russian OCTG made by TMK and solely distributed by Tenaris, then the position of Tenaris' non-USW mills should be disregarded with respect to the petitions on Russia.

[14]  SeAH Steel Webpages, attached as **Exhibit I-10**.

Barcode:4168004-02 A-357-824 INV - Investigation  -  PUBLIC VERSION

**D.    Previous requests for import relief for the merchandise (19 C.F.R. § 351.202(b)(4))**

The domestic industry has previously filed AD and CVD petitions on imports of OCTG from Brazil, Korea, Spain, Argentina, Mexico, Austria, Venezuela, Canada, Taiwan, Israel, Italy, Japan, China, Colombia, France, Germany, India, Indonesia, Romania, South Africa, Turkey, Ukraine, the Philippines, Saudi Arabia, Thailand, and Vietnam.[15] As of the filing of these petitions, the following AD and CVD orders on OCTG remain in place:

- AD order on OCTG from China;[16]

- CVD order on OCTG from China;[17]

- AD orders on OCTG from India, Korea, Turkey, Ukraine, and Vietnam;[18] and

- CVD orders on OCTG from India and Turkey.[19]

On June 22, 2001, the Commission instituted a safeguard investigation under section 202 of the Trade Act of 1974, to determine whether certain steel products, including OCTG, were

---

[15]    *See Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. No. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. 5090 (July 2020) ("*USITC Pub. 5090*") at I-6-7, excerpts attached at **Exhibit I-11**.

[16]    *See Certain Oil Country Tubular Goods From the People's Republic of China: Continuation of the Antidumping and Countervailing Duty Orders*, 85 Fed. Reg. 78,117 (Dep't Commerce Dec. 3, 2020). U.S. Steel was among the petitioners in the original investigation. *Certain Oil Country Tubular Goods from China*, Inv. No. 731-TA-1159 (Final), USITC Pub. 4152 (May 2010) ("*USITC Pub. 4152*") at 1, excerpts attached at **Exhibit I-12**.

[17]    *Id*. U.S. Steel was among the petitioners in the original investigation. *Certain Oil Country Tubular Goods from China*, Inv. No. 701-TA-463 (Final), USITC Pub. 4124 (Jan. 2010) ("*USITC Pub. 4124*") at 3, excerpts attached at **Exhibit I-13**.

[18]    *See Oil Country Tubular Goods From India, the Republic of Korea, the Republic of Turkey, Ukraine, and the Socialist Republic of Vietnam: Continuation of Antidumping and Countervailing Duty Orders*, 83 Fed. Reg. 48,665 (Dep't Commerce Aug. 12, 2020). U.S. Steel, Boomerang Tube LLC (now PTC Liberty), and Welded Tube USA were among the petitioners in the original investigation. *Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. No. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. 4489 (Sept. 2014) ("*USITC Pub. 4489*") at 2, excerpts attached at **Exhibit I-14**.

[19]    *Id*.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industries producing articles like or directly competitive with the imported article. On December 20, 2001, the Commission issued its determinations and remedy recommendations. The Commission made a negative determination with respect to seamless and welded OCTG.[20]

Petitioners have not filed for relief from imports of the subject merchandise under Sections 337 of the Act or Section 301 of the Trade Act of 1974. Imports of OCTG from Argentina, Korea, and Russia are currently subject to the duty and/or quota relief imposed by the President pursuant to Section 232 of the Trade Expansion Act of 1962.[21]

**E.     Scope of the investigations and a detailed description of the subject merchandise (19 C.F.R. § 351.202(b)(5))**

1.     Scope of investigations

The proposed scope of these investigations is as follows:

The merchandise covered by the investigation is certain oil country tubular goods (OCTG), which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (e.g., whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of the investigation also covers OCTG coupling stock.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise processed in a third country, including by

---

[20]   *See Steel*, Inv. No. TA-201-73, USITC Pub. 3479 (Dec. 2001), Vol. I at 17-18, excerpts attached at **Exhibit I-15**.

[21]   "Section 232 import duties cover all countries of origin except Argentina, Australia, Brazil, Canada, Mexico, and Korea. Section 232 absolute quotas cover imports from Argentina, Brazil, and Korea." *USITC Pub. 5090* at I-19 to I-20 excerpts attached at **Exhibit I-11**. (citing U.S. Customs and Border Protection, Section 232 Tariffs on Aluminum and Steel, https://www.cbp.gov/trade/programs-administration/trade-remedies/section-232-trade-remediesaluminum-and-steel). Mexico is exempted from both duties and quotas. *Id.*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

performing any heat treatment, cutting, upsetting, threading, coupling, or any other finishing, packaging, or processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the country of manufacture of the OCTG.

Excluded from the scope of the order are: casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

The merchandise subject to the investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40, 7304.29.10.50, 7304.29.10.60, 7304.29.10.80, 7304.29.20.10, 7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60, 7304.29.20.80, 7304.29.31.10, 7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50, 7304.29.31.60, 7304.29.31.80, 7304.29.41.10, 7304.29.41.20, 7304.29.41.30, 7304.29.41.40, 7304.29.41.50, 7304.29.41.60, 7304.29.41.80, 7304.29.50.15, 7304.29.50.30, 7304.29.50.45, 7304.29.50.60, 7304.29.50.75, 7304.29.61.15, 7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75, 7305.20.20.00, 7305.20.40.00, 7305.20.60.00, 7305.20.80.00, 7306.29.10.30, 7306.29.10.90, 7306.29.20.00, 7306.29.31.00, 7306.29.41.00, 7306.29.60.10, 7306.29.60.50, 7306.29.81.10, and 7306.29.81.50.

The merchandise subject to the investigation may also enter under the following HTSUS item numbers: 7304.39.00.24, 7304.39.00.28, 7304.39.00.32, 7304.39.00.36, 7304.39.00.40, 7304.39.00.44, 7304.39.00.48, 7304.39.00.52, 7304.39.00.56, 7304.39.00.62, 7304.39.00.68, 7304.39.00.72, 7304.39.00.76, 7304.39.00.80, 7304.59.60.00, 7304.59.80.15, 7304.59.80.20, 7304.59.80.25, 7304.59.80.30, 7304.59.80.35, 7304.59.80.40, 7304.59.80.45, 7304.59.80.50, 7304.59.80.55, 7304.59.80.60, 7304.59.80.65, 7304.59.80.70, 7304.59.80.80, 7305.31.40.00, 7305.31.60.90, 7306.30.50.55, 7306.30.50.90, 7306.50.50.50, and 7306.50.50.70.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the investigation is dispositive.

This scope language is identical to the scope of the AD/CVD orders on India, Korea, Turkey, Ukraine and Vietnam, with the addition of language confirming that imports of OCTG manufactured in the subject countries but packaged, finished, or processed in third countries

remains in the scope of the investigations.[22] A copy of proposed scope language is attached at **Exhibit I-16**. Relevant HTSUS excerpts are attached at **Exhibit I-17**.

2.     <u>Technical characteristics and uses</u>

OCTG includes casing, tubing, and coupling stock of carbon and alloy steel used in oil and gas wells.[23] OCTG can be produced either with regard to a specific specification, or produced without regard to specification, but OCTG is usually produced in accordance with the American Petroleum Institute ("API") specification 5CT.[24] The API 5CT specification for OCTG indicates that the product should be "stenciled", or marked by the manufacturer to indicate conformance with the specification to which it has been manufactured, and that the stenciling should identify the manufacturer's name, specification, size and weight designations, grade and class (*e.g.*, H40, J55, K55, M65, and N80 through Pl10), process of manufacture (seamless pipe or electric resistance welded ("ERW") pipe), heat treatment, and test pressure.

OCTG may be imported as either a plain end product or with finished ends. This finishing includes threaded ends, upset ends, or ends with attached coupling devices known as coupling stock.

**Casing** – The Commission has previously described casing as:

Casing is a circular pipe that serves as a structural retainer for the walls of the well. Casing typically has an outside diameter (OD) ranging from 4.5 inches to 20 inches and a length typically ranging from 34 feet to 48 feet. Casing provides a firm foundation for the drill string by supporting the walls of the hole to prevent caving in or wall collapse both during drilling and after the well is completed. After the casing is set in the well hole, concrete is usually pumped down through

---

[23]   *See Oil Country Tubular Goods From India, the Republic of Korea, the Republic of Turkey, Ukraine, and the Socialist Republic of Vietnam: Continuation of Antidumping and Countervailing Duty Orders*, 83 Fed. Reg. 48,665 (Dep't Commerce Aug. 12, 2020); *see also USITC Pub. 5090* at 6, excerpts attached at **Exhibit I-11**.

[23]   *USITC Pub. 5090* at I-20 to I-26, excerpts attached at **Exhibit I-11**.

[24]   *Id*. at I-25.

the casing to the bottom of the well and then up the annulus (the space between the well wall and the casing) until the annulus is filled.

Casing also serves as a surface pipe designed to prevent contamination of the recoverable oil and gas by surface water, gas, sand, or limestone. Casing must be sufficiently strong to carry its own weight, as well as to resist both external pressure and pressure within the well. Casing can be threaded at both ends and connected with other casing pieces with couplings or connectors. Because the amount of open hole that can be drilled at any one time is limited, larger wells require a string of concentric layers of casing rather than a single casing. Several sizes of casing may be set inside the well after it has been drilled, with the larger sizes set at the top of the well, and the smaller sizes set toward the bottom.[25]

**Tubing** – The Commission has previously given the following description for tubing:

Tubing is a smaller-diameter pipe (between 1.050–4.5 inches OD) installed inside the larger-diameter casing that is used to conduct the oil or gas to the surface, either through natural flow or through pumping. Substances such as lubricants are also pumped into the well through the tubing for well treatment. Tubing must be strong enough to support its own weight, that of the oil or gas, and that of any pumping equipment suspended on the string.[26]

**Coupling Stock** – The Commission has previously described coupling stock as:

A thick-walled, seamless tubular product used to manufacture coupling blanks. Coupling blanks, in turn, are unthreaded tube blanks used to make individual couplings. Couplings are thick-walled and internally threaded seamless cylinders that are used for joining two lengths of threaded OCTG. Couplings are produced and certified to the same API grade and type as the OCTG to which the couplings are joined. Coupling typically accounts for 2-3 percent of the weight of end-finished tubing or casing.[27]

**Green Tubing** -- The Commission has previously described green tubing as "heat-treated semi-finished OCTG" which typically meets certain basic API requirements (such as diameter and wall thickness) and can be converted into casing or tubing, but is not itself sold "at grade."[28]

In addition, the Commission has recognized that certain OCTG that already meets and is

---

[25]   *Id.* at I-23 to I-25.

[26]   *Id.* at I-25.

[27]   *Id.* at I-26.

[28]   *Id.* at 7 and I-26.

certified to API 5CT specifications for casing and tubing, but is produced with a steel chemistry that allows it to be upgraded, can also be referred to as "green tube," but this is not a consistent practice in the industry.[29] Green tube can be compared to finished casing and tubing, which typically refers to products that have been heat treated (if required), tested, threaded, and coupled.[30]

   3. <u>Production process</u>[31]

  OCTG mills manufacture casing and tubing either by the seamless process or by the electric-resistance-welding ("ERW") process, a lower-cost method than the seamless process, depending on the service requirements. By contrast, mills manufacture coupling stock for OCTG couplings exclusively through the seamless process.

  **Seamless OCTG** is manufactured by either of two high-temperature methods to form a central cavity in a solid steel billet; namely, the rotary piercing method and the hot extrusion method. Round or square billets serve as the input for seamless tubing. If a square billet is used, it is first forced through a circular roll pass, which transforms the billet from square to round for the piercing operation. In the rotary piercing method, the heated billet is gripped by angled rolls, which cause the billet to rotate and advance over a piercer point, forming a hole through the length of the billet and a hollow shell. In the extrusion method, the billet is hot punch-pierced and then extruded axially through a die and over a mandrel, forming a hollow shell. The hollow shell produced by either method is then rolled with a fixed plug or with a continuous mandrel

---

[29]  *Id*.

[30]  *Id*.

[31]  This description of the production process for OCTG is taken from the Commission's final staff report in *USITC Pub. 5090* at I-27-32, excerpts attached at **Exhibit I-11**.

inside the shell to reduce the wall thickness and increase the shell's length. Finally, the shell is rolled in a sizing mill or a stretch-reducing mill where it is formed to size.

**Welded OCTG** is manufactured from steel sheet in coil form. The steel sheet is slit to the width that corresponds to the desired diameter of tube. The slit sheet passes through a series of rollers while at ambient temperature and forms a tubular shape. The edges are then heated by electric resistance and welded together by heat and pressure, without the addition of filler metal. The welding pressure causes some of the metal to be squeezed from the welding joint, forming a bead of metal on the inside and outside of the tube. This bead, or welding flash, is usually trimmed from both the outside and the inside surfaces.

**Finishing Phase.** After the forming phase, the pipe body is heat-treated, and its ends upset, threaded and coupled, as needed. U.S. pipe mills typically are equipped with the facilities necessary to perform these processes. Independent processors operate facilities that are capable of full-body heat treatment and that may upset pipe ends. Threaders are capable of threading and coupling, hydrostatic testing, and measuring the length of OCTG products. Some processors and threaders may also manufacture couplings that become part of finished OCTG. Processors and threaders mainly serve imports, since OCTG is often imported with plain ends, and is heat treated, upset, and threaded in the United States.

**Heat Treatment.** In the steel manufacturing process, specific engineering characteristics and mechanical properties of the steel can be achieved through the application of different heat treatments. Heat treating may involve one or more heating cycles in either a continuous or batch furnace, with controlled rates of cooling. Specific heat treating requirements depend on the grade of steel being processed. For welded pipe, the heat treatment may cover the welded seam only, or the full cross section of the pipe. API standards specify a documented procedure for every

16

particular grade and type of pipe. API-specific heat treatment processes in the production of casing and tubing include annealing, normalizing, and quench and tempering.

Annealing is a single heat treatment process that prepares the steel for fabrication or service. The steel is heated to a temperature in or near a specific range and cooled at a predetermined rate or cycle. Annealing relieves internal residual stresses or hardness induced by welding, by cold working, or by machining.

In the normalizing process, the pipe is heated above a specific temperature, held at this temperature for a specified time, and then air-cooled. Normalizing refines the steel grain size and obtains a carbide size and distribution that is more suitable for future heat treatment than the as-rolled structure.

Quenching and tempering is a sequential process in which the pipe is heated to a specific temperature for a specified time period to modify the steel's microstructure, and then "quenched" in a cooling medium such as water, oil, or air, depending on the thickness of the pipe. After quenching, the steel is very brittle and must be reheated and then cooled under specific conditions. This process is called "tempering." The pipe must undergo a specified process of quenching and tempering in order to qualify for certain API grades.

Depending on the pipe design, API standards may specify a single heat treatment process or combination of processes for the pipe, such as normalizing and tempering, or quenching and tempering. After heat treatment, sizing rolls shape the tube to accurate diameter tolerances. The product is cooled and then cut to length at the end of the tube mill.

Coupling stock is made to the same grade and type specifications as casing and tubing. It must also be subject to the same heat treatment as pipe, except where specified by the purchaser.

**Upsetting and Threading.** Casing and tubing are finished by threading and the attachment of a suitable coupling to one end of each length. If additional strength in the joint is required, such as for some casing or tubing that is subject to severe or sour service, the ends of the pipe are upset before threads are cut. In the upsetting process, the end of the pipe is heated to forging temperature, and then inserted endwise into an upsetting machine. The machine pushes the hot metal back, creating a thicker wall at the end of the pipe. The upsetting may be controlled to displace the extra thickness to the inside or the outside of the pipe.

Casing and tubing can be joined directly using male (outer) and female (inner) threading, or by using couplings with female threads on each end. Typically, the pipe is mounted on a lathe and threads are cut by using sharp steel cutting tools (called chasers), which are mounted on a threading die surrounding the pipe. As the pipe is turned on the lathe, the threading die moves along the pipe's axis, producing the required spiral cut on the inner or outer surface of the pipe. Threading can be made to meet API standards or made to proprietary standards that are designed, registered, and protected by patents or other intellectual property rights mechanism and that are not specified by API standards. For instance, OCTG producers may market proprietary "semi-premium" or "premium" threaded connections that provide higher torsional loads, bending resistance, or greater sealability for casing in challenging drilling environments. Premium threaded connections generally refer to OCTG connections that have a metal-to-metal, gas type seal to ensure pressure integrity. Semi-premium connections generally refer to connections that do not have a metal-to-metal seal, yet maintain water-type sealability, and thus may be used in less demanding wells with no gas-type sealability requirements. After threading, a thread protector is applied to the threaded pipe ends during handling, transportation, or storage.

4.    Tariff classification

Subject OCTG are normally entered under HTSUS 7304.29.10.10, 7304.29.10.20,

7304.29.10.30, 7304.29.10.40, 7304.29.10.50, 7304.29.10.60, 7304.29.10.80, 7304.29.20.10,

7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60, 7304.29.20.80,

7304.29.31.10, 7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50, 7304.29.31.60,

7304.29.31.80, 7304.29.41.10, 7304.29.41.20, 7304.29.41.30, 7304.29.41.40, 7304.29.41.50,

7304.29.41.60, 7304.29.41.80, 7304.29.50.15, 7304.29.50.30, 7304.29.50.45, 7304.29.50.60,

7304.29.50.75, 7304.29.61.15, 7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75,

7305.20.20.00, 7305.20.40.00, 7305.20.60.00, 7305.20.80.00, 7306.29.10.30, 7306.29.10.90,

7306.29.20.00, 7306.29.31.00, 7306.29.41.00, 7306.29.60.10, 7306.29.60.50, 7306.29.81.10, and

7306.29.81.50.

The merchandise subject to the investigation may also enter under the following HTSUS

item numbers: 7304.39.00.24, 7304.39.00.28, 7304.39.00.32, 7304.39.00.36, 7304.39.00.40,

7304.39.00.44, 7304.39.00.48, 7304.39.00.52, 7304.39.00.56, 7304.39.00.62, 7304.39.00.68,

7304.39.00.72, 7304.39.00.76, 7304.39.00.80, 7304.59.60.00, 7304.59.80.15, 7304.59.80.20,

7304.59.80.25, 7304.59.80.30, 7304.59.80.35, 7304.59.80.40, 7304.59.80.45, 7304.59.80.50,

7304.59.80.55, 7304.59.80.60, 7304.59.80.65, 7304.59.80.70, 7304.59.80.80, 7305.31.40.00,

7305.31.60.90, 7306.30.50.55, 7306.30.50.90, 7306.50.50.50, and 7306.50.50.70.

Relevant excerpts from the Harmonized Tariff Schedule of the United States are attached

at **Exhibit I-17**.

**F.      The domestic like product proposed by the petitioner (19 C.F.R. § 207.11(b)(2)(i))**

The domestic like product is "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation."[32] The like product determination is a factual one made on a case-by-case basis.[33] The Commission generally considers the following factors: (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions; (5) common manufacturing facilities, production processes, and production employees; and, where appropriate, (6) price.[34] No single factor is dispositive. In evaluating these factors, the Commission looks for clear dividing lines and disregards minor variations.[35]

In its investigations on OCTG from China, and its investigations on OCTG from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam, cases with an almost identical scope to these petitions,[36] the Commission determined that there was a single like product, co-extensive with the scope.[37] In its last sunset review on OCTG from China in November 2020, the Commission continued to define one domestic like product that included all OCTG, co-extensive with Commerce's scope.[38] In its most recent sunset review on OCTG from

---

[32]   19 U.S.C. § 1677(10).

[33]   *See, e.g.*, *NEC Corp. v. Department of Commerce*, 36 F. Supp. 2d 380, 383 (Ct. Int'l Trade 1998).

[34]   *See, e.g.*, *Cleo Inc. v. United States,* 501 F.3d 1291, 1295 (Fed. Cir. 2007).

[35]   *Id.*

[36]   The only exception as discussed above is with regard to third country processing.  In an effort to avoid circumvention, Petitioners are including in the scope third country processing of semi-finished or "green tube."

[37]   *See USITC Pub. 4124* at 6, excerpts attached at **Exhibit I-13**, and *USITC Pub. 4489* at 12, excerpts attached at **Exhibit I-14**.

[38]   *Oil Country Tubular Goods from China*, Inv. Nos. 701-TA-463 and 731-TA-1159 (Second Review), USITC Pub. 5136 (Nov. 2020) at 6-7, excerpts attached at **Exhibit I-18**.

India, Korea, Turkey, Ukraine, and Vietnam, also completed in 2020, the Commission again found that all OCTG constituted a single domestic like product.[39]

As summarized below, the facts that supported these findings remain the same today, and the Commission should therefore find that there is one domestic like product that consists of all OCTG that are within the scope of these investigations.

*Physical Characteristics and Uses*. All OCTG, regardless of manufacturing process, share basic physical characteristics and are produced in accordance with specifications promulgated by the API. Though certain OCTG may be required or preferred in certain drilling conditions, all OCTG is used in drilling for oil or natural gas.

*Manufacturing Facilities, Production Processes and Employees*. U.S. mills produce welded and seamless OCTG on separate productions lines. Some domestic producers make both seamless and welded OCTG, though most make only one. Although the initial production processes are different for welded and seamless OCTG, the process for heat treating and finishing are the same.

*Channels of Distribution*. OCTG is primarily sold through distributors, though some OCTG is sold direct to end users.

*Interchangeability*. The Commission has found that welded and seamless OCTG are interchangeable to a large extent, with seamless OCTG capable of use in all applications while welded OCTG can be used for most applications. The degree of overlap between seamless and welded OCTG has grown over the last decade.

*Producer and Customer Perceptions*. Producers and customers perceive OCTG as a product particularly suited for one end use, the drilling for oil and gas.

---

[39] *See USITC Pub. 5090* at 7, excerpts attached at **Exhibit I-11**.

*Price*. OCTG is sold in a large price range, influenced greatly by the size and grade of OCTG.

In sum, and consistent with past cases, there is no clear dividing line between the full range of OCTG products and thus all OCTG comprise a single domestic like product.

**G.    The names of the home market countries and the name of any intermediate country through which the merchandise is transshipped (19 C.F.R. § 351.202(b)(6))**

The OCTG covered by these petitions is manufactured in and exported to the United States from Argentina, Mexico, Korea, and Russia. Petitioners do not have any evidence indicating that the subject merchandise is produced in a country other than that from which it is exported.

**H.    The names and addresses of each person believed to sell the merchandise at less than normal value and the proportion of total exports to the United States (19 C.F.R. § 351.202(b)(7)(i)(A))**

The names and addresses of the entities believed by the Petitioners to be producing and exporting subject OCTG are provided in **Exhibit I-19**. Information reasonably available to the Petitioners does not allow the identification of the proportion of total exports to the United States accounted for during the most recent twelve month period by the listed producers. Petitioners believe, however, that the companies listed in **Exhibit I-19** account for the majority of subject exports.

**I.    All factual information related to the calculation of export price and the constructed export price of the subject merchandise and the normal value of the foreign like product (19 C.F.R. § 351.202(b)(7)(i)(B))**

Volumes II, III, and IV of these Petitions contain the necessary information concerning the calculation of the export price and normal value for merchandise produced and exported from Argentina, Mexico, and Russia.

**J.      The names and addresses of each person believed to benefit from a countervailable subsidy who exports the subject merchandise to the United States and the proportion of total exports to the United States (19 C.F.R. § 351.202(b)(7)(ii)(A))**

Volume V contains countervailing duty information relating to OCTG from Korea. Volume VI contains countervailing duty information relating to OCTG from Russia. The names and addresses of the entities believed by Petitioners to be benefiting from countervailable subsidies and who have exported the OCTG subject to these petitions are provided in **Exhibit I-19**. Information reasonably available to the Petitioners does not allow the identification of the proportion of total exports to the United States accounted for during the most recent twelve month period by the listed producers. Petitioners believe, however, that the companies listed in **Exhibit I-19** account for the majority of relevant exports.

**K.      The alleged countervailable subsidies and related factual information (19 C.F.R. § 351.202(b)(7)(ii)(B))**

Volumes V and VI of these Petitions contain information concerning the alleged countervailable subsidies provided by the Government of Korea and the Government of Russia, respectively, as well as factual information relevant to the alleged countervailable subsidies such as the laws, regulations, and decrees under which the subsidies were bestowed, the manner in which the subsidies were paid, and Petitioners' estimation – to the extent practicable – of the value of the subsidies to producers and exporters of OCTG subject to these petitions.

**L.      The volume and value of the merchandise imported during the most recent two-year period (19 C.F.R. § 351.202(b)(8))**

Imports of OCTG from Argentina, Mexico, Korea, and Russia, were significant over the most recent two-year period. The volume and value of subject imports during the most recent two calendar years is contained in **Exhibit I-20**.

Barcode:4168004-02 A-357-824 INV - Investigation  -  PUBLIC VERSION

**M.    Contact information for each entity the petitioners believe imports or is likely to import the subject merchandise (19 C.F.R. § 207.11(b)(2)(iii); 19 C.F.R. § 351.202(b)(9))**

The names and contact information for those firms believed to be importers of the subject merchandise are contained in **Exhibit I-21**. The Petitioners believe that there may be a number of importers of subject OCTG that are unknown to the Petitioners at this time. The Petitioners respectfully request that Commerce and the Commission obtain this information from Customs and Border Protection. The Petitioners do not have access to this information.

**N.    Identification of pricing products (19 C.F.R. § 207.11(b)(2)(iv))**

The Petitioners request that the Commission collect pricing data on U.S. shipments to unrelated U.S. distributors for the following pricing products:

- <u>Product 1</u> – Tubing, Grade L-80, 2 7/8" O.D., 6.5 lbs./ft., threaded and coupled, range 2, seamless.

- <u>Product 2</u> – Tubing, Grade J-55, 2 3/8" O.D., 4.7 lbs./ft., threaded and coupled, range 2, welded.

- <u>Product 3</u> – Casing, Grade P-110, 5 1/2" O.D., 20.0 lbs./ft., threaded and coupled, range 3, welded.

- <u>Product 4</u> – Casing, Grade P-110, 5 1/2" O.D., 17.0 lbs./ft., threaded and coupled, range 3, seamless.

**O.    Lost sales and revenue (19 C.F.R. § 207.11(b)(2)(v))**

Petitioners are submitting, separately, Lost Sales/Lost Revenue Allegations using the Commission's template form. Petitioners expect that purchaser responses to the Commission's Lost Sales/Lost Revenues Survey, combined with other evidence developed during the investigations, will confirm significant domestic industry lost sales and revenues and other indicia of adverse price effects.

24

## II.    INJURY INFORMATION

According to the Act, a domestic industry is entitled to AD/CVD relief if it is experiencing material injury or the threat of material injury by reason of unfairly traded imports.[40] The statute defines "material injury" as "harm which is not inconsequential, immaterial, or unimportant."[41] When assessing if a domestic industry is materially injured, or threatened with material injury, "by reason of" dumped imports, the Commission examines the "significance" of the volume and price effects of such imports, and the impact of those imports on the condition of the domestic industry.[42] In assessing the impact of dumped imports on the state of the industry, the Commission must account for the prevailing conditions of competition in the United States for the subject imports and the domestic like product.[43] As described below, the domestic industry producing OCTG is both suffering from material injury and threatened with further material injury by reason of dumped and subsidized imports of OCTG from Argentina, Mexico, Korea, and Russia.

### A.    The Domestic like product consists of all OCTG covered by the scope

In determining whether an industry in the United States has suffered material injury or is threatened with material injury, the Commission first defines the domestic like product, *i.e.*, "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation."[44] As noted in Section I.F, above, there is a single domestic like product consisting of all OCTG covered by the scope.

---

[40]    19 U.S.C. §§ 1671, 1673.

[41]    19 U.S.C. § 1677(7)(A).

[42]    19 U.S.C. § 1677(7)(B)(i)

[43]    19 U.S.C. § 1677(7)(C)(iii).

[44]    19 U.S.C. § 1677(10).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-02 A-357-824 INV - Investigation  -  PUBLIC VERSION

### B.    The domestic industry consists of U.S. producers of the like product

Section 771(4)(A) of the Act defines the relevant industry as the domestic "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[45] In past proceedings, the Commission has found the domestic industry to include both U.S. mills that produce OCTG and processors that engage in heat treatment.[46]

Section 771(4)(B) of the Act, however, allows the Commission, if appropriate circumstances exist, to exclude from the domestic industry producers that are related to an exporter or importer of subject merchandise or which are themselves importers.[47] Exclusion of such a producer is based upon the facts presented in each investigation, with the Commission examining, amongst others, the following factors:

1. the percentage of domestic production attributable to the importing producer;

2. the reason the U.S. producer has decided to import the product subject to investigation (whether the firm benefits from the LTFV sales or subsidies or whether the firm must import in order to enable it to continue production and compete in the U.S. market);

3. whether inclusion or exclusion of the related party will skew the data for the rest of the industry;

4. the ratio of import shipments to U.S. production for the imported product; and

5. whether the primary interest of the importing producer lies in domestic production or importation.[48]

---

[45]    19 U.S.C. § 1677(4)(A).

[46]    *See*, *e.g.*, *USITC Pub. 5090* at 7-8, excerpts attached at **Exhibit I-11**.

[47]    *See Torrington Co. v. United States*, 790 F. Supp. 1161, 1168 (Ct. Int'l Trade 1992), *aff'd without opinion*, 991 F.2d 809 (Fed. Cir. 1993); *Sandvik AB v. United States*, 721 F. Supp. 1322, 1331-32 (Ct. Int'l Trade 1989), *aff'd mem.*, 904 F.2d 46 (Fed. Cir. 1990); *Empire Plow Co. v. United States*, 675 F. Supp. 1348, 1352 (Ct. Int'l Trade 1987).

[48]    *Changzhou Trina Solar Energy Co. v. USITC*, 100 F. Supp.3d 1314, 1326-31 (Ct. Int'l. Trade 2015); *see also Torrington Co. v. United States*, 790 F. Supp. at 1168.

26

For these petitions, while the domestic industry consists of the U.S. producers and processors of OCTG (the domestic like product), two domestic producers, Tenaris and SeAH Steel USA, fall under the related party provision. Tenaris is a related party as a producer of the subject merchandise in Argentina and Mexico. Tenaris' subsidiary in Argentina, Siderca, has the capacity to produce 900,000 tons of seamless OCTG.[49] In Mexico, Tubos de Acero de México, S.A. ("TAMSA" or "TenarisTamsa") has the capacity to produce 1,230,000 tons of seamless OCTG per year, 70 percent of which is exported.[50] Not only does Tenaris import the subject merchandise from those two countries into the United States, but it also sells (and likely imports) subject merchandise from Russia as part of a distribution agreement with Russian producer TMK.[51] In fact, the distribution agreement with TMK was part of the agreement between Tenaris and TMK, under which Tenaris acquired IPSCO Tubulars in the United States to lock in the ability to sell Russian subject merchandise for six years as the "exclusive distributor of TMK's OCTG" in the United States.[52] Similarly, SeAH Steel USA is a related party as a subsidiary of Korean producer and exporter SeAH Steel, which has the capacity to produce over 2.2 million

---

[49]   Tenaris, Environmental Production Declaration: Oil Country Tubular Goods OCTG, Version 2.2 (Revised Oct. 19, 2018) at 4, attached as **Exhibit I-5**.

[50]   *Id*. and TenarisTamsa, Industrial Center at Slide 3, attached as **Exhibit I-6**.

[51]   Tenaris is also a future producer in Russia. In 2019, Tenaris and Severstal announced a joint venture to build a welded OCTG pipe mill in Russia that would have an annual production capacity of 300,000 tons. *Tenaris and Severstal to form joint venture to build a welded pipe plant in West Siberia*, Tenaris Website (Feb. 5, 2019), attached as **Exhibit I-8**. Tenaris and Severstal paused construction activities on this plant in March 2021 due to demand conditions. *Tenaris and Severstal provide update on the status of their welded pipe plant in West Siberia*, Tenaris Website (Mar. 15, 2021), attached as **Exhibit I-9**. Despite this pause, Tenaris' decision indicates that when demand returns, it will be invested not only in exporting Russian OCTG to the U.S. market produced by TMK, but also Russian-made OCTG produced in its own joint venture facility with Severstal.

[52]   Press Release, Tenaris completes acquisition of IPSCO Tubulars from TMK, Tenaris Website (Jan. 2, 2020), attached as **Exhibit I-7**.

tons of steel pipes and plates each year.[53] As such, and based on the record developed in these investigations, the Commission may decide to exclude Tenaris and SeAH Steel USA from the domestic industry.

Petitioners reserve the right to comment further on this or on any other related party issues that may arise during the course of the investigations at a later date.

### C.     Subject imports are not negligible

Pursuant to 19 U.S.C. § 1677(24)(A)(i), imports are not considered to be negligible if they account for at least three percent of the volume of all such merchandise imported into the United States in the most recent twelve-month period for which data are available that precedes the filing of the petitions.

In this case, the most recent twelve-month period for which data are available is August 2020 through July 2021. The data show that imports of OCTG from Argentina accounted for 11.7 percent of total imports by volume, imports from Mexico accounted for 22.5 percent, imports from Korea accounted for 39.2 percent, and imports from Russia accounted for 8.3 percent.[54] Therefore, pursuant to 19 U.S.C. § 1677(24), imports from each subject country are not negligible.

### D.     Subject imports should be cumulated

For the purposes of evaluating volume and price effects for a determination of material injury, the statute directs the Commission to cumulate imports from all subject countries as to which petitions were filed on the same day if such imports compete with each other and the

---

[53]     SeAH Steel Webpages, attached as **Exhibit I-10**.

[54]     *See* Negligibility Analysis, attached at **Exhibit I-22**.

domestic like product in the U.S. market.[55] In assessing whether subject imports compete with each other and the domestic like product, the Commission generally considers four factors: (1) the degree of fungibility between subject imports from each country and between subject imports and the domestic like product; (2) the presence of sales or offers to sell in the same geographic markets; (3) the existence of common or similar channels of distribution; and (4) whether the subject imports are simultaneously present in the U.S. market.[56] Only a reasonable overlap of competition is required.[57] In this case, these petitions are all being filed on the same day, and, as described in more detail below, each of the factors the Commission considers supports a finding that imports of OCTG from all subject countries compete with each other and with the domestic like product. The Commission should therefore cumulate subject imports in its determination of material injury, and the remainder of the injury analysis in these petitions is presented on a cumulated basis.

    1.   <u>Fungibility</u>

OCTG from all subject countries and the domestic like product are fungible. The Commission has previously found, including in prior proceedings involving OCTG from Korea, that "{c}asing and tubing products, regardless of source, are generally produced in accordance with standards set by the API" and that, despite minor limitations in fungibility between welded and seamless OCTG, different grades of OCTG, as well as finished OCTG and green tube, there is "a sufficient degree of substitutability" to establish that products from different sources are

---

[55]  19 U.S.C. § 1677(7)(G)(i).

[56]  *See, e.g., Low Melt Polyester Staple Fiber from Korea and Taiwan*, Inv. Nos. 731-TA-1378-1379 (Final), USITC Pub. 4808 (Aug. 2018) at 7.

[57]  *See id*.

fungible for purposes of a cumulation analysis.[58] Furthermore, the Commission has found that seamless OCTG can be used for any welded OCTG application, and while seamless OCTG is required only for certain high-stress applications, however, the Commission has found that the differences between seamless and welded OCTG do not significantly limit competition."[59]

### 2.     Channels of distribution

Most shipments of OCTG from domestic producers are through distributors to end users who consume the OCTG in oil and gas exploration activities,[60] and imports of OCTG from each of the subject countries are also ultimately sold to the same end users, whether through distributors or direct.

### 3.     Geographic overlap

The Commission has previously found that domestically produced OCTG and imports from OCTG from Korea are sold throughout the United States.[61] The same is true for imports of OCTG from each of the other subject countries. The import statistics attached at **Exhibit I-20** show that OCTG from each of the subject countries entered at ports in all regions of the country, including the Northeast, Midwest, Southeast, Central Southwest, Mountains, and Pacific Coast.

---

[58]   *See, e.g.*, *USITC Pub. 4489* at 21-22, excerpts attached at **Exhibit I-14**. The Commission has also accounted for different sources concentrating in different OCTG grades and connection types but has found sufficient overlap in concluding that OCTG from different sources are fungible. *See id.* at 22.

[59]   *Id.* at 31.

[60]   *See, e.g.*, *id.* at 23.

[61]   *USITC Pub. 5090* at II-4, excerpts attached at **Exhibit I-11**.

4.    <u>Simultaneous presence in the market</u>

Imports of OCTG from each of the subject countries have been present in nearly every month of the period of investigation.[62] Subject imports and the domestic like product are thus simultaneously present in the market.

5.    <u>Conclusion</u>

Subject imports from Argentina, Korea, Mexico, and Russia and the domestic like product are fungible, are present in the same distribution channels, overlap geographically, and are simultaneously present in the U.S. market. Thus, each of the factors the Commission considers regarding cumulation supports cumulating subject imports from all four countries in these investigations.

**E.    Conditions of Competition**

1.    <u>Subject Imports and Domestically Produced OCTG are Substitutable and Primarily Sold on the Basis of Price</u>

As discussed above, the Commission has previously found that OCTG is produced according to API standards and specifications, specifically API specification 5CT, which encompasses a number of grades for casing and tubing. For OCTG produced and sold to the same API grade and type, the Commission has found that there is a "moderate to high degree of substitutability between U.S.-produced OCTG and imported OCTG."[63] While certain import sources may primarily supply either seamless OCTG or welded OCTG, the Commission has found that there is a "significant degree of interchangeability between welded and seamless OCTG."[64] Moreover, because the domestic industry produces both seamless and welded OCTG,

---

[62]    *See* Import Statistics, attached at **Exhibit I-20**.

[63]    *USITC Pub. 4489* at 30, excerpts attached at **Exhibit I-14**.

[64]    *Id*. at 31.

a subject country's imports — whether seamless or welded — compete at least with the domestic industry's production of that type of product.

As subject imports and domestically produced OCTG are substitutable, purchasing decisions primarily are made on the basis of price. The Commission has confirmed this phenomenon in past proceedings, recently finding that "price is an important factor in purchasing decisions."[65]

<div align="center">

2.    <u>Demand is Tied to Oil and Gas Activity</u>

</div>

The Commission consistently has found that overall U.S. demand for OCTG is cyclical and largely driven by oil and natural gas activity, with demand for OCTG generally rising in conjunction with higher oil prices and demand for oil and gas.[66]

Starting in 2019, oil prices fell sharply, as did drilling activity. The U.S. rotary rig count fell from 1,083 rigs at the end of 2018 to just 805 rigs at the end of 2019, a drop of 25.7 percent.[67] Then, in the Spring and Summer of 2020, the rig count dropped even more precipitously, bottoming out at a historically low 244 rigs in August 2020.[68] Even after a slight recovery, the rig count was still only 351 rigs by the end of 2020, which is a 56.4 percent drop from the same period the year before.[69] With the onset of the COVID-19 pandemic and resulting economic contraction, oil prices plummeted and reached negative territory for the first time in

---

[65]    *USITC Pub. 5090* at 30, attached at **Exhibit I-11**.

[66]    *See*, *e.g.*, *Id.* at 22.

[67]    *See* Baker Hughes Rig Count Data, attached at **Exhibit I-23**.

[68]    *See id*.

[69]    *See id*.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

history in April of 2020.[70] By the last count of the period of investigation in June 2021, the rig count still only totals 470 rigs, which is less than half of the period of investigation high.[71]

U.S. Oil & Gas Rig Count[72]



As a result of these declines in oil and gas activity, apparent consumption for OCTG cratered by [    ] percent from 2018 to 2020, and then fell again by [    ] percent from the first half of 2020 to the first half of 2021.

3.      The Domestic Industry Is A Reliable Supplier of OCTG

The domestic industry is the largest supplier of OCTG in the U.S. market, representing more than half the U.S. market since 2018.[73] The domestic industry has not experienced any

---

[70]   Camila Domonoske, "Free Fall: Oil Prices Go Negative," NPR.Org (Apr. 20, 2020), attached at **Exhibit I-24**.

[71]   *See* Baker Hughes Rig Count Data, attached at **Exhibit I-23**.

[72]   *See id*.

[73]   *See* Section II.F.1 below.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED
Barcode:4168004-02 A-357-824 INV - Investigation  -  PUBLIC VERSION

significant supply constraints and U.S. mills have substantial unutilized capacity with which to increase production.[74]

### F.    Subject imports are causing material injury to the domestic industry

In determining whether a domestic industry is experiencing present material injury by reason of unfairly traded imports, the Commission must consider: (1) the volume of subject imports; (2) the effect of imports of subject merchandise on U.S. prices for the domestic like product; and (3) the impact of subject imports on the domestic industry.[75] In this case, each factor favors a finding of present material injury.

#### 1.    The volume of subject imports is significant

In assessing the volume of subject imports, the Commission must "consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."[76]

The volume of cumulated imports of OCTG from Argentina, Korea, Mexico, and Russia is significant, particularly when viewed in light of the massive decline in apparent consumption during the period of investigation. While subject imports declined in absolute terms from 2018-2020, subject imports maintained a significant share of the market during this period, never falling below [     ] percent during the period of investigation.

---

[74]    *See* Petitioners' Confidential Data, attached at **Exhibit I-1**.

[75]    19 U.S.C. § 1677(7)(B).

[76]    19 U.S.C. § 1677(7)(C)(i).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Barcode:4168004-02 A-357-824 INV - Investigation  -    PUBLIC VERSION

Subject Imports and Market Share[77]
Short Tons

| | | 2018 | 2019 | 2020 | Jan-Jun 2020 | Jan-Jun 2021 | |
|---|---|---|---|---|---|---|---|
| Domestic Shipments | [ | | | | | | ] |
| Subject Imports | | 1,352,970 | 1,042,492 | 532,296 | 331,812 | 484,533 | |
| Nonsubject Imports | | 1,377,308 | 1,238,082 | 517,473 | 405,848 | 216,536 | |
| Apparent Consumption | [ | | | | | | ] |
| Domestic % | [ | | | | | | ] |
| Subject % | [ | | | | | | ] |
| Nonsubject % | [ | | | | | | ] |

Despite the massive decline in apparent consumption, which continued into the first half

of 2021, subject imports actually increased on an absolute basis in the first half of 2021

compared to the first half of 2020, from 331,812 ST to 484,533 ST, a 46 percent increase. As a

result, subject import market share increased by [      ] percentage points across the interim

periods. Indeed, subject import market share peaked in the first half of 2021, reaching [      ]

percent, and is [      ] percentage points higher than at the beginning of the period of

investigation.

These increases came at the expense of the domestic industry, which [


]. Although

the domestic industry was able to [


] as subject imports surged into the U.S. market.

---

[77]    *See* Import Statistics, attached at **Exhibit I-20**. Domestic shipments are from [
], excerpts attached at **Exhibit I-2**.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-02 A-357-824 INV - Investigation   -   PUBLIC VERSION

The volume of subject imports is thus significant both in absolute terms and relative to consumption, and the increase in subject import volume market share over the period is also significant.

> 2.    <u>Subject imports have had significant adverse price effects</u>

In evaluating the effect of subject imports on prices, the Commission must consider whether "there has been significant price underselling by the imported merchandise," and whether the effect of imports "otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree."[78] Subject imports of OCTG have undersold the domestic like product, and these imports also depressed and suppressed prices to a significant degree over the period of investigation.

As discussed above, subject imports increased market share significantly late in the period of investigation at the expense of the domestic industry. Given the substitutability of imported and domestic OCTG and the fact that OCTG is sold primarily on the basis of price, such market share gains by subject imports were achieved through low-price leadership. Publicly available information indicates that subject imports of OCTG entered the U.S. market at lower prices than the domestic like product. As shown below, subject import AUVs from all subject countries were lower than U.S. commercial shipment unit values throughout the period of investigation, but particularly late in the period when subject imports surged and captured significant market share at the expense of the domestic industry. As such, Petitioners expect that pricing data collected by the Commission with respect to the pricing products set out above will confirm significant subject import underselling during the period of investigation.

---

[78]    19 U.S.C. § 1677(7)(c)(ii).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Barcode:4168004-02 A-357-824 INV - Investigation -    PUBLIC VERSION

Comparison of Subject Import AUVs and
Petitioners' U.S. Commercial Shipment Unit Values[79]
$/MT

| | | 2018 | 2019 | 2020 | Jan–June 2020 | Jan–June 2021 | |
|---|---|---|---|---|---|---|---|
| Petitioners' U.S. Commercial Shipments | [ | | | | | | ] |
| Argentina | | $1,286.41 | $1,409.85 | $1,265.41 | $1,344.59 | $1,022.10 | |
| Korea | | $892.03 | $922.75 | $711.91 | $706.97 | $848.70 | |
| Mexico | | $1,405.97 | $1,553.81 | $1,418.12 | $1,508.62 | $1,260.90 | |
| Russia | | $925.78 | $903.74 | $700.60 | $697.92 | $598.63 | |
| Argentina % | [ | | | | | | ] |
| Korea % | [ | | | | | | ] |
| Mexico % | [ | | | | | | ] |
| Russia % | [ | | | | | | ] |

There is also evidence that subject imports suppressed domestic producer prices.

Petitioners' ratio of cost-of-goods-sold to sales [



],[80] [




].[81] This price suppression occurred

[                                                                              ].

Finally, significant volumes of low-priced subject imports have resulted in lost sales and

lost revenues, which further evidence the adverse price effects caused by subject imports. Such

---

[79]    *See* Import Statistics, attached at **Exhibit I-20**. *See also* Petitioners' Data, attached at **Exhibit I-1**.

[80]    [

                                                          ]. *See* Section II.F.1 above.

[81]    *See* Petitioners' Data, attached at **Exhibit I-1**. Moreover, domestic producer pricing in reaction to the sharp increase in subject import market share in H1-2021 may reflect price depression, though such behavior would only be apparent after the period of investigation. The Commission should take note of the likely price depression that would be occurring in reaction to low subject import pricing and loss of market share, and not discount this likelihood merely because data of such depression is not yet available.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

lost sales and lost revenues are reflected in the domestic industry's market share losses and

[                                    ] late in the period of investigation. Petitioners are separately submitting

Lost Sales/Lost Revenue Allegations using the Commission's template form. Petitioners expect

that purchaser responses to the Commission's Lost Sales/Lost Revenues Survey, combined with

other evidence developed during the investigations, will confirm significant domestic industry

lost sales and revenues and other indicia of adverse price effects during the period of

investigation.

     In short, subject imports have caused significant adverse price effects.

     3.   <u>Subject imports have had a significant adverse impact on the domestic industry</u>

     In examining the impact of subject imports on the domestic industry, the Commission is

instructed to "evaluate all relevant economic factors which have a bearing on the state of the

industry, in the United States."[82] These factors include, but are not limited to:

- Actual and potential declines in output, sales, market share, profits, productivity, return on investments, and utilization of capacity;
- Factors affecting domestic prices;
- Actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment;
- Actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product; and
- The magnitude of the margin of dumping.[83]

As explained in more detail below, these factors support a determination that the domestic

industry has been materially injured by subject imports.

---

[82]  19 U.S.C. § 1677(7)(c)(iii).

[83]  *Id*.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Subject imports gained market share at the expense of the domestic industry over the period of investigation. Subject import market share increased from [     ] percent in 2018 to [     ] percent in the first half of 2021.[84] The increases came in part at the expense of the domestic industry, whose market share declined from [     ] percent in 2018 to [     ] percent in the first half of 2021.[85] Yet the loss of market share by the domestic industry to subject imports over the entire period of investigation is not the whole story. During the first part of the period of investigation, from 2018 to 2020, the domestic industry gained [    ] percentage points of market share, [                                        ]. As such, the loss in market share to subject imports was particularly acute from interim 2020 to interim 2021, as subject import share rose [


].

As subject imports seized market share from domestic producers from 2020 to 2021, an already difficult situation for the domestic industry got even worse. After already having to reduce commercial shipments by [     ] percent from 2018 to 2020, Petitioners' U.S. commercial shipments dropped by another [     ] percent from interim 2020 to interim 2021, and its production also fell by [     ] percent.[86] As a result, Petitioners' capacity utilization rate dropped to a period of investigation low of [     ] percent in interim 2021.[87] These declines were not just due to a drop in demand. While apparent consumption did fall by [     ] percent from interim

---

[84]   *See* Section II.F.1, above.

[85]   *See id.*

[86]   *See* Petitioners' Data, attached at **Exhibit I-1**.

[87]   *See id.*

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

2020 to interim 2021, Petitioners' shipments and production fell even more sharply as rising subject imports took market share from the domestic industry.[88] In other words, when the market finally started to rebound, even if only modestly, subject imports rushed into the market, using low prices to take market share. Subject imports thus not only deprived the domestic industry of the opportunity to participate in slowly recovering demand – subject imports also eroded the domestic industry's existing market share.

As rising low-priced imports took market share and undercut domestic prices, the Petitioners were unable to improve their financial position, even as the rig count began to rebound, with demand in the first half of 2021 exceeding demand in the second half of 2020. The value of U.S. commercial shipments from interim 2020 to interim 2021 [

                            ], the [

    ], and the ratio of cost of goods sold to sales [                              ].[89] As a result, Petitioners were unable [

              ] interim 2021. Indeed, given that domestic producers were [




                              ].

For all of these reasons, the Commission should find that the domestic OCTG industry has been materially injured by imports of OCTG from Argentina, Korea, Mexico, and Russia.

---

[88]  *See* Section II.F.1, above.

[89]  *See* Petitioners' Data, attached at **Exhibit I-1**.

Barcode:4168004-02 A-357-824 INV - Investigation  -  PUBLIC VERSION

**G.    Subject imports threaten the domestic industry with additional material injury**

In examining the threat of material injury by subject imports, the statute directs the Commission to consider a number of specific factors, including: (1) an increase in foreign producers' productive capacity or existing unused capacity; (2) a significant rate of increase of the volume or market penetration of the subject imports; and (3) the likelihood that imports of the subject merchandise are entering at prices that will have a significant depressing or suppressing effect on domestic prices.[90] Based on these criteria, there is ample evidence that subject imports of OCTG present an imminent threat of additional material injury to the U.S. industry.

1.    <u>Cumulative assessment of threat</u>

Under the statute, the Commission may "cumulatively assess the volume and price effects of imports of the subject merchandise" with respect to petitions which were filed on the same day, if such products compete with each other and with the domestic like product.[91] As discussed in Section II.D above, imports of subject merchandise from Argentina, Korea, Mexico, and Russia are fungible and compete directly with each other and the domestic like product. Additionally, these petitions are being filed on the same day. The Commission should therefore assess the cumulative impact of such imports when determining whether imports threaten additional material injury.

---

[90]    19 U.S.C. § 1677(7)(F)(i).

[91]    19 U.S.C. § 1677(7)(H).

2.    Countervailable subsidies encourage production and export of OCTG from Korea and Russia

As part of its threat analysis, the Commission must consider "if a countervailable subsidy is involved" and, in particular, "whether the countervailable subsidy is a subsidy described in Article 3 or 6.1" of the WTO Agreement on Subsidies and Countervailing Measures.[92] Article 3 of the WTO Subsidies Agreement describes subsidies that are prohibited because they are contingent upon export performance or upon the use of domestic over imported goods.[93]

As documented in Volume V of these petitions, the Government of Korea has in place numerous subsidy programs to encourage and finance the production and the export of OCTG. Korean government entities encourage OCTG producers to export in numerous ways, including:

- Export-Import Bank of Korea Subsidy Programs;
- Korea Development Bank's Short-Term Discounted Loans for Export Receivables;
- K-SURE Export Credit Insurance; and
- K-SURE Export Credit Guarantees.

As documented in Volume VI of these petitions, the Government of Russia also has in place numerous subsidy programs to encourage and finance the production and the export of OCTG. Russian government entities encourage OCTG producers to export in numerous ways, including:

- Eximbank Exports Credit Support Program;
- Eximbank Tender Guarantees;
- Eximbank Guarantees of Return of Advanced Payment;

---

[92]   19 U.S.C. § 1677(7)(F)(i)(I).

[93]   Agreement on Subsidies and Countervailing Measures (April 14, 1994), Marrakesh Agreement Establishing the World Trade Organization, Annex 1, 1867 U.N.T.S. 14, at Art. 3.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-02 A-357-824 INV - Investigation  -  PUBLIC VERSION

- Eximbank Guarantees of Performance of Services Specified in Export Contract; and

- Eximbank Payment Guarantees.

These export subsidies encourage Korean and Russian producers to export their production, thus exacerbating the threat posed by subject imports.

       3.   <u>Subject producers have large and growing capacity and exports</u>

Subject producers have large OCTG production capacities and are focused on growing their production and exports.

- As stated above, Tenaris' subsidiary in Argentina, Siderca, has the capacity to produce 900,000 tons of seamless OCTG per year.[94]

- In Mexico, TenarisTamsa has the capacity to produce 1,230,000 tons of seamless OCTG per year, 70 percent of which is exported.[95]

- Korean producer Iljin opened a new seamless tube plant in 2012 with a capacity of 300,000 tons per year and has received a number of technology awards from the Government of Korea.[96]

- Korean producer Husteel has four pipe and tube production lines with an annual capacity of 240,000 metric tons, and it exports around the world.[97]

- The Chelpipe group, a Russian producer recently acquired by TMK, is one of the largest pipe producers in the world, with annual production of two million tons, and it advertises that it serves the global energy industry.[98]

- TMK is Russia's largest pipe producer and exporter. It has seven plants with 4.8 million tons of annual capacity but less than 3 million tons of sales.[99]

---

[94]   *See* Tenaris, Environmental Production Declaration: Oil Country Tubular Goods OCTG, Version 2.2 (Revised Oct. 19, 2018) at 4, attached as **Exhibit I-5**.

[95]   *Id.* and TenarisTamsa, Industrial Center at Slide 3, attached as **Exhibit I-6**.

[96]   ILJIN Steel Corporation, "Your Best Partner", at 3, attached as **Exhibit I-25**.

[97]   Husteel Industry Group, Steel Pipe & Fittings, attached as **Exhibit I-26**. (https://www.husteel-group.com/product.html)

[98]   Chelpipe Group, About Us, attached as **Exhibit I-27**.

[99]   TMK Who We Are, attached as **Exhibit I-28**.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Not only are subject foreign producers large and export-oriented – they are also likely to have substantial excess capacity. TMK's website materials alone suggest it has over a million tons of unused capacity.[100] Unused production capacity indicates an ability to substantially increase exports in the future, posing a threat of material injury to domestic producers.[101] This is particularly true here, as many producers have established pathways into the U.S. market. For example, Tenaris not only exports the subject merchandise from Argentina and Mexico to the United States, but also exports subject merchandise from Russia as part of a distribution agreement with Russian producer TMK,[102] who, as set out above, has over a million tons of unused capacity. Moreover, given the sharp global downturn in energy markets, subject foreign producers are desperately searching for any outlet for their production and unused capacity. The attractive U.S. market will continue to be a prime target for these foreign producers. Substantial excess capacity indicates that producers in all four countries have the ability to further increase exports if orders are not imposed.

> 4.    Other trade measures incentivize subject producers to export to the U.S. market

OCTG from Korea, Mexico, and Russia are currently subject to trade measures in third countries. In Canada, there is currently an AD measure in place on imports of OCTG from

---

[100]    *Id.*

[101]    *See* 19 U.S.C. § 1677(7)(F)(i)(II).

[102]    Tenaaris is also a future producer in Russia. In 2019, Tenaris and Severstal announced a joint venture to build a welded OCTG pipe mill in Russia that would have an annual production capacity of 300,000 tons. *Tenaris and Severstal to form joint venture to build a welded pipe plant in West Siberia*, Tenaris Website (Feb. 5, 2019), attached as **Exhibit I-8**. Tenaris and Severstal paused construction activities on this plant in March 2021 due to demand conditions. *Tenaris and Severstal provide update on the status of their welded pipe plant in West Siberia*, Tenaris Website (Mar. 15, 2021), attached as **Exhibit I-9**. Despite this pause, Tenaris' decision indicates that when demand returns, it will be invested not only in selling imported Russian OCTG produced by TMK but also in producing Russian-made OCTG in its own joint venture facility with Severstal.

44

Appx278

Korea.[103] On July 15, 2021, Canada also initiated an AD investigation concerning OCTG from Mexico, recently publishing a preliminary determination notice setting provisional duties at 51.1 percent *ad valorem* for TenarisTamsa and 128.4 percent *ad valorem* for all others.[104] In addition, the European Union has in place, and recently extended,[105] a safeguard on steel imports, which includes quota restrictions on imports of OCTG from Korea, Mexico, and Russia.[106] These trade measures, particularly the volume quotas applied to imports into the European Union, leave subject producers with excess OCTG production and inventories looking for a market. As the United States is the biggest market for OCTG, these barriers incentivize producers to redirect their exports to the U.S. market.

5.    Facilities in the subject countries that are currently being used to make other products could be used to produce OCTG

The Act provides that, in weighing the threat to the domestic industry, the Commission must consider "the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products."[107] With regards to OCTG, the potential for product shifting is substantial. As the Commission has recognized, OCTG is one of the highest-valued pipe and tube products, and producers generally have a strong incentive to shift capacity that is currently being used to make other product in order to increase their production of OCTG to either take advantage of higher

---

[103]   Committee on Anti-Dumping Practices, Canada: Semi-Annual Report Under Article 16.4 of the Agreement, WTO Doc. G/ADP/N/350/CAN (Mar. 15, 2021) at 18, attached at **Exhibit I-29**.

[104]   Canada Border Service Agency, Statement of Reasons Concerning Dumping Investigation of OCTG from Mexico (Jul. 15, 2021) and Notice of Preliminary Determination, attached at **Exhibit I-30**.

[105]   European Commission Directorate-General for Trade, "EU prolongs steel safeguard for three years," June 25, 2021, attached at **Exhibit I-31**.

[106]   Commission Implementing Regulation (EU) 2019/159, 2019 O.J. (L 31/27) at 62 and 69-70, attached at **Exhibit I-32**.

[107]   19 U.S.C. § 1677(7)(F)(i)(VI).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Barcode:4168004-02 A-357-824 INV - Investigation   -   PUBLIC VERSION

prices or to avoid trade remedy measures on other pipe and tube products.[108] In particular, subject producers in Korea and Russia have added incentive to switch from the production of seamless carbon and alloy steel standard, line, and pressure pipe to production of OCTG due to recently issued antidumping and countervailing duty orders on those products.[109] Thus, this factor also supports an affirmative threat determination.

> 6.  Subject producers have demonstrated their ability to rapidly penetrate the U.S. market

As documented above, imports of OCTG from Argentina, Korea, Mexico, and Russia are significant and gained market share over the period of investigation, particularly in the first half of 2021. *See* Section II.F.1, above. Subject imports gained [     ] percentage points of market share from interim 2020 to interim 2021. Absent relief, the domestic industry will continue to be forced to compete with large volumes of low-priced subject imports. Such increases in subject market share will be even more injurious as demand continues to languish at all-time lows. As demonstrated in Section II.F.1, above, the U.S. rig count is currently less than half of what it was at in 2018, and, although there has been a slight recovery, there are no signs rig activity will recover to prior levels anytime soon. In short, trends during the period of investigation confirm that subject producers will continue to rapidly increase their share of the U.S. market in the absence of antidumping and countervailing duties.

---

[108]   *Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico*, Inv. Nos. 701-TA-364 and 731-TA-711, and 713-716 (Review), USITC Pub. 3434 (June 2001) at 16, attached at **Exhibit I-33** and *USITC Pub. 4124* at 20, attached at **Exhibit I-13** (stating that production facilities that currently produce other pipe products have the potential to be shifter to producing OCTG, and are incentivized to do so to avoid trade remedy measures on other pipe products).

[109]   *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe From the Republic of Korea, the Russian Federation, and Ukraine: Antidumping Duty Orders*, 86 Fed. Reg. 47,055 (Dep't Commerce Aug. 23, 2021) and *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe From the Republic of Korea and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 47,060 (Dep't Commerce Aug. 23, 2021).

46

Appx280

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

7.    Subject imports will likely enter at prices that will further undersell and suppress and/or depress U.S. prices

Producers of subject merchandise are likely to continue to use aggressive underselling to gain market share if orders are not imposed. As demonstrated in Section II.F.2, above, information available to Petitioners indicates that importers of OCTG from Argentina, Korea, Mexico, and Russia are engaged in pervasive underselling of the domestic like product. This underselling has also suppressed, and likely depressed, U.S. prices. If relief is not imposed, these trends will worsen.

8.    Rising volumes of low-priced imports will further injure the domestic industry

The domestic industry is not just vulnerable to further material injury – it is on the brink of collapse. Petitioners' capacity utilization rate at the end of the period of investigation was only [     ] percent. The industry has suffered [

]. The domestic industry has been decimated by layoffs, such as those made by PTC Liberty in January 2021, in which it was forced to lay off 185 workers (out of its total workforce of more than 340) at its facility in Liberty, Texas.[110] While energy prices and drilling activities are starting to recover from historical lows, the market remains at severely depressed levels and is not expected to fully recover any time soon. If orders are not imposed, any continued low-priced OCTG imports from Argentina, Korea, Mexico, and Russia will decimate what remains of the domestic industry.

Importers will use aggressive underselling to continue seizing market share. Domestic producers will be forced to choose between foregoing shipments and lowering prices in order to

---

[110]   Mahoney, Noi, "185 Texas workers laid off from metal supplier", Freight Waves (Jan. 4, 2021), attached at **Exhibit I-34**.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED
Barcode:4168004-02 A-357-824 INV - Investigation  -    PUBLIC VERSION

compete, a particularly difficult choice in a time of continued poor demand and [                    ] low capacity utilization rates. As demonstrated above, despite slight increases in demand after the market bottomed out in late 2020, Petitioners have not seen any substantial improvement of their financial position due to those increases, as subject imports swooped in at unfairly low prices, taking market share away from a domestic OCTG industry that could not spare any. As such, the domestic industry's employment, operating profits, and net income all suffered. Further increases in unfairly traded imports will only worsen these dire trends if orders are not imposed.

9. Conclusion

In sum, the statutory factors the Commission must consider in deciding threat of injury indicate that there is an imminent threat of further material injury from subject imports. Existing volume and price trends would lead to further injury if they continue without relief. The industries in Argentina, Korea, Mexico, and Russia have ample and growing capacity to export in ever more injurious quantities, and they have every incentive to do so given the relatively attractive U.S. market and third-country trade measures blocking their shipments. The Korean and Russian governments, moreover, are encouraging more exports in the sector, including through prohibited export subsidies. These circumstances create a serious threat of further material injury and even extinction to an extremely vulnerable domestic industry and its workers.

## III.    CONCLUSION

Petitioners respectfully requests that Commerce initiate antidumping and countervailing duty investigations on OCTG from Argentina, Korea, Mexico, and Russia, that the Commission find that the domestic industry is materially injured or threatened with injury by these imports, and that antidumping and countervailing duty orders be imposed to offset the dumping and subsidies found.

\*        \*        \*

Respectfully submitted,

Thomas M. Beline
Myles S. Getlan
Mary Janes Alves
Jack A. Levy
CASSIDY LEVY KENT (USA) LLP
900 19th Street NW
Suite 400
Washington, DC 20006
(202) 567-2300
*Counsel to U. S. Steel Tubular Products, Inc.*

Roger B. Schagrin
Christopher T. Cloutier
Jeffrey D. Gerrish
Luke A. Meisner
William A. Fennell
Benjamin J. Bay
Michelle R. Avrutin
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700
*Counsel to Borusan Mannesmann Pipe USA, Inc., PTC Liberty Tubulars LLC, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA, Inc.*

49

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

## TABLE OF EXHIBITS

| Exhibit # | Description | BPI Requested / Public |
|---|---|---|
| I-1 | Petitioners' Data | BPI Requested |
| I-2 | [                                    ] | BPI Requested |
| I-3 | [                               ] | BPI Requested |
| I-4 | USW Letter | Public |
| I-5 | Tenaris, Environmental Production Declaration: Oil Country Tubular Goods OCTG, Version 2.2 (Revised Oct. 19, 2018) | Public |
| I-6 | TenarisTamsa, Industrial Center | Public |
| I-7 | Tenaris completes acquisition of IPSCO Tubulars from TMK (Jan. 2, 2020) | Public |
| I-8 | *Tenaris and Severstal to form joint venture to build a welded pipe plant in West Siberia*, Tenaris Website (Feb. 5, 2019) | Public |
| I-9 | *Tenaris and Severstal provide update on the status of their welded pipe plant in West Siberia*, Tenaris Website (Mar. 15, 2021) | Public |
| I-10 | SeAh Steel Webpages | Public |
| I-11 | Excerpts from *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. No. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. 5090 (July 2020) | Public |
| I-12 | Excerpts from *Certain Oil Country Tubular Goods from China*, Inv. No. 731-TA-1159 (Final), USITC Pub. 4152 (May 2010) | Public |
| I-13 | Excerpts from *Certain Oil Country Tubular Goods from China*, Inv. No. 701-TA-463 (Final), USITC Pub. 4124 (Jan. 2010) | Public |
| I-14 | Excerpts from *Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. No. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. 4489 (Sept. 2014) | Public |
| I-15 | Excerpts from *Steel*, Inv. No. TA-201-73, USITC Pub. 3479 (Dec. 2001), Vol. I | Public |
| I-16 | Proposed Scope | Public |
| I-17 | HTSUS Excerpts | Public |
| I-18 | Excerpts from *Oil Country Tubular Goods from China*, Inv. Nos. 701-TA-463 and 731-TA-1159 (Second Review), USITC Pub. 5136 (Nov. 2020) | Public |

| I-19 | Producers and Exporters of Subject OCTG | BPI Requested |
| I-20 | Import Statistics | Public |
| I-21 | Importers of Subject OCTG | BPI Requested |
| I-22 | Negligibility Analysis | Public |
| I-23 | Baker Hughes Rig Count Data | Public |
| I-24 | Camila Domonoske, "Free Fall: Oil Prices Go Negative," NPR.Org (Apr. 20, 2020) | Public |
| I-25 | ILJIN Steel Corporation, "Your Best Partner" | Public |
| I-26 | Husteel Industry Group, Steel Pipe & Fittings | Public |
| I-27 | Chelpipe Group, About Us | Public |
| I-28 | TMK Who We Are | Public |
| I-29 | Committee on Anti-Dumping Practices, Canada: Semi-Annual Report Under Article 16.4 of the Agreement, WTO Doc. G/ADP/N/350/CAN (Mar. 15, 2021) | Public |
| I-30 | Canada Border Service Agency, Statement of Reasons Concerning Dumping Investigation of OCTG from Mexico (Jul. 15, 2021) and Notice of Preliminary Determination | Public |
| I-31 | European Commission Directorate-General for Trade, "EU prolongs steel safeguard for three years," June 25, 2021 | Public |
| I-32 | Commission Implementing Regulation (EU) 2019/159, 2019 O.J. (L 31/27) | Public |
| I-33 | Excerpts from *Oil Country Tubular Goods from Argentina, Italy, Japan, Korea, and Mexico*, Inv. Nos. 701-TA-364 and 731-TA-711, and 713-716 (Review), USITC Pub. 3434 (June 2001) | Public |
| I-34 | Mahoney, Noi, "185 Texas workers laid off from metal supplier", Freight Waves (Jan. 4, 2021) | Public |

51

Barcode:4168004-02 A-357-824 INV - Investigation  -

# EXHIBIT I-1

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED
Barcode:4168004-02 A-357-824 INV - Investigation -

**NOT SUSCEPTIBLE TO PUBLIC SUMMARY**

Barcode:4168004-02 A-357-824 INV - Investigation -

# EXHIBIT I-2

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

# NOT SUSCEPTIBLE TO PUBLIC SUMMARY

Barcode:4168004-02 A-357-824 INV - Investigation -

# EXHIBIT I-3

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Barcode:4168004-02 A-357-824 INV - Investigation  -

**NOT SUSCEPTIBLE TO
PUBLIC SUMMARY**

Barcode:4168004-02 A-357-824 INV - Investigation  -

# EXHIBIT I-4

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-02 A-357-824 INV - Investigation  -

October 6, 2021

The Honorable Gina M. Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

Dear Secretary Raimondo:

The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"), a co-petitioner, supports these antidumping duty petitions on oil country tubular goods ("OCTG") from Argentina, Mexico, and Russia and these countervailing duty petitions on OCTG from Korea and Russia. The USW is a certified union that represents workers engaged in the production of OCTG in the United States, and the USW is thus a domestic interested party pursuant to 19 U.S.C. § 1677(9)(D).

The USW represents workers engaged in the production of OCTG at the following facilities:

- Evraz Pueblo in Pueblo, CO;

- Tenaris in Ambridge PA, Koppel, PA, Conroe, TX, Hickman, AR, and Wilder, KY;

- U. S. Steel in Bellville, TX, Fairfield, AL, Lone Star, TX, and Lorain, OH; and

- Wheatland Tube in Warren, OH and Wheatland, PA.

Thank you for your attention to this matter.

Respectfully Submitted,

Roy Houseman
Legislative Director
United Steelworkers

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

# EXHIBIT I-5



Barcode:4168004-02 A-357-824 INV - Investigation -

# Environmental Product Declaration

## Oil Country Tubular Goods OCTG



| BASED ON: | CERTIFICATION N°: | DATE OF REVISION: | ISSUE DATE: | VALID UNTIL: |
|---|---|---|---|---|
| PCR 2012:01 version 2.2 Construction products and construction services | S-P-01064 | 2018/10/19 - rev 2 | 2017/11/29 | 2022/09/14 |
| EN 15804:2014 | | | | |
| ISO 14025 | | | | |

EPD ®
ENVIRONMENTAL PRODUCT DECLARATION

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-02 A-357-824 INV - Investigation -

# General information

## EPD® REFERENCES

EPD OWNER: TENARIS SA, 29 AVENUE DE LA PORTE-NEUVE, L2227 - LUXEMBOURG

PROGRAMME: THE INTERNATIONAL EPD® SYSTEM, www.environdec.com

PROGRAMME OPERATOR: EPD international AB, box 210 60, SE-100 31 Stockholm, Sweden

## INDEPENDENT VERIFICATION

EPD document valid worldwide, according to sales market conditions

CEN standard EN 15804 served as the core PCR (PCR 2012:01, Construction products and Construction services, Version 2.2, 2017-05-30)
PCR review was conducted by: The Technical Committee of the International EPD® System. Chair: Filippo Sessa
Contact via info@environdec.com

Independent verification of the declaration and data, according to EN ISO 14025 : 2010

Third party verifier:  ICMQ SpA,  via De Castillia, 10  20124  Milano (www.icmq.it)     EPD process certification (Internal)     EPD verification (External)

Accredited by: Accredia

Environmental declarations published within the same product category, though originating from different programs, may not be comparable. In particular, EPDs of construction products may not be comparable if they do not comply with EN 15804.

## CONTACTS

Tenaris Corporate is available to release an Environmental Product Declaration for one specific product if requested by the customer.

For additional information about this EPD® and about Tenaris activities please contact:
Carolina Bengochea - cbengochea@tenaris.com



Technical support to TenarisDalmine was provided by Life Cycle Engineering, Italy.
(info@lcengineering.eu), www.lcengineering.eu).



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
3 | Oil Country Tubular Goods - OCTG

Appx298

No image

Barcode:4168004-02 A-357-824 INV - Investigation -

# Tenaris Group

Tenaris is a leading supplier of tubes and related services for world energy industry and other industrial applications worldwide.

The mission is to deliver value to customers through product development, manufacturing excellence and supply chain management.

A global leader around the world is committed to continuous improvement by sharing knowledge across a single global organization. All of manufacturing facilities share a unified global quality policy and have QHSE Policy, ISO 9001, ISO 14001 and OHSAS 18001 certifications.

Tenaris has an annual production capacity of 6 million tons of steel tubes.

The four Tenaris plants involved in this EPD® are:

## TAMSA
### MEXICO

**Production capacity**
1 230 000 tons of seamless steel tubes.

**Main features**
1 steel shop, 3 rolling mills.

**Certifications**
ISO 9001, ISO 14001 and OHSAS 18001:2007

## SIDERCA
### ARGENTINA

**Production capacity**
900 000 tons of seamless tubes.

**Main features**
DRI production, 1 steel shop, 2 rolling mills.

**Certifications**
ISO 9001, ISO 14001 and OHSAS 18001:2007

## DALMINE
### ITALY

**Production capacity**
950 000 tons of finished products.

**Main features**
1 steel shop, 2 rolling mills

**Certifications**
ISO EN 9001, ISO EN 14001, OHSAS 18001 and ISO EN 50001 for energy efficiency

## SILCOTUB
### ROMANIA

**Production capacity**
180 000 tons of seamless tubes.

**Main features**
1 steel shop,1 rolling mill.

**Certifications**
ISO 9001, ISO 14001 and OHSAS 18001:2007

> Seamless steel tubes for energy industry, the automotive sector and for industrial applications



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

No image.
Offshore and Onshore Seamless Line Pipe Solutions | 4

Appx299

Barcode:4168004-02 A-357-824 INV - Investigation  -

# EXHIBIT I-6



Bar Code: 4168004-02 A-357-...  VSK-t Investigation  -



TenarisTamsa, Tenaris's Industrial Center in Mexico, is one of the world's largest steel pipe manufacturers for the energy industry. Located in Veracruz, it meets the needs of oil and gas companies and provides solutions for the most demanding exploration and production environments.

Appx302



Barcode: 9780044-02 A-570-084 INV - Investigation -



Appx304

Barcode:4844799542 457-824 INV - Investigation -



Our integrated production process starts with the manufacturing of steel from scrap and sponge iron, which are turned into billets through continuous casting. These billets are transformed into seamless steel pipes in our rolling mill. Subsequently, the pipes are heat treated, inspected and finished before being delivered to the customer.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved



# NEW PIPE MILL

In May 2011, we opened our third seamless pipe mill. Designed according to the highest standards of safety, engineering and environment, this building is the first industrial facility of its kind in Mexico to receive LEED® certification, which is awarded by the U.S. Green Building Council.

**25 months**
was how long it took to build the building mill, in record time and within budget

**850,000,000 US dollars**
was the investment required to build the third mill in Veracruz

**3,500**
people hired at the peak of construction.

**39,500**
man-hours of training

Barcode:4168008-02 A-570-106 INV - Investigation -



"From our origins, our business dream has been to create industries that can compete with the largest in the world, to grow on a global scale while contributing to the growth of our people and of the communities where we are rooted, establishing strong and long-lasting ties."

PAOLO ROCCA, TENARIS CEO



Bar Code: 4000004-02 A-557-824 INV - Investigation -

Appx308



We are specialists in corrosion resistant and high temperature and high collapse steels, our dimensional range goes from 2 3/8" to 20".

We also offer TenarisHydril premium connections, sucker rods and services such as Rig Direct® (before Just in Time), which covers everything from string design and material selection to running assistance.



## OUR PRODUCTS AND SERVICES

We have over 60 years experience manufacturing and supplying seamless casing, drill pipe, tubing line pipe and accessories in different steel grades for the following industries:

- Oil and gas
- Construction
- Automotive
- Mining
- Industrial applications
- Power generation

Barcode: 4168004 Date: 3-23-INV    Investigation -

Barcode:4168-04-02 A-357-824 INV - ... ... ...



Barcode:4169+04-03 357-1 GNV - Investigation -



Bar code: 41680 • 03 • 357 • 8 • 5 INV: Investigation -



Appx312



Barcode:4168004-03 A-357-824 INV - Investigation -

Appx313



Filed By: rschagrin@schagrinassociates.com    Filed Date: 10/5/2, 4:51 PM    Submission Status: Approved

Barcode:4168004-03 A-357-824 INV - Investigation -



# AUTOMOTIVE COMPONENT CENTER

Opened in 2005, this center manufactures tubular components of pressure vessels for air bags and drive shafts for the North American market.

**28 million**
parts produced per year

**13.5 million USD**
invested in 2015

**5.5 million USD**
initial investment in 2005

Appx315

Barcode:4168004-03 A-357-824 INV - Investigation -



Barcode:4168004-03A-857-1424  [N] - No Subrogation -

# INVESTMENTS



Expansion of the Steel Mill. Through this investment, Tenaris Tamsa not only expands the production capacity of the steel mill, but also potentiated equipment for greater efficiency and environment care.

**110 million USD**
total investment

# SUCKER RODS MILL



Opened in March, 2012. With this investment, Tenaris Tamsa became the first local producer of sucker rods, seeking to respond to growing demand of our customers in Mexico, the United States and Canada, by increasing production flexibility and optimizing lead times.

**1 million sucker rods**
per year production capacity

**47 million USD**
total investment

Barcode:4168004-03 A-357-824 INV - Investigation -





## AVANT-GARDE ARCHITECTURE

In our administrative building, opened in December 2001, the abstraction of volumes, colors and Mexican archetypal forms coexist in perfect harmony. For example, the architecture takes the Mayan arch of our Pre-Hispanic roots. Overall, the architectural space is a combination of advanced technology and tradition.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 9/2/2021 6:51 PM, Submission Status: Approved

Appx318

Barcode: - Investigation -



## COMMUNITY

Improving the quality of life of our employees and their families and contributing to the development of the community, is our mission; community projects constitute the social dividend that the company pays back to the local community.

Since 1996, Tamsa, A.C., our civil association, has promoted projects that foster excellence, with an emphasis on areas such as education, health, culture, integration of staff and their families, community development and the environment.

Appx319



Barcode: TUSS0041-0  INV -  Investment -

Filed By: rschagrin@schagrinassociates.com, Filed Date: 11/12/21 6:01 PM, Submission Status: Approved

Appx320

Barcode:4168004-0 357-824 IMS Investigation -



## GROWING IN MEXICO

For the past 60 years, TenarisTamsa has contributed to the development and growth of the Mexican oil industry through joint work with PEMEX in the supply of products, technology and services to meet the most demanding requirements.

Over the years, the relationship has been consolidated, developing Rig Direct™ (before Just at Time) that allows Pemex to reduce their operational, administrative and storage costs.



Barcode:4752001093 A-357-824 INV - Investigation -

# VOCATION, VISION AND PASSION

The Tenaris/Tamsa Industrial Center is the result of a long-term project with a global vision.

After six decades, it takes pride in its extensive and fruitful manufacturing history, which has been key to the Mexican and international oil industry.



● Agostino Rocca, founder of the Techint Organization and Tenaris/Tamsa.

Appx322

Barcode:4168004-03 A-357-824 INV - Investigation -



Case: 25-1382    Document: 42-1    Page: 345    Filed: 09/15/2025    (345 of 631)

Barcode:4168004-03 A-357-824 INV - Investigation  -

# EXHIBIT I-7

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Appx324

Barcode:4168004-03 A-357-824 INV - Investigation -

☰ IR Menu

# Tenaris completes acquisition of IPSCO Tubulars from TMK

02 / 01 / 20

LUXEMBOURG, Jan. 02, 2020 (GLOBE NEWSWIRE) — Tenaris S.A. (NYSE, Mexico: TS and MTA Italy: TEN) announced today the completion of its previously announced acquisition of IPSCO Tubulars, Inc., a U.S. manufacturer of steel pipe, from PAO TMK. The acquisition price was determined on a cash-free, debt-free basis, and the final amount paid in cash, following contractual adjustments, was US$1,067 million (including approximately US$220 million in working capital). Tenaris will consolidate IPSCO's balance sheet and results of operations in its consolidated financial statements beginning in the first quarter of 2020.

In connection with the closing of the transaction, the parties entered into a 6-year master distribution agreement whereby, beginning on January 2, 2020, Tenaris will be the exclusive distributor of TMK's OCTG and line pipe products in the United States and Canada.

"The IPSCO acquisition marks a new chapter in our U.S. expansion and represents another milestone in Tenaris's history. Together, we are uniquely positioned to serve the U.S. oil and gas industry, with an extensive geographic deployment throughout North America and an unmatched product range," said Paolo Rocca, Chairman and CEO of Tenaris.

Tenaris's existing U.S. industrial and service network – located primarily in the south – is complemented by IPSCO's facilities located mainly in the mid-western and northeastern regions of the country. IPSCO's steel shop in Koppel, PA, is Tenaris's first in the United States, providing vertical integration through domestic production of a relevant part of its steel bar needs. Its Ambridge, PA, mill adds a second seamless manufacturing facility and complements Tenaris's seamless plant in Bay City, Texas.

"With IPSCO, we will be able to strengthen our Rig Direct® offering with shorter lead times and more responsive service capabilities," added Rocca. "We look forward to integrating IPSCO's team and serving our customers more efficiently."

*Some of the statements contained in this press release are "forward-looking statements". Forward-looking statements are based on management's current views and assumptions and involve known and unknown risks that could cause actual results, performance or events to differ materially from those expressed or implied by those statements.*

*Tenaris is a leading global supplier of steel tubes and related services for the world's energy industry and certain other industrial applications.*

Giovanni Sardagna

Tenaris

Our Site uses cookies. By using our Site (through any device) you agree that these rules on use of cookies apply. Further information on these cookies can be found in the Terms & Conditions.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-03 A-357-824 INV - Investigation  -

SHARE

Our Site uses cookies. By using our Site (through any device) you agree that these rules on use of cookies apply. Further information on these cookies can be found in the Terms & Conditions.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-03 A-357-824 INV - Investigation  -

# EXHIBIT I-8

Tenaris and Severstal to form joint venture to build a welded pipe plant ...      https://ir.tenaris.com/index.php/news-releases/news-release-details/tenari...

Barcode:4168004-03 A-357-824 INV - Investigation   -

≡ IR Menu

# Tenaris and Severstal to form joint venture to build a welded pipe plant in West Siberia

SHARE  in  f  y

05 / 02 / 19

LUXEMBOURG, Feb. 05, 2019 (GLOBE NEWSWIRE) -- Tenaris S.A. (NYSE, Buenos Aires and Mexico: TS and MTA Italy: TEN) announced today that it will form a joint venture with PAO Severstal to build a welded pipe plant to produce OCTG products in the Surgut area, West Siberia, Russian Federation. Tenaris will have a 49% interest in the joint venture company, with Severstal owning the remaining 51%. The commencement of the project is subject to regulatory approvals and other customary conditions.

The plant, which is estimated to require an investment of USD240 million and a two year construction period, is planned to have an annual production capacity of 300,000 tons. Through this joint venture, Tenaris and Severstal aim to serve the growing market for welded OCTG pipe products in Russia and neighbouring countries, combining Tenaris's knowhow in OCTG pipe manufacturing and sales with Severstal's expertise in producing high quality steel products.

Paolo Rocca, Chairman and CEO of Tenaris, commented:"We are very pleased to form this partnership today with Severstal. By combining our respective strengths and our commitment to industrial excellence, we believe that we can support the Russian and CIS oil and gas industry with a world-class and very competitive alternative for high quality OCTG products and services. As in all our operations around the world, we seek to deliver solutions that help to make customer operations more efficient and cost-effective".

Alexey Mordashov, Chairman of the Board of Directors of Severstal, commented: "Our strategic goal is to make Severstal the leader in the future steel industry. And the future belongs to those companies that can provide their clients with unique solutions based on excellent understanding of their needs. To offer the oil and gas market best-in-class OCTG products and a range of customized and innovative services we are happy to join forces with a global leader in the manufacturing and supply of high-quality welded and seamless steel pipes. The production will be located in close proximity to the main oil and gas companies which will ensure cost efficiency both for us and our customers' operations".

*Tenaris is a leading global supplier of steel tubes and related services for the world's energy industry and certain other industrial applications.*

*Severstal is a leading Russian steel producer of high value-added flat, long and tubular steel products for the construction, automotive, machinery and energy industries.*

*Some of the statements contained in this press release are "forward-looking statements". Forward-looking statements are based on management's current views and assumptions and involve known and unknown risks that could cause actual results, performance or events to differ materially from those expressed or implied by those statements.*

Giovanni Sardagna
Tenaris
1-888-300-5432
www.tenaris.com

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

9/7/21, 4:55 PM

Appx328

Tenaris and Severstal to form joint venture to build a welded pipe plant ...          https://ir.tenaris.com/index.php/news-releases/news-release-details/tenari...

Barcode:4168004-03 A-357-824 INV - Investigation   -

Source: Tenaris S.A.

SHARE   in    |   f    |   y

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

                                                                                          9/7/21, 4:55 PM

Appx329

Barcode:4168004-03 A-357-824 INV - Investigation  -

# EXHIBIT I-9

Barcode:4168004-03 A-357-824 INV - Investigation  -


EN ⌄

← BACK

# Tenaris and Severstal provide update on the status of their welded pipe plant in West Siberia

**PUBLISHED ON 03/15/2021**

SHARE   in   |   f   |   🐦

With reference to their joint venture announced in February 2019, Tenaris and Severstal inform that, although they continue to have a strong interest in the venture, they have agreed to put on hold the construction activities on their welded pipe plant in Surgut, West Siberia, while they assess the impact of the changes in the relevant markets and competitive environment and determine whether any adjustments or changes to the

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

9/14/21, 2:47 PM

Tenaris and Severstal provide update on the status of their welded pipe pl...    https://www.tenaris.com/en/newsroom/news-listing/severstal-update--06...

project could be necessary.

Barcode:4168004-03 A-357-824 INV - Investigation  -

**Tenaris**    EN ⌄

For more information, follow us on Facebook, Twitter, Linkedin and Instagram.

;

Barcode:4168004-03 A-357-824 INV - Investigation  -

# EXHIBIT I-10

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-03 A-357-824 INV - Investigation   -

# History

Take a journey through the history that has made SeAH Steel a leading manufacturing facility.

Since our initial start as a leading manufacturing facility in Korea, SeAH Steel has seen many growth periods leading up to our 20+ facilities, including our newest locations acting as domestic providers for the OCTG market:

• Company was established in 1960, manufacturing Carbon Steel Pipe and Conduit Pipe.

• First Korean Company to export Carbon Steel Pipe into the US Market in 1967.

• In 1969 SeAH became public by being listed in Korean Stock exchange.

• In 1979 SeAH obtained license to apply API monogram for Casing, tubing, Linepipe and High Pressure pipe.

• SeAH Steel is growing from being a domestic company into a global corportation based on technology skills, developing new value added products for its customers, and increase production capacity.

Through facilities in Pohang, Suncheon, Changwon and Gusan,

Appx334

Barcode:4168004-03 A-357-824 INV - Investigation  -

Pipe and Special Pipe Manufacturing. In addition, SeAH Steel is developing new customer relationships all over the world adding seven overseas production facilities and sales offices in Countries like United States, Japan, China, Vietnam, UAE, Itlay and Indonesia.

Subscribe to Updates

© 2017 Seah Steel USA. All Rights Reserved │ Privacy Policy │ Terms of Use

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Appx335

Barcode:4168004-03 A-357-824 INV - Investigation  -

SeAH                              Business

# Business

SeAH Steel                                                                                    ⌄

### SeAH Steel

**With its Exceptional Expertise and Technology, SeAH Steel has been an Elite Steel Pipe Producer for more than 50 years**



### Becoming a Role Model in the Steel Pipe Industry

Established in 1960, SeAH Steel was the first in the steel pipe industry to lead exports to the US market in 1967. SeAH Steel carried out its IPO in 1969 at a time when companies were reluctant to go public. Consistently developing new products and pushing into new markets, SeAH Steel has become the steel pipe leader in Korea.

### Leading the Industry with its Technology and Production Capacity

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

9/30/21, 12:08 PM                                                    SEAH GROUP

Starting from API steel pipes, the first welded pipes produced in Korea, SeAH Steel continued to secure its global reputation for leading technology and superb quality. The company's Pohang Plant is one of the largest steel plants in the world with an annual capacity of 1.2 million tons. Together with production bases in Gunsan, Suncheon, and Changwon, SeAH Steel produces over 2.2 million tons of various steel pipes and plates each year. Through its overseas production and distribution overseas, including the newly acquired Italian steel pipe producer Inox Tech, SeAH Steel continues to expand its international presence.

| | |
|---|---|
| **CEO** | Howard Lee, Seok il Kim |
| **Main Products** | Welded Carbon Steel Pipes, Welded Stainless Steel Pipes, Titanium Tubes, Galvanized & Pre-painted Steel Sheets |
| **Established** | 1960 |
| **Location** | Korea: Pohang, Suncheon, Changwon, Gunsan |
| | Overseas: USA, Japan, China, Italy, Vietnam, UAE, Indonesia (24 affiliates in 7 countries) |
| **Homepage** | http://www.seahsteel.co.kr/eng/main.jsp |

| Family Site |
|---|

**Korean**    **Location**                                                           © SeAH

Appx337

# EXHIBIT I-11

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

# Oil Country Tubular Goods from
# India, Korea, Turkey, Ukraine, and Vietnam

Investigation Nos. 701-TA-499-500 and
731-TA-1215-1216, 1221-1223 (Review)

**Publication 5090**                                      **July 2020**



**U.S. International Trade Commission**

**Washington, DC 20436**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No Image

Barcode:4168004-04 A-357-824 INV - Investigation  -

and counsel for Domestic Producers appeared at the Commission's hearing.[9]  The Government of Ukraine was the only respondent to submit briefs or participate in the hearing.

U.S. industry data are based on the questionnaire responses of 12 U.S. producers that are believed to account for the large majority of domestic production of OCTG in 2019.[10]  U.S. import data and related information are based on Commerce's official import statistics and the questionnaire responses of 32 U.S. importers of OCTG that accounted for approximately two-thirds of imports of casing and tubing from all sources and approximately one-third of subject imports from subject sources in 2019.[11] [12]  Foreign industry data and related information are based on the questionnaire responses of two responding producers in India accounting for an estimated *** percent of total OCTG production in India in 2019 and one responding producer in Ukraine believed to account for the vast majority of total production of OCTG in Ukraine in 2019.[13]  In addition, one subject producer in Turkey is estimated to account for *** production of subject merchandise in that country provided some data in its response to the notice of institution but did not submit a questionnaire response.[14]  No foreign producers from Korea or Vietnam responded to the Commission questionnaire.[15]

## II.     Domestic Like Product and Industry

### A.     Domestic Like Product

In making its determination under section 751(c) of the Tariff Act, the Commission defines the "domestic like product" and the "industry."[16]  The Tariff Act defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle."[17]  The Commission's

---

[9] In light of restrictions on access to the Commission building due to the COVID-19 pandemic, the Commission conducted its hearing by video conference, as set forth in procedures provided to the parties.

[10] Confidential Report ("CR") and Public Report ("PR") at I-36.  The Commission received usable responses from 12 U.S. producers.  *Id*. at I-36, III-1, and III-23.

[11] CR/PR at I-13-14.  Importers responding to the questionnaires accounted for 101.9 percent of subject imports from Turkey, 74.6 percent of subject imports from Ukraine, 17.4 percent of subject imports from Korea, and zero percent of subject imports from India and Vietnam in 2019.  *Id*. at IV-1.

[12] The official U.S. import statistics and GTA export data discussed in these Views cover the major forms of OCTG, casing and tubing, but do not cover coupling stock.  However, the volume of trade in coupling stock is extremely limited.  *See, e.g.*, CR/PR at Table IV-4 (coupling stock is *** percent of U.S. importers' U.S. shipments in 2019).

[13] CR/PR at I-14.  No foreign producers from Korea or Vietnam responded to the Commission questionnaire.  *See id*. at IV-34, IV-46.

[14] CR/PR at IV-37-38.

[15] CR/PR at IV-34, IV-46.

[16] 19 U.S.C. § 1677(4)(A).

[17] 19 U.S.C. § 1677(10); *see, e.g.*, *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007); *NEC Corp. v. Department of Commerce*, 36 F. Supp. 2d 380, 383 (Ct. Int'l Trade 1998); *Nippon Steel Corp. v. United States*, 19 CIT 450, 455 (1995); *Timken Co. v. United States*, 913 F. Supp. 580, 584 (Ct. Int'l

5

## Appx340

practice in five-year reviews is to examine the domestic like product definition from the original investigations and consider whether the record indicates any reason to revisit the prior findings.[18]

Commerce has defined the scope of the antidumping and countervailing duty orders in these five-year reviews as follows:

The merchandise covered by the orders is OCTG, which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (*e.g.*, whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of the orders also covers OCTG coupling stock.

Excluded from the scope of the orders are: casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.[19]

The scope has not changed since the original investigations. OCTG includes casing, tubing, and coupling stock of carbon and alloy steel used in oil and gas wells.[20] Casing is a circular pipe that serves as a structural retainer for the walls of the well. It typically has an outside diameter ranging from 4.5 inches to 20 inches and a length ranging from 34 feet to 48 feet. Casing provides a firm foundation for the drill string by supporting the walls of the hole to prevent caving in or wall collapse both during drilling and after the well is completed.[21] Casing also serves as a surface pipe designed to prevent contamination of the recoverable oil and gas by surface water, gas, sand, or limestone.[22] Tubing is a smaller-diameter pipe (between 1.050–

---

Trade 1996); *Torrington Co. v. United States*, 747 F. Supp. 744, 748-49 (Ct. Int'l Trade 1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991); *see also* S. Rep. No. 249, 96th Cong., 1st Sess. 90-91 (1979).

[18] *See, e.g., Internal Combustion Industrial Forklift Trucks from Japan*, Inv. No. 731-TA-377 (Second Review), USITC Pub. 3831 at 8-9 (Dec. 2005); *Crawfish Tail Meat from China*, Inv. No. 731-TA-752 (Review), USITC Pub. 3614 at 4 (July 2003); *Steel Concrete Reinforcing Bar from Turkey*, Inv. No. 731-TA-745 (Review), USITC Pub. 3577 at 4 (Feb. 2003).

[19] *Certain Oil Country Tubular Goods From India, the Republic of Korea, Turkey, and the Socialist Republic of Vietnam: Final Results of Expedited First Sunset Reviews of the Antidumping Duty Orders*, 85 Fed. Reg. 12774, 12775 (Mar. 4, 2020); *Oil Country Tubular Goods From India: Final Results of the Expedited Sunset Review of the Countervailing Duty Order*, 84 Fed. Reg. 50001, 50002 (Sept. 24, 2019); *Oil Country Tubular Goods From the Republic of Turkey: Final Results of the Expedited First Sunset Review of the Countervailing Duty Order*, 84 Fed. Reg. 55139, 55140 (Oct. 15, 2019); *Oil Country Tubular Goods From Ukraine: Final Results of the First Five-Year Sunset Review of the Antidumping Duty Order*, 85 Fed. Reg. 27206, 27206-07 (May 7, 2020).

[20] CR/PR at I-20.

[21] CR/PR at I-23.

[22] CR/PR at I-24.

4.5 inches outside diameter) installed inside the larger-diameter casing that is used to conduct the oil or gas to the surface, either through natural flow or through pumping.  Coupling stock is a thick-walled, seamless tubular product used to manufacture coupling blanks.  Coupling blanks, in turn, are unthreaded tube blanks used to make individual couplings.  Couplings are thick-walled and internally threaded seamless cylinders that are used for joining two lengths of threaded OCTG and, when unattached, are specifically excluded from the scope.  Casing and tubing are usually produced in accordance with specification 5CT of the American Petroleum Institute ("API").[23]

In the original investigations, the Commission defined a single domestic like product encompassing all OCTG, coextensive with the scope.  In doing so, the Commission rejected a respondent argument that the Commission should find a separate like product for U.S. heat-treated semi-finished OCTG or "green tubes."  The Commission found that there was not a clear dividing line between green tubes and finished OCTG.[24]

Domestic Producers argue that in these reviews the Commission should adopt the like product definition from the original investigations.[25]  No respondent has briefed the appropriate definition of the domestic like product.  The record in these reviews indicates that the characteristics and uses of domestically produced OCTG have not changed since the original investigations.[26]  Accordingly, we again define the domestic like product to include all OCTG coextensive with the scope.

### B.    Domestic Industry

Section 771(4)(A) of the Tariff Act defines the relevant industry as the domestic "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[27]  In defining the domestic industry, the Commission's general practice has been to include in the industry producers of all domestic production of the like product, whether toll-produced, captively consumed, or sold in the domestic merchant market.

In the original investigations, the Commission found that processors that provide heat treatment engaged in sufficient production-related activities to be treated as domestic producers.[28]  Accordingly, the Commission defined the domestic industry to include all U.S.

---

[23] CR/PR at I-25-26.  API 5CT specifications require the seamless manufacturing process for grades ***, while grades *** can be produced using either the welded or seamless process.  *Id*.

[24] *Original Determinations*, USITC Pub. 4489 at 11-12.

[25] Domestic Producers' Prehearing Brief at 18.

[26] *See generally* CR/PR at I-35-36.

[27] 19 U.S.C. § 1677(4)(A).  The definitions in 19 U.S.C. § 1677 are applicable to the entire subtitle containing the antidumping and countervailing duty laws, including 19 U.S.C. §§ 1675 and 1675a.  *See* 19 U.S.C. § 1677.

[28] *Original Determinations*, USITC Pub. 4489 at 13-14

7

Barcode:4168004-04 A-357-824 INV - Investigation  -

producers of OCTG, including both mills that produce OCTG and processors that engage in heat treatment.[29]

The information in the current reviews indicates that the heat-treatment process has not changed materially since the original investigations,[30] and the record of these reviews contains no information that would warrant revisiting the decision to include processors in the domestic industry.[31]  In light of these considerations, we again find that processors that provide heat treatment engage in sufficient production-related activity to be considered domestic producers.

We must also determine whether any producer of the domestic like product should be excluded from the domestic industry pursuant to section 771(4)(B) of the Tariff Act.  This provision allows the Commission, if appropriate circumstances exist, to exclude from the domestic industry producers that are related to an exporter or importer of subject merchandise or which are themselves importers.[32]  Exclusion of such a producer is within the Commission's discretion based upon the facts presented in each investigation.[33]

In the current reviews, Borusan falls under the related party provision because it imported subject merchandise from Turkey during the period of review and by virtue of its affiliation with ***, a Turkish producer of subject merchandise.[34]  Domestic Producers assert that the Commission may exclude Borusan as a related party, but do not affirmatively take a position on whether appropriate circumstances exist for its exclusion.[35]  Borusan commenced domestic production of OCTG at a new production facility in Baytown, Texas in the summer of 2014.[36]  In 2019, it was the *** largest domestic mill producer, accounting for *** percent of

---

[29] *Original Determinations*, USITC Pub. 4489 at 14.  There were no related party issues in the original final determinations.  *Id.* at 14 n.75.

[30] *See* CR/PR at I-30-31.

[31] Domestic Producers Prehearing Brief at 20-21.

[32] *See Torrington Co. v. United States*, 790 F. Supp. 1161, 1168 (Ct. Int'l Trade 1992), *aff'd without opinion*, 991 F.2d 809 (Fed. Cir. 1993); *Sandvik AB v. United States*, 721 F. Supp. 1322, 1331-32 (Ct. Int'l Trade 1989), *aff'd mem.*, 904 F.2d 46 (Fed. Cir. 1990); *Empire Plow Co. v. United States*, 675 F. Supp. 1348, 1352 (Ct. Int'l Trade 1987).

[33] The primary factors the Commission has examined in deciding whether appropriate circumstances exist to exclude a related party include the following:

    (1) the percentage of domestic production attributable to the importing producer;

    (2) the reason the U.S. producer has decided to import the product subject to investigation (whether the firm benefits from the LTFV sales or subsidies or whether the firm must import in order to enable it to continue production and compete in the U.S. market);

    (3) whether inclusion or exclusion of the related party will skew the data for the rest of the industry;

    (4) the ratio of import shipments to U.S. production for the imported product; and

    (5) whether the primary interest of the importing producer lies in domestic production or importation.  *Changzhou Trina Solar Energy Co. v. USITC*, 100 F. Supp.3d 1314, 1326-31 (Ct. Int'l. Trade 2015); *see also Torrington Co. v. United States*, 790 F. Supp. at 1168.

[34] CR/PR at III-18 n.2, Table I-8.

[35] Domestic Producers' Prehearing Brief at 21-24.

[36] CR/PR at Tables III-1-2.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

### b.  Current Reviews

The drivers of demand for OCTG have not changed from the original investigations. OCTG demand continues to be cyclical and largely driven by oil and natural gas activity.[129] During the period of review, market participants had mixed views on demand trends, with almost half of all market participants reporting fluctuating U.S. demand and most of the remaining firms reporting a decline in U.S. demand.[130]  Most firms reported that fluctuating or decreasing oil prices drove the changes in demand.[131]  Domestic Producers stated that the decline in OCTG demand was due to a decline in oil prices, which in turn caused a decline in the overall rig count.[132]  Since 2014, the prices for crude oil and natural gas, and thus the number of operating oil and gas rigs, have declined significantly, reaching its lowest point during the period of review in 2016, the same year U.S. apparent consumption of OCTG was at its lowest point.[133]  Apparent U.S. consumption of OCTG dropped from 7.6 million short tons in 2014 to 2.3 million short tons in 2016, before gradually increasing to 5.8 million short tons in 2018, then falling to 5.3 million short tons in 2019.[134]

The record indicates that the U.S. oil and gas rig count and U.S. drilling footage have declined significantly since January 2020.[135]  Demand for OCTG also declined significantly since the beginning of 2020, and projections indicate mixed future trends.[136]  Domestic Producers claim that oversupply of oil by OPEC, combined with the global COVID-19 pandemic, impacted demand for OCTG in the spring of 2020.[137]  Domestic Producers assert that downturns in economic activity related to the pandemic depressed demand for OCTG because the decline in transportation decreased demand for oil and gas products, thereby impacting oil production.[138] Domestic Producers state the oversupply of oil combined with the pandemic caused rigs to be shut down almost instantaneously, and had a near instant impact on OCTG producers,[139] noting the number of rigs in May 2020 was the lowest ever recorded in the history of the Baker Hughes rig count.[140]

---

lead to double counting on a quantity basis because all OCTG shipped by processors had already been counted as a shipment by a U.S. mill or as an import.  *Id.* at 28 n.154.  We have followed the same approach for computing apparent U.S. consumption in these reviews.  *See* CR/PR at Table I-11 note.

[129] CR/PR at II-12.

[130] CR/PR at II-18 and Table II-5.

[131] CR/PR at II-18.

[132] Hearing Transcript at 46 (Shagrin).

[133] CR/PR at II-12 and Tables I-11 and II-2.

[134] CR/PR at Table I-11.

[135] CR/PR at Figures II-2, II-5.

[136] CR/PR at II-16-17, Figures II-3, II-5, II-6.

[137] Hearing Transcript at 45 (Getlan).

[138] Hearing Transcript at 21 (Schagrin); CR/PR at II-17.

[139] Hearing Transcript at 38 (Getlan).

[140] Hearing Transcript at 21 (Schagrin).  According to Domestic Producers, the Baker Hughes rig count dropped to 329 rigs in May 2020 compared to 944 rigs in 2019.  *Compare id.* with CR/PR at Table IV-31.

22

Barcode:4168004-04 A-357-824 INV - Investigation  -

Demand for OCTG, which has historically been characterized by boom and bust cycles, is currently in a bust period.  The Energy Information Administration projects that crude oil and natural gas prices will not return to near January 2020 levels until the end of 2021.[141]  Domestic Producers project that at least several months of lower oil production and therefore lower demand for OCTG,[142] but suggest that OCTG demand may begin to recover in the next six to 12 months.[143]

### 2. Supply Conditions

#### a. Original Investigations

During the original investigations, the Commission observed that the domestic industry was the largest supplier of OCTG in the U.S. market.  The domestic industry increased its U.S. mill capacity from 5.0 million short tons in 2011 to 5.8 million short tons in 2013.  Its share of apparent U.S. consumption fell from 52.5 percent in 2011 to 48.7 percent in 2012, but rose to 53.5 percent in 2013.[144]  U.S. producers stated that they planned further expansions and additional plant openings in 2014 but had shut down and idled some facilities.[145]

Cumulated subject imports held *** percent of apparent U.S. consumption in 2013, while nonsubject imports accounted for *** percent that year.[146]  The Commission found that a sizeable portion of imports from both subject and nonsubject sources were further processed in the United States.[147]

The Commission indicated that inventories of domestically-produced OCTG and OCTG from subject and nonsubject countries held by purchasers were an additional source of supply.  U.S. inventory levels expressed in months of supply on hand reached a trough of 4.2 months in January 2012.[148]

#### b. Current Reviews

During the period of review, the U.S. OCTG market was again supplied by the domestic industry, subject imports, and imports from nonsubject sources.  The domestic industry was the largest supplier of OCTG to the U.S. market during the period of review.  Its share of the U.S.

---

[141] CR/PR at Figure II-3.

[142] Hearing Transcript at 32 (Spak).  Tenaris projects that current inventory will take 16.8 months at current consumption levels to use all the OCTG that is already in the country.  One year prior, Tenaris calculated the current inventory levels at 6.6 months.  *Id*.; Domestic Producer's Testimony, Exhibit 3 at 4 (Cura).

[143] Domestic Producers' Posthearing Brief at I-8; Domestic Producers' Testimony, Exhibit 5 at 2 (Polk).

[144] *Original Determinations*, USITC Pub. 4489 at 29, 35.

[145] *Original Determinations*, USITC Pub. 4489 at 29.

[146] *Original Determinations*, USITC Pub. 4489 at 34-35; Confidential Original Determinations, EDIS Doc. No. 681373, at 53.

[147] *Original Determinations*, USITC Pub. 4489 at 29-30.

[148] *Original Determinations*, USITC Pub. 4489 at 30.

23

**Appx345**

Barcode:4168004-04 A-357-824 INV - Investigation  -

declines did not correlate with trends in subject import volume.  Instead, when prices for domestic products decreased sharply in 2012, subject imports rose by *** percent, showing a correlation.[202]  The Commission also rejected respondents' argument that declining prices were caused by falling raw material costs.  In 2011, raw material price trends for scrap and hot-rolled sheet diverged from price trends for the six pricing products, and although the trends moved in a manner more similar to the six pricing products from 2012 through the first quarter of 2014, raw material cost changes could not account fully for the six products' price movements.[203]  Finally, the Commission rejected respondents' argument that declines in domestic OCTG prices were attributable to the domestic industry's capacity expansions.  The growth in production capacity of U.S. OCTG mills was not appreciably greater than the growth in demand, and mostly occurred in 2013, whereas prices for domestically produced products began to fall in late 2011 and early 2012.[204]

The Commission therefore determined that there had been significant price underselling by the subject imports and that subject imports depressed domestic prices to significant degree.[205]

## 2.  The Current Reviews

As discussed above, the record in the current reviews indicates that there is a high degree of substitutability among subject imports from India, Korea, Turkey, Ukraine, and Vietnam, and between these imports and the domestic like product, and that price is an important factor in purchasing decisions.

The Commission collected pricing data on sales of six products in these reviews.[206]  Seven U.S. producers and five importers provided usable pricing data accounting for approximately 10.5 percent of U.S. producers' shipments of OCTG and 1.3 percent of U.S. shipments of subject imports in 2019.[207]  There were no pricing data for sales of subject imports from Vietnam.[208]

Cumulated subject imports undersold the domestic like product in 62 of 93 instances with underselling margins between 0.0 and 29.7 percent.[209]  This predominant underselling

---

[202] *Original Determinations*, USITC Pub. 4489 at 38; Confidential Original Determinations at 58.
[203] *Original Determinations*, USITC Pub. 4489 at 38-39.
[204] *Original Determinations*, USITC Pub. 4489 at 39.
[205] *Original Determinations*, USITC Pub. 4489 at 39.
[206] CR/PR at V-6.  The six pricing products for which data were collected were:
**Product 1.--** Tubing, Grade L-80, 2 7/8" O.D., 6.5 lbs./ft., threaded and coupled, range 2, seamless.
**Product 2.--** Tubing, Grade J-55, 2 3/8" O.D., 4.7 lbs./ft., threaded and coupled, range 2, welded.
**Product 3.--** Casing, Grade P-110, 5 ½" O.D., 20.0 lbs./ft., threaded and coupled, range 3, welded.
**Product 4.--** Casing, Grade P-110, 5 ½" O.D., 17.0 lbs./ft., threaded and coupled, range 3, seamless.
**Product 5.--** Casing, Grade J-55, 8 5/8" O.D., 32.0 lbs./ft., threaded and coupled, range 3, welded.
**Product 6.--** Casing, Grade J-55, 9 5/8" O.D., 36.0 lbs./ft., threaded and coupled, range 3, welded.  *Id*.
[207] CR/PR at V-6.  Not all firms reported pricing for all products for all quarters.  *Id*.
[208] CR/PR at V-6.
[209] CR/PR at Table V-11.

30

occurred despite the disciplining effects of the orders under review.  Given the predominant underselling during the period of review and the significant underselling in the original investigations, as well as our finding that the volume of subject imports would likely increase upon revocation, we find that significant underselling would likely recur if the antidumping and countervailing duty orders were revoked.  Because of the importance of price in purchasing decisions, this underselling in turn would likely cause the domestic industry to consider either reducing its prices or foregoing price increases to maintain market share, as was the case in the original investigations, or risk losing sales and market share to subject imports.

We therefore conclude that if the orders were revoked, the likely significant volume of cumulated subject imports would likely undersell the domestic like product to a significant degree to gain market share and would also have likely significant price depressing or suppressing effects.

### E.    Likely Impact

#### 1.  The Original Investigations

In the original investigations, the Commission found that cumulated subject imports had a significant impact on the domestic industry.  Although the domestic industry's trade and employment indicators grew reflecting a period of strong demand, its financial performance deteriorated between 2011 and 2013.[210]  While the net sales values of U.S. mills increased by 11.4 percent from 2011 to 2013, COGS increased by 19.3 percent, resulting in declining operating income.  U.S. mills' operating income fell from $614 million in 2011 to $613 million in 2012 and $312 million in 2013.  Their operating income ratio followed a similar trend, declining from 11.5 percent in 2011 to 9.8 percent in 2012 and 5.0 percent in 2013.  Capital expenditures also declined over the period of investigation.[211]  The Commission found that the effect on processors, which made up a much smaller part of the domestic industry, was less discernible than that on mills.[212]

The Commission found the significant and increasing volume of low-priced subject imports caused domestic producers significantly to lower their prices.  As a result, the domestic industry's revenues did not increase commensurately with either output or costs, and the industry exhibited significant declines in operating performance.[213]

In its non-attribution analysis, the Commission observed that nonsubject imports had a declining presence in the U.S. market during most of the period of investigation.  Moreover, the pricing data in the record showed that nonsubject imports undersold the domestic product less frequently than subject imports and were frequently priced higher than subject imports and thus could not explain the observed price depression.[214]  The Commission rejected respondents' argument that the domestic industry's profitability was adversely impacted by the

---

[210] *Original Determinations*, USITC Pub. 4489 at 40.
[211] *Original Determinations*, USITC Pub. 4489 at 41-42.
[212] *Original Determinations*, USITC Pub. 4489 at 42.
[213] *Original Determinations*, USITC Pub. 4489 at 42-43.
[214] *Original Determinations*, USITC Pub. 4489 at 43.

Barcode:4168004-04 A-357-824 INV - Investigation -

# Previous and related investigations

OCTG has been the subject of several previous investigations conducted by the Commission. Table I-1 presents a listing of those proceedings.

**Table I-1**
**OCTG: Previous and related Commission proceedings, since 1984**

| Original investigations | | | | Commission reviews | | Current status |
|---|---|---|---|---|---|---|
| Date | Number | Country | Outcome | Dates[1] | Outcomes | |
| 1984 | 701-TA-215 | Brazil | Affirmative | - | - | ITA revoked 8/21/85 |
| 1984 | 701-TA-216 | Korea | Negative | - | - | - |
| 1984 | 701-TA-217 | Spain | Affirmative | - | - | ITA revoked 7/31/85 |
| 1984 | 731-TA-191 | Argentina | Negative | - | - | - |
| 1984 | 731-TA-192 | Brazil | Affirmative[2] | - | - | Petition withdrawn |
| 1984 | 731-TA-193 | Korea | Affirmative[2] | - | - | Petition withdrawn |
| 1984 | 731-TA-194 | Mexico | Affirmative[2] | - | - | Petition withdrawn |
| 1984 | 731-TA-195 | Spain | Affirmative | - | - | ITA revoked 6/30/85 |
| 1985 | 701-TA-240 | Austria | Affirmative[2] | - | - | Petition withdrawn |
| 1985 | 701-TA-241 | Venezuela | Affirmative[2] | - | - | Petition withdrawn |
| 1985 | 701-TA-255 | Canada | Affirmative | - | - | ITA revoked 7/10/91 |
| 1985 | 701-TA-256 | Taiwan | Negative | - | - | - |
| 1985 | 731-TA-249 | Austria | Affirmative[2] | - | - | Petition withdrawn |
| 1985 | 731-TA-251 | Venezuela | Affirmative[2] | - | - | Petition withdrawn |
| 1985 | 731-TA-275 | Argentina | Affirmative[2] | - | - | Terminated |
| 1985 | 731-TA-276 | Canada | Affirmative | 1999 | Negative | Revoked |
| 1985 | 731-TA-277 | Taiwan | Affirmative | 1999 | Negative | Revoked |
| 1986 | 701-TA-271 | Israel | Affirmative | - | - | ITA revoked 3/1/93 |
| 1986 | 731-TA-318 | Israel | Affirmative | - | - | ITA revoked 7/27/99 |
| 1995 | 701-TA-363 | Austria | Negative | - | - | - |
| 1995 | 701-TA-364 | Italy | Affirmative | 2001 | Affirmative | ITA revoked 12/26/06 |
| 1995 | 731-TA-711 | Argentina | Affirmative | 2001 / 2006 | Affirmative/Negative | Revoked |
| 1995 | 731-TA-712 | Austria | Affirmative | - | - | - |
| 1995 | 731-TA-713 | Italy | Affirmative | 2001 / 2006 | Affirmative/Negative | Revoked |
| 1995 | 731-TA-714 | Japan | Affirmative | 2001 / 2006 | Affirmative/Negative | Revoked |
| 1995 | 731-TA-715 | Korea | Affirmative | 2001 / 2006 | Affirmative/Negative | Revoked |
| 1995 | 731-TA-716 | Mexico | Affirmative | 2001 / 2006 | Affirmative/Negative | Revoked |
| 1995 | 731-TA-717 | Spain | Negative | - | - | - |

Table continued on next page.

I-6

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No Image

Barcode:4168004-04 A-357-824 INV - Investigation  -

**Table I-1--Continued**
**OCTG: Previous and related Commission proceedings, since 1984**

| | Original investigations | | | Commission reviews | | Current status |
|---|---|---|---|---|---|---|
| Date | Number | Country | Outcome | Dates[1] | Outcomes | |
| 2002 | 701-TA-428 | Austria | Negative[2] | - | - | - |
| 2002 | 731-TA-992 | Austria | Negative[2] | - | - | - |
| 2002 | 731-TA-993 | Brazil | Negative[2] | - | - | - |
| 2002 | 731-TA-994 | China | Negative[2] | - | - | - |
| 2002 | 731-TA-995 | Colombia | ([3]) | - | - | - |
| 2002 | 731-TA-996 | France | Negative[2] | - | - | - |
| 2002 | 731-TA-997 | Germany | Negative[2] | - | - | - |
| 2002 | 731-TA-998 | India | Negative[2] | - | - | - |
| 2002 | 731-TA-999 | Indonesia | Negative[2] | - | - | - |
| 2002 | 731-TA-1000 | Romania | Negative[2] | - | - | - |
| 2002 | 731-TA-1001 | South Africa | Negative[2] | - | - | - |
| 2002 | 731-TA-1002 | Spain | Negative[2] | - | - | - |
| 2002 | 731-TA-1003 | Turkey | Negative[2] | - | - | - |
| 2002 | 731-TA-1004 | Ukraine | Negative[2] | - | - | - |
| 2002 | 731-TA-1005 | Venezuela | Negative[2] | - | - | - |
| 2009 | 701-TA-463 | China | Affirmative | 2020 | Affirmative/instituted | Order in place |
| 2009 | 731-TA-1159 | China | Affirmative | 2020 | Affirmative/instituted | Order in place |

[1] Dates refers to the year in which the investigation, first review, or second review was instituted by the Commission.
[2] Preliminary determination.
[3] Following the withdrawal of the petition on Colombia and Commerce's decision not to institute an investigation on OCTG from that country, the Commission discontinued its investigation No. 731-TA-995 (OCTG from Colombia).

Note: On June 22, 2001, the Commission instituted investigation No. TA-201-73, Steel, under section 202 of the Trade Act of 1974, to determine whether certain steel products, including seamless and welded OCTG, were being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industries producing articles like or directly competitive with the imported article. On December 20, 2001, the Commission issued its determinations and remedy recommendations. The Commission made a negative determination with respect to OCTG.

Source: *Certain Oil Country Tubular Goods From India, Korea, Philippines, Saudi Arabia, Taiwan, Thailand, Turkey, Ukraine, and Vietnam, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1223 (Final)*, USITC Publication 4489, September 2014, pp. I-5-I-6; and *Oil Country Tubular Goods from China, Inv. Nos. 701-TA-463 and 731-TA-1159 (Review)*, USITC Publication 4532, May 2015, p. 1.

I-7

Barcode:4168004-04 A-357-824 INV - Investigation  -

### Tariff treatment

OCTG is classifiable in the Harmonized Tariff Schedule of the United States ("HTS") under subheadings 7304.29.10, 7304.29.20, 7304.29.31, 7304.29.41, 7304.29.50, 7304.29.61, 7305.20.20, 7305.20.40, 7305.20.60, 7305.20.80, 7306.29.10, 7306.29.20, 7306.29.31, 7306.29.41, 7306.29.60, and 7306.29.81, and reported for statistical purposes under statistical reporting numbers 7304.29.1010, 7304.29.1020, 7304.29.1030, 7304.29.1040, 7304.29.1050, 7304.29.1060, 7304.29.1080, 7304.29.2010, 7304.29.2020, 7304.29.2030, 7304.29.2040, 7304.29.2050, 7304.29.2060, 7304.29.2080, 7304.29.3110, 7304.29.3120, 7304.29.3130, 7304.29.3140, 7304.29.3150, 7304.29.3160, 7304.29.3180, 7304.29.4110, 7304.29.4120, 7304.29.4130, 7304.29.4140, 7304.29.4150, 7304.29.4160, 7304.29.4180, 7304.29.5015, 7304.29.5030, 7304.29.5045, 7304.29.5060, 7304.29.5075, 7304.29.6115, 7304.29.6130, 7304.29.6145, 7304.29.6160, 7304.29.6175, 7305.20.2000, 7305.20.4000, 7305.20.6000, 7305.20.8000, 7306.29.1030, 7306.29.1090, 7306.29.2000, 7306.29.3100, 7306.29.4100, 7306.29.6010, 7306.29.6050, 7306.29.8110, and 7306.29.8150. OCTG imported from India, Korea, Turkey, Ukraine, and Vietnam enter the U.S. market at a column 1-general duty rate of "free." Decisions on the tariff classification and treatment of imported goods are within the authority of U.S. Customs and Border Protection.

### Section 232 tariff treatment

OCTG imports produced in India, Turkey, Ukraine, and Vietnam are subject to a 25 percent ad valorem duty under Section 232 of the Trade Expansion Act of 1962, as amended.[31] The history of Section 232 Presidential proclamations is included in appendix E. OCTG imports produced in Korea are exempt from the 25 percent ad valorem duty under Section 232, but are instead subject to an aggregate absolute import quota of 460,867,818 kilograms (508,020 short tons) per year.[32] Section 232 import duties cover all countries of origin except Argentina,

---

[31] Adjusting Imports of Steel Into the United States, Presidential Proclamation 9705, March 8, 2018, 83 FR 11625, March 15, 2018. OCTG imports produced in Turkey were subject to a 50 percent ad valorem duty under Section 232 from August 13, 2018, through May 20, 2019. Beginning on May 21, 2019, the 232 duty for Turkey returned to 25 percent. U.S. Customs and Border Protection, "Trade Remedies," https://www.cbp.gov/trade/programs-administration/trade-remedies, retrieved June 16, 2020.

[32] See U.S. note 16(e), subchapter III of chapter 99 of the HTSUS. Also, see U.S. Customs and Border Protection, QB 18-118 Steel Mill Articles (AMENDED), https://www.cbp.gov/trade/quota/bulletins/qb-18-118-steel-mill-articles, retrieved April 6, 2020.

(*continued*...)

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Appx350

Barcode:4168004-04 A-357-824 INV - Investigation  -

Australia, Brazil, Canada, Mexico, and Korea. Section 232 absolute quotas cover imports from Argentina, Brazil, and Korea.[33]

## The product

### Description and applications[34]

Steel pipe and tubes are made in circular, rectangular, or other cross sections, and are generally manufactured by either the welded or seamless process. Steel pipe and tube manufactured by either process can be categorized by the carbon and alloy grades used in steel production. In addition, steel pipe and tube can be further categorized by end use. The American Iron and Steel Institute (AISI) has defined six such end use categories: standard pipe, line pipe, structural pipe and tubing, mechanical tubing, pressure tubing, and oil country tubular goods.[35]

Steel pipe and tubes are generally produced according to standards and specifications published by a number of organizations, including the American Society for Testing and Materials (ASTM), the American Society of Mechanical Engineers (ASME), and the API. Comparable organizations in the United Kingdom, Japan, and Russia, and other countries also have developed standard specifications for steel pipe and tubes.

OCTG includes casing and tubing of carbon and alloy steel used in oil and gas wells. Figure I-1 shows a simplified schematic arrangement of a typical well with a system of casing and tubing. Figure I-2 presents a more detailed representation of an oil or gas well, including descriptions of different types of casing by depth and function.

---

[33] U.S. Customs and Border Protection, Section 232 Tariffs on Aluminum and Steel, https://www.cbp.gov/trade/programs-administration/trade-remedies/section-232-trade-remedies-aluminum-and-steel, retrieved April 6, 2020. Australia, Canada, and Mexico were exempted from duties and quotas.

[34] Unless otherwise noted, this information is based on *Certain oil Country Tubular Goods From India, Korea, Philippines, Saudi Arabia, Taiwan, Thailand, Turkey, Ukraine, and Vietnam, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1223 (Final)*, USITC Publication 4489, September 2014, pp. I-13 through I-20.

[35] OCTG are steel pipe and tubes used in the drilling of oil and gas wells and in the conveying of oil and gas from within the well to ground level. Standard, line, and pressure pipe is generally intended to convey liquids and is typically tested and rated for its ability to withstand hydrostatic pressure. Structural pipe and tubing are used for load-bearing purposes and construction, and only small amounts of seamless pipe are used in structural applications. Seamless mechanical tubing is typically a custom-designed product employed within the automotive industry and by equipment manufacturers.

I-20

Barcode:4168004-04 A-357-824 INV - Investigation  -

**Figure I-1**
**Casing and tubing: Simplified diagrammatic representation of a well showing the casing strings and production tubing**



Source: Introduction to Oil and Gas Production, Fifth Edition, American Petroleum Institute, June 1996, p. 11.

I-21

Appx352

Barcode:4168004-04 A-357-824 INV - Investigation  -

**Figure I-2**
**Casing and tubing: Subsurface components of an oil or gas well, including descriptions of different types of casing by depth and function**



Source: The Energy Council, "Facts," found at https://energycouncil.org/facts/#about-natural-gas, retrieved April 6, 2020.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

Advancements in oil and gas exploration technologies, including advanced horizontal drilling[36] and hydraulic fracturing (figure I-3),[37] have enabled oil and gas wells to reach locations that were previously deemed cost-prohibitive. In addition, the application of new technologies permits more wells per acre, thus increasing oil and gas production and recoverable reserves.

Casing is a circular pipe that serves as a structural retainer for the walls of the well. Casing typically has an outside diameter (OD) ranging from 4.5 inches to 20 inches and a length typically ranging from 34 feet to 48 feet. Casing provides a firm foundation for the drill string[38] by supporting the walls of the hole to prevent caving in or wall collapse both during drilling and after the well is completed. After the casing is set in the well hole, concrete is usually pumped down through the casing to the bottom of the well and then up the annulus (the space between the well wall and the casing) until the annulus is filled.

---

[36] Horizontal drilling is a variant of directional drilling in which vertical drilling within a well turns horizontal with the reservoir rock to expose more of the wellbore to the oil or natural gas. More oil and natural gas can be produced from fewer wells with less surface disturbance. American Petroleum Institute (API), "Advanced Drilling Techniques," found at http://www.api.org/oil-and-natural-gas-overview/exploration-and-production/natural-gas/advanced-drilling, retrieved April 6, 2020. The number of active drilling rigs has decreased since the original investigation. On August 22, 2014, 70 percent of active rotary rigs (1,321 rigs) in the United States employed horizontal drilling, while 11 percent (209 rigs) employed directional drilling; the remaining 19 percent (366 rigs) employed vertical drilling. However, as of May 29, 2020, 90 percent of active rotary rigs (271 rigs) in the United States employed horizontal drilling, while 8 percent (23 rigs) employed directional drilling; the remaining 2 percent (7 rigs) employed vertical drilling. Baker Hughes International Inc., "North American Rotary Rig Count (Jan 2000 – Current)," May 29, 2020, found at https://rigcount.bhge.com/na-rig-count, retrieved June 2, 2020. The footage of onshore wells drilled in the United States *** from *** feet in 2014 to *** feet in 2019. Footage drilled was projected to *** to *** feet in 2020. ***.

[37] Hydraulic fracturing (commonly referred to as "fracking") requires the high-pressure injection of a mixture of water, sand, and chemicals through the well and into the surrounding shale rock formations, creating a network of narrow fractures in the rock. The fractures allow more oil and natural gas to enter through perforations made in the casing and tubing.

[38] The drill string consists of three different nonsubject products: drill pipe, drill collars, and the drill bit.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

**Figure I-3**
**Casing and tubing: Horizontal drilling and hydraulic fracturing**



Source: American Petroleum Institute (API), "The Facts About Hydraulic Fracturing and Seismic Activity," 2013.

Casing also serves as a surface pipe designed to prevent contamination of the recoverable oil and gas by surface water, gas, sand, or limestone. Casing must be sufficiently strong to carry its own weight, as well as to resist both external pressure and pressure within the well. Casing can be threaded at both ends and connected with other casing pieces with

I-24

couplings or connectors. Because the amount of open hole that can be drilled at any one time is limited, larger wells require a string of concentric layers of casing rather than a single casing. Several sizes of casing may be set inside the well after it has been drilled, with the larger sizes set at the top of the well, and the smaller sizes set toward the bottom.

Tubing is a smaller-diameter pipe (between 1.050–4.5 inches OD) installed inside the larger-diameter casing that is used to conduct the oil or gas to the surface, either through natural flow or through pumping. Substances such as lubricants are also pumped into the well through the tubing for well treatment. Tubing must be strong enough to support its own weight, that of the oil or gas, and that of any pumping equipment suspended on the string. Tubing, like casing, usually is produced in accordance with API specification 5CT.

The API specification 5CT designates 10 separate grades of casing and tubing, identified by a letter and a number: H40, J55, K55, N80, L80, C90, R95, T95, P110, and Q125.[39] The API grade letter is an arbitrary designation, while the number refers to minimum yield strength in thousands of pounds per square inch, or "ksi".[40]  In addition, an API grade may be further delineated by chemical composition, method of production (i.e., seamless or welded), dimension, heat treatment, testing procedures, and other engineering specifications, depending on customers' requirements.[41] According to industry representatives, API grades H40, J55, and K55 generally refer to carbon grades that have lower minimum yield strengths and that do not require heat treatment. API grades N80, L80, P110, and Q125 generally refer to alloy grades (due to the inclusion of additional alloying elements in the steel) that have minimum yield strengths greater than 80,000 ksi and require heat treatment. Heat treatment enhances particular physical characteristics, including greater yield and tensile strengths.

API 5CT specifications require the seamless manufacturing process for grades ***, while grades *** can be produced using either the welded seamless process.[42] Seamless OCTG can be used to meet any API grade, while welded OCTG can be used to meet the majority of API grades, including those sold in the largest volumes in the United States.[43]

---

[39] Techstreet Store, "API SPEC 5CT," https://www.techstreet.com/standards/api-spec-5ct?product_id=2016190, retrieved June 3, 2020.

[40] Thus, Q125 has a higher yield strength than grade J55 or K55 (J55 and K55 differ with respect to minimum tensile strengths).

[41] For example, Grade L80, type 9Cr must contain 8-10 percent chromium by weight, be produced by the seamless manufacturing process, and be tempered and quenched.

[42] Grade *** must be produced by the seamless manufacturing process, while grade *** can be produced using either the welded seamless process. Domestic interested parties' posthearing brief, Exhibit 4.

[43] Domestic interested parties' posthearing brief, pp. I-5; Exhibits 2 and 3.

I-25

As noted above, not all OCTG requires heat treatment. For OCTG that does require heat treatment there are two categories of tubular products. Tubular products in the first category are often referred to as "green tube" (or less frequently "green pipe") and typically meet certain basic API requirements, such as those for diameter and wall thickness. The underlying steel is produced to a customer's specification so that the green tube can be converted into the required casing or tubing product, but the green tube itself is not sold "at grade."

Tubular products in the second category already meet and are certified to API 5CT specifications for casing and tubing but are produced with a steel chemistry that allows them to be upgraded. Such upgradeable OCTG is sometimes referred to as green tube, but industry practice is less consistent, since the upgradeable product is certified to chemical and mechanical properties, has an API monogram, and (as discussed below) does not require heat treatment.

Upgradeable OCTG that meets the minimum specifications for lower-grade API 5CT casing and tubing (i.e., H40 and J55) can be certified to those grades and used in applications not requiring additional heat treatment.[44]  Alternatively, depending on its steel composition and wall thickness, upgradeable OCTG that meets non-heat treatable API grades of casing and tubing can be subsequently heat treated to increase yield and tensile strengths in order to meet the minimum specifications for higher-grade API 5CT casing and tubing (e.g., L80 and P110).[45]

Finally, finished casing and tubing typically refers to product that has been heat treated (if required), tested, threaded, and coupled.

Coupling stock is a thick-walled, seamless tubular product used to manufacture coupling blanks. Coupling blanks, in turn, are unthreaded tube blanks used to make individual couplings. Couplings are thick-walled and internally threaded seamless cylinders that are used for joining two lengths of threaded OCTG. Couplings are produced and certified to the same API grade and type as the OCTG to which the couplings are joined. Coupling typically accounts for 2-3 percent of the weight of end-finished tubing or casing.

---

[44] Green tube certified to these grades undergo further finishing operations, including threading.

[45] API 5CT grades H40, J55, and K55 do not require heat treatment (although grades J55 and K55 can be heat treated at the manufacture's option). API grades N80 (types I and II), L80, C90, R95, T95, P110, and Q125 require some form of heat treatment. All grades are threaded in one form or another to finish the pipe. Domestic interested parties' posthearing brief, pp. I-4, June 1, 2020.

(*continued*...)

Barcode:4168004-04 A-357-824 INV - Investigation  -

## Manufacturing processes[46]

OCTG mills manufacture casing and tubing either by the seamless process or by the electric-resistance-welding ("ERW") process, a lower-cost method than the seamless process, depending on the service requirements. By contrast, mills manufacture coupling stock for OCTG couplings exclusively through the seamless process.

**Seamless OCTG** is manufactured by either of two high-temperature methods to form a central cavity in a solid steel billet; namely, the rotary piercing method and the hot extrusion method. Round or square billets serve as the input for seamless tubing (figure I-4). If a square billet is used, it is first forced through a circular roll pass, which transforms the billet from square to round for the piercing operation. In the rotary piercing method, the heating billet is gripped by angled rolls, which cause the billet to rotate and advance over a piercer point, forming a hole through the length of the billet. In the extrusion method, the billet is hot punch-pierced and then extruded axially through a die and over a mandrel, forming a hollow shell. The hollow shell produced by either method is then rolled with a fixed plug or with a continuous mandrel inside the shell to reduce the wall thickness and increase the shell's length. Finally, the shell is rolled in a sizing mill or a stretch-reducing mill where it is formed to size.

**Welded OCTG** is manufactured from steel sheet in coil form (figure I-5). The steel sheet is slit to the width that corresponds to the desired diameter of tube. The slit sheet passes through a series of rollers while at ambient temperature and forms a tubular shape. The edges are then heated by electric resistance and welded together by heat and pressure, without the addition of filler metal. The welding pressure causes some of the metal to be squeezed from the welding joint, forming a bead of metal on the inside and outside of the tube. This bead, or welding flash, is usually trimmed from both the outside and the inside surfaces.

---

[46] Unless otherwise noted, this information is based on *Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final)*, USITC Publication 4489, September 2014, p. I-21-28.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

**Figure I-4**
**Casing and tubing: Seamless manufacturing process**



Source: JFE Steel Corporation, OCTG (Product Catalog).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

**Figure I-5**
**Casing and tubing: General schematic of the ERW manufacturing process**



Source: JFE Steel Corporation, OCTG (Product Catalog).

I-29

Appx360

**Finishing phase**

After the forming phase, the pipe body is heat-treated, and its ends upset, threaded and coupled, as needed. U.S. pipe mills typically are equipped with the facilities necessary to perform these processes. Independent processors operate facilities that are capable of full-body heat treatment and that may upset pipe ends.[47] Threaders are capable of threading and coupling, hydrostatic testing, and measuring the length of OCTG products. Some processors and threaders may also manufacture couplings that become part of finished OCTG. Processors and threaders mainly serve imports, since OCTG are often imported with plain ends, and are heat treated, upset, and threaded in the United States. This approach provides the flexibility to offer casing and tubing in compliance with a variety of specifications, thus allowing them to serve a wide range of consumer needs.

**Heat treatment**

In the steel manufacturing process, specific engineering characteristics and mechanical properties of the steel can be achieved through the application of different heat treatments. Heat treating may involve one or more heating cycles in either a continuous or batch furnace, with controlled rates of cooling. Specific heat treating requirements depend on the grade of steel being processed. For welded pipe, the heat treatment may cover the welded seam only, or the full cross section of the pipe. API standards specify a documented procedure for every particular grade and type of pipe. API-specific heat treatment processes in the production of casing and tubing include annealing, normalizing, and quench and tempering.

Annealing is a single heat treatment process that prepares the steel for fabrication or service. The steel is heated to a temperature in or near a specific range and cooled at a predetermined rate or cycle. Annealing relieves internal residual stresses or hardness induced by welding, by cold working, or by machining.

In the normalizing process, the pipe is heated above a specific temperature, held at this temperature for a specified time, and then air-cooled. Normalizing refines the steel grain size

---

[47] API defines a processor as: "firm, company, or corporation that operates facilities capable of heat treating pipe made by a pipe mill." Most processors typically perform threading operations, although many threaders do not perform processing operations. Discussion of independent threaders is limited in this report, as the Commission in recent OCTG investigations has not deemed independent threaders to be part of the domestic industry producing casing and tubing. *Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam, Investigation Nos. 731-TA-1215-1217 and 1219-1223 (Final)*, USITC Publication 4489, September 2014, pp. 13, I-24. *Certain Oil Country Tubular Goods from China, Investigation Nos. 701-TA-463 and 731-TA-1159 (Review)*, USITC Publication 4532, May 2015, p. 23.

I-30

and obtains a carbide size and distribution that is more suitable for future heat treatment than the as-rolled structure.

Quenching and tempering is a sequential process in which the pipe is heated to a specific temperature for a specified time period to modify the steel's microstructure, and then "quenched" in a cooling medium such as water, oil, or air, depending on the thickness of the pipe. After quenching, the steel is very brittle and must be reheated and then cooled under specific conditions. This process is called "tempering." The pipe must undergo a specified process of quenching and tempering in order to qualify for certain API grades.

Depending on the pipe design, API standards may specify a single heat treatment process or combination of processes for the pipe, such as normalizing and tempering, or quenching and tempering. After heat treatment, sizing rolls shape the tube to accurate diameter tolerances. The product is cooled and then cut to length at the end of the tube mill.

Coupling stock is made to the same grade and type specifications as casing and tubing. It must also be subject to the same heat treatment as pipe, except where specified by the purchaser.

**Upsetting and threading**

Casing and tubing are finished by threading and the attachment of a suitable coupling to one end of each length. If additional strength in the joint is required, such as for some casing or tubing that is subject to severe or sour service,[48] the ends of the pipe are upset before threads are cut. In the upsetting process, the end of the pipe is heated to forging temperature, and then inserted endwise into an upsetting machine. The machine pushes the hot metal back, creating a thicker wall at the end of the pipe. The upsetting may be controlled to displace the extra thickness to the inside or the outside of the pipe.

Casing and tubing can be joined directly using male (outer) and female (inner) threading, or by using couplings with female threads on each end. Typically, the pipe is mounted on a lathe and threads are cut by using sharp steel cutting tools (called chasers), which are mounted on a threading die surrounding the pipe. As the pipe is turned on the lathe, the threading die moves along the pipe's axis, producing the required spiral cut on the inner or outer surface of the pipe. Threading can be made to meet API standards, or made to proprietary standards that

---

[48] Sour crude oil or sour gas is defined as an oil/gas containing common impurities such as water, carbon dioxide, hydrogen sulfide, and oxygen, which are mixed in with the oil/gas during extraction. These impurities corrode or cause cracking in steel; albeit, without any observable change in appearance prior to failure.

I-31

Barcode:4168004-04 A-357-824 INV - Investigation  -

are designed, registered, and protected by patents or other intellectual property rights mechanism and that are not specified by API standards. For instance, OCTG producers may market proprietary "semi-premium" or "premium" threaded connections that provide higher torsional loads, bending resistance, or greater sealability for casing in challenging drilling environments. Premium threaded connections generally refer to OCTG connections that have a metal-to-metal, gas type seal to ensure pressure integrity. Semi premium connections generally refer to connections that do not have a metal-to-metal seal, yet maintain water-type sealability, and thus may be used in less demanding wells with no gas-type sealability requirements. Examples of threaded and coupled semi premium and premium connections are shown in figures I-6 and I-7. After threading, a thread protector is applied to the threaded pipe ends during handling, transportation, or storage.[49]

_____

[49] Threading can be performed after transportation to avoid damage caused by movement, water, or weather. Damaged threads can cause expensive ruptures of the pipe string in casing and tubing applications where pipes are connected to one another by threaded joints.

I-32

Barcode:4168004-04 A-357-824 INV - Investigation  -

**Figure I-6**
**Casing and tubing: Threaded and coupled semi-premium connection**

USS-CDC™



Source: U.S. Steel Tubular Products, found at http://usstubular.com/octg-products-and-services/octgconnections, retrieved June 18, 2014.

I-33

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

**Figure I-7**
**Casing and tubing: Threaded and coupled premium connection**



Source: U.S. Steel Tubular Products, found at http://usstubular.com/octg-products-and-services/octgconnections, retrieved June 18, 2014.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Appx365

Barcode:4168004-04 A-357-824 INV - Investigation  -

**Table II-2**
**OCTG: U.S. producers' and importers' share of reported U.S. shipments, by sources and channels of distribution, January 2014-December 2019**

| Item | Calendar year | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| | Share of U.S. shipments (percent) | | | | | |
| U.S. producers: to Distributors | 92.8 | 88.5 | 86.6 | 88.5 | 84.8 | 83.2 |
| to Processors | *** | *** | *** | *** | *** | *** |
| to End users | *** | *** | *** | *** | *** | *** |
| U.S. importers:  India to Distributors | *** | *** | *** | *** | *** | *** |
| to Processors | *** | *** | *** | *** | *** | *** |
| to End users | *** | *** | *** | *** | *** | *** |
| U.S. importers:  Korea to Distributors | *** | *** | *** | *** | *** | *** |
| to Processors | *** | *** | *** | *** | *** | *** |
| to End users | *** | *** | *** | *** | *** | *** |
| U.S. importers:  Turkey to Distributors | *** | *** | *** | *** | *** | *** |
| to Processors | *** | *** | *** | *** | *** | *** |
| to End users | *** | *** | *** | *** | *** | *** |
| U.S. importers:  Ukraine to Distributors | *** | *** | *** | *** | *** | *** |
| to Processors | *** | *** | *** | *** | *** | *** |
| to End users | *** | *** | *** | *** | *** | *** |
| U.S. importers:  Vietnam to Distributors | *** | *** | *** | *** | *** | *** |
| to Processors | *** | *** | *** | *** | *** | *** |
| to End users | *** | *** | *** | *** | *** | *** |
| U.S. importers:  Nonsubject sources to Distributors | 84.7 | 82.2 | 72.0 | 72.3 | 66.5 | 65.3 |
| to Processors | *** | *** | *** | *** | *** | *** |
| to End users | *** | *** | *** | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

## Geographic distribution

U.S. producers reported selling OCTG to all regions in the contiguous United States (table II-3). Imported OCTG from Korea was sold throughout all regions in the United States, while imports from other subject countries were focused in particular regions. Imports of OCTG from *** were sold in all regions except the Southeast and imports of OCTG from *** were sold in all regions except the Mountains. Imports for OCTG from India were focused in the Midwest, Central Southwest and Pacific Coast, and imports of OCTG from *** were focused in the Midwest and Central Southwest.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

**Table II-3**
**OCTG: Geographic market areas in the United States served by U.S. producers and importers**

| Region | U.S. producers | India | Korea | Turkey | Ukraine | Vietnam | Subject sources |
|--------|---------------|-------|-------|--------|---------|---------|-----------------|
| Northeast | 9 | --- | 1 | *** | *** | *** | 2 |
| Midwest | 8 | 1 | 1 | *** | *** | *** | 2 |
| Southeast | 6 | --- | 1 | *** | *** | *** | 2 |
| Central Southwest | 9 | 2 | 4 | *** | *** | *** | 7 |
| Mountains | 8 | --- | 1 | *** | *** | *** | 2 |
| Pacific Coast | 6 | 2 | 2 | *** | *** | *** | 5 |
| Other[1] | 3 | --- | --- | *** | *** | *** | --- |
| All regions (except Other) | 5 | --- | 1 | *** | *** | *** | 1 |
| Reporting firms | 10 | 4 | 4 | 1 | 2 | 1 | 8 |

Note: Regions are defined as follows: Northeast (CT, ME, MA, NH, NJ, NY, PA, RI, and VT), Midwest (IL, IN, IA, KS, MI, MN, MO, NE, ND, OH, SD, and WI), Southeast (AL, DE, DC, FL, GA, KY, MD, MS, NC, SC, TN, VA, and WV), Central Southwest (AR, LA, OK, and TX), Mountains (AZ, CO, ID, MT, NV, NM, UT, and WY), Pacific Coast (CA, OR, and WA). Other is all other U.S. markets, including AK, HI, PR, and VI.
Source: Compiled from data submitted in response to Commission questionnaires.

For both U.S. producers and importers, approximately half of sales were between 101 and 1,000 miles of their production facilities. Most of U.S. producers' remaining sales shipped over 1,000 miles of their production facilities, while most U.S. importers' remaining sales were shipped between zero and 100 miles of point of importation or storage facility.

## Supply and demand considerations

### U.S. supply

Table II-4 provides a summary of the supply factors regarding OCTG from U.S. producers and from subject countries. No questionnaire data were received from foreign producers in Korea, Turkey, or Vietnam, so data are limited. However, based on available data, staff believe that U.S. producers and producers of OCTG from subject countries have the ability to respond to changes in demand with at least moderately large changes in the quantity of shipments to the U.S. market.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

# EXHIBIT I-12

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

# Certain Oil Country Tubular Goods from China

Investigation No. 731-TA-1159 (Final)

**Publication 4152**                                                 **May 2010**



**U.S. International Trade Commission**

**Washington, DC 20436**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

# UNITED STATES INTERNATIONAL TRADE COMMISSION

## Investigation No. 731-TA-1159 (Final)

## CERTAIN OIL COUNTRY TUBULAR GOODS FROM CHINA

**DETERMINATION**

On the basis of the record[1] developed in the subject investigation, the United States International Trade Commission (Commission) determines, pursuant to section 735(b) of the Tariff Act of 1930 (19 U.S.C. § 1673d(b)) (the Act), that an industry in the United States is threatened with material injury by reason of imports from China of certain oil country tubular goods ("OCTG"), primarily provided for in subheadings 7304.29, 7305.20, and 7306.29 of the Harmonized Tariff Schedule of the United States, that have been found by the Department of Commerce (Commerce) to be sold at less than fair value.[2][3]

**BACKGROUND**

The Commission instituted this investigation effective April 8, 2009, following receipt of a petition filed with the Commission and Commerce by Maverick Tube Corporation, Houston, TX; United States Steel Corporation, Pittsburgh, PA; V&M Star LP, Houston, TX; V&M Tubular Corporation of America, Houston, TX; TMK IPSCO, Camanche, IA; Evraz Rocky Mountain Steel, Pueblo, CO; Wheatland Tube Corp., Wheatland, PA; and the United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO–CLC, Pittsburgh, PA. The final phase of the investigation was scheduled by the Commission following notification of a preliminary determination by Commerce that imports of certain OCTG from China were being subsidized within the meaning of section 703(b) of the Act (19 U.S.C. § 1671b(b)). Notice of the scheduling of the final phase of the Commission's investigation and of a public hearing to be held in connection therewith was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the *Federal Register* of September 30, 2009 (74 FR 50242). Following notification of a preliminary determination by Commerce that imports of OCTG from China were being sold at LTFV within the meaning of section 733(b) of the Act (19 U.S.C. § 1673b(b)) (74 FR 59117, November 17, 2009), the Commission issued additional scheduling dates with respect to the antidumping duty investigation (74 FR 67248, December 18, 2009). The hearing was held in Washington, DC, on December 1, 2009, and all persons who requested the opportunity were permitted to appear in person or by counsel.

---

[1] The record is defined in sec. 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR § 207.2(f)).

[2] Commissioners Charlotte R. Lane and Irving A. Williamson determine that the domestic OCTG industry is materially injured by reason of imports of the subject merchandise from China. They make a negative finding with respect to critical circumstances.

[3] Chairman Shara L. Aranoff, Vice Chairman Daniel R. Pearson, Commissioner Deanna Tanner Okun, and Commissioner Dean A. Pinkert determine that they would not have found material injury but for the suspension of liquidation.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

# VIEWS OF THE COMMISSION

Based on the record in the final phase of this investigation, we determine that an industry in the United States is threatened with material injury by reason of imports of certain oil country tubular goods ("OCTG") from China that have been found by the U.S. Department of Commerce ("Commerce") to be sold in the United States at less than fair value.[1]

## ADOPTION OF VIEWS IN EARLIER COUNTERVAILING DUTY INVESTIGATION

This investigation arose out of simultaneously filed petitions seeking the imposition of antidumping duties and countervailing duties on imports of OCTG from China. The Commission was previously required to issue its determination in the countervailing duty investigation of OCTG from China (in January 2010),[2] because Commerce issued its final determination in the countervailing duty investigation[3] earlier than in the antidumping investigation.[4]

Under section 771(7)(G)(iii) of the Tariff Act of 1930, as amended, we make our determination in this investigation on the same record as that of our determination in the earlier countervailing duty investigation, except that the record in this investigation also includes Commerce's final determination in the antidumping investigation of subject imports from China and the parties' final comments concerning the significance of that determination.[5][6][7]   Based on the record in the final phase of this investigation, we

---

[1] Commissioners Charlotte R. Lane and Irving A. Williamson determine that a domestic industry is materially injured by reason of subject imports of OCTG from China.

[2] 75 Fed. Reg. 3248 (Jan. 20, 2010), Certain Oil Country Tubular Goods from China, Inv. No. 701-TA-463 (Final), USITC Pub. 4124 (Jan. 2010).

[3] Certain Oil Country Tubular Goods from the People's Republic of China:  Final Affirmative Countervailing Duty Determination, 74 Fed. Reg. 64045 (Dec. 7, 2009).

[4] Certain Oil Country Tubular Goods from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, 75 Fed. Reg. 30335 (Apr. 19, 2010).

[5] Comments on Commerce's final determination in the antidumping investigation were filed by petitioners Maverick Tube Corporation and United States Steel Corporation, and by Chinese producers and exporters Tianjin Pipe (Group) Corporation; Baosteel Group Corporation; Zhejiang Jianli Group; Jiangsu Changde Steel Tube Share Co., Ltd.; Wuxi Seamless Oil Pipe Co., Ltd.; Baotou Iron & Steel (Group) Co., Ltd.; Anhui Tianda Oil Pipe Co., Ltd.; Pangang Group Chengdu Iron & Steel Co., Ltd.; Shengli Oilfield Highland Petroleum Equipment Co., Ltd.; Jiangsu Changbao Steel Tube Co., Ltd.; Hengyang Valin Steel Tube Co., Ltd.; and Angang Steel Company Limited (collectively, "Chinese Respondents").

[6] Section 771(7)(G)(iii) provides –

> In each final determination in which it cumulatively assesses the volume and effect of imports [in determining whether a domestic industry is materially injured by reason of subject imports], the Commission shall make its determinations based on the record compiled in the first investigation in which it makes a final determination, except that when [Commerce] issues its final determination in a subsequently completed investigation, the Commission shall permit the parties in the subsequent investigation to submit comments concerning the significance of [Commerce's] final determination, and shall include such comments and [Commerce's] final determination in the record for the subsequent investigation.

19 U.S.C. § 1677(7)(G)(iii).  Chinese Respondents assert that the record in the antidumping duty investigation ought not to be defined or limited by section 1677(7)(G)(iii) because the Commission's affirmative determination in the countervailing duty investigation of OCTG from China was based on threat of material injury, whereas section

(continued...)

3

Barcode:4168004-04 A-357-824 INV - Investigation -

adopt the findings and analyses in our earlier countervailing duty investigation concerning OCTG from China with respect to the domestic like product, the domestic industry, conditions of competition, material injury, and threat of material injury.[8]

## CONCLUSION

For the foregoing reasons, we determine that the domestic industry producing OCTG is threatened with material injury by reason of subject imports of OCTG from China that are sold in the United States at less than fair value.[9]

---

[6] (...continued)
1677(7)(G)(iii) applies only to determinations based on material injury. Chinese Respondents are mistaken. All Commissioners have cumulatively assessed the volume and effect of the subsidized and dumped OCTG imports for purposes of determining material injury in these investigations. See Bingham & Taylor v. United States, 815 F.2d 1482 (Fed. Cir. 1987); see also Softwood Lumber from Canada, Inv. Nos. 701-TA-414 (Final) and 731-TA-928 (Final), USITC Pub. 3509 (May 2002) at 29. The record in the antidumping investigation, therefore, is limited by section 1677(7)(G)(iii) to the record that was before the Commission in the countervailing duty investigation, plus Commerce's final determination in its antidumping duty investigation and party comments on that determination. Id. That is, once cumulation occurs in our analysis of material injury, section 1677(7)(G)(iii) applies regardless of whether the material injury determination is followed by assessment of threat of material injury as well. A final determination addressing threat of material injury will always be preceded by a determination addressing present material injury, and we have done so here by adopting our previous finding. See, generally, R-M Industries v. United States, 18 CIT 219, 228-29, 848 F. Supp. 204, 212 (1994) (an affirmative final threat determination must include a determination on whether present material injury exists).

[7] Commerce found that all of the subject imports from China were sold at less than fair value in the United States. 75 Fed. Reg. 30335, 30340-41 (Apr. 19, 2010). For producers/exporters Tianjin Pipe International Economic and Trading Corp.; Zhejiang Jianli Co., Ltd.; Wuxi Seamless Pipe Co., Ltd.; and all other companies that received separate rates, Commerce found a dumping margin of 29.94 percent. For all other producers and exporters of OCTG from China, Commerce calculated a dumping margin of 99.14 percent. Id. The Chinese Respondents and petitioners Maverick Tube Corporation and U.S. Steel Corporation filed comments on Commerce's final antidumping duty determination on April 16, 2010.

[8] Commissioners Charlotte R. Lane and Irving A. Williamson adopt the findings and analyses in their separate views in the earlier countervailing duty investigation concerning OCTG from China (USITC Pub. 4124 at 29-35) and again join sections I-V of the Commission's determination in that investigation (id. at 3-16).

[9] Commissioners Charlotte R. Lane and Irving A. Williamson determine that a domestic industry is materially injured by reason of subject imports of OCTG from China. They make a negative critical circumstances finding with respect to those subject imports from China for which Commerce made an affirmative finding of critical circumstances in its final less than fair value determination. Between the six months pre- and post-filing of the petition (October 2008-March 2009 and April 2009-September 2009), the relevant subject imports from China declined by *** percent. Memorandum INV-HH-039 (Apr. 21, 2010) at Table I-2. Accordingly, they find that the imports from China subject to Commerce's critical circumstances determination are *not* "likely to undermine seriously the remedial effect of the antidumping order to be issued." 19 U.S.C. § 1673d(b)(4)(A)(i).

4

Barcode:4168004-04 A-357-824 INV - Investigation  -

# PART I:  INTRODUCTION

## BACKGROUND

This investigation results from a petition filed with the U.S. Department of Commerce ("Commerce") and the U.S. International Trade Commission ("USITC" or "Commission") by Maverick Tube Corporation ("Maverick"), Houston, TX; United States Steel Corporation ("U.S. Steel"), Pittsburgh, PA; V&M Star LP ("V&M Star"), Houston, TX; V&M Tubular Corporation of America ("V&M TCA"), Houston, TX; TMK IPSCO, Camanche, IA; Evraz Rocky Mountain Steel, Pueblo, CO; Wheatland Tube Corp. ("Wheatland"), Wheatland, PA; and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC, Pittsburgh, PA, alleging that an industry in the United States is materially injured and threatened with material injury by reason of subsidized and less-than-fair-value ("LTFV") imports of certain oil country tubular goods ("OCTG")[1] from China.  The following tabulation provides information relating to the background of the now-completed countervailing duty investigation,[2] as well as the antidumping duty investigation.[3]

| Effective date | Action |
|---|---|
| April 8, 2009 | Petition filed with Commerce and the Commission; institution of the Commission's investigation (74 FR 17514, April 15, 2009) |
| May 5, 2009 | Commerce's notice of initiation (74 FR 20671 and 74 FR 20678) |
| May 26, 2009 | Commission's preliminary determination (74 FR 27559, June 10, 2009) |
| September 15, 2009 | Commerce's preliminary CVD determination (74 FR 47210); scheduling of final phase of Commission investigation (74 FR 50242, September 30, 2009) |
| November 17, 2009 | Commerce's preliminary AD determination (74 FR 59117) |
| December 1, 2009 | Commission's hearing |
| December 7, 2009 | Commerce's final CVD determination (74 FR 64045); the Commission received formal notification of Commerce's determination on November 30, 2009 |
| December 30, 2009 | Commission's CVD vote |
| January 13, 2010 | Commission's CVD determination transmitted to Commerce (75 FR 3248, January 20, 2010) |
| April 19, 2010 | Commerce's final AD determination (75 FR 20335) |
| May 3, 2010 | Commission's AD vote |
| May 14, 2010 | Commission's AD determination transmitted to Commerce |

The information contained in this report is intended to be used in conjunction with data presented in the Commission's report entitled *Certain Oil Country Tubular Goods from China, Inv. No. 701-TA-463 (Final)*, USITC Publication 4124, January 2010 ("USITC Publication 4124") and its corresponding confidential version contained in memorandum No. INV-GG-113, *Certain Oil Country Tubular Goods*

---

[1] This report uses the term "OCTG" to describe the product at issue, even though certain lower volume or specialized forms of OCTG (drill pipe, high-chromium casing and tubing) are excluded.

[2] The Commission transmitted its affirmative determination and views with respect to the countervailing duty investigation concerning OCTG from China on January 13, 2010.  *Certain Oil Country Tubular Goods from China, Inv. No. 701-TA-463 (Final)*, USITC Publication 4124, January 2010, p. I-1.  The Commission's affirmative determination was published in the *Federal Register* on January 20, 2010 (75 FR 3248).

[3] Commerce's *Federal Register* notice of its final determination of sales at LTFV (cited in the tabulation) is presented in app. A.

I-1

*from China* ("INV-GG-113"). No new information except for Commerce's final affirmative determination of sales at LTFV of OCTG from China and party comments thereon is included in the record for this proceeding.

## NATURE AND EXTENT OF SALES AT LTFV

On April 9, 2010, Commerce published a notice in the *Federal Register* of its final determination of sales at LTFV with respect to imports of OCTG from China. Table I-1 presents Commerce's final dumping margins with respect to imports of OCTG from China.[4]

**Table I-1**
**OCTG:  Commerce's final weighted-average LTFV margins with respect to imports from China**

| Exporter | Final weighted-average dumping margin (*percent*) |
|---|---|
| Tianjin Pipe International Economic and Trading Corp. | 29.94 |
| Zhejiang Jianli Co., Ltd. (Separate Rate Company) | 29.94 |
| Wuxi Seamless Pipe Co., Ltd. (Separate Rate Company) | 29.94 |
| All Other Separate Rate Companies[1] | 29.94 |
| PRC-wide (including Jiangsu Changbao Steel Tube Co., Ltd.) | 99.14 |

[1] For a complete list of companies see the *Federal Register* notice of Commerce's final determination.

Source:  75 FR 20335, April 19, 2010.

## CRITICAL CIRCUMSTANCES

In its preliminary determination, Commerce concluded that "critical circumstances" did not exist for mandatory respondent Jiangsu Chengbao Steel Tube Co., Ltd. ("Changbao"), among others, but did exist with respect to imports of the PRC-wide entity. In its final determination, however, Commerce concluded that "critical circumstances" did exist for Changbao. Based on existing record evidence, Changbao's U.S. imports for October 2008-September 2009[5] are included in table I-2. Table I-2 of this report corresponds to table IV-5 of USITC Publication 4124 and INV-GG-113.

**Table I-2**
**OCTG:  U.S. imports from China subject to Commerce's final critical circumstances determination, by month, October 2008 - September 2009**

\*        \*        \*        \*        \*        \*        \*

---

[4] Table I-1 of this report corresponds to table I-3 of USITC Publication 4124 and INV-GG-113.

[5] These data are compiled from confidential Customs information (EDIS document no. 404538).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

# EXHIBIT I-13

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No Image

Barcode:4168004-04 A-357-824 INV - Investigation  -

# Certain Oil Country Tubular Goods from China

Investigation No. 701-TA-463 (Final)

**Publication 4124**                                    **January 2010**



**U.S. International Trade Commission**

**Washington, DC 20436**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

UNITED STATES INTERNATIONAL TRADE COMMISSION

Investigation No. 701-TA-463 (Final)

CERTAIN OIL COUNTRY TUBULAR GOODS FROM CHINA

## DETERMINATION

On the basis of the record[1] developed in the subject investigation, the United States International Trade Commission (Commission) determines, pursuant to section 705(b) of the Tariff Act of 1930 (19 U.S.C. § 1671d(b)) (the Act), that an industry in the United States is threatened with material injury by reason of imports from China of certain oil country tubular goods ("OCTG"), primarily provided for in subheadings 7304.29, 7305.20, and 7306.29 of the Harmonized Tariff Schedule of the United States, that have been found by the Department of Commerce (Commerce) to be subsidized by the Government of China.[2] [3]

## BACKGROUND

The Commission instituted this investigation effective April 8, 2009, following receipt of a petition filed with the Commission and Commerce by Maverick Tube Corporation, Houston, TX; United States Steel Corporation, Pittsburgh, PA; V&M Star LP, Houston, TX; V&M Tubular Corporation of America, Houston, TX; TMK IPSCO, Camanche, IA; Evraz Rocky Mountain Steel, Pueblo, CO; Wheatland Tube Corp., Wheatland, PA; and the United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO–CLC, Pittsburgh, PA. The final phase of the investigation was scheduled by the Commission following notification of a preliminary determination by Commerce that imports of certain oil country tubular goods from China were being subsidized within the meaning of section 703(b) of the Act (19 U.S.C. § 1671b(b)). Notice of the scheduling of the final phase of the Commission's investigation and of a public hearing to be held in connection therewith was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the *Federal Register* of September 30, 2009 (74 FR 50242). The hearing was held in Washington, DC, on December 1, 2009, and all persons who requested the opportunity were permitted to appear in person or by counsel.

---

[1] The record is defined in sec. 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR § 207.2(f)).

[2] Commissioners Charlotte R. Lane and Irving A. Williamson determine that the domestic OCTG industry is materially injured by reason of imports of the subject merchandise from China.

[3] Chairman Shara L. Aranoff, Vice Chairman Daniel R. Pearson, Commissioner Deanna Tanner Okun, and Commissioner Dean A. Pinkert determine that they would not have found material injury but for the suspension of liquidation.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-04 A-357-824 INV - Investigation -

# VIEWS OF THE COMMISSION

Based on the record in the final phase of this investigation, we find that an industry in the United States is threatened with material injury by reason of certain imports of oil country tubular goods ("OCTG") from China that are subsidized by the Government of China.[1]

## I.     BACKGROUND

The petition in this investigation was filed on April 8, 2009.  The petitioners are domestic producers Maverick Tube Corporation ("Maverick"), Houston, Texas; United States Steel Corporation ("U.S. Steel"), Pittsburgh, Pennsylvania; V&M Star LP ("V&M"), Houston, Texas; V&M Tubular Corporation of America, Houston, Texas; TMK IPSCO, Camanche, Iowa; Evraz Rocky Mountain Steel ("EVRAZ"), Pueblo, Colorado; Wheatland Tube Corp. ("Wheatland"), Wheatland, Pennsylvania; and the trade union United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC, Pittsburgh, Pennsylvania ("Steel Workers") (collectively, "petitioners").  The petitioners filed prehearing and posthearing briefs and appeared at the hearing.  The Chinese producers or exporters of OCTG that filed prehearing and posthearing briefs and appeared through counsel at the hearing include Tianjin Pipe (Group) Corporation; Baosteel Group Corporation; Zhejiang Jianli Group; Jiangsu Changde Steel Tube Share Co., Ltd.; Wuxi Seamless Oil Pipe Co., Ltd.; Baotou Iron & Steel (Group) Co., Ltd.; Anhui Tianda Oil Pipe Co., Ltd.; Pangang Group Chengdu Iron & Steel Co., Ltd.; Shengli Oilfield Highland Petroleum Equipment Co., Ltd.; Jiangsu Changbao Steel Tube Co., Ltd; Hengyang Valin Steel Tube Co., Ltd.; and Angang Steel Company Limited (collectively, "Respondents").

There are 12 mills and processors believed to be producing OCTG in the United States, of which seven responded with usable data.[2]  These questionnaire responses account for over \*\*\* percent of domestic mill production and shipments of OCTG.[3]  The Commission received usable preliminary and/or final phase questionnaire responses from importers accounting for 77.9 percent of total U.S. OCTG imports from China in 2008.[4][5]  The Commission also received usable questionnaire responses from 16 Chinese producers/exporters, which accounted for approximately \*\*\* percent of production capacity of OCTG and related tubular products in China during 2008, approximately 56 percent of total exports of OCTG from China in 2009 and 66 percent of exports from China to the United States in 2008.[6]

---

[1] Commissioners Lane and Williamson determine that the domestic industry is materially injured by reason of subject imports.  See Separate Views of Commissioners Charlotte R. Lane and Irving A. Williamson.  They join in parts I-V of these Views.

[2] The Commission received responses from the seven petitioning firms, but several firms certified by the American Petroleum Institute ("API") to manufacture (Paragon Industries and Tex Tube) or process (Tejas Tubulars, Texas Steel Conversion, and Tubular Services, LP) OCTG provided \*\*\* data.  See Confidential Staff Report, INV-GG-113 ("CR") at I-3, III-1, and Table III-1; Public Staff Report ("PR") at I-3, III-1, and Table III-1.

[3] CR/PR at III-1.

[4] CR/PR at IV-1.

[5] Ten importers that responded to the Commission's importer questionnaire in the preliminary phase of this investigation and the companion antidumping duty investigation did not respond in this final phase.  The preliminary phase responses of these companies, which accounted for \*\*\* percent of subject imports from China in 2008, are reflected in the full year data in the Commission's staff report, but no data for those companies are included among the data for the interim periods (January - September 2008 and January - September 2009).  CR/PR at IV-1 n.2.

[6] CR at VII-6-7, PR at VII-3-4.  The coverage calculations for the Chinese industry include questionnaires submitted less than a week before the issuance of the staff report.

3

Barcode:4168004-04 A-357-824 INV - Investigation -

## II.    DOMESTIC LIKE PRODUCT

### A.    In General

In determining whether an industry in the United States is materially injured or threatened with material injury by reason of imports of the subject merchandise, the Commission first defines the "domestic like product" and the "industry."[7]  Section 771(4)(A) of the Tariff Act of 1930, as amended ("the Tariff Act"), defines the relevant domestic industry as the "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[8]  In turn, the Tariff Act defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation ... ."[9]

The decision regarding the appropriate domestic like product(s) in an investigation is a factual determination, and the Commission has applied the statutory standard of "like" or "most similar in characteristics and uses" on a case-by-case basis.[10]  No single factor is dispositive, and the Commission may consider other factors it deems relevant based on the facts of a particular investigation.[11]  The Commission looks for clear dividing lines among possible like products and disregards minor variations.[12]  Although the Commission must accept the determination of the U.S. Department of Commerce ("Commerce") as to the scope of the imported merchandise subsidized or sold at LTFV,[13] the Commission determines what domestic product is like the imported articles Commerce has identified.[14]

---

[7] 19 U.S.C. § 1677(4)(A).

[8] 19 U.S.C. § 1677(4)(A).

[9] 19 U.S.C. § 1677(10).

[10] See, e.g., Cleo, Inc. v. United States, 501 F.3d 1291, 1299 (Fed. Cir. 2007); NEC Corp. v. Department of Commerce, 36 F. Supp.2d 380, 383 (Ct. Int'l Trade 1998); Nippon Steel Corp. v. United States, 19 CIT 450, 455 (1995); Torrington Co. v. United States, 747 F. Supp. 744, 749 n.3 (Ct. Int'l Trade 1990), aff'd, 938 F.2d 1278 (Fed. Cir. 1991) ("every like product determination 'must be made on the particular record at issue' and the 'unique facts of each case'").  The Commission generally considers a number of factors including the following: (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions of the products; (5) common manufacturing facilities, production processes, and production employees; and, where appropriate, (6) price.  See Nippon, 19 CIT at 455 n.4; Timken Co. v. United States, 913 F. Supp. 580, 584 (Ct. Int'l Trade 1996).

[11] See, e.g., S. Rep. No. 96-249 at 90-91 (1979).

[12] Nippon, 19 CIT at 455; Torrington, 747 F. Supp. at 748-49; see also S. Rep. No. 96-249 at 90-91 (1979) (Congress has indicated that the like product standard should not be interpreted in "such a narrow fashion as to permit minor differences in physical characteristics or uses to lead to the conclusion that the product and article are not 'like' each other, nor should the definition of 'like product' be interpreted in such a fashion as to prevent consideration of an industry adversely affected by the imports under consideration.").

[13] See, e.g., USEC, Inc. v. United States, 34 Fed. Appx. 725, 730 (Fed. Cir. 2002) ("The ITC may not modify the class or kind of imported merchandise examined by Commerce."); Algoma Steel Corp. v. United States, 688 F. Supp. 639, 644 (Ct. Int'l Trade 1988), aff'd, 865 F.3d 240 (Fed. Cir.), cert. denied, 492 U.S. 919 (1989).

[14] Hosiden Corp. v. Advanced Display Mfrs., 85 F.3d 1561, 1568 (Fed. Cir. 1996) (Commission may find a single like product corresponding to several different classes or kinds defined by Commerce); Cleo, 501 F.3d at 1298 n.1 ("Commerce's {scope} finding does not control the Commission's {like product} determination."); Torrington, 747 F. Supp. at 748-52 (affirming Commission determination of six like products in investigations where Commerce found five classes or kinds).

4

Barcode:4168004-04 A-357-824 INV - Investigation -

B.     **Product Description**

In its final countervailing duty determination, Commerce defined the imported merchandise within the scope of the investigation as follows:

> OCTG, which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (e.g., whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute ("API") or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached.  The scope of the investigation also covers OCTG coupling stock.  Excluded from the scope of the investigation are casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.[15]

OCTG are tubular steel products used in oil and gas wells and include casing, tubing, and coupling stock of carbon and alloy steel.[16]  Casing is a circular pipe that serves as the structural retainer for the walls of the well with an outside diameter (OD) ranging from 4.5 to 20 inches.  Casing is used in the well to provide a firm foundation for the drill string[17] by supporting the walls of the hole to prevent caving in both during drilling and after the well is completed.  After the casing is set, concrete is usually pumped between the outside of the casing and the wall of the hole to provide a secure anchor.  Casing also serves as a surface pipe designed to prevent contamination of the recoverable oil and gas by surface water, gas, sand, or limestone.  Casing must be sufficiently strong to carry its own weight and to resist both external pressure and pressure within the well.  Casing can be threaded at both ends and connected to other casing pieces with couplings or connectors.  Because the amount of open hole that can be drilled at any one time is limited, a string of concentric layers of casing, rather than a single casing, is used for larger wells.  Several sizes of casing may be set inside the well after it has been drilled, with the larger sizes set at the top of the well and the smaller sizes toward the bottom.[18]

Tubing is a smaller-diameter pipe (between 1.050 and 4.500 inches in OD) installed inside a larger-diameter casing that is used to conduct the oil or gas to the surface either through natural flow or pumping.  Substances (such as lubricant) are also pumped into the well through the tubing for well treatment.  Tubing must be strong enough to support its own weight, that of the oil or gas, and that of any pumping equipment suspended on the string.[19]

Coupling stock is a seamless tubular product used to make coupling blanks which, in turn, are used to produce coupling.  Only coupling stock, not coupling blanks or couplings, is within Commerce's scope.  A coupling is a thick walled and internally threaded cylinder that is used to join two lengths of threaded pipe.  Coupling typically accounts for between 2 and 3 percent of the weight of the end-finished

---

[15] CR at I-9, PR at I-8.  The merchandise covered by the investigation is generally classifiable under Harmonized Tariff Schedule of the United States ("HTSUS") subheadings 7304.29, 7305.20, and 7306.29, applicable to casing and tubing of a kind used in drilling for oil and gas.  Commerce states that OCTG coupling stock covered by the investigation may also enter under HTSUS subheadings 7304.39 and 7304.59.  CR at I-9-10 n.13, PR at I-8-9 n.13.

[16] CR at I-10-11, I-15-16; PR at I-10, I-14.

[17] A "drill string" consists of nonsubject products, such as drill pipes, drill collars, and the drill bit.  CR at I-15 n.22, PR at I-10 n.22.

[18] CR at I-15, PR at I-10.

[19] CR at I-15, PR at I-14.

5

Barcode:4168004-04 A-357-824 INV - Investigation -

tubing or casing.  Casing, tubing, and coupling stock are all usually produced in accordance with API specification 5CT.[20]

### C.  Analysis

In the preliminary phase of this investigation, the Commission found that all OCTG are used in the same general application (i.e., the extraction of oil or natural gas), share common physical characteristics, are manufactured to the same specification, and may be subjected to the same additional finishing processes, such as heat treating, threading, hydrostatic testing, and cutting to length.  Based on these similarities, and in the absence of clear dividing lines between different types of OCTG, the Commission found a single domestic like product, consisting of all OCTG, that is co-extensive with the scope of the investigation.[21]

In this final phase of the investigation, petitioners support finding one like product that is coextensive with the scope of the investigation, and no party objects to that domestic like product definition.  The evidence collected in the final phase of this investigation does not warrant a departure from the Commission's like product finding in the preliminary determination.[22]  Accordingly, for the reasons stated in the preliminary determination, we find a single domestic like product, consisting of all OCTG, that is co-extensive with the scope of the investigation.

## III.  DOMESTIC INDUSTRY

The domestic industry is defined as the domestic "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[23]  In defining the domestic industry, the Commission's general practice has been to include in the industry producers of all domestic production of the like product, whether toll-produced, captively consumed, or sold in the domestic merchant market.  Based on our definition of the domestic like product, we define a single domestic industry consisting of all domestic producers of OCTG.[24] [25]

---

[20] CR at I-16, I-25;  PR at I-14, I-21.

[21] USITC Pub. 4081 at 4-7.

[22] Record information with respect to OCTG coupling stock reinforces our finding of a single domestic like product.  Although coupling stock and other OCTG appear to differ with respect to the channels of distribution through which they are sold, the record does not establish clear differences in respect to the other factors we consider.  CR at I-24-26, PR at I-20-21.  In light of their overall similarities, we find coupling stock and other OCTG to be a single domestic like product.  Id.

[23] 19 U.S.C. § 1677(4)(A).

[24] CR/PR at Table III-1.  Domestic producers of OCTG from which the Commission received questionnaire responses include Maverick, U.S. Steel, V&M, TCA, IPSCO, Evraz, and Wheatland.  CR/PR at Table III-1.

[25] We find no basis to exclude any producer from the domestic industry under the statute's related party provision, 19 U.S.C. § 1677(4)(A), and no party has argued that any producer should be excluded.  ***.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

shows that high volumes of subject imports continued to enter the U.S. market well after the period that Respondents' theory would suggest.

Respondents also claim that subject imports have now exited the market in response to the severe drop in demand beginning in the third quarter of 2008.[96]  In considering Respondents' assertion, we note first that, although the Chinese producers did respond to some extent to changing demand, the market share of subject imports nonetheless increased steadily over the period examined regardless of whether demand was increasing or decreasing.  With respect to Respondents' explanation for the very low volume of subject imports in recent months, we note that the monthly volumes declined to this level only after the antidumping duty and countervailing duty petitions were filed.[97]  Notably, the virtual absence of subject imports in these recent months stands in stark contrast to the relatively substantial presence of nonsubject imports in that same time frame.[98]  We also take account of numerous press accounts and statements on behalf of Chinese producers indicating that the recent drop in subject imports is related to the pending investigations.[99]  Based on the record evidence, we find that the near cessation of subject imports at the end of the period examined resulted from the pendency of this investigation and the companion antidumping duty investigation on OCTG from China,[100] as well as the slump in OCTG demand.  Absent these investigations, the absolute and relative volumes of subject imports would likely have been greater in interim 2009.  Moreover, we determine likely behavior in the imminent future based on data for the entire period examined, not simply the behavior in the final months of the period.  Based on the above information, we find the volume of subject imports during the period examined, both on an absolute basis and relative to apparent U.S. consumption and production, to be significant.

## 2.   Analysis of Threat of Material Injury by Reason of Subject Imports

We begin our analysis of the likely future volume of subject imports by noting, as discussed above, that the market penetration of subject imports increased consistently during the period examined.  In addition, we have analyzed the likely future volume of imports in the context of past and expected demand for OCTG in the U.S. market.  As noted previously, demand for OCTG fell sharply during the second half of 2008 and continued to decline through mid-2009.  Although demand increased somewhat in the final months of the period examined and is predicted to increase modestly by the end of 2010, consumption is projected to remain at a much lower level than its peak in 2008, or even its level in 2006 and 2007.

Moreover, as noted above, the extent to which OCTG supply exceeded OCTG demand in 2008 and 2009 resulted in a sharp increase in inventories held by importers and purchasers at the end of the period examined.[101]  These inventories would be sufficient to supply several months of demand without resort to new domestic supply or imports from any source.[102]  We note too that the contemporaneous occurrence of peak subject imports and peak inventory levels in 2008 indicates that purchases of subject

---

[96] Respondents' Prehearing Brief at 5, 7-8.

[97] CR/PR at Table IV-4.

[98] CR/PR at Table IV-4.

[99] E.g., U.S. Steel's Prehearing Brief at 6-8, TMK IPSCO et al. Prehearing Brief at 2-3.

[100] See 19 U.S.C. § 1677(7)(I).

[101] CR at II-9, PR at II-5; CR/PR at Figure II-1, Table VII-6.

[102] Market participants prefer to see inventories in the United States at or below six months of supply.  CR at II-7, PR at II-4.  The inventories of distributors and end users alone, however, were at 11.8 months of supply at the end of the period examined (September 2009) and 10.9 months in October 2009.  CR/PR at Table II-2.  We note that these figures represent the aggregate quantities held in inventory.

18

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

imports contributed to the significant inventory build-up that occurred in 2008.[103]  Those inventories remain high and will likely exert downward pressure on orders for the domestic like product, as well as domestic prices, in the imminent future.[104]  Because of lower projected demand and high inventory levels, we believe that the absolute volume of purchases from all sources will be lower in the imminent future than it was during the period examined.  Nevertheless, for the reasons discussed below, we find that subject imports will likely increase significantly in the imminent future, albeit not to the extremely high levels seen during the preceding period of high demand (2008).

OCTG producers in China will likely have the ability to increase shipments to the United States to a great extent.  China is the world's leading producer of OCTG, accounting for an estimated *** of world production in 2007.[105]  The Chinese producers that responded to the Commission's questionnaire report that their allocated OCTG capacity increased from 5.87 million short tons in 2006 to 6.07 million short tons in 2007 and 7.42 million short tons in 2008.[106]  The Chinese industry's capacity was higher in interim 2009, at 4.86 million short tons, than in interim 2008, at 4.80 million short tons.[107]  Various Chinese producers report that they have added capacity in 2009 or will be adding capacity in 2010, increases that appear unrelated to the current demand environment globally.[108]  Thus, the Chinese industry has demonstrated an ability to increase capacity substantially in a short period of time, and this trend is likely to continue unabated in the imminent future.  Moreover, inasmuch as the reporting producers account for only *** percent of Chinese capacity for production of OCTG and related tubular products,[109] actual OCTG capacity in China is likely substantially higher than that of the responding producers.[110] [111]

---

[103] The share of purchasers' end-of-period inventories accounted for by imports from China increased from 13.6 percent in 2006 to 18.5 percent in 2007 and 32.6 percent in 2008.  Imports of OCTG from China accounted for 33.6 percent of purchasers' end-of-period inventories in interim 2008 and 35.9 percent in interim 2009.  CR at II-9, PR at II-5.

[104] CR/PR  at Table III-7

[105] CR at VII-3, PR at VII-2; CR/PR at Table VII-1.

[106] CR/PR at Table VII-4.

[107] CR/PR at Table VII-4.

[108] CR at VII-2, PR at VII-1-2; CR/PR at Tables VII-2, VII-4.  Respondents did not offer, nor does the record otherwise suggest, evidence that the global recession and accompanying credit crisis have resulted in anything more than limited cancellations of these projects.  One exception appears to be ***, which reportedly has been placed on hold indefinitely due to market conditions and environmental issues.  CR at VII-7 n.28, PR at VII-4 n.28.

[109] CR at VII-6-7, PR at VII-3-4.

[110] Although we find that actual OCTG capacity in China is likely substantially higher than that reported by the producers that responded to our foreign producers questionnaire, CR/PR Table VII-4, our analysis relies largely upon the data for those producers.  We note, however, that both the capacity reported by responding producers, as well as the capacity reported by members of the China Steel Pipe Association (CR at VII-13, PR at VII-6), yield fairly conservative capacity totals compared with some other sources for Chinese capacity on the record.  See, e.g., Maverick's Prehearing Brief at 63 (estimate of capacity ***); CR at VII-2, PR at VII-1-2 (World Steel Association reports actual production of all tubular products in China of 45 million short tons in 2007).

[111] Commissioner Okun notes that the statute authorizes the Commission to take adverse inferences but such authorization does not relieve the Commission of its obligation to consider the record evidence as a whole in making its determination.  See 19 U.S.C. § 1677e.  She generally gives credence to the facts supplied by the participating parties and certified by them as true, but bases her decision on the evidence as a whole, and does not automatically accept participating parties' suggested interpretations of the record evidence.  Regardless of the level of participation, the Commission is obligated to consider all evidence relating to each of the statutory factors and may not draw adverse inferences that render such analysis superfluous.  "In general, the Commission makes determinations by weighing all of the available evidence regarding a multiplicity of factors relating to the domestic

(continued...)

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Chinese producers also reported that their production increased from 4.89 million short tons in 2006 to 5.00 million short tons in 2007 and 6.40 million short tons in 2008, but was lower in interim 2009, at 3.36 million short tons, than in interim 2008, at 3.80 million short tons.[112]  Accordingly, 31.0 percent of the responding Chinese producers' capacity was unused in interim 2009, meaning that, based solely on existing capacity at the end of the period examined, these producers have the ability to produce approximately two million short tons over their 2008 level, an additional quantity nearly equivalent to total U.S. imports from China in 2008.[113]  Again, because the Commission received data from producers accounting for only about *** of Chinese production capacity for OCTG and related tubular products, actual unused capacity is likely substantially larger than that of the responding producers.

Additionally, the rise in inventories of OCTG in China would permit Chinese producers to increase exports to the United States substantially.  Chinese producers' end-of-period inventories increased from *** short tons in 2006 to *** short tons in 2008, and were *** short tons in interim 2008 and *** short tons in interim 2009.  Chinese producers' interim 2009 inventories thus were equivalent to about *** percent of domestic producers' interim 2009 production of *** short tons.[114]  U.S. importers' inventories were also substantial at the end of the period examined,[115] and the sale and shipment of those inventories into the U.S. market will likely occur in the imminent future with a consequent negative impact on demand for new OCTG production.[116]

Moreover, production facilities in China that are currently used to produce other pipe products have the potential to be shifted to production of OCTG.  Many Chinese producers report that ***.[117]  In fact, Chinese welded pipe producers have an incentive to shift production to OCTG to avoid countervailing and antidumping duties in the United States on welded standard pipe and line pipe.[118]

The record indicates not only that producers of subject OCTG have the ability to increase shipments to the United States, but that they have a strong interest in increasing such shipments as well. It appears that Chinese producers have been motivated to increase subject imports for quite some time.

---

[111] (...continued)
industry as a whole and by drawing reasonable inferences from the evidence it finds most persuasive."  Statement of Administrative Action ("SAA") on Uruguay Round Agreements Act ("URAA"), H.R. Rep. 103-316, Vol. I at 869 (1994).

[112] CR/PR at Table VII-4.

[113] CR/PR at Tables VII-4, C-1.  Chinese producers forecast that they will increase their OCTG production in 2010 over the level they forecast for 2009.  CR/PR at Table VII-4.

[114] CR/PR at Table VII-4, C-1.

[115] CR/PR Table VII-6.  The importers' inventory totals discussed in the context of likely demand, supra, included inventories of both subject and nonsubject imports.  Relevant to the likely volume of subject imports, however, are importers' inventories of subject imports.  Importers' inventories of subject merchandise increased from *** short tons in 2006 to *** short tons in 2007 and *** short tons in 2008.  Importers' inventories of subject imports were *** short tons in interim 2008 and *** short tons in interim 2009.  Id.

[116] We noted in our preliminary determination that we intended to consider inventories of purchasers further in any final phase investigation.  In this regard, the statute (19 U.S.C. § 1677(7)(F)(i)) "mak{es} it clear that the Commission will consider inventories of the subject merchandise wherever they are located."  SAA at 854.  As noted above, we have considered purchaser inventories, which will be a factor dampening any increase in demand in the imminent future.

[117] See CR/PR at Table VII-3 nn. 2, 4, 5, 6, 9, 10, 11, 14, 16 (***).

[118] 73 Fed. Reg. 42545 (Jul. 22, 2008) (countervailing duty order on standard pipe from China), 73 Fed. Reg. 42547 (Jul. 22, 2008) (antidumping duty order on standard pipe from China), 74 Fed. Reg. 4136 (Jan. 23, 2009) (countervailing duty order on line pipe from China); 74 Fed. Reg. 22515 (May 13, 2009) (antidumping duty order on line pipe from China).

20

China has not only been the world's leading OCTG exporter in recent years, but its exports have increased sharply, from 1.3 million short tons in 2006 to 4.3 million short tons in 2008.[119]  As a result, the Chinese industry is export oriented, with Chinese producers' exports rising to 38.0 percent of their total shipments in 2008.[120]  The Chinese OCTG industry's growing reliance upon export markets is highlighted by the increase in China's OCTG trade surplus of approximately 3.2 million tons during the period examined, from 0.9 million short tons in 2006 to 4.1 million short tons in 2008.[121]

Recent events have only intensified subject producers' incentive to increase shipments to the United States.  OCTG producers in China have brought new production capacity on line at the very time that the global economic downturn has reduced global demand for oil and natural gas.[122]  The difficulties for OCTG producers in China have deepened as a result of trade restricting remedies on imports from China by both Canada and the EU.  In March 2008, the Canadian Government found that seamless oil and gas well casing from China not exceeding 11.75 inches threatened to cause injury to the Canadian OCTG industry.  In October 2009, it also reached an affirmative preliminary injury determination regarding all welded or seamless OCTG, other than seamless casing covered by the March 2008 determination, with outside diameters from 2-3/8 inches and 13-3/8 inches.[123]  The EU imposed antidumping duties in October of 2009 on a range of seamless pipe products, including seamless OCTG.[124]  These trade restrictions will likely inhibit shipments of OCTG from China to these markets in the imminent future.[125]  Given that China's OCTG production capacity is growing and demand in non-U.S. markets will not return to peak or near peak levels in the imminent future, Chinese producers of OCTG face even greater pressure to increase export shipments to the United States than they did in the past.

The United States represents a highly attractive market.  In fact, producers in China apparently identified the United States as a very attractive market even prior to the current conditions that intensified the pressure to increase export shipments.  As noted, subject imports to the United States from China tripled from 2006 to 2008, and the share of OCTG production exported from China that was directed to

---

[119] CR/PR at Table VII-11.  At the same time, home market shipments by responding Chinese producers declined from 75.6 percent of their total shipments in 2006 to 59.6 percent in 2008, notwithstanding that their home market shipments increased to 71.3 percent of total shipments with the decline in global demand in interim 2009.  Id.

[120] CR/PR at Table VII-4.  Chinese producers forecast that they will increase their total exports in 2010 over the levels expected for 2009.  CR/PR at Table VII-4.

[121] CR/PR at Table VII-11.

[122] E.g., CR/PR at Table VII-2; CR at VII-2, PR at VII-1; CR at II-11-15, PR at II-7.

[123] CR at VII-15-16, PR at VII-7.

[124] CR at VII-16, PR at VII-7-8.

[125] Respondents downplay the significance of import restraints in these markets, among others.  See Respondents' Posthearing Brief at Exhibit 6.  Although each of these two markets was individually substantially smaller than the U.S. market in 2008, both Canada and the EU were among China's top 10 export markets in that year.  See U.S. Steel's Prehearing Brief at Exhibit 68 (also referenced in Respondents' Posthearing Brief at Exhibit 6).  The EU is a market in which recent OCTG prices have exceeded those in the United States (Metal Bulletin Research (Nov. 2009) at 2), making the retention of other relatively high-priced markets all the more important for the Chinese industry.

Moreover, Chinese producers face the ongoing challenge of selling OCTG into export markets with active import injury investigations concerning OCTG.  These include Canada (welded OCTG and seamless tubing, preliminary determination in October 2009), and Argentina (seamless and welded OCTG, initiated in November 2009) (CR at VII-15 through VII-16 and nn. 32 through 37, PR at VII-7 through VII-8 and nn. 32 through 37), as well as Mexico (seamless OCTG, initiated in September 2009) (U.S. Steel's Prehearing Brief at Exhibit 87 ("Mexico launches anti-dumping investigation into Chinese seamless . . .")).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

the U.S. market increased from 45 percent in 2006 to 60 percent in 2008.[126] [127]  This focus is not unexpected, considering that the United States is the world's largest single country market for OCTG.[128]  Additionally, although prices for seamless OCTG in the United States are somewhat lower than in Western Europe and Japan, they are noticeably higher than prices in Eastern Europe and the Middle East.[129]  Moreover, the U.S. market is well understood by OCTG producers in China, who increased shipments to the United States from 2006 to 2008 and, in so doing, established relationships with a broader range of importers.  The record does not include any indication that Chinese producers, in the absence of a countervailing or antidumping duty order, would find the U.S. market any less attractive in the imminent future than they did during the period examined.[130]  Although demand in the United States is expected to be lower in the imminent future than in prior years, Chinese producers will target the new orders for OCTG that arise, consistent with their market share gains in the United States throughout the period examined.

Based on the above, we conclude that producers of OCTG in China have both the ability and the incentive to increase exports of subject OCTG.  We also conclude that the United States is a highly attractive market for Chinese OCTG producers, given that it is the largest OCTG market in the world, it has attractive prices, and Chinese producers are familiar with the market and have dramatically increased shipments to it in recent years.  Additionally, we note that the market share of subject imports in the United States has increased consistently, regardless of U.S. market conditions, throughout the period under examination.  Thus, we conclude that subject import volume is likely to be significant within an imminent time frame, both in absolute terms and relative to consumption and production in the United States, and that the increase in subject imports' market share will likely be significant.

---

[126] Although the United States accounted for only 27 percent of exports of subject OCTG from China during interim 2009, the fact that subject merchandise continued to gain market share in the United States and accumulated in inventory indicates that the United States remained a very attractive market for producers of subject OCTG during that period.  CR/PR at Table C-1.

[127] Official Commerce statistics indicate that subject imports have been at extremely low levels since July 2009, and responding importers report that they have not imported or arranged for the importation of OCTG from China since October 2009.  CR/PR at Tables IV-4, VII-7.  We note, however, that ***.  CR at VII-10 n.29, PR at VII-4 n 29.  ***.  Id.  As noted above, moreover, we find that the decline in subject imports is at least in part attributable to the pendency of this investigation.  See  19 U.S.C. § 1677(7)(I)).

[128] CR at VII-21, PR at VII-11; CR/PR at Table VII-11.

[129] See Posthearing Brief of TMK IPSCO et al. at Exhibit 6; Metal Bulletin Research (Nov. 2009) at 2.

[130] To the contrary, the Vice President for Strategic Planning and Business Development of Wuxi Seamless Oil Pipe Co., Ltd., a major Chinese producer of OCTG and a respondent in this investigation, acknowledged in a press report that Wuxi is closely watching the U.S. trade remedy proceedings on Chinese OCTG, that it reduced exports to the United States in 2009 in response to this proceeding, and that, if no duties are imposed as a result, "we would be back immediately."  "WSP rejigs Texas OCTG plant schedule," American Metal Market (Sept. 11, 2009) (exhibit 2 to Prehearing Brief of TMK IPSC et al.).  Putting those statements in context, between 2006 and 2008, Wuxi's OCTG capacity *** while its OCTG exports to the United States ***.  Wuxi projects that its OCTG capacity *** but projects that its OCTG exports to the United States ***, based on "temporary estimation."  Wuxi foreign producer questionnaire response at 7.

22

Barcode:4168004-04 A-357-824 INV - Investigation  -

# EXHIBIT I-14

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

# Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam

Investigation Nos. 701-TA-499-500 and
731-TA-1215-1217 and 1219-1223 (Final)

**Publication 4489**　　　　　　　　　　　　　　**September 2014**



U.S. International Trade Commission

Washington, DC 20436

Barcode:4168004-04 A-357-824 INV - Investigation -

## UNITED STATES INTERNATIONAL TRADE COMMISSION

Investigation Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final)

CERTAIN OIL COUNTRY TUBULAR GOODS FROM INDIA, KOREA, THE PHILIPPINES, TAIWAN, THAILAND, TURKEY, UKRAINE, AND VIETNAM

### DETERMINATIONS

On the basis of the record[1] developed in the subject investigations, the United States International Trade Commission ("Commission") determines, pursuant to sections 705(b) and 735(b) of the Tariff Act of 1930 (19 U.S.C. § 1671d(b)) and (19 U.S.C. § 1673d(b)) ("the Act"), that an industry in the United States is materially injured by reason of imports of certain oil country tubular goods from India, Korea, Turkey, Ukraine, and Vietnam, provided for in subheadings 7304.29, 7305.20, and 7306.29 of the Harmonized Tariff Schedule of the United States, that have been found by the Department of Commerce ("Commerce") to be sold in the United States at less than fair value ("LTFV") and to be subsidized by the governments of India and Turkey.[2] The Commission also determines, pursuant to section 735(b) of the Act, that an industry in the United States is threatened with material injury by reason of imports of certain oil country tubular goods from Taiwan that have been found by Commerce to be sold in the United States at LTFV.[3]

The Commission further determines that imports of these products from the Philippines and Thailand are negligible pursuant to section 771(24) of the Act (19 U.S.C. § 1677(24)), and its investigations with regard to these countries are thereby terminated pursuant to section 735(b) of the Act.

### BACKGROUND

The Commission instituted these investigations effective July 2, 2013, following receipt of a petition filed with the Commission and Commerce by United States Steel Corporation,

---

[1] The record is defined in sec. 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR § 207.2(f)).

[2] All five participating Commissioners voted in the affirmative (Commissioner F. Scott Kieff did not participate in these investigations).   The Commission also finds that imports subject to Commerce's affirmative critical circumstances determinations are not likely to undermine seriously the remedial effect of the countervailing duty orders on certain oil country tubular goods from India or Turkey. The Commission further finds that imports subject to Commerce's affirmative critical circumstances determinations are not likely to undermine seriously the remedial effect of the antidumping duty orders on certain oil country tubular goods from Turkey or Vietnam.

[3] Chairman Meredith M. Broadbent dissenting with regard to imports from Taiwan, determining that subject imports from Taiwan are negligible.

1

Appx389

Pittsburgh, PA; Maverick Tube Corporation, Houston, TX; Boomerang Tube LLC, Chesterfield, MO; Energex, a division of JMC Steel Group, Chicago, IL; Northwest Pipe Company, Vancouver, WA; Tejas Tubular Products Inc., Houston, TX; TMK IPSCO, Houston, TX; Vallourec Star, L.P., Houston, TX; and Welded Tube USA, Inc., Lackawanna, NY.    The final phase of the investigations was scheduled by the Commission following notification of preliminary determinations by Commerce regarding the subsidization of imports of certain oil country tubular goods from India and Turkey within the meaning of section 703(b) of the Act (19 U.S.C. § 1671b(b)) and sales at less than fair value of imports of certain oil country tubular goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam within the meaning of section 733(b) of the Act (19 U.S.C. § 1673b(b)).    Notice of the scheduling of the final phase of the Commission's investigations and of a public hearing to be held in connection therewith was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the *Federal Register* on April 7, 2014 (79 FR 19122).    The hearing was held in Washington, DC, on July 15, 2014, and all persons who requested the opportunity were permitted to appear in person or by counsel.

2

Barcode:4168004-04 A-357-824 INV - Investigation  -

## Views of the Commission

Based on the record in the final phase of these investigations, we find that an industry in the United States is materially injured by reason of imports of certain oil country tubular goods ("OCTG") from India, Korea, Turkey, Ukraine, and Vietnam found by the U.S. Department of Commerce ("Commerce") to be sold in the United States at less than fair value, and by reason of imports of the subject merchandise from India and Turkey found by Commerce to have been subsidized by the governments of India and Turkey.[1]  We also determine that an industry in the United States is threatened with material injury by reason of imports of OCTG from Taiwan that Commerce found to be sold in the United States at less than fair value.[2]  We find that critical circumstances do not exist with respect to the entities exporting the subject merchandise from India, Turkey, and Vietnam for which Commerce made affirmative critical circumstances determinations.

We further determine that imports of OCTG from the Philippines and Thailand that Commerce found to be sold in the United States at less than fair value are negligible.

## I.     Background

The petitions in these investigations were filed on July 2, 2013 by the United States Steel Corporation ("U.S. Steel"); Maverick Tube Corporation ("Maverick"); Boomerang Tube LLC; Energex, a division of JMC Steel Group; Northwest Pipe Company; Tejas Tubular Products Inc.; TMK IPSCO; Vallourec Star, L.P.; and Welded Tube USA, Inc. (these seven collectively, "Other Petitioners") (U.S. Steel, Maverick, and Other Petitioners are collectively the "Petitioners"). Evraz Inc., NA, ("Evraz"), a domestic producer, also appeared in these investigations. Petitioners and Evraz (collectively, "Domestic Producers") are domestic producers of OCTG and accounted for almost all of domestic OCTG production during the January 2011-March 2013 period of investigation ("POI").[3]  Petitioners appeared at the hearing and submitted prehearing and posthearing briefs.  Evraz also submitted a prehearing brief.

The following respondents appeared at the Commission's hearing and submitted prehearing and posthearing briefs:

*India*.  Jindal SAW Ltd. ("Jindal"), Jindal Pipe Ltd., GVN Fuels Limited ("GVN"), and Maharashtra Seamless Ltd., producer/exporters and importers of subject merchandise.  The government of India also filed a posthearing statement.

*Korea*.  AJU Besteel Co., Ltd., Husteel Co., Ltd., Hyundai HYSCO, Nexteel Co., Ltd., SeAH Steel Corp., producers of subject merchandise; and Husteel USA, Inc., Hyundai USA, Inc.,

---

[1] Commissioner Kieff did not participate in these investigations.

[2] Chairman Broadbent determines that imports of OCTG from Taiwan are negligible.  *See* Separate and Dissenting Views of Chairman Broadbent.

[3] *See* Confidential Staff Report, as amended by Memoranda INV-MM-075 and INV-MM-081 ("CR") at Table III-1, Public Report, *Certain Oil Country Tubular Goods from India, Korea, Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. 4489 (Sept. 2014) ("PR") at Table III-1.

3

Appx391

Barcode:4168004-04 A-357-824 INV - Investigation -

Hyundai HYSCO USA, Inc., and SeAH Steel America, Inc., U.S. importers of subject merchandise ("Korean Respondent Group"). ILJIN Steel Corporation, a producer and exporter of subject merchandise ("ILJIN").

*The Philippines*. HLD Clark Steel Pipe Co., Ltd., a producer and exporter of subject merchandise ("Philippine Respondent" or "HLD Clark").

*Thailand*. Boly Pipe Co., Ltd. ("Boly Pipe"), a producer and exporter of subject merchandise.

*Turkey*. Borusan Mannesmann Boru Sanayi ve Ticaret Anonim Sirketi, Çayirova Boru Sanayi ve Ticaret A.S., Yücel Boru Ithalat-Ihracat ve Pazarlama A.S., Tosçelik Profil ve Sac Endustrisi A.S., and Tosyali Dis Ticaret A.S., producers and exporters of subject merchandise (collectively "Turkish Respondents"). A representative of the government of Turkey appeared at the hearing.

*Ukraine*. Interpipe, a producer and exporter of subject merchandise, and North American Interpipe, Inc., a U.S. importer of subject merchandise ("Ukrainian Respondents"). A representative of the government of Ukraine appeared at the hearing.

In addition, C&F International, an importer of OCTG, filed briefs, and Nexgen Metals, Inc., also an importer of OCTG, filed a posthearing statement.[4]

U.S. industry data are based on the questionnaire responses from 17 domestic producers that accounted for the vast majority of domestic production of OCTG during 2013.[5] U.S. import data are based on official Commerce import statistics, except as noted in the staff report.[6]

The Commission received responses to its questionnaires from 31 foreign producers/exporters of subject merchandise:

- eight producers/exporters in India, accounting for approximately *** of all exports of subject merchandise to the United States from India in 2013;[7]
- seven producers/exporters in Korea, accounting for all U.S. imports of subject merchandise from Korea in 2013;[8]
- one producer/exporter in the Philippines, accounting for all U.S. imports of subject merchandise from the Philippines in 2013;[9]
- five producers/exporters in Taiwan, accounting for all U.S. imports of subject merchandise from Taiwan in 2013;[10]
- one producer/exporter in Thailand, accounting for *** of U.S. imports of subject merchandise from Thailand in 2013;[11]

---

[4] No respondents from Taiwan or Vietnam participated in the final phase investigations.
[5] CR at I-6, PR at I-4.
[6] CR at I-6, PR at I-4-5.
[7] CR at VII-4, PR at VII-3.
[8] CR at VII-10, PR at VII-5.
[9] CR at VII-15, PR at VII-8.
[10] CR at VII-29, PR at VII-13.
[11] CR at VII-34, PR at VII-15.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

- three producers/exporters in Turkey, accounting for *** percent of U.S. imports of subject merchandise from Turkey in 2013;[12]
- two producers/exporters in Ukraine, accounting for *** U.S. imports of subject merchandise from Ukraine in 2013;[13] and
- one producer/exporter in Vietnam, accounting for *** percent of U.S. imports of subject merchandise from Vietnam in 2013.[14]

On August 11, 2014, after correcting ministerial errors in its original final determination of sales at less than fair value with respect to OCTG from Saudi Arabia, Commerce terminated that investigation.[15]  The Commission was made aware of this action two days before its scheduled vote in these investigations.[16]  On August 13, 2014, the Commission reopened its record for the limited purpose of receiving Commerce's amended final determination and termination with regard to OCTG from Saudi Arabia and comments from parties with regard to this new factual information.[17]  U.S. Steel; the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union; Maverick;[18] Turkish Respondents; ILJIN; HLD Clark; and Boly Pipe filed comments.  The Commission terminated its investigation with respect to imports from Saudi Arabia on August 21, 2014.[19] [20]

## II.      Domestic Like Product

### A.      In General

In determining whether an industry in the United States is materially injured or threatened with material injury by reason of imports of subject merchandise, the Commission first defines the "domestic like product" and the "industry."[21]  Section 771(4)(A) of the Tariff Act of 1930, as amended ("the Tariff Act"), defines the relevant domestic industry as the

---

[12] CR at VII-39, PR at VII-16-17.

[13] CR at VII-45, PR at VII-18-19.

[14] CR at VII-51, PR at VII-21.

[15] *Amended Final Determination and Termination of the Investigation of Sales at Less Than Fair Value:  Certain Oil Country Tubular Goods From Saudi Arabia*, 79 Fed. Reg. 49051 (Aug. 19, 2014).

[16] *See* EDIS Doc. 540196.  The Commission's vote was originally scheduled for August 14, 2014.

[17] *Certain Oil Country Tubular Goods from India, Korea, the Philippines, Saudi Arabia, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, *Reopening of the Record and Request for Comments*, 79 Fed. Reg. 49102 (Aug. 19, 2014).

[18] Maverick's additional final comments exceeded the 10-page limit set by the Commission. Accordingly, we have disregarded the material in these comments beyond the first 10 pages.

[19] *Certain Oil Country Tubular Goods from Saudi Arabia*, *Termination of Investigation*, 79 Fed. Reg. 51192 (Aug. 27, 2014).

[20] We note that these Views would normally have been completed by September 2, 2014, the date we issued our determinations in these investigations.  However, they were necessarily delayed by Commerce's termination of its investigation with respect to Saudi Arabia, and the need to reopen the record and assess the new information and arguments made by the parties.

[21] 19 U.S.C. § 1677(4)(A).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

"producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[22]  In turn, the Tariff Act defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation."[23]

The decision regarding the appropriate domestic like product in an investigation is a factual determination, and the Commission has applied the statutory standard of "like" or "most similar in characteristics and uses" on a case-by-case basis.[24]  No single factor is dispositive, and the Commission may consider other factors it deems relevant based on the facts of a particular investigation.[25]  The Commission looks for clear dividing lines among possible like products and disregards minor variations.[26]  Although the Commission must accept Commerce's determination as to the scope of the imported merchandise that is subsidized or sold at less than fair value,[27] the Commission determines what domestic product is like the imported articles Commerce has identified.[28]

---

[22] 19 U.S.C. § 1677(4)(A).

[23] 19 U.S.C. § 1677(10).

[24] *See, e.g.*, *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007); *NEC Corp. v. Department of Commerce*, 36 F. Supp. 2d 380, 383 (Ct. Int'l Trade 1998); *Nippon Steel Corp. v. United States*, 19 CIT 450, 455 (1995); *Torrington Co. v. United States*, 747 F. Supp. 744, 749 n.3 (Ct. Int'l Trade 1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991) ("every like product determination 'must be made on the particular record at issue' and the 'unique facts of each case'").  In the semi-finished products analysis applicable in these investigations, the Commission examines the following: (1) the significance and extent of the processes used to transform the upstream into the downstream articles; (2) whether the upstream article is dedicated to the production of the downstream article or has independent uses; (3) differences in the physical characteristics and functions of the upstream and downstream articles; (4) whether there are perceived to be separate markets for the upstream and downstream articles; and (5) differences in the costs or value of the vertically differentiated articles.  *See, e.g.*, *Glycine from India, Japan, and Korea*, Inv. Nos. 731-TA-1111-1113 (Preliminary), USITC Pub. 3921 at 7 (May 2007); *Artists' Canvas from China*, Inv. No. 731-TA-1091 (Final), USITC Pub. 3853 at 6 (May 2006); *Live Swine from Canada*, Inv. No. 731-TA-1076 (Final), USITC Pub. 3766 at 8 n.40 (Apr. 2005); *Certain Frozen Fish Fillets from Vietnam*, Inv. No. 731-TA-1012 (Preliminary), USITC Pub. 3533 at 7 (Aug. 2002).

[25] *See, e.g.*, S. Rep. No. 96-249 at 90-91 (1979).

[26] *Nippon*, 19 CIT at 455; *Torrington*, 747 F. Supp. at 748-49; *see also* S. Rep. No. 96-249 at 90-91 (Congress has indicated that the like product standard should not be interpreted in "such a narrow fashion as to permit minor differences in physical characteristics or uses to lead to the conclusion that the product and article are not 'like' each other, nor should the definition of 'like product' be interpreted in such a fashion as to prevent consideration of an industry adversely affected by the imports under consideration.").

[27] *See, e.g.*, *USEC, Inc. v. United States*, 34 Fed. Appx. 725, 730 (Fed. Cir. 2002) ("The ITC may not modify the class or kind of imported merchandise examined by Commerce."); *Algoma Steel Corp. v. United States*, 688 F. Supp. 639, 644 (Ct. Int'l Trade 1988), *aff'd*, 865 F.3d 240 (Fed. Cir.), *cert. denied*, 492 U.S. 919 (1989).

[28] *Hosiden Corp. v. Advanced Display Mfrs.*, 85 F.3d 1561, 1568 (Fed. Cir. 1996) (the Commission may find a single like product corresponding to several different classes or kinds defined by Commerce); (Continued...)

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

B.     **Product Description**

Commerce defined the scope of the imported merchandise under investigation as follows:

> The merchandise covered by the investigation is certain oil country tubular goods ("OCTG"), which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (*e.g.*, whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute ("API") or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of the investigation also covers OCTG coupling stock.

> Excluded from the scope of the investigation are: casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.[29]

---

(...Continued)

*Cleo*, 501 F.3d at 1298 n.1 ("Commerce's {scope} finding does not control the Commission's {like product} determination."); *Torrington*, 747 F. Supp. at 748-52 (affirming the Commission's determination defining six like products in investigations in which Commerce found five classes or kinds).

[29] *E.g., Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances: Certain Oil Country Tubular Goods from India,* 79 Fed. Reg. 41981, 41983 (July 18, 2014). According to Commerce, the merchandise subject to the investigation is currently classified in the Harmonized Tariff Schedule of the United States ("HTSUS") under item numbers:  7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40, 7304.29.10.50, 7304.29.10.60, 7304.29.10.80, 7304.29.20.10, 7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60, 7304.29.20.80, 7304.29.31.10, 7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50, 7304.29.31.60, 7304.29.31.80, 7304.29.41.10, 7304.29.41.20, 7304.29.41.30, 7304.29.41.40, 7304.29.41.50, 7304.29.41.60, 7304.29.41.80, 7304.29.50.15, 7304.29.50.30, 7304.29.50.45, 7304.29.50.60, 7304.29.50.75, 7304.29.61.15, 7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75, 7305.20.20.00, 7305.20.40.00, 7305.20.60.00, 7305.20.80.00, 7306.29.10.30, 7306.29.10.90, 7306.29.20.00, 7306.29.31.00, 7306.29.41.00, 7306.29.60.10, 7306.29.60.50, 7306.29.81.10, and 7306.29.81.50.

The merchandise subject to the investigations may also enter under the following HTSUS item numbers:  7304.39.00.24, 7304.39.00.28, 7304.39.00.32, 7304.39.00.36, 7304.39.00.40, 7304.39.00.44, 7304.39.00.48, 7304.39.00.52, 7304.39.00.56, 7304.39.00.62, 7304.39.00.68, 7304.39.00.72, 7304.39.00.76, 7304.39.00.80, 7304.59.60.00, 7304.59.80.15, 7304.59.80.20, 7304.59.80.25, (Continued...)

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

OCTG includes casing, tubing, and coupling stock of carbon and alloy steel used in oil and gas wells.[30] Casing is a circular pipe that serves as a structural retainer for the walls of the well. It typically has an outside diameter (OD) ranging from 4.5 inches to 20 inches and a length ranging from 34 feet to 48 feet. Casing provides a firm foundation for the drill string by supporting the walls of the hole to prevent caving in or wall collapse both during drilling and after the well is completed.[31] Casing also serves as a surface pipe designed to prevent contamination of the recoverable oil and gas by surface water, gas, sand, or limestone.[32] Tubing is a smaller-diameter pipe (between 1.050 and 4.5 inches OD) installed inside the larger-diameter casing that is used to conduct the oil or gas to the surface, either through natural flow or through pumping.[33] Coupling stock is a thick-walled, seamless tubular product used to manufacture coupling blanks. Coupling blanks, in turn, are unthreaded tube blanks used to make individual couplings. Couplings are thick-walled and internally threaded seamless cylinders that are used for joining two lengths of threaded OCTG.[34] Casing and tubing are usually produced in accordance with specification 5CT of the American Petroleum Institute ("API").[35]

### C. Arguments of the Parties

Petitioners argue that the Commission should find a single domestic like product which is coextensive with the scope of Commerce's investigations, as it did in the preliminary determinations.[36] More specifically, Petitioners argue that there is no clear dividing line between green tubes and finished OCTG.[37]

---

(…Continued)
7304.59.80.30, 7304.59.80.35, 7304.59.80.40, 7304.59.80.45, 7304.59.80.50, 7304.59.80.55, 7304.59.80.60, 7304.59.80.65, 7304.59.80.70, 7304.59.80.80, 7305.31.40.00, 7305.31.60.90, 7306.30.50.55, 7306.30.50.90, 7306.50.50.50, and 7306.50.50.70. *Id.*

[30] CR at I-17, PR at I-14.

[31] CR at I-20, PR at I-17.

[32] CR at I-22, PR at I-18.

[33] CR at I-22, PR at I-19.

[34] CR at I-25, PR at I-19.

[35] CR at I-22, PR at I-19.

[36] U.S. Steel Prehearing Brief at Exh. 1, 1; Other Petitioners' Prehearing Brief at 3, Maverick Prehearing Brief at 2-3.

[37] U.S. Steel adopts the definition of green tubes in the prehearing report, namely, "a term that can apply to unfinished, non-heat-treated tube bodies intended for casing and tubing." U.S. Steel Prehearing Brief at Exh. 1, 4 n.21. Maverick states that the industry defines green tubes as "pipe that has not been tested and is therefore incapable of achieving an API certification," but acknowledges that other parties use different definitions. Maverick Prehearing Brief at 3-4. Maverick further asserts that only the category identified by Commission staff as "unfinished OCTG not at API grade" should be considered green tube. Maverick Prehearing Brief at 4. Other Petitioners define green tubes as "circular welded or seamless steel tube intended and suited for production into OCTG, that has not yet been heat treated, upset, threaded, or otherwise processed." Other Petitioners' Prehearing Brief at 4.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

ILJIN's arguments regarding the definition of the domestic like product have evolved in the course of these final phase investigations.  It argued in its prehearing brief that "green tubes subject to heat treatment in the United States prior to sale to the merchant market" should be treated as a separate domestic like product.[38]  In its posthearing brief, ILJIN argued that "{a}t the very least, the Commission should find a separate domestic like product for those green tubes that must be heat treated subsequent to importation and prior to sale."[39]  In addition, ILJIN submitted that "entries of unfinished upgradeable seamless OCTG should be considered 'green tubes' falling into the same category as 'Not API/proprietary grade' inasmuch as unheat-treated, unfinished seamless OCTG would not have any other use other than to be upgraded by a U.S. processor."[40]  ILJIN also argued that it would be "appropriate" for the Commission to include in the separate domestic like product upgradeable J-55 welded OCTG that is in fact heat treated after importation.[41]  In its final comments, ILJIN acknowledged that the term "green tubes" does not have a single, accepted definition, and that it was itself partially responsible for any confusion over the meaning of the term.[42]  ILJIN urged the Commission to define "U.S. heat-treated semi-finished OCTG" as a separate domestic like product.[43]  ILJIN also noted that there are, in its view, more narrow definitions of semifinished OCTG that would qualify for separate domestic like-product treatment, namely (i) all semifinished OCTG not at API grade, and (ii) semifinished seamless OCTG that has not been heat treated prior to importation, but is imported at API grade (upgradeable seamless OCTG).[44]

### D.    Domestic Like Product Analysis

We consider whether "U.S. heat-treated semi-finished OCTG" should be treated as a separate domestic like product.  As we understand ILJIN's argument, this category of products encompasses (i) tubular products that require further processing to comply fully with the API 5CT specifications for casing and tubing, and (ii) tubular products – whether seamless or welded – that meet the minimum specifications for lower-grade API 5CT casing and tubing (*i.e.*, H40 and J55) and can be upgraded from one API grade to a more demanding API grade through heat treatment ("upgradeable" product).  For the sake of convenience, we refer to these products as "green tubes."[45]  We have not considered ILJIN's "alternative" domestic like product formulations, as they were not raised in a timely fashion.[46]

---

[38] ILJIN Prehearing Brief at 9.  We note that neither ILJIN nor any other party asked the Commission to collect additional separate information for green tubes, however defined, when commenting on the draft questionnaires in these final phase investigations.  CR at I-36 n.46, PR at I-29 n.46.

[39] ILJIN Posthearing Brief at Appdx. 1, 44.

[40] ILJIN Posthearing Brief at Appdx. 1, 44-45.

[41] ILJIN Posthearing Brief at Appdx. 1, 45.

[42] ILJIN Final Comments (Aug. 8, 2014) at 8.

[43] ILJIN Final Comments (Aug. 8, 2014) at 9.

[44] ILJIN Final Comments (Aug. 8, 2014) at 10.

[45] We note that a number of parties apply an incorrect domestic like product inquiry when they argue that the Commission should treat certain *imported* products as a separate like product.  *E.g.*, ILJIN (Continued...)

9

Appx397

Barcode:4168004-04 A-357-824 INV - Investigation  -

Because the question of whether green tubes should be treated as a separate domestic like product from finished OCTG involves a comparison of articles at different stages of processing, we use our semi-finished product analysis to resolve this issue.

*Dedication for Use*.   ILJIN concedes that all green tubes are dedicated to the production of finished OCTG.[47]  Green tubes have no practical use other than to be further processed.  As a representative of a distributor stated at the hearing (presumably referring to OCTG not at API grade), without being finished, green tube is "either a very expensive fence post or it's a cattle guard."[48]  With regard to seamless, upgradeable product, ILJIN explains that, while it is conceivable that it could be used without heat treatment, the price premium associated with that product makes that economically and commercially unrealistic.[49]  To the extent that upgradeable product could be used without being further heat treated, it would be used for the same use (*i.e.*, as OCTG) as if it were heat treated.

*Separate Markets*.  ILJIN's assertion that there are completely separate markets for green tubes and finished OCTG – with the former being sold to processers and the latter being sold to distributors[50] – is not supported by the record.  Several U.S. OCTG producers reported selling green tubes to distributors.  In the preliminary phase of these investigations, U.S. Steel reported selling green tubes to processors and to distributors ***.[51]  ***, the largest domestic producer of unfinished OCTG not at API/proprietary grade, accounting for *** percent of U.S. producers' shipments of this product in 2013,[52] only shipped this product to distributors and not to end users or processors.[53]  *** also reported selling unfinished OCTG not at API/proprietary grade to a distributor.[54]  Thus, the record shows that green tubes are not only sold to processors, but some are sold to distributors which can then arrange for the green tubes to be heat treated and/or finished.

---

(…Continued)

Posthearing Brief, Appdx. 1, 41 (arguing that the "unfinished seamless OCTG ILJIN sells to the United States" should be treated as a separate domestic like product); U.S. Steel Prehearing Brief at Exh. 1, 5 (noting that green tubes from both U.S. producers and importers go through distribution); Maverick Prehearing Brief at 4 (noting that most imported OCTG is already at API grade).

[46] ILJIN proposed these formulations for the first time in its final comments.  Under both the Commission's regulations and the statute, such comments should "only concern such information" as to which the parties have not previously had an opportunity to comment.  19 C.F.R. § 207.30(b); *see also* 19 U.S.C. § 1677m(g).  Consequently, final comments are not to be a vehicle for asserting new legal arguments.  This is particularly true concerning arguments that would require collection or analysis of new data, such as domestic like product arguments, insofar as the statute states that the Commission "shall cease collecting information" before the filing of such comments.  19 U.S.C. § 1677m(g).

[47] ILJIN Prehearing Brief at 11.
[48] Hearing Tr. at 153 (Shoaff).
[49] ILJIN Final Comments (Aug. 8, 2014) at 10.
[50] ILJIN Prehearing Brief at 11-12.
[51] CR at I-39 n.58, PR at I-31 n.58.
[52] Calculated from *** response to Question II-17 in the Commission's domestic producer questionnaire and aggregate U.S. shipment data from CR at Table IV-9.
[53] Email from *** to Commission staff, dated July 29, 2014.
[54] Other Petitioners' Posthearing Brief at ***.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

*Differences in Physical Characteristics and Functions of the Upstream and Downstream Articles*. Green tubes intended for specific OCTG applications are produced to chemical and dimensional specifications for those applications.[55] Thus, the specific characteristics of green tubes impart characteristics essential to the functionality of the finished OCTG. The various forms of heat treatment (annealing, normalizing, and quenching and tempering) do not change the physical appearance of the tubes, but they may change their microstructure and mechanical properties.[56] The further steps of the finishing process (upsetting pipe ends and threading them) do change the physical characteristics of the tubes to some extent.[57] In sum, green tubes and finished OCTG share some physical characteristics, but are different in other respects. Their functions are the same, in that green tubes have no practical function other than to be processed into finished OCTG.

*Differences in Value*. There is some evidence in the record that prices for green tubes may be substantially lower than prices for finished OCTG. For example, in 2013 U.S. producers' U.S. shipments of finished OCTG had an average unit value ("AUV") of $1,568, whereas shipments of unfinished OCTG not at API had an AUV of $*** and shipments of OCTG at API but upgradeable had an AUV of $***.[58] We treat these AUV data with caution, however, given that they are derived from categories with vastly different aggregate quantities and given the potential for variations in product mix. Other data in the record show that the value added by processors (both tollers and non-tollers) ranged from *** percent to *** percent.[59]

*Extent of Processes Used to Transform Downstream Product into Upstream Product*. The processes involved in the heat treatment and other finishing (upsetting, in some cases, and threading and coupling) of green tubes can be substantial.[60] As discussed below, we find that processors that perform heat treatment engage in sufficient production-related activity to qualify as domestic producers of OCTG.

*Conclusion*. All green tubes are dedicated to the production of finished OCTG, suggesting a single domestic like product. The two products are not sold in completely different markets. Although some green tube is sold to processors, some is also sold to distributors, to whom finished OCTG is also sold. Green tubes and finished OCTG share many basic physical characteristics, but not others. Their functions are essentially the same. There is a significant difference in the value of green tubes and finished OCTG, although the magnitude of this difference is unclear. The extent of the processes involved in transforming green tubes into finished OCTG can be substantial. On balance, we find that there is not a clear dividing line

---

[55] CR at I-38, PR at I-30.

[56] CR at I-30-31, PR at I-24.

[57] CR at I-32, PR at I-25.

[58] CR/PR at Table IV-9.

[59] CR at III-17 and VI-20-21, PR at III-11 and VI-8. These percentages were derived from (1) a ratio of the sum of direct factory labor and factory overhead costs (conversion costs) to cost of goods sold ("COGS"); and (2) a ratio of conversion costs plus selling, general, and administrative ("SG&A") expenses to the sum of COGS and SG&A expenses. We note that a substantial portion of the green tube finished by U.S. processors was imported. CR/PR at Table III-7 (toll processing); CR at III-23 and 24, PR at III-14 (non-toll processing).

[60] CR at I-30-32, PR at I-24-26.

11

between green tubes and finished OCTG and we do not find them to be separate domestic like products.  Accordingly, we define the domestic like product in these investigations as all OCTG, a category that is coextensive with the scope of Commerce's investigations.

## III.    Domestic Industry

The domestic industry is defined as the domestic "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[61]  In defining the domestic industry, the Commission's general practice has been to include in the industry producers of all domestic production of the like product, whether toll-produced, captively consumed, or sold in the domestic merchant market.

### A.    Sufficient Production-Related Activities

In deciding whether a firm qualifies as a domestic producer of the domestic like product, the Commission generally analyzes the overall nature of a firm's U.S. production-related activities, although production-related activity at minimum levels could be insufficient to constitute domestic production.[62]

Maverick argues that the domestic industry should only include U.S. mills that produce OCTG and that processors should not be included in the Commission's definition because processors do not engage in sufficient production-related activity to be deemed domestic producers.[63]  ILJIN argues that the Commission should continue to include processors in its definition of the domestic industry because processors engage in sufficient production-related activities to qualify as part of the domestic industry.[64]

*Capital Investments.*  Five processors that provided data reported aggregate capital expenditures of $*** during the POI.  Four firms reported their sources of funding, including private capital and credit lines.[65]  Processors that reported construction of new facilities spent an average of $*** each.[66]  We note that these amounts do not take into account capital investments that were made before the POI, which would also be relevant to an assessment of the extent of the processors' overall capital investments.

---

[61] 19 U.S.C. § 1677(4)(A).

[62] The Commission generally considers six factors:  (1) source and extent of the firm's capital investment; (2) technical expertise involved in U.S. production activities; (3) value added to the product in the United States; (4) employment levels; (5) quantity and type of parts sourced in the United States; and (6) any other costs and activities in the United States directly leading to production of the like product.  No single factor is determinative and the Commission may consider any other factors it deems relevant in light of the specific facts of any investigation.  *Diamond Sawblades and Parts Thereof from China and Korea*, Inv. Nos. 731-TA-1092-93 (Final), USITC Pub. 3862 at 8-11 (July 2006).

[63] Maverick Prehearing Brief at 8.

[64] ILJIN Prehearing Brief at 7-8.

[65] CR at III-16, PR at III-10.

[66] Maverick Prehearing Brief at 10 n.30.

Barcode:4168004-04 A-357-824 INV - Investigation -

*Technical Expertise.*  The various forms of heat treatment and other finishing activities require considerable technical expertise.  OCTG processor *** reported that it employs metallurgical personnel and a heat treatment equipment operator.  *** reported technical expertise in heat treating, inspection, and threading.  *** reported having a heat treatment production director and an API 5CT quality director.[67]

*Value Added.*  The value added by processors (both tollers and non-tollers) ranged from *** percent to *** percent.[68]  We disagree with Maverick's argument that these percentages are overstated because they may include finishing operations other than heat treatment.  We have appropriately considered the full range of a processor's production-related activities, including, but not limited to, heat treatment, when assessing the value added by the processor.  Indeed, because Maverick did not advocate the collection of value added data for heat treatment alone when it commented on the Commission's draft questionnaires, the value-added data in the staff report are the information available to the Commission in these proceedings.

*Employment.*  Processors employed a total of 2,019 production and related workers in 2013.[69]

*Quantity and Type of Parts Sourced in the United States*.  In 2013, non-toll processors sourced *** percent of their purchased green tubes from U.S. mills.[70]  Toll processors do not source green tubes because they do not take title to the product; however, in 2013, *** percent of their processing was performed for the account of U.S. mills.[71]

In sum, the record indicates that processors have made significant capital investments, use substantial technical expertise to engage in heat treatment and other finishing activities, add significant value, employ a substantial number of personnel, and source some green tube in the United States.[72]  In light of these considerations, we find that processors that provide heat treatment engage in sufficient production-related activities in the United States to be treated as domestic producers.[73] [74]

---

[67] CR at III-16, PR at III-11.

[68] CR at III-17 and VI-20-21, PR at III-11 and VI-8.

[69] CR at III-18, PR at III-11.

[70] U.S. producers' questionnaire responses of ***.

[71] CR/PR at Table III-7.

[72] There is no information in the record on any other costs processors incur or other activities in the United States directly leading to production of OCTG.

[73] Without identifying the firms involved or providing any further information, ILJIN argues that some of its customers that contract with tollers to provide heat treatment services should also be treated as domestic producers.  ILJIN Prehearing Brief at 9.  ILJIN has not provided enough information to enable us to identify these entities or to assess their activities.  In any event, the Commission has generally treated the toller, and not the tollee, as the domestic producer in these situations.  *See, e.g.*, *Certain Welded Large Diameter Line Pipe from Japan*, Inv. No. 731-TA-919 (Final), USITC Pub. 3464 (November 2001) at 10, n. 53 (while toll producers that engage in sufficient production related activity are included, tollees "that merely supply raw materials and pay a fabrication fee" are not).  *See also*, *e.g.*, *Certain Potassium Phosphate Salts from China*, Inv. Nos. 701-TA-473 and 473-TA-1173 (Final), USITC Pub. 4171 (July 2010) at 7, n. 30 ("In accordance with our standard practice, we do not consider the (Continued...)

13

Appx401

For the foregoing reasons, we define the domestic industry to include all U.S. producers of OCTG, including both mills that produce OCTG and processors that engage in heat treatment.[75]

## IV.  Negligible Imports

### A.  Legal Standard

Pursuant to Section 771(24) of the Tariff Act, imports from a subject country of merchandise corresponding to a domestic like product that account for less than 3 percent of all such merchandise imported into the United States during the most recent 12 months for which data are available preceding the filing of the petition shall be deemed negligible.[76]  The statute further provides that subject imports from a single country that account for less than 3 percent of such total imports of the product may not be considered negligible if there are several countries subject to investigation with negligible imports and the sum of such imports from all such countries accounts for more than 7 percent of all such merchandise imported into the United States.[77]

---

(…Continued)

tollee . . .to be part of the domestic industry because it does not engage in production of the like product.").

[74] Maverick argues that, if the Commission includes processors in the domestic industry, it should follow its decision in *DRAMs and DRAM Modules from Korea* ("*DRAMs*"), Inv. No. 701-TA-431 (Final), USITC Pub. 3616 (Aug. 2003), and exclude processors and tollers of subject imports from the domestic industry.  Maverick characterizes such processors and tollers as being merely a "conduit for . . . unfairly traded imports."  Maverick contends that in *DRAMs*, the Commission generally included assemblers of uncased DRAMs into cased DRAMs in the domestic industry, but excluded assemblers of subject imports.  Maverick Posthearing Brief, Exh. 1, 34.  Maverick misreads the *DRAMs* decision.  There is no evidence in that decision that the Commission excluded assemblers of subject imports from the domestic industry.  The Commission considered an argument that DRAMs assembled in the United States that had been fabricated in third countries should be treated as nonsubject imports.  The Commission rejected this argument.  It noted that "{i}n effect, what respondents request is for the Commission to give determinative weight to the 'quantity and type of parts sourced in the United States' factor on a transaction-by-transaction basis."  Pub. 3616 at 10.  In effect, Maverick is doing the same thing here; it is asking the Commission to give determinative weight to only one of the five factors that the Commission considers in deciding whether firms engage in sufficient production-related activity to be treated as domestic producers.

[75] We find no basis to exclude any producer from the domestic industry under the statute's related party provision, 19 U.S.C. § 1677(4)(A), and no party has argued that any producer should be excluded.

[76] 19 U.S.C. §§ 1671b(a), 1673b(a), 1677(24)(A)(i), 1677(24)(B);  *see also* 15 C.F.R. § 2013.1 (identifying certain developing countries for purposes of 19 U.S.C. § 1677(24) for which the relevant negligibility threshold is different in countervailing duty investigations).

[77] 19 U.S.C. § 1677(24)(A)(ii).  For the purpose of countervailing duty investigations, the threshold is 9 percent for designated developing countries.  19 U.S.C. § 1677(24)(B).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No Image

The statute further provides that, even if subject imports are found to be negligible for purposes of present material injury, they shall not be treated as negligible for purposes of a threat analysis should the Commission determine that there is a potential that subject imports from the country concerned will imminently account for more than 3 percent of all such merchandise imported into the United States, or that there is a potential that the aggregate volumes of subject imports from all countries with currently negligible imports will imminently exceed 7 percent of all such merchandise imported into the United States.[78]

### B.    Arguments of the Parties

U.S. Steel, the United Steelworkers, and Maverick argue that subject imports from the Philippines, Taiwan, and Thailand individually will imminently account for more than 3 percent of total imports, and that the aggregate volume of imports from these countries will imminently exceed 7 percent of total imports.  Addressing the three countries individually, U.S. Steel and the United Steelworkers argue that each country is on pace to imminently exceed the 3 percent level.[79]

Philippine respondent HLD Clark argues that subject imports from the Philippines are unlikely to exceed 3 percent of total imports.[80]  Thai respondent Boly Pipe argues that subject imports from Thailand are unlikely to exceed 3 percent of total imports and that the aggregate volume of subject imports from Taiwan, Thailand, and the Philippines is unlikely to exceed 7 percent.[81]

### C.    Analysis

During the pertinent 12-month period for determining negligibility (July 2012-June 2013), imports from the following five subject countries were above the 3 percent negligibility threshold:  India (\*\*\* percent of total imports), Korea (\*\*\* percent), Turkey (\*\*\* percent), Ukraine (\*\*\* percent), and Vietnam (5.5 percent).[82]  We consequently find that imports from these five subject countries are not negligible.[83]

Imports from the following three subject countries were below the applicable 3 percent statutory threshold:  the Philippines (2.2 percent of total imports), Taiwan (\*\*\* percent), and Thailand (0.8 percent).[84]  The aggregate volume of imports from these countries (\*\*\* percent)

---

[78] 19 U.S.C. § 1677(24)(A)(iv).

[79] U.S. Steel Prehearing Brief at Exh. 2, 2-3 and Final Comments (Aug. 18, 2014) at 2-4.  Maverick Final Comments (Aug. 18, 2014) at 9-10.

[80] HLD Clark Final Comments (Aug. 18, 2014) at 2-4.

[81] Boly Pipe Final Comments (Aug. 18, 2014) at 3-5.

[82] CR/PR at Table IV-8.

[83] For purposes of countervailing duty investigations, India is among the countries classified as "developing countries" under 15 C.F.R . § 2013.1, so the negligibility threshold for the countervailing duty investigation of subject imports from India is 4 percent.  19 U.S.C. § 1677(24)(B).  Subject imports from India (at \*\*\* percent) are above that threshold.  CR/PR at Table IV-8.

[84] CR/PR at Table IV-8.

15

Appx403

Barcode:4168004-04 A-357-824 INV - Investigation  -

is below the statutory aggregate 7 percent level during the relevant 12-month period.  We therefore determine that imports from these three countries are negligible for purposes of present material injury.

We next consider, for purposes of a threat analysis, whether there is a potential that subject imports from the Philippines, Taiwan, and Thailand will imminently exceed the statutory negligibility thresholds.  For the reasons provided in the paragraphs below, we find that there is a potential that subject imports from Taiwan will exceed the 3 percent negligibility threshold,[85] but there is not a potential that subject imports from the Philippines and Thailand will exceed the 3 percent negligibility threshold individually or exceed the 7 percent negligibility threshold when considered in the aggregate with subject imports from Taiwan.  In reaching these determinations, we have made reasonable estimates on the basis of available statistics, as we are permitted to do by the statute.[86]

*Taiwan.*  The production capacity of subject producers in Taiwan expanded during the POI, *** from 2011 to 2012, as one of the subject producers brought a new mill online.[87]  The capacity utilization of these producers *** in 2012 (***), and utilization remained at *** levels throughout the rest of the POI.[88]  Over the period of investigation, subject imports from Taiwan were increasing steadily as a share of all imports, from *** percent in 2011 to *** percent in 2012 and then to *** percent in 2013.[89]  The producer with the ***.[90]  In the aggregate, subject producers in Taiwan project that their export shipments to the United States will reach *** short tons in 2014, increasing from *** short tons in 2013.

To estimate the share of total imports that would be accounted for by subject imports from Taiwan in the imminent future, we assumed that subject imports from Taiwan would be *** short tons, the amount projected by subject producers for 2014.  We estimated that total imports in 2014 would fall in a range between *** short tons and *** short tons.[91]  Using these

---

[85] Chairman Broadbent determines that there is not a potential that subject imports from Taiwan will imminently exceed 3 percent of total imports, and does not join the discussion concerning Taiwan below, except as it pertains to the estimation of total U.S. imports in 2014. *See* Separate and Dissenting Views of Chairman Broadbent.

[86] 19 U.S.C. §1677(24)(C).

[87] The capacity of subject producers in Taiwan increased from *** short tons in 2011 to *** tons in 2012 and *** in 2013.  Capacity was *** short tons in both January-March ("interim") 2013 and interim 2014.  CR/PR at Table VII-9.

[88] Production of subject producers in Taiwan increased from *** short tons in 2011 to *** short tons in 2012, and then declined to *** short tons in 2013.  Production was *** short tons in interim 2013 and *** short tons in interim 2014.  CR/PR at Table VII-9.  Capacity utilization declined from *** percent in 2011 to *** percent in 2012 and *** percent in 2013.  Capacity utilization was *** percent in interim 2013 and *** percent in interim 2014.  *Id.*

[89] CR/PR at Table IV-2.

[90] CR at VII-30, PR at VII-13.

[91] We arrived at these estimates of total imports in the following manner.   The lower end of the range was calculated by annualizing total imports in the first quarter of 2014 (***).  The upper end of the range was calculated by calculating the ratio of total imports in the first quarter of 2013 to total imports in all of 2013 (*i.e.*, ***), and then multiplying total imports in the first quarter of 2014 by the
(Continued...)

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

figures, we estimate that subject imports from Taiwan would range between *** percent and *** percent of total imports in 2014.[92]  On the basis of these estimates, the increased capacity and low capacity utilization rates among subject producers in Taiwan, and the steady increase in subject imports from Taiwan over the POI, we determine that there is a potential that subject imports from Taiwan will imminently surpass 3 percent of total imports.

*The Philippines.*  The production capacity of the subject producer in the Philippines fluctuated in a stable range throughout the POI, except in interim 2014 when it was lower than in interim 2013.[93]  The capacity utilization of this producer *** in all parts of the POI ***.[94]

To estimate the share of total imports that would be accounted for by subject imports from the Philippines in the imminent future, we assumed that subject imports from the Philippines would be at their highest annual level during the POI, which was 73,969 short tons in 2013.[95]  Using this amount and the estimated range of total imports described above, we estimate that subject imports from the Philippines would fall in a range between *** percent and *** percent of total imports in 2014.[96]  On the basis of these estimates, and the stable capacity and high capacity utilization rate of the subject producer in the Philippines, we determine that there is not a potential that subject imports from the Philippines will imminently surpass 3 percent of total imports.

*Thailand.*  The Commission received a questionnaire response in the final phase of these investigations from one subject producer in Thailand, Boly Pipe.  There is one other known producer of OCTG in Thailand, WSP Pipe Co., Ltd. ("WSP"), and there is evidence in the record

---

(…Continued)

inverse of that ratio (*i.e.*, ***).  CR/PR at Table IV-2.  That the annualized Q1 2014 data is "reasonable" is supported by its use by petitioner U.S. Steel.  U.S. Steel Final Comments (Aug. 18, 2014) at 7 n.35.

[92] These estimates were calculated as follows, using the methodology described in footnote 91 above:  ***.

[93] The capacity of the subject producer in the Philippines was *** short tons in 2011, *** short tons in 2012, *** short tons in 2013, *** short tons in interim 2013 and *** short tons in interim 2014.  CR/PR at Table VII-5.  U.S. Steel argued that the producer in the Philippines *** to make pipe product.  U.S. Steel Final Comments (Aug. 18, 2014) at 5.  We note that U.S. Steel relies solely on a Dow Jones news story that primarily concerns port facilities (U.S. Steel Prehearing Brief at Exh. 68), and we do not find that this evidence contradicts the reported capacity of the subject producer in the Philippines.  We note that even if capacity in the Philippines were higher than reported, it would not affect our analysis because our projections are based on actual import levels and demonstrated production ability, not capacity.

[94] Capacity utilization rose from *** percent in 2011 to *** percent in 2012 and *** percent in 2013.  Capacity utilization was *** percent in interim 2013 and *** percent in interim 2014.  CR/PR at Table VII-4.  The *** in 2011 reflected the fact that the subject producer in the Philippines began OCTG production in that year.  CR at VII-15, PR at VII-8.  The following factors indicate a relatively low ability of the subject producer in the Philippines to increase shipments to the United States:  the producer's relatively small capacity, its high capacity utilization, the fact that the vast majority of its sales are already exports to the United States, and the absence of inventories.  CR/PR at Table II-4.

[95] CR/PR at Table C-1.

[96] These estimates were calculated as follows, using the methodology described in footnote 91 above:  ***.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

that that firm has idled its plant.[97] [98]  The production capacity of Boly Pipe was \*\*\* short tons in 2013, the first year in which it was producing OCTG, and is projected to rise to \*\*\* short tons in 2014 and \*\*\* short tons in 2015.[99]  Boly's capacity utilization rate was \*\*\* percent in 2013 and \*\*\* percent in interim 2014.[100]

To estimate the share of total imports that would be accounted for by subject imports from Thailand in the imminent future, we first estimated what Boly Pipe's production would be in 2014.  We did this by assuming that it would reach its projected capacity of \*\*\* short tons in 2014 and that it would operate at the same capacity utilization rate in 2014 as it did in 2013 (\*\*\* percent).  This would result in production of \*\*\* short tons.  We then assumed that all the increased production in 2014 (\*\*\* short tons) would be exported to the United States.  We added these increased exports to the level of its imports to the United States in 2013 (33,741 + \*\*\*) to arrive at an estimate for subject exports to the United States of \*\*\* short tons.  Using that amount and the estimated range of total imports described above, we estimate that subject imports from Thailand would fall between \*\*\* percent and \*\*\* percent of total imports

---

[97] CR at VII-34, PR at VII-15.  Boly Pipe, which has its facilities located in the same industrial park in Thailand as those of WSP, states that WSP idled its plant in November 2013 and that it would take many months to bring that plant back online, should WSP wish to do so.  Boly Pipe Final Comments (Aug. 18, 2013) at 7-8.  U.S. Steel described recent significant financial losses reported by WSP's Chinese parent and uncertainty as to the parent's ability to continue as a going concern.  U.S. Steel Prehearing Brief at 86. The idling of WSP's plant in Thailand in November 2013 would be consistent with these developments.

[98] U.S. Steel contends that there are two other mills in Thailand in addition to Boly Pipe and WSP.  U.S. Steel Final Comments (Aug. 18, 2014) at 6.  One of these "other" mills appears in fact to be Boly Pipe.  Exhibit 93 to U.S. Steel's Prehearing Brief describes this new producer, owned by Baosteel (Boly Pipe's parent) and another Chinese partner, called "Baoli Steel Pipe," which began production in 2013 (the same year that Boly Pipe began production).

With respect to the issue of a second additional mill in Thailand, we note that the Commission sent questionnaires in both the preliminary and final phase investigations to all entities named in the petition as producers of subject merchandise from Thailand, and only Boly Pipe and WSP provided responses.   There are no publicly available sources identifying other sources of exports to the United States.  Consequently, the information submitted by reporting Thai producers is the information available with respect to the OCTG industry in Thailand.  We also note that, to the extent that there were other exporters of subject merchandise from Thailand, their data would be reflected in the official U.S. import statistics.  The share of total imports represented by subject imports from Thailand increased by only \*\*\* percentage point from 2012 to 2013, and we have projected greater growth based on data from the foreign producers' questionnaires than would be reflected by looking at available full-year data from all importers.

[99] CR/PR at Table VII-11.  U.S. Steel argued that Boly Pipe \*\*\* to make OCTG by over \*\*\* metric tons.  U.S. Steel Final Comments (Aug. 18, 2014) at 6.  We note that U.S. Steel relies solely on an undated brochure which may or may not reflect Boly Pipe's true capacity (U.S. Steel Prehearing Brief at Exh. 98).  We note that even if capacity in Thailand were higher than reported, it would not affect our analysis because our projections are based on actual import levels, and demonstrated production ability, not capacity.

[100] CR/PR at Table VII-11.

18

Appx406

Barcode:4168004-04 A-357-824 INV - Investigation  -

in 2014.[101]  On the basis of these estimates, we determine that there is not a potential that subject imports from Thailand will imminently surpass 3 percent of total imports.

*Aggregate Analysis*.[102]  To determine whether there is a potential that subject imports from the Philippines, Taiwan, and Thailand in the aggregate will imminently exceed 7 percent of total imports, we added together the numbers for each country, as detailed above.  The sum of these numbers ranges from *** to *** percent. Thus, even using assumptions that are most favorable to petitioners, there is not a potential that subject imports from the Philippines, Taiwan, and Thailand will imminently exceed 7 percent.

For the foregoing reasons, we determine that subject imports from the Philippines and Thailand are negligible for purposes of both our present material injury analysis and our threat of material injury analysis and that subject imports from Taiwan are negligible for purposes of our present material injury analysis, but not for purposes of our threat of material injury analysis.[103]

## V.     Cumulation

### A.     Background

For purposes of evaluating the volume and price effects for a determination of material injury by reason of subject imports, section 771(7)(G)(i) of the Tariff Act requires the Commission to cumulate subject imports from all countries as to which petitions were filed and/or investigations self-initiated by Commerce on the same day, if such imports compete with each other and with the domestic like product in the U.S. market.  In assessing whether subject imports compete with each other and with the domestic like product, the Commission generally has considered four factors:

(1)     the degree of fungibility between subject imports from different countries and between subject imports and the domestic like product, including consideration of specific customer requirements and other quality related questions;

(2)     the presence of sales or offers to sell in the same geographic markets of subject imports from different countries and the domestic like product;

---

[101] These estimates were calculated as follows, using the methodology described in footnote 91 above: ***.

[102] Chairman Broadbent determines that there is not a potential that subject imports from the Philippines, Taiwan, and Thailand will imminently exceed 7 percent of total imports. *See* Separate and Dissenting Views of Chairman Broadbent.

[103] Chairman Broadbent determines that subject imports from Taiwan are negligible for purposes of both the Commission's present material injury analysis and its threat of material injury analysis. *See* Separate and Dissenting Views of Chairman Broadbent.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

(3)     the existence of common or similar channels of distribution for subject imports from different countries and the domestic like product; and

(4)     whether the subject imports are simultaneously present in the market.[104]

While no single factor is necessarily determinative, and the list of factors is not exclusive, these factors are intended to provide the Commission with a framework for determining whether the subject imports compete with each other and with the domestic like product.[105]  Only a "reasonable overlap" of competition is required.[106]

### B.     Arguments of the Parties

Petitioners argue that the Commission should cumulate subject imports from all countries.[107]  The government of India argues that it would be inconsistent with Article 15 of the WTO Agreement on Subsidies and Countervailing Measures ("SCM Agreement") for the Commission to cumulate the effects of imports from countries subject only to antidumping duty investigations with those of imports subject to countervailing duty investigations, *i.e.*, India and Turkey.[108]  The Philippine Respondent argues that subject imports from the Philippines should not be cumulated with those from other subject countries.[109]

### C.     Analysis

With respect to the government of India's argument, we believe that the Commission's long-standing practice of "cross-cumulating" imports subject to Commerce's affirmative subsidy determinations with imports subject to Commerce's affirmative dumping determinations, when the conditions for cumulation are otherwise met, is consistent with U.S. law.[110]  We recognize

---

[104] *See Certain Cast-Iron Pipe Fittings from Brazil, the Republic of Korea, and Taiwan*, Inv. Nos. 731-TA-278-280 (Final), USITC Pub. 1845 (May 1986), *aff'd*, *Fundicao Tupy, S.A. v. United States*, 678 F. Supp. 898 (Ct. Int'l Trade), aff'd, 859 F.2d 915 (Fed. Cir. 1988).

[105] *See*, *e.g.*, *Wieland Werke, AG v. United States*, 718 F. Supp. 50 (Ct. Int'l Trade 1989).

[106] The Statement of Administrative Action (SAA) to the Uruguay Round Agreements Act (URAA), expressly states that "the new section will not affect current Commission practice under which the statutory requirement is satisfied if there is a reasonable overlap of competition."  H.R. Rep. No. 103-316, Vol. I at 848 (1994) (*citing Fundicao Tupy, S.A. v. United States*, 678 F. Supp. at 902); *see Goss Graphic Sys., Inc. v. United States*, 33 F. Supp. 2d 1082, 1087 (Ct. Int'l Trade 1998) ("cumulation does not require two products to be highly fungible"); *Wieland Werke, AG*, 718 F. Supp. at 52 ("Completely overlapping markets are not required.").

[107] U.S. Steel Prehearing Brief at Exh. 3, 2-3, Maverick Prehearing Brief at 39.

[108] Posthearing Comments from the government of India.

[109] Philippine Respondent's Posthearing Brief at 2-4.

[110] 19 U.S.C. § 1677(7)(G).  *E.g.*, *Circular Welded Carbon-Quality Steel Pipe from India, Oman, the United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-482-484 and 731-TA-1191-1194 (Final), USITC Pub. 4362 at 12 n.59 (Dec. 2012); *Softwood Lumber from Canada*, Inv. Nos. 701-TA-414 and 731-TA-928 (Continued...)

20

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

that a WTO dispute resolution panel recently found this practice to be inconsistent with Article 15 of the SCM Agreement, but this panel report has not been adopted by the WTO Dispute Settlement Body, and the United States has appealed the panel report.[111]

The statutory threshold for cumulation is satisfied in these investigations because Petitioners filed the antidumping/countervailing duty petitions with respect to all nine countries on the same day, July 2, 2013.[112]  As explained above, we have found that imports from the Philippines, Taiwan, and Thailand are negligible for purposes of our analysis of material injury by reason of subject imports.  Thus, we consider whether to cumulate subject imports from the remaining five subject countries – India, Korea, Turkey, Ukraine, and Vietnam – for purposes of this analysis.[113]  As discussed below, we find that there is a reasonable overlap of competition among subject imports from these five countries and between subject imports from each source and the domestic like product.

*Fungibility*.  Casing and tubing products, regardless of source, are generally produced in accordance with standards set by the API.[114]  All responding domestic producers and a majority of importers and purchasers reported that subject OCTG from the subject countries are always or frequently used interchangeably with each other and with the domestic like product.  The remaining domestic producers and importers indicated that subject imports from the subject countries are sometimes used interchangeably with each other and with the domestic like product.  No domestic producers or importers reported that subject imports are never used interchangeably with each other and with the domestic like product.  Most of the remaining purchasers also reported that subject imports are sometimes used interchangeably with each other and with the domestic like product; very few of them reported that subject imports are never used interchangeably with each other and with the domestic like product.[115]

We recognize that there are several factors that may limit the fungibility between and among subject imports from each source and the domestic like product.  First, welded and seamless OCTG are not interchangeable in all applications.  Imports from the subject countries tended to be concentrated in one product or the other:  imports from Korea, Turkey, and Vietnam were almost exclusively welded OCTG; imports from Ukraine were exclusively seamless OCTG; and imports from India were predominantly seamless OCTG.[116]  Although seamless OCTG can be used in any application which requires welded OCTG, the reverse is not true.  Certain high stress applications require seamless OCTG, and the seamless product may also be preferred in some applications to reduce risk.[117]  However, a witness for petitioners

---

(…Continued)

(Final), USITC Pub. 3509 at 29-31 (May 2009); *Bingham & Taylor v. United States*, 815 F.2d 1482 (Fed. Cir. 1987).

[111] www.wto.org/english/tratop_e/dispu_e/cases_e/ds436_e.htm.

[112] Because the investigation on OCTG from Saudi Arabia has been terminated, those imports are not eligible for cumulation.  19 U.S.C. § 1677(7)(G)(ii)(II).

[113] See 19 U.S.C. § 1677(24)(B)(iv).

[114] CR at I-16-17, PR at I-14.

[115] CR/PR at Table II-12.

[116] CR at II-39-40, PR at II-29.

[117] CR at II-39, PR at II-29.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

estimated that welded OCTG could be used for 70 percent of seamless applications, and a witness for respondents noted that they are interchangeable in many cases from an engineering perspective.[118]

Fungibility may also be somewhat limited by requirements for proprietary or premium connections. OCTG producers are unable to offer particular proprietary connections if they do not have access to the intellectual property rights required to produce those connections, although these producers would have the option of developing their own proprietary connections.[119] Purchasers reported that for seamless OCTG, 37.4 percent of purchases required proprietary connections, 8.3 percent preferred proprietary connections, and 54.2 percent were unrestricted. For welded OCTG, 14.4 percent of purchases required proprietary connections, 4.2 percent preferred them, and 81.4 percent were unrestricted.[120] The record contains data on shipments broken down by end finish. Subject imports had little presence in the "threaded and coupled, proprietary" category. In 2013, only *** percent of subject import shipments were in this category, compared to *** percent of domestic producers' shipments.[121] On the other hand, there was substantial overlap in 2013 between shipments of the domestic product and subject imports in the categories of "threaded and coupled, not proprietary" and "plain end."[122]

Fungibility may also be somewhat limited by the domestic product and subject imports being concentrated in different grades. Whereas there was substantial overlap in 2013 between the domestic product and subject imports in the three grades with the highest volumes, J-55, L-80, and P-110, the highest volume product for the domestic industry was higher alloy P-110, whereas subject imports were concentrated in the more commodity-like J-55 grade.[123]

Another factor that may limit fungibility somewhat is the extent to which subject countries and the domestic industry ship semi-finished or finished OCTG. Although a large proportion of responding purchasers reported buying finished OCTG from both domestic sources and the subject countries, a relatively larger proportion of the purchasers reported buying "unfinished at API but upgradable" product from subject countries than from domestic sources.[124]

On balance, we find that the record indicates a sufficient degree of substitutability between and among subject imports and the domestic like product to establish that products from the different sources are fungible for purposes of a cumulation analysis.

---

[118] CR at II-39, PR at II-29.

[119] Hearing Tr. at 297 (Hraibi).

[120] CR at II-41-42, PR at II-30.

[121] See CR/PR at Table IV-13 and derived from Table G-15.

[122] See CR/PR at Table IV-13 and derived from Table G-15.

[123] In 2013, the quantities of U.S. producers' U.S. shipments and U.S. importers' U.S. shipments of subject imports, respectively, for the three grades with the highest volumes were as follows: (i) J-55 – 806,818 shorts tons and *** short tons; (ii) L-80 – 553,466 short tons and *** short tons; and (iii) 1,727,521 short tons and *** short tons. CR/PR at Tables IV-12 and G-15.

[124] CR/PR at Table II-10.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

*Channels of Distribution*.  Subject imports and the domestic like product shared the same channels of distribution.  During the POI, all domestically produced and most subject imports from each source were shipped to distributors.

*Geographic Overlap*.  The majority of imports from each subject country are concentrated in the Central Southwest.[125]  The Pacific Coast received the second greatest coverage by subject imports, with imports from all subject countries serving that region.  All responding U.S. producers reported making sales to the Central Southwest, and eight of 13 reported making sales to the Pacific Coast region.[126]

*Simultaneous Presence in Market*.  Subject imports from each subject country were present in the United States in each year of the POI and in interim 2014.[127]  Subject imports from each subject country were present in the majority of the 39 months of the POI.[128]

*Conclusion*.  In sum, because the relevant antidumping duty petitions and countervailing duty petitions were filed on the same day, and the record indicates that there is a reasonable overlap of competition between and among subject imports and the domestic like product, we analyze subject imports from India, Korea, Turkey, Ukraine, and Vietnam on a cumulated basis for our analysis of material injury by reason of subject imports.

## VI.  Material Injury by Reason of Subject Imports from India, Korea, Turkey, Ukraine, and Vietnam

Based on the record in the final phase of these investigations, we find that an industry in the United States is materially injured by reason of imports of OCTG from India, Korea, Turkey, Ukraine, and Vietnam found by Commerce to be sold in the United States at less than fair value and imports of the subject merchandise from India and Turkey found by Commerce to have been subsidized by the governments of India and Turkey.

### A.  Legal Standards

In the final phase of antidumping and countervailing duty investigations, the Commission determines whether an industry in the United States is materially injured or threatened with material injury by reason of the imports under investigation.[129]  In making this determination, the Commission must consider the volume of subject imports, their effect on prices for the domestic like product, and their impact on domestic producers of the domestic like product, but only in the context of U.S. production operations.[130]  The statute defines

---

[125] CR at II-3, PR at II-3, and CR/PR at Table II-2.
[126] CR at II-3, PR at II-3, and CR/PR at Table II-2.
[127] CR/PR at Table IV-14.
[128] CR/PR at Table IV-14.
[129] 19 U.S.C. §§ 1671d(b), 1673d(b).
[130] 19 U.S.C. § 1677(7)(B).  The Commission "may consider such other economic factors as are relevant to the determination" but shall "identify each {such} factor ... and explain in full its relevance to the determination."  19 U.S.C. § 1677(7)(B).

23

Barcode:4168004-04 A-357-824 INV - Investigation  -

Germany, Japan, and Mexico.  Several domestic producers have affiliates that produce OCTG in nonsubject countries such as ***.[176]  OCTG imports from China have all but disappeared from the U.S. market after antidumping and countervailing duty orders were imposed on OCTG from China in 2010.[177]

A sizable portion of imports from subject and, to some degree, nonsubject sources consists of OCTG products that are further processed in the United States, such as green tubes that may not have been heat treated or threaded, as well as plain-end pipe that may have been heat treated but not threaded.[178]

Inventories of U.S.-produced OCTG and OCTG from subject and nonsubject countries held by purchasers are also a source of current supply.  U.S. inventory levels expressed in months of supply on hand reached a trough of 4.2 months in January 2012, but then increased until October 2012.  After dipping slightly at the end of 2012, U.S. inventories increased until the fourth quarter of 2013 and then dropped again in the first quarter of 2014.[179]

### 3.    Substitutability

OCTG is produced according to standards and specifications published by a number of organizations, including the API.[180]  Once a mill passes inspection and obtains API certification, it may begin marketing its OCTG as API grade.[181]  OCTG is usually produced in accordance with API specification 5CT, which encompasses 11 separate grades of casing and tubing.[182]  OCTG is produced in two forms:  seamless and welded.[183]

There is a moderate to high degree of substitutability between U.S.-produced OCTG and imported OCTG that is of the same API grade and type.[184]  All responding domestic producers and a majority of importers and purchasers reported that subject imports of OCTG from the subject countries are always or frequently used interchangeably with each other and with the domestic like product. The remaining domestic producers and importers indicated that subject imports from the subject countries are sometimes used interchangeably with each other and with the domestic like product.  No domestic producers or importers reported that subject imports are never used interchangeably with each other and with the domestic like product. Most of the remaining purchasers also reported that subject imports are sometimes used interchangeably with each other and with the domestic like product; very few of them reported

---

[176] CR/PR at Table III-1 notes 5, 6, 7, 8, 12, 14, 15, and 16.
[177] Exhibit to Testimony by U.S. Steel entitled "Trade Relief Against Chinese Imports Has Been Extremely Effective."
[178] CR/PR at Tables G-4 and IV-11.
[179] CR/PR at Figure II-1.
[180] CR at I-16-17, PR at I-13.  While other organizations and standards exist, for the purposes of these investigations, we will identify different grades of OCTG using API standards and specifications.
[181] CR at II-13, PR at II-24.
[182] CR at I-22, PR at I-19.
[183] CR at I-16, PR at I-13.
[184] CR at II-24, PR at II-18.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

that subject imports are never used interchangeably with each other and with the domestic like product.[185]

We recognize that substitutability between subject imports and the domestic like product may be somewhat limited by a number of factors, including differences between seamless and welded OCTG, differences between "upgradeable" and finished OCTG, the concentration of subject imports and the domestic like product in different grades, the limitation of proprietary connections mostly to the domestic like product, and the use of program sales. We discuss each of these in turn below.

*Seamless and Welded OCTG.* Imports from each of the subject countries tended to be concentrated in either welded or seamless OCTG. Imports from Korea, Turkey, and Vietnam were almost exclusively welded OCTG; imports from Ukraine were exclusively seamless OCTG; and imports from India were predominantly seamless OCTG.[186] Production by the domestic industry was more equally divided, with a small preponderance of seamless product.[187] Regardless of whether a subject country's imports were concentrated in one or the other type of OCTG, they compete at least with the domestic industry's production of that type of product. Moreover, there is a significant degree of interchangeability between welded and seamless OCTG, notwithstanding that welded and seamless OCTG are not interchangeable in all applications. Seamless OCTG can be used in any welded OCTG application. The reverse is not true, however, because certain high-stress applications require seamless OCTG, and the seamless product may also be preferred in some applications to reduce risk.[188] In short, differences between seamless and welded OCTG do not significantly limit competition between cumulated subject imports and the domestic like product.

*"Upgradeable" and Finished OCTG.* We recognize that some subject imports are imported in the condition of "at API but upgradeable" and that a larger proportion of subject imports than U.S. producers' U.S. shipments are in this condition.[189] Nonetheless, a large and increasing proportion of subject imports were either "at final API but needs end finishing" or "finished OCTG" – the two categories in which most U.S. producers' U.S. shipments were concentrated.[190] OCTG that is "at final API but needs end finishing" requires relatively little

---

[185] CR/PR at Table II-12.

[186] CR at IV-17, PR at IV-12. Additionally, imports from Taiwan were almost exclusively welded OCTG.

[187] CR at IV-17, PR at IV-12.

[188] CR at II-39, PR at II-29. A witness for petitioners estimated that welded OCTG could be used for 70 percent of seamless applications, and a witness for respondents noted that they are interchangeable in many cases from an engineering perspective. Conference Tr. pp. 109 (Matthews) and 261 (Brewer).

[189] For example, in 2013, *** percent of U.S. importers' U.S. imports from India, Korea, Turkey, Ukraine, and Vietnam consisted of "at API but upgradeable" product (*See* CR/PR at Table G-5), whereas only *** percent of U.S. producers' U.S. shipments were in this category. See CR/PR at Table IV-9.

[190] For example, in 2013, *** percent of U.S. importers' U.S. imports from India, Korea, Turkey, Ukraine, and Vietnam were in these two product categories (See CR/PR at Table G-5), as were *** percent of U.S. producers' U.S. shipments. *See* CR/PR at Table IV-9.

31

Appx413

Barcode:4168004-04 A-357-824 INV - Investigation  -

further processing before becoming a finished product.[191]  Thus, the fact that some subject imports are imported in the condition of "at API but upgradeable" does not alter our conclusion that there is a moderate to high degree of substitutability between U.S.-produced OCTG and imported OCTG that is of the same API grade and type.

    *Different Grades of OCTG.*  We recognize that particular OCTG grades constitute different percentages of subject imports from India, Korea, Turkey, Ukraine, and Vietnam on the one hand, and the domestic like product on the other.  For example, in 2013, the individual grade with the largest volume for subject imports was J-55, while it was P-110 for the domestically produced product.[192]  Nonetheless, for both the subject imports and the domestic like product, substantial volumes of shipments were concentrated in the same three OCTG grades:  J-55, L-80, and P-110.[193]  The largest volume of U.S. importers' U.S. shipments from subject sources in 2013 was in the J-55 grade, at *** short tons, compared to the 806,818 short tons of U.S. shipments from U.S. producers.[194]  Thus, the varying percentages that individual grades represent of the subject imports and the domestic like product do not indicate significantly limited competition between subject imports and the domestic like product.

    The evidence in the record as to trends in the types of OCTG consumed in the United States during the POI is mixed.  Petitioners maintain that changes in technology, specifically a shift to horizontal oil drilling and pad drilling, have altered the type of OCTG consumed by wells, and that because horizontal rigs generally are onshore in nonhostile environments, they do not generally require premium or proprietary connections.  This and the standardization of drilling patterns have led to increased use of standard, API-grade OCTG products that constitute the bulk of subject imports, according to Petitioners.  Petitioners estimate that about 80 percent of U.S. demand is for standard, API-grade OCTG.[195]  Respondents, on the other hand, maintain that the recent increased use of horizontal drilling and of hydraulic fracturing has, in fact, shifted the composition of U.S. OCTG demand away from basic API grades and toward increased use of high grade and specialty OCTG products, including those with proprietary premium connections – products that are not available from subject imports, but are available from domestic producers and nonsubject import sources affiliated with domestic producers.[196]  The majority of producers and importers responding to the Commission's questionnaires reported that the increase in demand for OCTG used in horizontal drilling has led to greater

---

[191] *See* CR at I-32, PR at I-25.

[192] CR/PR at Tables G-15 and IV-12.

[193] In 2013, 91.8 percent of shipments of subject imports from India, Korea, Turkey, Ukraine, and Vietnam were in these three grades (*See* CR/PR at Table G-5), as were 79.2 percent of U.S. producers' U.S. shipments.  *See* CR/PR at Table IV-12.  In 2013, the quantities of U.S. producers' U.S. shipments and U.S. importers' U.S. shipments of subject imports, respectively,  for these three grades were :  (i) J-55 – 806,818 shorts tons and *** short tons; (ii) L-80 – 553,466 short tons and *** short tons; and (iii) 1,727,521 short tons and *** short tons.  CR/PR at Tables IV-12 and G-9.

[194] CR/PR at Tables G-15 and IV-12.

[195] *E.g.*, Maverick Prehearing Brief at 19-23.

[196] Korean Respondent Group Prehearing Brief at 7-10, Borusan Prehearing Brief at 8-10, Ukrainian Respondents' Prehearing Brief at 6-9, Saudi Respondents' Prehearing Brief at 8-14,

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

demand for higher-grade OCTG, such as more heat-treated or alloy grade OCTG.[197]  We conclude that, regardless of the nature of trends in the types of OCTG consumed in the United States during the POI, the record shows that subject imports and the domestic like product were both represented in the major types of OCTG.

   *Proprietary Connections.*  As discussed above in connection with cumulation, the requirement to supply proprietary connections limits substitutability for certain sales.  We note, however, that most of the domestic industry's shipments do not involve OCTG with proprietary connections.[198]  Moreover, subject imports were also present in this part of the market.[199]  Thus, the demand for proprietary connections does not significantly limit competition between subject imports and the domestic like product.

   *Program Sales.*  Program sales are non-contractual obligations between mills, distributors, and end users which encompass what type of OCTG is to be supplied, when it will be supplied, and at what price it will be supplied.[200]  We recognize that program sales are an important means for making sales for the domestic industry[201] and that subject imports participate in these types of sales arrangements to a considerably lesser degree.[202]  This does not mean, however, that domestically produced OCTG sold pursuant to these arrangements is insulated from price competition from subject imports.  Many market participants reported that the terms of program sales are not legally binding.[203]  Thus, the pricing terms of these program sales could be subject to renegotiation to reflect pricing pressure brought by subject imports or any other source of supply.  Moreover, even to the extent that pricing terms in program sales are legally binding, these terms are affected by published price indexes,[204] which in turn are affected by external pricing pressure.  In short, the domestic industry's use of program sales does not significantly limit competition between subject imports and the domestic like product.

   We have also considered the foregoing factors in the aggregate and we conclude that, even when considered in such a manner, they do not significantly attenuate competition between the subject imports and the domestic like product.  At most, the factors cited by the respondents focus on product characteristics, or, in the case of program sales, the nature of the sales process.  They indicate – both individually and in the aggregate – that there is not a perfect overlap between the cumulated subject imports and the domestic like product.  Nevertheless, respondents do not explain how these factors operate in the aggregate to shield the domestic industry from competition by the subject imports, and the record does not

---

[197] CR at II-21, PR at II-16.

[198] For example, in 2013 only *** percent of U.S. producers' U.S. shipments had such connections.  CR/PR at Table IV-13.

[199] For example, in 2013, U.S. importers reported shipping *** short tons from India, Korea, Turkey, Ukraine, and Vietnam with proprietary connections.  CR/PR at Table G-15.

[200] CR at II-42, PR at II-31.

[201] In 2013, *** percent of the domestic industry's sales were program sales.  CR/PR at Table V-3.

[202] *See* CR/PR at Table V-3.

[203] CR/PR at Table V-5.

[204] *See, e.g.,* U.S. Purchasers' Questionnaire Responses of ***, at III-25(i).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

indicate that there is a lack of competition between the domestic like product and the subject imports in any significant and discrete segment of the market. To the contrary, the record indicates significant competition between the domestic like product and the cumulated subject imports.

### 4.    Other Conditions

The primary raw materials used to make OCTG are hot-rolled steel and billets (and associated inputs such as coke, scrap, pig iron, and hot-briquetted iron). Raw materials as a share of the cost of goods sold for domestic OCTG mills decreased from 59.3 percent in 2011 to 58.3 percent in 2012 and increased to 59.0 percent in 2013; they were 58.1 percent in interim 2014 and 59.3 percent in interim 2013.[205]

### C.    Volume of Subject Imports

Section 771(7)(C)(i) of the Tariff Act provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."[206]

Cumulated subject imports from India, Korea, Turkey, Ukraine, and Vietnam had a substantial presence in the U.S. market throughout the POI. Cumulated subject imports increased from *** short tons in 2011 to *** short tons in 2012, and remained at that level in 2013.[207] The absolute volume of cumulated subject imports had increased sharply since 2010, when Commerce issued antidumping and countervailing duty orders on OCTG from China.[208] As explained above, apparent U.S. consumption rose during the POI, increasing by 16.4 percent between 2011 and 2012 and by 0.3 percent between 2012 and 2013, for an overall increase of 16.8 percent between 2011 and 2013.[209] The volume of cumulated subject imports rose much faster, increasing by *** percent between 2011 and 2012 but decreasing by *** percent between 2012 and 2013, for an overall increase of *** percent between 2011 and 2013.[210]

The market share (by quantity) of cumulated subject imports from India, Korea, Turkey, Ukraine, and Vietnam increased from *** percent in 2011 to *** percent in 2012 and then

---

[205] CR/PR at V-1.

[206] 19 U.S.C. § 1677(7)(C)(i).

[207] CR/PR at Table G-8. Cumulated subject imports were *** short tons in interim 2013 and *** short tons in interim 2014.

[208] CR/PR at Table G-1; *Certain Oil Country Tubular Goods From the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 75 Fed. Reg. 3203 (Jan. 20, 2010); *Certain Oil Country Tubular Goods From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 75 Fed. Reg. 28551 (May 21, 2010).

[209] CR/PR at Table C-1. Apparent U.S. consumption in interim 2014 was 14.7 percent higher than in interim 2013. *Id.*

[210] CR/PR at Table G-8. The volume of cumulated subject imports in interim 2014 was *** percent higher than in interim 2013. *Id.*

34

Barcode:4168004-04 A-357-824 INV - Investigation  -

# EXHIBIT I-15

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

# STEEL

Investigation No. TA-201-73

VOLUME I: DETERMINATIONS AND VIEWS OF COMMISSIONERS

**Publication 3479**                                          **December 2001**



U.S. International Trade Commission

Washington, DC 20436

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Appendix B

Barcode: 4169004-01 A-552-824 INV - Investigation

Carbon & Alloy Flat Products: 1 Slabs, 2 Plate, 3 Hot-rolled, 4 Cold-rolled, 5 GOES, 6 Coated, 7 Tin
Carbon & Alloy Long Products: 8 Ingots, 9 Hot bar, 10 Cold bar, 11 Rebar, 12 Rails, 13 Wire, 14 Rope, 15 Nails, 16 Shapes, 17 Fabricated units
Carbon & Alloy Tubular Products: 18 Seamless, 19 Seamless OCTG, 20 Welded, 21 Welded OCTG, 22 Fittings
Stainless & Tool Steel Products: 23 Slabs/ingots, 24 Plate, 25 Bar, 26 Rod, 27 Tool steel, 28 Wire, 29 Cloth, 30 Rope, 31 Seamless pipe, 32 Welded pipe, 33 Fittings

| Commissioner | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Koplan | A | A | A | A | N | A | N | N | A | A | A | N | N | N | N | N | N | N | N | A | N | A | N | N | A | A | A | A | N | N | N | N | A |
| Canada | N | N | N | N |  | N |  |  | A | A | N |  |  |  |  |  |  |  |  | A |  | N |  |  | A | N | N | N |  |  |  | N | N |
| Mexico | A | A | A | A |  | A |  |  | A | N | N |  |  |  |  |  |  |  |  | A |  | A |  |  | N | N | N | N |  |  |  |  |  |
| Okun | A | A | A | A | N | A | N | N | A | A | A | N | N | N | N | N | N | N | N | A | N | A | N | N | A | A | A | A | N | N | N | N | N |
| Canada | N | N | N | N |  | N |  |  | N | N | N |  |  |  |  |  |  |  |  | N |  | A |  |  | A | N | N | N |  |  |  |  |  |
| Mexico | A | A | A | A |  | A |  |  | A | A | N |  |  |  |  |  |  |  |  | N |  | A |  |  | N | N | N | N |  |  |  |  |  |
| Bragg | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A | N | A | A | A | A | A | A | A | A | A | A | A | N | A | N | N | A |
| Canada | N | N | N | N |  | N | A | N | N | N | N | N | A | A | A | N |  | N | N | N | A | A | N | N | N | N | N | N |  | N |  |  | A |
| Mexico | A | A | A | A |  | A | A | N | N | A | N | N | A | A | A | N |  | N | N | N | A | A | N | N | N | N | N | N |  | N |  |  | A |
| Miller | A | A | A | A | A | A | A | A | A | A | A | N | N | N | N | N | N | N | N | A | A | A | N | N | A | A | A | A | N | N | N | N | N |
| Canada | N | N | N | N |  | N | A |  | A | A | N |  |  |  |  |  |  |  |  | A |  | A |  |  | A | N |  | N |  |  |  |  |  |
| Mexico | A | A | A | A |  | A | N |  | A | A | N |  |  |  |  |  |  |  |  | A |  | A |  |  | N | N |  | N |  |  |  |  |  |

*Continued on next page*

17

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 357-824 INV -- Investigation -

| Group | # | Product | Hillman | Hillman–Canada | Hillman–Mexico | Devaney | Devaney–Canada | Devaney–Mexico | Commission | Commission–Canada | Commission–Mexico |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Carbon & Alloy Flat Products | 1 | Slabs | A | N | A | A | N | N | A | N | A |
| | 2 | Plate | A | N | A | A | N | A | A | N | A |
| | 3 | Hot-rolled | A | N | A | A | N | A | A | N | A |
| | 4 | Cold-rolled | A | N | A | A | N | N | A | | |
| | 5 | GOES | N | | | N | | | N | | |
| | 6 | Coated | A | N | A | A | N | N | A | N | A |
| | 7 | Tin | N | | | A | N | N | T-I-E | N | N |
| Carbon & Alloy Long Products | 8 | Ingots | N | | | N | | | N | | |
| | 9 | Hot bar | A | A | N | A | N | N | A | | N |
| | 10 | Cold bar | A | A | N | A | N | N | A | | N |
| | 11 | Rebar | A | N | N | A | N | N | A | N | N |
| | 12 | Rails | N | | | A | N | N | N | | |
| | 13 | Wire | N | | | A | N | N | N | | |
| | 14 | Rope | N | | | A | N | N | N | | |
| | 15 | Nails | N | | | A | N | N | N | | |
| | 16 | Shapes | N | | | A | N | N | N | | |
| | 17 | Fabricated units | N | | | N | | | N | | |
| Carbon & Alloy Tubular Products | 18 | Seamless | N | | | A | N | N | N | | |
| | 19 | Seamless OCTG | N | | | A | N | N | N | | |
| | 20 | Welded | A | N | N | A | N | N | A | T-I-E | |
| | 21 | Welded OCTG | N | | | A | N | N | N | | |
| | 22 | Fittings | A | A | N | A | N | N | A | A | A |
| Stainless & Tool Steel Products | 23 | Slabs/Ingots | N | | | A | N | N | N | | |
| | 24 | Plate | N | | | A | N | N | N | | |
| | 25 | Bar | A | A | N | A | N | N | A | A | N |
| | 26 | Rod | A | N | N | A | N | N | A | N | N |
| | 27 | Tool steel | N | | | A | N | N | T-I-E | N | N |
| | 28 | Wire | N | | | A | N | N | T-I-E | N | N |
| | 29 | Cloth | N | | | N | | | N | | |
| | 30 | Rope | N | | | A | N | N | N | | |
| | 31 | Seamless pipe | N | | | N | | | N | | |
| | 32 | Welded pipe | N | | | N | | | N | | |
| | 33 | Fittings | N | | | A | A | A | T-I-E | A | A |

Note--With regard to welded tubular products other than OCTG, Chairman Koplan, Vice Chairman Okun, Commissioner Miller, and Commissioner Hillman made an affirmative determination based on threat of serious injury. With regard to carbon and alloy wire, rope, and nails and stainless wire and rope, Commissioner Bragg made affirmative determinations based on threat of serious injury.

18

Barcode:4168004-04 A-357-824 INV - Investigation  -

# EXHIBIT I-16

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

**OCTG from Argentina, Korea, Mexico, and Russia – Draft Scope**

The merchandise covered by the investigation is certain oil country tubular goods (OCTG), which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (e.g., whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products), whether or not thread protectors are attached. The scope of the investigation also covers OCTG coupling stock.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise processed in a third country, including by performing any heat treatment, cutting, upsetting, threading, coupling, or any other finishing, packaging, or processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the country of manufacture of the OCTG.

Excluded from the scope of the order are: casing or tubing containing 10.5 percent or more by weight of chromium; drill pipe; unattached couplings; and unattached thread protectors.

The merchandise subject to the investigation is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40, 7304.29.10.50, 7304.29.10.60, 7304.29.10.80, 7304.29.20.10, 7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60, 7304.29.20.80, 7304.29.31.10, 7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50, 7304.29.31.60, 7304.29.31.80, 7304.29.41.10, 7304.29.41.20, 7304.29.41.30, 7304.29.41.40, 7304.29.41.50, 7304.29.41.60, 7304.29.41.80, 7304.29.50.15, 7304.29.50.30, 7304.29.50.45, 7304.29.50.60, 7304.29.50.75, 7304.29.61.15, 7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75, 7305.20.20.00, 7305.20.40.00, 7305.20.60.00, 7305.20.80.00, 7306.29.10.30, 7306.29.10.90, 7306.29.20.00, 7306.29.31.00, 7306.29.41.00, 7306.29.60.10, 7306.29.60.50, 7306.29.81.10, and 7306.29.81.50.

The merchandise subject to the investigation may also enter under the following HTSUS item numbers: 7304.39.00.24, 7304.39.00.28, 7304.39.00.32, 7304.39.00.36, 7304.39.00.40, 7304.39.00.44, 7304.39.00.48, 7304.39.00.52, 7304.39.00.56, 7304.39.00.62, 7304.39.00.68, 7304.39.00.72, 7304.39.00.76, 7304.39.00.80, 7304.59.60.00, 7304.59.80.15, 7304.59.80.20, 7304.59.80.25, 7304.59.80.30, 7304.59.80.35, 7304.59.80.40, 7304.59.80.45, 7304.59.80.50, 7304.59.80.55, 7304.59.80.60, 7304.59.80.65, 7304.59.80.70, 7304.59.80.80, 7305.31.40.00, 7305.31.60.90, 7306.30.50.55, 7306.30.50.90, 7306.50.50.50, and 7306.50.50.70.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the investigation is dispositive.

Barcode:4168004-04 A-357-824 INV - Investigation  -

# EXHIBIT I-17

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -



United States
International Trade Commission

# Harmonized Tariff Schedule of the United States (2021)
# Basic Revision 7

August 2021
Publication Number: 5224

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

**Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)**
Barcode:41680... Annotated for Statistical Reporting Purposes Investigation -

CHAPTER 73

ARTICLES OF IRON OR STEEL

<div align="right">
XV
73-1
</div>

Notes

1.  In this chapter the expression "cast iron" applies to products obtained by casting in which iron predominates by weight over each of the other elements and which do not comply with the chemical composition of steel as defined in Note 1(d) to chapter 72.

2.  In this chapter the word "wire" means hot- or cold-formed products of any cross-sectional shape, of which no cross-sectional dimension exceeds 16 mm.

Additional U.S. Notes

1.  For the purposes of heading 7304 or 7306, the rate of duty "Free (C)" appearing in the "Special" subcolumn applies only to tubes and pipes with attached fittings, suitable for conducting gases or liquids.

2.  For the purposes of subheading 7307.19.30, the expression "ductile fittings" refers to fittings which contain over 2.5 percent carbon and over 0.02 percent of magnesium or of magnesium and cerium, by weight.

Statistical Note

1.  For the purposes of statistical reporting numbers 7310.10.0005, 7310.29.0020 and 7310.29.0055, "refillable stainless steel kegs, whether or not pressurized" refers to cylindrical kegs for liquid beverages, each keg with a domed top and bottom and a single neck piece, designed for a coupler (valve) system and an extractor tube (spear) by which the keg can be cleaned, filled and dispense the liquid contents.

Compiler's Note

The provisions of subchapter II of chapter 99 (Miscellaneous Tariff Bills or MTBs), the provisions of the Generalized System of Preferences (GSP) found in General Note 4 and most product exclusions from the additional tariffs on products of China in subchapter III of chapter 99 expired on December 31, 2020. However, no endnotes or footnotes relating to these provisions have been deleted as of the issue date of this edition.

**Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)**

Barcode:4168006 - ... - Amended Non-Statistical Reporting Proposed Investigation -

XV
73-6

| Heading/ Subheading | Stat. Suffix | Article Description | Unit of Quantity | Rates of Duty 1 General | Rates of Duty 1 Special | Rates of Duty 2 |
|---|---|---|---|---|---|---|
| 7304 (con.) | | Tubes, pipes and hollow profiles, seamless, of iron (other than cast iron) or steel: (con.) | | | | |
| | | Casing, tubing and drill pipe, of a kind used in drilling for oil or gas: (con.) | | | | |
| 7304.29 | | Other: | | | | |
| | | Casing: | | | | |
| | | Of iron or nonalloy steel: | | | | |
| 7304.29.10 | | Threaded or coupled.................... | ............... | Free [1/2/] | | 20% |
| | | Having an outside diameter less than 215.9 mm: | | | | |
| | 10 | Having a wall thickness less than 12.7 mm.......... | kg | | | |
| | 20 | Having a wall thickness of 12.7 mm or more.......... | kg | | | |
| | | Having an outside diameter of 215.9 mm or more but not exceeding 285.8 mm: | | | | |
| | 30 | Having a wall thickness less than 12.7 mm.......... | kg | | | |
| | 40 | Having a wall thickness of 12.7 mm or more.......... | kg | | | |
| | | Having an outside diameter exceeding 285.8 mm but not exceeding 406.4 mm: | | | | |
| | 50 | Having a wall thickness less than 12.7 mm.......... | kg | | | |
| | 60 | Having a wall thickness of 12.7 mm or more.......... | kg | | | |
| | 80 | Having an outside diameter exceeding 406.4 mm.......... | kg | | | |
| 7304.29.20 | | Other.................... | ............... | Free [1/2/] | | 1% |
| | | Having an outside diameter less than 215.9 mm: | | | | |
| | 10 | Having a wall thickness less than 12.7 mm.......... | kg | | | |
| | 20 | Having a wall thickness of 12.7 mm or more.......... | kg | | | |
| | | Having an outside diameter of 215.9 mm or more but not exceeding 285.8 mm: | | | | |
| | 30 | Having a wall thickness less than 12.7 mm.......... | kg | | | |
| | 40 | Having a wall thickness of 12.7 mm or more.......... | kg | | | |
| | | Having an outside diameter exceeding 285.8 mm but not exceeding 406.4 mm: | | | | |
| | 50 | Having a wall thickness less than 12.7 mm.......... | kg | | | |
| | 60 | Having a wall thickness of 12.7 mm or more.......... | kg | | | |
| | 80 | Having an outside diameter exceeding 406.4 mm.......... | kg | | | |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

**Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)**
Barcode:4168001 Annotated for Statistical Reporting Purposes  -

XV
73-7

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 7304 (con.) | | Tubes, pipes and hollow profiles, seamless, of iron (other than cast iron) or steel: (con.) | | | | |
| | | Casing, tubing and drill pipe, of a kind used in drilling for oil or gas: (con.) | | | | |
| 7304.29 (con.) | | Other: (con.) | | | | |
| | | Casing: (con.) | | | | |
| | | Of other alloy steel: | | | | |
| 7304.29.31 | | Threaded or coupled.................... | .................. | Free[1/2/] | | 28% |
| | 10 | Having an outside diameter less than 215.9 mm: Having a wall thickness less than 12.7 mm............................. | kg | | | |
| | 20 | Having a wall thickness of 12.7 mm or more.................. | kg | | | |
| | | Having an outside diameter of 215.9 mm or more but not exceeding 285.8 mm: | | | | |
| | 30 | Having a wall thickness less than 12.7 mm............................. | kg | | | |
| | 40 | Having a wall thickness of 12.7 mm or more.................. | kg | | | |
| | | Having an outside diameter exceeding 285.8 mm but not exceeding 406.4 mm: | | | | |
| | 50 | Having a wall thickness less than 12.7 mm............................. | kg | | | |
| | 60 | Having a wall thickness of 12.7 mm or more.................. | kg | | | |
| | 80 | Having an outside diameter exceeding 406.4 mm............................. | kg | | | |
| 7304.29.41 | | Other............................................ | .................. | Free[1/2/] | | 8.5% |
| | | Having an outside diameter less than 215.9 mm: | | | | |
| | 10 | Having a wall thickness less than 12.7 mm............................. | kg | | | |
| | 20 | Having a wall thickness of 12.7 mm or more.................. | kg | | | |
| | | Having an outside diameter of 215.9 mm or more but not exceeding 285.8 mm: | | | | |
| | 30 | Having a wall thickness less than 12.7 mm............................. | kg | | | |
| | 40 | Having a wall thickness of 12.7 mm or more.................. | kg | | | |
| | | Having an outside diameter exceeding 285.8 mm but not exceeding 406.4 mm: | | | | |
| | 50 | Having a wall thickness less than 12.7 mm............................. | kg | | | |
| | 60 | Having a wall thickness of 12.7 mm or more.................. | kg | | | |
| | 80 | Having an outside diameter exceeding 406.4 mm............................. | kg | | | |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

**Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)**

Barcode:4168000 Amended Prchisbard REVnting process igation -

XV
73-8

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 7304 (con.) | | Tubes, pipes and hollow profiles, seamless, of iron (other than cast iron) or steel: (con.) | | | | |
| | | Casing, tubing and drill pipe, of a kind used in drilling for oil or gas: (con.) | | | | |
| 7304.29 (con.) | | Other: (con.) | | | | |
| | | Tubing: | | | | |
| 7304.29.50 | | Of iron or nonalloy steel................................. | ................. | Free[1/2/] | | 25% |
| | | Having an outside diameter not exceeding 114.3 mm: | | | | |
| | 15 | Having a wall thickness not exceeding 9.5 mm................................. | kg | | | |
| | 30 | Having a wall thickness exceeding 9.5 mm................................. | kg | | | |
| | 45 | Having an outside diameter exceeding 114.3 mm but less than 215.9 mm............. | kg | | | |
| | 60 | Having an outside diameter of 215.9 mm or more but not exceeding 406.4 mm....... | kg | | | |
| | 75 | Having an outside diameter exceeding 406.4 mm................................ | kg | | | |
| 7304.29.61 | | Of other alloy steel............................................. | ................. | Free[1/2/] | | 35% |
| | | Having an outside diameter not exceeding 114.3 mm: | | | | |
| | 15 | Having a wall thickness not exceeding 9.5 mm................................. | kg | | | |
| | 30 | Having a wall thickness exceeding 9.5 mm................................. | kg | | | |
| | 45 | Having an outside diameter exceeding 114.3 mm but less than 215.9 mm............ | kg | | | |
| | 60 | Having an outside diameter of 215.9 mm or more but not exceeding 406.4 mm....... | kg | | | |
| | 75 | Having an outside diameter exceeding 406.4 mm................................ | kg | | | |

Appx428

**Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)**

Barcode:4168001 Office of the Assistant Secretary for Investigation - Annual or Periodic Reporting Purposes

XV
73-9

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty | | 2 |
|---|---|---|---|---|---|---|
| | | | | General | Special | |
| 7304 (con.) | | Tubes, pipes and hollow profiles, seamless, of iron (other than cast iron) or steel: (con.) | | | | |
| | | Other, of circular cross section, of iron or nonalloy steel: | | | | |
| 7304.31 | | Cold-drawn or cold-rolled (cold-reduced): | | | | |
| 7304.31.30 | 00 | Hollow bars.................. | kg............. | Free[1/2/] | | 22% |
| 7304.31.60 | | Other.................. | ............... | Free[1/2/] | | 25% |
| | 10 | Suitable for use in boilers, superheaters, heat exchangers, condensers, refining furnaces and feedwater heaters................ | kg | | | |
| | 50 | Other.................. | kg | | | |
| 7304.39.00 | | Other.................. | ............... | Free[1/2/] | | 25% |
| | | Suitable for use in boilers, superheaters, heat exchangers, condensers, refining furnaces and feedwater heaters: | | | | |
| | 02 | Having an outside diameter less than 38.1 mm................ | kg | | | |
| | 04 | Having an outside diameter of 38.1 mm or more but less than 190.5 mm................ | kg | | | |
| | 06 | Having an outside diameter of 190.5 mm or more but not exceeding 285.8 mm............... | kg | | | |
| | 08 | Having an outside diameter exceeding 285.8 mm................ | kg | | | |

## Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)

Barcode:4168001 Annotated for Statistical Reporting Purposes - Investigation

XV
73-10

| Heading/ Subheading | Stat. Suf-fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | General | Special | 2 |
| 7304 (con.) | | Tubes, pipes and hollow profiles, seamless, of iron (other than cast iron) or steel: (con.) | | | | |
| | | Other, of circular cross section, of iron or nonalloy steel: (con.) | | | | |
| 7304.39.00 (con.) | | Other (con.) | | | | |
| | | Other: | | | | |
| | 16 | Galvanized, having an outside diameter not exceeding 114.3 mm......................................... | kg | | | |
| | | Other: | | | | |
| | 20 | Having an outside diameter less than 38.1 mm............................................ | kg | | | |
| | | Having an outside diameter of 38.1 mm or more but not exceeding 114.3 mm: | | | | |
| | 24 | Having a wall thickness less than 6.4 mm............................................ | kg | | | |
| | 28 | Having a wall thickness of 6.4 mm or more but not exceeding 12.7 mm....... | kg | | | |
| | 32 | Having a wall thickness exceeding 12.7 mm............................................ | kg | | | |
| | | Having an outside diameter exceeding 114.3 mm but less than 190.5 mm: | | | | |
| | 36 | Having a wall thickness less than 12.7 mm............................................ | kg | | | |
| | 40 | Having a wall thickness of 12.7 mm or more but less than 19 mm................... | kg | | | |
| | 44 | Having a wall thickness of 19 mm or more........................................... | kg | | | |
| | | Having an outside diameter of 190.5 mm or more but not exceeding 285.8 mm: | | | | |
| | 48 | Having a wall thickness less than 12.7 mm............................................ | kg | | | |
| | 52 | Having a wall thickness of 12.7 mm or more but less than 19 mm................... | kg | | | |
| | 56 | Having a wall thickness of 19 mm or more........................................... | kg | | | |
| | | Having an outside diameter exceeding 285.8 mm but not exceeding 406.4 mm: | | | | |
| | 62 | Having a wall thickness less than 12.7 mm............................................ | kg | | | |
| | 68 | Having a wall thickness of 12.7 mm or more but less than 19 mm................... | kg | | | |
| | 72 | Having a wall thickness of 19 mm or more........................................... | kg | | | |
| | | Having an outside diameter exceeding 406.4 mm: | | | | |
| | 76 | Having a wall thickness less than 19 mm............................................ | kg | | | |
| | 80 | Having a wall thickness of 19 mm or more........................................... | kg | | | |

**Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)**

Barcode:4168004-01 A-533-824 REV - Sunset Review - Investigation -
Annual Inquiry Service List Reporting Process

XV
73-11

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 7304 (con.) | | Tubes, pipes and hollow profiles, seamless, of iron (other than cast iron) or steel: (con.) | | | | |
| | | Other, of circular cross section, of stainless steel: | | | | |
| 7304.41 | | Cold-drawn or cold-rolled (cold-reduced): | | | | |
| 7304.41.30 | | Of an external diameter of less than 19 mm.......... | .................. | Free[1/2/] | | 36% |
| | 05 | Of high-nickel alloy steel................................. | kg | | | |
| | | Other: | | | | |
| | 15 | Suitable for use in boilers, superheaters, heat exchangers, condensers, refining furnaces and feedwater heaters............... | kg | | | |
| | 45 | Other.............................................. | kg | | | |
| 7304.41.60 | | Other............................................................ | .................. | Free[1/2/] | | 36% |
| | 05 | Of high-nickel alloy steel................................. | kg | | | |
| | | Other: | | | | |
| | 15 | Suitable for use in boilers, superheaters, heat exchangers, condensers, refining furnaces and feedwater heaters............... | kg | | | |
| | 45 | Other[5/].............................................. | kg | | | |
| 7304.49.00 | | Other............................................................ | .................. | Free[1/2/] | | 36% |
| | 05 | Of high-nickel alloy steel................................. | kg | | | |
| | | Other: | | | | |
| | 15 | Hollow bars................................... | kg | | | |
| | | Other: | | | | |
| | 45 | Suitable for use in boilers, superheaters, heat exchangers, condensers, refining furnaces and feedwater heaters............... | kg | | | |
| | 60 | Other.............................................. | kg | | | |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

**Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)**

Barcode:4168001 Annotated for Statistical Reporting Purposes

XV
73-12

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 7304 (con.) | | Tubes, pipes and hollow profiles, seamless, of iron (other than cast iron) or steel: (con.) | | | | |
| | | Other, of circular cross section, of other alloy steel: | | | | |
| 7304.51 | | Cold-drawn or cold-rolled (cold-reduced): | | | | |
| 7304.51.10 | 00 | Suitable for use in the manufacture of ball or roller bearings............................................................. | kg | Free[1/2/] | | 34% |
| 7304.51.50 | | Other.................................................................. | .................. | Free[1/2/] | | 35% |
| | 05 | Of high-nickel alloy steel............................... | kg | | | |
| | | Other: | | | | |
| | | Suitable for use in boilers, superheaters, heat exchangers, condensers, refining furnaces and feedwater heaters: | | | | |
| | 15 | Of heat-resisting steel........................ | kg | | | |
| | 45 | Other................................................... | kg | | | |
| | 60 | Other......................................................... | kg | | | |
| 7304.59 | | Other: | | | | |
| 7304.59.10 | 00 | Suitable for use in the manufacture of ball or roller bearings............................................................. | kg | Free[1/2/] | | 34% |
| | | Other: | | | | |
| 7304.59.20 | | Suitable for use in boilers, superheaters, heat exchangers, condensers, refining furnaces and feedwater heaters...................................... | .................. | Free[1/2/] | | 35% |
| | 30 | Of heat-resisting steel................................ | kg | | | |
| | | Other: | | | | |
| | 40 | Having an outside diameter less than 38.1 mm....................................................... | kg | | | |
| | 45 | Having an outside diameter of 38.1 mm or more but not exceeding 114.3 mm.......................................................... | kg | | | |
| | 55 | Having an outside diameter exceeding 114.3 mm but less than 190.5 mm...... | kg | | | |
| | 60 | Having an outside diameter of 190.5 mm or more but not exceeding 285.8 mm.......................................................... | kg | | | |
| | 70 | Having an outside diameter exceeding 285.8 mm but not exceeding 406.4 mm.................................................... | kg | | | |
| | 80 | Having an outside diameter exceeding 406.4 mm.................................................... | kg | | | |

Appx432

**Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)**
Barcode:4168000 Annotated for Statistical Reporting Purposes - Investigation

XV
73-13

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 7304 (con.) | | Tubes, pipes and hollow profiles, seamless, of iron (other than cast iron) or steel: (con.) | | | | |
| 7304.59 (con.) | | Other, of circular cross section, of other alloy steel: (con.) Other: (con.) Other: | | | | |
| 7304.59.60 | 00 | Of heat-resisting steel.................... | kg.......... | Free[1/][2/] | | 36% |
| 7304.59.80 | | Other...................................... | ............. | Free[1/][2/] | | 35% |
| | 10 | Having an outside diameter less than 38.1 mm............................... | kg | | | |
| | | Having an outside diameter of 38.1 mm or more but not exceeding 114.3 mm: | | | | |
| | 15 | Having a wall thickness less than 6.4 mm........................ | kg | | | |
| | 20 | Having a wall thickness of 6.4 mm or more but not exceeding 12.7 mm........................ | kg | | | |
| | 25 | Having a wall thickness exceeding 12.7 mm........................ | kg | | | |
| | | Having an outside diameter exceeding 114.3 mm but less than 190.5 mm: | | | | |
| | 30 | Having a wall thickness less than 12.7 mm........................ | kg | | | |
| | 35 | Having a wall thickness of 12.7 mm or more but less than 19 mm........................ | kg | | | |
| | 40 | Having a wall thickness of 19 mm or more........................ | kg | | | |
| | | Having an outside diameter of 190.5 mm or more but not exceeding 285.8 mm: | | | | |
| | 45 | Having a wall thickness less than 12.7 mm........................ | kg | | | |
| | 50 | Having a wall thickness of 12.7 mm or more but less than 19 mm........................ | kg | | | |
| | 55 | Having a wall thickness of 19 mm or more........................ | kg | | | |
| | | Having an outside diameter exceeding 285.8 mm but not exceeding 406.4 mm: | | | | |
| | 60 | Having a wall thickness less than 12.7 mm........................ | kg | | | |
| | 65 | Having a wall thickness of 12.7 mm or more but less than 19 mm........................ | kg | | | |
| | 70 | Having a wall thickness of 19 mm or more........................ | kg | | | |
| | 80 | Having an outside diameter exceeding 406.4 mm........................ | kg | | | |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Appx433

**Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)**

Barcode:4168000 Office For Statistical Reporting Investigation -

XV
73-14

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 7304 (con.) | | Tubes, pipes and hollow profiles, seamless, of iron (other than cast iron) or steel: (con.) | | | | |
| 7304.90 | | Other: | | | | |
| | | Having a wall thickness of 4 mm or more: | | | | |
| 7304.90.10 | 00 | Of iron or nonalloy steel........................................ | kg............. | Free [1/] [2/] | | 1% |
| 7304.90.30 | 00 | Of alloy steel........................................................ | kg............. | Free [1/] [2/] | | 8.5% |
| | | Having a wall thickness of less than 4 mm: | | | | |
| 7304.90.50 | 00 | Of iron or nonalloy steel........................................ | kg............. | Free [1/] [2/] | | 25% |
| 7304.90.70 | 00 | Of alloy steel........................................................ | kg............. | Free [1/] [2/] | | 35% |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Appx434

**Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)**

Barcode:4168006 - Amended Scope Scope Rebutting Investigation -

XV
73-15

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 7305 | | Other tubes and pipes (for example, welded, riveted or similarly closed), having circular cross sections, the external diameter of which exceeds 406.4 mm, of iron or steel: | | | | |
| | | Line pipe of a kind used for oil or gas pipelines: | | | | |
| 7305.11 | | Longitudinally submerged arc welded: | | | | |
| 7305.11.10 | | Of iron or nonalloy steel.................................... | .................. | Free[1/2] | | 5.5% |
| | 30 | With an external diameter exceeding 406.4 mm but not exceeding 609.6 mm....... | kg | | | |
| | 60 | With an external diameter exceeding 609.6 mm.............. | kg | | | |
| 7305.11.50 | 00 | Of alloy steel............................................ | kg............ | Free[1/2] | | 10% |
| 7305.12 | | Other, longitudinally welded: | | | | |
| 7305.12.10 | | Of iron or nonalloy steel.................................... | .................. | Free[1/2] | | 5.5% |
| | 30 | With an external diameter exceeding 406.4 mm but not exceeding 609.6 mm....... | kg | | | |
| | 60 | With an external diameter exceeding 609.6 mm.............. | kg | | | |
| 7305.12.50 | 00 | Of alloy steel............................................ | kg | Free[1/2] | | 10% |
| 7305.19 | | Other: | | | | |
| 7305.19.10 | | Of iron or nonalloy steel.................................... | .................. | Free[1/2] | | 5.5% |
| | 30 | With an external diameter exceeding 406.4 mm but not exceeding 609.6 mm....... | kg | | | |
| | 60 | With an external diameter exceeding 609.6 mm.............. | kg | | | |
| 7305.19.50 | 00 | Of alloy steel............................................ | kg | Free[1/2] | | 10% |
| 7305.20 | | Casing of a kind used in drilling for oil or gas: | | | | |
| | | Of iron or nonalloy steel: | | | | |
| 7305.20.20 | 00 | Threaded or coupled.................................... | kg | Free[1/2] | | 20% |
| 7305.20.40 | 00 | Other.................................... | kg | Free[1/2] | | 1% |
| | | Of alloy steel: | | | | |
| 7305.20.60 | 00 | Threaded or coupled.................................... | kg | Free[1/2] | | 28% |
| 7305.20.80 | 00 | Other.................................... | kg | Free[1/2] | | 8.5% |
| | | Other, welded: | | | | |
| 7305.31 | | Longitudinally welded: | | | | |
| 7305.31.20 | 00 | Tapered pipes and tubes of steel principally used as parts of illuminating articles............................... | kg | Free[1/2] | | 45% |
| | | Other: | | | | |
| 7305.31.40 | 00 | Of iron or nonalloy steel............................... | kg | Free[1/2] | | 5.5% |
| 7305.31.60 | | Of alloy steel............................... | | Free[1/2] | | 10% |
| | 10 | Of stainless steel............................... | kg | | | |
| | 90 | Other............................... | kg | | | |
| 7305.39 | | Other: | | | | |
| 7305.39.10 | 00 | Of iron or nonalloy steel............................... | kg | Free[1/2] | | 5.5% |
| 7305.39.50 | 00 | Of alloy steel............................... | kg | Free[1/2] | | 10% |
| 7305.90 | | Other: | | | | |
| 7305.90.10 | 00 | Of iron or nonalloy steel............................... | kg | Free[1/2] | | 5.5% |
| 7305.90.50 | 00 | Of alloy steel............................... | kg | Free[1/2] | | 10% |

Appx435

**Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)**

Barcode:4168008 Contidential R&D Investigation -

XV
73-16

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 7306 | | Other tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel: | | | | |
| | | Line pipe of a kind used for oil or gas pipelines: | | | | |
| 7306.11.00 | | Welded, of stainless steel........................ | .............. | Free[1/2/] | | 10% |
| | 10 | With an outside diameter not exceeding 114.3 mm.......................... | kg | | | |
| | 50 | With an outside diameter exceeding 114.3 mm..... | kg | | | |
| 7306.19 | | Other: | | | | |
| 7306.19.10 | | Of iron or nonalloy steel......................... | .............. | Free[1/2/] | | 5.5% |
| | 10 | With an outside diameter not exceeding 114.3 mm. | kg | | | |
| | 50 | With an outside diameter exceeding 114.3 mm. | kg | | | |
| 7306.19.51 | | Of alloy steel......................... | .............. | Free[1/2/] | | 10% |
| | 10 | With an outside diameter not exceeding 114.3 mm. | kg | | | |
| | 50 | With an outside diameter exceeding 114.3 mm. | kg | | | |
| | | Casing and tubing of a kind used in drilling for oil or gas: | | | | |
| 7306.21 | | Welded of stainless steel: | | | | |
| | | Casing: | | | | |
| 7306.21.30 | 00 | Threaded or coupled..................... | kg | Free[1/2/] | | 28% |
| 7306.21.40 | 00 | Other.......................... | kg | Free[1/2/] | | 8.5% |
| 7306.21.80 | | Tubing.......................... | | Free[1/2/] | | 10% |
| | 10 | Imported with coupling..................... | kg | | | |
| | 50 | Other.......................... | kg | | | |
| 7306.29 | | Other: | | | | |
| | | Casing: | | | | |
| | | Of iron or nonalloy steel: | | | | |
| 7306.29.10 | | Threaded or coupled..................... | .............. | Free[1/2/] | | 20% |
| | 30 | Imported with coupling..................... | kg | | | |
| | 90 | Other.......................... | kg | | | |
| 7306.29.20 | 00 | Other.......................... | kg | Free[1/] | | 1% |
| | | Other: | | | | |
| 7306.29.31 | 00 | Threaded or coupled..................... | kg | Free[1/2/] | | 28% |
| 7306.29.41 | 00 | Other.......................... | kg | Free[1/2/] | | 8.5% |
| | | Tubing: | | | | |
| 7306.29.60 | | Of iron or nonalloy steel......................... | .............. | Free[1/2/] | | 5.5% |
| | 10 | Imported with coupling..................... | kg | | | |
| | 50 | Other.......................... | kg | | | |
| 7306.29.81 | | Other.......................... | .............. | Free[1/2/] | | 10% |
| | 10 | Imported with coupling..................... | kg | | | |
| | 50 | Other.......................... | kg | | | |

Appx436

**Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)**
Barcode:4168004 A-351-824 REV - Proceeding Annual Reporting Investigation -

XV
73-17

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 7306 (con.) | | Other tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel: (con.) | | | | |
| 7306.30 | | Other, welded, of circular cross section, of iron or nonalloy steel: | | | | |
| 7306.30.10 | 00 | Having a wall thickness of less than 1.65 mm.............. | kg.............. | Free[1/2/] | | 25% |
| | | Having a wall thickness of 1.65 mm or more: | | | | |
| 7306.30.30 | 00 | Tapered steel pipes and tubes principally used as parts of illuminating articles.................... | kg.............. | Free[1/2/] | | 45% |
| 7306.30.50 | | Other.................... | kg.............. | Free[1/2/] | | 5.5% |
| | 10 | Suitable for use in boilers, superheaters, heat exchangers, condensers, refining furnaces and feedwater heaters, whether or not cold drawn.................... | kg | | | |
| | 15 | Other, cold-drawn.................... | kg | | | |
| | 20 | Other, cold-rolled (cold-reduced) with a wall thickness not exceeding 2.54 mm.................... | kg | | | |
| | | Other: | | | | |
| | | With an outside diameter not exceeding 114.3 mm: | | | | |
| | | Galvanized: | | | | |
| | 25 | Imported with coupling.................... | kg | | | |
| | 28 | Internally coated or lined with a non-electrically insulating material, suitable for use as electrical conduit.................... | kg | | | |
| | 32 | Other.................... | kg | | | |
| | | Other: | | | | |
| | 35 | Tube and pipe hollows for redrawing.................... | kg | | | |
| | 40 | Other, imported with coupling...... | kg | | | |
| | 55 | Other.................... | kg | | | |
| | | With an outside diameter exceeding 114.3 mm but not exceeding 406.4 mm: | | | | |
| | 85 | Galvanized.................... | kg | | | |
| | 90 | Other.................... | kg | | | |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)
Annotated for Statistical Reporting Purposes

XV
73-18

Barcode:4168009 - Amended for 35A824 Restraint Investigation -

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 7306 (con.) | | Other tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel: (con.) | | | | |
| 7306.40 | | Other, welded, of circular cross section, of stainless steel: | | | | |
| 7306.40.10 | | Having a wall thickness of less than 1.65 mm............ | ................. | Free[1/2/] | | 36% |
| | | Containing more than 0.5 percent by weight of nickel: | | | | |
| | 10 | Containing more than 1.5 percent but less than 5 percent by weight of molybdenum................ | kg | | | |
| | 15 | Other...................................................... | kg | | | |
| | 90 | Other...................................................... | kg | | | |
| 7306.40.50 | | Having a wall thickness of 1.65 mm or more............. | ............. | Free[1/2/] | | 11% |
| | 05 | Of high-nickel alloy steel.......................... | kg | | | |
| | | Other: | | | | |
| | 15 | Suitable for use in boilers, superheaters, heat exchangers, condensers, refining furnaces and feedwater heaters, whether or not cold-drawn............................................... | kg | | | |
| | | Other, cold-drawn or cold-rolled (cold-reduced): | | | | |
| | 40 | Containing more than 0.5 percent but less than 24 percent by weight of nickel........ | kg | | | |
| | | Other: | | | | |
| | 42 | Containing less than 15 percent by weight of chromium............................ | kg | | | |
| | 44 | Other............................................ | kg | | | |
| | | Other: | | | | |
| | | With an outside diameter not exceeding 114.3 mm: | | | | |
| | | Containing more than 0.5 percent but less than 24 percent by weight of nickel: | | | | |
| | 62 | Containing more than 1.5 percent but less than 5 percent by weight of molybdenum.............................. | kg | | | |
| | 64 | Other........................................ | kg | | | |
| | 80 | Other............................................ | kg | | | |
| | | With an outside diameter exceeding 114.3 mm but not exceeding 406.4 mm: | | | | |
| | 85 | Containing more than 0.5 percent but less than 24 percent by weight of nickel......................................... | kg | | | |
| | 90 | Other.................................................... | kg | | | |

Appx438

**Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)**

Barcode:4168000 Unofficial 755-824 REP Reporting Process Investigation  -

XV
73-19

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 7306 (con.) | | Other tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel: (con.) | | | | |
| 7306.50 | | Other, welded, of circular cross section, of other alloy steel: | | | | |
| 7306.50.10 | 00 | Having a wall thickness of less than 1.65 mm | kg | Free[1/2] | | 35% |
| | | Having a wall thickness of 1.65 mm or more: | | | | |
| 7306.50.30 | 00 | Tapered pipes and tubes of steel principally used as parts of illuminating articles | kg | Free[1/2] | | 45% |
| 7306.50.50 | | Other | | Free[1/2] | | 10% |
| | 10 | Suitable for use in boilers, superheaters, heat exchangers, condensers, refining furnaces and feedwater heaters, whether or not cold-drawn | kg | | | |
| | 30 | Other, cold-drawn or cold-rolled (cold-reduced) | kg | | | |
| | | Other: | | | | |
| | 50 | With an outside diameter not exceeding 114.3 mm | kg | | | |
| | 70 | With an outside diameter exceeding 114.3 mm but not exceeding 406.4 mm | kg | | | |
| | | Other, welded, of noncircular cross section: | | | | |
| 7306.61 | | Of square or rectangular cross section: | | | | |
| | | Having a wall thickness of 4 mm or more: | | | | |
| 7306.61.10 | 00 | Of iron or nonalloy steel | kg | Free[1/2] | | 1% |
| 7306.61.30 | 00 | Of alloy steel | kg | Free[1/2] | | 28% |
| | | Having a wall thickness of less than 4 mm: | | | | |
| 7306.61.50 | 00 | Of iron or nonalloy steel | kg | Free[1/2] | | 25% |
| 7306.61.70 | | Of alloy steel | | Free[1/2] | | 35% |
| | 30 | Of stainless steel | kg | | | |
| | 60 | Other | kg | | | |
| 7306.69 | | Of other noncircular cross section: | | | | |
| | | Having a wall thickness of 4 mm or more: | | | | |
| 7306.69.10 | 00 | Of iron or nonalloy steel | kg | Free[1/2] | | 1% |
| 7306.69.30 | 00 | Of alloy steel | kg | Free[1/2] | | 28% |
| | | Having a wall thickness of less than 4 mm: | | | | |
| 7306.69.50 | 00 | Of iron or nonalloy steel | kg | Free[1/2] | | 25% |
| 7306.69.70 | | Of alloy steel | | Free[1/2] | | 35% |
| | 30 | Of stainless steel | kg | | | |
| | 60 | Other | kg | | | |
| 7306.90 | | Other: | | | | |
| 7306.90.10 | 00 | Of iron or nonalloy steel | kg | Free[1/2] | | 5.5% |
| 7306.90.50 | 00 | Of alloy steel | kg | Free[1/2] | | 10% |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

## Harmonized Tariff Schedule of the United States Basic Revision 7 (2021)

Barcode:4168000 Modified Revision 7 Reporting Investigation -

1/ See 9903.88.15.
2/ See U.S. note 16 to subchapter III, chapter 99.
3/ See 9903.88.03.
4/ See 9903.88.16.
5/ See 9903.88.51.
6/ See 9903.88.45.
7/ See 9903.88.35.
8/ See 9903.88.46.
9/ See 9903.88.02.
10/ See 9903.88.43 and 9903.88.56.
11/ See 9903.88.37 and 9903.88.56.
12/ See 9903.88.48 and 9903.88.56.
13/ See 9903.88.17 and 9903.88.59.
14/ See 9903.88.17 and 9903.88.20.
15/ See 9903.88.43.
16/ See 9903.88.43 and 9903.88.48.
17/ See 9903.88.48.
18/ See 9903.88.18.
19/ See 9903.88.33 and 9903.88.56.
20/ See 9903.88.37.
21/ See 9902.14.94 and 9903.88.03.
22/ See 9903.88.38.
23/ See 9903.88.33.
24/ See 9902.14.95 and 9903.88.03.
25/ See 9903.88.40, 9903.88.48 and 9903.88.56.
26/ See 9903.88.18 and 9903.88.56.
27/ See 9902.14.96, 9902.14.97 and 9903.88.16.
28/ See 9902.14.98, 9902.14.99, 9902.15.01 and 9903.88.03.
29/ See 9903.88.36.
30/ See 9903.88.13, 9903.88.37, 9903.88.43 and 9903.88.46.
31/ See 9903.88.34 and 9903.88.43.
32/ See 9902.15.02, 9902.15.03, 9902.15.04, 9902.15.05, 9902.15.06 and 9903.88.03.
33/ See 9903.88.33, 9903.88.36, 9903.88.37, 9903.88.38, 9903.88.43, 9903.88.45, 9903.88.46, 9903.88.48 and 9903.88.56.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

# EXHIBIT I-18

Barcode:4168004-04 A-357-824 INV - Investigation  -

# Oil Country Tubular Goods from China

Investigation Nos. 701-TA-463 and 731-TA-1159 (Second Review)

**Publication 5136**                    **November 2020**



**U.S. International Trade Commission**

**Washington, DC 20436**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

Investigation Nos. 701-TA-463 and 731-TA-1159 (Second Review)

Oil Country Tubular Goods from China

**DETERMINATIONS**

On the basis of the record[1]  developed in the subject five-year reviews, the United States International Trade Commission ("Commission") determines, pursuant to the Tariff Act of 1930 ("the Act"), that revocation of the countervailing and antidumping duty orders on oil country tubular goods from China would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.

**BACKGROUND**

The Commission instituted these reviews on April 1, 2020 (85 FR 18268, April 1, 2020) and determined on July 6, 2020 that it would conduct expedited reviews (85 FR 64161, October 9, 2020).

---

[1]  The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

1

information are based on official import statistics.[12]  Foreign industry data and related information are based on information Domestic Producers provided in their response to the notice of institution and on public information compiled by Commission staff.[13]  Six U.S. purchasers responded to the adequacy phase questionnaire.[14]

## II.     Domestic Like Product and Domestic Industry

### A.     Domestic Like Product

In making its determination under section 751(c) of the Tariff Act, the Commission defines the "domestic like product" and the "industry."[15]  The Tariff Act defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle."[16]  The Commission's practice in five-year reviews is to examine the domestic like product definition from the original investigation and consider whether the record indicates any reason to revisit the prior findings.[17]

Commerce has defined the imported merchandise within the scope of the orders under review as follows:

> Certain OCTG, which are hollow steel products of circular cross-section, including oil well casing and tubing, of iron (other than cast iron) or steel (both carbon and alloy), whether seamless or welded, regardless of end finish (*e.g.*, whether or not plain end, threaded, or threaded and coupled) whether or not conforming to American Petroleum Institute (API) or non-API specifications, whether finished (including limited service OCTG

---

[12] CR/PR at I-29.

[13] *See* CR/PR at I-31–35.

[14] CR/PR at D-3.

[15] 19 U.S.C. § 1677(4)(A).

[16] 19 U.S.C. § 1677(10); *see*, *e.g.*, *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007); *NEC Corp. v. Department of Commerce*, 36 F. Supp. 2d 380, 383 (Ct. Int'l Trade 1998); *Nippon Steel Corp. v. United States*, 19 CIT 450, 455 (1995); *Timken Co. v. United States*, 913 F. Supp. 580, 584 (Ct. Int'l Trade 1996); *Torrington Co. v. United States*, 747 F. Supp. 744, 748-49 (Ct. Int'l Trade 1990), *aff'd*, 938 F.2d 1278 (Fed. Cir. 1991); *see also* S. Rep. No. 249, 96th Cong., 1st Sess. 90-91 (1979).

[17] *See*, *e.g.*, *Internal Combustion Industrial Forklift Trucks from Japan*, Inv. No. 731-TA-377 (Second Review), USITC Pub. 3831 at 8-9 (Dec. 2005); *Crawfish Tail Meat from China*, Inv. No. 731-TA-752 (Review), USITC Pub. 3614 at 4 (July 2003); *Steel Concrete Reinforcing Bar from Turkey*, Inv. No. 731-TA-745 (Review), USITC Pub. 3577 at 4 (Feb. 2003).

5

Barcode:4168004-04 A-357-824 INV - Investigation -

products) or unfinished (including green tubes and limited service OCTG
products), whether or not thread protectors are attached.  The scope of
the order also covers OCTG coupling stock.  Excluded from the scope of
the order are casing or tubing containing 10.5 percent or more by weight
of chromium; drill pipe; unattached couplings; and unattached thread
protectors.[18]

OCTG are tubular steel products used in oil and gas wells and include casing, tubing, and
coupling stock of carbon and alloy steel.[19]  Casing is a circular pipe that serves as the structural
retainer for the walls of the well with an outside diameter ("OD") ranging from 4.5 to 20 inches.
Casing is used in the well to provide a firm foundation for the drill string by supporting the walls
of the hole to prevent caving in both during drilling and after the well is completed. After the
casing is set, concrete is usually pumped between the outside of the casing and the wall of the
hole to provide a secure anchor.  Casing also serves as a surface pipe designed to prevent
contamination of the recoverable oil and gas by surface water, gas, sand, or limestone.[20]

Tubing is a smaller-diameter pipe (between 1.050 and 4.500 inches in OD) installed
inside a larger-diameter casing that is used to conduct the oil or gas to the surface either
through natural flow or pumping.  Tubing must be strong enough to support its own weight,
that of the oil or gas, and that of any pumping equipment suspended on the string.[21]  Coupling
stock is a seamless tubular product used to make coupling blanks, which in turn are used to
produce coupling.  Coupling is a thick-walled internally threaded cylinder that is used for joining
two length of threaded pipe and typically accounts for 2-3 percent of the weight of end-finished
tubing or casing.[22]

In the prior proceedings, the Commission defined a single domestic like product
coextensive with Commerce's scope.[23]  In these reviews, Domestic Producers have stated that
they agree with the Commission's definition of the domestic like product from the prior

---

[18] *Certain Oil Country Tubular Goods From the People's Republic of China: Final Results of
Expedited Second Sunset Review of the Antidumping Duty Order*, 85 Fed. Reg. 45577 (July 29, 2020);
*Certain Oil Country Tubular Goods From the People's Republic of China: Final Results of Expedited Second
Sunset Review of the Countervailing Duty Order*, 85 Fed. Reg. 38849 (June 29, 2020).  The scope is
unchanged from the original investigations.  *See Final CVD Determination*, USITC Pub. 4124 at 5.

[19] CR/PR at I-9.

[20] CR/PR at I-12–14.

[21] CR/PR at I-14.

[22] CR/PR at I-14.

[23] *Final CVD Determination*, USITC Pub. 4124 at 6; *First Review Determinations*, USITC Pub. 4532
at 6.

6

Appx445

proceedings.[24]  There is no new information obtained during these reviews that would suggest that the characteristics and uses of domestically produced OCTG have changed materially since the prior proceedings.[25]  Accordingly, we again define a single domestic like product consisting of all OCTG, coextensive with Commerce's definition of the scope of the orders under review.

### B.    Domestic Industry

Section 771(4)(A) of the Tariff Act defines the relevant industry as the domestic "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[26]  In defining the domestic industry, the Commission's general practice has been to include in the industry producers of all domestic production of the like product, whether toll-produced, captively consumed, or sold in the domestic merchant market.

In the original investigations, the Commission defined the domestic industry as consisting of all domestic producers of OCTG.[27]  In the first reviews, the Commission found that there were no related party issues and again defined the domestic industry as consisting of all domestic producers of OCTG.[28]

In the current reviews, Domestic Producers agree with the Commission's definition of the domestic industry from the prior proceedings.[29]  The record further does not indicate that any domestic producer is a related party.[30]  Accordingly, we define the domestic industry to be all domestic producers of OCTG.

---

[24] Response at 31.

[25] *See generally* CR/PR at I-8–22.

[26] 19 U.S.C. § 1677(4)(A).  The definitions in 19 U.S.C. § 1677 are applicable to the entire subtitle containing the antidumping and countervailing duty laws, including 19 U.S.C. §§ 1675 and 1675a.  *See* 19 U.S.C. § 1677.

[27] *Final CVD Determination*, USITC Pub. 4124 at 6.  In the original investigations, the Commission found that appropriate circumstances did not exist to exclude any producer from the domestic industry pursuant to the related parties provision.  *Id.* at 6 n.25.

[28] *First Review Determinations*, USITC Pub. 4532 at 7.

[29] Response at 31.

[30] Domestic Producers state that none of the participating individual producers is an importer of subject merchandise or is related to a producer or exporter of subject merchandise, nor are they aware of any other U.S. producer that imports subject merchandise or is related to an exporter of such merchandise.  *See* Response at 26–27, Exh. 9.

Filed By: rschagrin@schagrinsociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

# EXHIBIT I-19

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

# Foreign Producers of OCTG

<u>Argentina</u>

**Formar S.A.**[1]
Ruta 7 Km. 700
Villa Mercedes, San Luis 5730
Argentina
Tel: +54 2657 440100

**M. Royo S.A.**
Av. 27 de Febrero 6151
Ciudad Autonoma de Buenos Aires, C1437FXL
Argentina
Website: mroyo.com/en/
Tel: + (54-11) 4918-4431
Fax: + (54-11) 4918-4440

**Tenaris**
Dr. Simini 250
Campana, Buenos Aires B2804MHA
Argentina
Website: teneris.com
Tel: + 54-348-9-433166

**Tubhier S.A.**
Ruta 7 KM 699.5
Villa Mercedes, San Luis 5730
Argentina
Tel: +54 2657 440100

---

[1] The entries for Formar S.A. and Tubhier S.A. in the API composite list have almost identical addresses, and identical phone numbers, which indicates that these two producers may have merged or be, in fact, the same company.

Korea

**AJU Besteel Co., Ltd.**
No. 766-1 Daigak-Li
Daisong-Myeon, Nam-gu
Pohang City, Kyung Buk 790841
Korea
Phone: +82 542887310
Fax: +82 542887007

**Husteel Co., Ltd.**
14F, 15F, Teheran-ro 512 (Shinan Bldg., Daechi-dong),
Gangnam-gu, Seoul, Korea
Website: https://www.husteel.com/eng/main.hu
Tel: +82-2-828-9131 ~ 9148

**Hyundai Steel**
12, Heolleung-ro, Seocho-gu, Seoul, 137-938
Korea
Website: hyundai-steel.com/en
Phone: +82 2-3464-6114
Fax: +82 2-3464-6060

**Iljin Steel Corp.**
1746 Hoguk-ro, Imsil-eup, Imsil-gun,
Jeollabuk-do, South Korea
Website: http://www.iljinsteel.com/eng/
Tel: +82-2-707-9700
Fax: +82-2-707-9706

**Kumkang Kind. Co., Ltd.**
21, Saemal-ro 5-gil, Songpa-gu, Seoul,
Korea
Website: kumkangkind.com/eng/index.asp
Phone: +82 2 - 3415 - 4167

**Nexteel Co., Ltd.**
195, Songdeok-ro 212 Beon-gil
Daesong-Myun, Nam-gu
Pohang-si, Kyeongbuk 37875
Korea
Website: nexteel.com
Phone: +82 54-288-5537
Fax: +82 54-288-5616

2

Appx449

Barcode:4168004-04 A-357-824 INV - Investigation  -

**SeAH Steel Corp.**
SeAH Tower 23 floor , 45,
Yanghwa-ro, Mapo-gu, Seoul,
Korea
Website: www.seahsteel.co.kr/eng
Phone: +82 2 - 6970 - 0110
Fax: +82 2 - 6970 - 0127

3

Barcode:4168004-04 A-357-824 INV - Investigation -

Mexico

**Pytco S.A. de C.V.**
Libramiento Carlos Salinas de Gortari
No. 1500, Km 8.5
Frontera, Coahuila 25640
Mexico
Website: pytco.com.mx
Tel: +52 866-649-1300

**Tenaris**
KM 433.7 Carr. Mexico-Veracruz Via Xalapa
Veracruz, Veracruz 91697
Mexico
Website: tenaris.com
Tel: +52 229-989-1220

**Tubacero**
Av. Guerrero #3729 nte,
Col del Norte, Monterrey NL 64500
Mexico
Website: tubacero.com
Tel: (+52) 81 8305 5500

**Vallourec Oil & Gas Mexico, S.A. de C.V.**
Ave. Framboyanes S/N Lote 6 Manzana 5
Cd. Industrial Bruno Pagliai
Veracruz, Veracruz 91697
Mexico
Website: vallourec.com
Tel: +52 229-989-8751

4

Barcode:4168004-04 A-357-824 INV - Investigation  -

Russia

**OMK**
115184, Moscow, Ozerkovskaya embankment, 28, bldg. 2
Russia
Website: omk.ru
Tel: +7 (495) 231 77 71
Fax: +7 (495) 231 77 72
Email: info@omk.ru

**PJSC "Chelyabinsk Pipe Plant"**
21 Machinostroiteley Str
Chelyabinsk, 454129
Russia
Website: https://chelpipegroup.com/
Tel:  +7 495 775 3555
Email: info@chelpipegroup.com

**TMK**
40/2a Pokrovka Street
Moscow, 105062
Russia
Website: https://www.tmk-group.com/production_russia
Tel: +7 (495) 775 7600
Fax: +7 (495) 775 7601
E-mail: tmk@tmk-group.com

**Urals Pipe Works, JSC**
Sakko i Vantsetti Str.,28,
Pervouralsk, Sverdlovsk Region, 623107,
Russia
Website: trubprom.com
Tel: +7-3439-297-502
Fax: +7-3439-297-530
Email: export@trubprom.com

5

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

# NOT SUSCEPTIBLE TO
# PUBLIC SUMMARY

Barcode:4168004-04 A-357-824 INV - Investigation  -

# EXHIBIT I-20

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

**Imports for Consumption, 2018 to June 2021**
**Quantities in Metric Tons**

| Country | Annual 2018 | Annual 2019 | Annual 2020 | 1H 2020 | 1H 2021 |
|---|---|---|---|---|---|
| Korea, South................ | 457,417 | 408,308 | 273,378 | 150,975 | 197,464 |
| Mexico......................... | 383,897 | 194,317 | 149,571 | 99,493 | 115,912 |
| Argentina..................... | 146,829 | 147,757 | 15,182 | 9,539 | 73,495 |
| Russia.......................... | 239,252 | 195,352 | 44,761 | 41,008 | 52,690 |
| Austria......................... | 159,291 | 97,722 | 55,316 | 39,307 | 45,746 |
| Canada......................... | 157,728 | 71,015 | 48,843 | 32,234 | 41,687 |
| Brazil........................... | 75,617 | 62,099 | 56,396 | 42,628 | 30,957 |
| Ukraine........................ | 80,009 | 102,137 | 6,680 | 6,279 | 19,077 |
| Taiwan......................... | 160,598 | 202,427 | 74,526 | 71,326 | 14,877 |
| Italy............................. | 61,674 | 58,830 | 15,342 | 10,443 | 7,726 |
| Japan........................... | 85,166 | 52,278 | 17,197 | 13,243 | 6,109 |
| Germany....................... | 39,946 | 42,610 | 20,437 | 12,070 | 6,075 |
| Turkey.......................... | 52,820 | 47,433 | 10,411 | 10,410 | 5,836 |
| Thailand....................... | 69,164 | 82,594 | 44,351 | 41,521 | 4,985 |
| Spain........................... | 83,644 | 62,237 | 21,214 | 17,341 | 4,020 |
| Belarus........................ | 14,471 | 383 | 6,591 | 5,830 | 3,025 |
| Romania....................... | 15,259 | 6,417 | 90 | 89 | 2,297 |
| France......................... | 2,329 | 3,470 | 874 | 493 | 1,137 |
| Saudi Arabia................ | 65,944 | 74,366 | 23,742 | 7,817 | 1,103 |
| United Kingdom............ | 10,404 | 11,968 | 3,378 | 3,342 | 808 |
| United Arab Emirates... | 3,792 | 1,750 | 1,579 | 466 | 341 |
| Brunei.......................... | 10,384 | 27,279 | 8,392 | 5,385 | 290 |
| Czech Republic............ | 1,726 | 7,295 | 7,045 | 6,246 | 212 |
| China........................... | 727 | 358 | 912 | 853 | 92 |
| India............................ | 3,300 | 714 | 719 | 16 | 41 |
| Netherlands.................. | 1 | --- | --- | --- | 0 |
| Vietnam....................... | 22,989 | 40,038 | 24,423 | 22,442 | --- |
| Greece......................... | 537 | 9,534 | 15,762 | 15,762 | --- |
| Philippines................... | 51,704 | 38,934 | 3,024 | 470 | --- |
| Georgia........................ | 152 | 2,236 | 1,784 | 1,784 | --- |
| Trinidad and Tobago.... | --- | --- | 276 | 276 | --- |
| Indonesia..................... | 599 | 4,030 | 130 | 103 | --- |
| Colombia...................... | 6,113 | 3,914 | 4 | --- | --- |
| Uruguay........................ | --- | --- | 3 | 3 | --- |
| Australia...................... | --- | --- | 0 | --- | --- |
| South Africa................. | 11,929 | 8,125 | --- | --- | --- |
| Malaysia....................... | --- | 925 | --- | --- | --- |
| Singapore..................... | 18 | 37 | --- | --- | --- |
| Denmark....................... | --- | 9 | --- | --- | --- |
| Belgium........................ | --- | 5 | --- | --- | --- |
| Sweden........................ | 90 | 4 | --- | --- | --- |
| Switzerland.................. | 1,340 | --- | --- | --- | --- |
| Cambodia..................... | 12 | --- | --- | --- | --- |
| New Zealand................ | 0 | --- | --- | --- | --- |
| **ALL COUNTRIES........** | **2,476,869** | **2,068,905** | **952,336** | **669,194** | **635,999** |

Source: Census Data for HTSUS 7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40, 7304.29.10.50, 7304.29.10.60, 7304.29.10.80, 7304.29.20.10, 7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60, 7304.29.20.80, 7304.29.31.10, 7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50, 7304.29.31.60, 7304.29.31.80, 7304.29.41.10, 7304.29.41.20, 7304.29.41.30, 7304.29.41.40, 7304.29.41.50, 7304.29.41.60, 7304.29.41.80, 7304.29.50.15, 7304.29.50.30, 7304.29.50.45, 7304.29.50.60, 7304.29.50.75, 7304.29.61.15, 7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75, 7305.20.20.00, 7305.20.40.00, 7305.20.60.00, 7305.20.80.00, 7306.29.10.30, 7306.29.10.90, 7306.29.20.00, 7306.29.31.00, 7306.29.41.00, 7306.29.60.10, 7306.29.60.50. 7306.29.81.10. and 7306.29.81.50

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

**Imports for Consumption, 2018 to June 2021**
**Customs Values in US$**

| Country | Annual 2018 | Annual 2019 | Annual 2020 | 1H 2020 | 1H 2021 |
|---|---|---|---|---|---|
| Korea, South..................... | 408,030,646 | 376,764,996 | 194,619,106 | 106,735,093 | 167,586,906 |
| Mexico............................ | 539,746,415 | 301,930,309 | 212,110,264 | 150,096,782 | 146,153,466 |
| Argentina.......................... | 188,881,672 | 208,315,839 | 19,210,840 | 12,825,972 | 75,119,553 |
| Canada............................ | 222,508,947 | 101,263,936 | 58,573,101 | 38,919,507 | 58,292,523 |
| Austria............................ | 207,233,377 | 121,768,086 | 55,216,273 | 39,709,130 | 49,495,046 |
| Brazil............................. | 70,521,548 | 64,899,062 | 71,713,485 | 60,406,130 | 33,464,970 |
| Russia............................. | 221,494,157 | 176,547,189 | 31,359,481 | 28,620,158 | 31,541,948 |
| Ukraine........................... | 74,202,588 | 96,668,915 | 5,747,753 | 5,418,366 | 18,749,760 |
| Taiwan............................ | 129,776,902 | 165,570,175 | 43,115,368 | 41,037,461 | 10,759,486 |
| Germany.......................... | 64,969,009 | 64,848,741 | 57,126,934 | 28,368,695 | 10,016,758 |
| Japan.............................. | 133,769,960 | 79,108,820 | 19,464,094 | 15,538,715 | 9,689,347 |
| Italy............................... | 71,578,971 | 61,451,331 | 15,380,659 | 11,624,363 | 9,337,534 |
| Thailand.......................... | 69,092,085 | 74,276,520 | 30,523,778 | 28,399,806 | 5,212,151 |
| Spain.............................. | 106,813,762 | 68,629,291 | 18,953,848 | 15,715,905 | 4,760,177 |
| Turkey............................ | 42,334,667 | 31,341,223 | 6,961,824 | 6,957,939 | 3,837,270 |
| Belarus........................... | 15,554,206 | 612,822 | 11,318,083 | 9,918,721 | 3,803,387 |
| Romania.......................... | 23,201,021 | 8,869,160 | 118,520 | 107,753 | 2,980,285 |
| Saudi Arabia..................... | 79,459,727 | 82,115,801 | 20,003,940 | 6,209,215 | 910,375 |
| Brunei............................ | 8,378,148 | 22,669,227 | 4,891,858 | 3,133,916 | 528,393 |
| France............................ | 1,205,859 | 1,950,200 | 429,566 | 239,709 | 400,702 |
| United Kingdom................. | 4,624,708 | 7,818,089 | 2,265,705 | 2,206,740 | 398,164 |
| United Arab Emirates........ | 3,196,838 | 1,486,127 | 1,100,480 | 326,388 | 294,149 |
| China............................. | 1,565,392 | 625,735 | 1,932,302 | 1,756,103 | 232,512 |
| Czech Republic................. | 1,979,674 | 7,285,764 | 5,550,864 | 4,866,757 | 170,455 |
| India............................. | 3,193,976 | 614,905 | 990,127 | 43,575 | 141,464 |
| Netherlands...................... | 6,381 | --- | --- | --- | 2,266 |
| Vietnam.......................... | 18,833,339 | 33,618,838 | 17,038,922 | 15,711,959 | --- |
| Greece............................ | 446,881 | 10,001,736 | 13,191,536 | 13,191,536 | --- |
| Philippines....................... | 41,654,350 | 30,692,965 | 1,710,355 | 258,436 | --- |
| Georgia........................... | 129,046 | 1,827,730 | 1,373,614 | 1,373,614 | --- |
| Trinidad and Tobago........ | --- | --- | 1,110,711 | 1,110,711 | --- |
| Indonesia......................... | 2,121,261 | 6,411,702 | 488,451 | 387,581 | --- |
| Uruguay.......................... | --- | --- | 13,457 | 13,457 | --- |
| Australia.......................... | --- | --- | 5,000 | --- | --- |
| Colombia.......................... | 6,900,881 | 4,313,899 | 4,000 | --- | --- |
| South Africa..................... | 11,265,936 | 8,565,960 | --- | --- | --- |
| Malaysia.......................... | --- | 1,175,533 | --- | --- | --- |
| Singapore........................ | 297,740 | 120,229 | --- | --- | --- |
| Denmark........................... | --- | 11,730 | --- | --- | --- |
| Belgium........................... | --- | 4,011 | --- | --- | --- |
| Sweden........................... | 1,178,457 | 3,660 | --- | --- | --- |
| Switzerland....................... | 1,359,279 | --- | --- | --- | --- |
| Cambodia......................... | 49,800 | --- | --- | --- | --- |
| New Zealand..................... | 10,350 | --- | --- | --- | --- |
| ALL COUNTRIES............. | 2,777,567,956 | 2,224,180,256 | 923,614,299 | 651,230,193 | 643,879,047 |

Source: Census Data for HTSUS 7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40,
7304.29.10.50, 7304.29.10.60, 7304.29.10.80, 7304.29.20.10, 7304.29.20.20, 7304.29.20.30,
7304.29.20.40, 7304.29.20.50, 7304.29.20.60, 7304.29.20.80, 7304.29.31.10, 7304.29.31.20,
7304.29.31.30, 7304.29.31.40, 7304.29.31.50, 7304.29.31.60, 7304.29.31.80, 7304.29.41.10,
7304.29.41.20, 7304.29.41.30, 7304.29.41.40, 7304.29.41.50, 7304.29.41.60, 7304.29.41.80,
7304.29.50.15, 7304.29.50.30, 7304.29.50.45, 7304.29.50.50, 7304.29.50.75, 7304.29.61.15,
7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75, 7305.20.20.00, 7305.20.40.00,
7305.20.60.00, 7305.20.80.00, 7306.29.10.30, 7306.29.10.90, 7306.29.20.00, 7306.29.31.00,
7306.29.41.00, 7306.29.60.10, 7306.29.60.50, 7306.29.81.10, and 7306.29.81.50

Barcode:4168004-04 A-357-824 INV - Investigation -

**Imports for Consumption, 2018 to June 2021**
**Unit Values (Customs) in US$ per Metric Ton**

| Country | Annual 2018 | Annual 2019 | Annual 2020 | 1H 2020 | 1H 2021 |
|---|---|---|---|---|---|
| Netherlands............... | 6,381.00 | --- | --- | --- | 20,600.00 |
| India........................... | 967.97 | 860.90 | 1,377.57 | 2,691.31 | 3,473.47 |
| China.......................... | 2,153.01 | 1,748.17 | 2,117.68 | 2,059.85 | 2,525.71 |
| Brunei......................... | 806.84 | 831.02 | 582.89 | 581.93 | 1,819.84 |
| Germany..................... | 1,626.42 | 1,521.93 | 2,795.24 | 2,350.37 | 1,648.95 |
| Japan.......................... | 1,570.70 | 1,513.22 | 1,131.83 | 1,173.31 | 1,586.16 |
| Canada....................... | 1,410.72 | 1,425.96 | 1,199.21 | 1,207.41 | 1,398.34 |
| Romania...................... | 1,520.49 | 1,382.17 | 1,324.01 | 1,216.75 | 1,297.57 |
| Mexico........................ | 1,405.97 | 1,553.81 | 1,418.12 | 1,508.62 | 1,260.90 |
| Belarus....................... | 1,074.84 | 1,598.02 | 1,717.14 | 1,701.46 | 1,257.51 |
| Italy............................ | 1,160.61 | 1,044.55 | 1,002.53 | 1,113.08 | 1,208.61 |
| Spain.......................... | 1,277.01 | 1,102.71 | 893.45 | 906.29 | 1,184.06 |
| Austria........................ | 1,300.98 | 1,246.07 | 998.20 | 1,010.22 | 1,081.94 |
| Brazil.......................... | 932.61 | 1,045.09 | 1,271.60 | 1,417.05 | 1,081.03 |
| Thailand..................... | 998.97 | 899.30 | 688.23 | 683.99 | 1,045.58 |
| Argentina.................... | 1,286.41 | 1,409.85 | 1,265.41 | 1,344.59 | 1,022.10 |
| Ukraine....................... | 927.43 | 946.46 | 860.38 | 862.97 | 982.87 |
| United Arab Emirates.... | 843.00 | 848.99 | 696.85 | 699.70 | 861.57 |
| Korea, South............... | 892.03 | 922.75 | 711.91 | 706.97 | 848.70 |
| Saudi Arabia.............. | 1,204.97 | 1,104.21 | 842.55 | 794.32 | 825.70 |
| Czech Republic........... | 1,147.18 | 998.77 | 787.96 | 779.21 | 804.86 |
| Taiwan........................ | 808.08 | 817.92 | 578.53 | 575.35 | 723.25 |
| Turkey......................... | 801.49 | 660.75 | 668.69 | 668.37 | 657.56 |
| Russia......................... | 925.78 | 903.74 | 700.60 | 697.92 | 598.63 |
| United Kingdom........... | 444.50 | 653.23 | 670.67 | 660.36 | 492.78 |
| France........................ | 517.65 | 562.05 | 491.28 | 486.48 | 352.55 |
| Australia..................... | --- | --- | 14,450.87 | --- | --- |
| Uruguay...................... | --- | --- | 4,019.41 | 4,019.41 | --- |
| Trinidad and Tobago..... | --- | --- | 4,019.16 | 4,019.16 | --- |
| Indonesia.................... | 3,543.85 | 1,590.94 | 3,748.00 | 3,761.97 | --- |
| Colombia..................... | 1,128.94 | 1,102.21 | 1,139.93 | --- | --- |
| Greece........................ | 832.23 | 1,049.09 | 836.91 | 836.91 | --- |
| Georgia....................... | 850.21 | 817.40 | 770.00 | 770.00 | --- |
| Vietnam...................... | 819.24 | 839.68 | 697.67 | 700.11 | --- |
| Philippines.................. | 805.63 | 788.34 | 565.55 | 549.84 | --- |
| Singapore................... | 16,393.57 | 3,252.42 | --- | --- | --- |
| Denmark..................... | --- | 1,324.97 | --- | --- | --- |
| Malaysia..................... | --- | 1,271.27 | --- | --- | --- |
| South Africa................ | 944.38 | 1,054.31 | --- | --- | --- |
| Sweden....................... | 13,123.42 | 939.91 | --- | --- | --- |
| Belgium...................... | --- | 809.98 | --- | --- | --- |
| New Zealand............... | 134,415.58 | --- | --- | --- | --- |
| Cambodia.................... | 4,139.65 | --- | --- | --- | --- |
| Switzerland................. | 1,014.66 | --- | --- | --- | --- |
| **ALL COUNTRIES.........** | **1,121.40** | **1,075.05** | **969.84** | **973.16** | **1,012.39** |

Source: Census Data for HTSUS 7304.29.10.10, 7304.29.10.20, 7304.29.10.30,
7304.29.10.40, 7304.29.10.50, 7304.29.10.60, 7304.29.10.80, 7304.29.20.10,
7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60,
7304.29.20.80, 7304.29.31.10, 7304.29.31.20, 7304.29.31.30, 7304.29.31.40,
7304.29.31.50, 7304.29.31.60, 7304.29.31.80, 7304.29.41.10, 7304.29.41.20,
7304.29.41.30, 7304.29.41.40, 7304.29.41.50, 7304.29.41.60, 7304.29.41.80,
7304.29.50.15, 7304.29.50.30, 7304.29.50.45, 7304.29.50.60, 7304.29.50.75,
7304.29.61.15, 7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75,
7305.20.20.00, 7305.20.40.00, 7305.20.60.00, 7305.20.80.00, 7306.29.10.30,

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

No image

## Imports For Consumption | Monthly data for 2018

| Country | Quantity | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Argentina | KG | 25,093,524 | 7,811,068 | 17,751,165 | 12,049,983 | 5,280,618 | 7,390,385 | 14,502,968 | 13,934,104 | 10,262,565 | 9,851,005 | 10,398,559 | 12,503,025 |
| Mexico | KG | 36,370,204 | 37,148,937 | 33,642,312 | 27,488,695 | 47,480,310 | 16,931,388 | 39,119,730 | 53,305,443 | 29,387,245 | 21,675,410 | 20,566,295 | 20,780,634 |
| Russia | KG | 21,099,494 | 12,015,328 | 12,444,503 | 9,080,147 | 28,985,935 | 19,282,726 | 27,287,480 | 30,108,875 | 22,848,149 | 28,892,596 | 22,827,407 | 4,379,159 |
| South Korea | KG | 112,260,252 | 77,446,218 | 73,799,077 | 97,847,738 | 19,756,515 | 48,699,166 | 13,111,466 | 1,959,738 | 5,137,047 | 0 | 6,928,078 | 472,126 |
| **Total:** | KG | **194,823,474** | **134,421,551** | **137,637,057** | **146,466,563** | **101,503,378** | **92,303,665** | **94,021,644** | **99,308,160** | **67,635,106** | **60,419,011** | **60,720,339** | **38,134,944** |

Source:  USITC Dataweb for HTSUS 7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40, 7304.29.10.50, 7304.29.10.60, 7304.29.10.80,
7304.29.20.10, 7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60, 7304.29.20.80, 7304.29.31.10,
7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50, 7304.29.31.60, 7304.29.31.80, 7304.29.41.10, 7304.29.41.20,
7304.29.41.30, 7304.29.41.40, 7304.29.41.50, 7304.29.41.60, 7304.29.41.80, 7304.29.50.15, 7304.29.50.30, 7304.29.50.45,
7304.29.50.60, 7304.29.50.75, 7304.29.61.15, 7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75, 7305.20.20.00,
7305.20.40.00, 7305.20.60.00, 7305.20.80.00, 7306.29.10.30, 7306.29.10.90, 7306.29.20.00, 7306.29.31.00, 7306.29.41.00,
7306.29.60.10, 7306.29.60.50, 7306.29.81.10, and 7306.29.81.50

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

Imports For Consumption | Monthly data for 2019

| Country | Quantity | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Argentina | KG | 4,144,284 | 11,059,332 | 15,709,990 | 4,749,170 | 4,662,338 | 25,645,388 | 11,005,028 | 11,899,206 | 21,196,722 | 10,122,131 | 10,861,759 | 16,702,089 |
| Mexico | KG | 30,584,044 | 13,604,395 | 14,383,431 | 17,446,196 | 25,446,017 | 10,683,581 | 19,006,689 | 10,672,510 | 9,855,867 | 15,801,504 | 13,556,641 | 13,275,671 |
| Russia | KG | 44,108,910 | 5,622,321 | 32,539,073 | 38,287,866 | 26,243,613 | 13,718,406 | 19,591,065 | 11,420,194 | 50,354 | 1,696,424 | 2,074,250 | 0 |
| South Korea | KG | 70,742,520 | 15,799,073 | 41,631,237 | 54,186,261 | 41,952,552 | 11,742,192 | 16,162,246 | 40,400,247 | 21,626,556 | 19,080,416 | 39,312,866 | 35,671,545 |
| **Total:** | KG | **149,579,758** | **46,085,121** | **104,263,731** | **114,669,493** | **98,304,520** | **61,789,567** | **65,765,028** | **74,392,157** | **52,729,499** | **46,700,475** | **65,805,516** | **65,649,305** |

Source: USITC Dataweb for HTSUS 7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40, 7304.29.10.50, 7304.29.10.60, 7304.29.10.80, 7304.29.20.10, 7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60, 7304.29.20.80, 7304.29.31.10, 7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50, 7304.29.31.60, 7304.29.31.80, 7304.29.41.10, 7304.29.41.20, 7304.29.41.30, 7304.29.41.40, 7304.29.41.50, 7304.29.41.60, 7304.29.41.80, 7304.29.50.15, 7304.29.50.30, 7304.29.50.45, 7304.29.50.60, 7304.29.50.75, 7304.29.61.15, 7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75, 7305.20.20.00, 7305.20.40.00, 7305.20.60.00, 7305.20.80.00, 7306.29.10.30, 7306.29.10.90, 7306.29.20.00, 7306.29.31.00, 7306.29.41.00, 7306.29.60.10, 7306.29.60.50, 7306.29.81.10, and 7306.29.81.50

No image

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

No image

Imports For Consumption | Monthly data for 2020

| Country | Quantity | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Argentina | KG | 4,726,027 | 4,313,308 | 103,413 | 375,068 | 21,122 | 0 | 32,370 | 19,732 | 0 | 0 | 1,273,775 | 4,316,743 |
| Mexico | KG | 22,618,536 | 15,124,726 | 19,155,503 | 18,660,435 | 12,152,301 | 11,781,268 | 2,706,191 | 6,637,269 | 8,253,780 | 7,528,791 | 5,262,282 | 19,690,398 |
| Russia | KG | 4,661,946 | 12,231,684 | 1,906,101 | 9,871,972 | 5,316,388 | 7,019,536 | 131,429 | 0 | 157,714 | 442,796 | 247,102 | 2,774,165 |
| South Korea | KG | 7,190,019 | 5,112,053 | 53,836,819 | 8,502,855 | 48,379,278 | 27,954,448 | 35,066,159 | 14,641,755 | 522,320 | 22,870,981 | 9,912,762 | 39,388,458 |
| **Total:** | **KG** | **39,196,528** | **36,781,771** | **75,001,836** | **37,410,330** | **65,869,089** | **46,755,252** | **37,936,149** | **21,298,756** | **8,933,814** | **30,842,568** | **16,695,921** | **66,169,764** |

Source:

USITC Dataweb for HTSUS 7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40, 7304.29.10.50, 7304.29.10.60,
7304.29.10.80, 7304.29.20.10, 7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60, 7304.29.20.80,
7304.29.31.10, 7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50, 7304.29.31.60, 7304.29.31.80, 7304.29.41.10,
7304.29.41.20, 7304.29.41.30, 7304.29.41.40, 7304.29.41.50, 7304.29.41.60, 7304.29.41.80, 7304.29.50.15, 7304.29.50.30,
7304.29.50.45, 7304.29.50.60, 7304.29.50.75, 7304.29.61.15, 7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75,
7305.20.20.00, 7305.20.40.00, 7305.20.60.00, 7305.20.80.00, 7306.29.10.30, 7306.29.10.90, 7306.29.20.00, 7306.29.31.00,
7306.29.41.00, 7306.29.60.10, 7306.29.60.50, 7306.29.81.10, and 7306.29.81.50

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

No image

## Imports For Consumption | Monthly data for 2021

| Country | Quantity | JAN | FEB | MAR | APR | MAY | JUN |
|---|---|---|---|---|---|---|---|
| Argentina | KG | 7,141,057 | 11,485,212 | 11,322,897 | 22,607,230 | 10,010,160 | 10,928,672 |
| Mexico | KG | 17,488,048 | 13,319,777 | 22,530,757 | 18,392,574 | 25,879,714 | 18,301,531 |
| Russia | KG | 7,070,686 | 1,930 | 14,899,377 | 459,278 | 14,230,366 | 16,028,322 |
| South Korea | KG | 10,387,138 | 37,506,111 | 44,237,382 | 29,989,981 | 25,849,542 | 49,493,451 |
| **Total:** | KG | **42,086,929** | **62,313,030** | **92,990,413** | **71,449,063** | **75,969,782** | **94,751,976** |

Source:   USITC Dataweb for HTSUS 7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40, 7304.29.10.50, 7304.29.10.60,
7304.29.10.80, 7304.29.20.10, 7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60, 7304.29.20.80,
7304.29.31.10, 7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50, 7304.29.31.60, 7304.29.31.80, 7304.29.41.10,
7304.29.41.20, 7304.29.41.30, 7304.29.41.40, 7304.29.41.50, 7304.29.41.60, 7304.29.41.80, 7304.29.50.15, 7304.29.50.30,
7304.29.50.45, 7304.29.50.60, 7304.29.50.75, 7304.29.61.15, 7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75,
7305.20.00.00, 7305.20.40.00, 7305.20.60.00, 7305.20.80.00, 7306.29.10.30, 7306.29.10.90, 7306.29.20.00, 7306.29.31.00,
7306.29.41.00, 7306.29.60.10, 7306.29.60.50, 7306.29.81.10, and 7306.29.81.50

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

**Imports For Consumption | Quarterly data by port for 2018**

| Country | District | Quantity | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|---|---|
| Argentina | Anchorage, AK | KG | 350,617 | 23,226 | 0 | 0 |
| Argentina | Detroit, MI | KG | 0 | 130,412 | 0 | 0 |
| Argentina | Great Falls, MT | KG | 0 | 14,310 | 0 | 0 |
| Argentina | Houston-Galveston, TX | KG | 50,305,140 | 24,553,038 | 38,699,637 | 29,747,309 |
| Argentina | Philadelphia, PA | KG | 0 | 0 | 0 | 3,005,280 |
| Mexico | Anchorage, AK | KG | 203,766 | 0 | 0 | 146,926 |
| Mexico | Cleveland, OH | KG | 0 | 0 | 0 | 294 |
| Mexico | Detroit, MI | KG | 0 | 328,293 | 0 | 0 |
| Mexico | Duluth, MN | KG | 0 | 1,484,430 | 0 | 0 |
| Mexico | El Paso, TX | KG | 1,710,370 | 2,383,803 | 4,544,971 | 7,207,757 |
| Mexico | Great Falls, MT | KG | 0 | 563,867 | 100,238 | 16,340 |
| Mexico | Houston-Galveston, TX | KG | 88,451,585 | 70,916,286 | 102,204,282 | 41,288,476 |
| Mexico | Laredo, TX | KG | 16,522,187 | 12,300,714 | 13,912,908 | 13,569,648 |
| Mexico | New York, NY | KG | 0 | 1,213,422 | 310,134 | 676,268 |
| Mexico | Ogdensburg, NY | KG | 0 | 102,060 | 0 | 0 |
| Mexico | Pembina, ND | KG | 273,545 | 1,754,218 | 580,441 | 0 |
| Mexico | Philadelphia, PA | KG | 0 | 759,520 | 159,544 | 116,630 |
| Mexico | Seattle, WA | KG | 0 | 93,780 | 0 | 0 |
| Russia | Houston-Galveston, TX | KG | 45,559,325 | 57,348,808 | 80,244,504 | 56,099,162 |
| South Korea | Houston-Galveston, TX | KG | 263,505,547 | 166,303,419 | 19,987,046 | 5,830,154 |
| South Korea | Los Angeles, CA | KG | 0 | 0 | 0 | 1,570,050 |
| South Korea | New Orleans, LA | KG | 0 | 0 | 221,205 | 0 |
| **Total:** | | | **466,882,082** | **340,273,606** | **260,964,910** | **159,274,294** |

Source:  USITC Dataweb for HTSUS 7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40, 7304.29.10.50,
7304.29.10.60, 7304.29.10.80, 7304.29.20.10, 7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50,
7304.29.20.60, 7304.29.20.80, 7304.29.31.10, 7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50,
7304.29.31.60, 7304.29.31.80, 7304.29.41.10, 7304.29.41.20, 7304.29.41.30, 7304.29.41.40, 7304.29.41.50,
7304.29.41.60, 7304.29.41.80, 7304.29.50.15, 7304.29.50.30, 7304.29.50.45, 7304.29.50.60, 7304.29.50.75,
7304.29.61.15, 7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75, 7305.20.20.00, 7305.20.40.00,
7305.20.60.00, 7305.20.80.00, 7306.29.10.30, 7306.29.10.90, 7306.29.20.00, 7306.29.31.00, 7306.29.41.00,
7306.29.60.10, 7306.29.60.50, 7306.29.81.10, and 7306.29.81.50

Barcode:4168004-04 A-357-824 INV - Investigation  -

**Imports For Consumption | Quarterly data by port for 2019**

| Country | District | Quantity | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|---|---|
| Argentina | Great Falls, MT | KG | 0 | 0 | 19,009 | 19,887 |
| Argentina | Houston-Galveston, TX | KG | 29,970,991 | 35,039,722 | 44,011,303 | 37,649,339 |
| Argentina | Miami, FL | KG | 0 | 5,740 | 0 | 0 |
| Argentina | Pembina, ND | KG | 39,865 | 11,434 | 70,644 | 16,753 |
| Argentina | Philadelphia, PA | KG | 902,750 | 0 | 0 | 0 |
| Mexico | Anchorage, AK | KG | 0 | 54,704 | 10,019 | 0 |
| Mexico | Buffalo, NY | KG | 0 | 0 | 0 | 20,307 |
| Mexico | Cleveland, OH | KG | 0 | 4,281 | 0 | 0 |
| Mexico | Detroit, MI | KG | 0 | 0 | 15,564 | 44,316 |
| Mexico | El Paso, TX | KG | 4,670,096 | 2,868,089 | 5,091,291 | 9,002,444 |
| Mexico | Great Falls, MT | KG | 309,449 | 23,534 | 614,299 | 190,116 |
| Mexico | Houston-Galveston, TX | KG | 41,585,729 | 37,878,351 | 27,656,328 | 23,268,614 |
| Mexico | Laredo, TX | KG | 10,731,548 | 7,898,246 | 2,305,913 | 5,113,384 |
| Mexico | New Orleans, LA | KG | 0 | 0 | 2,769 | 0 |
| Mexico | New York, NY | KG | 857,095 | 1,893,061 | 1,073,228 | 2,133,226 |
| Mexico | Ogdensburg, NY | KG | 193,321 | 248,930 | 0 | 19,589 |
| Mexico | Pembina, ND | KG | 21,102 | 146,258 | 463,450 | 1,189,518 |
| Mexico | Philadelphia, PA | KG | 203,530 | 2,560,340 | 2,202,840 | 1,420,197 |
| Mexico | Portland, ME | KG | 0 | 0 | 0 | 153,619 |
| Mexico | Seattle, WA | KG | 0 | 0 | 99,365 | 78,486 |
| Russia | Houston-Galveston, TX | KG | 82,270,304 | 78,249,885 | 31,011,259 | 3,770,674 |
| Russia | Miami, FL | KG | 0 | 0 | 23,210 | 0 |
| Russia | Pembina, ND | KG | 0 | 0 | 27,144 | 0 |
| South Korea | Houston-Galveston, TX | KG | 127,125,228 | 107,881,005 | 78,044,309 | 94,064,827 |
| South Korea | Los Angeles, CA | KG | 1,042,555 | 0 | 0 | 0 |
| South Korea | New Orleans, LA | KG | 0 | 0 | 144,740 | 0 |
| South Korea | Pembina, ND | KG | 3,429 | 0 | 0 | 0 |
| South Korea | Savannah, GA | KG | 1,618 | 0 | 0 | 0 |
| Total: | | | 299,928,610 | 274,763,580 | 192,886,684 | 178,155,296 |

Source:    USITC Dataweb for HTSUS 7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40, 7304.29.10.50, 7304.29.10.60,
7304.29.10.80, 7304.29.20.10, 7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60,
7304.29.20.80, 7304.29.31.10, 7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50, 7304.29.31.60,
7304.29.31.80, 7304.29.41.10, 7304.29.41.20, 7304.29.41.30, 7304.29.41.40, 7304.29.41.50, 7304.29.41.60,
7304.29.41.80, 7304.29.50.15, 7304.29.50.30, 7304.29.50.45, 7304.29.50.60, 7304.29.50.75, 7304.29.61.15,
7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75, 7305.20.20.00, 7305.20.40.00, 7305.20.60.00,
7305.20.80.00, 7306.29.10.30, 7306.29.10.90, 7306.29.20.00, 7306.29.31.00, 7306.29.41.00, 7306.29.60.10,
7306.29.60.50, 7306.29.81.10, and 7306.29.81.50

Barcode:4168004-04 A-357-824 INV - Investigation  -

**Imports For Consumption | Quarterly data by port for 2020**

| Country | District | Quantity | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|---|---|
| Argentina | Great Falls, MT | KG | 0 | 94,327 | 13,418 | 0 |
| Argentina | Houston-Galveston, TX | KG | 9,039,335 | 71,198 | 0 | 5,590,518 |
| Argentina | Pembina, ND | KG | 103,413 | 230,665 | 38,684 | 0 |
| Mexico | Baltimore, MD | KG | 0 | 0 | 0 | 595,780 |
| Mexico | Buffalo, NY | KG | 0 | 41,894 | 0 | 0 |
| Mexico | El Paso, TX | KG | 5,182,246 | 5,367,980 | 885,789 | 595,933 |
| Mexico | Great Falls, MT | KG | 19,156 | 36,539 | 53,778 | 221,405 |
| Mexico | Houston-Galveston, TX | KG | 39,923,455 | 26,524,835 | 12,683,264 | 22,365,083 |
| Mexico | Laredo, TX | KG | 6,547,193 | 3,568,558 | 1,383,507 | 5,873,007 |
| Mexico | New Orleans, LA | KG | 1,969 | 0 | 0 | 0 |
| Mexico | New York, NY | KG | 1,686,077 | 1,154,040 | 975,736 | 908,028 |
| Mexico | Ogdensburg, NY | KG | 273,584 | 0 | 0 | 0 |
| Mexico | Pembina, ND | KG | 182,127 | 409,558 | 27,688 | 463,475 |
| Mexico | Philadelphia, PA | KG | 3,082,958 | 5,490,600 | 1,587,478 | 1,458,760 |
| Russia | Houston-Galveston, TX | KG | 18,799,731 | 22,207,896 | 289,143 | 3,464,063 |
| South Korea | Houston-Galveston, TX | KG | 65,619,960 | 84,836,581 | 49,857,049 | 71,225,564 |
| South Korea | Los Angeles, CA | KG | 518,931 | 0 | 373,185 | 946,637 |
| **Total:** | | | **150,980,135** | **150,034,671** | **68,168,719** | **113,708,253** |

Source:     USITC Dataweb for HTSUS 7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40, 7304.29.10.50, 7304.29.10.60,
            7304.29.10.80, 7304.29.20.10, 7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60,
            7304.29.20.80, 7304.29.31.10, 7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50, 7304.29.31.60,
            7304.29.31.80, 7304.29.41.10, 7304.29.41.20, 7304.29.41.30, 7304.29.41.40, 7304.29.41.50, 7304.29.41.60,
            7304.29.41.80, 7304.29.50.15, 7304.29.50.30, 7304.29.50.45, 7304.29.50.60, 7304.29.50.75, 7304.29.61.15,
            7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75, 7305.20.20.00, 7305.20.40.00, 7305.20.60.00,
            7305.20.80.00, 7306.29.10.30, 7306.29.10.90, 7306.29.20.00, 7306.29.31.00, 7306.29.41.00, 7306.29.60.10,
            7306.29.60.50, 7306.29.81.10, and 7306.29.81.50

**Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved**

Barcode:4168004-04 A-357-824 INV - Investigation -

**Imports For Consumption | Quarterly data by port for 2021**

| Country | District | Quantity | First Quarter | Second Quarter |
|---|---|---|---|---|
| Argentina | Houston-Galveston, TX | KG | 29,949,166 | 43,546,062 |
| Mexico | El Paso, TX | KG | 1,476,642 | 78,813 |
| Mexico | Great Falls, MT | KG | 0 | 1,135,224 |
| Mexico | Houston-Galveston, TX | KG | 38,825,539 | 46,469,921 |
| Mexico | Laredo, TX | KG | 9,872,624 | 10,271,170 |
| Mexico | Mobile, AL | KG | 164,894 | 785,066 |
| Mexico | New Orleans, LA | KG | 0 | 51,475 |
| Mexico | New York, NY | KG | 1,045,063 | 277,510 |
| Mexico | Ogdensburg, NY | KG | 142,120 | 0 |
| Mexico | Pembina, ND | KG | 0 | 358,415 |
| Mexico | Philadelphia, PA | KG | 1,811,700 | 3,146,225 |
| Russia | Great Falls, MT | KG | 24,960 | 0 |
| Russia | Houston-Galveston, TX | KG | 21,947,033 | 30,717,966 |
| South Korea | Houston-Galveston, TX | KG | 91,926,859 | 105,332,974 |
| South Korea | Los Angeles, CA | KG | 203,772 | 0 |
| **Total:** | | | **197,390,372** | **242,170,821** |

Source:   USITC Dataweb for HTSUS 7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40,
7304.29.10.50, 7304.29.10.60, 7304.29.10.80, 7304.29.20.10, 7304.29.20.20,
7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60, 7304.29.20.80,
7304.29.31.10, 7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50,
7304.29.31.60, 7304.29.31.80, 7304.29.41.10, 7304.29.41.20, 7304.29.41.30,
7304.29.41.40, 7304.29.41.50, 7304.29.41.60, 7304.29.41.80, 7304.29.50.15,
7304.29.50.30, 7304.29.50.45, 7304.29.50.60, 7304.29.50.75, 7304.29.61.15,
7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75, 7305.20.20.00,
7305.20.40.00, 7305.20.60.00, 7305.20.80.00, 7306.29.10.30, 7306.29.10.90,
7306.29.20.00, 7306.29.31.00, 7306.29.41.00, 7306.29.60.10, 7306.29.60.50,
7306.29.81.10, and 7306.29.81.50

Barcode:4168004-04 A-357-824 INV - Investigation  -

# EXHIBIT I-21

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Barcode:4168004-04 A-357-824 INV - Investigation  -

# NOT SUSCEPTIBLE TO
# PUBLIC SUMMARY

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Appx481-Appx487

Barcode:4168004-04 A-357-824 INV - Investigation  -

# EXHIBIT I-22

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

No image

Imports For Consumption | Negligibility Analysis

| Country | Quantity | AUG 2020 | SEP 2020 | OCT 2020 | NOV 2020 | DEC 2020 | JAN 2021 | FEB 2021 | MAR 2021 | APR 2021 | MAY 2021 | JUN 2021 | JUL 2021 | Total | PCT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Argentina | KG | 39,464 | 0 | 0 | 2,547,550 | 8,633,486 | 14,282,114 | 22,970,424 | 22,645,794 | 45,214,460 | 20,020,320 | 21,857,344 | 43,433,072 | 201,644,028 | 11.70% |
| Mexico | KG | 13,274,538 | 16,507,560 | 15,057,582 | 10,524,564 | 39,380,796 | 34,976,096 | 26,639,554 | 45,061,514 | 36,785,148 | 51,759,428 | 36,603,062 | 60,600,872 | 387,170,714 | 22.46% |
| Russia | KG | 0 | 315,428 | 885,592 | 494,204 | 5,548,330 | 14,141,372 | 3,860 | 29,798,754 | 918,556 | 28,460,732 | 32,056,644 | 30,324,766 | 142,948,238 | 8.29% |
| South Korea | KG | 29,283,510 | 1,044,640 | 45,741,962 | 19,825,524 | 78,776,916 | 20,774,276 | 75,012,222 | 88,474,764 | 59,979,962 | 51,699,084 | 98,986,902 | 105,393,084 | 674,992,846 | 39.16% |
| World Total: | KG | 62,135,313 | 25,963,254 | 80,883,730 | 49,655,815 | 147,914,318 | 114,775,280 | 138,442,523 | 208,323,990 | 177,579,303 | 188,787,014 | 247,652,263 | 281,707,509 | 1,723,820,312 | |

Source:    USITC Dataweb for HTSUS 7304.29.10.10, 7304.29.10.20, 7304.29.10.30, 7304.29.10.40, 7304.29.10.50, 7304.29.10.60, 7304.29.10.80,
7304.29.20.10, 7304.29.20.20, 7304.29.20.30, 7304.29.20.40, 7304.29.20.50, 7304.29.20.60, 7304.29.20.80, 7304.29.31.10,
7304.29.31.20, 7304.29.31.30, 7304.29.31.40, 7304.29.31.50, 7304.29.31.60, 7304.29.31.80, 7304.29.41.10, 7304.29.41.20,
7304.29.41.30, 7304.29.41.40, 7304.29.41.50, 7304.29.41.60, 7304.29.41.80, 7304.29.50.15, 7304.29.50.30, 7304.29.50.45,
7304.29.50.60, 7304.29.50.75, 7304.29.61.15, 7304.29.61.30, 7304.29.61.45, 7304.29.61.60, 7304.29.61.75, 7305.20.20.00,
7305.20.40.00, 7305.20.60.00, 7305.20.80.00, 7306.29.10.30, 7306.29.10.90, 7306.29.20.00, 7306.29.31.00, 7306.29.41.00,
7306.29.60.10, 7306.29.60.50, 7306.29.81.10, and 7306.29.81.50

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

# EXHIBIT I-23

Barcode:4168004-04 A-357-824 INV - Investigation  -

**U.S. Rig Count**

| Date | Total U.S. Rig Count |
|------|---------------------|
| 01/05/18 | 924 |
| 01/12/18 | 939 |
| 01/19/18 | 936 |
| 01/26/18 | 947 |
| 02/02/18 | 946 |
| 02/09/18 | 975 |
| 02/16/18 | 975 |
| 02/23/18 | 978 |
| 03/02/18 | 981 |
| 03/09/18 | 984 |
| 03/16/18 | 990 |
| 03/23/18 | 995 |
| 03/29/18 | 993 |
| 04/06/18 | 1003 |
| 04/13/18 | 1008 |
| 04/20/18 | 1013 |
| 04/27/18 | 1021 |
| 05/04/18 | 1032 |
| 05/11/18 | 1045 |
| 05/18/18 | 1046 |
| 05/25/18 | 1059 |
| 06/01/18 | 1060 |
| 06/08/18 | 1062 |
| 06/15/18 | 1059 |
| 06/22/18 | 1052 |
| 06/29/18 | 1047 |
| 07/06/18 | 1052 |
| 07/13/18 | 1054 |
| 07/20/18 | 1046 |
| 07/27/18 | 1048 |
| 08/03/18 | 1044 |
| 08/10/18 | 1057 |
| 08/17/18 | 1057 |
| 08/24/18 | 1044 |
| 08/31/18 | 1048 |
| 09/07/18 | 1048 |
| 09/14/18 | 1055 |
| 09/21/18 | 1053 |
| 09/28/18 | 1054 |
| 10/05/18 | 1052 |
| 10/12/18 | 1063 |
| 10/19/18 | 1067 |

Barcode:4168004-04 A-357-824 INV - Investigation -

| Date | Total U.S. Rig Count |
|---|---|
| 10/26/18 | 1068 |
| 11/02/18 | 1067 |
| 11/09/18 | 1081 |
| 11/16/18 | 1082 |
| 11/21/18 | 1079 |
| 11/30/18 | 1076 |
| 12/07/18 | 1075 |
| 12/14/18 | 1071 |
| 12/21/18 | 1080 |
| 12/28/18 | 1083 |
| 01/04/19 | 1075 |
| 01/11/19 | 1075 |
| 01/18/19 | 1050 |
| 01/25/19 | 1059 |
| 02/01/19 | 1045 |
| 02/08/19 | 1049 |
| 02/15/19 | 1051 |
| 02/22/19 | 1047 |
| 03/01/19 | 1038 |
| 03/08/19 | 1027 |
| 03/15/19 | 1026 |
| 03/22/19 | 1016 |
| 03/29/19 | 1006 |
| 04/05/19 | 1025 |
| 04/12/19 | 1022 |
| 04/18/19 | 1012 |
| 04/26/19 | 991 |
| 05/03/19 | 990 |
| 05/10/19 | 988 |
| 05/17/19 | 987 |
| 05/24/19 | 983 |
| 05/31/19 | 984 |
| 06/07/19 | 975 |
| 06/14/19 | 969 |
| 06/21/19 | 967 |
| 06/28/19 | 967 |
| 07/03/19 | 963 |
| 07/12/19 | 958 |
| 07/19/19 | 954 |
| 07/26/19 | 946 |
| 08/02/19 | 942 |
| 08/09/19 | 934 |
| 08/16/19 | 935 |
| 08/23/19 | 916 |
| 08/30/19 | 904 |
| 09/06/19 | 898 |

Appx492

Barcode:4168004-04 A-357-824 INV - Investigation -

| Date | Total U.S. Rig Count |
|------|---------------------|
| 09/13/19 | 886 |
| 09/20/19 | 868 |
| 09/27/19 | 860 |
| 10/04/19 | 855 |
| 10/11/19 | 856 |
| 10/18/19 | 851 |
| 10/25/19 | 830 |
| 11/01/19 | 822 |
| 11/08/19 | 817 |
| 11/15/19 | 806 |
| 11/22/19 | 803 |
| 11/27/19 | 802 |
| 12/06/19 | 799 |
| 12/13/19 | 799 |
| 12/20/19 | 813 |
| 12/27/19 | 805 |
| 01/03/20 | 796 |
| 01/10/20 | 781 |
| 01/17/20 | 796 |
| 01/24/20 | 794 |
| 01/31/20 | 790 |
| 02/07/20 | 790 |
| 02/14/20 | 790 |
| 02/21/20 | 791 |
| 02/28/20 | 790 |
| 03/06/20 | 793 |
| 03/13/20 | 792 |
| 03/20/20 | 772 |
| 03/27/20 | 728 |
| 04/03/20 | 664 |
| 04/09/20 | 602 |
| 04/17/20 | 529 |
| 04/24/20 | 465 |
| 05/01/20 | 408 |
| 05/08/20 | 374 |
| 05/15/20 | 339 |
| 05/22/20 | 318 |
| 05/29/20 | 301 |
| 06/05/20 | 284 |
| 06/12/20 | 279 |
| 06/19/20 | 266 |
| 06/26/20 | 265 |
| 07/02/20 | 263 |
| 07/10/20 | 258 |
| 07/17/20 | 253 |
| 07/24/20 | 251 |

Barcode:4168004-04 A-357-824 INV - Investigation  -

| Date | Total U.S. Rig Count |
|---|---|
| 07/31/20 | 251 |
| 08/07/20 | 247 |
| 08/14/20 | 244 |
| 08/21/20 | 254 |
| 08/28/20 | 254 |
| 09/04/20 | 256 |
| 09/11/20 | 254 |
| 09/18/20 | 255 |
| 09/25/20 | 261 |
| 10/02/20 | 266 |
| 10/09/20 | 269 |
| 10/16/20 | 282 |
| 10/23/20 | 287 |
| 10/30/20 | 296 |
| 11/06/20 | 300 |
| 11/13/20 | 312 |
| 11/20/20 | 310 |
| 11/25/20 | 320 |
| 12/04/20 | 323 |
| 12/11/20 | 338 |
| 12/18/20 | 346 |
| 12/23/20 | 348 |
| 12/31/20 | 351 |
| 01/08/21 | 360 |
| 01/15/21 | 373 |
| 01/22/21 | 378 |
| 01/29/21 | 384 |
| 02/05/21 | 392 |
| 02/12/21 | 397 |
| 02/19/21 | 397 |
| 02/26/21 | 402 |
| 03/05/21 | 403 |
| 03/12/21 | 402 |
| 03/19/21 | 411 |
| 03/26/21 | 417 |
| 04/01/21 | 430 |
| 04/09/21 | 432 |
| 04/16/21 | 439 |
| 04/23/21 | 438 |
| 04/30/21 | 440 |
| 05/07/21 | 448 |
| 05/14/21 | 453 |
| 05/21/21 | 455 |
| 05/28/21 | 457 |
| 06/04/21 | 456 |
| 06/11/21 | 461 |

Barcode:4168004-04 A-357-824 INV - Investigation  -

| Date | Total U.S. Rig Count |
|------|---------------------|
| 06/18/21 | 470 |
| 06/25/21 | 470 |

Source: Baker Hughes

Barcode:4168004-04 A-357-824 INV - Investigation  -

# EXHIBIT I-24

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation -

HOURLY NEWS
WAMU 88.5
LISTEN LIVE
On Air Now
PLAYLIST

npr WAMU 88.5 AMERICAN UNIVERSITY RADIO

DONATE

## Coronavirus Updates

THE CORONAVIRUS CRISIS

# Free Fall: Oil Prices Go Negative

April 20, 2020 · 11:21 AM ET
Heard on All Things Considered

CAMILA DOMONOSKE

3-Minute Listen

PLAYLIST Download

Transcript

A U.S. crude oil benchmark has hit record lows. Above, pump jacks draw crude oil near Long Beach, Calif., on March 9.
*David McNew/AFP via Getty Images*

**Updated at 4:53 p.m. ET**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

The dramatic collapse in worldwide demand for oil led to an extraordinary development on Monday: U.S. oil prices fell below zero for the first time ever, and kept falling.

The key U.S. oil benchmark, West Texas Intermediate, settled at negative $37.63.

Driven by a trading contract deadline, traders desperately looked for buyers for the barrels of oil they normally hold in their books. But buyers were hard to find — even when the oil was being given away for free.

So some traders, instead of paying to buy oil, were ready to pay as much as $37.63 to get someone to accept delivery of one barrel of oil.

The coronavirus pandemic has led the global economy to slam the brakes, leading to an extremely sharp drop in demand for oil. It has created a massive oil glut and raised concerns about the lack of physical storage space for it.

**Article continues after sponsor message**



**CORONAVIRUS LIVE UPDATES**

Oil Prices Keep Slipping As Demand Drops By Record Amounts

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

The specific sell-off on Monday is partly due to market mechanics, because the May futures contract for West Texas Intermediate is about to expire. During normal times, traders just sell these contracts and roll on to those of future months. But now, buyers that are capable of receiving and storing that much oil are in short supply.

The prices of other types of crude, without a deadline coming up that quickly, have not dropped nearly so sharply.

But in general, crude oil prices are very low and continue to fall. Brent, an international benchmark, is in the mid-$20s and fell more than 9% on Monday.

At the start of 2020, a barrel of West Texas Intermediate cost around $60. Prices had dropped swiftly because of the coronavirus, landing at around $18 a barrel on Friday, ahead of Monday's big dive.

Oil-producing countries and companies are trying to reduce their output, but they can't keep pace with the extremely rapid drop in global demand as the world economy hits the brakes.

That's creating a massive oversupply of oil and raising concerns about where to physically store it all.

covid-19        coronavirus        oil prices        oil

## Sign Up For The New Normal Newsletter

Find the latest news on the coronavirus crisis and help getting through whatever comes next. Sent twice a week.

| What's your email? | SUBSCRIBE |

By subscribing, you agree to NPR's terms of use and privacy policy. NPR may share your name and email address with your NPR station. See Details. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-04 A-357-824 INV - Investigation  -

# EXHIBIT I-25

Barcode:4168004-04 A-357-824 INV - Investigation  -

Carbon & Alloy Steel Seamless Tube & Pipe

# ILJIN Steel Corporation

## "Your Best Partner"



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

# Company Overview

## History

| | |
|---|---|
| 1982. 05. | Established ILJIN Steel Corporation |
| 1991. 03. | Established R&D Center |
| 1992. 05. | Established Suwon Plant |
| 1992. 06. | Development of Precision Cold Drawn Steel Tubes |
| 1998. 06. | Development of Cold Drawn Shapes |
| 2005. 03. | Development of Cold Drawn Stainless Steel tubes |
| 2007. 12. | Development of Heat Exchanger Tube |
| 2008. 09. | Nominated "Advanced Technology Center" by Korean Government |
| 2008. 12. | Received "Parts and Materials Technology Award" by Korean Government |
| 2011. 02. | Groundbreaking for Hot Finished Seamless Tube Plant |
| 2011. 08. | Jeonju Cold Drawn Tube Plant Completed (Capa. Increased to 100,000 Metric Tons Per Year) |
| 2012. 07. | Jeonju Hot Finished Seamless Tube Plant Completed |

## Production Plant

| Location | Jeonju Plant | | Suwon Plant |
|---|---|---|---|
| Plant | Seamless Tube | Cold Drawing | Cold Drawing |
| Size Range (mm) O.D (mm) | 25.4–177.8 | 19.05–88.9 | 50.8–304.8 |
| Size Range (mm) Length (m) | 4–25 | 4–30 | 4–15 |
| Capacity (ton/yr) | 300,000 | 30,000 | 70,000 |
| Items | OCTG, Line pipe, Power generation, Mechanical | Power generation, Mechanical | Mechanical |

Suwon Plant

Jeonju Plant

No image

Your Best Partner

Carbon & Alloy Steel

Seamless Tube & Pipe

# Contents

| | |
|---|---|
| Company Overview | 03 |
| Manufacturing Process and Equipment | 04 |
| OCTG – Casing & Tubing | 06 |
| OCTG – Drill Pipe | 18 |
| Line Pipe | 22 |
| Process & Power Generation | 26 |
| Mechanical Tube | 30 |
| Quality Management | 34 |
| Contact Us | 36 |

## Manufacturing Process and Equipment

Barcode:4168004-05 A-357-824 INV - Investigation -

### [4] 24 Stand Stretch Reducing Mill



- High Diameter Reduction
- Wide Outside Diameter
- High Elongation

### [3] 3-Roll Type Mandrel Mill

- Thin wall High precision tube
- High Alloy rolling without defect
- Excellent wall uniformity



Round Billet ▶ Billet Cutting ▶ [1] Rotary Hearth Furnace ▶ [2] Cone Type Piercer ▶ [3] 6 Stand 3-Roll MPM with Online thickness Gauge ▶ Reheating Furnace ▶ [4] 24 Stand SRM ▶ Walking Beam Cooling Bed ▶ Pipe Layer Saw ▶ Straightening ▶ End Facing ▶ Ultra-sonic Inspection / Hydrostatic Inspection / Electro Magnetic Inspection

### [1] Rotary Hearth Billet Heating



- Uniform Heating for Exact Piercing
- Temperature Deviation in Billet Section : ±5°C

### [2] Cone Type Piercer

- High Elongation & Diameter Expansion
- High Alloy Steel Piercing
- Excellent Wall Uniformity
- Fine Outside and inside surface

# OCTG – Casing & Tubing

## Products

| Method | | O.D(inch) | W.T(inch) | Standards/Grades |
|---|---|---|---|---|
| Tubing | Seamless | 2 3/8-4 1/2 | 0.167-0.630 | J55, K55, L80, N80, C90, C95, P110 |
| Casing | | 4 1/2-7 | 0.205-0.875 | |

## Dimension and Tolerance

| Item | | Tolerance |
|---|---|---|
| O.D | Pipe Body | D≥101.60mm:±0.79mm |
| | D≥101.60mm | +1.0%D / -0.5%D |
| Wall Thickness | | -12.5%t |
| Weight | Single Lengths | +6.5%, -3.5% |

## Mechanical Properties

| Specification | Application | | Grade | Yield Strength min ksi (Mpa) | Yield Strength max ksi (Mpa) | Tensile Strength min ksi (Mpa) | Elongation(%) |
|---|---|---|---|---|---|---|---|
| API 5CT | | Group 1 | H40 | 40 (276) | 80 (552) | ≥ 60 (414) | API Formula |
| | | | J55 | 55 (379) | 80 (552) | ≥ 75 (517) | API Formula |
| | | | K55 | 55 (379) | 80 (552) | ≥ 95 (655) | API Formula |
| | | | N80 | 80 (552) | 110 (758) | ≥ 100 (689) | API Formula |
| | | | R95 | 95 (655) | 110 (758) | ≥ 105 (724) | API Formula |
| | | Group 2 | M65 | 65 (448) | 85 (586) | ≥ 85 (586) | API Formula |
| | | | L80-1 | 80 (552) | 95 (655) | ≥ 95 (655) | API Formula |
| | | | C90-1 | 90 (621) | 105 (724) | ≥ 100 (689) | API Formula |
| | | | T95-1 | 95 (655) | 110 (758) | ≥ 105 (724) | API Formula |
| | | | C110 | 110 (758) | 120 (828) | ≥ 115 (793) | API Formula |
| | | Group 3 | P110 | 110 (758) | 140 (965) | ≥ 125 (862) | API Formula |

## Chemical Composition

| Specification | Application | | Grade | C min | C max | Mn min | Mn max | Mo min | Mo max | Cr min | Cr max | Ni max | Cu max | P max | S max | Si max |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| API 5CT | | Group 1 | H40 | | | | | | | | | | | | | |
| | | | J55 | | | | | | | | | | | | | |
| | | | K55 | | | | | | | | | | | | | |
| | | | N80 | | | | | | | | | | | | | |
| | | | R95 | | 0.45[c] | | | | | | | | | | | |
| | | Group 2 | M65 | | | | | | | | | | | | | |
| | | | L80-1 | | 0.43[a] | | 1.90 | | | | | 0.25 | 0.35 | 0.030 | 0.030 | 0.45 |
| | | | C90-1 | | 0.35 | | 1.20 | 0.25[b] | 0.85 | | 1.50 | 0.99 | | 0.020 | 0.030 | |
| | | | T95-1 | | 0.35 | | 1.20 | 0.25[d] | 0.85 | 0.40 | 1.50 | 0.99 | | 0.020 | 0.005 | |
| | | | C110 | | | | | | | | | | | 0.030 | 0.030 | |
| | | Group 3 | P110 | | 0.35 | | 1.35 | | 0.85 | | 1.50 | 0.99 | | 0.020 | 0.010 | |

a. The carbon content for L80 may be increased up to 0.05% maximum if the product is oil-quenched.
b. The molybdenum content for Grade C90 Type 1 has no minimum tolerance if the wall thickness is less than 17.78mm.
c. The carbon content for R95 may be increased up to 0.55% maximum if the product is oil-quenched.
d. The molybdenum content for T95 Type 1 may be decreased to 0.15 minimum if the wall thickness is less than 17.78mm.

06-07

**OCTG – Casing & Tubing**

## Materials selection

| Min. Y.S (ksi) | Group 1 | Group 2 | Group 3 | Group 4 | High Collapse | Sour Service | Arctic Service |
|---|---|---|---|---|---|---|---|
| 40 | H40 | | | | | | |
| 55 | J55, K55 | | | | | | |
| 65 | M65 | | | | | | |
| 80 | N80Q | L80, L80-1, L80-1-3Cr | | | HC L80 | | L8L |
| 90 | | C90-1 | | | | C90 | |
| 95 | | C95, T95-1 | | | HC T95 | T95 | |
| 110 | | | P110 | | HC P110 | C110 | P110L |
| 125 | | | | Q125-1 | | | |

## Available Materials for Sour and Sweet Service



Barcode:4168004-05 A-357-824 INV - Investigation -

## Tubing Dimensional Range and Performance Properties
### Size 2 3/8 – 2 7/8"

| Size O.D | Grade | Dimensions, in | | | | Performance Properties | |
|---|---|---|---|---|---|---|---|
| | | Wall Thickness | Inside Diameter | Drift Diameter | Special Clearance | Collapse (psi) | Burst (psi) |
| 2 3/8 | J55 | 0.167 | 2.04 | 1.95 | | 7190 | 6770 |
| | L80 | | | | | 9980 | 9840 |
| | N80 | | | | | 9980 | 9840 |
| | C90 | | | | | 9840 | 11070 |
| 2 3/8 | J55 | 0.190 | 2.00 | 1.90 | 2.91 | 8100 | 7700 |
| | L80 | | | | | 11780 | 11200 |
| | N80 | | | | | 11780 | 11200 |
| | C90 | | | | | 13250 | 12600 |
| | T95 | | | | | 13980 | 13300 |
| 2 3/8 | L80 | 0.254 | 1.87 | 1.77 | 2.91 | 16130 | 15400 |
| | N80 | | | | | 15280 | 14970 |
| | C90 | | | | | 17190 | 16840 |
| | T95 | | | | | 18150 | 17780 |
| | P110 | | | | | 21010 | 20990 |
| 2 3/8 | L80 | 0.295 | 1.79 | 1.69 | | 17410 | 17390 |
| | C90 | | | | | 19580 | 15960 |
| | T95 | | | | | 20670 | 20650 |
| 2 3/8 | T95 | 0.336 | 1.70 | 1.61 | 2.91 | 21860 | 22280 |
| | P110 | | | | | 23080 | 23520 |
| 2 7/8 | J55 | 0.217 | 2.44 | 2.35 | 3.46 | 7680 | 7260 |
| | L80 | | | | | 11170 | 10570 |
| | N80 | | | | | 11170 | 10570 |
| | C90 | | | | | 12380 | 11890 |
| | T95 | | | | | 12840 | 13250 |
| | P110 | | | | | 14550 | 13440 |
| 2 7/8 | L80 | 0.276 | 2.32 | 2.23 | 3.46 | 13890 | 15960 |
| | C90 | | | | | 15620 | 18480 |
| | T95 | | | | | 16490 | |
| | P110 | | | | | 19090 | |
| 2 7/8 | L80 | 0.308 | 2.26 | 2.17 | 3.46 | 15300 | 15500 |
| | N80 | | | | | 15300 | 15500 |
| | C90 | | | | | 17220 | 16870 |
| | T95 | | | | | 18170 | 17810 |
| | P110 | | | | | 21040 | 20260 |
| 2 7/8 | L80 | 0.340 | 2.20 | 2.10 | 3.46 | 16680 | 16560 |
| | C90 | | | | | 18770 | 18770 |
| | T95 | | | | | 19810 | 18660 |

Barcode:4168004-05 A-357-824 INV - Investigation  -

## OCTG – Casing & Tubing

### Tubing Dimensional Range and Performance Properties Size 2 7/8 ~ 4"

| Size O.D | Grade | Wall Thickness | Inside Diameter | Drift Diameter | Special Clearance | Collapse (psi) | Burst (psi) |
|---|---|---|---|---|---|---|---|
| 2 7/8 | J80 | 0.392 | 2.09 | 2.00 | | 18840 | 19090 |
| | C90 | | | | | 21200 | 21470 |
| | T95 | | | | | 22370 | 22670 |
| 2 7/8 | L80 | 0.440 | 2.00 | 1.90 | | 20740 | 21430 |
| | C90 | | | | | 23330 | 24100 |
| | T95 | | | | | 24630 | 25440 |
| 3 1/2 | J55 | 0.216 | 3.07 | 2.94 | 4.18 | 5970 | 5940 |
| | L80 | | | | | 7870 | 8640 |
| | N80 | | | | | 7870 | 8640 |
| | C90 | | | | | 8540 | 9720 |
| 3 1/2 | J55 | 0.254 | 2.99 | 2.87 | | 7400 | 6990 |
| | L80 | | | | | 10540 | 10160 |
| | N80 | | | | | 10540 | 10160 |
| | C90 | | | | | 11570 | 11430 |
| | T95 | | | | | 12080 | 12070 |
| | P110 | | | | | 13530 | 13970 |
| 3 1/2 | J55 | 0.289 | 2.92 | 2.80 | | 8310 | 7950 |
| | L80 | | | | | 11720 | 11560 |
| | N80 | | | | | 11720 | 11560 |
| | C90 | | | | | 13640 | 13010 |
| | T95 | | | | | 14390 | 13730 |
| | P110 | | | | | 15310 | 15000 |
| 3 1/2 | L80 | 0.375 | 2.75 | 2.63 | 4.18 | 15310 | 15000 |
| | C90 | | | | | 17220 | 16880 |
| | T95 | | | | | 18180 | 17810 |
| | P110 | | | | | 21050 | 20630 |
| 3 1/2 | L80 | 0.430 | 2.64 | 2.52 | | 17240 | 17200 |
| | C90 | | | | | 19400 | 19350 |
| | T95 | | | | | 20480 | 20430 |
| 3 1/2 | L80 | 0.476 | 2.55 | 2.42 | | 18800 | 19040 |
| | C90 | | | | | 21150 | 21420 |
| | T95 | | | | | 22330 | 22610 |
| 3 1/2 | L80 | 0.530 | 2.44 | 2.32 | | 20560 | 21200 |
| | C90 | | | | | 23130 | 23850 |
| | T95 | | | | | 24410 | 25170 |
| 4 | J55 | 0.226 | 3.55 | 3.42 | | 5110 | 5440 |
| | L80 | | | | | 6590 | 7910 |
| | N80 | | | | | 6590 | 7910 |
| | C90 | | | | | 7080 | 8900 |

### Tubing Dimensional Range and Performance Properties Size 4 ~ 4 1/2"

| Size O.D | Grade | Wall Thickness | Inside Diameter | Drift Diameter | Special Clearance | Collapse (psi) | Burst (psi) |
|---|---|---|---|---|---|---|---|
| 4 | J55 | 0.262 | 3.48 | 3.35 | | 6590 | 6300 |
| | L80 | | | | | 8800 | 9170 |
| | N80 | | | | | 8800 | 9170 |
| | C90 | | | | | 9590 | 10320 |
| 4 | L80 | 0.330 | 3.34 | 3.22 | | 9980 | 10890 |
| | N80 | | | | | 12110 | 11550 |
| | C90 | | | | | 13620 | 12990 |
| | T95 | | | | | 14880 | 13720 |
| 4 | L80 | 0.415 | 3.17 | 3.05 | | 14880 | 14530 |
| | C90 | | | | | 16740 | 16340 |
| | T95 | | | | | 17670 | 17250 |
| 4 | L80 | 0.500 | 3.00 | 2.88 | | 17500 | 17500 |
| | C90 | | | | | 19990 | 19690 |
| | T95 | | | | | 20780 | 20780 |
| 4 | L80 | 0.610 | 2.78 | 2.66 | | 20680 | 21350 |
| | C90 | | | | | 23260 | 24020 |
| | T95 | | | | | 24560 | 25350 |
| 4 1/2 | J55 | 0.271 | 3.96 | 3.88 | | 5730 | 5800 |
| | L80 | | | | | 7500 | 8430 |
| | N80 | | | | | 7500 | 8430 |
| | C90 | | | | | 8120 | 9490 |
| | T95 | | | | | 8410 | 10010 |
| 4 1/2 | L80 | 0.337 | 3.83 | 3.70 | | 11080 | 10480 |
| | C90 | | | | | 11220 | 11800 |
| | T95 | | | | | 12760 | 12450 |
| | P110 | | | | | 12370 | 11820 |
| 4 1/2 | L80 | 0.380 | 3.74 | 3.62 | | 13900 | 13300 |
| | C90 | | | | | 14090 | 14040 |
| | T95 | | | | | 13890 | 13380 |
| 4 1/2 | L80 | 0.430 | 3.64 | 3.52 | | 15560 | 15050 |
| | C90 | | | | | 15050 | 15890 |
| | T95 | | | | | 16420 | 15560 |
| 4 1/2 | L80 | 0.500 | 3.50 | 3.38 | | 15800 | 17500 |
| | C90 | | | | | 15560 | 18470 |
| | T95 | | | | | 17780 | 17420 |
| 4 1/2 | L80 | 0.560 | 3.38 | 3.26 | | 18770 | 19600 |
| | C90 | | | | | 17480 | 20690 |
| | T95 | | | | | 19610 | 19260 |
| 4 1/2 | L80 | 0.630 | 3.24 | 3.12 | | 20700 | 19260 |
| | C90 | | | | | 21670 | 21670 |
| | T95 | | | | | 22880 | 22880 |

No image

10/11

**OCTG – Casing & Tubing**

Barcode:4168004-05 A-357-824 INV – Investigation –

## Casing Dimensional Range and Performance Properties Size 4 1/2"

| Size O.D | Wall Thickness (in) | Weight Plain End (lb/ft) | Grade | Inside Diameter (in) | Drift Diameter (in) | Collapse Pressure (psi) | Burst Pressure (psi) |
|---|---|---|---|---|---|---|---|
| 4 1/2 | 0.205 | 9.50 / 9.41 | H40 | 4.09 | 3.97 | 2760 | 3190 |
| | | | J55 | | | 3310 | 4380 |
| | | | K55 | | | 3310 | 4380 |
| | | | M65 | | | 3600 | 5180 |
| 4 1/2 | 0.224 | 10.50 / 10.24 | J55 | 4.05 | 3.93 | 4010 | 4790 |
| | | | K55 | | | 4010 | 4790 |
| | | | M65 | | | 4430 | 5660 |
| 4 1/2 | 0.250 | 11.60 / 11.36 | J55 | 4.00 | 3.88 | 4960 | 5350 |
| | | | K55 | | | 4960 | 5350 |
| | | | M65 | | | 5560 | 6320 |
| | | | L80 | | | 6350 | 7780 |
| | | | N80 | | | 6350 | 7780 |
| | | | C90 | | | 6820 | 8750 |
| | | | C95 | | | 7030 | 9240 |
| | | | T95 | | | 7030 | 9240 |
| | | | P110 | | | 7580 | 10690 |
| | | | HC-P110 | | | 8650 | 10690 |
| 4 1/2 | 0.290 | 13.50 / 13.05 | M65 | 3.92 | 3.80 | 7310 | 9020 |
| | | | N80 | | | 8540 | 9020 |
| | | | C95 | | | 8540 | 10710 |
| | | | P110 | | | 9660 | 12410 |
| | | | HC-P110 | | | 10690 | 12410 |
| 4 1/2 | 0.337 | 15.10 / 15.00 | P110 | 3.83 | 3.70 | 11600 | 14420 |
| | | | HC-P110 | | | 14350 | 14420 |
| | | | Q125 | | | 15830 | 16380 |

## Casing Dimensional Range and Performance Properties Size 5"

| Size O.D | Wall Thickness (in) | Weight Plain End (lb/ft) | Grade | Inside Diameter (in) | Drift Diameter (in) | Collapse Pressure (psi) | Burst Pressure (psi) |
|---|---|---|---|---|---|---|---|
| 5 | 0.220 | 11.50 / 11.24 | J55 | 4.56 | 4.44 | 3060 | 4240 |
| | | | K55 | | | 3060 | 4240 |
| | | | M65 | | | 3290 | 5010 |
| 5 | 0.253 | 13.00 / 12.84 | J55 | 4.49 | 4.37 | 4140 | 4870 |
| | | | K55 | | | 4140 | 4870 |
| | | | M65 | | | 4590 | 5760 |
| 5 | 0.296 | 15.00 / 14.88 | J55 | 4.41 | 4.28 | 5560 | 5700 |
| | | | K55 | | | 5560 | 5700 |
| | | | M65 | | | 6280 | 6730 |
| | | | L80 | | | 7250 | 8290 |
| | | | N80 | | | 7830 | 9320 |
| | | | C90 | | | 8110 | 9840 |
| | | | C95 | | | 8110 | 9840 |
| | | | P110 | | | 8850 | 11400 |
| 5 | 0.362 | 18.00 / 17.95 | M65 | 4.28 | 4.15 | 8730 | 8240 |
| | | | L80 | | | 10500 | 10140 |
| | | | N80 | | | 10500 | 10140 |
| | | | C90 | | | 11520 | 11520 |
| | | | C95 | | | 12010 | 12040 |
| | | | T95 | | | 12030 | 12040 |
| | | | P110 | | | 13410 | 13940 |
| | | | Q125 | | | 13840 | 15340 |
| 5 | 0.437 | 21.40 / 21.32 | M65 | 4.13 | 4.00 | 10370 | 9940 |
| | | | L80 | | | 12760 | 12240 |
| | | | N80 | | | 12760 | 12240 |
| | | | C90 | | | 14860 | 13170 |
| | | | C95 | | | 15150 | 14530 |
| | | | T95 | | | 15160 | 14530 |
| | | | P110 | | | 17550 | 16020 |
| | | | Q125 | | | 19940 | 19120 |
| 5 | 0.478 | 23.20 / 23.11 | L80 | 4.04 | 3.92 | 16430 | 13380 |
| | | | N80 | | | 16430 | 13380 |
| | | | C90 | | | 18830 | 15560 |
| | | | C95 | | | 18830 | 15890 |
| | | | T95 | | | 19020 | 15890 |
| | | | P110 | | | 21670 | 18400 |
| | | | Q125 | | | 22500 | 20910 |
| 5 | 0.500 | 24.10 / 24.05 | N80 | 4.00 | 3.88 | 14400 | 14000 |
| | | | C90 | | | 16200 | 15750 |
| | | | C95 | | | 17100 | 16630 |
| | | | T95 | | | 17100 | 16630 |
| | | | P110 | | | 19800 | 19250 |
| | | | Q125 | | | 22500 | 21880 |

12 13

Barcode:4168004-05 A-357-824 INV - Investigation -

# OCTG – Casing & Tubing

## Casing Dimensional Range and Performance Properties Size 5 1/2"

| Size O.D | Wall Thickness (in) | Weight Plain End (lb/ft) | Grade | Inside Diameter (in) | Drift Diameter (in) | Collapse Pressure (psi) | Burst Pressure (psi) |
|---|---|---|---|---|---|---|---|
| 5 1/2 | 0.244 | 14.00 / 13.71 | J55 | 5.01 | 4.89 | 3120 | 4270 |
| | | | K55 | | | 3120 | 4270 |
| | | | M65 | | | 3360 | 5050 |
| 5 1/2 | 0.275 | 15.50 / 15.36 | J55 | 4.95 | 4.83 | 4040 | 4810 |
| | | | K55 | | | 4040 | 4810 |
| | | | M65 | | | 4470 | 5690 |
| 5 1/2 | 0.304 | 17.00 / 16.89 | J55 | 4.89 | 4.77 | 4910 | 5320 |
| | | | K55 | | | 4910 | 6290 |
| | | | M65 | | | 5510 | 7740 |
| | | | L80 | | | 6290 | 7740 |
| | | | N80 | | | 6290 | 8710 |
| | | | C90 | | | 6740 | 9190 |
| | | | T95 | | | 6940 | 9190 |
| | | | P110 | | | 6940 | 9190 |
| 5 1/2 | 0.361 | 20.00 / 19.83 | J55 | 4.78 | 4.65 | 7480 | 10640 |
| | | | K55 | | | 7540 | 7470 |
| | | | M65 | | | 7540 | 7470 |
| | | | L80 | | | 8830 | 9190 |
| | | | N80 | | | 8830 | 9190 |
| | | | C90 | | | 9630 | 10340 |
| | | | C95 | | | 10020 | 10910 |
| | | | T95 | | | 10910 | 10910 |
| | | | P110 | | | 11100 | 12640 |
| | | | HC-P110 | | | 12080 | 12640 |
| 5 1/2 | 0.415 | 23.00 / 22.56 | M65 | 4.67 | 4.55 | 9070 | 8580 |
| | | | L80 | | | 11160 | 10560 |
| | | | N80 | | | 11160 | 10560 |
| | | | C90 | | | 12380 | 11880 |
| | | | C95 | | | 12930 | 12540 |
| | | | T95 | | | 12930 | 12540 |
| | | | P110 | | | 14540 | 14530 |
| | | | Q125 | | | 16060 | 16510 |
| 5 1/2 | 0.500 | 26.80 / 26.73 | C90 | 4.50 | 4.38 | 14880 | 14320 |
| | | | T95 | | | 15700 | 15100 |
| 5 1/2 | 0.562 | 29.70 / 29.67 | T95 | 4.38 | 4.25 | 16510 | 16990 |
| | | | C90 | | | 17430 | 17900 |
| 5 1/2 | 0.625 | 32.60 / 32.57 | C90 | 4.25 | 4.13 | 18130 | 17900 |
| | | | T95 | | | 19140 | 18890 |

## Casing Dimensional Range and Performance Properties Size 5 1/2 ~ 7"

| Size O.D | Wall Thickness (in) | Weight Plain End (lb/ft) | Grade | Inside Diameter (in) | Drift Diameter (in) | Collapse Pressure (psi) | Burst Pressure (psi) |
|---|---|---|---|---|---|---|---|
| 5 1/2 | 0.687 | 35.30 / 35.35 | C90 | 4.13 | 4.00 | 19680 | 19670 |
| | | | T95 | | | 20770 | 20770 |
| 5 1/2 | 0.750 | 38.00 / 38.08 | C90 | 4.00 | 3.88 | 21200 | 21480 |
| | | | T95 | | | 22380 | 22670 |
| 5 1/2 | 0.812 | 40.50 / 40.69 | C90 | 3.88 | 3.75 | 22650 | 22650 |
| | | | T95 | | | 23910 | 23250 |
| 5 1/2 | 0.875 | 43.10 / 43.26 | C90 | 3.75 | 3.63 | 24080 | 24540 |
| | | | T95 | | | 25060 | 25060 |
| | | | | | | 25420 | 26450 |
| 6 5/8 | 0.288 | 20.00 / 19.51 | H40 | 6.05 | 5.92 | 2520 | 3040 |
| | | | J55 | | | 2970 | 4180 |
| | | | K55 | | | 2970 | 4940 |
| | | | M65 | | | 3190 | 4940 |
| 6 5/8 | 0.352 | 24.00 / 23.60 | J55 | 5.92 | 5.80 | 4560 | 5110 |
| | | | K55 | | | 4560 | 5110 |
| | | | M65 | | | 5080 | 6040 |
| | | | L80 | | | 5760 | 7440 |
| | | | N80 | | | 6140 | 8370 |
| | | | C90 | | | 6310 | 8830 |
| | | | C95 | | | 6310 | 8830 |
| | | | T95 | | | 6730 | 10230 |
| | | | P110 | | | 7010 | 10230 |
| 6 5/8 | 0.417 | 28.00 / 27.67 | M65 | 5.79 | 5.67 | 7160 | 7160 |
| | | | L80 | | | 8170 | 8810 |
| | | | N80 | | | 8880 | 8810 |
| | | | C90 | | | 9220 | 9910 |
| | | | C95 | | | 9220 | 10460 |
| | | | T95 | | | 10160 | 10460 |
| | | | P110 | | | 10320 | 12120 |
| 6 5/8 | 0.475 | 32.00 / 31.23 | L80 | 5.68 | 5.55 | 10320 | 10040 |
| | | | N80 | | | 11330 | 10040 |
| | | | C90 | | | 11820 | 11290 |
| | | | C95 | | | 11820 | 11920 |
| | | | T95 | | | 13220 | 11920 |
| | | | P110 | | | 14540 | 13800 |
| | | | Q125 | | | | 15680 |
| 7 | 0.231 | 17.00 | H40 | 6.54 | 6.41 | 1420 | 2310 |

14 15

Barcode:4168004-05 A-357-824 INV - Investigation -

## OCTG – Casing & Tubing

### Casing Dimensional Range and Performance Properties Size 7"

| Size O.D | Wall Thickness (in) | Weight Plain End (lb/ft) | Grade | Inside Diameter (in) | Drift Diameter (in) | Collapse Pressure (psi) | Burst Pressure (psi) |
|---|---|---|---|---|---|---|---|
| 7 | 0.498 | 35.00 / 34.61 | L80 | 6.00 | 5.88 | 10180 | 9960 |
| | | | N80 | | | 10180 | 9960 |
| | | | C90 | | | 11170 | 11210 |
| | | | C95 | | | 11650 | 11830 |
| | | | T95 | | | 11650 | 11830 |
| | | | P110 | | | 13030 | 13700 |
| | | | Q125 | | | 14310 | 15560 |
| 7 | 0.540 | 38.00 / 37.29 | L80 | 5.92 | 5.80 | 10800 | 10800 |
| | | | N80 | | | 11390 | 10800 |
| | | | C90 | | | 11390 | 12150 |
| | | | C95 | | | 12810 | 12830 |
| | | | T95 | | | 13430 | 12830 |
| | | | P110 | | | 15130 | 14850 |
| | | | Q125 | | | 16740 | 16880 |
| 7 | 0.625 | 42.70 / 42.59 | C90 | 5.75 | 5.63 | 15550 | 14060 |
| | | | T95 | | | 16440 | 14840 |
| 7 | 0.687 | 46.40 / 46.36 | C90 | 5.63 | 5.50 | 15930 | 15460 |
| | | | T95 | | | 16820 | 16320 |
| 7 | 0.750 | 50.10 / 50.11 | C90 | 5.50 | 5.38 | 17220 | 16880 |
| | | | T95 | | | 18180 | 17810 |
| 7 | 0.812 | 53.60 / 53.71 | C90 | 5.38 | 5.25 | 18660 | 18270 |
| | | | T95 | | | 19480 | 19290 |
| 7 | 0.875 | 57.10 / 57.29 | C90 | 5.25 | 5.13 | 19690 | 19690 |
| | | | T95 | | | 20780 | 20780 |

### Casing Dimensional Range and Performance Properties Size 7"

| Size O.D | Wall Thickness (in) | Weight Plain End (lb/ft) | Grade | Inside Diameter (in) | Drift Diameter (in) | Collapse Pressure (psi) | Burst Pressure (psi) |
|---|---|---|---|---|---|---|---|
| 7 | 0.317 | 23.00 / 22.65 | J55 | 6.37 | 6.24 / 6.25 | 3270 | 4360 |
| | | | K55 | | | 3270 | 4360 |
| | | | H65 | | | 3540 | 5150 |
| | | | M65 | | | 3540 | 5150 |
| | | | L80 | | | 3830 | 6340 |
| 7 | 0.362 | 26.00 / 25.69 | J55 | 6.28 | 6.15 | 4330 | 4980 |
| | | | K55 | | | 4330 | 4980 |
| | | | H65 | | | 4810 | 5880 |
| | | | M65 | | | 4810 | 5880 |
| | | | L80 | | | 5410 | 7240 |
| | | | N80 | | | 5410 | 7240 |
| | | | HC-L80 | | | 5740 | 7240 |
| | | | C90 | | | 5890 | 8150 |
| | | | C95 | | | 5890 | 8600 |
| | | | T95 | | | 6100 | 8600 |
| | | | P110 | | | 6100 | 9960 |
| 7 | 0.408 | 29.00 / 28.75 | J65 | 6.18 | 6.06 | 6100 | 6630 |
| | | | H65 | | | 6630 | 6630 |
| | | | M65 | | | 6630 | 6630 |
| | | | L80 | | | 7030 | 8160 |
| | | | N80 | | | 7030 | 8160 |
| | | | HC-L80 | | | 7580 | 8160 |
| | | | C90 | | | 7720 | 9180 |
| | | | C95 | | | 7840 | 9690 |
| | | | T95 | | | 7840 | 9690 |
| | | | P110 | | | 8530 | 11220 |
| 7 | 0.453 | 32.00 / 31.70 | M65 | 6.09 | 5.97 / 6.00 | 7360 | 7360 |
| | | | L80 | | | 8530 | 9060 |
| | | | N80 | | | 8600 | 9060 |
| | | | C90 | | | 9380 | 10190 |
| | | | C95 | | | 9740 | 10760 |
| | | | T95 | | | 9740 | 10760 |
| | | | P110 | | | 10780 | 12460 |

16 17

Barcode:4168004-05 A-357-824 INV - Investigation -

## Drill Pipe Dimensional Range and Performance Properties Size 2 3/8 ~ 4"

| Nominal Size | | Nominal Weight | | Wall Thickness | | Inside Diameter | | Grade | Tensile Yield | | Torsional Yield | | Internal Pressure | | Collapse | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| in | mm | lb/ft | kg/m | in | mm | in | mm | | lb | kN | ft-lb | Nm | psi | bar | psi | bar |
| 2 3/8 | 60.3 | 6.65 | 9.34 | 0.280 | 7.11 | 1.815 | 46.13 | E75 | 138214 | 615 | 6250 | 8474 | 15474 | 1067 | 15599 | 1075 |
| | | 6.65 | 9.34 | 0.280 | 7.11 | 1.815 | 46.13 | X95 | 175072 | 779 | 7917 | 10734 | 19600 | 1351 | 19759 | 1362 |
| | | 6.65 | 9.34 | 0.280 | 7.11 | 1.815 | 46.13 | G105 | 193500 | 861 | 8751 | 11864 | 21663 | 1493 | 21839 | 1505 |
| 2 7/8 | 73.0 | 10.4 | 15.49 | 0.362 | 9.19 | 2.151 | 54.64 | E75 | 214344 | 953 | 11554 | 15665 | 16526 | 1139 | 16609 | 1138 |
| | | 10.4 | 15.49 | 0.362 | 9.19 | 2.151 | 54.64 | X95 | 271503 | 1208 | 14635 | 19842 | 20933 | 1443 | 20911 | 1441 |
| | | 10.4 | 15.49 | 0.362 | 9.19 | 2.151 | 54.64 | G105 | 300082 | 1335 | 16176 | 21932 | 23137 | 1595 | 23112 | 1593 |
| 3 1/2 | 88.9 | 13.3 | 19.81 | 0.368 | 9.35 | 2.764 | 70.20 | S135 | 385820 | 1716 | 20798 | 28198 | 29747 | 2051 | 29916 | 2048 |
| | | 13.3 | 19.81 | 0.368 | 9.35 | 2.764 | 70.20 | E75 | 271569 | 1208 | 18551 | 25152 | 13800 | 951 | 14113 | 973 |
| | | 13.3 | 19.81 | 0.368 | 9.35 | 2.764 | 70.20 | X95 | 343988 | 1530 | 23498 | 31860 | 17480 | 1205 | 17807 | 1232 |
| | | 13.3 | 19.81 | 0.368 | 9.35 | 2.764 | 70.20 | G105 | 380197 | 1691 | 25972 | 35213 | 19320 | 1332 | 19758 | 1362 |
| | | 15.5 | 23.09 | 0.449 | 11.4 | 2.602 | 66.10 | S135 | 488825 | 2174 | 33392 | 45273 | 24840 | 1712 | 25404 | 1751 |
| | | 15.5 | 23.09 | 0.449 | 11.4 | 2.602 | 66.10 | E75 | 322775 | 1436 | 21086 | 28589 | 16838 | 1160 | 16774 | 1156 |
| | | 15.5 | 23.09 | 0.449 | 11.4 | 2.602 | 66.10 | X95 | 408848 | 1819 | 26708 | 36211 | 21328 | 1470 | 21247 | 1465 |
| | | 15.5 | 23.09 | 0.449 | 11.4 | 2.602 | 66.10 | G105 | 451885 | 2010 | 29520 | 40023 | 23573 | 1625 | 23484 | 1619 |
| | | 15.5 | 23.09 | 0.449 | 11.4 | 2.602 | 66.10 | S135 | 580995 | 2585 | 37954 | 51459 | 30308 | 2090 | 30194 | 2081 |
| 4 | 101.6 | 14.0 | 20.85 | 0.330 | 8.38 | 3.340 | 84.84 | E75 | 258359 | 1269 | 23288 | 31574 | 10828 | 746 | 11354 | 782 |
| | | 14.0 | 20.85 | 0.330 | 8.38 | 3.340 | 84.84 | X95 | 361454 | 1608 | 29498 | 39994 | 13716 | 945 | 14382 | 992 |
| | | 14.0 | 20.85 | 0.330 | 8.38 | 3.340 | 84.84 | G105 | 399502 | 1777 | 32603 | 44204 | 15159 | 1045 | 15896 | 1096 |

# OCTG - Drill Pipe

## Products

| Method | O.D(inch) | W.T(inch) | Standard/Grades |
|---|---|---|---|
| Drill Pipe | 2 3/8 ~ 5 1/2 | 0.280 ~ 0.500 | E75, X95, G105, S135 |
| Drill Rod | 1 3/4 ~ 4 1/2 | 0.185 ~ 0.314 | SAE1026, 4130, 1541 |

## High Precision Drill Rod for Mining Industries

| Size(mm) | | Tolerance(mm) | | | Residual Stress(MPa) | Supply Condition |
|---|---|---|---|---|---|---|
| O.D | W.T | O.D | W.T(%) | Length | | |
| 44.45 | 4.70 | ±5 | 0~+5 | | 100 max | Seamless Cold Drawn or Cold Drawn & Q/T |
| 55.55 | 4.75 | ±0.1 | 0~+5 | | 100 max | |
| 56.52 | 3.94 | ±0.1 | 0~+5 | | 100 max | |
| 69.85 | 4.76 | ±0.1 | 0~+5 | | 100 max | |
| 73.03 | 4.38 | ±0.1 | 0~+5 | | 100 max | |
| 88.90 | 5.55 | ±0.12 | 0~+5 | | 100 max | |
| 114.30 | 6.35 | ±0.15 | 0~+5 | | 100 max | |





18/19

Barcode:4168004-05 A-357-824 INV - Investigation -

No image

**OCTG - Drill Pipe**

## Drill Pipe Dimensional Range and Performance Properties Size 4 1/2 ~ 5"

| Nominal Size (in / mm) | Nominal Weight (lb/ft / kg/m) | Wall Thickness (in / mm) | Inside Diameter (in / mm) | Grade | Tensile Yield (lb / kN) | Torsional Yield (ft-lb / Nm) | Internal Pressure (psi / bar) | Collapse (psi / bar) |
|---|---|---|---|---|---|---|---|---|
| 4 1/2 / 114.3 | 16.6 / 24.73 | 0.337 / 8.56 | 3.826 / 97.18 | E75 | 330558 / 1470 | 30807 / 41774 | 9829 / 678 | 10392 / 717 |
| | 16.6 / 24.73 | 0.337 / 8.56 | 3.826 / 97.18 | X95 | 418707 / 1863 | 39022 / 52914 | 12450 / 859 | 12765 / 880 |
| | 16.6 / 24.73 | 0.337 / 8.56 | 3.826 / 97.18 | G105 | 462781 / 2059 | 43130 / 58484 | 13761 / 949 | 13828 / 953 |
| | 16.6 / 24.73 | 0.337 / 8.56 | 3.826 / 97.18 | S135 | 595004 / 2647 | 55453 / 75194 | 17693 / 1220 | 16773 / 1157 |
| | 20.00 / 29.79 | 0.430 / 10.92 | 3.64 / 92.46 | E75 | 412358 / 1834 | 36901 / 50038 | 12542 / 865 | 12964 / 894 |
| | 20.00 / 29.79 | 0.430 / 10.92 | 3.64 / 92.46 | X95 | 522220 / 2323 | 46741 / 63381 | 15886 / 1096 | 16421 / 1132 |
| | 20.00 / 29.79 | 0.430 / 10.92 | 3.64 / 92.46 | G105 | 577301 / 2568 | 51661 / 70052 | 17558 / 1211 | 18149 / 1252 |
| | 20.00 / 29.79 | 0.430 / 10.92 | 3.64 / 92.46 | S135 | 742244 / 3302 | 66421 / 90067 | 25575 / 1557 | 23355 / 1609 |
| 5 / 127.0 | 19.50 / 29.05 | 0.362 / 9.19 | 4.276 / 108.62 | E75 | 395595 / 1760 | 41167 / 55822 | 9503 / 655 | 9962 / 687 |
| | 19.50 / 29.05 | 0.362 / 9.19 | 4.276 / 108.62 | X95 | 501087 / 2229 | 52144 / 70707 | 12037 / 830 | 12026 / 829 |
| | 19.50 / 29.05 | 0.362 / 9.19 | 4.276 / 108.62 | G105 | 553883 / 2464 | 57633 / 78150 | 13304 / 918 | 12999 / 896 |
| | 19.50 / 29.05 | 0.362 / 9.19 | 4.276 / 108.62 | S135 | 712070 / 3168 | 74100 / 100480 | 17105 / 1180 | 15672 / 1081 |
| | 25.60 / 38.13 | 0.50 / 12.70 | 4.000 / 101.60 | E75 | 530144 / 2358 | 52257 / 70860 | 13125 / 905 | 13500 / 931 |

## Drill Pipe Dimensional Range and Performance Properties Size 5 ~ 5 1/2"

| Nominal Size (in / mm) | Nominal Weight (lb/ft / kg/m) | Wall Thickness (in / mm) | Inside Diameter (in / mm) | Grade | Tensile Yield (lb / kN) | Torsional Yield (ft-lb / Nm) | Internal Pressure (psi / bar) | Collapse (psi / bar) |
|---|---|---|---|---|---|---|---|---|
| 5 / 127.0 | 25.60 / 38.13 | 0.50 / 12.70 | 4.000 / 101.60 | X95 | 671515 / 2987 | 66192 / 89756 | 16625 / 1147 | 17100 / 1179 |
| | 25.60 / 38.13 | 0.50 / 12.70 | 4.000 / 101.60 | G105 | 742201 / 3302 | 73159 / 99204 | 18375 / 1267 | 18900 / 1303 |
| | 25.60 / 38.13 | 0.50 / 12.70 | 4.000 / 101.60 | S135 | 954259 / 4245 | 94062 / 127548 | 23625 / 1629 | 24300 / 1676 |
| 5 1/2 / 139.7 | 21.90 / 32.62 | 0.361 / 9.17 | 4.778 / 121.36 | E75 | 437116 / 1944 | 50710 / 68763 | 8615 / 594 | 8413 / 580 |
| | 21.90 / 32.62 | 0.361 / 9.17 | 4.778 / 121.36 | X95 | 553681 / 2463 | 64233 / 84100 | 10912 / 753 | 10019 / 691 |
| | 21.90 / 32.62 | 0.361 / 9.17 | 4.778 / 121.36 | G105 | 611963 / 2722 | 70994 / 96258 | 12061 / 832 | 10753 / 742 |
| | 21.90 / 32.62 | 0.361 / 9.17 | 4.778 / 121.36 | S135 | 786809 / 3500 | 91278 / 123773 | 15507 / 1069 | 12679 / 874 |
| | 24.70 / 36.79 | 0.415 / 10.54 | 4.670 / 118.62 | E75 | 497222 / 2212 | 56574 / 76714 | 9983 / 683 | 10064 / 722 |
| | 24.70 / 36.79 | 0.415 / 10.54 | 4.670 / 118.62 | X95 | 629814 / 2802 | 71660 / 97171 | 12544 / 865 | 12933 / 892 |
| | 24.70 / 36.79 | 0.415 / 10.54 | 4.670 / 118.62 | G105 | 686111 / 3097 | 79204 / 107401 | 13865 / 956 | 14013 / 966 |
| | 24.70 / 36.79 | 0.415 / 10.54 | 4.670 / 118.62 | S135 | 894999 / 3981 | 101833 / 138086 | 17826 / 1229 | 17023 / 1174 |

20-21

Barcode:4168004-05 A-357-824 INV - Investigation -

# Line Pipe

ILJIN Steel manufactures a wide range of line pipe for onshore and offshore applications.

Line pipe is available in sizes ranging from 1 to 7 inches and can be produced by seamless method according to API 5L, EN and DNV standards

The pipe is inspected for internal and external defects using ultrasonic inspection equipment. The pipe is automatically packed in bundles and tied with steel banding or wires in compliance with API loading and transportation standards





## Chemical Composition for PSL2, API Spec 5L / ISO 3183

| Steel Grade (Steel Name) | Mass fraction, based upon heat & product analysis %, max | | | | | | | | | Carbon equivalent |
|---|---|---|---|---|---|---|---|---|---|---|
| | C | Si | Mn | P | S | V | Nb | Ti | other | CE_iw |
| L245N or BN | 0.24 | 0.4 | 1.2 | 0.025 | 0.015 | | | | * | ≤0.43 |
| L290N or X42N | 0.24 | 0.4 | 1.2 | 0.025 | 0.015 | | 0.05 | | * | ≤0.43 |
| L320N or X46N | 0.24 | 0.4 | 1.4 | 0.025 | 0.015 | 0.06 | 0.05 | 0.04 | * | ≤0.43 |
| L360N or X52N | 0.24 | 0.45 | 1.4 | 0.025 | 0.015 | 0.04 | 0.05 | 0.04 | * | ≤0.43 |
| L390N or X56N | 0.24 | 0.45 | 1.4 | 0.025 | 0.015 | 0.1 | 0.05 | 0.04 | * | ≤0.43 |
| L415N or X60N | 0.24 | 0.45 | 1.4 | 0.025 | 0.015 | 0.1 | 0.05 | 0.04 | * | ≤0.43 |
| L290Q or X42Q | 0.18 | 0.45 | 1.4 | 0.025 | 0.015 | 0.05 | 0.05 | 0.04 | * | ≤0.43 |
| L320Q or X46Q | 0.18 | 0.45 | 1.4 | 0.025 | 0.05 | 0.05 | 0.05 | 0.04 | * | ≤0.43 |
| L360Q or X52Q | 0.18 | 0.45 | 1.5 | 0.025 | 0.015 | 0.07 | 0.05 | 0.04 | * | ≤0.43 |
| L390Q or X56Q | 0.18 | 0.45 | 1.5 | 0.025 | 0.015 | 0.07 | 0.05 | | * | ≤0.43 |
| L415Q or X60Q | 0.18 | 0.45 | 1.70 | 0.025 | 0.015 | | | | * | ≤0.43 |
| L450Q or X65Q | 0.18 | 0.45 | 1.70 | 0.025 | 0.015 | | | | * | ≤0.43 |
| L485Q or X70Q | 0.18 | 0.45 | 1.80 | 0.025 | 0.015 | | | | * | ≤0.43 |
| L555Q or X80Q | 0.18 | 0.45 | 1.90 | 0.025 | 0.015 | | | | * | as agreed |

* Calculated according to API Spec 5L / ISO 3183

## Chemical Composition for Sour&Offshore, API Spec 5L / ISO 3183

| Steel Grade (Steel Name) | Mass fraction, based upon heat & product analysis %, max | | | | | | | | | | | | | | | | Carbon equivalent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | C | Si | Mn | P | S | V | Nb | Ti | Al | Cu | Ni | Cr | Mo | B | N | other | CE_iw |
| L360QS or X52QS | 0.16 | 0.45 | 1.65 | 0.020 | 0.008 | 0.07 | 0.05 | 0.04 | 0.06 | 0.35 | 0.3 | 0.3 | 0.15 | 0.0005 | 0.12 | * | ≤0.20 + 0.03 |
| L390QS or X56QS | 0.16 | 0.45 | 1.65 | 0.020 | 0.008 | 0.07 | 0.05 | 0.04 | 0.06 | 0.35 | 0.3 | 0.3 | 0.15 | 0.0005 | 0.12 | * | ≤0.21 + 0.03 |
| L415QS or X60QS | 0.16 | 0.45 | 1.65 | 0.020 | 0.008 | 0.08 | 0.05 | 0.04 | 0.06 | 0.35 | 0.3 | 0.3 | 0.15 | 0.0005 | 0.12 | * | ≤0.22 + 0.03 |
| L450QS or X65QS | 0.16 | 0.45 | 1.65 | 0.020 | 0.008 | 0.09 | 0.05 | 0.04 | 0.06 | 0.35 | 0.3 | 0.3 | 0.15 | 0.0005 | 0.12 | * | ≤0.22 + 0.03 |
| L485QS or X70QS | 0.16 | 0.45 | 1.65 | 0.020 | 0.008 | 0.09 | 0.05 | 0.04 | 0.06 | 0.35 | 0.3 | 0.3 | 0.15 | 0.0005 | 0.12 | * | ≤0.22 + 0.03 |

* Other
(1) CE ≤ 0.006%
(2) API 2.2.1 (Not application to TI-killed or Ti treated steel)

# Products

| Standard / Grade | | API 5L Grade B / X42 / X46 / X52 / X60 / X65 / X70 / X80 |
|---|---|---|
| Main Size | O.D | 21.3mm ~ 304.8mm (NPS 1/2" ~ 12") |
| | Length | 6.40m ~ 18,288mm (SRL / DRL / TRL) |
| Manufacturing Method | | Hot Finished : NPS 2" and above; Cold Finished : Less than NPS 2" |
| End Finish | | Plain-End Beveled, Plain-End Square Cut |
| Delivery Option | | Outside Surface : Varnish Coated 3-LPE (FBE+Adhesive+PE); Inside Surface : PE |

22 23

# Line Pipe

## Mechanical Properties for PSL2, API Spec 5L / ISO 3183

| Steel Grade | Yield Strength Re0.5 MPa (Psi) min | max | Tensile Strength Rm0.5 MPa (Psi) min | max |
|---|---|---|---|---|
| | Pipe Body (Seamless) | | | |
| X42/L290 | 290(42 100) | 495(71 800) | 415(60 200) | 760(110 200) |
| X46/L320 | 320(46 400) | 525(76 100) | 435(63 100) | 760(110 200) |
| X52/L360 | 360(52 200) | 530(76 900) | 460(66 700) | 760(110 200) |
| X56/L390 | 390(56 600) | 545(79 000) | 490(71 100) | 760(110 200) |
| X60/L415 | 415(60 200) | 565(81 900) | 520(75 400) | 760(110 200) |
| X65/L450 | 450(65 300) | 600(87 000) | 535(77 600) | 760(110 200) |
| X70/L485 | 485(70 300) | 635(92 100) | 570(82 700) | 760(110 200) |
| X80/L555 | 555(80 500) | 705(102 300) | 625(90 600) | 825(199 700) |

## Coating Pipe Range

| Coatings | O.D | W.T | Length | Coatings |
|---|---|---|---|---|
| External | 60.33~273 | 3.9~25 | 12,800 | 3LPE |
| Internal | 114.3~273 | 6.0~25 | 6,400 | PE |

## External Three Layer PE Coating

| Parameter | Specification |
|---|---|
| Application Standard | API, DIN |
| Coating Thickness | 1st Layer : 100~175 μm / 2nd Layer : 150~400 μm / 3rd Layer : 1800 μm |
| Pipe end space | 130~150mm |
| Adhesion Strength | Under Room Temp.: 150N/cm length |
| Pressure Resistance | Under Room Temp. : 0.2mm |
| Elongation(%) | Under40℃: 100 |

Barcode:4168004-05 A-357-824 INV - Investigation -

## Seamless Line Pipe Dimensional Range



| O.D inch | mm |
|---|---|
| 1.051 | 26.7 |
| 1.314 | 33.4 |
| 1.661 | 42.2 |
| 1.902 | 48.3 |
| 2.374 | 60.3 |
| 2.874 | 73.0 |
| 3.500 | 88.9 |
| 4.000 | 101.6 |
| 4.500 | 114.3 |
| 5.562 | 141.3 |
| 6.625 | 168.3 |
| 7.000 | 177.8 |
| 7.625 | 193.68 |
| 8.625 | 219.1 |
| 9.625 | 244.8 |
| 10.748 | 273 |
| 12.000 | 304.8 |

No image

Barcode:4168004-05 A-357-824 INV - Investigation  -

## Process & Power Generation

ILJIN Steel provides tube and pipe serving the power generation industry where critically high temperatures and pressures necessitate rigorous quality standards.

Made of carbon and alloy steel in accordance with EN and ASTM standard, ILJIN produces a broad range of high quality hot-rolled tube and pipe for process and power generation applications.

Pipe is made in random lengths from 3 to 30m and fixed lengths upon customer request.





## List of Standards and Ranges for Process & Power Generation

| Specification | O.D (mm) | W.T (mm) | Steel Grade |
|---|---|---|---|
| **Carbon and alloyed steel** | | | |
| DIN EN 10216-2<br>Seamless steel tubes for pressure purposes; Non-alloy and alloy steel tubes with specified elevated temperature properties | 16 - 177.8 | 1.8 - 30 | St 45.8, St35.8, 17Mn5, 19Mn5, 15Mo3, 16Mo3, 13CrMo4-5, P235GH, P265GH |
| ASTM A106/A106M<br>Carbon Steel seamless pipe for high temperature service | 17.1 - 177.8 | 1.65 - 28.58 | Gr.A, Gr.B, Gr.C |
| ASTM A210/A210M<br>Seamless Medium-Carbon Steel Boiler & Superheater tubes | 19.05 - 127 | 2.11 - 12.7 | Gr. A-1, Gr.C |
| ASTM A179<br>Seamless Cold-Drawn Low-Carbon Steel Heat-Exchanger & Condenser Tubes | 15.88 - 88.9 | 1.65 - 7.62 | Low carbon steel |
| ASTM A192<br>Seamless Carbon Steel Boiler Tubes for High-Pressure Service | 19.05 - 114.3 | 2.11 - 11.53 | Low carbon steel |
| DIN 17175<br>Seamless Tubes of Heat resistant Steels /<br>SUPERSEDE BY DIN IN 10216-2 | 10 - 177.8 | 1.8 - 30 | St 35.8, St 45.8, 15Mo3, 13CrMo4-4 |
| **Alloy steel** | | | |
| ASTM A335/A335M<br>Seamless Ferritic Alloy Steel Pipe for High-Temperature Service | 42.2 - 177.8 | On Request | P5, P9, P11, P12, P22, P91 and others |
| ASTM A213/ASME SA213<br>Seamless Ferritic and Austenitic Alloy Steel Boiler, Superheater and Heat-Exchanger Tubes | 20.6 - 127 | 2.87 - 12.7 | T5, T9, T22, T91 |
| **Low temperature service** | | | |
| DIN EN 10216-4<br>Seamless steel tubes for pressure purposes; Non-alloy and alloy steel tubes with specified low temperature properties | 16 - 177.8 | 1.8 - 30 | P215NL, P265NL |
| ASTM A333<br>Seamless and Welded Carbon Steel Pipe for Low-Temperature Service (only seamless for ILJIN) | 17.1 - 177.8 | 1.65 - 30 | Grade 1, Grade 6 |
| ASTM A334<br>Seamless and Welded Carbon and Alloy Steel Tubes for Low-Temperature Service (only seamless for ILJIN) | 17.1 - 177.8 | 1.65 - 30 | Grade 1, Grade 6 |

## Products

| Method | O.D (mm) | W.T (mm) | Standards |
|---|---|---|---|
| Seamless | 21.3 - 177.8 | 2 - 25 | ASTM A106, A179, A192, A210, A213, A335, EN 10216-2, DIN 17175 |

26_27

No image

**Barcode:4168004-05 A-357-824 INV - Investigation -**

**Process & Power Generation**

## Mechanical Properties acc. to ASTM A213 & A335 Grade

| Steel Grade | Tensile testing at room temperature | | | Impact Strength |
|---|---|---|---|---|
| | Yield Strength MPa, Min. | Tensile Strength MPa, Min. | Elongation A% Min. | Average value J, Min |
| T11 | 170 | 415 | 30 | - |
| T12 | 220 | 415 | 30 | - |
| T22 | 205 | 415 | 20 | - |
| T91 | 415 | 585 | 20 | - |
| P12 | 220 | 415 | 22 | 35 |
| P22 | 205 | 415 | 22 | 35 |
| P91 | 415 | 585 | 20 | 35 |
| P92 | 440 | 620 | 20 | 35 |

## Chemical Composition % acc. to ASTM A213 & A335 Grade

| Steel Grade | C | Mn | P max | S max | Si max | Cr | Mo | Ni max | V | Nb | N | Al max | Ti max | others |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T11 | 0.05 -0.15 | 0.30 -0.60 | 0.025 | 0.025 | 0.50 -1.00 | 1.00 -1.50 | 0.44 -0.65 | | | | | | | |
| T12 | 0.05 -0.15 | 0.30 -0.60 | 0.025 | 0.025 | 0.50 max | 0.80 -1.25 | 0.44 -0.65 | | | | | | | |
| T22 | 0.05 -0.15 | 0.30 -0.60 | 0.025 | 0.025 | 0.50 max | 1.90 -2.60 | 0.87 -1.13 | | | | | | | |
| T91 | 0.07 -0.14 | 0.30 -0.60 | 0.020 | 0.010 | 0.20 -0.50 | 8.00 -9.50 | 0.85 -1.05 | 0.40 | 0.18 -0.25 | 0.06 -0.10 | 0.030 -0.07 | 0.020 | 0.01 | |
| P12 | 0.05 -0.15 | 0.30 -0.60 | 0.025 | 0.025 | 0.50 max | 0.80 -1.25 | 0.44 -0.65 | | | | | | | |
| P22 | 0.05 -0.15 | 0.30 -0.60 | 0.025 | 0.025 | 0.50 max | 1.90 -2.60 | 0.87 -1.13 | | | | | | | |
| P91 | 0.08 -0.12 | 0.30 -0.60 | 0.020 | 0.010 | 0.20 -0.50 | 8.00 -9.50 | 0.85 -1.05 | 0.40 | 0.18 -0.25 | 0.06 -0.10 | 0.030 -0.07 | 0.020 | 0.01 | Cu 0.06 -0.10 2/0.01 max |
| P92 | 0.07 -0.13 | 0.30 -0.60 | 0.020 | 0.010 | 0.50 max | 8.50 -9.50 | 0.30 -0.60 | 0.40 | 0.15 -0.25 | 0.04 -0.09 | 0.030 -0.07 | 0.020 | | Cu 0.04 -0.09 W 1.50 -2.00 B 0.001 -0.006 2/0.01 max |

## Correlation Between EN and ASTM Grades

| EN | ASTM | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EN 10216-2 | A106 | A179 | A192 | A210 | A213 | A335 | | |
| P195GH | Grade A | low carbon | low carbon | | | | | |
| P265GH | Grade B | | | Grade A-1 | | | | |
| | Grade C | | | Grade C | | | | |
| 13CrMo4-5 | | | | | T12 | P12 | | |
| 10CrMo9-10 | | | | | T22 | P22 | | |
| X10CrMoVNb9-1 | | | | | T91 | P91 | | |
| X10CrWMoVNb9-2 | | | | | T92 | P92 | | |

## Dimensional Range acc. to ASTM 106



Wall Thickness, mm

OD (mm): 21.3, 26.7, 33.4, 42.4, 44.5, 48.3, 51.0, 54.3, 57.0, 60.3, 63.5, 70.0, 73.0, 76.1, 82.5, 88.9, 101.6, 108.0, 114.3, 127.0, 133.0, 139.7, 141.3, 152.4, 159.0, 168.3, 177.8

Barcode:4168004-05 A-357-824 INV - Investigation  -

## Mechanical Tube

ILJIN Steel produces hot-rolled and cold-drawn mechanical tubes made of alloy steel that meet or exceed various international standards including ASTM A519, ASTM A513, EN 10297 and EN 10305.

ILJIN Steel have integrated process with Seamless tube and cold drawing.

It is possible to provide better service to customer, quick delivery, technical improvement, value engineering, prompt feed back for quality improvement.

### Tube For Automotive Parts

(Unit : mm)

| Items | Material | Size(mm) | | Condition |
|---|---|---|---|---|
| | | O.D | WT | |
| Drive Shaft | ASTM 1026<br>ASTM 1035<br>EN 25CrMo4 | 20 ~ 60 | 2 ~ 6 | Cold drawn & Annealed<br>Cold Drawn & QT |
| Airbag Inflator | SAE 1510 M<br>10CrMoMo | 20 ~ 70 | 1.5 ~ 4 | Cold Drawn & QT |
| Axle | SAE 1030, SAE 1527<br>EN E 355 (ST 52) | 101.6 ~ 152.4 | 6.35 ~ 25.4 | Hot Finished SMLS |
| CV Joint Cage | SAE 8617H<br>EN 16NiCrMo2 | 40 ~ 90 | 4 ~ 14 | As rolled, or normalized |
| Bearing | SAE52100<br>EN 100Cr6, SUJ2 | 20 ~ 170 | 1.5 ~ 20 | Spheroidizing Annealed |

### Tube For Hydraulic Cylinder

**Ready to Honing**

| Application | Supply Condition | Material Grade | Size Range (mm) |
|---|---|---|---|
| Double-Acting<br>Telescopic | ERW & Seamless<br>(DOM, CDS) | Stress Relived (BKS) | SAE1020, 1026<br>EN 10305(St52.3)<br>STKM13C | O.D : 40 ~ 308<br>W.T : 4.0 ~ 25.0<br>L.Th : 4 ~ 11.5m |

**Ready to Use**

| Application | Supply Condition | Material Grade | Size Range (mm) |
|---|---|---|---|
| SSID Tube<br>(No honing) | Tube Condition | ERW & DOM (ERW) | SAE 1020/1026<br>EN10305(St52.3)<br>STKM13C | O.D : 15.0 ~ 140<br>W.T : 1.0 ~ 12.5<br>L.Th : 4 ~ 11.5m |
| | Dimension Tolerance | ISO H9 Grade | | |
| | Inside Roughness | Rmax. 5μm Max. | | |

### List of Standards and Ranges for Mechanical Application

| Specification | Steel Grade |
|---|---|
| **ASTM A519/513**<br>Seamless/ERW Carbon and Alloy Steel Mechanical Tubes | 1008 - 1045, 52100, 1520, 1534,<br>1541, 4115, 4130 |
| **JIS 3441**<br>Alloy Steel Tube for Machine Structural Purpose | STKM11 - 20 |
| **JIS 3445**<br>Carbon Steel Tube for Machine Structural Purpose | S10C ~ S58C<br>SCM, SCR, SNCM, SUJ2 |
| **JIS 4051**<br>Carbon Steel for Machine Structual use | |
| **DIN EN 10297-1**<br>Seamless circular steel tubes for mechanical and general engineering purpose;<br>Non-alloy and alloy steel tubes | E235, E355, E470 and others<br>according to standards |
| **DIN EN 10305-1**<br>Steel tubes for precision applications, Seamless cold drawn tubes | E235, E355 |

30-31

No image



Barcode:4168004-05 A-357-824 INV - Investigation -

Mechanical Tube

Size Range

**Barcode:4168004-05 A-357-824 INV - Investigation  -**

## Quality Certificates



## Quality Management

### Inspection Equipment

For more reliable quality, ILJIN Steel has various inspection equipment such as
On-line thickness gauge, most advanced UST, EMI, and Hydro-static Tester.
All inspections are conducted by international standards, API, ASME, EN and ISO





### Test Equipment

ILJIN Steel has various test equipment for seamless pipe quality
-Mechanical Testing : UTM, DWTT, Impact Tester, Burst Tester, Collapse Tester
-High temperature properties : Creep Tester, Dilatometer, Jominy Tester
-Corrosion resistance Testing : SSCC, HIC, Auto Clave, Steam Oxidation Tester
-Micro Structure Inspection : SEM/EDS, Optical Micro Scope, Image Analyzer







Barcode:4168004-05 A-357-824 INV - Investigation  -

**ILJIN**

Steel

## Contact Us

**Jeonju Head Office / Plant**
1746, Hoguk-ro, Imsil-gun, Jeollabuk-do, Korea
**Tel :** +82-31-220-6926    **Fax :** +82-31-220-6906    **E-mail :** dukyou.lee@iljin.co.kr

**Suwon Plant**
905-80, Mannyeon-ro, Hwaseong-si, Gyeonggi-do, Korea
**Tel :** +82-31-220-6971    **Fax :** +82-31-220-6906    **E-mail :** junpyo.hong@iljin.co.kr

**Busan Sales Office**
#1103, 303, Daedong-ro, Sasang-gu, Busan, Korea
**Tel :** +82-51-711-7811    **Fax :** +82-51-315-6906    **E-mail :** henry@iljin.co.kr

www.iljinsteel.com

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Appx519

Barcode:4168004-05 A-357-824 INV - Investigation  -

# EXHIBIT I-26

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

9/27/21, 4:59 PM                                              Steel Pipe & Fittings



Warrant:4168004.05 A-357-224 INV - Investigation -



HUSTEEL INDUSTRY GROUP

About Us     Why Choose Us     Investors Relations     Partners & Age

Choose

Products Categories     Services     Technology     Projects     Our Values     Caree



Home > Products Categories                                                                Our

| Steel Pipe | OCTG Products | Fittings |
|---|---|---|
| The current yearly producon capacity of the company is 240,000 metric tons of steel pipes, that are produced by 4 producon lines, with sizes ranging from (1/2 - 20) inches.... | Focus is on OCTG (casing, tubing and drillpipe), but we also provide line pipe and specialty tubulars for refineries and high tech applicaons, are used for a variety of applicaons including oil and gas well drilling, extracng oil and gas.... | Fings are parts that connect the pipes and aid in changing the direcon of the flow or the pipe size or connecng different components for instance elbow fing, tee fing, eccentric reducer, and compression fing, etc.... |

Steel Pipe

OCTG Products

Fings

inquiry:
info@husteel-group.com

| Seamless Steel Pipe | Drill Pipe | Flange |
| ERW Steel Pipe | Tubing & Casing | Elbow |
| LSAW Steel Pipe | | Reducer |
| SSAW Steel Pipe | | Tee |
| Stainless Steel Pipe | | |
| Alloy Steel Pipe | | |
| Square Tube | | |
| Rectangular Tube | | |

United Kingdom
Spain                HUNAN STANDARD STEEL CO.,LTD
             United Arab Emirates   Singapore
Nigeria
                                          Australia
South Africa

Home > Products Categories

## About Us
Who We Are
Subsidiaries
Organizaon Structure
Our Culture
Mission & Vision
Safety

## Why Choose Us
Advantages
Quality Policy
Quality Management
Quality Control
Environmental Policy
Social Responsibility

## Products Categories
Steel Pipe
OCTG Products
Fings

## Services
Warehouses & Processing
Logiscs
Cut-to-Length
Coang

## Leaving a message
Please input your name          Please input you
Please input your messages

Submit

Copyright @ 2016 Husteel Industry Group. All Rights Reserved

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

https://www.husteel-group.com/product.html                                                      1/1

Appx521

Barcode:4168004-05 A-357-824 INV - Investigation  -

# EXHIBIT I-27

7/2/2020                                      About us - usefull information | Chelpipe Group

Barcode:4168004-05 A-357-824 INV - Investigation  -

✕      Chelpipe Group catalog



# Company profile

ChelPipe Group operates steel products facilities and companies, including: Chelyabinsk Pipe Rolling Plant; Pervouralsk New Pipe Plant; a warehouse facility selling the Group's steel pipes in Russian regions; META, a scrap procurement and processing company; SOT, ETERNO and MSA (Czech Republic), trunkline equipment manufacturers, and Rimera, a provider of oilfield services.

Chelpipe Group is one of the largest pipe manufacturers globally and second largest pipe producer in Russia with a diversified client base. Key segments of Chelpipe is seamless industrial pipes, seamless oil&gas pipes, LDP and another welded pipes, trunk pipeline systems and oilfield services. Chelpipe Group is best-in-class producer of steel pipes with strong position in the Russian market and leadership in growing industrial seamless pipe segments.

ChelPipe Group's mission is to meet any needs of Russian and global fuel and energy companies by developing and supplying integrated solutions to trunkline and intra-field pipeline transport.

With its capacities sufficient to offer a wide product range of welded and seamless pipes, and a mature warehousing system, ChelPipe Group is an effective universal player in the Russian and CIS pipe market, offering steel pipes to all major economic sectors. Chelpipe Group has a corporate META philosophy based on the principles of sustainability and consists of two parts: production system and corporate culture.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

7/2/2020

About us - usefull information | Chelpipe Group

Barcode:4168004-05 A-357-824 INV - Investigation  -

✕     Chelpipe Group catalog



**Tubular products**

manufactured by ChelPipe annually

Num

servic

## Investors and shareholders



### Andrey Komarov

Chairman of the ChelPipe Group's Board of Directors, co-Chairman of the Fund for the Development of the Pipe Industry of the Russian Federation. Honorary Metallurgist of the Russian Federation.

🖾 andrey_komarov_chelpipe



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

No image

7/2/2020                          About us - usefull information | Chelpipe Group

Barcode:4168004-05 A-357-824 INV - Investigation  -

✕        Chelpipe Group catalog



## Alexander Fedorov

Deputy of the Legislative Assembly of the Chelyabinsk Region. First Vice President of the Chelyabinsk Regional Association of Employers – Union of Industrialists and Entrepreneurs, full member (academician) of the International Academy of Authors of Scientific Discoveries and Inventions.

## Product applications



Appx525

7/2/2020

About us - usefull information | Chelpipe Group

Barcode:4168004-05 A-357-824 INV - Investigation  -

✕     Chelpipe Group catalog



🛢 Oil and gas

🧪 Chemistry and petrochemistry

🚗 Engineering and car industry

⚡ Energy sector

🏢 Construction and public utilities

🏭 Industrial facilities

## Our footprint

| All facilities | 📍 Pipe division | 📍 Oilfield services division | 📍 Scrap division |

**ChelPipe PJSC**
Chelyabinsk,
21 Mashinostroiteley street

**PNTZ JSC**
Pervouralsk,
1 Torgovaya street

**SOT**
Kopeysk,
26 Kosmonavtov street

⌃

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

https://chelpipegroup.com/about/

No image

Appx526

7/2/2020                                About us - usefull information | Chelpipe Group

Barcode:4168004-05 A-357-824 INV - Investigation  -

# Our history

## 2020

### TAPI (Turkmenistan – Afghanistan – Pakistan – India) trunkline

Approximately 200 km of the pipeline in Turkmenistan will be built using ChelPipe Group's 1,422 mm X70 steel pipes with ex all the qualification stages, and its supply conditions were the best of those offered by 94 bidders.

○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○ ○



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Appx527

7/2/2020    About us - usefull information | Chelpipe Group

Barcode:4168004-05 A-357-824 INV - Investigation  -

✕    Chelpipe Group catalog



Map data ©2020 Google, INEGI



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

https://chelpipegroup.com/about/    5/6

Appx528

Barcode:4168004-05 A-357-824 INV - Investigation  -

# EXHIBIT I-28

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

7/2/2020                                        Who we are

Barcode:4168004-05 A-357-824 INV - Investigation -
02/07/20 18:45 MOEX (RUR): 60.02 change in % 0.00   LSE (USD): 3.40 change in % 0.23



TMK / About Us / Who we are

## WHO WE ARE

TMK is one of the world's leading producers of tubular products for the oil and gas industry. Since 2009 it has been ranked first in the world by volume of pipes shipped. In 2018, TMK's pipe shipments totaled 4.01 million tonnes.

The Company operates production sites in Russia, Romania and Kazakhstan. TMK has steel pipe production capacity with the largest share of sales dedicated to oil country tubular goods (OCTG).

TMK enjoys strong market positions in the seamless OCTG segment. In 2018, our sales represented approximately 15% of the worldwide market for this pipe. The company is a national leader in Russia with 24% market share, including 63% of the seamless OCTG market. TMK is focused on meeting the demands of the global oil and gas industry, which makes up approximately 78% of the Company's customer base.

TMK's clients include leading oil and gas companies, such as Shell, ENI, Total, ExxonMobil, Occidental Petroleum, ONGC, Saudi Aramco, Anadarko, Marathon, Rosneft, Gazprom, Transneft, Lukoil and other global oil and gas companies.

The Company's major presence in the global market is secured by the extensive sales network that covers virtually all main global oil and gas production regions: the U.S., Canada, Latin America, Russia and the CIS, Europe, the Middle East, North and Sub-Saharan Africa and South-East Asia. TMK supplies products to more than 80 countries worldwide.

The Company's shares are traded on the London Stock Exchange as well as on Russia's MICEX-RTS trading floor.

## MORE ABOUT TMK

Open all     Close all

### PRODUCTS

TMK plants produce almost the entire range of existing pipes used in the oil-and-gas sector, the chemical and petrochemical industries, energy and machine-building, construction and municipal housing, shipbuilding, aviation and aerospace, and agriculture.



OCTG - Oil Country Tubular Goods - (seamless and welded); these are drill pipes, well casings, and tubing used in the drilling, equipping, and operation of oil and gas wells;

Line pipe (seamless and welded); used for infield pipelines, to deliver crude oil

Large-diameter welded pipes. This product range is used in the construction of trunk pipeline systems for the long-distance

**PIPES SOLD IN 2018 (THOUSAND TONNES) TOTAL**

**4,010**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

https://www.tmk-group.com/who_we_are                                        1/3

Appx530

7/2/2020                                         Who we are

Barcode:4168004-05 A-357-824 INV - Investigation -

and natural gas from fields to refineries, storage tank farms, loading terminals and distribution points;

Seamless industrial pipe; used in machine-building, hydraulics, boiler and process equipment, in the chemical industry and in the production of bearings;

transportation of natural gas, crude oil and petroleum products;

Welded industrial pipe; commodity product used in the construction, utilities and agricultural sectors.

TMK pipes are manufactured from carbon, stainless, and heat-resistant steels, titanium and nickel alloys.

**SEAMLESS PIPES**

**2,767**

**WELDED PIPES**

**1,243**

**Read more in the Products section**

## CORPORATE GOVERNANCE

TMK consistently strives to ensure that its activities respect best practices in the global standards of financial openness and transparency. This approach promotes the Company's credibility in the eyes of investors, partners and state authorities.

**Find out more**



## SOCIAL RESPONSIBILITY

TMK's social policy is founded on the principles of balancing the Company's and people's interests, local regulatory compliance, respect for human rights, non-discrimination, cooperation with trade unions and public organisations at TMK plants under annually renewed collective agreements.

**Find out more**



## CONTACT US

**TMK** 40/2a Pokrovka Street, Moscow, 105062, Russia

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Appx531

7/2/2020                                        Who we are

**Phone:** +7 (495) 775 7600 **Fax:** +7 (495) 775 7601 **E-mail:** tmk@tmk-group.com
Barcode:4168004-05 A-357-824 INV - Investigation  -

Appx532

7/2/2020                                    TMK Russian Division

Barcode:4168004-05 A-357-824 INV - Investigation -
02/07/20 18:45 MOEX (RUR): 60.02 change in % 0.00   LSE (USD): 3.40 change in % 0.23



TMK / TMK Divisions / TMK Russian Division

## TMK is a global supplier of a range of pipes for the oil and gas industry. It is Russia's largest manufacturer and exporter of steel pipes.

**Read more**

**TMK Russian Division**          TMK European Division



**EMPLOYEES**

**38,000**

**PRODUCTION PLANTS**

**7**

**PIPE MAKING CAPACITY**

**4,835 kt**

Appx533

Barcode:4168004-05 A-357-824 INV - Investigation  -

# TMK Russian Division

| REVENUE IN 2018 (MILLION USD) | SALES IN 2017 (THOUSAND TONNES) |
|---|---|
| **3,442** | **2,985** |

TMK Russian Division includes plants located in Russia and CIS countries. It is the biggest pipe producer in the region. The Division's enterprises manufacture almost all types of the pipe products: seamless oil country tubular goods (OCTG), seamless and welded line pipe, seamless and welded industrial pipe, welded large diameter pipe.

Our priority is to produce high-tech and high value-added products such as premium connection pipe including lubricant-free coating for threaded connections – GreenWell as well as vacuum insulated and plain-end tubing made of 13 Cr super-chromesteel with gas-tight premium threaded connections.

Among the Division's customers are the biggest Russian companies such as Rosneft, Gazprom, Surgutneftegaz and Lukoil.



### Volzhsky Pipe Plant

**(Volzhsky, Volgograd Region, Russia)**
The Volzhsky Pipe Plant manufactures seamless pipe for the oil and gas, chemical, petrochemical, automotive, machine-building and thermal energy sectors. It also manufactures spirally and longitudinally welded large diameter pipe for the construction and operation of oil and gas pipelines.



### Seversky Pipe Plant

**(Polevskoy, Sverdlov Region, Russia)**
The main products of Seversky Tube Works are hot-rolled and welded steel pipe, both round and shaped. Pipe from Seversky Tube Works is widely used in the oil and gas industry and in the construction of various types of pipelines, as well as in the engineering, construction and utilities sectors.

### Sinarsky Pipe Plant

**(Kamensk-Uralsky, Sverdlov Region, Russia)**
Sinarsky Pipe Plant produces a wide range of OCTG — drill pipe, casing, tubing, as well as seamless hot-rolled and colddeformed pipe, stainless steel pipe, and vacuum insulated tubing (VIT). Products manufactured at the plant are used by oil and gas and machine-building companies, as well as by energy, construction and

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

7/2/2020                                    TMK Russian Division

Barcode:4168004-05 A-557-824 INV - Investigation  -

utilities companies.





### Taganrog Metallurgical Plant

**(Taganrog, Rostov Region, Russia)**

TAGMET manufactures almost all types of steel pipe, including high-strength pipe with special properties, corrosion-resistant pipe, pipe with gas-tight premium connections, drill pipe with welded tool joints, tubing, casing, couplings and shaped tubes. Products are used by oil and gas, machine-building, construction and utilities companies.



### TMK-CPW

**(Polevskoy, Sverdlov Region, Russia)**

TMK-CPW manufactures longitudinally welded large diameter pipe and industrial pipe. Products are used for the production and transport of oil and gas, as well as in the construction industry.



### TMK-Kaztrubprom

**(Uralsk, Western Kazakhstan Region, Kazakhstan)**

TMK-Kaztrubprom produces tubing and casing, with premium connections with a diameter ranging from 60.3 mm to 177.8 mm, which are used in the oil and gas industry.



### TMK-INOX

**(Kamensk-Uralsky, Sverdlov Region, Russia)**

TMK-INOX produces cold-rolled, hot-rolled, and welded stainless pipe and tube according to international standards DIN EN, ASTM, the Russian standards and specifications.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Appx535

7/2/2020                                          TMK Russian Division

Barcode:4168004-05 A-357-824 INV - Investigation  -

.

## CONTACT US

**TMK** 40/2a Pokrovka Street, Moscow, 105062, Russia

**Phone:** +7 (495) 775 7600 **Fax:** +7 (495) 775 7601 **E-mail:** tmk@tmk-group.com

Appx536

Barcode:4168004-05 A-357-824 INV - Investigation  -

# EXHIBIT I-29

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -



**G/ADP/N/350/CAN**

15 March 2021

(21-2096)                                                    Page: 1/23

**Committee on Anti-Dumping Practices**                    Original: English

### SEMI-ANNUAL REPORT UNDER ARTICLE 16.4
### OF THE AGREEMENT

#### Canada

Reproduced herewith is the semi-annual report for the period 1 July-31 December 2020 from **Canada**.

_____

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 AD/N/250/CAN

G/ADP/N/350/CAN - Investigation -

- 15 -

### ANNEXES

### DEFINITIVE ANTI-DUMPING MEASURES IN FORCE AS OF 31 DECEMBER 2020 (NOTE 5)

| Country/ Customs Territory | Product, investigation ID number | Measure(s) | Date of original imposition; publication reference | Date(s) of extension; publication reference(s) |
|---|---|---|---|---|
| Argentina | Sucker rods 2 SR2 2019 IN/AR (*) | Suspension Agreement | 20.03.2020[1] | - |
| Belarus | Certain concrete reinforcing bar RB2 2016 IN/BY (*) | Duties | 03.05.2017 C.Gaz.2017.I.151.19 | - |
| Brazil | Sucker rods 2 SR2 2019 IN/BR (*) | Suspension Agreement | 20.03.2020[2] | - |
| | Certain hot-rolled steel sheet (previously hot-rolled carbon steel sheet) AD/1262/BR (*) | Duties | 17.08.2001 C.Gaz.2001.I.135.34 | 16.08.2006 C.Gaz.2006.I.140.34 15.08.2011 C.Gaz.2011.I.145.35 12.08.2016 C.Gaz.2016.I.150.35 |
| | Certain copper tube AD/1401/BR (*) | Duties | 18.12.2013 C.Gaz.2014.I.148.01 | 25.09.2019 C.Gaz.2019.I.153.40 |
| | Certain steel plate AD/1402/BR (*) | Duties | 20.05.2014 C.Gaz.2014.I.148.22 | 13.03.2020 C.Gaz.2020.I.154.12 |
| Bulgaria | Certain hot-rolled steel plate (previously hot-rolled carbon steel plate) AD/1304/BG (*) | Duties | 09.01.2004 C.Gaz.2004.I.138.03 | 08.01.2009 C.Gaz.2009.I.143.03 07.01.2014 C.Gaz.2014.I.148.03 31.10.2019 C.Gaz.2019.I.153.45 |
| China | Certain hot-rolled steel plate (previously hot-rolled carbon steel plate) AD/1139/CN | Duties | 27.10.1997 C.Gaz.1997.I.131.45 | 10.01.2003 C.Gaz.2003.I.137.03 09.01.2008 C.Gaz.2008.I.142.03 08.01.2013 C.Gaz.2013.I.147.03 09.08.2018 C.Gaz.2018.I.152.33 |
| | Certain hot-rolled steel sheet (previously hot-rolled carbon steel sheet) AD/1262/CN (*) | Duties | 17.08.2001 C.Gaz.2001.I.135.34 | 16.08.2006 C.Gaz.2006.I.140.34 15.08.2011 C.Gaz.2011.I.145.35 12.08.2016 C.Gaz.2016.I.150.35 |
| | Certain steel fasteners AD/1308/CN (*) | Duties | 07.01.2005 C.Gaz.2005.I.139.04 | 06.01.2010 C.Gaz.2010.I.144.03 05.01.2015 C.Gaz.2015.I.149.03 02.09.2020 C.Gaz.2020.I.154.37 |
| | Certain copper pipe fittings AD/1358/CN (*) | Duties | 19.02.2007 C.Gaz.2007.I.141.09 | 17.02.2012 C.Gaz.2012.I.146.24 28.11.2016 C.Gaz.2017.I.151.07 |
| | Certain seamless steel casing AD/1371/CN | Duties | 10.03.2008 C.Gaz.2008.I.142.12 | 11.03.2013 C.Gaz.2013.I.147.30 28.11.2018 C.Gaz.2018.I.152.49 |

---

[1] No Gazette notice due to COVID-19 related circumstances.
[2] No Gazette notice due to COVID-19 related circumstances.

Barcode:4168004-05 G/ADP/N/350/CAN - Investigation -

G/ADP/N/350/CAN

- 17 -

| Country/ Customs Territory | Product, investigation ID number | Measure(s) | Date of original imposition; publication reference | Date(s) of extension; publication reference(s) |
|---|---|---|---|---|
| Denmark | Certain refined sugar AD/1110/DK (*) | Duties | 06.11.1995 C.Gaz.1995.I.129.46 | 03.11.2000 C.Gaz.2000.I.134.47 02.11.2005 C.Gaz.2005.I.139.46 01.11.2010 C.Gaz.2010.I.144.47[3]; 30.10.2015 C.Gaz.2015.I.149.46 |
| | Certain steel plate AD/1402/DK (*) | Duties | 20.05.2014 C.Gaz.2014.I.148.22 | 13.03.2020 C.Gaz.2020.I.154.12 |
| Germany | Certain refined sugar AD/1110/DE (*) | Duties | 06.11.1995 C.Gaz.1995.I.129.46 | 03.11.2000 C.Gaz.2000.I.134.47 02.11.2005 C.Gaz.2005.I.139.46 01.11.2010 C.Gaz.2010.I.144.47[4] 30.10.2015 C.Gaz.2015.I.149.46 |
| Greece | Certain copper tube AD/1401/GR (*) | Duties | 18.12.2013 C.Gaz.2014.I.148.01 | 25.09.2019 C.Gaz.2019.I.153.40 |
| Hong Kong, China | Certain concrete reinforcing bar RB2 2016 IN/HK (*) | Duties | 03.05.2017 C.Gaz.2017.I.151.19 | - |
| India | Certain carbon steel welded pipe AD/1396/IN (*) | Duties | 11.12.2012 C.Gaz.2012.I.146.51 | 15.10.2018 C.Gaz.2018.I.152.43 |
| | Certain oil country tubular goods AD/1404/IN (*) | Duties | 02.04.2015 C.Gaz.2015.I.149.16 | 30.12.2020 C.Gaz.2021.I.155.3 |
| | Corrosion-resistant steel sheet COR 2018 IN/IN (*) | Duties | 21.02.2019 C.Gaz.2019.I.153.9 | - |
| Indonesia | Certain steel plate AD/1402/ID (*) | Duties | 20.05.2014 C.Gaz.2014.I.148.22 | 13.03.2020 C.Gaz.2020.I.154.12 |
| | Certain oil country tubular goods AD/1404/ID (*) | Duties | 02.04.2015 C.Gaz.2015.I.149.16 | 30.12.2020 C.Gaz.2021.I.155.3 |
| Italy | Certain steel plate AD/1402/IT (*) | Duties | 20.05.2014 C.Gaz.2014.I.148.22 | 13.03.2020 C.Gaz.2020.I.154.12 |
| Japan | Certain steel plate AD/1402/JP (*) | Duties | 20.05.2014 C.Gaz.2014.I.148.22 | 13.03.2020 C.Gaz.2020.I.154.12 |
| | Certain large diameter carbon and alloy steel line pipe AD/1408/JP (*) | Duties | 20.10.2016 C.Gaz.2016.I.150.44 | - |
| | Certain concrete reinforcing bar RB2 2016 IN/JP (*) | Duties | 03.05.2017 C.Gaz.2017.I.151.19 | - |
| Korea, Rep. of | Certain hollow structural sections AD/1303/KR (*) | Duties | 23.12.2003 C.Gaz.2004.I.138.02 | 22.12.2008 C.Gaz.2009.I.143.01 20.12.2013 C.Gaz.2014.I.148.01 16.10.2019 C.Gaz.2019.I.153.43 |
| | Certain copper pipe fittings AD/1358/KR (*) | Duties | 19.02.2007 C.Gaz.2007.I.141.09 | 17.02.2012 C.Gaz.2012.I.146.24 28.11.16 C.Gaz.2017.I.151.07 |

---

[3] The finding against Denmark was originally rescinded but this decision was reversed on appeal and duties were reinstated in accordance with the Tribunal's decision of 28 September 2012.

[4] The finding against Germany was originally rescinded but this decision was reversed on appeal and duties were reinstated in accordance with the Tribunal's decision of 28 September 2012.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-05/ADP/N350/GAN    G/ADP/N350/GAN Investigation -

- 18 -

| Country/ Customs Territory | Product, investigation ID number | Measure(s) | Date of original imposition; publication reference | Date(s) of extension; publication reference(s) |
|---|---|---|---|---|
| Korea, Rep. of (Cont'd) | Certain liquid dielectric transformers AD/1395/KR | Duties | 20.11.2012 C.Gaz.2012.I.146.48 | 31.05.2018 C.Gaz.2018.I.152.24 |
| | Certain carbon steel welded pipe AD/1396/KR (*) | Duties | 11.12.2012 C.Gaz.2012.I.146.51 | 15.10.2018 C.Gaz.2018.I.152.43 |
| | Certain copper tube AD/1401/KR (*) | Duties | 18.12.2013 C.Gaz.2014.I.148.01 | 25.09.2019 C.Gaz.2019.I.153.40 |
| | Certain steel plate AD/1402/KR (*) | Duties | 20.05.2014 C.Gaz.2014.I.148.22 | 13.03.2020 C.Gaz.2020.I.154.12 |
| | Certain concrete reinforcing bar AD/1403/KR (*) | Duties | 09.01.2015 C.Gaz.2015.I.149.03 | 14.10.2020 C.Gaz.2020.I.154.43 |
| | Certain oil country tubular goods AD/1404/KR (*) | Duties | 02.04.2015 C.Gaz.2015.I.149.16 | 30.12.2020 C.Gaz.2021.I.155.3 |
| | Certain fabricated industrial steel components FISC 2016 IN/KR (*) | Duties | 25.05.2017 C.Gaz.2017.I.151.22 | - |
| | Certain carbon and alloy steel line pipe LP2 2017 IN/KR | Duties | 04.01.2018 C.Gaz.2018.I.152.02 | - |
| | Certain cold-rolled steel CRS 2018 IN/KR (*) | Duties | 21.12.2018 C.Gaz.2019.I.153.01 | - |
| | Corrosion-resistant steel sheet COR 2018 IN/KR (*) | Duties | 21.02.2019 C.Gaz.2019.I.153.9 | - |
| Mexico | Sucker rods 2 SR2 2019 IN/MX (*) | Suspension Agreement | 20.03.2020[5] | - |
| | Certain copper tube AD/1401/MX (*) | Duties | 18.12.2013 C.Gaz.2014.I.148.01 | 25.09.2019 C.Gaz.2019.I.153.40 |
| Netherlands | Certain refined sugar AD/1110/NL (*) | Duties | 06.11.1995 C.Gaz.1995.I.129.46 | 03.11.2000 C.Gaz.2000.I.134.47 02.11.2005 C.Gaz.2005.I.139.46 01.11.2010 C.Gaz.2010.I.144.47[6] 30.10.2015 C.Gaz.2015.I.149.46 |
| Oman | Certain carbon steel welded pipe AD/1396/OM (*) | Duties | 11.12.2012 C.Gaz.2012.I.146.51 | 15.10.2018 C.Gaz.2018.I.152.43 |
| Pakistan | Carbon steel welded pipe 3 CSWP3 2018 IN/PK (*) | Duties | 15.02.2019 C.Gaz.2019.I.153.8 | - |
| Philippines | Carbon steel welded pipe 3 CSWP3 2018 IN/PH (*) | Duties | 15.02.2019 C.Gaz.2019.I.153.8 | - |
| Portugal | Certain concrete reinforcing bar RB2 2016 IN/PT (*) | Duties | 03.05.2017 C.Gaz.2017.I.151.19 | - |
| Romania | Certain hot-rolled steel plate (previously hot-rolled carbon steel plate) AD/1304/RO (*) | Duties | 09.01.2004 C.Gaz.2004.I.138.03 | 08.01.2009 C.Gaz.2009.I.143.03 07.01.2014 C.Gaz.2014.I.148.03 31.10.19 C.Gaz.2019.I.153.45 |

[5] No Gazette notice due to COVID-19 related circumstances.
[6] The finding against the Netherlands was originally rescinded but this decision was reversed on appeal and duties were reinstated in accordance with the Tribunal's decision of 28 September 2012.

Barcode:4168004-05 A-357-824 INV - Investigation  -

# EXHIBIT I-30

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

OCTG3 2021-05 A-357-824 INV - Investigation -

🍁 Canada Border
Services Agency

Agence des services
frontaliers du Canada

**OCTG3 2021 IN**

OTTAWA, July 15, 2021

# STATEMENT OF REASONS

**Concerning the initiation of an investigation into the dumping of**

**CERTAIN OIL COUNTRY TUBULAR GOODS
ORIGINATING IN OR EXPORTED FROM MEXICO**

# DECISION

Pursuant to subsection 31(1) of the *Special Import Measures Act*, the Canada Border Services Agency initiated an investigation on June 30, 2021, respecting the alleged injurious dumping of certain oil country tubular goods originating in or exported from Mexico.

Cet *Énoncé des motifs* est également disponible en français.
This *Statement of Reasons* is also available in French.

_____

Canada 🍁

Barcode:4168004-05 A-357-824 INV - Investigation  -

## TABLE OF CONTENTS

SUMMARY ...............................................................................................................................2

INTERESTED PARTIES ........................................................................................................2

    Complainants ........................................................................................................................2

    Other Canadian Producers ....................................................................................................3

    Trade Unions ........................................................................................................................3

    Exporters ..............................................................................................................................4

    Importers ..............................................................................................................................4

PRODUCT INFORMATION .................................................................................................4

    Definition .............................................................................................................................4

    Additional Product Information ............................................................................................5

    Product Characteristics and Uses .........................................................................................5

    Production Process ...............................................................................................................6

    Classification of Imports ......................................................................................................8

LIKE GOODS AND CLASS OF GOODS ..............................................................................8

THE CANADIAN INDUSTRY ..............................................................................................9

    Standing ...............................................................................................................................9

CANADIAN MARKET .........................................................................................................10

EVIDENCE OF DUMPING .................................................................................................12

    Normal Values ...................................................................................................................13

    Export Price .......................................................................................................................15

    Estimated Margin of Dumping ...........................................................................................16

EVIDENCE OF INJURY ......................................................................................................16

    CBSA's Conclusion – Injury ..............................................................................................26

THREAT OF INJURY ..........................................................................................................27

    CBSA's Conclusion – Threat of Injury ...............................................................................30

CAUSAL LINK – DUMPING AND INJURY/THREAT OF INJURY ...............................30

CONCLUSION ......................................................................................................................30

SCOPE OF THE INVESTIGATION ...................................................................................31

FUTURE ACTION ................................................................................................................31

RETROACTIVE DUTY ON MASSIVE IMPORTATIONS ...............................................32

UNDERTAKINGS .................................................................................................................32

PUBLICATION .....................................................................................................................33

INFORMATION ....................................................................................................................33

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation  -

## SUMMARY

[1]      On May 10, 2021, the Canada Border Services Agency (CBSA) received a written complaint from Evraz Inc. NA Canada (Regina, Saskatchewan) and Welded Tube of Canada Corp. (Concord, Ontario) (hereinafter, the Complainants) alleging that imports of certain oil country tubular goods (OCTG) originating in or exported from Mexico are being dumped. The Complainants alleged that the dumping has caused injury and is threatening to cause injury to the Canadian industry producing like goods.

[2]      On May 31, 2021, pursuant to paragraph 32(1)(a) of the *Special Import Measures Act* (SIMA), the CBSA informed the Complainants that the complaint was properly documented. The CBSA also notified the Government of Mexico that a properly documented complaint had been received.

[3]      The Complainants provided evidence to support the allegations that OCTG from Mexico has been dumped. The evidence also discloses a reasonable indication that the dumping has caused injury and is threatening to cause injury to the Canadian industry producing like goods.

[4]      On June 30, 2021, pursuant to subsection 31(1) of SIMA, the CBSA initiated an investigation respecting the dumping of OCTG from Mexico.

## INTERESTED PARTIES

**Complainants**

[5]      The name and address of the Complainants are as follows:

        EVRAZ Inc. NA Canada
        P.O. Box 1670
        100 Armour Road
        Regina, Saskatchewan S0G 5K0

        Welded Tube of Canada Corporation
        111 Rayette Road
        Concord, Ontario L4K 2E9

**EVRAZ Inc. NA Canada**

[6]      EVRAZ Inc. NA Canada (Evraz) is a vertically integrated steel pipe producer with four production facilities that manufacture oil country tubular goods (OCTG) located in Regina, Saskatchewan, as well as in Calgary, Camrose, and Red Deer, Alberta.[1] Evraz has operated in Canada since 2008 when it acquired the facilities formerly owned by IPSCO.[2]

---

[1] OCTG 3 Complaint narrative – paragraph 1 (NC).
[2] https://www.evraz.com/en/company/history/

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

**Welded Tube of Canada Corporation**

[7]     Welded Tube of Canada Corporation (Welded Tube or WTC) was founded in 1970 as a family-owned business with three facilities in Canada producing and finishing OCTG: a primary production facility located in Concord, Ontario, and two finishing facilities located in Welland and Port Colborne, Ontario. [3]

**Other Canadian Producers**

[8]     The following Canadian producer also manufactures OCTG:

> Algoma Tubes Inc.
> Prudential Steel ULC (closed in July 2020)[4]
> Tenaris Global Services (Canada) Inc.
> Hydril Canadian Company LP
> (The above companies are collectively referred to as "Tenaris Canada")
> 530 - 8th Avenue SW, Suite 400
> Calgary, Alberta  T2P 3S8

[9]     Tenaris Canada along with the Complainants account for all known domestic production.

**Trade Unions**

[10]     The following trade unions were identified for the various facilities producing like goods in Canada.

[11]     For Evraz:

> United Steel Workers 5890
> 26 –395 Park Street
> Regina, Saskatchewan S4N 3V9

> United Steel Workers 6673
> 2888 Glenmore Trail SE,
> Calgary, Alberta, T2C 4V7

> UNIFOR 551
> 6215 – 48th Avenue
> Camrose, Alberta T4V 0K4

---

[3] OCTG 3 Complaint narrative – paragraph 1 (NC).
[4] OCTG 3 Complaint narrative – paragraph 66 (NC).

Trade and Anti-dumping Programs Directorate                                              3

Iron Workers 805
106, 25 Chisholm Avenue
St. Albert, Alberta T8N 5A5

[12]    For Welded Tube:

United Steel Workers 8328
25 Cecil Street
Toronto, Ontario M5T 1N1

UNIFOR 199
124 Bunting Road
St. Catharines. Ontario, L2P 3G5

**Exporters**

[13]    The CBSA identified two potential exporters of the subject goods from CBSA import documentation and from information submitted in the complaint. The potential exporters were asked to respond to the CBSA's Dumping Request for Information (RFI).

**Importers**

[14]    The CBSA identified two potential importers of the subject goods from CBSA import documentation and from information submitted in the complaint. The potential importers were asked to respond to the CBSA's Importer RFI.

## PRODUCT INFORMATION

**Definition**

[15]    For the purpose of this investigation, subject goods are defined as:

*Oil country tubular goods, which are casing, tubing and green tubes made of carbon or alloy steel, welded or seamless, heat treated or not heat treated, regardless of end finish, having an outside diameter from 2 ⅜ inches to 13 ⅜ inches (60.3 mm to 339.7 mm), meeting or supplied to meet American Petroleum Institute specification 5CT or equivalent and/or enhanced proprietary standards, in all grades, excluding drill pipe, pup joints, couplings, coupling stock and stainless steel casing, tubing or green tubes containing 10.5 percent or more by weight of chromium, originating in or exported from the United Mexican States.*

---

Trade and Anti-dumping Programs Directorate            4

Barcode:4168004-05 A-357-824 INV - Investigation -

**Additional Product Information**

[16]    For greater certainty, the term "green tube" refers to unfinished casing, tubing, or other tubular products (including upgradable OCTG that may or may not already be tested, inspected, and/or certified) originating in or exported from Mexico and imported for use in the production or finishing of OCTG meeting final specifications, including grade and connections, required for use downhole. Green tubes, as they are commonly referred to in the OCTG industry, are intermediate or in process tubing and casing which require additional processing, such as threading, heat treatment and testing, before they can be used as fully finished oil and gas well casing or tubing in end-use applications.

[17]    For greater clarity, the product definition does not include green tubes originating in or exported from Mexico which are upgraded in the manner described above in an intermediate country prior to being exported to Canada for purposes of this dumping investigation. The CBSA considers these high-strength tubing and casing to originate in the intermediate country for purposes of the investigation.

[18]    Pup joints are essentially short lengths of OCTG used for spacing in a drill string, and these are excluded where their length is 12 feet or below (with a three-inch tolerance), as defined in the API 5CT specification.

[19]    Furthermore, accessory products used in conjunction with downhole OCTG tubing and casing strings such as cross-over joints, marker joints, elbows etc. are not covered by the product definition, nor are further manufactured products which use OCTG as inputs to their production such as vacuum insulated tubing (VIT). Coiled tubing is also not part of the product definition.

**Product Characteristics and Uses** [5]

[20]    Casing is used to prevent the walls of the bored hole from collapsing, both during drilling and after the well has been completed. Tubing is used to convey oil and gas to the surface.

[21]    As noted above, subject OCTG may be manufactured by the seamless or welded process. Typical casing and tubing end finishes include plain end, beveled, external upset ends, threaded, or threaded and coupled (including proprietary premium or semi-premium connections).

---

[5] OCTG 3 Complaint narrative – paragraphs 7 – 12 (NC).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

[22]    OCTG must be able to withstand outside pressure and internal yield pressures within the well. In addition, OCTG must have sufficient joint strength to hold the weight of the pipe string and must be equipped with threads sufficiently tight to contain the well pressure where lengths are joined. Threading may be performed by the manufacturer or a third-party threading operation. Various factors limit the total amount of open hole that can be drilled at any one time, and it may be necessary to set more than one string of OCTG concentrically for certain portions of the well depth.

[23]    Subject OCTG are supplied to meet at a minimum API specification 5CT. OCTG from Mexico is supplied in all grades including and not limited to, H40, J55, K55, N80, L80, L80 HC, L80 LT, L80 SS, C90, C95, C110, P110, P110 HC, P110 LT, T95, T95 HC, and Q125, or proprietary grades manufactured as substitutes for, or enhancements to, these specifications. The grade numbers define the minimum yield strength required of the grade in thousands of pounds per square inch (ksi).

[24]    Heat-treated grades are more sophisticated higher strength grades of pipes used in horizontal applications, deeper wells, and more severe environments such as low temperature services, sour service, heavy oil recovery, etc. These grades are made beginning with the use of a specific chemistry in the steel (either in billet for the seamless process or the steel coil in the ERW process) and are further-processed with heat treatment to attain certain combinations of mechanical properties and/or resistance to corrosion and environmental cracking.

[25]    For example, maximum strength (N80, P110, Q125), high-strength with lower ductility (normally proprietary enhancements of API grades), or high-strength combined with resistance to corrosion and environmental cracking (L80, C90, C95, C110, T95 and proprietary enhancements).

[26]    Semi-premium and premium connections similarly enhance the function of an OCTG string by providing additional performance and/or sealing characteristics which may be required in more demanding applications.

**Production Process** [6]

[27]    OCTG casing and tubing are made on the same production equipment. Production may be by either the seamless or the welded process.

[28]    The seamless process for producing OCTG begins with the formation of a central cavity in a sound solid steel billet to create a shell. The shell is then rolled on a retained mandrel and reduced in a stretch reduction mill to produce the finished size before cooling on a walking beam cooling bed.

---

[6] OCTG 3 Complaint narrative – paragraphs 13 – 20 (NC).

---

Trade and Anti-dumping Programs Directorate                                        6

Barcode:4168004-05 A-357-824 INV - Investigation -

[29]     The welded process begins by slitting flat hot-rolled steel in coil form of a pre-determined thickness (skelp) to the proper width required to produce the desired diameter of pipe. The skelp is then sent through a series of forming rolls that bend it into a tubular shape. As the edges of the skelp come together under pressure in the final forming rolls, an electric current is passed between them. The resistance to the current heats the edges of the skelp to the welding temperature, and the weld is formed as the two edges are fused together. OCTG produced using the welded process is also known as electric-resistance welded (ERW) OCTG.

[30]     Pipe that is formed by either the seamless or the ERW methods is then cut to length. Depending on the API or proprietary specifications needed, OCTG may also be heat-treated at this point. The product is then sent to the finishing line where it is beveled and threaded on both ends. Tubing may undergo a separate process of upsetting and normalizing prior to threading. Finally, a coupling and coupling protector are applied to one end of the pipe and a thread protector is applied to the other end before it is ready for shipment. Finishing operations also include cooling, straightening, facing, testing, coating, marking, and/or bundling.

[31]     Evraz and Welded Tube both employ the ERW production process. Specifically, Evraz produces specific OCTG products at the following four locations.

[32]     In Regina, Saskatchewan, Evraz produces ERW plain-end tubing in sizes ranging from 2.375 inches to 3.5 inches in outside diameter (OD).

[33]     In Calgary, Alberta, Evraz produces ERW casing, threaded and coupled with API connections, in sizes ranging from 4.5 inches to 13.375 inches in OD, as well as ERW tubing, threaded and coupled with API connections, in sizes ranging from 2.375 inches to 3.5 inches in OD.

[34]     In Camrose, Alberta, Evraz produces ERW plain-end casing in sizes ranging from 6.625 inches to 16 inches in OD.

[35]     Finally, in Red Deer, Alberta, Evraz produces ERW casing, threaded and coupled with both API and proprietary (premium and semi-premium) connections, in sizes ranging from 4.5 inches to 12.75 inches in OD.

[36]     Plain-end products are finished at either the Red Deer or the Calgary facilities. Finishing activities at these locations include heat treatment, as well as testing, inspection, measurement, and certification. In addition, threading and coupling for API, premium, or semi-premium connections takes place at the Red Deer facility and threading and coupling for API connections takes place at the Calgary facility.

[37]     As a result of production at each of these facilities, Evraz is capable of producing ERW OCTG in grades including API 5CT H40, J55, L80, L80 HC, L80 HCI, L80 RY, N80, P110, P110 HC, P110 HCI, P110 RY and other proprietary grades.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

[38]    Welded Tube produces and finishes OCTG casing for the Canadian market at three production facilities in Canada. Welded Tube's primary pipe production facility is in Concord, Ontario, where it produces, among other products, hollow structure sections and welded OCTG green tube for further processing into finished casing.

[39]    The OCTG green tube produced at the Concord facility is transferred to the facility in Welland, Ontario for quenching, tempering, threading and coupling, and other finishing steps such as further testing and inspection. The output of the Welland facility therefore is finished API 5CT casing in sizes ranging from 4.5 inches to 9.625 inches OD, and up to 0.475 inches in wall thickness, in grades including H40, J55, N80, L80, L80 HC, P110, P110 HC, and proprietary grade WTC80, threaded and coupled with API and semi-premium connections.

[40]    At its third facility, located in Port Colborne, Ontario, Welded Tube performs threading and coupling operations and other finishing steps such as further testing and inspection. The output of the Port Colborne facility therefore is finished API 5CT casing in sizes ranging from 4.500 inches to 9.625 inches OD, and up to 0.475 inches in wall thickness, in grades including H40, J55, N80, L80, L80 HC, EP L80, CY P110, P110, P110 HC, HP P110, and proprietary grade WTC80, threaded and coupled with API and semi-premium connections.

**Classification of Imports** [7]

[41]    The allegedly dumped goods are normally classified under the following tariff classification numbers:

| | | |
|---|---|---|
| 7304.29.00.11 | 7304.29.00.51 | 7306.29.00.19 |
| 7304.29.00.19 | 7304.29.00.59 | 7306.29.00.21 |
| 7304.29.00.21 | 7304.29.00.61 | 7306.29.00.31 |
| 7304.29.00.29 | 7304.29.00.69 | 7306.29.00.29 |
| 7304.29.00.31 | 7304.29.00.71 | 7306.29.00.39 |
| 7304.29.00.39 | 7304.29.00.79 | 7306.29.00.61 |
| 7304.29.00.41 | 7306.29.00.11 | 7306.29.00.69 |
| 7304.29.00.49 | | |

[42]    The listing of tariff classification numbers is for convenience of reference only. The tariff classification numbers may include non subject goods. Also, subject goods may fall under tariff classification numbers that are not listed. Refer to the product definition for authoritative details regarding the subject goods.

## LIKE GOODS AND CLASS OF GOODS

[43]    Subsection 2(1) of SIMA defines "like goods" in relation to any other goods as goods that are identical in all respects to the other goods, or in the absence of any identical goods, goods the uses and other characteristics of which closely resemble those of the other goods.

---

[7] OCTG 3 Complaint – paragraph 21 (NC).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

[44]    In considering the issue of like goods, the Canadian International Trade Tribunal (CITT) typically looks at a number of factors, including the physical characteristics of the goods, their market characteristics, and whether the domestic goods fulfill the same customer needs as the subject goods.

[45]    As noted in the complaint, the CITT has consistently determined that welded and seamless OCTG are like goods, and that OCTG of different grades are not separate classes of goods.[8] Welded and seamless OCTG have similar characteristics and generally compete with one another in the domestic market.

[46]    OCTG casing and tubing are made to the same minimum API 5CT specifications and/or to proprietary equivalent/enhanced specifications, and are both used in down hole well applications. Casing and tubing are produced on the same equipment and have the same channels of distribution.

[47]    Although the goods produced by the Canadian industry may or may not be considered identical in all respects to the subject goods imported from Mexico, the CBSA has concluded that the Canadian goods closely resemble the subject goods. Further, after reviewing the physical characteristics of the goods, the end-uses and all other relevant factors, the CBSA is of the opinion that the subject goods constitute only one class of goods.

## THE CANADIAN INDUSTRY

[48]    The domestic industry is comprised of 3 producers: the Complainants and Tenaris Canada, which is divided into Algoma Tubes (Sault Ste. Marie, Ontario) and Tenaris Hydril (Nisku, Alberta). Prudential Steel was also part of the Tenaris Canada group of companies until it was closed in July 2020.[9]

**Standing**

[49]    Pursuant to subsection 31(2) of SIMA, the following conditions must be met in order for an investigation to be initiated:

(a) the complaint is supported by domestic producers whose production represents more than 50% of the total production of like goods by those domestic producers who express either support for or opposition to the complaint; and,

(b) the production of the domestic producers who support the complaint represents 25% or more of the total production of like goods by the domestic industry.

---

[8] CITT Dumping and Subsidizing *Findings and Reasons* on Oil Country Tubular Goods, April 17, 2015, paragraph 42.
[9] OCTG 3 Complaint narrative – paragraph 66 (NC).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

[50]    SIMA provides that where a domestic producer is an importer of, or is related to an exporter or importer of, allegedly dumped or subsidized goods, any such producer may be excluded from the definition of "domestic producers", for purposes of determining the standing under subsection 31(2). Similarly, subsection 31(3) stipulates that such producers may also be excluded from the definition of "domestic industry," for purposes of standing.

[51]    In the present case, the two supporting domestic producers collectively account for more than 25% of the production of like goods in Canada, with the only other remaining domestic producer (Tenaris Canada)[10] being related to the importer (TGS Canada) of the allegedly dumped goods, as well as being related to the sole exporter (Tenaris Tubos de Acero de Mexico SA) of the goods in question.

[52]    As such, for purposes of standing, Tenaris Canada was excluded from the definition of "domestic producer" as per the aforementioned SIMA provisions. This means that the Complainants satisfy the requirements for standing under both paragraphs 31(2)(a) and 31(2)(b) of SIMA.

[53]    Based on the above, the requirements for standing as set out in subsection 31(2) of SIMA are satisfied.

## CANADIAN MARKET

[54]    The Complainants estimated the domestic market by supplementing their own internal sales information and their estimates of Tenaris Canada's domestic sales from domestic production. Using Statistics Canada data and Global Affairs Canada import permit data, the Complainants estimated the total volume of imports of OCTG from Mexico, the United States and all other countries for the full years of 2017 to 2020 as well as January to April 2020 and 2021 respectively. Tenaris Canada's sales of Mexican imports were calculated based on the estimated imports and adjusted to account for estimated changes in inventory levels based on market intelligence and information available from prior proceedings before the CITT. [11]

[55]    The CBSA conducted its own independent review of the import data from the CBSA's customs database for goods imported from January 2018 to March 31, 2021. The CBSA made adjustments to customs import data obtained through FIRM [12] to correct data entry errors and to remove non-subject imports from the database based on its review. In addition, the CBSA also reviewed goods description reports generated from the Accelerated Commercial Release Operations Support System (ACROSS) database for goods imported from January 2020 to March 31, 2021.

---

[10] This is inclusive of Algoma Tubes, Tenaris Hydril and Tenaris Prudential facilities, which are collectively referred to as Tenaris Canada.
[11] OCTG 3 Complaint Narrative (NC) – paragraph 160; Exhibit 5-01 (PRO).
[12] Facility for Information Retrieval Management (FIRM)

---

Trade and Anti-dumping Programs Directorate                                    10

Barcode:4168004-05 A-357-824 INV - Investigation -

[56]     The table below summarizes the CBSA's estimate of imports:

**TABLE 1**
**CBSA'S ESTIMATES OF IMPORTS**
**(EXPRESSED AS A PERCENTAGE OF VOLUME)**

| Source* | 2018 | 2019 | 2020 | Q1-2020 | Q1-2021 |
|---|---|---|---|---|---|
| *OCTG 1* | 5.1% | 2.6% | 1.5% | 1.0% | 0.0% |
| *OCTG 2* | 7.0% | 13.9% | 2.2% | 4.1% | 0.0% |
| *Seamless Casing* | 6.6% | 1.0% | 1.5% | 2.8% | 0.0% |
| **Mexico** | **22.0%** | **14.1%** | **20.9%** | **20.5%** | **32.8%** |
| United States | 36.8% | 39.8% | 41.0% | 46.8% | 37.3% |
| Other | 22.5% | 28.6% | 32.9% | 24.8% | 30.0% |
| **Total Import Volume**** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |

  \* References to *OCTG 1, OCTG 2 and Seamless Casing* are references to the CBSA's current measures in force on OCTG from other countries (https://www.cbsa-asfc.gc.ca/sima-lmsi/mif-mev/menu-eng.html).
\*\* Some totals may not add to 100% due to rounding.

[57]     Detailed information regarding the volume and value of imports of OCTG and domestic production cannot be divulged for confidentiality reasons. The CBSA, however, has prepared the following table to show the estimated import share of subject goods in Canada as well as the Canadian market as a whole.[13]

---

[13] OCTG3 Complaint Analysis, Table 9.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

**TABLE 2**
**CBSA'S ESTIMATE OF APPARENT CANADIAN MARKET**
**(EXPRESSED AS A PERCENTAGE OF VOLUME)**

| Source* | 2018 | 2019 | 2020 | Q1-2020 | Q1-2021 |
|---|---|---|---|---|---|
| Complainants | 27.0% | 29.8% | 24.0% | 27.5% | 19.5% |
| Tenaris Canada | 26.6% | 27.4% | 31.8% | 34.4% | 36.0% |
| **Total Sales - Canadian Production [1]** | **53.5%** | **57.2%** | **55.8%** | **61.9%** | **55.5%** |
| *OCTG 1* | 3.2% | 1.5% | 0.8% | 0.6% | - |
| *OCTG 2* | 4.4% | 8.1% | 1.2% | 2.1% | - |
| *Seamless Casing* | 4.1% | 0.6% | 0.9% | 1.5% | - |
| **Mexico** | **13.7%** | **8.2%** | **11.8%** | **10.8%** | **18.8%** |
| United States [2] | 7.0% | 7.7% | 10.9% | 10.2% | 8.5% |
| All Other Countries | 14.0% | 16.7% | 18.6% | 13.0% | 17.2% |
| **Total Apparent Canadian Market**** | **100%** | **100%** | **100%** | **100%** | **100%** |

\* References to *OCTG 1, OCTG 2 and Seamless Casing* are references to the CBSA's current measures in force on OCTG from other countries (https://www.cbsa-asfc.gc.ca/sima-lmsi/mif-mev/menu-eng.html).

\*\* Some percent totals may not add to 100% due to rounding

*Note 1:  From Exhibit 5-1(PRO) of Complaint. Includes Evraz, WTC and Tenaris Canada (Est.)*

*Note 2:  Unlike the CBSA import table above, the Estimated Canadian Market Table has been adjusted to reflect re-exported goods by WTC as reported by the Complainants.*

[58]    The CBSA will continue to gather and analyze information on the volume of imports during the period of investigation of May 1, 2020 to April 30, 2021, as part of the preliminary phase of the dumping investigation and will refine these estimates.

## EVIDENCE OF DUMPING

[59]    The Complainants alleged that the subject goods from Mexico have been injuriously dumped into Canada. Dumping occurs when the normal value of the goods exceeds the export price to importers in Canada.

[60]    Normal values are generally based on the domestic selling price of like goods in the source of export where competitive market conditions exist or as the aggregate of the cost of production of the goods, a reasonable amount for general, administrative, selling (GS&A), and other costs, and a reasonable amount for profits.

[61]    The export price of goods sold to importers in Canada is generally the lesser of the exporter's selling price and the importer's purchase price, less all costs, charges and expenses resulting from the exportation of the goods.

Trade and Anti-dumping Programs Directorate                                    12

Appx555

[62]    Estimates of normal values and export prices by both the Complainants and the CBSA are discussed below.

**Normal Values**

<u>**Complainants' Estimates**</u>

[63]    The Complainants have indicated that they were unable to find any publicly available home market pricing for OCTG sales in Mexico, and as such, the Complainants provided estimated normal values using a constructed cost approach based on the methodology prescribed under paragraph 19(b) of SIMA,[14] calculated based on the aggregate of estimates of the cost of production of the subject goods, a reasonable amount for GS&A, and other costs, and a reasonable amount for profits. The Complainants' estimated normal value, based on the methodology in paragraph 19(b) of SIMA, was constructed as detailed in the following paragraphs.

[64]    A group of benchmark products were selected for normal value estimations. These products are representative of the Complainants' sales of like goods in Canada.[15]

[65]    Quarterly costs of production were estimated based on Evraz's own quarterly cost information adjusted to reflect estimated differences in labour and scrap steel input costs in Mexico.[16] Evraz's costing information used in normal value estimations taken from their accounting systems was substantiated via reconciliations of sample costs to Evraz's accounting data.[17] Where there was no production of a particular model in a particular quarter, the Complainants used the costs from the most recent prior quarter.[18]

[66]    Raw material costs, with the exception of scrap costs, were based on the Complainants' own costs. With respect to scrap costs, as Tenaris Tubos de Acero de Mexico SA (TAMSA) also manufactures billets from scrap and sponge iron, the Complainants have used scrap pricing published in the trade publication Fastmarkets American Metal Market (AMM) converted to Canadian dollar per tonne.[19] To assist the CBSA in normal value estimations, the Complainants also provided estimations of the cost differences between various kinds of end finishes (i.e. standard API, semi-premium, and premium).[20]

---

[14] OCTG 3 Complaint narrative – paragraphs 88-89 (NC).
[15] OCTG 3 Complaint narrative – paragraph 90 (NC).
[16] OCTG 3 Complaint narrative – paragraph 91 (NC); Exhibit 6-06 (PRO).
[17] OCTG 3 Complaint narrative – paragraph 91 (NC); Exhibits 6-07a through 6-07f (PRO).
[18] OCTG 3 Complaint narrative – paragraph 91 (NC); Exhibit 6-06 (PRO).
[19] OCTG 3 Complaint narrative – paragraph 92 (NC); Exhibit 6-03 (PRO), 6-15 (PRO).
[20] OCTG 3 Complaint narrative – paragraphs 92-93 (NC); Exhibit 6-05 (PRO).

---

Trade and Anti-dumping Programs Directorate                                                                13

[67]    Labour costs were estimated based on Evraz's direct labour costs, adjusted to reflect wage differences between Canada and Mexico. This downward adjustment was calculated based upon publicly available information reported by the Instituto Nacional de Estadistica y Geografia in Mexico and by Statistics Canada. The resulting labour adjustment factor was 13.6% of Evraz's costs.[21]

[68]    Overhead costs were based on Evraz's overhead costs with the labour component of overhead adjusted using the same methodology as for labour costs.[22] The Complainants made reasonable adjustments to Evraz's overhead costs.[23]

[69]    Public financial statements for Tenaris, S.A.[24] covering the period from Q2-2020 to Q1-2021 were used in estimating GS&A and financial expenses. The resulting GS&A rate is 27.7% and the resulting rate for financial and other expenses is 0.1%.[25]

[70]    For the amount for profits, the Complainants submitted that while Q1-2021 was the most recent quarter in which Tenaris S.A. posted a profit, it was too short a time period to assess profitability for the dumping period of review. As such, Tenaris S.A.'s 2019 annual profit of 13.2% was used in estimating normal values.[26]

[71]    The Complainants contended that due to the differences in production processes (i.e. the Complainants produce welded OCTG while the subject goods are seamless OCTG), an upward adjustment was applied to account for the difference in the costs of production between producing seamless and welded OCTG.[27]

## CBSA's Estimates

[72]    The CBSA noted that home market pricing for OCTG sales in Mexico is not publicly available. Based on the information available to the Complainants, the CBSA found the normal value estimates based on the methodology of paragraph 19(b) of SIMA to be reasonable and representative.

[73]    The methodology used by the Complainants to estimate normal values under their cost-plus approach described above was accepted by the CBSA. As discussed, the Complainants provided quarterly normal value estimates based on a group of benchmark products that are representative of the like goods produced by the Complainants.

---

[21] OCTG 3 Complaint narrative – paragraph 94 (NC); Exhibits 6-06 (PRO), 6-08 through 6-10 (NC), 6-15 (PRO).
[22] OCTG 3 Complaint narrative – paragraph 95 (NC); Exhibits 6-06 (PRO), 6-10 (NC), 6-15 (PRO).
[23] OCTG 3 Complaint narrative – paragraph 96 (NC); Exhibit 6-06 (PRO), 6-15 (PRO).
[24] Tenaris S.A. is the parent company of Tenaris Canada and TAMSA
[25] OCTG 3 Complaint narrative – paragraph 97 (NC); Exhibits 6-11 (NC), 6-12 (NC), 6-15 (PRO).
[26] OCTG 3 Complaint narrative – paragraph 98 (NC); Exhibits 6-11 (NC), 6-12 (NC), 6-15 (PRO).
[27] OCTG 3 Complaint narrative – paragraph 99 (NC); Exhibits 6-13 (PRO), 6-14 (PRO), 6-15 (PRO).

---

[74]     The CBSA used a selection of these benchmark products to estimate normal values for products it found to be exported during the period of review from Mexico, based on its review of customs import data.[28] In order to estimate a normal value for an imported good, the CBSA matched the imported product to one of the benchmark products for which the Complainants had estimated a normal value based on its grade, outside diameter, and end finish. Where there were no exact matches for an imported good sampled, the CBSA matched the good to a benchmark product that it determined to best resemble the characteristics of the imported good. Where needed, the CBSA adjusted normal values for purposes of accounting for the cost differences in producing different kinds of end finishes in accordance with the cost differences estimated by the Complainants.

[75]     The CBSA determined that the Complainants' constructed cost methodology was reasonable and as such, the CBSA's estimates of normal values are equal to the Complainants' estimates adjusted for cost differences between producing different kinds of end finishes where necessary.

**Export Price**

[76]     The export price of goods sold to an importer in Canada is generally determined in accordance with section 24 of SIMA as being an amount equal to the lesser of the exporter's sale price for the goods and the price at which the importer has purchased or agreed to purchase the goods adjusted by deducting all costs, charges, expenses, and duties and taxes resulting from the exportation of the goods.

[77]     The Complainants estimated export prices in accordance with section 24 of SIMA based on import data available from Statistics Canada for the period from June 1, 2020 to March 31, 2021.[29] The total value for duty and quantity information was used in estimating export prices.

[78]     Since multiple benchmark products (discussed above) produced by Evraz could fall within a single Tariff Classification Code, the Complainants weighted the volume of imports under the applicable Tariff Classification Code to each benchmark product within that Tariff Classification Code on an equal basis.[30]

---

[28]Databases are the Accelerated Commercial Release Operations Support System (ACROSS) and Facility for Information Retrieval Management (FIRM).

[29] OCTG 3 Complaint narrative – paragraphs 86-87 (NC); Exhibit 6-01 (PRO). The Complainants believed that imports under Tariff Code 7304.29.00.39 were misclassified and reclassified to Tariff Code 7304.29.00.29 for purposes of their export price estimations. Tariff Code 7304.29.00.39 relates to OCTG with a diameter greater than 298.5 mm (11.75"). Over the period from June 1, 2020 to March 31, 2021, Statistics Canada reported imports of over 7,700 tonnes, which is much higher than Evraz's estimated demand for carbon and alloy OCTG with a diameter greater than 298.5 mm.

[30] OCTG 3 Complaint narrative – paragraph 101 (NC); Exhibits 6-16 (PRO).

---

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

[79]     Given the large number of export prices calculated by the Complainants and the confidential nature of the associated product matching, the table of export prices has not been reproduced in this report, but was submitted in the complaint as a confidential exhibit.[31]

[80]     In estimating export prices for the purposes of initiation, the CBSA used the value for duty (VFD) and quantity reported in the customs database [32]for each individual shipment imported during the period of review. The CBSA made adjustments to the data to correct errors and to remove non-subject imports based on its review.

**Estimated Margin of Dumping**

[81]     The CBSA estimated the margin of dumping for Mexico by comparing the total estimated normal values based on the methodology of paragraph 19(b) of SIMA with the total weighted average estimated export prices in accordance with section 24 of SIMA for the period reviewed (April 1, 2020 to March 31, 2021).

[82]     The estimated margin of dumping for the period of review was 22.1%, expressed as a percentage of the estimated export price.

**EVIDENCE OF INJURY**

[83]     The Complainants alleged that the goods from Mexico have been dumped, and that the dumping has caused and is threatening to cause material injury to the domestic industry in Canada.

[84]     SIMA refers to material injury caused to the domestic producers of like goods in Canada. The CBSA has concluded that OCTG produced by the domestic industry are like goods to the subject goods from Mexico.

[85]     The Complainants have relied significantly on confidential declarations from three major arm's length distributors of OCTG in Canada, each of which has identified TAMSA as the source of dumping of OCTG into Canada which is causing injury to the Canadian market. [33]

[86]     Each of these declarations provided extensive information and allegations concerning the effects of injurious dumping of OCTG from Mexico, all of which is alleged to be produced by TAMSA.

---

[31] OCTG 3 Complaint – Exhibit 6-16 (PRO).
[32] Facility for Information Retrieval Management (FIRM)
[33] OCTG 3 Complaint – Exhibit 7-05 (PRO): Declaration of Bill Thomas and Steve Sutton – Alberta Tubular Products (ATP); 19 pages; Exhibit 7-06 (PRO): Declaration of Henry Ewert and Greg Northcott – Hallmark Tubulars Ltd. (Hallmark); 22 pages; Exhibit 7-07 (PRO): Declaration of Gordon Kozak – Triumph Tubular & Supply Ltd. (Triumph); 26 pages.

Trade and Anti-dumping Programs Directorate                                              16

No Image

[87]     These declarations provide substantial corroborative support to the allegations the Complainants have made with respect to the alleged injury caused to the Canadian industry. This includes evidence the Complainants have provided in respect of: a substantial increase in subject imports; loss of market share; price undercutting and lost sales; price depression; price suppression; and negative impacts on: financial performance, employment, return on investments, production and capacity utilization.

[88]     The Complainants were also careful to acknowledge that the decline in the Canadian market has contributed to the injury it has sustained since early in 2020. However, the Complainants have argued and provided evidentiary support that "dumped Mexican imports were in and of themselves a cause of materially injurious volume effects over the period of investigation." [34]

**Major Proportion**

[89]     A condition that must be satisfied prior to initiation of an investigation is that there must be a reasonable indication that the dumping or subsidizing is causing injury to the domestic industry. Domestic industry is defined in subsection 2(1) of SIMA. Part of that definition refers to "domestic producers whose collective production of the like goods constitutes a major proportion of the total domestic production of the like goods..."

[90]     Although the term "major proportion" is not defined in either SIMA or the WTO Agreements, the CBSA has, for some time, been equating a "major proportion" with at least 25 to 30%. That is, in practice, it was required that the complaint contain evidence of injury to 25 to 30% of Canadian production. Therefore, the 25% rule required for standing, in most cases, will be satisfied in conjunction with the major proportion analysis.[35]

[91]     Similar to the approach when dealing with the standing issue, a producer may be disregarded from calculations when assessing the "major proportion" issue, if that producer is related to an importer or exporter of the allegedly dumped imports, or if the producer is itself an importer of the allegedly dumped or subsidized goods.

[92]     Given the earlier analysis that Tenaris Canada would not be considered part of the domestic producers for purposes of standing in subsection 31(2) of SIMA, the CBSA extended the same consideration in respect of injury to the major proportion of the domestic industry. Without Tenaris Canada factored into the equation, Evraz and Welded Tube account for 100% of the domestic industry for purposes of this complaint.

**Corporate Strategy and The Recent Substantial Increase in Subject Imports**

[93]     The Complainants cited their Canadian Market estimates as evidence of past and very recent surges in subject imports which they alleged have caused injury to the Canadian industry producing the like goods.

---

[34] OCTG 3 Complaint narrative – paragraph 157 (NC).
[35] SIMA Handbook – Section 4.1.4.2. "Major Proportion."

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

[94]     The backdrop to these sudden import surges over the period of review, is largely attributed to Tenaris's business model. Tenaris's mills do not operate with autonomy in determining their production schedules; and as such, the decision as to where goods are produced to satisfy sales are not at the sole discretion of the individual facilities. [36] This has previously been acknowledged by the CITT in past proceedings concerning OCTG:

"The Tribunal is also aware of the globally integrated business model by which Tenaris operates and the consequent flow of non-subject imports from Tenaris affiliates into the Canadian market. In this regard, the Tribunal notes that, while the volume of sales of domestically produced goods fell by 3 percent in 2012 (from 588,251 tonnes in 2011 to 569,983 tonnes in 2012), the producers' sales volume of non-subject imports increased by 69 percent in that same period." [37]

[95]     More recently, during the *Certain Steel Goods* Safeguard inquiry, the CITT noted Tenaris's business strategy which resulted in displacing Canadian production through its imports from TAMSA:

"Tenaris accounted for all of the domestic industry's imports from the subject countries during the POI, and a significant portion of these imports are from Tenaris' Mexican affiliate, TAMSA. The evidence before the Tribunal suggests that, while certain of these imports involved specialty products not made in Canada, a significant portion of these substitutable products (or similar products) could have been produced in Canada (by Tenaris or other domestic producers)." [38]

[96]     The recent closure of Prudential steel and subsequent dramatic increase in imports from Mexico in Q1-2021 of grades previously manufactured at the Prudential facility, are further evidence of this corporate strategy. The global inventory management model allows Tenaris to quickly switch from domestic production to imports to manage its efficiencies in order to hold existing and secure additional market share.

[97]     The CITT further noted that this strategy is not purely influenced by domestic facility availability:

"Tenaris' imports of subject goods from Mexico resulted from a corporate decision by Tenaris to idle its Canadian operations and supply the weak Canadian market with imports from TAMSA. Tenaris argued that it did so in order to maintain its market position and relationship with its clients during the period when its Canadian production facilities were suspended. However, although decreasing somewhat, significant volumes of subject imports from TAMSA continued into interim 2018, i.e., even after Tenaris' Canadian facilities had resumed operating." [39]

---

[36] OCTG 3 Complaint narrative – paragraph 217 (NC) – Certain Steel Goods Safeguard Transcript Excerpt.
[37] CITT Finding and Reasons: Oil Country Tubular Goods 2, NQ-2014-002 at para 168; June 18, 2015.
[38] OCTG 3 Complaint narrative – paragraph 117 (NC); Certain Steel Goods, GC-2018-001 (April 3, 2019), p. 84.
[39] OCTG 3 Complaint – paragraph 113 (NC); *Certain Steel Goods*, GC-2018-001 (April 3, 2019), p. 84-85.
https://decisions.citt-tcce.gc.ca/citt-tcce/s/en/418294/1/document.do

---

Trade and Anti-dumping Programs Directorate                                    18

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation  -

[98]    As noted by the Complainants, the CITT took the acknowledgment of this corporate strategy one step further to affirm that it was, in part, causing injury to the Canadian industry:

"Tenaris sought to justify its import strategy as a reasonable business and commercial strategy. That may be so, but the Tribunal cannot simply accept Tenaris' explanations as a valid consideration for not treating this strategy as having resulted in self-inflicted injury for the purpose of its analysis…Tenaris' imports from TAMSA and from other subject countries had the effect of displacing Canadian production… The replacement of domestic production by subject imports also means that the domestic industry is less able to benefit from economies of scale, thereby spreading domestic producers' fixed costs over a smaller base than would otherwise be the case. Thus, the evidence before the Tribunal indicates that a portion of any injury experienced by the domestic industry is self-inflicted." [40]

[99]    The CITT then summarized its injury analysis in the 2019 Safeguard hearing by stating:

"In its serious injury analysis, the Tribunal concluded that imports of the subject goods by the domestic industry have displaced domestic sales from domestic production during the POI, including in interim 2018. The evidence does not suggest that the domestic producers are likely to significantly curb their imports of the subject goods. First, as noted above, volumes of subject imports by the domestic industry were on an upward trend in interim 2018, increasing by 8 percent compared to interim 2017, and they accounted for a significant share of the subject imports. A substantial share of Tenaris' imports from Mexico during the POI were products that Tenaris itself could have manufactured in Canada or that other Canadian producers could have produced as substitutes. The Tribunal is of the view that Tenaris' subject country imports, including those from Mexico, are likely to continue at high volumes. There is no evidence that Tenaris is considering changing its current corporate approach of supplying the Canadian market with imports from TAMSA in Mexico in the foreseeable future. In light of the foregoing and in light of projected {weaker} market conditions, the Tribunal concludes that subject imports by the domestic industry are likely to continue at high volumes during the period relevant for its threat of injury assessment."

[100]    The Complainants acknowledged the enormous volume of subject imports in 2018 and the subsequent declines in 2019 and 2020, while pointing out that apparent Canadian market also decreased substantially over that same period. However, it is the more recent Q1-2021 period which they emphasize as the most concerning indicator of injury. The data provided by the Complainants indicated that "the absolute volume of imports from Mexico has since *increased* by 8% from 17,344 MT April YTD 2020 to 18,734 MT as of April YTD 2021." [41]

[101]    The CBSA's import data confirms a similar percentage increase in Q1-2021 over the same period in Q1-2020. This comparative increase is accompanied by a 32.8% share of imports based on volume that Mexico is estimated to hold in Q1-2021 as per Table 1. This is the largest import share for Mexico based on volume during the period of analysis.

---

[40] OCTG 3 Complaint – paragraph 115 (NC); Certain Steel Goods, GC-2018-001 (April 3, 2019), p. 85. https://decisions.citt-tcce.gc.ca/citt-tcce/s/en/418294/1/document.do
[41] OCTG 3 Complaint – paragraph 125 (NC).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

**Loss of Market Share**

[102]   The Complainants emphasized that in terms of the injury from subject imports, it is the relative levels of subject imports which are most telling rather than trends in absolute volumes. That is, the volume of imports of subject OCTG from Mexico relative to the domestic industry's production.[42]

[103]   The Complainants noted that "the period of sharpest increase in subject imports of OCTG from Mexico relative to domestic production started in the latter part of 2020 into 2021." [43]

[104]   The CBSA's data concerning apparent Canadian market mirrors the trend in Mexican imports growing as a ratio of the complainants' sales from domestic production.

[105]   The Complainants also stated that "the share of subject imports from Mexico also grew substantially relative to total imports of OCTG, from 22.4% in 2018 to 29.0% in interim 2021. With the exception of imports from the United States, subject imports from Mexico were by far the most significant source of OCTG imports from any country in 2020 and interim 2021." [44]

[106]   The CBSA's data does indicate that while the USA maintains a fairly steady share of OCTG imports, those from Mexico are growing significantly in import share. The share of Mexican imports relative to the overall apparent Canadian market has also grown over the same period with a growth from 8.2% in 2019 to 11.8% in 2020 and up to 18.8% in Q1-2021.[45]

[107]   Over the same period, the CBSA estimates that since 2019, the Complainants have been losing market share in Canada; from 29.8% in 2019 down to 24.0% in 2020 to 19.5% in Q1-2021.[46]

[108]   The Complainants contended that the CITT's finding in its recent *Certain Steel Goods* Safeguard investigation corroborates that Tenaris is gaining market share through TAMSA:

"This finding supports the conclusion that Tenaris used its Mexican imports to capture market share and that the imports were brought in to compete broadly with the industry's like goods (as opposed to filling a niche only)." [47]

---

[42] OCTG 3 Complaint – paragraph 126 (NC).
[43] OCTG 3 Complaint – paragraph 127 (NC).
[44] OCTG 3 Complaint narrative – paragraph 128 (NC).
[45] Table 2.
[46] Table 2.
[47] OCTG 3 Complaint narrative – paragraph 64 (NC).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No Image

Barcode:4168004-05 A-357-824 INV - Investigation -

[109]   In addition, the Complainants pointed out that the Tribunal cited the public questionnaire response of Pacific Tubulars, which reported that "imports from Mexico are the biggest component of imports into Canada and those imports will continue regardless of the order being rescinded or not. Mexican imports are the single biggest factor in displacing Canadian production." [48]

[110]   Based on the above and the CBSA's analysis of the evidence contained in the complaint, the CBSA is of the opinion that the evidence reasonably demonstrates the Complainants' loss of market share can, in part, be reasonably linked to the imports of the allegedly dumped subject goods.

**Price Undercutting and Lost Sales**

[111]   The Complainants have relied significantly on confidential declarations from three OCTG distributors to corroborate their allegations that Tenaris's Mexican OCTG is undercutting the price of like goods. ATP, Hallmark, and Triumph – distributors who quote customers and receive price feedback from end-users regarding their price levels on specific items on a regular basis – each individually affirmed that Tenaris's Mexican OCTG is the price leader in the market and consistently undercuts domestically-produced OCTG on a model-specific basis. [49]

[112]   The Complainants further alleged that Tenaris's dual position in the market as major importer of alleged dumped goods from Mexico and producer of like goods in Canada, exacerbates the injury to the Canadian industry as Tenaris is able to provide a broader range of bundled products that is a combination of domestic and imported OCTG in order to win entire bids.

[113]   Consequently, the injury sustained by the Canadian industry is amplified by dumped goods, which the Complainants alleged is making Tenaris's tenders, which can include both domestic and imported OCTG, more competitive, causing the Canadian industry to suffer a cascading effect of injury through lost sales than had the subject goods been completely separate negotiations from domestically produced goods.

[114]   This alleged effect is evident in the CBSA's Apparent Canadian Market analysis. The combination of estimated sales by Tenaris Canada from domestic production and imports from Mexico rose over the period of analysis as a percentage of the total apparent market. As noted in Table 2 of this report, in 2018, those combined sales accounted for 40.3% of the apparent market and climbed to 43.6% in 2020 and 54.8% in Q1-2021.

---

[48] OCTG 3 Complaint narrative – paragraph 65 (NC); Exhibit 5-03 (NC) – Pacific Tubulars ERQ Response for OCTG 2 Expiry Review, page 14 of 18; CITT Orders and Reasons: *Oil Country Tubular Goods 2*, RR-2019-006 at footnote 179.
[49] OCTG 3 Complaint narrative – paragraph 138 (NC).

---

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

[115]   The Complainants also provided 16 examples of lost sales where they were allegedly undercut by subject goods going back to 2018 and covered a material amount of estimated volume.[50] The sworn declarations from each of the three distributors as well as two other declarations from Evraz provided more detailed analysis of dumped subject goods and included additional evidence in the form of attachments which supported claims made in the declarations.

[116]   The Complainants further alleged that while seamless OCTG typically trades for a premium over OCTG produced by the ERW method, subject "imports are actually undercutting domestically produced welded OCTG in absolute or real terms. This is also likely to have (and to continue to have) a significantly depressive effect on the price of like goods as the market corrects to restore the historical seamless premium." [51]

[117]   As noted earlier, the Complainants also argued that "dumped Mexican imports were in and of themselves a cause of materially injurious volume effects over the period of investigation." [52]

[118]   This allegation is supported by the CBSA's estimate of the Apparent Canadian Market.

[119]   Based on the above and the CBSA's analysis of the evidence contained in the complaint, including the three confidential declarations from Canadian distributors of OCTG, the CBSA is of the opinion that the Complainants' evidence reasonably demonstrates the Complainants have faced significant price undercutting and as a result, have lost sales, both of which can reasonably be linked to the imports of the allegedly dumped subject goods.

**Price Depression and Suppression**

[120]   The Complainants stated that they have been forced to lower their prices to compete against the allegedly dumped pricing of the subject goods, which have continued to undercut their selling prices as discussed above. In the sworn declarations provided, the Complainants presented several examples where they lowered their price quotes given that they were competing against subject imports and still lost those sales.

[121]   The Complainants provided numerous examples of declines in average unit values (AUVs) over the Period of analysis as support to their argument that dumped subject goods have been depressing their pricing of OCTG in Canada. [53]

[122]   Also in support of their arguments, the Complainants made a reference to the recent CITT expiry review decision on OCTG 1, where the commodity nature of OCTG coupled with a depressed market was cited along with the ensuing effect this has with price sensitivity:[54]

---

[50] OCTG 3 Complaint narrative – paragraph 139 (NC).
[51] OCTG 3 Complaint narrative – paragraphs 143 (NC), 144(NC).
[52] OCTG 3 Complaint narrative – paragraph 157 (PRO).
[53] OCTG 3 Complaint narrative – paragraph 148 (NC).
[54] OCTG 3 Complaint narrative – paragraph 147 (NC).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

"In this regard, the Tribunal recalls that it has previously found that a price difference 'as small as 2 to 3% could sway a sale from one supplier to another.' In the present expiry review, the evidence is that purchasers are even more price-sensitive and thus even more inclined to seek out the lowest prices in the market. The evidence on the record indicates potential price undercutting substantially greater than 2-3 percent in the absence of the order.

As low-priced imports increase, domestic producers would be forced to lower their prices to compete and attempt to maintain their market share. In the previous expiry review, the Tribunal found that the likely increase in subject goods should the finding be rescinded would "likely drive down OCTG prices in the Canadian market, lowering the value of existing inventory and eroding the prices of the like goods." Given the likelihood of significant price undercutting found in this review, the Tribunal arrives at the same conclusion: the rescission of the order would likely result in significant price depression." [55]

[123]   Given the evidence of price undercutting discussed above, it is reasonable to believe that this undercutting, at prices which appear dumped, has also depressed prices as the Complainants struggle to compete with those prices by lowering their own. However, given the downturn in the OCTG market since early 2020, which saw dramatic declines in the demand for OCTG in the Canadian market, it is difficult to quantify how much of the price declines reported by the Complainants are attributable to the dumped subject goods.

[124]   The Complainants have also alleged that the dumped subject goods have suppressed their ability to raise prices to keep in step with rising costs. They alleged two types of evidence in respect of price suppression.

[125]   The first is the cost-price squeeze, whereby costs grow as a ratio of selling prices. The Complainants cited their financial reports in support of this allegation. [56]

[126]   Both Evraz and Welded Tube have faced increasing raw material input costs since 2020, with Evraz purchasing scrap and Welded Tube purchasing hot-rolled coil (HRC) in their OCTG production. To illustrate the significance of the cost increases, the Complainants stated that HRC prices increased from US$437/ton in August 2020 to US$1,375/ton in April 2021. [57]

[127]   The second evidence of price suppression alleged by the Complainants is at the account specific level. [58]

---

[55] *Oil Country Tubular Goods*, RR-2019-005 (December 10, 2020) at paragraph 82-83.
[56] OCTG 3 Complaint narrative – paragraph 151 (NC); Exhibit 5-05 (PRO): Consolidated Income Statements.
[57] OCTG 3 Complaint narrative – paragraph 152 (NC).
[58] OCTG 3 Complaint narrative – paragraph 153 (NC).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

[128]   With respect to price suppression, the CBSA is of the opinion that the evidence provided reasonably supports the Complainants' argument that the dumped subject goods have contributed to their inability to raise prices to offset rising raw material costs and to maintain margins. These raw material cost increases are unrelated to the downturn in the OCTG market and producers should have a reasonable expectation to pass on cost increases, which the evidence provided indicates they have been unable to do.[59]

**Negative Impact on Financial Performance**

[129]   According to the Complainants, the allegedly dumped subject imports have negatively impacted their financial performance, which can be attributed to the Complainants having lowered their prices in order to compete with the allegedly dumped subject imports.

[130]   Exacerbating the situation is that the injury sustained by the Complainants comes at a time when Tenaris Prudential, the closest local supplier, ceased its supply and left the market entirely.

[131]   Evraz stressed the importance of being "allowed to participate fully in any market recovery at the earliest possible time" as well as the "destructive impact of losses at key accounts." [60]

[132]   The Complainants asserted that "these trends in industry profitability need not have resulted, notwithstanding the significant market contraction experience over 2019 and 2020. But for the lost volumes and lost pricing sustained by the Complainants in head-to-head competition with Tenaris sales of dumped Mexican OCTG, the industry very well could have weathered the market downturn significantly better, even with reduced sales and production output on lower overall OCTG demand." [61]

[133]   In support of their assertion, the Complainants included a "but for" analysis which further demonstrated that even a minimal increase in their selling prices would have had significant effect on the their gross margins such as to not leave them in the current more perilous situation.[62]

[134]   Based on the above and the CBSA's analysis of the evidence contained in the complaint, the CBSA is of the opinion that the Complainants' evidence reasonably demonstrates that the imports of the allegedly dumped subject goods, which have undercut the domestic industry's prices, suppressed and depressed those prices and caused the domestic industry to lose market share, have subsequently had a negative impact on the Complainants' financial results.

---

[59] OCTG 3 Complaint – Exhibit 5-05 (PRO): Consolidated Income Statements.
[60] OCTG 3 Complaint narrative – paragraph 179 (NC).
[61] OCTG 3 Complaint narrative – paragraph 181 (NC).
[62] OCTG 3 Complaint narrative – paragraphs 199 – 200 (PRO); Exhibit 7-02 (PRO)

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

**Negative Impact on employment**

[135]   The Complainants stated that the negative impacts on financial performance experienced as a result of the importation of allegedly dumped subject goods, addressed in the previous section, have significantly impacted their ability to maintain optimal levels of employment.

[136]   The Complainants underscored the fact that Evraz, for example, maintained relatively stable employment levels.[63]

[137]   However, the alleged dumped Mexican OCTG imports, including the inventory draw down at the time of a severe market downturn in 2020, resulted in all of Evraz's OCTG mills being temporarily idled, affecting employees involved in OCTG production. While the Complainants concede that the impacts on employment in 2020 were due to the market downturn, "the extent to which layoffs were required and the length of time during which Evraz facilities remained idle was directly attributable to Tenaris' destructive importer conduct." [64]

[138]   The Complainants also provided examples of significant employment and operational impacts for Welded Tube. [65]

[139]   Based on the above and the evidence contained in the complaint, the CBSA is of the opinion that the Complainants' evidence reasonably demonstrates that the imports of the allegedly dumped subject goods, which were previously noted to have contributed to the financial hardship experienced by the Canadian industry, have exacerbated the impact on employment beyond the market downturn, which includes a temporary shutdown of Evraz's facilities.

**Negative Impact on the Return on Investments**

[140]   The Complainants have stated their commitment to make investments in their Canadian operations.

[141]   Both Evraz and Welded Tube have made significant investments in their Canadian production facilities in the past; [66] however, these planned investments are very much in doubt given current OCTG market demand and pricing uncertainties. [67]

---

[63] OCTG 3 Complaint – paragraph 186 (NC).
[64] OCTG 3 Complaint – paragraph 186 (NC).
[65] OCTG 3 Complaint – paragraph 204 (NC).
[66] OCTG 3 Complaint – Exhibit 7-02 (PRO): Declaration of Olesya Afanasyeva (Evraz) at paragraph 33; Exhibit 7-03 (PRO): Declaration of Robert (Butch) Mandel and James McEwen (Evraz) at paragraph 29.
[67] OCTG 3 Complaint – Exhibit 7-03 (PRO): Declaration of Robert (Butch) Mandel and James McEwen (Evraz) at paragraph 29.

---

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

[142]   Both Evraz and Welded Tube have also spent significant resources developing OCTG products. The Complainants alleged that these investments in product development are now in danger of not providing an appropriate return on investment due to the dumping of subject goods. [68]

[143]   Based on the above and the evidence contained in the complaint, the CBSA is of the opinion that the evidence reasonably demonstrates that the Complainants' ability to achieve a reasonable rate of return on investments has been negatively impacted due to poorer financial performance which has been linked to the imports of the allegedly dumped subject goods.

**Negative Impact on the Production and Capacity Utilization**

[144]   The Complainants stated that the trends in capacity and production demonstrate that capacity utilization remains depressed. The Complainants contended that "while the collapse of Evraz and Welded Tube's production, capacity utilization and domestic sales from domestic production is in part attributable to the significant downturn in the oil and gas industry," "Mexican imports were in and of themselves a cause of materially injurious volume effects over the period of investigation." [69]

[145]   Similar to the analysis on sales and market share earlier, the data available to the CBSA indicates that the Complainants have suffered greater relative declines in production than the decline in the market suggests they should have, had it been the only cause.

[146]   Based on CBSA's analysis and the evidence contained in the complaint, the CBSA is of the opinion that the evidence reasonably demonstrates that the Complainants' ability to maintain production and capacity utilization rates have been negatively impacted by the imports of the allegedly dumped subject goods, which have displaced production of the Complainants.

**CBSA's Conclusion – Injury**

[147]   Overall, based on the evidence provided in the complaint and supplementary data available to the CBSA through its own research and customs documentation, the CBSA is of the opinion that the evidence discloses a reasonable indication that the allegedly dumped subject goods from Mexico have caused injury to the domestic industry in Canada in the forms of a substantial increase in subject imports; loss of market share; price undercutting and lost sales; price depression; price suppression; and negative impacts on: financial performance, employment, return on investments, production and capacity utilization.

---

[68] OCTG Complaint narrative – paragraph 194-195 (PRO).
[69] OCTG 3 Complaint – paragraph 157 (NC).

Trade and Anti-dumping Programs Directorate                                                26

Barcode:4168004-05 A-357-824 INV - Investigation -

**THREAT OF INJURY**

[148]   The Complainants alleged that the dumped goods threaten to cause further material injury to the domestic producers of oil country tubular goods. The Complainants provided the following information to support the allegation that imports of subject goods threaten to cause further injury to the Canadian industry.

**Likely Increased Subject Imports**

[149]   The Complainants cited the recent trends in subject imports as evidence that increased subject good imports is inevitable, "particularly given the closure and decommissioning of the Prudential facility in Calgary" that previously produced lower grade products in Canada. The Complainants also cited the export orientation of TAMSA, coupled with the expected market demand increase in Canada in 2021 and beyond. [70]

[150]   In particular, the Complainants referenced that "the absolute volume of imports from Mexico has increased by 8%, from 17,344 MT in interim 2020 to 18,734 MT in interim 2021, notwithstanding a year-over-year decrease in the estimated apparent market." [71]

[151]   The Complainants also cited recent statements by Tenaris's CEO and Chairman, that as demand in North America has picked up, Tenaris was actively "strengthening {its} position in the U.S. and Canadian Markets." [72]

[152]   The Complainants emphasized the significance of this in relation to the evidence that Tenaris: "does not expect its new ERW mill in Sault Ste. Marie, or its idled U.S. mills to begin or increase production until later in 2021,[73] leaving TAMSA to strengthen its position in Canada and the United States." Beginning in March 2020, Tenaris temporarily shut down numerous mill operations in the United States, but continued operations in Mexico. [74]

---

[70] OCTG 3 Complaint narrative – paragraph 226 (NC).

[71] OCTG 3 Complaint narrative – paragraph 227 (NC).

[72] OCTG 3 Complaint – Exhibit 7-10 (NC), "Tenaris, Q4 2020 Earnings Call," (Feb 28, 2021) at page 4.

[73] OCTG 3 Complaint – Exhibit 7-13 (NC), "Consolidated Financial Statements for the Years Ended December 2020, 2019 and 2018" at page 62; Exhibit 7-10 (NC), "Tenaris, Q4 2020 Earnings Call," (Feb 28, 2021) at page 4.

[74] OCTG 3 Complaint narrative – paragraph 232 (NC); Exhibit 7-14 (NC), Tenaris, "Half Year Report" at page 12.

---

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No Image

**Likely Negative Price Effects**

[153]   The Complainants stated that the likely negative price effects is supported by the fact that the "subject goods have already undercut, depressed and suppressed the prices of the like goods. But there is also – right up until the most period, Q1-2021 – a clear trend of lower pricing in the Mexican imports and an increasing trend of underselling, while at the same time, the domestic industry's costs are rising." As such, the Complainants state that "it is a virtual certainty that the dumped subject goods will have a significant depressing and suppressing effect on the price of like goods" [75]

[154]   This concern has become exacerbated by the recent increase in "importing extraordinarily low-priced carbon grade imports from Mexico since Q4 2020." [76]

[155]   The Complainants argued that the injurious impact on the domestic industry is likely to worsen, given the current vulnerability of the domestic industry, which includes delays in restarts of production operations, of depressed sales and production, of lost market share, and of declining profitability. The Complainants also cited the CITT's recent orders continuing the findings on OCTG I and II as evidence of the injury vulnerability faced by the Canadian industry to dumped imports.

[156]   The Complainants further cited what they characterized as a longstanding pattern of behaviour by Tenaris as a global entity where "there is absolutely no reason to believe that this leveraging will stop over the next 12 months and beyond." [77] This pattern of behaviour is worsened according to the Complainants when considering the substantial volume of annual seamless OCTG TAMSA has available for export. [78]

[157]   With Tenaris's United States mills expected to re-start later this year, the Complainants alleged that TAMSA will no longer have as much of a U.S. market to sell OCTG to. The Complainants thus argued that:

> "Due to the United States being the largest destination market for Mexican OCTG exports by far,[79] any reduction in those exports on a percentage basis will require an even larger increase in exports to other markets such as Canada. At the end of Q4 2020 and into Q1 2021, for example, U.S. imports of OCTG from Mexico decreased by 33%, while subject good imports into Canada rose correspondingly by 103%." [80]

---

[75] OCTG 3 Complaint narrative – paragraph 232 (NC).

[76] OCTG 3 Complaint narrative – paragraph 170 (NC).

[77] OCTG 3 Complaint narrative – paragraph 238 (NC).

[78] OCTG 3 Complaint narrative – paragraph 241 (PRO); Exhibit 7-15 (NC), Tenaris, "United States Security and Exchange Commission, Form 20-F" (2020) at page 24; Exhibit 7-17 (PRO), Wheatland Tube, "Energy Tubular Capacity Report," (August 4, 2020) at page 8 of 13.

[79] OCTG 3 Complaint – Exhibit 7-36 (NC), United Nations Comtrade Data.

[80] OCTG 3 Complaint narrative – paragraph 253 (NC); Exhibit 12-5 (NC), Statistics Canada Data; Exhibit 7-31 (NC), United States DataWeb, OCTG Imports From Mexico; between December 2020 and February 2021.

---

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

[158]   The Complainants also cited potential trade restrictions in the U.S. and the European Union (E.U.) as mechanisms which will divert Mexican OCTG to Canada in absence of anti-dumping measures. The expected growth in drilling activity and ensuing demand for OCTG in Canada, coupled with the idling of Evraz and Welded Tube facilities in Canada, were also cited as factors the Complainants believe will lead to increased exports of OCTG from Mexico over the next 12-months, in absence of anti-dumping protection. [81]

**Likely Adverse Impact**

[159]   In regards to the likely adverse impact of the continued dumping of OCTG from Mexico, the Complainants cited the cumulative evidence on the record and in particular, "the detailed evidence of the three arm's length distributors included with this complaint demonstrates not only that the subject goods have been undercutting the like goods over the past two plus years, but that this trend of undercutting is in fact increasing." [82]

[160]   As part of the support to the statement regarding undercutting, the Complainants provided data on average import prices from Mexico over the period, to demonstrate the progressive pricing decline from Mexico. The Complainants separated the data by broad classifications (i.e. HS Classification codes) to reduce the impact of changing product mix influencing average prices. [83]

[161]   The likely adverse effect of this according to the Complainants is that the decline in import pricing from Mexico coincides with a period where the Complainants are experiencing higher costs due to increases in raw material pricing. They argued that competing with dumped goods that undercut them in the market is damaging enough but even more so when they should in fact be raising their own prices to offset cost increases. [84]

[162]   Based on the above, the CBSA is of the opinion that that the Complainants' evidence reasonably demonstrates many of the injury factors cited throughout the complaint are a threat to continue in the future, causing an adverse financial impact through increasingly dumped volumes of OCTG, which undercut the Complainants' domestic selling prices.

**Magnitude of the Margin of Dumping**

[163]   The Complainants submitted that the magnitude of their estimated margin of dumping of 24.9% for Mexico indicates that the threat posed by the dumped subject goods is real, foreseeable, and imminent.

---

[81] OCTG 3 Complaint narrative – paragraphs 257 – 260 (NC).
[82] OCTG 3 Complaint narrative – paragraphs 262 (NC).
[83] OCTG 3 Complaint narrative – paragraph 264 - 266 (NC).
[84] OCTG 3 Complaint narrative – paragraphs 270 – 272 (NC).

---

Trade and Anti-dumping Programs Directorate                                29

[164]   The CBSA's estimated weighted average margins of dumping for Mexico is 22.1%. This is very comparable in terms of magnitude to the range of margins estimated by the Complainants on individual transactions.

[165]   Based on the above, the CBSA is of the opinion that that the Complainants' evidence reasonably demonstrates that the subject goods pose a threat to the domestic industry based on the magnitude of the estimated margin of dumping.

**CBSA's Conclusion – Threat of Injury**

[166]   The CBSA is of the opinion that the evidence disclosed in the complaint reasonably indicates that imports of allegedly dumped subject goods pose a threat of injury to the domestic industry based on a likelihood of a substantial increase in subject imports; the likelihood of subject goods having a negative impact on the price of like goods in Canada, leading to adverse financial results; and the magnitude of the margin of dumping.

## CAUSAL LINK – DUMPING AND INJURY/THREAT OF INJURY

[167]   The CBSA finds that the Complainants have reasonably linked the injury they have suffered to the alleged dumping of subject goods imported into Canada. The injury includes a substantial increase in subject imports; loss of market share; price undercutting and lost sales; price depression; price suppression; negative impacts on financial performance, employment, return on investments, production and capacity utilization.

[168]   This injury relates directly to the price advantage the apparent dumping has produced between the imports of subject goods from Mexico and the like goods produced in Canada. Evidence has been provided to establish this link and includes: price quotes, market data, the sworn declarations of the three arm's length distributors, citations from CITT proceedings and financial information related to the production and sales of like goods in Canada.

[169]   The CBSA also finds that the Complainants have provided sufficient evidence of a reasonable indication that the continued alleged dumping of the subject goods threatens to cause further injury in the future.

[170]   In summary, the evidence submitted by the Complainants discloses a reasonable indication that the alleged dumping has caused injury and is threatening to cause injury.

## CONCLUSION

[171]   Based on information provided in the complaint, other available information, and the CBSA's import documentation, the CBSA is of the opinion that there is evidence that OCTG originating in or exported from Mexico have been dumped. Further, there is a reasonable indication that such dumping has caused and is threatening to cause injury to the Canadian industry. As a result, pursuant to subsection 31(1) of SIMA, a dumping investigation was initiated on June 30, 2021.

---

Trade and Anti-dumping Programs Directorate                                                    30

## SCOPE OF THE INVESTIGATION

[172]   The CBSA is conducting an investigation to determine whether the subject goods have been dumped.

[173]   The CBSA has requested information from all potential exporters and importers to determine whether or not subject goods imported into Canada during the period of investigation (POI) of May 1, 2020 to April 30, 2021, were dumped. The information requested will be used to determine the normal values, export prices and margins of dumping, if any.

[174]   All parties have been clearly advised of the CBSA's information requirements and the time frames for providing their responses.

## FUTURE ACTION

[175]   The CITT will conduct a preliminary inquiry to determine whether the evidence discloses a reasonable indication that the alleged dumping of the goods has caused or is threatening to cause injury to the Canadian industry. The CITT must make its decision on or before the 60th day after the date of the initiation of the investigation. If the CITT concludes that the evidence does not disclose a reasonable indication of injury to the Canadian industry, the investigation will be terminated.

[176]   If the CITT finds that the evidence discloses a reasonable indication of injury to the Canadian industry and the CBSA's preliminary investigation reveal that the goods have been dumped, the CBSA will make preliminary determinations of dumping within 90 days after the date of the initiation of the investigation, by September 28, 2021. Where circumstances warrant, this period may be extended to 135 days from the date of the initiation of the investigation.

[177]   Under section 35 of SIMA, if, at any time before making a preliminary determination, the CBSA is satisfied that the volume of goods of a country is negligible, the investigation will be terminated with respect to goods of that country.

[178]   Imports of subject goods released by the CBSA on and after the date of a preliminary determination of dumping, other than goods of the same description as goods in respect of which a determination was made that the margin of dumping of the goods is insignificant, may be subject to provisional duty in an amount not greater than the estimated margin of dumping on the imported goods.

[179]   Should the CBSA make a preliminary determination of dumping, the investigation will be continued for the purpose of making final decisions within 90 days after the date of the preliminary determinations.

---

Barcode:4168004-05 A-357-824 INV - Investigation -

[180]   After the preliminary determination, if, in respect of goods of a particular exporter, the CBSA's investigation reveal that imports of the subject goods from that exporter have not been dumped, or that the margin of dumping is insignificant, the investigation will be terminated in respect of those goods.

[181]   If a final determination of dumping is made, the CITT will continue its inquiry and hold public hearings into the question of material injury to the Canadian industry. The CITT is required to make a finding with respect to the goods to which the final determination of dumping applies, not later than 120 days after the CBSA's preliminary determination.

[182]   In the event of an injury finding by the CITT, imports of subject goods released by the CBSA after that date will be subject to anti-dumping duty equal to the applicable margin of dumping on the imported goods.

## RETROACTIVE DUTY ON MASSIVE IMPORTATIONS

[183]   When the CITT conducts an inquiry concerning injury to the Canadian industry, it may consider if dumped goods that were imported close to or after the initiation of an investigation constitute massive importations over a relatively short period of time and have caused injury to the Canadian industry.

[184]   Should the CITT issue such a finding, anti-dumping duties may be imposed retroactively on subject goods imported into Canada and released by the CBSA during the period of 90 days preceding the day of the CBSA making a preliminary determination of dumping.

## UNDERTAKINGS

[185]   After a preliminary determination of dumping by the CBSA, other than a preliminary determination in which a determination was made that the margin of dumping of the goods is insignificant, an exporter may submit a written undertaking to revise selling prices to Canada so that the margin of dumping or the injury caused by the dumping is eliminated.

[186]   An acceptable undertaking must account for all or substantially all of the exports to Canada of the dumped goods. Interested parties may provide comments regarding the acceptability of undertakings within nine days of the receipt of an undertaking by the CBSA. The CBSA will maintain a list of parties who wish to be notified should an undertaking proposal be received. Those who are interested in being notified should provide their name, telephone and fax numbers, mailing address and e-mail address to one of the officers identified in the "Information" section of this document.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

[187]   If undertakings were to be accepted, the investigation and the collection of provisional duties would be suspended. Notwithstanding the acceptance of an undertaking, an exporter may request that the CBSA's investigation be completed and that the CITT complete its injury inquiry.

## PUBLICATION

[188]   Notice of the initiation of this investigation is being published in the Canada Gazette pursuant to subparagraph 34(1)(a)(ii) of SIMA.

## INFORMATION

[189]   Interested parties are invited to file written submissions presenting facts, arguments, and evidence that they feel are relevant to the alleged dumping. Written submissions should be forwarded to the attention of the SIMA Registry and Disclosure Unit.

[190]   To be given consideration in this investigation, all information should be received by the CBSA by November 3, 2021.

[191]   Any information submitted to the CBSA by interested parties concerning this investigation is considered to be public information unless clearly marked "confidential". Where the submission by an interested party is confidential, a non-confidential version of the submission must be provided at the same time. This non-confidential version will be made available to other interested parties upon request.

[192]   Confidential information submitted to the CBSA will be disclosed on written request to independent counsel for parties to these proceedings, subject to conditions to protect the confidentiality of the information. Confidential information may also be released to the CITT, any court in Canada, or a WTO or Canada-United States-Mexico Agreement (CUSMA) dispute settlement panel. Additional information respecting the CBSA's policy on the disclosure of information under SIMA may be obtained by contacting the SIMA Registry and Disclosure Unit or by visiting the CBSA's website.

[193]   The schedule of the investigation and a complete listing of all exhibits and information are available at: www.cbsa-asfc.gc.ca/sima-lmsi/i-e/menu-eng.html. The exhibit listing will be updated as new exhibits and information are made available.

---

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

[194]  This *Statement of Reasons* is available through the CBSA's website at the address below. For further information, please contact the officers identified as follows:

|                |                                                  |              |
|----------------|--------------------------------------------------|--------------|
| **Mail:**      | SIMA Registry and Disclosure Unit                |              |
|                | Trade and Anti-dumping Programs Directorate       |              |
|                | Canada Border Services Agency                     |              |
|                | 100 Metcalfe Street, 11th floor                   |              |
|                | Ottawa, Ontario  K1A 0L8                          |              |
|                | Canada                                            |              |
| **Telephone:** | Andrew Manera                                     | 343-553-1868 |
|                | Andy Fei                                          | 343-553-1866 |
| **E-mail:**    | simaregistry@cbsa-asfc.gc.ca                      |              |
| **Website:**   | www.cbsa-asfc.gc.ca/sima-lmsi                     |              |

Doug Band
Director General
Trade and Anti-dumping Programs Directorate

 Government Gouvernement
of Canada du Canada

**Barcode:4168004-05 A-357-824 INV - Investigation  -**

 Canada

Canada Border Services Agency

Home ➔ Import and export ➔ Anti-dumping and countervailing ➔ Investigations

OCTG3 2021 IN: Oil country tubular goods 3
# Notice of preliminary determination

Ottawa, September 28, 2021

On September 28, 2021, the Canada Border Services Agency (CBSA), pursuant to subsection 38(1) of the *Special Import Measures Act* (SIMA), made a preliminary determination of dumping respecting certain oil country tubular goods from Mexico.

The subject goods are usually imported under the following tariff classification numbers:

7304.29.00.11
7304.29.00.19
7304.29.00.21
7304.29.00.29
7304.29.00.31
7304.29.00.39
7304.29.00.41
7304.29.00.49
7304.29.00.51
7304.29.00.59
7304.29.00.61
7304.29.00.69
7304.29.00.71
7304.29.00.79
7306.29.00.11
7306.29.00.19
7306.29.00.21
7306.29.00.31
7306.29.00.39
7306.29.00.61
7306.29.00.69

The above-listed tariff classifications cover both subject and non-subject goods and are for convenience of reference only. Refer to the product definition, for authoritative details regarding the subject goods.

Provisional duties will now be payable on the subject goods from Mexico that are released from the CBSA on or after September 28, 2021.

Additional information about this investigation is contained in a *Statement of Reasons*, which will be available within 15 days on the CBSA's website.

For assistance in properly completing accounting documents and the payment of provisional duties, please consult the Guide for Self-assessing SIMA duties.

Officer's name and contact information:

**Telephone:**
Andrew Manera: 343-553-1868

**Email:** simaregistry-depotlmsi@cbsa-asfc.gc.ca

## Estimated margins of dumping and provisional duties

| Origin or export | Estimated margins of dumping (as % of export price) | Provisional duties payable (as a % of export price) |
|---|---|---|
| Mexico | | |
| Tubos de Acero de Mexico S.A. (TAMSA) | 51.1% | 51.1% |
| All other exporters | 128.4% | 128.4% |

**Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved**

No image

Barcode:4168004-05 A-357-824 INV - Investigation  -

**Date modified:**
2021-09-28

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Appx579

Barcode:4168004-05 A-357-824 INV - Investigation  -

# EXHIBIT I-31

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation  -

# European Commission
## Directorate-General for Trade

## News archive

▌**ACTIONS AGAINST IMPORTS INTO THE EU** | Brussels, 25 June 2021

## EU prolongs steel safeguard for three years

*The EU is prolonging for three additional years the safeguard measure currently in place on imports of certain steel products. The prolongation will apply from 1 July 2021. The initial safeguard measure was introduced in July 2018 to protect the Union steel market against trade diversion, following the US decision to impose, under its Section 232 legislation, duties on imports of steel into the US market. The US Section 232 measures are still in force.*

The decision to extend the safeguard measure follows an investigation requested by 12 EU Member States on whether the conditions to prolong are fulfilled. In accordance with the requirements under EU and WTO rules, the Commission found in its investigation  that the safeguard measure continues to be necessary to prevent or remedy serious injury to the EU steel industry, and that the EU industry is adjusting to a market situation in the EU with higher level of imports.

The Commission will closely monitor the prolongation and will review it to ensure that it remains limited to the strict minimum, is adapted to the evolution of the market, and is in line with the overall interest of the EU. This will allow the Commission to change the functioning of the safeguard measure as necessary. In line with WTO rules, the duty-free import quotas of steel will also be increased by 3% annually. The Commission will also initiate a review if the US introduces significant changes to its 'Section 232' measure on steel.

Background

The safeguard measure takes the form of Tariff-Rate-Quotas ('TRQs') reflecting traditional trade flows from third countries, above which a 25% duty is levied on imports. The Commission has reviewed the functioning of the measure twice – in October 2019 and July 2020. Following a duly substantiated request by 12 EU Member States, the Commission launched an investigation in February 2021 to assess whether to prolong the steel safeguard beyond June 30, 2021.

The regulation (all EU languages)
More on Safeguards

Appx581

Barcode:4168004-05 A-357-824 INV - Investigation  -

# EXHIBIT I-32

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

**COMMISSION IMPLEMENTING REGULATION (EU) 2019/159**

**of 31 January 2019**

**imposing definitive safeguard measures against imports of certain steel products**

THE EUROPEAN COMMISSION,

Having regard to the Treaty on the Functioning of the European Union,

Having regard to Regulation (EU) 2015/478 of the European Parliament and of the Council of 11 March 2015 on common rules for imports ([1]), and in particular Article 16 thereof,

Having regard to Regulation (EU) 2015/755 of the European Parliament and of the Council of 29 April 2015 on common rules for imports ([2]), and in particular Article 13 thereof,

Whereas:

## 1. PROCEDURE

### 1.1. Provisional measures

(1) On 18 July 2018, Commission implementing regulation (EU) 2018/1013 ([3]) imposed provisional safeguard measures with regard to imports of certain steel products ('the provisional Regulation').

(2) The investigation was initiated ex officio on 26 March 2018 ('Notice of Initiation') ([4]) into 26 different steel product categories, pursuant to Article 5 of Regulation (EU) 2015/478 of the European Parliament and of the Council and Article 3 of Regulation (EU) 2015/755 of the European Parliament and of the Council.

(3) On 28 June 2018, the Commission extended the product scope of the safeguard investigation to two additional categories ('Extension Notice') ([5]).

(4) As mentioned in recital (20) of the provisional Regulation, the investigation covered the period from 2013 to 2017 ('the period considered').

### 1.2. Due process

(5) The Commission received 452 questionnaire replies from interested parties in the framework of this investigation.

(6) The Commission has also received an extensive number of written comments on the findings contained in the provisional Regulation from Union producers, exporting producers, importers, users, associations and third countries' authorities.

(7) Following the adoption of provisional measures, the Commission undertook to verify more in depth the information (including the most recent data) supplied by the Union producers for the purpose of the final determination. Given the sheer number of EU cooperating producers, it was materially impossible to undergo verification visits at the premises of every single Union producer. Consequently, the Commission opted for checking the quality and reliability of the data by verifying those of a selected number of producers that were chosen to cover a sufficiently large production volume and the widest possible range of the product categories under investigation. On this basis, the Commission verified the questionnaire replies at the premises of ten Union producers that accounted for over 15 % of the overall sales in the Union in 2017 of the product under investigation.

(8) From June to September 2018, verification visits were carried out at the premises of the following Union producers:

— ArcelorMittal Poland S.A., Poland;

— Compañía Española de Laminación, S.L (CELSA), Spain;

---

([1]) OJ L 83, 27.3.2015, p. 16.
([2]) OJ L 123, 19.5.2015, p. 33.
([3]) Commission implementing regulation (EU) 2018/1013 of 17 July 2018 imposing provisional safeguard measures with regard to imports of certain steel products (OJ L 181, 18.7.2018, p. 39).
([4]) Notice of initiation of a safeguard investigation concerning imports of steel products (OJ C 111, 26.3.2018, p. 29).
([5]) Notice amending the notice of initiation of a safeguard investigation concerning the imports of steel products (OJ C 225, 28.6.2018, p. 54).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

L 31/28     EN     Official Journal of the European Union     1.2.2019

— Mannesmann Precision Tubes GmbH, (Salzgitter Group), Germany;

— Mannesmann Stainless Tubes GmbH, (Salzgitter Group), Germany;

— Marcegaglia Carbon steel Spa, Italy;

— Marcegaglia Specialties Spa, Italy;

— Riva Stahl GmbH, Germany;

— SIJ Acroni d.o.o., Slovenia;

— U. S. Steel Košice, s.r.o., Slovakia; and

— Ugitech SA, France.

(9) In order to obtain the most recent information for its final determination, on 7 September 2018 the Commission requested the associations of Union producers to submit an updated set of data on the product categories under investigation.

(10) Pursuant to Article 5 of Regulation (EU) 2015/478 and Article 3 of Regulation (EU) 2015/755 all interested parties who requested a hearing within the limit set were granted such hearing. On 12, 13 and 14 September and 1 October 2018, the Commission organised 93 individual hearing sessions, during which 150 interested parties expressed their views.

(11) Comments submitted within the deadlines by interested parties, in writing or orally during the hearing sessions, were duly considered and taken into account where appropriate.

## 2. PRODUCT CONCERNED AND LIKE OR DIRECTLY COMPETING PRODUCT

(12) The product concerned is certain steel products belonging to the 28 steel product categories defined in the above-mentioned Notice of Initiation, as amended by the Extension Notice, taken all together. These product categories are subject to the US tariff measures under Section 232 of the Trade Expansion Act of 1962 ('US Section 232 measures').

### 2.1. A single group definition

(13) The Commission defined the product scope of the safeguard investigation in recitals (11) to (17) of the provisional Regulation, where it presented a detailed reasoning in support of the global analysis in the light of the strong interrelations between all product categories subject to the investigation.

(14) After the publication of the provisional Regulation, several interested parties claimed that there is not one single product concerned but several products concerned. These parties observed that the Notice of Initiation does not refer to a single product concerned but uses in some passages the plural and refers to 'products concerned'.

(15) The same parties claimed that the approach followed by the Commission in the current investigation is contrary to the ruling of the Appellate Body ('AB') in US – Steel Safeguards [6]. In this case, the AB ruled that applying a global approach to the calculation of '*unforeseen developments*' could lead to the application of '*safeguard measures to a broad category of products even if imports of one or more of those products did not increase and did not result from the "unforeseen developments"*' and would not meet the requirement of Article XIX of the GATT. These parties also claimed that in the 2002 Steel safeguard investigation [7] the Commission carried out a separate analysis per product category for which reason the same individual assessment should also be carried out in this case.

(16) Finally, several interested parties contested the interrelations and interconnections between product categories that the Commission put forward to justify its single analysis. These parties, while recognising that such linkages do exist between certain product categories, were of the view that they are not present across all categories, for instance between carbon steel and stainless steel categories, or between flat products, long products and pipes.

---

[6] WTO Appellate Body Report, *US – Definitive Safeguard Measures on Imports of Certain Steel Products*, WT/DS259/AB/R, para. 319.
[7] Commission Regulation (EC) No 1694/2002 (OJ L 261, 28.9.2002, p. 1).

No image

Barcode:4168004-05 A-357-824 INV - Investigation  -

1.2.2019     EN     Official Journal of the European Union     L 31/29

(17)  The Commission analysed these claims and rejected them on the following basis. First, the Notice of Initiation clearly states repeatedly and without doubt that the 28 product categories under investigation were treated as a single group of products for the purposes of analysing whether the conditions for adopting safeguards were warranted. In fact, the provisional Regulation refers to the 28 product categories as the 'product concerned' or 'the product categories concerned' (see recital (11) of the provisional Regulation) and the analysis therein is made on the basis of the 28 product categories concerned taken all together (see recital (22) of the provisional Regulation). Thus, the reference to 'products concerned' should be understood as the product categories examined together as part of a single product concerned.

(18)  Second, the WTO Agreement on Safeguards does not impose any specific obligations with respect to the definition or the scope of the product under investigation and does not contain any guidelines with respect to this matter, as confirmed by a WTO Panel. Indeed, a safeguard measure may be applied to a product, imports of which have increased; however, a disaggregated analysis for all cases in which the definition of the product under investigation comprises more than one product is not required. Accordingly, it is the investigating authority which defines the product under investigation, as well as the way in which the relevant data should be analysed in the investigation ([8]). Moreover, no claim has been brought explaining how, in the circumstances of the present case, the joint consideration of product categories could have affected the analysis made by the Commission and/or resulted in an inadequate determination of the increase in imports during the period of investigation. Finally, and incidentally, the Commission also notes that the Appellate Body ruling referred to by the parties concerns the analysis of unforeseen development, and not as such the issue of whether a global analysis is permitted under the WTO Agreement on Safeguards.

(19)  Third, although the Commission reiterated and confirmed in its final determination the need to carry out in the present case an overall analysis of the conditions required to impose safeguards, in order to further examine the linkage between certain categories as argued by some interested parties, the Commission further decided to examine the 28 product categories under investigation, which are treated formally as a single group, also as three steel 'product families'. This decision has been taken in order to examine, in addition, whether the findings for the single group are confirmed at more disaggregated level and to dispel any doubts about the reliability of the conclusions reached at an overall level. The three steel product families regroup certain product categories showing an even stronger degree of commonalities between them.

(20)  Indeed, the steel industry commonly uses three steel product families, namely: flat products, long products and tubes. In the framework of this safeguard investigation, it is considered that within each of these families, the products present similar characteristics, frequently share production processes, are often the input for other downstream products within the family, have common users or customers in the supply chain, which is why their supply and demand substitutability and intra-'family' competition is more marked than if all steel product categories were taken together in a single group.

(21)  The three 'product families' are defined as follows:

Table 1

**Product families**

| Product family | Product category |
|---|---|
| 1 Flat products | 1,2,3,4,5,6,7,8,9,10,11 |
| 2 Long products | 12,13,14,15,16,17,18,19,27,28 |
| 3 Tubes | 20,21,22,23,24,25,26 |

(22)  Accordingly, the Commission will address the comments made by certain interested parties as regards the broad definition of the product concerned by complementing the overall assessment of the 28 product categories under investigation with an analysis per product family as defined above.

([8]) WTO Panel Report, *Dominican Republic — Safeguard Measures on Imports of Polypropylene Bags and Tubular Fabric*, WT/DS415/R, WT/DS416/R, WT/DS417/R, WT/DS418/R, paras. 7.177 and 7.236.

2.2. **Requests concerning specific product categories**

(23)    Several interested parties claimed that certain specific product categories should be excluded from the scope of the product concerned, due to an alleged lack or limited availability of Union production. These claims concern notably the following product categories:

—  Non-grain oriented electrical sheets used in motors and generators manufacturing (falling within product category 3);

—  Steel parts used as inputs in the automotive industry (falling within product category 4);

—  Tin mill products (falling within product category 6);

(24)    The Commission analysed carefully these claims and came to the conclusion that like or directly competing product categories are in fact produced in the Union by the Union industry. Furthermore, as it will be elaborated below in the section on Union interest, the Commission has shaped the safeguard measures in such a way as to ensure that disruption to imports is minimised and traditional import levels from trading partners are preserved. Therefore, the alleged likelihood of a shortage of some product categories is unjustified, also considering the adjustments and considerations laid down in the Union interest analysis.

(25)    The Commission therefore concluded that the request to exclude certain product categories should be rejected.

(26)    In the absence of further comments regarding the product concerned and the like or directly competing product, the conclusions reached in recitals (11) to (17) of the provisional Regulation are hereby confirmed.

3.  **INCREASE IN IMPORTS**

(27)    In recitals (20) to (29) of the provisional Regulation, the Commission made an overall analysis of the increase in imports for the 28 product categories concerned over the period 2013-2017. This global analysis already excluded product categories that did not show an import increase at individual level.

(28)    For its definitive determination, the Commission followed the same approach but, as previously explained, complemented its analysis by examining the development of imports for each of the three product families identified in Section 2.2 to confirm the soundness of the conclusions reached on a global basis.

(29)    The Commission used in its analysis the most recent statistics, namely import data covering the first half of 2018. For ensuring data comparability with previous full-year periods, the Commission established an additional ad-hoc 12-month period made of the last 6 months of 2017 and the first 6 months of 2018 ('the most recent period' or 'MRP'). The Commission also corrected some minor clerical errors in the data used at provisional stage.

(30)    Furthermore, in its assessment of imports evolution, the Commission has not taken into account the import volumes from a series of countries that should be excluded from the scope of the definitive measures, in particular: the European Economic Area (EEA) countries and certain countries with which the Union has signed an Economic Partnership Agreement that is currently in force, and which specifically foresee an exclusion from the scope of multilateral safeguard ([9]).

(31)    While, at provisional stage, imports were found not to increase for 5 product categories ([10]), the examination of the most recent import data shows that only 2 out of the 28 product categories did not experience an increase in imports, namely product category 11 and product category 23. The Commission therefore decided to exclude these two product categories from the scope of its final analysis. The individual development of imports for each product category is included in Annex II

([9])  Botswana, Cameroon, Fiji, Ghana, Ivory Coast, Lesotho, Mozambique, Namibia, South Africa, Eswatini.
([10])  These were product categories 10, 11, 19, 24 and 27.

Barcode:4168004-05 A-357-824 INV - Investigation  -

(32) As to the global imports' analysis, the imports of the 26 remaining product categories under assessment show the following developments:

*Table 2*

**Import volume (after exclusion of certain countries and products) and market share**

|  | 2013 | 2014 | 2015 | 2016 | 2017 | MRP |
|---|---|---|---|---|---|---|
| Imports (000 tonnes) | 18 329 | 21 868 | 26 552 | 29 141 | 30 094 | 31 314 |
| *index 2013 = 100* | *100* | *119* | *145* | *159* | *164* | *171* |
| Market share | 12,7 % | 14,4 % | 16,9 % | 17,9 % | 18,1 % | 18,8 % |

*Source*: Eurostat and Union Industry questionnaire replies.

(33) Imports increased in absolute terms by 71 % during the period of analysis, and in relative terms with market shares increasing from 12,7 % to 18,8 %. The most significant increase took place in the period 2013-2016. Subsequently, imports continued to increase at a slower pace before picking up again in the MRP, when the US Section 232 measures entered into force. The above-mentioned trend is also confirmed by the vast majority of the questionnaire replies received from producers based in the main exporting countries ([11]).

(34) In order to supplement the global import analysis, the Commission conducted an examination of the import evolution for each of the three product families identified above: flat products, long products and tubes. On this basis, the import volumes and corresponding market shares developed as follows:

*Table 3*

**Import volume (after exclusion of certain countries and products) and market share – by product family**

|  | 2013 | 2014 | 2015 | 2016 | 2017 | MRP |
|---|---|---|---|---|---|---|
| **Flat products** | | | | | | |
| imports (000 tonnes) | 12 327 | 14 215 | 18 391 | 20 281 | 20 299 | 20 202 |
| *index 2013 = 100* | *100* | *115* | *149* | *164* | *164* | *164* |
| Market share | 14,2 % | 15,8 % | 19,4 % | 20,7 % | 20,9 % | 20,9 % |
| **Long products** | | | | | | |
| imports (000 tonnes) | 4 001 | 5 258 | 6 028 | 6 550 | 6 465 | 7 901 |
| *index 2013 = 100* | *100* | *131* | *151* | *164* | *162* | *197* |
| Market share | 8,6 % | 10,6 % | 11,8 % | 12,4 % | 11,8 % | 14,0 % |
| **Tubes** | | | | | | |
| imports (000 tonnes) | 2 001 | 2 396 | 2 134 | 2 310 | 3 330 | 3 212 |
| *index 2013 = 100* | *100* | *120* | *107* | *115* | *166* | *160* |
| Market share | 20,4 % | 20,8 % | 19,9 % | 20,1 % | 25,3 % | 25,7 % |

*Source*: Eurostat and Union Industry questionnaire replies.

([11]) Former Yugoslav Republic of Macedonia, India, People's Republic of China, Russia, South Korea and Turkey.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

No image

(35) The statistics show that all three product families (flat products, long products and tubes) increased in absolute terms by respectively 64 %, 97 % and 60 % during 2013-MRP. In the same period, imports also increased in relative terms with market shares increasing respectively from 14,2 % to 20,9 %; 8,6 % to 14,0 % and 20,4 % to 25,7 %.

(36) The most significant increase for the flat products, both in absolute and relative terms, took place in the period 2013-2016. Imports thereafter remained relatively stable but at a much higher level than in the period 2013-2015. For long products, the most significant increase both in absolute and relative terms, took place in the period 2013-2016 before picking up steeply in the MRP. As for tubes, imports increased progressively over the period 2013-2016, before steeply increasing, both in absolute and relative terms, in the period 2016-MRP.

(37) As regards the comments received by the Commission, one interested party claimed that two product categories out of the five that had been excluded from the scope of the provisional measures, namely product category 10 and 19, should be covered by the definitive measures as recent statistics show an increase in imports. Another party made a similar claim as regards product category 24. These claims have been accepted since, as previously explained, import statistics pertaining to product categories 10, 19 and 24 actually showed an overall increase in imports over the period 2013-MRP. Moreover, import volumes for these three product categories also increased over the period 2017-MRP. Furthermore, as developed in recital (34), these products belong to product families that also show an increase over the period 2013-MRP.

(38) Several interested parties claimed that there was no sudden, sharp, significant and recent increase of imports and referred to the Appellate Body report Argentina – Footwear ([12]) and other WTO cases such as US – Wheat Gluten ([13]), Ukraine – Passenger Cars ([14]), US – Steel Safeguards ([15]). In summary, this case-law provides that it is not enough for an investigation to show simply that imports have increased over a five-year period. The increase must be sufficiently recent, sudden and significant both quantitatively and qualitatively, to cause or threaten to cause serious injury. This case law also clarified the meaning of sharp ('involving sudden change of direction; abrupt, steep') and sudden ('happening or coming without warning; unexpected', or 'abrupt, sharp'). Other parties also claimed that the increase in imports was steady or that the imports increased up to 2015 without showing a sharp sudden or significant increase ever since.

(39) In this regard, it is first recalled that the Commission conducted a thorough analysis of the import volumes of the 28 product categories over the period 2013-2017 (considering the trends in imports over the period of investigation, rather than just comparing the end points) and that it also analysed the development of imports in the MRP. On this basis, it has excluded upfront certain product categories that did not show an increase over the period 2013-MRP. Furthermore, as explained in recitals (33), (35) and (36), the Commission concluded that imports had increased in absolute terms by 71 % globally and between 60 % and 97 % when grouped into product families over the period 2013-MRP. Additionally, Eurostat statistics also show that imports increased by 45 % between 2013 and 2015 and that this sharp increase continued until the MRP to reach 71 % overall. A similar trend is also observed as far as the relative increase in imports is concerned. On this basis, it is confirmed that the increase in imports was sharp and sudden as clarified by the case-law. Considering the extent of the increase, it is also confirmed that the increase was significant. As far as the recentness is concerned, the Commission notes that there is no specific jurisprudence as to how the term 'recent' should be interpreted. The Appellate Body has merely interpreted the requirement that a Member may apply a safeguard only if a product 'is being imported' in increased quantities to mean that the increase in imports must be 'recent' enough to cause or threaten to cause serious injury ([16]). The Commission confirmed that increase in imports, in view of the developments in the period 2013-MRP and even 2015-MRP, was recent enough to cause or threaten to cause serious injury. Accordingly, the Commission rejected the above-mentioned claims on lack of qualifying import increase.

([12]) WTO Appellate Body Report, *Argentina – Safeguard Measures on Imports of Footwear*, WT/DS121/9, para.131.

([13]) WTO Panel Report, *US – Definitive Safeguard Measures on Imports of Wheat Gluten from the European Communities*, WT/DS166/R, para. 8.31.

([14]) WTO Panel Report, *Ukraine – Definitive Safeguard Measures on Passenger Cars*, WT/DS468/R, Panel Report of 26 June 2015, para. 7.146.

([15]) WTO Panel Report, *US – Definitive Safeguard Measures on Imports of Certain Steel Products*, WT/DS259/R, para. 10.168.

([16]) WTO Appellate Body Report, *Argentina – Safeguard Measures on Imports of Footwear*, WT/DS121/AB/R, adopted 12 January 2000, para. 130.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-05 A-357-824 INV - Investigation -

1.2.2019 [EN] Official Journal of the European Union L 31/33

(40) Several interested parties claimed that the Commission end-point to end-point analysis at an aggregate level was insufficient and that the Commission should also have analysed intervening trends over the period 2013-2017, in line with WTO case law such as US – Steel safeguards ([17]) and Ukraine – Passenger Cars ([18]). According to such case law, the analysis cannot rely on a comparison of the end-points of the period of analysis as it could lead to manipulated results in cases where there is no clear and uninterrupted upward trend in import volumes. The case law also foresees that the investigating authority shall set out a reasoned and adequate explanation concerning the development of imports between the end-points.

(41) The Commission considers that it has not just made an end-point to end-point analysis since, as substantiated above in recital (33) to (36), the Commission has also analysed intervening trends and made an adequate and reasoned analysis of import trends. The relevant claims have therefore been rejected.

(42) Certain interested parties indicated that analysing the evolution of imports over the period 2013 – 2017 was misleading since the level of imports in 2013 was abnormally low as a result of the global economic crisis, and the increase in the subsequent period was merely a recovery of a normal situation.

(43) In this regard, the Commission considered that taking 2013 as the starting point for the analysis did not taint that analysis. While EU steel consumption indeed increased by 14 % over the period 2013-2017 (see Table 4 below), such an increase was achieved in a progressive manner throughout the period. In contrast imports increased much more than the EU demand, namely by 64 % over the same period and at a much faster rate than EU consumption. Consequently, market share of imports increased by 5,4 % points (from 12,7 % to 18,1 %) over the period 2013-2017. On this basis, this claim was rejected.

(44) Several interested parties claimed that imports by the Union industry should have been excluded from the analysis of import volumes. In this regard, it should be noted that there is no legal requirement to make such an exclusion. In any event, based on the questionnaire replies received from the Union producers, such imports remained stable over the period 2013-2017 and only accounted for a marginal portion of the total import (ranging from 0,3 % to 0,7 % of the total imports). The above claim was therefore rejected.

(45) One interested party claimed that imports through inward processing should have been excluded from the analysis of the import volumes in general and for product category 25 in particular. In this regard, it should be noted that for all product categories other than product category 25, the import volume trend observed does not change if inward processing is excluded from the analysis. In the particular case of product category 25, a sale by a Union producer was lost to the benefit of an exporting producer in a third country market. As a consequence, it was considered appropriate to include such volumes in the assessment of the increase in imports in order to reflect the full impact of third country imports. On this basis, this claim has been rejected.

(46) Certain interested parties claimed that the import volume and corresponding market share for product categories 1, 6, 7, 17 and 28 decreased over the period 2016-2017. In this regard, the Commission notes that in its final determination it has also considered the development of imports during the most recent period and, on this basis, imports did increase for all these categories with the exception of category 7. However, even for this latter category, imports during the MRP were significantly higher than in 2013-2014. In addition, the Commission carried out a global analysis for all steel products and individually for each of the three product families identified, and concluded that imports increased overall during the whole analysed period. This claim was therefore rejected.

(47) Accordingly, the Commission concludes that there has been a sudden, steep, and significant increase of imports both in absolute and relative terms for the product concerned under assessment. This finding is also confirmed by the data at the level of each of the three product families assessed.

## 4. UNFORESEEN DEVELOPMENTS

(48) As explained in detail in recitals (30) to (36) of the provisional Regulation, the Commission had concluded preliminarily that the above-mentioned increase in imports of certain steel products in the Union had been the result of unforeseen developments that found their source in a number of factors establishing and aggravating imbalances in the international trade of the product concerned.

---

([17]) WTO Panel Report, *US – Definitive Safeguard Measures on Imports of Certain Steel Products*, WT/DS259/R, footnote 17, para. 374.
([18]) WTO Panel Report, *US – Definitive Safeguard Measures on Imports of Certain Steel Products*, WT/DS259/R, para. 10.168, footnote 16, para. 7.132.

(49)  These factors consisted of an unprecedented steelmaking overcapacity that persists despite the important number of measures adopted worldwide to reduce it, accentuated by distortive subsidies and government support measures, which led to price depression, the increased use of trade restrictive practices, trade defence instruments and the US Section 232 measures adopted in March 2018.

(50)  Several interested parties claimed that unforeseen developments should be demonstrated for each product category. The Commission disagrees with these views and considers that, given the high interrelation and interconnection between the product categories as explained in Section 2.1, it is sufficient to demonstrate the existence of unforeseen developments globally. On this basis, this claim was rejected.

(51)  As far as overcapacity is concerned, several interested parties claimed that overcapacity is well-known to the Commission and could not be considered as an unforeseen development. They also claimed that the Commission had previously linked the injury suffered by the Union industry to dumped or subsidized imports and that the link between the increase in imports and the unforeseen development of steel overcapacity had not been established.

(52)  In this regard, it should first be noted that, as provided in Figure 2.3 of the Global Trade Alert report 'Going Spare: Steel, Excess Capacity, and Protectionism' ([19]), the world crude steel excess capacity decreased from 2009 to 2011 before following an opposite trend from 2011 to 2016. Considering that the total crude steel excess production capacity in 2011 was already well above the total production of that year, it was expected that total crude steel capacity would decrease or at least remain stable in order to improve capacity utilization and cost efficiency. Total crude steel production capacity, however, unexpectedly continued to increase after 2011, generating an additional world excess capacity as confirmed by the Commission in its Communication 'Steel: Preserving Sustainable Jobs and Growth in Europe' ([20]). Considering the timing of the events described above and more specifically the fact that excess production capacity increased at a time when it was economically expected to decrease, it is concluded that the steel overcapacity should be considered as an unforeseen development.

(53)  As far as the causality established in previous investigations tackling unfair trading practices is concerned, reference is made to the above-mentioned Communication, which provides that such investigations are recognized as 'measures aiming to mitigate the effects of overcapacity'. On such basis, it is clear that overcapacity is inherently closely linked to dumped and subsidized imports. Yet, in anti-dumping and anti-subsidy investigation, the overcapacity in the steel sector is not examined as an unforeseen development since this requirement is not present in an assessment underlying the imposition of those trade remedy instruments.

(54)  As far as the link between the unforeseen development of steel overcapacity and the increase in imports is concerned, it is clear that exporting producers have an interest in maximizing their capacity utilization. In situations where spare capacity is available after supplying their domestic market, they will seek other business opportunities on export markets and thus generate an increase in import volumes on such markets. On this basis, the above mentioned claims have to be rejected.

(55)  As far as the surge of adoption of trade restrictive measures is concerned, several parties claimed that they could not be recognized as unforeseen developments as they are recognized exceptions to the general WTO rules and that the number of trade defence instrument measures imposed in 2017 decreased. They also claimed that the link between the increase in imports and the unforeseen development of trade restrictive measures had not been established.

(56)  The Commission disagrees with such claims as the fact that trade restrictive actions are taken within the framework of WTO rules does not imply that they cannot be considered as an unforeseen development. The Commission does not contest the right of countries to take anti-dumping or anti-subsidy measures according to the relevant WTO rules. The issue at stake, however, is the unprecedented and increased number of such measures taken by third countries, which have created trade diversion resulting in increase of imports into the EU. It is recalled that, in recital (34) of the provisional Regulation, the Commission noted that, based on WTO statistics, whereas an average of 77 steel-related investigations had been initiated per year during 2011-2013, this average increased to 117 during 2015-2016. No party has questioned these figures which indicate an unforeseen development, leading to the increase of imports established above. Therefore, the above claims were rejected.

---

([19])  https://www.globaltradealert.org/reports/download/44, p. 11.
([20])  COM(2016) 155 final of 16 March 2016.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

No image

1.2.2019    EN    Official Journal of the European Union    L 31/35

(57) As far as the US Section 232 measures are concerned, several interested parties claimed that these measures cannot be considered to be an unforeseen development triggering an increase in imports as they were imposed after the period 2013-2017. Other interested parties indicated that even the imports that took place from January 2018 to March 2018 are not affected by the US Section 232 measures.

(58) In this regard, it should first be noted that while the US Section 232 measures were effectively introduced on 8 March 2018, the investigation that led to their adoption was already initiated in April 2017 and the report on which basis they were decided was issued on 11 January 2018. Even if, arguably, the US Section 232 measures could not have caused any impact on imports before their adoption, the mere initiation of the investigation did undoubtedly create uncertainty on the market and caused effects on steel trade flows. Moreover, as further confirmed below, since the adoption of the US Section 232 measures, the Commission considered that trade diversion was already taking place with regard to some product categories.

(59) It should also be noted, in this respect, that the US Section 232 measures have sped up the increase in imports by adding further trade diversion flows to the prevailing prior increasing trend. As reported in Table 14, available statistics show that, with the exception of April 2018, monthly imports of steel into the US became consistently lower than their corresponding volume in 2017. This coincides with an opposite increasing trend in imports observed in the Union, where, as noted in Table 12, monthly imports volumes were consistently at a higher level than a year before.

(60) Other interested parties indicated that the impact of the Section 232 measures should be disregarded or not be overestimated as they operate subject to many product exclusions. In the same context, it was claimed that Korean exports are a non-issue as Korea has secured enough export quota volume from the US administration.

(61) In this regard, it should be noted that only Australia was unconditionally exempted from the Section 232 measures and that its imports of the products concerned accounted for around 1 % of total US imports in 2017 ([21]). Other countries such as South Korea, Argentina and Brazil were granted a tariff-free quota but were not exempted from the measures. As far as these countries are concerned, it should be noted that a higher number of quotas were set at zero and that numerous quotas were already exhausted upon allocation ([22]). On this basis, it is considered that the allocated quotas give no guarantee that the allocated quota would be sufficient to prevent trade diversion. Furthermore, on the basis of available statistics, it appears that these three countries accounted for less than 20 % of the total 2017 imports. Therefore, the relevant claims on quotas were rejected.

(62) Considering the above, it is confirmed that the unforeseen developments described in recital (49) have lead and will further lead to a clear increase of the steel imports into the Union.

## 5. THREAT OF SERIOUS INJURY

(63) In line with the global product scope approach defined in this investigation, at provisional stage, the injury analysis was also made globally. Occasionally, the provisional Regulation illustrated that the conclusions on injury under the global analysis were corroborated also at product category level by way of examples.

(64) Likewise, the injury assessment at the definitive stage has been conducted on a global basis, namely for the product concerned under assessment, thereby including the 26 product categories where the Commission found an increase in imports. However, as in the evolutions of imports, the Commission supplemented its analysis with an assessment for each of the three product families referred to in recital (21) above.

(65) The injury analysis below is based on the questionnaire replies submitted by the Union industry. Following receipt of more up-to-date information and the verification of the data, the injury indicators described at provisional stage were updated where appropriate in order to include the most recent (2018) data.

---

[21] Source: Global Trade Atlas.
[22] https://www.cbp.gov/trade/quota/bulletins/qb-18-126-absolute-quota-aluminum-products-argentina-brazil-south-korea

Barcode:4168004-05 A-357-824 INV - Investigation -

L 31/36     EN     Official Journal of the European Union     1.2.2019

5.1.  **Global development of the situation of the Union steel industry**

5.1.1.  *Consumption, domestic sales and market shares*

(66)  The Commission established the Union consumption by adding to the sales in the Union of the Union producers, the imports from all countries, excluding imports from members of the EEA and from certain countries with which the Union has signed an Economic Partnership Agreement that is currently in force (see recital (30) above).

(67)  On this basis, Union consumption, sales of Union producers and the corresponding market share developed as follows:

*Table 4*

**The Union consumption, domestic sales and market share**

| (000 tonnes) | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Consumption (all) | 148 455 | 155 730 | 160 742 | 166 375 | 169 350 |
| *index 2013 = 100* | *100* | *105* | *108* | *112* | *114* |
| Domestic sales (all) | 129 592 | 133 285 | 133 575 | 136 586 | 138 636 |
| *index 2013 = 100* | *100* | *103* | *103* | *105* | *107* |
| Market share (all) | 87,3 % | 85,6 % | 83,1 % | 82,1 % | 81,9 % |

*Source:* Eurostat and industry data.

(68)  Overall consumption of the relevant 26 product categories increased consistently over the period 2013 – 2017, with an overall increase by 14 %. Sales volumes of Union industry producers increased over this period, but to a much lesser extent than Union consumption, i.e. by 7 % only. The Union industry's overall market share, therefore, decreased consistently during the period considered, by 5,4 percentage points.

5.1.2.  *Production, production capacity, capacity utilisation rate and stocks*

(69)  Production, production capacity and capacity utilisation rate and stocks developed as follows:

*Table 5*

**Production, production capacity, capacity utilisation, stocks**

| (000 tonnes) | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Production (all) | 243 945 | 249 855 | 248 763 | 249 204 | 254 925 |
| *index 2013 = 100* | *100* | *102* | *102* | *102* | *105* |
| Production capacity (all) | 337 010 | 334 545 | 332 427 | 333 179 | 335 358 |
| *index 2013 = 100* | *100* | *99* | *99* | *99* | *100* |
| Capacity utilisation (all) | 72 % | 75 % | 75 % | 75 % | 76 % |
| Stocks (all) | 11 883 | 12 734 | 13 159 | 12 974 | 14 140 |
| *index 2013 = 100* | *100* | *107* | *111* | *109* | *119* |

*Source:* Industry data and questionnaire replies.

(70)  Production volume for the product concerned under assessment increased overall by 5 % during the period considered. Production capacity remained stable and, therefore, capacity utilisation increased overall by 4 percentage points during the period 2013 - 2017. Stocks held by the cooperating Union industry producers increased overall by 19 % during the period 2013 - 2017

Barcode:4168004-05 A-357-824 INV - Investigation  -

5.1.3.  *Unit sales prices, profitability and cash flow*

(71)    Unit sales prices, profitability and cash flow developed as follows:

*Table 6*

**Unit sales price, profitability, cash flow**

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Unit sales price (EUR/tonne) | 693,6 | 673,4 | 636,6 | 591,0 | 697,7 |
| *index 2013 = 100* | *100* | *97* | *92* | *85* | *101* |
| Profitability (% turnover) | − 0,9 % | 0,8 % | 0,6 % | 2,1 % | 5,6 % |
| Cash flow (million EUR) | 3 721 | 4 975 | 6 461 | 5 508 | 6 201 |
| *index 2013 = 100* | *100* | *134* | *174* | *148* | *167* |

*Source*: Questionnaire replies.

(72)    Verified and updated figures confirm the trend established in the provisional Regulation. For all products, there was significant price depression on the Union market until 2016. Prices recovered to their 2013 level thereafter. Overall, and despite a significant decrease in prices, the Union industry could reduce its cost of production to achieve a marginal profit level in 2016 and increase it to a more sustainable level in 2017 (5,6 %). The overall cash flow position of the Union industry increased by 67 % from 2013 to 2017.

5.1.4.  *Employment*

(73)    In terms of employment, the Union industry lost 9 208 jobs from 2013 to 2017, shown in the table below.

*Table 7*

**Employment**

| (FTE) | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Employment (all) | 225 607 | 220 429 | 218 010 | 217 460 | 216 399 |
| *index 2013 = 100* | *100* | *98* | *97* | *96* | *96* |

*Source*: Industry data and questionnaire replies.

5.2.  **Analysis of the situation of the Union steel industry for the three product families**

5.2.1.  *Consumption, domestic sales and market shares*

(74)    For each of the three product families, consumption, domestic sales and market shares developed as follows:

*Table 8*

**Consumption, domestic sales, market share per product family**

| (000 tonnes) | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Consumption (flat) | 87 679 | 90 729 | 95 598 | 98 749 | 98 124 |
| *index 2013 = 100* | *100* | *103* | *109* | *113* | *112* |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-05 A-357-824 INV - Investigation -

| (000 tonnes) | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Consumption (long) | 50 829 | 53 333 | 54 160 | 55 890 | 57 921 |
| *index 2013 = 100* | *100* | *105* | *107* | *110* | *114* |
| Consumption (tubes) | 9 947 | 11 667 | 10 985 | 11 735 | 13 305 |
| *index 2013 = 100* | *100* | *117* | *110* | *118* | *134* |
| | | | | | |
| Domestic sales (flat) | 75 212 | 76 365 | 77 020 | 78 274 | 77 601 |
| *index 2013 = 100* | *100* | *102* | *102* | *104* | *103* |
| Domestic sales (long) | 46 461 | 47 679 | 47 757 | 48 935 | 51 095 |
| *index 2013 = 100* | *100* | *103* | *103* | *105* | *110* |
| Domestic sales (tubes) | 7 920 | 9 241 | 8 799 | 9 377 | 9 940 |
| *index 2013 = 100* | *100* | *117* | *111* | *118* | *126* |
| | | | | | |
| Market share (flat) | 86 % | 84 % | 81 % | 79 % | 79 % |
| Market share (long) | 91 % | 89 % | 88 % | 88 % | 88 % |
| Market share (tubes) | 80 % | 79 % | 80 % | 80 % | 75 % |

*Source*: Eurostat and industry data.

(75) Consumption for flat products peaked in 2016, then marginally decreased in 2017, showing an overall increase by 12 %. Consumption for long products and tubes increased consistently until the end of 2017, resulting respectively in an overall increase by 14 % and 34 %.

(76) Sales for all steel products increased overall by 7 % in the period 2013-2017. During the same period a similar increase, but less pronounced than the increase in consumption, was observed under the three product families: sales of the Union industry producers of flat products increased by 3 %, sales of long products by 10 % and sales of tubes by 26 %.

(77) The trend of the Union industry's overall market (minus 5 percentage points) was confirmed when analysing separately flat products (minus 7 percentage points), long products (minus 3 percentage points) and tubes (minus 5 percentage points).

5.2.2. *Production, production capacity, capacity utilisation rate and stocks*

(78) For each of the three product families, production, production capacity and capacity utilisation rate and stocks developed as follows:

*Table 9*

**Production, production capacity, capacity utilisation, stocks per product family**

| (000 tonnes) | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Production (flat) | 172 873 | 177 224 | 176 567 | 177 247 | 180 986 |
| *index 2013 = 100* | *100* | *103* | *102* | *103* | *105* |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

| (000 tonnes) | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Production (long) | 59 082 | 59 535 | 60 079 | 59 706 | 60 572 |
| *index 2013 = 100* | *100* | *101* | *102* | *101* | *103* |
| Production (tubes) | 11 991 | 13 096 | 12 116 | 12 251 | 13 366 |
| *index 2013 = 100* | *100* | *109* | *101* | *102* | *111* |
| | | | | | |
| Production capacity (flat) | 234 615 | 233 689 | 230 216 | 230 921 | 232 220 |
| *index 2013 = 100* | *100* | *100* | *98* | *98* | *99* |
| Production capacity (long) | 80 833 | 78 244 | 79 455 | 79 736 | 81 806 |
| *index 2013 = 100* | *100* | *97* | *98* | *99* | *101* |
| Production capacity (tubes) | 24 053 | 25 482 | 27 721 | 27 255 | 24 224 |
| *index 2013 = 100* | *100* | *106* | *115* | *113* | *101* |
| | | | | | |
| Capacity utilisation (flat) | 74 % | 76 % | 77 % | 77 % | 78 % |
| Capacity utilisation (long) | 73 % | 76 % | 76 % | 75 % | 74 % |
| Capacity utilisation (tubes) | 50 % | 51 % | 44 % | 45 % | 55 % |
| Stocks (flat) | 7 573 | 8 171 | 8 386 | 8 098 | 8 623 |
| *index 2013 = 100* | *100* | *108* | *111* | *107* | *114* |
| Stocks (long) | 3 449 | 3 430 | 3 722 | 3 740 | 3 877 |
| *index 2013 = 100* | *100* | *99* | *108* | *108* | *112* |
| Stocks (tubes) | 861 | 1 132 | 1 050 | 1 137 | 1 639 |
| *index 2013 = 100* | *100* | *132* | *122* | *132* | *190* |

*Source: Industry data and questionnaire replies.*

(79)    For the three product families the development of the production diverged. Production increased by 5 % for flat products and by 3 % for long products, and decreased for tubes by 11 % during the whole period considered. In any event, the production variation can be regarded as rather stable.

(80)    Overall production capacity remained stable. This trend was consistently confirmed when analysing each product family: for flat products (decrease by 1 %), long products (increase by 1 %) and tubes (increase by 1 %) in the period considered. Capacity utilisation increased overall by for each product family (flat plus 4 percentage points, long plus 1 percentage points and tubes plus 5 percentage points).

(81)    Stocks for flat and long products increased to a similar level during the period 2013 - 2017, while, for tubes, they nearly doubled. The verified and updated figures therefore confirm the trend established in the provisional Regulation.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

No image

L 31/40    EN    Official Journal of the European Union    1.2.2019

5.2.3.  *Unit sales prices, profitability and cash flow*

(82)    For each of the three product families, unit sales prices, profitability and cash flow developed as follows:

*Table 10*

**Unit sales price, profitability, cash flow per product family**

| (EUR / tonne) | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Unit sales price (EUR/tonne, flat) | 711,3 | 689,3 | 659,8 | 612,8 | 744,3 |
| *index 2013 = 100* | *100* | *97* | *93* | *86* | *105* |
| Unit sales price (EUR/tonne, long) | 607,0 | 591,3 | 546,4 | 509,1 | 584,4 |
| *index 2013 = 100* | *100* | *97* | *90* | *84* | *96* |
| Unit sales price (EUR/tonne, tubes) | 1 093,9 | 1 063,5 | 1 013,9 | 913,2 | 949,3 |
| *index 2013 = 100* | *100* | *97* | *93* | *83* | *87* |
| Profitability (% turnover, flat) | -1,9 % | 0,2 % | 0,5 % | 2,5 % | 7,7 % |
| Profitability (% turnover, long) | 0,7 % | 2,1 % | 1,7 % | 2,1 % | 3,1 % |
| Profitability (% turnover, tubes) | 1,3 % | 0,4 % | − 3,4 % | − 1,2 % | − 1,7 % |
| Cash flow (million EUR, flat) | 2 309 | 3 997 | 5 209 | 4 235 | 5 177 |
| *index 2013 = 100* | *100* | *173* | *226* | *183* | *224* |
| Cash flow (million EUR, long) | 820 | 1 156 | 1 534 | 1 473 | 1 159 |
| *index 2013 = 100* | *100* | *141* | *187* | *180* | *141* |
| Cash flow (million EUR, tubes) | 592 | − 178 | − 283 | − 200 | − 135 |
| *index 2013 = 100* | *100* | *− 30* | *− 48* | *− 34* | *− 23* |

*Source: Questionnaire replies.*

(83)    Sales prices for flat products decreased by 14 % until 2016 and then recovered in 2017, rising to a level higher than 2013 (+ 5 %). Unit sales price for long products and tubes also decreased significantly until 2016 (respectively by 16 % and 17 %) and then slightly picked up again in 2017. Overall, prices for these products decreased by respectively 4 % and 13 %.

(84)    As concerns profitability, (i) the Union industry managed to achieve a marginal profit level for flat products in 2016 (after losses and break-even situation in the previous years) and increased its profitability to 7,7 % in 2017; (ii) profitability for long products reached 2,1 % in 2014 and remained around the same level until 2017, when it increased up to 3,1 %; (iii) profitability for tubes dropped significantly from 2013 (1,3 %) to − 3,4 % in 2015, and remained negative in 2016 and 2017 (− 1,2 % and − 1,7 % respectively).

(85)    The cash flow position for flat and long products improved (it increased by 124 % for flat and to a much lower extent for long products, i.e. only by 41 %), while for tubes cash flow decreased significantly, by 130 % in 2014, and remained negative until the end of 2017.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-05 A-357-824 INV - Investigation  -

5.2.4. *Employment*

(86) As concerns employment, producers of flat products were particularly hit as they lost almost 8 600 jobs during that period. In percentage terms, the most severe situation was for the tube producing industry where job losses amounted to 12 % during the period considered.

*Table 11*

**Employment per product family**

| (FTE) | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Employment (flat) | 134 720 | 129 256 | 127 743 | 126 300 | 126 124 |
| *index 2013 = 100* | *100* | *96* | *95* | *94* | *94* |
| Employment (long) | 49 545 | 49 662 | 51 288 | 53 946 | 53 943 |
| *index 2013 = 100* | *100* | *100* | *104* | *109* | *109* |
| Employment (tubes) | 41 342 | 41 511 | 38 978 | 37 214 | 36 333 |
| *index 2013 = 100* | *100* | *100* | *94* | *90* | *88* |

*Source*: Industry data and questionnaire replies.

### 5.3. **Conclusion on the situation of the Union industry and most recent developments**

(87) The above analysis showed that the Union industry – both globally and for each of the three product families – was in a difficult economic situation until 2016, and only partially recovered in 2017. The industry is thus still in a fragile and vulnerable position.

(88) In September 2018, the Commission requested the Union industry associations to provide economic data for the first semester of 2018, in order to examine how the situation developed after the period of investigation, which consisted of the years 2013-2017.

(89) The information obtained by the Commission could not be verified. Moreover, since the Commission did not have data corresponding to the first semester of 2017 (the information was provided on the basis of the full year 2017), the Commission could not draw any reliable conclusion based on the situation of the industry during the first semester 2018. Nevertheless, based on these 2018 data, the trend of 2017, namely a partial recovery of the industry, could be confirmed. It should however be noted that – as indicated in table 12 below – monthly imports into the Union started to increase mostly since June 2018. Moreover, steel prices in the Union started to follow a declining trend since the third quarter of 2018. It is, therefore, not possible to observe the effects of these imports and price development on the situation of the Union industry during the first semester of 2018. Therefore, the recent data confirmed the delicate situation of the Union industry and the threat posed by the most recent increase in imports.

### 5.4. **Threat of serious injury**

(90) In the provisional Regulation, the Commission concluded that the situation of the Union industry deteriorated significantly in the period 2013-2016 and recovered partially in 2017. However, the Commission considered that the Union industry, despite the temporary improvement, was still in a fragile situation and under the threat of serious injury if the increasing trend in imports continued with the ensuing price depression and profitability drop below sustainable levels.

(91) This provisional finding can also be confirmed at definitive stage in light of the above-mentioned updated analysis of the development of the injury indicators both globally and at the level of the three product families (flat products, long products and tubes).

(92) The updated injury indicators include the data of three product categories that had previously been excluded from the scope at provisional stage. Where available, the most recent data have been analysed and this comprehensive analysis has confirmed the key findings made at the provisional stage.

(93)    At the provisional stage, a critical element in the determination of threat of injury was that the significant increase in imports observed since 2013 would not come to a stop but would further rise and reach serious injurious levels in the absence of remedial action. This expected trend is already underway as the most updated set of data show (see section 5.6 below).

### 5.5.    Comments received after provisional measures

(94)    Several interested parties submitted that the Union industry is not in a vulnerable or fragile position, as most of the indicators improved over the period considered, for example it actually achieved a profitability of 6,2 % in 2017 (as mentioned in the provisional Regulation) and the sales prices increased by almost 20 % between 2016 and 2017. It was also mentioned that Eurofer itself had announced that the outlook for the Union industry is positive. In the same vein, these parties also claimed that the standard for establishing serious injury is very high and much higher than the material injury standard in the Anti-Dumping Agreement and the SCM Agreement, as serious injury must be clearly imminent and on the very verge of occurring.

(95)    In the provisional Regulation, the Commission concluded that the Union industry was in a fragile situation, recovering from a period where its situation had deteriorated significantly. This recovery was attributed, *inter alia*, to the effectiveness of the different trade defence measures that have been adopted, in particular since 2016. As the Commission could not establish the existence of serious injury, it assessed the threat thereof. In this context, the Commission confirmed that the ongoing provisional recovery could quickly be reversed if a further increase of imports was to take place. As established above, such a further increase in imports was likely to be exacerbated as a result of the US Section 232 measures. The Commission, therefore, concluded that the fact that the situation for the Union industry in 2017 showed an improvement as compared to previous years did not prevent the findings of the existence of a threat of serious injury. These findings were confirmed in the above analysis and the claim is therefore rejected.

(96)    As concerns the profitability level of the Union industry, several interested parties submitted that, in a number of trade defence cases in the steel sector, the Commission has considered that a 3 to 7 % profit could be considered adequate. Therefore, an overall profitability of 6,2 %, as provisionally established, should be sufficient for the Union industry to remain viable and highly competitive.

(97)    As explained in recitals (90) to (93), despite the fact that in 2017 the profitability levels had significantly improved from previous years (where the Union industry was either loss-making or break-even), this situation could rapidly be reversed if imports would continue to increase (or surge, as a result of inter alia, the US Section 232 measures). In fact, in a situation of threat of serious injury, the analysis must necessarily contain forward-looking elements. In this context, the established risk of trade diversion would be a key element that would negatively affect the current economic situation of the Union industry if measures are not adopted. Consequently, the profitability levels achieved by the industry in 2017 cannot be taken in isolation, and do not invalidate the finding of a threat of serious injury. This claim is thus rejected.

### 5.6.    Post-2017 data analysis

(98)    In the context of threat of serious injury analysis, it is necessary to carry out a forward-looking exercise given that, for the period analysed, the situation has not been deemed to be one of serious injury. In particular, Article 9(2) of Regulation (EU) 2015/478 and Article 6(3) of Regulation (EU) 2015/755, require − in cases of threat of injury − an examination of the rate of increase of the exports to the Union and the likelihood that available capacity is used to export into the Union.

(99)    While the rate of increase of exports was already examined above, the Commission has carried out a more accurate analysis of the likelihood of further increased exports based on an analysis of the most recent data available, namely the period January-September 2018. This updated set of data allowed the Commission to confirm the findings made at provisional stage, in particular with regard to the import trends and the risk of trade diversion.

(100)    As the statistics in the tables below show, the upward trend in imports continued and the first signs of trade diversion have already been observed in the months following the entry into force of the US Section 232 measures, with imports into the USA progressively decreasing and imports into the Union increasing ([23]). In the Commission's view, for the reasons developed below, this increasing trend will become more pronounced in the future if definitive measures are not adopted.

---

([23])   US Section 232 measures entered into force on 8 March 2018, and the Commission analysed data up until September 2018.

Barcode:4168004-05 A-357-824 INV - Investigation    -
1.2.2019    EN    Official Journal of the European Union    L 31/43

#### 5.6.1. *Development of imports into the Union*

(101) The period analysed for the development of imports has been extended by adding the first semester of 2018. This updated analysis shows that, overall, imports of the product under assessment have, on an annual basis further increased. The increase in imports in the period July 2017 – June 2018 as compared to January 2017 – December 2017 is explained by the relatively high level of imports in the first semester of 2018, when the total volume of imports of the products under assessment amounted to 17,4 million MT as compared to 15,4 million MT during the first semester of 2017 and 14,5 million MT during the second semester of 2017. Therefore, this more recent data confirms the Commission's assessment at provisional stage that imports were likely to further increase after 2017.

(102) The US Section 232 measures were imposed on 8 March 2018. It is, therefore, relevant to assess the volume of imports in 2018 on a monthly basis, comparing them with the same period in the preceding year (2017). That comparison demonstrates that, for each and every month in 2018, import volumes into the Union in 2018 were higher than import volumes in 2017. The differences were more substantial in June and July 2018, a few months after the imposition of the US Section 232 measures. In August and September 2018, the increase was still significant but less pronounced than in the preceding two months, possibly in view of the provisional safeguard measures were imposed on 18 July 2018.

(103) Both analyses show a clear trend of a continuous increase in imports into the Union, therefore confirming the Commission's assessment at provisional stage.

*Table 12*

**Monthly imports to the Union**

| EU (000 tonnes) | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|---|---|---|---|
| Imports 2017 (all) | 2 737 | 2 464 | 2 914 | 2 648 | 2 984 | 2 512 | 2 315 | 2 308 | 2 339 |
| Imports 2018 (all) | 3 080 | 2 490 | 2 934 | 3 033 | 2 999 | 2 940 | 2 828 | 2 414 | 2 587 |
| *Increase 2018 from 2017* | + 13 % | + 1 % | + 1 % | + 15 % | + 1 % | + 17 % | + 22 % | + 5 % | + 11 % |

*Source:* Eurostat.

#### 5.6.2. *Development of imports into the USA*

(104) During the hearings mentioned under recital (10), several interested parties submitted that import prices into the USA had increased sharply since the imposition of the US Section 232 measures, to a level that, despite the 25 % duty, would allow these companies to make a profit. Therefore, given that situation, there would be no incentive whatsoever to redirect any of their sales to the USA to any other markets like the Union. It was also claimed that, as a result, the level of imports into the USA was hardly affected by those measures.

(105) The Commission collected statistical data with regard to imports into the USA of the products under assessment in 2018 on a monthly basis:

*Table 13*

**Monthly imports to the US in 2018**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|---|---|---|---|
| Import volume (all) (000 tonnes) | 2 087 | 1 800 | 2 218 | 2 585 | 2 192 | 1 666 | 1 969 | 1 848 | 1 689 |
| *index Jan 2018 = 100* | 100 | 86 | 106 | 124 | 105 | 80 | 94 | 89 | 81 |

*Source:* US national statistics.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-05 A-357-824 INV - Investigation -

(106) The data show that imports into the USA of the 26 products under assessment have sharply decreased, in particular since the imposition of the US Section 232 measures. In September 2018, the level of imports was 35 % below the level of imports in April 2018. Overall, the decrease in imports from January to September 2018 was 19 %.

(107) It should also be noted that, in 2018, a high number of US producers of products covered by the US Section 232 measures have announced important production expansion plans ([24]). Whereas in the short term there might be no or little alternative sources but the imported products, it seems clear that the US industry is preparing to supply the US market on a much bigger scale in the medium term, to the detriment of imports. Consequently, the US market will no longer be able to absorb an increased domestic production and the same level of imports as before. As a consequence, exporting producers will have to look for alternative markets and the Union market is then, in view of its size, an ideal substitute market. The trend of increased imports in the Union, which is driven in part by the impact of the US Section 232 measures, has already started as described in chapter 5.6.1 above. This trend will, therefore, be even more pronounced in the near future if no measures are taken.

(108) The Commission also analysed the volume of imports into the USA in 2018 on a monthly basis as compared the same period in 2017.

(109) Table 14 confirms the trend shown in the table in recital (105) above.

*Table 14*

**Monthly imports to the US**

| US (000 tonnes) | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|---|---|---|---|
| Imports 2017 (all) | 2 088 | 1 893 | 2 284 | 2 259 | 2 345 | 2 684 | 2 614 | 2 220 | 2 259 |
| Imports 2018 (all) | 2 087 | 1 800 | 2 218 | 2 585 | 2 192 | 1 666 | 1 969 | 1 848 | 1 689 |
| *Decrease 2018 from 2017* | *0 %* | *– 5 %* | *– 3 %* | *14 %* | *– 7 %* | *– 38 %* | *– 25 %* | *– 17 %* | *– 25 %* |

*Source:* US national statistics.

Therefore, the imports into the USA, irrespective of the type of comparison carried out, consistently show that there has been a clear and steady trend of a decrease in imports into the USA. This progressive decrease is already causing and will further generate trade diversion that is liable to speed up the increase trend of imports into the Union.

5.7. **Conclusion**

(110) Accordingly, in view of an updated analysis of the situation of the Union industry, a thorough analysis of the comments received after disclosure of the provisional measures and during the hearings, as well a detailed analysis the most recent statistical data, the Commission concluded that the Union steel industry is in a situation of threat of serious injury for the product concerned, including the 26 product categories under assessment. Recitals (58) to (69) of the provisional Regulation are therefore confirmed.

6. **CAUSATION**

(111) In the provisional Regulation, at recitals (70) to (77) the Commission had concluded that there was a causal link between increased imports of the product under assessment and the vulnerable situation of and threat of serious injury to the Union industry as the steel products produced by the Union producers are commonly like or directly competing with the steel products concerned.

---

([24]) Company and date(s) of announcement(s), million short tons: Big River, 25.4.2018 and 29.6.2018, 3,2; US Steel, 5.3.2018, 2,8; JSW Steel, 26.3.2018 and 21.6.2018, 2,5; Nucor, 10.1.2018, 2.3.2018, 11.5.2018 and 7.9.2018, 2,25; North Star Bluescope, 13.8.2018, 0,7-1,0; Liberty Steel Group, 26.6.2018, 0,75; Republic Steel Group, 12.3.2018 and 19.7.2018, 0,66; Steel Dynamics, 26.6.2018, 0,4. The total planned capacity expansion announced by this non-exhaustive list of 2018 press reports (mostly company press releases) is 13,5 million short tonnes, equal to around 12 million MT.

Barcode:4168004-05 A-357-824 INV - Investigation  -

6.1. **Comments received after provisional measures**

(112)  Several interested parties submitted that there was no causation between an increase in imports and the state of the Union industry, as the increase of imports during the period considered had gone hand in hand with an increase in profitability and production and sales volumes.

(113)  As a preliminary point, the Commission wishes to clarify that it has established a threat of serious injury if imports continue to increase. It has not established injury during the investigation due to the increase of imports over the period considered.

(114)  On substance, with regard to this claim, it is important to stress that the Union industry indeed achieved profitable levels of production during the year 2017, which was clearly higher than the one achieved in all other years of the period considered, when it was close to break-even only. However, overall, the largest increase of imports during that period was between 2014 and 2015 (see Table 2 above) and the parallel profitability drop in that same period (down from 0,8 % to 0,6 %, see Table 6 above) demonstrates that there is a doubtless connection between the increase in imports and the state of the Union industry. Moreover, as explained in recital (45) of the provisional Regulation, the profitability achieved in 2017 should be considered as temporary in the current circumstances of a continuously increasing import trend and exceptionally favourable sales prices on the market in that period. Nevertheless, even a profit level of 5,6 % is low in this capital intensive industry. It is, in fact, below the regulated minimum target profit level, for all industrial sectors, in trade defence investigations conducted by the Commission ([25]). Consequently, the Commission considered that the Union industry will find itself in a vulnerable and critical situation if imports continue to increase. This claim is, therefore, rejected.

(115)  It was also submitted by various interested parties that, in previous anti-dumping and anti-subsidy investigations concerning the same products, the Commission had argued that it was the alleged dumping or subsidisation – and not a mere increase in imports – which had caused price depression and injury. According to these interested parties, the dumped or subsidised imports have already been dealt with successfully through the adoption of anti-dumping and anti-subsidy measures concluding those investigations, which would be why the Commission should not now argue that the same injury was caused by something else, i.e. increased imports.

(116)  With regard to this claim, it is important to underline that anti-dumping and anti-subsidy measures do not follow the same logic as safeguard measures. They have, in fact, different objectives. To mention some of the most striking and relevant differences, both anti-dumping and anti-subsidy measures are specific to a limited product scope and address the issue of unfair competition, through dumping or subsidisation, with regard to imports from a certain origin (country), whereas they are as a rule applied for five years, with a possibility to extend that period if certain conditions are fulfilled. By contrast, safeguard measures address an overall increase in imports, with no distinction in the nature of competition or origin (i.e. they are not applied '*sui generis*' to a specific type of imports) and are normally limited in duration. Moreover and more specifically, the anti-dumping and anti-subsidy measures referred to through this claim concern only a few of the product categories covered by the current investigation and only from certain origins. In spite of those measures, the Commission nevertheless found a significant, sudden and sharp overall increase in imports and established a related threat of injury. That claim is, accordingly, rejected.

(117)  Several interested parties submitted that the Commission had not performed a non-attribution analysis to address other factors, which might have caused the injury, in particular with regard to the raw material cost development, declining export performance and imports made by the Union producers. The Commission wishes to clarify that, indeed, at provisional stage it has not assessed all factors that might contribute to the serious injury, which the Union industry would suffer if no measures are taken, as due to the critical circumstances, provisional measures needed to be adopted and imposed without delay. After the imposition of provisional measures, the Commission assessed the impact of these three factors on the state of the Union industry and, thus, their possible contribution to the threat of serious injury.

(118)  With regard to the development of raw material costs, several parties generally observed that the Commission should look into this element, whereas one interested party submitted that the conjectural market situation, linked to cheaper raw materials worldwide, has caused the difficulties 'alleged' by the Commission.

---

([25])  Article 7(2c) of Regulation (EU) 2016/1036 of the European Parliament and of the Council, as amended by Regulation (EU) 2018/825 of the European Parliament and of the Council of 30 May 2018 (OJ L 143, 7.6.2018, p. 6).

No image

Barcode:4168004-05 A-357-824 INV - Investigation  -

L 31/46         EN         Official Journal of the European Union         1.2.2019

(119) The data provided by the Union industry demonstrate that the cost of production for the product concerned developed as follows:

*Table 15*

**Cost of production**

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Cost of production (EUR/tonne) | 700 | 668 | 633 | 579 | 661 |
| *index 2013 = 100* | *100* | *95* | *90* | *83* | *94* |

*Source*: Questionnaire replies.

(120) The above trend is similar to the trend in sales prices, as described in recital 5.1.3 above, with the exception of 2017 when, as explained, sales prices were exceptionally favourable as compared to costs, resulting in a relatively high profit (albeit still under target profit level). This trend does not reveal any particular link between raw material cost and profitability development, if only that in the year when the Union industry's profit declined the strongest as compared to the previous year, i.e. in 2015 (down by 25 %), its cost of production decreased significantly. There is therefore no ground for concluding that the development of raw material prices, either upwards or downwards, represents a threat of injury. That claim therefore, was rejected.

(121) Interested parties also raised the claim that export performance of the Union industry was declining. They based their claims on statements made by Eurofer as well as on the assumption or likelihood that exports to the USA and Turkey would drop in view of the US Section 232 measures and Turkish safeguard investigation.

(122) An analysis of the export performance of the Union industry with regard to the product concerned has been made based on Eurostat data:

*Table 16*

**Exports of the Union industry**

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Export volume (000 tonnes) | 31 181 | 31 599 | 29 449 | 27 578 | 27 603 |
| *index 2013 = 100* | *100* | *101* | *94* | *88* | *89* |
| Export price (EUR/tonne) | 962 | 931 | 934 | 850 | 953 |
| *index 2013 = 100* | *100* | *97* | *97* | *88* | *99* |

*Source*: Eurostat.

(123) The above table demonstrates two things. Firstly, the volumes exported by the Union industry throughout the period considered are relatively small as compared to the volumes sold on the Union market – they accounted, depending on the year, for 17 % - 19 % of the sales volumes of the Union industry only. Secondly, the export price development was rather flat over the period considered, with the exception of 2016 when export prices were overall significantly lower than in the other years (the cost of production was also at a low in 2016). Based on the export sales volumes, the development of those volumes over the period considered and the export sales prices, the Commission found no reason to assume that export sales performance of the Union industry is a major threat of serious injury to the Union industry.

(124) As concerns the role of imports made by Union producers or traders/distributors related thereto, as described in recital (44) above, these imports were marginal and relatively stable over the period considered, representing 0,3 % to 0,7 % of total imports depending on the year. These imports have not affected the import trends, and the claim was therefore rejected.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-05 A-357-824 INV - Investigation  -

(125) Several interested parties submitted that the Commission had not assessed the conditions of competition between the imported products and domestic products as it has allegedly disregarded the breadth and heterogeneity of different product categories covered by the safeguard investigation and only reached conclusions for all product categories in the aggregate. In the same vein, several interested parties claimed that, for each of the product categories, the Commission should have performed a separate causation analysis.

(126) As explained in section 2.1, the Commission considered that, in view of the high degree of interrelation between the product categories that make up the product concerned, that the imported product and the Union product are 'like or directly competing'. The acknowledgement that a global analysis is warranted given the strong interrelations between all product categories subject to the investigation also entails that the most appropriate way to perform the causation analysis is by aggregating the three product families that were distinguished in certain parts of the overall analysis. On this basis, the claim was rejected.

### 6.2. Conclusion

(127) The cumulative attribution analysis of the other factors in recitals (79) and (80) in the provisional Regulation and in section 6.1 above showed that the other factors, both separately and when taken together, did not attenuate the causal link between increase in imports and the threat of serious injury to the Union industry. In the absence of any other comments, recitals (70) to (81) of the provisional Regulation are confirmed.

### 7. UNION INTEREST

(128) The purpose of safeguard measures is to remedy or prevent serious injury that has occurred as a result of increased imports. In accordance with Article 16 of Regulation 2015/478, the Commission has also examined whether any compelling economic reasons exist which could lead to the conclusion that it is not in the Union interest to impose measures.

(129) For this purpose, the impact of possible measures on all Union producers, importers and users of the product concerned and the possible consequences of taking or not taking the measures were considered based on the evidence available. Where necessary, the Commission devised a mechanism which would prevent serious injury from occurring whilst permitting traditional trade flows in a way compatible with a continued competitive functioning of the steel market.

### 7.1. Interest of the Union producers

(130) It was provisionally concluded that imposing safeguard measures would be in the interest of Union producers as it would prevent any serious injury caused by a further and significant increase of imports. After the imposition of provisional measures, the Commission did not receive any comments from the Union producers contradicting this view. The provisional conclusions were therefore confirmed.

### 7.2. Interest of the Union importers and users

(131) The Commission sent questionnaires to known importers and users in order to evaluate their interest.

(132) The Commission received 61 responses from importers and 70 responses from users other than those related to importers. Importers and users also made their views known both orally and in writing.

(133) Several Union importers and users claimed that the imposition of the safeguard measures would not be in the interest of the Union because it would increase import prices and restrict competition on the Union market. They also claimed that the imposition of measures would result in shortages of supply since, allegedly, the Union producers are not producing all types of steel products or not in sufficient quantities to supply the Union demand. This is, allegedly, further exacerbated by the fact that the availability of some products in the Union is restricted because they are subject to anti-dumping or anti-subsidy measures.

(134) After the imposition of provisional measures, several Union users and importers argued that, if definitive measures should be taken, the following elements should be considered:

— A quota level established on the basis of the average of the last three years should be increased by 10 %, as it was done as regards the Union steel safeguard measures in 2002, in order to accommodate for the likely increase in demand in downstream sectors;

Barcode:4168004-05 A-357-824 INV - Investigation -

— Any quota should be allocated to each specific supplying country instead of a 'first-come-first-serve' allocation, in order to maintain traditional trade flows and avoid that certain supplying countries might take advantage of their geographic position or export capacities to fill up rapidly the quota and crowd out other traditional supplying countries;

— Economic certainty should be ensured by establishing a quota system based on licenses. This would ensure continuity of supply and guarantee that shipments go through the tariff free quota the moment they leave the exporting country. Alternatively, it was claimed that the yearly quota should be established on a quarterly basis in order to avoid massive imports at the beginning of the year, which would be detrimental to users that are not in a position to build up stocks and need to be supplied on a stable basis throughout the year.

— Some product types should be subject to separate quotas due to their specificities as compared to other product types falling within the same category. For these products, quotas should further be increased on a regular basis in order to reflect the expected significant increase of demand in the Union market in the next years.

(135) The Commission examined in detail these claims and came to the following conclusions.

(136) First, as already established in the provisional Regulation, the Commission agrees with the fact that traditional trade flows should be maintained as far as possible. Based on the above conclusions of the existence of a threat of serious injury, only imports in excess of these traditional trade flows would cause serious injury to the Union industry. With safeguard measures established under the form of a Tariff Rate Quota, the Commission considers that effective competition between imports and the Union industry will be maintained, and that the risk of general price increases and of any shortage is unlikely. Indeed, with such a form of measures, it is expected that imports will continue at traditional non-injurious levels, and the safeguard measures would only apply if, and when, the level of the quota is reached and the threat materialises.

(137) Furthermore, the Union industry claimed it is able to manufacture all types of steel products. In any event, imports will be maintained – without measures – at their traditional levels, and are still possible above the quota, albeit subject to safeguard measures.

(138) As to the existence of anti-dumping or anti-subsidy measures, their objective is to remedy unfair trade practices. While these measures may indeed have an impact on the level of exports from some supplying countries, this does not affect the level of fairly-priced imports that would have entered the Union market absent injurious dumping or subsidisation practices. This issue, and in particular the cumulation of safeguard with anti-dumping or anti-subsidy measures, is considered under recital (186).

(139) For the above reasons, the claims made by the parties as outlined in recital (133) are hereby rejected.

(140) As to the claims concerning the form and level of measures, the Commission considered the following elements.

### *Level of the tariff-rate quota*

(141) While users and importers consider that any tariff-rate quota should be established at a level of 10 % above the average imports in the last three years since Union steel consumption in certain product categories is likely to experience double-digit growth rates, Union producers claimed that Union steel consumption will remain relatively flat in the coming years.

(142) According to Article 15(3) of Regulation 2015/478, any quota shall, in principle, be set at the average level of imports over the last three representative years. This provision, however, applies in case measures take the form of a quota. As confirmed by the relevant jurisprudence ([26]), a tariff-rate quota is not a quantitative restriction under the WTO Agreement on Safeguards, and therefore, the Commission is not as such bound to establish the level of the tariff-rate quota in this particular case at a level strictly corresponding to the average imports over the last three years.

(143) In view of the claims raised in recital (141) above, and in line with the large economic, political, and legal discretion afforded to the Commission pursuant to Article 16 of Regulation (EU) 2015/478 and 13 of Regulation (EU) 2015/755, the Commission considered it necessary to modulate the tariff-rate quota level above the average import level for the last three years to take account of the competing interests between users and importers, on the one hand, and the Union industry, on the other hand. In this regard, as evidenced under recital (32), the Commission notes that imports of the product categories concerned rose by 4 % from 2017 to the MRP without

---

([26]) WTO Appellate Body Report, *US- Line Pipe*, WT/DS202, para. 235.

Barcode:4168004-05 A-357-824 INV - Investigation -

causing serious injury. The outlook for a future, albeit flatter, import growth rate under normal market conditions, coupled with the economic and political interests of the Union industry as a whole, accordingly mandate for the imposition of a quantitative level of the tariff-rate quota just above the average import level during the period 2017 to the MRP.

(144) On this basis, and in order to limit the increase of imports to a level that is unlikely to cause serious injury to the Union industry whilst, at the same time, ensuring that traditional trade flows are maintained and existing user and importing industry sufficiently supported, the Commission considers that the quantitative level of the tariff-rate quota should be based on the average imports in the period 2015-2017 plus 5 %.

### Allocation of the tariff-rate quotas

(145) Almost all interested parties, including the Union industry, argued in favour of an allocation of tariff-rate quotas to specific supplying countries instead of a global quota system as established at provisional stage.

(146) The Commission agrees that a country-specific tariff-rate quota system is indeed the most appropriate system to ensure traditional trade flows. It has however some limitations. First, the number of supplying countries is significant for each product category. It is not reasonably practicable to allocate a tariff-rate quota to each of them. Second, the Commission considers that it is necessary, for an adequate tariff-rate quota allocation, to take into account special factors that will affect the trade in the products concerned. Indeed, for a number of products falling within the scope of this investigation, the Union has recently imposed anti-dumping/countervailing duty measures on certain exporting countries. This has often resulted in a significant decrease of imports from these countries in the most recent year, and will continue to do so during the period of imposition of these measures. A country-specific tariff-rate quota for these countries will therefore more than likely be used only marginally since the level of the tariff-rate quota is based on the average level of imports in the years 2015-2017, i.e. including a period when anti-dumping/countervailing duty measures were not yet in place and the level of import was significant due to unfair trade practices. It would, therefore, not be in the Union interest to allocate a country specific tariff-rate quota in these circumstances since the level of future imports would unavoidably be below their traditional trade levels.

(147) The Commission concluded that, given the above circumstances, a mixed approach would be the most appropriate. First, a country specific tariff-rate quota should be allocated to countries having a significant supplying interest, based on their imports over the last 3 years. For the purpose of this regulation, it is considered that countries with a share of more than 5 % of imports for the product category concerned have a significant supplying interest. A global tariff-rate quota ('the residual quota') based on the average of the remaining imports over the last three years should be allocated to all other supplying countries.

(148) A country specific tariff-rate quota should however not be allocated to those countries whose export level – for each product category concerned – has substantially diminished in the recent past because of anti-dumping/countervailing duty measures in place for the above reasons. These countries should fall within the residual tariff-rate quota.

(149) In the specific case of product category 1 (hot rolled coils), since close to 60 % of imports are currently covered by anti-dumping measures, the Commission considers that a global quota and no country-specific allocation is the most appropriate.

(150) Finally, the Commission considers that it is also in the Union interest that when a supplying country has exhausted its specific tariff-rate quota, it should be allowed to have access to the residual tariff-rate quota. This possibility should however only be applied during the last quarter of the period, in order to strike a balance between the interests of the countries endowed with a country specific tariff-rate quota and the countries drawing on the global tariff-rate quota. This would not only ensure the maintenance of traditional trade flows but also avoid that, as the case may be, parts of the residual tariff-rate quota would remain unused.

### Predictability of the tariff-rate quota over time

(151) The Commission considers that the introduction of a licensing system is not necessary to ensure predictability.

(152) First, data concerning the development of imports under the tariff-rate quota and the free of duty quota usage is publically available and updated on a daily basis. The data on the tariff-rate quota usage can be found at the following web address:

http://ec.europa.eu/taxation_customs/dds2/taric/quota_consultation.jsp

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-05 A-357-824 INV - Investigation -

L 31/50     EN     Official Journal of the European Union     1.2.2019

(153) Furthermore, a country-specific allocation should also ensure an additional level of predictability for traditional suppliers and users. In addition, when a country-specific tariff-rate quota is exhausted, the country in question will be in a position to export through the available residual quota, although only during the last quarter of the period, which is the most critical period in terms of quota availability.

(154) Finally, the Commission considers that the residual tariff-rate quota should be divided quarterly in order to ensure that imports are evenly distributed over the year and prevent that significant imports of standard products are stockpiled at the beginning of the period in order to avoid possible duties. Unused quarterly tariff-rate quota allocations would also be automatically transferred to the next period.

### Product classification

(155) The Commission has examined the claims made by users and importers to create specific sub-categories for their products. In particular, the Commission has found that two product categories, namely category 3 and 4, present distinct characteristics for which the claims are acceptable.

(156) Category 4 – corrosion resistant sheets – include both products produced specifically for the automotive industry, based on precise product specifications and subject to long term contracts, and other standard products. For the former products, suppliers need first to obtain a certification necessary to supply the industry over a long time period, based on a just-in-time system. For this product category, the Commission acknowledges that there is a risk that some specific product types are crowded out from the free of duty quota by standard products that can be massively supplied and stockpiled at the beginning of the year.

(157) Furthermore, the standard types of products under this product category are currently subject to anti-dumping duties, which also have an impact on future import developments as well as quota allocation, based on what is explained above. The fact that these more specialised products were not covered in the industry's request for anti-dumping measures is also an indication that these products should be considered separately from the standard types of products.

(158) As far as category 3 – electrical sheets – is concerned, the relevant user industry also claimed that some specialised products, i.e. non-grain oriented electrical sheets ([27]), should be separated from other products in this category. This claim is based on the fact that these product types are strategic for the Union economy, as they are used in the new energy/mobility sectors (e.g. new energy vehicles, wind turbines). Users and importers claim that these products are high-value, specialty products, with the risk that they are crowded out by standard products included in the same product category. In addition, users also claimed that the Union demand is likely to increase significantly in the near future and that the specific quota should be increased accordingly in the future. Even though the latter claim could not be duly supported by any evidence, a separate quota for these products would allow examining further duly substantiated requests in the future.

(159) The Commission further considers that, without undermining whatsoever the remedial effect of the measure, it is possible to create sub-sets of products within these two existing product categories, which would accordingly be allocated their own quota.

(160) On the basis of the above, the Commission accepted the claims to split product category 4 (metallic coated sheets) and product category number 3 (electrical sheets (other than GOES)) into two sub-categories.

### Review clause

(161) Finally, the Commission considers that, based on the Union interest, it may have to adjust the level or allocation of the tariff-rate quota as set out in Annexes IV.1 and IV.2 in case of changes of circumstances during the period of imposition of the measures. Such review could concern any product category subject to measures, including (but not limited) to the product categories 3, 4, 6 and 16 that were subject to detailed and substantiated submissions during the investigation as well as in the context of the bilateral consultations held by the Commission. The changed circumstances could, for example, materialise in the case of an overall increase or contraction in Union demand for some product categories that would require a reassessment of the level of the tariff-rate quota, the imposition of anti-dumping or anti-subsidy measures that may significantly affect future import developments, or even any development concerning the US Section 232 that may have a direct impact on the conclusions of this investigation, namely in terms of trade diversion. The Commission may also review whether the operation of the measures could have detrimental effects in achieving the integration objectives

---

([27]) CN codes 7225 19 90, 7226 19 80.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

No image

Barcode:4168004-05 A-357-824 INV - Investigation  -

pursued with preferential trading partners, such as substantially risking their stabilisation or economic development. The Commission will carry out an assessment of the situation on a regular basis, and consider a review at least at the end of each year of imposition of measures. The Commission shall initiate the first review investigation no later than on 1 July 2019.

### 7.3. Conclusion on Union Interest

(162) Based on the above considerations, and a careful examination of the various interests at stake, the Commission concludes that the Union interest requires the adoption of definitive safeguard measures under the form of a tariff rate quota, in order to prevent further deterioration in the situation of the Union producers.

## 8. FINAL CONSIDERATIONS

(163) It is concluded that the Union steel industry is in a situation of threat of serious injury for 26 product categories and that the situation is likely to develop into actual serious injury in the foreseeable future, in the absence of safeguard measures. It is also concluded that it would be in the Union interest to adopt appropriate measures to avoid a further increase of imports.

### 8.1. Form and level of measures

(164) At provisional stage, the Commission found that a measure in the form of a tariff-rate quota was the best way to reconcile the interests of Union steel producers and users. Such a form, if appropriately tuned, would allow to temporarily bringing the imports' increase to a non-injurious level for the Union steel industry, while keeping a suitable choice of supply sources available for its customers in a way that is compatible with a continued competitive functioning of the steel market.

(165) Based on the above Union interest analysis, the Commission considers that a tariff-rate quota is indeed the best form of measure to balance the various interest at stake, namely preventing serious injury and ensuring that traditional trade flows are maintained.

(166) In the comments received by the Commission after provisional measures, although the majority of steel users contested their adoption, they also provided useful suggestions to modulate them and minimize their negative impacts on the market.

(167) Among the comments received, very few concerned the micro simulations and the macro model presented by the Commission to check the proportionality of the off-quota tariff level.

(168) As to the macro model, an association of exporters in a third country criticised that the elasticities used in the Armington model for the overall set of product categories differ from those used in certain more disaggregated studies of specific steel product categories; however these parties did not propose any alternative levels for the overall calculation. The same association also claimed that the Commission had ignored the significant increase in the price levels in the US market, which continues to attract imports despite the Section 232 measures. Concerning the micro simulations, an Union users association and several exporters contended that the benchmarking of micro simulations had only been made with respect to a limited number of product categories, whereas the measures covered a larger set; they also criticised that the calculations were reportedly based on the costs of Chinese producers which could not be considered as representative of all import sources. Several exporters claimed that the Commission has not sufficiently explained the use of the abovementioned models and that the fixing of a 25 % off-quota tariff based on that basis is arbitrary.

(169) The Commission considers that both the micro simulations and the macro model are stylisations of the reality but, contrary to some comments, they are means that allow a technical discussion of alternative scenarios to make policy decision grounded on facts rather than on arbitrary judgements.

(170) The Commission would like to stress that the 25 off-quota tariff fixed by the Commission at the provisional measures' stage intends to deal with a significant increase of steel imports into the Union, which in the most recent period has speeded as a result of the global 25 % tariff that the US have imposed on steel imports (with a limited number of origin exceptions subjected to very restrictive quotas) and the 50 % tariff on Turkish imports. The express aim intended by the US with their measures is to achieve the industrial policy objective of artificially reducing the level of steel imports by 13,3 million metric tons, which will in turn enable the US steel industry to operate at an 80 % capacity utilization rate.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-05 A-357-824 INV - Investigation -

(171) Contrary to the views of a few interested parties, it is against this backdrop that a 25 % level Union off-quota tariff rate is not arbitrary but appears to be fully proportionate measure and perfectly consistent with the objective to protect the Union steel market against a surge of imports, which in the recent period originates to a large extent in the trade deviation that the US protectionist measures are producing. In fact, worldwide steel exporters confronted with a 25 % or 50 % tariff or with restrictive quotas in the US could redirect their exports to the Union above the level of their traditional sales and produce injury to the Union steel industry if there is not a sufficiently deterring hurdle in the Union when imports start exceeding their traditional levels.

(172) It is important to highlight here again that, whereas the tariffs under the Section 232 measures are levied from the first import and therefore seriously distort import trade inflows downwards, the Union tariff-rate quota allows the continued entry of imports from all origins without additional hurdles and only produce effects if the relevant quotas representing the traditional flow of imports from every origin are exceeded, notably because of the trade diversion produced by the US measures.

(173) In these circumstances, unless the Union imposes an above quota tariff on the relevant steel imports of an amount at least equal to the tariff applied by the US, the exporter to the US will gain extra margin or minimise the loss thereof by redirecting sales to the EU. This analysis indicates that the lower end of the off-quota tariff level capable of ensuring a minimal protection of the Union against the trade diversion should at least be 25 %. However, this level will not stop trade diversion. As import prices are pushed upwards in the US by protectionist measures, an important proportion of US steel production that previously was uneconomic becomes profitable, displacing imports and diverting trade towards other markets, being the Union the most attractive alternative destination.

(174) In this context, the micro economic simulations of the contribution margin of landed Union imports proposed by the Union industry and presented at provisional stage by the Commission are key to discuss the commercial behaviour of an exporter confronted with the above-mentioned choice of selling on the US market after payment of the Section 232 tariffs or alternatively exporting incrementally to the Union beyond its traditional sales to avoid such payment.

(175) Contrary to the comments made by some parties, the assumptions made in the simulations are realistic and conservative. They are not mainly based on Chinese costs. The most important component of the costs used in the simulation is a raw material basket valued at international prices. Chinese benchmarks are only used for a comparatively lower proportion of ancillary variable costs on top of the raw materials, on account that China is one of the most prominent exporters across product categories. Finally, the choice of freight costs from China to the Union to calculate the landed cost is a very conservative assumption in the calculation, since if lower freight costs of other possible origins were used the contribution margin would be higher.

(176) These simulations allow calculating the actual level of the out-of-quota tariff capable of deterring trade diversion. As explained in the provisional measures' regulation, these simulations show that the contribution to the margin of the sales for an exporter of steel to the Union in a large variety of the most representative steel product categories under investigation are in excess of 30 % with a median of 34 %. Only above-quota tariffs at these levels would be able to completely offset the contribution to the margin of the relevant steel imports into the Union market and this way remove the incentive for an exporter to the US to redirect diverted sales to the Union market as with this tariff they become uneconomic.

(177) Against this background, the Union has chosen to adopt the least disruptive above quota tariff level of 25 %, which is at the lower end among the range of options discussed above. As explained, this above quota tariff level does not grant full protection shielding the Union completely against trade diversion. To the contrary, it will not only allow the free flow of traditional imports but, on top, said quota tariff levels will also make it possible that, despite the payment of the tariff, a limited proportion of trade diverted sales still remain possible on the Union market, even when traditional trade levels are exceeded to meet an expected increasing demand.

(178) With respect to the comments made by interested parties on the use of a single macro-economic model taking all the product categories together instead of using more disaggregated analysis with the model, the Commission, as explained at provisional stage and in Section 2 above, considers that given the high degree of interconnections between the product categories from a supply and demand point of view such an overall assessment is fully pertinent notably if conservative values of elasticities are taken.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-05 A-357-824 INV - Investigation  -

(179) In the provisional Regulation, the Commission stated that it would closely follow the evolution of imports before adopting a final position. The US and Union statistics on imports of the product categories of steel under investigation show that despite the important increase in prices by the Section 232 measures on the US market, there is a substantial lasting decrease of imports in the US in the last six months since May 2018 which is corresponded with a sustained increase in the growth of imports into the Union of the same steel product categories during the same period. Since May up to September 2018, the US imports of the product categories under investigation decreased by 2,6 million tonnes with respect to the same period in 2017, whereas the EU imports of the same products surged substantially with an increase of 2 million tonnes (77 % of the US decrease) over the same period. This represents a clear upward trend. These data noticeably show that the intended effects of the US Section 232 protectionist measures to produce a reduction in steel imports of 13,3 million metric tons from 2017 levels is well underway. Therefore, the observed most recent import trends do not appear to contradict the assumptions made in the model of possible trade diversion rate of about 70 % which the US measures could eventually achieve once they will have deployed their full protectionist effects over time. Nor would this contradict the ensuing need to have an above quota tariff rate of above 30 % to fully shield the Union market from their induced effects. This level also coincides with the above-described result of the microeconomic simulations.

(180) Accordingly, the Commission has decided to confirm the 25 % above quota tariff rate representing the lower end and least disruptive remedial option against the trade diversion produced by the US Section 232 measures.

### 8.2. Administration of the tariff-rate quotas

(181) As explained above, based on Union interest considerations and in order to maintain as far as possible traditional trade flows, the best way of ensuring optimal use of the tariff quotas is to allocate it between the countries having a substantial interest in supplying the product concerned and, for the others, in the chronological order of the dates on which declarations of release for free circulation are accepted, as provided for in Commission Implementing Regulation (EU) 2015/2447 ([28]). This method of administration calls for close cooperation between the Member States and the Commission.

(182) The eligibility of imported goods from developing countries to be excluded from the tariff quotas is dependent on the origin of the goods. The criteria for determining non-preferential origin currently in force in the Union should therefore be applied.

(183) For the purpose of the definitive measures, in order to permit traditional trade flows to continue, a specific quota will be determined for each of the product categories on which this Regulation imposes definitive measures.

### 8.3. Applicable anti-dumping and anti-subsidy measures

(184) After the imposition of provisional measures, several users and importers reiterated their claims that Union producers are not in need of additional protection because of the existing anti-dumping and anti-subsidy measures, and that in any event safeguard and anti-dumping/anti-subsidy measures should not be cumulated.

(185) The Commission recalls that anti-dumping and countervailing duty measures do not seek to close the Union market but merely remedy injurious trading practices. As such, these measures target country-specific situations of dumping and subsidisation, have a different scope of application and purpose than the safeguard measure imposed by way of this Regulation, and are not mutually exclusive.

(186) However, as mentioned in recital (117) of the provisional Regulation, the Commission acknowledges that a cumulation of anti-dumping/anti-subsidy measures with safeguards may lead to a greater effect than desirable. Since this issue of cumulation would only potentially arise once tariff-rate quota ceilings are reached, the Commission will explore the need to address the issue at a later stage and in due course. In this framework, in order to avoid the imposition of 'double remedies' whenever the tariff quota is exceeded, the Commission may consider necessary to suspend or reduce the level of the existing anti-dumping and countervailing duties to ensure that the combined effect of these measures does not exceed the highest level of the safeguard or anti-dumping/countervailing duties in place.

---

([28]) Commission Implementing Regulation (EU) 2015/2447 of 24 November 2015 laying down detailed rules for implementing certain provisions of Regulation (EU) No 952/2013 of the European Parliament and of the Council laying down the Union Customs Code (OJ L 343, 29.12.2015, p. 558).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-05 A-357-824 INV - Investigation -

8.4.  **Duration**

(187)  The Commission considers that the measures should be in place for a period of three years (including the period of imposition of the provisional measures), expiring on 30 June 2021. A tariff-rate quota should be open for the period 2 February 2019 to 30 June 2019, thereafter, for the period of 1 July 2019 to 30 June 2020, and, thereafter, for the period 1 July 2020 to 30 June 2021, as specified in Annex VI for each product category concerned.

(188)  Since the duration of the measures is for over a year, the measures must be progressively liberalised at regular intervals during the period of application. The Commission considers that the most appropriate way to liberalise the measures is to increase the level of the free of duty quota by 5 % after the each year. This should include the period of application of provisional measures, meaning that the first liberalisation will take place on 1 July 2019, with the second liberalisation taking place on 1 July 2020. Subsequent liberalisations will follow the same pattern.

8.5.  **Surveillance on steel products**

(189)  Surveillance measures on steel products subject to this investigation were introduced in April 2016 since it appeared that trends in imports threatened to cause serious injury. Given the findings of this investigation and the imposition of definitive safeguard measures, the Commission considers that the surveillance system on steel products subject to safeguard measures should be suspended during the time of the imposition of safeguard measures.

9.  **EXCLUSION OF CERTAIN COUNTRIES FROM THE SCOPE OF THE DEFINITIVE MEASURES**

(190)  In accordance with Article 18 of Regulation (EU) 2015/478 and the international obligations of the Union, the provisional measures should not apply to any product originating in a developing country member of the WTO as long as its share of imports of that product into the Union does not exceed 3 %, provided that developing country members of the WTO with less than a 3 % import share, collectively account for not more than 9 % of total Union imports of the product concerned.

(191)  The final determination made by the Commission shows that the product categories concerned originating in certain developing countries meet the requirements to benefit from the abovementioned derogation. Annex III.2 (*List of product categories originating in developing countries to which the provisional measures apply*) specifies the developing countries for the purposes of this Regulation. It also indicates for each of the 26 product categories the developing countries to which the provisional measures apply. The Commission considers it appropriate to calculate the volume of imports from developing countries, based on statistics available during the most recent period for each product category since the tariff rate quota is also established by reference to traditional trade flows from each category individually.

(192)  Since the exclusion of the developing country Members of the WTO should apply as long as their share of Union imports does not exceed 3 %, the Commission will carry out an assessment of the situation on a regular basis, and at least at the end of each year of imposition of measures, in order to examine whether any country has exceeded the above threshold and should eventually be included in the scope of the safeguard measures.

(193)  As set out in recital (80) of the provisional Regulation, on account of the close integration of markets with EEA members, the overall figures of imports from these countries, and the low risk of trade diversion, the Commission considers that the products under assessment originating in Norway, Iceland, and Liechtenstein should be excluded from the application of this Regulation. Furthermore, in order to comply with bilateral obligations, certain countries with which the Union has signed an Economic Partnership Agreement that is currently in force ([29]) should also be excluded from the application of this Regulation. After the imposition of the provisional measures, the Commission did not receive any comment that would lead to a change in these conclusions which are therefore confirmed.

10.  **OBLIGATIONS ARISING FROM BI-LATERAL AGREEMENTS BETWEEN THE UNION AND THIRD COUNTRIES.**

(194)  The Commission ensured that the safeguard measures taken pursuant to this Regulation also complies with the obligations arising from the bilateral Agreements signed with certain third countries.

---

([29])  Botswana, Cameroon, Fiji, Ghana, Ivory Coast, Lesotho, Mozambique, Namibia, South Africa, Eswatini.

Barcode:4168004-05 A-357-824 INV - Investigation  -

1.2.2019          EN          Official Journal of the European Union          L 31/55

(195) In this respect, it is noted that imports from the former Yugoslav Republic of Macedonia into the Union were found to have increased significantly in the period under investigation and contributed to the threat of serious injury suffered by the Union steel industry. These imports, therefore, meet the conditions required to take safeguard measures pursuant to Article 37(1) of the Stabilisation and Association Agreement concluded between the European Communities and their Member States, and the former Yugoslav Republic of Macedonia ([30]).

(196) It is also considered that given the scope and the conclusions of the investigation, there are serious disturbances in the steel sector, and that safeguard measures are therefore also justified under Article 26 of the Agreement concluded between the European Economic Community and the Swiss Confederation in 1972 ([31]).

(197) Finally, imports originating in Turkey also fulfil the conditions required by Article 12 of the Agreement concluded between the European Coal and Steel Community and the Republic of Turkey on trade in products covered by the Treaty establishing the European Coal and Steel Community ([32]) and Article 60 of Additional Protocol signed on 23 November 1970, annexed to the Agreement establishing the Association between the European Economic Community and Turkey ([33]).

## 11. FINAL CONSIDERATIONS

(198) In view of the case-law of the Court of Justice ([34]), it is appropriate to provide for the rate of default interest to be paid in case of any potential reimbursement of definitive duties, because the relevant provisions in force concerning customs duties do not provide for such an interest rate, and the application of national rules would lead to undue distortions between economic operators depending on which Member State is chosen for customs clearance.

(199) The measures provided for in this Regulation are in accordance with the opinion of the Committee on Safeguards established under Article 3(3) of Regulation (EU) 2015/478 and Article 22(3) of Regulation (EU) 2015/755 respectively,

HAS ADOPTED THIS REGULATION:

*Article 1*

1. Subject to Articles 6 and 7, a tariff quota is hereby opened in relation to imports into the Union of each of the 26 products categories concerned (defined by reference to the CN codes specified in relation to it in Annex I) and each of the periods specified in Annex IV.1 and IV.2.

2. For each of the product categories concerned, and with the exception of product category 1, a part of each tariff-rate quota is allocated to the countries specified in Annex IV.

3. The remaining part of each tariff-rate quota, as well as the tariff-rate quota for product category 1, shall be allocated on a first-come-first-served basis, based on a tariff-rate quota established equally for each quarter of the period of imposition.

4. The drawings on each quarterly quota shall be stopped on the twentieth working day of the Commission following the end of the quarterly period. At the end of each quarter, the unused balances of the tariff-rate quota shall automatically be transferred to the next quarter. No unused balance at the end of the last quarter of each year of application of the definitive tariff-rate quota shall be transferred.

5. Where the relevant quota under paragraph 2 is exhausted for one specific country, imports from that country can be made under the remaining part of the tariff-rate quota for the same product category. That provision shall only apply during the last quarter of each year of application of the definitive tariff-rate quota.

6. Where the relevant tariff-rate quota is exhausted or where imports of the product categories do not benefit from the relevant tariff-rate quota, an additional duty at the rate of 25 %, applicable to the net, free-at-Union-frontier price, before duty, shall be applied on the product categories set out in Annex IV.1.

---

[30] OJ L 84, 20.3.2004, p.13.
[31] OJ L 300, 31.12.1972, p. 189.
[32] OJ L 227, 7.9.1996, p. 3.
[33] OJ L 293, 29.12.1972, p.3.
[34] Judgment of the Court (Third Chamber) of 18 January 2017, C-365/15, *Wortmann v Hauptzollamt Bielefeld*, EU:C:2017:19, paragraphs 35 to 39.

L 31/56        EN        Official Journal of the European Union        1.2.2019

*Article 2*

1.    The origin of any product to which this Regulation applies shall be determined in accordance with the provisions in force in the Union relating to non-preferential origin.

2.    Unless otherwise specified, the provisions in force concerning customs duties shall apply. The default interest to be paid in case of reimbursement that gives rise to a right to payment of default interest shall be the rate applied by the European Central Bank to its principal refinancing operations, as published in the C series of the *Official Journal of the European Union*, in force on the first calendar day of the month in which the deadline falls, increased by one percentage point.

*Article 3*

The tariff-rate quotas set out in Article 1 shall be managed by the Commission and the Member States in accordance with the management system for tariff-rate quotas provided for in Articles 49 to 54 of Commission Implementing Regulation (EU) 2015/2447.

*Article 4*

The Member States and the Commission shall cooperate closely to ensure compliance with this Regulation.

*Article 5*

1.    Subject to paragraph 2, imports of the 26 product categories specified in Annex IV originating in one of the countries specified in Annex III shall not be subject to the measures contained in Article 1.

2.    For each of the 26 product categories specified in Annex IV, Annex III.2 specifies the originating countries which shall be subject to the measures set out in Article 1.

*Article 6*

1.    Products originating in Norway, Iceland, and Liechtenstein shall not be subject to the measures set out in Article 1.

2.    The following countries shall also not be subject to the measures set out in Article 1: Botswana, Cameroon, Fiji, Ghana, Ivory Coast, Lesotho, Mozambique, Namibia, South Africa, Eswatini.

*Article 7*

Prior surveillance measures in force by means of Commission Implementing Regulation (EU) 2016/670 ([35]) shall be suspended for the products mentioned in Annex IV during the time of the imposition of safeguard measures set out in Article 1.

*Article 8*

During the period set out in Annexes IV.1 and IV.2 the Commission may review the measures in case of change of circumstances.

*Article 9*

Any amounts paid in respect of additional duties imposed pursuant to Implementing Regulation (EU) 2018/1013 in relation to the products specified in Annex IV of this Regulation shall be definitively collected at the level set in Article 1(3) of Implementing Regulation (EU) 2018/1013.

*Article 10*

This Regulation shall enter into force on the day following that of its publication in the *Official Journal of the European Union*.

_____

([35]) Commission Implementing Regulation (EU) 2016/670 of 28 April 2016 introducing prior Union surveillance of imports of certain iron and steel products originating in certain third countries (OJ L 115, 29.4.2016, p. 37).

No image

1.2.2019 | EN | Official Journal of the European Union | L 31/57

This Regulation shall be binding in its entirety and directly applicable in all Member States.

Done at Brussels, 31 January 2019.

*For the Commission*
*The President*
Jean-Claude JUNCKER

———

No image

Barcode:4168004-05 A-357-824 INV - Investigation -

L 31/58    EN    Official Journal of the European Union    1.2.2019

*ANNEX I*

**Product concerned**

| Product Number | Product category | CN Codes |
|---|---|---|
| 1 | Non Alloy and Other Alloy Hot Rolled Sheets and Strips | 7208 10 00, 7208 25 00, 7208 26 00, 7208 27 00, 7208 36 00, 7208 37 00, 7208 38 00, 7208 39 00, 7208 40 00, 7208 52 10, 7208 52 99, 7208 53 10, 7208 53 90, 7208 54 00, 7211 13 00, 7211 14 00, 7211 19 00, 7212 60 00, 7225 19 10, 7225 30 10, 7225 30 30, 7225 30 90, 7225 40 15, 7225 40 90, 7226 19 10, 7226 91 20, 7226 91 91, 7226 91 99 |
| 2 | Non Alloy and Other Alloy Cold Rolled Sheets | 7209 15 00, 7209 16 90, 7209 17 90, 7209 18 91, 7209 25 00, 7209 26 90, 7209 27 90, 7209 28 90, 7209 90 20, 7209 90 80, 7211 23 20, 7211 23 30, 7211 23 80, 7211 29 00, 7211 90 20, 7211 90 80, 7225 50 20, 7225 50 80, 7226 20 00, 7226 92 00 |
| 3 | Electrical Sheets (other than GOES) | 7209 16 10, 7209 17 10, 7209 18 10, 7209 26 10, 7209 27 10, 7209 28 10, 7225 19 90, 7226 19 80 |
| 4 | Metallic Coated Sheets | 7210 20 00, 7210 30 00, 7210 41 00, 7210 49 00, 7210 61 00, 7210 69 00, 7210 90 80, 7212 20 00, 7212 30 00, 7212 50 20, 7212 50 30, 7212 50 40, 7212 50 61, 7212 50 69, 7212 50 90, 7225 91 00, 7225 92 00, 7225 99 00, 7226 99 10, 7226 99 30, 7226 99 70 |
| 5 | Organic Coated Sheets | 7210 70 80, 7212 40 80 |
| 6 | Tin Mill products | 7209 18 99, 7210 11 00, 7210 12 20, 7210 12 80, 7210 50 00, 7210 70 10, 7210 90 40, 7212 10 10, 7212 10 90, 7212 40 20 |
| 7 | Non Alloy and Other Alloy Quarto Plates | 7208 51 20, 7208 51 91, 7208 51 98, 7208 52 91, 7208 90 20, 7208 90 80, 7210 90 30, 7225 40 12, 7225 40 40, 7225 40 60 |
| 8 | Stainless Hot Rolled Sheets and Strips | 7219 11 00, 7219 12 10, 7219 12 90, 7219 13 10, 7219 13 90, 7219 14 10, 7219 14 90, 7219 22 10, 7219 22 90, 7219 23 00, 7219 24 00, 7220 11 00, 7220 12 00 |
| 9 | Stainless Cold Rolled Sheets and Strips | 7219 31 00, 7219 32 10, 7219 32 90, 7219 33 10, 7219 33 90, 7219 34 10, 7219 34 90, 7219 35 10, 7219 35 90, 7219 90 20, 7219 90 80, 7220 20 21, 7220 20 29, 7220 20 41, 7220 20 49, 7220 20 81, 7220 20 89, 7220 90 20, 7220 90 80 |
| 10 | Stainless Hot Rolled Quarto Plates | 7219 21 10, 7219 21 90 |
| 11 | Grain-Oriented Electrical Sheet | 7225 11 00, 7226 11 00 |
| 12 | Non Alloy and Other Alloy Merchant Bars and Light Sections | 7214 30 00, 7214 91 10, 7214 91 90, 7214 99 31, 7214 99 39, 7214 99 50, 7214 99 71, 7214 99 79, 7214 99 95, 7215 90 00, 7216 10 00, 7216 21 00, 7216 22 00, 7216 40 10, 7216 40 90, 7216 50 10, 7216 50 91, 7216 50 99, 7216 99 00, 7228 10 20, 7228 20 10, 7228 20 91, 7228 30 20, 7228 30 41, 7228 30 49, 7228 30 61, 7228 30 69, 7228 30 70, 7228 30 89, 7228 60 20, 7228 60 80, 7228 70 10, 7228 70 90, 7228 80 00 |
| 13 | Rebars | 7214 20 00, 7214 99 10 |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved
No image

Barcode:4168004-05 A-357-824 INV - Investigation  -

1.2.2019   EN   Official Journal of the European Union   L 31/59

| Product Number | Product category | CN Codes |
|---|---|---|
| 14 | Stainless Bars and Light Sections | 7222 11 11, 7222 11 19, 7222 11 81, 7222 11 89, 7222 19 10, 7222 19 90, 7222 20 11, 7222 20 19, 7222 20 21, 7222 20 29, 7222 20 31, 7222 20 39, 7222 20 81, 7222 20 89, 7222 30 51, 7222 30 91, 7222 30 97, 7222 40 10, 7222 40 50, 7222 40 90 |
| 15 | Stainless Wire Rod | 7221 00 10, 7221 00 90 |
| 16 | Non Alloy and Other Alloy Wire Rod | 7213 10 00, 7213 20 00, 7213 91 10, 7213 91 20, 7213 91 41, 7213 91 49, 7213 91 70, 7213 91 90, 7213 99 10, 7213 99 90, 7227 10 00, 7227 20 00, 7227 90 10, 7227 90 50, 7227 90 95 |
| 17 | Angles, Shapes and Sections of Iron or Non Alloy Steel | 7216 31 10, 7216 31 90, 7216 32 11, 7216 32 19, 7216 32 91, 7216 32 99, 7216 33 10, 7216 33 90 |
| 18 | Sheet Piling | 7301 10 00 |
| 19 | Railway Material | 7302 10 22, 7302 10 28, 7302 10 40, 7302 10 50, 7302 40 00 |
| 20 | Gas pipes | 7306 30 41, 7306 30 49, 7306 30 72, 7306 30 77 |
| 21 | Hollow sections | 7306 61 10, 7306 61 92, 7306 61 99 |
| 22 | Seamless Stainless Tubes and Pipes | 7304 11 00, 7304 22 00, 7304 24 00, 7304 41 00, 7304 49 10, 7304 49 93, 7304 49 95, 7304 49 99 |
| 23 | Bearing Tubes and Pipes | 7304 51 12, 7304 51 18, 7304 59 32, 7304 59 38 |
| 24 | Other Seamless Tubes | 7304 19 10, 7304 19 30, 7304 19 90, 7304 23 00, 7304 29 10, 7304 29 30, 7304 29 90, 7304 31 20, 7304 31 80, 7304 39 10, 7304 39 52, 7304 39 58, 7304 39 92, 7304 39 93, 7304 39 98, 7304 51 81, 7304 59 10, 7304 59 92, 7304 59 93, 7304 59 99, 7304 90 00 |
| 25 | Large welded tubes | 7305 11 00, 7305 12 00, 7305 19 00, 7305 20 00, 7305 31 00, 7305 39 00, 7305 90 00 |
| 26 | Other Welded Pipes | 7306 11 10, 7306 11 90, 7306 19 10, 7306 19 90, 7306 21 00, 7306 29 00, 7306 30 11, 7306 30 19, 7306 30 80, 7306 40 20, 7306 40 80, 7306 50 20, 7306 50 80, 7306 69 10, 7306 69 90, 7306 90 00 |
| 27 | Non-alloy and other alloy cold finished bars | 7215 10 00, 7215 50 11, 7215 50 19, 7215 50 80, 7228 10 90, 7228 20 99, 7228 50 20, 7228 50 40, 7228 50 61, 7228 50 69, 7228 50 80 |
| 28 | Non Alloy Wire | 7217 10 10, 7217 10 31, 7217 10 39, 7217 10 50, 7217 10 90, 7217 20 10, 7217 20 30, 7217 20 50, 7217 20 90, 7217 30 41, 7217 30 49, 7217 30 50, 7217 30 90, 7217 90 20, 7217 90 50, 7217 90 90 |

Barcode:4168004-05 A-357-824 INV - Investigation -

No image

## ANNEX II

### II.1 — Growth in imports for the 26 product categories (in tonnes)

| Product Number | Product category | 2013 | 2014 | 2015 | 2016 | 2017 | MRP | Growth MRP compared to 2013 |
|---|---|---|---|---|---|---|---|---|
| 1 | Non Alloy and Other Alloy Hot Rolled Sheets and Strips | 4 867 242 | 5 263 815 | 7 854 395 | 8 610 847 | 7 048 217 | 7 209 718 | 48 % |
| 2 | Non Alloy and Other Alloy Cold Rolled Sheets | 1 837 875 | 1 906 067 | 2 761 337 | 2 007 299 | 2 463 937 | 2 463 941 | 34 % |
| 3 | Electrical Sheets (other than GOES) | 266 355 | 284 376 | 279 777 | 312 647 | 377 744 | 433 526 | 63 % |
| 4 | Metallic Coated Sheets | 1 855 325 | 2 203 135 | 2 688 830 | 3 924 906 | 5 019 132 | 4 637 052 | 150 % |
| 5 | Organic Coated Sheets | 681 646 | 725 004 | 622 482 | 730 619 | 919 000 | 937 693 | 38 % |
| 6 | Tin Mill products | 549 941 | 660 743 | 634 722 | 754 638 | 616 810 | 735 928 | 34 % |
| 7 | Non Alloy and Other Alloy Quarto Plates | 1 439 430 | 1 968 634 | 2 573 220 | 2 834 744 | 2 549 694 | 2 374 170 | 65 % |
| 8 | Stainless Hot Rolled Sheets and Strips | 157 197 | 213 885 | 247 090 | 326 631 | 407 886 | 408 468 | 160 % |
| 9 | Stainless Cold Rolled Sheets and Strips | 645 004 | 954 179 | 697 199 | 753 058 | 869 091 | 972 415 | 51 % |
| 10 | Stainless Hot Rolled Quarto Plates | 26 799 | 34 700 | 31 586 | 25 995 | 27 704 | 28 677 | 7 % |
| 12 | Non Alloy and Other Alloy Merchant Bars and Light Sections | 942 999 | 1 265 397 | 1 233 328 | 1 429 511 | 1 419 973 | 1 792 392 | 90 % |
| 13 | Rebars | 528 702 | 972 572 | 1 430 000 | 1 292 936 | 1 191 379 | 1 755 338 | 232 % |
| 14 | Stainless Bars and Light Sections | 114 638 | 149 670 | 144 875 | 149 499 | 161 973 | 184 811 | 61 % |
| 15 | Stainless Wire Rod | 52 068 | 71 209 | 57 542 | 58 659 | 63 022 | 69 786 | 34 % |
| 16 | Non Alloy and Other Alloy Wire Rod | 1 107 169 | 1 267 308 | 1 694 707 | 2 001 322 | 2 093 877 | 2 354 164 | 113 % |
| 17 | Angles, Shapes and Sections of Iron or Non Alloy Steel | 222 797 | 274 863 | 267 851 | 387 353 | 262 759 | 373 732 | 68 % |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

No image

| Product Number | Product category | 2013 | 2014 | 2015 | 2016 | 2017 | MRP | Growth MRP compared to 2013 |
|---|---|---|---|---|---|---|---|---|
| 18 | Sheet Piling | 15 871 | 16 497 | 14 051 | 36 683 | 84 549 | 83 502 | 426 % |
| 19 | Railway Material | 14 587 | 25 532 | 23 202 | 12 494 | 18 232 | 23 013 | 58 % |
| 20 | Gas pipes | 275 378 | 349 078 | 314 471 | 354 261 | 401 410 | 445 569 | 62 % |
| 21 | Hollow sections | 485 038 | 578 426 | 602 190 | 757 274 | 862 889 | 956 360 | 97 % |
| 22 | Seamless Stainless Tubes and Pipes | 42 417 | 55 590 | 54 948 | 51 614 | 49 593 | 49 781 | 17 % |
| 24 | Other Seamless Tubes | 440 696 | 509 052 | 448 761 | 448 333 | 410 822 | 480 600 | 9 % |
| 25 | Large welded tubes | 295 502 | 418 808 | 218 549 | 171 512 | 1 053 049 | 720 886 | 144 % |
| 26 | Other Welded Pipes | 462 137 | 484 915 | 494 914 | 526 634 | 551 764 | 558 457 | 21 % |
| 27 | Non-alloy and other alloy cold finished bars | 446 086 | 514 066 | 479 271 | 454 924 | 454 921 | 501 232 | 12 % |
| 28 | Non Alloy Wire | 555 798 | 700 560 | 683 041 | 726 158 | 714 480 | 762 600 | 37 % |

II.2 — Growth in imports for the 2 product categories (in tonnes)

| Product Number | Product category | 2013 | 2014 | 2015 | 2016 | 2017 | MRP | Growth MRP compared to 2013 |
|---|---|---|---|---|---|---|---|---|
| 11 | Grain-Oriented Electrical Sheet | 114 388 | 112 258 | 101 737 | 109 518 | 99 917 | 106 570 | – 7 % |
| 23 | Bearing Tubes and Pipes | 7 475 | 8 998 | 8 337 | 7 035 | 6 137 | 6 265 | – 16 % |

Barcode:4168004-05 A-357-824 INV - Investigation -

ANNEX III

## III.1 — List of developing countries, members of the WTO

Afghanistan, Albania, Angola, Antigua and Barbuda, Argentina, Armenia, Bahrain, Bangladesh, Barbados, Belize, Benin, Bolivia, Botswana, Brazil, Brunei Darussalam, Burkina Faso, Burundi, Cabo Verde, Cambodia, Cameroon, Central African Republic, Chad, Chile, China, Colombia, Congo, Costa Rica, Côte d'Ivoire, Cuba, Democratic Republic of the Congo, Djibouti, Dominica, Dominican Republic, Ecuador, Egypt, El Salvador, Eswatini, Fiji, Gabon, Gambia, Georgia, Ghana, Grenada, Guatemala, Guinea, Guinea-Bissau, Guyana, Haiti, Honduras, Hong Kong, India, Indonesia, Jamaica, Jordan, Kazakhstan, Kenya, Kuwait, Kyrgyz Republic, Lao People's Democratic Republic, Lesotho, Liberia, Macao, Madagascar, Malawi, Malaysia, Maldives, Mali, Mauritania, Mauritius, Mexico, Moldova, Mongolia, Montenegro, Morocco, Mozambique, Myanmar, Namibia, Nepal, Nicaragua, Niger, Nigeria, Oman, Pakistan, Panama, Papua New Guinea, Paraguay, Peru, Philippines, Qatar, Rwanda, Saint Kitts and Nevis, Saint Lucia, Saint Vincent and the Grenadines, Samoa, Saudi Arabia, Senegal, Seychelles, Sierra Leone, Solomon Islands, South Africa, Sri Lanka, Suriname, Tanzania, Thailand, Former Yugoslav Republic of Macedonia, Togo, Tonga, Trinidad and Tobago, Tunisia, Turkey, Uganda, Ukraine, United Arab Emirates, Uruguay, Vanuatu, Venezuela, Vietnam, Yemen, Zambia, Zimbabwe.

## III.2 — List of product categories originating in developing countries to which the definitive measures apply

| Country / Product group | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 24 | 25 | 26 | 27 | 28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Brazil | × | × | | | | × | × | × | | | | | | | | | | | | | | | | | | |
| China | | | × | × | × | × | | × | × | × | × | | | × | | × | × | × | | × | × | | × | × | × | × |
| Egypt | × | | | | | | | | | | × | | | | | | | | | | | | | | | |
| Former Yugoslav Republic of Macedonia | | | | | × | | × | | | | | | | | | | | | × | × | × | | | | | |
| India | × | × | × | × | × | × | | × | × | × | | | × | × | | | | | × | × | × | | | × | | |
| Indonesia | | | | | | | × | | | | | | | | | | | | | | | | | | | |
| Malaysia | | | | | | | | | × | | | | | | | | | | | | | | | | | |
| Mexico | | | | | | | | | | | | | | | | | | | | | | × | | | | |
| Moldova | | | | | | | | | | | | × | | | × | | | | | | | | | | | |
| Thailand | | | | | | | | | × | | | | | | | | | | | | | | | | | |
| Turkey | × | × | | × | × | | | | × | × | × | × | | | × | × | × | × | × | × | × | × | × | × | × | × |
| Ukraine | × | × | | | | | × | | | × | × | × | × | | × | × | × | × | × | × | × | × | | × | × | × |
| United Arab Emirates | | | | | | | | | | | | | | | | × | × | | × | | | | | × | | |
| Vietnam | | × | | × | | | | | × | | | | | | | | | | | | | | | × | | |

Barcode:4168004-05 A-357-824 INV - Investigation -

ANNEX IV

## IV.1 — Volumes of tariff-rate quotas

| Product Number | Product category | CN Codes | Allocation by country (Where Applicable) | Volume of tariff-rate quota (net tonnes) From 2.2.2019 to 30.6.2019 | From 1.7.2019 to 30.6.2020 Volume of tariff-rate quota (net tonnes) | From 1.7.2020 to 30.6.2021 Volume of tariff-rate quota (net tonnes) | Additional duty rate | Order numbers |
|---|---|---|---|---|---|---|---|---|
| 1 | Non Alloy and Other Alloy Hot Rolled Sheets and Strips | 7208 10 00, 7208 25 00, 7208 26 00, 7208 27 00, 7208 36 00, 7208 37 00, 7208 38 00, 7208 39 00, 7208 40 00, 7208 52 10, 7208 52 99, 7208 53 10, 7208 53 90, 7208 54 00, 7211 13 00, 7211 14 00, 7211 19 00, 7212 60 00, 7225 19 10, 7225 30 10, 7225 30 30, 7225 30 90, 7225 40 15, 7225 40 90, 7226 19 10, 7226 91 91, 7226 91 99 | All third countries | 3 359 532,08 | 8 641 212,54 | 9 073 273,16 | 25 % | (¹) |
| 2 | Non Alloy and Other Alloy Cold Rolled Sheets | 7209 15 00, 7209 16 90, 7209 17 90, 7209 18 91, 7209 25 00, 7209 26 90, 7209 27 90, 7209 28 90, 7209 90 20, 7209 90 80, 7211 23 20, 7211 23 30, 7211 23 80, 7211 29 00, 7211 90 20, 7211 90 80, 7225 50 20, 7225 50 80, 7226 20 00, 7226 92 00 | India | 234 714,39 | 603 720,07 | 633 906,07 | 25 % | 09.8801 |
| | | | Korea (Republic of) | 144 402,99 | 371 425,82 | 389 997,11 | 25 % | 09.8802 |
| | | | Ukraine | 102 325,83 | 263 197,14 | 276 357,00 | 25 % | 09.8803 |
| | | | Brazil | 65 398,61 | 168 214,89 | 176 625,64 | 25 % | 09.8804 |
| | | | Serbia | 56 480,21 | 145 275,43 | 152 539,20 | 25 % | 09.8805 |
| | | | Other countries | 430 048,96 | 1 106 149,42 | 1 161 456,89 | 25 % | (²) |
| 3.A | Electrical Sheets (other than GOES) | 7209 16 10, 7209 17 10, 7209 18 10, 7209 26 10, 7209 27 10, 7209 28 10 | Korea (Republic of) | 1 923,96 | 4 948,72 | 5 196,15 | 25 % | 09.8806 |
| | | | China | 822,98 | 2 116,84 | 2 222,68 | 25 % | 09.8807 |
| | | | Russia | 519,69 | 1 336,71 | 1 403,54 | 25 % | 09.8808 |
| | | | Iran (Islamic Republic of) | 227,52 | 585,21 | 614,47 | 25 % | 09.8809 |
| | | | Other countries | 306,34 | 787,96 | 827,35 | 25 % | (²) |

No image

Barcode:4168004-05 A-357-824 INV - Investigation -

No image

| Product Number | Product category | CN Codes | Allocation by country (Where Applicable) | Volume of tariff-rate quota (net tonnes) From 2.2.2019 to 30.6.2019 | Volume of tariff-rate quota (net tonnes) From 1.7.2019 to 30.6.2020 | Volume of tariff-rate quota (net tonnes) From 1.7.2020 to 30.6.2021 | Additional duty rate | Order numbers |
|---|---|---|---|---|---|---|---|---|
| 3.B | | 7225 19 90, 7226 19 80 | Russia | 51 426,29 | 132 276,00 | 138 889,80 | 25 % | 09.8811 |
| | | | Korea (Republic of) | 31 380,40 | 80 715,02 | 84 750,77 | 25 % | 09.8812 |
| | | | China | 24 187,01 | 62 212,57 | 65 323,20 | 25 % | 09.8813 |
| | | | Taiwan | 18 144,97 | 46 671,54 | 49 005,12 | 25 % | 09.8814 |
| | | | Other countries | 8 395,39 | 21 594,19 | 22 673,90 | 25 % | (⁶) |
| 4.A (⁶) | Metallic Coated Sheets | TARIC Codes: 7210 41 00 20, 7210 49 00 20, 7210 61 00 20, 7210 69 00 20, 7212 30 00 20, 7212 50 61 20, 7212 50 69 20, 7225 92 00 20, 7225 99 00 11, 7226 99 30 10, 7226 99 70 11, 7226 99 70 91, 7226 99 70 94 | Korea (Republic of) | 69 571,10 | 178 947,15 | 187 894,51 | 25 % | 09.8816 |
| | | | India | 83 060,42 | 213 643,66 | 224 325,84 | 25 % | 09.8817 |
| | | | Other countries | 761 518,93 | 1 958 739,13 | 2 056 676,09 | 25 % | (⁷) |
| 4.B (⁷) | | CN Codes: 7210 20 00, 7210 30 00, 7210 90 80, 7212 20 00, 7212 50 20, 7212 50 30, 7212 50 40, 7212 50 90, 7225 91 00, 7226 99 10 TARIC codes: 7210 41 00 80, 7210 49 00 80, 7210 61 00 80, 7210 69 00 80, 7212 30 00 80, 7212 50 61 80, 7212 50 69 80, 7225 92 00 80, 7225 99 00 25, 7225 99 00 95, 7226 99 30 90, 7226 99 70 19, 7226 99 70 96 | China | 204 951,07 | 527 164,42 | 553 522,64 | 25 % | 09.8821 |
| | | | Korea (Republic of) | 249 533,26 | 641 836,39 | 673 928,21 | 25 % | 09.8822 |
| | | | India | 118 594,25 | 305 041,91 | 320 294,00 | 25 % | 09.8823 |
| | | | Taiwan | 49 248,78 | 126 675,12 | 133 008,88 | 25 % | 09.8824 |
| | | | Other countries | 125 598,05 | 323 056,72 | 339 209,55 | 25 % | (⁸) |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

1.2.2019 | EN | Official Journal of the European Union | L 31/65

No image

| Product Number | Product category | CN Codes | Allocation by country (Where Applicable) | Volume of tariff-rate quota (net tonnes) From 2.2.2019 to 30.6.2019 | Volume of tariff-rate quota (net tonnes) From 1.7.2019 to 30.6.2020 | Volume of tariff-rate quota (net tonnes) From 1.7.2020 to 30.6.2021 | Additional duty rate | Order numbers |
|---|---|---|---|---|---|---|---|---|
| 5 | Organic Coated Sheets | 7210 70 80, 7212 40 80 | India | 108 042,36 | 277 900,89 | 291 795,94 | 25 % | 09.8826 |
| | | | Korea (Republic of) | 103 354,11 | 265 842,04 | 279 134,14 | 25 % | 09.8827 |
| | | | Taiwan | 31 975,79 | 82 246,46 | 86 358,79 | 25 % | 09.8828 |
| | | | Turkey | 21 834,45 | 56 161,42 | 58 969,49 | 25 % | 09.8829 |
| | | | Former Yugoslav Republic of Macedonia | 16 331,15 | 42 006,13 | 44 106,44 | 25 % | 09.8830 |
| | | | Other countries | 43 114,71 | 110 897,39 | 116 442,26 | 25 % | (⁹) |
| 6 | Tin Mill products | 7209 18 99, 7210 11 00, 7210 12 20, 7210 12 80, 7210 50 00, 7210 70 10, 7210 90 40, 7212 10 10, 7212 10 90, 7212 40 20 | China | 158 139,17 | 406 757,31 | 427 095,17 | 25 % | 09.8831 |
| | | | Serbia | 30 545,88 | 78 568,52 | 82 496,95 | 25 % | 09.8832 |
| | | | Korea (Republic of) | 23 885,70 | 61 437,55 | 64 509,42 | 25 % | 09.8833 |
| | | | Taiwan | 21 167,00 | 54 444,65 | 57 166,88 | 25 % | 09.8834 |
| | | | Brazil | 19 730,03 | 50 748,55 | 53 285,98 | 25 % | 09.8835 |
| | | | Other countries | 33 167,30 | 85 311,19 | 89 576,75 | 25 % | (¹⁰) |
| 7 | Non Alloy and Other Alloy Quarto Plates | 7208 51 20, 7208 51 91, 7208 51 98, 7208 52 91, 7208 90 20, 7208 90 80, 7210 90 30, 7225 40 12, 7225 40 40, 7225 40 60 | Ukraine | 339 678,24 | 873 702,59 | 917 387,71 | 25 % | 09.8836 |
| | | | Korea (Republic of) | 140 011,38 | 360 129,93 | 378 136,43 | 25 % | 09.8837 |
| | | | Russia | 115 485,12 | 297 044,77 | 311 897,01 | 25 % | 09.8838 |
| | | | India | 74 811,09 | 192 425,17 | 202 046,43 | 25 % | 09.8839 |
| | | | Other countries | 466 980,80 | 1 201 143,58 | 1 261 200,76 | 25 % | (¹¹) |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

No image

| Product Number | Product category | CN Codes | Allocation by country (Where Applicable) | Volume of tariff-rate quota (net tonnes) | | | Additional duty rate | Order numbers |
|---|---|---|---|---|---|---|---|---|
| | | | | From 2.2.2019 to 30.6.2019 | From 1.7.2019 to 30.6.2020 | From 1.7.2020 to 30.6.2021 | | |
| 8 | Stainless Hot Rolled Sheets and Strips | 7219 11 00, 7219 12 10, 7219 12 90, 7219 13 10, 7219 13 90, 7219 14 10, 7219 14 90, 7219 22 10, 7219 22 90, 7219 23 00, 7219 24 00, 7220 11 00, 7220 12 00 | China | 87 328,82 | 224 622,62 | 235 853,75 | 25 % | 09.8841 |
| | | | Korea (Republic of) | 18 082,33 | 46 510,43 | 48 835,95 | 25 % | 09.8842 |
| | | | Taiwan | 12 831,07 | 33 003,41 | 34 653,58 | 25 % | 09.8843 |
| | | | United States of America | 11 810,30 | 30 377,84 | 31 896,74 | 25 % | 09.8844 |
| | | | Other countries | 10 196,61 | 26 227,19 | 27 538,55 | 25 % | ([12]) |
| 9 | Stainless Cold Rolled Sheets and Strips | 7219 31 00, 7219 32 10, 7219 32 90, 7219 33 10, 7219 33 90, 7219 34 10, 7219 34 90, 7219 35 10, 7219 35 90, 7219 90 20, 7219 90 80, 7220 20 21, 7220 20 29, 7220 20 41, 7220 20 49, 7220 20 81, 7220 20 89, 7220 90 20, 7220 90 80 | Korea (Republic of) | 70 813,18 | 182 141,97 | 191 249,07 | 25 % | 09.8846 |
| | | | Taiwan | 65 579,14 | 168 679,23 | 177 113,19 | 25 % | 09.8847 |
| | | | India | 42 720,54 | 109 883,53 | 115 377,71 | 25 % | 09.8848 |
| | | | United States of America | 35 609,52 | 91 592,94 | 96 172,59 | 25 % | 09.8849 |
| | | | Turkey | 29 310,69 | 75 391,41 | 79 160,98 | 25 % | 09.8850 |
| | | | Malaysia | 19 799,24 | 50 926,57 | 53 472,90 | 25 % | 09.8851 |
| | | | Vietnam | 16 832,28 | 43 295,10 | 45 459,86 | 25 % | 09.8852 |
| | | | Other countries | 50 746,86 | 130 528,43 | 137 054,85 | 25 % | ([13]) |
| 10 | Stainless Hot Rolled Quarto Plates | 7219 21 10, 7219 21 90 | China | 6 765,50 | 17 401,86 | 18 271,95 | 25 % | 09.8856 |
| | | | India | 2 860,33 | 7 357,20 | 7 725,06 | 25 % | 09.8857 |
| | | | Taiwan | 1 119,34 | 2 879,11 | 3 023,06 | 25 % | 09.8858 |
| | | | Other countries | 1 440,07 | 3 704,07 | 3 889,27 | 25 % | ([14]) |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

No image

| Product Number | Product category | CN Codes | Allocation by country (Where Applicable) | From 2.2.2019 to 30.6.2019 Volume of tariff-rate quota (net tonnes) | From 1.7.2019 to 30.6.2020 Volume of tariff-rate quota (net tonnes) | From 1.7.2020 to 30.6.2021 Volume of tariff-rate quota (net tonnes) | Additional duty rate | Order numbers |
|---|---|---|---|---|---|---|---|---|
| 12 | Non Alloy and Other Alloy Merchant Bars and Light Sections | 7214 30 00, 7214 91 10, 7214 91 90, 7214 99 31, 7214 99 39, 7214 99 50, 7214 99 71, 7214 99 79, 7214 99 95, 7215 90 00, 7216 10 00, 7216 21 00, 7216 22 00, 7216 40 10, 7216 40 90, 7216 50 10, 7216 50 91, 7216 50 99, 7216 99 00, 7228 10 20, 7228 20 10, 7228 20 91, 7228 30 20, 7228 30 41, 7228 30 49, 7228 30 61, 7228 30 69, 7228 30 70, 7228 30 89, 7228 60 20, 7228 60 80, 7228 70 10, 7228 70 90, 7228 80 00 | China | 166 217,87 | 427 536,89 | 448 913,74 | 25 % | 09.8861 |
| | | | Turkey | 114 807,87 | 295 302,79 | 310 067,93 | 25 % | 09.8862 |
| | | | Russia | 94 792,44 | 243 820,15 | 256 011,16 | 25 % | 09.8863 |
| | | | Switzerland | 73 380,52 | 188 745,54 | 198 182,81 | 25 % | 09.8864 |
| | | | Belarus | 57 907,73 | 148 947,24 | 156 394,60 | 25 % | 09.8865 |
| | | | Other countries | 76 245,19 | 196 113,88 | 205 919,57 | 25 % | (¹³) |
| 13 | Rebars | 7214 20 00, 7214 99 10 | Turkey | 117 231,80 | 301 537,50 | 316 614,37 | 25 % | 09.8866 |
| | | | Russia | 94 084,20 | 241 998,46 | 254 098,38 | 25 % | 09.8867 |
| | | | Ukraine | 62 534,65 | 160 848,36 | 168 890,77 | 25 % | 09.8868 |
| | | | Bosnia and Herzegovina | 39 356,10 | 101 229,71 | 106 291,20 | 25 % | 09.8869 |
| | | | Moldova | 28 284,59 | 72 752,14 | 76 389,74 | 25 % | 09.8870 |
| | | | Other countries | 217 775,50 | 560 150,74 | 588 158,28 | | (¹⁴) |
| 14 | Stainless Bars and Light Sections | 7222 11 11, 7222 11 19, 7222 11 81, 7222 11 89, 7222 19 10, 7222 19 90, 7222 20 11, 7222 20 19, 7222 20 21, 7222 20 29, 7222 20 31, 7222 20 39, 7222 20 81, 7222 20 89, 7222 30 51, 7222 30 91, 7222 30 97, 7222 40 10, 7222 40 50, 7222 40 90 | India | 44 433,00 | 114 288,24 | 120 002,65 | 25 % | 09.8871 |
| | | | Switzerland | 6 502,75 | 16 726,03 | 17 562,33 | 25 % | 09.8872 |
| | | | Ukraine | 5 733,50 | 14 747,41 | 15 484,78 | 25 % | 09.8873 |
| | | | Other countries | 8 533,24 | 21 948,75 | 23 046,19 | 25 % | (¹⁷) |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

No image

| Product Number | Product category | CN Codes | Allocation by country (Where Applicable) | From 2.2.2019 to 30.6.2019 Volume of tariff-rate quota (net tonnes) | From 1.7.2019 to 30.6.2020 Volume of tariff-rate quota (net tonnes) | From 1.7.2020 to 30.6.2021 Volume of tariff-rate quota (net tonnes) | Additional duty rate | Order numbers |
|---|---|---|---|---|---|---|---|---|
| 15 | Stainless Wire Rod | 7221 00 10, 7221 00 90 | India | 10 135,23 | 26 069,31 | 27 372,78 | 25 % | 09.8876 |
| | | | Taiwan | 6 619,68 | 17 026,79 | 17 878,13 | 25 % | 09.8877 |
| | | | Korea (Republic of) | 3 300,07 | 8 488,26 | 8 912,67 | 25 % | 09.8878 |
| | | | China | 2 216,86 | 5 702,09 | 5 987,20 | 25 % | 09.8879 |
| | | | Japan | 2 190,40 | 5 634,03 | 5 915,73 | 25 % | 09.8880 |
| | | | Other countries | 1 144,43 | 2 943,64 | 3 090,82 | 25 % | (18) |
| 16 | Non Alloy and Other Alloy Wire Rod | 7213 10 00, 7213 20 00, 7213 91 10, 7213 91 20, 7213 91 41, 7213 91 49, 7213 91 70, 7213 91 90, 7213 99 10, 7213 99 90, 7227 10 00, 7227 20 00, 7227 90 10, 7227 90 50, 7227 90 95 | Ukraine | 149 009,10 | 383 273,39 | 402 437,06 | 25 % | 09.8881 |
| | | | Switzerland | 141 995,22 | 365 232,67 | 383 494,31 | 25 % | 09.8882 |
| | | | Russia | 122 883,63 | 316 074,84 | 331 878,59 | 25 % | 09.8883 |
| | | | Turkey | 121 331,08 | 312 081,44 | 327 685,51 | 25 % | 09.8884 |
| | | | Belarus | 97 436,46 | 250 620,96 | 263 152,01 | 25 % | 09.8885 |
| | | | Moldova | 73 031,65 | 187 848,18 | 197 240,59 | 25 % | 09.8886 |
| | | | Other countries | 122 013,20 | 313 835,96 | 329 527,76 | 25 % | (19) |
| 17 | Angles, Shapes and Sections of Iron or Non Alloy Steel | 7216 31 10, 7216 31 90, 7216 32 11, 7216 32 19, 7216 32 91, 7216 32 99, 7216 33 10, 7216 33 90 | Ukraine | 42 915,19 | 110 384,21 | 115 903,42 | 25 % | 09.8891 |
| | | | Turkey | 38 465,03 | 98 937,73 | 103 884,61 | 25 % | 09.8892 |
| | | | Korea (Republic of) | 10 366,76 | 26 664,84 | 27 998,09 | 25 % | 09.8893 |
| | | | Russia | 9 424,08 | 24 240,12 | 25 452,12 | 25 % | 09.8894 |
| | | | Brazil | 8 577,95 | 22 063,74 | 23 166,93 | 25 % | 09.8895 |
| | | | Switzerland | 6 648,01 | 17 099,66 | 17 954,65 | 25 % | 09.8896 |
| | | | Other countries | 14 759,92 | 37 964,70 | 39 862,93 | 25 % | (20) |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

No image

| Product Number | Product category | CN Codes | Allocation by country (Where Applicable) | From 2.2.2019 to 30.6.2019 Volume of tariff-rate quota (net tonnes) | From 1.7.2019 to 30.6.2020 Volume of tariff-rate quota (net tonnes) | From 1.7.2020 to 30.6.2021 Volume of tariff-rate quota (net tonnes) | Additional duty rate | Order numbers |
|---|---|---|---|---|---|---|---|---|
| 18 | Sheet Piling | 7301 10 00 | China | 12 198,24 | 31 375,68 | 32 944,46 | 25 % | 09.8901 |
| | | | United Arab Emirates | 6 650,41 | 17 105,84 | 17 961,13 | 25 % | 09.8902 |
| | | | Other countries | 480,04 | 1 234,73 | 1 296,46 | 25 % | (21) |
| 19 | Railway Material | 7302 10 22, 7302 10 28, 7302 10 40, 7302 10 50, 7302 40 00 | Russia | 2 147,19 | 5 522,90 | 5 799,05 | 25 % | 09.8906 |
| | | | China | 2 145,07 | 5 517,42 | 5 793,30 | 25 % | 09.8907 |
| | | | Turkey | 1 744,68 | 4 487,58 | 4 711,96 | 25 % | 09.8908 |
| | | | Ukraine | 657,60 | 1 691,46 | 1 776,03 | 25 % | 09.8909 |
| | | | Other countries | 1 010,85 | 2 600,06 | 2 730,07 | 25 % | (22) |
| 20 | Gas pipes | 7306 30 41, 7306 30 49, 7306 30 72, 7306 30 77 | Turkey | 88 914,68 | 228 701,68 | 240 136,77 | 25 % | 09.8911 |
| | | | India | 32 317,40 | 83 125,12 | 87 281,37 | 25 % | 09.8912 |
| | | | Former Yugoslav Republic of Macedonia | 9 637,48 | 24 789,01 | 26 028,46 | 25 % | 09.8913 |
| | | | Other countries | 22 028,87 | 56 661,52 | 59 494,59 | 25 % | (23) |
| 21 | Hollow sections | 7306 61 10, 7306 61 92, 7306 61 99 | Turkey | 154 436,15 | 397 232,59 | 417 094,22 | 25 % | 09.8916 |
| | | | Russia | 35 406,28 | 91 070,18 | 95 623,68 | 25 % | 09.8917 |
| | | | Former Yugoslav Republic of Macedonia | 34 028,95 | 87 527,48 | 91 903,85 | 25 % | 09.8918 |
| | | | Ukraine | 25 240,74 | 64 922,92 | 68 169,06 | 25 % | 09.8919 |
| | | | Switzerland | 25 265,29 | 57 369,40 | 60 237,87 | 25 % | 09.8920 |
| | | | Belarus | 20 898,79 | 53 754,78 | 56 442,52 | 25 % | 09.8921 |
| | | | Other countries | 25 265,29 | 64 986,05 | 68 235,36 | 25 % | (24) |

Barcode:4168004-05 A-357-824 INV - Investigation -

L 31/70    EN    Official Journal of the European Union    1.2.2019

No image

| Product Number | Product category | CN Codes | Allocation by country (Where Applicable) | From 2.2.2019 to 30.6.2019 Volume of tariff-rate quota (net tonnes) | From 1.7.2019 to 30.6.2020 Volume of tariff-rate quota (net tonnes) | From 1.7.2020 to 30.6.2021 Volume of tariff-rate quota (net tonnes) | Additional duty rate | Order numbers |
|---|---|---|---|---|---|---|---|---|
| 22 | Seamless Stainless Tubes and Pipes | 7304 11 00, 7304 22 00, 7304 24 00, 7304 41 00, 7304 49 10, 7304 49 93, 7304 49 95, 7304 49 99 | India | 8 315,90 | 21 389,71 | 22 459,20 | 25 % | 09.8926 |
| | | | Ukraine | 5 224,94 | 13 439,33 | 14 111,29 | 25 % | 09.8927 |
| | | | Korea (Republic of) | 1 649,31 | 4 242,27 | 4 454,39 | 25 % | 09.8928 |
| | | | Japan | 1 590,45 | 4 090,86 | 4 295,41 | 25 % | 09.8929 |
| | | | United States of America | 1 393,26 | 3 583,68 | 3 762,86 | 25 % | 09.8930 |
| | | | China | 1 299,98 | 3 343,74 | 3 510,92 | 25 % | 09.8931 |
| | | | Other countries | 2 838,17 | 7 300,20 | 7 665,21 | 25 % | (25) |
| 24 | Other Seamless Tubes | 7304 19 30, 7304 19 90, 7304 23 00, 7304 29 30, 7304 29 90, 7304 31 20, 7304 31 80, 7304 39 10, 7304 39 52, 7304 39 58, 7304 39 92, 7304 39 93, 7304 39 98, 7304 51 81, 7304 51 89, 7304 59 10, 7304 59 92, 7304 59 93, 7304 59 99, 7304 90 00 | China | 49 483,75 | 127 279,51 | 133 643,48 | 25 % | 09.8936 |
| | | | Ukraine | 36 779,89 | 94 603,32 | 99 333,49 | 25 % | 09.8937 |
| | | | Belarus | 19 655,31 | 50 556,35 | 53 084,17 | 25 % | 09.8938 |
| | | | Japan | 13 766,04 | 35 408,29 | 37 178,71 | 25 % | 09.8939 |
| | | | United States of America | 12 109,53 | 31 147,50 | 32 704,87 | 25 % | 09.8940 |
| | | | Other countries | 55 345,57 | 142 356,97 | 149 474,82 | 25 % | (26) |
| 25 | Large welded tubes | 7305 11 00, 7305 12 00, 7305 19 00, 7305 20 00, 7305 31 00, 7305 39 00, 7305 90 00 | Russia | 140 602,32 | 361 649,91 | 379 732,41 | 25 % | 09.8941 |
| | | | Turkey | 17 543,40 | 45 124,22 | 47 380,43 | 25 % | 09.8942 |
| | | | China | 14 213,63 | 36 559,56 | 38 387,54 | 25 % | 09.8943 |
| | | | Other countries | 34 011,86 | 87 483,52 | 91 857,70 | 25 % | (27) |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

1.2.2019    EN    Official Journal of the European Union    L 31/71

| Product Number | Product category | CN Codes | Allocation by country (Where Applicable) | Volume of tariff-rate quota (net tonnes) From 2.2.2019 to 30.6.2019 | Volume of tariff-rate quota (net tonnes) From 1.7.2019 to 30.6.2020 | Volume of tariff-rate quota (net tonnes) From 1.7.2020 to 30.6.2021 | Additional duty rate | Order numbers |
|---|---|---|---|---|---|---|---|---|
| 26 | Other Welded Pipes | 7306 11 10, 7306 11 90, 7306 19 10, 7306 19 90, 7306 21 00, 7306 29 00, 7306 30 11, 7306 30 19, 7306 30 80, 7306 40 20, 7306 40 80, 7306 50 20, 7306 50 80, 7306 69 10, 7306 69 90, 7306 90 00 | Switzerland | 64 797,98 | 166 669,96 | 175 003,46 | 25 % | 09.8946 |
| | | | Turkey | 60 693,64 | 156 113,01 | 163 918,66 | 25 % | 09.8947 |
| | | | United Arab Emirates | 18 676,40 | 48 038,46 | 50 440,38 | 25 % | 09.8948 |
| | | | China | 18 010,22 | 46 324,96 | 48 641,20 | 25 % | 09.8949 |
| | | | Taiwan | 14 374,20 | 36 972,56 | 38 821,19 | 25 % | 09.8950 |
| | | | India | 11 358,87 | 29 216,69 | 30 677,53 | 25 % | 09.8951 |
| | | | Other countries | 36 898,57 | 94 908,57 | 99 653,99 | 25 % | (28) |
| 27 | Non-alloy and other alloy cold finished bars | 7215 10 00, 7215 50 11, 7215 50 19, 7215 50 80, 7228 10 90, 7228 20 99, 7228 50 20, 7228 50 40, 7228 50 61, 7228 50 69, 7228 50 80 | Russia | 117 519,41 | 302 277,28 | 317 391,14 | 25 % | 09.8956 |
| | | | Switzerland | 27 173,22 | 69 893,54 | 73 388,22 | 25 % | 09.8957 |
| | | | China | 20 273,26 | 52 145,82 | 54 753,12 | 25 % | 09.8958 |
| | | | Ukraine | 15 969,02 | 41 074,67 | 43 128,40 | 25 % | 09.8959 |
| | | | Other countries | 17 540,47 | 45 116,69 | 47 372,52 | 25 % | (29) |
| 28 | Non Alloy Wire | 7217 10 10, 7217 10 31, 7217 10 39, 7217 10 50, 7217 10 90, 7217 20 10, 7217 20 30, 7217 20 50, 7217 20 90, 7217 30 41, 7217 30 49, 7217 30 50, 7217 30 90, 7217 90 20, 7217 90 50, 7217 90 90 | Belarus | 88 294,51 | 227 106,51 | 238 461,84 | 25 % | 09.8961 |
| | | | China | 66 719,82 | 171 613,24 | 180 193,90 | 25 % | 09.8962 |
| | | | Russia | 41 609,21 | 107 025,04 | 112 376,29 | 25 % | 09.8963 |
| | | | Turkey | 40 302,46 | 103 663,89 | 108 847,08 | 25 % | 09.8964 |
| | | | Ukraine | 26 755,09 | 68 818,05 | 72 258,95 | 25 % | 09.8965 |
| | | | Other countries | 39 770,29 | 102 295,06 | 107 409,81 | 25 % | (30) |

(¹) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 and 31.3.2021: 09.8601.
(²) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8602.
(³) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 and 31.3.2021: 09.8603.
(⁴) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8604.
(⁵) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 and 31.3.2021: 09.8605.
(⁶) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8606.
(⁷) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 and 31.3.2021: 09.8607.
(⁸) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8608.

No image

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

L 31/72   EN   Official Journal of the European Union   1.2.2019

No image

(f) Products subject to anti-dumping duties

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8609.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8610

(f) Products which are not subject to anti-dumping duties (including automotive)

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8611.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8612

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8613.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8614

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8615.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8616

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8617.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8618

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8619.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8620

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8621.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8622

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8623.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8624

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8625.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8626

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8627.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8628

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8629.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8630

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8631.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8632

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8633.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8634

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8635.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8636

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8637.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8638

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8639.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8640

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8641.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8642

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8643.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8644

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8645.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8646

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8647.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8648

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8649.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8650

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8651.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8652

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8653.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8654

(f) From 2.2.2019 to 31.3.2019, from 1.7.2019 to 31.3.2020 and from 1.7.2020 to 31.3.2021: 09.8655.

(f) From 1.4.2019 to 30.6.2019, from 1.4.2020 to 30.6.2020 and from 1.4.2021 to 30.6.2021: 09.8656

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

1.2.2019    EN    Official Journal of the European Union    L 31/73

No image

## IV.2 — Volumes of global tariff-rate quotas per trimester

| Product number | | YEAR 1 | | | | YEAR 2 | | | | YEAR 3 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | From 2.2.2019 to 31.3.2019 | From 1.4.2019 to 30.6.2019 | From 1.7.2019 to 30.9.2019 | From 1.10.2019 to 31.12.2019 | From 1.1.2020 to 31.3.2020 | From 1.4.2020 to 30.6.2020 | From 1.7.2020 to 30.9.2020 | From 1.10.2020 to 31.12.2020 | From 1.1.2021 to 31.3.2021 | From 1.4.2021 to 30.6.2021 |
| 1 | Other countries | 1 307 737,32 | 2 051 794,76 | 2 172 108,07 | 2 172 108,07 | 2 148 498,20 | 2 148 498,20 | 2 286 962,00 | 2 286 962,00 | 2 237 245,44 | 2 262 103,72 |
| 2 | Other countries | 167 401,61 | 262 647,35 | 278 048,49 | 278 048,49 | 275 026,22 | 275 026,22 | 292 750,78 | 292 750,78 | 286 386,63 | 289 568,70 |
| 3A | Other countries | 119,25 | 187,09 | 198,07 | 198,07 | 195,91 | 195,91 | 208,54 | 208,54 | 204,01 | 206,27 |
| 3B | Other countries | 3 268,01 | 5 127,39 | 5 428,05 | 5 428,05 | 5 369,05 | 5 369,05 | 5 715,07 | 5 715,07 | 5 590,82 | 5 652,94 |
| 4A | Other countries | 296 430,19 | 465 088,74 | 492 360,66 | 492 360,66 | 487 008,91 | 487 008,91 | 518 395,07 | 518 395,07 | 507 125,61 | 512 760,34 |
| 4B | Other countries | 48 890,51 | 76 707,53 | 81 205,51 | 81 205,51 | 80 322,84 | 80 322,84 | 85 499,39 | 85 499,39 | 83 640,71 | 84 570,05 |
| 5 | Other countries | 16 782,91 | 26 331,80 | 27 875,85 | 27 875,85 | 27 572,85 | 27 572,85 | 29 349,83 | 29 349,83 | 28 711,79 | 29 030,81 |
| 6 | Other countries | 12 910,76 | 20 256,54 | 21 444,34 | 21 444,34 | 21 211,25 | 21 211,25 | 22 578,25 | 22 578,25 | 22 087,42 | 22 332,83 |
| 7 | Other countries | 181 777,76 | 285 203,04 | 301 926,80 | 301 926,80 | 298 644,99 | 298 644,99 | 317 891,70 | 317 891,70 | 310 981,01 | 314 436,35 |
| 8 | Other countries | 3 969,15 | 6 227,46 | 6 592,63 | 6 592,63 | 6 520,97 | 6 520,97 | 6 941,22 | 6 941,22 | 6 790,33 | 6 865,78 |
| 9 | Other countries | 19 753,81 | 30 993,05 | 32 810,42 | 32 810,42 | 32 453,79 | 32 453,79 | 34 545,33 | 34 545,33 | 33 794,35 | 34 169,84 |
| 10 | Other countries | 560,56 | 879,51 | 931,08 | 931,08 | 920,96 | 920,96 | 980,31 | 980,31 | 959,00 | 969,65 |
| 12 | Other countries | 29 679,33 | 46 565,85 | 49 296,38 | 49 296,38 | 48 760,55 | 48 760,55 | 51 903,01 | 51 903,01 | 50 774,69 | 51 338,85 |

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/5/21 6:51 PM, Submission Status: Approved

Barcode:4168004-05 A-357-824 INV - Investigation -

L 31/74   EN   Official Journal of the European Union   1.2.2019

| Product number | | YEAR 1 | | YEAR 2 | | | | YEAR 3 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | From 2.2.2019 to 31.3.2019 | From 1.4.2019 to 30.6.2019 | From 1.7.2019 to 30.9.2019 | From 1.10.2019 to 31.12.2019 | From 1.1.2020 to 31.3.2020 | From 1.4.2020 to 30.6.2020 | From 1.7.2020 to 30.9.2020 | From 1.10.2020 to 31.12.2020 | From 1.1.2021 to 31.3.2021 | From 1.4.2021 to 30.6.2021 |
| 13 | Other countries | 84 771,67 | 133 003,83 | 140 802,92 | 140 802,92 | 139 272,45 | 139 272,45 | 148 248,11 | 148 248,11 | 145 025,33 | 146 636,72 |
| 14 | Other countries | 3 321,66 | 5 211,58 | 5 517,17 | 5 517,17 | 5 457,20 | 5 457,20 | 5 808,90 | 5 808,90 | 5 682,62 | 5 745,76 |
| 15 | Other countries | 445,48 | 698,95 | 739,93 | 739,93 | 731,89 | 731,89 | 779,06 | 779,06 | 762,12 | 770,59 |
| 16 | Other countries | 47 495,07 | 74 518,13 | 78 887,73 | 78 887,73 | 78 030,25 | 78 030,25 | 83 059,05 | 83 059,05 | 81 253,42 | 82 156,24 |
| 17 | Other countries | 5 745,47 | 9 014,45 | 9 543,04 | 9 543,04 | 9 439,31 | 9 439,31 | 10 047,64 | 10 047,64 | 9 829,22 | 9 938,43 |
| 18 | Other countries | 186,86 | 293,18 | 310,37 | 310,37 | 306,99 | 306,99 | 326,78 | 326,78 | 319,68 | 323,23 |
| 19 | Other countries | 393,49 | 617,37 | 653,57 | 653,57 | 646,46 | 646,46 | 688,13 | 688,13 | 673,17 | 680,65 |
| 20 | Other countries | 8 575,00 | 13 453,88 | 14 242,79 | 14 242,79 | 14 087,97 | 14 087,97 | 14 995,90 | 14 995,90 | 14 669,90 | 14 832,90 |
| 21 | Other countries | 9 834,81 | 15 430,48 | 16 335,29 | 16 335,29 | 16 157,73 | 16 157,73 | 17 199,05 | 17 199,05 | 16 825,16 | 17 012,10 |
| 22 | Other countries | 1 104,79 | 1 733,38 | 1 835,02 | 1 835,02 | 1 815,08 | 1 815,08 | 1 932,05 | 1 932,05 | 1 890,05 | 1 911,05 |
| 24 | Other countries | 21 543,91 | 33 801,65 | 35 783,72 | 35 783,72 | 35 394,77 | 35 394,77 | 37 675,84 | 37 675,84 | 36 856,80 | 37 266,32 |
| 25 | Other countries | 13 239,52 | 20 772,34 | 21 990,39 | 21 990,39 | 21 751,37 | 21 751,37 | 23 153,17 | 23 153,17 | 22 649,84 | 22 901,51 |
| 26 | Other countries | 14 363,20 | 22 535,37 | 23 856,80 | 23 856,80 | 23 597,48 | 23 597,48 | 25 118,27 | 25 118,27 | 24 572,22 | 24 845,24 |
| 27 | Other countries | 6 827,84 | 10 712,64 | 11 340,81 | 11 340,81 | 11 217,54 | 11 217,54 | 11 940,47 | 11 940,47 | 11 680,90 | 11 810,68 |
| 28 | Other countries | 15 481,05 | 24 289,24 | 25 713,51 | 25 713,51 | 25 434,02 | 25 434,02 | 27 073,16 | 27 073,16 | 26 484,61 | 26 778,88 |